CASE NO. _____10 cv 1168_____

ATTACHMENT NO. _____1_____

EXHIBIT _____B- L_____

TAB (DESCRIPTION) _____

# EXHIBIT - B

# EXHIBIT - B



"ExhiBiT — B"



"ExhiBiT-B"



"ExhiBiT – B"

# EXHIBIT - C

# EXHIBIT - C

Case: 1:10-cv-01168 Document #: 1-2 Filed: 02/22/10 Page 7 of 42 PageID #:86

"Exhibit-C"

| (Court Branch) | (Court Date) | |
|---|---|---|

**FELONY** (1-82) CCMCI-216

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of the State of Illinois
  Plaintiff

v.

  Nathson FIELDS
................................
    Defendant

**COMPLAINT FOR PRELIMINARY EXAMINATION**

NO. . . . . . . . . . . . . . 85-175230  02 . . . . . .

...... DeeEggers VAUGHN ......................... complainant, now appears before
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states that

............... Nathson FIELDS ........................................... has, on or about
(defendant)

28 March 1985 ......... at ...... 1016 East 41st Place ........ Chgo, Ill. ......
(date)                                      (place of offense)

committed the offense of ........................... MURDER ........................... in that he

... killed DeeEggers VAUGHN without lawful justification by shooting her with a gun and ...
stabbing her with a knife knowing that such an act created a strong probability of
death to the victim, DeeEggers VAUGHN ...............................................
................................................................
................................................................

in violation of Chapter ....................... 38 ......... Section .... 9.1.a.2. .....

**ILLINOIS REVISED STATUTES**

*Sgt. J Murphy #1319*
........................................
(Complainant's Signature)

STATE OF ILLINOIS    }
                      } SS:
COUNTY OF COOK       }

........................................
(Complainant's Address)          (Telephone No.)

............. Sgt. J. Murphy ...............
(Complainant's Name Printed or Typed)

being first duly sworn, on ............................. his ......... oath, deposes and says that he has read the foregoing
complaint by him subscribed and that the same is true.

*Sgt. J Murphy #1319*
........................................
(Complainant's Signature)

Subscribed and sworn to before me ............................. May 17 .......... 19 55

*Sgt J Murphy #1319 /s Morgan Finley* ..............
(Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that
there is probable cause for filing same. Leave is given to file said complaint.

Summons issued,      Judge .................................................
  or
Warrant issued,      Bail set at ..........................................
  or
Bail set at .........              Judge .................................................

## MORGAN M. FINLEY, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

"Exhibit-C"

"Exhibit - C"

66

| (Court Branch) | (Court Date) |

FELONY                                                    (1-82) CCMC1-216

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of the State of Illinois
          Plaintiff

                                    COMPLAINT FOR PRELIMINARY EXAMINATION

          v.                        NO. . . . . . . 85-175230 01 . . . . . . . .

. . . . Nathson FIELDS . . . . .
          Defendant

. . . . . . . . . Joseph WHITE . . . . . . . . . . (Deceased) . . . . . . . complainant, now appears before
                    (Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states that

. . . . . Nathson FIELDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . has, on or about
                    (defendant)

. . . . 28 March 1985 . . . . . . at . . . . 1016 East 41st Place . . . Chgo, Ill. . . . .
          (date)                              (place of offense)

committed the offense of . . . . . . . . . . . . . . . . MURDER . . . . . . . . . . . . . . . . . . . . . . in that he

. . killed Joseph WHITE without lawful justification by shooting him with a gun and

. . stabbing him with a knife knowing that such an act created a strong probability of

. . death to the victim, Joseph WHITE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in violation of Chapter . . . . . . . . . . . . . . . 38 . . . . . . . . Section . . . 9 1 a 2 . . . .

ILLINOIS REVISED STATUTES        _Sgt. J Murphy #1359_

                                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                              (Complainant's Signature)

STATE OF ILLINOIS  }
                   } ss.    MORGAN M FINLEY   (Complainant's Address)        (Telephone No.)

COUNTY OF COOK     }                         . . . . . Sgt. J. Murphy . . . . . . . . . . . . . . . . . . .
                                              (Complainant's Name Printed or Typed)

being first duly sworn, on . . . . . . . . . . . . his . . . . . . . . . . . oath, deposes and says that he has read the foregoing
complaint by him subscribed and that the same is true.       _Sgt J Murphy #1359_

                                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                              (Complainant's Signature)

Subscribed and sworn to before me . . . . . . . . . . . . . _May_ . . . 17 . . . . . . . ,19 85 .

