UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
<u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.  10 CV 1168** |
| **CITY OF CHICAGO;** | ) | |
| **COUNTY OF COOK;** | ) | **Hon. Matthew F. Kennelly** |
| **RICHARD M. DALEY;** | ) | |
| **former Assistant State's Attorneys** | ) | |
| **LARRY WHARRIE and DAVID KELLEY;** | ) | |
| **former and current Chicago Police** | ) | |
| **Officers DAVID O'CALLAGHAN** | ) | |
| **THOMAS RICHARDSON,** | ) | |
| **STEPHEN CASTO, JAMES MINOGUE,** | ) | |
| **JOSEPH BOGDALEK,** | ) | |
| **JOSEPH MURPHY, STEVEN HOOD,** | ) | |
| **JAMES DELANEY, ROBERT EVANS,** | ) | |
| **DANIEL BRANNIGAN,** | ) | |
| **JOHN ROBERTSON, RICH KOBEL, and** | ) | |
| **RICHARD KOLOVITZ,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

<u>SECOND AMENDED COMPLAINT</u>

NOW COMES THE PLAINTIFF, NATHSON E. FIELDS, by and through his attorneys, Leonard Goodman, H. Candace Gorman, Molly Armour, and Melissa Matuzak, and complains of the Defendants as follows:

<u>INTRODUCTION</u>

1.     On June 27, 1986, Nathson E. Fields (hereinafter, "Fields") was found guilty of the murders of Talman Hickman and Jerome Smith and two months later was

sentenced to death for a double murder that he did not commit. Fields was wrongfully imprisoned for almost eighteen years, most of which he spent on death row. This wrongful conviction was the result of misconduct by the Defendants, who conspired to build a false case against him irrespective of his innocence. Fields has continually maintained his innocence throughout this ordeal.

2. On September 18, 1996, Fields' Petition For Post-Conviction Relief was granted on the grounds that the trial judge's corrupt practices deprived Fields due process of law. Fields remained imprisoned until he could post bond on May 9, 2003. Although the case against Fields had been exposed as false, the Defendants pressed on with a retrial which concluded on April 8, 2009 with Fields' acquittal on all charges. On December 10, 2009, Fields was granted a Certificate of Innocence. Yet, to this day the Defendants persist in extending Fields' ordeal by challenging his Certificate of Innocence.

3. Although Fields won back his freedom, he can never regain the decades lost in his life. This lawsuit seeks redress for those injuries.


**JURISDICTION AND VENUE**

4. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Fields' rights as secured by the United States Constitution. Supplemental jurisdiction to entertain state law claims arises under 28 U.S.C. Section 1367.

5.     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper under 28 U.S.C. § 1391(b).  The parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**PARTIES TO THE CASE**

**PLAINTIFF:**

6.     Nathson E. Fields is a resident of the City of Chicago, State of Illinois.  At the time of his arrest in June of 1985, Fields was 30 years old and a member of the El Rukn street gang.  Fields was charged with, found guilty of, and sentenced to death for the double murders of Talman Hickman and Jerome Smith, despite the fact that he was innocent.

**DEFENDANTS:**

7.     The City of Chicago is a municipal corporation operating and existing within The State of Illinois.  The City of Chicago is responsible for the acts of its employees while acting within the scope of their employment, and is responsible for the policies, practices, and customs of the Chicago Police Department.

8.     The County of Cook is a governmental entity operating within the State of Illinois which consists in part of the Cook County State's Attorney's Office.  The County of Cook is responsible for the acts of its employees while acting within the scope of their employment.  At times relevant to this action, Cook County was the employer of Defendants Richard M. Daley, Larry Wharrie and David Kelley; all are necessary parties to this lawsuit.

9.     The following Defendants are sued in their individual capacities, and acted under color of law and within the scope of their employment during proceedings which are part of this lawsuit.  Upon information and belief the following individuals acted in a malicious, willful and/or wanton manner toward Fields and were involved in all or some of the following: investigating the two double murders discussed herein; the arrest and wrongful conviction of Fields in the first trial; witness fabrications and/or other conduct directly relating to the wrongful conviction, imprisonment and imposition of death sentence of Fields; the second prosecution of Fields; the contesting of Fields' innocence in the hearing for a Certificate of Innocence; the frivolous appeal of the Certificate of Innocence; and the other misconduct alleged herein:

a.     Richard M. Daley, at all times relevant to this action, was the chief administrator for the State's Attorney of Cook County's Office, and was responsible for the policies, practices, and customs of that office. Although Daley was never part of the prosecution team in this case, on information and belief, discovery will show that Daley was personally involved in directing or consenting to the fabrication of evidence against Fields as well as the suppression of exculpatory evidence.  Also on information and belief, discovery will show that Daley was personally involved in the targeting of El Rukns for prosecution and personally approved of the use the powers of his office to get El Rukns off the street with trumped up charges grounded upon fabricated evidence.  Daley followed this policy in order to enhance his political standing and that philosophy permeated the State's Attorney's Office at the relevant times and facilitated the misconduct on the part of the other named Defendants. Also on information and belief, discovery will show that Daley personally reviewed, consented, and condoned the misconduct alleged in this complaint in connection with his decision to seek and pursue the death penalty against Fields.

