# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 10 CV 1168** |
| **CITY OF CHICAGO;** | ) | |
| **COUNTY OF COOK;** | ) | **Hon. Matthew F. Kennelly** |
| **RICHARD M. DALEY;** | ) | |
| **former Assistant State's Attorneys** | ) | |
| **LARRY WHARRIE and DAVID KELLEY;** | ) | |
| **former and current Chicago Police** | ) | |
| **Officers DAVID O'CALLAGHAN** | ) | |
| **THOMAS RICHARDSON,** | ) | |
| **STEPHEN CASTO, JAMES MINOGUE,** | ) | |
| **JOSEPH BOGDALEK,** | ) | |
| **JOSEPH MURPHY, STEVEN HOOD,** | ) | |
| **JAMES DELANEY, ROBERT EVANS,** | ) | |
| **DANIEL BRANNIGAN,** | ) | |
| **JOHN ROBERTSON, RICH KOBEL, and** | ) | |
| **RICHARD KOLOVITZ,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

### THIRD AMENDED COMPLAINT

NOW COMES THE PLAINTIFF, NATHSON E. FIELDS, by and through his attorneys, Leonard Goodman, H. Candace Gorman, Molly Armour, and Melissa Matuzak, and complains of the Defendants as follows:

### INTRODUCTION

1. On June 27, 1986, Nathson E. Fields (hereinafter, "Fields") was found guilty of the murders of Talman Hickman and Jerome Smith and two months later was

1

sentenced to death for the double murder that he did not commit. Fields liberty was taken away from him without due process of law for almost eighteen years, most of which he spent on death row. Even after his release from prison Fields was deprived of his liberty while on bond for an additional seven years. The violations that led to his ordeal were the result of misconduct by the Defendants, who deprived him of his constitutional right to a fair trial and conspired to build a false case against him irrespective of his innocence. Fields has continually maintained his innocence throughout this ordeal.

2. On September 18, 1996, Fields' Petition for Post-Conviction Relief was granted on the grounds that the trial judge's corrupt practices deprived Fields due process of law. Fields remained imprisoned until he could post bond on May 9, 2003. Fields remained on bond for seven additional years. Although the case against Fields had been exposed as false, the Defendants pressed on with a retrial which concluded on April 8, 2009 with Fields' acquittal on all charges. On December 10, 2009, Fields was granted a Certificate of Innocence. Yet, to this day the Defendants persist in extending Fields' ordeal by challenging his Certificate of Innocence.

3. Although Fields won back his freedom, he can never regain the decades lost in his life. This lawsuit seeks redress for those injuries.

**JURISDICTION AND VENUE**

4. This action is brought pursuant to 42 U.S.C. section 1983 to redress the deprivation under color of law of Fields' rights as secured by the United States

Constitution.    Supplemental jurisdiction to entertain state law claims arises under 28 U.S.C.  section 1367.

5.    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper under 28 U.S.C. § 1391(b).  The parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## PARTIES TO THE CASE

**PLAINTIFF:**

6.    Nathson E. Fields is a resident of the City of Chicago, State of Illinois.  At the time of his arrest in June of 1985, Fields was 30 years old and a member of the El Rukn street gang.  Fields was charged with, found guilty of, and sentenced to death for the double murders of Talman Hickman and Jerome Smith, despite the fact that he was innocent.

**DEFENDANTS:**

7.    The City of Chicago is a municipal corporation operating and existing within the State of Illinois.  The City of Chicago is responsible for the acts of its employees while acting within the scope of their employment, and is responsible for the policies, practices, and customs of the Chicago Police Department.

8.    The County of Cook is a governmental entity operating within the State of Illinois which consists in part of the Cook County State's Attorney's Office.  The County of Cook is responsible for the acts of its employees while acting within the scope of their employment.    At times relevant to this action, Cook County was the employer of

Defendants Richard M. Daley, Larry Wharrie, and David Kelley; all are necessary parties to this lawsuit. The County of Cook is a necessary party to this action.

9. The following Defendants are sued in their individual capacities, and acted under color of law and within the scope of their employment during the actions which are part of this lawsuit. Upon information and belief the following individuals acted in a malicious, willful and/or wanton manner toward Fields and were involved in all or some of the following: investigating the two double murders discussed herein; the arrest and failure to provide a fair trial for Fields in the first trial; withholding exculpatory evidence of his actual innocence; procuring witness fabrications and/or other conduct directly relating to his wrongful conviction; the taking of Fields liberty for almost 25 years; facilitating the imposition of the death sentence; failing to provide a fair trial for Fields in the second trial; the contesting of Fields' innocence in the hearing for a Certificate of Innocence; the frivolous appeal of the Certificate of Innocence; and the other misconduct alleged herein:

    a.    Richard M. Daley, at times relevant to this action, was the chief administrator for the State's Attorney of Cook County's Office, and was responsible for the policies, practices, and customs of that office. Although Daley was never part of the prosecution team in this case, on information and belief, discovery will show that Daley was personally involved in directing or consenting to the fabrication of evidence against Fields as well as the suppression of exculpatory evidence. Daley's tenure as States Attorney ended in 1989. Also on information and belief, discovery will show that Daley was personally involved in the targeting of El Rukns for prosecution and personally approved of the use the powers of his office to get El Rukns off the street with trumped up charges grounded upon fabricated evidence and the suppression of exculpatory evidence. Daley followed this policy in order to enhance his political

standing and that philosophy permeated the State's Attorney's Office at the relevant times and facilitated the misconduct on the part of the other named Defendants. Also on information and belief, discovery will show that Daley personally reviewed, consented, and condoned the misconduct alleged in this complaint in connection with his decision to seek and pursue the death penalty against Fields. The allegations against Daley relate only to the time period between 1984 to 1989.

