UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| NATHSON E. FIELDS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 10 CV 1168 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| CITY OF CHICAGO et al., | ) | |
| Defendants. | ) | |

### RENEWED MOTION FOR SANCTIONS AND TO TAKE THE DEPOSITIONS OF INDIVIDUALS IN "LEGAL AFFAIRS," DEPOSITIONS OF OTHER INDIVIDUALS IN LEGAL AFFAIRS NOT PREVIOUSLY SOUGHT, AND FOR OTHER RELIEF

NOW COMES Plaintiff Nathson Fields, by and through his attorneys, and hereby again moves this Court to allow the Plaintiff to take the depositions of certain individuals in the City's department of "legal affairs." In addition, Plaintiff asks this Court to allow him to take additional depositions of certain lawyers within that department, regarding a policy that has only now been discovered. Plaintiff also asks that this Court enter an Order preserving the files in the file cabinets located in the boiler room at 51st and Wentworth until such time as counsel for Plaintiff can do a complete review of the files to determine whether there are other materials present in said cabinets related to the Plaintiff's case -- including but not limited to any documents related to Plaintiff's theory that he was a victim of a conspiracy by members of the Chicago Police Department and El Rukn Task Force to pin cold case murders on members of the

El Rukns organization. Finally, Plaintiff asks this Court to use its inherent authority to order a full inventory of all of the open files located in the basement of 51st and Wentworth, at the City's expense. In support of his motion, Mr. Fields states the following:

**BACKGROUND**

On February 12, 2013 Mr. Fields filed a new motion for sanctions based on the City's continued stonewalling with regard to the whereabouts of the long-missing street file after the City *finally* produced on February 9, 2013, a set of emails between the department of legal affairs and others within the C.P.D. in 2010 (communications regarding the tendering of the long missing street file). Plaintiff sought several forms of relief in that filing, including depositions of individuals in the legal affairs department based on the newly tendered documents. This Court held that Plaintiff could not take the depositions of the individuals in the legal affairs department because such personnel were merely intermediaries in the process by which the street file was retrieved and ultimately produced to Plaintiff, and, as such, they would probably not have much to offer regarding the whereabouts of the file itself. This Court reserved ruling on the underlying Motion for Sanctions.

The City, through its attorneys, has long maintained that the missing file inexplicably turned up in April, 2010 and that no one at the City knew where that file had been located during the 28 years that it was missing – (much like the

investigative file in the *Vanecko* case which recently mysteriously reappeared after several years.[1] )

Plaintiff has taken more than 20 depositions in his attempt to piece together the location of the missing file over the years. Meanwhile, documents have trickled in from the City in dribs and drabs, providing bits and pieces of information that only started to form a coherent picture on March 26, 2013, when Plaintiff's attorneys deposed Sgt. Fred Melean -- the Administrative Sgt. for the Record Inquiry Section, the office in charge of responding to subpoenas for the C.P.D. during the period between 2005 and 2010. As further shown below, Sgt. Melean's startling testimony revealed that the Police Department has a policy under which investigative files deemed "open" (as opposed to cleared and closed, for example) are not considered subject to subpoenas; C.P.D. has never provided notice that it was withholding information pursuant to that policy. As described below, Melean testified that when subpoena processors encounter a subpoena for documents relating to an "open" investigation, their practice is to contact legal affairs for further instruction pursuant to the C.P.D. policy that open files are not subject to a subpoena – and that it is the attorneys in the legal affairs department who determine whether any, components of an open file should be tendered and if so which pages. This admission by Sgt. Melean moves the department of legal affairs to the top of the chain regarding the whereabouts

---

[1] http://www.suntimes.com/news/watchdogs/18849909-452/lost-files-in-daley-nephew-case-removed-then-mysteriously-returned.html

3

of Mr. Field's file from the time of his arrest in 1985 to the tendering of that file in 2011. The C.P.D.'s inexplicable use of an investigative file's status as a mechanism by which to shield the contents of a file from a subpoena, without notice, sheds new light on the mysterious disappearance and reappearance of the investigative file in Mr. Fields' case, and gives rise to a disturbing but strong theory as to why the street file was withheld from Mr. Fields for so many years.

