1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
     EASTERN DIVISION

3

4    NATHSON E. FIELDS,                    )
                                           )   Docket No. 10 1168
5              Plaintiff,                   )
                                           )
6              vs.                          )
                                           )   Chicago, Illinois
7    CITY OF CHICAGO, et al.,               )   February 20, 2013
                                           )   9:30 a.m.
8              Defendants.                  )

9                   TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12

13   For the Plaintiff:    LAW OFFICE OF H. CANDACE GORMAN
                           BY:  MS. H. CANDACE GORMAN
14                         220 South Halsted Street
                           Suite 200
15                         Chicago, Illinois  60661

16                         LEN GOODMAN LAW OFFICE LLC
                           BY:  MS. MELISSA ANN MATUZAK
17                         53 West Jackson Boulevard
                           Suite 1650
18                         Chicago, Illinois  60604

19   For the Defendants:   DYKEMA GOSSETT PLLC
                           BY:  MR. TERRENCE M. BURNS
20                              MR. DANIEL MATTHEW NOLAND
                                MR. PAUL A. MICHALIK
21                         10 South Wacker Drive
                           Suite 2300
22                         Chicago, Illinois  60606

23

24                 Valarie M. Ramsey, CSR, RMR
                   P.O. Box 16
25                 Hazel Crest, Illinois 60429
                   (708) 860-8482

 1          THE CLERK:  10 C 1168, Fields versus City.

 2          MS. GORMAN:  Good morning, your Honor.  Candace

 3   Gorman for the plaintiff.

 4          MS. MATUZAK:  Melissa Matuzak, M-a-t-u-z-a-k, for the

 5   plaintiff.

 6          MR. BURNS:  Good morning, your Honor.  Terrence Burns

 7   appearing on behalf of the City of Chicago.

 8          MR. NOLAND:  Good morning, Judge.  Dan Noland for the

 9   City defendants.

10          MR. MICHALIK:  And Paul Michalik, M-i-c-h-a-l-i-k,

11   for the City defendants.

12          THE COURT:  Okay.  So I've reviewed the motion for

13   sanctions.  There was a response filed yesterday.  I've looked

14   at that.

15          So I guess what I want to do first is I want to give

16   Ms. Gorman a chance to say anything you want to tell me about

17   the response, and then I want to have a discussion.

18          MS. GORMAN:  Your Honor, I read the response last

19   night too, and I'll just say it just looked like they were

20   trying to throw everything in except the kitchen sink and see

21   what sticks.

22          I would say one thing that caught my eye, a couple of

23   things caught my eye is that -- their contention that I had

24   agreed to their response to the interrogatories back in April

25   of 2012, and I would only say that that was at the point when

1    we were talking about a stipulation.  They said they didn't

2    know, you know, what was -- what had happened and let's work

3    out a stipulation.  As the court will recall, in August we

4    went outside this courtroom door to see, after I filed a

5    motion to refile the rule to show cause, we went outside.  We

6    worked out the stipulation.  And then when I sent them the

7    thing we worked out outside the courtroom, they added three

8    more paragraphs and things I wouldn't accept.

9            So I've been trying to get these answers for a year

10   now, over a year.

11           THE COURT:  You said a couple of things caught your

12   eye.  That was one.  Is there another one?

13           MS. GORMAN:  Well, they didn't ever address why they

14   have never -- never looked for these emails and never looked

15   for --

16           THE COURT:  I'm going to ask about that in a minute,

17   so I understand that.

18           Let me just sort of -- I want to back up about 20

19   steps here.  So the documents that turned up that the

20   plaintiff contends he didn't have before and his lawyers

21   didn't have before, what are they?  Can you give me sort of a

22   nutshell, nice little small nutshell description of what they

23   are?

24           MS. GORMAN:  The ones that just came now?

25           THE COURT:  No, no.  I'm talking about the 92

1    document pages or the 90 pages or whatever it is, the street
2    file, in other words.
3                MS. GORMAN:  Okay.
4                THE COURT:  So what's in there?
5                MS. GORMAN:  There's handwritten notes from the
6    investigators talking -- interviewing people.  There are some
7    typed notes that were never turned over interviewing people
8    who were witnesses.
9                One in particular that -- and I'll just give you a
10   couple of examples, because there were a lot of tips.
11               THE COURT:  Understood.
12               MS. GORMAN:  One of the tips was from a person named
13   James Langston, who said he was in the ballpark playing ball
14   when this murder happened.  He couldn't identify the shooters,
15   but in this typewritten note that was never tendered he
16   identified one of the individuals in the car, the getaway car,
17   and the individual was someone who had been -- who was the
18   brother of someone who had been murdered by the Goon Squad, a
19   member of the Disciples, and there was this rivalry going back
20   and forth between the Goon Squad and this other gang.
21               THE COURT:  In other words, somebody that you might
22   have a -- might potentially lead you to a suspect, in other
23   words.
24               MS. GORMAN:  Correct.
25               And it also blows away their theory that this was an

1   El Rukn hit.  This person was not an El Rukn.

2   THE COURT:  All right.  So that gives me a little bit

3   of a flavor.

4   And the plaintiff's contention is that this material,

5   or at least some of it, was not produced in discovery in the

6   criminal case.

7   MS. GORMAN:  Correct.

8   THE COURT:  When it was on trial either the first

9   time or the second time.

10  MS. GORMAN:  Correct, your Honor.

11  THE COURT:  And I know one of the -- Jack Smeeton was

12  the lawyer in one of the trials.  I don't remember if that's

13  the first or the second.

14  MS. GORMAN:  It's the first.

15  THE COURT:  First.  Who was the lawyer in the second

16  trial, primary lawyer?

17  MS. GORMAN:  Jean Snyder.

18  THE COURT:  And do both of them -- they haven't been

19  deposed yet, I take it, I'm sort of inferring from what I've

20  read?

21  MR. NOLAND:  We deposed Mr. Smeeton, who --

22  THE COURT:  What did he say about whether he had this

23  stuff or not?

24  MR. NOLAND:  He did not recall.  His file --

25  THE COURT:  He didn't recall one way or the other, or

1  he didn't recall having it?

2         MR. NOLAND:  He didn't recall one way or the other.

3  His file was destroyed or lost.

4         THE COURT:  Have the prosecutors -- have the

5  prosecutors -- and I know we have this whole issue with

6  Mr. Garcia or that Mr. Garcia keeps raising about depositions,

7  which I've dealt with, but have the prosecutors said whether

8  they ever saw the stuff?

9         MS. GORMAN:  Your Honor, I didn't --

10        MR. NOLAND:  They responded to plaintiff's request to

11 admit stating or admitting that they had not seen this

12 material before.

