```
1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4    NATHSON E. FIELDS,          )
                                 )
5                  Plaintiff,    )   Docket No. 10 C 1168
                                 )
6            vs.                 )
                                 )
7    CITY OF CHICAGO, et al.,    )   Chicago, Illinois
                                 )   June 13, 2013
8              Defendants.       )   10:30 a.m.

9                  TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiff:    LAW OFFICES OF H. CANDACE GORMAN
                           BY:  MS. H. CANDACE GORMAN
14                         220 South Halsted Street
                           Suite 200
15                         Chicago, Illinois  60661

16
                           LEN GOODMAN LAW OFFICE, LLC
17                         BY:  MS. MELISSA A. MATUZAK
                           53 West Jackson Boulevard
18                         Suite 1650
                           Chicago, Illinois  60604
19

20   For the Defendant:    DYKEMA GOSSETT PLLC
                           BY:  MR. PAUL A. MICHALIK
21                         10 South Wacker Drive
                           Suite 2300
22                         Chicago, Illinois  60606

23
                           COOK COUNTY STATE'S ATTORNEY
24                         BY:  MR. DANIEL M. NOLAND
                           500 Richard J. Daley Center
25                         Chicago, Illinois   60602
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

1    (The following proceedings were had in open court:)

2         THE CLERK:  10 C 1168, Fields v. City of Chicago.

3         MS. GORMAN:  Good morning, your Honor; Candace Gorman

4    for the plaintiff.

5         MR. MICHALIK:  Paul Michalik for the City of Chicago

6    defendants.

7         MR. NOLAND:  Dan Noland for the City defendants as

8    well.

9         THE COURT:  I know it's a rule.  It's an outmoded

10   rule, and I know it's difficult to have individual rules.  You

11   never have to give me the unreported decisions.  There are

12   some of us who are trying to change this.  Surprisingly, we

13   are being met with resistance among other quarters.  Anyway, I

14   get these piles of things and, like, why?

15        MR. NOLAND:  Thank you, your Honor.

16        THE COURT:  Anyway, so just make a note.  You don't

17   ever have to give me the unreported decisions.

18        So I want to talk first about the motion to compel.

19   So I assume you have seen both responses, Ms. Gorman.

20        MS. GORMAN:  Yes, your Honor.

21        THE COURT:  So let's talk about --

22        Let me hear what else you have to say on the motion

23   to compel.

24        MS. GORMAN:  Your Honor, this is a motion for a party

25   file, the party file being the Office of Legal Affairs.  I

1    requested this file after we understood what was going on with

2    Legal Affairs and what we think was going on with Legal

3    Affairs in regards to being the gatekeeper for subpoenas for

4    cases that are considered open.

5            I would also say, your Honor, early on in this case,

6    I asked the City for all files related to Mr. Fields, related

7    to the Vaughn-White murders and the Hickman-Smith murders.

8    They never disclosed that there was a file.  That was in

9    September of 2011 when they responded to that discovery.

10           They never responded by saying that there was a file

11   that they were withholding on the basis of attorney/client

12   privilege.

13           THE COURT:  Well, one of the things I think I was

14   told in the response here was that the Office of Legal Affairs

15   didn't exist until X.  What is the X?

16           MR. NOLAND:  The file didn't exist.

17           THE COURT:  The file didn't exist.

18           MR. NOLAND:  Legal Affairs has always been around.

19           THE COURT:  Has always been around, but the file

20   didn't exist until when?

21           MR. NOLAND:  This lawsuit.  The file was created as a

22   result of this lawsuit to assist corporation counsel or

23   outside counsel with the lawsuit.

24           THE COURT:  Okay.  And the Office of Legal Affairs

25   consists of what, lawyers and paralegals basically?

1    MR. NOLAND:  Yes.

2    THE COURT:  All right.  So let me ask you this

3 question, Ms. Gorman.  So if you sent a document request to

4 Dykema Gossett saying, give me your file on the Fields case,

5 what do you think I would do with that?

