UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHSON E. FIELDS, ) | |
|     Plaintiff, ) | |
| ) | No. 10 CV 1168 |
| v. ) | |
| ) | Hon. Matthew F. Kennelly |
| CITY OF CHICAGO et al., ) | |
|     Defendants. ) | |

**PLAINTIFF'S REDACTED VERSION OF MOTION TO MAKE PUBLIC THE NAMES OF VICTIMS IN THE SINGLE FILE CABINET VIEWED BY COUNSEL**

NOW COMES Plaintiff Nathson Fields, by and through his attorneys, and hereby asks this Court to allow counsel for the Plaintiff to publicly disseminate the names of the deceased homicide victims whose investigative homicide files are contained in the single file cabinet at the basement of 51st and Wentworth that Plaintiff's attorneys were allowed to inventory and review; the homicide investigative files contained in said cabinet date from 1944 to 1987. In response to this Court's request on July 30, 2013 for more specific information regarding counsels' investigation, counsel for Plaintiff supplements his July 24th, 2013 Motion (Docket 398) with the following:

**BACKGROUND**

As more fully described in Plaintiff's response motion filed on April 2, 2013 (Docket 345) and Motion filed on April 5th 2013 (Docket 347) there lie in the basement at 51st and Wentworth, a facility currently the home of Area Central – formerly Area One – more than 20 file cabinets containing thousands of investigative files that the City has designated "open," and which have never been cataloged or inventoried in any manner.

Counsel have only been allowed to view in depth and inventory *one* cabinet -- the one file cabinet that the City *thinks might have* held the Plaintiff's investigative file at some point during the twenty-eight years it was missing. (A list of the names from the one homicide file cabinet examined is attached as Ex. A) Plaintiff's counsel have concluded, from their limited investigation, that some of the files, despite being designated as "open," are not in fact "open." As further described below, and based upon their investigation, counsel also believes that some of the files are similar to the missing street file in Mr. Fields' case, in that they were very likely never tendered in criminal proceedings to defendants.

**ARGUMENT**

The withholding of "street" files (investigative files) by the CPD has a long and sordid history (see, *Palmer vs. City of Chicago* 755 F.2d 560 (7th Cir.1985); *Palmer vs. City of Chicago* 806 F.2d 1316 (7th Cir. 1986) and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)). Since filing the above motions regarding the twenty plus file cabinets containing thousands of uninventoried "open" investigative files in the basement at 51st and Wentworth, counsel for the Plaintiff have conducted an investigation into several criminal prosecutions stemming from homicide investigations whose corresponding investigative files are now housed in the one file cabinet reviewed and inventoried by counsel.

Plaintiff sought, in discovery, copies of only five of the 300 homicide files in the one file cabinet--four of which counsel believes reveal a pattern of withholding *Brady* material from defendants and hiding the files in the "open files" cabinets. The City has

produced three of the requested files but has refused to tender the two other files that Plaintiffs' counsel sought. As further described below, counsel for Plaintiff have concluded based on their *limited* investigation, that two of the three files tendered by the City, and the two additional files that the City refuses to tender are not "open" in the traditional sense, and contain pertinent documents that were very likely never shared with the accused defendants in their criminal proceedings. Each of the files Plaintiff sought has ties to Plaintiff's own litigation and thus a further examination of their contents was justified in what (not surprisingly) turned into a discovery dispute. Despite the justification offered by Plaintiff, the City refused and still refuses to tender two of the files sought. The five files that Plaintiff requested were:



a.
b.
c.
d.
e.
.

These five files were selected by counsel for three reasons: 1.) the files had overlapping issues with the Plaintiff's case; 2.) several of the files contained information suggesting that suspects had been identified, charged, prosecuted and convicted in criminal proceedings, thereby indicating that the investigative files were not "open" in any traditional sense - at least at the time of the criminal proceedings; and 3.) several of the files were familiar to counsel and documents within the files suggested that some of

the materials in the files were exculpatory, and likely never tendered in the underlying criminal litigation. Nevertheless, the City continues to refuse to tender two of the files, the investigative files for the ███████ and ███████ homicides.

