1      IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3

4  NATHSON E. FIELDS,              )
                                   )
5                Plaintiff,        )  Docket No. 10 C 1168
                                   )
6          vs.                     )
                                   )
7  CITY OF CHICAGO, et al.,        )  Chicago, Illinois
                                   )  July 30, 2013
8                Defendants.       )  10:00 a.m.

9                TRANSCRIPT OF PROCEEDINGS
10     BEFORE THE HONORABLE MATTHEW F. KENNELLY

11 APPEARANCES:

12

13 For the Plaintiff:    LAW OFFICES OF H. CANDACE GORMAN
                         BY:  MS. H. CANDACE GORMAN
14                       220 South Halsted Street
                         Suite 200
15                       Chicago, Illinois  60661

16
                         MR. LEONARD C. GOODMAN
17                       53 West Jackson Boulevard
                         Suite 1650
18                       Chicago, Illinois   60604

19

20 For the Defendant:    DYKEMA GOSSETT PLLC
                         BY:  MR. DANIEL M. NOLAND
21                            MR. PAUL A. MICHALIK
                         10 South Wacker Drive
22                       Suite 2300
                         Chicago, Illinois  60606
23

24                       COOK COUNTY STATE'S ATTORNEY
                         BY:  MR. STEPHEN L. GARCIA
25                       500 Richard J. Daley Center
                         Chicago, Illinois

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois  60604
(312) 435-5785

1    (The following proceedings were had in open court:)

2        THE CLERK:  10 C 1168, Fields v. City of Chicago.

3        MS. GORMAN:  Good morning, your Honor; Candace Gorman

4    for Mr. Fields.

5        MR. GOODMAN:  Leonard Goodman for Mr. Fields.

6        MR. NOLAND:  Good morning, your Honor; Dan Noland for

7    the City defendants.

8        MR. MICHALIK:  Paul Michalik for the City.

9        MR. GARCIA:  Stephen Garcia for defendants Wharrie

10   and Kelley.

11       THE COURT:  Okay.  We have got to start out with

12   inventory because I was trying to make sure I know what

13   exactly is up.

14       So not necessarily in this order, I've got the

15   plaintiff's motion to make public.  I've got the plaintiff's

16   motion to bar, which concerns Mr. Delorto, which I don't know

17   that I have ruled on.  I don't remember whether I ruled on it

18   or not.  It's still showing up as pending.

19       MR. NOLAND:  That was tied in with our motion --

20       THE COURT:  On Ms. Langston.

21       MR. NOLAND:  -- Ms. Langston.  The Court entered and

22   continued it today.

23       And essentially the Court made known, I think, its

24   thought process.

25       THE COURT:  But it's still, technically speaking,

1  still not a closed matter because we have got to talk about it
2  more.
3          MR. NOLAND:  Yes.
4          THE COURT:  You were going to tell me today what was
5  going to happen, I think, with Langston, and then I was going
6  to kind of go from there.
7          Okay.  So I've got the corresponding motion, the City
8  defendant's motion to bar regarding Ms. Langston, and then
9  I've got the motion relating to Mr. Brannigan.
10         Does that sound like everything?
11         MS. GORMAN:  Yes.
12         THE COURT:  Okay.  So let's talk about the Brannigan
13  motion first.  So you have seen the response, I assume.
14         MS. GORMAN:  I have.
15         THE COURT:  Talk to me.
16         MS. GORMAN:  Well, your Honor, I guess there's two
17  things.  If the City wanted to contest --
18         This Court said Mr. Brannigan should not be talking
19  to the witnesses, and if the City wanted --
20         THE COURT:  Well, I think what I said is it was an
21  incredibly stupid idea, perhaps the most stupid I had heard in
22  X amount of time.  I didn't issue an injunction.
23         MS. GORMAN:  Right.
24         THE COURT:  Yes.
25         MS. GORMAN:  But I think their obligation would have

