1     IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

3

4   NATHSON E. FIELDS,                )
                                      )
5                   Plaintiff,        )   Docket No. 10 C 1168
                                      )
6            vs.                      )
                                      )
7   CITY OF CHICAGO, et al.,          )   Chicago, Illinois
                                      )   September 18, 2013
8                   Defendants.       )   10:20 a.m.

9                  TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
    APPEARANCES:
12

13  For the Plaintiff:    LAW OFFICES OF H. CANDACE GORMAN
                            BY:  MS. H. CANDACE GORMAN
14                          220 South Halsted Street
                            Suite 200
15                          Chicago, Illinois  60661

16
    For the Defendant:    DYKEMA GOSSETT PLLC
17                          BY:   MR. DANIEL M. NOLAND
                                  MR. PAUL A. MICHALIK
18                          10 South Wacker Drive
                            Suite 2300
19                          Chicago, Illinois  60606

20

21

22

23
              LAURA M. BRENNAN - Official Court Reporter
24            219 South Dearborn Street - Room 2102
                   Chicago, Illinois  60604
25                     (312) 435-5785

1      (The following proceedings were had in open court:)

2          THE CLERK:  Case 10 C 1168, Fields v. City of

3  Chicago.

4          MS. GORMAN:  Good morning, your Honor; Candace Gorman

5  for the plaintiff.

6          MR. NOLAND:  Good morning, your Honor; Dan Noland for

7  the City defendants.

8          MR. MICHALIK:  And Paul Michalik for the City

9  defendants.

10         THE COURT:  Okay.  So I think I would like to get a

11  response from the defendants.  I assume it's the City that

12  would want to respond to the plaintiffs' motion that was filed

13  under seal, the one that is called supplemental motion to make

14  names public or something like that.

15         MR. MICHALIK:  Correct, your Honor.

16         THE COURT:  So how long would you like?

17         MR. MICHALIK:  14 days.

18         THE COURT:  So that motion, Pam, just so you have got

19  the right number, is docket number 414.

20         The response is due by the -- that would be the 2nd

21  of October.  And two more weeks after that for the reply,

22  that's the 16th.

23         MS. GORMAN:  Thank you.

24         THE COURT:  10/2 and 10/16.

25         Then on the other thing that I had given you some

1    thoughts on and then it continued over for today was the

2    defendants' motion for mental examination and testing, and I

3    got a supplement the other day, or I guess it was yesterday,

4    from defense counsel.

5         You have had a chance to look at that, I'm assuming,

6    Ms. Gorman?

7         MS. GORMAN:  I did.

8         THE COURT:  Do you want to give me your thoughts?

9         MS. GORMAN:  Well, your Honor, I thought you had

10   already ruled that there would be --

11        THE COURT:  Hang on a second.  It's a little noisy

12   out there.  Let me close this door.

13      (Brief interruption.)

14        THE COURT:  All right.  Judge Pallmeyer has a

15   boisterous jury.

16        MS. GORMAN:  I thought the Court already ruled that

17   there was only going to be one interview.

18        THE COURT:  Well, I think what I said, though, is I

19   said maybe I'm missing something.  I don't have a transcript

20   in front of me to look at, but I think what I said is, maybe

21   I'm missing something, and if I'm missing something, you will

22   let me know that.  I guess there is a transcript there.

23        MR. MICHALIK:  It's attached as an exhibit to our

24   supplement, your Honor.

25        MS. GORMAN:  And I did read it since they ordered it.

1    And you said if Cavanaugh wasn't going to be able to do it the
2    way you were saying it with one interview, that you were going
3    to make them come in and explain why.
4         THE COURT:  Okay.  So you don't think his letter is
5    good enough is what you're telling me?
6         MS. GORMAN:  That's what I'm saying.
7         THE COURT:  Okay.  So let me give you my thoughts on
8    the letter.  All right.  On the critical point, it is
9    conclusory.  The critical point is the first sentence, second
10   full paragraph on page 2:
11              "It would be a deviation of the standard of care" --
12              It should say "deviation of (sic) of the standard of
13   care."  It should be "from."
14              -- "for Dr. Wasyliw and I to conduct a joint
15   examination of Mr. Fields."
16              Okay.  The rest of what he says in that paragraph
17   doesn't support it.  The rest of the paragraph says:  We each
18   have our own things to ask.  But it's clear, it is crystal
19   clear, from the rest of both of the letters of Dr. Wasyliw and
20   Dr. Cavanaugh that there is a significant amount of overlap,
21   okay.  And I'm not seeing any explanation, and nobody is
22   giving me something that says, okay, the standard of care says
23   that the psychiatrist can't be in the room when the
24   psychologist interviews the patient about the overlapping
25   stuff, and vice versa.  I'm just not seeing that.  It's

1    conclusory.

