UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHSON E. FIELDS,    )<br>    Plaintiff,    )<br>    )<br>v.    )<br>    )<br>CITY OF CHICAGO et al.,    )<br>    Defendants.    ) | No.  10 CV 1168<br><br>Hon. Matthew F. Kennelly |

**REPLY TO PLAINTIFF'S SUPPLEMENTAL MOTION TO MAKE PUBLIC THE NAMES OF VICTIMS IN THE SINGLE FILE CABINET VIEWED BY COUNSEL**

NOW COMES Plaintiff Nathson Fields, by and through his attorneys, and hereby replies to the city's response as follows:

**THE CITY'S RESPONSE**

In a nutshell, the city states that Plaintiff's motion should be denied because the supplemental motion is "thin on detail," is based on speculative inferences and conjectures, and is *unrelated* to Plaintiff's case. The city is wrong on all fronts. In addition, and most notably, the city's response does not support its assertion that there would be any harm to the city in disclosing *the names* of the homicide victims from thirty to sixty years ago (Response at pages 3 and 14) and, more to the point, the city has not produced any evidence to suggest that the limited investigation by the Plaintiff is not accurate.[1] Instead, the city complains that counsel should be made to do a more exhaustive examination before *the mere names* of the homicide victims from that one Area 1 file cabinet with files dating from between 1946 and 1987 see the light of day.

---

[1] The city does contend that the ▌▌▌▌ file is appropriately labeled "open" however that file illustrates the disturbing fact of how exculpatory information can be hidden away in what might otherwise be considered an "open" file.

**ARGUMENT**

There are really several issues here—one, is that Plaintiff's motion concerns the same file cabinet that the city *thinks might have* held the Plaintiff's file while it was "missing" for almost 28 years and, therefore, the fact that there might be other files in the cabinet that are not "open" but are instead "mistakenly" placed in the cabinet is pertinent to this case. Second, Plaintiff has a *Monell* claim in this case, and these files could be used as evidence of an unwritten policy for *Monell* purposes. Third, the city's past compliance history and its systematic failure to locate and turn over files is also relevant to demonstrate the city's intent in this case. Fourth, in this day and age of information technology and electronic data storage, the city's maintenance of these records in such an antiquated manner evinces a deliberate intent to prevent their discovery, and to keep affected individuals incarcerated. Fifth, there is the issue regarding the fact that there are exculpatory materials relating to other individuals in these files -- files that the city has admitted it has not reviewed or inventoried in this file cabinet (or the other 20 or more other file cabinets in the basement). Finally, at least two of the files that have been tendered to Plaintiff's counsel involve homicides that are not only "closed" but were investigated by some of the same defendants named in this case, a fact which goes to the motivation and intent of those defendants.

As noted above the city has not properly argued any harm to it in releasing the names of the homicide victims, and it has not attempted to properly assert a law enforcement privilege. In order to properly assert such a privilege, the law requires that an affidavit be submitted before the privilege can be sustained. *Hallett v.*

2

*Village of Richmond*, No. 05 C 50044, 2006 WL 2088214, at *2 (N.D. Ill. July 25, 2006) (to assert the law enforcement privilege, "a responsible official in the department must lodge a formal claim of privilege, after actual personal consideration, specifying with particularity the information for which protection is sought, and explain why the information falls within the scope of the privilege"). In addition, the law enforcement privilege is qualified and not absolute, *Craig v. City of Chicago*, No. 08 C 2275, 2010 WL 529447, at *1 (N.D. Ill. Feb. 8, 2010), and the city bears the burden of establishing the need for the privilege in a particular case. *Id.* at *2. The city cannot establish such a need here because many of these files are actually not "open" at all – as individuals have been arrested, tried, and convicted of the crimes to which these files pertain, and are currently serving time in prison on those charges. In fact, some of these files could only be deemed to be "open" in the sense that there is reason to doubt the conviction because of the hidden street file.

However, even assuming that all of the files were open, there is no danger *at all* in releasing the *names* of the homicide victims. "The purpose of the law enforcement privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Santiago v. City of Chicago*, 09 C 3137, 2010 WL 1257780, at *2 (N.D. Ill. Mar. 26, 2010). Release of the names of homicide victims alone will not compromise any of the factors that justify assertion of the privilege.

