**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 CV 1168** |
| **v.** | ) | |
| | ) | **Hon. Matthew F. Kennelly** |
| **CITY OF CHICAGO et al.,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT**

## A. THE MURDER OF JEROME "Fuddy" SMITH AND TALMAN HICKMAN

1. On Friday April 27, 1984 Delbert Edwards, a young man living across the street from the 706 E. 39th street building filed a police report claiming that two members of the goon squad Paul Haley and Chundell Leaks fired a gun at him. Haley and Leaks told police that actually it was Delbert Edwards who fired a gun at them. (Exhibit 1: CITY-NF-001086-001088)[1].

2. On Saturday April 28, 1984, around 10:17 AM, Jerome "Fuddy" Smith and Talman Hickman were shot to death in front of a Chicago Housing Authority building at 706 E. 39th street in Chicago, Illinois (hereinafter the "706 building.") (Exhibit 1: CITY-NF-001044).

3. Jerome "Fuddy" Smith and Talman Hickman were both 30-year-old African American males who resided at the 706 Building. Mr. Smith was the leader of the gang called the Goon Squad. Mr. Hickman was apparently an acquaintance of Mr. Smith. (Exhibit 1: CITY-001044-001049).

---

[1] CITY-NF refers to Bates-Stamped documents from The City of Chicago.

4.  Witnesses stated that there were two shooters who escaped in a 1970's model blue Coup de Ville Cadillac and that two other individuals were in the getaway car. (Exhibit 1: CITY-001044-001049-50)..

**B.  THE INITIAL INVESTIGATION**

5.  The police personnel involved in this initial investigation included the following defendants: Evans, Hood, Richardson, Minogue, Casto and Bogdalek. Defendant Murphy was a supervising sergeant at Area 1 homicide at the time and had supervisory duties in the investigation of the Hickman and Smith murders. (Exhibit 1: CITY-NF-001047, 001075) (Exhibit 2: CITY-NF-07838). Exhibit 23: Murphy Deposition pp. 51-53, 168-171). (Exhibit 22: Casto Deposition pp. 31-34).

6.  Defendant O'Callaghan was assigned to conduct investigations into El Rukn murders and was involved in the investigation of the Hickman and Smith murders when Anthony Sumner began "cooperating." (Exhibit 16: O'Callaghan Deposition, pp. 7-8).

7.  In the immediate aftermath of the Smith-Hickman double homicide, the initial detectives on the scene were defendant's Evans and Hood who conducted a canvass involving interviews with approximately 100 people.  (Exhibit 3: June 24, 1986 Testimony of Robert Evans Bates-stamped pp. 599-600, 635).

8.  Defendants Bogdalek and Minogue worked the second shift and also worked on the investigation of the Hickman and Smith murders in the days immediately following the murders and they interviewed approximately 20 individuals.  (Exhibit 21: Bogdalek Deposition, pp. 53-57).

2

9. The Hickman/Smith shootings, and their investigation, occurred at a time when a joint local and federal law enforcement task force, targeting the El Rukns was in its formative stages; the task force included defendants Brannigan and Kolovitz. (Exhibit 4: Memo from ATF Special Agent in Charge to Chicago Police Superintendent Richard Brzeczak).

## C. DUTY TO RETAIN AND TURN OVER NOTES

10. At the time of the 1984 Hickman/Smith murder investigation Detective Division Special Order 83-1 was in effect. (Exhibit 5: Detective Division Special Order 83-1).

11. Special Order 83-1 was adopted in the wake of a disclosure during the criminal trial of George Jones that the CPD maintained files of "unofficial" reports, containing detective notes, witness statements and other materials which were kept separately from "official reports" and not tendered to the prosecutors or the defense. *Jones vs. City of Chicago* 856 F.2d 895 (7th Cir. 1988).

12. James Hickey, Assistant Director of Research and Development with the Chicago Police Department, was a 30(b)(6) witness selected by the City of Chicago to speak authoritatively on the subject of policies and procedures related to the detective division during 1984 and 1985. (Exhibit 6: Hickey Deposition, pp. 8-11) (Exhibit 24: 30(b)(6) Notice).

13. Mr. Hickey testified up until the implementation of Special Order 83-1, detectives had considered their notes to be personal property and that CPD investigative personnel were informed in 1983 that their investigative notes were not their

personal property, but rather belonged to the Department and had to be preserved. (Exhibit 6: Hickey Deposition, pp. 12-13).

14. Special Order 83-1 was ultimately updated by 86-3, a May 19, 1986 Detective Division Special Order which reiterated the file retention instructions in 83-1, and provided that Detective Division personnel would conduct periodic, unscheduled inspections of the subject files to ensure compliance with the order. (Exhibit 7: CITY-NF-001821-001823).

15. Order 86-3 was still in effect at the CPD Detective Division in 2009 when Fields had his second trial. (Exhibit 8: Loughran Deposition, pp. 11-13).

16. James Hickey testified that to his knowledge, nothing was done after the implementation of special order 83-1 to survey or audit how the process was proceeding. (Exhibit 6: Hickey Deposition, pp. 42-43).

17. Hickey testified that he was not aware of any recordkeeping that was done detailing what documents were sent to the state's attorney's office nor was he aware of any recordkeeping noting compliance with a subpoena. (Exhibit 6: Hickey Deposition at 45-49).

18. Special Order 83-1-Section III D required that the investigative file inventory sheet be forwarded to the Records Division whenever charges were lodged against a person to ensure proper notice of all existing documents pertaining to the investigation be made to the states attorney, the court and the defense counsel. (Exhibit 5: Special Order 83-1).

19. Special order 83-1 was silent on whose responsibility it was to make sure that the investigative file inventory sheet was sent to the records division after a felony was placed and Hickey did not know what the practice was in the areas. **(**Exhibit 6: Hickey Deposition at 50-53**).**

20. There was no paper trail established to document whether or not the investigative file inventory sheet was in fact turned over to the state's attorney's office. (Exhibit 6: Hickey Deposition at 54-57).

21. Hickey testified that the "unit file" is simply a copy of the original report and any supplementary reports for all cases that are assigned to that unit and that the "unit file" only contained official documents. (Exhibit 6: Hickey Deposition at 18-19)

22. Hickey testified that the detectives' "investigative case file" was also known as the "street file" and also known as the "running file" and that file included all of the detectives notes. (Exhibit 6: Hickey Deposition at 18**).**

23. Kathleen Loughran, a 30(b)(6) witness selected by the City of Chicago to speak authoritatively on the subject of policies, procedures and practices related to the retention, inventory, searching and access to certain reports, photos and notes in effect in the year 2009 (during Fields's second criminal trial), testified that while 86-3 represented the policy of the CPD, she could not testify as to whether it was complied with in practice. (Exhibit 8: Loughran Deposition, pp. 28-29**) (**Exhibit 24: 30(b)(6) Notice).

24. Special Order 86.3-Section III D required that the investigative file inventory sheet be forwarded to the Records Division whenever charges were lodged against a

person to ensure proper notice of all existing documents pertaining to the investigation be made to the states attorney, the court and the defense counsel. Loughran did not know whose responsibility it would have been in 2009 to make sure that those inventory sheets were forwarded. (Exhibit 8: Loughran Deposition, pp. 15-16) **(**Exhibit 7: June 19, 1986 Order (CITY-NF-001821-001823)**.**

25. Loughran could not answer as to what the actual practices were in the Areas because she was not in the Area and she could only answer to what the policies mandated. (Exhibit 8: Loughran Deposition, pp. at 28-29, 37, 40-41, 46)

26. Plaintiff has deposed Detectives Samuel Brown, Kevin O'Brien, John Posluszny, and Karen Williams, all of who worked with investigative files at Area 1 and none of who could recall witnessing an audit or inspection of filing maintenance practices. (Exhibit 9: Brown Deposition, p. 73) (Exhibit 10: O'Brien Deposition, pp. 22-23) (Exhibit 11: Posluszny Deposition, p. 30) (Exhibit 12: Karen Williams Deposition, pp. 28-29).

## D. DEFENDANTS ALL KNEW OF DUTY REGARDING NOTES

27. Defendant Robert Evans, who was a detective at the time of the Hickman and Smith investigation, testified that in 1984-1985 it was his practice to submit any notes made during an investigation to a sergeant's intake basket; Evans understands that this practice was informed by a written policy in effect at the time. (Exhibit 13: Evans Deposition, p.18) (Exhibit 1: CITY-NF-001047).

28. Defendant James Minogue, who was a detective at the time of the Hickman and Smith investigation, testified that he was aware of the policy on investigative file

retention and that he complied with it. (Exhibit 14: Minogue Deposition, p. 175) (Exhibit 1: CITY-NF-01077).

29. Defendant Hood, who was a detective at the time of the Hickman and Smith investigation, testified that he recalls being told that all notes were to be maintained and not destroyed – he was told this at some point approximately corresponding to the issuance of Special Order 83-1 and he complied with the policy. Hood testified that it was his understanding that the city had an obligation to turn over "all the documents they have." (Exhibit 15: Hood Deposition, pp. 19-20, 184) (Exhibit 1: CITY-NF-01077).

