**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | Magistrate Judge Geraldine Soat Brown |

**CITY DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, IL 60606
(312) 876-1700

# <u>TABLE OF CONTENTS</u>

**Page**

**I.** BACKGROUND FACTS ............................................................................ 1

**II.** STANDARD OF REVIEW .................................................................... 6

Fed. R. Civ. P. 56(c) ............................................................................ 6

**III.** DISCUSSION .................................................................................... 6

    **A.** All City Defendants are Entitled to Summary Judgment on Plaintiff's §1983 Claims
    Because His Due Process Claim Fails as a Matter of Law .................................. 6

        *Brady v. Maryland*,
           373 U.S. 83 (1963) ............................................................................ 6

        *Newsome v. McCabe*,
           256 F.3d 747 (7th Cir. 2001) .......................................................... 6

        *Ienco v. City of Chicago*,
           286 F.3d 994 (7th Cir. 2002) .......................................................... 6

        *Kyles v. Whitley*,
           514 U.S. 419 (1995) ........................................................................ 6

      1. Plaintiff Cannot Claim the Defendant Officers Denied Him of His Right to a Fair Trial
         Before Judge Maloney in 1986 ...................................................... 6

        *People v. Hawkins*,
           181 Ill. 2d 41, 690 N.E.2d 999 (1998) .......................................6, 7, 8

        *Brady v. Maryland*,
           373 U.S. 83 (1963) ........................................................................7, 8

        *Kyles v. Whitley*,
           514 U.S. 419 (1995) ........................................................................7

        *Drumgold v. Callahan*,
           707 F.3d 28 (1st Cir. 2013) ..............................................................7

      2. A Brady Claim Based On Plaintiff's Second Trial Cannot Succeed Because He Was
         Acquitted ...................................................................................... 8

        *Brady v. Maryland*,
           373 U.S. 83 (1963) ...................................................................8, 9, 10

        *Carvajal v. Dominguez*,
           542 F.3d 561 (7th Cir. 2008) ...........................................................8, 9

i

*Bielanski v. County of Kane*,
    550 F.3d 632 (7th Cir. 2008)................................................................8, 9

*Morgan v. Gertz*,
    166 F.3d 1307 (10th Cir. 1999) ...............................................................8

*Flores v. Satz*,
    137 F.3d 1275 (11th Cir. 1998) ...............................................................8

*McCune v. City of Grand Rapids*,
    842 F.2d 903 (6th Cir. 1988)....................................................................8

*Albright v. Oliver*,
    510 U.S. 266 (1994) .................................................................................9

*Ienco v. City of Chicago*,
    286 F.3d 994 (7th Cir. 2002)....................................................................9

*Newsome v. McCabe*,
    256 F.3d 747 (7th Cir. 2001)....................................................................9

*Parish v. City of Chicago*,
    594 F.3d 551 (7th Cir. 2010)....................................................................9

*Mosley v. City of Chicago*,
    614 F.3d 391 (7th Cir. 2010)....................................................................9

3.    There is No Evidence the Individual Defendants Deliberately Withheld the Subject
    File .......................................................................................................... 10

*Brady v. Maryland*,
    373 U.S. 83 (1963) .................................................................10, 11, 12

*Strickler v. Greene*,
    527 U.S. 263 (1999) ...............................................................................10

*Newsome v. McCabe*,
    260 F.3d 824 (7th Cir. 2001)...........................................................10, 11

*Lyons v. Village of Woodridge*,
    2011 WL 2292299 (N.D. Ill. 2011) .......................................................10

*Porter v. White*,
    483 F.3d 1294 (11th Cir. 2007)..............................................................10

*Villasana v. Wilhoit*,
    368 F.3d 976 (8th Cir. 2004)..................................................................11

*Jean v. Collins*,
    221 F. 3d 656 (4th Cir. 2000) ............................................................11

Fourteenth Amendment .........................................................................11

*Daniels v. Williams*,
    474 U.S. 327 (1986) ...................................................................11

*Kunz v. City of Chicago*,
    234 F.Supp.2d 820 (N.D. Ill. 2002).........................................................11

*Vance v. Peters*,
    97 F.3d 987 (7th Cir. 1996) .................................................................12

*Grieveson v. Anderson*,
    538 F.3d 763 (7th Cir. 2008) ...............................................................12

**B.** Defendants Minogue, Bogdalek, Evans, and Hood Are Entitled to Summary Judgment on Plaintiff's Due Process Claim ................................................................. 12

*Brady v. Maryland*,
    373 U.S. 83 (1963) .............................................................13, 14, 15

*United States v. Roberts*,
    534 F.3d 560 (7th Cir. 2008) ...............................................................14

*United States v. Parks*,
    100 F.3d 1300 (7th Cir. 1996) ..............................................................14

*Carvajal v. Dominguez*,
    542 F.3d 561 (7th Cir. 2008) ...............................................................15

**C.** Defendant Brannigan is Entitled to Summary Judgment on Plaintiff's Due Process Claim.............................................................................. 16

Fed. R. Evid. 801(c) ..................................................................17, 18

**D.** Defendant Kolovitz is Entitled to Summary Judgment on Plaintiff's Due Process Claim.............................................................................. 19

**E.** Defendant Murphy is Entitled to Summary Judgment on Plaintiff's Due Process Claim.............................................................................. 20

*Brady v. Maryland*,
    373 U.S. 83 (1963).........................................................................21

*Carvajal v. Dominguez*,
    542 F.3d 561 (7th Cir. 2008) ...............................................................21

*Harris v. Kuba*,
   486 F.3d 1010 (7th Cir. 2007) ...................................................................21

*People v. Fields*,
   135 Ill. 2d 18, 552 N.E.2d 791 (1990) ......................................................22

**F.** Defendant O'Callaghan is Entitled to Summary Judgment on Plaintiff's Due Process Claim ........................................................................................... 22

*Brady v. Maryland*,
   373 U.S. 83 (1963) ....................................................................................23

*United States v. Roberts*,
   534 F.3d 560 (7th Cir. 2008) .....................................................................23

*United States v. Parks*,
   100 F.3d 1300 (7th Cir. 1996) ...................................................................23

*Harper v. Albert*,
   400 F.3d 1052 (7th Cir. 2005) ..............................................................24, 25

Rule 804(b)(1) .....................................................................................................25

*United States v. Reed*,
   227 F.3d 763 (7th Cir. 2000) .....................................................................25

*Hill v. City of Chicago*,
   2011 WL 3876915 (N.D. Ill. 2011) ...........................................................25

**G.** Defendants Richardson and Casto Are Entitled to Summary Judgment on Plaintiff's Due Process Claim ........................................................................... 26

**H.** Defendants Kobel and Robertson Are Entitled to Summary Judgment on Plaintiff's Due Process Claim ........................................................................... 28

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................28, 29

*Sornberger v. City of Knoxville*,
   434 F.3d 1006 (7th Cir. 2006) ...................................................................29

**I.** Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 Failure to Intervene Claim Against Any City Defendant .................................................. 29

*Yang v. Hardin*,
   37 F.3d 282 (7th Cir. 1994) .......................................................................30

*Harper v. Albert*,
   400 F.3d 1052 (7th Cir. 2005) ...................................................................30

*Brady v. Maryland*,
373 U.S. 83 (1963)..................................................................30

**J.**  Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 Conspiracy
Claim Against Any City Defendant ..................................................... 31

*Smith v. Gomez*,
550 F.3d 613 (7th Cir. 2008) ..................................................31

*Cefalu v. Village of Elk Grove*,
211 F.3d 416 (7th Cir. 2000) ..................................................31

*Reynolds v. Jamison*,
488 F.3d 756 (7th Cir. 2007) ..................................................31

**K.**  Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 *Monell* Claim
Against the City ..................................................................... 32

*Monell v. New York City Dep't. of Soc. Servs.*,
436 U.S. 658 (1978).................................................32, 33, 34, 35

*Thompson v. Boggs*,
33 F.3d 847 (7th Cir. 1994) ...................................................32

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*,
520 U.S. 397 (1997)...........................................................32, 34

*City of Canton v. Harris*,
489 U.S. 378 (1989)...............................................................32

*Los Angeles v. Heller*,
475 U.S. 796 (1986)...............................................................32

*Treece v. Hochstetler*,
213 F.3d 360 (7th Cir. 2000) ..................................................32

*McTigue v. City of Chicago*,
60 F. 3d 381 (7th Cir. 1995) ..................................................33

*McNabola v. Chicago Transit Authority*,
10 F.3d 501 (7th Cir. 1993) ..................................................34

*Sims v. Mulcahy*,
902 F.2d 524 (7th Cir. 1990) ..................................................34

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................34

*Connick v. Thompson*,
    131 S.Ct. 1350 (2011) ........................................................................34

*Jenkins v. Bartlett*,
    487 F.3d 482 (7th Cir. 2007) ..............................................................34

*Grieveson v. Anderson*,
    538 F.3d 763 (7th Cir. 2008) ..............................................................34

**L.**  Defendant Officers are Entitled to Summary Judgment on Plaintiff's State Law Claim for Malicious Prosecution ........................................................................... 35

*Joiner v. Benton Community Bank*,
    82 Ill. 2d 40, 411 N.E.2d 229 (1980) .....................................................35

*Bergstrom v. McSweeney*,
    294 F.Supp.2d 961 (N.D. Ill. 2003) .......................................................36

*Frye v. O'Neill*,
    166 Ill. App. 3d 963, 520 N.E.2d 1233 (4th Dist. 1988) ...........................36

*People v. Fields*,
    135 Ill. 2d 18, 552 N.E.2d 791 (1990) ...................................................36

*Adams v. Sussman & Hertzberg, Ltd.*,
    292 Ill. App. 3d 30, 684 N.E.2d 935 (1st Dist. 1997)...............................36

*Swick v. Liautaud*,
    169 Ill. 2d 504, 662 N.E.2d 1238 (1996) ...............................................37

*Johnson v. Target Stores, Inc.*,
    341 Ill. App. 3d 56, 791 N.E.2d 1206 (1st Dist. 2003).............................37

**M.**  Defendant Officers are Entitled to Summary Judgment on Plaintiff's Remaining State Law Claims ........................................................................... 38

*Feltmeier v. Feltmeier*,
    207 Ill.2d 263, 798 N.E.2d 75 (2003) ....................................................38

*Cooney v. Casaday*,
    746 F. Supp. 2d 973 (N.D. Ill. 2010) .....................................................38

745 ILCS 10/2-109 ........................................................................39

## I. BACKGROUND FACTS

At or around 10:15 a.m. on April 28, 1984, a Saturday morning, Jerome "Fuddy" Smith and Talman Hickman were shot and killed outside a public housing complex at 706 E. 39th Street, in Chicago.  (SOF, ¶8).  Fuddy was the leader of a street gang known as the Goon Squad, a faction of the Black Gangster Disciples.  At the time of the shooting, there was an ongoing gang rivalry between the Goon Squad and the El Rukns.  (SOF, ¶9).

