6

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATHSON E. FIELDS,    )
                      )
     Plaintiff,       )
                      )
vs.                   )
                      ) No. 10 CV 1168
CITY OF CHICAGO; COUNTY OF )
COOK; RICHARD M. DALEY; Former) Honorable Matthew F.
Assistant State's Attorneys: ) Kennelly
LARRY WHARRIE and DAVID KELLEY)
Former and Current Chicago   )
Police Officers:             )
DAVID O'CALLAGHAN, THOMAS    )
RICHARDSON; STEPHEN CASTO,   )
JAMES MINOGUE, JOSEPH BOGDALEK)
JOSEPH MURPHY, STEPHEN HOOD, )
JAMES DELANEY, ROBERT EVANS, )
DANIEL BRANNIGAN, JOHN       )
ROBERTSON, RICH KOBEL, and   )
RICHARD KOLOVITZ,            )
              ) Jury Trial Demanded
     Defendants.   )

The deposition of JAMES K. HICKEY, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 220 South Halsted Street, Suite 200, in the City of Chicago, Cook County, Illinois, commencing at 10:00 o'clock a.m. on the 30th day of May, 2012.

## Page 2

There were present during the taking of this deposition the following counsel:

LAW OFFICE OF H. CANDACE GORMAN,
BY: MS. H. CANDACE GORMAN
(220 South Halsted Street
Suite 200
Chicago, Illinois 60661)
(312) 427-2313

    Appeared on behalf of
    The Plaintiff;

DYKEMA GOSSETT, P.L.L.C.,
BY: MR. DANIEL M. NOLAND
(10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606)
(312) 876-1700

    Appeared on behalf of
    The City of Chicago.

## Page 3

INDEX

WITNESS:                              PAGE:
JAMES K. HICKEY

    Examination by Ms. Gorman:         4
    Examination by Mr. Noland:        65

EXHIBITS

Fields No. 15          8
Fields No. 16         49
Fields No. 17         57

## Page 4

(WHEREUPON, the Witness was sworn.)

JAMES K. HICKEY, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. GORMAN:

Q   Could you please state your name for the record and spell it.
A   James K. Hickey, H-i-c-k-e-y.
Q   Mr. Hickey, what is your position?
A   Assistant director, Research and Development, for the Chicago Police Department.
Q   And how long have you been in that position, Research and Development?
A   This time, about three years.
Q   Okay. You were there before?
A   I was there before in the '90s, late '90s, early 2000s.
Q   Did you leave the police or just --
A   No.
Q   -- change jobs?
A   I did not leave the police department. I had another position.

**Page 5**

1  Q   What was your position during that
2  period?
3  A   I was a lieutenant as a sworn member
4  of the police department, and now I am a civilian.
5  Q   Congratulations. Can you tell me what
6  your duties are in the Research and --
7  A   Development.
8  Q   -- Development?
9  A   Primarily I oversee and guide the
10 development of all policy and procedures, directives,
11 which are issued in the name of the superintendent of
12 police.
13 Q   As part of your job, do you research
14 previous police orders, superintendent orders?
15 A   Correct.
16 Q   What did you review in preparation for
17 today?
18 A   I looked at a prior directive,
19 Detective Division Special Order 83-1, and a
20 department lineup order. The year escapes me at the
21 moment, but it is here. I also reviewed my prior
22 depositions on similar subjects from 1982, and,
23 again, I think this was about 2005 or so.
24 Q   Were you deposed in the Palmer case?

**Page 6**

1  A   Yes, I was.
2  Q   What was the case in 2005 that you
3  were deposed in?
4  A   I can't remember. I remember who
5  deposed me.
6  Q   Who was that?
7  A   Locke Bowman. He was at that time at
8  MacArthur -- MacArthur-something, at the University
9  of Chicago. I think he's moved on to Northwestern,
10 and his name is Locke Bowman.
11 Q   Locke?
12 A   L-o-c-k-e, Bowman.
13 Q   And do you know what you were deposed
14 about in regards to that case?
15 A   Investigative notes. Detective
16 Division investigative notes.
17 Q   Did you review the special orders,
18 superintendent special orders, that came down after
19 83-1?
20 A   Yes.
21 Q   On which subject? On the
22 investigative files?
23 A   I looked at the Chief of Detectives
24 Standard Operating Procedures manual regarding

**Page 7**

1  investigative notes from 1988.
2  Q   Did you look at any of the Special
3  Orders that were numbered 83-2, 83-2A?
4  A   I don't know those topics or I --
5  Q   I guess the answer would be no?
6  A   No. No.
7  Q   What about a notice provision to the
8  detectives that's numbered 84-6? Did you review that
9  at all?
10 A   No.
11 Q   Did you review the actual Palmer
12 decision by the Seventh Circuit?
13 A   No -- well, many years -- was that the
14 one from the '80s?
15 Q   Right.
16 A   Yes, many years ago.
17 Q   But you did not review it for
18 today's --
19 A   No, I did not.
20 MS. GORMAN: Would you mark this as the next
21 exhibit, please? I think it's 15.
22 MS. REPORTER: Oh, sorry. I have 19. Is it
23 15?
24 MS. GORMAN: That's what we have.

**Page 8**

1       (WHEREUPON, Fields Exhibit 15 was
2       marked and tendered to Witness.)
3  BY MS. GORMAN:
4  Q   Have you seen this notice before?
5  A   I have.
6  Q   And are you prepared to discuss those
7  policies that were in effect; policies, procedures,
8  and practices, that were in existence in '84 and '85?
9  A   I am. I am.
10 Q   And there are a few others listed for
11 2009, and we're not going to discuss those.
12 A   Thank you.
13 Q   You're welcome. The reason that I
14 asked you about Detective Division Special Orders
15 83-2, 83-2A, and Detective Division Notice 84-6, is
16 because in the order, Special Order, that was entered
17 in 19 -- or in 1986 for investigative files, and it
18 says it's rescinding those orders and --
19 A   It's rescinding which orders?
20 Q   Detective Division Special Orders 83-2
21 and additionally 17 and --
22 A   Okay.
23 Q   -- Detective Division Special Order
24 83-2A and Detective Division Notice 84-6.

**Page 9**

1  A   Oh, okay.
2  Q   Do you have any idea what those are?
3  A   I do not. I have to look at them.
4  Q   Detective Division Special Order 83-1
5  that you did review, that was a Special Order by then
6  Superintendent Brzeczek?
7  A   No, it was not. It was issued by the
8  chief of detectives, William Hanhardt.
9  Q   So when the Seventh Circuit in their
10 opinion says that this special order was entered by
11 Brzeczek, they were incorrect?
12 A   Yes.
13 Q   And who, again, are you saying was the
14 head of detectives then?
15 A   At that time, it was William Hanhardt,
16 H-a-n-d-a-r-t (sic).
17 Q   Did you review any actual street files
18 from the '84/'85 time period?
19 MR. NOLAND: Object to the form of the
20 question.
21 BY MS. GORMAN:
22 Q   Please go ahead and answer.
23 A   I have seen street files that you
24 refer to by general progress reports and since -- in

