**9**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATHSON E. FIELDS,                    )
                                      )
            Plaintiff,                )
                                      )
    vs.                               ) No. 10 CV 1168
                                      )
CITY OF CHICAGO; COUNTY OF COOK,      ) Hon. Matthew F.
RICHARD J. DALEY; Former Assistant )  Kennelly
State's Attorneys LARRY WHARRIE and)
DAVID KELLEY; Former and Current  )
Chicago Police Officers DAVID     )
O'CALLAGHAN, THOMAS RICHARDSON,    )
STEPHEN CASTO, JAMES MINOGUE,      )
JOSEPH BOGDALEK, JOSEPH MURPHY,    )
STEPHEN HOOD, JAMES DELANEY,       )
ROBERT EVANS, DANIEL BRANNIGAN,    )
JOHN ROBERTSON, RICH KOBEL, and    )
RICHARD KOLOVITZ,                  )
                                   )
            Defendants.            )

    The deposition of SAMUEL BROWN, pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Carmella T. Fagan, C.S.R., R.P.R., Notary Public
within and for the County of Cook and State of
Illinois, at 220 South Halsted Street, Suite 200, in
the City of Chicago, Cook County, Illinois,
commencing at 11:05 a.m. on the 21st day of December,
2012.

1

---

1       There were present during the taking
2   of this deposition the following counsel:
3
4           LAW OFFICES OF H. CANDACE GORMAN,
            BY:  MS. H. CANDACE GORMAN
5           (220 South Halsted Street
            Suite 200                          ʼ
6           Chicago, Illinois  60661)
            (312) 427-2313
7
            Appeared on behalf of
8           the Plaintiff;
9
            DYKEMA GOSSETT, P.L.L.C.,
10          BY:  MR. DANIEL M. NOLAND
            (10 South Walker Drive
11          Suite 2300
            Chicago, Illinois  60606)
12          (312) 876-1700
13          Appeared on behalf of
            City of Chicago and Individually-
14          Named Police Officers;
15
    ALSO PRESENT:
16
        MR. ADRIAN BLEIFUSS, Attorney at Law;
17      MR. NATHSON E. FIELDS, Plaintiff.
18
19
20
21
22
23
24

2

---

1
                    I N D E X
2
3
    WITNESS:                          PAGE
4
    SAMUEL BROWN
5
6       Examination by Ms. Gorman:        4
        Examination by Mr. Noland:      110
7       Further Examination by Ms. Gorman:  113
8
9
10          E X H I B I T S
11  Fields No. 3                 12
    Fields No. 77                12
12  Fields Group No. 78          35
13
14
15
16
17
18
19
20
21
22
23
24

3

---

1           (WHEREUPON, the Witness was
2           sworn.)
3           SAMUEL BROWN,
4    called as a witness herein, having been first
5    duly sworn, was examined and testified as follows:
6                 EXAMINATION
7    BY MS. GORMAN:
8       Q      Could you state your name for the
9    record and spell your name?
10      A      Detective Samuel Brown, B-r-o-w-n.
11      Q      Detective Brown, have you had your
12   deposition taken before?
13      A      In this case?
14      Q      In any case.
15      A      Yes, I have.
16      Q      When was the last time you had your
17   deposition taken?
18      A      About two years ago.
19      Q      Okay.  I'll give you some reminders
20   about -- that's water for you, by the way -- just
21   some things to keep in mind during the course of the
22   deposition.  If you don't understand a question that
23   I ask you, please ask me to rephrase it or ask me to
24   explain to you what it is I'm asking, so we both know

