# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NATHSON E. FIELDS,           )
                                 )

 Plaintiff,               )

                                 )    **No. 10 CV 1168**

   v.                  )

                                 )    **Hon. Matthew F. Kennelly**

CITY OF CHICAGO et al.,       )
      Defendants.          )

## PLAINTIFF'S MEMORADUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff and in Response to Defendants' Motion for summary judgment asks this Court to deny Defendants' Motion in its entirety, grant Plaintiff's motion for partial summary judgment, and proceed to the trial in this case on the remaining issues so triable and for a jury determination as to damages, for the following reasons:

**DEFENDANTS STATEMENT OF "FACTS" FOUND IN ITS MEMORANDUM**:

Plaintiff is not responding to the "distilled version" of the facts found in defendants' memorandum at pp. 1-5, but instead responds to the statement of facts found in defendants Rule 56.1(A)(3) statement.[1] This should not be taken as an acquiescence of any of the purported "facts" found in the memorandum.

## I.    THE DEFENDANTS[2] ARE NOT ENTITLED TO SUMMARY JUDGMENT

---

[1] Facts referred to in Plaintiff's Statement of Additional Facts will be cited as follows: "PSAF¶ __"; References to Plaintiff's Response to the City's Statements of Fact will be cited like so: "PRSF¶ ___."

[2] Defendants Kolovitz, Robertson and Kobel have been voluntarily dismissed from this case and therefore Plaintiff does not address issues and facts related to them. Doc. 454.

**ON FIELDS'S DUE PROCESS CLAIM, HOWEVER FIELDS IS ENTITLED TO SUMMARY JUDGMENT ON HIS DUE PROCESS *BRADY* CLAIM**

Fields provided an in-depth argument in support of summary judgment for his due process *Brady* violation and will not repeat himself in this response except to draw the Court's attention to those arguments and the facts attached thereto and to incorporate those in this response.

*Brady* should be seen as requiring two interdependent goals: a judicially enforced mechanism for *both* protecting the right to a fair trial *and* discouraging misconduct on the part of police and prosecutors. Defendants take the position that they are relieved of responsibility for their *Brady* violation during Fields's first criminal trial because of the misconduct of Fields's co-defendant, his co-defendant's counsel, and the judge. Somehow, the defendants think that they can also ignore valid subpoenas (in this case more than ten valid subpoenas) and not provide material, which, in any case, was required to be produced under *Brady*, because defendants learned, at some point, that a co-defendant tried to bribe the judge. PSF¶¶53-55, 86-94. The defendants then conclude that since Fields was acquitted after his second trial 23 years later (after Fields spent 12 years on death row, eight years in jail, and six years out on bond with severe restrictions) that there is no harm, no foul, and that they have no liability for not producing or disclosing the street file over those many years.

The defendants are wrong for several reasons: 1) the duty to provide the street file pursuant to the subpoenas and *Brady* is unconditional; 2) The duty to disclose *Brady* material is a continuing duty; 3) The finding of not-guilty in 2009 does not foreclose a

*Brady* claim, and the affidavit from former defendant ASA Sexton does not present a material fact; 4) The defendants all had a duty to intervene; and 5) The Street file was withheld pursuant to the city's custom.

A. **The *Brady* violations**

*1. The duty to disclose Brady material is unconditional*:

Fields established in his Motion for Summary Judgment that the withheld street file contained *Brady* material and hereby incorporates that argument and facts here. Fields Memo. @ 8-15. The city and the defendant police officers have no authority to withhold *Brady* material merely because they learned, after the fact, that Fields's co-defendant and his attorney were corrupting the trial. Unlike Fields's co-defendant Earl Hawkins (who immediately used his lawyers' attempt to bribe Judge Maloney as a ticket off of death row during one of his first visits with defendant Brannigan) Fields has steadfastly denied knowing anything about the bribe, until it became public knowledge. PSF¶119, PSAF¶263. There is no evidence that Fields or his attorney knew of the bribe.

Nevertheless, the defendants argue that they should be relieved of their duties under *Brady* because of the illegal activity of others. In fact, the defendants' position goes even further, because, as mentioned above, Fields and his various attorneys repeatedly served subpoenas, seeking the street file, upon the defendants. Therefore, defendants are arguing that they had the right to both defy subpoenas and violate *Brady* because of the misconduct of third parties, whom Fields did not control. Defendants, of course, have no law to support such a claim. *Brady v. Maryland* and its progeny *require*

police to disclose exculpatory and impeaching evidence to prosecutors, who must, in turn, disclose said evidence to defendants. *Brady,* 373 U.S. 83.

Moreover, because Fields and his various defense teams actually subpoenaed the street file, any discretion generally afforded to the state's attorney in determining what is and is not *Brady* material flies out the window. As further explained below, ASA Sexton's retroactive assessment of this issue is without merit or relevance because, even if this Court were to determine that the material in the street file was not *Brady* material, the defendants' failure to turn over the file pursuant to the subpoenas issued by Fields's attorneys also constitutes a violation of Fields's due process rights. Just as there is no exception in the case law that excuses the defendants from providing *Brady* material upon learning (after the fact) that one of the defendants in a criminal proceeding tried to bribe a judge, there is similarly no exception in the law permitting defendants to ignore valid subpoenas.

Finally, there is no legal basis for the defendants' claim of an attempt to bribe Judge Maloney as an "intervening, superseding event that severed any causal link" between the city's alleged misconduct and Fields's conviction and death sentence. Resorting to the "intervening, superseding cause" rubric—a principle typically limited to the realm of negligence—is misleading here, where the claims are intentional, constitutional torts. "Animating the doctrine [of superseding cause] is the idea that it is unreasonable to make a person liable for such improbable consequences of negligent activity as could hardly figure in his deciding how careful he should be." *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 447 (7th Cir. 2000). In the context of a *Brady* violation, there is

nothing improbable about a conviction. Simply put, the bribe attempt by Fields's co-defendant does not sever the causal link between the *Brady* violations and their likely consequences—the wrongful conviction of Fields.

Even if the bribe were relevant to the causation analysis here, the city's argument ignores two points that wreak havoc with their "superseding cause" theory: (1) Maloney's "cold feet" were a direct result of the strength of the State's case, and (2) Maloney's crookedness was foreseeable, if not known, to the prosecution. First, the city neglects to mention the explanation that Maloney's go-between, Robert McGee, offered to Hawkins's attorney when he returned the money— McGee said that the "State witnesses were too good and the case was going to[o] well for the State." *People v. Hawkins*, 181 Ill. 2d 41, 690 N.E.2d 1001-02 (1998). Thus, according to *Hawkins*, the city's only factual source for this argument, the intervening cause was not intervening at all— it was a direct result of the strength of the prosecution's case. And the strength of that case was a direct result of the *Brady* violations at issue here. Second, the Cook County State's Attorney's Office was alerted to the attempted bribe as it unfolded. PSAF¶262. A cause is foreseeable—and therefore not superseding—if the tortfeasor was aware of it before the harm occurred.

