UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 CV 1168 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| CITY OF CHICAGO et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS
SUPPLEMENTING PLAINTIFF'S LOCAL RULE 56.1 STATEMENT**

236. From 1983 through 1993, defendant Brannigan was a lead investigator in the task force targeting the El Rukn organization; in a sworn statement Brannigan described the investigation as complicated by "many unique investigative obstacles" and that cultivating informants was "extraordinarily difficult." Brannigan described Anthony Sumner as the first major cooperating witness who emerged from that effort of law enforcement. (Exhibit 111: Brannigan 8-16-1995 Affidavit, pp. 1-2.)

237. On May 9, 1985, defendant Brannigan flew to Cleveland Ohio; the next day he participated in the arrest of Earl Hawkins, Anthony Sumner, and others individuals at an East Cleveland house; it was after these arrests that defendants Brannigan and Wharrie interrogated Sumner in what ATF Agents Thomas O'Brien and Lewis Wolfe described as an "extensive interview" and

secured assurances from Sumner that he would cooperate with law enforcement. (Exhibit 28: ATF May of 1985 Report of Investigation).

238. In the aftermath of the Vaughn-White murders, Anthony Sumner and Earl Hawkins fled to a house in Milwaukee, Wisconsin, where they told a confidential police informant that "they went to the victim's house because the victim 'Joe' owed them some money" and that Hawkins had ultimately shot Joe and the wife in a struggle – the informant made no mention of Fields. (Exhibit 112: 8-31-1985 Supp. Report).

239. In April and May of 1985, Nathson Fields was in Chicago, working as a manager of the African Hut building; around that same time Fields evicted Anthony Sumner from that building because of Sumner's failure to pay the rent. (Exhibit 113: Affidavit of Nathson Fields; Exhibit 114: 3-30-1985 Vaughn/White General Progress Report.)

240. In the wake of the Vaughn-White murders, Clarence Glenn told police that he had seen Sundown (i.e. Anthony Sumner) approximately a week before the murders, at the 1016 E. 41st street building where Vaughn and White were later killed; Sumner told Glenn that he needed money for rent because he was being "put out." (Exhibit 114: 3-30-1985 Vaughn/White General Progress Report; Exhibit 32: 3-31-1985 Vaughn/White Supp. Report.)

241. Defendants Murphy and O'Callaghan swore out complaints for preliminary examination against Fields – Murphy for the Vaughn White murder, and

2

O'Callaghan for the Hickman-Smith murder. (Exhibit 115: Complaints for Preliminary Examination dated 5-17-1985 and 6-14-1985).

242. On June 25, 1985, defendant Murphy testified before a grand jury regarding Fields's supposed role in the Vaughn-White murders, describing the account of cooperator Anthony Sumner which implicated Fields; Detective O'Callaghan has admitted that he knew of no evidence which corroborated Sumner's account. (Exhibit: 116: 6-25-1985 Murphy Grand Jury Testimony, Exhibit 103: O'Callaghan Deposition, pp. 67-68.)

243. Defendant Brannigan has testified that he did nothing to corroborate the statements of Anthony Sumner implicating Fields in the Vaughn-White murders – and that he knows of nobody who did. (Exhibit 117: Brannigan Deposition, pp. 207-208.)

244. A report dated March 31, 1985 (two days after the Vaughn and White murders) and signed by defendant O'Callaghan reveals that Sheree Vaughn (age 12) and James Michael Vaughn (age 8) witnessed two men murder Joe White and Dee Eggers Vaughn through a partially open door – and that Sheree Vaughn identified Anthony Sumner as a perpetrator from a photograph array. (Exhibit 32: 3-31- 1985 Supp. Report).

245. Felony screening memos in relation to the arrest of Fields for the Vaughn-White murder indicate that Assistant State's Attorneys were (falsely) told that there were no eyewitnesses to the Vaughn-White murders. (Exhibit 118: Vaughn-White Felony Screening Memo.)

246. On April 25, 1985, the Vaughn children viewed a lineup for the Vaughn-White Murders and identified two men, whom police were pursuing as offenders in the Vaughn/White murders. (Exhibit 19: 4-25-1985 Vaughn/White Supp. Report., Exhibit 120: Arrest Warrant for Robert Jackson, Exhibit 121: Arrest Warrant for Counsial Glenn).