          _Sgt J Murphy #1359_  for  Morgan Finley
                                              (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that
there is probable cause for filing same. Leave is given to file said complaint.

Summons issued,        Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
     or
Warrant Issued,        Bail set at . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
     or
Bail set at . . . . . . . . . . . . . . . . . . . . . . . . . Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### MORGAN M. FINLEY, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

"EXHIBIT - C"

# EXHIBIT - D

# EXHIBIT - D

## "EXHIBIT D"

1      THE CLERK:  Earl Hawkins, George Carter,

2  Nathson Fields.

3      MR. SWANO:  Judge, for the record, William

4  Swano, on behalf of Earl Hawkins, who is the

5  gentleman seated on your right.

6      THE COURT:  Hawkins.

7      DEFENDANT HAWKINS: How are you doing, your

8  Honor?

9      MR. SOLOMON:  For the record, Fredrick Solomon,

10.  on behalf of Mr. Carter.

11      THE COURT:  And Mr. Fields?

12      MR. SMEETON:  Smeeton.

13      MR. SWANO:  On the last Court date, we received

14  extensive discovery from the State on both cases.

15  There are two double murders involved in this with

16  these gentlemen -- at least my client.

17          My investigator has been looking for

18  witnesses that are alleged eyewitnesses and the

19  addresses are not correct. And I would be

20  requesting for Mr. Ruckert, who has probably

21  informally updated addresses, as to some of those

22  witnesses.

23          In addition, street files have been

24  subpoenaed in, and that have not come in, according

2

*ExHiBiT-D*

# "Exhibit D"

1  to Mr. Smeeton, who issued the subpoenas for those

2  street files.

3         Additionally, I have not filed my

4  answer, because my investigation has been a

5  continuing investigation.

6         On the last Court date, Judge Maloney

7  had indicated that he would like to get the matter

8  to trial. I'm not in a position to ask for a trial

9  date, yet. I would like to ask for one more status

10  date to continue my investigation, get updated

11  addresses to interview alleged eyewitnesses, and

12  then, on the next Court date, ask for a trial date.

13         I would be requesting February 11th,

14  as the status date. Hopefully, final status date,

15  before we set the matter for trial.

16  MR. RUCKERT:  Judge, as to the witnesses, I'll

17  be happy to make the witnesses available any time

18  you want me to do that.

19         As for the discovery, the State has

20  tendered their discovery, at least two Court dates

21  ago.

22         We're ready for trial. If there

23  should be another status date, I'd like to get the

24  case to trial in February, Judge. If we want to set

"Exhibit-8"

# EXHIBIT - E

# EXHIBIT - E

**EXHIBIT - E**

1   Rueckert was on his way up.

2       MR. WARNICK:  Mr. Rueckert has been in court.  We

3   can handle it.

4       MR. SOLOMON:  Your Honor, for the record,

5   Frederick Solomon on behalf of George Carter and Mr.

6   Swano's client.

7       MR. SMEETON:  For the record, Jack Smeeton on

8   behalf of Mr. Fields.  Sorry I was late.  I was

9   outside in the hall, sir.

10      THE COURT:  What is the status of this matter?

11      MR. SMEETON:  Judge, the case was set two weeks

12  ago.  I believe it was and again today for defense to

13  have filed our answer to discovery, completion of

14  discovery.

15          The defendant has not received a copy of

16  the street files yet.  We had agreed last time we

17  were before your Honor and again in front of Judge

18  Karnezis a week or two ago when Mr. Rueckert was

19  sitting in the courtroom that he would tender those

20  to us because he was in possession.

21          All defense attorneys had a copy of the

22  subpoena that he had on the police department.  We

23  have not yet received them.

24      THE COURT:  Well, here's the return of your

2

35   **"EXHIBIT - E"**

# EXHIBIT - F

# EXHIBIT - F

*Exhibit - F*

1   murder under the RD number listed.  What I was

2   returned was another copy of the police reports.

3       THE COURT:  Maybe that is all there is.

4       MR. SMEETON:  With not one page of notes taken

5   therein?