b.     Larry Wharrie, at all times relevant to his involvement in this action, was an Assistant State's Attorney employed by the Office of the Cook County

4

State's Attorney who co-anchored the prosecution team during the original trial of Fields. Defendant Wharrie is being sued solely for his role in an investigative capacity. On or about May 12, 1985, ASA Wharrie participated in a raid of an El Rukn safe house which led to the arrest of Anthony Sumner, a high ranking member of the El Rukns. Following this raid, Sumner became a cooperating witness in the investigation of the El Rukn gang by the Cook County State's Attorney and the United States Attorney for the Northern District of Illinois. Sumner was interviewed by Chicago police officers, including Defendant Brannigan, Assistant United States Attorneys and Assistant State's Attorneys—including defendant Larry Wharrie. During this, Wharrie, acting alone or together with other defendants, caused Sumner to fabricate evidence linking Nathson Fields to two double murders: the murders of Jerome Smith and Talman Hickman, and the murders of Dee Eggers Vaughn and Joseph White. These fabrications by Sumner led to the issuance of the arrest warrant for Nathson Fields. Later, in 1987, while Fields' appeal was pending and after Wharrie's role as prosecutor had ended, Wharrie began negotiating with Fields' co-defendant Earl Hawkins. These negotiations concluded in or about 1998 when Hawkins agreed to provide false testimony for the State at Fields' re-trial.

c.      David Kelley, at all times relevant to his involvement in this action, was an Assistant State's Attorney employed by the Office of the Cook County State's Attorney who co-anchored the prosecution team during the second trial of Fields. Defendant Kelley is being sued solely for his role in an investigative capacity. Beginning in or about 1998, ASA Kelley, acting alone and together with other defendants, began contacting a witness named Randy Langston, who at that time was serving time in prison. ASA Kelley knew that Langston had admitted under oath that his testimony identifying Nathson Fields as a shooter in the Smith and Hickman homicides was false. Kelley nevertheless used coercive tactics to induce Langston to return back to his false testimony that he saw Fields participate in the shooting.

d.      James Delaney, at all times relevant to his involvement in this action, was the Watch Commander for Area One Violent Crimes of the Chicago Police Department and was responsible for the formulation, implementation and administration of policies, practices, procedures, customs, training, supervision and control of all subordinates under his command. Upon information and belief, Delaney personally approved of, condoned, ratified, acquiesced to and encouraged the withholding of "Street files" and/or "general progress reports" relevant to the investigation.

e.  David O'Callaghan, Star No. 14721, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, had a special assignment with the Office of the Cook County State's Attorney, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant O'Callaghan participated in the investigation of the Hickman-Smith murders and fabricated evidence linking Nathson Fields to that crime, offered false testimony against Fields at his trials, and suppressed exculpatory evidence.

f.  Detective Thomas Richardson, Star No. 3385, at all times relevant to his involvement in this action, was employed as a Detective by the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in 1984, Defendant Richardson participated in the investigation of the Hickman-Smith murders, the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

g.  Detective Stephen Casto, Star No. 15489, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Casto participated in the investigation of the Hickman-Smith murders, the fabrication of evidence linking Nathson Fields to that crime, and the suppression of exculpatory evidence.

h.  James Minogue, Star No. 13871, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in 1984, Defendant Minogue participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

i.  Joseph Bogdalek, Star No. 14674, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in 1984, Defendant Bogdalek participated in the investigation of the Hickman-Smith murders

and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

j.      Joseph Murphy, Star No. 1389, at all times relevant to his involvement in this action, was employed as a Sergeant with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Murphy participated in the investigation of the Hickman-Smith murders and, on information and belief, fabricated evidence linking Nathson Fields to that crime, impeded the defense investigation, and suppressed exculpatory evidence.

k.      Steven Hood, Star No. 11885, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Hood participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

l.      Robert Evans, Star No. 12754, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Evans participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

m.      Daniel Brannigan, Star No. 4638, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Brannigan participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

n.    Richard Kolovitz, Star No. 12408, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Kolovitz participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

o.    John Robertson, Star No. 13732, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Robertson participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

p.    Richard Kobel, Star No. 4383, at all times relevant to his involvement in this action, was employed as a Detective with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Kobel participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

## STATEMENT OF FACTS

## A. THE INVESTIGATION

10.    On Saturday morning, April 28, 1984, at approximately 10:15 a.m., Talman Hickman and Jerome "Fuddy" Smith were shot multiple times and died outside 706 East 39th Street, a public housing complex in Chicago. That day, witnesses told Chicago Police detectives that the victims were standing in front of the building, and that two men wearing masks and with guns came up behind them, shooting them in the back of the head.

11.     Jerome "Fuddy" Smith was the leader of a street gang known as the Black Gangster Goon Squad, and his friend Talman Hickman was a member of that same street gang.  At the time of shooting, there was an ongoing gang rivalry between the Goon Squad and the El Rukns.

12.     Soon after the shootings, Chicago Police Detectives Thomas Richardson, Joseph Bogdalek, James Minogue, Robert Evans, and Steven Hood interviewed eyewitnesses to the shooting including Randy Langston, Sandra Langston, and Gerald Morris.  At this time, the detectives learned that only one of these eyewitnesses, Sandra Langston, had the ability to give any description of the physical appearance of the two shooters. Sandra Langston told the detectives that she observed, from her second floor bedroom window, that both offenders were black males, both "light complexion," in their "early 20s."  Detectives also learned that one or both of the perpetrators wore ski masks at the time of the shooting.