b.  Larry Wharrie, at all times relevant to his involvement in this action, was an Assistant State's Attorney employed by the Office of the Cook County State's Attorney who co-anchored the prosecution team during the original trial of Fields. Defendant Wharrie is being sued solely for his role in an investigatory capacity. On or about May 12, 1985, ASA Wharrie participated in a raid of an El Rukn "safe house" which led to the arrest of Anthony Sumner, a high ranking member of the El Rukns. Following this raid, Sumner became a cooperating witness in the investigation of the El Rukn gang by the Cook County State's Attorney and the United States Attorney for the Northern District of Illinois. Sumner was interviewed by Chicago police officers, including Defendant Brannigan, Assistant United States Attorneys and Assistant State's Attorneys—including defendant Larry Wharrie. During this, Wharrie, acting alone or together with other defendants, caused Sumner to fabricate evidence linking Nathson Fields to two double murders: the murders of Jerome Smith and Talman Hickman, and the murders of Dee Eggers Vaughn and Joseph White. These fabrications by Sumner led to the issuance of the arrest warrant for Nathson Fields. Later, in 1987, while Fields' appeal was pending and after Wharrie's role as prosecutor had ended, Wharrie began negotiating with Fields' co-defendant Earl Hawkins procuring Hawkins false testimony for the State at Fields' re-trial.

c.  David Kelley, at all times relevant to his involvement in this action, was an Assistant State's Attorney employed by the Office of the Cook County State's Attorney who co-anchored the prosecution team during the second trial of Fields. Defendant Kelley is being sued solely for his role in an investigative capacity. Beginning in or about 1998, ASA Kelley, acting alone and together with other defendants, began contacting a witness named Randy Langston, who at that time was serving time in prison. ASA Kelley knew that Langston had admitted under oath that his testimony identifying Nathson Fields as a shooter in the Smith and Hickman homicides was false. Kelley nevertheless used coercive tactics to induce Langston to return back to his false testimony that he saw Fields

participate in the shooting. None of the allegations in the complaint prior to 1998 relate to Kelley.

d.    James Delaney, at all times relevant to his involvement in this action, was the Watch Commander for Area One Violent Crimes of the Chicago Police Department and was responsible for the formulation, implementation and administration of policies, practices, procedures, customs, training, supervision and control of all subordinates under his command.  Upon information and belief, Delaney personally approved of, condoned, ratified, acquiesced to and encouraged the withholding of "Street files" and/or "general progress reports" relevant to the investigation. The street files that were withheld provided exculpatory evidence of the actual innocence of Fields.

e.    David O'Callaghan, Star No. 14721, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, had a special assignment with the Office of the Cook County State's Attorney, and participated in the investigation and/or trial of Fields.  Beginning in about 1985, Defendant O'Callaghan participated in the investigation of the Hickman-Smith murders and fabricated evidence linking Nathson Fields to that crime, offered false testimony against Fields at his trials, and suppressed exculpatory evidence.

f.    Officer Thomas Richardson, Star No. 3385, at all times relevant to his involvement in this action, was employed as a Officer by the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Richardson participated in the investigation of the Hickman-Smith murders, the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

g.    Officer Stephen Casto, Star No. 15489, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in about 1985, Defendant Casto participated in the investigation of the Hickman-Smith murders, the fabrication of evidence linking Nathson Fields to that crime, and the suppression of exculpatory evidence.

h.    James Minogue, Star No. 13871, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Minogue participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

i.    Joseph Bogdalek, Star No. 14674, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Bogdalek participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

j.    Joseph Murphy, Star No. 1389, at all times relevant to his involvement in this action, was employed as a Sergeant with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Murphy participated in the investigation of the Hickman-Smith murders and, on information and belief, fabricated evidence linking Nathson Fields to that crime, impeded the defense investigation, and suppressed exculpatory evidence.

k.    Steven Hood, Star No. 11885, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields.  Beginning in 1984, Defendant Hood participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

l.    Robert Evans, Star No. 12754, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in

the investigation and/or trial of Fields. Beginning in 1984, Defendant Evans participated in the investigation of the Hickman-Smith murders and, on information and belief, participated in the fabrication of evidence linking Nathson Fields to that crime and the suppression of exculpatory evidence.

m.    Daniel Brannigan, Star No. 4638, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Brannigan participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

n.    Richard Kolovitz, Star No. 12408, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Kolovitz participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

o.    John Robertson, Star No. 13732, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Robertson participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

p.    Richard Kobel, Star No. 4383, at all times relevant to his involvement in this action, was employed as a Officer with the Chicago Police Department, worked out of Area One Violent Crimes, and participated in the investigation and/or trial of Fields. Beginning in about 1985, Defendant Kobel participated in the investigation of the Hickman-Smith murders, fabricated evidence linking Nathson Fields to that crime and, on information and belief, suppressed exculpatory evidence.

**STATEMENT OF FACTS**

**A.  THE INVESTIGATION**

10.     On Saturday morning, April 28, 1984, at approximately 10:15 a.m., Talman Hickman and Jerome "Fuddy" Smith were shot multiple times and died outside 706 East 39th Street, a public housing complex in Chicago.  That day, witnesses told Chicago Police officers that the victims were standing in front of the building, and that two men wearing masks and with guns came up behind them, and shot them in the back of the head.