Based on this new information regarding this policy, it becomes clear that the office of legal affairs is not a dispassionate intermediary in the process by which documents are produced pursuant to subpoenas; indeed, under the regime described by Sgt. Melean, legal affairs personnel are involved in making critical calls regarding whether documents will be tendered pursuant to subpoena or shielded by their "open" status – a C.P.D. policy that until now was a closely guarded secret. Plaintiff therefore respectfully asks this Court to allow Plaintiff to take those depositions previously sought, and to take still more depositions of individuals in policy-making positions within the office of legal affairs pursuant to Plaintiff's *Monell* claim. Given Melean's admission regarding the role played by legal affairs personnel, Plaintiff believes these depositions would fall squarely within the scope of proper discovery as defined by the federal rules, which allow a party to obtain discovery regarding: "any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who

know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). The key question is whether the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Redwood v. Dobson*, 476 F.3d 462, 469 (7th Cir. 2007). Plaintiff submits for the reasons herein that the requested depositions are reasonably calculated to lead to the discovery of admissible evidence.

In addition, Plaintiff seeks a Court Order barring the City of Chicago from removing any file from the boiler room at 51st and Wentworth until such time as counsel can conduct a more expansive look into the files being held at that location -- in furtherance of Plaintiff's theory that C.P.D. members of the El Rukn Task Force engaged in a conspiracy to pin cold case files on members of that organization and in the interest of justice. As further shown below, the initial inspection by Plaintiff's counsel confirms the theory, and the fact that there are fifteen file cabinets containing "open" files that were apparently never tendered in discovery because of the status of being "open" confirms the likelihood that individuals are languishing in prison who never received the underlying investigatory files in their trials.

I.  ARGUMENT

   A.  The C.P.D.'s Disregard for Subpoenas for "Open" Files

On December 14, 2012 the City of Chicago, for the first time, tendered certain documents related to the recovery of the "missing" street file in this case (on February 9, 2013 the City provided even more "recently found" documents related to the recovery of the file which led to the motion filed by Plaintiff on

February 12, 2013). Two of the documents tendered to Plaintiff indicated that at the time attorneys for the City (from the Dykema firm) were asking for the file related to the Fields litigation (shortly after the lawsuit was filed), the file in question was considered "open." (Ex. A) This was the first time counsel was made aware that the long-missing file in this case was considered an "open" file. On December 20, 2012, counsel for the City and counsel for Mr. Fields held a conference call to discuss those newly produced documents. Although counsel for Fields did not understand the importance of that "open" designation until the deposition of Sgt. Melean on March 26, 2013, counsel inquired about that designation during the December 20 conference call and counsel for the Plaintiff attempted to determine what effect (if any) the designation of a file as "open" would have on how such a file would be handled.

During that December 20, 2012 conversation between counsel, attorney Noland stated that the document stamped City NF 009084 a memo from Kathleen Loughran (administrator to the chief of detectives) to paralegal Mary Beth Majka (in legal affairs) *probably* indicated that the file was still considered open because Henry Andrews remained at large until indicted in the federal El Rukn case in 1989—*and that the log was never corrected.* (Ex. B, p. 2 -- letter mistakenly identified the memo as stamped 009087). In addition, attorney Noland also stated that there was no computer database that Detective Loughran reviewed to determine whether the case was and remained "open." Finally, attorney Noland stated that the "log" which indicated that the case was still open

(the document that Noland believed Kathleen Loughran had reviewed) was probably still available. Fields' counsel asked for a copy of the document and attorney Noland stated that he would look for the document. Counsel sent several letters to Mr. Noland seeking the document but to date it was never tendered. Importantly, attorneys for the City never alerted Plaintiff to the City's policy to disregard subpoenas for "open" files. Counsel does not know whether the document n question would have alerted Plaintiff to the City's policy that "open" files were not subject to subpoena -- but the fact that the City continues to refuse to provide the document suggests that it might have been illuminating on this point.

On March 26, 2013, attorney Gorman took the deposition of Sgt. Melean, regarding a subpoena that he responded to in 2006 (a subpoena from Fields' criminal attorneys at the time). The following exchange regarding subpoenas received by the C.P.D. for files the department considered "open" occurred in the course of the deposition:

19

```
16   Q     If this file showed up as open, what
17   would the process be?
18      A     The process would be to contact Legal
19   Affairs.
20      Q     So if the file was still an open file
21   even though it was an old case, the process for the
22   subpoena processors would be to contact Legal
23   Affairs?
24      A     Correct.
```

20

1    Q    Why is that?
2    A    To see what can and cannot go out.
3    Q    Explain that to me.
4    A    To see what documents can be released.
5    Q    Why is that?  If this is a subpoena,
6  is there an issue that some documents cannot go out
7  in response to a subpoena if it's an open file?
8    A    Open investigations aren't subject to
9  a subpoena.
10    Q    Open investigations are not?
11    A    They're still being worked on, so it
12  wouldn't be a complete file.
13    Q    So if the subpoena came to your
14  offices --
15    A    Um-hum.
16    Q    -- and someone looked in the database
17  and learned that the file was open, they would
18  contact Legal Affairs?
19    A    Correct.
20    Q    And who in Legal Affairs would be the
21  contact person when you were there?
22    A    They have many attorneys up there, so
23  I have no idea who, in fact, they contacted at that
24  time.