13        THE COURT:  Okay.  All right.  That's about as good

14 as --

15        MR. NOLAND:  If I could correct that.  Not this file.

16 They responded that they had received aspects of things in the

17 file.  There are documents in the file that they did receive.

18 But the file as a whole.

19        THE COURT:  Well, for example, the thing that

20 Ms. Gorman just referred to.

21        MR. NOLAND:  That would not be included in something

22 that they said they saw.

23        MS. GORMAN:  Can I address that?

24        THE COURT:  Hang on a second.

25        MR. NOLAND:  They did not see it.

1          THE COURT:  Okay.  Thank you.  That was much easier.

2          What did you want to say?

3          MS. GORMAN:  Well, when the state's attorney

4    responded to my request to admit, they listed seven documents

5    that they said they had seen before, two wrap sheets, two

6    something else, and I just sent a letter to Mr. Garcia

7    yesterday because the documents that are in their file that

8    they claim that they had before are different than the ones

9    that were in the street file, noticeably different on their

10   face.  So I think eventually --

11          THE COURT:  So it may end up being zero as opposed to

12   seven or whatever it is.

13          MS. GORMAN:  Correct.

14          THE COURT:  Just as an aside, what's the status of --

15   I know today isn't a status date, but we have a status date

16   next week, so just -- I'm going to be asking you at the status

17   date next week, I won't do it without Mr. Garcia here, is

18   what's the status of the depositions of the two --

19          MS. GORMAN:  They have still not responded to the

20   discovery.  And I was going to bring that up if he was here

21   today.

22          THE COURT:  Well, so here's what you do.  You get a

23   motion to compel on file for next week for the date -- for the

24   date of the status.  Okay.

25          There's references in -- it may be in both sides'

1    papers, I read it more recently in the response to something,

2    called the Area file.  Is that what Ms. Gorman is referring to

3    as the street file, or is that something else?  What's the

4    lingo?

5            MR. NOLAND:  Well, I think -- there's three files.  I

6    have them all here with me, a copy.

7            THE COURT:  There's the permanent retention file.

8            MR. NOLAND:  Yes.

9            THE COURT:  Which doesn't include the materials that

10   Ms. Gorman is referring to, the 90 pages, right?

11           MR. NOLAND:  Correct.

12           THE COURT:  Okay.  Then there's the Area file.  Is

13   there something else between those two?

14           MR. NOLAND:  Well, theoretically there'd be one Area

15   file.  Here, the first file, the files that Miss Gorman is

16   referring to, came from the Area when we got them in

17   June 2010.  What I think --

18           THE COURT:  Came from the Area, capital A.

19           MR. NOLAND:  Area 1, yes.

20           I think that what your Honor is referring to is what

21   we were talking about in our response in March of 2012 when I

22   went down to the warehouse at 39th and Michigan and I met

23   with -- there's two warehouse guys.  Man's name is Mike

24   Callender.  In my presence Mr. Callender pulled off a box, and

25   this file, which would be known as an Area file, was also

1  found.

2          THE COURT:  But you say there's two Area files.

3  What's the other one?

4          MR. NOLAND:  So what traditionally you would think of

5  the documents or that I would think of the documents that

6  Miss Gorman is talking about would be part of the Area file.

7          THE COURT:  But they weren't the part of the, what

8  I'll call the standard Area file in this case.  They were in

9  this other thing that you found in March of 2012.

10          MR. NOLAND:  I think it would be the opposite.

11          THE COURT:  Oh.  My mistake.

12          MR. NOLAND:  Right.  I don't mean to read your mind

13  at all, but I think what you're saying is the standard Area

14  file would be the one that was found with me in 2012.

15          THE COURT:  No, no, no, no.  No.  That's not the

16  case, though, right?  The standard Area file is not what you

17  found in March 2012.  You found something else.

18          MR. NOLAND:  No.  I found the standard Area file in

19  March 2012.

20          THE COURT:  And it contained the -- well, 90 pages,

21  I'm going to use the phrase the 90 pages to refer to what

22  Ms. Gorman is referring to as the street file, and maybe 92

23  pages but whatever.  That was found in March 2012 and that was

24  part?  No?

25          MR. NOLAND:  No.  That was found -- that's what this

1    litigation -- that's what we've been discussing over the

2    past -- you know, what this -- her interrogatories is about.

3            THE COURT:  You know what, it seems like we've been

4    discussing it for about 40 years, and so that's why I'm trying

5    to -- seriously.  That's why I'm trying to get -- when did the

6    90 pages first show up?

7            MR. NOLAND:  June 24th, 2010.

8            THE COURT:  Okay.  All right.  So that's this right

9    here.  And so it's Paragraph 6 of your response where it says

10   that Majka, M-a-j-k-a, emailed the subject file to Dykema.

11   That's your law firm.  The cover sheet on the file states

12   documents from Area and gives a number.  Majka's email of the

13   document says I've attached documents I received from the

14   detective division which I believe came from the Area.  And so

15   that's where the 90 pages were?

16           MR. NOLAND:  Yes.

17           THE COURT:  Now, so what you were talking about that

18   you found in March 2012 when you went out to the warehouse

19   contained -- did it contain those 90 pages or not?

20           MR. NOLAND:  No.

21           THE COURT:  It did not.

22           MR. NOLAND:  For the most part, no.

23           THE COURT:  And so the stuff that it contained, this

24   is Paragraph 9 of your response, is essentially stuff that

25   you, at least as far as you can tell, was produced in the

1    criminal case, the March 2012, as far as you can tell?

2          MR. NOLAND:  I can't say -- I can't say page per

3    page.  Miss Gorman has sent a letter I don't think

4    acknowledging that the entire thing was produced but

5    acknowledging some of it was produced.

6          THE COURT:  Well, you said most so -- your filing

7    says most of which were indisputably produced in the criminal

8    case.

9          MS. GORMAN:  I'm --

10         THE COURT:  I'm not asking you a question right now.

11         MS. GORMAN:  I'm sorry.

12         MR. NOLAND:  That's what I believe.  That's what we

13    believe.

14         In particular it's got -- Mr. Fields made the

15    allegation that there were -- what he received in 1985-'86

16    during the first criminal trial was eight pages of GPR's,

17    general progress reports that Mr. Smeeton made a statement on

18    the record about that, hey, Judge, I asked for this file, what

19    I got was eight pages of GPR's plus some memos and notes or

20    something like is what he said.  Those eight pages of GPR's

21    from the date of the murders were in this file.