6    MS. GORMAN:  I don't think you would give it to me.

7    THE COURT:  You're right.  Okay.  Why is this

8 different?

9    MS. GORMAN:  Because I think it's a party file, your

10 Honor.  I mean, I gave -- I turned over my client's files at

11 the beginning of this litigation and a privilege log.

12    THE COURT:  Your client is not lawyer.

13    MS. GORMAN:  Correct.

14    THE COURT:  I mean, we're talking about a lawyer,

15 and, granted, it's an in-house lawyer.

16    But I guess I should change the hypothetical.  Let's

17 say you were suing -- just to pick a name out of the air, R.R.

18 Donnelley & Company -- it's a case that Ms. Gorman and I had

19 that went on for a long time -- and you were to send a

20 subpoena that says, give me the files of the general counsel

21 and his office.  I would do the same thing.  You would never

22 get it.

23    I mean, if I was reasonably confident that there was

24 no file until a lawsuit was initiated, you wouldn't get it

25 because it's really no different, for all practical purposes,

1  from the outside lawyer's file because they're working

2  together.  If there was some document, some document within

3  this file that the inside lawyer, or in this case the Office

4  of Legal Affairs or its paralegal, had collected that you did

5  not otherwise have, okay, that would be a different thing, but

6  I'm being told that there is no such thing that they have that

7  hasn't otherwise been produced.

8          So I guess I'm kind of missing the point here.  I

9  mean, you say something in here about, okay, maybe these

10  documents could point to where this one file was that was

11  missing.  I get that.  But the request that you submitted goes

12  way beyond that.

13          I mean, if the request that was in front of me says,

14  give me everything that's in the Office of Legal Affairs'

15  files that pertains to the existence and location of this file

16  that was found in the basement of area whatever it was on such

17  and such a date, you would have a better argument at least for

18  the privilege log and maybe for production altogether.  But

19  you sent something that says, give me everything that refers

20  to homicides or to Mr. Fields or, you know, to anything

21  relating to the incident in issue in the litigation.  It's way

22  broader than I think you're entitled to.

23          MS. GORMAN:  And, your Honor, I did have a conference

24  call with them, and as I put in my motion, what I had asked

25  for was for them to describe for me or to give to me anything

1    that was not privileged and describe what is privileged.  So I
2    think I've narrowed it in the --

3          THE COURT:  No, you haven't because it's still going
4    to require somebody to go through the file and create a
5    privilege log.  I just don't think you're entitled to that.

6          So I'm denying the motion, but I will say this.  If
7    in response to this, you now get a request that says, give us
8    everything in the Office of Legal Affairs' files that pertains
9    to the existence and location of the missing file -- you don't
10   agree it's missing, but you know what I am talking about when
11   I say that -- and if I were in your shoes, I would give her
12   the privilege log.  I mean, I would produce whatever you have
13   and I would give her the privilege log.

14         The primary problem with this is it's vastly
15   overbroad, and the overbroad part of it covers things that I
16   think the plaintiff is not entitled to.  If there is something
17   that is zeroed in on that issue, I would have a different
18   view.  Okay, so I will just kind of leave you to your own
19   devices on that.

20         MS. GORMAN:  Your Honor, can I have leave to file
21   that since discovery ends in two weeks?

22         THE COURT:  It's encompassed within this, so why
23   don't you just talk more about it.

24         MS. GORMAN:  Okay, thank you.

25         THE COURT:  So let's talk about the other one for a

1    second.  Here is my question, or first question, for the

2    defendant.  So these 15 people that you identified here, and

3    they all relate to --

4          Well, with the exception of the fellow from the FBI,

5    they relate to incidents or alleged incidents, it looks like,

6    that occurred when Mr. Fields was in custody, okay.  So my

7    question to you is, when did you -- and when I say "you," I'm

8    defining that in the broadest possible -- anybody involved in

9    the defense of the case find out about it?