What follows is a summation of the investigation by Plaintiffs' counsel regarding the five files, an investigation which has led to this request to release the names of all of the homicide victims in the file cabinet reviewed by counsel. This request is made in the interest of justice.

**A. The ███████ Investigative File**

Mr. ███ was murdered on ███████. There were two trials regarding this murder. One of the defendants in the first trial was Earl Hawkins -- Plaintiff's co-defendant in the Hickman/Smith murders. Hawkins was acquitted of the ████ murder in ████.

On or about May 13, 1985 Anthony Sumner, a former El Rukn, began to "cooperate" with the CPD and the federal prosecutors investigating the El Rukn organization. Subsequent to Sumner's cooperation, police conducted raids on buildings owned by members of the El Rukn organization and on the El Rukn headquarters on May 17, 1985. More than twenty members of the El Rukn organization were arrested during those raids and, over the next few days, many of those men were placed in line-ups relating to various unresolved murders about which Anthony Sumner had supposedly begun to provide information. Based on Sumner's "information," warrants were issued at that same time for Plaintiff Nathson Fields and Earl Hawkins, for the

4

murders of Dee Eggers Vaughn and Joseph White.[1] Some days later, and also based on "information" from Sumner a warrant was also issued for Earl Hawkins and Plaintiff Nathson Fields in the Hickman and Smith murders which occurred at the Ida B. Wells housing project 15 months earlier.

In the course of discovery in this civil rights action, Plaintiff's counsel received from the federal government a line-up report from the Hickman/Smith murders from the May 18, 1985 line-up. However, as shown by the crime lab copy of the report, the witnesses did not identify Mr. Hawkins as a perpetrator in the Hickman/Smith murders but instead identified Ray Fergerson. (Ex. C) The detective division copy of that same line-up report shows Ray Fergerson's identification scratched out with pen. (Ex. D.) (The original document – which counsel for plaintiff reviewed at the CPD warehouse, shows the identification of Mr. Fergerson whited out).

In addition to this falsified revision of the line-up report, the narrative of the line-up report was changed on May 21, 1985 to indicate that the three witnesses identified Earl Hawkins as one of the men to commit the murders of Hickman and Smith. (Ex. E) (This was not the only instance in which Plaintiff discovered falsifications of documents

---

[1] Two weeks prior to his death in 1992 Anthony Sumner signed an admission with the States Attorney's office admitting that he lied to the grand jury about the Vaughn and White murders and that those murders were actually committed by himself and Earl Hawkins; Sumner admitted that Nathson Fields had nothing to do with the murders. Sumner also admitted that he was mad at Mr. Fields, a building manager, for putting his family out of their apartment for failure to pay rent and that was the reason he named Mr. Fields as an accomplice. At the time that Mr. Sumner admitted lying to the Grand Jury regarding Mr. Fields involvement in the Vaughn/White murders the States Attorneys never questioned Mr. Sumner about the Hickman and Smith murders. Sumner died before Mr. Fields's defense counsel could question him. (Ex. B)

5

by the CPD during the El-Rukn line-ups conducted during the weekend of May 18th, 1985 but it is the only one that is pertinent herein.) Counsel has investigated this inexplicable identification of Mr. Fergerson in a Hickman/Smith murder lineup, and the CPD's subsequent efforts to literally white it out of history; counsel believes that Mr. Fergerson was retroactively written out of the Hickman and Smith investigation when police discovered that he had a strong alibi and was therefore unsuitable for that particular prosecution. Plaintiff believes that this also establishes that the CPD had a very early indication that the "information" coming from Sumner was not reliable.