1   been to come to you if they wanted to allow Mr. Brannigan to
2   still --
3           THE COURT:  Really?
4           MS. GORMAN:  -- go and talk with people.
5           THE COURT:  Why?  There's no injunction.  I didn't
6   say you couldn't do it; I just said it was really dumb.  If
7   people didn't do dumb things, everybody standing up and
8   everybody sitting up here would be out of a job, and probably
9   most of the people sitting on that side of the room over
10  there.
11          MS. GORMAN:  Well, your Honor, that's my position is
12  that I should have --
13          THE COURT:  I don't agree with that.
14          MS. GORMAN:  Okay.
15          THE COURT:  I mean, I'm not taking a position yet
16  about what is or isn't going to be admissible at what point in
17  time, but I don't think that anybody had to come and ask
18  permission of me because I didn't make any order.  I mean, I
19  just made comments.
20          MS. GORMAN:  My understanding was that you did tell
21  him not to, but that was just my understanding.
22          THE COURT:  I think you're mistaken.
23          MS. GORMAN:  The other thing is if they're saying
24  that Mr. Brannigan is going there just to introduce them,
25  there is no explanation as to why Mr. Hunter had to be

1    introduced twice to counsel.

2         THE COURT:  How many people?  Are we talking about

3    two, two witnesses?

4         MS. GORMAN:  Correct.

5         THE COURT:  It's Hunter and?

6         MS. GORMAN:  And Cooksey.

7         THE COURT:  Cooksey, okay.

8         All right.  So if the question were asked of

9    Brannigan in a deposition, why did you go, okay, why did you

10   go on the visit to Mr. Hunter, just to pick an example out of

11   the air, and the truthful answer would be, because my attorney

12   asked me to, would that be privileged or work product?  My

13   attorney asked me to go; not the reasons, just my attorney.

14   Why did you go?  My attorney asked me to.

15        MR. NOLAND:  I believe it would be attorney/client

16   and work product.

17        THE COURT:  How would it be attorney/client?  How is

18   it a communication for the purpose of obtaining legal advice?

19      (Brief interruption.)

20        THE COURT:  It's go meet with this guy.

21        MR. NOLAND:  Because it relates --

22        THE COURT:  The record should reflect a pregnant

23   pause.  He's thinking.  That's okay.

24        MR. NOLAND:  It's a communication between

25   Mr. Brannigan and Dykema.

1          THE COURT:  Not everything a lawyer says to a client,

2    and vice versa, is privileged.  It's a communication for the

3    purpose of obtaining legal advice.  Now, it might be work

4    product.

5          I'm having a hard time seeing how me telling my

6    client, go talk to this guy, is attorney/client privileged.

7          MR. NOLAND:  I think the attorney/client privilege

8    allows communication with your client discussing whether to

9    talk to a witness.

10          THE COURT:  That wasn't -- but that's not what we're

11    talking about here.  The question was, why did you go see him,

12    and if the answer is, my lawyer told me to --

13          So, in other words, Noland says to Brannigan, you go

14    talk to Hunter, period, end of discussion, that's the only

15    discussion that's had, I'm not seeing how that is

16    attorney/client privileged.  Now, it may be work product,

17    okay, because maybe you could say it's a strategic thing,

18    it's, you know, thought processes or whatever.

19          But I guess what I'm wondering here is why everybody

20    on both sides is all so worked up about this, and maybe I'm

21    the cause of it.  Maybe it's because of the comments that I

22    made I don't know how many months ago it was.  I mean, I don't

23    know whether you have --

24          In the response there is a reference that at some

25    earlier point in time, and I didn't go back and look at the

1  whole transcript, but at some earlier point in time, Ms.

2  Gorman said, well, I'm not going to use this at trial.

3  But, I mean, I would think that, you know, just

4  sticking with Mr. Hunter for the moment, just from a purely

5  evidentiary standpoint, okay, if the plaintiff's contention is

6  that Mr. Hunter, you know, isn't really quite telling the

7  straight story and he's been kind of singing what you would

8  call the party line, I would think it would be fair game at a

9  trial to say -- to bring out the fact that, you know, before

10  Mr. Hunter's deposition, Mr. Brannigan went and got him;

11  before Mr. Hunter's interview -- you know, when Mr. Hunter was

12  interviewed by the investigators, Mr. Brannigan came along

13  with, you know, combined with whatever else you have on

14  Mr. Brannigan and, you know, you could use that, I assume, to

15  argue that either Hunter was biased or that there was some

16  attempt to influence him or something like that, assuming that

17  you had some evidence of that.