2         And it frankly doesn't make any sense to me that

3    there would be a viable argument that because there's another

4    person in the room during the interview that the interview

5    violates the standard of care.  We all know that sometimes

6    there are other people in the room when these interviews are

7    done in the context of litigation.  Sometimes they are

8    lawyers.

9         So I'm not persuaded at this point.  I'm not saying

10   you would never be able to persuade me, but I'm not persuaded

11   by this, that they can't do a joint interview at least for the

12   overlapping stuff.  It's clear to me that each of them has

13   their own specific things to ask, but it's equally clear, if

14   not clearer, that there is overlapping material.  So I don't

15   think you have given me enough to change my mind on that.

16        So the order is going to say that the motion for

17   mental examination and testing is granted with the limitations

18   stated in open court on the 11th of September.  So you will

19   get it sorted out.

20        Was today --

21             MR. NOLAND:  Judge, just a couple things on that.

22             THE COURT:  Yes.

23             MR. NOLAND:  What Dr. Cavanaugh did tell us with

24   respect to that issue is that in his 30 years of practice,

25   he's never been involved where he has had an interview such as

1    that with the psychologist and that the interviews have always

2    been separate.  He has not done it.  He doesn't want to do it.

3    He doesn't think that it's the appropriate thing to do.

4           He, with the rapport of the person that is being

5    interviewed and the one-on-one connection, I think that that

6    is part of it.  So, you know, that's why I --

7           We understand the Court's ruling.

8           THE COURT:  So when I cross Cavanaugh on that, he's

9    going to say that I never had a resident in the room doing an

10   interview with me because I work at a teaching -- I've worked

11   at a teaching hospital?  He's not going to say that.  He

12   couldn't do it with a straight face.

13          MR. NOLAND:  Well, I don't --

14          THE COURT:  I have --

15          MR. NOLAND:  I don't know the answer to that

16   question.

17          THE COURT:  I have been involved in cases where -- I

18   have been involved in cases where there's been a lawyer in the

19   room when he's doing it.  Now, he doesn't like to do it, but

20   he does it.  It doesn't violate the standard of care.

21          And my guess is that I would preclude cross of him,

22   you know, with the proposition that, oh, you did an interview

23   with Wasyliw in the room and, therefore, it violated the

24   standard of care because that wouldn't be appropriate cross if

25   I said that's the way it had to be done.

1        I mean, like I say -- and Ms. Gorman is correct.  I
2   did say on the 12th that he's going to -- he would have to
3   come in and explain it to me.  And I will interpret "come in
4   and explain" to include letters.  The letter doesn't explain
5   it; it just concludes it.  He says a lot of stuff, but he
6   doesn't explain why it would be a violation or a deviation
7   from the standard of care for him and Dr. Wasyliw to do a
8   joint examination.
9        You just keep saying that we need to do it
10  separately; well, we need to do it separately; well, we need
11  to do it separately.  It's clear from the preceding
12  discussion, specifically the paragraph at the bottom of the
13  first page of Dr. Cavanaugh's letter as compared with the
14  second page, the bottom half of the second page of Dr.
15  Wasyliw's letter, that there is almost complete overlap
16  between the things that they need to ask for.  It's almost
17  completely overlapping.
18       There may be some additional subjects, and I
19  understand that Dr. Wasyliw has to do the psychological test
20  and Cavanaugh isn't there for that.  And there may be some
21  things that Dr. Cavanaugh would ask that really aren't part of
22  Dr. Wasyliw's examination.
23       The whole idea here is that, you know, what we're
24  going to get here -- and I know it because it happens in cases
25  that I have tried as a judge -- so we're going to say, okay,

1  well, you told Dr. Wasyliw this and you told Dr. Cavanaugh
2  that.
3          MR. NOLAND:  Judge, I don't think so.  Judge --
4          THE COURT:  I have seen it happen.
5          MR. NOLAND:  We don't believe that's the point of
6  this.  The point is that --
7          THE COURT:  It may not be the purpose.  I'm talking
8  about effects, not purposes.
9          MR. NOLAND:  The way I would understand it is this.
10  We feel -- our consultants feel strongly that the
11  psychological testing is necessary.
12          THE COURT:  I get it.
13          MR. NOLAND:  Dr. Wasyliw, as he explained, needs to
14  have that clinical interview under the ethical rules of his
15  profession.
16          THE COURT:  I get that.
17          MR. NOLAND:  So he needs to do that.
18          THE COURT:  Right.
19          MR. NOLAND:  Cavanaugh also needs to meet and
20  interview Mr. Fields and has not participated in a joint
21  interview in the past with the psychologist.  So it's the fact
22  that we need -- they feel that they want to do the
23  psychological testing and that Wasyliw needs to do his
24  interview, which is I think only 90 minutes is what he's
25  estimated, and that Dr. Cavanaugh would be about three hours.