On the other hand, there are incredibly strong reasons to deny any assertion of the privilege over these names -- first and foremost is that privileges should never act to cover up illegal and unconstitutional conduct. In addition, there is the fact that individuals are suffering in prison after being denied their constitutional rights in their criminal proceedings; also, the public has an interest in these crimes being solved correctly, with the correct perpetrator brought to justice which justifies examining files that might have been withheld. As further described below, the police have been and still are engaging in a practice that is unconstitutional and this has been the subject of federal litigation that tried to bring a stop to the practice in the past, and so examination of the files is warranted to finally root out this practice.

### A. The ▬▬▬▬▬▬ Investigative File

The city contends that the language used by counsel somehow confirms that counsel is only speculating as to whether or not the entire ▬▬▬ file was ever tendered. Counsel have been very careful about the wording used, for obvious reasons -- counsel does not have every piece of information that was tendered in the case, cannot discuss the file contents with the defendants and attorneys from those cases and therefore can only state as to what they have seen and the inferences that can be drawn from that information. In the case of the ▬▬▬ and ▬▬▬ files, Plaintiff's counsel have considered an extensive body of materials. Both of those files had trials where convictions were secured, men are still incarcerated and both of those files were investigated by some of the same CPD defendants as in this case.

4

As to the city's objections regarding Plaintiff's position vis-à-vis the ▇ file, counsel for the Plaintiff state the following:

1. The city contends that Plaintiff provided no factual support to suggest that "▇" was on the scene at the time of the murder of ▇ Unbeknownst (apparently) to the city, it has provided that factual support in its own Exhibit D to its Response at CITY-NF-13047. The police report lists the individuals at the scene and an interview of the various individuals. According to the police report, ▇ was at the scene, interviewed by the police and he claimed that he "saw nothing." ▇ is ▇. The same ▇ aka ▇ that was arrested for the unlawful use of a weapon on the night of the ▇ murder in a car that matched the getaway car. (Motion at 7-8 and Ex. H)

2. In addition, the city provides the subpoenas from the federal government to the CPD in the El Rukn trials, as evidence as to the size of the materials tendered by the city in the federal El Rukn trials regarding the ▇ case, the Hickman-Smith case and the ▇ case. Although the ▇ investigatory file that counsel for Petitioner has reviewed from the basement contains 116 pages only 23 pages <u>in total</u> were apparently tendered in the ▇ federal litigation (19 pages were tendered by the city in the federal Hickman-Smith litigation, although Plaintiff now has 145 pages from the missing street file *alone*.)

3. The city also provided some of the testimony of ▇ from the 1988 trial, that testimony also confirms that counsel for the defense did not have the complete file. In the testimony from the trial ▇ stated that he

5

went to the police station the night of the murder, that after he left the police station he was never contacted again until May of 1985. However, in the street file, investigative notes show that ▓ after going to the police station returned to the scene of the crime with police and identified a portion of a parked vehicle where ▓ supposedly touched or leaned upon; palm prints were subsequently lifted from this vehicle by the CPD. The car apparently belonged to ▓ cousin and the palm print ultimately did not match those of ▓ That additional information did not come out in ▓ testimony as tendered by the city. (Ex. I)

4. In addition, the investigative file shows that one of the government's main witnesses ▓ could not identify ▓ as an offender until another supposed witness (▓) ostensibly told police that one of the offenders was an "El Rukn" and was shown a CPD photo book of known "El Rukns." (▓ was not listed in the initial report as being on the scene of the murder.) ▓ identified ▓ photo as an individual outside the bar at the time of the murder. The photo of ▓ was then shown to ▓ and only then did ▓ identify ▓ as the individual he saw at the scene. The investigative file confirms that the ASA's refused to have a warrant issued for ▓ based on the flimsy photo evidence. The detectives later brought ▓ back to view a line-up of Hawkins (whose photo had already been shown to him) and, with a new assistant state's attorney, the CPD were able to proceed to obtain charges against ▓. Based on counsel's

6

review of the case file and transcript, that information was not available at the trial. (Exs. J at CITY-NF-13041 and K)

5. As again outlined by the Federal Government in its materials appended to the city's response, the testimony of Earl Hawkins was crucial in the retrial. Earl Hawkins has repeatedly admitted that he would, and did, say anything to avoid the death penalty. In addition, and as outlined in the initial motion, Hawkins admitted that the ▓▓▓▓ case was the first one he cooperated in because he thought he couldn't get charged again, and Detective Brannigan told him "You got to show something that would show good face (sic) … You better come up with something quick." (Exs. F and G.)