30. Defendant O'Callaghan, who was a detective at the time of the Hickman and Smith investigation, testified that he "would assume" that Nathson Fields was entitled to investigative notes related to the Hickman/Smith case Defendant O'Callaghan knew that all notes were supposed to be turned over for inclusion into the file, however, O'Callaghan also testified that he believed it was his role to determine which materials were exculpatory. (Exhibit 16: O'Callaghan Deposition, pp. 6-7, 199-207, 224).

31. Defendant Daniel Brannigan, who was a detective assigned to investigate the El Rukns at the time of the Hickman and Smith investigation, testified that he has no knowledge as to why an investigative file was not tendered to Fields. (Exhibit 17: Brannigan Deposition, pp. 303-304).

32. Defendant John Robertson who was a detective at the time of the Hickman and Smith investigation, testified that in the early 1980s, he underwent a training

regarding the permanent retention of all documents, including reports and notes related to homicide investigations. (Exhibit 18: Robertson Deposition, pp. 11, 272-274).

33. Defendant Rich Kobel, who was a detective at the time of the Hickman and Smith investigation, testified that all of his work product would be submitted to a supervisor for approval, and put in a violent crimes "office file." (Exhibit 19: Kobel Deposition, pp. 12, 23).

34. Defendant Thomas Richardson, who was a gang specialist at the time of the Hickman and Smith investigation, testified that gang specialist would typically hand their notes over to the detectives. (Exhibit 20: Richardson Deposition, pp. 4-11, 26-27).

35. Defendant Joseph Bogdalek, who was a detective at the time of the Hickman and Smith investigation, testified that he understood the term "street file" to mean a file containing everything related to an investigation, including handwritten notes and detective reports. In his deposition he referred to that file as "the folder" which was distinct from the unit file; Defendant Bogdalek knew that all notes had to be turned over for inclusion into the file. (Exhibit 21: Bogdalek Deposition, pp. 12-17) (Exhibit 1: CITY-NF-001075).

36. Defendant Stephen Casto, who was a gang specialist at the time of the Hickman and Smith investigation, maintains that he would not have known about the Detective Division file retention policies because he did not work in the division; however it was Casto's understanding that "all the documentation in a particular case"

including "all known documents" would be made available to the courts. (Exhibit 22: Casto Deposition, pp. 9, 157-162).

37. Defendant Joseph Murphy, who was a sergeant and a supervisor at Area 1 homicide at the time of the Hickman and Smith investigation, testified that criminal defendants should be entitled to their entire investigative file – and that there should be only one file. (Exhibit 23: Murphy Deposition, pp. 251-253) (Exhibit 2: CITY-NF-07838).

38. Defendant Murphy testified that investigative files would typically be kept in the office with the sergeants and administrative staff and that it was the responsibility of those personnel to make sure that notes made it into the file. (Exhibit 23: Murphy Deposition, pp. 247-249).

39. Officer Mickel, who the first police officer on the scene of the Hickman Smith murder, testified that only detectives would compile general progress reports, and that beat officers would make handwritten notes and later discard them; Mickel was never instructed to keep his notes. (Exhibit 25: Mickel Deposition, pp. 8, 15).

**E. ARREST AND TRIAL OF NATHSON FIELDS**

40. On March 28, 1985 El Rukn members Anthony Sumner and Earl Hawkins went to the home of Joseph White and Dee Eggers Vaughn with the objective of robbing the couple of cash and cocaine; in the course of the robbery, Sumner and Hawkins murdered White and Vaughn, while the victims' children watched from an adjoining room. (Exhibit 26: Hawkins Deposition, pp. 155-165) (Exhibit 27: Sumner Recantation Statement).

41. In May of 1985, Anthony Sumner and Earl Hawkins were arrested after fleeing to a safe house in East Cleveland, Ohio. (Exhibit 28: ATF May 8, 1985 Report of Investigation).

42. Subsequent to his arrest, Anthony Sumner began cooperating with the authorities, and within the first few days of his cooperation; defendants Wharrie, Brannigan, and Murphy questioned Sumner about various unsolved murders. (Exhibit 29: Wharrie Deposition, pp. 26-28) (Exhibit 23: Murphy Deposition, pp. 53-55) (Exhibit 17: Brannigan Deposition, pp. 189-192).

43. Once Anthony Sumner began to cooperate, the CPD began looking into old cases for El Rukn involvement based on what Sumner had to say, they would pull the file and restart (or continue) the investigation. It's also possible that they brought files to Sumner and asked him what he knew about them. Sumner was brought to 26th for his interviews and the main people involved in Sumner's interviews were: Brannigan and Kolovitz (Exhibit 29: Wharrie Deposition, pp. 26- 28).

44. Sumner told Chicago police and defendant Wharrie that Nathson Fields had accompanied Sumner and Hawkins during the March 28, 1985 robbery and double murder of Dee Eggers Vaughn and Joseph White; Sumner assigned the principal blame for the murders to Fields and Hawkins, and downplayed his own role. (Exhibit 30: May 30, 1985 Sumner Grand Jury Testimony).

45. The two child-witnesses to the Vaughn/White murders were Sheree Vaughn (age 12) and James Michael Vaughn (age 8); the children told the police that there were two (and not three) assailants and they identified Anthony Sumner as one of the

assailants. (Exhibit 31: March 28, 1985 Vaughn/White Supp. Report) (Exhibit 32: March 31, 1985 Vaughn/White Supp. Report).

46. At some point, after implicating Nathson Fields in the March 28, 1985 Vaughn/White murders, Anthony Sumner decided to implicate Nathson Fields in the April 28, 1984 murders of Jerome Smith and Talman Hickman. The "notes" from that meeting with Sumner show the interview date to be May 14, 1985 on the top but the signature line shows Murphy shows really signed the notes in 1986. (Exhibit 33: Murphy May 14, 1985/86 General Progress Report) (Exhibit 34: June 19, 1986 Sumner Testimony Bates-stamped pp. 374-376).

47. Nathson Fields was arrested on June 13, 1985, more than fourteen months after the Hickman/Smith murders, and consequently he cannot recall where he was on t1984 date; Fields was arrested by Chicago police personnel for a warrant on Vaughn/White murder. (Exhibit 35: Arrest Report of June 13, 1985 JMSNY010401)[2] (Exhibit 36: Fields Testimony of August 22, 2013, p. 41) (Exhibit 97: Fields Arrest Warrant).

48. Fields testified that he was arrested while on his way for coffee from his apartment and one of the arresting officers told him "See you in 40 years, Nate." (Exhibit 36: Fields testimony of 8-22-2013, pp. 56-57).

49. On June 13, 1985, defendant David O'Callaghan filed a formal request that Fields be held past the next court call, in order to allow him to be put before a lineup for the

---

[2] JMSNY refers to Bates-Stamped documents from Fields's criminal attorney Jean M. Snyder.

Vaughn White murder; Defendant Murphy approved O'Callaghan's request. (Exhibit 37: June 13, 1985 Hold Over Form).

50. Defendant David O'Callaghan testified that he was not aware of any information corroborating Sumner's contention that Nathson Fields was involved in the Vaughn/White murders. (Exhibit 16: O'Callaghan Deposition, pp. 67-68).

51. Fields stood in two separate line-ups on June 14, 1985 although there are no records showing that Fields was ever put in a Vaughn/White lineup. (Exhibit 36: Fields testimony of 8-22-2013, pp. 56-57, 61-62).

52. A supplementary report dated June 17, 1985, shows that Fields was in a Hickman/Smith lineup on June 14, 1985 and that Randy Langston, Eric Langston, and Gerald Morris positively identified him. (Exhibit 93: CITY-NF-09552-09554).

## F. ATTEMPTS TO GET THE STREET FILE BEFORE THE FIRST TRIAL

53. On July 2, 1985, William Swano, the attorney for Fields's co-defendant Earl Hawkins, served a subpoena on the Chicago Police Department Records Division seeking "investigative files, memos, 'street files,'" lineup photos and reports relating to the Hickman/Smith murder. (Exhibit 39: Swano Subpoena, CITY-NF-07537).

54. On or about October 15, 1985, Assistant State's Attorney Randy Rueckert—who was assigned to the Hickman/Smith murder case—served a subpoena on the Area 1 Commander seeking the "investigative file" or "street file" for the Hickman/Smith murder. (Exhibit 40: CITY-NF-07533).

55. On or about January 15, 1986, Fields's attorney Jack Smeeton served a subpoena for the Investigative Street File for the Hickman and Smith murder on the "Keeper of

Records of the Chicago Police Department" (CPD). (Exhibit 41: January 15, 1986
Subpoena).

56. On February 27, 1986, in pre-trial proceedings, Jack Smeeton complained to the
Judge that he had only received 8 pages of notes in response to his subpoena for the
investigative file – 8 pages all dated April 28, 1984 – the very date of the shooting.
(Exhibit 42: February 27, 1986 pre-trial proceedings before Judge Thomas Maloney,
pp. 40-43) (Exhibit 43: 8 pages of notes from State's Attorney's Office).

57. The eight pages of notes tendered to Mr. Smeeton were authored by Defendant
Evans, Defendant Hood, and Detective VanBerschott – and made no reference to
Nathson Fields. (Exhibit 43: 8 pages of notes from State's Attorney's Office).