Chicago Police Department ("CPD") Detectives Steve Hood and Robert Evans were the first detectives to arrive at the scene of the Smith/Hickman murders.  (SOF, ¶10).  Numerous people were at the scene, and Detectives Hood and Evans attempted to talk to as many of them as possible.  (SOF, ¶12).  Detectives Joseph Bogdalek and James Minogue reported for their shift on the afternoon of April 28, 1984, and were assigned to the murder scene for followup investigation.  (SOF, ¶16).  As part of their investigation, Bogdalek and Minogue talked to Sandra Langston, who provided a description of two individuals she saw following murder victim Fuddy Smith shortly before he was shot.  (SOF, ¶17).

Bogdalek and Minogue worked on the investigation of the Smith/Hickman murders for three or four days, checking out a number of anonymous tips and talking to possible witnesses.  Their involvement in the investigation ended at that time because all of their leads were exhausted.   (SOF, ¶18).   Detectives Evans and Hood stopped actively working on the Smith/Hickman investigation sometime in May 1984, because they were not getting anywhere.  Hood did recall performing some investigation of an anonymous tip in early June 1984.  (SOF, ¶19).  During the 1984 investigation conducted by Detectives Hood, Evans, Bogdalek, and Minogue, Nathson Fields' name did not come up and they did not consider him a suspect at that time.  (SOF, ¶24).

In the early 1980's, the federal government became interested in investigating the El Rukns. (SOF, ¶180). The Justice Department development a regional task force known as the Organized Crime Drug Task Force ("OCDTF") made up of Assistant United States Attorneys ("AUSAs") and agents from various law enforcement agencies in the Northern District of Illinois. (SOF, ¶181). One of the OCDTF assignments was to investigate the El Rukn street gang for racketeering and drugs. Chicago police officers were assigned to the OCDTF investigation, along with members of the Cook County State's Attorney's Office ("SAO") and federal agents from the Bureau of Alcohol, Tobacco & Firearms ("ATF"). (SOF, ¶182).

Based on information received from a federal wiretap, FBI agents raided an El Rukn safe house in East Cleveland, Ohio on May 10, 1985. (SOF, ¶25). AUSA Patrick Deady sent Dan Brannigan, a CPD Gang Crimes Specialist detailed to the ATF, to participate in the raid. (SOF, ¶26). During the raid, agents discovered five members of the El Rukn street gang staying at the safe house and took them into custody. One of the El Rukn gang members was Anthony Sumner. (SOF, ¶27). Brannigan interviewed Sumner and the other El Rukns, in the hope they might become cooperating witnesses. (SOF, ¶28). Sumner eventually agreed to cooperate with the authorities in the El Rukn investigation. (SOF, ¶29). Brannigan and Sumner then returned to Chicago and went to the SAO offices. (SOF, ¶33).

Over the next several days in mid-May 1985, Sumner was debriefed by members of the CPD and SAO, as well as AUSA Deady. (SOF, ¶34). Sumner provided information about a number of murders committed by himself and other members of the El Rukns. (SOF, ¶36). One of the cases Sumner discussed was the Smith/Hickman murders. Sumner told authorities Earl Hawkins was in charge of the hit team, and that on orders from El Rukn leader Jeff Fort, Fuddy Smith was to be killed. (SOF, ¶42). Hawkins recruited three other El Rukns to participate in the

hit team:  Nathson Fields, George Carter, and Hank Andrews.  Fields and Carter were to be the shooters, and Hank Andrews would be the getaway driver.  Hawkins would act as the spotter.  (SOF, ¶43).  Sumner also told authorities he talked to Fields about the shooting of Fuddy Smith.  When Sumner said he heard Fields had something to do with it, Fields responded, "it was a good exercise."  (SOF, ¶44).  Sumner also told authorities in the mid-May 1985 debriefings that he, Earl Hawkins, and Nathson Fields participated in the murders of Dee Eggars Vaughn and Joseph White.  (SOF, ¶¶ 45-46).

Following the revelations by Anthony Sumner concerning the Smith/Hickman homicides, Detective David O'Callaghan was assigned to the investigation.  (SOF, ¶47).  As part of his 1985 investigation into the Smith/Hickman murders, O'Callaghan interviewed witnesses Gerald Morris, Randy Langston, and Eric Langston, among others.  (SOF, ¶48).  Those witnesses viewed a lineup on May 18, 1985, that included Earl Hawkins.  The witnesses identified Hawkins as an offender in the Smith/Hickman murders.  (SOF, ¶¶ 51-52; 55).

Nathson Fields was arrested on June 13, 1985.  (SOF, ¶56).  Fields denied involvement in the Smith/Hickman and Vaughn/White murders.  (SOF, ¶57).  On June 17, 1985, Randy Langston, Eric Langston, and Gerald Morris each separately viewed a lineup at Area 1, which included Nathson Fields.  All three witnesses identified Fields as one of the offenders involved in the Smith/Hickman murders.  (SOF, ¶58).

The State eventually charged Nathson Fields, Earl Hawkins, and George Carter with the Smith/Hickman murders.  Hank Andrews had not been apprehended and remained at large when the case went to trial.  (SOF, ¶¶ 77-78).  The State elected to prosecute the Smith/Hickman case and use the Vaughn/White case in aggravation during the sentencing phase.  (SOF, ¶79).  William Swano was hired to represent Earl Hawkins.  Jack Smeeton was hired to represent

Fields. (SOF, ¶80). George Carter's case was severed from that of Fields and Hawkins shortly before trial. (SOF, ¶81).

William Swano initially was recommending a jury trial, but he then began to suggest a bench trial because he thought he could work out a deal with the trial judge, Judge Maloney. (SOF, ¶84). Swano told the El Rukns he could bribe Judge Maloney to fix the case. El Rukn leader Jeff Fort eventually gave approval for the bribe. (SOF, ¶¶ 85-87). On June 17, 1986, the morning of the trial, Swano went to El Rukn headquarters to get the $10,000 bribe money. (SOF, ¶87). On that same date, Fields and Hawkins waived their rights to a jury trial and for the first time, advised Judge Maloney they were taking a bench trial. (SOF, ¶88). Before the end of the trial, Judge Maloney returned the $10,000 in bribe money to Swano because he feared the FBI was watching him. (SOF, ¶90).

On June 26, 1986, Judge Maloney found Fields and Hawkins guilty of the murders. (SOF, ¶95). During the sentencing phase, the State introduced evidence from Anthony Sumner, in which he testified Hawkins and Fields were involved with him in the Vaughn/White double murder. (SOF, ¶97). Judge Maloney sentenced Hawkins and Fields to death. (SOF, ¶100). In 1990, the Illinois Supreme Court affirmed Fields' conviction and death sentence. (SOF, ¶111).

In early 1987, Earl Hawkins reached out for Dan Brannigan to convey his possible interest in cooperating with authorities. (SOF, ¶¶ 101-02). Hawkins provided information to the federal authorities about the El Rukn attempt to bribe Judge Maloney, as well as other El Rukn crimes. (SOF, ¶¶ 107-10). On June 26, 1991, a federal grand jury returned a four count indictment against Judge Maloney and William Swano alleging, among other criminal acts, that Swano gave the $10,000 bribe to Maloney to acquit Fields and Hawkins in the 1986 trial.

Following a trial in which Hawkins testified, Judge Maloney was found guilty on all counts of the indictment on April 16, 1993. (SOF, ¶¶ 110, 112).

In late 1991, Anthony Sumner recanted his statement that Fields was involved in the Vaughn/White homicides to AUSA William Hogan. (SOF, ¶115). Sumner also provided a written statement to ASA Jack Hynes on January 3, 1992, in which he recanted his testimony regarding the Vaughn/White murders. (SOF, ¶116). On January 10, 1992, the SAO provided Fields' criminal counsel with a copy of Sumner's written statement to ASA Hynes. (SOF, ¶117).

Fields filed a first amended post-conviction petition on September 8, 1992. The petition argued in part that the circumstances of the attempted bribe of Judge Maloney resulted in the deprivation of Fields' due process rights. (SOF, ¶113). The petition also attached Sumner's January 3, 1992 written statement to ASA Hynes in which he recanted his statement that Fields was involved in the Vaughn/White homicides. (SOF, ¶118). Judge Deborah Dooling entered an order on September 18, 1996, granting Fields' post-conviction petition and ordering a new trial. Judge Dooling determined Fields was denied a fair trial because Judge Maloney had a "direct, personal, substantial, pecuniary interest" in the outcome of Fields' trial. Judge Dooling also found that post-conviction relief would not be barred by Hawkins' and Fields' own participation in the bribery scheme. (SOF, ¶114). On January 29, 1998, the Illinois Supreme Court affirmed Judge Dooling's ruling on the post-conviction petition. (SOF, ¶129).

On remand, the matter was assigned to Judge Vincent M. Gaughan. (SOF, ¶130). Judge Gaughan made pretrial rulings that were the subject of two appeals taken by the State. Fields' retrial took place in the spring of 2009. (SOF, ¶132). Following a bench trial, Judge Gaughan determined the State failed to prove Fields guilty beyond reasonable doubt, and found Fields not guilty of the Smith/Hickman murders. (SOF, ¶138).