**Page 10**

1  the '84/'85 time period, but I did not do it as part
2  of my Palmer review.
3  Q   Okay. So 83-1, which you've brought
4  with today to the deposition, do you know if the
5  Areas were compliant with that order in 1984 and
6  1985?
7  A   Yes.
8  Q   Do you know how detectives were
9  notified of the need to comply with that order?
10 A   I do.
11 Q   How were they notified?
12 A   Through the issuance of the Detective
13 Division Special Order 83-1 issued by the chief of
14 detectives. All members of the Detective Division
15 were bound to follow those guidelines.
16 Q   Was there any punishment when an
17 individual did not follow those guidelines?
18 MR. NOLAND: Objection to an incomplete
19 hypothetical.
20     You can answer.
21 THE WITNESS: I am not aware of any. Are you
22 asking me what might it be?
23 BY MS. GORMAN:
24 Q   What might it be, if you were made

**Page 11**

1  aware of any?
2  A   Reprimand, all the way up to a
3  worst-case scenario, a Complaint Register number.
4  Q   Do you know if any training was
5  governed by 83-1 regarding what training was
6  provided?
7  A   I absolutely do.
8  Q   What training was provided?
9  A   Each member of the Detective Division
10 and the entire Bureau of Investigative Services was
11 called in for a seminar on investigative note taking
12 and a review of the intent of the order that we are
13 talking about.
14 Q   Do you know when that was?
15 A   I do not, no. I don't know if it was
16 '82 or '83, but. . .
17 Q   Do you know who conducted the
18 training?
19 A   I do.
20 Q   Who was that?
21 A   Myself.
22 Q   So I guess you know a little bit about
23 the training?
24 A   Yes, I do.

**Page 12**

1  Q   Can you tell me what was involved in
2  the training?
3  A   It was a review of what is now
4  referred to as "investigative files" or "street
5  files." It was the review of a temporary restraining
6  order which had been issued by a Judge MacMillan and
7  a review of Superintendent Brzeczek's comments that
8  we were to preserve investigative notes.
9      We stressed that investigative notes
10 were not the personal property of detectives, but
11 actually belonged -- they were the work product of
12 the Chicago Police Department and, as such, they had
13 to be preserved.
14 Q   Did you do this training by Area, or
15 how was the training itself conducted? How were the
16 individuals brought together?
17 A   We call in an X-number of people from
18 each unit on each watch. You don't take down an
19 entire Area because they have operations and daily
20 responsibilities, but a few from each unit until
21 everyone was trained. In total, about 1200 people
22 were trained.
23 Q   And were they given any -- anything in
24 their file to show that they had completed the

**Page 13**

1 training?
2 A   I doubt it. There may have been an
3 Education and Training Division attendance card, but
4 I'm not aware if such was done.
5 Q   Were the detectives -- let me think
6 how to phrase that.
7         Up until this point, detectives
8 considered their notes to be their own personal
9 property; is that correct?
10 MR. NOLAND: Ob --
11 THE WITNESS: Yes.
12 MR. NOLAND: -- jection to the scope, and
13 overly broad.
14         Over the objections, you can answer.
15 BY MS. GORMAN:
16 Q   And when Brzeczek determined that
17 these were no longer going to be personal property,
18 that they were property of the police department, was
19 there a concern raised by the detectives to that
20 policy?
21 A   There may have been comments, but a
22 decision had been made by the boss and --
23 Q   Do you remember any of the comments?
24 A   I don't -- I recall I was a detective,

**Page 14**

1 and I realized that not everything I wrote down was
2 all that important.
3 Q   Um-hum.
4 A   And sometimes I couldn't read my own
5 handwriting, depending on when and where I wrote my
6 notes, standing on the hood of a car, or, you know,
7 wherever I might have been. It was an issue, it was
8 a procedural issue, at that time.
9 Q   When the injunction was first issued
10 in the Palmer case, 83-1 had not been entered at that
11 point?
12 A   Correct.
13 Q   Do you know how much after the
14 injunction it was actually entered, before the police
15 department decided to enter the order, the special
16 order?
17 A   Well, there was -- I do, but on the
18 day that the injunction was issued, the
19 superintendent of police issued a teletype message.
20 A teletype message preceded fax messages, for those
21 who may need an explanation on that, and it was the
22 fastest, most direct means of communication. And the
23 superintendent of police, Richard Brzeczek, issued
24 this message to preserve all notes.

**Page 15**

1 Q   Was there some controversy regarding
2 that actual order from Brzeczek about what the extent
3 of that was?
4 MR. NOLAND: Object to the form of the
5 question, foundation.
6 THE WITNESS: Controversy? I don't know. Are
7 you talking about media controversy?
8 BY MS. GORMAN:
9 Q   No. Let me try to phrase it -- did
10 some detectives that you're aware of believe that
11 that order did not include their personal property
12 notes?
13 A   There was discussion on that topic.
14 Yes.
15 Q   Was it because of that that the
16 special order was entered?
17 A   In the interim before the special
18 order, there was a Detective Division notice that was
19 issued which I believe clarified that issue.
20 Unfortunately, I don't have that, and I don't think
21 the department -- I know the department can no longer
22 find it.
23 Q   That was before 83-1 was actually --
24 A   Yes, it was.

**Page 16**

1 Q   And did that clarify that notes were
2 no longer personal property?
3 A   Yes, it did.
4 Q   At that time, were audits done of the
5 units of what was being done with notes?
6 A   A little bit earlier --
7 Q   Okay.
8 A   -- there was an audit. I don't think
9 it met the professional standard of, you know, 95
10 percent, give or take 2 percent accounting level, but
11 I was part of a team that went to the various Areas
12 and reviewed investigative notes.
13 Q   I would like to go over some of the
14 definitions with you, just because there are some
15 words that to me seem to mean the same thing, and I'm
16 not sure if they do. What's an "investigative case
17 file"?
18 A   Investigative case file is a folder
19 that has an RD number on it, Records Division number
20 on it, and inside is placed copies of the original
21 report, perhaps a crime scene report, supplementary
22 reports, copies of inventories, copies of general
23 progress reports, or originals, and those items that
24 have come into our custody that we may not know the

1 evidentiary value of. It might have been a
2 photograph and we don't know who some of the people
3 in the photograph are, or telephone numbers on scraps
4 of pieces of paper. It certainly would vary, but
5 that's what an investigative file is.
6     Q    And who maintained the investigative
7 case files back in '84/'85?
8     A    The unit, the Violent Crimes Unit.
9 Only the Violent Crimes field investigations were
10 required to have an investigative folder.
11     Q    Can you explain to me what that means?
12     A    In the Detective Division, we have
13 cases that are assigned three levels of
14 investigation; the highest is the field
15 investigation, the second would be called the
16 summary, in which the -- you might get a phone call
17 from the detective, and the --
18     Q    Um-hum.
19     A    -- third is administratively
20 processed, file-stamped, perhaps like a
21 lost-and-found case report.
22     Q    So this is maintained, the
23 investigative case file is maintained by the field
24 office?

17

1     A    Then there were Violent Crimes
2 offices.
3     Q    And those are offices within a unit?
4     A    Yes, within a detective Area.
5     Q    Within a detective Area. So what's
6 not in an investigative case file? What's not in
7 there? Are there notes from the detectives in the
8 investigative case file?
9     A    Yes, there are.
10     Q    So that would include notes on scrap
11 paper and backs of matchbooks and all that stuff?
12     A    Yes, ma'am.
13     Q    So what is the street file?
14     A    That is the same.
15     Q    And a running file?
16     A    Same.
17     Q    So all three of those names are
18 interchangeable?
19     A    They are.
20     Q    What is a unit file? Is that the
21 same?
22     A    A unit file is simply a copy of the
23 original report and any supplementary reports for all
24 the cases that are assigned to that unit.