4

---

1    we're talking about the same thing.
2         So anything you don't understand, just
3    let me know. And if you don't, I will try to
4    rephrase it and make sure that you understand what
5    I'm asking. If you answer a question, I'm going to
6    assume that you understood what I'm asking.
7         If you would please -- the court
8    reporter, as you know, takes everything down, so it's
9    important that your responses be audible, so you
10   can't shake your head or say, "uh-huh" or something
11   like that. It has to be "yes" or "no" so that she
12   can take it down in the record.
13        Probably the hardest part for me and
14   for you is when I ask a question, you've got to let
15   me finish the question before you start answering it.
16   It sounds common sense, like, of course you would,
17   but there's going to be a lot of questions when you
18   know what I'm asking before I finish the question,
19   and a lot of times people just jump in and start
20   answering before the question is complete.
21        The reason it's important to let me
22   complete it is because it's all being taken down.
23   And for reading it later, it's important that the
24   questions are completely in there before the

                                                    5

1    response.
2         In the same vein, I might think that
3    you've finished answering the question because you've
4    taken a pause or you're maybe thinking about it some
5    more. If I interrupt you before you've completed
6    your answer, please let know so that I don't go on
7    asking the next question before you've finished
8    answering, okay?
9    A    Okay.
10   Q    Thank you. At any time, you can take
11   a break, except I ask that you not take a break in
12   the middle of a question. So if there's a question
13   pending, you'll answer the question that's pending,
14   and then you can take a break.
15        If you just want to stretch your legs
16   or you want to, you know, go outside for a cigarette
17   or whatever, you're free to do that, but just not
18   while a question is pending, okay?
19   A    Okay.
20   Q    Thank you. Have you reviewed any
21   documents for today?
22   A    Yes, I have.
23   Q    Do you recall what you reviewed?
24   A    I've seen the copies of the report

                                                    6

1    that's in question.
2    Q    The street file?
3    A    The homicide file. Yes.
4    Q    Okay.
5    A    And I've seen the interrogatories that
6    were in response to your questions about this case.
7    Q    You called this document a "report."
8    Is there anything else besides the file itself that's
9    part of that report?
10   A    I'm sorry. Say it one more time?
11   Q    Well, you referred to this document,
12   which is actually Exhibit Number 3, as a "report"
13   just now.
14   A    Okay.
15   Q    And I'm wondering if what you're
16   referring to as a report is this file that's Exhibit
17   Number 3?
18   A    Well, I'm not sure exactly what's in
19   that file. What I'm talking about is the homicide
20   file that you came down and were requesting.
21   Q    Fair enough. There wasn't anything in
22   addition to that?
23   A    No.
24   Q    Okay. Have you spoken to any other

                                                    7

1    personnel from the police department about your
2    deposition today?
3    A    Yes, I have.
4    Q    Who did you speak to?
5    A    Lieutenant Duffin.
6    Q    And when did that discussion take
7    place?
8    A    About three or four days ago.
9    Q    And can you tell me what you said to
10   Lieutenant Duffin and what he said to you in that
11   conversation?
12   A    I told him that I had received
13   notification to come down for a deposition, and he
14   said okay.
15   Q    Was that the extent of the discussion?
16   A    That is it.
17   Q    Did you ever at any other time talk
18   with Lieutenant Duffin about the file that you
19   reviewed in preparation for today?
20   A    We talked in the -- earlier this year.
21   He had asked me if I knew where this file had been
22   located.
23   Q    And what did you tell him?
24   A    "I don't know."

                                                    8

---

**Page 9**

```
 1      Q     You don't know what you told him?
 2      A     No.  I don't know where the file was
 3   located.
 4      Q     At that time you knew where the file
 5   was located; is that correct?  When you were talking
 6   with him, you knew where the file was at that point
 7   in time?
 8      A     It's my understanding that they did
 9   have the file.  Where exactly it was, I couldn't tell
10   you.
11      Q     And who was it that had the file as
12   you -- who was it that had the file at that time?
13      A     I assume it was Lieutenant Duffin.
14      Q     Did he tell you where he found the
15   file?
16      A     No, he did not.
17      Q     Did he tell you anything about where
18   he thought the file was located?
19      A     No.
20      Q     Did he talk to you at all about any
21   control card for that file?
22      A     I don't recall.
23      Q     Do you know what a control card is?
24      A     I believe you're talking about the
```