But there is a deeper problem with applying the doctrine of superseding causes here: in, constitutional-tort claims, a tortfeasor takes the victim as he finds him. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("a prosecutor's decision to charge, and grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who

deliberately supplied misleading information that influenced the decision.")  Here, the defendants found their victim in a courtroom with a corrupt judge.  Their constitutional violations bolstered their case against Fields, and his wrongful conviction was their prize.

The city concedes that there is no way to know whether a non-corrupt judge would have convicted Fields and sent him to death row on the basis of the evidence offered at the first trial.  It is clear, however, that in a case such as this, where defendants presented a trial judge with false and fabricated evidence, connecting the accused to a double homicide; where the defendants hampered the plaintiff's ability to rebut their false evidence by withholding evidence about other suspects and motives; and where the defendants further asked the trial judge to order the plaintiff's execution based on additional false and fabricated evidence connecting the defendant to another double homicide, the city cannot avoid responsibility for the damage done to the Plaintiff by merely invoking the fact that the trial judge may have attempted to obtain a bribe, which *may* have influenced his verdict.

2.  *The duty to disclose* Brady *material is a continuing duty*

The defendants' position that they were relieved of their obligation to tender *Brady* material because of the corruption by Fields's co-counsel is also misplaced because the obligation to tender the street file did not end with Fields' first conviction. As the Seventh Circuit held in *Whitlock v. Brueggemann* 682 F.3d 567, 588 (2012) "the *Brady* line of cases has clearly established a defendant's right to be informed about exculpatory evidence throughout the proceedings, including appeals and authorized post-

conviction procedures, when that exculpatory evidence was known to the state at the time of the original trial." Defendants, therefore, had a continuing obligation to disclose the street file through the period of Fields' appeals and post-conviction procedures, up until the time of his second trial in 2009.

The reason there is a continuing obligation on the state to disclose evidence is not because of some special right associated with post-conviction or clemency, but because "the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues." [internal citation omitted] "As we explained at length before, *Brady* and its progeny impose an obligation on state actors to disclose exculpatory evidence that is discovered before or during trial." *Id*. at 588. This obligation does not cease to exist at the moment of conviction. Otherwise no one could argue a *Brady* point either on direct appeal or in a collateral attack under 28 U.S.C. § 2254 or § 2255. *Id.* at 588

The defendants' also do not say when it is that they would, if ever, be required to tender the withheld *Brady* material. Clearly they felt no compunction about withholding the street file during Fields's first trial, during all of Fields's appeals and post-conviction proceedings, and during Fields's second trial. Not even after the corruption at the trial became widespread public knowledge did they release the file. The city's position seems to be that because of the illegal activity of Fields's co-defendant and judge, the city defendants *never* had a duty to turn over the withheld street file that would provide the many leads to the true killers.

3.    *The finding of not-guilty in 2009 does not foreclose a* Brady *claim and the affidavit from*

*former defendant ASA Sexton does not present a material fact*

The Seventh Circuit has not definitively stated whether a *Brady* claim can be asserted after an acquittal. The defendants rely on mechanical conclusions based on generalized "fair trial" language in *Brady* and related cases, without conducting an analysis of the constitutional source of the claim – procedural due process. In addition, none of these cases rely on facts similar to Fields, where *Brady* material was withheld for 26 years, the individual was first found guilty and sentenced to death, imprisoned for decades and only later exonerated after a second trial took place. The closest analogy to Fields's situation arises in *Whitlock v. Brueggemann* in which the defense also raised as a defense that Plaintiffs in that case could not have a *Brady* claim because they ultimately prevailed years after their conviction, and after trials that were riddled with constitutional violations. The Court summarily rejected that defense when it held "The fact that Whitlock and Steidl were ultimately able to have their convictions set aside does not mean that they are 'prevailing criminal defendants' in the sense that *Mosley* uses the term. To hold otherwise would be a perverse application of that doctrine." *Id.* at 588. The same result should hold true for Fields.

With respect to Fields's *Brady* claims relating to his second trial, the city relies on *Carvajal* and *Bielanski* to advance its argument that there could be no *Brady* violation because Fields was ultimately acquitted *twenty three years* later! *Carvajal v. Dominguez*, 542 F.3d 561, 565 (7th Cir.2008), *Bielanski v. County of Kane*, 550 F.3d 632, 635 (7th Cir. 2008). Neither *Carvajal* or *Bielanski* foreclose a *Brady* claim after acquittal, but the Court found in those two cases, where the defendants were acquitted after the first trial, that in those circumstances the *Brady* claim did not survive. The instant case is

distinguishable from both *Carvajal* and *Bielanski* and more like *Whitlock* in that Fields had been, in 2009, deprived of his liberty for nearly a quarter-century -- 17 of those years incarcerated in some capacity, eleven of those years on death row, and nearly six years subject to the restrictions of his release on bond. PSF¶47, 64, 121-123. The suppression of any *Brady* material in the run-up to Fields's 2009 trial would inevitably compound a pre-existing and ongoing constitutional violation.

With respect to other authority cited by the city, *Morgan v. Gertz*, 166 F.3d 1307 (10th Cir. 1999), mistakenly characterized the claim as one for substantive, rather than procedural due process, and then relies on the Supreme Court's reluctance to expand substantive due process into novel areas. *Flores v. Satz*, 137 F.3d 1275 (11th Cir. 1998), and *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988), limit *Brady* itself to convictions at unfair trials, without addressing the constitutional source of the right. The city also relies on *Albright*, despite the fact that in *Albright* the criminal complaint was dismissed at a pre-trial hearing and the use of *Brady* and fabricated evidence was not at issue in the *Albright* plaintiff's civil rights action. *Albright v. Oliver,* 510 U.S. 266, 269 (1994).

The city's invocation of other possible causes of action under *Newsome v. McCabe*, 256 F.3d 747(7th Cir. 2001), and *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002) does not foreclose Fields's right to bring his *Brady* claims.

In *Strickler*, the Supreme Court made it clear that the core of the analysis "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial." *Strickler v. Greene*,

527 U.S. 263, 289-90 (1999). This holding requires a prospective analysis, i.e. whether at the time the evidence is concealed it could be expected to affect the outcome of trial; not the retrospective analysis suggested by the defendants. With the *Brady* material still hidden during the second trial, Fields's defense primarily relied on the unreliability of the state witnesses who testified against him, namely, former co-defendant Earl Hawkins, whose decision to cooperate reduced his murder charges to armed violence (PSAF¶272), Randy Langston, who had previously recanted and disavowed his testimony implicating Fields in Hickman-Smith, but who, in the intervening years before the second trial, had received benefits from the ASA's assigned to Fields' case -- including being placed in an apartment and receiving more than $2,000 for rental and security deposit expenses. PSF¶117,118, PRSF¶125. Gerald Morris, who had also earlier recanted, testified against Fields at the second trial and later admitted the extent of the coercion that he was subjected to, and the benefits extended to him by police, specifically defendant O'Callaghan.[3] PSF¶110-116. Judge Gaughan found none of the witnesses who testified against Fields to be credible. PSF¶123-126.