247. Defendant Wharrie has testified that he had no recollection of the Vaughn children being brought in for a line-up of Fields, but Wharrie testified that it was something that ought to have been done, given that they were eyewitnesses. (Exhibit 122: Wharrie Deposition, pp. 81-82).

248. Defendant Brannigan is listed on Plaintiff Fields's arrest warrant, on a June 17, 1985 Supplementary Report, describing Fields arrest and lineup identification, and on an August 31, 1985 Supplementary Report recounting a confidential informant's statement that Hawkins and Sumner (and not Fields) fled to Milwaukee following their role in the Vaughn-White murders. (Exhibit 97: Fields Arrest Warrant, Exhibit 123: 6-17-1985 Supp. Report, Exhibit 112: 8-31-1985 Supplementary Report.)

249. In Anthony's Sumner's January 3, 1992 statement given to ASA Jack Hynes; Sumner admitted that he named Fields as a participant in the murders because "[he] was confused and afraid. Nathson Fields had put [his] family out of one of the El Rukn buildings and [he] did not like him." (Exhibit: 27 Sumner Recantation to Hynes).

4

250. AUSA William Hogan has testified learned that Anthony Sumner had falsely implicated Nathson Fields in the Vaughn-White murders in May or June of 1991, that that he waited until December of 1991 to notify the Cook County State's Attorney because, he (Hogan) was busy. (Exhibit 110: 10-11-2013 Hogan Testimony, pp. 167-168.)

251. On June 25, 1985, defendant O'Callaghan testified before a grand jury regarding Fields's supposed role in the Hickman-Smith murders – O'Callaghan testified that Fields had been identified by eyewitnesses as a shooter in the Hickman-Smith murder. (Exhibit 124: 6-25-1985 O'Callaghan Grand Jury Testimony).

252. Defendant O'Callaghan testified that in the course of the Hickman-Smith investigation, he "knocked on every door in the complex; including a "hundred apartments," and that the police were "going after" people who had been identified on the scene "and hundreds more, every door on every floor was knocked on." (Exhibit 103: O'Callaghan Deposition, pp. 112, 177, 182.)

253. In the wake of Fields's arrest, Assistant State's Attorney Jack Hynes wrote a memo to Assistant State's Attorney Tim Quinn, who held a supervisory role at the time, informing Quinn that defendant O'Callaghan had information on the Hickman-Smith witnesses and that, according to detectives, the witnesses to the Hickman-Smith shooting were not gang members. (Exhibit 125: Hynes Note to Quinn; Exhibit 122: Wharrie Deposition, pp. 84-86)

254. A Crime lab report purporting to relate to a Hickman-Smith lineup, and signed by defendant Joseph Murphy, indicates that one Ray Fergerson was identified by persons viewing the lineup; later the detective division version of this document shows Fergerson's name was crossed; a supplementary report drafted three days later shows Hawkins name being inserted as the person identified in the line-up. (Exhibit 126: Crime Lab Lineup Reports with Fergerson identified and later scratched out, Exhibit 127: 5-21-1985 Supp. Report.)

255. Defendant Murphy has admitted that it was "absolutely" impossible for Ray Fergerson to have been involved in the Hickman Smith shooting. (Exhibit 128: Murphy Deposition, pp. 183-185)

256. A general progress report, signed by defendant Murphy concerning the Hickman-Smith homicide, purportedly dated May 14, 1985, appears in neither the eight pages of notes tendered to Fields at trial, or in the CPD's permanent retention file for the Hickman-Smith shooting, nor the recently tendered street file. (Exhibit 1: Street File, Exhibit 129: Permanent Retention File, Exhibit 43: 8 pages of notes from the State's Attorney's Office, Exhibit 33: Murphy GPR dated May 14.)

257. In a body of handwritten notes which defendant Murphy has acknowledged to be his own, taken during interviews with Earl Hawkins in 1988, Murphy appears to review a series of crimes which were pinned on the El Rukns; on page 19 of these notes, Murphy makes an entry for "Talman Hickman +

6

TEST

Jerome Smith" and below this makes the notation "Refer to the notes I took in April 1986 in <u>Special Notes.</u>" (Exhibit 130: Murphy Notes from 2-9- 1988, Exhibit 128: Murphy Deposition, pp. 283-286).

258. Murphy has testified that the April 1986 "Special Notes" referenced above, refer to a general progress report, which is double-dated May 14, 1985 and May 14, 1986. Exhibit 128: Murphy Deposition, pp. 283-286).