6       THE COURT:  Maybe that is all there is.

7       MR. SMEETON:  Well, I really don't know.  I guess

8   without talking to Mr. Rueckert.  Mr. Rueckert

9   indicated to me there were in fact street files that

10  he was going to copy for us.

11      THE COURT:  Did he say anything about that?

12      MR. WARNICK:  Judge, our representation from Mr.

13  Rueckert was that he didn't advise us of this

14  difficulty with Mr. Smeeton.  He said whenever we

15  could set this down, we are set to go.  If you want

16  to pass this for me to talk to Mr. Rueckert, maybe

17  they can resolve this today.

18      THE COURT:  Well, do you want to do that?  We

19  can't have continuances to be talking about the same

20  thing over and over.

21      MR. SMEETON:  I have an answer that I am prepared

22  to file.  However, I am not sure it's complet because

23  I don't know about the street files.

24      THE COURT:  We can always amend it.

4

37   *"Exhibit - F"*

# EXHIBIT - G

# EXHIBIT - G

# "Exhibit - G"

MR. SMEETON: Okay. I think we are all set.

MR. WARNICK: Judge, I spoke with Mr. Rueckert this morning with regards to this case. He and Mr. Smeeton indicated they had worked everything out and we could set it for trial.

THE COURT: How about you, Mr. Solomon, is your answer or file?

MR. SOLOMON: I believe it might have been on file six or eights months ago, Your Honor.

THE COURT: All right. And how about Mr. Swano's answer to discovery?

MR. SMEETON: I don't know if it is on file or not.

I would indicate, for the record, while we are looking, I did receive what purports to be general progress reports and street files from Mr. Rueckert this past week, which consists of eight pages of notes on the date of April 23, '84.

THE COURT: How did you receive them, in the mail?

MR. SMEETON: He mailed them.

THE COURT: And what are they?

MR. SMEETON: Eight pages of general progress reports from detectives of the Chicago Police Department, all dated April 28th, 1984.

As you will recall, I subpoenaed these from the

"Exhibit - G"

# "ExhiBiT - G"

Police Department and received nothing but the regular
PD reports.

    Mr. Rueckert provided me with the general
progress reports and the notes and reports and statements
of witnesses, et cetera, in the case.

    MR. WARNICK: Judge, Mr. Rueckert asked me to ask
leave of Court to set this down for trial certain on
April 8th, essentially that date. He told me he had
already had plans, he was going to be out of town for
two weeks before that, I guess that was the first week
in April and the last week in March, when he looked at
the calendar for that. And that is the first day he is
available.

    MR. SMESTON: Judge, if I may, I understand this is
a long case. I am also not certain that once we come in
on the trial date it will be tried that first trial date
and not be continued. I have a terrible problem with
that week of the 8th with several trials set.

    If your Honor would consider the 14th.

    THE COURT: Well, we have never set a case that far
ahead in the past eight years that I know of. I know
that you have other courtrooms, but we don't do it here.
This is still February. And you are talking about the
middle of April.

# "ExhiBiT - G"

# EXHIBIT - H

# EXHIBIT - H

## "Exhibit - H"

1    JOSEPH BOGDALEK,

2    called as a witness on behalf of the defendants,

3    having been first duly sworn, was examined and

4    testified as follows:

5              DIRECT EXAMINATION

6              BY MR. SMEETON:

7        Q    Good afternoon, investigator.  Please give

8    us your name and pronounce it for me, if you would,

9    and spell your last name?

10       A    Detective Joseph Bogdalek,

11   B-o-d-g-a-l-e-k.

12       Q    Investigator Bogdalek, how are you

13   employed, sir?

14       A    I'm a police detective for the City of

15   Chicago.

16       Q    How long have you been so employed?

17       A    Approximately sixteen years.

18       Q    Bringing your attention to the month of

19   April of 1984, where were you assigned at that

20   time?

21       A    To the Area One, Violent Crimes Unit.

22       Q    Did you become involved in the

23   investigation of the shooting death of a

24   Talman Hickman and Jerome Smith, sir?

bh28

"Exhibit - H"

"Exhibit - H"

1      A    Yes, I did.

2      Q    Was that on April 28th of '84, sir, or a

3  subsequent date?

4      A    That date.

5      Q    Did you work with a partner that day?

6      A    Yes, I did.

7      Q    Detective Minogue, was it?

8      A    That is correct.

9      Q    What was your assignment that day in this

10  case?