13.     Fields is a dark-skinned black man.  At the time of the shooting, he was thirty years old.  He did not fit the description of either of the shooters.

14.     From April of 1984 until May of 1985, the investigation continued.  Upon information and belief, the individual police detectives named herein were involved in the investigation and interviewed at least one hundred witnesses and drafted written reports of these interviews.  None of these eyewitnesses identified Fields as one of the perpetrators.  Nor did any eyewitness give a description of an offender that matched Fields.

15.     On information and belief, many of the reports of witness interviews taken by the Defendant Detectives Thomas Richardson, Joseph Bogdalek, James Minogue, Robert Evans, and Steven Hood were inconsistent with the fabricated case later brought against Nathson Fields.  These and other Defendants suppressed and secreted these reports (also referred to as "street files" and "general progress reports") intentionally and with malice so as to prevent Fields from refuting the false identification testimony offered against him at his trial.  The secreted and suppressed interview reports include the statements taken from Randy Langston and Gerald Morris shortly after the shooting which contradict the testimony of these witnesses at Fields' trials.

16.     On or about January 1985, Richard M. Daley, the Cook County State's Attorney's Office and the Chicago Police Department, in concert with federals agents from the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), began a campaign to target members of the El Rukn Street gang for arrest and prosecution.

17.     On or about March 28, 1985, Anthony Sumner and Earl Hawkins murdered Joe White and Dee Eggers Vaughn in the victims' home on the south side of Chicago during a drug-related armed robbery.  Following this crime, Sumner and Hawkins fled the City to avoid arrest, landing in an El Rukn "safe house" in Cleveland, Ohio.

18.     On or about April 9, 1985, Detectives David O'Callaghan, Thomas Richardson, and Steven Casto interviewed a witness named Robert Buckles at the Office of the Cook County State's Attorney.  During this interview, Buckles stated that he was present at

the time of the shooting of Smith and Hickman and that the two offenders ran past him and that he recognized one of the offenders as Man-Sur, the nickname of Earl Hawkins.

19.     On or about May 12, 1985, Chicago Police Detectives, Assistant State's Attorney Wharrie, and unknown others, raided an El Rukn "safe house" in Cleveland, Ohio and arrested gang member Anthony Sumner.

20.     Defendant Brannigan and others involved in the investigation, alongside Assistant State's Attorney Wharrie, used coercive tactics to directly or proximately cause Sumner to falsely implicate Nathson Fields in the Smith and Hickman homicides and to fabricate a story that Fields had admitted his involvement in the murders to Sumner.

21.     The Defendants used similar coercive tactics to directly or proximately cause Sumner to also falsely implicate Fields in the double murders of Joseph White and Dee Eggers Vaughn, a crime which Sumner himself had committed with Earl Hawkins.  In return, the Chicago Police Department and the State's Attorney's Office agreed not to prosecute Sumners for this murder.  Instead, these Defendants decided to use the fabricated statements of Sumners falsely implicating Fields in two double homicides to pursue capital murder charges against Fields.

22.     After causing Sumner to falsely implicate Fields in the Smith/Hickman murders, the Defendants set out to manufacture additional false evidence connecting Fields to these crimes.

23.     On or about May 16, 1985, Detectives David O'Callaghan, Thomas Richardson, Steven Casto and other Defendants used suggestive and coercive tactics to cause Randy

Langston and Gerald Morris to falsely identify a photograph of Nathson Fields as one of the persons they saw shoot Smith and/or Hickman.

24.     Despite the policy and procedure of the Chicago Police Department to inventory all photographs that are used in a photographic array, Defendants did not inventory or preserve the photograph(s) which they showed to the "eyewitnesses."  The failure to preserve this evidence was done intentionally and maliciously so as to obstruct Fields' ability to refute the false identification evidence offered against him at his trial.

25.     On June 14, 1985, nearly fourteen months after the shooting deaths of Hickman and Smith, personnel of the Chicago Police Department arrested Fields.

26.     Following Fields' arrest, Defendants O'Callaghan, Richardson, Casto and other Defendants used suggestive and coercive tactics to cause Randy Langston, Eric Langston, and Gerald Morris to falsely identify Fields in a lineup as one of the persons they saw shoot Smith and/or Hickman.  One suggestive tactic employed during the lineup by Defendant O'Callaghan was to help the witnesses select Fields by lifting up Fields' shirt to display his El Rukn tattoo, which was irrelevant to the identifications except insofar as the "witnesses" were from a rival gang.  Another suggestive tactic employed during the lineup by Defendant O'Callaghan was to simply tell the witness whom to select.

27.     David O'Callaghan, Thomas Richardson, Stephen Casto, Richard M. Daley, Larry Wharrie, and other Defendants knew that Randy Langston, Eric Langston, and Gerald Morris had given false identification evidence against Fields; yet they relied on these false identifications to build a case against Fields.