11.     Jerome "Fuddy" Smith was the leader of a street gang known as the Black Gangster Goon Squad, and his friend Talman Hickman was a member of that same street gang.  At the time of shooting, there was an ongoing gang rivalry between the Goon Squad and the El Rukns.

12.     Soon after the shootings, Chicago Police officers including, but not limited to, Thomas Richardson, Joseph Bogdalek, James Minogue, Robert Evans, and Steven Hood interviewed eyewitnesses to the shooting including Randy Langston, Sandra Langston, and Gerald Morris.   At this time, the officers learned that only one of these eyewitnesses, Sandra Langston, had the ability to give any description of the physical appearance of the two shooters.  Sandra Langston told the officers that she observed, from her second floor bedroom window, that both offenders were black males, both "light complexion," in their "early 20s."  Officers also learned that one or both of the perpetrators wore ski masks at the time of the shooting.

13.     Fields is a dark-skinned black man.  At the time of the shooting, he was thirty years old.  He did not fit the description of either of the shooters.

14.     From April of 1984 until May of 1985, the investigation continued.   Upon information and belief, the individual police officers named herein and other unknown officers were involved in the investigation and interviewed at least one hundred witnesses and drafted written reports of these interviews.  None of these eyewitnesses identified Fields as one of the perpetrators.  Nor did any eyewitness give a description of an offender that matched Fields.

15.     On information and belief, many of the reports of witness interviews taken by officers including, but not limited to, Defendants Thomas Richardson, Joseph Bogdalek, James Minogue, Robert Evans, and Steven Hood were inconsistent with the fabricated case later brought against Nathson Fields.   These Defendants and other officers suppressed and secreted the reports (also referred to as "street files" and "general progress reports") intentionally and with malice so as to prevent Fields from refuting the false identification testimony offered against him at his trial.   The secreted and suppressed interview reports include the statements taken from Randy Langston and Gerald Morris shortly after the shooting which contradict the testimony of these witnesses at Fields' trials.

16.     On or about January 1985, Richard M. Daley, the Cook County State's Attorney's Office, and the Chicago Police Department, in concert with federals agents from the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF), began a campaign to target members of the El Rukn Street gang for arrest and prosecution.

17.    On or about March 28, 1985, Anthony Sumner and Earl Hawkins murdered Joe White and Dee Eggers Vaughn in the victims' home on the south side of Chicago during a drug-related armed robbery.  Following this crime, Sumner and Hawkins fled the City to avoid arrest, landing in an El Rukn "safe house" in Cleveland, Ohio.

18.    On or about April 9, 1985, officers David O'Callaghan, Thomas Richardson, and Steven Casto interviewed a witness named Robert Buckles at the Office of the Cook County State's Attorney.  During this interview, Buckles stated that he was present at the time of the shooting of Smith and Hickman and that the two offenders ran past him and that he recognized one of the offenders as Man-Sur, the nickname of Earl Hawkins.

19.    On or about May 12, 1985, Chicago Police officers, Assistant State's Attorney Wharrie, and unknown others, raided an El Rukn "safe house" in Cleveland, Ohio and arrested gang member Anthony Sumner.

20.    Defendant Brannigan and others involved in the investigation, alongside Assistant State's Attorney Wharrie, used coercive tactics to directly or proximately cause Sumner to falsely implicate Nathson Fields in the Smith and Hickman homicides and to fabricate a story that Fields had admitted his involvement in the murders to Sumner.

21.    The Defendants (excluding Daley) used similar coercive tactics to directly or proximately cause Sumner to also falsely implicate Fields in the double murders of Joseph White and Dee Eggers Vaughn, a crime which Sumner himself had committed

11

with Earl Hawkins. In return, the Chicago Police Department and the State's Attorney's Office agreed not to prosecute Sumners for this murder. Instead, it was decided to use the fabricated statements of Sumners falsely implicating Fields in two double homicides to pursue capital murder charges against Fields.

22. After causing Sumner to falsely implicate Fields in the Smith/Hickman murders, the Defendants (excluding Daley) set out to manufacture additional false evidence connecting Fields to these crimes.

23. On or about May 16, 1985, officers including, but not limited to, David O'Callaghan, Thomas Richardson, Steven Casto, and other Defendants used suggestive and coercive tactics to cause Randy Langston and Gerald Morris to falsely identify a photograph of Nathson Fields as one of the persons they saw shoot Smith and/or Hickman.

24. Despite the policy and procedure of the Chicago Police Department to inventory all photographs that are used in a photographic array, Defendant officers and unknown officers failed to inventory or preserve the photograph(s) that they showed to the "eyewitnesses." The failure to preserve this evidence was done intentionally and maliciously so as to obstruct Fields' ability to refute the false identification evidence offered against him at his trial.

25. On June 14, 1985, nearly fourteen months after the shooting deaths of Hickman and Smith, personnel of the Chicago Police Department arrested Fields.

26. Following Fields' arrest, Defendant officers including, but not limited to, O'Callaghan, Richardson, Casto used suggestive and coercive tactics to cause Randy

Langston, Eric Langston, and Gerald Morris to falsely identify Fields in a lineup as one of the persons they saw shoot Smith and/or Hickman. One suggestive tactic employed during the lineup by Defendant O'Callaghan was to help the witnesses select Fields by lifting up Fields' shirt to display his El Rukn tattoo, which was irrelevant to the identifications except insofar as the "witnesses" were from a rival gang. Another suggestive tactic employed during the lineup by Defendant O'Callaghan was to simply tell the witness whom to select.