21

1    Q    It would be a request to an attorney,
2  though?
3    A    Correct.
4    Q    Would that be something that they
5  would do in writing, or is that something that would
6  be handled over the telephone?
7    A    Different individuals, I don't know if
8  they would e-mail or they would do it on the phone.
9    Q    Were there any procedures set up when
10  you were working there, when you were supervising
11  this area, as to what they should do even if you
12  don't know exactly what they did do?
13    A    No, there was no set procedure.
14    Q    Did you do any review in preparing for
15  today to see if anyone did, in fact, contact Legal
16  Affairs regarding this subpoena?
17    A    No, I did not.

In this portion of Sgt. Melean's testimony, he was speaking authoritatively about a matter thoroughly within his bailiwick; Melean was in charge of the CPD office that oversaw the response to subpoenas for five years – a period during which a subpoena for street files and other investigative materials was served upon the City by Plaintiff's criminal attorneys. From Melean's testimony, it is now clear why Plaintiff's file was withheld all of these years – the City had a secret policy of withholding files for cases it considered "open." As the City never informed Mr. Fields, or others, of this policy of ignoring subpoenas -- it was impossible for Mr. Fields (and countless other criminal defendants) to challenge this unconstitutional practice. The City was successful in keeping this "policy" a secret in this litigation for almost eighteen months, while Plaintiff's counsel sought unsuccessfully to obtain concrete information regarding the whereabouts of this file over the twenty-eight years that Mr. Fields and his criminal attorneys sought a complete record of the Hickman and Smith murder investigation. This newly discovered policy now takes center stage in both Plaintiff's *Monell* claim, and conspiracy claims, and, with a discovery cutoff looming, Plaintiff asks this Court to be allowed to take depositions regarding individuals with knowledge of the full extent and duration of the policy as soon as possible.

### B. The File Cabinets Filled with Missing Files

With the cat out of the bag regarding the "open" file policy Plaintiff believes it is necessary that this Court enter an order forbidding the C.P.D. from moving or discarding any file currently located in the boiler room. The policy reveals a C.P.D. that believes itself to be above the law. In the inspection that counsel conducted on February 28, 2013, Plaintiff's counsel viewed 19 file cabinets that contain "open" files. In addition, counsel discovered evidence that confirms the documents received from the DOJ pursuant to subpoena- that C.P.D. members of the El Rukn Task Force were reviewing open files to pin those murders on el Rukn members.

For example, in one particular "open" file -- detective notes appear to show that the C.P.D. intended on pinning a different murder on Mr. Fields -- until they realized he was in prison at the time of the incident, and could not be effectively prosecuted. Notes reviewed from the initial investigation into that particular "open" file showed no indication that anyone related to the El Rukn organization was involved in the murder-nevertheless Mr. Fields. The detectives appeared undeterred by their failure to pin the murder on Mr. Fields, and ultimately other El Rukns were charged with that murder.

In yet another file -- a file that Plaintiff's counsel was very familiar with because of her investigation into a cooperating witness for the government in Mr. Fields' case who also testified in that case, it appears that important exculpatory information was never turned over to the criminal defendants who were

ultimately charged in those particular offenses -- several El Rukn defendants were sentenced to lengthy prison terms as a consequence of that particular case. Plaintiff's counsel believe those men were, like the Plaintiff, innocent of those crimes. These are but two examples, both of which bear directly on Plaintiff and his case, and Plaintiff's counsel has not completed their investigation of the files.