22         THE COURT:  That you found in March 2012.

23         MR. NOLAND:  Yes, your Honor.

24         THE COURT:  But they were not in the 90 pages.

25         MR. NOLAND:  Yes, your Honor.

1    THE COURT:  Okay.  All right.

2    Okay.  So can you give me some sort of an explanation

3  of why it's just now that this email correspondence is being

4  turned over after we've had all of this wrangling and

5  screaming and yelling and disputation and repeated motions and

6  repeated orders where it's extremely clear that what the

7  plaintiff is trying to get at and what I've ruled on at least

8  a half a dozen occasions she's entitled to do is get to the

9  bottom of where the 90 pages have been for 20 years or

10  18 years or whatever, why it is that just now these emails are

11  getting produced, you know, a week ago, a week and a half ago?

12    MR. NOLAND:  Judge, they were produced really in the

13  letter and spirit of what the court said in October.

14    THE COURT:  Yeah, but, I mean, can you just sort of

15  imagine standing there how much of what we have been going

16  through for the past God knows how many months could have been

17  avoided, and it wouldn't have avoided the whole dispute, but

18  how much of it would have been avoided if Ms. Gorman had had

19  all that stuff back then?  Can you just imagine that?  Because

20  I can.

21    I mean, I get -- and, you know, this case is more

22  contentious than most.  Okay.  I understand that.  But I've

23  never had this many motions, this many discovery motions

24  seeking sanctions in a case.  Okay.  And you could say, well,

25  that's just because Ms. Gorman is a contentious person, and I

1   may even sort of agree with that.  All right.  But it doesn't
2   mean that there's nothing there.

3          And, I mean, I could go back and figure out when it
4   was that we first started talking about this, but it's been a
5   long time ago.  I mean, it's been a year ago, right, since we
6   started talking about -- I mean, it was almost a year ago when
7   Ms. Gorman first came in in March of 2012 asking for a further
8   response to interrogatories 4 and 5, which is the whole chain
9   of custody thing.

10          I mean, why are we just now seeing these emails, I
11  mean, when we had all of this stuff about, you know, people
12  can't tell who they talked to and it's work product and it's
13  attorney-client, blah, blah, blah?  And, I mean, I've got
14  emails here going back to 2010.  Why are you just now turning
15  those over?  I mean, it doesn't make any sense to me.

16          MR. NOLAND:  Really the scope of the investigation
17  changed.  When she filed the motion, we had the initial
18  discussions.  She was asking for the chain of custody from '84
19  to the present, or '84 to the filing of the lawsuit.  And the
20  focus really on the time from our thought process is the --
21  under Brady versus Maryland whether it was produced during the
22  criminal process.  When she files the motion and then we
23  appear before this court on April 10th, we had worked it out,
24  and the answer was -- and we weren't talking about the stip --
25  April 10th, 2012, your Honor, I said to the court and to the

1   plaintiff's counsel we worked it out, what we believe the

2   answer is going to be is that the City cannot determine the

3   chain of custody of the file all these years.  And you asked

4   Ms. Gorman are you okay with that or do you have a problem

5   with that, and she essentially said no and she just wanted us

6   to actually respond that way in 14 days.  We did that.  So

7   that was the end of the story, that we had done the

8   investigation as outlined, or most of it, in the answer.

9          And then the motion was filed with respect to

10  Sergeant Flores's deposition, and that's when we got into the

11  stipulation discussion.  And the stipulation was the same

12  thing:  We cannot determine the chain of custody.

13         And then ultimately we were very close.  Those

14  discussions did not -- you know, we almost got it.  We were

15  one sentence apart.  Your Honor ruled, and then your Honor

16  ruled again, and in both of those, including on November 14th

17  when your Honor said to us, and it's on Page 15, and we took

18  it very seriously, have a discussion, meet and confer, go

19  through with the plaintiff what's been done, et cetera, and it

20  changed from what the answer was, what the chain of custody

21  was, to what has been done.

22         THE COURT:  Yeah, but the change happened before

23  that.  I mean, and I'm going to ask Ms. Gorman some questions

24  about that in a second, but it became pretty clear before that

25  because it was the subject of the sanctions ruling, you know,

1    that Ms. Gorman was trying to figure out where this stuff had

2    been.  And I'm going to ask her in a second to explain to me

3    again, which I'm sure she's done before, why that's so

4    important.  But that was on the table in the sanctions motion

5    and in the renewed sanctions motion, both of which had already

6    been filed way long before November of 2012.

7            I mean, of course, the problem is, you know, the

8    problem is, is that the scope or the group of people whose

9    fingers were in the pie somewhere in terms of trying to track

10   down documents, okay, gets bigger every time more emails get

11   produced.  And the problem, you know, and it's -- and I

12   certainly understand what you're saying in your response here

13   when you say, look, we'd like to just sort of sit down and

14   kind of get our arms around this and get a handle on it and

15   have something finite so we can just be done with this and

16   move on.  I'm perfectly willing to do that.  The problem is,

17   is that the way in which the information has come out, and the

18   word trickle doesn't quite capture it.  It's whatever, it's

19   like six levels below what a trickle would be.  It just sort

20   of engenders a view, and it's not, you know, completely

21   paranoid or Oliver Stone-esque, that, you know, I'm getting

22   the information in dribs and drabs for a reason, because

23   somebody is still trying to hide something, maybe not anybody

24   standing in the room, but maybe somebody out at the Area or

25   whoever it was at the Area or whatever.  That's what happens

1    when, you know, first you're told that it's -- this is the --

2    that this is the guy, lieutenant what's his name, you know,

3    who's going to know the answers to this, and then he doesn't

4    know anything, and then, you know, they say, well, we want to

5    depose the paralegal and Mr. Noland, and I say, no, no, don't

6    do that, let's try to get at it another way, and then a couple

7    of more names get in there.  And now we got even more names.

8            And so the problem with the expanding scope of

9    discovery, I will tell the City's lawyers with all due

10   respect, is a self-created problem on your part given the way

11   in which this information was either gathered, not gathered

12   and, you know, disclosed to the plaintiff.

13           So let me turn over to Ms. Gorman for a second.  So

14   here's my question for you.  I wrote it down and I got lost

15   where I wrote it down.  So let's just kind of step back from

16   all of this, you know, who do you get to depose and what not.

17   So in terms of proving your case, it's a Brady claim, right?

18   Or at least this part of it's a Brady claim, and you're trying

19   to -- part of what you're prove -- you're trying to prove that

20   there was material exculpatory information that was not

21   produced at the trial.  Okay.  And so whether it was or wasn't

22   produced at the trial isn't going to be anything you're going

23   to get from, I wouldn't think, from police officers.  That's

24   going to be the prosecutors and defense attorneys.  And you've

25   already presumably done quite a bit on that.  You know, you've

1    got the admission responses from the state's attorneys, who

2    basically say we'd never see this or we didn't see all but a

3    little bit of it.  You got, you know, the lawyers for the

4    defendant saying whatever they say and so on.  And presumably

5    you got Mr. Fields saying I didn't know about any of this

6    either.  Okay.  So that's the nondisclosure part.