10          MR. NOLAND:  I think it would be technically when we

11   received our response to the subpoena --

12          THE COURT:  Okay.

13          MR. NOLAND:  -- to the appellate defender.  And so I

14   guess we would be on constructive notice of the contents of

15   that file.

16          THE COURT:  Which was when?

17          MR. NOLAND:  It was in 2012.  I can't remember when.

18          THE COURT:  So you sent a subpoena to the state

19   appellate defender for what exactly?

20          MR. NOLAND:  Their file relating to the --

21          They represented Mr. Fields.  I believe it was in

22   that file, as I sit here today, but it came --

23          THE COURT:  So you think that there were some

24   disciplinary records from the prison that were in that file

25   somewhere?

1    MR. NOLAND:  Yes.  There was an IDOC file in there.
2  I don't think IDOC had their file anymore.  We sent a subpoena
3  to them, too, but I believe we got these from the appellate
4  defender.

5    THE COURT:  Oh, IDOC didn't have a file anymore.  At
6  least you didn't get one from them.

7    MR. NOLAND:  We didn't get much from them.  We didn't
8  get much.

9    THE COURT:  Did you get any of this from them?

10   MR. NOLAND:  I don't think so.

11   THE COURT:  Okay.  And when you say 2012, that
12  encompasses 366 days.  Was it early in 2012, middle, late?

13   MR. NOLAND:  We had it before Mr. Fields' deposition
14  which proceeded in February 2012.

15   THE COURT:  Did you ask him about this stuff in his
16  deposition?

17   MR. NOLAND:  Yes, some of it.  Some of these are
18  deposition exhibits actually.

19   THE COURT:  Oh, okay.  All right.

20   Do you disagree that he asked -- that they asked
21  Mr. Fields about some -- at least some of these incidents in
22  deposition?

23   MS. GORMAN:  I don't recall, your Honor.  I have to
24  say I was at his deposition.  I have no recollection at all.
25  I would say that --

1          THE COURT:  That's a significant factor, okay.  I

2    mean, I don't agree pretty much with anything anybody has said

3    on this motion.  I have my own views which I will tell you in

4    a second, but to me it's a significant factor if these things

5    were discussed.

6          When was his deposition, ball park?  Was it this

7    year, last year?

8          MR. NOLAND:  I believe it was February 2012.

9          THE COURT:  So it was over a year, okay.  All right.

10         So in terms of the application of Rule 37(c), to me

11   it would be a significant factor if, you know, these incidents

12   were inquired about during his deposition.

13         MS. GORMAN:  Your Honor, I would --

14         THE COURT:  And particularly if at least some of the

15   documents were used as exhibits although that wouldn't be a

16   dispositive factor in my view.

17         MS. GORMAN:  Your Honor, I would also just say that

18   there are tons of names in these IDOC documents, and so

19   without them disclosing exactly, you know, who they thought

20   was relevant or important, it would be impossible for us to --

21         THE COURT:  So that touches on one of the problems I

22   have.  So, you know, the knowledge --

23         What Rule 26 is about is -- I don't have to make this

24   up.  I can go from the rule.  What Rule 26 is about is

25   identifying not everybody who has knowledge of the case.  It

1   doesn't stop there.  It says, everybody who is likely to have

2   discoverable information that the disclosing party may use to

3   support its claims or defenses.

4           So there's two parts of it.  It's a person with

5   knowledge that we might use.  Now, when you're talking about

6   under Rule 37 the sanction section for nondisclosure or, in

7   certain circumstances, for late disclosure, you know, it talks

8   about whether the failure to disclose was, quote,

9   "substantially justified or harmless," close quote.  And on

10  the harmlessness part of the inquiry, there's all sorts of law

11  that talks about whether, well, somebody should have been able

12  to figure this out from discovery.

13          So the real question, though, is what is the "this"

14  that they should have been able to figure out, and the "this"

15  in my view isn't just that there's a person out there; it's

16  that there's a person that the opposing party may use to

17  support its claims or defenses because in a given case, and

18  this case is a prime example of it, there's potentially

19  hundreds of people who have knowledge, and the real question

20  for the lawyer on the other side who is trying to figure out

21  who should I depose, where should I spend my time, where

22  should I spend my resources, is, are they going to use these

23  people.