The ▮▮▮▮▮ homicide file contained in the basement cabinet shows a line-up report from May 19th, 1985 which again includes both Ray Fergerson and Earl Hawkins. The witnesses picked out Earl Hawkins, the original defendant in the ▮▮▮▮▮ ▮▮▮▮▮ – and not Mr. Fergerson. No arrests were made in the spring of 1985 regarding the ▮▮ murder. The unfortunate Mr. Fergerson was charged in yet another "open file" –again based on "information" from Sumner - the beating and death of Maurice Coleman. (Upon information and belief every El Rukn member who was arrested during the raids was charged with committing offences found in open files.) Two years later, after Earl Hawkins[2] began cooperating with the CPD and federal authorities, Mr. Fergerson was charged in the ▮▮▮ murder based on the testimony of Hawkins and two other *cooperating* El Rukn witnesses --Anthony Sumner and Tramell

---

[2] In his recent deposition Mr. Hawkins admitted that he began his *cooperation* by discussing the ▮▮ case because he understood he could not be prosecuted a second time for that murder and CPD Detective Brannigan told him "you better come up with something quick." Hawkins also admitted that Detective Brannigan told him that instead of facing execution he could probably get his sentenced reduced to around 20 years. These conversations occurred early in their meetings after Hawkins wrote to Brannigan from death row in early 1987. (Exs. F and G)

6

Davis. The ███ trial took place in the ██████ and Mr. Fergerson and several others were convicted of that murder. The ███ murder investigative file, housed in the basement of 51st and Wentworth, is clearly not properly designated an "open" file; the case was not "unsolved" and no suspects remained at large; instead, the file is rather similar to the Hickman and Smith homicide file – i.e., a file hidden away in the basement of Area One - involving a murder where convictions were secured. Counsel believes based on their investigation that the complete investigative file found in the basement was most likely never tendered to the defendants in the second trial.

The investigation by counsel included reviewing the court file from the 1988 trial, reading the court transcript and reviewing materials submitted in discovery. That investigation leads to the conclusion that this investigative file (or parts thereof) was most likely never tendered to the defendants in the ██████████ second trial because the investigative file from the basement contains what appears to be *Brady* material that was not utilized by any of the defendants at the trial. Coincidently, a name that appears in this file as a suspect also appears as a suspect in a similar style murder - the ███ murder- another file found in the basement file cabinet and discussed below — ██████████████." Although "███" is named as a suspect in the Bibbs murder no mention was apparently made at the ███ trial that "███" was actually on the scene at the time of the ███ murder. In addition, in a note found in the ███ file the CPD remarked on the similarity between the ███ shooting and the ███ shooting. As shown below, that similarity most likely has to do with the

7

involvement of "▮▮▮" a notorious drug supplier at the time - and not a member of the El Rukns.

These facts, of course, do not prove that the file was not turned over to the defense but based on the fact that this file was hidden in a cabinet with supposedly "open" files - ostensibly the same cabinet that Mr. Fields file was hidden for some or all of 28 years - coupled with the investigation by counsel suggesting that at least some pertinent information raised in the file was never put forward by *any* of the defense counsel during the trial certainly raises a strong possibility that this file (or parts thereof) was never turned over. There are still men in prison who were convicted in that second trial for the ▮▮▮ murder and counsel believes that this file should be made available to those men.

    **B. The ▮▮▮▮▮▮▮▮ Investigative File.**

Eighteen months after the ▮▮▮ shooting, in ▮▮▮▮▮▮, ▮▮▮▮▮▮▮ was sitting in a parked car at 56th and Michigan in Chicago with two other women, ▮▮▮▮▮ and ▮▮▮▮▮, when a masked gunman approached the car and started shooting. ▮▮▮▮▮▮ and ▮▮▮▮▮ were both hit by the gunfire. ▮▮▮▮▮▮ died the next day, ▮▮▮▮▮ survived.

According to the "open" investigative file, housed in the basement at 51st and Wentworth, ▮▮▮▮▮ immediately recognized the person who shot into the car as ▮▮▮▮▮▮▮▮); ▮▮" had driven the car to the location where it was parked and he left the three women in the car while he supposedly went into the apartment of a friend. Just prior to being shot ▮▮▮▮▮ recognized the masked "▮▮" as he

8

approached the car with a gun (by his clothes and voice). According to ██████, █ ██ said to ████ "bitch, give up the coat" as he opened fire on ████. As █ ██ was shooting at ██████████ (who was sitting in the front seat) █ ███n, (who was sitting in the back seat) asked ████, why you doing this?" at which point ██████ turned the gun on ████ ███████, who jumped out of the car just moments prior to the shooting and hid by the side of the car during the gunfire, also told police that the perpetrator had been "███," accompanied by ██████████ and █ ███. The investigative file contains approximately 150 pages of notes and leads -- mostly relating to "███" (██████████) and an associate named "███" (████ ██████) the owner of the car in which ██████ was killed. ████ had apparently purchased the old car that same day. As mentioned above ██████ was also a suspect in the similar style murder of ██████████ months earlier.