18  But, you know, beyond that, beyond the fact that he

19  is there and he's there ahead of everybody else and he's there

20  getting the foot in the door or whatever he's doing or, you

21  know, he's there because he's the known quantity that somebody

22  who is probably reluctant to talk to people about this, you

23  know, might need in order to be able to talk, I do think that

24  once you start getting beyond that, you're getting into

25  strategic issues which is getting pretty close to work product

1  and probably is work product.

2  I don't really think -- I don't think we're talking

3  about the attorney/client privilege here unless there is a

4  communication between Mr. Noland and one of the other lawyers

5  and Mr. Brannigan talking about why.  But if all we're talking

6  about here is, hey, we want to make sure Hunter talks to our

7  investigator, go out there first because he knows you, I mean,

8  beyond that, I don't think you're entitled to really get into

9  the thing.

10  MS. GORMAN:  Okay, your Honor.

11  THE COURT:  And I think you have already got that.

12  You have got that he was there.  You have got that he got

13  there ahead of people.  You have got that he sat down and had

14  coffee with Hunter before the deposition or whatever it is.

15  So I don't really think there is anything more that you can

16  appropriately get out of that.

17  MS. GORMAN:  Okay.

18  THE COURT:  So the motion to compel, which is

19  document number 391, is denied for the reasons stated in open

20  court.

21  So let's talk about the Langston/Delorto issue next.

22  What developments have there been on that?

23  MS. GORMAN:  Your Honor, we have agreed with counsel

24  that if we can get Ms. Langston in for a deposition, that they

25  can piggyback on.  That has not happened yet.

1  THE COURT:  Piggyback being with the state innocence
2  case?  Yes.
3  MS. GORMAN:  And we still don't even know if we are
4  able to get her in for a deposition.  I exchanged email with
5  her counsel last week, and it's just not clear that they're --
6  that she's going to be willing to come in for the innocence
7  hearing.  We're still working on it.  I hope she will.  If so,
8  there has to be a deposition by order of Judge Biebel.  She
9  has to be deposed before the innocence hearing if she's going
10  to testify.
11  THE COURT:  Is it still set for -- it was a date in,
12  like, October or something?
13  MS. GORMAN:  19th of August.
14  THE COURT:  August.  And it's still set for then.
15  MS. GORMAN:  Yes.
16  THE COURT:  Does anybody think it's not going to
17  happen?
18  MS. GORMAN:  No, it's going to happen.
19  THE COURT:  You think it is going to happen.
20  MS. GORMAN:  Yes.
21  THE COURT:  Yes.
22  MS. GORMAN:  We just don't know if Ms. Langston will
23  be testifying.
24  THE COURT:  Do you have anything you want to
25  contribute on that?

1           MR. NOLAND:  No.

2           THE COURT:  So should I just kind of keep all that in

3    a state of suspended animation for the moment?

4           MR. NOLAND:  That's fine, yes.

5           THE COURT:  Fine, done on that.  So those two we'll

6    just kind of keep open.

7           And then the last thing is the one that is entitled

8    Plaintiff's Motion to Make Public the Names of Victims in the

9    One File Cabinet Viewed By Counsel.

10          MS. GORMAN:  Your Honor, one thing I didn't make

11   clear in the motion is that these are homicide files.

12          THE COURT:  I assumed that.

13          Well, all I'm going to say is that the motion was --

14   I mean, I get where you're -- I get what you're telling me in

15   general terms, but it was little thin on detail.

16          MS. GORMAN:  That's because everything is protected.

17   I mean --

18          THE COURT:  Well, it's not protected from me, I would

19   think.  You could file something under seal.

20          I mean, when you say -- when you say in here that on

21   information and belief, you, quote, unquote, believe -- and

22   I'm doing air quotes liberally here -- believe that there are

23   files that, you know, contain materials that weren't tendered

24   to defendants in the underlying cases, it might contain

25   exculpatory information, I mean, if you really want to tell me

1    that, I mean, I think you would probably want to tell me that

2    in a more fulsome way.