1    Dr. Silverberg interviewed him for eight hours.

2           THE COURT:  That's a pretty long interview.  A

3    three-hour interview is a pretty long interview.  A 90-minute

4    interview is a pretty long interview.

5           You know, over in the state court, a --

6           MR. NOLAND:  Plaintiff's --

7           THE WITNESS:  -- a layman's deposition is three

8    hours.

9           MR. NOLAND:  Dr. Silverberg, the plaintiff's expert,

10   interviewed on two occasions for a total of eight hours.

11          THE COURT:  Okay.  I don't dispute that.  There is

12   one person, one interview by one person.  Okay.

13          MR. NOLAND:  If I may just --

14          THE COURT:  I haven't imposed any --

15          Let me respond to everything you said.  I have not

16   imposed a single limitation on the length of any interview.  I

17   have not said that Dr. Wasyliw can't interview him.  I haven't

18   said that Dr. Wasyliw can't do psychological testing.  I

19   haven't said that Dr. Cavanaugh can't interview him.  I

20   haven't said they can't ask different questions.  I haven't

21   said that their interviews have to completely overlap.

22          I have observed from the submissions they themselves

23   have made to me that the subjects of their interviews do

24   virtually completely overlap, and what I have said is that you

25   don't need to do that twice.  You can do it once.  And then if

1   each person has their own stuff, they can arrange their

2   schedules so that, you know, Wasyliw comes in early and asks

3   his separate stuff or stays late or whatever, and vice versa.

4   That's what I'm saying.

5           Now, I gave you an oppor- -- I could have just

6   ordered it before.  Okay.  I gave you an opportunity to come

7   in with something, and what I get is one line out of five

8   pages of letters that is entirely conclusory, unsupported by

9   anything, where a man tells me that it is a deviation from the

10  standard of care, which, if that were true, I would expect to

11  see some documentation supporting that.  There is none.  There

12  is not even any explanation.

13          You have heard the order.  Good-bye.

14          MR. NOLAND:  Your Honor, there was just --

15          THE COURT:  What?

16          MR. NOLAND:  Well, the --

17          THE COURT:  Mr. Noland, if we're going to keep

18  talking about the same thing, save your breath.

19          MR. NOLAND:  I'm not.

20          Just the -- what Dr. Cavanaugh has asked in the event

21  that the Court would not permit this are two interviews,

22  was --

23          THE COURT:  You want a little more time.

24          MR. NOLAND:  Well, we do have to have more time, yes,

25  because Dr. Wasyliw is going to be out --

1          THE COURT:  You will work that out.

2          MR. NOLAND:  They would ask -- he would ask that the

3   interview that Dr. Wasyliw does be videotaped so that Dr.

4   Cavanaugh can watch.

5          THE COURT:  You don't have a problem with that,

6   right?

7          MS. GORMAN:  You mean, he's going to watch it some

8   time later?

9          MR. NOLAND:  Later.

10          THE COURT:  You want that.

11          MS. GORMAN:  Yes, as long as it's later, it's not --

12          I'm confused.

13          THE COURT:  He's going to videotape it so Cavanaugh

14   can watch it later.

15          MS. GORMAN:  That's fine.

16          THE COURT:  Yes, fine.  There you go.

17          MR. NOLAND:  Thank you, your Honor.

18          THE COURT:  You can do that.

19          All right, take care.

20          MR. NOLAND:  Judge, there's a couple other issues

21   that are --

22          THE COURT:  By the way, you just proved my point, but

23   that's another issue, but go ahead.

24          A couple other issues.  Go ahead.

25          MR. NOLAND:  Just the timing of the expert, if we

1   could have an extra month on this?  Dr. Wasyliw is going out
2   of the country.
3           THE COURT:  Yes, we talked about that before, and I
4   think I told you, you know, you can go ahead and tweak those
5   dates, if you want, so as long as it doesn't affect my
6   dispositive motion, pretrial order and trial dates.  And my
7   sense is that this is all about damages, and so I wouldn't
8   think it would affect any of those things.
9           So I'm going to expect you to work all of that out.
10          MR. NOLAND:  Thank you.
11          Another issue on that is that we had asked
12  plaintiff's counsel -- Dr. Silverberg has, I think, some notes
13  of his interview or possibly a transcription.
14          THE COURT:  Why shouldn't you have to cough up the
15  notes?
16          MS. GORMAN:  I said we would when they -- when their
17  report was in, so we're still on the equal footing, so that
18  they're not getting our notes ahead of time.
19          THE COURT:  Nah.  Cough up the notes now.
20          MS. GORMAN:  Okay.
21          MR. NOLAND:  Then there's a completely separate
22  issue, discovery issue, that has recently come up.  And, I
23  mean, rather than file a motion, it might be better to bring
24  it up now, if the Court is okay with it.
25          THE COURT:  Let's do it now.