6. In Fields's Motion filed under seal on September 11, 2013 (docket at 414) counsel, by way of background, discussed the line-up issues involving Mr. Fergerson. (Motion at 5.) The city and the individual defendants claim that this was a simple "mistake." That position strains credibility when viewed in light of all of the other "mistakes" in this matter. In fact, multiple line-ups of members of the El Rukns were being conducted during this time because of the *cooperation* of Anthony Sumner. By way of further example, the line-up report of George Carter, an original co-defendant in the Hickman and Smith murder, apparently took place on May 18, 1985 at 1750 hours *without him being present*. Carter was not arrested until May 21st, 1985, three days after Carter's supposed "line-up." (Exs. L and M) Defendants contend that this was just another *mistake*, however it is clear that the CPD officers and detectives, some of whom are defendants in this

case, were manipulating the names provided by Sumner and rearranging the defendants' charges based on their alibis.

7. Finally, the ▌ murder was investigated by some of the same detectives involved in this case. Defendants Murphy, Brannigan, O'Callaghan and Kolovitz were involved in the ▌ investigation. Specifically, Defendant Murphy was involved in the shenanigans involving the photo identification of Hawkins and the subsequent line-up.

Again, these facts, some actually supplied by the city in its response, provide strong evidence that the investigative files hidden in the boiler room were not tendered to the defendants in their trial. Furthermore, the fact that the ▌ homicide file, which in no way was or could have been considered "open," was hidden in a file cabinet with supposedly "open" files – in ostensibly the same cabinet that Mr. Fields file was hidden for some or all of 28 years -- raises a strong probability that this file was never turned over to the defendants in the state proceeding, or in the federal proceeding. There are still men in prison who were convicted in the ▌ murder and counsel believes that this file should be made available to those men and their attorneys.

### B. The ▌ Investigative File.

Again the city ignores the very substantial factual information provided regarding the murder of ▌ and attempted murder of ▌, including eye witness identifications of the real culprit, not only from ▌ herself but also from the other woman in the car (▌ who escaped and who

8

admitted being in on the plan to shoot ███████ (although she claims not to have known ███ would be murdered). This file is also not an "open" file as there was a trial and convictions that were not overturned. According to the city, the fact that ███ ███ identified the man who tried to shoot her, that he was not an El Rukn, and the fact that her identification of that individual was not mentioned by *any* of the defense counsel at the El Rukn federal trial is not conclusive of anything. That argument is absurd on its face. Counsel for Fields suggests to this Court that there is a strong inference that could be made that none of the defendants or their counsel knew of this exculpatory information and in fact the city's suggestion requires speculating that each of the defense counsel chose to ignore the admission by the victim that she knew her attacker and it was not one of the defendants.

In the ███████ case the city again attempts to hang its hat on the federal government inventory but again that inventory falls short and adds credence to the claim that the entire file was not turned over in the trial. The inventory shows 59 pages of documents turned over. The investigative file *alone*, that was found in the basement, includes 142 pages. In addition, like the ███ file (and the Hickman Smith file) there was a trial in this matter (in federal court) and convictions were obtained that were not overturned – there is no reason for this file to be hidden in the boiler room with "open" files. Finally, this murder too was investigated by several of the named defendants in this case including defendant Brannigan, defendant O'Callaghan and defendant Murphy -- showing a pattern of hidden files associated with these defendants.

C. The ███████████ Homicide File

9

As counsel stated in regards to this file, as far as they can determine, the file is genuinely open and no defendant has been charged or convicted of ▓▓▓▓▓▓ murder. Counsel note that the file itself includes several other record division files within that file and counsel have not determined whether each of those files is open (or if documents from those other RD files were hidden in this file as in the ▓▓▓ file) nor have they determined why so many separate RD files are included within this one file.