## G. THE TRIAL AND SENTENCING

58. Nathson Fields was tried before Judge Maloney for the Hickman/Smith shooting in
June of 1986. *People v. Hawkins, et al.*, 690 N.E.2d 999 (S. Ct. Il. 1998).

59. Gerald Morris and Randy Langston testified as eye witnesses against Fields at the
1986 trial. Anthony Sumner also testified at the trial. (Exhibit 44: 6-17-1986 Langston
Testimony p. 119) (Exhibit 38: 6-18-1986 Morris Testimony Bates-stamped p. 287)
(Exhibit 34: 6-19-1986 Sumner Testimony Bates-stamped p. 369).

60. Gerald Morris, a member of the Goon Squad (the street gang of which Fuddy was
the leader) first came forward as a witness to the murders and identified Nathson
Fields in May of 1985 (after Sumner allegedly placed Fields in the Hickman/Smith
murders, which had occurred a year earlier). (Exhibit 38: 6-18-1986 Morris
Testimony, Bates-stamped pp. 286, 301-02).

13

61. Randy Langston, also a member of the Goon Squad who on the day of the murders told police he had seen only one shooter involved in the Hickman/Smith murders, first identified Nathson Fields more than a year after the murders. (Exhibit 44: 6-17-1986 Langston Testimony pp. 136-138) (Exhibit 1: Street File CITY-NF-001075) (Exhibit 93: CITY-NF-09540-09541).

62. Chicago Police officer Anthony Mickel, and defendants O'Callaghan, Evans, Bogdalek, and Murphy all testified in the case. (Exhibit 50: Testimony of Anthony Mickel, Bates-stamped p. 96) (Exhibit 45: Testimony of David O'Callaghan) (Exhibit 3: Testimony of Robert Evans Testimony) (Exhibit 47: Testimony of Joseph Bogdalek) (Exhibit 72: Testimony of Joseph Murphy, Bates-stamped p. 681).

63. Anthony Sumner testified at the sentencing phase, alleging that Fields was involved in the Vaughn/White murders. (Exhibit 49: Testimony of Anthony Sumner, Bates-stamped p. 1035).

64. Fields was convicted of the Hickman/Smith murders on June 27, 1986. (Exhibit 48: Transcript of 6-27-1986, pp. 755-757).

65. Fields was subsequently sentenced to death by Judge Thomas Maloney. (Exhibit 51: Judgment and Execution Order).

**H. ATTEMPTS TO GET THE FILE AFTER DEATH SENTENCE**

66. In 1988, while on death row, Fields filed a pro se lawsuit against the City and defendants James Delaney, Joseph Murphy, Robert Evans, Steven Hood, Joseph Bogdalek, James Minogue, David O'Callaghan, Stephen Casto, Thomas Richardson, Randy Rueckert and Larry Wharrie in federal court (*Fields v. City of Chicago, et al.*, 88

C 5608); the lawsuit alleged that street files from the Hickman/Smith homicide investigation had been withheld from him; the lawsuit alleged that attorney Smeeton had alerted the court that he had received only 8 pages of general progress reports all dated the date of the murders, and that defendant Evans had testified that approximately 100 people had been interviewed during a police canvass. Attached to the lawsuit were various pages of transcripts from pretrial proceedings and from the trial. (Exhibit 2: File on Fields's 1988 Lawsuit at CITY-NF-07743-07870. See specifically pages CITY-NF-007754-07789).

67. Pursuant to the investigation into the allegations of Fields's 1988 lawsuit, the Chicago Police Internal Affairs Division ("CPIAD") sent an agent to the Records Storage Section at 1121 S. State Street; officers there reported that they were unable to locate *any* street files related to the Hickman/Smith case. (Exhibit 2: File on Fields's 1988 Lawsuit, CITY-NF-07836).

68. Pursuant to the investigation of Fields's lawsuit by CPIAD, defendants Murphy, Delaney, Hood, Evans, Minogue, Casto, Richardson, Bogdalek and O'Callaghan were asked to submit statements regarding their knowledge as to the Hickman/Smith street file. (Exhibit 2: CITY-NF-07837-7870).

69. Pursuant to the CPIAD investigation, Defendant Joseph Murphy (a supervising sergeant at Area 1 at the time of the Hickman/Smith murders and at the supervising sergeant who oversaw the arrest of Fields in 1985) signed a statement denying any knowledge that materials had been withheld from the official investigative file in the Hickman/Smith murders. Murphy admitted in his deposition that he conducted no

investigation into whether anything had been withheld from Fields, and did not ask to have the Hickman/Smith file pulled in order to review its contents. (Exhibit 2: CITY-NF-07838-07839) (Exhibit 23: Murphy deposition, pp. 244-66)**.**

70. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, James Delaney (a commander at Area 1 at the time of the Hickman/Smith murders) signed a statement denying any knowledge that notes, informal reports, or street files had been destroyed or withheld from Fields. [Delaney died before his deposition could be taken.] (Exhibit 2:  CITY-NF-07841).

71. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, a statement was prepared, purportedly by defendant Stephen Hood, denying that Hood had withheld any written notes or street files from Fields; however, upon reviewing this statement at his deposition, defendant Hood stated that it was not his signature and that he had no recollection of the lawsuit. (Exhibit 2:  CITY-NF-07845) (Exhibit 15: Hood Deposition, pp.  12-13).

72. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant Robert Evans signed a statement claiming that all pertinent information he had received had been placed "in the file." However, defendant Evans testified at his deposition that he would not have conducted any investigation into the matter upon having received notice of Fields's lawsuit. (Exhibit 2:  CITY-NF-07846) (Exhibit 13: Evans Deposition, pp. 98-100).

73. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant James Minogue signed a statement claiming that at no time did he destroy notes or

withhold information regarding the Hickman/Smith investigation. However, defendant Minogue testified at his deposition that he did not conduct any investigation into the matter upon having received notice of Fields's lawsuit. (Exhibit 2: CITY-NF-07837) (Exhibit 14: Minogue Dep. 177-180).

74. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant Stephen Casto signed a statement asserting that he had not deliberately withheld any written notes or any evidence relating to the Hickman/Smith investigation. Casto testified at his deposition that at the time, his only investigation consisted of ascertaining whether or not he currently possessed any street files relating to Fields, or to the Hickman/Smith murders; Casto concluded that he did not possess any such files and he did no further investigation into the matter. (Exhibit 2: CITY-NF-07852) (Exhibit 22: Casto Deposition, pp. 77-78).

75. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant Thomas Richardson signed a statement denying intentionally suppressing any written notes known as street files. (Exhibit 2: CITY-NF-07857).

76. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant Joseph Bogdalek signed a statement denying that he had intentionally suppressed written notes containing exculpatory information or evidence relevant to the investigation, and indicating that he was not aware of anyone suppressing such written notes or evidence. However defendant Bogdalek testified at his deposition that he had previously (around the time of the first trial) noticed that his handwritten notes were missing from the file but he reported this to nobody. Bogdalek testified that he did

17

not "consider" the missing notes at the time he signed his statement in regards to the 1988 lawsuit. Defendant Bogdalek also testified that he did nothing to investigate the substance of Fields's 1988 lawsuit.  (Exhibit 2:  CITY-NF-07862) (Exhibit 21: Bogdalek Deposition, pp. 75-77).

77. At defendant's Bogdalek's deposition, counsel for the city attempted to conflate the street file, which Bogdalek referred to as the "folder" with the "unit file" – however Bogdalek had clearly distinguished these two files, stating that the folder contained made clear was a separate body of documents, the folder containing "everything, every little note." (Exhibit 21: Bogdalek Deposition, p. 14-18, 178-179).

78. The "unit file" only contains official documents such as a copy of the original report and any supplementary reports for all cases that are assigned to that unit. (Exhibit 6: Hickey Deposition, pp. 18-19).

79. The "investigative file" aka "street file" aka "running file" would contain all the investigative notes. (Exhibit 6: Hickey Deposition, pg. 18)

80. Pursuant to the investigation by CPIAD of Fields's 1988 lawsuit, defendant David O'Callaghan signed a statement denying having withheld any *exculpatory information of a written nature* from Nathson Fields. Defendant O'Callaghan also testified at his deposition that he believed *it was his role* to determine whether information was exculpatory or inculpatory.  (Exhibit 2:  File on Fields's 1988 Lawsuit CITY-NF-07867) (Exhibit 16: O'Callaghan Deposition pp. 202-203).

81. O'Callaghan also testified that there was a big room in the federal building that contained a box full of files that contained case reports and interview notes from the

Hickman and Smith murder and other boxes that were part of the investigations regarding the El Rukn Federal trials. (Exhibit 16: O'Callaghan, pp. 206-207).

82. The City's internal investigation resulted in a finding that Field's allegations in his lawsuit were "unfounded." (Exhibit 2: File on Fields's 1988 Lawsuit CITY-NF-07747).

83. The defendants admitted in the Motion to dismiss Fields's 1988 lawsuit that if they were withholding the street file Fields would be entitled to release from Menard [where he was held on death row at the time] and monetary damages. *Fields v. City of Chicago, et al.*, 1990 WL 84521 (N.D. Ill. 1990).