## II. <u>STANDARD OF REVIEW</u>

A court should grant summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). (*See* City Defendants' Joint Motion for Summary Judgment, p. 2).

## III. <u>DISCUSSION</u>

**A.  All City Defendants are Entitled to Summary Judgment on Plaintiff's §1983 Claims Because His Due Process Claim Fails as a Matter of Law**

Count I of the TAC purports to assert a due process claim against all City Defendants. Plaintiff alleges defendants withheld exculpatory materials from him in violation of his due process rights. A plaintiff may bring a §1983 claim based on the denial of a fair trial where material exculpatory or impeachment evidence has been withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) *("Newsome I")*. Where a state remedy for malicious prosecution exists, as it does in Illinois, a plaintiff cannot sustain a denial of a fair trial claim absent a *Brady* violation. *Newsome I*, 256 F.3d at 750-51; *see also Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).

> *1.  Plaintiff Cannot Claim the Defendant Officers Denied Him of His Right to a Fair Trial Before Judge Maloney in 1986*

Plaintiff's gang (the El Rukns), Williams Swano, and Judge Maloney undisputedly corrupted Plaintiff's 1986 trial. Nothing the Defendants Officers did or did not do played any role in the corruption and resulting outcome of that trial. The reason Plaintiff was convicted was because Judge Maloney got cold feet and returned the $10,000 bribe to the El Rukns through Swano. *People v. Hawkins*, 181 Ill. 2d 41, 690 N.E.2d 999, 1004 (1998). Had Judge Maloney

kept the El Rukns' money and adhered to the plan, Fields and Hawkins would have been acquitted. It is pure speculation to guess what the outcome of the trial would have been without the bribe. As a result, it is impossible to say there is a reasonable probability the outcome of the trial would have been different if the allegedly withheld evidence were disclosed. The Supreme Court of Illinois already reached that very conclusion in this case when it upheld Judge Dooling's ruling awarding Plaintiff a new trial: "Having determined that due process was lacking in the criminal proceedings, it is impossible for this court to know whether the verdict would have been the same if rendered by an uncorrupted judge." *Id.* at 1007. Plaintiff's due process claim against the City Defendants therefore necessarily fails.

To establish a §1983 *Brady* claim, a plaintiff must show a reasonable probability that the suppressed evidence would have produced a different verdict. *Kyles*, 514 U.S. at 433-34 (1995). Plaintiff must show "by a preponderance of the evidence a causal link between the *Brady* violation and his conviction." *Drumgold v. Callahan*, 707 F.3d 28, 48 (1st Cir. 2013). As Judge Dooling ruled, plaintiff was denied a fair trial because of Judge Maloney's "direct, personal, substantial, pecuniary interest" in the outcome of plaintiff's trial. (SOF, ¶114). Judge Dooling also found Plaintiff was entitled to post-conviction relief regardless of his own participation in the El Rukn bribery scheme. (*Id.*) The Illinois Supreme Court affirmed Judge Dooling's ruling and ordered a new trial based on the corruption. *People v. Hawkins*, 690 N.E.2d at 1007.

There is no question of fact for a jury to decide in this case. It was already found by Judge Dooling and the Illinois Supreme Court that plaintiff's 1986 trial was unfair due to the El Rukns' bribe of the judge. The Supreme Court of Illinois also already determined it is impossible to know whether the verdict would have been the same if rendered by an uncorrupted judge. *Id.* at 1007. Because it is impossible to say what the outcome of the trial would have

been absent the bribe, it is similarly impossible for a trier of fact in this case to find there is a reasonable probability the outcome of that trial would have been different absent the alleged *Brady* violation.  As the Supreme Court held, this trial was "fatally flawed" due to the El Rukns' bribe.  *Id.*  The bribe was an intervening, superseding event that severed any causal link between the alleged suppression of evidence and the trial result.  As Judge Dooling observed, Judge Maloney's decision was not based on the evidence, but on his own self-interest.

 2. *A Brady Claim Based On Plaintiff's Second Trial Cannot Succeed Because He Was Acquitted*

Any *Brady* claim based upon the 2009 trial and the prosecution leading up to that trial also fails.  Following the bench trial, on April 8, 2009, Judge Gaughan found that the State failed to prove plaintiff guilty beyond a reasonable doubt.  (SOF, ¶138).  The absence of a conviction forecloses plaintiff's due process claim based on a *Brady* violation.  As the Seventh Circuit stated in *Carvajal*, "we are doubtful . . . that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation."  *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008); s*ee also Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008); *Morgan v. Gertz*, 166 F.3d 1307 (10th Cir. 1999) (because *Brady* is grounded on the due process right to a fair trial, a criminal defendant who was acquitted cannot be said to have been denied a fair trial.); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988).  The *Carvajal* court explained that "[t]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.*, *citing Strickler v. Greene*, 527 U.S. 263, 289 (1999).  Because the verdict at plaintiff's trial was a "not guilty," Plaintiff cannot plausibly argue that the evidence, if disclosed, would undermine confidence in the verdict.  Plaintiff is therefore barred from claiming he was denied his right to a fair trial.

To the extent plaintiff argues that had he learned of the alleged suppressed information earlier, the proceedings against him would have concluded earlier, his §1983 *Brady* claim still fails. At the outset, the Supreme Court rejects the notion that there is a Fourteenth Amendment claim to be free from prosecution without probable cause. *Albright v. Oliver*, 510 U.S. 266, 275 (1994). §1983 provides a remedy for 14th Amendment due process violations when connected to certain fair trial-related rights. *See Ienco*, 286 F.3d at 997-98; *Newsome I*, 256 F.3d at 752.

Though a §1983 *Brady* claim has not been formally recognized in this Circuit for an acquitted defendant, the Seventh Circuit has discussed in dicta whether such a cause of action would be available where "the decision to go to trial would have been altered by the desired disclosure." *Carvajal*, 542 F.3d at 569; *see also Bielanski*, 550 F.3d at 645; *Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. 2010). As the Seventh Circuit explained, assuming *arguendo* such a cause of action existed, the plaintiff "must show that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment." *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010). Plaintiff cannot make that showing here.

Much of the discovery in this case has focused on the Subject File. There is no evidence in the record to show that any of the evidence allegedly suppressed in the Subject File, if disclosed earlier, would have changed the Cook County State's Attorney's decision to prosecute Plaintiff. In fact, the evidence is to the contrary as the prosecutor who tried Plaintiff in 2009 has confirmed the prosecution would have proceeded regardless of the Subject File. (SOF, ¶¶ 165-67). Consistent with that position, the State has opposed and is currently actively litigating against Plaintiff's petition for a Certificate of Innocence. (SOF, ¶¶ 143-45).

9

A review of the Subject File shows why it would not have changed the prosecutor's decision to proceed to trial. The eyewitnesses mentioned in the Subject File (such as James Langston, Carlos Willis, Randy Langston, Minnie White) were known to the defense attorneys at the time, and some of them were called to testify by Swano in 1986. (SOF, ¶151). There is nothing in the Subject File impeaching of any of the State's witnesses. The Subject File does not contain anything inconsistent with the sworn testimony of several witnesses that Nathson Fields was one of the two shooters. There are at least six former El Rukns who testified plaintiff was one of the shooters, including one of the El Rukns (Hawkins) who was present for these murders. (SOF, ¶128). In short, there is nothing in the Subject File that would have caused the State to dismiss the charges against Fields. (SOF, ¶¶ 166-67). Indeed, there is no material, exculpatory information in the file that would meet all of the elements of *Brady*.

Plaintiff has likewise failed to show how any of the other evidence suggested in plaintiff's *Brady* claim would have changed the prosecutors' decision. Again, the opposite is true, as the State was aware of all the other allegedly suppressed evidence (such as the recants of Randy Langston and Gerald Morris, the photo array, the line-up, and Sumner's Vaughn/White recant) and chose to prosecute plaintiff in 2009 anyway.

3.     *There is No Evidence the Individual Defendants Deliberately Withheld the Subject File*

In the criminal context, *Brady* applies whether the suppression of evidence is willful or inadvertent. *Strickler*, 527 U.S. at 281-82. The law is different in the context of a §1983 civil claim. *See Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001) (per curiam on petition for rehearing) ("*Newsome II*"); *see also Lyons v. Village of Woodridge*, 2011 WL 2292299 (N.D. Ill. 2011). As Judge Guzman discussed in *Lyons*, three other Circuits have held that a higher level of culpability than inadvertence is required. *Porter v. White*, 483 F.3d 1294, 1311 (11th Cir.

10

2007) (§1983 *Brady* claim requires reckless suppression); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) (§1983 claim requires police officer's bad faith suppression); *Jean v. Collins*, 221 F. 3d 656, 660-61 (4th Cir. 2000) (divided *en banc* court stating §1983 claim requires police officers' bad faith suppression). Citing *Jean*, the Seventh Circuit stated that "police who deliberately withhold exculpatory evidence, and thus prevent the prosecutors from complying with the obligations articulated in *Brady*, violate the due process clause." *Newsome II*, 260 F.3d at 824 (emphasis added). The Supreme Court has held, though not within the *Brady* context, that mere negligence is insufficient to support a Fourteenth Amendment due process claim. *Daniels v. Williams*, 474 U.S. 327, 332 (1986). As the Seventh Circuit explained, "police need not spontaneously reveal to prosecutors every tidbit that with the benefit of hindsight (and the context of other evidence) could be said to assist defendants." *Newsome II*, 260 F.3d at 824. *See also Kunz v. City of Chicago*, 234 F.Supp.2d 820, 824 (N.D. Ill. 2002).