18

1     Q    So only official documents, if I'm
2 understanding right?
3     A    Correct.
4     Q    So it would be the supplementary
5 reports and the arrest reports or whatever?
6     A    That's correct.
7     Q    Where are the unit files maintained?
8     A    In the offices of those responsible
9 for the investigation of violent crimes, so the
10 Violent Crimes Unit, or in Property Crimes, if it's a
11 property crime.
12     Q    What's an RD file?
13     A    Same as a unit file.
14     Q    When a case was closed during this
15 time period, '84/'85, were the unit files and the
16 investigative case files put somewhere?
17     MR. NOLAND: Object to the form.
18 BY MS. GORMAN:
19     Q    Go ahead and answer.
20     A    There's two answers to your question.
21     Q    Okay.
22     A    Cases can be cleared and closed, which
23 means everyone has been -- who is a suspect who has
24 been named is in custody. In that situation, the

19

1 detective Area is required to send -- when a case is
2 completely closed, cleared and closed, they are
3 required, the individual Violent Crimes Unit is
4 required, to send that file, investigative file, to
5 the Chicago Police Department Records Division
6 headquarters.
7     The second part of that question is a
8 case can be cleared/open; for instance, only one of
9 three offenders has been arrested; they are required
10 to send the investigative notes to -- make a copy of
11 the investigative notes and send it to the Records
12 Division for permanent retention but keep the
13 investigative file in the detective Area either until
14 the case is cleared/closed or ten years has come to
15 pass.
16     Q    Okay. And after ten years, what are
17 they supposed to do?
18     A    Send the entire -- send it in its
19 entirety to the Records Division headquarters.
20     Q    Do you know where the Records Division
21 headquarters was in '84/'85?
22     A    I don't know what year we moved to our
23 new headquarters at 35th and Michigan. I know we
24 have been there ten, 11 years, so it was either 1121

20

5 (Pages 17 to 20)

**Page 21**

1  South Michigan -- 1121 South State or 3510 South
2  Michigan. I just can't remember when we moved.
3  Q    Is that where investigative files
4  would be today for any violent crime?
5  A    They are under the control of the
6  Records Division, and that is headquartered at 3510
7  South Michigan. I do believe they have some space
8  issues, so, from time to time, they use a warehouse
9  to hold some of these reports off-site.
10  Q    Right. Okay. What about unit files?
11  Are they -- is it the same process for unit files?
12  A    Unit files are -- so much has changed
13  with the electronic world.
14  Q    Right.
15  A    In a totally paper world, the
16  originals were kept at the Records headquarters, so
17  it was part of the normal process in an Area. It was
18  a two-form form set; it might even be three, I can't
19  remember. But the original went to Records Division
20  headquarters for preservation.
21  Q    Last file: a court file.
22  A    What is a court file?
23  Q    Yes. Is that terminology used by the
24  police department?

**Page 22**

1  A    No. No, it's not.
2  Q    Is there a file -- is there a name for
3  a file that's turned over to the state's attorney's
4  office?
5  A    When information is -- I can't think
6  of the name for --
7  Q    Okay.
8  A    -- that entire collection of documents
9  and information.
10  Q    Well, we'll get back to that. I'd
11  like to talk about -- if I use the words "street
12  file," you'll know I'm talking about the
13  investigative file and running file? They're both
14  interchangeable?
15  MR. NOLAND: I would object and not agree to
16  the use of that term with respect to -- I object to
17  that term. I don't think it should be -- well, I
18  object.
19  MS. GORMAN: Okay.
20  BY MS. GORMAN:
21  Q    I'm going to use the words "street
22  file." What I would like to know is what exactly is
23  a street file?
24  MR. NOLAND: I'll have a standing objection as

**Page 23**

1  to the term, no foundation. It's not a term used by
2  the Chicago Police Department or otherwise, so,
3  objection.
4  MS. GORMAN: Okay.
5  THE WITNESS: In 1983, we used the term
6  "investigative file" for what previously did not have
7  a name, but sometimes prior to '83 was referred to as
8  a "running file" or "street file."
9  BY MS. GORMAN:
10  Q    And what exactly is the street file or
11  the running file or the investigative file?
12  A    Is the --
13  MR. NOLAND: Objection, asked and answered.
14  THE WITNESS: Investigative file, which I
15  previously answered, is that document or multiple
16  documents in a folder which were taken by the
17  detectives who were assigned follow-up investigation
18  responsibilities, taken in their car, and they worked
19  that case, and during the course of their tour of
20  duty would read it, interview people, and take notes
21  from these interviews.
22  Q    And would they pass that file along to
23  the next shift on occasion, or was it one individual
24  detective's file?

**Page 24**

1  A    As of 1983, it is required to be
2  turned in at the end of their tour of duty.
3  Q    When you say, "tour of duty," you mean
4  at the end of their day?
5  A    Yes, at the end of their shift.
6  Q    Then whoever is assigned on that case,
7  the next shift would take over that file?
8  A    Correct, if an individual is actually
9  assigned. Sometimes on midnights the case is stopped
10  for a few hours.
11  Q    Right. Got you. Do you know if these
12  files were reviewed by supervisors of the detectives?
13  A    Yes.
14  Q    What was the process for that review?
15  A    The supervisor signed off on general
16  progress reports.
17  Q    The files that actually held notes and
18  your documents, perhaps I'm not -- the notes that we
19  talked about, would the supervisor review those as
20  well?
21  A    They would review the general progress
22  reports, and there was a requirement to enter on the
23  inventory control sheet anything that was new.
24  Q    Can you give me a visual of the

BREHON REPORTING  (708) 442-4522

**Page 25**

1  inventory control sheet?
2  A   8-1/2-by-11 piece of paper,
3  multilines, and it may say "General Progress Report"
4  and the date.
5  Q   Might it say "Interview notes with Joe
6  Schmo"?
7  A   It might, or it might simply say -- it
8  might be multiple people. More likely than not, it
9  would say "General Progress Report," because many
10 times there was more than the person that was
11 interviewed.
12 Q   Was a general progress report always
13 created after an interview?
14     MR. NOLAND: Objection, calls for speculation.
15     THE WITNESS: I don't know if it was always.
16 Certainly, according to our direction, it was
17 supposed to.
18 BY MS. GORMAN:
19 Q   A general progress report was supposed
20 to, during this time period --
21     MR. NOLAND: Objection. Sorry.
22     MS. GORMAN: Let me --
23 BY MS. GORMAN:
24 Q   A general progress report was supposed