---

**Page 10**

```
 1   little green card that --
 2      Q     Correct.
 3      A     Yes, I know what that is.
 4      Q     Thank you.  Have you ever seen a
 5   control card for this file number?
 6      A     No.
 7      Q     Do you know if anyone else has had the
 8   control card or seen the control card that has told
 9   you about it for this file?
10      A     I don't know.
11      Q     You don't know if anyone has?  My
12   question is:  Has anyone told you that --
13      A     No, they haven't.
14      Q     -- it exists?  Okay.  Thank you.  The
15   conversation that you had with Lieutenant Duffin in
16   the past about this file, can you tell me exactly or
17   approximately when that discussion was?
18      A     Earlier this year.
19      Q     In 2012?
20      A     Yes.
21      Q     What was the context of this
22   discussion coming up?  I mean, how did you happen to
23   be talking to Lieutenant Duffin about this file?
24      A     He called me over and asked me if I
```

---

**Page 11**

```
 1   knew where the file was --
 2      Q     And why --
 3      A     -- had been located.
 4      Q     I'm sorry.  Why was he looking for it
 5   at that time?
 6      A     I don't know.
 7      Q     In 2012, was the file not located in
 8   Lieutenant Duffin's office?
 9      A     I don't know.
10      Q     Did you ever talk with him about that
11   file at any other time?
12      A     No.
13      Q     Did you ever talk with anybody else
14   about that file at any time?
15      A     Not that I recall.  No.
16      Q     Okay.  I think before we get any
17   further along, I want to make sure we're --
18      MR. NOLAND:  Can I just interrupt?  I think
19   you had talked with Sam and he might be confused by
20   that question be -- could we go off the record?  Do
21   you mind?
22      MS. GORMAN:  No.
23      MR. NOLAND:  You don't mind?
24      MS. GORMAN:  No, I don't mind.
```

---

**Page 12**

```
 1      MR. NOLAND:  Okay.  Thanks.
 2          (WHEREUPON, there was an
 3           off-the-record discussion had by
 4           Counsel.)
 5   BY MS. GORMAN:
 6      Q     Before we get started, I want to make
 7   sure that we're using the right terminology.  I'm
 8   going to show you what has previously been marked
 9   Exhibit 3 for identification.
10      A     Okay.
11          (WHEREUPON, Fields Exhibit 3 was
12           tendered to Witness.)
13      MS. GORMAN:  That does not include the
14   photographs that were part of the file, and I'm going
15   to show you those.  They are going to be marked now.
16   I believe we're at Exhibit 77?
17      MS. REPORTER:  That's what I've got.
18      MS. GORMAN:  Great.
19          (WHEREUPON, Fields Exhibit 77 was
20           marked and tendered to Witness.)
21   BY MS. GORMAN:
22      Q     So the first document has already been
23   marked Exhibit 3 for identification.  It's not marked
24   on -- on your copy, but it has been marked at a
```

---

**Page 13**

1    previous deposition.
2         When I went to look at the street file
3    the first time -- I'm sorry.  Let's make sure we're
4    all using the same name.  How would you refer to this
5    document?
6         A     Not -- I wouldn't refer to -- this
7    looks like a copy of the reports, but the documents
8    we have in our office, we call them homicide files.
9         Q     Would it also be called the Area file?
10   Have you ever heard that terminology?
11        A     Loosely it could be.  We have homicide
12   files; we have felony files.  That's the only thing I
13   know.  All --
14        Q     And -- I'm sorry.
15        A     All of them are in the Area.
16        Q     What about a unit file?  Would it be
17   considered a unit file?  I've heard it called
18   different things and I just want to know what you --
19        A     Well, what I know is homicide files
20   and felony files.  They're all in the Area; they're
21   all in the unit.  But we have two kinds of files,
22   homicide files and felony files.
23        Q     Have you heard the terminology of a
24   "street file"?