Finally, the city cites the affidavit of ASA Brian Sexton, apparently to try to raise a factual issue to support its claim that the withheld street File is immaterial under *Brady*. City Memo. @ 10. This self-serving affidavit by the Cook County assistant state's attorney, who himself was a defendant in this case until being voluntarily dismissed by

---

[3] Indeed, any attempt to discount the coercion Morris testified to in his affidavit is supported by ASA Sexton's admission at the innocence hearing that he sent investigators and local police to try to bring Morris to testify against Fields once again; but that Morris steadfastly refused. In fact, Sexton did all of this knowing about the protective order and that Morris had an attorney but never attempted to contact that attorney or return her calls. PSAF¶¶277, 278.

Plaintiff, and whose co-counsel during most of the appeal proceedings and the second trial (David Kelley) remains a defendant, should not be given any weight -- not only because it is not relevant and immaterial, but also because it is inherently partial and biased because of the personal involvement of ASA Sexton, and the States Attorney's Office in the continued misconduct. The fact that ASA Sexton claims he would not have been influenced by the 30-year-old street file and its many leads, which were never developed at the time of the first trial, is not relevant here -- and is more a reflection on the Cook County State's Attorney's Office, than a meaningful assessment of the street file itself.

Fields's defense was entitled to those materials at his first trial, materials which should have been provided to him under *Brady* and pursuant to the subpoenas seeking the street files. The file was concealed to effectively quash any investigation by Fields, over the course of his long ordeal – including two trials, into the identities of the true perpetrators, and the full circumstances surrounding the Hickman-Smith shooting. In short, Sexton has a dog in this fight. Any of the biased statements in his affidavit, therefore, cannot resolve any issue of material fact and should be disregarded. Finally, the city defendants should not be allowed to hide behind the officials whom they have defrauded (even if the officials herein don't appear to care that they were defrauded). *Jones v. City of Chicago, supra*, 856 F.2d at 994.

4. *The Defendants all had a duty to Intervene*

As noted in footnote 6 in Fields's motion for Summary Judgment, although pled as a separate count in this case, failure to intervene is actually a theory of liability and,

as such, is actually a component of the cause of action. *Padilla vs. City of Chicago*, 932 F.Supp 2d 907 (N.D. Ill. 2013). Fields has alleged sufficient facts herein and in his own motion for summary judgment to support his theory that each of the defendants had an opportunity and yet failed to intervene to secure Fields's constitutional rights. Fields Memo. @ 16-22.

*5. The Street file was withheld pursuant to the City's custom*

The defendants' also argue that there is no *Monell* claim here, because they enacted special order 83-1. Defendants' motion should be denied because there is no fact at issue here -- the city was found to have a custom and practice and of hiding the street files and the "special order" (83-1), which had no provision for audit or compliance, should be deemed a sham as a matter of law. Fields's motion for summary judgment on the *Monell* claim should be granted and Fields incorporates that argument and facts herein (Fields Memo. @ 23-30).

At the risk of briefly repeating himself, Fields again argues that there is no issue of material fact in dispute that the city had a widespread practice of maintaining separate investigative files at the very time that the city was hiding the street file in Fields's case; the city cannot deny with a straight face that the practice was widespread. PSF ¶11, *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983). The city had been caught red handed in the *Palmer* case, of maintaining the separate secret file system and the city acknowledged in *Jones* that the policy deprived Plaintiffs of their constitutional right to a fair trial. *Jones v. City of Chicago* , 856 F.2d 895 (7th Cir. 1988). Additionally, the city admitted in Fields's own section 1983 lawsuit (filed in 1988) that if they had

withheld the street file, Fields was entitled to be released from prison and awarded monetary relief. The city should not be allowed to backtrack from that admission now that it has been shown that they did withhold the file.

Indeed, it is now common knowledge that in the early to mid–1980s, right at the time Fields was seeking the street file in the Hickman/Smith murders, that Chicago Police detectives routinely maintained separate investigative files that were not turned over to the states attorney or defendants. PSF ¶10-11 (*Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983, *Palmer v. City of Chicago* 755 F2d 560 (1985), *Jones v. City of Chicago* , 856 F.2d 895 (7th Cir. 1988), *Jones v. City of Chicago*, 1987 WL 16611, *7 (N.D.Ill. Sept. 1, 1987).

Despite the fact that this issue was front and center at the time of Fields' criminal trial, and at the time he filed his 1988 lawsuit, the city did absolutely no meaningful investigation into why a double murder investigation that was open for more than a year before Fields was arrested only yielded eight pages of investigation notes – all dated to the day of the murders. PSF ¶56-57,61, 66 -77.

*Special Order 83-1 was nothing more than a sham*

Although the city, on paper, implemented a special order requiring the street files be turned over, the facts show that, despite the lofty language found in Special Order 83-1, the city continued its widespread and well-settled unwritten practice of hiding investigative files (known as street files) even after the enactment of that order. As defendants admit, Special Order 83-1 had no mechanism for monitoring compliance – making the order illusory. It is undisputed that the city had no actual regulation or

rules for oversight or audit (to ensure that the special order was actually being followed) until less than three weeks before Fields's first trial started, and, even then, defendants presented no evidence that the new order was actually complied with. City SOF¶174, 177.

Curiously, the defendants actually *brag* in their Statement of Facts that there were no procedures for ensuring that file maintenance policy was being followed until *possibly* the enactment of Special Order 86-3 (which, as noted above, was of no help to Fields because it was enacted a few short weeks prior to Fields's first trial and there is no provision in the order for retroactive audits). City SOF¶174, 177. The enactment of Special Order 86-3 marked the first time the city actually established on paper (if not in actuality) an audit procedure to determine whether the requirements of special order 83-1 were even being followed.

James Hickey was a 30(b)(6) witness selected by the City of Chicago to speak authoritatively on the subject of policies and procedures related to the detective division during 1984 and 1985. PSF¶12. Hickey testified that, to his knowledge, nothing was done after the implementation of special order 83-1 to survey or audit how the process was proceeding. PSF¶12,16. Even after implementation of special order 86-3 there is no indication in the record that the city did anything to ensure that this new order was complied with and that the files were being turned over to prosecutors and defendants.

In any event, as evidenced by Fields's case, the order was not being complied with because the street file was not turned over. In fact, none of the lofty provisions of

83-1 seem to have been utilized in relation to the missing street file in Fields' case. There is no Investigative File Inventory sheet, and no Detective Division File Control log. The city was on notice, at the very time that Fields was seeking the street file before his 1986 trial, that it had a practice of hiding these files, and only eight pages of investigative notes were tendered -- all written on the day of a double homicide. This for an investigation more than a year old (at the time of Fields's arrest). This was part and parcel of the city's custom. [4]

In addition, key file maintenance personnel deposed by Plaintiff, Detectives Brown, O'Brien, and Karen Williams had still at the time of their depositions never witnessed any audit, inspection or compliance measure. PSF ¶26. Finally, Kathleen Loughran, a 30(b)(6) witness selected by the City of Chicago to speak authoritatively on the subject of policies, procedures and practices related to files for the year 2009 (during Fields's second criminal trial), testified that while 86-3 represented the policy of the CPD, she could not testify as to whether the order was complied with in practice. PSF ¶23.