259. In a May 1, 1991 memorandum to the Commanding Officer of Area 2 Detective Division, and a sergeant in Internal Affairs, defendant Murphy conceded that he had interviewed Anthony Sumner on May 14, 1985 about the Ronnie Bell murder. (Exhibit 131: 5- 1-1991 Murphy Memo re: *Houston v. Partee*).

260. The City contends that it has lost its litigation file in *Houston v. Partee* in which Murphy, Brannigan, and Wharrie were all named as defendants. (Exhibit 52: City's Answers to Second Request to Admit, No 12).

261. A General Progress Report signed by defendant Murphy and describing Sumner's account of the Hickman-Smith murders implicating Fields, shows the date of May 14, 1985 at the head of the page but it shows the date of May 14, 1986 as the date he signed it. (Exhibit 33: Murphy May, 14 GPR.)

262. In June of 1986, while Fields's trial was ongoing, federal law enforcement communicated to the Cook County State's Attorney's Office, their suspicions that William Swano was arranging a bribe with Judge Thomas Maloney. (Exhibit 132: 6-18- 1986 FBI Teletype, pp. 4-5.)

263. As he has previously testified, Nathson Fields knew nothing about the attempt to bribe Judge Maloney before the attempted bribe became public knowledge; Nathson Fields was never contacted or questioned by law enforcement personnel about the bribe. (Exhibit 113: Affidavit of Nathson Fields.)

264. As the Hickman-Smith murder trial was about to commence, George Carter, initially one of Fields's co-defendants, was dismissed from the case and walked free. (Exhibit 133: Deposition of George Carter, pp. 97-98.)

265. A Supplemental Report signed by defendants Murphy and O'Callaghan and describing a supposed identification of George Carter in a Hickman-Smith lineup, shows Carter was identified by witnesses on May 18, 1985 – days before Carter's actual arrest on May 21, 1985 – the day his arrest warrant was issued. (Exhibit 134: Carter Warrant, Exhibit 135: ASA Memo on George Carter's Arrest, Exhibit 136: 5-21-1985 George Carter Arrest Supp. Report).

266. George Carter was later charged with the Smith-Hickman murders in the federal indictment brought against Carter and dozens of other El Rukns; Derrick Kees and Earl Hawkins testified against Carter but he was acquitted on the Hickman and Smith murder charges. (Exhibit 133: Deposition of George Carter, p. 58.)

267. In 1984, Carlos Willis lived with his grandmother near the scene of the Hickman-Smith murders. At the Willis heard the gunshots and looked out his window, saw the bodies and then saw two men running from the scene of the murder with masks on, because of the masks he was unable to identify the

8

men. Willis testified that defendant O'Callaghan tried to get him to identify Hawkins in the line-up by repeatedly asking Willis if he recognized Hawkins, which Willis was unable to do. (Exhibit 137: 6-23- 1986 Testimony of Carlos Willis, pp. 526-534)

268. Evelyn Custer, Carlos Willis' grandmother, testified that she overheard O'Callaghan tell her grandson "don't worry about anything" and "just to agree with, you know, what he was saying" Custer also testified as to improper suggestions of favors by O'Callaghan. (Exhibit 138: 6-23- 1986 testimony of Evelyn Custer, pp. 546-550).

269. In Earl Hawkins' initial meetings with defendant Brannigan at Menard (upon Hawkins' decision to cooperate with law enforcement in 1987) Earl Hawkins offered statements concerning the murder of Willie Bibbs; Hawkins felt comfortable raising the Bibbs murder because he had already been unsuccessfully prosecuted for that crime, and he believed that he was now safe from prosecution under the double jeopardy rule; Hawkins testified that Brannigan told Hawkins "You got to show something that would show good face (sic) … You better come up with something quick.." (Exhibit 109: Hawkins Deposition, pp. 101-103.)

270. Earl Hawkins has testified that defendant Brannigan helped convince him (Hawkins) to cooperate by assuring him that he would only serve 20 years in prison, a period which Hawkins considered "doable." (Exhibit 109: Hawkins Deposition, pp. 186-187.)