11      A    Myself and my partner were assigned to

12  conduct a follow-up investigation into that double

13  murder.

14      Q    Did you have occasion to go to 706 East

15  39th Street to talk to prospective witnesses?

16      A    Yes, I did.

17      Q    And did you go to apartment number 106,

18  the home of the Langstons?

19      A    Yes, I did.

20      Q    And while you were there did you talk to

21  members of the Langston family,

22      A    Yes, I did.

23      Q    Do you recall which members of the

24  Langston family you interviewed?

bh29

"Exhibit - H"

# EXHIBIT - I

# EXHIBIT - I

"*Exhibit - I*"

1   week of May?

2       A    Quite possibly, yes.

3       Q    About how many witnesses did you talk to?

4       A    I talked to approximately a hundred

5   people.

6       Q    At no time during your investigation did

7   you ever have occasion to talk to a man by the name

8   of Gerald Morris, did you?

9       A    Not to my knowledge.

10          MR. SMEETON:  Nothing further.

11              CROSS-EXAMINATION

12          BY MR. RUECKERT:

13      Q    Detective, were you the first team of

14  detectives to investigate this homicide?

15      A    Yes, we were.

16      Q    When you got to the scene of the homicide

17  were there a lot of people standing around?

18      A    Quite a few, a hundred or so.

19      Q    I'm going to show you what's been marked

20  as People's Exhibit No. 22 for identification; do

21  you recognize that?

22      A    Yes, I do.

23      Q    What is that, sir?

24      A    This photo depicts the scene in front of

bh37

"*Exhibit - I*"

# Exhibit - I

1    Q    Do you recall about what time you went to

2    the scene?

3    A    Shortly after it occurred.

4    Q    Did you canvass the area and talk to

5    witnesses?

6    A    Yes.

7    Q    As a matter of fact, you talked to at

8    least ten potential witnesses during the course of

9    your investigation; isn't that correct?

10    A    I talked to many more people than that.

11    Q    Did you resume your investigation beyond

12    the 28th of April, 1984, and interview other

13    witnesses?

14    A    Yes.

15    Q    What day was that?

16    A    The investigation was ongoing.  I talked

17    to many people several days following the initial

18    incident.

19    Q    Well, would you have been out canvassing

20    the building on the 29th?

21    A    Yes.

22    Q    The 30th?

23    A    Possibly, yes.

24    Q    Could it have gone on even into the first

bh36

"Exhibit - I"

"Exhibit - I"

1  Q    Detective, how are you employed, sir?

2  A    I'm a detective for the Chicago Police

3  Department.

4  Q    How long?

5  A    I've been employed by the police

6  department for fourteen years, now.

7  Q    Bringing your attention to April the 28th,

8  1984, were you so employed, sir.

9  A    Yes, I was.

10 Q    Where were you particularly assigned?

11 A    Area One, Violent Crimes.

12 Q    On that day, the 28th of April, '84, you

13 were assigned the investigation of the murder

14 deaths of Talman Hickman and Jerome Smith, sir?.

15 A    Yes, I was.

16 Q    Did you work that day with a partner?

17 A    Yes, I did.

18 Q    And would that be -- That would be who,

19 sir?

20 A    Detective Steven Hood.

21 Q    What was your assignment on that homicide

22 investigation?

23 A    We investigated the initial scene of the

24 homicide.

"Exhibit - I"

bh35

"Exhibit - I"

1    you?

2         MR. WHARRIE:  Objection, judge.

3         THE COURT:  Sustained.

4    BY MR. SMEETON:

5         Q    You didn't put in your police report any

6    description by Randy Langston, did you?

7         A    I don't believe I did.

8         MR. SMEETON:  Nothing further.

9         MR. WHARRIE:  Nothing further.

10        THE COURT:  You may step down.

                      (Witness excused.)

11

12        THE COURT:  Who's next?

13        MR. SMEETON:  Detective Evans, please.

                      (Witness sworn.)

14

15             ROBERT EVANS,

16   called as a witness on behalf of the defendants,

17   having been first duly sworn, was examined and

18   testified as follows:

19             DIRECT EXAMINATION

20        BY MR. SMEETON:

21        Q    Detective, good afternoon, sir.  Would you

22   please give us your name and spell it for the court

23   reporter with you  star number?