12

28.     The coercive tactics which the Defendant officers and unknown officers used to induce witnesses to give false evidence against Fields, included, but were not limited to, physical violence, threats of physical violence, threats of prosecution, inducements such as payment of rent and other expenses for the witness, promises to relocate the witness and/or his or her family out of the projects, promises to get a family member reduced jail time, and promises to defer prosecution for crimes committed by the witness, including the crime of murder.

29.     Defendants swore out criminal complaints alleging that Fields shot and killed Hickman and Smith regardless of the fact that there was no physical evidence or reliable witness that linked Fields to these crimes, only the manufactured "evidence" that falsely implicated Fields.

30.     This fabrication of evidence and the suppression of exculpatory evidence violated Fields' constitutional rights.


**B.  THE MALICIOUS PROSECUTIONS**

31.     The Defendants failed to disclose to Mr. Fields or to his lawyers that they had used coercive and suggestive tactics to obtain the evidence implicating him in the murders, despite their constitutional obligation to disclose to the defense any favorable evidence which is material either to guilt, punishment, or impeachment.

32.     Further, on information and belief, the investigating officers, including but not limited to Joseph Bogdalek, James Minogue, Robert Evans, Steven Hood, and Daniel Brannigan, failed to provide Fields and his attorneys with a substantial number of

witness reports, "street files," general progress reports and other material documents, despite repeated and specific requests for such discovery.

33.     Defendants only disclosed to Fields and his defense counsel their notes of a small number of reports of insignificant witness interviews, all of which were conducted by Defendants on or about April 28, 1984, the date of the murders.  However, during the thirteen-month investigation, the individual officers and other unknown individuals interviewed over one hundred witnesses, and on information and belief, created numerous witness reports and other material documentation of these interviews.  The Defendants suppressed and secreted these reports and failed to disclose them to Mr. Fields or to the lawyers who defended him on the false murder charges, despite numerous written and oral requests for discovery. On information and belief, these reports contain information revealing that Fields was not involved in this crime.

34.     Investigating officers, including but not limited to Joseph Bogdalek, James Minogue, Robert Evans, Steven Hood, and Daniel Brannigan, also illegally and wrongfully suppressed police reports, including general progress reports and supplemental reports relating to the murders of Joseph White and Dee Eggers Vaughn which took place on or about March 28, 1985.  On information and belief, these reports contain information revealing that Fields was not involved in this crime.

35.     Additionally, the individually named Defendants deliberately and affirmatively failed to disclose information pertaining to investigations that established the guilt of individuals other than Fields.   Consistent with that endeavor, those Defendants

unlawfully suppressed information that would have implicated others and thereby exonerated Fields.

36.     Moreover, the Defendants actively interfered with and impeded the defense's pre-trial investigation.  On July 22, 1985, Sergeant Joseph Murphy and other officers learned that the attorney for Fields' co-defendant was speaking with witnesses Eric Langston and Randy Langston at the scene of the crime.  Defendants went to the scene, removed Eric Langston and Randy Langston and detained defense counsel and his investigator.

## C.  THE TRIAL BEFORE THE CORRUPT JUDGE

37.     The Defendants charged three men with the Smith and Hickman murders:  Earl Hawkins, George Carter, and Nathson Fields.

38.     On June 17, 1986, Fields and Hawkins proceeded to trial before Judge Thomas J. Maloney, who acted as the trier of fact.  The Defendants' theory at the trial was that Fields and Hawkins were the masked shooters of Smith and Hickman while Carter drove the getaway car.

39.     Unbeknownst to Fields or his attorney, the attorney for co-defendant Hawkins, William Swano, had paid $10,000 to Judge Maloney prior to trial to assure a not guilty verdict for Hawkins.  Judge Maloney later became concerned that he was the subject of a federal investigation and he returned the bribe money.  Thereafter, on June 27, 1986, Judge Maloney found Fields and his co-defendant guilty of the charged offenses.

40.    The FBI was indeed secretly recording Judge Maloney's chambers.    Federal agents had knowledge that Fields' trial was fundamentally corrupted, and failed to disclose this information to counsel for Fields, even after Fields was sent to death row, but upon information and belief, they informed Richard M. Daley and the Chicago Police Department.

41.    Fields was convicted of the murders as a proximate result of the misconduct on the part of the Defendants as described above and as discovery will further disclose.

42.    Following his wrongful conviction, the state prosecutors additionally offered false evidence at the penalty phase of Fields' capital trial.  In particular, the prosecution offered the false testimony of Anthony Sumner implicating Fields in the murders of Joseph White and Dee Eggers Vaughn, murders which Sumner had himself committed with Earl Hawkins in March, 1985.  Upon information and belief, Richard M. Daley, the State's Attorney's Office, and the Chicago Police Department knew that Sumner and Hawkins had committed the murders of White and Vaughn yet condoned the use of the false evidence to secure a death sentence against Fields.

43.    Also, at the death penalty hearing, prosecution witness Randy Langston admitted under oath that his identification testimony at trial was false and had been coerced by the Defendant O'Callaghan.  Eric Langston also testified at this hearing that Defendant O'Callaghan had told him who to select in the lineups and had promised to help his brother Randy in exchange for his false identifications.

44.    On August 22, 1986, a jury returned a verdict finding no mitigating factors sufficient to spare Fields' life, and Judge Maloney sentenced Fields to death.  As a direct

16

result of the false testimony presented by the prosecution and the Chicago Police Department, Fields was sentenced to death.