27. David O'Callaghan, Thomas Richardson, Stephen Casto, Richard M. Daley, Larry Wharrie, and other officers and unknown individuals knew that Randy Langston, Eric Langston, and Gerald Morris had given false identification evidence against Fields; yet the Defendant officers relied on these false identifications to build a case against Fields and deliberately withheld exculpatory evidence of Fields' actual innocence.

28. The coercive tactics which the Defendants and unknown others used to induce witnesses to give false evidence against Fields, included, but were not limited to, physical violence, threats of physical violence, threats of prosecution, inducements such as payment of rent and other expenses for the witness, promises to relocate the witness and/or his or her family out of the projects, promises to get a family member reduced jail time, and promises to defer prosecution for crimes committed by the witness, including the crime of murder.

29. Defendant officers swore out criminal complaints alleging that Fields shot and killed Hickman and Smith regardless of the fact that there was no physical evidence or

reliable witness that linked Fields to these crimes, only the manufactured "evidence" that falsely implicated Fields.

30.     This fabrication of evidence and the suppression of exculpatory evidence violated Fields' constitutional rights.

**B.  FAILURE TO DISCLOSE EXCULPATORY EVIDENCE AT FIRST TRIAL**

31.     The Defendants failed to disclose to Mr. Fields or to his lawyers that coercive and suggestive tactics were used to obtain the evidence implicating him in the murders, despite their constitutional obligation to disclose to the defense any favorable evidence which is material either to guilt, punishment, or impeachment.

32.     Further, on information and belief, the investigating officers, including but not limited to Joseph Bogdalek, James Minogue, Robert Evans, Steven Hood, and Daniel Brannigan, failed to provide Fields and his attorneys with a substantial number of witness reports, "street files," general progress reports, and other material documents despite repeated and specific requests for such discovery.

33.     Defendants only disclosed to Fields and his defense counsel notes of a small number of reports of insignificant witness interviews, all of which were conducted by police officers on or about April 28, 1984, the date of the murders.  However, during the thirteen-month investigation, the individual officer Defendants and other unknown individuals interviewed over one hundred witnesses, and on information and belief, created numerous witness reports and other material documentation of these interviews.  The Defendants suppressed and secreted these reports and failed to disclose them to Mr. Fields or to the lawyers who defended him on the false murder

charges, despite numerous written and oral requests for discovery. On information and belief, these reports contain information revealing that Fields was not involved in this crime.

34. Investigating officers, including but not limited to Joseph Bogdalek, James Minogue, Robert Evans, Steven Hood, and Daniel Brannigan, also illegally and wrongfully suppressed police reports, including general progress reports, and supplemental reports relating to the murders of Joseph White and Dee Eggers Vaughn which took place on or about March 28, 1985. On information and belief, these reports contain information revealing that Fields was not involved in this crime.

35. Additionally, the individually named Defendants and unknown others deliberately and affirmatively failed to disclose information pertaining to investigations that established the guilt of individuals other than Fields. Consistent with that endeavor, those Defendants unlawfully suppressed information that would have implicated others and thereby exonerated Fields.

36. Moreover, the Defendant officers and other unknown officers, in an effort to further hide exculpatory information, actively interfered with and impeded the defense's pre-trial investigation. On July 22, 1985, Sergeant Joseph Murphy and other officers learned that the attorney for Fields' co-defendant was speaking with witnesses Eric Langston and Randy Langston at the scene of the crime. Defendants went to the scene, removed Eric Langston and Randy Langston and detained defense counsel and his investigator.

37.     The lawless and illegal tactics used by Defendants to hide exculpatory information was part of a policy and practice of the Chicago Police Department.

## C.  THE TRIAL BEFORE THE CORRUPT JUDGE

38.     Three men were charged with the Smith and Hickman murders:  Earl Hawkins, George Carter, and Nathson Fields.

39.     On June 17, 1986, Fields and Hawkins proceeded to trial before Judge Thomas J. Maloney, who acted as the trier of fact.  The Governments' theory at the trial was that Fields and Hawkins were the masked shooters of Smith and Hickman while Carter drove the getaway car.

40.     Unbeknownst to Fields or his attorney, the attorney for co-defendant Hawkins, William Swano, had paid $10,000 to Judge Maloney prior to trial to assure a not guilty verdict for Hawkins.  Judge Maloney later became concerned that he was the subject of a federal investigation and he returned the bribe money.  Thereafter, on June 27, 1986, Judge Maloney found Fields and his co-defendant guilty of the charged offenses.

41.     The FBI was indeed secretly recording Judge Maloney's chambers.  Federal agents had knowledge that Fields' trial was fundamentally corrupted, and failed to disclose this information to counsel for Fields, even after Fields was sent to death row, but upon information and belief, they informed Richard M. Daley and the Chicago Police Department.

42.     Fields was convicted of the murders as a proximate result of the misconduct on the part of the Defendants as described above and as discovery will further disclose.

43.     Following his wrongful conviction, the state prosecutors additionally offered false evidence at the penalty phase of Fields' capital trial.  In particular, the prosecution offered the false testimony of Anthony Sumner implicating Fields in the murders of Joseph White and Dee Eggers Vaughn, murders which Sumner had himself committed with Earl Hawkins in March, 1985.  Upon information and belief, Richard M. Daley, the State's Attorney's Office, and officers of the Chicago Police Department (including the named officers) knew that Sumner and Hawkins had committed the murders of White and Vaughn yet condoned the use of the false evidence to secure a death sentence against Fields.