Given these concerns, Plaintiff believes it is imperative that the City not be allowed to meddle or rearrange any files or cabinets in the basement of Area Central – and that this Court shoulder enter an order to that effect. In analyzing whether such an order is appropriate, this Court may consider 1) whether Defendants will likely destroy necessary documentation without a preservation order; 2) whether Plaintiff will suffer irreparable harm if a preservation order is not entered; and 3) the burden imposed upon the parties by granting a preservation order. *See, In re African-American Slave Descendants' Litigation*, 2003 WL 24085346, *2 (N.D. Ill. July 15, 2003). In the case at hand, the City has demonstrated a clear pattern of re-locating, relabeling, and conveniently losing track of key documents; thus, in the absence of an order, Plaintiff can reasonably fear that the contents of the files in the basement of Area Central will be compromised or scattered. Plaintiff would suffer irreparable harm not only because it shows the C.P.D. targeting him but also because the contents of the above-mentioned cabinets reveal a clear pattern of deliberate obfuscation and contempt for duly issued subpoenas on the part of City -- both of which bolster Plaintiff's *Monell* and conspiracy claims. Finally, the burden imposed on the City

11

will not be great, as Plaintiff is merely asking that the status quo be preserved regarding a set of file cabinets in a C.P.D. basement -- no additional interventions or disruptions in City operations or protocols is required.

Assuming that the City has been true to its policy of hiding these materials by designating these files as "open," Plaintiff will need to utilize the documents reviewed by Plaintiff's attorneys in his own case in order to demonstrate the extent of the C.D.P.'s unconstitutional practices. Moreover, even if these crumbling files are not made publicly available --  an inventory of the victim names and file numbers should be made available to the public because individuals languishing in our prison system are not going to have the wherewithal or ability to know if the case they were charged in was considered "open" by the C.P.D..

Counsel believes that under this Court's inherent authority the information contained in these secretive systems of cabinets should be inventoried and made publicly available. A subpoena is a writ whose authority is derived from the court itself. Therefore, a policy of secretly (but systematically) disregarding subpoenas -- and effectively hiding documents sought by properly issued and served subpoenas represents a pattern of contempt which no court should tolerate.  Historically, American jurisprudence has recognized that courts enjoy a range of inherent powers which are not articulated specifically in any statutory or constitutional provision. The exercise of these powers is appropriate in a variety of contexts, chief among them is the power to craft appropriate

sanctions for contumacious behavior. As the Supreme Court stated in *U.S. v. Hudson*, "certain implied powers must necessarily result to our Courts of justice from the nature of their institution. . . . To fine for contempt— imprison for contumacy—[enforce] the observance of order, &c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." 11 U.S. 32, 34 (1812).

The contours of such inherent power are not narrowly defined. Above all, inherent powers cases reflect justice's "suppleness of adaptation to varying conditions." *Landis v. N. Am. Co.,* 299 U.S. 248, 256 (1936). The conditions in the facts at hand involve a local law enforcement agency imposing a policy of secrecy and opacity in total defiance of the judicial system's ancient and established mechanism for disclosure: the subpoena. Therefore, a supple and commensurate response by this Court to such bad behavior would be the approval of a thorough inspection of the documents and files in question -- and a public airing of sufficient information from those files so that defendants would know if their particular case was involved in this unconstitutional conduct. Plaintiff can conceive of no other method by which the wrongs inherent in the C.P.D.'s policy of withholding "open" files can be righted.

WHEREFORE, Plaintiff respectfully requests this Court grant his renewed motion for sanctions and to order the relief requested herein and any other relief this Court deems appropriate.

Dated: April 5, 2013

>Respectfully Submitted,
>
> /s/H. Candace Gorman
> One of the Attorneys for Fields

For Fields:

| | |
|---|---|
| Leonard C. Goodman | H. Candace Gorman |
| Melissa Matuzak | 220 S. Halsted |
| 53 W. Jackson Boulevard | Suite 200 |
| Suite 1650 | Chicago Illinois 60661 |
| Chicago, Illinois 60604 | 312-427-2313 |
| 312-986-1984 | |

**CERTIFICATE OF SERVICE**

I, H. Candace Gorman, hereby certify that the foregoing Motion was served to the parties electronically by means of the Court's CM/ECF system.


Dated: April 5, 2013

                                        Respectfully Submitted,

                                        /s/H. Candace Gorman
                                        One of the Attorneys for Fields


For Fields:

| | |
|---|---|
| Leonard C. Goodman | H. Candace Gorman |
| Melissa Matuzak | 220 S. Halsted |
| 53 W. Jackson Boulevard | Suite 200 |
| Suite 1650 | Chicago Illinois 60661 |
| Chicago, Illinois 60604 | 312-427-2313 |
| 312-986-1984 | |