7            Materiality tends to be an issue.  The police aren't

8    going to able to shed any light on that because that's a

9    question of comparing, you know, the information with what the

10   charges were and what was disclosed and trying to figure out

11   how important it was.

12           And exculpatory, that's really a function of what the

13   information was.  Okay.

14           So what are you trying to get at by trying to figure

15   out where it was for the intervening 18 years, seeing as how

16   the claim, I mean, in its sort of focused sense is did it get

17   produced at the trial?

18           MS. GORMAN:  Well, also why has it been this

19   conspiracy aspect of it?  It's 28 years that it was withheld,

20   and I'm trying to figure out where it's been this 28 years.  I

21   thought this might be --

22           THE COURT:  But why?  Tell me what the significance

23   of that is.

24           MS. GORMAN:  I think it goes to the conspiracy

25   aspects of trying to keep this hidden from him, but also I

1  believe that when I finally track this down, where it's been,
2  it's going to be down to one of the four defendants that we
3  haven't deposed yet, which is why I've held off on those four
4  defendants.  They were involved in the El Rukn --
5          THE COURT:  The detectives, in other words?
6          MS. GORMAN:  I'm sorry?
7          THE COURT:  The detectives?
8          MS. GORMAN:  The four main detectives, for lack of a
9  better word.
10         THE COURT:  Okay.
11         MS. GORMAN:  We've taken eight of the detectives'
12 depositions, but not the last four.  And they were involved in
13 the El Rukn task force, and they were also -- two of them were
14 involved in Gang Crimes South.  And I believe that what we're
15 going to be able to show is that they took this file, along
16 with some other files, and that gets to another issue I want
17 to raise with this court, they took these files to see if they
18 could pin murders on El Rukns.
19         These were open files.  This was 15 months old when
20 my client was arrested and the other -- when the other men.  I
21 think they took all of these files, maybe from other areas as
22 well, brought them to the El Rukn task force or the gang
23 crimes, wherever they were meeting, and started going through
24 them and pinning murders.  And that's what I would like to --
25 I'd like to find out where this file has been.  Can I track it

1    back to these four people.

2            And that brings me to the issue of these two --

3            THE COURT:  Time out for a second.

4            Okay.  So Mr. Fields was arrested when?

5            MS. GORMAN:  He was --

6            THE COURT:  Charged when, or ballpark?

7            MS. GORMAN:  June of '85.

8            THE COURT:  June of '85.  Okay.

9            And so the theory that you've just laid out basically

10   talks about things that people did before June of '85 that led

11   to Mr. Fields being falsely accused of this in June of '85.

12           MS. GORMAN:  Right.

13           THE COURT:  So what we're talking about now is where

14   was the file from '86 to now.  When was the second trial?

15           MS. GORMAN:  2009.

16           THE COURT:  Let's forget about 2009.  Where was it

17   between then and now?

18           MS. GORMAN:  I'd like to know where it was in 2009

19   too because there were subpoenas out for it for that trial,

20   and it still doesn't show up until 2010, right after the

21   trial, right after he's found not guilty.  To me it looks like

22   to me somebody's purposely hiding this file until --

23           THE COURT:  Okay.  So just pause for a second.  I

24   want to make sure I'm getting that.

25           So the retrial, the second trial, happened in 2009.

1          MS. GORMAN:  Correct.

2          THE COURT:  And -- or he was -- it happened in 2009,

3   and he was acquitted when?

4          MS. GORMAN:  I want to say November.

5          THE COURT:  Also 2009.

6          MS. GORMAN:  2009, yes.

7          THE COURT:  Okay.  And the 90 pages, based on what

8   you've learned from the discovery process, first surfaces with

9   the City, not when it gets produced to you, first surfaces

10  with the City in --

11         MS. GORMAN:  May.

12         THE COURT:  -- May-ish of 2010, so about five,

13  six months later.  Okay.

14         And so what you're saying is that it's -- you want to

15  know where it was in 2009, it's important for you to know why

16  it didn't get produced then as well.  Yeah, that kind of makes

17  sense to me.  Doesn't that make sense?  I mean, because

18  there's punitive damages claims, right?  There's a request for

19  punitive damages obviously, and so if somebody is -- if it's

20  not just the thing that, well, you know, the information was

21  in the file and nobody looked in the right place, but rather

22  that somebody was holding it back deliberately, that might be

23  a reason to not just impose liability, but also impose

24  punitive damages, wouldn't it?

25         MR. BURNS:  Potentially.

1    THE COURT:  If that was true.

2    I'm sorry?

3    MR. BURNS:  Potentially it could be, right.

4    THE COURT:  Yes.  Okay.

5    So how do you -- so basically the way that this is

6    lining up right now, to get back to the discovery point, is

7    that Ms. Gorman, every time she gets a name of somebody she

8    says, okay, now I need to depose that person to find out what

9    they know.  And I get it that all these people are basically

10   showing up and saying I have no clue, I don't remember, I

11   don't know, I don't remember.  And, you know, if I was a

12   betting person, I would probably bet that that's going to

13   continue to be the case with pretty much everybody else that

14   comes down the pike.  But how do you propose on the defense

15   side that I draw a wall around it and say, okay, these other

16   people who may or may not have had their fingers on the file

17   but there's at least some suggestion that they might have

18   looked, that they aren't appropriately the subject of

19   depositions?  How do you propose to do that, if that's what

20   you're asking?

21   MR. NOLAND:  Your Honor, we previously were very

22   close to a stipulation.

23   THE COURT:  Well, but I think it goes beyond that

24   now.  I mean, I understand what you're saying is that at some

25   point in time a year ago or whenever it was, or eight months

1    Ms. Gorman -- or six months ago Ms. Gorman was maybe ready to

2    agree to a stipulation, but maybe it goes beyond that at this

3    point.  Maybe she says I'm not willing to -- you know, there

4    was an offer.  You changed the terms of the offer by adding

5    something.  Therefore the offer has been rejected.  There's no

6    offer on the table, and I think about this differently now

7    because of what's happened in the meantime.  I mean, it would

8    be hard to -- it's nothing forcible there at this point.

9              MS. GORMAN:  And also, your Honor --

10             THE COURT:  Because I think what Ms. Gorman is

11   basically telling me is that she's not satisfied at the

12   moment, she's not satisfied at the moment with the proposition

13   that we don't know where it was.  She wants to try to find out

14   whether she can figure out where it was even if you can't.