24          Okay.  So the fact that a name got mentioned during

25  discovery by itself to me doesn't carry the day on that.  It

1    has to be something that leads -- that tells the person or at

2    least suggests to a reasonable person, let's say, that this

3    isn't just somebody with knowledge; it's somebody with

4    knowledge that they might use, okay.  So that's part of it.

5         Then another part of it is, like, when does this all

6    happen.  So when you have this kind of scenario -- I mean, you

7    know, I spent a decent amount of time on that side of the

8    podium, too, and some of it in cases that had a lot of

9    witnesses in them.  And so, you know, in any given deposition,

10   depositions -- obviously, in federal court we don't have the

11   dichotomy between discovery and evidence depositions.  They're

12   all evidence depositions, really.  But a lot of names might

13   get mentioned during a deposition.  And, again, you have to

14   make a judgment about, okay, now, what do I need to follow up

15   on.  And part of that judgment is premised on what the Rule 26

16   disclosures say.  That's why we have Rule 26(a)(1).

17        And so if a deposition happens in February -- and,

18   you know, I'm taking you at your word that these people were

19   discussed in a deposition -- and there is no supplementation

20   of the discovery responses, and February turns into summer of

21   2012 and the fall of 2012 and the winter of 2012 and the

22   spring of 2013, and lo and behold, it's three weeks or

23   whatever it is before the close of discovery, that all of a

24   sudden these people get mentioned, you know, most -- let's

25   just say most reasonable lawyers in Ms. Gorman's position,

1   this wouldn't even be on their radar screen anymore.  It would
2   have dropped off the radar screen because it was just
3   something that was mentioned in the deposition that nobody
4   ever put in the Rule 26 disclosures.
5           So what prompted you to put them in the Rule 26
6   disclosures now?
7           MR. NOLAND:  I've recently looked at his deposition
8   again and saw that some of the thought processes that I had --
9   I went back to my 26s and I realized that I overlooked
10  including these individuals in the 26s, and we made sure to
11  get them out before the close of discovery.
12          THE COURT:  And so how many more depositions are --
13          The close of fact discovery is what?
14          MS. GORMAN:  The 1st of July.
15          THE COURT:  So it's about two weeks, a little bit
16  more than two weeks.
17          You have got other depositions scheduled between?
18          MS. GORMAN:  We have the 30(b)(6) depositions for
19  Legal Affairs.
20          THE COURT:  Yes, the stuff from one of those other
21  orders.  Then what else?
22          MS. GORMAN:  Two other attorneys from Legal Affairs
23  that we knew of individually, and we also have a witness that
24  the defendants have noticed up.  I think that's all of them.
25          THE COURT:  It's a dep you guys are taking.

 1          MR. NOLAND:  (Nodding.)

 2          THE COURT:  Okay.  You know, we're talking about

 3   people here who are --

 4          What did I do with the list?  Do you know where these

 5   people are?

 6          MR. NOLAND:  Other than that they were IDOC

 7   employees, no.  These are basically --

 8          THE COURT:  I mean, I suppose I could -- I mean, I

 9   suppose I could stop there.  I could say that your disclosure

10   doesn't comply with Rule 26(a)(1)(A)(1) because you don't

11   really say anything about where to find these people.

12          MR. NOLAND:  Your Honor, these witnesses are really

13   exclusively foundational and --

14          THE COURT:  Foundational?

15          MR. NOLAND:  -- rebuttal.

16          THE COURT:  In what way?

17          MR. NOLAND:  Documents that they dealt with in

18   disciplinary matters.

19          THE COURT:  How did the documents get in?  Are you

20   going to call --

21          I mean, in other words, I'm assuming -- maybe I'm

22   making an unwarranted assumption here, but my assumption is

23   that you want to put in evidence that Mr. Fields was involved

24   in violent incidents, you know, or other incidents of

25   misconduct in one way or another to attempt to --

1    I mean, the most obvious topic would be it's damages
2    related.  Is there something other than that?