The leads found in the investigative file were developed from eyewitness interviews and paint a compelling narrative suggesting that ████ and ██████ set out to kill ██████████ on account of ██████ selling a stolen coat loaned to her, and then used the proceeds to buy drugs for herself. ████ and ██████, members of the Titanic Stones gang, needed the proceeds from the sale of the stolen coat to pay back a drug-related debt. ██████████ and ██████████ were the primary suspects in the investigative file found in the basement of Area One and substantial evidence from that file indicates that those two men were most likely responsible for the shooting. One of the last notes in the file indicates that the CPD was close to disproving ██████" alibi. The file also suggests, based on an interview with ██████████ cousin ██████████, that

9

▇▇▇▇ (the passenger that escaped from the car) had some foreknowledge that "▇▇" intended to confront ▇▇▇▇, and that ▇▇▇▇ removed herself from the car seconds before the shooting. In later notes found in the file ▇▇▇▇ admitted that she did have advanced notice but that she did not know that "▇▇" was going to murder ▇▇▇▇.

Despite the vast evidence in the investigative file that "▇▇" and "▇▇" were the shooters (and that ▇▇▇▇ had advance notice of the hit-allowing her to exit the car prior to the shooting) the murder of ▇▇▇▇ and attempted murder of ▇▇▇▇ were wrapped into the federal RICO case against members of the El Rukn organization. The 1989 indictment in *United States of America v. Henry Andrews, et al*. (89 cr 908) names J.L. Houston, William Doyle, Jackie Clay and Edgar Cooksey with Racketeering Act nos. ▇ and ▇ the murder of ▇▇▇▇ and the attempted murder of ▇▇▇▇. Ironically, Racketeering Act ▇▇ and ▇ also identifies ▇▇▇▇ as a would-be victim of the hit, even though he was not in the vehicle with ▇▇▇, and even though the initial investigation pointed to ▇▇▇▇ ▇▇▇ as a likely accomplice in the murder (the same ▇▇▇▇ whose name surfaced in the similar ▇▇ attack noted above).

Despite having positively identified "▇r" as the individual who shot her, ▇▇▇▇ testified for the Government at the trial against Houston, Doyle, Clay, and Cooksey. Several of the men were found guilty under those counts, including J.L. Houston. Counsel for Fields has read as much of the record as she could obtain and concludes that the file (or parts thereof) that was in the basement of 51st and Wentworth

10

-- and designated as an open file – was most likely never tendered to the defendants in the federal racketeering trial (counsel has no information as to whether the file was ever turned over to federal prosecutors). Plaintiff's counsel believes defense counsel never received the file from the basement because pertinent exculpatory information found in that file - *some* of which is described herein- was never raised by *any* of the accused defendants in the federal proceeding. Counsel has been unable to determine if any defendants are still in prison for that particular crime, but the crime itself was utilized by the federal government as evidence of the pattern of acts of violence[3] on the part of members of the El Rukn organization in the racketeering counts of the indictment.

**C. The ▮▮▮▮▮ Homicide File**

Counsel requested the ▮▮▮▮▮ homicide file from the City defendants because the file contains the names of many of the same suspects that appear in the long missing street file for the Hickman/Smith murders – the body of documents which now figures so prominently in Plaintiff's civil rights case (the file that was withheld from Nathson Fields during his two trials, for twenty-eight years). The ▮▮▮▮▮ homicide file expands on the ongoing shootings between local gangs within the Ida B. Wells complex around the same time as the Hickman and Smith murders. Those feuds, counsel believes, likely led to the murder of Mr. Smith (the leader of a small gang within the Ida B. Wells complex) and his friend Mr. Hickman. As far as counsel can

---

[3] The ▮▮▮ murder was also used as evidence of the pattern of acts of violence on the part of the El Rukn organization in the federal indictment at Racketeering Act Nos. ▮ and ▮

11

determine, the file is genuinely open and no defendant has been charged or convicted of ███████ murder.