3              MS. GORMAN:  Okay.

4              THE COURT:  But with that in mind, is there anything

5    you guys want to say about this at the moment?

6              MR. MICHALIK:  I think our two responses -- that

7    would be our first response, that there's nothing in here in

8    terms of any detail or evidence.  This has been raised a

9    couple of times before your Honor, and I think the last

10   memorandum --

11             THE COURT:  It's getting more specific, but it's not

12   quite specific.

13             MR. MICHALIK:  Well, and I think your Honor's last

14   order --

15             THE COURT:  I said I wasn't going to be the innocence

16   commission for the City of Chicago.

17             MR. MICHALIK:  That's right.

18             And then subsequently in a memorandum opinion and

19   order, you indicated that if plaintiff had some evidence, to

20   bring that to your attention.  It's not here.

21             And then, secondly, I think the motion itself sort of

22   betrays itself as a, for lack of a better term, a fishing

23   expedition to see if there might be some more clients

24   available for civil rights lawsuits.

25             THE COURT:  Okay.  Well, you got that off your chest.

1          So what I'm going to say is this is denied without

2     prejudice to filing a more detailed motion.

3          MS. GORMAN:  Okay.

4          THE COURT:  All right.

5          What else should we talk about?  I'm always hesitant

6     to ask that, but I figure I should anyway.  Are there any

7     other things we need to talk about or that we ought to talk

8     about?

9          What is the next deadline?

10          MS. GORMAN:  Our expert reports are due August 16th.

11          THE COURT:  Okay.  All right.  So, Mr. Garcia, your

12    office is involved -- not you necessarily personally, but your

13    office is involved in the proceeding in front of Judge Biebel.

14          MR. GARCIA:  Correct.

15          THE COURT:  Is it Judge Biebel who is doing it?

16          MR. GARCIA:  Yes.

17          THE COURT:  Are you involved in it yourself?

18          MR. GARCIA:  I'm not.

19          THE COURT:  You're not, but you are and you are.

20          MS. GORMAN:  Correct.

21          MR. GOODMAN:  Yes.

22          THE COURT:  Do you have a sense of how long it's

23    supposed to go?

24          MS. GORMAN:  Two or three days.

25          THE COURT:  Two to three days.

1      All right.  Just out of curiosity, who is handling it

2  from the state's attorney's office?

3      MR. GARCIA:  Brian Sexton.

4      THE COURT:  Oh, okay.

5      MS. GORMAN:  Your Honor, Mr. Hawkins' deposition is

6  being taken in both cases.

7      THE COURT:  Right.

8      MS. GORMAN:  And we agreed that his deposition is

9  actually going to be the starting point that Monday, the 19th,

10  and then his testimony will start on the 2 --

11      THE COURT:  Well, he's going to do the deposition and

12  then he's going to testify down at 26th Street.

13      MS. GORMAN:  Correct.

14      THE COURT:  Okay.  All right.  So I'm going to have

15  you come back at the beginning of September then.  Can you do

16  the 4th?  Does that work okay?

17      MS. GORMAN:  Your Honor, can we have the next, the

18  following week?

19      THE COURT:  Is the 11th okay?

20      MS. GORMAN:  That would be great.

21      THE COURT:  The 11th of September at 9:30 for a

22  status.  See you then.

23      MR. MICHALIK:  Thank you, your Honor.

24      MR. NOLAND:  Thank you, Judge.

25      MS. GORMAN:  Thank you.

1        MR. GOODMAN:  Thank you.

2        MR. GARCIA:  Thank you.

3     (Which were all the proceedings had in the above-entitled

4  cause on the day and date aforesaid.)

5

6

7

8                    C E R T I F I C A T E

9

10        I hereby certify that the foregoing is a true and

11  correct transcript of the above-entitled matter.

12

13

14  /s/ Laura M. Brennan                    September 26, 2013

15

16  _____          _____

17  Laura M. Brennan
    Official Court Reporter                     Date
18  Northern District of Illinois

19

20

21

22

23

24

25