1    MR. NOLAND:  One of our trial witnesses, an El Rukn

2  named Derrick Kees who's been identified long ago and known,

3  who provided information incriminatory of the plaintiff with

4  respect to these murders, we have learned is going to be

5  giving a deposition in the innocence proceeding on

6  October 7th.  He is, our understanding is, a Bureau of Prisons

7  WITSEC, and, therefore, our plan was to call him at trial.

8    As it turns out, Ms. Gorman is going to be taking his

9  deposition on October 7th in this building in the U.S.

10  attorney's office, and then he's going to be testifying in the

11  continued innocence proceeding.

12    THE COURT:  And you're going to ask me that you want

13  that to be his trial testimony?

14    MR. NOLAND:  Well, that would be a later potential

15  request.  We would still rather have him at trial.  We're just

16  asking to attend.

17    THE COURT:  Oh, I see what you're saying.  Okay.  So

18  he hasn't been deposed in this case.

19    MR. NOLAND:  True.

20    THE COURT:  He's being deposed in the innocence --

21  the state court innocence case, and you want to be able to go

22  to the deposition.

23    MR. NOLAND:  Yes.

24    THE COURT:  Okay.  Do you have a problem with him

25  going to the deposition?

1    MS. GORMAN:  I do, your Honor.

2    THE COURT:  Why?

3    MS. GORMAN:  Discovery is closing.  They never made

4    any attempt to take his deposition.

5    THE COURT:  He didn't ask to ask questions.  He just

6    asked to go.

7    MS. GORMAN:  Well, my assumption was that he was

8    going to --

9    THE COURT:  Do you want to ask questions or do you

10   just want to be there?  And if you want to ask questions, then

11   you have got to answer her point about why didn't you do the

12   dep before.

13   MR. NOLAND:  We would potentially like to ask

14   questions.  We would be --

15   THE COURT:  Wait a second.  So, Ms. Gorman, hang on a

16   second.

17   So as everybody stands there right now, you would

18   expect, I take it from what you say, Mr. Noland, that Mr. Kees

19   would --

20   Is it K-e-y-s?

21   MR. NOLAND:  K-e-e-s.

22   THE COURT:  K-e-e-s.

23   -- would be a witness in this case because you're

24   going to offer him to provide evidence that Mr. Fields is

25   anything but not guilty.

1     MR. NOLAND:  Yes.

2     THE COURT:  Okay.  All right.  And you didn't take

3  his deposition in this case even though he's a potential

4  witness for them, right?

5     MS. GORMAN:  Correct.

6     THE COURT:  Okay.

7     MS. GORMAN:  They listed, as we said before, you

8  know, 100, 200 people.

9     THE COURT:  But now you're going to take his

10  deposition in the innocence proceeding.

11     MS. GORMAN:  The state's attorney listed him as a

12  witness and is bringing him in, and Judge Biebel said any

13  witness they're bringing in, we have the right to take the

14  deposition.

15     THE COURT:  And you're doing that.

16     MS. GORMAN:  And so we're doing that.

17     THE COURT:  So when Mr. Kees comes and testifies in

18  this case, presumably if he says something that varies with

19  what he said in the deposition, you're going to stick the

20  deposition in his ear, figuratively speaking; no?

21     MS. GORMAN:  Correct.

22     THE COURT:  They get to come.

23     MS. GORMAN:  Do they get to ask questions?

24     THE COURT:  Yes.

25     MS. GORMAN:  Okay.

1     THE COURT: All right.

2     MR. NOLAND: Thanks, Judge.

3     THE COURT: See you.

4     MR. MICHALIK: Thank you.

5  (Which were all the proceedings had in the above-entitled

6 cause on the day and date aforesaid.)

7

8

9       C E R T I F I C A T E

10

11    I hereby certify that the foregoing is a true and

12 correct transcript of the above-entitled matter.

13

14

15 */s/ Laura M. Brennan*     September 30, 2013

16

17 _____  _____

18 Laura M. Brennan
  Official Court Reporter      Date
  Northern District of Illinois

19

20

21

22

23

24

25