**D. & E. The ▓▓▓▓▓▓ and ▓▓▓▓▓▓▓ Homicide Files**

These are the two files that the city has refused to tender to counsel for the Plaintiff. As mentioned in the initial motion, the ▓▓▓ file contains cryptic references to the Dee Eggers Vaughn murder[2] and also to another supposed "El Rukn" related homicide (the Harold's Chicken shack shooting in April, 1985). One of Plaintiff's counsel spent two afternoons reviewing the three files at the Dykema office (after that review the city agreed to provide the ▓▓▓▓ file but not these two files). However, this was not enough time to ascertain the nature and origins of a bound calendar-type book contained within the file, a book which included references to one of the double murders with which Plaintiff was charged (Vaughn and White). If the file were actually tendered to counsel, a more substantial review of the file and the bound book could be conducted, and the nature of this reference to the Vaughn and White double murder could be established conclusively. As also stated in Plaintiff's initial motion, without

---

[2] This was the double murder that Anthony Sumner originally accused Mr. Fields of being involved in, and which was used against Fields in sentencing to allow for his execution; Sumner later admitted he made this up because he was mad at Fields for evicting him and his family from their apartment for nonpayment of rent. (Ex. B)

10

having the documents to compare to actual court documents in that case, Plaintiff could not make a final determination regarding the information she reviewed -- only that it appeared exculpatory and troubling.

Finally, the ▮ file contains documents that address issues relating to the Gangster Disciples and to that particular gang's *internal* fights, including murders, relating to drug sales within the gang. This was the actual reason Plaintiff initially sought the file, as the city has taken the position that there was a major feud between the Disciples and the El Rukns. This file establishes that in reality there was a major feud within the Disciples organization itself -- relating to drug trafficking. Again, counsel could only perform a cursory examination of this file, other RD numbers are also associated with this file, and counsel have not been afforded an opportunity to compare those documents with court documents from subsequent criminal prosecutions because of the city's refusal to tender the two files.

Counsel does not know if the suspect in the ▮ murder was actually arraigned in that case, but it does appear that the matter went before a grand jury. What is also clear is that the accused ultimately couldn't be convicted of the murder of Mr. ▮ because he would have been a young child at the time of the murder. Unfortunately for the suspect, he was in the clutches of the CPD and was instead charged with two other murders. Exculpatory information that would have helped the accused in those other murder trials is hidden away in the ▮ murder investigative file.

The city mocks the Plaintiff's counsel's inability to provide supporting material, when it is the city itself that has actually withheld the files, and denied Plaintiff the

11

opportunity to present a more detailed argument. The city also mocks Plaintiff's counsel because the exculpatory materials in the ▮▮▮▮ file relate to cases other than that for which the suspect was ultimately tried and convicted. Actually, the fact that open files are being used as a repository for exculpatory information in other cases, and that no city personnel have examined these files is deeply troubling, and establishes the need for a full review of all of the "open" files—not the mocking of counsel who have uncovered this malfeasance.

### F. DIRECT RELATION TO PLAINTIFF'S CASE

It is clear that counsel for Plaintiff have found the CPD's secret hiding place for stashing Area 1, 3 and 4 files that it does not want to tender to defendants in criminal prosecutions. In response to this discovery, the city balks at having the files disclosed and examined, and argues that the files, both open and closed, associated with the file cabinets in the boiler room have no relation to the Plaintiff's case. However, in Plaintiffs third amended complaint at paragraphs 63 to 67, Mr. Fields sets out, in no uncertain terms, a street files practice claim. Proving that claim requires Mr. Fields to show other instances where this CPD practice resulted in a wrongful conviction. The production and public disclosure of the files is necessary, so that Mr. Fields has access to the *context* necessary to show a pattern of *Brady* violations resulting in wrongful convictions that would have put the City on notice that it had an ongoing problem that needed to be fixed.

The fact of the files' existence isn't enough on its own—Mr. Fields needs to be able to compare the contents of and facts contained in those files to other publically

available records, records pertaining to the criminal proceedings, and the people who have been involved in the prosecution and defense of these individuals in order to properly prove up Mr. Fields *Monell* claim. Counsel believes that they will be able to show individuals who are still wrongfully in prison today, based on the withholding of these files, but it is necessary to talk with those individuals and their attorneys and to pursue admissible evidence. In addition, the fact remains that individual CPD defendants in Mr. Fields' case repeatedly maintained and kept hidden street files containing material, exculpatory evidence in other cases. That they repeatedly did so is evidence that they did so in Fields's case.