84. The City of Chicago no longer has the file from Fields's 1988 lawsuit (88 C 5608). (Exhibit 52: City's Response to Second Request to Admit, Nos. 8-9).

85. The court file for Fields's 1988 case (88 C 5608) is no longer available on pacer or at the archives. (Exhibit 53: Affidavit of Adrian Bleifuss).

86. On or about April 22, 1991, Nathson Fields's then-attorney, John L. Stainthorp, served a subpoena on the Keeper of Records of the Chicago Police Department seeking "Each and every document, file, paper or recorded information regarding the homicide of Talman Hickman and Jerome Smith … including information maintained in 'street files,' 'personal files,' 'detective's files' or any other files maintained at any time … at Area 1." (Exhibit 54: JMSNY003863-4).

87. In response to the above-referenced April 22 1991, subpoena from Mr. Stainthorp, Commander Frederick B. Miller of Area 1, sent a memo to Olivia Russell, Director of

the Chicago Police Department's Records Division, stating that there were no responsive "documents on file" in the Area. (Exhibit 54: JMSNY003866).

88. On July 28, 1998, attorney Stainthorp served a subpoena on the Chicago Police Department seeking all "documents relating to the investigation into the murders of Talman Hickman and/or Jerome Smith … including all street files, master files, working files, investigator files, informal files and/or record division files." (Exhibit 55: JMSNY003986-87).

89. On August 26, 1998, attorney Stainthorp served another subpoena on the Chicago Police Department seeking "documents relating to the investigation into the murders of Talman Hickman and/or Jerome Smith … including all street files, master files, working files, investigator files, informal files and/or record division files." (Exhibit 56: JMSNY003977-79).

90. On December 2, 1998, attorney Stainthorp again served a subpoena on the Chicago Police Department seeking all "documents relating to the investigation into the murders of Talman Hickman and/or Jerome Smith … including all street files, master files, working files, investigator files, informal files and/or record division files." (Exhibit 57: JMSNY003975-76).

91. On January 27, 2006, Nathson Fields's then-attorney Jean Snyder directed a subpoena to defendant Thomas Richardson, seeking, "reports, notes and street files" relating to the Hickman and Smith murder investigations. (Exhibit 58: JMSNY002514-2517).

92. On January 27, 2006, attorney Jean Snyder served a subpoena on the Custodian of Records of the Chicago Police Department, seeking, "all police reports, notes and street files" relating to the Hickman and Smith murder investigations. (Exhibit 59: JMSNY002542-2545).

93. On January 27, 2006 attorney Jean Snyder served a subpoena on defendant Brannigan, seeking, "all police reports, notes and street files" relating to the Hickman and Smith murder investigations. (Exhibit 60: JMSNY001577-1580).

94. On January 27, 2006 attorney Jean Snyder served a subpoena on defendant O'Callaghan, seeking, "all police reports, notes and street files" relating to the Hickman and Smith murder investigations. (Exhibit 61: JMSNY001573-1576).

95. Jean Snyder has testified at her deposition that she had multiple telephone conversations during which she followed up with Chicago police regarding her subpoenas for documents; Snyder recalled that in one such conversation she was told that the documents were too old to produce. (Exhibit 62: Snyder Deposition, p. 44).

96. Snyder's contemporaneous notes indicate that she spoke with a Mrs. Martin who told her that the documents were too old and that "they don't give them out anymore." (Exhibit 63: JMS0001).

97. After being told that the records were too old, attorney Snyder contacted Sgt. Fred Melean of the Subpoena Unit. (Exhibit 62: Snyder deposition, p. 53-54).

98. Fred Melean has testified in a deposition in this case that he had never seen the Hickman/Smith street file that was ultimately tendered in this litigation, until it was

shown to him in the offices of the City attorneys in preparation for his deposition. (Exhibit 64: Melean Deposition, pp. 26-27).

99. Fred Melean also testified at his deposition that he would not handle subpoenas himself, but that he was the supervisor for the subpoena unit. (Exhibit 64: Melean Deposition, pp. 9)..

100. Fred Melean did not recall at his deposition searching for any documents in response to Snyder's subpoena, and did not recall the subpoena itself. (Exhibit 64: Melean Deposition, pp. 34-35).

101. Fred Melean testified that, in the event that a subpoena served on the Chicago Police Department seeks a file designated as "open" – the protocol of subpoena processors would be to consult with the Chicago Police Department's Office of Legal Affairs, in order to in order to see "what can and cannot go out" because "open investigations are not subject to subpoena." (Exhibit 64: Melean deposition, pp. 19-20).

102. Attorney Snyder's notes indicate that she spoke with an Attorney at the Office of Legal Affairs, Sgt. Matt Brady. (Exhibit 63: JMS001).

103. Sgt. Brady was deposed in this case; Brady testified that he did not know anything about Fields's case and that he did not recall being contacted by attorney Snyder. (Exhibit 65: Brady Deposition, pp. 7,10).

104. Attorney Snyder was never provided the Hickman/Smith street file that was eventually tendered to Fields in this lawsuit in 2011. Snyder testified in her deposition that, with the exception of work product and those documents covered

22

by the attorney-client privilege, she tendered her entire file for Fields's case to the Plaintiff and to the City of Chicago. (Exhibit 62: Snyder Deposition, p. 87).

## I.  THE RECANTATIONS

105.  Sometime in the summer of 1991, Anthony Sumner admitted to AUSA William Hogan that he had fabricated Nathson Field's connection to the Vaughn/White murders in order to exact revenge on Fields for having evicted Mr. Sumner and his family from their apartment due to his failure to pay rent. (Exhibit 27: Sumner Recantation).

106.  Mr. Hogan informed the State's Attorneys' Office of Sumner's admission months later, on December 10 of 1991. (Exhibit 66: Hogan's Letter to ASAs)

107.  AUSA Hogan has testified that he knew of at least three occasions in which Anthony Sumner perjured himself in judicial proceedings including Fields's first trial. (Exhibit 99: October 11, 2013 Testimony of William Hogan, p. 100).

108.  When Assistant State's Attorney Jack Hynes (now Judge Hynes) took the recantation statement from Sumner regarding the Vaughn and White murders, Mr. Hynes failed to specifically ask about the truthfulness of Sumner's testimony regarding the Hickman/Smith shootings. (Exhibit 67: August 23, 2013 Testimony of Jack Hynes, pp. 33-36).

109.  Anthony Sumner died two weeks after giving his recantation to Mr. Hynes, when he was apparently struck by a vehicle, in Georgia. (Exhibit 100: Gwinnett County Death Certificate for Anthony Sumner).

110.   On August 25, 1999, Gerald Morris signed an affidavit stating that he never saw the faces of the Hickman/Smith shooters. (Exhibit 68: Morris August 25, 1999 Affidavit).

111.   On December 13, 2011, Gerald Morris signed an affidavit stating that on April 28, 1984, he had seen two men running from the scene of the Hickman/Smith shootings but he could *not* see their faces.  (Exhibit 46: Morris December 13, 2011 Affidavits, pp. 1, 2-4).

112.    Morris's 2011 affidavit states that approximately a year after the murders, defendant O'Callaghan and another detective visited Morris and informed him that they had apprehended the men who had murdered Jerome Smith; they told Morris that they had three men—a light skinned man, a dark skinned man, and the driver. They mentioned Nate Fields by name. (Exhibit 46: Morris December 13, 2011 Affidavit, p. 2).

113.   Morris's 2011 affidavit states that despite not having seen the faces of the shooters, Morris told defendant O'Callaghan and other detectives that he would help them, and be willing to testify – in order to do the "right thing by Fuddy." (Exhibit 46: Morris December 13, 2011 Affidavits, p.2).

114.   Morris's affidavit states that he selected a photo of Nate Fields from a series of photos shown to him, despite having never seen Fields—Morris then identified Fields in a physical lineup, based on the photograph he had previously been shown. (Exhibit 46: Morris December 13, 2011 Affidavit, p. 2).

115.    Morris' affidavit states that the detectives told Morris that he needed to testify that he had seen two masked men running toward the car, and that he had been able to see their faces when they pulled their masks off and looked around; defendant O'Callaghan and the other detectives rehearsed this story with Morris on multiple occasions. (Exhibit 46: Morris December 13, 2011 Affidavit, p. 2).

116.    Morris' 2011 affidavit states that he falsely testified against Fields, knowing his testimony to be untrue – and that he did so because he was afraid to speak up against defendant O'Callaghan; Morris also states that his family received funds for rent, household necessities, and relocation expenses from the police. (Exhibit 46 Morris December 13, 2011 Affidavit, pp. 2-3).

117.    Randy Langston recanted his testimony against Fields almost immediately after testifying in the 1986 trial. Randy Langston again reversed himself and testified for the State at both Fields's re-trial for the Hickman/Smith murders in 2009, and at the 2013 hearings relating to Fields's petition for a certificate of innocence. (Exhibit 70: April 8, 2009 Findings of Judge Gaughan, pp. 54-55).

118.    On August 27, 1999, Randy Langston signed an affidavit reiterating that he had never seen the faces of the Hickman/Smith Shooters well enough or long enough to be able to identify them, that he lied when he testified on behalf of the state in the Hickman/Smith murder trial, and that he told the truth and the sentencing hearing for Fields and Hawkins. (Exhibit 69: Randy Langston 1999 Affidavit).