Here, plaintiff has failed to establish the Defendant Officers had any role in withholding the Subject File. Detectives Hood, Evans, Minogue, and Bogdalek, who were involved in the initial investigation in 1984, placed their work product in the file, which is why it still exists today. (SOF, ¶¶ 21; 152). Gang Specialists Brannigan, Kolovitz, Casto and Richardson did not generate any of the documents in the Subject File and there is no evidence they ever had it or were asked to produce it. The same applies to Detectives Kobel, Robertson, O'Callaghan, and Sgt. Murphy, with the exception that Sgt. Murphy's signature appears on one document in the Subject File (a Request for Identification Photos Bates-stamped CITY-NF-001038). (SOF, ¶155). Assuming, *arguendo*, Plaintiff did not receive that form, it was of no assistance to Plaintiff as "exculpatory" of anything. In short, there is no evidence any of the Defendant Officers deliberately or recklessly failed to produce the Subject File. And since the evidence is

11

that they had no role in responding to criminal subpoenas (SOF, ¶¶ 162-64), Plaintiff does not even have evidence the Defendant Officers *inadvertently* failed to produce the Subject File.  All of the City Defendants are entitled to summary judgment on plaintiff's *Brady* claim to the extent it relies on the alleged non-production of the Subject File.

* * *

Each City Defendant is entitled to summary judgment on alternative grounds.  "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation."  *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996); *see also Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions.").  Plaintiff has failed to develop evidence showing that any City Defendant individually caused or participated in the deprivation of his rights under *Brady*.  To the extent the due process claim is based on coercion of witnesses or fabrication of evidence, Plaintiff likewise has not presented sufficient evidence to establish any City Defendant caused or participated in such alleged misconduct.

### B.    Defendants Minogue, Bogdalek, Evans, and Hood Are Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC asserts a due process claim against Defendants Minogue, Bogdalek, Evans, and Hood alleging they suppressed exculpatory evidence pertaining to the Smith/Hickman and Vaughn/White homicide investigations.  Plaintiff has developed no evidence to support any of these allegations against Minogue, Bogdalek, Evans, or Hood.

Plaintiff has failed to present any evidence Minogue, Bogdalek, Evans, or Hood suppressed reports of witness interviews conducted during their initial investigation of the Smith/Hickman homicides in May-June 1984.  As to Minogue and Bogdalek, they were assigned

12

to the murder scene for follow-up investigation. They initially canvassed the area, and for the next three or four days, checked out anonymous tips and talked to possible witnesses. (SOF, ¶¶ 16, 18). Their involvement in the Smith/Hickman investigation ended at that time because all their leads were exhausted. (SOF, ¶18). Minogue, Bogdalek, Evans, and Hood generated notes and reports as part of their investigation, which were turned in by placing them in a basket on the sergeant's desk. (SOF, ¶21). Minogue, Bogdalek, Evans, and Hood each testified he did not withhold or destroy any notes pertaining to the Smith/Hickman homicide investigation. (SOF, ¶152). Plaintiff has not produced any evidence to the contrary. (*See* Section III(A)(3), *supra*).

Plaintiff also has contended Bogdalek (and others) withheld information obtained from an interview of Sandra Langston. According to Plaintiff, Sandra provided a description of the suspects, which Bogdalek knew did not match Nathson Fields. (*See* Exhibit 48, ¶1a). The actual evidence refutes this contention. Sandra's description of the two suspects is contained in a Supplementary Report dated April 30, 1984, prepared by Bogdalek and Minogue. (SOF, ¶17). Plaintiff cannot in good faith contend this Supplementary Report was withheld from him. One of the bases Plaintiff asserted for post-conviction relief was that his defense counsel was ineffective for failing to pursue the investigation of Sandra based on her descriptions set forth in police reports. (*See* Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, at ¶20). Plaintiff thus knew of Sandra's description of the suspects prior to his trial, and he obviously knew whether or not he matched that description. Plaintiff cannot establish any officer committed a *Brady* violation concerning Sandra Langston's description of the suspect, because Plaintiff had that information at the time of his 1986 trial.

Plaintiff similarly has failed to present any evidence Evans or Hood suppressed reports of witness interviews conducted during their initial investigation of the Smith/Hickman homicides

13

in May-June 1984. According to Plaintiff, Evans testified he and Hood "interviewed approximately one hundred people" during the course of their investigation, but neither Plaintiff nor his counsel received copies of their notes or reports. (*See* Exhibit 50, ¶1a; Exhibit 51, ¶1a). Plaintiff concludes Evans either lied under oath, or Evans and Hood suppressed those documents. (*Id*.) Plaintiff's "interpretation" of Evans' testimony is misleading and his resulting conclusion is pure speculation, which is insufficient to support a *Brady* claim. Evans never testified he and Hood "interviewed" one hundred people. More accurately, Evans stated he and Hood canvassed these scene and talked to approximately a hundred people, but that most would not even give him their names. (SOF, ¶¶ 12, 14). Nor is there evidence Evans and/or Hood prepared notes of interviews of a hundred or so individuals. Since there is no evidence Evans and Hood prepared documents reflecting interviews of one hundred people, there is no basis to conclude Evans either lied under oath or suppressed those documents. Moreover, it is pure speculation to conclude those documents, if they existed, would be exculpatory to Plaintiff. Mere speculation cannot be the basis of a *Brady* claim. *See United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008) ("defendant must provide some evidence other than mere speculation or conjecture that evidence was exculpatory and suppressed by the Government"); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) ("speculation is not enough to establish that the Government has hidden evidence").

Plaintiff similarly has failed to present any evidence to support his allegation that Evans, Minogue, and Bogdalek suppressed materials relating to the Vaughn/White investigation. These detectives did not have any role in the Vaughn/White murder investigation. (SOF, ¶76).

As to all defendants, Plaintiff alleges generally they failed to "come forward" with information they learned in January 1992 that Sumner admitted to falsely implicating Plaintiff in

the Vaughn/White murders. (TAC, ¶51). Plaintiff's TAC and answers to contention interrogatories do not disclose any other basis for his claim that information pertaining to the Vaughn/White investigation was suppressed. It is extremely disingenuous for Plaintiff to assert a *Brady* claim against any Defendant Officer based on the Sumner recant regarding Fields' involvement in the Vaughn/White murders. The duty to disclose under *Brady* extends to police officers and requires them to turn over to prosecutors exculpatory evidence, thereby triggering the prosecutor's disclosure obligations. *Carvajal*, 542 F.3d at 566. Sumner recanted his accusation directly to the federal prosecutor (Hogan) in December 1991, and shortly thereafter provided the State prosecutor (Hynes) with a statement acknowledging his false incrimination of Fields in the Vaughn/White murders on January 3, 1992. (SOF, ¶¶ 115-16). Assuming, *arguendo*, the defendant officers learned of Sumner's admission in January 1992 as alleged, there cannot be a *Brady* violation for their alleged failure to disclose that information to the prosecution, because the prosecutors already had that information.

Making this particular *Brady* allegation even more improper, Plaintiff himself knew in 1992 of Sumner's recantation. The SAO sent Fields' criminal defense counsel a copy of Sumner's written statement to Hynes in January 1992. (SOF, ¶117). Plaintiff clearly received it as he filed a post-conviction petition in September 1992 *attaching Sumner's written statement to ASA Hynes as an exhibit*. (*See* Exhibit 20). Plaintiff's knowledge and use of the Sumner admission establish the evidence was not "suppressed" from him for purposes of *Brady*. Plaintiff's attempt to assert a *Brady* claim arising from Anthony Sumner's recantation utterly lacks a good faith basis, and all City Defendants are entitled to summary judgment on this aspect of the due process claim.[1]

---

[1] This same conclusion is warranted for all City Defendants, but in the interests of brevity, this discussion will not be restated in the remaining sections of the Memorandum.

The due process claim in the TAC does not set forth any specific allegations against Minogue, Bogdalek, Hood, or Evans based on coercion of witnesses or fabrication of evidence. Plaintiff's answers to interrogatories do not provide any further accusations in that regard. (*See* Exhibits 48, 49, 50, 51). Discovery has revealed no evidence demonstrating Minogue, Bogdalek, Hood, or Evans threatened or coerced any witnesses. There is no evidence Minogue, Bogdalek, Hood, or Evans fabricated any evidence implicating Fields in the Smith/Hickman murders. Defendants Minogue, Bogdalek, Hood, and Evans are entitled to summary judgment on count I of the TAC.

### C. Defendant Brannigan is Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC asserts a due process claim against Defendant Brannigan based in part on his alleged suppression of exculpatory evidence from the Smith/Hickman homicide investigation. However, Plaintiff has presented no evidence to support this claim against Brannigan.

Plaintiff does not allege and the evidence does not show Brannigan had any involvement in the initial 1984 CPD investigation of the Smith/Hickman murders. (SOF, ¶22). Brannigan was a Gang Crimes Specialist detailed to the ATF and not a homicide detective. The only act that connects Brannigan to the Smith/Hickman investigation was his recruitment of Anthony Sumner to cooperate with authorities. (SOF, ¶¶ 26-28). It was Sumner who provided the initial information linking Fields to the Smith/Hickman murders. Brannigan's recruitment of Sumner was related to his work for the Task Force investigating the El Rukn street gang, and not as part of the Smith/Hickman murder investigation.

There is no evidence to support the claim that repeated requests were made to Brannigan for materials pertaining to the Smith/Hickman homicide and that he failed to provide that information to Plaintiff. Plaintiff similarly lacks evidence linking Brannigan to the Subject File.

(*See* Section III(A)(3), *supra*). Brannigan's testimony that he never saw the subject file prior to this civil lawsuit (SOF, ¶157) is unrebutted.

Plaintiff's due process claim also alleges Brannigan improperly coerced government witnesses Anthony Sumner and Earl Hawkins. Plaintiff specifically contends Brannigan coerced Sumner to falsely implicate Plaintiff in the Smith/Hickman and Vaughn/White murders. Plaintiff also alleges Brannigan, along with ASA Kelley, "cut a deal" with Hawkins to obtain perjured testimony at Fields' retrial.