**Page 26**

1  to be generated after each interview or after a group
2  of interviews at that time period, correct?
3      MR. NOLAND: Objection, calls for speculation,
4  incomplete hypothetical.
5      THE WITNESS: The direction called for the
6  preparation of a general progress report.
7  BY MS. GORMAN:
8  Q   And is that 83-1?
9  A   It is.
10 Q   And did that also call for the
11 inventory sheet notice -- or, I mean, entering it on
12 the inventory sheet?
13 A   It did.
14 Q   Do you know where those general -- I'm
15 sorry -- where those inventory sheets were
16 maintained?
17 A   With the investigative file under the
18 control of the Violent Crimes Unit.
19 Q   So it should be actually in the file
20 or on top of the file, or how was it?
21 A   On top of the file. It had a two-hole
22 paper clip, and that was intended to be the top
23 document.
24 Q   Do you know where the street file or

**Page 27**

1  the investigative file was kept in a unit when it was
2  not driving around with a detective?
3  A   It varied from unit to unit.
4  Q   Can you tell me some of the places
5  that you can recall them being held?
6  A   My own experience was that of a
7  detective before this time period, in the late '70s.
8  It would be kept on tables in the general work area
9  as well as in filing cabinets.
10 Q   Were there any written policies in
11 effect in 1984/'85, in regards to how a detective
12 kept notes in regards to a homicide investigation?
13 A   Detective Division 83-1, the Special
14 Order, was the governing directive on that topic.
15 Q   Would that also have been the topic or
16 the order for retention of those notes, 83-1?
17 A   It was. That's the governing
18 directive.
19 Q   Do you know if the inventory sheet was
20 actually being utilized in 1984/'85?
21 A   According to the directive, yes, it
22 was.
23 Q   Are you familiar with the
24 investigative file control card?

**Page 28**

1  A   I am.
2  Q   What is that?
3  A   It's a hard stock piece of paper, also
4  8-1/2-by-11 in size. I believe it was a color -- I
5  can't remember -- it might have been green, and it
6  was used as a placeholder for the purpose of
7  informing the office staff that this particular
8  investigative file was outside on the street. It
9  also enabled those who put the files back to put it
10 in the right place, always a challenge.
11 Q   When an investigator took a file, the
12 investigative or street file, and was taking it out
13 to interview whoever, they would fill out the
14 inventory control card saying who was taking it?
15 A   They were supposed to.
16 Q   They were supposed to? Do you know if
17 it was actually done?
18 A   Done regularly, all the time? I don't
19 know.
20 Q   But they were supposed to?
21 A   Yes. It's an aid. It's not a
22 requirement. It's an aid.
23 Q   Do you know who kept the control cards
24 when the file was missing?

## Page 29

1  A   No, I don't.
2  Q   Do you know where a detective would
3  put the investigative file control card when they
4  were taking the file and leaving that?
5  A   On the desk of the supervisor.
6  MR. NOLAND: Let's take a break, take a quick
7  break.
8  THE WITNESS: Sure.
9  (WHEREUPON, there was a brief
10  recess had in the proceedings.)
11  MR. NOLAND: Okay. Back on.
12  BY MS. GORMAN:
13  Q   Do you know if there were any changes
14  made in the way street files and investigative files
15  were maintained within a unit during the 1984/'85
16  time period besides what we've already talked about?
17  MR. NOLAND: I would renew my objection to the
18  use of "street files."
19  MS. GORMAN: It's a continuing objection, so
20  you don't have to keep making it.
21  MR. NOLAND: You don't have to use the term
22  either.
23  MS. GORMAN: I'm going to use the term.
24  MR. NOLAND: It's been established that the

## Page 30

1  policy changed in 1983.
2  MS. GORMAN: You can make your argument to the
3  judge. I'm going to be continuing with my line of
4  questioning.
5  THE WITNESS: Could you repeat the question,
6  please?
7  MS. GORMAN: I'll ask her to read it back.
8  (WHEREUPON, the Record was read as
9  follows:
10  "Question: Do you know if there
11  were any changes made in the way
12  street files and investigative
13  files were maintained within a
14  unit during the 1984/'85 time
15  period besides what we've
16  already talked about?")
17  THE WITNESS: I do not.
18  BY MS. GORMAN:
19  Q   When a new policy is enacted or a
20  special order is enacted and it rescinds a prior
21  order or policy --
22  A   Correct.
23  Q   -- could officers still utilize the
24  rescinded policy?

## Page 31

1  A   The directive, which has been
2  rescinded, is no longer in effect; therefore, the new
3  directive should be the guiding -- the guidelines.
4  Q   There's also some documents that were
5  maintained by the police officers, by detectives,
6  during this time that were called memos, to-from
7  memos. Are you familiar with those?
8  MR. NOLAND: I'll object to the form, "during
9  this time."
10  Over that objection, you can answer.
11  BY MS. GORMAN:
12  Q   Over the course of this deposition, we
13  will be talking about '84 and '85. So when I'm
14  talking about "during this time," I hope you'll
15  understand what time I'm talking about.
16  A   Yes, ma'am.
17  Q   Should I ask her to read it back?
18  A   A to-from subject report is what
19  you've asked.
20  Q   Thank you.
21  A   There was no prohibition against a
22  to-from subject report, but it was the intent to
23  preserve anything produced in regards to the
24  investigation.

## Page 32

1  Q   I'm sorry. There was no prohibition
2  against using the to-from subject report, but was
3  there a report that was preferred by the detective
4  units?
5  A   If the to-from subject report had to
6  do with the investigation, it -- the preferred form
7  was the general progress report, but there may have
8  been a to-from subject report to the crime lab or
9  someone outside their unit, so that would have been
10  an acceptable form of communication.
11  Q   Was it not an acceptable form to have
12  two detectives leave a to-from to two other
13  detectives within the unit?
14  A   It was not the piece of paper that we
15  preferred them to use.
16  Q   Was there training on this, on the use
17  of progress reports, that you're aware of?
18  A   Yes.
19  Q   Were all of the detectives trained on
20  that?
21  A   We may have missed one or two, but,
22  yes, they were trained.
23  Q   Do you know the time period in which
24  that training took place?

**Page 33**

    MR. NOLAND: Objection, asked and answered.
    THE WITNESS: I can't remember. It was '82 or '83.
BY MS. GORMAN:
    Q    That was the same training as when the special order went into effect?
    A    Yes, ma'am.
    Q    Was there a policy in place as to how long after an interview of a witness and the drafting of a progress report that it had to be submitted?
    A    There's no written guidelines on that. It is -- at the end of your tour of duty is the normal guideline that you were expected to submit what you had learned, what the detective has learned.
    Q    Were all progress reports supposed to be in the unit file as well as the investigative file?
    A    No.
    Q    So progress reports only went to the investigative/street file?
    A    Correct.
    Q    What about supplementary reports? Did those go into the unit --
    A    Always the unit file and sometimes the

**Page 34**

investigative file.
    Q    Was there any policy in place with regard to the follow-up investigation of leads and witnesses?
    A    Beyond normal detective training? I'm not aware of anything in a directive form at this time in that time period.
    Q    When you say, "normal detective training," you're referring to the training that all detectives receive in regards to interviewing witnesses?
    A    Correct.
    Q    Are you familiar with the term of "watch commander logs"?
    A    Growing vague in my memory, I'm sorry to say. There's so many terms in the police department that use -- so many occasions that we use the term "watch commander," I'm starting to not remember all their uses.
    Q    What about a watch commander report or sometimes referred to as a period performance activity? Does that ring a bell?
    A    Period performance activity suggests the rating, the evaluation, of detectives, which was