**Page 14**

1         A     I've heard that before.
2         Q     Is that what these would be called
3    sometimes, too?
4         A     No.  I only heard it when I talked to
5    other attorneys.
6         Q     But you know what they're referring to
7    when they talk about a "street file"?
8         A     Not really.  I know what a homicide
9    file is.
10        Q     If someone asked you about a street
11   file, you would not know that they were referring to
12   a homicide file?
13        A     Not necessarily, no.
14        Q     If it was a homicide case and they
15   were asking you about the street file, would you know
16   what they were talking about?
17        A     I would ask, "Are you talking about
18   the homicide file?"  That's what I know.
19        Q     If someone says, "I would like to see
20   a street file," what would you say in response to
21   that?
22        A     I'd say, "What file do you want?"
23        Q     And then you would get a description
24   that would match up with what you considered --

**Page 15**

1         A     They would give me a report number and
2    I could look it up, and then I would know whether it
3    was a homicide file or a felony file.
4         Q     For the report number, are you talking
5    about the "F" number that's on the file?
6         A     Yes.
7         Q     So in this case, the file number is
8    F-151922?
9         A     That's correct.
10        Q     When I went to look at this file the
11   first time, and I believe that was a year ago, in
12   December of 2011, the photos that are marked Exhibit
13   77 for identification, Fields Exhibit 77, were
14   separate.  The two documents were side by side with
15   each other.  Do you know if that's how they were
16   maintained?
17        A     No.  I don't know how they were
18   maintained.
19        Q     When you looked at the file folder in
20   preparation for today, were the photographs in an
21   envelope inside the file?
22        A     I only seen a copy of the file.
23        Q     Oh, you didn't see the original?
24        A     No.

**Page 16**

1         Q     Have you ever seen the original?
2         A     No.
3         Q     Not to --
4         A     Not that I -- to the best of my
5    knowledge, I don't know if I've seen the original.
6         Q     Okay.  The reason I'm asking about the
7    photographs is because the second time I saw the file
8    from case number F-151922, the photographs were in an
9    envelope inside the original file, and I'm just
10   wondering how they were maintained.  Are photographs
11   usually maintained within the file folder itself, do
12   you know?
13        A     For these -- for this type -- for this
14   case?  No, I couldn't tell you how they were
15   maintained.
16        Q     What about in other cases?
17        A     They -- it depends on who's
18   maintaining them.
19              (WHEREUPON, Ms. Gorman's cellular
20              telephone vibrated.)
21        MS. GORMAN:  Sorry.  Excuse me.  I'll just
22   turn my phone off.
23              (WHEREUPON, there was a brief
24              pause in the proceedings.)

4 (Pages 13 to 16)

BY MS. GORMAN:

Q    Do you understand that in Mr. Fields' case, he is maintaining that this file was never turned over to him during his criminal trials? Were you ever told about that?

A    Yes.

Q    When did you learn that?

A    I learned that when I was looking at the interrogatories.

Q    That was the first time you learned that he's claiming that this file was never turned over?

A    I had an idea that's what it was about.

Q    But no one told you that?

A    I'm not sure, but it's obvious.

Q    Why would that be?

A    Because I'm here.

(WHEREUPON, there was laughter.)

Q    But since you never saw the file, you must be wondering why you're here.

A    That's exactly right.

Q    Is it part of your job to -- well, tell me what your job is currently.

17

A    Maintaining homicide files.

Q    In Unit 1 -- Area 1?

A    It's Area Central now.  It was Area 1 until March of this year.

Q    And how long have you had the job of maintaining the files?

A    End of November 2009.

Q    And before November 2009, what was your position?

A    I was an investigator investigating in the field.

Q    Tell me what your duties were as an investigator.

A    To investigate homicides and other violent crimes.

Q    In Area 1 at that time?

A    Yes.