One thing is clear and Fields's situation shows it best -- the city's implementation

---

[5] Ironically, Fields was potentially a putative class member in the class definition established by the Plaintiffs in the *Palmer* case. The class definition included two separate classes- those who were convicted of crimes and did not have the benefit of the street files and those awaiting trial who did not have the benefit of the street file- Fields was awaiting trial while that case was pending. Unfortunately for Fields, the Seventh Circuit would not allow the class of individuals awaiting trial to be included in the class definition finding that those individuals had state remedies available to them because "as criminal defendants in pending felony proceedings in the Cook County Circuit Court, [they] are presently able to file motions to compel production and preservation of evidence with the state court trial judge." *Palmer v. City of Chicago*, 755 F.2d 560, 575 (7th Cir. 1985).

of 83-1 was ineffective because it did not stop the custom, and it had no audit or other mechanism to ensure compliance. The *frightening abuse of power* described by the Seventh Circuit in *Jones* was visited upon Fields when he was charged, convicted and sentenced to death in the Hickman and Smith homicides, while the file stayed hidden.

### B. *The Other Due process violations*

In addition to the *Brady* violations, the defendants engaged in a myriad of violations of Fields's constitutional rights to liberty, and to a fair trial. Because the facts related to Fields's other due process violations are best explained in the context of the malicious prosecution and conspiracy claim, Fields discusses those facts therein but also incorporates those facts as further evidence of his constitutional violations.

## II. THE BRADY AND OTHER DUE PROCESS VIOLATIONS SUPPORT FIELDS'S MALICIOUS PROSECUTION AND CONSPIRACY COUNTS

### A. ALL OF THE DEFENDANTS ARE GUILTY OF MALICIOUS PROSECUTION AND CONSPIRACY

The facts in support of the malicious prosecution claim are interwoven with the facts in support of the conspiracy claims, and together they show a gross violation of Fields's constitution rights. Each of the defendants conspired and agreed with each other to deprive Fields of his due process right under the Illinois and United States Constitution. In a nutshell, defendants Bogdalek, Minogue, Casto, Richardson, Evans, and Hood are guilty of malicious prosecution and conspiracy because they shut their mouths and looked the other way when the documents from the initial investigation were hidden from Fields. Their conduct paved the way for defendants Murphy, O'Callaghan, and Brannigan to conspire to frame Fields for the Hickman/Smith murders, while using the

charges against Fields in the Vaughn/White murders in aggravation for imposition of the death penalty. Together, the two groups of co-conspirators almost succeeded in executing Fields.

Under Illinois Law, the elements of malicious prosecution are as follows: (1) the defendant commenced or continued a criminal proceeding against the plaintiff; (2) the proceeding was terminated in favor of the plaintiff; (3) there was no probable cause to commence or continue the proceeding; (4) the defendant acted with malice; and (5) the plaintiff suffered damages as a proximate result of the defendant's conduct. *Thompson v. City of Chicago*, 722 F.3d 963, 978 (7th Cir. 2013). For purposes of this test, this Court's interpretation of "commenced or continued" should be interpreted broadly; "[l]iability for malicious criminal prosecution is not confined to situations where the defendant signed a complaint against the plaintiff. Rather, liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present." *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233, 1240 (1988).

The city claims that there is no evidence that defendants Bogdalek, Minogue, Evans, Hood, Casto or Richardson commenced or continued criminal proceedings against Fields. As further described in Fields's summary judgment motion (at pp. 16-22), each of these defendants played a role in depriving Fields of *Brady* material – either at the 1986 trial – or later in 1988 when all five had notice that Fields alleged that he had been deprived of investigative materials. Yet none of these defendants did anything to safeguard Fields' constitutional rights. It was these defendants' failure to disclose

exculpatory material (or to so much as lift a finger to ascertain what had happened) after being put on notice, that resulted in Fields long ordeal in the criminal justice system; thus these defendants fall under the umbrella of persons who, under *Frye*, "played a significant role" in Plaintiff's unjustified prosecution.  *Id*.

As further shown below, the team of Brannigan, O'Callaghan and Murphy was relentless in its efforts to frame Fields. While Brannigan worked on getting false statements from "cooperating" witness Anthony Sumner, defendants O'Callaghan and Murphy quite literally commenced the prosecution of Fields by swearing out complaints for preliminary examination against him based on knowingly false and coerced evidence – defendant Murphy signed the complaint for the Vaughn-White murder case and defendant O'Callaghan signed the complaint for the Hickman-Smith murder case.  Both appeared before the grand jury on the same day. PSAF¶¶242, 241, 251.

**BRANNIGAN**:

Defendant Brannigan played a critical role in initiating Anthony Sumner's troubled career as a professional witness (and Sumner played a critical role in advancing defendant Brannigan's career as law enforcement's *supposed expert* in the El Rukn organization.) Brannigan was a lead investigator in the El Rukn task force between 1983 and 1993; as further elaborated below, Brannigan himself has described the initial investigation as extraordinarily difficult and that Anthony Sumner was the first major cooperating witness in the El Rukn investigation. PSAF¶236. Brannigan was intimately involved in securing Sumner's "cooperation" in May of 1985, when, under

pressure from Brannigan, Sumner concocted the false Vaughn-White story implicating Fields. PSF¶ 41-44.

On May 9, 1985, defendant Brannigan flew to Cleveland Ohio; the next day he participated in the arrest of Earl Hawkins, Anthony Sumner, and others individuals at an East Cleveland house; it was after these arrests that defendants Brannigan and Wharrie interrogated Sumner in what ATF Agents Thomas O'Brien and Lewis Wolfe described as an "extensive interview" and secured assurances from Sumner that he would cooperate with law enforcement. PSAF¶237. Shortly after that encounter, and over the course of the spring of 1985, Sumner began feeding law enforcement statements implicating El Rukns in various crimes, including implicating Nathson Fields in the Vaughn-White and Hickman-Smith murders. PSF¶¶42-44, 46.

Once Sumner began cooperating, Brannigan developed an extensive role in the criminal investigation targeting Fields; defendant Brannigan appears, with defendant Murphy, on the Arrest Warrant for Nathson Fields for the Vaughn-White murder, issued on May 17, 1985; defendant Brannigan is listed among other defendants in the June 17, 1985 Supplementary Report, describing Fields's arrest and lineup identification; Brannigan is also listed alongside other assigned personnel in an August 31, 1985 Supplementary Report recounting a confidential informant's statement that Hawkins and Sumner (and not Fields) fled to Milwaukee following the their role in the Vaughn-White murders; PSAF¶248.

Despite having notice of a Milwaukee informant whose account conflicted with Sumner's narrative regarding Vaughn-White, Defendant Brannigan himself has testified

that he made no efforts to corroborate Sumner's statements regarding Fields; and that he is not aware of any other persons who did so. PSAF¶243.