9

271. Earl Hawkins has repeatedly testified that he would say anything to avoid the death penalty. (Exhibit 139: Hawkins Testimony of 2-25-2009, p. 87, Exhibit 140: Hawkins Testimony in *People v. Fort* date: 10-18-1988, p. 224)

272. In exchange for his testifying for the state in Fields's 2009 murder trial, Earl Hawkins entered into an agreement with the Cook County State's Attorney's Office whereby his murder charges were dismissed and he pleaded guilty to two counts of armed violence, for which he would serve 42 consecutive years per count. (Exhibit 139: Hawkins Testimony of 2-25-2009, pp. 5-7.)

273. On December 9, 2013, in exchange for testifying against Fields in this proceeding and in the civil innocence hearing, Earl Hawkins had his sentence reduced from two consecutive 42 year sentences in Illinois state prison time to two consecutive 39 year sentences, with an understanding that he would not serve any state time beyond his 60-year federal sentence. (Exhibit 141: Hawkins 12-9-2013 Plea Agreement, Exhibit 142: Hawkins Testimony 8-21-2013, pp. 202-207)

274. On October 9, 2013, in exchange for testifying against Fields in this proceeding and in the civil innocence hearing, Derrick Kees received a five-year reduction in his Illinois state prison sentence. (Exhibit 143: Derrick Kees 10-9-2013 Plea Hearing, p. 10.)

275. Between 2012 and 2013, the Cook County State's Attorney's Office covered at least three rental payments for Tramell Davis, saving him from eviction, in

exchange for testifying against Fields in this proceeding and in the civil innocence hearing. (Exhibit 144: Tramell Davis Deposition, pp. 137-138)

276. On May 4, 2012, this Court entered a minute order granting a motion for a protective order brought by witness Gerald Morris's attorney Heather Winslow, and barring the parties or their attorneys from contacting Gerald Morris, other than through questions in a duly noticed deposition. The order states in part: "absent prior order of court, no party in this case, no attorney for any party in this case, and no person acting on behalf of or in concert with any party or attorney for any party may have contact with Morris other than to question him at a duly noticed deposition;" the Court directed all counsel to communicate the order to their clients. Docket 225.

277. On July 2, 2013, at the request of ASA Brian Sexton, investigators for the Cook County State's Attorney's Office drove to Jefferson City, MO to contact Gerald Morris and question him about the Nathson Fields case. When Morris refused to identify himself to the detectives they obtained a photo of Morris and returned to his home with a uniformed Jefferson City police officer. Morris identified himself but refused to be interviewed (Exhibit 145: 7-9-2013 SAO Investigative Report).

278. As of January 9, 2014 Heather Winslow, Gerald Morris' attorney, has never been contacted by Brian Sexton or any personnel from the Cook County State's Attorney's Office regarding their outreach to Morris; after learning of the state's attorneys attempts to contact Morris she made at least two calls to

11

ASA Sexton, leaving messages specifically inquiring about the contacts with Gerald Morris, and received no response. (Exhibit 146: Affidavit of Heather Winslow).

279. As a result of Fields's wrongful conviction, his time on death row, his time incarcerated, and his time spent out of jail awaiting a new trial, Fields has Some of the symptoms he has include: trouble sleeping (and when sleeping having nightmares about his time in prison on death row); trouble concentrating; constant fear because of how easy it was for the police to frame him. He also has trouble keeping the thoughts out of his head of his imprisonment, the conditions he was subjected to, and, the men he watched walk to their death while on death row. He has been diagnosed with post-traumatic stress disorder. (Exhibit 113: Affidavit of Nathson Fields.)

Respectfully Submitted,

/s/ H. Candace Gorman
One of the Attorneys for Fields

For Fields:

Leonard C. Goodman
Melissa Matuzak
53 W. Jackson Boulevard
Suite 1650
Chicago, Illinois 60604
312-986-1984

H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Illinois 60661
312-427-2313

## **CERTIFICATE OF SERVICE**

I, H. Candace Gorman, hereby certify that the foregoing Statement of Additional Facts was served to the parties electronically by means of the Court's CM/ECF system.

Dated: January 10, 2014

                                                                            Respectfully Submitted,

                                                                            /s/H. Candace Gorman
                                                                            One of the Attorneys for Fields

For Fields:

| | |
|---|---|
| Leonard C. Goodman | H. Candace Gorman |
| Melissa Matuzak | 220 S. Halsted |
| 53 W. Jackson Boulevard | Suite 200 |
| Suite 1650 | Chicago Illinois 60661 |
| Chicago, Illinois 60604 | 312-427-2313 |
| 312-986-1984 | |