24        A    Detective Robert Evans, E-v-a-n-s.

"Exhibit - I"

bh34

# EXHIBIT - J

# EXHIBIT - J

"Exhibit - J"

1              MR. SWANNO:  In the basement.

2              THE COURT:  All right.  We will take care of

3 it, then.  Ricardo will call him, ask him if he can come

4 up.  Tell him we have to get something resolved here.

5              MR. SWANNO:  Thank you, Judge.  One other

6 matter:  would it be possible to adjourn today at five

7 o'clock?

8              THE COURT:  Yes.

9                 All right.  Call the next witness.

10            MR. WHARRIE:  The People would call David

11 O'Callaghan.

12              (WHEREUPON, the witness was

13                duly sworn).

14

15             DAVID O'CALLAGHAN,

16 a witness called by the People of the State of Illinois

17 herein, having been first duly sworn, was examined and

18 testified as follows:

19             DIRECT EXAMINATION

20                   BY

21             MR. WHARRIE:

22   Q     Sir, what is your name?

23   A     Detective David O'Callaghan.

24   Q     Please spell that last name?

"Exhibit - J"

*EXHIBIT - J*

40

1      A      O-'-C-a-l-l-a-g-h-a-n.

2      Q      Detective O'Callaghan, where are you

3  presently assigned?

4      A      I'm assigned to Area One, Violent Crimes,

5  Chicago Police Department.

6      Q      How long have you been a Violent Crimes

7  Detective?

8      A      I was made detective in 1978.

9      Q      How long have you been a Chicago police

10  officer?

11      A      Seventeen years.

12      Q      Detective O'Callaghan, I would like to direct

13  your attention to on or about May 14th of 1985:  were you

14  with the Violent Crimes Unit at that time?

15      A      I was.

16      Q      Did you receive a special assignment?

17      A      Yes, I did.

18      Q      And what was the nature of that assignment?

19      A      I was detailed to the Cook County State's

20  Attorney's Gang Prosecutions Unit, to do follow-up

21  investigations in regards to a homicide concerning members

22  of the El Rukins.

23      Q      Were you specifically assigned to, among

24  others, the investigation involving Talman Hickman and

*"EXHIBIT - J"*

*Exhibit - J*

41

1    Jerome Smith, two deceased men?

2           A      Yes, I was.

3           Q      Upon being given that assignment, what did

4    you do?

5           A      After reviewing the case, I then proceeded

6    over to the area of the murders, began a canvas.

7           Q      Did you become aware of when the murders had

8    occurred?

9           A      Yes, I did.

10          Q      And approximately how much time had passed

11   since the murders had occurred?

12          A      About a year, a little over a year.

13          Q      Now, I want to direct your attention to May

14   16, 1985:  on that day, did you interview a Randy Langston?

15          A      Yes, I did.

16          Q      Where did that take place?

17          A      On the 13th floor, in the Cook County State's

18   Attorney's Office.

19          Q      Who was present besides yourself and Mr.

20   Langston, if you recall?

21          A      Myself, Detectives Castro and Richardson.

22          Q      Did you talk to him relative to the Talman

23   Hickman and Jerome Smith shooting?

24          A      I did.

*"Exhibit - J"*

*"ExhiBiT - J"*

54

1      A      I can't recall whether I spoke with Randy

2   Langston on that day or not.

3      Q      Well, who introduced you to Gerald Morris,

4   was it Randy or Eric Langston?

5      A      Gerald Morris, I believe, was part of the

6   canvas.  We talked to hundreds of people during that

7   investigation, and he was one of the subjects we ran into.

8      Q      Just happened to knock on his door and

9   interview him and ask if he knew anything?

10     A      Spoke to him right by 706.

11     Q      It turns out that Gerald Morris is the cousin

12  of Randy Langston, correct?

13     A      He is related in some way, I believe.

14     Q      And it turns out that he also is a member or

15  at least at that time was a member of the Goon Squad.

16     A      Not to my knowledge.

17     Q      He indicated to you that he was close,

18  personal friends with Fuddy, did he not?

19     A      He indicated he knew him, yes.

20     Q      Now, on the 18th day of the line-up, in which

21  Earl Hawkins was a participant in the line-up, you

22  additionally brought Carlos Willis and Torrence White to

23  that line-up, correct?