45.     During the time of Fields' arrest and first trial, the Cook County State's Attorney's Office, under the direction of Defendant Daley, along with Federal and State offices, commenced a crackdown of the El Rukn street gang in an effort to put an end to the gang. The Cook County State's Attorney's Office adopted a policy to do whatever it took to make cases against members of the El Rukns, even if the cases were based on fabricated evidence.  The Office policy further condoned the suppression of exculpatory evidence in order to obtain convictions based upon fabricated evidence.  The lawless and illegal tactics used by Defendants to prosecute Nathson Fields were part of this policy and practice of the Defendants to use illegal and unconstitutional means to make cases against members of the El Rukns.

46.     There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant. The Office of the Cook County State's Attorney decided to seek the death penalty against Fields despite the fact that the case was based on false evidence.

47.     The actions of Defendant Daley in seeking capital murder charges against Fields based upon false evidence and in refusing and failing to investigate the actions of both the Chicago Police Department and his own office in suppressing the exculpatory evidence in his possession proximately caused Fields to be convicted and sentenced to death for a crime that he did not commit and caused his wrongful incarceration and pain and suffering.

17

**D.  AFTER THE FIRST TRIAL**

48.     In or about early 1987, while Fields' direct appeal was pending in the Illinois Courts, Defendants Wharrie, Brannigan, and others began to negotiate a deal with Earl Hawkins, a cold-blooded killer.  Hawkins had been convicted with Fields for the murders of Smith and Hickman and was on death row at the Penitentiary at Menard, Illinois.  During these discussions, Hawkins indicated his willingness to testify against other El Rukns in exchange for his removal from death row.  Defendant Wharrie and Hawkins began negotiations of a mutually beneficial plan.  On or about April 1987, Hawkins was removed from death row and sent to the Metropolitan Correctional Center to begin cooperating with federal prosecutors.

49.     On February 16, 1990, Fields' conviction and death sentence were upheld by the Illinois Supreme Court.

50.     In 1991, Anthony Sumner admitted to Assistant United States Attorney William Hogan (and to others whose names are not known at this time) that he and Earl Hawkins had committed the murders of White and Vaughn, and that his story about Fields' involvement in that crime was wholly fabricated and was motivated by his personal animus towards Fields.  Later, on January 3, 1992, Sumner repeated this admission about falsely implicating Fields in a signed statement to representatives of the Chicago Police Department and the State's Attorney's Office.  Nevertheless, the Defendants ignored their obligation to come forward with this vital information despite the fact the fact that Sumner's false testimony was central to prosecution's case against

18

Fields both at his trial and at his capital sentencing hearing. Despite Sumner's admission of perjury against Fields, Defendants continued to seek Fields' execution.

51.     In April of 1993, Judge Maloney was convicted in federal district court of conspiracy, racketeering, extortion, and obstructing justice.

52.     On September 18, 1996, Judge Deborah M. Dooling of the Circuit Court of Cook County granted Fields' Petition for Post-Conviction Relief on the grounds that the trial judge, Thomas Maloney, acted as a corrupt jurist during Fields' trial, thereby depriving Fields of due process of law.

53.     After Fields was granted a new trial, Defendants pursued interlocutory appeals to attempt to save the false conviction and death sentence. These appeals postponed the retrial for several years. During these appeals, the State's Attorney's Office conceded that the passage of time since the crime and other factors rendered the State's case against Fields "untriable."

54.     Beginning in or about 1998, ASA David Kelley and other defendants used coercive tactics to cause witnesses Randy Langston and Gerald Morris to repeat their false identifications from the first trial despite knowing that these witnesses had truthfully admitted that they lacked the ability to identify Fields and that their identification testimony from the first trial was false and had been coerced.

## E.  THE RETRIAL

55.     After the Defendants failed in their efforts to overturn Judge Dooling's order, rather than admit their mistake, the named Defendants pursued the retrial of Fields

despite knowing that they had no credible evidence that Fields was responsible for the murders.

56.     In or about 1998, to improve their chances of winning another false conviction and with Sumners dead, the Office of the Cook County State's Attorney and Defendant David Kelley, with the participation of Defendants Brannigan and Murphy, cut a deal with Earl Hawkins to obtain his cooperation and testimony at Fields' retrial. At this time, Hawkins was cooperating with the federal government and had admitted to personally committing more than ten murders. Nevertheless, the Defendants agreed to dismiss the double murder charges against Hawkins, thereby assuring Hawkins that he would not have to return to death row. Defendants further agreed that Hawkins would not be prosecuted for the murders of Vaughn and White despite the fact that Hawkins had admitted committing these murders and Anthony Sumners had also implicated Hawkins in this crime. In return, Hawkins agreed to give false testimony against Fields at the re-trial. The Defendants knew that Hawkins would say anything to get off death row.

57.     To facilitate their deal with Hawkins, the Defendants decided to change their position at Fields' retrial as to the identity of the two shooters. At the original trial of Fields and Hawkins, the Prosecution had taken the position that Earl Hawkins and Nathson Fields were the two masked men who had shot and killed Talman Hickman and Jerome Smith, and that George Carter drove the getaway car. (Indeed, the Defendants had introduced eyewitness testimony at that trial identifying Hawkins as

one of the shooters.)  But at the re-trial, Defendants elicited sworn testimony from Earl Hawkins that the two masked killers were Nathson Fields and George Carter.