44.     Also, at the death penalty hearing, prosecution witness Randy Langston admitted under oath that his identification testimony at trial was false and had been coerced by the Defendant O'Callaghan.  Eric Langston also testified at this hearing that Defendant O'Callaghan had told him who to select in the lineups and had promised to help his brother Randy in exchange for his false identifications.

45.     On August 22, 1986, a jury returned a verdict finding no mitigating factors sufficient to spare Fields' life, and Judge Maloney sentenced Fields to death.  As a direct result of the false testimony, failure to provide exculpatory evidence and other unconstitutional and illegal conduct, as further described herein, Fields was sentenced to death.

46.     During the time of Fields' arrest and first trial, the Cook County State's Attorney's Office, under the direction of Defendant Daley, along with Federal and State offices, commenced a crackdown of the El Rukn street gang in an effort to put an end to

the gang. The Cook County State's Attorney's Office adopted a policy to do whatever it took to make cases against members of the El Rukns, even if the cases were based on fabricated evidence. The Office policy further condoned the suppression of exculpatory evidence in order to obtain convictions based upon fabricated evidence. The lawless and illegal tactics used by Defendants to prosecute Nathson Fields were part of this policy and practice to use illegal and unconstitutional means to make cases against members of the El Rukns.

47.     There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant. The Office of the Cook County State's Attorney decided to seek the death penalty against Fields despite the fact that the case was based on false evidence.

48.     The actions of Defendant Daley in seeking capital murder charges against Fields based upon false evidence as well as in refusing and failing to investigate the actions of his own office or to call for an investigation of the Chicago Police Department regarding the suppression of exculpatory evidence facilitated Fields' conviction and sentence to death for a crime that he did not commit, his wrongful incarceration and his pain and suffering.

**D.  AFTER THE FIRST TRIAL**

49.     In or about early 1987, while Fields' direct appeal was pending in the Illinois courts, Defendants Wharrie, Brannigan, and others began to negotiate a deal with Earl Hawkins, a cold-blooded killer. Hawkins had been convicted with Fields for the murders of Smith and Hickman and was on death row at the Penitentiary at Menard,

18

Illinois. During these discussions, Hawkins indicated his willingness to testify against other El Rukns in exchange for his removal from death row. Defendant Wharrie and Hawkins began negotiations of a mutually beneficial plan. On or about April 1987, Hawkins was removed from death row and sent to the Metropolitan Correctional Center to begin cooperating with federal prosecutors.

50. On February 16, 1990, Fields' conviction and death sentence were upheld by the Illinois Supreme Court.

51. In 1991, Anthony Sumner admitted to Assistant United States Attorney William Hogan (and to others whose names are not known at this time) that he and Earl Hawkins had committed the murders of White and Vaughn, and that his story about Fields' involvement in that crime was wholly fabricated and was motivated by his personal animus towards Fields. Later, on January 3, 1992, Sumner repeated this admission about falsely implicating Fields in a signed statement to representatives of the Chicago Police Department and the State's Attorney's Office. Nevertheless, the Defendants and other individuals all ignored their obligation to come forward with this vital information despite the fact that Sumner's false testimony was central to the prosecution's case against Fields both at his trial and at his capital sentencing hearing. Despite Sumner's admission of perjury against Fields, Defendants continued to seek Fields' execution.

52. In April of 1993, Judge Maloney was convicted in federal district court of conspiracy, racketeering, extortion, and obstructing justice.

53.     On September 18, 1996, Judge Deborah M. Dooling of the Circuit Court of Cook County granted Fields' Petition for Post-Conviction Relief on the grounds that the trial judge, Thomas Maloney, acted as a corrupt jurist during Fields' trial, thereby depriving Fields of due process of law.

54.     After Fields was granted a new trial, the states attorney's office and the individual officers pursued interlocutory appeals to attempt to save the false conviction and death sentence.  These appeals postponed the retrial for several years.  During these appeals, the State's Attorney's Office conceded that the passage of time since the crime and other factors rendered the State's case against Fields "untriable."

55.     Beginning in or about 1998, ASA David Kelley and unknown others used coercive tactics to cause witnesses Randy Langston and Gerald Morris to repeat their false identifications from the first trial despite knowing that these witnesses had truthfully admitted that they lacked the ability to identify Fields and that their identification testimony from the first trial was false and had been coerced.

**E.  THE RETRIAL**

56.     After the Defendants failed in their efforts to overturn Judge Dooling's order, rather than admit their mistake, they pursued the retrial of Fields despite knowing that they had no credible evidence that Fields was responsible for the murders, that they had deliberately withheld exculpatory evidence and that they had fabricated evidence against Fields.

57.     In or about 1998, to improve their chances of winning another false conviction and with Sumners dead, the Office of the Cook County State's Attorney and Defendant

David Kelley, with the participation of Defendants Brannigan and Murphy and unknown others, cut a deal with Earl Hawkins to obtain his cooperation and testimony at Fields' retrial.  At this time, Hawkins was cooperating with the federal government and had admitted to personally committing more than ten murders.  Nevertheless, the States Attorney's Office agreed to dismiss the double murder charges against Hawkins, thereby assuring Hawkins that he would not have to return to death row and further agreed that Hawkins would not be prosecuted for the murders of Vaughn and White despite the fact that Hawkins had admitted committing these murders and Anthony Sumners had also implicated Hawkins in this crime.  In return, Hawkins agreed to give false testimony against Fields at the re-trial.  The States Attorney's office, the Unites States Attorney's office  and the individually named Defendants all knew that Hawkins would say anything to get off death row and that his testimony at the trial would be false.