15   That's basically what you're telling me, right?

16             MS. GORMAN:  Correct.

17             MR. BURNS:  So the alternative, Judge, would be

18   that's why we suggested meeting with this court.  We've had

19   meet and confers.

20             THE COURT:  To do what, though?  What do you want me

21   to do at the meeting?  Pretend like we're having the meeting.

22   What are you asking me to do?

23             MR. BURNS:  I mean, these people are there.  We've

24   had opportunities for Miss Gorman to meet some of these

25   witnesses outside of a deposition.  We've tried to answer her

1   questions.  We apparently --

2        THE COURT:  But you know the difference between a
3   deposition and a meeting.

4        MR. BURNS:  I appreciate that, but the point is we're
5   working toward trying to get -- we don't have the answer.  If
6   we had it, Judge, there'd be nothing more we'd like to do than
7   say, Judge, here it is, it's in front of you, and end this.
8   We just don't have the information.  We found the file.  We
9   turned it over.

10       THE COURT:  No, and I get all that.  But, I mean,
11  obviously the file didn't just, you know, descend as a chunk
12  of blue ice from an airplane that just took off from Midway
13  Airport.  Okay.  It was somewhere.  It was somewhere.  And
14  somebody had it, and somebody found it, and somebody figured
15  out that this is what -- this is part of what these people who
16  are looking for these documents, you know, that are sending
17  the requests through are asking for, and they turned it over.
18  And they either knew where to look, or they didn't know where
19  to look and they just kind of stumbled on it.

20       I have this case right now.  I have this case right
21  now.  It's an antitrust case that involves every major
22  cellphone service provider in the country, and it's about
23  price fixing, and the person who was involved, you know, kept
24  notebooks of all of their meetings where they talked about
25  prices at this one company, and she said that she had these

1   notebooks, and they got lost.  They got lost.  And they were

2   lost for like two years, and then somebody found them sitting

3   under a desk.  And now we've got discovery to try to figure

4   out why they were under the desk.  Was somebody trying to hide

5   them or what?  I mean, and it's legitimate when you're talking

6   about something of significance to a case to kind of figure

7   out where it was.

8        Like I say, the documents didn't walk in the door on

9   their own.  They got there because somebody sent them there,

10  and either that person knew where to look or stumbled upon

11  them, and where they are might have been relevant in some way

12  because right now you're telling me that nobody even knows

13  where to look.  And, I mean, and I've asked before, you know,

14  does anybody keep a, you know, a paper trail of where requests

15  come from and who dealt with it, and you told me no, and, I

16  mean, I guess that's right, although there is some sort of a

17  log I saw in one of these exhibits here.

18       MR. NOLAND:  Judge, there is a -- there was a -- the

19  reference when we got them was they came from the --

20       THE COURT:  So let me ask you the question.  If I was

21  just to ask you -- okay.  And I'm asking you know.  Let's

22  pretend it's a deposition.  I'm asking you do you have any

23  idea who found these documents.  What would you tell me?

24       MR. NOLAND:  Judge, I guess upon information and

25  belief, I would say that on May 25th of 2010, that's when we

1    got --

2         THE COURT:  By the way, it was a yes/no question, but

3    go ahead.  Go ahead.

4         MR. NOLAND:  It's difficult.

5         THE COURT:  I got nothing but time.  On information

6    and belief.

7         MR. NOLAND:  We received a permanent retention file

8    at say 2:30 in the afternoon.  About an hour later there is an

9    email from Detective Lofgren to Detective Elizando.  Both of

10   them work detective division headquarters at 39th and

11   Michigan.  Lofgren says to Elizando basically hopefully the

12   Area -- we're checking with the Area.  Hopefully they're going

13   to find something.  Basically she's saying I'm going to be

14   gone, which she was gone for three weeks.

15        THE COURT:  She was on leave, right.

16        MR. NOLAND:  If you get it can you forward it along.

17   Lofgren then goes on furlough for three weeks.  She comes back

18   on June the 24th -- or June the 23rd.  We received them the

19   next day.  So Lofgren has said that the --

20        THE COURT:  It was probably sitting in a pile of

21   paper on my desk.

22        MR. NOLAND:  Right.

23        So Lofgren has said she would check with the Area.

24   She called down to the Area, the violent crimes unit, to speak

25   with whoever answered the phone.  Her understanding was that

1   this guy Sam Brown, who was that person that has been

2   discussed in the papers, that he's in charge of the homicide

3   files or organizing them, and he's the one that would -- she

4   would expect or somebody in his stead would pull the file,

5   make a copy and bring it down to her.  So that is really the

6   answer.

7         And then there are file cabinets, that so-called prop

8   that Miss Gorman has referred to --

9         THE COURT:  But has somebody said that this is the

10   file cabinet that the thing was in when the unknown person

11   found it?

12         MR. NOLAND:  We have nobody to say that, Your Honor.

13         THE COURT:  Great, because we don't know who found

14   it.

15         MR. NOLAND:  What we do know is that there's a label

16   on the file cabinet, and counsel has seen it.  It says Area 1.

17   There's a file cabinet.  There's old Area 1 --

18         THE COURT:  Goes back to the forties or fifties.

19         MR. NOLAND:  They're very old.  Not only Area 1 files

20   for a period of 45 years, but Area 3 files because Area 3 had

21   shut down and they combined them.  There's file cabinets

22   together with all these old files.  And two of the drawers,

23   one says Area 1 '83/'84, the other one says right below it

24   Area 1 '84/'85.

25         So, Judge, you asked me a question.  My belief is

1   that's what happened.  Lofgren called down.  Brown or somebody
2   else went into that file.
3           THE COURT:  And knows that that file cabinet's there,
4   goes to the file cabinet, sees what's there, here's the file,
5   pulls it out, gives it somebody.
6           MR. NOLAND:  And Brown would say he drives it
7   downtown to headquarters, drops it off, and then it's
8   produced.
9           THE COURT:  Isn't the more pertinent inquiry then not
10  really who pulled the file out then, but who -- but who put it
11  there?
12          MS. GORMAN:  Who put the whole file cabinet there.
13          THE COURT:  Right.  But, okay, the file cabinet
14  contains the file.  You don't care about some other murder.
15  At least I don't think you do.  The question is who put it
16  there, and none of these depositions that you're talking about
17  right now of all of these people who are on the emails about
18  trying to find something and, you know, let's get the people
19  down there to look for it or whatever, none of them are going
20  to know who put it there.  They're not going to have any
21  information about that, are they?  Is there any possible
22  reason to think that they'd have information about that?
23          MS. GORMAN:  Well, that's why I've moved on to the
24  cabinet, your Honor, because I really think this cabinet is
25  just -- it's strange.  It's strange to have in the middle of

1  2009, 2010, 2011 file -- two cabinets with old homicides.