3    MR. NOLAND:  Yes.
4    THE COURT:  What?
5    MR. NOLAND:  There's two.  One is that Hank Andrews,
6    who was the getaway driver in the car in this double homicide,
7    came to visit Fields in 1980 or '81.  There's a document from
8    IDOC which we would simply seek to introduce either through
9    the person who signed it at IDOC or the recordkeeper.
10    THE COURT:  Just to prove that Mr. Andrews visited
11    Mr. Fields?
12    MR. NOLAND:  Yes.
13    THE COURT:  Which gets you where?
14    MR. NOLAND:  It gets a relationship to them while he
15    was a member and had been a longtime member of the El Rukns.
16    It gets them closer to each other and makes it more likely.
17    Mr. Andrews was from Evanston.  Mr. Fields had -- he said he
18    had met him before the homicide, but I think the fact that Mr.
19    Andrews visited him in prison would be something that would be
20    introduced in trial.
21    THE COURT:  So that's Jimmy Hensley.  So putting him
22    aside, so Mr. Farmer, Ms. Ebers, Mr. Zweigert, Mr. Gales,
23    Lieutenant Littleton, Mr. Schweitzer, Mr. or Ms. Taylor,
24    Mr. Brown, Mr. or Ms. Langlois, L-a-n-g-l-o-i-s, Mr. Jenkins,
25    Mr. Crane, Captain Daniels, all of those people are people who

1    have apparently some information regarding alleged misconduct

2    by Mr. Fields while he was at Menard Correctional Center.

3         MR. NOLAND:  Yes, and Mr. Jenkins, Paul Jenkins, the

4    incident there was that Mr. Fields had a firearms manual.

5         THE COURT:  Yes, right.

6         MR. NOLAND:  It is our contention in this litigation

7    that Mr. Fields was a hit man for the El Rukns and that, when

8    he got out, he continued.

9         THE COURT:  So let's put the guy you mentioned aside

10   there.  So these other people --

11        MR. NOLAND:  Sorry.  I don't want to --

12        The last one is --

13        THE COURT:  I'm talking about the IDOC people.

14        MR. NOLAND:  Okay.

15        THE COURT:  Okay, so don't interrupt me again if you

16   want to talk anymore.  All right.

17        So you said a moment ago that all these people are

18   just foundational.  I said:  Foundational for what?  You said,

19   the documents.  So how are you going to get documents about

20   these other incidents in?

21        In other words, you're talking about somebody's

22   report that says, in other words, that these people didn't

23   witness the incident, that they're saying -- they're just

24   putting in the document.  How are you going to get those

25   documents in?

1        MR. NOLAND:  Business record, IDOC business record.

2        THE COURT:  You have seen the law on police reports

3   coming in as business records is not good for you on this

4   topic.  Police reports do not come in as business records.

5        MR. NOLAND:  Also, a public record under 803-8.

6        THE COURT:  If that were true, it would be true about

7   police reports, and it's not.

8        So how are you going to get this stuff in other than

9   what you just described to me?

10       MR. NOLAND:  Impeachment as well, your Honor.

11       THE COURT:  Uh-huh.  How does the --

12       I'm just going to hold my tongue on what I was about

13  to say, but I think you misunderstand the Rules of Evidence.

14  If you think that you're able to get in a document, a hearsay

15  document, where one person says this is what happened, you're

16  going to be able to get the contents of that document in to

17  impeach, I think you're sadly mistaken.

18       Well, so the problem with this is -- I mean, there's

19  just a whole list of problems.  Problem one is you have

20  provided no information on how to contact these people.  You

21  haven't.  And with due respect, you have had since February

22  of 2012 to come up with that information.  I mean, you haven't

23  complied with Rule 26(a)1)(A)(1).  That's the first thing.

24       The second thing is I have questions about the

25  admissibility of at least some of this, but I'm not really

1  relying on that.