**D. & E. The ███████, and ███████ Homicide Files**

These are the two files that the City has refused to tender to counsel for the Plaintiff. The ███ file contains cryptic references to the Dee Eggers Vaughn murder (the double murder described above that Mr. Fields was originally charged with and which was used against him in sentencing to allow for his execution) and also to another supposed "El Rukn" related homicide (Harold's Chicken shack shooting in April, 1985). The ███ file contains documents that address issues relating to the Gangster Disciples' and that particular gang's *internal* fights, including murders, relating to drug sales within the gang. Both files contain disturbing documents related to the suspects in those cases. Counsel could only perform a cursory examination of these two files, and has not been afforded an opportunity to compare those documents with court documents from subsequent criminal prosecutions because of the City's refusal to tender the two files. However, the cursory examination by counsel strongly suggests that exculpatory materials found in those files were never tendered to the suspects.

In the ███ file the evidence is particularly troubling because the suspect identified in the file was ultimately not charged in that particular murder; the ███ file contains materials compiled long after the murder took place and it turned out that the suspect was a young child at the time of the shooting. Nevertheless, the *suspect* in the ███ murder was conveniently charged with two separate murders after it was

12

determined that he could not have been involved in the ███ murder (one of the murders took place on the day of his arrest) even though there was no physical evidence linking the man to either crime. The "suspect" confessed to the first murder after being interrogated continuously over several days by a CPD detective with an infamous history. After the first confession the interrogation continued for more than another day and the suspect confessed to a second murder. The "suspect" is in prison for his natural life. Again, because counsel did not have the actual investigative file to compare with court documents this investigation is incomplete.

**CONCLUSION**

The few files reviewed suggest to counsel that if the names of the victims corresponding to the single homicide file cabinet that Plaintiff's attorneys were allowed to inventory -- were to be made public, there would be several individuals, some of whom are still in prison, who could possibly have an argument that *Brady* material was never turned over by the City in their criminal cases. This claim is not made lightly -- it is made by comparing documents found in two of the three investigative files that Plaintiff was allowed to receive and review -- with the actual court files in the criminal cases, judicial opinions, and discovery material. Counsel also did a limited review of public information on the two files that the City refuses to tender (albeit without the benefit of having the actual documents in those files to confirm counsels' suspicions).

If Plaintiff's counsels' fears are substantiated, there are individuals currently in prison who would have an opportunity to argue for a new trial based on the information contained in this one particular file cabinet. Counsel for Plaintiff have not

conducted an in-depth review of all of the files in the cabinet however, based on counsels' knowledge of some of the cases and the review conducted upon receiving the five files (as described above) it appears that the repository of "open" files in the basement at 51st and Wentworth contains other files that have been withheld from defendants during their criminal proceedings. If this Court were to allow the list of victim names to be publicly released counsel believes that, at very minimum, individuals who were not provided complete investigatory information from the files found in that particular cabinet, would have an opportunity to have that information reviewed.

Wherefore, Plaintiff asks that this Court -- in the interest of justice -- allow his counsel to release the names of the deceased victims from the one file cabinet inventoried by counsel, and for such other and further relief as this Court deems just.

Dated: September 11, 2013

                                        Respectfully Submitted,

                                        /s/H. Candace Gorman
                                        One of the Attorneys for Fields

Law office of H. Candace Gorman
220 S. Halsted, Suite 200
Chicago IL. 60661
312.427.2313

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, hereby certify that the foregoing Redacted document was served to the parties through the ECF system.

Dated: September 11, 2013

                                              Respectfully Submitted,

                                              /s/H. Candace Gorman
                                              One of the Attorneys for Fields

For Fields:

| | |
|---|---|
| Leonard C. Goodman<br>Melissa Matuzak<br>53 W. Jackson Boulevard<br>Suite 1650<br>Chicago, Illinois 60604<br>312-986-1984 | H. Candace Gorman<br>220 S. Halsted<br>Suite 200<br>Chicago Illinois 60661<br>312-427-2313 |