The fact that these files exist is made more troubling, and the need for their production and removal from the protective order is made more essential, by the litigation on the issue of street files that took place in the Seventh Circuit in the early 1980s in the *Palmer* and *Jones* cases (*Palmer vs. City of Chicago* 755 F.2d 560 (7th Cir.1985); *Palmer vs. City of Chicago* 806 F.2d 1316 (7th Cir. 1986) and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). In *Palmer*, the city *conceded* in the district court that the practice of maintaining a separate street file that was not turned over to defendants violated the Constitution. What happened to Mr. Fields demonstrates that the practice of maintaining clandestine street files continued *even after* the courts had already gone to great length to curb the practice, and after the CPD and city leadership stood up in court and promised to put a stop to the practice. Access to these files will help Mr. Fields show that the City and individual defendants were engaged in a practice of withholding street files from criminal defendants, even as they told the federal courts in

13

Chicago that the practice had ceased. What has also been uncovered is that files that are in some respects "open" are also being utilized to hide exculpatory information that should have been provided to defendants in other criminal proceedings.

Mr. Fields is a victim of this policy, and counsel would like the opportunity to fully investigate all of the file cabinets to ascertain and show the jury how widespread the policy is, and how many people have gone to prison because the exculpatory information was hidden from them pursuant to this policy. This Court warned the city not to move the files and Mr. Fields will be asking this Court to allow the jury to visit the boiler room at 51st and Wentworth to see for themselves the cache of files being stored without an inventory. At a minimum, counsel would like to fully review the materials in the one file cabinet that the city thinks *might* have held the Hickman and Smith investigatory file -- and explain these contents to the jury. This review can be done much more straightforwardly if the names from that file cabinet are made public, so that Plaintiff's counsel can talk with the individuals convicted of those murders (and their attorneys) about the materials provided to them at their trials.

In addition, in the few files that counsel have been allowed to review, it is clear that some of the named defendants in this case have substantial ties to other files which have no place in this file cabinet. Neither the ▮▮▮▮ nor the ▮▮▮▮▮ files are properly designated as *open* as both have gone to trial, convictions were obtained and men are still imprisoned for those crimes -- as discussed above, several of the named defendants in this case were involved in those investigations. Despite these facts, the files have been hidden in a file cabinet which has been shielded from defendants in their criminal trials.

14

**CONCLUSION**

The few files reviewed and the names of the victims of other files within that cabinet strongly suggests that if the names of the victims corresponding to the single homicide file cabinet that Plaintiff's attorneys were allowed to inventory -- were to be made public, there would be several individuals, some of whom are still in prison, who could establish that *Brady* material was never turned over by the city in their criminal cases. The city knows this and the city also knows that this information would go a long way in establishing that it has continued to maintain its policy of withholding exculpatory information from defendants in homicide cases, including in the Plaintiff's case. If this Court were to allow the list of victim names to be publicly released, counsel believes that, at very minimum, individuals who were not provided complete investigatory information from the files found in that particular cabinet, would have an opportunity to have that information reviewed and Plaintiff could, in turn use that information to establish liability on his *Monell* claim.

If this Court is still reluctant to release the names of the homicide victims the disclosure of the RD#'s for those cases will also allow for an investigation of the files -- it will just require an extra step of reviewing city records to ascertain those names.

Wherefore, Plaintiff asks that this Court -- in the interest of justice -- allow his counsel to release the names of the deceased victims from the one file cabinet inventoried by counsel, and for such other and further relief as this Court deems just.

                                        Respectfully Submitted,

                                        /s/ H. Candace Gorman

...
...
...

## **CERTIFICATE OF SERVICE**

I, H. Candace Gorman, hereby certify that the foregoing Reply to Motion was served to the parties by email.

Dated: October 16, 2013

                                                Respectfully Submitted,

                                                /s/H. Candace Gorman
                                                One of the Attorneys for Fields

For Fields:

| | |
|---|---|
| Leonard C. Goodman | H. Candace Gorman |
| Melissa Matuzak | 220 S. Halsted |
| 53 W. Jackson Boulevard | Suite 200 |
| Suite 1650 | Chicago Illinois 60661 |
| Chicago, Illinois 60604 | 312-427-2313 |
| 312-986-1984 | |