**J. FIELDS GETS A NEW TRIAL**

119.    Earl Hawkins began cooperating with authorities shortly after being sentenced to death. One of the very first things Hawkins told defendant Brannigan was about his and his attorneys attempt to bribe Judge Maloney at the criminal trial. (Exhibit 73: August 21, 2013 Testimony of Earl Hawkins, pp. 49-51).

120.    In 1991, Judge Maloney was indicted for taking bribe, and Nathson Fields learned for the first time that the Judge had been offered a bribe in his case. Fields's attorney, John Stainthorp, filed an amended post-conviction motion also seeking a new trial for Fields because of the corrupt judge. *United States v. Maloney*, 71 F.3d 645, 652 (7th Cir. 1995). (Exhibit 36: August 22, 2013 Testimony of Nathson Fields, pp. 89-92).

121.    In 1996, Cook County Circuit Judge Deborah Mary Dooling vacated Fields's conviction and ordered a new trial; Dooling's ruling was upheld in 1998 by the Supreme Court of Illinois. *People v. Hawkins, et al.*, 690 N.E.2d 999 (S. Ct. Il. 1998).

122.    Fields was subsequently brought to Cook County Jail after spending twelve years on death row. He spent a total of eight years at Cook County jail and was bonded out in 2003. (Exhibit 75: Fields Deposition, pp. 301-303, 329-330).

123.    In 2009, Fields was finally retried for the Hickman and Smith murders; he was acquitted by Judge Vincent Gaughan on April 8, 2009. (Exhibit 70: April 8, 2009 Findings of Judge Gaughan, pp. 58-59).

124.    Fields's former co-defendant, Earl Hawkins, testified against Fields in the 2009 retrial; Judge Vincent Gaughan, noting Hawkins' extensive list of murders observed "Mr. Hawkins was asked between 1982 and 1984, how many murders did you

26

actually commit or words to that effect, or how many murders did you conspire to commit. His answer was very abrupt, was ten. Then I recall the other was before 1982, how many murders did you commit or how many murders did you conspire to commit. And the answer was with hesitation, five to ten. If someone had this disregard for human life, do you think they really have any regard for an oath? I find Mr. Hawkins incredible." (Exhibit 70: April 8, 2009 Findings of Judge Gaughan, pp. 57-58).

125.    Randy Langston also testified against Fields in his 2009 retrial; Judge Gaughan, noting Randy Langston's inconsistent testimony and history of recantations, found that Randy Langston's word was "worth little if anything." (Exhibit 70: April 8, 2009 Findings of Judge Gaughan, pp. 54-55).

126.    Gerald Morris similarly testified against Fields in 2009; Judge Gaughan observed that Gerald Morris had recanted his testimony against Fields in a previous affidavit, that his testimony was contradicted by other witnesses, and that he did not identify Fields until a year after the Hickman/Smith murders; Judge Gaughan found that these factors gave "insight into … [Morris'] credibility." (Exhibit 70: April 8, 2009 Findings of Judge Gaughan, pp. 55-56).

K. **THE STREET FILE FINALLY APPEARS ON THE SCENE WITH NEW LEADS AND THEORIES**

127.    On July 6, 2011, Plaintiff served a request to produce on the City in this case; this request sought, among other things, "all documents referring to or relating to Talman Hickman and Jerome Smith, including but not limited to the investigation of

27

their murder from the time period of January 1, 1984 *to the present*." (*emphasis added*) (Exhibit 77: Request to Produce, Request No. 29). (Exhibit 79: Plaintiff Interrogatories, pp. 1, 10).

128.   On September 8, 2011, in the course of this litigation, and in response to Plaintiff's request to produce, the City tendered a body of documents containing 142-pages of notes, reports, and photographs of persons of interest, Bates-stamped CITY-NF-000972-001117, from a folder labeled "Double – Smith + Co" and marked "F-151922" (hereinafter "the street file") to attorneys for the Plaintiff, hereinafter referred to as "the street file." (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, Nos. 3-4). (Exhibit 1: CITY-NF-000972-001117).

129.   The street file does not contain the 8 pages of investigative notes produced to Fields 's criminal attorney Jack Smeeton pursuant to his 1986 subpoena. (Exhibit 43: 8 pages of notes from State's Attorney's Office) (Exhibit 1:  CITY-NF-000972-001117).

130.   According to the City, the City's attorneys came into possession of the street file on June 24, 2010.  (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, pp. 2-3).

131.   The City admits that it has no evidence or knowledge that the street file was ever tendered to Fields or the State's Attorney's Office. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, Nos. 32-35).

132.   According to the City, the street file was located at Area 1 when it was found. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, Nos. 3, 9).

133.   The City claims it does not know where at Area 1 the street file was located between June of 1984, and the filing of Fields's civil rights lawsuit in 2010. (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, p. 2) (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, No. 9).

## L.  THE FILE CABINET

134.   In response to interrogatories by Fields, trying to ascertain exactly where this file had located over the years, the City stated in its initial response that the street file was *currently* located at the police facility at 51st and Wentworth (Area 1 Detective Division). In supplemental responses it said that it believed but *could not definitively state*, that the street file was located in a file cabinet at Area 1 that ostensibly contained open files. The drawer in which the file *might have been found* was labeled 1983-1984, which contained "some other old Area 1 homicide files." (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, p. 5) (Exhibit 98: City's Answers to First Set of Interrogatories, para. 4). (See also *Fields v.City et al.*, 10 C 1168, Docket 414, Docket 415).

135.   This file cabinet described above contains approximately 300 investigative files dating from 1944 to 1987, which are homicide files from Area 1 and are designated

as "open" by the Chicago Police department. (*Fields*, 10 C 1168, Docket 414, Docket 415).

136.    Counsel for Fields viewed the file cabinet on the second floor of Area 1 on June 12, 2012. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, No. 14).

137.    At the time of the visit by counsel for Fields on June 12, 2012, the file cabinet described above contained five drawers which were labeled as follows: a. The top drawer had a label indicating dates from 1944 to 1969; b. the second drawer from the top had a label indicating dates from 1970 to 1980; c. the third drawer from the top had a label indicating dates from 1980 to 1983; d. the forth drawer from the top had a label indicating dates from 1983 and 1984; e.the bottom drawer had a label indicating dates from 1984 and 1985. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, No. 18).

138.    Counsel for Fields made a second visit to view the file cabinet on August 8, 2012. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, No. 22).

139.    When counsel visited Area 1 on August 8, 2012 the file cabinet was no longer on the second floor where it had been located on June 12, 2012. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, Nos. 23-24).

140.    The file cabinet had been moved shortly after counsel's visit to Area 1 on June 12, 2012, to the basement of Area 1. (Exhibit 9: Brown Deposition, pp. 45-46).

141.    Counsel for Fields made a third visit to view the file cabinet in the basement of Area 1 on February 28, 2013. On this visit counsel was allowed to view and index the files in the cabinet. (*Fields*, 10 C 1168, Docket 347, Docket 414)**.**

142.    When counsel for Fields finally viewed the files in the cabinet described above, the file contained five drawers. The first drawer from the top contained files from 1944 to 1978.  The second drawer from the top contained files from 1976 to 1981. The third drawer from the top contained files from 1980 to 1983. The fourth drawer from the top contained files from 1983 to 1984. The fifth drawer (the bottom drawer) contained two files from 1984, seventeen files from 1985, two files from 1986, one file from 1987, and seventy-one files were from 1977. (Exhibit 53: Affidavit of Adrian Bleifuss).

143.    This cabinet is one of more than 20 similar cabinets currently located in the basement of the Area Central facility at 51st and Wentworth. (See *Fields*, 10 C 1168, Docket 414, 415).

144.    There is no computerized inventory system for the above-referenced file cabinets.  (Exhibit 9: Brown Deposition, pp. 58-59).

145.    Despite containing files designated as "open," some of the files in the cabinets relate to crimes for which suspects were identified, prosecuted, and convicted. (See *Fields*, 10 C 1168, Docket 414, 415).


L.  **TRACKING THE WHEREABOUTS OF THE FILE**

146. In responses to requests to admit, the city admitted that the street file was located at Area 1 at the time it was located in 2010, but the City stated that it was without sufficient information to admit or deny *precisely where* the file was located at Area 1. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit, Nos. 9-10).

147. The city has admitted that it does not know which employee located and/or retrieved the street file that was found at Area 1. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit No. 11).

148. The city has admitted that it does not know and is unable to determine which employee and/or employees at Area 1 made the copies of the file and sent the file to the legal affairs department of the city. (Exhibit 78: Defendant City of Chicago's Response to Plaintiff's Requests to Admit No. 12).

149. The City admitted that Chicago Police Department employees interviewed by the City's legal team stated that they had no recollection of the street file. (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 3 and 5, pp. 3-7).

150. In its attempts to explain the previous whereabouts of the street file from June of 1984 through and including June 24, 2010, the City has disclosed that on or about March 31, 2010, Mary Beth Majka of the Office of Legal Affairs forwarded a request for documents relating to the Smith and Hickman murders to the Records Services Division of the Chicago Police Department. (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First

Set of Interrogatories, p. 2) (Exhibit 80: March 31, 2010 B.A.S. Service Request, CITY-NF-009083).