Plaintiff is unable to present any admissible evidence that Brannigan improperly coerced Sumner to falsely implicate Nathson Fields in the Smith/Hickman murders. Following the raid of the El Rukn safe house in East Cleveland, Sumner told Brannigan he would cooperate with authorities regarding El Rukn activities. (SOF, ¶29). Brannigan has testified he never beat Sumner nor threatened him in order to obtain his agreement to cooperate (SOF, ¶30), and there is no admissible evidence to the contrary. Although Sumner provided statements to El Rukn attorneys Chuck Murphy and William Swano suggesting police officers beat and threatened him unless he cooperated, Plaintiff cannot properly rely on those statements to create a genuine issue of material fact on the issue of coercion. The statements to Murphy and Swano are out of court statements being offered to prove the truth of the matter asserted, and thus constitute inadmissible hearsay. Fed. R. Evid. 801(c). Moreover, Sumner testified in court that his statements to Murphy and Swano about Brannigan were untrue. (SOF, ¶32). According to Sumner, he had been instructed by the El Rukn hierarchy to "make something up" to explain his cooperation with authorities. (SOF, ¶31). Sumner has never recanted that aspect of his testimony. There is no admissible evidence presented by Plaintiff establishing Brannigan

coerced Sumner or any other witness to falsely implicate Fields in the Smith/Hickman or Vaughn/White murders.

In an allegation that appears to be directed more to the SAO defendants, Plaintiff asserts ASA Kelley, with Brannigan's participation, "cut a deal" with Hawkins to obtain his cooperation and testimony at Plaintiff's retrial. (*See* TAC, ¶57). In and of itself, that allegation does not suggest a constitutional tort. A plea agreement is not coercion of a witness.

Plaintiff has further asserted the SAO entered into an agreement with Hawkins in which Hawkins agreed to give false testimony against Plaintiff at the retrial. (*Id*.) That allegation does not appear to be directed against Brannigan, and in any event, Plaintiff has presented no evidence of an agreement between the State and Hawkins wherein Hawkins agreed to give false testimony. There is no evidence to support the assertion Brannigan (or anyone else) "knew" Hawkins' testimony at the 2009 retrial would be false. To the contrary, Hawkins by that time had testified multiple times in several federal trials about the details of the Smith/Hickman murders, and he consistently testified Fields was involved. (SOF, ¶¶ 108-09). In addition, multiple El Rukn cooperating witnesses had by that time corroborated Hawkins' testimony regarding Fields' involvement in those crimes. (SOF, ¶128). State and federal prosecutors, and the CPD (including Brannigan), therefore had every reason to believe Hawkins' testimony at the 2009 retrial was truthful.

Finally, Plaintiff has failed to present any evidence Brannigan was "directly involved in the subornation of perjury" from Hawkins. (Exhibit 52, ¶1d). There is no evidence to establish Hawkins perjured himself regarding Plaintiff's involvement in the Smith/Hickman murders. Hawkins has consistently testified Fields was involved in those murders, and he never recanted that testimony. He has never testified he committed perjury regarding Smith/Hickman or that

Brannigan induced him to commit perjury. Plaintiff therefore lacks a good faith basis to assert Brannigan suborned perjury from Hawkins.

Plaintiff has failed to present sufficient evidence of a due process violation by Brannigan, whether based on the alleged suppression of evidence, improper coercion of a witnesses, or fabrication of evidence. Brannigan is entitled to summary judgment on count I of the TAC.

### D. Defendant Kolovitz is Entitled to Summary Judgment on Plaintiff's Due Process Claim

A good faith basis for Plaintiff's inclusion of Defendant Kolovitz as a party in this case remains a mystery. The TAC lacks any specific allegation of misconduct against Kolovitz, vaguely alleging "on information and belief" he suppressed exculpatory evidence and/or fabricated evidence linking Plaintiff to the Smith/Hickman murders. Plaintiff has presented no evidence that Kolovitz suppressed any evidence of an exculpatory nature or fabricated any evidence implicating Plaintiff in the Smith/Hickman murders. Kolovitz is entitled to summary judgment on Plaintiff's due process claim.

Like Brannigan, Kolovitz was a Gang Crimes Specialist detailed to the ATF. Plaintiff does not allege Kolovitz had any involvement in the initial 1984 CPD investigation of the Smith/Hickman murders, and the evidence does not show otherwise. (SOF, ¶22). Although Kolovitz may have been consulted by detectives investigating the Smith/Hickman murders, he was not a homicide detective and did not investigate that crime. (SOF, ¶67). There is no evidence linking Kolovitz to the Subject File Plaintiff claims was withheld from him. (*See* Section III(A)(3), *supra*). In sum, there is no evidence to support the bald allegations Kolovitz suppressed any notes or information pertaining to the Smith/Hickman homicide.

In answer to contention interrogatories, Plaintiff stated he expected to show Kolovitz was involved in the Smith/Hickman and Vaughn/White murder investigations, and suppressed

documentation related to those crimes. (Exhibit 53, ¶¶1a, 1b). Kolovitz had no investigative responsibilities for the Smith/Hickman murders. The same is true of the Vaughn/White murder investigation. More to the point, Plaintiff has not presented any evidence Kolovitz was personally involved in any suppression of any documentation, exculpatory or otherwise, related to either investigation. Any such conclusion would be pure speculation.

Nor is there evidence to support the allegation Kolovitz fabricated evidence implicating Plaintiff in the Smith/Hickman murders. (TAC, ¶9n). Not only did Plaintiff's answers to contention interrogatories provide no clarification on this vague allegation, they appear to have abandoned the fabrication claim against Kolovitz. (Exhibit 53, ¶¶1a, 1b). Plaintiff has abandoned this claim by not identifying any specific act of fabrication by Kolovitz or pursuing it in discovery. Kolovitz is entitled to summary judgment on Plaintiff's due process claim.

### E. Defendant Murphy is Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC asserts a due process claim against Defendant Murphy based in part on his alleged suppression of exculpatory evidence pertaining to the Smith/Hickman murders. Plaintiff has presented no evidence to support this claim against Murphy.

Certainly, Commander Murphy participated in an important witness interview leading to resolution of the Smith/Hickman homicide investigation when he debriefed Anthony Sumner in mid-May 1985 following Sumner's agreement to cooperate with authorities. Information provided by Sumner reignited the investigations of Smith/Hickman and several other El Rukn homicide cases. At the time of the Sumner interviews, Murphy was detailed to the SAO. (SOF, ¶37). With respect to information Sumner provided about homicides, Murphy directed his original interview notes to the CPD file, with copies of the notes to the SAO and the United States Attorney's Office. (SOF, ¶¶ 39-40). By providing his notes of the Sumner interviews to

20

prosecutors, Murphy complied with his obligations under *Brady*. *See Carvajal*, *supra*; *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (*Brady* obligates police officers to turn over potentially exculpatory evidence to the prosecution).

It is unclear if Plaintiff is claiming he did not receive the interview notes reflecting Sumner's implication of Fields in the Smith/Hickman murders. The interview notes, which memorialize the information Sumner ultimately provided at trial (*i.e.*, Fields was one of the shooters), are incriminating of Fields, not exculpatory to him. And for purposes of *Brady*, Plaintiff has not identified anything from the interview he did not know.

In the TAC and in answers to contention interrogatories, Plaintiff refers to an incident in which Murphy allegedly "interfered" with an investigation being conducted by "criminal defense counsel" William Swano and Swano's investigator. (Exhibit 54, ¶¶1c). The incident took place on July 22, 1985, after Murphy received a telephone call from a witness, Gerald Morris, advising him that Randy Langston had just gone to the scene of the crime with a prosecutor and a detective. Murphy went to the scene where he saw Randy talking with Swano, Swano's investigator, and a woman. (SOF, ¶63). Randy told Murphy that Swano had identified himself as an Assistant State's Attorney and the other man as a detective.[2] When Murphy told Randy that Swano was an attorney representing the El Rukns, Randy stated that he did not want to talk to Swano. (SOF, ¶¶ 64-65).

Plaintiff has disclosed no evidence demonstrating how Murphy's alleged "interference" with Swano violated his constitutional rights. The information obtained by Swano from the Randy Langston interview was used at the 1986 trial. Swano's investigator, Robert Beseth, testified for the defense about his interview with Randy Langston on July 22, 1985, in which

---

[2] The investigator, Robert Beseth, has denied he and Swano misrepresented themselves as an ASA and police officer. It is unnecessary to resolve this factual dispute for purposes of this issue.

Randy supposedly told him he wasn't sure he could make a positive identification of the offenders. *People v. Fields*, 135 Ill. 2d 18, 36, 552 N.E.2d 791 (1990). Moreover, the fact of the incident itself was not suppressed and was known to the defense. Murphy testified about the details of the incident in rebuttal at the 1986 trial. (*Id.*) There is no evidence to support a constitutional violation based on the incident involving Murphy and Swano.

There is no contention or evidence to support a claim that Murphy improperly coerced any witness to falsely implicate Plaintiff. Murphy never made any promises to Anthony Sumner to gain his cooperation. (SOF, ¶38). There is no other testimony in this case by any witness that Murphy coerced him or her to falsely implicate Fields in the Smith/Hickman murders. The due process claim in the TAC includes an allegation that Murphy participated in "cutting a deal" with Earl Hawkins. (*See* TAC, ¶57). Plaintiff appears to have abandoned this claim against Murphy, as Plaintiff's answers to contention interrogatories do not even reference this assertion. (*See* Exhibit 54). In any event, the mere allegation that Murphy assisted prosecutors in obtaining a plea agreement with Hawkins does not in and of itself suggest a constitutional impropriety. There is no evidence of any misconduct by Murphy related to the plea agreements with Hawkins. Murphy's testimony that he couldn't make any promises to Hawkins regarding his willingness to cooperate is unrebutted.

There is no evidence Murphy suppressed exculpatory evidence, coerced witnesses or fabricated any evidence to falsely implicate Nathson Fields in the Smith/Hickman murders. Murphy is entitled to summary judgment on Plaintiff's due process claim in count I.