**Page 35**

done every 28 days.
    Q    I'm going to try another one. How about the "command and supervisor's field log"? Are you familiar with that?
    A    I certainly am. It's a patrol supervisor's log.
    Q    So it's not used by detectives?
    A    Right.
    Q    Were there logs for the detectives?
    A    Not that were the same for Patrol. In Patrol, this command and supervisor's log has the Patrol Division supervisor writing down the times and addresses that they saw those persons that they were supervising during a particular tour of duty.
    Q    Okay. What kind of log was used for the detectives for their activities, if there was one?
    A    There -- the detective supervisor primarily stays in the office, so there's -- unless it's a major crime scene, they're probably not going to see each other during their tour of duty.
    Q    When an officer was doing an investigation and took some interview notes of a witness or potential witnesses, were those notes

**Page 36**

supposed to be formalized in any way after the interview?
    A    No. There's not a requirement to create a supplementary report at the end of every tour of duty.
    Q    And not to -- it wasn't a requirement to put them in the general progress reports?
    A    There is that obligation to record your investigative notes on the general progress report.
    Q    Would you -- would the practice be to put down the whole interview or just that there was an interview?
    MR. NOLAND: Objection, incomplete hypothetical.
    THE WITNESS: Obviously it depended upon the individual detective. But as a former detective, you kind of write down the highlights of those things that you believe to be important or those things you might forget, like addresses and phone numbers.
BY MS. GORMAN:
    Q    Right. Was there a directive on the use of the progress reports for this purpose of interviewing witnesses?

```
1    A    It's 83-1.
2    Q    Okay. What is a "final supplementary
3  report"?
4    A    A final supplementary report denotes
5  that report at which the case is administratively
6  closed. Either it's unfounded, it had never
7  happened; it gets reclassified to another kind of
8  crime; or it is based upon arrest, cleared/open or
9  cleared/closed that we previously talked about.
10          It's the last report a detective
11  generates. But, frankly, there is no last report.
12  There's always in theory an occasion to write one
13  more.
14    Q    Um-hum. But is there an actual form
15  for the final?
16    A    No. It looks like all the other
17  supplementary reports.
18    Q    In the normal course -- are they
19  supposed to be done, a final report? Is there a
20  directive?
21          MR. NOLAND: Object to the form of the
22  question.
23          THE WITNESS: Every case assigned to a
24  Detective Division field investigation requires a
                                                     37
```

```
1  report, and sometimes the file report may be to
2  suspend the case. You know, you don't know who did
3  it.
4  BY MS. GORMAN:
5    Q    Okay. Should those reports be in the
6  Records Division file?
7    A    All supplementary reports are in the
8  Records Division.
9    Q    And it should also be in the
10  investigative/street file?
11    A    No.
12    Q    Just in the Records Division file?
13    A    Yes.
14    Q    And we said the Records Division file
15  and the unit file were the same?
16    A    No.
17    Q    No? I'm sorry. That's what I had
18  down, that it was the same. What's the unit file if
19  it's --
20    A    A unit file is the official report
21  maintained in the unit. The Records Division file is
22  the original case report as well as the original
23  supplementary report.
24          The confusion is both are referred to
                                                     38
```

```
1  as RD, Records Division, so there can be a record, an
2  RD file, in the unit, and a Records Division file at
3  the headquarters.
4    Q    The inventory sheet that's attached to
5  the investigative/street file, running file, that
6  document, does that make its way to the RD file, to
7  the Records Division file?
8    A    At the same time the entire
9  investigative file is turned over to the Records
10  Division. Yes, it does.
11    Q    And if the file is not turned over to
12  the Records Division, then that inventory sheet does
13  not go to the Records Division?
14    A    Correct.
15    Q    Could you tell me what the detective
16  "supplementary clearing and closing report" is? Is
17  that what we talked about, the final supplementary?
18    A    It is.
19    Q    Is there any difference between them,
20  or is it the same, just a different name?
21    A    Just a different name.
22    Q    And I think we -- I think you said
23  that that is supposed to be done? There is supposed
24  to be a --
                                                     39
```

```
1    A    Right. For every case that is
2  assigned a field investigation, there is a report.
3    Q    I know those are supposed to go to the
4  Records Division file?
5    A    The original.
6    Q    The original. Where do the copies go?
7    A    The unit file in the unit. We, at
8  that time, had a box on it that you utilized, in the
9  right-hand corner, that was checked off if someone
10  else may be interested. You know, it might be the
11  Park District, damage to property, or the City,
12  damage to property. You send them a copy, let them
13  know that the damaged pole has been resolved,
14  whatever the case may be.
15    Q    So except for the Records Division
16  file and the unit file, the only other copy is if
17  someone thought it would be important to others?
18    A    Correct.
19    Q    And those were not normally put in the
20  investigative file?
21          MR. NOLAND: Objection, asked and answered
22  several times.
23          THE WITNESS: They did not have to be. They
24  could be.
                                                     40
```

**Page 41**

BY MS. GORMAN:
Q   The general progress reports, were those a form that had multiple copies?
A   It was a pad of reports, and it -- it's a one-page report.
Q   So it didn't have, like, a --
A   It wasn't a form set.
Q   It wasn't a form set?
A   Right. It was not a form set.
Q   So they would have to make photocopies of it if there was going to be an additional copy made?
A   Yes.
Q   In a homicide situation, are there any other files created in a unit besides the ones we've talked about?
A   Reports or files?
Q   Files.
A   No.
Q   Would the technical aspects of the file -- when I say, "technical aspects," I'm referring to forensics or ballistics -- would those be with one of those three files that we've talked about?

**Page 42**

A   A forensics report that you just spoke of is a crime scene processing report. The mobile crime lab meets the detectives at the scene, then they go back to their office and write their report and they take a copy of their report and send it to the unit, the investigative unit of responsibility. When that investigative unit of responsibility receives a copy of the crime scene report, they put it in the unit file.
Q   Does the forensics team also have a file that they keep their copy in?
A   They have the original -- they also send the original to the Records Division for retention.
Q   I know we talked about the audit and the phrase that you used to describe it, not an official audit, but just a review of the procedures and policies, how they were being handled. That sounds like that was in '83?
A   I'm sorry. I can't remember the year, but it was very early.
Q   Around the time of the implementing of 83-1?
A   Before. Before.

**Page 43**

Q   Was there anything done after the implementation of 83-1 to survey or to audit how the process was going, the new process?
A   Not to my knowledge.
Q   Was there any directive as to what should not go into an investigative or street file?
A   No.
Q   So a detective could stick anything in there, but there were some things that they should put in there?
MR. NOLAND: Object to the form of the question.
THE WITNESS: Some things wouldn't fit.
BY MS. GORMAN:
Q   Yeah. Okay. When the training was conducted on the policy, the 83-1, for the detectives, was there any word of caution given to the detectives about the need to make sure everything was in there?
A   It's a very serious business. I mean, we are communicating a message on the importance and the obligation to preserve investigative materials.
Q   I guess what I'm trying to figure out is if the detectives were given any warning as to

**Page 44**

what would happen to them if they tried to retain the information as their personal property.
A   Anything that is a directive, and we have lots of directives in the Chicago Police Department, department orders, division orders; anything that's not followed has the potential for some consequence, whether it be training, verbal reprimand, or, in serious cases, a Complaint Register investigation being opened.
Q   What was the policy during this time period to ensure that the entire file would be turned over to the state's attorney's office?
A   The normal request from the state's attorney going directly to the Records Division. The Records Division reads the request for the information, and there are multiple units in the police department that may be able to respond to what the state's attorney needs.
    It might be a DUI reported from the Traffic Division, it might be a policy or procedure from the Records Division, it might be general progress investigation notes from a detective Area on a case which is still open, even though it was solved.