Q    How long had you been in Area 1?

A    '95, February of '95.

Q    Did you investigate violent crimes, homicides, or property crimes?

A    Violent crimes.

Q    And you've investigated violent crimes since '95?

18

A    Yes.

Q    Prior to 2009 when you became -- can you tell me what your title is now, your job title?

A    I don't know if it really has a title.

Q    Okay.

A    I guess you would call it homicide coordinator.  There's really no title for it.

Q    But your job is to maintain the files now?

A    Yes.

Q    Prior to you taking over that position in 2009, who, if anyone, had that position?

A    Detective Karen Williams.

Q    Karen Williams?

A    Yes.

Q    Do you know how long she was in that position?

A    No, I do not.

Q    Do you know if she was in the position the whole time you were in Area 1?

A    No, she was not.

Q    Do you know if she was in the position in all of 2000?

A    All of 2000?

19

Q    Well, from 2000 to 2009.

A    No, she was not.

Q    Was she in the position for a short time?

A    It seemed like a short time, yes.

Q    And prior to Karen Williams, do you know who was in that position?

A    Detective Sharon Colby.

Q    Colby?

A    Yeah.  And it may have been actually several detectives working it then.  I'm not sure.  I know she was one of them, but it may have been even more than that.

Q    Do you know which other ones?

A    No.

Q    Why do you think it might have been more than just her?

A    Because I remember when I first came up, I would see -- that had an office that they maintained, like, a Case Management office, and there would be more than one person in there, so they probably had more than one person doing it.

Q    Is that the office that you're in now?

A    I don't have an office.

20

5 (Pages 17 to 20)

1     A     No.
2     Q     So when a person, well, me, for
3   example, goes to the warehouse and looks at what's
4   called the permanent retention file for this case,
5   why is that -- if that's the same thing, why is it in
6   two different locations?
7         MR. NOLAND:  I'm going to object based on
8   foundation for this witness as to warehouse
9   recordkeeping.  There might be some confusion over
10  this "permanent retention" concept that was raised.
11        But you can answer over the objection.
12        THE WITNESS:  I don't know.
13  BY MS. GORMAN:
14    Q     Do you know what's kept at 39th and
15  Michigan -- 37th and Michigan?
16    A     No.
17    Q     Have you ever been there?
18    A     Yes.
19    Q     For what purpose did you go there?
20    A     I go there to pick up boxes, to drop
21  off files.
22    Q     What files do you drop off?
23    A     Files for permanent storage.
24    Q     Are those both permanent retention

                                            29

1   files or are those investigative files or are they
2   both, as far as you know?
3         MR. NOLAND:  I'm going to object to the form
4   of the question.
5   BY MS. GORMAN:
6     Q     You can go ahead and answer.
7         MR. NOLAND:  They're different.
8         MS. GORMAN:  Please don't testify.
9         THE WITNESS:  They're -- the same.
10        MR. NOLAND:  I'm not testifying.  It's a
11  compound question.
12  BY MS. GORMAN:
13    Q     So as far as your understanding, a
14  permanent retention file is the same as the
15  investigative file?
16    A     Investigative file and a homicide file
17  or a felony -- in most cases, felony files are
18  permanent retention files.
19    Q     Okay.  Do you know of any distinction
20  in the police department of files that are called
21  "permanent retention files," not the fact that
22  they're permanently retained, but have the title
23  "permanent retention files"?
24    A     No.

                                            30

1     Q     I know that you said you never saw
2   this Exhibit 3 prior to preparing for this
3   deposition.  Did you ever talk to anybody besides the
4   conversation you told me about with Lieutenant Duffin
5   about the investigative file in the murders of
6   Hickman and Smith?
7     A     No.
8     Q     Were you ever asked to find this file?
9     A     Not that I recall.
10    Q     Okay.  In June -- May of 2010, were
11  you working --
12    A     I don't know.
13    Q     -- in your job as maintaining the
14  files?
15    A     Yes.
16    Q     Do you know if you had any time off in
17  May or June of 2010?
18    A     Possibly.
19    Q     If a request had been made to find a
20  file from the Area in 2010 and you were not there,
21  who would look for that file?
22    A     I don't know.
23    Q     Is there anyone who takes over your
24  duties when you're not there?