On September 9, 1985, Anthony Sumner, in a brief interlude during which he broke free from the clutches of the CPD, gave defense lawyers statements describing how Brannigan had beaten him and threatened him with a triple murder that he had no connection with while he was detained in Ohio, and as a result that he provided false statements to the CPD. PRSF¶32. These admissions are now partially corroborated by none other than AUSA Hogan, who testified at Fields 2013 innocence hearing that Sumner was known to have lied to grand juries and at trials in regards to *at least* three different murder investigations. PSF¶107.

Having played a key role in securing the cooperation of Anthony Sumner, defendant Brannigan played a similarly important role in securing the cooperation of Earl Hawkins. Hawkins was on death row at Menard in 1987 when he reached out to defendant Brannigan in a letter, and offered to try to reach a mutual "understanding." PSF¶119, PRSF¶¶101-102. Earl Hawkins testified that Brannigan helped convince Hawkins to cooperate by falsely assuring him that he (Hawkins) would only serve 20 years in prison, a sentence which Hawkins believed was "doable." PSAF¶270. Hawkins has repeatedly admitted that he would, and did, say anything to avoid the death penalty. PSAF¶271. In his deposition, Hawkins admitted that the *Bibbs* case was the first one he cooperated on because he had been acquitted in that case and thought he couldn't get charged again. He further testified that defendant Brannigan told him "You got to show something that would show good face (sic) … You better come up with

something quick." PSAF¶269. Hawkins would ultimately testify against Fields in his 2009 trial, at which Judge Vincent Gaughan found Hawkins' testimony incredible. PSF¶¶123-124.

Had it not been for Brannigan's extensive involvement in Fields' case, most notably in cultivating state's witnesses to lie, it is likely that Fields would have never been charged with either the Vaughn-White or Hickman-Smith murders. Defendant Brannigan's outsized role in Fields' case places him squarely within the realm (in terms of *Frye*) of those persons who played a "significant role" in his prosecution. *See* 520 N.E.2d at 1240.

**O'CALLAGHAN**:

Defendant O'Callaghan apparently became more involved in the two double homicide investigations after Sumner started to "cooperate." O'Callaghan bragged at Fields first trial "we talked to hundreds of people" in the course of the Hickman-Smith investigation." City SOF¶50. The defendants, in their motion, attempt to put the brakes on O'Callaghan's grandiose claim by *explaining* that this statement should not be taken to mean that notes were made pertaining to each interviewee. City Memo.@ 23. Of course Fields does not assert that each and every one of those "hundreds" of interviews should have resulted in a separate body of notes; nevertheless, it defies belief that in O'Callaghan's interactions with these "hundreds of people" not a single note was produced by O'Callaghan.

In addition, defendant O'Callaghan played a direct role in coercing witnesses to falsely testify against Fields at his first criminal trial. Gerald Morris, a state's witness

against Fields, signed an affidavit stating that it was defendant O'Callaghan who told Morris to testify that he (Morris) had seen two masked perpetrators running toward the get-away car, and that he had been able to see their faces; Morris' affidavit makes it clear that he never saw the faces of the shooters and that he only testified for the state because he was afraid of Defendant O'Callaghan and because of the perks offered to him; Morris goes on to state that he was rewarded with rent money, household necessities and other expenses by the police. PSF¶¶111-16. Similarly, Randy Langston testified at Fields' aggravation hearing, after Fields was found guilty; Randy Langston admitted that it was defendant O'Callaghan who intimidated him into identifying Fields and testifying against him. PRSF¶126.

O'Callaghan's methods of strong-arming witnesses were also exposed by high school student Carlos Willis and his grandmother Evelyn Custer. Both testified for the defense on June 23, in Fields' 1986 trial. In 1984, Willis lived with his grandmother near the scene of the Hickman-Smith murders. Willis heard the gunshots and looked out his window, saw the bodies and then saw two men running from the scene of the murder with masks on, because of the masks he was unable to identify the men. Willis testified that a year later, in 1985 defendant O'Callaghan tried to get him to identify Hawkins in the line-up by repeatedly asking Willis if he recognized Hawkins but of course Willis could not identify Hawkins because he had not seen the faces of the men. PSAF¶267. Willis's grandmother Evelyn Custer was standing outside the line-up room and therefore she couldn't hear everything, but Custer testified that O'Callaghan told her grandson "don't worry about anything" and "just to agree with, you know, what he

was saying." Custer also testified as to improper suggestions of favors by O'Callaghan. PSAF¶268.

That O'Callaghan disingenuously testified before a grand jury that Fields had been identified by eyewitnesses as a shooter in the Hickman-Smith murder, knowing full well that he himself had coerced those identifications, is further evidence of his role in the malicious prosecution. PSAF¶251. Defendant O'Callaghan has also admitted that he knows of no information which corroborated Anthony Sumner's false account of the Vaughan-White murders. PSF¶50. Under Illinois law, corroboration of statements is considered among the indicia of reliability for the purposes of making a probable cause determination. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 642, 784 N.E.2d 258, 266 (Ill. App. Ct. 2002). Finally, O'Callaghan cannot claim to be ignorant of the fact that the initial investigation notes were withheld from Fields, as he was also named in Fields's 1988 lawsuit, and he responded to the internal investigation by claiming that he hadn't withheld any exculpatory information[5] "of a written nature" from Fields.

**MURPHY**:

Defendant Murphy also testified before a grand jury, repeating Anthony Sumner's undisputed lies implicating Fields' in the Vaughn-White murder. PSAF¶242. Murphy advanced these falsehoods despite the fact that the children-witnesses to the Vaughn-White murder had told police that there were two offenders (a fact confirmed in a report signed by defendant O'Callaghan two days after the murder and which,

_____

[5] O'Callaghan testified that it was *his role* to determine what was exculpatory. PSF¶80.

conflicts directly with Anthony Sumner's false narrative which implicated three offenders in total). PSF¶¶44-45. As further described below, Murphy was also actively involved in the Hickman and Smith frame-up by backdating documents, withholding documents and other fraud.

### a. There was nothing honest about the frame up in Vaughn White

The city defendants argue that the statement which they obtained from Anthony Sumner in 1985 implicating Fields in the Vaughan/White murders supported "a police officer's honest and strong suspicion" that Fields was involved in those murders. City Memo. @ 37. However, given the "totality of the facts," showing that the defendants did, at best, an absolutely abysmal job of investigating the facts in these murders overcomes any presumption of probable cause and supports a cause of action for malicious prosecution. *See, e.g. Woodley v. City of New York*, 2010 U.S. Dist. LEXIS 120390, at *31 (E.D.N.Y. 2010) [a finding that an officer was "grossly" negligent by "failure to carry out the most rudimentary investigation" overcomes any presumption of probable cause and will support a cause of action for malicious prosecution].

The city acknowledges that in 1991, Sumner admitted that Fields was not involved in these murders. City SOF¶115. In a handwritten statement given to Assistant State's Attorney Hynes on January 3, 1992, Sumner admitted that he named Fields as a participant in the murders because "[he] was confused and afraid. Nathson Fields had put [his] family out of one of the El Rukn buildings and [he] did not like him." PSAF ¶249.