24            That's correct.

*"ExhiBiT - J"*

# EXHIBIT - K

# EXHIBIT - K

# "Exhibit - K"

JOSEPH MURPHY,

called as a witness on behalf of the People of the
State of Illinois, in rebuttal, having been first
duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

### BY MR. WHARRIE:

Q    Sir, what is your name?

A    Joseph Murphy.

Q    How are you employed?

A    I'm currently employed by the City of
Chicago Police Department as a police sergeant in
the detective division.

Q    How long have you been a Chicago police
officer?

A    Almost seventeen years.

Q    Sergeant Murphy, recalling your attention
to May of 1985, were you given a special assignment
at that time?

A    Yes, sir, I was.

Q    And what was that assignment?

A    At that time I was involved in an
investigation of a double homicide of Talman
Hickman and Jerome Smith.

Q    I want do direct your attention to

bh63

"Exhibit - K"

# EXHIBIT - L

# EXHIBIT - L

"*Exhibit - L*"

1    First off, I want to compliment the
2    attorneys on their closing arguments and also the
3    civility that they have displayed to each other and to
4    this court.

5    Again I'm going to caution the members
6    of the audience that if there's any outburst whatsoever
7    and Michael, at this time get on your feet.  You will
8    be arrested and put in jail.  All right.

9    As has been pointed out, this case goes
10   all the way back to 1984.  Specifically April 28, 1984.
11   That's when the two murders did occur.  And people are
12   judged the way they testify in the courtroom and not
13   the way they testified years ago or how old they were
14   when they first viewed the event.  So everything is on
15   the table when they testify.

16   There were many motions in this case.
17   And at that time different evidence was presented to
18   this court.  I recall one of the situations where a
19   veteran appellate prosecutor of the state's attorney's
20   office under a different administration, argued before
21   the Supreme Court of Illinois that if they sustain the
22   trial court's order granting a new trial, the state
23   would not be able to try this case again.  I think that
24   gives us insight and at this time it gives me a lot

"*Exhibit - L*"

1    more insight.  I know this person who is this veteran
2    appellate lawyer is a person with dignity and
3    integrity.  So he would not just be making things up to
4    intimidate or try and persuade the Supreme Court one
5    way or another.

6                    Now to look at the witnesses.  As far as
7    Mr. Langston is concerned.  All right.  First off he
8    either has six or seven felony convictions.

9                    Then we have to look at the different
10   parts of his testimony.  And things that occurred
11   during this trial.  First off, the evidence that he
12   said under oath.  In the trial in 1985 or '6, he
13   testified to one story.  Then afterwards he was under
14   oath at the sentencing and he testified to another.
15   Then he was put under oath in the affidavit of 27th of
16   August, 1999, and he recanted his trial testimony.

17                   In a letter to Mr. Kelly, he again
18   unrecanted his testimony.  His testimony is that he
19   knew Mr. Hawkins, Mr. Hawkins was the shooter.  That
20   conflicts with other testimony in the state's case.

21                   He said -- on cross-examination he said
22   that he told the police the day of the shooting that
23   there was one shooter.  Then a year plus, he tells the
24   police that there was two shooters.

*"EXHIBIT-L"*

54

*"ExhiBiT L"*

1           There was no identification in this

2  case, nothing coming forward to lead anybody anyplace

3  until May of 1985.  This is approximately 13 months

4  after the shooting.  And the murders.  Was he

5  favorable?  I observed his demeanor while testifying.

6  I find out his testimony was worth little if anything.

7           I'm going to take things out of order.

8  Concerning Gerald Morris.  He said he was a member of

9  the goon squad.  Which was in the 706 building.  He

10  said drugs were never sold from the 706 building, which

11  is inconsistent with all the other testimony.  His

12  other thing which gives a little insight, when he was

13  asked about why he recanted.  It was almost the way he

14  said I was afraid for my family.  I wanted to get this

15  thing over.  An El Rukn had moved into my neighborhood

16  recently.  He said that several times and almost, it

17  just kept repeating itself like it was a recorded

18  transmission.

19           In People No. 35, which is his

20  affidavit, he said he could not see faces.  It was

21  brought out on cross-examination also through testimony

22  underlining what things were not true in there, but he

23  never underlined I could not see the faces as being

24  untrue.