58.     Fields was re-tried in the spring of 2009 for the murders despite his innocence. On April 8, 2009, Cook County Circuit Court Judge Vincent M. Gaughan found Fields not guilty of the shooting deaths of Hickman and Smith.  In acquitting Fields, Judge Gaughan made factual findings specifically rejecting the testimony of Hawkins, the State's purported occurrence witnesses, as improbable, highly suspect, and unworthy of belief.

59.     Subsequently, Fields was exonerated when he was granted a Certificate of Innocence in December 2009.

60.     All of the individual Defendants have willfully and wantonly engaged in a well-documented pattern of illegal activity, through individual and collective unlawful behavior, including but not limited to:  illegal and suggestive identification procedures, deliberate suppression of exculpatory evidence, witness coercion to produce false evidence, subornation of perjury, and perjury, all of which was coordinated to produce the wrongful arrest, wrongful conviction, wrongful imprisonment, and execution of Fields.

61.     Fields was not the only individual singled out for this pattern of illegal activity by Defendants, that pattern included a host of other people, inclusive of, but not limited

to numerous people who have been exonerated after spending years imprisoned for crimes which they did not commit.[1]

## F. POLICIES AND PRACTICES: CHICAGO'S "STREET FILES"

62. The unconstitutional withholding of exculpatory information from Fields' defense in this case, as well as the possible destruction of the same, was all undertaken pursuant to, and proximately caused by, policies and practices on the part of the Chicago Police Department and acquiesced to by the State's Attorney of Cook County.

63. Police officers were required by the policy of the Chicago Police Department to record information gathered during investigations of violent crimes and to preserve and submit unofficial reports known as "street files" and/or "general progress reports" to their Unit Supervisor for inclusion into an investigative file case folder.

64. Specifically, at all times relevant hereto, members of the Chicago Police Department, including but not limited to the individual defendant officers in this

---

[1] See, e.g., People v. Darby Tillis & Perry Cobb, People v. Dennis Williams, People v. Kenneth Adams, People v. Willie Rainge, People v. Omar Aguirre, People v. Santo Duarte, People v. Aaron Patterson, People v. Leroy Orange, People v. Madison Hobley, People v. Stanley Howard, People v. Paul Terry, People v. Ronald Kitchen, People v. Marvin Reeves, People v. Dan Young, People v. Angel Rodriguez, People v. Harold Hill, People v. James Newsome, People vs. Michael Tillman, People v. Xavier Arcos, People v. David Bates, People v. Paula Gray, People v. Juan Johnson, People v. Walter Godinez, People v. Thaddeus Jimenez, People v. Alton Logan, People v. Anthony Porter, People v. Miguel Castillo, People v. Ronald Jones, People v. Dean Gage, People v. Robert Williams, People v. Larry Ollins, People v.John Willis, Jr., People v. Marcelia Bradford, People v. Omar Saunders, People v. Marlon Pendleton, People v. Corethian Dion Bell, People v. Derrick Flewellen, People v. Maurice Deloney, People v. Fred Ewing, People v. Gerald Earl, People v. Verneal Jimerson, People v. Eric Gibson, People v. Elton Houston, People v. Robert Brown, People v. Gabriel Solis, People v. Xavier Carton, People v. David Fauntleroy, People v. LaFonso Rollins, People v. Darreal Stokes, People v. Alfonzia Neal, and People v. Steven Manning.

action, systematically suppressed <u>Brady</u> material by intentionally secreting discoverable information in so-called "street files."  As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the State's Attorney's Office and from criminal defendants and many were subsequently destroyed.  Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including but not limited to the named officers, concealed exculpatory evidence within street files which were never disclosed to Fields' criminal defense.  Upon information and belief, James Delaney, as Watch Commander for Area One Violent Crimes of the Chicago Police Department, approved of, condoned, ratified, acquiesced to and encouraged the withholding of "street files" and/or "general progress reports" relevant to the investigation.  This withholding of evidence—which would have exonerated Fields—was undertaken pursuant to the City's policy and practice in the manner described above.

65.    The State's Attorney of Cook County was well aware of the Street files utilized by the City of Chicago Police in its investigations but because of the policy and practice of Richard M. Daley to convict street gang members to get them off of the streets, (regardless of guilt or innocence) the States Attorney's Office not only looked the other way when the files were missing but actively participated in the misconduct.

66.    The policies and practices described in the foregoing paragraphs was consciously approved at the highest policy-making level for decisions involving the police department, and was a proximate cause of the injuries suffered here by the Fields.

## G.  FURTHER POLICIES AND PRACTICES: MALICIOUS PROSECUTION

67.     In addition to the foregoing, Fields was also the victim of, and his injuries were proximately caused by, a policy and practice on the part of the City of Chicago and the State's Attorney's Office to secure false convictions through profoundly flawed investigations.