58.    To facilitate their deal with Hawkins, the States Attorneys office, the individual Defendant police officers and unknown others, decided to change their position at Fields' retrial as to the identity of the two shooters.  At the original trial of Fields and Hawkins, the prosecution had taken the position that Earl Hawkins and Nathson Fields were the two masked men who had shot and killed Talman Hickman and Jerome Smith, and that George Carter drove the getaway car.  (Even introducing eyewitness testimony at that trial identifying Hawkins as one of the shooters.)  But at the re-trial, the States Attorney's Office elicited sworn testimony from Earl Hawkins that the two

masked killers were Nathson Fields and George Carter, knowing that the testimony from Hawkins was false.

59.     Fields was re-tried in the spring of 2009 for the murders despite his innocence. On April 8, 2009, Cook County Circuit Court Judge Vincent M. Gaughan found Fields not guilty of the shooting deaths of Hickman and Smith.  In acquitting Fields, Judge Gaughan made factual findings specifically rejecting the testimony of Hawkins, the State's purported occurrence witness, as improbable, highly suspect, and unworthy of belief.

60.     Subsequently, Fields was exonerated when he was granted a Certificate of Innocence in December 2009.

**F.     FAILURE TO PROVIDE FAIR TRIALS**

61.     All of the individual Defendants have willfully and wantonly engaged in a well-documented pattern of denying Fields his constitutional rights to a fair trial and depriving him of his liberty for almost 25 years, through individual and collective unlawful behavior, including but not limited to:  illegal and suggestive identification procedures, deliberate suppression of exculpatory evidence, witness coercion to produce false evidence, and subornation of perjury, all of which was coordinated to deny Fields his right to due process.

62.     Fields was not the only individual singled out for this pattern of illegal activity by Defendants; that pattern included a host of other people, inclusive of, but not limited

to numerous people who have been exonerated after spending years imprisoned for crimes which they did not commit.[1]

## G. POLICIES AND PRACTICES:  CHICAGO'S "STREET FILES"

63.     The unconstitutional withholding of exculpatory information from Fields' defense in this case, as well as the possible destruction of the same, was all undertaken pursuant to, and proximately caused by, policies and practices on the part of the Chicago Police Department and acquiesced to by the State's Attorney of Cook County.

64.     Police officers were required by the policy of the Chicago Police Department to record information gathered during investigations of violent crimes and to preserve and submit unofficial reports known as "street files" and/or "general progress reports" to their Unit Supervisor for inclusion into an investigative file case folder.

65.     Specifically, at all times relevant hereto, members of the Chicago Police Department, including but not limited to the individual defendant officers in this action, systematically suppressed Brady material by intentionally secreting discoverable

---

[1] See, e.g., People v. Darby Tillis & Perry Cobb, People v. Dennis Williams, People v. Kenneth Adams, People v. Willie Rainge, People v. Omar Aguirre, People v. Santo Duarte, People v. Aaron Patterson, People v. Leroy Orange, People v. Madison Hobley, People v. Stanley Howard, People v. Paul Terry, People v. Ronald Kitchen, People v. Marvin Reeves, People v. Dan Young, People v. Angel Rodriguez, People v. Harold Hill, People v. James Newsome, People vs. Michael Tillman, People v. Xavier Arcos, People v. David Bates, People v. Paula Gray, People v. Juan Johnson, People v. Walter Godinez, People v. Thaddeus Jimenez, People v. Alton Logan, People v. Anthony Porter, People v. Miguel Castillo, People v. Ronald Jones, People v. Dean Gage, People v. Robert Williams, People v. Larry Ollins, People v. John Willis, Jr., People v. Marcelia Bradford, People v. Omar Saunders, People v. Marlon Pendleton, People v. Corethian Dion Bell, People v. Derrick Flewellen, People v. Maurice Deloney, People v. Fred Ewing, People v. Gerald Earl, People v. Verneal Jimerson, People v. Eric Gibson, People v. Elton Houston, People v. Robert Brown, People v. Gabriel Solis, People v. Xavier Carton, People v. David Fauntleroy, People v. LaFonso Rollins, People v. Darreal Stokes, People v. Alfonzia Neal, and People v. Steven Manning.

information from so-called "street files." As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the State's Attorney's Office and from criminal defendants and many were subsequently destroyed. Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including but not limited to the named officers, concealed exculpatory evidence within street files which were never disclosed to Fields' criminal defense which would have shown his actual innocence. Upon information and belief, James Delaney, as Watch Commander for Area One Violent Crimes of the Chicago Police Department, approved of, condoned, ratified, acquiesced to and encouraged the withholding of "street files" and/or general progress reports relevant to the Fields investigation. This withholding of evidence—which would have exonerated Fields—was undertaken pursuant to the City's policy and practice in the manner described above.

66. The State's Attorney of Cook County was well aware of the street files utilized by the City of Chicago Police in its investigations but because of the policy and practice of Richard M. Daley to convict street gang members to get them off of the streets (regardless of guilt or innocence), the State's Attorney's Office not only looked the other way when the files were missing but actively participated in the misconduct by condoning the withholding of the exculpatory evidence of Fields actual innocence.

67. The policies and practices described in the foregoing paragraphs was consciously approved at the highest policy-making level for decisions involving the Chicago Police Department, and was a proximate cause of the injuries suffered here by Fields.