2  THE COURT:  You haven't seen my basement.

3  MS. GORMAN:  Now that I've looked at the cabinet,

4  they've moved it to the basement.  Why aren't these going to

5  the warehouse?  That's where files are supposed to go.  So I

6  would ask -- one of the other things I was going to ask this

7  court is for permission to go through those files because I

8  want to see if it even makes sense that there's '83/'84 files

9  in there.  I never looked to see what files were in that

10  drawer, 44 to 85.  And this Area 3 file cabinet that they

11  always want to put in stipulations as though there's somehow a

12  tag team, and why are they there, no one knows.  No one knows

13  when they arrived.  No one knows when they came.

14  THE COURT:  The stuff from Area 3 you mean.

15  MS. GORMAN:  Both cabinets.  No one knows why either

16  of those cabinets are there.

17  THE COURT:  My point is, and I want to try to stick

18  to the point, that the people -- and I understand you want me

19  to do all sorts of other things, which are just -- you're just

20  asking the court of appeals to come -- get on the elevator,

21  come walking down here and saying what in God's name did you

22  drink this morning.  Okay.  There's not a basis right now for

23  me to enter ten percent of the deemed admissions that you're

24  talking about here.  Okay.  So let's just forget about that

25  for the moment.

1          In terms of further follow-up, what you just talked

2    about there, in other words, trying to figure out why is this

3    file cabinet there, when did it get there, why is there Area 3

4    stuff there, which all goes to the question of how did this

5    folder with the 90 pages get into this file and who had it

6    before that, none of the people that you're talking about now

7    that you sent out notices of deposition for are going to have

8    the least clue about that.  There's just no reason to think

9    that.

10          MS. GORMAN:  Well, we do know from these new emails

11   that Commander Walsh, which was a new name for me until these

12   emails just came, except for that was the person I was

13   supposed to ask to see when I went to look at the file, that

14   she had this file for some period, so I'd like to know where

15   she got it.

16          THE COURT:  I'm not so much talking about that.  I'm

17   talking about the people on the other end who are saying find

18   this stuff, find this stuff, find this stuff, or the officer

19   who went on leave for three weeks and then had it on her desk.

20   She's not going to know anything.  She's not going to know

21   anything about who had the file before that, is she?

22          MS. GORMAN:  Actually I think that's part of her job.

23   And there was also a contradiction.

24          THE COURT:  Part of her job to know where the file

25   was from 1984 to 2000?

1        MS. GORMAN:  No.  Where she got it from.  She's the

2   one that received it in 2010, so she might have some clue as

3   to where this came from when it was given to her.

4        Your Honor, the other thing is that there were

5   requests.  This isn't something that was just requested in

6   eighty --

7        THE COURT:  Don't talk to me about that.

8        MS. GORMAN:  -- five.

9        THE COURT:  I really want to stay on point here.

10  Don't talk to me about that.  I don't care how long you've

11  been asking for it at this point.  I know that you've been

12  trying to get it for a long time.

13       So what's the -- give me the list of the names of the

14  people right now that you're hoping to depose, you know, with

15  regard to this file.  Who's the list?

16       MS. GORMAN:  Well, I would like to take Mary Beth

17  Majka's deposition, the paralegal.

18       THE COURT:  And she's a person on the other end who's

19  asking for stuff, right?

20       MS. GORMAN:  Correct.

21       THE COURT:  She's not down in the Area.  She's one of

22  the requestors.  So Majka, that's number one.  Who else?

23       MS. GORMAN:  Lofgren.

24       THE COURT:  That's the person who ultimately had this

25  thing on her desk and then turned it over, right?

1     MR. BURNS:  That's right.

2     MS. GORMAN:  Walsh, Commander Walsh.

3     THE COURT:  Now, Walsh is actually in the Area.

4     MS. GORMAN:  She was at the time.

5     THE COURT:  Was at the time.  Okay.  Who else?

6     MS. GORMAN:  Lieutenant Duffin.  He's the one who's

7  been holding it since -- I guess since --

8     THE COURT:  He has it now.

9     MS. GORMAN:  He has it now, and he has it since Walsh

10  left.

11     THE COURT:  Which is when did Walsh leave?

12     MS. GORMAN:  I don't k now when she left.

13     THE COURT:  2010, 2011, 2012.

14     MR. BURNS:  Approximately, Judge, it would be the

15  beginning of 2011, maybe late 2010.

16     THE COURT:  What do you think Duffin is going to know

17  about anything?

18     MS. GORMAN:  Well, they just sent me a letter telling

19  me what Duffin was going to say since I had his deposition

20  scheduled for last week and they canceled it.

21     THE COURT:  Okay.  What did the letter say that he

22  was going to say?

23     MS. GORMAN:  That he received the file from Commander

24  Walsh, he believes it was being held by Commander Walsh prior

25  to being given to him in 2011, that he's been holding it in

1  his desk.  I don't know what else he's going to say.

2       MR. NOLAND:  He's also -- he showed the file to a

3  number of persons at the Area to ask them if they had

4  recollection of it, and he has assisted in trying to figure

5  out if the file had been at the Area or --

6       THE COURT:  Have you identified the handwriting in

7  the 90 pages yet?  Or is there something that allows you to

8  figure out who wrote the notes?

9       MS. GORMAN:  I went through the eight depositions

10  that I took of the detectives from the early end of the

11  depositions.  Several of those defendants identified their own

12  handwriting in those notes.  One of the defendants, Detective

13  Bogdalek, said he actually had this file.  He believed he had

14  the file at the time of the criminal trial and reviewed it and

15  noticed some of his own handwritten notes missing at that

16  time.

17       THE COURT:  So Duffin.  Who else after Duffin?

18       MS. GORMAN:  I was just looking at my -- there were

19  some other names that came up in these emails.  One is the

20  secretary to -- I believe it's the secretary to Commander

21  Walsh, Benita Betts.  For some reason her name came up as

22  someone that was holding that file, and that to me seemed like

23  a likely person that might have been charged with trying to

24  find it.  But there's also a name of Mia Ogliore who came up

25  in these emails as someone who was looking for the file at the

1    time of -- at the time Mr. Fields filed his --

2              THE COURT:  What do you think somebody like that is

3    going to be able to contribute to figuring out where it had

4    been before?

5              MS. GORMAN:  I don't know if they'll know where they

6    found it.  If they know where they found it, it might

7    contribute to where it's been.