2      The third thing is I don't think that there's been

3  anything approaching due diligence here.  And essentially what

4  is happening is that these 15 people, or however many there

5  are, and I'm carving out -- I'm carving out Agent Moore and

6  I'm carving out the other person you just mentioned that talks

7  about the visit from Henry Andrews, the rest of them.  I don't

8  think there has been anything approaching due diligence

9  because there's been a very large amount of time between when

10 you had this information and when you chose to disclose it,

11 and there's only a minuscule amount of time left before the

12 close of discovery, which is largely occupied by other things,

13 and it's just not reasonable to expect Ms. Gorman to go and

14 depose these people.

15     Now, you could say, I suppose, well, Judge, just give

16 her an extension of discovery, but the law is clear that,

17 although the judge can do that, he is not required to.  At

18 some point I'm entitled to insist on compliance with the

19 discovery cutoff dates.

20     And then, you know, the corresponding problem is it's

21 not harmless.  So, first of all, it's not substantially

22 justified.  It's not harmless because if I were to essentially

23 throw all of these people into Ms. Gorman's court at this

24 point, first of all, I think for the reasons that I described

25 before, she has had no reason to believe that you were

1   actually going to use any of these people as witnesses until

2   you actually disclosed them in your 26(a)(1s).

3          And, number two, to say that she would have to

4   scramble to get these people deposed doesn't come close to

5   capturing it.  It's not possible, particularly without any

6   addresses, which is really your obligation to provide and not

7   hers.

8          So for those reasons, I think it was there was undue

9   delay, lack of due diligence, unfair prejudice and not

10  substantially justified, and so all of these people other than

11  Jimmy Hensley and Gary Moore are excluded for those reasons.

12         And now we're going to talk about Gary Moore.  So I

13  need a little bit of background here.  Again, I'm just sort of

14  inferring things.  I guess I'm making sort of an educated

15  hunch that there are some recordings on which Mr. Fields'

16  voice appears.

17         MR. NOLAND:  No.

18         THE COURT:  No, okay.  So what is the relevance of --

19  how does Mr. Moore, Agent Moore, fit in?

20         MR. NOLAND:  Mr. Moore, just based on what we have

21  read, was involved in overseeing the wiretaps of the El Rukns.

22  Jeff Fort was running the El Rukns from --

23         THE COURT:  From prison.

24         MR. NOLAND:  -- from Bastrop prison in Texas.

25         While the federal government was monitoring those,

1      that's when they picked up the El Rukns fix in this case.  And

2      so there's a series --

3              THE COURT:  When you say "this case," you mean the

4      state court criminal case in front of Judge Maloney.

5              MR. NOLAND:  Yes, your Honor.

6              THE COURT:  Okay.  Somebody is going to be looking at

7      this record some day, and I just want to be clear.

8              MR. NOLAND:  And --

9              THE COURT:  So something popped up on a wiretap that

10     led somebody to think that maybe the fix was in on the case in

11     front of Judge Maloney.

12             MR. NOLAND:  That's my understanding.

13             THE COURT:  Okay.  And how does that fit in to what

14     you would be trying to show at the trial in this case if we

15     got to that point?

16             MR. NOLAND:  I don't know if we'll need Mr. Moore.

17     He simply would be foundational.  If there's some type of an

18     objection to the, I guess, foundational aspects of the tapes

19     and how they were obtained, there could be other witnesses.

20             THE COURT:  So are there some of these tapes that

21     you're wanting to put in or that you think you might want to

22     put in?

23             MR. NOLAND:  Yes.

24             THE COURT:  Okay.  And have those been produced in

25     discovery, or transcripts of them at least?

1           MR. NOLAND:  The transcripts --

2           THE COURT:  Did you get them from the U.S.

3   attorney's office or something?

4           MR. NOLAND:  The transcripts were produced long ago.

5   My understanding is that in the state court certificate of

6   innocence proceeding that the lawyers handling that matter

7   have recently produced to Ms. Gorman the tapes.  We don't even

8   have them yet, but we're waiting to get them.