151.    March 31, 2010, the date of Mary Beth Majka's above-referenced Service Request, coincides with the very date that Nathson Fields moved for a default judgment against the City Defendants -- at which point this Court entered an order to the City to show cause as to why an order of default should not be entered for its failure to respond following service of summons. (*Fields*, 10 C 1168, Docket 35, Docket 36).

152.    Mary Beth Majka's request was received by Kathleen Loughran of the Detective Division Administration, who on April 13, 2010, responded to Majka stating: "I received your request for the double Homicide filed under RD#F151922. This investigation remains UNDERLINE OPEN [*capitalization and underlining original*] with one offender still at large." (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, p. 3). (Exhibit 81: April 13, 2010 Email from Loughran to Majka, CITY-NF-09506).

153.    On May 25, 2010, at 13:34 PM, Mia Ogliore, then commanding officer of the Detective Division Support Section, wrote an email to William Bazarek of the Office of Legal Affairs, informing him that "the file is ready and Marybeth can come down to pick it up now if she wishes." (Exhibit 82: Email Chain Disclosed February 2013, CITY-NF-09507).

154.    On May 25, 2010, at 3:40 PM, Kathleen Loughran wrote to Detective Al Elizondo, stating that "someone from Area One will hopefully be contacting you tomorrow

about possibly finding an Area File for the 1985 case I was discussing with you earlier today - filed under RD# F151922. If they do get a copy to us could you make a copy of it and give a copy each to records and to MaryBeth in legal affairs." (Exhibit 82: Email Chain Disclosed February 2013, CITY-NF-09518).

155.    The following year, on August 5, 2011, Mary Beth Majka emailed Commander Walsh (then commander of Area 1) about making the original file available for review by counsel; in that email Majka described the street file as the one that had been produced to the Office of Legal Affairs from Walsh's own office. (Exhibit 82: Email Chain Disclosed February 2013, CITY CITY-NF-09524).

156.    The exchanges between City personnel referenced in Exhibit 82 were disclosed in a body of emails tendered by the City to Plaintiffs for the first time on February 8, 2013. (Exhibit 82: Email Chain Disclosed February 2013, CITY CITY-NF-09916) (Exhibit 83: February 8, 2013 letter from Dan Noland).

157.    The emails produced on February 8, 2013 were tendered to Plaintiff twenty-one months after Plaintiff had served his First Request to Produce seeking all documents "related to the investigation, arrest and conviction of Nathson Fields for the murders of Jerome Smith and Talman Hickman" and "any and all documents, correspondence, and records in any way referring or relating to the investigation of the deaths of Talman Hickman and Jerome Smith between January 1, 1984 *to the present*"(*emphasis added*). (Exhibit 77: Plaintiff's Request for Production, Nos. 4, 29).

158.    The emails produced on February 8, 2013 were tendered to Plaintiff over a year-and-a-half after Plaintiff served his First Set of Interrogatories on the City of

Chicago, seeking, among other things "the names of any known persons, agencies, government offices, entities, or law enforcement officers or agencies both currently or previously involved in identifying, selecting, handling, transporting or copying documents or materials related to the investigation of the April 28, 1984 murders of Jerome "Fuddy" Smith and Talman Hickman. This interrogatory seeks to establish the chronological chain of custody for any and all documents, notes, or materials compiled during the investigation of the murders of Jerome "Fuddy'" Smith and Talman Hickman, including but not limited to, the documents Bates stamped CITY-NF-001023 through 1117." (Exhibit 84: First Set of Interrogatories, Interrogatory No. 4).

159.  In explaining to the Court why those emails were not produced to Fields attorneys earlier (after a series of motions to compel) Mr. Noland simply rewrote Plaintiff's discovery requests on the spot, and falsely told the Court that Plaintiff only sought documents *to the time of the filing the lawsuit*. Exhibit 85: Transcript of proceedings held on February 20, 2013, p. 13. (*Fields*, 10 C 1168, Docket 201, Docket 226, Docket 251).

160.  Patricia Walsh, who was deposed in this case, was the Commander of Area 1 at the time the street file *apparently* surfaced in 2010. Walsh claims that she has no recollection of the street file being discovered, and has no knowledge of the process by which the street file was discovered. (Exhibit 86: Walsh Deposition pp. 56-61).

161.  Kathleen Loughran has told the City's attorneys that she would, as a matter of routine, forward requests for Area 1 homicide files to Detective Samuel Brown, the

homicide coordinator, who was tasked with handling homicide files in the Area. (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, p. 4).

162.    Detective Samuel Brown has no recollection of the street file being discovered, and has no knowledge of the process by which it was found and tendered to attorneys for the City. (Exhibit 9: Brown Deposition 8-9, 31-32).

163.    According to the City, the original copy of the street file is and has been maintained in the office of Lt. Kevin Duffin, a commanding officer at Area 1 (now Area Central) for safe keeping since it was found. (Exhibit 79: Defendant City of Chicago's Third Amended and Supplemental Answers to Paragraphs 4 and 5 of Plaintiff's First Set of Interrogatories, p. 5).

164.    Lt. Duffin was deposed in this case and stated at this deposition that the street file was given to him "to the best of [his] recollection, in early fall of 2011." (Exhibit 87: Duffin Deposition, p. 11).

165.    Lt. Duffin stated that he was given the original file by either Commander Walsh or Detective Samuel Brown. (Exhibit 87: Duffin Deposition, p. 13).

166.    Neither Brown nor Walsh know or recall anything about how the file was produced. (Exhibit 9: Brown Deposition, pp. 8-9, 16-17) (Exhibit 86: Walsh Deposition, pp. 56-61).

167.    According to Lt. Duffin, on or about the fall of 2011, Lt. Duffin conducted an investigation to determine where the street file had been maintained before it was entrusted to his custody. (Exhibit 87: Duffin Deposition, p. 15).

168.    According to Lt. Duffin, In the course of this investigation, he spoke with Detectives Samuel Brown, Sharon Colby, Karen Williams, John Posluzny and retired Detective Kevin O'Brien, all of whom handled homicide files at Area 1 at the time the file was located. (Exhibit 87: Duffin Deposition, p. 15).

169.    According to Lt. Duffin, he learned nothing from these conversations as to where the street file had been located. (Exhibit 87: Duffin Deposition, p. 16).

170.    Detective Samuel Brown testified that he does not recall retrieving the file and does not recall ever being asked to find it. (Exhibit 9:  Brown Deposition, pp. 8-9, 16-17).

171.    Detective Sharon Colby testified that she was shown the street file by Lt. Duffin, and that she told him that she could not recall if she had ever seen it before. (Exhibit 88: Colby Deposition, pp. 28-30).

172.    Detective Karen Williams testified that she was shown the street file by Lt. Duffin, but that she did not know whether she had ever seen it before. (Exhibit 89: Karen Williams Deposition, pp. 21-22).

173.    Detective John Posluzny testified that Lt. Duffin had shown him the street file and asked him whether he had ever seen it; Posluzny informed Duffin that he had not. (Exhibit 11; Posluzny Deposition, pp. 14-15).

174.    Detective Kevin O'Brien testified he was shown the street file by Lt. Duffin, in the presence of attorney Noland, and that he did not recall ever seeing the file. (Exhibit 10: O'Brien Deposition, p. 8).

L.  **WHAT IS IN THE STREET FILE**

175.   The street file contains 90 pages of notes and reports and 56 pages of photographs of people of interest. (Exhibit 1: CITY-NF-000972-001117).

176.   A typed report from defendant Bogdalek and defendant Minogue to defendant Hood and defendant Evans in the street file states that James Langston (now deceased) had identified one of the individuals in the offenders' vehicle as a brother of the Ricky Baldwin, and that Ricky Baldwin had been murdered the previous summer. Although the fact that James Langston was a witness to the murders was discovered by Fields criminal attorneys after the trial and they attempted to file for a new trial based on that discovery they did not know that James Langston identified one of the perpetrators in the getaway car and that he told police that fact on the day of the murders. (Exhibit 1: CITY-NF-001075)(Exhibit 71: transcript from 8/14/86).

177.   This same report includes the notation: "see our notes for more details." The referenced notes are found nowhere in the street file and have never been tendered. (Exhibit 1: CITY-NF-001075).

178.   The street file contains notes revealing that the offender in the Ricky Baldwin murder was the Goon Squad member Jimmie Greene, who was also the boyfriend of Linda Smith, the niece of victim Jerome Fuddy Smith; Greene was also a member of the Goon Squad and was convicted of the murder of Ricky Baldwin. (Exhibit 1: CITY-NF-001062). *People v. Greene*, 160 Ill. App. 3d 1089, 1092, 513 N.E.2d 1092, 1094 (Ill. App. Ct. 1987).

179. Building janitor David Minnifield received a call from a tipster stating that Edward Stewart, Darryl Baldwin and "Chico" were involved in the Hickman/Smith murder. (Exhibit 1: CITY-NF-001077, 001116).

180. The street file contains a nickname index for "Chico" AKA Mertel Rey, "cousin to Darryl Baldwin." (Exhibit 1: CITY-NF-001108).