### F. Defendant O'Callaghan is Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC asserts a due process claim against Defendant O'Callaghan based in part on his alleged suppression of exculpatory evidence, but there is no evidence to support it. Like he did

with Defendant Evans, Plaintiff significantly mischaracterizes O'Callaghan's 1986 trial testimony in an effort to manufacture a due process claim. According to Plaintiff, O'Callaghan testified that he "interviewed hundreds of people" during the course of his investigation of the Smith/Hickman murders, but neither Plaintiff nor his counsel received copies of his notes or reports of those interviews. (*See* Exhibit 55, ¶1a). Plaintiff concludes O'Callaghan either lied under oath or he withheld or destroyed those documents. (*Id.*)

Plaintiff's "interpretation" of O'Callaghan's testimony is misleading. O'Callaghan never testified he "interviewed hundreds of people." What he actually said at the trial, in response to a question about witness Gerald Morris on cross-examination, was that he learned of Morris as part of a re-canvass: "We talked to hundreds of people during the investigation, and he was one of the subjects we ran into." (SOF, ¶50). To interpret that testimony as suggesting O'Callaghan "interviewed" hundreds of people and prepared notes pertaining to each one is unfair argument and unsupportable speculation. Compounding that misinterpretation by "concluding" O'Callaghan either lied under oath or suppressed or destroyed documents is wholly inappropriate. Finally, there is no basis to conclude those documents, if they existed, would be exculpatory to Plaintiff. Such unbridled speculation cannot be the basis of a *Brady* claim. *See United States v. Roberts, supra*; *United States v. Parks*, *supra*.

Plaintiff similarly offers only speculation that O'Callaghan suppressed the Subject File. (*See* Section III(A), *supra*). O'Callaghan affirmatively denied withholding anything of an exculpatory nature regarding the Smith/Hickman homicide investigation (SOF, ¶153), and Plaintiff has presented no evidence to the contrary.

Plaintiff's due process claim against O'Callaghan also alleges he coerced witnesses to implicate Fields in the Smith/Hickman murders. In answers to interrogatories, Plaintiff

complains about an unduly suggestive police line-up in which Fields was the only participant wearing a short-sleeve shirt. (Exhibit 55, ¶1b). Plaintiff seems to have abandoned this claim, however. Plaintiff has disclosed no evidence, through expert reports or otherwise, to support a conclusion that the line-up was unduly suggestive for this reason.

Plaintiff also contends O'Callaghan lifted Fields' sleeve during the line-up procedure to expose an El Rukn gang tattoo to witnesses who were from a rival gang. (*Id.*) There is no competent evidence reflecting that O'Callaghan exposed the tattoo to any witnesses while they were viewing the line-up. O'Callaghan lifted the sleeve to allow an evidence technician to take a photograph of the tattoo after the witnesses viewed the line-up. (SOF, ¶¶ 59-62). There is no testimony from any of the police officers or witnesses present at the line-up that O'Callaghan lifted up Fields' sleeve to reveal the El Rukn tattoo while the witnesses were viewing the line-up. Fields himself cannot say whether any of the witnesses were viewing the line-up when O'Callaghan lifted his sleeve. (SOF, ¶62). In sum, the evidence does not establish an improperly suggestive identification caused by O'Callaghan revealing Fields' El Rukn tattoo to witnesses viewing the line-up.[3]

Next, Plaintiff asserts Randy Langston, Eric Langston, and Gerald Morris were improperly coerced by O'Callaghan. Plaintiff has not disclosed any evidence of coercion from either of the Langstons that is admissible against O'Callaghan. For example, Plaintiff has alleged Randy Langston recanted his trial testimony at the 1986 death penalty hearing, claiming he identified Fields and Hawkins because O'Callaghan told him to and he was afraid of O'Callaghan. (SOF, ¶99). However, Randy's testimony from the death penalty hearing is

---

[3] Since there is no evidence of a violation of Fields' constitutional rights occurring at the line-up, there can be no basis for a claim against any other defendant officers present at the line-up for failure to intervene. Absent an underlying constitutional violation, there can be no claim for failure to intervene. *Harper*, 400 F.3d at 1064.

inadmissible as against O'Callaghan in this civil proceeding and does not meet the "former testimony" exception to the hearsay rule. Under Rule 804(b)(1), once a declarant has been deemed unavailable, his former testimony may be admitted into evidence as long as the party against whom the testimony is being offered, or a predecessor in interest, had an opportunity and a similar motive to develop the testimony by direct or cross-examination. Fed. R. Evid. 804(b)(1); *see also United States v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000). For starters, there is no evidence Randy Langston is "unavailable" at this time. But even if he is deemed "unavailable," O'Callaghan did not have the opportunity to develop Randy's testimony about him at the death penalty hearing through cross-examination. The prosecutors cannot be considered predecessors in interest to O'Callaghan. *See Hill v. City of Chicago*, 2011 WL 3876915, *2-4 (N.D. Ill. 2011) (Defendant officers in civil litigation were not parties to criminal proceedings, and prosecutors did not have a similar motive as the defendant officers to develop the witness's testimony for purposes of Rule 804(b)(1)). Randy's testimony at the death penalty hearing is inadmissible hearsay as against O'Callaghan.[4] Randy's 1999 affidavit provided to Fields' criminal defense counsel does not change the analysis. It simply states his testimony at the "sentencing hearing" was "the truth" (SOF, ¶124), and does not independently constitute admissible evidence that Randy was coerced by O'Callaghan.[5] O'Callaghan is entitled to summary judgment on this aspect of Plaintiff's due process claim.

---

[4] The same analysis applies to James Langston's testimony at the death sentencing phase, which is inadmissible as against O'Callaghan.

[5] Perhaps most significantly, Randy presumably will be available for the upcoming trial, and his testimony is not expected to assist Plaintiff's case. Randy subsequently recanted his testimony against O'Callaghan from the death penalty hearing. In the 2009 trial (and again in the recent 2013 Certificate of Innocence proceedings), Langston stated he did not testify truthfully at the 1986 death penalty hearing because of threats from the El Rukns. (SOF, ¶¶ 133-34; 146). In his most recent 2009 and 2013 testimony, Randy once again identified Fields as one of the perpetrators of the Smith/Hickman murders. (*Id.*)

Plaintiff presumably will argue the affidavit of Gerald Morris creates a question of fact as to whether O'Callaghan improperly coerced him to implicate Fields. According to the affidavit, O'Callaghan asked Morris to come to the police station and look at some photos, and mentioned Fields' name. Morris claims in the affidavit he never saw Fields on the day of the murder *or at any other time*. Yet, when Morris looked at the photographs, he picked out Fields, even though he had never seen him before. The affidavit does not say O'Callaghan told Morris which photograph to identify. It was only after Morris selected the photograph of Fields that O'Callaghan said Morris made the right choice and that Fields was the guy. (SOF, ¶141). Thus, a close reading of the affidavit reveals O'Callaghan did *not* tell Morris which photograph to pick before Morris selected the photograph of Fields. Even accepting the truth of the remarkable coincidence recounted in the affidavit, which contradicts all of Morris' prior trial testimony regarding Fields' involvement in the Smith/Hickman homicides (SOF, ¶¶ 93; 136), it falls short of creating a triable issue of fact concerning the claim that O'Callaghan coerced Morris to implicate Fields in the Smith/Hickman homicides.

There is no evidence O'Callaghan suppressed or destroyed evidence that was exculpatory to Fields, and no admissible, non-speculative evidence that he coerced witnesses or fabricated evidence to falsely implicate Nathson Fields in the Smith/Hickman murders. O'Callaghan is entitled to summary judgment on Plaintiff's due process claim in count I.

### G. Defendants Richardson and Casto Are Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC asserts a due process claim against Defendants Richardson and Casto based in part on their alleged suppression of exculpatory evidence. Plaintiff's answers to interrogatories include the generic contention that Richardson and Casto conducted numerous interviews and deliberately withheld reports they had compiled pertaining to the Smith/Hickman murders.

(Exhibit 56, ¶1a; Exhibit 57, ¶1a). Plaintiff has presented no evidence to support such a claim against Richardson or Casto. Richardson and Casto were Gang Crimes Specialists and not homicide detectives. Plaintiff does not allege Casto had any involvement in the initial 1984 CPD investigation of the Smith/Hickman murders, and the evidence does not show otherwise. (SOF, ¶22). Richardson responded to the scene of the Smith/Hickman murders on April 28, 1984, in response to a radio call, but he did not interview any potential witnesses at the scene. (SOF, ¶¶ 11;23). There is no evidence linking Richardson or Casto to the Subject File Plaintiff claims was withheld from him. (*See* Section III(A)(3), *supra*).

Although Richardson and Casto assisted homicide detectives in the renewed 1985 Smith/Hickman investigation, there is no evidence either officer knew of or was personally involved in the suppression of documentation from that investigation, exculpatory or otherwise. Casto testified he had no knowledge that any materials were withheld from Fields (SOF, ¶156), and Plaintiff has presented no evidence to the contrary. As to Richardson, Plaintiff alleges he suppressed reports of exculpatory interviews of Randy Langston and Gerald Morris (*See* TAC, ¶15), but Plaintiff has failed to come forward with evidence to support that assertion.

Plaintiff's due process claim against Richardson and Casto alternatively alleges they improperly coerced witnesses to identify Fields in interviews, photo arrays, and line-ups. There is no testimony from any witness supporting that claim against Casto or Richardson. They both were present at the line-ups on May 15, 1985, when witnesses Randy Langston, Eric Langston, and Gerald Morris each identified Fields. (SOF, ¶58). Plaintiff does not allege any specific "coercive and suggestive tactics" used by Richardson to influence the witnesses, and discovery has yielded no evidence of such misconduct. Plaintiff testified Richardson was in the room with him and O'Callaghan during the line-up and when the evidence technician took photographs.

27

(SOF, ¶60). However, Plaintiff's deposition testimony did not implicate Richardson in any improper conduct during the line-up process. As to Casto, Plaintiff contended he helped O'Callaghan display Fields' El Rukn tattoo to line-up witnesses (Exhibit 56, ¶1c), but there is no evidence that incident took place. Moreover, Plaintiff acknowledged Casto was not even in the room when the line-up was conducted. (SOF, ¶60).