**Page 45**

1  Q  Right.
2  A  The crime lab would be asked to
3  produce reports. Again, it depends upon the
4  uniqueness of the case and what they're asking for.
5  Then those persons in these receiving units would do
6  a good-faith search, and it becomes a clerical event.
7      Someone will find and locate what
8  they're looking for and make copies and -- hopefully
9  both sides, if it's a two-sided report -- the usual
10 customary clerical obligations.
11 Q  If the investigative/street file is in
12 the unit and the state's attorney's office is making
13 a request to the Records Division, how does it happen
14 that the entire file would get moved to the Records
15 Division or make its way to the state's attorney?
16 A  These individual recipients would send
17 the information to the Records Division. They bundle
18 it and give it to the requester.
19 Q  The Records Division contacts the unit
20 to get the rest of the stuff?
21 A  Yes.
22 Q  Is there any recordkeeping that's done
23 at the time so that you have a record that everything
24 is going to the state's attorney?

**Page 46**

1  A  I'm not aware of any.
2  Q  So --
3  A  I'm sure someone keeps a paper
4  somewhere, but I don't know. There's an awful lot of
5  requests, and subpoena requests. I don't know.
6  Q  So if there's a controversy between
7  the police department and the state's attorney's
8  office, as far as you know -- or you don't know if
9  there's a record that would solve that controversy as
10 to who had the documents?
11 A  I do not.
12 Q  Do you know if there was any formal
13 documentation that was required to be filled out
14 noting compliance to a subpoena?
15 A  No.
16 Q  Do you know if there were any logs or
17 anything that were utilized by the Records Division
18 department showing what went off to the state's
19 attorney?
20 A  I'm not aware of any.
21 Q  Are you familiar with another term,
22 "court complaint transmittal listing"?
23 A  I am.
24 Q  Could you tell me what that is?

**Page 47**

1  A  A court complaint transmittal is an
2  arrest report and, if available, a copy of the
3  complaints, and sometimes, but not always, a copy of
4  a case report. It's that information that's either
5  bundled and sent with the prisoner in the morning
6  either directly to court, or if the person is out on
7  bond, the arrestee is out on bond, it's sent to the
8  appropriate court with a date, you know, two weeks in
9  advance, so-and-so will be in your court. It comes
10 to be used both by the deputy sheriffs and the clerks
11 of the court.
12 Q  Where does it come from on the police
13 department side?
14 A  It comes from the district where the
15 arrestee is held in temporary detention.
16 Q  Is it used in Violent Crimes?
17 A  Yes.
18 Q  So it's not just DUIs or something
19 like that?
20 A  Well, it's used for anyone who is
21 arrested. All signed complaints are attached to the
22 arrest report.
23 Q  But that would not include any
24 investigative notes?

**Page 48**

1  A  No, it does not.
2  Q  When a defense attorney would subpoena
3  a document or a file in the course of a criminal
4  investigation, what was the process to ensure that
5  the Area had notice of the subpoena?
6  A  The Records Division, again, reading
7  each request on its own merits, would make a
8  determination of which unit best could respond to it,
9  and I have seen the Records Division circle -- they
10 make six or seven copies of the request, circle that
11 which they believe to be pertinent to one Area, and
12 then they put it in interdepartmental mail and to the
13 unit of investigative responsibility or the person
14 who may have the unit information.
15 Q  So it would go to someone at the unit,
16 the --
17 A  Right.
18 Q  Would it go to anyone in particular?
19 Would it go right to a Detective Division or would it
20 go to the watch commander?
21 A  It was sent out from the Records
22 Division to the investigative unit. Frankly, I don't
23 know if it was addressed to the commanding officer,
24 or, if over the course of everyday business

**Page 49**

1  interaction, they sent it to John, Charlie, or Susie
2  to personalize it. I don't know that.
3     Q   Okay.
4     A   But it's sent to the investigative
5  unit of responsibility.
6     Q   Do you know if a record of that is
7  kept anywhere, a record of sending it up to the unit?
8     A   I do not.
9     MS. GORMAN: I'm looking for 83-1.
10       (WHEREUPON, Mr. Noland tendered it
11       to Ms. Gorman.)
12      I'm just going to go make some copies.
13       (WHEREUPON, there was a brief
14       recess had in the proceedings.)
15       (WHEREUPON, Fields Exhibit 16 was
16       marked and tendered to Witness.)
17 BY MS. GORMAN:
18    Q   I'm showing you what has been marked
19 Exhibit 16 for identification, Fields Exhibit 16, and
20 ask if you've seen this document before.
21    A   I have.
22    Q   And this is Special Order 83-1?
23    A   It is.
24    Q   And this was attached to a Seventh

**Page 50**

1  Circuit case in Palmer versus City of Chicago?
2     A   It appears to be.
3     MR. NOLAND: Just for the record, it's a
4  District Court case, a District Court opinion.
5  BY MS. GORMAN:
6     Q   From the District Court Division,
7  562 F.Sup. 1067?
8     A   Correct.
9     Q   Can you tell me what this is?
10    A   This is Detective Division Special
11 Order 83-1. Its title is "Investigative Files."
12    Q   And can you give me the background on
13 how this order came to be entered?
14    A   I was a detective assigned to
15 detective headquarters, and I was the primary drafter
16 of this order on behalf of the chief of detectives.
17      The background is that the department,
18 and the Detective Division in particular, wanted to
19 standardize and institutionalize control over our
20 investigative documents.
21    Q   Was it -- was the order drafted
22 because of a lawsuit that was pending?
23    MR. NOLAND: I'm going to object to the extent
24 it calls for speculation.

**Page 51**

1     THE WITNESS: We did not issue it before the
2  temporary restraining order was issued, but it was a
3  policy decision made at the same time.
4  BY MS. GORMAN:
5     Q   And what was the policy decision that
6  is established in this order?
7     A   It requires the maintenance and the
8  preservation of any working files, running files, or
9  personal notes generated by detectives.
10    Q   I want to look at page 11, the second
11 page of this document that's numbered 11. In Section
12 III -- IV(D), "Investigative File Inventory Sheet" --
13    A   Yes.
14    Q   -- it describes it very much as you
15 described it earlier, and then it says that "This
16 form functions as the case index for all documents
17 within the investigative file case folder." Do you
18 see that?
19    A   Yes, ma'am.
20    Q   And then there's a second "(D)" --
21    A   Oh.
22    Q   -- that says, "A copy of the form will
23 be forwarded to the Records Division whenever felony
24 charges are placed against a person to ensure proper

**Page 52**

1  notice of all existing documents pertaining to the
2  subject investigation can be made to the State's
3  Attorney's Office, the courts and the defense
4  counsel." Do you see that?
5     A   I do.
6     Q   Do you know if those forms were, in
7  fact, forwarded to the Records Division when a felony
8  was -- a felony charge was made?
9     A   They were supposed to.
10    Q   And that's different than turning over
11 the investigative or street file, correct? These are
12 just for turning over this notice?
13    A   A copy of the form.
14    Q   A copy of the notice. Yes.
15    A   (Witness nodding head.)
16    Q   Do you know if -- well, strike that.
17      Do you know whose responsibility it
18 was in a unit to make sure that the investigative
19 file inventory sheet was sent to the Records Division
20 after a felony charge was placed?
21    A   The directive is silent on that
22 clerical procedure.
23    Q   In practice, do you know how it was
24 handled?