                                            31

1     A     Not that I recall.  No.
2     Q     So if a request came in to find a
3   file, most likely that request would be made to you;
4   is that correct?
5     A     No, it's not.
6     Q     Who is it made to?
7     A     I don't know.
8     Q     So if --
9     A     If I'm not there, I couldn't tell you
10  who it's made to.  You would have to ask the person
11  who requests files when I'm not there.
12    Q     But what I'm trying to get at:  If
13  you're not there, does it just wait for you, the
14  request, and when you come -- when you're there, you
15  look for it?
16    A     I don't know.
17    Q     So you never found out whether or
18  not -- do you have regular days?  Are you on a
19  regular schedule?
20    A     I'm in a day-off group.
21    Q     I'm sorry?
22    A     We have what we call day-off groups.
23    Q     I see.
24    A     So days off, I guess, they'd be

                                            32

1   why that particular file cabinet was in that room.
2        A    You would have to ask somebody who
3   worked between '44 and '85 that question. I could
4   not tell you.
5        Q    Do you know if that file cabinet was
6   always in that room since you've been maintaining the
7   files?
8        A    Yes, I believe it has.
9        Q    And next to that file cabinet was an
10  Area 3 file cabinet. Do you recall that?
11       A    Yes, I do.
12       Q    Do you know why that file cabinet was
13  in that room?
14       A    I don't know why it was in the room.
15  And, again, if those -- I wasn't in the job when
16  those were established, so you would have to ask
17  someone who was around back then.
18       Q    What about in 2012 when I went back
19  and looked at the file cabinet yet again --
20       A    Um-hum.
21       Q    -- in the summer, it was gone? The
22  file cabinet that was marked "1944 to 1985."
23       A    Right. They're in the basement now.
24       Q    And when did that move take place?

                                                45

1        A    After March of this year, af -- well,
2   after you came by, probably sometime this summer.
3        Q    Do you know why it was moved down
4   there?
5        A    Yes.
6        Q    Why?
7        A    For space.
8        Q    Do you know why the space became
9   needed now as opposed to anytime between 1985 and
10  now?
11       A    Because before we had five Districts,
12  and now we have nine, because when they eliminated
13  two Areas, we absorbed four of the Districts and
14  their files.
15       Q    When moving the file cabinet to the
16  basement, the "Area 1 Homicides" files from 1944 to
17  1985, that one cabinet, was any logging done upstairs
18  by you so that you would know where that cabinet was
19  and what was in it?
20       A    No.
21       Q    So if someone is looking for a file, a
22  homicide file -- well, are those all the homicide
23  files between 1944 and 1985 for Area 1?
24       A    I don't know.

                                                46

1        Q    Do you know what's in that cabinet at
2   all?
3        A    No.
4        Q    And as part of maintaining the files,
5   you don't have any responsibility for knowing what
6   files are there?
7        A    That would make my whole career.
8        Q    That one cabinet?
9        A    No, the whole -- assuming I'm doing
10  one cabinet, I would assume I have to do them all.
11  So if I have to know what's in all the homicide files
12  from -- assuming no beginning of time since we're
13  talking about the '40s, we could go back to the '20s,
14  then that would take my whole career. So why would
15  we start there?
16       Q    I'm not asking you about all these
17  other files in all the other cabinets.
18       A    Then the answer is no.
19       Q    Okay. There's a file cabinet that's
20  been up in your office -- in the file room -- sorry,
21  not yours, but in the file room -- on the second
22  floor for some time period, and you're in charge of
23  maintaining the files, but you've never looked in
24  that file cabinet?