Despite this admission of perjury (Sumner testified to Fields' involvement in the

Vaughn White murders before several grand juries and in criminal trials) and his professed ill will towards Fields, Hynes did not ask Sumner about any of his other statements and specifically did not ask him about the statement he made alleging that Fields was involved in the Hickman and Smith murders. PSF ¶108. Sumner should have been charged with multiple counts of perjury but, obviously, the repercussions would have wreaked havoc on the El Rukn federal prosecutions, and he was never charged. In his recantation statement Sumner also admitted that he told AUSA Hogan that Fields was not involved in the Vaughn and White murders at least six months earlier during the summer of 1991. Hogan did nothing with that information because he was "busy." Two weeks after the written recantation Sumner was apparently hit by a car and died. PSF ¶¶105,106, 109. PSAF¶250.

The city argues that back in 1985, when its officers took the statement from Sumner, and in 1986, when Sumner's testimony was used as the primary evidence in aggravation to send Fields to death row, there was no reason for the officers to disbelieve Sumner. According to the city, "everything Sumner initially told investigators about the Vaughn/White murders, including that Fields was involved, would have led a person of ordinary caution to believe, or entertain an honest and strong suspicion, he was being truthful." City Memo. @ 37-38. This is incorrect. Quite to the contrary, the defendant officers possessed a great deal of evidence at the time they took Sumner's initial statements that suggested Sumner was lying about Fields' involvement.

As mentioned above, an initial detective's report dated two days after the

murders of Vaughn and White (March 31, 1985), and signed by defendant O'Callaghan, revealed that there were two eyewitnesses to the Vaughan/White murders: the two children of Ms. Vaughan, who were present in the apartment in the next room and who watched through a partially open door as their mother and White were brutally murdered by Hawkins and Sumner. PSAF¶244. These two eyewitnesses, James Michael Vaughn (age 8) and Sheree Vaughn (age 12) both reported to the police that there were only two offenders. However, according to the statement which the defendants obtained from Sumner, the murders were committed by three men: Sumner, Hawkins and Fields. Thus, Sumner's statement implicating Fields in the murders directly conflicted with the statements of the two eyewitnesses. PSF¶¶44-45.

Furthermore, in the spring of 1985 police knew that in the period following the March 28 Vaughan/White murders, Sumner and Earl Hawkins fled Chicago and went to a house in Milwaukee, and then later to a house in East Cleveland, Ohio. PSF¶41, PSAF¶238. While Hawkins and Sumner were on the run, Fields was in Chicago managing an apartment building called the African Hut. Right around the time that Sumner and Hawkins murdered Vaughn and White Fields had evicted Sumner and his family for non-payment of rent. PSAF¶¶239, 240. A Supplementary Report, this time signed by defendants O'Callaghan and Murphy, indicates that on or about May 18, 1985 police detectives interviewed a confidential informant in Milwaukee who told police that Hawkins and Sumner had fled to Milwaukee because they had been involved in a murder of a husband and wife; Hawkins and Sumner told the informant that "they went to the victim's house because the victim 'Joe' owed them some money"

and that Hawkins had ultimately shot Joe and the wife in a struggle. There was no mention by the informant of Fields being involved in the murders. PSAF¶238. Therefore, the city defendants had overwhelming evidence from the very beginning that Sumner was lying about Fields' involvement in the Vaughan/White murders. But they chose to ignore that evidence and bring the false *uncorroborated* case against Fields which was later used to send Fields to death row. Further proof that the defendants deliberately framed Fields for the Vaughan/White murders is found in the felony screening forms which reveal that Defendant O'Callaghan (and dismissed defendant Robertson) falsely told Assistant State's Attorneys that there were "no eyewitnesses" to the Vaughn and White murders. PSAF¶245. Of course, O'Callaghan knew, there were two eyewitnesses to the murders, as indicated by the March 31, 1985 report he signed. Indeed, prior to the time Sumner began his cooperation, the police had interviewed these eyewitnesses and had them view a lineup, the police coerced the two to identify two other men whom the police were then planning on pinning the murders on – even though Sheree Vaughn had previously identified Sumner as a perpetrator from a photo array. PSAF¶¶244, 246.

Thus, a reasonable jury could find that the only plausible reason why the city defendants would falsely tell prosecutors that there were no eyewitnesses to the murders is that they knew the eyewitnesses would have exposed the falsity of Sumner's story that Fields had been involved. On June 13, 1985, defendant O'Callaghan submitted a request asking that Nathson Fields be held past the court call in order to allow him to be placed in a Vaughn-White lineup; the request was approved by

defendant Murphy. PSF ¶49. Fields recalls that he was placed in two separate lineups on June 14, 1985 although there are no records showing that Fields was in a Vaughn-White lineup. PSF ¶51. Either there was no line-up, which according to defendant ASA Wharrie ought to have occurred given the existence of eyewitnesses, or there was a line-up and the children did not identify Fields, and that documentation remains hidden. PSAF¶247.

### b. There was nothing honest in the frame up in Hickman-Smith

The defendants' determination to also pin the Hickman-Smith murders on Fields – or other El Rukns, facts be damned, is made evident by a handwritten note from ASA Jack Hynes to ASA Tim Quinn (who held a supervisory role at the time) which informs Quinn that defendant O'Callaghan has information on the witnesses to the Hickman-Smith shooting, and that the witnesses *were not gang members* according to detectives. PSAF¶253. In fact, both Gerald Morris and Randy Langston were admitted members of the Goon Squad, the same gang led by the victim Jerome Smith. PSF¶3, 61.

When Fields was finally brought in for a line-up in the Hickman and Smith murders, he was the only individual in the line up to be wearing a short-sleeved shirt. Defendant O'Callaghan actually had the sleeve lifted up even further to clearly show his gang tattoo. Given the accumulation of misconduct by defendant O'Callaghan, there is no reason a jury would need to believe that this was done after the line-ups, for the innocuous reason of having a photo record of the tattoo. PRSF¶59.

A jury could also infer that a report signed by defendant Murphy was fraudulently back-dated in an attempt to reconstruct the semblance of a thorough

investigation of Fields's involvement in the Hickman Smith murders after-the-fact, a General Progress Report, which purportedly describes Anthony Sumner's narrative regarding the Hickman-Smith case. At the top of the report the date of May 14, 1985 is inserted – corresponding to the period when Anthony Sumner began cooperating with the authorities however the report is signed by defendant Murphy a full year later on May 14, 1986. PSAF¶256. Although defendant Murphy contends this was a simple mistake, a jury would not have to believe Murphy, especially in light of defendant Murphy's other "mistakes" while trying to frame members of the El Rukn organization for the Hickman Smith murders after Sumner's "cooperation."