*"ExhiBiT - L"*

"ExhiBiT - L"

1    Another thing which gives us insight is
2    he was impeached by detective Boglalek,
3    B-o-g-l-a-l-e-k.  He said by stipulation that he had
4    never interviewed Mr. Morris.
5    Something that really gives us insight,
6    too, is that Mr. Morris does not come forward for
7    approximately I think it was two years.  No, again, I'm
8    sorry.  He again did not come forward for more than a
9    year.  And asked about did he talk to any police
10   officers on the night of the shooting.  He says I
11   talked to the police the night of the shooting for
12   about ten minutes.  Then asked to give a description of
13   the police officer, he couldn't.  This is for ten
14   minutes, face-to-face confrontation.  But then he can
15   say that somebody else, he can give a description of
16   people that he's seen for less than 30 seconds or three
17   minutes or something like that.  Who are running away
18   from a crime scene.  So this gives us insight into
19   again his credibility.  He's inconsistent with -- I
20   don't know why he said no drugs were sold from the 706
21   building.
22   Concerning Mr. Buckles.  He could not
23   identify Mr. Fields as the shooter.  His testimony, the
24   first time he talked to police, I'm correcting myself,

"ExhiBiT - L"

"Exhibit-L"

1   was about two years after the shooting. He said that

2   it was two men in the breezeway and they were in the

3   shadows. Everybody else is saying they could see what

4   was going on in the breezeway and everything. Does

5   this stand alone two years after the fact that he's

6   making this statement as stipulated in the trial

7   testimony.

8           Well, we look and see the stipulation,

9   of the stipulated testimony of officer Anthony Michel,

10  M-i-c-h-e-l. He also said there was shadows in the

11  front of the breezeway. So Mr. Fields is not

12  identified there.

13          Concerning Mr. Hawkins. I don't give

14  much weight -- there's only a few holy people in the

15  world that if someone -- the general population if they

16  were asked would you lie to get off death row, I think

17  the answer is in the affirmative. Maybe Mother Theresa

18  and couple other great people, holy people would say

19  no, I would not lie to get off death row. So I don't

20  give that weight either way.

21          Mr. Hawkins has steadfastly said he

22  wasn't one of the shooters. All the other state

23  witnesses said they knew him, he was one of the

24  shooting team. So there's direct conflict with that

"Exhibit-L"

*"ExhiBiT-L"*

1   evidence and the evidence of the state.  So there's

2   actual external conflicts.

3              But the thing that gives me some kind of

4   insight, certainly Mr. Hawkins was impeached or

5   inconsistent with Randy Langston's testimony, Richard

6   Buckle's testimony and Gerald Morris' testimony.

7              The other thing is what impressed me

8   during the trial is Mr. Hawkins was asked between 1982

9   and 1984, how many murders did you actually commit or

10  words to that effect, or how many murders did you

11  conspire to commit.  His answer was very abrupt, was

12  ten.  Then I recall the other was before 1982, how many

13  murders did you commit or how many murders did you

14  conspire to commit.  And the answer was with

15  hesitation, five to ten.

16             If someone had this disregard for human

17  life, do you think they really have any regard for an

18  oath?  I find Mr. Hawkins incredible.

19             Looking at the totality of the

20  circumstances and the evidence here, again, people are

21  impeached with, by their testimony, by other witness'

22  testimony.  Oaths are given little weight by the people

23  that took them.

24             I find under these circumstances, the

*"ExhiBiT-L"*

*"ExhiBiT -L"*

```
1    state has not proved Mr. Fields guilty beyond a
2    reasonable doubt.  There will be a finding of not
3    guilty.  Thank you.  Court's in recess.
4
5
6
7
8                    (Whereupon, proceedings were
9                    adjourned in this case)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

*"ExhiBiT -L"*

"Exhibit - L"

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 2

 3                          I, PAUL W. O'CONNOR, an Official

 4    Court Reporter for the Circuit Court of Cook County,

 5    County Department/Criminal Division, do hereby certify

 6    that I reported in shorthand the proceedings had at the

 7    hearing in the above-entitled cause; that I hereafter

 8    caused the foregoing to be transcribed into

 9    typewriting, which I hereby certify to be a true and

10    accurate transcript of the proceedings had before the

11    Honorable VINCENT GAUGHAN, Judge of said court.

12

13

14    _____

15                 Official Court Reporter

16    Lic. No. 084-002955

17

18    Dated this _____15th_____ day

19    of _____May_____, 2009.

20

21

22

23

24
```

"Exhibit - L"