68.     Specifically, throughout the 1970s and 1980s, and continuing thereafter, as part of the flawed investigations a group of Chicago Police Officers and Cook County State's Attorneys, including some or all of the individual Defendants named herein and other unknown officers, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

69.     In addition, the institutional desire to "solve" crimes more expediently regardless of guilt or innocence was utilized by the officers to enhance their personal standing in the Department and was known to the command personnel, who themselves participated in the practice.

70.     The above-described widespread practices, so well settled as to constitute *de facto* policy in the Chicago Police Department during the time period at issue, was able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem.

71.     The purported philosophy of Richard M. Daley was to "do whatever it takes" to get gang members off the streets of Cook County (regardless of guilt or innocence), was

well known both within the State's Attorney's Office and the Chicago Police Department and facilitated the malicious prosecutions.

72.     The FBI and ATF shared this "whatever it takes" philosophy in targeting Chicago street gangs, especially the El Rukns during the 1980s.

73.     The shared institutional desire to "solve" crimes regardless of guilt or innocence was also able to exist because of the willingness of the Defendant Richard M. Daley and the State's Attorney's Office to prosecute the flawed cases despite the fact that it was clear that the police were engaging in misconduct.

74.     In addition to Fields, there are now dozens of other known victims of similar abuses, though there may well be many more.  At least thirteen criminal defendants victimized by this practice were, like Fields, wrongfully sentenced to death.

75.     The widespread practices described in the preceding paragraphs were allowed to take place because the City and the County declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.  The Police Department's system for investigating and disciplining police officers accused of the type of misconduct which befell Fields was, and is, for all practical purposes, nonexistent.  Similarly, the County's system for investigating and disciplining Assistant State's Attorneys accused of the type of misconduct which befell Fields was, and is, for all practical purposes, nonexistent.

76.     Chicago police officers who manufactured criminal cases against individuals such as Fields had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to

be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the grievous misconduct at issue in this case.

77.     Cook County State's Attorneys who investigated the manufactured criminal cases against individuals such as Fields also had every reason to know that they too would enjoy *de facto* immunity (if not absolute immunity) from criminal prosecution and/or departmental discipline because they were following the policy of the office in doing whatever it took to keep known gang members off the streets of Chicago, regardless of their guilt or innocence.

## H.     FIELDS' DAMAGES

78.     On May 9, 2003, Fields posted bond and was released after spending 17 years and nearly 11 months of continuous wrongful imprisonment, 11 of those years on death row.  During his many years in prison, Fields was physically attacked and had chemical agents used upon him.  Fields remained out on bond for almost 6 years before the retrial would get underway.

79.     In January of 1996, Fields' mother suffered a massive heart attack and died. Fields requested to attend his mother's services, but his request was denied.

80.     While on death row, Fields endured the mental and emotional trauma associated with his pending execution.  Fields was further traumatized at least 11 times when other residents of death row were put to death.

81.     In serving almost eighteen years behind bars and six years awaiting trial to be exonerated, Fields was wrongfully deprived of nearly half of his adult life.  Fields was

stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, including watching his daughter grow up. As a result of his wrongful incarceration, Fields lost his fundamental freedom to live one's life as an autonomous human being, and he must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for that task.

82.    This long-running ordeal has caused psychological pain, intense emotional distress, physical sickness, humiliation, embarrassment, depression, deprivation of the enjoyment of life, sleep disruption, inability to concentrate, complete distrust and fear of the police, deprivation of employment opportunities and the accumulation of Social Security work credits, anxiety, and shame. He was compelled to endure many years of wrongful imprisonment including being subjected to degrading prison practices, such as being strip-searched at the whim of prison guards/officials. All of this has caused the need for professional mental and emotional counseling which Fields cannot afford.

83.    Fields seeks redress for his injuries, including compensatory damages, as well as attorneys' fees and costs.

## COUNT I — 42 U.S.C. § 1983 — DUE PROCESS

84.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

85.    As described more fully above, each of the individually named Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Fields of his liberty and his constitutional right to a fair trial.

86.    In the manner described more fully above, the named Defendants' and its employees and agents engaged in subornation of perjury, perjury, coercion of witnesses to produce false evidence against Fields, and the withholding and/or destroying of exculpatory evidence, thereby misleading and misdirecting the prosecution of Fields. These individuals also engaged in the unduly suggestive identification procedures, as described above.  Absent the totality of this misconduct, the prosecution of Fields could not and would not have been pursued.

87.    The misconduct of the City Defendants could also not have occurred without the specific acquiescence of the Defendant Richard M. Daley and the Cook County State's Attorney's Office in furtherance of their policy of prosecuting gang members regardless of guilt or innocence.

88.    The above-described misconduct directly resulted in the unjust criminal conviction of Fields, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution.

89.     As a result of this violation of his constitutional right to liberty and to a fair trial, Fields suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

90.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Fields' constitutional rights.

91.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in concert with the Cook County State's Attorney's Office in the manner described more fully above.  In this way, the City of Chicago and Defendant Daley violated Fields' rights through the actions of its agents by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

92.     As a result of this malicious prosecution, Fields' constitutional rights were violated, and he suffered other injuries, including but not limited to loss of liberty, as is more fully alleged above.

## COUNT II — 42 U.S.C. § 1983 — FAILURE TO INTERVENE

93.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

94.     In the manner described above, during the constitutional violations described above, the individual Defendants stood by without intervening to prevent the misconduct.