24

## H.  FURTHER POLICIES AND PRACTICES: MALICIOUS PROSECUTION

68.     In addition to the foregoing, Fields was also the victim of, and his injuries were proximately caused by, a policy and practice on the part of the City of Chicago to secure false convictions through profoundly flawed investigations.

69.     Specifically, throughout the 1970s and 1980s, and continuing thereafter, as part of the flawed investigations a group of Chicago Police officers including some or all of the individual officer Defendants named herein and other unknown officers, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

70.     In addition, the institutional desire to "solve" crimes more expediently regardless of guilt or innocence was utilized by the officers to enhance their personal standing in the Department and was known to the command personnel, who themselves participated in the practice.

71.     The above-described widespread practices, so well settled as to constitute *de facto* policy in the Chicago Police Department during the time period at issue, was able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem.

72.     The purported philosophy of Richard M. Daley was to "do whatever it takes" to get gang members off the streets of Cook County (regardless of guilt or innocence), facilitated the malicious prosecutions by the individual defendant police officers.

73.     The FBI and ATF shared this "whatever it takes" philosophy in targeting Chicago street gangs, especially the El Rukns during the 1980s which also facilitated the malicious prosecutions by the individual defendant police officers.

74.     The shared institutional desire to "solve" crimes regardless of guilt or innocence was also able to exist because of the known willingness of the Defendant Richard M. Daley and the State's Attorney's Office to prosecute the flawed cases despite the fact that it was clear that the police were engaging in misconduct including the fabrication of evidence and the withholding of exculpatory evidence.

75.     In addition to Fields, there are now dozens of other known victims of similar abuses, though there may well be many more.  At least thirteen criminal defendants victimized by this practice were, like Fields, wrongfully sentenced to death.

76.     The widespread practices described in the preceding paragraphs were allowed to take place because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.  The Police Department's system for investigating and disciplining police officers accused of the type of misconduct which befell Fields was, and is, for all practical purposes, nonexistent.

77.     Chicago police officers who manufactured criminal cases against individuals such as Fields had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the grievous misconduct at issue in this case.

## I.    FIELDS' DAMAGES

78.    On May 9, 2003, Fields posted bond and was released after spending 17 years and nearly 11 months of continuous wrongful imprisonment, 11 of those years on death row.  During his many years in prison, Fields was physically attacked and had chemical agents used upon him.  After release from prison Fields remained on bond for almost 6 years before the retrial would get underway.

79.    In January of 1996, Fields' mother suffered a massive heart attack and died. Fields requested to attend his mother's services, but his request was denied.

80.    While on death row, Fields endured the mental and emotional trauma associated with his pending execution.  Fields was further traumatized at least 11 times when other residents of death row were put to death.

81.    In serving almost eighteen years behind bars and six years awaiting trial to be exonerated, Fields was wrongfully deprived of his liberty for more than half of his adult life.  Fields was stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, including watching his daughter grow up.  As a result of his loss of liberty for almost twenty-five years, Fields lost his fundamental freedom to live one's life as an autonomous human being, and he must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for that task.

82.    This long-running ordeal has caused psychological pain, intense emotional distress, physical sickness, humiliation, embarrassment, depression, deprivation of the

enjoyment of life, sleep disruption, inability to concentrate, complete distrust and fear of the police, deprivation of employment opportunities and the accumulation of Social Security work credits, anxiety, and shame. He was compelled to endure many years of wrongful imprisonment including being subjected to degrading prison practices, such as being strip-searched at the whim of prison guards/officials. All of this has caused the need for professional mental and emotional counseling, which Fields cannot afford.

83.     Fields seeks redress for his injuries, including compensatory damages, as well as attorneys' fees and costs.


## COUNT I — 42 U.S.C. § 1983 — DUE PROCESS

84.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

85.     As described more fully above, each of the individually named Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Fields of his constitutional right to liberty and to a fair trial without due process of law.

86.     In the manner described more fully above, the named Defendants' and its employees and agents deprived Fields of his constitutional right to a fair trial by withholding and/or destroying exculpatory evidence, engaging in subornation of perjury, the coercion of witnesses to produce false evidence against Fields and other actions as described herein. These individuals also engaged in the unduly suggestive identification procedures, as described above.

87.     The above-described misconduct directly resulted in Fields being denied the right to a fair trial, being sentenced to death without due process of law, and having his liberty taken away for almost 25 years in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

88.     The deprivations most likely could not have occurred without the specific acquiescence of the Defendant Richard M. Daley and the Cook County State's Attorney's Office in furtherance of their policy of depriving gang members of their right to due process under the law regardless of guilt or innocence.

89.     As a result of this violation of his constitutional right to liberty and to a fair trial without due process of law, Fields suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

90.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Fields' constitutional rights.

91.     The misconduct described in this Count was also undertaken pursuant to the policy and practice of the Chicago Police Department and the Cook County State's Attorney's Office in the manner described more fully above.  In this way, the City of Chicago and Defendant Daley also violated Fields' rights through the actions of its agents by maintaining policies and practices that were a moving force driving the foregoing constitutional violations.

92.     As a result of these actions Fields' constitutional rights were violated, and he suffered injuries, including but not limited to the loss of liberty and the right to a fair trial, as is more fully alleged above.

## COUNT II — 42 U.S.C. § 1983 — FAILURE TO INTERVENE

93.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

94.     In the manner described above, during the constitutional violations described above, the individual Defendants stood by without intervening to prevent the misconduct, including but not limited to, the deliberate withholding of exculpatory evidence showing Fields actual innocence and the fabrication of evidence.