8              THE COURT:  She didn't find it, though.

9              MS. GORMAN:  I'm not sure.  She's the secretary to

10   the person who was holding it, and Benita Betts was -- I

11   believe she was Commander Walsh's secretary.  Mia Ogliore and

12   William Bazerak and Thomas --

13             THE COURT:  No.  I was talking about Ogliore.  What

14   do you think that she's going to be able to contribute to

15   figuring out where the file was between '84 and now?

16             MS. GORMAN:  Well, we know that there were

17   discussions, that she was involved in discussions at the time

18   of locating the file from these emails now that just came out.

19   I don't know what the nature of those discussions were, but,

20   you know, here's the file we were talking about, here's the

21   file we found.

22             MR. NOLAND:  Judge, she's at headquarters, and those

23   discussions had to do with forwarding the file to Dykema, the

24   permanent retention file.

25             THE COURT:  And where is Walsh currently?

```
 1        MR. NOLAND:  She's the commander of the Fifth
 2  District.
 3        THE COURT:  All right.  Okay.  I'll give everybody a
 4  minute per side to sum up.  Whatever it is you want to say,
 5  you have a minute.  You go first, starting now.  You're on the
 6  clock.
 7        MS. GORMAN:  Well, your Honor, as you know, I've been
 8  trying to find this information for a long time.  When we were
 9  close to working out a stipulation and when the City first
10  responded to the interrogatories saying they didn't know, what
11  caught my eye was doctor -- or Mr. Flores's affidavit, which
12  made it clear that they never really did a search.  He just
13  said -- his affidavit, which was before this court before, was
14  basically we don't know where it is but I didn't look for it
15  either.  And that's what got me on this trail.  Because when I
16  get a letter on February 8th saying, oh, here's what all these
17  people are going to be saying that you're setting up a
18  deposition for next week, it tells me that the investigation
19  is being done as the depositions are being scheduled.  And I
20  believe that there might be information with these other
21  people that they have not talked to yet.  As soon as I set up
22  the deposition, they'll talk to them like they keep doing in
23  every one of these depositions, and then they send me
24  information a few days before the deposition.  I'd like to
25  take these depositions.
```

1      THE COURT:  Okay.  That was exactly a minute.

2      MS. GORMAN:  Thank you.

3      MR. NOLAND:  Judge, we believe that those

4  conversations were what the court had in mind on November 14th

5  when it talked about gnashing of teeth.  We have heard this

6  court's message.  We have attempted to work these matters out

7  with the plaintiff.  We have produced the material.  We have

8  answered the court's questions and the plaintiff's questions.

9  When we didn't know an answer, we went and got the answer.

10  When it -- and we believe -- the answer has remained the same,

11  which is we don't know the chain of custody.  We wanted to

12  make sure that we hadn't missed anything, and that's why we

13  asked the archived email search to be done, and it showed that

14  we had not missed anything, that the answer was the same.  We

15  don't know the answer.  We wish we did.

16      Lofgren's email said she was hoping to find the file

17  at Area 1 or hoping it would be found.  And it was found.

18  That isn't the type of conduct that I think warrants sanctions

19  or that the people involved at least now are hiding anything.

20  We were trying to be forthcoming, and we have been forthcoming

21  and are being cooperative in answering the plaintiff's

22  attorney's questions and will continue to do so.

23      THE COURT:  Well, you know, so as I said before, one

24  of the problems here is the manner in which information has

25  come out.  And I'm not necessarily pointing fingers or trying

1    to affix blame, but you've got something here that is an

2    important -- that is an important topic.  I've concluded that

3    before, and I still think that.  In other words, why did this

4    file not get produced if in fact it wasn't produced.  And part

5    of how one figures out why it didn't get produced is to try to

6    figure out who had it and where it was.  So these are all

7    legitimate areas of inquiry.

8           And, you know, it hasn't been done perfectly on

9    either side.  You know, maybe knowing what she knows now,

10   Ms. Gorman might have asked different interrogatories or

11   served different kinds of discovery requests earlier.  But on

12   the other hand, as I said before, part of the problem here is

13   that the information has just kind of come out in a way that

14   doesn't leave someone with a warm and fuzzy feeling that

15   they're getting everything.  And I could be wrong.  It could

16   be that it is everything.  But, you know, I think the

17   plaintiff is entitled to sort of run this down, obviously,

18   within reason, to try to figure out, you know, who had the

19   files and where they were, or this file, I guess, and where it

20   was and why it didn't get produced, or at least try to come up

21   with something like that.

22          And that's why I think as we sit here -- as I sit

23   here right now that it's just not a sufficient answer to say,

24   well, we'll stipulate we don't know.  I mean, you've already

25   made it clear that you don't know.  That's about as clear as

1    can be in the interrogatory answers that have been filed.  But
2    I don't think the plaintiff is required to sort of accept that
3    and say okay, fine, then I'm done.  I think for the reasons
4    that I described before they're entitled to try to figure out
5    for their own whether they can come up with something at least
6    inferentially that shows, you know, where the file had been
7    before that.

8            Whether it's a sanctionable thing or not -- and I'm
9    not talking about necessarily attorneys here.  I may be
10   talking about parties.  You know, we could debate that.  You
11   know, one option here, which I don't necessarily advocate, but
12   one option would be for me to hold an evidentiary hearing on
13   the motions for sanctions and just say no, not going to have
14   any depositions, everybody is going to come up here and sit on
15   the witness stand in the 20-foot high ceiling room and tell
16   what they know and you can sort of question them on both sides
17   to your heart's content and then I'll rule on the motion for
18   sanctions.  That's an option.  I don't think it's necessarily
19   the best option, but it's an option which I thought about
20   before coming out here and I've thought about some more since
21   I've been out here today.  Option I suppose at the extreme on
22   the other side is to say call it a day.  I've rejected that
23   for the reasons that I've already told you just now.

24           In terms of trying to draw some sort of boundaries on
25   who can and who can't be deposed, I mean, I think that, you

1  know, there could be a way of doing that.  The difficulty with

2  that is that, you know, although I get -- certainly get plenty

3  of material from you all and I think I'm pretty quick on the

4  uptake and I learn the stuff and I understand it, I'm never

5  going to have the level of understanding that any of you do

6  about the ins and outs of this because I know what you've

7  given me and you know what you've given me plus how that fits

8  in with everything else that you don't have any reason to give

9  me right now because it's not directly pertinent, and so I'm

10  operating in a bit of an information vacuum, if you will.  So

11  that's what makes it difficult to say okay, you can depose --

12  you know, this is where the line gets drawn on the

13  depositions.

14        I really am not persuaded, though, as I sit here

15  right now that Ms. Majka really has anything to contribute.

16  I'm not shutting the door completely on that.  I think the

17  same about Mr. Noland.  I'm not persuaded right now that he

18  has really anything to contribute.