9           THE COURT:  The lawyers on her side of the state

10  court innocence proceeding or the state's attorney's office?

11          MR. NOLAND:  I believe the state's attorney office

12  has provided them to the lawyers on their side of the

13  proceedings in the sometime not too distant past.

14          THE COURT:  Okay, talk to me about Moore.

15          MS. GORMAN:  Well, we would, of course, be trying to

16  keep the tapes out.

17          I also would like to clarify, because I have been

18  listening to these tapes in relation to the innocence

19  petition --

20          THE COURT:  Yes.

21          MS. GORMAN:  -- that we did just receive, and it's

22  very clear that the bribe that the El Rukns, which my client

23  knew nothing about, that they were trying to bribe Judge

24  Maloney about, was the case that my client was never involved

25  in.  The other double murder, Vaughn-White, which Mr. Fields

1    was charged with and then the person who said he was involved

2    in that, a person named Anthony Sumner later admitted to the

3    state's attorney and the U.S. attorney that he made that up.

4    So he was not even involved in the Vaughn-White murders.

5    That's what the bribe attempt was about.

6          There is no evidence, and Mr. Fields never knew

7    anything about that bribe attempt.  It was between his

8    codefendant, his codefendant's attorney and Mr. Maloney.  I

9    mean Judge Maloney, former Judge Maloney.

10          THE COURT:  Go ahead.

11          MR. NOLAND:  If you would like?

12          THE COURT:  Yes, I would.

13          MR. NOLAND:  We'll be seeking -- we will be able to

14   introduce evidence linking Mr. Fields' knowledge to the bribe,

15   number one.

16          And, number two, the --

17          THE COURT:  I can see the connection.  I get it.  Has

18   anybody ever tried to take a deposition of an FBI agent who is

19   not a party in a case?

20          MS. GORMAN:  No.

21          THE COURT:  Yes, right.  It pretty much doesn't

22   happen.  There's this whole procedure that you have to go

23   through that is set out in a regulation somewhere.  There's a

24   name for it, and it comes from a case.  I'm blanking on what

25   it's called.

1      MS. GORMAN:  I would have to do, first, a request.

2      THE COURT:  You have got to go to DOJ and say, this

3 is why we need to take this person's deposition.  And

4 essentially what Ms. Gorman would be telling the DOJ person is

5 she would be sort of repeating back what you just said, that,

6 well, we think that this may be and he might do that.  And I

7 can tell from you experience in dealing with these, and most

8 of it as a judge, where the government has come in to object

9 to one thing or another, that the person in Washington who

10 deals with this when they get Ms. Gorman's request will start

11 laughing because it will be -- they will say, this is way too

12 vague.  We have no clue about how this relates to the case.

13      So I'm not at this point going to completely --

14      First of all, you would never get the deposition of

15 this guy before the discovery cutoff date anyway.

16      MS. GORMAN:  No.

17      THE COURT:  It just wouldn't happen.  I'm not going

18 to preclude it completely, but I guess what I am saying is

19 that you're going to need -- because, A, you're coming in kind

20 of at the eleventh and a half hour here and asking to add --

21 and adding this person in and basically putting the onus on

22 the other side, if they want to take the deposition, to do

23 this very complicated and not difficult or not easy task of

24 trying to justify a deposition.  You're going to need in

25 fairly short order, if you really want to use this person, to

1　give a much more specific Rule 26 disclosure, and maybe it

2　goes beyond a Rule 26 disclosure, that explains how what you

3　might want to use Mr. Moore for fits in to your defenses in

4　this case because essentially what you're doing is you're

5　providing --

6　　　　Ms. Gorman doesn't want to use him as a witness.  She

7　wants to depose him or maybe wants to depose him if you want

8　to use him as a witness.  So what you're providing her is

9　essentially the section that she's going to drop into her

10　letter that she's got to send in to DOJ to request this.  And

11　so you need to do that like within the next week to even have

12　a chance of doing this, and I'm not saying that you are going

13　to be able to use him anyway.  I mean, we'll kind of take it

14　from there.  But as of right now, I just don't think this

15　disclosure is detailed enough, given what you have to go

16　through.