181. The street file contains gang arrest information cards for "Chico" AKA Martel Ray. (Exhibit 1: CITY-NF-001111).

182. Notes regarding members of the Baldwin family appear repeatedly within the street file as persons of interest. (Exhibit 1: CITY-NF-001071-74, 001075, 001077, 001081, 001108, 001112, 001114, 001116).

183. The street file contains a handwritten note with information on Faye Baldwin, mother of Ricky Baldwin; – as well as a location for "Chico." (Exhibit 1: CITY-NF-001062).

184. The street file contains a handwritten note with addresses for "Chico" and "Poncho." (Exhibit 1: CITY-NF-001085).

185. The street file contains a report documenting a call was made to the "We T.I.P." private crime reporting agency, identifying one of the shooters in the Hickman/Smith case as a "Sabash" living on the 4100th block of Drexel; the tipster provided identifying information about Sabash including a tattoo on his arm, and identified the shooter's automobile as a blue 1979 Cadillac Coup de Ville. (Exhibit 1: CITY-NF-001052).

186.    Defendant Bogdalek testified that police attempted to secure photographs of the Baldwins for purposes of identification, but Bogdalek has no knowledge of how thoroughly the Baldwin leads were pursued, or if they were followed up. (Exhibit 21: Bogdalek Deposition, pp. 171-172).

187.    Police notes indicate that a witness had overheard Lawrence Edwards and Clifford Marshall Edwards in the stairwell of the 706 building discussing a plot to procure guns and masks to kill "Fuddy" (Jerome Smith) on the morning of the murders; Lawrence Edwards was overheard saying that Fuddy would not live through the night and Clifford Marshall Edwards said that Fuddy would not be "jumping on you anymore." (Exhibit 1: CITY-NF-001039-40).

188.    The street file contains a handwritten note making reference to "Lawrence" and "Marshall" Edwards, as well as an "incident night before" and "jumpsuits in shopping bag." (Exhibit 1: CITY-NF-001039).

189.    The street file contains an April 27, 1984 arrest report for purported Goon Squad members Paul Haley and Chundell Leaks, who were accused of shooting at Delbert Edwards. (Exhibit 1: CITY-NF-001086-001988).

190.    The street file contains a Chicago Police Department message form directed to Joseph Bogdalek, reading "Delbert Edwards" and featuring his IR (fingerprint) number. (Exhibit 1: CITY-NF-001043).

191.    An individual named Morris Haywood was driving a light blue, 1975 two-door Cadillac when he was arrested near the scene of the murders on May 2, 1984—a few days after the Hickman and Smith murders. (Exhibit 1: CITY-NF-001053-001059).

40

192.   Officers William Golon and Gerard Droba, who arrested Morris Haywood and deposed in this case, do not believe they ever asked Haywood about the Hickman/Smith murders. (Exhibit 90: Golon Deposition, pp. 9-17, Exhibit 91: Droba Deposition, pp. 9-13).

193.   Defendant Bogdalek testified that the arrest of Morris Haywood took place after "they" stopped working on the investigation so he doesn't know if any follow up was done.  Defendants Minogue, Evans and Hood also had no idea whether any follow up investigation was done on Mr. Haywood. (Exhibit 21: Bogdalek Deposition, pp. 134-137) (Exhibit 14: Minogue Deposition, pp. 118-19) (Exhibit 13: Evans Deposition, pp. 128-29) (Exhibit 15 - Hood Deposition, pp. 146-48).

194.   According to a general progress report by Defendant Minogue, police could not verify Edward Stewart's alibi that he was working at a McDonald's restaurant at the time of the murders because he worked the second shift and McDonalds was closed. There are no notes in the file to indicate that anyone followed up on his alibi. In his deposition, Defendant Minogue testified that he never followed up on the alibi and he doesn't know if anyone else did. Bogdalek, Evans and Hood also did not know if anyone followed up on the alibi. (Exhibit 1: CITY-NF-001077) (Exhibit 14: Minogue Deposition, pp. 53, 133-135) (Exhibit 21: Bogdalek Deposition, p. 154) (Exhibit 13: Evans Deposition, pp. 156-59) (Exhibit 15: Hood Deposition, pp. 163-64).

195.   The file contained notes indicating that the driver and passenger of the offenders' vehicle were named "Ronald" and "Donald." (Exhibit 1:  CITY-NF-001041).

41

196.    A tip to police suggested that Rodell Banks was involved in the Hickman and Smith murders. Banks was an El Rukn member who, along with Earl Hawkins, sold drugs in the 706 building and allegedly complained about Jerome "Fuddy" Smith. There is no indication in the street file that this lead was followed up. According to Hawkins, Rodell Banks was the person who called him the morning of the murders to tell Hawkins that "Fuddy" was outside. There is no indication in the files that any follow up investigation was conducted regarding Mr. Banks. (Exhibit 1: CITY-NF-001069) (Exhibit 26: Hawkins Deposition, pp. 16-20, 48-50) (Exhibit 21: Bogdalek Deposition, pp. 156-57) (Exhibit 13: Evans Deposition, pp. 162-63) (Exhibit 15: Hood Deposition, pp. 167).

197.    The street file contains a handwritten note reading "check for 9mm handguns inventoried + other .9mm hom. cases." There is no indication that this was done. (Exhibit 1: CITY-NF-001029).

198.    The street file contains arrest information cards for Louis Carter, Delbert Edwards, Andre Green, Gerald Green, and Damien Prince (aka "Chico"). (Exhibit 1: CITY-NF-001034-37, 001079-80, 001107).

199.    Louis Carter told police that he was driving a blue Cadillac Coup de Ville from his sister's house on 38th street to a location on Federal where he dropped off *three* friends; he then picked up his mother and took her to his sister's house. (Exhibit 1: CITY-NF-001050).

200.    In his deposition, Defendant Evans stated that Louis Carter had been questioned by detectives; Evans could not recall whether Carter had been questioned about the

42

identity of his three friends, or whether Carter knew Delbert Edwards; Evans believes he might have asked about Carter's gang affiliations, and that this information might have ended up in his notes—though that information was not preserved in the typed supplementary report, and no such notes exist in the street file or were otherwise tendered. Evans also testified that they would have checked out his Carter's alibi but there are no notes in the file to confirm that they checked out his alibi. (Exhibit 13: Evans deposition, pp. 69-72) (Exhibit 1: CITY-NF-000972-001117).

201.    In his deposition, Defendant Hood stated that he recalled nothing about his interactions with Louis Carter, or what questions had been directed to Mr. Carter. (Exhibit 15: Hood deposition, pp. 73-77).

202.    The street file contains arrest cards and handwritten notes providing physical descriptions of Louis Carter and Delbert Edwards. (Exhibit 1: CITY-NF-001034-001037).

203.    The street file contains a "Request for Identification Photos" form, prepared by Defendant Joseph Bogdalek seeking identification photographs of Gerald Green, Rodell Banks, and Edward Stewart. (Exhibit 1: CITY-NF-001038).

204.    The street file contains a handwritten note with identifying information for Simeon "Cameo" Johnson, Joseph Fritz, and John Rogers. (Exhibit 1: CITY-NF-001061).

205. The street file includes a document that contains a series of handwritten notes with identifying information for Carlos Willis and John A. Rogers, and an unidentified UUW report. (Exhibit 1: CITY-NF-001076).

206. The City of Chicago admits that the street file contains no reference to Nathson Fields. (Exhibit 78: City Response to Request to Admit, Request No. 38).

207. The City of Chicago admits that the street file contains no photograph of Nathson Fields. (Exhibit 78: City Response to Request to Admit, No. 39).

## ii. WHAT IS NOT IN THE STREET FILE….

208. Despite the fact that the City claims to have not known the whereabouts of the street file in the years between 1984 and 2010, Defendant Joseph Bogdalek testified in his deposition that he reviewed the street file around the time of Plaintiff's first trial for the Hickman and Smith murders in 1986. (Exhibit 21: Bogdalek Deposition, pp. 72-92).

209. Defendant Bogdalek testified in his deposition that on or about 1986, he noticed that certain of his notes were missing from the file –but that he didn't know of any policy that required him to bring he never mentioned the missing notes to anyone's attention. (Exhibit 21: Bogdalek Deposition, pp. 72-92).

210. Defendant Bogdalek testified that the missing notes related to interviews with Sandra Langston (the only person to provide a contemporaneous description of the shooters- two light complected men,) and James Langston who, as Plaintiff knows from the missing street file, identified a passenger in the getaway car as a member of the Baldwin family – the missing notes also related to interviews with Randy

44

Langston and Minnie White. (Exhibit 21: Bogdalek Deposition, pp. 72-92) (Exhibit 1: Street File, CITY-NF-001075).

211.    Defendant Bogdalek testified that his partner, defendant Minogue, prepared a General Progress Report (GPR) concerning the details of interviews with Lawrence and Marshall Edwards and confirming the supposed alibis of the Edwards brothers. No such GPR exists in the street file or was otherwise tendered. (Exhibit 21: Bogdalek Deposition, pp. 122-125) (Exhibit 1: Street File CITY-NF-000972-1117).