There is no other evidence Richardson or Casto "coerced" any of the witnesses. There is no evidence of any misconduct concerning witness Randy Buckles, and specifically, no evidence he was coerced by Richardson or Casto. There is no evidence Randy Langston or Gerald Morris were coerced or ever claimed to have been coerced by Richardson or Casto. In sum, there is no evidence of personal involvement on the part of Richardson or Casto in any improper coercion of witnesses to implicate Fields in the Smith/Hickman homicides. Richardson and Casto are entitled to summary judgment on Plaintiff's due process claim in count I.

### H.    Defendants Kobel and Robertson Are Entitled to Summary Judgment on Plaintiff's Due Process Claim

The TAC lacks any specific allegation of misconduct against Defendants Kobel or Robertson, vaguely alleging "on information and belief" they suppressed exculpatory evidence and/or fabricated evidence linking Plaintiff to the Smith/Hickman murders. Plaintiff has presented no evidence supporting these vague allegations.

Plaintiff does not allege Kobel or Robertson had any involvement in the initial 1984 CPD investigation of the Smith/Hickman murders, and the evidence does not show otherwise. There is no evidence linking Kobel or Robertson to the Subject File. (*See* Section III(A)(3), *supra*). There is no evidence to support a *Brady* claim against Kobel or Robertson arising from the renewed Smith/Hickman investigation in 1985. Kobel had no recollection of investigatory responsibilities on the Smith/Hickman murders. (SOF, ¶68). While Robertson was present

28

during an in-custody interview of Plaintiff on June 17, 1985, in which Plaintiff denied involvement in the Smith/Hickman murders (SOF, ¶57), there is no allegation, nor can there be, that Fields' denials were wrongfully suppressed from him. Fields was present and had knowledge of what occurred during the interview. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028-29 (7th Cir. 2006) (No viable *Brady* claim for failure to disclose circumstances of confession, since suspect knew what occurred during questioning and police had no obligation under *Brady* to tell her again what she already knew).

In answers to contention interrogatories, Plaintiff contended Kobel and Robertson compiled reports pertaining to witness interviews in the Smith/Hickman murder investigation and suppressed those materials. (Exhibit 58, ¶1a; Exhibit 59, ¶1a). There is no evidence to support Plaintiff's speculation such materials existed, or that if they did exist, the information contained therein would be exculpatory or impeaching. Plaintiff cannot base a *Brady* claim on such speculation.

Nor is there evidence to support the vague allegations Kobel and Robertson fabricated evidence implicating Plaintiff in the Smith/Hickman murders. (TAC, ¶¶ 9o, 9p). Plaintiff did not allege in his pleadings what evidence it was that Kobel and Robertson purportedly fabricated against Fields. Plaintiff's answers to contention interrogatories provided no clarification on this vague allegation, and in fact, appear to have abandoned the fabrication claim against Kobel and Robertson. (Exhibit 58, ¶¶1a, 1b; Exhibit 59, ¶¶1a, 1b). In any event, discovery has revealed no evidence of such misconduct. Plaintiff does not allege, and the evidence does not show, any misconduct by Robertson during the in-custody interview of Fields in June 1985. Kobel and Robertson are entitled to summary judgment on Plaintiff's due process claim in count I.

**I.      Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 Failure to Intervene Claim Against Any City Defendant**

The TAC alleges in count II that defendant officers "stood by without intervening" in the fabrication of evidence and the deliberate withholding of evidence exculpatory to Plaintiff. (TAC, ¶94). To establish a claim for a defendant officer's failure to intervene, a plaintiff must prove (1) a constitutional violation occurred, (2) the defendant knew another officer was about to commit that violation; and (3) the defendant had a realistic opportunity to prevent that violation from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Absent an underlying constitutional violation, there can be no claim for failure to intervene. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). To the extent this Court enters summary judgment based on Plaintiff's failure to establish a viable due process claim as a matter of law (Section III(A), *supra*), there can be no derivative claim for failure to intervene, and the City Defendants are likewise entitled to summary judgment on count II.

As an alternative basis for summary judgment, there is no evidence establishing any individual City Defendant suppressed exculpatory evidence or fabricated any evidence implicating Fields in the Smith/Hickman murders. Accordingly, there can be no claim for failure to intervene. *Harper*, 400 F.3d at 1064. There is insufficient evidence to establish any officer suppressed or destroyed *Brady* material, so there can be no claim a defendant officer failed to prevent that conduct. There is insufficient evidence to show Fields was "framed" for the Smith/Hickman murders, so the defendant officers cannot have failed to intervene in that non-existent conduct. But even if Plaintiff can somehow establish evidence of wrongful suppression of exculpatory information or fabrication of evidence, there is no evidence any City Defendant knew another officer was about to commit such a due process violation, had a realistic opportunity to intervene and prevent that violation from occurring, and then failed to do so. This

Court should enter summary judgment in favor of the City Defendants on Plaintiff's failure to intervene claim in count II.

### J.     Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 Conspiracy Claim Against Any City Defendant

The TAC alleges in count III that defendant officers conspired to deprive Plaintiff of his due process rights.  Absent an underlying constitutional violation, there can be no claim for a §1983 conspiracy.  "Conspiracy is not an independent basis of liability in §1983 actions."  *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008).  Where a plaintiff fails to prove an underlying constitutional violation, any derivative conspiracy claim necessarily fails.  *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000).  To the extent this Court enters summary judgment based on Plaintiff's failure to establish a viable due process claim as a matter of law (*see* Section (III)(A), *supra*), there can be no derivative §1983 claim for conspiracy, and the City Defendants would be entitled to summary judgment on count III.

As an alternative basis for summary judgment, Plaintiff has failed to present evidence any City Defendant suppressed information that was exculpatory to Nathson Fields, or that any of City Defendant framed him, so that any derivative conspiracy claim necessarily fails.  *Cefalu*, 211 F.3d at 423.  Moreover, a §1983 civil conspiracy claim requires Plaintiff to show an agreement between the parties to deprive him of his constitutional rights.  *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).  There is no evidence of an agreement between the City Defendants, or between them and any other parties, to deprive Plaintiff of exculpatory materials, or to frame him for the Smith/Hickman murders.  Plaintiff's answers to contention interrogatories appear to abandon any claim that any individual defendant officer entered into a conspiracy to violate Plaintiff's constitutional rights (*see* Exhibits 49 through 59), and those responses have never been amended or supplemented.  Plaintiff's conspiracy claims are entirely

31

speculative as against all defendants, and summary judgment should be entered in their favor on count III of the TAC.[6]

### K. Plaintiff Has Failed to Present Sufficient Evidence to Establish a §1983 *Monell* Claim Against the City

The TAC includes a *Monell*[7] claim against the City. The first step Plaintiff must take in proving a *Monell* claim is to establish that he suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). Plaintiff then must show "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400 (1997) (hereafter "*Bryan County*"). Next, Plaintiff must establish the requisite degree of culpability on the City's part—namely, that the alleged municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Finally, plaintiff must demonstrate a direct causal link between the municipal policy and the constitutional injury. *Bryan County*, 520 U.S. at 404.

The City cannot be liable for Plaintiff's alleged constitutional injuries[8] without evidence of a deficient policy or practice. "A municipality may not be held liable under §1983 solely because it employs a tortfeasor." *Bryan County*, 520 U.S. at 403. The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*." *Id.*

---

[6] For these same reasons, the City Defendants are entitled to summary judgment on Plaintiff's state law conspiracy claim in count VI.

[7] *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658 (1978).

[8] If Plaintiff does not prove that the individual defendants caused him to suffer a constitutional injury, he cannot succeed against the City on his *Monell* claim. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a plaintiff is unsuccessful in a claim against the individual defendants, he will no longer have a claim against the municipality); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000). To that extent, and to the extent Plaintiff's claims against the City are based upon principles of *respondeat superior* or indemnification, the City joins the motions for summary judgment presented on behalf of the individual officers.

A plaintiff seeking to hold a municipality liable under §1983 must show that his alleged constitutional injury is attributable to the municipality itself in one of three ways. First, he may prove that "an express policy . . . when enforced, cause[d] a constitutional deprivation." *McTigue v. City of Chicago*, 60 F. 3d 381, 382 (7th Cir. 1995). Second, he may prove that his constitutional injury was caused by "a widespread practice that, although not authorized by written law or express municipal policy, [was] so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* Finally, he may prove that his constitutional injury was caused by "the act of a person with final policymaking authority." *Id.*

Plaintiff first contends the CPD had a policy of withholding exculpatory information in so-called "street files." (TAC, ¶63). The City's express policies refute this claim. Detective Division Special Order 83-1, adopted in 1983, requires the maintenance and retention of working files, investigative documents, and personal notes generated by homicide detectives during an investigation. (SOF, ¶¶ 170-72). The Special Order expressly states it is the policy of the CPD that detectives "preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved." (*Id.*) As such, the CPD policy in 1984-85, contrary to Plaintiff's allegations, was that all information obtained during a homicide investigation, including materials helpful to the defense, were to be preserved. Assuming, *arguendo*, the Subject File was not tendered and further, that material exculpatory information was contained in that file, its non-production was contrary to the CPD's express policy.

Alternatively, Plaintiff may be basing his *Monell* claim on a "custom" -- *i.e.*, a practice that has "not been formally approved by an appropriate decision maker" but is "so widespread as

33

to have the force of law." *Bryan County*, 520 U.S. at 404. Custom can be established through widespread, enduring practices that violate constitutional rights in a systematic manner. *See McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). "Isolated" acts committed by non-policymaking officials do not amount to a "custom," which "implies a habitual practice of a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (*quoting Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)), *cert. denied*, *Sims v. Mulcahy*, 498 U.S. 897 (1990).