**Page 53**

1  A   I do not.
2  Q   Was the policy ever changed to make it
3  less silent?
4  A   I'm not aware of it.
5  Q   There's a Section V on page 12 that
6  talks about "Responsibilities and Procedures"?
7  A   Yes, ma'am.
8  Q   It has the Violent Crimes Unit
9  supervisor responsible for a number of things
10 enumerated here, including the investigative file
11 case folder.
12     Do you know whether or not it was the
13 supervisor of the Violent Crimes Unit that was
14 responsible for making sure that the investigative
15 file inventory sheet was, in fact, forwarded to the
16 Records Division?
17 A   I do not. Again, it was silent on
18 that particular function.
19 Q   Was this ever brought to anyone's
20 attention that you're aware of, that this was a
21 problem, that no one knew who to turn it in to?
22     MR. NOLAND: Objection to the form of the
23 question.
24     THE WITNESS: I'm not aware of it ever having

**Page 54**

1  been identified as a problem.
2  BY MS. GORMAN:
3  Q   Well, I see on page 12, Section V(C),
4  it actually states it's -- I'm looking at V, the
5  Roman numeral V(C)(2), "A copy of the completed
6  Investigative File Inventory Sheet is" -- I'm sorry.
7  V(C) states that "The Violent Crimes Unit commanding
8  officer will ensure that"--
9  A   Right.
10 Q   -- and then Section (2) says, "a copy
11 of the completed Investigative File Inventory Sheet
12 is forwarded to the Records Division"?
13 A   Correct. The word "ensure" suggests
14 that person may not have personally done it and would
15 have delegated it to whoever was present --
16 Q   Um-hum.
17 A   -- and capable of responding to that
18 duty.
19 Q   But it would have been the commanding
20 officer to make sure it was done?
21 A   Right, to establish the procedures.
22 Q   What would the title be of the
23 commanding officer of the Violent Crimes Unit in each
24 unit?

**Page 55**

1  A   Lieutenant.
2  Q   Lieutenant? If I asked this before, I
3  apologize. But is there any way to determine if
4  either the inventory sheet or the actual street
5  file/investigative file was, in fact, turned over to
6  the state's attorney's office?
7  A   If they requested it, I would presume
8  they received it.
9  Q   But as far as a paper trail?
10 A   No. No, there's not.
11 Q   So if the state's attorney's office
12 said, "We never got it," you guys wouldn't be able to
13 show that, in fact, they did get it?
14 A   Right.
15 Q   Do you know if there was any criminal
16 violation in not turning over the inventory sheet by
17 the department -- or by the unit, I mean?
18 A   A criminal violation?
19 Q   Yes.
20 A   I'm not aware of any. I mean, they
21 should be as thorough as possible in searching for
22 those documents, finding them, and sending them
23 forward.
24     If, from time to time, the right piece

**Page 56**

1  of paper didn't get there, I suspect it was purely a
2  people error and probably done by a person who had
3  nothing to do with the investigation.
4  Q   Do you know if there was any criminal
5  violation in not turning over the investigative file?
6  A   I am not -- I mean, I don't understand
7  the question, I guess.
8  Q   Okay. I'm wondering if you're aware
9  whether or not someone at the police department could
10 be held criminally responsible for failing to turn
11 over a criminal investigation in a case.
12 A   I understand the concept that someone
13 would be held criminally responsible for disobeying
14 the order of the court or discovery or whatever the
15 case might be. Yes.
16 Q   And, in fact, in 1984 and 1985, there
17 was a policy in place to turn over the
18 investigative/street files to the state's attorney's
19 office?
20 A   When requested.
21 Q   When requested. Yes?
22 A   Yes.
23 Q   And it would be a violation of that
24 policy if it was withheld?

**Page 57**

1  A   Correct.
2  Q   I want to move on to the lineups.
3       (WHEREUPON, Fields Exhibit 17 was
4       marked and tendered to Witness.)
5       I'm showing you what has been marked
6  Fields Exhibit 17 for identification, and I'll ask
7  you if you've seen this document before.
8  A   I've seen general order 83-5. I have
9  not reviewed the attachment to 83-5, "Facsimile
10 Message" --
11 Q   Yeah.
12 A   -- which was issued in 2003.
13 Q   And we're only going to be discussing
14 the first two pages.
15 A   Okay.
16     MR. NOLAND: Do we need to have the last three
17 pages, seeing as they are all 2003?
18     MS. GORMAN: Well, we can use it for the next
19 deposition, since it came to us attached that way.
20 So I like to keep things in the same manner that I
21 got them.
22 BY MS. GORMAN:
23 Q   Was this the policy in place in
24 regards to conduct of a lineup in '84/'85?

**Page 58**

1  A   General Order 83-5 was for the time
2  period that we are discussing.
3  Q   In '84/85, if a lineup is conducted
4  and there is not an identification made, what was the
5  procedure in regards to taking the photographs of the
6  lineups?
7  A   No photographs were required.
8  Q   What about a supplementary report?
9  A   A supplementary report was required.
10 Q   In documenting a lineup where an
11 identification is not made, what is the procedure for
12 that supplementary report, if you know? What are
13 they supposed to put in it?
14 A   For a negative identification for a
15 lineup, we normally identify all the participants in
16 the lineup, and the key identification mostly was the
17 CB number, which is the Central Booking number, that,
18 of course, will lead to how tall they were and how
19 much they weighed if that became a piece of
20 information. So it's a CB number and the name of the
21 individuals at least that was required of all those
22 who participated in the lineup.
23 Q   So everyone who was in the lineup
24 should be listed on that supplementary report?

**Page 59**

1  A   Right. I can make one assumption
2  here. Most of our lineups were chosen from other
3  arrestees, but in theory we could have nonarrestees.
4  Q   Including police officers, correct?
5  A   They have been used, from time to
6  time.
7  Q   In a lineup at this time under this
8  policy, what was the policy as far as what the other
9  individuals -- how they should be dressed, how they
10 should look in comparison to the subject?
11 A   There is no specific policy as to how
12 the others should dress. "Suspects in a lineup
13 should generally be the same height and weight and
14 should have similar hair and skin color." It further
15 says, "When more than one suspect is to be viewed" --
16 I'm reading from the directive.
17 Q   You're reading from section II-G?
18 A   Yes, II-G. I think that's the
19 pertinent part.
20 Q   Anything else that you're aware of
21 during that time period that should be done to make
22 sure that a lineup is fair?
23 A   If they are of different heights, they
24 should take some action to minimize this disparity.