                                                47

1        A    No.
2        MR. NOLAND: Objection, asked --
3        THE WITNESS: Not --
4        MR. NOLAND: -- and answered.
5        THE WITNESS: -- that I recall. No.
6   BY MS. GORMAN:
7        Q    And you've never been asked to look
8   for a file from that time from of '44 to '85 that --
9        A    Not that I recall.
10       Q    -- you recall? Do you know if there
11  are any other files, homicide files, from Area 1 for
12  the time period of 1944 to 1985 somewhere else in the
13  building?
14       A    No.
15       Q    So those are the only files that you
16  know of?
17       A    Yes.
18       Q    Do you know why those were not moved
19  to the Michigan Avenue location?
20       A    No, I do not.
21       Q    Did you ever ask anyone?
22       A    No.
23       Q    What office is Lieutenant Duffin in?
24  Physically I would like you to describe his office.

                                                48

12 (Pages 45 to 48)

1    Q    And, again, Office of Legal Affairs,
2  the one Bates-stamped 9087, you've never seen that
3  form before?
4    A    Which one is that?
5    Q    It's 9087, it's another Office of
6  Legal Affairs Request for Information.
7    A    No.
8    Q    You've never seen that form before?
9    A    Not that I recall. No.
10   Q    I would like you to turn to the last
11 two pages, and I skipped one there, I see. It
12 says -- this is 9 - CITY-NF-9090. Have you seen
13 this before?
14   A    No.
15   Q    Do you know what "Detective Division
16 Report Numbers" refers to?
17   A    No.
18   Q    Go to the last page. Have you ever
19 seen this kind of an inventory sheet before?
20   A    No, I have not.
21   Q    If a request was made for someone to
22 come look at a file up in the Area 1 Detective
23 Division, would that request go to you to find the
24 file for them to look at?

57

1    A    Sometimes. Not a written request. If
2  someone asks to look at a file, I could pull it, but
3  there's no written request to look at a file.
4    Q    Have you ever been asked to pull a
5  file for the Smith and Hawkins murders -- Smith and
6  Hickman murders from Exhibit 3?
7    A    For this case here?
8    Q    For this case.
9  THE WITNESS: Not that --
10 MR. NOLAND: Objection.
11 THE WITNESS: -- I recall.
12 BY MS. GORMAN:
13   Q    You stated that you had started
14 inventorying files or having the computer database
15 and Excel sheets files from back to 2002?
16   A    Yes.
17   Q    Do you share those with other
18 divisions, or is that just for your own personal use?
19   A    That's for my own personal use.
20   Q    Is there any other kind of central
21 database that you're aware of for files within the
22 police department?
23   A    No.
24   Q    If you wanted to find a file and you

58

1  didn't know if it was at 37th and Michigan or if it
2  was in one of the Area files, how would you go about
3  looking for it?
4    A    How much information do I have?
5    Q    The file number.
6    A    I would look it up on the computer if
7  it's recent.
8    Q    You're talking about your own database
9  on the computer?
10   A    Right.
11   Q    Is there anywhere else if it's not
12 recent that you would look?
13   A    I've really never had the need to.
14   Q    Well, let's say you have the need now.
15 Where would you look if you were trying to find a
16 file that was before 2002 with your own database
17 system? Where would --
18   A    I would look -- even then, I would
19 look on my -- I can read the reports right there on
20 the computer.
21   Q    So you've got everything on the
22 computer? They're all scanned?
23   A    No, they're not scanned, but the
24 reports are in, the police reports are in.