For example, a crime lab report, signed by defendant Murphy indicates that the "witnesses" all identified Ray Fergerson in the Hickman-Smith lineup with Hawkins; however the detective division copy of that same report shows that the name of Fergerson was subsequently scratched out and Hawkins name was added three days later in a supplemental report as the identified party. PSAF¶254. Defendant Murphy admitted at his deposition that it was absolutely impossible for Fergerson to have been charged with that crime. PSAF¶255. In yet another Supplemental Report, signed by defendants Murphy and O'Callaghan, the line-up of another of the co-defendants in the Hickman and Smith murders, George Carter, by witnesses Gerald Morris and Eric Langston took place on May 18, 1985; this despite the fact that George Carter's arrest warrant was not issued until May 21, 1985, the same day he was arrested, making it

clear that Carter could not have been in a line-up on May 18, 1985.[6] PSAF¶265.

Finally, in regards to defendant Murphy, the city contends that defendant Murphy complied with all of his requirements to tender his notes to the CPD file, and to prosecutors. City Memo. @ 20. If this were the case, it does not explain why his general progress report concerning the Hickman-Smith homicide, double dated May 14, 1985 and May 14, 1986, appear in neither the eight pages of notes tendered to Fields at trial, the new street file or in the CPD's permanent retention file for the Hickman-Smith shooting. PSAF¶256.

Also, in a body of handwritten notes which Murphy has acknowledged in his deposition to be his own, taken during interviews with Earl Hawkins in 1988, Murphy appears to review a series of crimes which they were pinning on the El Rukns; on page 19 of these notes, Murphy makes an entry for "Talman Hickman + Jerome Smith" and below this makes the following notation "Refer to the notes I took in April 1986 in Special Notes" (underlining in original). PSAF¶257. When examined about this note in his deposition, defendant Murphy incredibly claimed that the special notes from "April 1986" referred to the above-referenced general progress report, which as described above is implausibly dated both May 14, 1985 and May 14, 1986. PSAF¶258. Fields has never been tendered the "special notes" and a jury could clearly find this to be further evidence of the malicious prosecution.

---

[6] The state charges against Carter were dismissed before trial. Carter was tried in the federal indictment for the Hickman Smith murders and found not-guilty. In that trial the government claimed Carter and Fields were the killers and Hawkins played the role of spotter. PSAF ¶264, 266, PRSF¶133.

Not so coincidently, defendant Murphy (along with defendants Wharrie and Brannigan) were among those sued in the Northern District of Illinois by Elton Houston and Robert Brown in *Houston v. Partee* (90 cv 3342). In 1984, Houston and Brown had been wrongly convicted of the murder of one Ronnie Bell, and sentenced to 35 years in prison; in May of 1985, Anthony Sumner informed police that Houston and Brown were innocent and Sumner provided the names of the real killers– this information did not reach Houston or Brown until 1989 when they were finally released. *Houston v. Partee*, 978 F.2d 362, 363 (7th Cir. 1992). In a May 1, 1991 memorandum to the Commanding Officer of Area 2 Detective Division, and a sergeant in Internal Affairs, defendant Murphy conceded that he had interviewed Anthony Sumner on May 14, 1985 about the Ronnie Bell murder. PSAF¶259. Whatever protocol defendant Murphy purported to follow regarding his notes after that interview in 1985, it did little good for Mr. Houston and Mr. Brown, who would continue to languish in prison for years after Sumner disclosed their innocence. The city claims to have *lost* the *Houston v Partee file*. PSAF¶260.

**THE 2009 TRIAL**

The city claims that probable cause for Fields' prosecution was present in 2009, at the time of Fields' second trial, on account of the testimony of the cooperating El Rukns that testified for federal prosecutors in the 1990s RICO trials targeting members of the El Rukn organization. However, probable cause exists only when a "prudent person, or one of reasonable caution" believes that a suspect committed a crime. *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013). The credibility of those witnesses was

thoroughly compromised by the collapse of the first round of El Rukn trials due to prosecutorial misconduct and undisclosed benefits conferred to those USAO witnesses. *United States v. Boyd*, 833 F. Supp. 1277, 1365-66 (N.D. Ill. 1993); *United States v. Andrews*, 824 F. Supp. 1273, 1291 (N.D. Ill. 1993); *United States v. Burnside*, 824 F. Supp 1215, 1272 (N. D. Ill. 1993). At Fields' 2009 trial, Judge Gaughan found that the state's key witnesses, Earl Hawkins, Randy Langston, and Gerald Morris, were incredible[7]. PSF¶¶124-126. In addition, for the reasons set forth in section IV below, the testimony of the city's 2013 "cooperating witnesses" should be given no weight.

### B. CONSPIRACY TO FRAME FIELDS

The defendant officers argue that "[t]here is no evidence in the record to support the finding of an express or an implied agreement among the defendants to deprive Plaintiff of his constitutional rights." This is not the case. Instead, the record is full of evidence that serves as strong indicia of an agreement, common plan, or joint enterprise—that is, of a conspiracy.

To be clear, Fields alleges that the defendants conspired to violate his civil rights and railroad him into a false conviction of murder with the consequence being his execution -- or at least a life sentence in prison. Crucially, there was no evidence whatsoever that Fields had anything to do with either the Hickman/Smith murders or the Vaughn/White murders at the time of his arrest, aside from the coerced witnesses.

Plaintiff must rely on circumstantial evidence, which may itself "provide

---

[7] Morris and Randy Langston testified that they witnessed Fields and Hawkins murder the victims while Hawkins testified that it was Carter and Fields who were the killers and that his role was as a spotter across the street. PRSF¶¶43, 133, 137.

adequate proof of conspiracy" because the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," it requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) (quoting *Hoffman-LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir.1971)) (internal quotes omitted). Especially in light of the fact that the defendants have deprived Plaintiff of any direct evidence of their intent, Plaintiff has satisfied his burden of showing that a genuine issue of fact remains on his conspiracy claims, and the jury is entitled to decide whether, and to what extent, that conspiracy exists. *Cf. Putman v. Gerloff*, 701 F.2d 63, 65 (8th Cir. 1983) ("The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims as circumstantial evidence may provide adequate proof of a conspiracy (and, indeed, is often the only proof available)."; *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980); *Adickes v. Kress & Co.*, 393 U.S. 144, 158-159 (1970); **See** *also, Rodgers v. People's Gas, Light and Coke Co.*, 315 Ill. App. 3d 340 (2000) ("The conspiracy may be inferred if the parties pursue the same object by common means, one performing one part and another performing another part.")

Fields also believes that the defendants misunderstand how the law of conspiracy, cited above, works. "In a tort case such as this, … the function of

conspiracy doctrine is … to yoke particular individuals to the specific torts charged in the complaint," and the "requirements for establishing participation in a conspiracy" under § 1983 are the same "as in a case (criminal or civil) in which conspiracy is a substantive wrong." *Jones*, 856 F.2d at 992. In other words, the conspiracy doctrine makes individuals liable for actions that they did not themselves take part in if those actions were the foreseeable acts of co-conspirators in furtherance of an antecedent agreement. *Cf. United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) (noting that "co-schemers are jointly responsible for one another's acts in furtherance in the scheme, and that a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of conspiracy") (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)). So even if this Court dismisses the due process claim against certain of the defendants those defendants can still be found guilty of conspiracy. Otherwise, conspiracy would be completely redundant of the underlying claim and the personal responsibility requirement under § 1983 would effectively merge into the "agreement" requirement for a conspiracy.[8]

Clearly the facts alleged herein and in Fields's motion for summary judgment establish a genuine issue of material fact as to whether there was a conspiracy among the defendants when taking all of the facts in the light most favorable to Plaintiffs. Based on all of these facts a reasonable jury could find that these were not the result of

---

[8] Plaintiff acknowledges that there are some cases in this district that have treated individual liability on the substantive count as a prerequisite for liability under § 1983 on a conspiracy claim.

a spontaneous coincidence, but were instead evidence of a conspiracy to unlawfully arrest and frame Fields for those murders.