95.     As a result of the Defendants' failure to intervene to prevent the violation of Fields' constitutional rights, Fields suffered pain and injury, as well as emotional distress, as is more fully alleged above.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Fields' constitutional rights.

97.     The misconduct described in this Count was undertaken pursuant to the policies and practices of both the City of Chicago and the State's Attorney's Office in the manner described in preceding paragraphs.

## COUNT III — 42 U.S.C. § 1983 — CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

98.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

99.     After the murder at issue, the individual Defendants reached an agreement amongst themselves to frame Fields for the crime, and to thereby deprive Fields of his constitutional rights, all as described in the various Paragraphs of this Complaint.

100.    Independently, before and after Fields' first conviction, each of the individually named Defendants further conspired, and continue to conspire, to deprive Fields of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

101.     In this manner, the individually named Defendants, acting in concert with other unknown co-conspirators, including persons who are not members of either the Chicago Police Department or the Cook County State's Attorney's Office, have conspired by concerted action to accomplish an unlawful purpose by unlawful means.

102.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

103.     As a direct and proximate result of the illicit prior agreement referenced above, Fields' rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

104.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

105.     The misconduct described in this Count was undertaken pursuant to the policies and practices of both the Chicago Police Department and the Cook County State's Attorney's Office in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for both the City of Chicago and the County of Cook with final policymaking authority.

## COUNT IV — STATE LAW CLAIM — MALICIOUS PROSECUTION

106.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

107.     The individually named Defendant officers individually and/or jointly and in conspiracy caused Fields to be improperly subjected to judicial proceedings for which

31

there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Fields' favor in a manner indicative of innocence. Each of the individually named Defendant officers were instrumental in the initiation and/or perpetuation of the prosecution of Fields.

108.    The individually named Defendant officers accused Fields of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

109.    Prosecutors, even after learning that the accusations were without probable cause not only acquiesced in the continued judicial proceedings but actively prosecuted Fields knowing he was not guilty of the crimes alleged.

110.    Statements of the individually named Defendant officers regarding Fields' alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information.

111.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

112.    As a result of this misconduct, Fields sustained, and continues to sustain, injuries including pain and suffering, as well as emotional distress, as is more fully alleged above.

## COUNT V — STATE LAW CLAIM — INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

113.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

114.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous.  The individual Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Fields, as is more fully alleged above.

115.    Said actions and conduct did directly and proximately cause severe emotional distress to Fields, and thereby constituted intentional infliction of emotional distress.

116.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

117.    As a proximate result of Defendants' wrongful acts, Fields suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT VI — STATE LAW CLAIM — CIVIL CONSPIRACY

118.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

119.    As described more fully in the preceding paragraphs, individual Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

120.    In furtherance of the conspiracy, individual Defendants committed overt acts and were otherwise willful participants in joint activity.

121.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

122.    As a proximate result of Defendants' conspiracy, Fields suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

### COUNT VII — STATE LAW CLAIM — RESPONDEAT SUPERIOR

123.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

124.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department—an agency of the City of Chicago—and all were acting at all relevant times within the scope of employment and under color of law.

125.    In committing the acts alleged in the preceding paragraphs, Defendant Daley, Defendant Wharrie, and Defendant Kelley were agents of the Cook County State's Attorney's Office—an agency of the County of Cook—and were acting at all relevant times within the scope of their employment and under color of law.

126.    Both the Defendant City of Chicago and the Defendant County of Cook are liable as principal for all torts committed by its agents.

## COUNT VIII — STATE LAW CLAIM — INDEMNIFICATION

127.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

128.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are individually liable within the scope of their employment activities.

129.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

130.    Richard M. Daley, Larry Wharrie, and David Kelley were employees of the County of Cook, who acted within the scope of their employment, when committing the misconduct described herein.

WHEREFORE, Plaintiff, Nathson E. Fields, respectfully requests that this Court enter judgment in his favor and against Defendants in the amount of $360,000,000 in compensatory damages, punitive damages against each and every individually named Defendant, as allowable under the law, because these Defendants acted in a malicious, willful and/or wanton manner toward Fields.  Plus costs and attorneys' fees against the Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, Nathson E. Fields, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

 /s/   Leonard C. Goodman

One of the Attorneys for Fields

For Fields:

Leonard Goodman                          H. Candace Gorman
Molly Armour                             220 S. Halsted
Melissa Matuzak                          Suite 200
53 W. Jackson Boulevard                  Chicago Illinois 60661
Suite 1650                               312-427-2313
Chicago, Illinois 60604
312-986-1984

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
<u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 10 CV 1168** |
| **CITY OF CHICAGO, et. al** | ) | |
| **Defendants,** | ) | **Hon. Matthew F. Kennelly** |

<u>NOTICE OF FILING AND CERTIFICATE OF SERVICE</u>

To:     ALL COUNSEL OF RECORD

PLEASE TAKE NOTICE that on the 21st day of September, 2010, I filed with the Court's electronic filing system a copy of Plaintiff's Second Amended Complaint to be served upon you.

<u>/s/ Leonard C. Goodman</u>
Counsel for Plaintiff

Leonard C. Goodman
53 W. Jackson
Suite 1650
Chicago, Illinois 60604
(312) 986-1984