95.     As a result of the individual Defendants' failure to intervene to prevent the violation of Fields' constitutional rights, Fields suffered pain and injury, as well as emotional distress, as is more fully alleged above.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Fields' constitutional rights.

97.     The misconduct described in this Count was undertaken pursuant to the policies and practices of both the City of Chicago and the State's Attorney's Office in the manner described in preceding paragraphs.

## COUNT III — 42 U.S.C. § 1983 — CONSPIRACY TO
## DEPRIVE CONSTITUTIONAL RIGHTS

98.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

99.     After the murder at issue, the individual Defendants reached an agreement amongst themselves to frame Fields for the crime. The agreement reached by the

Defendants deprived Fields of his constitutional right to a fair trial and to liberty without due process of law. The parties also conspired to take the life of Fields by subjecting Fields to the death penalty based on fabricated evidence and without due process of law, as described in the various Paragraphs of this Complaint.

100.    Independently, before and after Fields' first conviction, each of the individually named Defendants further conspired, and continue to conspire, to deprive Fields of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

101.    In this manner, the individually named Defendants, acting in concert with other unknown co-conspirators, including persons who are not members of either the Chicago Police Department or the Cook County State's Attorney's Office, have conspired by concerted action to accomplish the deprivation of Fields' liberty and right to a fair trial by unlawful means.

102.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

103.    As a direct and proximate result of the illicit prior agreement referenced above, Fields' constitutional rights to liberty and a fair trial were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

104.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

31

105.    The misconduct described in this Count was also undertaken pursuant to the policies and practices of both the Chicago Police Department and the Cook County State's Attorney's Office in the manner described more fully in preceding paragraphs, and was tacitly ratified by policy-makers for both the City of Chicago and the County of Cook with final policymaking authority.

## COUNT IV — STATE LAW CLAIM — MALICIOUS PROSECUTION

106.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

107.    The individually named Defendant officers individually and/or jointly and in conspiracy caused Fields to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Fields' favor in a manner indicative of innocence.  Each of the individually named Defendant officers were instrumental in the initiation and/or perpetuation of the prosecution of Fields.

108.    The individually named Defendant officers accused Fields of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

109.    Statements of the individually named Defendant officers regarding Fields' alleged culpability were made with knowledge that said statements were false and

perjured. In so doing, the Defendants officers fabricated evidence and withheld exculpatory information.

110. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

111. As a result of this misconduct, Fields sustained, and continues to sustain, injuries including pain and suffering, as well as emotional distress, as is more fully alleged above.

## COUNT V — STATE LAW CLAIM — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

112. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

113. The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The individual Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Fields, as is more fully alleged above.

114. Said actions and conduct did directly and proximately cause severe emotional distress to Fields, and thereby constituted intentional infliction of emotional distress.

115. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

116. As a proximate result of Defendants' wrongful acts, Fields suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT VI — STATE LAW CLAIM — CIVIL CONSPIRACY

117.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

118.    As described more fully in the preceding paragraphs, the individual Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

119.    In furtherance of the conspiracy, the individual Defendants committed overt acts and were otherwise willful participants in joint activity.

120.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Fields.

121.    As a proximate result of Defendants' conspiracy, Fields suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT VII — STATE LAW CLAIM — RESPONDEAT SUPERIOR

122.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

123.    In committing the acts alleged in the preceding paragraphs, each of the Defendant officers were members of, and agents of, the Chicago Police Department—an agency of the City of Chicago—and all were acting at all relevant times within the scope of employment and under color of law.

124.    In committing the acts alleged in the preceding paragraphs, Defendant Daley, Defendant Wharrie, and Defendant Kelley were agents of the Cook County State's

Attorney's Office—an agency of the County of Cook—and were acting at all relevant times within the scope of their employment and under color of law.

125. The Defendant City of Chicago is liable as principal for all torts committed by its agents.

126. The Defendant County of Cook is liable as a necessary party for the torts committed by its agents.

## COUNT VIII — STATE LAW CLAIM — INDEMNIFICATION

127. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

128. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are individually liable within the scope of their employment activities.

129. The Defendant officers are or were employees of the Chicago Police Department (an agency of the City of Chicago), who acted within the scope of their employment in committing the misconduct described herein.

130. Richard M. Daley, Larry Wharrie, and David Kelley were employees of the County of Cook, who acted within the scope of their employment, when committing the misconduct described herein.

WHEREFORE, Plaintiff, Nathson E. Fields, respectfully requests that this Court enter judgment in his favor and against Defendants in the amount of $360,000,000 in compensatory damages, punitive damages against each and every individually named

Defendant, as allowable under the law, because these Defendants acted in a malicious, willful and/or wanton manner toward Fields. Plus costs and attorneys' fees against the Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, Nathson E. Fields, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ H. Candace Gorman

One of the Attorneys for Fields

For Fields:

Leonard Goodman
Molly Armour
Melissa Matuzak
53 W. Jackson Boulevard
Suite 1650
Chicago, Illinois 60604
312-986-1984

H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Illinois 60661
312-427-2313

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 10 CV 1168** |
| **CITY OF CHICAGO, et. al** | ) | |
| **Defendants,** | ) | **Hon. Matthew F. Kennelly** |

**NOTICE OF FILING AND CERTIFICATE OF SERVICE**

To:     ALL COUNSEL OF RECORD

        PLEASE TAKE NOTICE that on the 27st day of October, 2010, I filed with the Court's electronic filing system a copy of Plaintiff's Third Amended Complaint to be served upon you.

*/s/ H. Candace Gorman*
Counsel for Plaintiff

H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Il. 60661
312-427-2313