19        Now I'm looking for where I wrote down this list of

20  names.

21        As far as the rest of them are concerned, it seems to

22  me that the focus needs to be on people -- not on the people

23  who were -- who were tasked with trying to get stuff, that

24  were tasked from the sort of the City's end with trying to get

25  stuff, but rather the people who were on the sort of the

1    receiving end of those requests and, you know, either had the

2    responsibility of actually gathering stuff or telling other

3    people to gather it or who might have had this thing in their

4    hands or might be expected to know where the filing cabinet

5    had been and so on.  So I think probably what that means is

6    that it's more likely -- it's less likely that Lofgren, or

7    however you pronounce it, is going to have anything

8    significant to say, and so I would say put her at the end of

9    the list and maybe I'll eventually say that deposition doesn't

10   get taken.

11          I think Commander Walsh would probably be closer to

12   the top of the list because she was at least present at the

13   Area, Area with a capital A, where these documents ultimately

14   appear to have been found.

15          As far as Duffin is concerned, the fact that he got

16   the file from Walsh I don't think really tells you much.  The

17   fact that he took it around to other people, asked if they

18   knew about it, I mean, essentially what you're looking for

19   there is who did you take it to and what did they say.  I

20   would think that there would be a way of getting that in some

21   sort of a sworn and binding form short of taking the person's

22   deposition.

23          As far as Ms. Ogliore, O-g-l-i-o-r-e I think is how

24   it's spelled maybe, I have a hard time seeing what she's going

25   to be able to contribute.  She's not there.  She's at

1  headquarters.

2  　　　　As far as Walsh's secretary is concerned, I don't

3  have enough of a feel to say about her or not.

4  　　　　But, you know, one other thing that Ms. Gorman

5  mentioned today that I want to get your views on before I make

6  a decision about it is that she says, well, I'd like to just

7  kind of go look through the file cabinet and see what else is

8  in there so I can try to get a handle on whether it actually

9  is what it purports to be.  So do you have a position on that?

10  　　　　MR. NOLAND:  Your Honor, my recollection is when we

11  did show, she did flip through the order they're kept by.  The

12  homicide number was 844445, and then, you know, the next one

13  is --

14  　　　　THE COURT:  Okay.  So you let her flip through it, so

15  you shouldn't have a problem letting her flip through it

16  again.

17  　　　　MR. BURNS:  We'll arrange for it, Judge.

18  　　　　THE COURT:  Okay.  Then that should be done promptly.

19  　　　　MS. GORMAN:  And I would like to make it clear, your

20  Honor, if you would.  Can I look through this whole cabinet?

21  　　　　THE COURT:  That's what I'm talking about.

22  　　　　MS. GORMAN:  Yeah.  Okay.  Thank you.

23  　　　　THE COURT:  Yeah.  That's what I'm talking about.

24  　　　　And I guess I just put this -- I table this until,

25  you know, you've had an opportunity to do some of that.

1       So, you know, we're getting I think -- my concern is
2   that you're getting too bogged down in the process of what
3   happened from May the 24th of 2010 to now.  And, I mean, I
4   understand why you got there, but I just don't think that's --
5   in terms of trying to advance the case, that's not
6   particularly productive, and what's more productive is what
7   happened before that, and so I think that's where the effort
8   needs to be focused.
9       And I guess what I'm also going to say on these
10  depositions of these people, given the -- how long have you
11  been deposing these people for?  How long do they take
12  typically?
13      MS. GORMAN:  The ones last week were less than an
14  hour each.
15      THE COURT:  Okay.  So none of these depositions we're
16  talking about having to do with file retention and so on or
17  file gathering can be more than an hour.  They got to be all
18  within an hour.  And it probably shouldn't take that long even
19  on some of them.
20      You know, and I guess I'm not willing to say at this
21  point, although I guess I suggested it before back in
22  November, I'm not willing to say okay you just go get the
23  information and give it to Ms. Gorman in some form and that
24  will be the end of it because I think -- I'm not willing to
25  impose on her the obligation to trust what she's getting.  And

1  that's not a comment on anybody here, but, you know, sometimes

2  things happen when people testify that don't happen when

3  they're interviewed.  I saw it last week actually.  So there

4  you go.

5      Motion for sanctions is entered and continued.  And

6  so what I want you to do is tell me when you come in on the

7  status next week, tell me what -- I want you to give me sort

8  of a lineup.  And then if somebody can -- and I understand, I

9  understand that there's an interlocutory appeal.  I've made my

10 comments on that.  I expect to have that motion to compel

11 noticed up for that date, and please pass on to Mr. Garcia or

12 whoever is going to be dealing with it from his side that I'm

13 going to rule on it on that date, so he needs to be prepared

14 to deal with it.  So make sure you get it on file with enough

15 notice to comply with the rules.  Okay?

16      MS. GORMAN:  Thank you.

17      MR. NOLAND:  Your Honor, if I could have just one

18 comment as to review of the --

19      THE COURT:  Yes.  If you don't mind if I stretch

20 while you do it.

21      MR. NOLAND:  No.

22      The review of the files.  The CPD with these being

23 other files as far as the substance of them, what I gather is

24 Miss Gorman wants to look to make sure that these are other --

25      THE COURT:  You want to have some sort of a

1 protective order.

2 　　　　　MR. NOLAND:  I think that makes sense, your Honor.

3 　　　　　THE COURT:  Yes.  There should be.

4 　　　　　MS. GORMAN:  I don't mind a protective order, your

5 Honor.  I do want to be able to go through the files.

6 　　　　　THE COURT:  Yes.

7 　　　　　MR. BURNS:  We'll work that out, though, with her.

8 　　　　　THE COURT:  So you'll get something worked out on

9 that.  And anybody who is unreasonable on either side about

10 the terms of the protective order will be answering to me.

11 　　　　　MS. GORMAN:  Thank you.

12 　　　　　THE COURT:  So try to get it worked out.  Try to get

13 it worked out.  You can just send me an agreed order.  If you

14 can't, just be prepared to talk about it next week when you

15 come in for the status.

16 　　　　　MR. NOLAND:  Thanks, Your Honor.

17 　　　　　MS. GORMAN:  Thank you.

18 　　　　　THE COURT:  Take care.

19 　　　　　MR. BURNS:  Thank you.

20 　　　　　　　*　　*　　*　　*　　*　　*　　*

21 　　　　　　　　C E R T I F I C A T E

22 　　　　I hereby certify that the foregoing is a true and

23 correct transcript of the above-entitled matter.

24 /s/ Valarie M. Ramsey　　　　　　　02-26-2013

25 　─────────────────────　　　──────────
　　Court Reporter　　　　　　　　　　Date