17　　　　And so that leaves us with Jimmy Hensley.  And so let

18　me just make sure I'm understanding here.  So if you were to

19　call Mr. Hensley, so is he the --

20　　　　What is he, the recordkeeper, or is he the desk

21　officer or what exactly?  This is about the Henry Andrews

22　visit.

23　　　　MR. NOLAND:  Right.  I believe he's the IDOC employee

24　whose name appeared on the --

25　　　　THE COURT:  On the sign-in sheet?

1          MR. NOLAND:  On the sign-in sheet or some document

2    like that.

3          THE COURT:  If you were going to --

4          This is a question here.  So if you were going to

5    call Mr. Hensley to testify, you would be calling him to

6    testify, I'm the guy who was there when this person who signed

7    his name as Henry Andrews signed in.  And maybe you would show

8    him a picture of Henry Andrews and say, is this the guy.  Do

9    you have something --

10          And he would either say, yeah, that's him, or he

11   would say, I don't have a clue or whatever.

12          Is there anything beyond that?

13          MR. NOLAND:  And that he was there to visit Mr. --

14          THE COURT:  Yes, and he signed in and he was

15   visiting --

16          MR. NOLAND:  Yes, that's it.

17          THE COURT:  -- Nathson Fields.

18          MR. NOLAND:  And this was the plaintiff -- this is

19   Exhibit 6.

20          THE COURT:  And you have got a date in September 9th,

21   1980.  I'm sort of inclined to let him use that one.

22          MS. GORMAN:  Your Honor, I think -- and I didn't go

23   back and look at Exhibit 6 from Mr.  Fields' deposition, but I

24   believe Mr. Fields testified in his deposition that all of

25   these names after his family members were written by somebody

1    else, people that were given permission to come see him.

2    Those weren't from him.

3          THE COURT:  I mean, he would have the ability to

4    testify to that, obviously, at the trial.  You can use

5    Mr. Hensley.  I don't think it's --

6          I think that one is largely harmless given the fairly

7    narrow scope of the testimony that would be given.  But what

8    you need to do on that is -- and I'm going to really put the

9    burden on you.  You have got to, within the next week, come up

10   with some location for this guy, Mr. Noland.  So it's either

11   you're going to have to, you know, contact somebody at IDOC

12   and say, does this guy still work for you and what prison is

13   he assigned to, and if that's not the case, you're going to

14   have to do your best to come up with some sort of an address

15   for him so that Ms. Gorman has somebody to deal with.

16         And if you want to take his deposition and you need

17   to do that after the discovery cutoff date, I will let you do

18   that.

19         MS. GORMAN:  Okay, thank you.

20         THE COURT:  So the second motion to bar, which is

21   document number 383, again, the order is just going to say

22   it's granted in part and denied in part as stated in open

23   court.

24         All right.  I'm not going to ask whether there is

25   anything else that anybody wants to talk about.  Okay.

1          MR. MICHALIK:  Thank you, your Honor.

2          THE COURT:  So I'll see you the next time I see you.

3          MS. GORMAN:  Thank you.

4          MR. MICHALIK:  Thank you, your Honor.

5          THE COURT:  Bye-bye.

6          MR. NOLAND:  Thanks, Judge.

7      (Which were all the proceedings had in the above-entitled

8  cause on the day and date aforesaid.)

9

10

11                    C E R T I F I C A T E

12

13       I hereby certify that the foregoing is a true and

14  correct transcript of the above-entitled matter.

15

16

17  */s/ Laura M. Brennan*                    June 14, 2013

18

19  _____          _____

20  Laura M. Brennan
    Official Court Reporter                    Date
21  Northern District of Illinois

22

23

24

25