212.    Defendant Bogdalek testified that he and his partner prepared a General Progress Report related to follow-up investigations concerning one Simeon Johnson. No such GPR exists in the street file or was otherwise tendered. (Exhibit 21: Bogdalek Deposition, pp. 136-138) (Exhibit 1: Street File CITY-NF-000972-1117).

213.    Defendant Bogdalek testified that he thought there was a report about a "Chico" but he did not know that "Chico" was a nickname for one of the Baldwins. No such report exists in the street file or was otherwise tendered. (Exhibit 21: Bogdalek Deposition, pp. 139, 154-157) (Exhibit 1: CITY-NF-001108).

214.    Defendant Bogdalek testified that he recalled an interaction with Shawn Baldwin recorded in a report. No such report exists in the street file or was otherwise tendered. (Exhibit 21: Bogdalek Deposition, pp. 144-146, 171) (Exhibit 1: CITY-NF-000972-1117).

215.    Defendant Bogdalek testified that he does not know whether there was any investigative follow up with Morris Haywood (Exhibit 21: Bogdalek Deposition, pp. 134-136).

216.    Defendant Bogdalek testified that he does not know whether a lead implicating Rodell Banks in the Hickman/Smith murders was pursued. (Exhibit 21: Bogdalek Deposition, pp. 143-144).

217.    Defendant Bogdalek testified that he does not know whether any follow up was conducted into the alibi of Edward Stewart, who claimed to be working at McDonald's. (Exhibit 21: Bogdalek Deposition, pp. 153-154).

218.    Defendant Bogdalek testified that he does not know whether possible Baldwin family connection to the crime was fully investigated. (Exhibit 21: Bogdalek Deposition, pp. 169-172).

219.    Defendant Evans stated at his deposition that he believed he reviewed the "folder" prior to his testimony at the first trial. The "folder" was the name Evans used for the investigative file and it contained the notes, photos, documents, etc. from the investigation that was used by the detectives during the course of the investigation. Evans also stated that there was a copy of everything that was in the folder in the office file. (Exhibit 13: Evans Deposition, pp. 16-21, 36-43).

220.    Detective Hood described the "folder" as the file they carried around while investigating.  Hood also thought the office file and the folder should contain the same information. Hood identified the street file in this case as looking like the "folder." (Exhibit 15: Hood Deposition, pp.  127-30).

221.    In response to questions from his attorney at the deposition Evans said he only reviewed his own notes prior to testifying at the first trial. However, Evans

acknowledged that although he only focused on his own notes materials from other detectives were sent to him for review. (Exhibit 13: Evans Deposition, pp. 182-86).

222.    Detective Evans testified that he and his partner took turns interviewing witnesses and whichever was the one interviewing witnesses would take their own notes. Detective Evans testified at Fields's first trial that witness Cleveland Ball gave a detailed description of the assailants. At his deposition Evans stated that either he or his partner took notes regarding the interview with Ball but no notes regarding that interview were in the file or were otherwise tendered. (Exhibit 13: Evans Deposition, pp. 21-35). (Exhibit 1: CITY-NF-000972-1117).

223.    Detective Evans testified that when he typed the supplemental reports he would have had notes in front of him, for example in the supplemental report from the day of the murder there is an entry that Otha Hickman identified her brother's body and the body of Jerome Smith. However, no notes from the interview with Otha Hickman were in the file or were otherwise tendered. Detective Hood also does not know where those notes are or how the information could have been inserted without notes. (Exhibit 1: CITY-NF-001049) (Exhibit 13: Evans Deposition, pp. 64-66) (Exhibit 15: Hood Deposition, pp. 63-66) (Exhibit 1: CITY-NF-000972-1117).

224.    Defendant Evans testified that he did not know if any investigation was done regarding the three friends that were driving with Louis Carter in a car that matched the description of the getaway car. His partner defendant Hood also did not know of any investigation into the three friends. (Exhibit 13: Evans Deposition, pg. 69-77) (Exhibit 15: Hood Deposition, 74-77).

47

225.    Defendant Evans testified that he was certain that he or his partner (Hood) took notes regarding the investigation into the alibis of Louis Carter and Delbert Edwards (who claimed he was at his aunt's house at the time of the murders) but those notes do not appear in the file. Defendant Hood could not recall any investigation into Delbert Edwards or Louis Carter. (Exhibit 13: Evans Deposition, pp. 70-78) (Exhibit 15: Hood Deposition, pp. 74-80, 151-152) (Exhibit 1: CITY-NF-000972-1117).

226.    Defendant Evans testified that had he investigated the Baldwin connection to the murders he would have produced notes; Detective Hood testified that as far as he could recall he did no investigation into the Baldwin connection. (Exhibit 13: Evans Deposition, pp. 134-149) (Exhibit 15: Hood Deposition: p. 151).

227.    Defendant Evans testified that if he had followed up on the tip that Rodell Banks had been involved in the murder, he would have left a note in the file indicating that he had followed up. There is no note in the file indicating that Evans followed up on that tip. Evans thought someone did interview Banks but there are no notes in the file to indicate that anyone interviewed Banks. Defendant Hood did not know if anyone followed up with Banks or if Banks had an alibi. (Exhibit 13: Evans Deposition, pp. 142-44, 162-64) (Exhibit 15: Hood Deposition, pp. 153-154, 167) (Exhibit 1: CITY-NF-000972-1117).

228.    Defendant Evans testified that if he had followed up on the alibi of Edward Stewart (who claimed he was at work at McDonalds at the time of the murders) he would have made a note to the file. Defendant Hood has no recollection of following

up on the Edward Stewart alibi or any other alibi. (Exhibit 13: Evans Deposition, pp. 158-59) (Exhibit 15: Hood Deposition, pp. 164-65).

229.     The We T.I.P report contains a handwritten notation instructing Defendant Hood to produce a report by Jun 11, 1984; no such report is contained within the street file. (Exhibit 1:  CITY-NF-001052).

230.     In his deposition, Defendant Hood stated that he would have made a follow-up report in response to the We T.I.P. submission, that he would not have ignored the request and that the report would have been made in the form of a to-from memo to a supervisor. (Exhibit 15: Hood Deposition, pp. 141-145).

L.  **THE CITY DOES NOT CONTEND THE FILE WAS EVER TENDERED**

231.     The City admits that it has no evidence that the street file was ever provided to the U.S. Attorney's Office, despite the fact that George Carter, Henry Andrews, and Earl Hawkins were charged with the Hickman/Smith murders in federal court, and more than a dozen other men were charged with conspiracy to commit that murder. (Exhibit 78: City Response to Request to Admit, Request No. 36) (Exhibit 92: Federal El Rukn Indictment, pp. 55-56).

232.     That the City contends that eight pages in the street file Bates-stamped CITY-001044-001051 are also contained in the "Permanent Retention File."  However, the versions of those eight pages that appear in the permanent retention file contains markings clearly distinguishing those pages from the eight corresponding pages in the street file—markings such as stamps reading "permanent retention file" and

circular numerical stamps. (Exhibit 93: CITY-NF-09530-09537) (Exhibit 1: CITY-NF-001044-1051).

233.    Cook County admits that it never possessed the missing street file prior to the civil rights litigation.  (Exhibit 94: Response of Larry Wharrie, David Kelly and Cook County to Plaintiff's Request to Admit, Request Nos. 10-13).

234.    The Cook County State's Attorney maintains that it possessed versions of 17 pages of documents from the 145-page street file; however, it admits that fourteen of those seventeen pages contain markings distinguishing them from the versions of those pages in the street file – and that the other three pages of those 17 pages are no longer found within the State's Attorney's file on the Hickman/Smith murders. (Exhibit 95: Amended Response of Larry Wharrie and David Kelley to Plaintiff's Second Request to Admit to County Defendants, Request Nos. 30-34).

235.    In the course of this litigation, the City of Chicago has produced three distinct files of investigative materials relating to the Hickman/Smith murders: 1) the recently-tendered street file (Exhibit 1: CITY-NF-000972-001117); 2) the more recently tendered separate file which the City's attorneys have referred to as the "Area File" and which is also referred to as the "unit file."(Exhibit 96: April 9, 2012 Letter from Attorney Noland providing additional documents from the Permanent Retention file, and providing the Area File); and 3) a body of documents marked for "permanent retention." (Exhibit 96: April 9, 2012 Letter from Attorney Noland providing additional documents from the Permanent Retention file, and providing the Area File).

Respectfully Submitted,

 /s/H. Candace Gorman
One of the Attorneys for Fields

For Fields:

|  | H. Candace Gorman |
| Leonard Goodman | 220 S. Halsted |
| Melissa Matuzak | Suite 200 |
| 53 W. Jackson Boulevard | Chicago Illinois 60661 |
| Suite 1650 | 312-427-2313 |
| Chicago, Illinois 60604 | |

51

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, hereby certify that the foregoing 56.1 Statement was served to the parties by pursuant to the Court's ECF filing system.

Dated: December 9, 2013

Respectfully Submitted,

/s/ H. Candace Gorman

One of the Attorneys for Fields

For Fields:

Leonard C. Goodman
Melissa Matuzak
53 W. Jackson Boulevard
Suite 1650
Chicago, Illinois 60604
312-986-1984

H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Illinois 60661
312-427-2313