Plaintiff has not presented or disclosed any evidence there was a widespread practice at the CPD of withholding exculpatory evidence after Special Order 83-1 was implemented in 1983. Discounting speculation, Plaintiff has presented no evidence of another case after Special Order 83-1 was issued where it was established exculpatory material was withheld by CPD detectives. Plaintiff's own expert concedes he is unaware of any other case since the implementation of Special Order 83-1 in which it was established the CPD withheld *Brady* or *Giglio* material from a suspect in a so-called "street file." (SOF, ¶176). In other words, Plaintiff has failed to present evidence of a practice that was so widespread as to have the force of law, *i.e.*, a custom. Proof of a pattern of misconduct requires multiple prior incidents before it can be actionable under *Monell*; a single incident is insufficient. *Connick v. Thompson*, 131 S.Ct. 1350 (2011); *Jenkins v. Bartlett*, 487 F.3d 482, 492-93 (7th Cir. 2007) (four incidents in a five-year span insufficient); *Grieveson v. Anderson*, 538 F.3d 763, 773 (7th Cir. 2008) (four alleged instances did not point to a widespread practice). Plaintiff's failure to prove an express policy or a widespread practice of withholding exculpatory evidence is fatal to his "street files" *Monell* claim.

The TAC also attempts to assert a *Monell* claim based on the City's alleged policy and practice of maliciously prosecuting gang members, and El Rukns in particular, regardless of their actual guilt or innocence. (SOF, ¶ 179). Plaintiff has presented no evidence to establish such a policy or practice existed. Plaintiff has disclosed no expert witness on the issue. The mere fact Chicago police officers were assigned to the Justice Department's OCDTF does not suggest the existence of the policy or practice alleged by Plaintiff. There is no evidence to suggest the Task Force maliciously prosecuted anyone, let alone Nathson Fields. Plaintiff thus lacks evidence establishing the policy alleged. And even if Plaintiff could establish the existence of such a policy, which he cannot, he has presented no evidence such policies were carried out by the City with deliberate indifference to their known or obvious consequences, and no evidence demonstrating a causal link between the alleged policy and his alleged constitutional injury. The City is entitled to summary judgment on Plaintiff's §1983 *Monell* claims.

### L. Defendant Officers are Entitled to Summary Judgment on Plaintiff's State Law Claim for Malicious Prosecution

To state a claim for malicious prosecution under Illinois law, Plaintiff must prove (1) the commencement or continuation of a prior criminal proceeding by the defendant against him; (2) a termination "on the merits" of the prior proceeding in a manner indicative of his innocence; (3) a lack of probable cause for the prior proceeding; (4) malice; and (5) damages that proximately result to plaintiff from the alleged misconduct. *Joiner v. Benton Community Bank*, 82 Ill. 2d 40, 45, 411 N.E.2d 229 (1980). Because Plaintiff has failed to present evidence in support of several of these required elements, summary judgment should be entered in favor of all City Defendants on the malicious prosecution claim in count IV of the TAC.

There is no evidence Defendants Bogdalek, Minogue, Evans, or Hood commenced or continued criminal proceedings against Fields. Their investigation of the Smith/Hickman

murders in May-June 1984 went nowhere. Indeed, Fields was not a suspect and his name had not even come up during their part of the investigation. (SOF, ¶24). According to Plaintiff, Detective O'Callaghan swore out the criminal complaint accusing Fields of the Smith/Hickman murders, and Joseph Murphy swore out the criminal complaint accusing Fields of the Vaughn/White murders. (Exhibit 55, ¶1a; Exhibit 54, ¶1b). A malicious prosecution claim can only be asserted where it is alleged that a police officer's "participation in [the prosecution] was so active and positive a character as to amount to advice and cooperation." *Bergstrom v. McSweeney*, 294 F.Supp.2d 961, 968 (N.D. Ill. 2003). *See also Frye v. O'Neill*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233 (4th Dist. 1988) (Liability for malicious prosecution "extends to all persons who played a significant role in causing the prosecution of the plaintiff"). The mere fact that Bogdalek and Evans testified at Fields' 1986 trial[9] does not establish active "participation" for purposes of a malicious prosecution claim. *See, e.g.*, *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 44, 684 N.E.2d 935 (1st Dist. 1997) (*citing* Restatement (Second) of Torts §655, comment c, at 414 (1977)) ("It is not enough that he appears as a witness * * * and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be active, as by insisting upon or urging further prosecution"). There is a similar failure of proof that Casto, Richardson, Kobel, Robertson, Kolovitz, or Brannigan played an active or significant role in the State's prosecution of Fields.

Even assuming, *arguendo*, any of the Defendants could be said to have "commenced" or "continued" the criminal prosecution of Fields, they would still be entitled to summary judgment, including O'Callaghan and Murphy. Plaintiff's malicious prosecution claim fails due to the existence of probable cause for Fields' prosecution. Probable cause is an absolute bar to a

---

[9] Bogdalek was called by defense counsel to testify in the defense case, and Evans was called by the State in rebuttal. *People v. Fields*, 135 Ill. 2d at 35-37.

claim for malicious prosecution. *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238 (1996). For purposes of an Illinois malicious prosecution claim, probable cause is a "state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offenses charged." *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 72, 791 N.E.2d 1206 (1st Dist. 2003).

Prior to the 1986 trial, there was sufficient evidence to support a police officer's honest and strong suspicion Fields was involved in the Smith/Hickman and Vaughn/White murders. Anthony Sumner provided a significant amount of information to investigators and prosecutors regarding El Rukn criminal activities, including the involvement of Fields and Hawkins in both double murders. As to Smith/Hickman, Sumner never recanted his trial testimony that Fields was involved. (SOF, ¶120). There was no reason to disbelieve Sumner regarding Smith/Hickman, and Sumner was not the only witness linking Fields to those murders prior to the 1986 trial. Eyewitnesses to the shootings included Randy Langston, Eric Langston, and Gerald Morris, each of whom identified Fields as being involved. (SOF, ¶69). All of this information supported a reasonable belief prior to the 1986 trial Fields was involved in the Smith/Hickman homicides.

As to Vaughn/White, Sumner did not admit until late 1991 and January 1992 that he falsely implicated Fields in those murders. Sumner never told police before that time Fields was not involved. Sumner had admitted he was present during those murders and implicated himself in their commission. Everything else Sumner told police about the Vaughn/White murders appeared to be accurate. The information provided by Sumner in 1985 was so convincing it caused the State to drop charges against two other suspects previously charged in the Vaughn/White murders. (SOF, ¶¶ 72-74). For purposes of probable cause, everything Sumner

initially told investigators about the Vaughn/White murders, including that Fields was involved, would have led a person of ordinary caution to believe, or entertain an honest and strong suspicion, he was being truthful.

By the time of the 2009 trial, even more evidence existed to support the officers' probable cause to believe Fields was involved in the Smith/Hickman murders. Although Sumner was deceased, Hawkins had become a cooperating witness, and provided testimony in a number of settings, including federal trials, regarding his and Fields' involvement in the Smith/Hickman murders. By that time, other El Rukn cooperating witnesses, including Derrick Kees, Eugene Hunter, Jackie Clay, and Tramell Davis, also implicated Fields in the Smith/Hickman murders. (SOF, ¶128). There was ample evidence supporting probable cause to believe Fields was involved in the Smith/Hickman murders. This Court should enter summary judgment in favor of the City Defendants on count IV of the TAC.

### M. Defendant Officers are Entitled to Summary Judgment on Plaintiff's Remaining State Law Claims

Under Illinois law, three elements are necessary to state a claim for intentional infliction of emotional distress ("IIED"):

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct would cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*Feltmeier v. Feltmeier*, 207 Ill.2d 263, 798 N.E.2d 75 (2003). To the extent Plaintiff has failed to establish evidence of a due process claim, or that a City Defendant had personal involvement in a willful violation of his constitutional rights, or that a City Defendant maliciously prosecuted him, Plaintiff likewise has failed to present evidence of extreme or outrageous conduct sufficient to support a claim for IIED. *Cooney v. Casaday*, 746 F. Supp. 2d 973, 977-78 (N.D. Ill. 2010)

(Without evidence of misconduct on a defendant's part, summary judgment is appropriate on an IIED count that is based on the same conduct underlying plaintiff's §1983 claim). To the extent the City Defendants are entitled to summary judgment on counts I through IV of the TAC, they also are entitled to summary judgment of the IIED claim in count V.

Plaintiff's state law conspiracy claim in count VI also fails. Plaintiff merely reincorporates previously asserted conspiracy allegations as the basis for count VI. (TAC, ¶ 117). To the extent Plaintiff has failed to establish evidence of a §1983 conspiracy, he cannot support a state law conspiracy claim. (*See* footnote 6, *supra*).

As a final issue, the TAC asserts vicarious theories of recovery against the City in count VII (*respondeat superior*) and count VIII (indemnity). Section 2-109 of the Tort Immunity Act provides that a "local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable." (745 ILCS 10/2-109). To the extent summary judgment is entered against Plaintiff in favor of a City Defendant on any claim in the TAC, the City likewise would be entitled to summary judgment as there would be no remaining basis to impose vicarious liability on the City pursuant to a derivative *respondeat superior* or indemnification claim.

Dated: December 9, 2013                              Respectfully submitted,


                                                     By: s/ Paul A. Michalik
                                                         One of the Attorneys for the City Defendants

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
(312) 876-1700 (telephone)
(312) 876-1155 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2013, I electronically filed the foregoing **City of Chicago Defendants' Joint Memorandum of Law in Support of Their Motion for Summary Judgment** with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to:

***Attorneys for Plaintiff***
H. Candace Gorman
Adrian J. Bleifuss Prados
Law Office of H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
312.427.2313
312.427.9552 (fax)
hcgorman1@gmail.com
ableifuss@gmail.com

***Attorney for Defendants David Kelley, Larry Wharrie and County of Cook***
Patrick T. Driscoll, Jr.
Stephen L. Garcia
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
312.603.5475
patrick.driscolljr@cookcountyil.gov
stephen.garcia@cookcountyil.gov

and

Leonard C. Goodman
Melissa A. Matuzak
Law Offices of Leonard C. Goodman
53 W. Jackson
Suite 1650
Chicago, IL 60604
312.986.1984
312.663.3707 (fax)
lcgoodman@rcn.com
melissamatuzak@gmail.com

s/ Paul A. Michalik
Paul A. Michalik