**Page 60**

1  Q   When you say, "If they are of
2  different heights," you mean if there's different
3  suspects of different heights?
4  A   Right. Right.
5  Q   So they could be in the same lineup,
6  both suspects?
7  A   They could be, but actually it's
8  supposed to be one suspect per grouping.
9  Q   When an identification is not made and
10 there's a supplementary report drafted, would you be
11 able to find from that supplementary report
12 information about who viewed the lineup?
13 A   Yes.
14 Q   Would you be able to determine what
15 everybody looked like in the lineup?
16 A   Not if it's negative. I mean, that
17 would be subject to memory.
18 Q   Okay. Would you be able to find the
19 other individuals who were in that lineup to
20 ascertain what they look like?
21 A   Yes. With the same, you know, race,
22 sex, age, height, weight, and from the booking
23 number, it would give us a pretty good clue as to how
24 we could find them.

**Page 61**

1  Q   That policy eventually changed, didn't
2  it?
3  A   I believe it's been revised several
4  times since 1983.
5  Q   Do you know if any training was given
6  in regards to this policy, 83-5, for detectives?
7  A   I do not personally know that.
8  Q   Is it primarily the detectives
9  conducting the lineups?
10 A   Yes.
11 Q   Then are there other technicians
12 available to take pictures, but they only take the
13 pictures if the identification was made?
14 A   Yes. And I actually know the reason
15 for the evidence technician. Not all lineups lead to
16 positive identification. There's a limited number of
17 evidence technicians that physically work out of
18 other locations in the city other than detective
19 Areas, and it takes a long time to conduct a lineup,
20 and we didn't want to waste evidence technicians'
21 time when they have other responsibilities, such as
22 burglaries and processing crime scenes.
23 Q   When a lineup is being conducted, you
24 don't know ahead of time whether someone is going to

**Page 62**

1  be identified or not?
2  A   We do not.
3  Q   So when would you call in a
4  technician?
5  A   When a positive identification was
6  made. It's kind of a slow process.
7  Q   So it could be hours later that the
8  photo --
9  A   Yes --
10 Q   -- is taken?
11 A   -- it could be, depending on the
12 availability of the evidence technician.
13 Q   And after a lineup is conducted,
14 someone is identified, everybody -- the witnesses
15 leave?
16 A   The witnesses could leave.
17 Q   And then you come back -- then someone
18 comes back and takes the photo maybe a couple hours
19 later?
20 A   Right. It's as close to a reenactment
21 as you could find. It's certainly not done
22 contemporaneously with the lineup itself. They're
23 still in the same place but done separate in time.
24 Q   Who ensures that they are in the same

**Page 63**

1  place?
2  A   Well, they are kept in the room.
3  Q   Oh, they're kept in the room for those
4  hours?
5  A   Yes.
6  Q   And someone keeps track of where
7  everyone was sitting?
8  A   Yes.
9  Q   And would that be the detective?
10 A   Yes.
11 Q   Your counsel was making a big deal
12 about using the words "street files" when talking
13 about investigative files.
14     Do you know if individuals within the
15 police department understood after 83-1 went into
16 effect, even if counsel, defense counsel, used the
17 words "street file," that they were talking about
18 investigative files?
19 A   The department referred to them as
20 "investigative files" after 1983.
21 Q   But they understood what a street file
22 was, correct?
23 A   Did the detectives understand?
24 Q   Whoever was answering subpoenas, if

**Page 64**

1  someone asked for a street file. Yes.
2  A   Yes.
3  Q   They understood they were
4  investigative files?
5  A   Yes.
6  Q   Weren't the police officers and
7  detectives still using the words "street files" for
8  "investigative files"?
9  A   Some may have. I can't personally
10 acknowledge or testify to that because I was no
11 longer assigned to the Homicide Unit.
12 Q   What about running filings? Were some
13 detectives still referring to the investigative files
14 as running filings?
15 A   Again, I wasn't working in those
16 units, nor did I do any research into that topic.
17 Q   But you did do the research before the
18 83-1 directive went into place?
19 A   Yes.
20 Q   And those terms were all being used
21 interchangeably?
22 A   Same term, different units, like the
23 Tower of Babel.
24     MS. GORMAN: I don't have anything else.

## Page 65

EXAMINATION

BY MR. NOLAND:

Q  With respect to the creation of GPRs, if a detective talked to an individual and the individual either would cooperate or provide any information, would the detective be required to complete a GPR?

MS. GORMAN: What's a GPR?

THE WITNESS: General progress report.

MS. GORMAN: Thank you.

THE WITNESS: No. There's not a requirement to record each and every person they've talked to. Detectives have to have discretion to put down that which is pertinent or potentially relevant.

BY MR. NOLAND:

Q  In Exhibit 17, paragraph II-G, there was some discussion of having an or -- one suspect in a lineup.

A  I see that.

Q  In the usual -- oftentimes the lineup would have one suspect in the lineup; is that correct?

A  Correct.

Q  But, in fact, the general order seems

## Page 66

to contemplate that it is theoretically possible and not a violation of that policy to have two suspects in that lineup.

A  That's correct. The lineup should consist of ideally four nonsuspects, so it is possible to have more than one suspect in a lineup

MR. NOLAND: That's all I have.

MS. GORMAN: I have nothing else.

MR. NOLAND: We will reserve signature.

MS. GORMAN: I'm going to have it typed up.

MR. NOLAND: And I would like a copy.

MS. REPORTER: Thank you.

FURTHER DEPONENT SAYETH NAUGHT
SIGNATURE RESERVED

## Page 67

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATHSON E. FIELDS,      )
                        )
         Plaintiff,     )
                        )
    vs.                 )  No. 10 CV 1168
CITY OF CHICAGO; et al.,)
                        )
         Defendants.    )

WITNESS CERTIFICATION

I hereby certify that I have read the foregoing transcript of my deposition, given on the 30th day of May, 2012, at the time and place aforesaid, consisting of pages 1 through 69; and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given.

I have ____ not ____ submitted errata sheets.
Signed: _____
                    JAMES K. HICKEY, Deponent

SUBSCRIBED AND SWORN TO
before me this ____ day
of _____ A.D., _____.

_____
NOTARY PUBLIC

## Page 68

STATE OF ILLINOIS )
                  ) ss:
COUNTY OF C O O K )

I, CARMELLA T. FAGAN, a Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to wit, on the 30th day of May, 2012, personally appeared before me at 220 South Halsted Street, Suite 200, Chicago, Illinois, JAMES K. HICKEY, a witness in a certain cause now pending and undetermined in said Court.

I further certify that the said JAMES K. HICKEY, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me, in the presence of said witness and afterwards reduced to typewriting via computer-aided transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature of the witness to the foregoing deposition was reserved by agreement of counsel for the respective parties.

17 (Pages 65 to 68)

BREHON REPORTING  (708) 442-4522

```
1        I further certify that the taking of
2   this deposition was pursuant to notice, and that
3   there were appearances as heretofore noted.
4        I further certify that I am not counsel
5   for nor in any way related to any of the parties to
6   this suit, nor am I in any way interested in the
7   outcome thereof.
8        In testimony whereof I have hereunto
9   set my hand and affixed my notarial seal this _____
10  day of _____, 2012.
11
12       _____
13       Carmella T. Fagan, C.S.R., R.P.R.
14
15  My notary expires:
16  _____
17
18
19
20
21
22
23
24
                            69
```