59

1    Q    When you say "reports," what are you
2  referring to?
3    A    The detective reports are on the
4  computer.
5    Q    The GPRs?
6    A    Not the GPRs, but the supps that the
7  detectives create.
8    Q    What if they did it as a handwritten
9  note -- I mean, a handwritten supp instead of a
10 computerized one?
11   A    They weren't handwritten supps in
12 2002, not the detectives, I don't believe.
13   Q    Okay. What about when they're out on
14 the street interviewing people? They take
15 handwritten notes?
16   A    Yes.
17   Q    What happens with those?
18   A    Those I put in the file.
19   Q    In the physical file?
20   A    Yes.
21   Q    How does that make its way to the
22 physical -- how does it make its way to you to put in
23 the physical file?
24   A    It's turned in to a supervisor who

60

15 (Pages 57 to 60)

1    A    Yes.
2    Q    Do you know when -- well, are you part
3    of the audit that goes on at the Area for files?
4    A    No.
5    Q    Do you know who does the audit?
6    A    No.
7    Q    Do you know what department does the
8    audit?
9    A    No.
10   Q    Are you aware that there is an audit
11   done?
12   A    No.
13   Q    Do you know if anyone ever makes an
14   attempt at Area 1 to figure out what files should
15   stay there and what files should go to bulk storage?
16   A    The decision is usually based on
17   space.
18   Q    Okay.  And --
19   A    And the files that they leave, they
20   would leave the -- usually leave the year -- they
21   leave where they left off.  So if they sent 2000 down
22   and they ran out of space, they would send 2001 next.
23   Q    Do you know who makes that decision?
24   A    It would be the Violent Crimes

73

1    lieutenant.
2    Q    Okay.  Do you know if -- do they send
3    all the 2001 files, or are there some that would be
4    kept for one reason for another?
5    A    If year you're talking about now --
6    Q    Um-hum.
7    A    -- it's the whole year.
8    Q    Okay.  So what if there's a case that
9    still has things going on that dates back to 2001?
10   A    Then they would have to get it from
11   bulk storage.
12   Q    Which brings me back to that question
13   about that cabinet with 1944 through 1985:  Why was
14   that never sent to bulk storage?
15   A    I don't know.
16   Q    Did you ever ask anyone?
17   A    No.
18   Q    Do files ever come back to the Area
19   from bulk storage?
20   A    You can sign a file out from bulk
21   storage, but they don't come back.
22   Q    So if a case has been closed but then
23   there's parts of the case that are ongoing, if a
24   detective needs that file --

74

1    A    They would have to sign it out of bulk
2    storage.
3    Q    Sign it out of --
4    A    And then when they were done, they
5    would return it to bulk storage.
6    Q    Do you know if there's been any
7    investigation of the file system of Area 1 by any
8    federal agencies?
9    A    No, I don't.
10   Q    When in 2009 did you become the
11   coordinator of the files?
12   A    It was around Thanksgiving.
13   Q    Do you know if there's any record kept
14   in the Area of documents that are responded to by
15   subpoena?
16   A    I don't know.
17   Q    Do you know who would know that?
18   A    No.
19   Q    If you were working on the day that
20   request came from Ms. Loughran to pull Mr. Fields'
21   file, would you have been the one to pull it?
22   MR. NOLAND:  Object --
23   THE WITNESS:  Possibly.
24   MR. NOLAND:  Just object to the extent it

75

1    calls for speculation as to who it is, Ms. Loughran
2    in particular, but --
3    THE WITNESS:  It's possible, but I don't know.
4    BY MS. GORMAN:
5    Q    Do you know who else it would be
6    possible that they would have pulled it?
7    A    No.
8    Q    In 2010, was there anyone else besides
9    you that would have pulled files in response to
10   requests from Ms. Loughran?
11   A    I don't know.
12   Q    Who would be the person to know that?
13   A    I don't know.
14   Q    If you're not there when Ms. Loughran
15   calls, does she just leave a message for you?
16   A    She has sometimes.
17   Q    Do you know if you're not there if she
18   calls someone else?
19   A    No, I don't.
20   Q    Do you recall getting a request from
21   Ms. Loughran in 2010 for a file that you couldn't
22   find?
23   A    No.
24   Q    Do you recall getting a request for a

76

19 (Pages 73 to 76)