### III. THE FACTS SUPPORT THE PLAINTIFFS REMAINING STATE LAW CLAIMS

For the reasons stated in Plaintiff's motion for summary judgment and herein, Plaintiff satisfies the requirements of his IIED count, having presented sufficient evidence of misconduct including concealing the street file that led to his wrongful conviction, his twelve year stay on death row and the six additional years at Cook County jail awaiting trial, for his claim to survive summary judgment as these facts set forth extreme and outrageous behavior by the defendants. As a result of the extreme and outrageous behavior of the defendants Fields suffers from Post-traumatic stress disorder and other psychological trauma. *Feltmeier v. Feltmeier* 207 Il. 2d 263, 278 Ill. Dec. 228, 798 N.E.2d 75, 80 (2003). PSAF¶279.

Similarly, as Plaintiff is well positioned to prevail on his section 1983 conspiracy claim, he is well positioned to prevail on his state conspiracy claim – and, because he has made valid claims against the individual defendant officers, he satisfies the requirements of Section 2-109 of Illinois' Tort Immunity Act, and he is well positioned to recover from the city based on the theories of *respondeat superior* and indemnity.

### IV. THIS COURT SHOULD EXCLUDE THE TESTIMONY OF WITNESSES WHO HAVE BEEN OFFERED ANYTHING OF VALUE, INCLUDING CASH OR OTHER FINANCIAL ASSISTANCE, OR REDUCED PRISON SENTENCES OR OTHER FORMS OF LENIENCY, IN EXCHANGE FOR TESTIMONY AGAINST FIELDS IN THIS CASE.

In the case at bar, the defendants have listed as witnesses Earl Hawkins, Derrick

Kees and Tramell Davis and each had their depositions taken simultaneously in this case and in the innocence proceeding. Each testified at the innocence hearing against Fields. The 2013 testimony of these men has been provided to this Court in support of defendants' motion and (in particular) to show they had probable cause for Fields 2009 trial. City SOF¶128. In exchange for their testimony implicating Fields in criminal activity in these depositions, at the innocence hearing, and in this proceeding (both of which are civil proceedings) each of these defendants has been provided with various forms of compensation.  On December 9, 2013, in exchange for testifying against Fields, Earl Hawkins had his sentence reduced from two consecutive 42 year sentences in Illinois state prison time to two consecutive 39 year sentences, with an understanding that he would not serve any state time beyond his 60-year federal sentence. PSAF¶273. On October 9, 2013, in exchange for testifying against Fields, Derrick Kees received a five year reduction in his Illinois state prison sentence. PSAF¶274. In 2012 and 2013, the state covered several monthly rental payments for Tramell Davis, to save him from eviction from his home, in exchange for his testimony against Fields. PSAF¶275.

Because the testimony of these individuals was undertaken specifically for use in civil actions, the 2013 testimony of Hawkins, Kees, Davis and any other witness who has been compensated by the defendants in connection with these *non-criminal proceedings* should be excluded from giving evidence in this case.

18 U.S.C. § 201(c)(2) states in pertinent part: "Whoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness

upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony ... shall be fined under this title or imprisoned for not more than two years, or both."

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-to declare that the Government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution. *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

The public policy against payments to fact witnesses is also expressed in Illinois ethical rules. The Illinois Rules of Professional Conduct state, "A lawyer shall not…offer an inducement to a witness that is prohibited by law." IL RPC Rule 3.4.

The policy against paying for testimony is also expressed in the law of contracts. Thus, contracts to pay fact witnesses are void as violative of public policy. See 6A Arthur Linton Corbin, Corbin on Contracts § 1430 (1962); Restatement of Contracts § 552(1) (1932); Restatement (Second) of Contracts, § 73 cmt. b (1981); 7 Richard A. Lord, Williston on Contracts § 15:6 (4th ed.1997).

The defendants in this non-criminal lawsuit cannot claim any "law enforcement justification" for their payment of compensation to fact witnesses. The law enforcement justification exists to allow field officers a practically necessary means to detect and prevent crime, and to apprehend suspects. See *United States v. Russell*, 411 U.S. 423, 432 (1973)) (narcotics); *United States v. Kelly*, 707 F.2d 1460, 1468 (D.C.Cir.) (public corruption), cert. denied, 464 U.S. 908 (1983); *United States v. Monaco*, 700 F.2d 577, 580-81 (10th Cir.1983) (prostitution).

Finally, suppression is the proper sanction for the violation of the federal bribery rules and the Illinois ethical rules. Suppression is a judicially fashioned rule whose primary purpose is to deter official misconduct. See *United States v. Peltier*, 422 U.S. 531, 542 (1975); *United States v. Calandra*, 414 U.S. 338, 347-48 (1974). The benefits of deterrence outweigh the evil of excluding relevant evidence, and the balance falls heavily in favor of suppression.

A secondary policy protected by the exclusionary rule is "the imperative of judicial integrity." *Elkins v. United States*, 364 U.S. 206, 222 (1960). Thus, exclusion of the evidence is also necessary here so that this Court will not be made party to lawlessness by permitting unhindered use of purchased testimony which unfairly tips the scales of justice in favor of one party to a civil lawsuit. See *Terry v. Ohio*, 392 U.S. 1, 12-13 889 (1968); *Mapp v. Ohio*, 367 U.S. 643, 660 (1961).

**CONCLUSION**

For the foregoing reasons Plaintiff asks this Court to deny Defendants motion for summary judgment in full and entered Plaintiffs motion for partial summary

judgment and for whatever else this Court deems just.

Respectfully Submitted,

 /s/H. Candace Gorman
One of the Attorneys for Fields
H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Illinois 60661
312-427-2313

Leonard Goodman
Melissa Matuzak
53 W. Jackson Boulevard
Suite 1650
Chicago, Illinois 60604

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, hereby certify that the foregoing Memorandum was served to the parties by pursuant to the Court's ECF filing system.

Dated: January 10, 2014

Respectfully Submitted,

 /s/H. Candace Gorman
One of the Attorneys for Fields

For Fields:

Leonard C. Goodman                          H. Candace Gorman
Melissa Matuzak                             220 S. Halsted
53 W. Jackson Boulevard                     Suite 200
Suite 1650                                  Chicago Illinois 60661
Chicago, Illinois 60604                     312-427-2313
312-986-1984