# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **NATHSON E. FIELDS,** | ) | |
| *Plaintiff,* | ) | |
| | ) | **No. 10 CV 1168** |
| **v.** | ) | |
| | ) | **Hon. Matthew F. Kennelly** |
| **CITY OF CHICAGO et al.,** | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S LOCAL RULE 56.1(b)(3)
## <u>RESPONSE TO CITY DEFENDANTS' STATEMENT OF FACTS</u>

Plaintiff Nathson Fields, through his attorneys, respectfully submits the following response to City Defendants' Local Rule 56.1(A)(3) Statement of Facts in support of their Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(b)(3):

## I. PARTIES, VENUE, JURISDICTION

1. Plaintiff Nathson Fields is a United States citizen. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶6).**

> **Response:** **Paragraph six of the complaint does not state that Plaintiff is a citizen of the United States. Nevertheless, Plaintiff admits he is a citizen of the United States.**

2. In 1984, Fields was a member of the El Rukn street gang **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶6)**, holding the rank of Officer. **(Exhibit 2, Plaintiff's Deposition, p. 87).** The El Rukns' hierarchy in 1984 consisted of Jeff Fort as the Chief, followed by Generals, then Officers, then Ambassadors, then Soldiers. **(*Id.* at 86-87).**

**Response:** **Plaintiff objects, as this Statement of Fact is not relevant and not material. In addition, Plaintiff notes that page 86 was not attached to Defendants' Exhibit 2.**

**Plaintiff admits that in 1984 he was a member of the El Rukn street gang and that he held the rank of Officer.**

**Plaintiff admits that in 1984 ambassadors were above soldiers in the hierarchy.**

**Plaintiff denies the remaining propositions as unsupported.**

3. Defendant, the City of Chicago ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois. **(Exhibit 3, City of Chicago's Answer to Third Amended Complaint, ¶7).**

**Response:** **Plaintiff admits.**

4. Defendants David O'Callaghan, Thomas Richardson, Stephen Casto, James Minogue, Joseph Bogdalek, Joseph Murphy, Steven Hood, Robert Evans, Daniel Brannigan, John Robertson, Rich Kobel, and Richard Kolovitz were Chicago police officers at certain time periods alleged in Plaintiff's Third Amended Complaint. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶¶ 9(e) through (p)).**

**Response:** **Plaintiff admits. Stating further, Plaintiff has voluntarily dismissed Robertson, Kobel and Kolovitz. (See Docket Entry #454).**

5. Venue is proper in the Northern District of Illinois because the City is located within this judicial district and the events giving rise to this action occurred within this judicial district. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶5).**

**Response:** **Plaintiff admits.**

6. Plaintiff has alleged claims against the City defendants under 42 U.S.C. §

1983 in Count I (violation of due process), Count II (failure to intervene), and Count III (conspiracy to violate constitutional rights), and Illinois state law claims in Count IV (malicious prosecution), Count V (intentional infliction of emotional distress), Count VI (conspiracy), Count VII (*respondeat superior*), and Count VIII (an indemnification claim pursuant to 745 ILCS 10/9- 102). **(Exhibit 1, Plaintiff's Third Amended Complaint).**

>    **Response:** **Plaintiff admits.**

7.    This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1367. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶5).**

>    **Response:** **Plaintiff admits.**

## II.    SMITH AND HICKMAN MURDERS

8.    On Saturday morning of April 28, 1984, at around 10:15 a.m., Jerome "Fuddy" Smith and Talman Hickman were shot and killed outside a public housing complex at 706 East 39th Street, in Chicago. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶10).**

>    **Response:** **Plaintiff admits.**

9.    Fuddy was the leader of a street gang known as the Goon Squad, a faction of the Black Gangster Disciples. At the time of the shooting, there was an ongoing gang rivalry between the El Rukns and the Goon Squad. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶11).**

>    **Response:** **Plaintiff admits that "Fuddy" was a leader of a street gang known as the Goon Squad, which purportedly had a rivalry with the El**

3

Rukns.

Plaintiff denies that the Goon Squad was a faction of the Black Gangster Disciples as this proposition is unsupported and untrue.

### III. INITIAL 1984 CHICAGO POLICE DEPARTMENT ("CPD") INVESTIGATION

10.     On April 28, 1984, Area One Detectives Steve Hood and Robert Evans responded to a radio call and were the first detectives to arrive on the scene of the Smith/Hickman murders. **(Exhibit 4, Hood Deposition, pp. 30-31; Exhibit 5, Evans Deposition, pp. 46, 95)**.

**Response:     Plaintiff admits.**

11.     Gang Specialist Thomas Richardson also responded to the radio call and went to the scene. Richardson did not conduct or participate in any interviews of potential witnesses at the scene. **(Exhibit 6, Richardson Deposition, pp. 18, 20)**.

**Response:     Plaintiff admits the first sentence. Plaintiff admits that Richardson testified that he did not conduct or participate in any interviews at the scene of the murder.**

12.     There were a lot of people at the scene, and Detectives Hood and Evans tried to talk to as many of them as possible. Evans and Hood talked to possibly as many as a hundred people. Many of the people at the scene wouldn't talk to the detectives, give their names, or provide any information. Others provided information and were interviewed. **(Exhibit 4, Hood Deposition, pp. 37-38)**.

**Response:     Plaintiff admits that there were many people at the scene and that Evans and Hood talked to possibly as many as "a hundred" people.**

**To clarify, the deposition statement from Hood states "In many**

> cases they wouldn't talk to us or they wouldn't give us their names or give us any information." (Def. Ex. 4, p. 38)

> Plaintiff admits that "others" provided information and were interviewed, however, the cited pages do not state that fact.

13.     Evans testified in Plaintiff's criminal proceedings before Judge Maloney on June  24, 1986.  (Exhibit 18, Evans 1986 Trial Testimony in *People v. Fields*, p. 632).

> **Response:     Plaintiff admits.**

14.     Evans testified he and his partner Detective Hood canvassed the crime scene and  "talked to many people." He further stated, "I talked to approximately a hundred people." The  majority of those people did not give him their names. **(Exhibit 18, Evans 1986 Trial  Testimony in *People v. Fields*, pp. 634-36)**.

> **Response:     Plaintiff admits.**

15.     Evans did not testify on June 24, 1986, that he "interviewed approximately one  hundred people" or that he prepared notes or memoranda reflecting "interviews" of one hundred people.  **(Exhibit 18, Evans 1986 Trial Testimony in *People v. Fields*, pp. 632-48)**.

> **Response:     Plaintiff admits only that the referenced pages do not discuss the taking of notes or memorandum during the interviews.**
>
> **Stating further, although defendants now attempt to distinguish between "interviewing" witnesses and "talking to" witnesses, those terms were used interchangeably in Evans's 1986 testimony, as evidenced in the following exchange:**
>
> **Q:     Do you recall about what time you went to the scene?**
> **A:     Shortly after it occurred.**
> **Q:     Did you canvass the area and talk to witnesses?**
> **A:     Yes.**

> Q:     As a matter of fact, you talked to at least ten potential witnesses during the course of your investigation, isn't that correct?
>
> A:     I talked to many more people than that.
>
> Q:     Did you resume your investigation beyond the 28th of April, 1984, and interview other witnesses?
>
> A:     Yes.
>
> Q:     What day was that?
>
> A:     The investigation was ongoing. I talked to many people several days following the initial incident.

**(Def. Ex. 18, p. 634)**

16.     Area One Detectives Joseph Bogdalek and James Minogue were assigned to the murder scene for follow-up investigation after reporting for their shift on the afternoon of April 28, 1984, and started by canvassing the area. **(Exhibit 7, Bogdalek Deposition, pp. 45-46; 53)**.

    **Response:**     **Plaintiff admits.**

17.     A Supplementary Report prepared by Bogdalek and Minogue, dated April 30, 1984, memorializes their interview of Sandra Langston on April 28, 1984, in which Sandra provided a description of two individuals she saw following murder victim Fuddy Smith shortly before he was shot. **(Exhibit 19, 4/30/84 Supplementary Report, p. 2; Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, ¶20)**.

    **Response:**     **Plaintiff admits that the 4/30/84 report prepared by Bogdalek and Minogue memorializes an interview of Sandra Langston in which she describes the two individuals.**

            **Plaintiff further states that in the 4/30/84 report Sandra Langston's description is that one of the two men was "in early 20s, light complexion and wearing a red ski mask and white jacket," and the other was "in early 20s, light complexion and wearing a blue**

jacket." (Def. Ex. 19).

18.     Bogdalek and Minogue worked on the investigation of the Smith/Hickman murders for three or four days, checking out anonymous tips and talking to possible witnesses. **(Exhibit 7, Bogdalek Deposition, pp. 44; 46; 53; Exhibit 8, Minogue Deposition, pp. 93-95)**. Their involvement in the investigation ended at that time because all their leads were exhausted. **(Exhibit 7, Bogdalek Deposition, pp. 44-45)**.

> **Response:**    **Plaintiff admits that detectives Bogdalek and Minogue both testified that they did not recall working on the matter after three, four or five days.**
>
> **Plaintiff denies that Bogdalek and Minogue's involvement in the Smith/Hickman investigation ended because "all their leads were exhausted." (PSF ¶¶ 208-230).**

19.     Although the investigation remained open, Evans and Hood stopped actively working on it sometime in May 1984, because they weren't getting anywhere. **(Exhibit 4, Hood Deposition, p. 39)**. Evans did not recall doing any further work on the case after he returned from an early June 1984 vacation. **(Exhibit 5, Evans Deposition, p. 178)**. Hood vaguely recalled performing some investigation into an anonymous tip dated June 8, 1984. **(Exhibit 4, Hood Deposition, pp. 141-42)**.

> **Response:**    **Plaintiff admits that Hood testified that he wasn't getting anywhere in the investigation so he gave up.**
>
> **In addition, Hood testified that he stopped working on the investigation because he had other investigations to work on. (Def. Ex. 4 at 39).**
>
> **Plaintiff admits that Evans testified that he does not recall working on the case after he returned from vacation in June 1984.**

> **Plaintiff denies that Hood vaguely recalled performing some investigation into an anonymous tip dated June 8, 1984. Hood testified that he vaguely recalls the document containing the anonymous tip (Def. Ex. 4, p. 141), but that he does not recall investigating the anonymous tip. (Def. Ex. 4, p. 142). Hood further stated that he would have made a follow-up report in response to the We T.I.P. submission, that he would not have ignored the request and that the report would have been made in the form of a to-from memo to a supervisor. (PSF ¶230).**

20.     In 1984-85, it was the policy of the CPD that detectives were to turn in their notes along with all reports. **(Exhibit 5, Evans Deposition, pp. 44-46; Exhibit 8, Minogue Deposition, p. 92; Exhibit 17, CPD Special Order 83-1)**.

> **Response:     Plaintiff admits that the written policy in 1984-85 was for defendants to turn in their notes along with all reports and that Defendant Minogue stated that he followed that policy.**
>
> **Stating further, the pages cited from Evans's deposition do not support this proposition. In the cited pages, Evans testified that it was the policy of the police department that investigative notes were not to be thrown away; there is no mention of a requirement to "turn in" notes. Nevertheless, Plaintiff admits that Evans testified that he believed there was a written procedure in 1984 that required detectives to turn in notes, and that it was his practice to do so. (Def. Ex. 5, p. 18).**

21.     Detectives Hood, Evans, Bogdalek, and Minogue would generate notes and reports as part of their investigations. They turned in their notes and reports pertaining to the Smith/Hickman case by placing them in an in-basket on the sergeant's desk. **(Exhibit 4, Hood Deposition, pp. 13-15, 121; Exhibit 5, Evans Deposition, pp. 17-18, 96; Exhibit 7, Bogdalek Deposition, pp. 19-20, 40, 80; Exhibit 8, Minogue Deposition, pp. 26-27, 175, 182-83)**.

> **Response:     Plaintiff admits only that the detectives testified at their**

depositions that they would sometimes generate notes and reports as part of their investigations.

Plaintiff denies that the detectives "turned in their notes and reports pertaining to the Smith/Hickman case by placing them in an in-basket on the sergeant's desk" as the none of the cited testimony supports the proposition that the detectives specifically turned in their notes on the Smith/Hickman case. Rather, as set forth in the following paragraphs, each detective testified as to their practice generally.

Hood testified generally that notes were usually put "on a memo or in a case report" and then turned in to a basket on the sergeant's desk. (Def. Ex. 4, pp. 14-15, 121).

Evans testified that it was his practice to turn in notes to the in-basket for the sergeant. (Def. Ex. 5, pp. 18, 96).

Bogdalek testified that if they made out a report with notes, they would put "them" in the basket, and also that GPRs would be put in the basket.  (Def. Ex. 7, pp. 19-20). Bogdalek testified that he turned over all of his notes (Def. Ex. 7, p. 40), and further that the notes he took during interviews were submitted with his "Supp" report. (Def. Ex. 7, p. 80).

Minogue testified that he did not always take notes of interviews, but that "to the best of [his] knowledge" every note that he wrote went in to the sergeant's in-basket. Minogue also testified that the process for submitting reports, memos, or progress reports was to submit them to the in-basket for approval by the supervisor. (Def. Ex. 8, pp. 26-27). Pages 175, 182, and 183 of Minogue's deposition do not support this proposition.

Plaintiff further states that numerous notes remain missing and therefore Plaintiff denies that all of the notes were turned in. (PSF ¶¶ 208-230).

22.     Area One Detectives O'Callaghan, Kobel, and Robertson, and Gang Crimes Specialists Casto, Richardson, Brannigan, and Kolovitz, had no involvement in the 1984 CPD investigation of the Smith/Hickman homicides. (Exhibit 9, O'Callaghan Deposition, pp. 26-29; 59; Exhibit 10, Kobel Deposition, pp. 94; 109;

Exhibit 11, Robertson Deposition, p. 254; Exhibit 12, Casto Deposition, p. 26; Exhibit 6, Richardson Deposition, pp. 20, 22; Exhibit 13, Brannigan Deposition, pp. 252-56; Exhibit 14, Kolovitz Deposition, p. 40; Exhibit 21, O'Callaghan 6/18/86 Trial Testimony in *People v. Fields*, at 261-62)**.**

> **Response:** Plaintiff denies as to O'Callaghan, as the cited pages do not support or relate to this proposition.
>
> Plaintiff denies as to Brannigan, who could not recall if he did any work on the Hickman/Smith investigation (Def. Ex. 13, p. 252).
>
> Plaintiff denies as to Casto, who could not recall if he did any work on the Hickman/Smith investigation prior to 1985. (Def. Ex. 12, p. 26).
>
> Plaintiff denies as to Richardson, who admitted that he was involved as a "gang specialist." (Def. Ex. 6, pp. 23-25).
>
> Plaintiff has voluntarily dismissed Robertson, Kobel and Kolovitz. (See Docket Entry #454).

23.     Richardson did not conduct or sit in on any interviews of witnesses or suspects in the Smith/Hickman homicide investigation in 1984. **(Exhibit 6, Richardson Deposition, pp. 25-28)**.

> **Response:** Plaintiff denies. Richardson could not recall one way, or the other. (Def. Ex. 6, pp. 25-28).

24.     Fields' name did not come up and he was not a suspect during the 1984 Smith/Hickman murder investigation conducted by Hood, Evans, Bogdalek, and Minogue. **(Exhibit 4, Hood Deposition, pp. 108, 115; Exhibit 5, Evans Deposition, p. 178; Exhibit 7, Bogdalek Deposition, p. 94; Exhibit 8, Minogue Deposition, p. 56)**.

> **Response:** Plaintiff admits.

## IV.  RAID OF EL RUKN SAFE HOUSE IN EAST CLEVELAND

25.  Based on information obtained from a federal wiretap, FBI agents raided an El Rukn safe house in East Cleveland, Ohio, on or around May 10, 1985. **(Exhibit 13, Brannigan Deposition, pp. 131-32; 139-40; Exhibit 1, Plaintiff's Third Amended Complaint at ¶19; Exhibit 22, ATF Report of Investigation (also designated as Plaintiff's Exhibit #106)).**

> **Response:    Plaintiff admits.**

26.  AUSA Patrick Deady sent CPD Gang Crimes Specialist Dan Brannigan, who was detailed at the time to the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), to participate in the raid. **(Exhibit 13, Brannigan Deposition, pp. 131-32; 135)**.

> **Response:    Plaintiff denies that Deady "sent" Defendant Brannigan to participate in the raid, as the cited pages make no such claim.**
>
> **Plaintiff admits that Brannigan was detailed to the ATF at the time of the raid and that Brannigan was present at the raid.**

27.  During the raid, five members of the El Rukn street gang were found staying at the safe house and taken into custody, including Anthony Sumner. **(Exhibit 13, Brannigan Deposition, pp. 138, 143, 147-48, 150; Exhibit 23, Wharrie Deposition, p. 50)**.

> **Response:    Plaintiff admits.**

28.  Brannigan individually interviewed Sumner and the other El Rukns at a Cleveland police station, trying to recruit them to become cooperating witnesses. **(Exhibit 13, Brannigan Deposition, pp. 145, 153-54)**.

> **Response:    Plaintiff admits that Brannigan testified that he interviewed**

**Sumner, and that he tried to recruit the arrestees to become cooperating witnesses.**

29.     Sumner told Brannigan he would cooperate with the authorities in the

El Rukn investigation.  (*Id.* **at 154, 160-61**).

> **Response:     Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Moreover, Plaintiff denies that Sumner "told" Brannigan he would cooperate with the authorities in the El Rukn investigation. Brannigan admitted that Sumner did not tell him he was going to cooperate at that time. (Def. Ex. 13, p. 154). An ATF report from May of 1985 indicates that it was only after Brannigan and ASA Larry Wharrie interrogated Sumner—in what ATF Agents Thomas O'Brien and Lewis Wolfe described as an "extensive interview"—that they secured assurances from Sumner that he would cooperate with law enforcement. (PSF ¶41).**

30.     Brannigan never beat Sumner nor threatened him with criminal charges

in order  to obtain his agreement to cooperate.  (*Id.* **at 158-59**).

> **Response:     Plaintiff admits that Brannigan stated at his deposition that he never beat Sumner nor threatened him with criminal charges (Def. Ex. 24, pp. 452-53, 457-463), but Sumner testified in an affidavit, and in a recorded interview, otherwise. (See response to SOF #32, below; Pl. Ex. 101; Pl. Ex. 102).**

31.     At Fields' 1986 criminal trial, Sumner explained that in August and

September of  1985, he was told by Sammie Knox, a General in the El Rukns, to meet

with  El Rukn attorneys Chuck Murphy and William Swano and "make up

something" against  the police and say they beat and threatened him. **(Exhibit 24,**

**Sumner 1986 Trial Testimony in** *People v. Fields*, **pp.  452-53, 482-85**).

> **Response:     Plaintiff denies that the record supports that the purported conversation with Sammie Knox took place in August or September 1985.**
>
> **Plaintiff admits that Sumner testified at Fields's 1986 trial that**

12

**Sammie Knox told him to meet with the lawyers and "make up something saying that [the police] beat me."**

32.     Sumner provided statements to Murphy and Swano indicating that police officers threatened, choked, and struck him unless he agreed to cooperate. The things Sumner told attorneys Murphy and Swano were not the truth. **(Id. at 452-53; 456-63; 485)**.

**Response:     Plaintiff admits that on August 27, 1985, Sumner provided a signed statement to attorney Murphy. The letter was discovered by a Deputy U.S. Marshal in one of the drainpipes at the El Rukn fort. Stating further, Sumner stated that during his initial interrogation in East Cleveland, Ohio, he told Chicago Police that he had "no knowledge" of the murders about which he was being questioned, and that the officers threatened him with physical harm, choked him, struck him, and threatened that "they had a seat for [him] in the getaway car," which Sumner took to mean that if he did not cooperate, the police would frame him for a murder involving James Walker that he had "nothing to do with." Sumner further stated that, "all the testimony [he] gave before the state or federal grand juries was untrue, as [he] simply kept providing them with information that in turn would keep [him] out of trouble."(Pl. Ex. 101).**

**Plaintiff admits that on September 9, 1985 Sumner gave a recorded statement to attorney Swano, in the presence of attorney Earl Washington, attorney Fred Solomon, Investigator Robert Beseth, and Law Clerk Amy Patton. Stating further, in that statement, Sumner described how Brannigan put Sumner's shirt over Sumner's head, choked him, hit his head against a locker and hit him several times. After the beating, Sumner agreed to give the police false information about a murder involving James Walker. Sumner admitted that he testified in front of two grand juries—one state and one federal—and that he lied to both. Sumner admitted that he told police that Fields, Hawkins, Carter, and Andrews were involved in the Smith/Hickman murders, and that information was not true. (Pl. Ex. 102).**

**Plaintiff states further that AUSA Hogan testified that he knew of at least three occasions in which Sumner lied in judicial proceedings, including Fields's first trial, despite the fact that**

> **Sumner had been told "repeatedly by Federal and State prosecutors that he had to tell the complete truth." (Def. Ex. 61, pp. 99-101; PSF ¶107).**
>
> **Because of Sumner's contradictory statements, and the corroboration by Hogan that Sumner in fact testified falsely in grand jury and trial testimony, whether the things that Sumner told Murphy and Swano are true is a question of material fact.**

33.     After Sumner agreed to cooperate, Brannigan and Sumner returned from Cleveland and went to the Cook County State's Attorney's Office ("SAO") in Chicago. **(Exhibit 13, Brannigan Deposition, pp. 195-96; 199-201).**

> **Response:     Plaintiff admits.**

34.     Sumner was then debriefed at the Cook County State's Attorney's Offices over the next several days in mid-May 1985 by members of the CPD, the SAO, and AUSA Deady. AUSA Deady also conducted a separate interview of Sumner at the United States Attorney's Office in mid-May 1985. **(Exhibit 13, Brannigan Deposition, pp. 194, 203-04; Exhibit 15, Cmdr. Murphy Deposition, pp. 54-56; Exhibit 16, Deady Deposition, pp. 9, 13-17, 19-21).**

> **Response:     Plaintiff objects to the word "debriefed" as not accurate as the information provided by Sumner was false. Plaintiff admits that Sumner was interrogated by the above in mid-May 1985.**

35.     CPD members Hood, Evans, Bogdalek, Minogue, O'Callaghan, Kobel, Robertson, Casto, and Richardson were not present during the mid-May 1985 debriefings of Anthony Sumner. **(Exhibit 4, Hood Deposition, p. 125; Exhibit 5, Evans Deposition, p. 178; Exhibit 7, Bogdalek Deposition, p. 46; Exhibit 8, Minogue Deposition, p. 111; Exhibit 9, O'Callaghan Deposition, p. 26; Exhibit 10,**

Kobel Deposition, p. 99; Exhibit 11, Robertson Deposition, p. 188; Exhibit 12, Casto Deposition, p. 49; Exhibit 6, Richardson Deposition, pp. 63, 69).

> **Response:** Plaintiff objects to the word "debriefings" as not an accurate description of the interrogations of Mr. Sumner.
>
> Plaintiff denies as to Evans, Richardson, Casto and O'Callaghan for the reasons stated below.
>
> There is nothing in the citation to support the fact that Evans was *not* present during the interrogations of Sumner. Evans testified that he does not "recall working on the file" after he came back from vacation in June, 1984. (Def. Ex. 5, p. 178).
>
> Richardson admitted "talking" to Sumner but claims that his discussion with Sumner was not an "interview." (Def. Ex. 6, p. 69).
>
> Casto was unsure as to whether he was present or not. (Def. Ex. 12, p. 49).
>
> O'Callaghan admitted to talking with Sumner and guarding him at his hotel but claimed he did not interrogate Anthony Sumner or interview him about anything "in-depth," but suggested that he may be wrong, if Plaintiff had any document to show he had other contact with Sumner. (Pl. Ex. 103, p. 48)
>
> Plaintiff admits that Hood, Bogdalek, and Minogue claim not to have been involved.
>
> Plaintiff has voluntarily dismissed Robertson and Kobel. (See Docket Entry #454).

36.    In the mid-May 1985 debriefings, Sumner provided information about a number of murders committed by himself and other members of the El Rukns. **(Exhibit 15, Cmdr. Murphy Deposition, pp. 53; 73-74; Exhibit 16, Deady Deposition, pp. 16-18).**

> **Response:** Plaintiff denies. The citations Defendants provide for this proposition indicate that Sumner talked about various murders,

**but do not support Sumner providing information about murders committed by "other members of the El Rukns" in the mid-May 1985 interviews. (Def. Ex. 15, pp. 53; 73-74) (Def. Ex. 16, pp. 16-18).**

**Plaintiff objects as to the deposition testimony of Deady on the ground that it is inadmissible hearsay. Deady testified that he was informed by unknown others of information provided by Sumner and that the only first-hand knowledge he learned from Sumner related to a murder Sumner was involved in in Detroit. (Def. Ex. 16, 16-18).**

37.     Then-Sergeant Murphy conducted a number of interviews of Sumner in the Gang Crimes area of the State's Attorney's Office in mid-May 1985. Murphy was assigned to the State's Attorney's Office at the time. **(Exhibit 15, Cmdr. Murphy Deposition, pp. 56; 151)**.

>    **Response:     Plaintiff denies. There is no indication in citation that Defendant Murphy "conducted" the interviews, only that he was present at some of the interviews. (Def. Ex. 15, pp.56; 151).**

>    **Plaintiff admits that defendant Murphy was assigned to the State's Attorney's office at the time.**

38.     During the interviews, Murphy made it clear he wasn't making any promises to Sumner to get him to cooperate. **(*Id*. at 65).**

>    **Response:     Admitted that Murphy *claims* that he made it clear that he wasn't making any promises to Sumner, however, this is a question of material fact since Sumner was never charged with any of the murders he admitted to.**

39.     Murphy took notes of his interviews of Sumner. Murphy provided copies of the notes to the SAO by giving them to an SAO secretary in Gang Crimes. He also provided copies to the United States Attorney's Office. **(*Id*. at 53; 88-89; 151-52).**

>    **Response:     Although Murphy testified to these facts, Plaintiff denies that it is true. Stating further, a general progress report signed by**

> **defendant Murphy and describing Sumner's account of the Hickman-Smith murders implicating Fields, shows the date of May 14, 1985 at the head of the page but it shows the date of May 14, 1986 as the date he signed it. This report appears in neither the eight pages of notes tendered to Mr. Fields at trial, or in the CPD's permanent retention file for the Hickman-Smith shooting, nor the recently tendered street file. Moreover, in a body of handwritten notes which defendant Murphy has acknowledged to be in his own, taken during interviews with Earl Hawkins in 1988, Murphy appears to review a series of crimes which were pinned on the El Rukns; on page 19 of these notes, Murphy makes an entry for "Talman Hickman + Jerome Smith" and below this makes the notation "Refer to the notes I took in April 1986 in <u>Special Notes.</u>" Murphy has testified that the April 1986 "Special Notes" referenced above, refer to a general progress report, which is double-dated May 14, 1985 and May 14, 1986. (PASF ¶¶ 256-58; 261).**

40. The original notes from Sumner that pertained to homicides would be given to homicide detectives from the Area where the homicide occurred. Murphy instructed the homicide detectives to place the original notes in the investigative file. **(*Id.* at 85-88; 164).**

    **Response:**     **See response 39.**

41. Murphy would ask Sumner what cases he knew about and what he had knowledge of, and took notes about each case Sumner talked about. Sumner talked to Murphy about the Smith/Hickman murders on May 14, 1985. **(*Id.* at 72-73; 80).**

    **Response:**     **Plaintiff denies. A General Progress Report signed by defendant Murphy and describing Sumner's account of the Hickman-Smith murders implicating Fields shows the date of May 14, 1985 at the head of the page but it shows the date of May 14, 1986 as the date he signed it. (PASF ¶261).**

42. With respect to the Smith/Hickman murders, Sumner told authorities Earl Hawkins was in charge of the hit team, and that on orders from Jeff Fort, Fuddy

Smith was to be killed. (*Id.* **at 66-67; Exhibit 24, Sumner 1986 Trial Testimony in** *People v. Fields*, **pp. 371- 72, 377).**

> **Response:** **Plaintiff admits only that Sumner so testified. Stating further, there are several contradictory versions of this story. On September 9, 1985, Anthony Sumner himself gave a statement to defense lawyers, which repudiated any notion that Mr. Fields had been involved in either the Hickman-Smith or the Vaughn White case; Sumner stated that defendant Brannigan had beaten him in the period following his arrest in Ohio. (Pl. Ex. 102).**

43.     Sumner also told authorities that Hawkins recruited Fields and El Rukn George Carter to be the shooters of Smith, and El Rukn Hank Andrews to be the getaway driver. Hawkins himself planned to act as the spotter. **(Exhibit 24, Sumner 1986 Trial Testimony in** *People v. Fields*, **pp. 371-77, 380-81; Exhibit 15, Cmdr. Murphy Deposition, pp. 66-67).**

> **Response:** **Plaintiff admits only that Sumner so stated and testified.**

44.     Sumner told authorities in the mid-May 1985 debriefings he later talked to Fields about the shooting of Fuddy Smith, and when Sumner said he heard Fields had something to do with it, Fields responded, "It was good exercise." **(Exhibit 24, Sumner 1986 Trial Testimony in** *People v. Fields*, **pp. 379-80; 438; Exhibit 15, Cmdr. Murphy Deposition, pp. 66-67).**

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.**
>
> **Plaintiff objects to the characterization "debriefings" as not an accurate description of the interrogation Sumner was subjected to. Stating further, Sumner did not know who Smith and Hickman were until after his arrest. (Pl. Ex. 102).**

18

45.     Sumner also told authorities in the mid-May 1985 debriefings about the murders of Dee Eggars Vaughn and Joseph White. **(Exhibit 16, Deady Deposition, p. 81).**

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.**
>
> **Plaintiff objects to the characterization "debriefings" as not an accurate description of the interrogation Sumner was subjected to.**
>
> **Plaintiff admits that in mid-May 1985 Sumner told authorities about the murders of Ms. Vaughn and Mr. White. Stating further, in the mid-May 1985 interrogations, Sumner lied to authorities and told authorities that Nathson Fields was involved in the Vaughn/White murders when it was actually Sumner and Hawkins who murdered Ms. Vaughn and Mr. White in the presence of Ms. Vaughn's children. (PSF ¶ 105).**

46.     Sumner reported in the mid-May 1985 debriefings that he, Earl Hawkins, and Nathson Fields participated in the Vaughn/White double homicide. **(Exhibit 15, Cmdr. Murphy Deposition, pp. 117-19).**

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Plaintiff further objects to the characterization "debriefings" as not an accurate description of the interrogation Sumner was subjected to. In addition, in this citation, Murphy is testifying about the contents of an August 31, 1985 Supplementary Report, which purports to recount Sumner's interviews with law enforcement.**
>
> **Plaintiff admits that Sumner lied and stated that Plaintiff participated in the Vaughn/White murders.**

## V.     1985 CPD INVESTIGATION OF SMITH/HICKMAN HOMICIDES

47.     Around the time in 1985 when Anthony Sumner started cooperating with the authorities, Detective O'Callaghan was assigned to investigate a number of

open homicides. O'Callaghan's investigations included a number of homicides that according to Sumner, were committed by members of the El Rukns, including the Smith/Hickman homicides. (**Exhibit 9, O'Callaghan Deposition, pp. 26-29; 59; Exhibit 15, Cmdr. Murphy Deposition, p. 51).**

      **Response:** **Plaintiff admits that O'Callaghan and Murphy so testified.**

48.    As part of his investigation into the Smith/Hickman murders, O'Callaghan interviewed Gerald Morris, Randy Langston, Eric Langston, and others. (**Exhibit 21, O'Callaghan 6/18/86 Trial Testimony in** *People v. Fields***, at 272-75).**

      **Response:** **Plaintiff admits that O'Callaghan stated that he interviewed Gerald Morris, Randy Langston, and Eric Langston in 1985, more than a year after the murders of Smith and Hickman.**

                  **Plaintiff denies as to "others" because the citation does not support this proposition.**

49.    O'Callaghan performed a re-canvass of the scene in 1985. (**Exhibit 9, O'Callaghan Deposition, pp. 112-13).**

      **Response:** **Plaintiff denies that O'Callaghan "performed a re-canvass of the scene in 1985" as not supported by the citation. O'Callaghan stated that he "knocked on" "every door on every floor", and did some interviews, but the citation does not indicate that this was in 1985. (Def. Ex. 9, pp. 112-13).**

50.    O'Callaghan testified Gerald Morris was one of the individuals he came across during the re-canvass, stating, ""We talked to hundreds of people during that investigation, and he was one of the subjects we ran into." (**Exhibit 21, O'Callaghan 6/18/86 Trial Testimony in** *People v. Fields***, at 275).**

Response:    **Plaintiff admits that Callaghan so stated, but Plaintiff denies the accuracy of this testimony. Stating further, O'Callaghan has no verifying proof of this proposition, as he testified that he did not take notes when he talked to these hundreds of people, but "wrote some reports" at some later time. (Def. Ex. 9, pp. 112-13).**

51.    On May 18, 1985, during the Smith/Hickman investigation, witnesses viewed a line-up that included Earl Hawkins and Ray Fergerson. **(Exhibit 15, Cmdr. Murphy Deposition, p. 183).**

Response:    **Plaintiff admits.**

52.    The witnesses identified Earl Hawkins as an offender in the Smith/Hickman murders, but Detective Coffman mistakenly noted in a Crime Laboratory form report that Ray Fergerson had been identified. **(*Id*. at 183-84)**.

Response:    **Plaintiff denies. Stating further, a crime lab report purporting to relate to a Hickman-Smith lineup, and signed by defendant Murphy, indicates that one Ray Fergerson was identified by persons viewing the lineup; later the detective division version of this document shows Mr. Fergerson's name was crossed off; a supplementary report drafted after-the-fact shows Hawkins name being inserted as the one identified. (PASF ¶ 254).**

**Plaintiff denies that Detective Coffman "mistakenly" noted Fergerson's identification as not true and not supported by the record.**

53.    When Murphy saw that the report erroneously indicated Fergerson had been identified, he scratched out the word "identified" that had been placed next to Fergerson's name by Detective Coffman. **(*Id*.)**

Response:    **Plaintiff admits that Murphy so testified. Stating further, two days after the line-up Murphy scratched out the identification of Fergerson on the Detective Division copy of the report, but not on the Crime Lab copy. (PASF ¶254). Murphy admitted that it was "absolutely" impossible for Fergerson to have been involved in**

**the Smith/Hickman murder. (Def. Ex. 15, p. 185; PASF ¶255).**

54.     The Crime Laboratory Report form that Coffman filled out consists of a set of duplicate pages, with the Detective Division copy on top. The Detective Division copy reflects Murphy's crossing out of the word "identified" next to Fergerson's name. **(*Id*. at 187-88)**.

> **Response:    Plaintiff admits that the document was duplicate pages and that Murphy only crossed off Fergerson's name on the Detective Division copy.**

55.     The supplementary police report pertaining to the May 18, 1985 line-up reflects that Hawkins was identified by the witnesses. **(*Id*. at 185).**

> **Response:    Plaintiff admits that three days later the Detective Division copy of the report was changed to indicate Hawkins and that the subsequent Supplementary Report shows Hawkins as the person identified.**

56.     Nathson Fields was arrested on or around June 13, 1985. **(Exhibit 2, Fields Deposition, p. 204).**

> **Response:    Plaintiff admits.**

57.     Following Fields' arrest, while he was in police custody, he was interviewed by Detective O'Callaghan. Detective Robertson was present during that interview. In the interview, Fields denied involvement in the Smith/Hickman and Vaughn/White murders. **(Exhibit 9, O'Callaghan Deposition, pp. 127-28; 164; Exhibit 11, Robertson Deposition, pp. 198-99; 257-58).**

> **Response:    Plaintiff admits that he was interrogated by Detective O'Callaghan following his arrest, that Robertson testified that he was present during that interview, and that Plaintiff denied involvement in the Smith/Hickman and Vaughn/White murders.**

> **Stating further, Detective Richardson came in to the interrogation room and hit Fields with a baton. (Pl. Ex. 147, pp. 214-16). Moreover, Richardson did not deny that he was present, he testified that the first time he saw Plaintiff was at Area 1, after his arrest, but claims that he can not recall anything about that encounter. (Pl. Ex. 106).**

58.     Randy Langston, Eric Langston, and Gerald Morris each separately viewed a line-up at Area One on June 14, 1985. All three witnesses identified Nathson Fields as one of the persons involved in the Smith/Hickman murders. (**Exhibit 9, O'Callaghan Deposition, pp. 128-31; Exhibit 6, Richardson Deposition, pp. 115-23; Exhibit 15, Cmdr. Murphy Deposition, p. 208**).

> **Response:     Plaintiff admits that the above cited Defendants testified that the three witnesses identified Plaintiff Fields. Stating further, this Statement of Fact is not credible for numerous reasons, including, but not limited to, the fact that the line-up was manipulated by the police and prosecution to fit the story that defendants concocted, i.e., that Nathson Fields was involved in the murders of Smith and Hickman. (PASF ¶251-268).**

59.     Following the line-up in which Fields was identified, Detective O'Callaghan lifted Fields' sleeve to reveal an El Rukn tattoo, which was photographed by an evidence technician. (**Exhibit 9, O'Callaghan Deposition, pp. 191-92; Exhibit 6, Richardson Deposition, pp. 120-22**).

> **Response:     Plaintiff denies. Stating further, when Mr. Fields was brought in for a lineup in the Hickman-Smith murders, he was the only lineup participant in a short-sleeved shirt; while Fields was in the lineup, defendant O'Callaghan raised Mr. Fields' sleeve, exposing his El Rukn tattoo on Mr, Fields' upper arm. O'Callaghan testified that the photo was taken was taken "to show Mr. Fields' loyalty and affiliation with the Almighty El Rukns, a/k/a the Blackstone Rangers, his gang membership," so that in a future prosecution, "just as if [there was] a photo of people holding guns across their chest and a logo of the Vice Lords behind them, it would show, A,**

**they're gangsters and shooters, and, B, they're gang members. So in case Mr. Fields came to court later and said, "Oh, I never, ever was a bad boy, I never was involved in gangs or anything," why would you have a tattoo such as that?" (Def. Ex. 9, pp. 192-193). But Richardson testified that photos of scars and tattoos are taken as a matter of course, "for our information." (Def. Ex. 6, p. 121).**

60.     The only police officers Fields observed during the line-up procedure and when the evidence technician took photographs were O'Callaghan and Richardson. **(Exhibit 2, Fields  Deposition, p. 225)**.

     **Response:     Plaintiff admits.**

61.     O'Callaghan never showed a photograph of Fields' tattoo to any witnesses. (Exhibit 9, O'Callaghan Deposition, pp. 192-95).

     **Response:     Plaintiff admits that O'Callaghan so stated.**

62.     Detective O'Callaghan did not lift up Fields' sleeve to reveal the tattoo during the  line-up  procedure. **(Exhibit 6, Richardson Deposition, p. 120).**   Fields cannot say any witness  to the Smith/Hickman murders was looking at the line-up when O'Callaghan lifted up the sleeve  so the evidence technician could photograph the tattoo.  **(Exhibit 2, Fields Deposition, p. 233).**

     **Response:     Plaintiff objects to Richardson testifying as to O'Callaghan's intent in lifting Plaintiff's sleeve.**

63.     On July 22, 1985, then-Sergeant Murphy received a telephone call from Gerald  Morris advising him that Randy Langston had just gone to the scene of the crime with  two  individuals, one of whom identified himself as a homicide detective and another who identified  himself as an Assistant State's Attorney. After talking to

Morris in person, Murphy then went to the scene where he saw Randy Langston with El Rukn attorney William Swano, Swano's investigator, and a woman. **(Exhibit 25, Murphy 6/24/86 Trial Testimony in *People v. Fields*, at 682-86).**

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.**

64.     Randy Langston told Murphy that Swano had identified himself as an Assistant State's Attorney and the other man as a detective from Area One Homicide. **(*Id*.; Exhibit 6, Richardson Deposition, pp. 133-37**).

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.**

65.     After Murphy told Randy Langston that Swano was an attorney representing the El Rukns, Randy said he did not want to talk to Swano. **(Exhibit 25, Murphy 6/24/86 Trial Testimony in *People v. Fields*, at 682-86).**

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.**

66.     The police then detained Swano and the investigator for impersonating a police officer, but the State's Attorney's Office declined to press charges. **(*Id*.; Exhibit 6, Richardson Deposition, pp.137-38; *see also People v. Fields* ("*Fields I*"), 135 Ill. 2d 18, 36, 552 N.E.2d 791 (1990))**.

> **Response:** **Plaintiff admits that Richardson so testified. Stating further, the citation to "*Fields I*" shows that Murphy testified that he arrested Swano, and arrested his investigator Robert Beseth for impersonating a police officer. Murphy testified that grand jury subpoenas had been issued for Mr. Swano, Mr. Beseth and the woman who was with them. On cross-examination, Murphy admitted that he was testifying from memory and that no police report had been prepared regarding the incident. (*People v. Fields***

(*"Fields I"*), **135 Ill. 2d 18, 36, 552 N.E.2d 791 (1990))**.

67.     Gang Specialist Kolovitz may have been consulted by homicide detectives at some point about whether the Smith/Hickman murders might have been El Rukn-related. Kolovitz did not investigate the Smith/Hickman murders. Kolovitz did not participate in any line-ups or witness interviews as part of the Smith/Hickman investigation. **(Exhibit 14, Kolovitz Deposition, pp. 40; 110-11; 128-31).**

> **Response:    Plaintiff has voluntarily dismissed Kolovitz. (See Docket Entry #454).**

68.     Detective Kobel had no recollection of any substantive involvement in the Smith/Hickman homicide investigation. **(Exhibit 10, Kobel Deposition, pp. 109-10).**

> **Response:    Plaintiff has voluntarily dismissed Kobel. (See Docket Entry #454).**

69.     Fields is unable to provide an alibi as to his whereabouts on the morning of April 28, 1984, when Smith and Hickman were murdered. **(Exhibit 2, Fields Deposition, p. 150)**.

> **Response:    Plaintiff denies. The page indicated for this citation was not provided.**

**VI.    VAUGHN/WHITE MURDERS**

70.     On or around March 28, 1985, Earl Hawkins and Anthony Sumner murdered Joe White and Dee Eggers Vaughn in Chicago. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶17)**.

**Response: Plaintiff admits.**

71.     There were two eyewitnesses to the Vaughn/White murders, a 12-year-old girl ("SV"), and an eight-year-old boy ("MV"). **(Exhibit 11, Robertson Deposition, pp. 21-23).**

> **Response:     Plaintiff admits that the two children of Ms. Vaughn witnessed the murder of their mother and her boyfriend Mr. White.**
>
> **Plaintiff states further that he has voluntarily dismissed Robertson. (See Docket Entry #454).**

72.     The two child eyewitnesses viewed line-ups conducted by police on March 29, 1985 and on April 25, 1985. In the April 1985 line-up, SV identified Robert "Pumpkin" Jackson, and MV identified Jackson and a second individual, Counsial "Squeaky" Glenn. **(*Id*. at  55-60; 135-39).**

> **Response:     Plaintiff admits that police reports indicate that the children viewed line-ups on March 29, 1985 and April 25, 1985. Stating further, a report dated March 31, 1985 (two days after the Vaughn and White murders) and signed by defendant O'Callaghan reveals that  Sheree Vaughn (age 12) and James Michael Vaughn (age 8) witnessed two men murder Joe White and Dee Eggers Vaughn through a partially open door – and that Sheree Vaughn identified Anthony Sumner as a perpetrator from a photograph array. (PASF ¶244).**

73.     The SAO approved arrest warrants for both Jackson and Glenn for the charges of  murder of Vaughn and White. The SAO decided to give final approval for placement of charges  against Jackson.  **(Exhibit 26, 4/27/85 Supplementary Report, at CITY-NF-001158-59)**.

> **Response:     Plaintiff admits that after several tries the SAO approved warrants for Jackson and Glenn.**

74.     Based on information provided by Anthony Sumner in 1985, the State dropped the charges against Jackson and Glenn for the Vaughn/White homicides. Sumner told authorities that he, Earl Hawkins, and Nathson Fields were present and involved in the Vaughn/White murders. **(Exhibit 27, 8/31/85 Supplementary Report, at CITY-NF-001151)**.

>   **Response:     Plaintiff admits that the false charges against Jackson and Glenn were dropped and that Anthony Sumner falsely implicated Plaintiff in that double murder.**

75.     Nathson Fields and Earl Hawkins were subsequently charged with the Vaughn/White murders. **(*Id.*; Exhibit 11, Robertson Deposition, pp. 178-82; 185-86).**

>   **Response:     Plaintiff admits. Plaintiff states further that he has voluntarily dismissed Robertson. (See Docket Entry #454).**

76.     Detectives Evans, Bogdalek, and Minogue, and Gang Specialists Brannigan and Casto, had no involvement in the investigation of the Vaughn/White homicides. **(Exhibit 5,  Evans Deposition, p. 93; Exhibit 7, Bogdalek Deposition, p. 72; Exhibit 8, Minogue Deposition, p. 20; Exhibit 13, Brannigan Deposition, p. 229; Exhibit 12, Casto Deposition,  p. 80)**.

>   **Response:     Plaintiff admits.**

## VII.     1986 CRIMINAL TRIAL BEFORE JUDGE MALONEY

77.     The State charged Nathson Fields, Earl Hawkins, and George Carter with the Smith/Hickman murders. **(*Fields I*, 135 Ill. 2d at 27)**.

>   **Response:     Plaintiff admits.**

78.     The fourth individual implicated in the Smith/Hickman murders, Hank

Andrews, had not been apprehended and remained at large when the case went to trial. Andrews and fellow El Rukn Derrick Kees had fled to Milwaukee, Portland, San Diego, and Detroit to avoid capture by police. **(Exhibit 28, Kees Deposition, pp. 238-40)**.

> **Response:** **Plaintiff denies. The citation does not support the proposition that Andrews "had not been apprehended and remained at large when the case went to trial."**
>
> **Further, Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Plaintiff objects to Kees's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶274).**

79. The State elected to prosecute the Smith/Hickman case first. The State used the Vaughn/White case in aggravation during the sentencing phase. (*Fields I*, **135 Ill. 2d at 38-39**).

> **Response:** **Plaintiff admits.**

80. William Swano was hired to represent Earl Hawkins. Jack Smeeton was hired to represent Fields. **(Exhibit 29, Hawkins Deposition, pp. 209-10; Exhibit 2, Fields Deposition, p. 285)**.

> **Response:** **Planitff admits that Swano represented Hawkins, and that Plaintiff's family hired Jack Smeeton to represent him.**

81. George Carter's case was severed from those of Fields and Hawkins shortly before trial. (*Fields I*, **135 Ill. 2d at 27**).

> **Response:** **Plaintiff admits that George Carter's case was severed. Stating further, the state released Carter and never attempted to try him again. (PASF ¶264).**

82.     The cases initially were assigned to Judge James Bailey. Because Fields was concerned with Judge Bailey's reputation as a stern judge, he took a substitution of judge from Judge Bailey. **(Exhibit 2, Fields Deposition, p. 240).**

**Response:     Plaintiff admits.**

83.     The case was reassigned to Judge Maloney. Fields was similarly concerned that Judge Maloney had a reputation as very stern and prosecution-minded. For that reason, Fields did not want a bench trial before Judge Maloney. **(*Id.* at 240-42)**.

**Response:     Plaintiff admits. Stating further, see response to SOF #89 below.**

84.     At first, Swano was recommending a jury trial, but he then began suggesting a bench trial because he thought he could work out a deal with Judge Maloney. **(Exhibit 29, Hawkins Deposition, pp. 234-35).**

**Response:     Plaintiff admits that Hawkins so testified, but objects to this Statement of Fact on the ground that it is inadmissible hearsay. Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

85.     Swano told the El Rukns it would take $20,000 to fix the case before Judge Maloney. **(Exhibit 30, Hawkins 8/21/13 Certificate of Innocence Testimony, at pp. 169-71)**. The actual amount of the bribe to be paid to Judge Maloney was $10,000. **(*United States v. Maloney*, 71 F.3d 645, 651 (7th Cir. 1995); *People v. Hawkins*, 181 Ill. 2d 41, 47, 690 N.E.2d 999 (1998))**.

**Response:     Plaintiff admits that there was testimony that Swano agreed to pay $10,000 to Maloney, but denies Swano telling "the El Rukns" it would take $20,000 to fix the case as not supported by the citation. Further, Plaintiff objects to this Statement of Fact on the ground**

**that it is inadmissible hearsay.**

**Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

86.     Alan Knox, an El Rukn General, was responsible for getting the money together to pay the bribe. Knox first had to get approval for the bribe from El Rukn leader Jeff Fort. **(Exhibit 29, Hawkins Deposition, p. 205; Exhibit 30, Hawkins 8/21/13 Testimony, at p. 174)**.

> **Response:** **Plaintiff objects to this proposition as lacking foundation as to what Alan Knox was responsible for. Plaintiff objects to the proposition that Knox had to get approval from Fort as inadmissible hearsay.**
>
> **Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

87.     There was a delay with the El Rukns in providing the bribe money to Swano. **(Exhibit 29, Hawkins Deposition, p. 237-38).** On June 17, 1986, the morning of the trial, Swano went to El Rukn headquarters to get the bribe money. **(*United States v. Maloney*, 71 F.3d at 651)**.

> **Response:** **Plaintiff objects, as this Statement of Fact is not relevant and not material.**
>
> **Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

88.     On June 17, 1986, Fields and Hawkins waived their rights to a jury trial and for the first time, advised Judge Maloney they were taking a bench trial. **(Exhibit 2,**

Fields Deposition, pp. 242-44).

Response:     **Plaintiff admits that he and Hawkins both waived jury trial on June 17, 1986. Stating further, Plaintiff has insufficient information to admit or deny that June 17, 1986 was the "first time" Hawkins or his attorney so advised Maloney.**

89.     Nathson Fields made the decision in his case to take a bench trial rather than a jury trial. **(Exhibit 31, Smeeton Deposition, p. 42-43)**.

Response:     **Plaintiff denies. Stating further, Smeeton testified that he doesn't recall the decision being his to make, but that he is certain he was asked his opinion, which was that it "looked like a dead-bang winner." (Def. Ex. 31, pp. 42-43). Plaintiff testified that "[i]t seemed like at first we was thinking about the jury trial. That's what I wanted, but I was concerned that the gang thing, the jury might, you know, might have a problem with the gang thing. And [Smeeton] was telling me that he had other cases before Maloney and that he wouldn't go for the theory that the State was bringing, and he said he felt quite confident that the judge would be, you know -- he would see straight through, you know, the case that the State was bringing and that a bench would be the way to go." (Pl. Ex. 107, pp. 79-80).**

**In addition, as this Court is aware, a criminal defendant has three fundamental trial rights, one of which is whether to take a bench or a jury. This decision must be "made" by a criminal defendant, but is typically reached after consultation with his or her attorney, as happened in this case.**

90.     Before the end of the trial, Judge Maloney returned the $10,000 in bribe money to Swano because he thought the FBI was watching him. **(Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, ¶51; *United States v. Maloney*, 71 F.3d at 651; *People v. Hawkins*, 181 Ill. 2d at 48). Checked exhibit 20- also case #**

Response:     **Plaintiff admits that this was in his First Amended Post-Conviction Petition, which was filed on September 8, 1992, after the allegations against Maloney and Swano came to light, and that this Statement of Fact is in each of the opinions cited. Stating further, the opinion in *Maloney* cited by Defendants indicates that**

> **there was evidence that it was FBI suspicions, "coupled with the strength of the State's case" that prompted Maloney to return the money to Hawkins's lawyer William Swano. (*United States v. Maloney*, 71 F.3d at 651).**

91.     Mike Angarola, a supervisor with the SAO, was made aware during the 1986 bench trial of the possibility the El Rukns were trying to bribe Judge Maloney. Angarola alerted the prosecuting attorneys to the possibility of a bribe, telling them to be aware of it and "try your case." **(Exhibit 23, Wharrie Deposition, pp. 123-29 and Plaintiff's Exhibit ##120-121 discussed therein)**.

> **Response:     Plaintiff admits that the States Attorney's Office was aware that Fields trial was corrupted. Stating further, the State's Attorney's Office did not step in or otherwise inform Fields. (PASF ¶¶262-263).**

92.     During the trial, the State presented a number of witnesses including Randy Langston, Gerald Morris, and Anthony Sumner. **(*Fields I*, 135 Ill. 2d at 28-34)**.

> **Response:     Plaintiff admits.**

93.     In the 1986 trial, Gerald Morris testified he saw Fields and Hawkins follow Fuddy Smith into the breezeway of the Ida B. Wells housing complex shortly before he heard gunshots, and then saw the same two men run out of the breezeway and throw guns into a waiting car before getting in that car. **(*Id.* at 31).**

> Response:     **Plaintiff admits that Morris so testified. Stating further, Morris admitted in December 2011 that he was coerced to identify Fields and that he never saw the faces of the shooters of Smith and Hickman. (PSF ¶110-116))**

94.     Sumner testified at the trial he entered into an agreement with the State, in which the Vaughn/White murder charges against him would be dropped in

exchange for his agreement to testify truthfully to all activities concerning El Rukn gang members and to plead guilty to conspiracy to purchase drugs. (*Id*. at 34).

> **Response:** **Plaintiff admits that the case citation shows that Sumner so testified. Stating further, Plaintiff denies that Sumner ever testified "truthfully," as he lied under oath repeatedly in many trials and grand juries. (See Def. Ex. 61, pp. 100-101).**

95. On June 26, 1986, Judge Maloney found Fields and Hawkins guilty of the murders of Fuddy Smith and Talman Hickman. (*Fields I*, **135 Ill. 2d at 37;** *People v. Hawkins*, **181 Ill. 2d at 48**).

> **Response:** **Plaintiff admits.**

96. Fields and Hawkins elected to waive their right to a jury at the first stage of the death sentencing hearing. Judge Maloney found both defendants eligible for the death penalty. A jury was selected for the second stage to hear evidence in aggravation and mitigation (*Fields I*, **135 Ill. 2d at 37-38**).

> **Response:** **Plaintiff admits. Stating further, Maloney denied the defendants' motions for separate juries to determine whether to impose the death penalty. (*People v. Fields I*, 135 Ill. 2d at 37).**

97. As part of the aggravation phase of the second stage, the State introduced evidence from Anthony Sumner in which he stated Hawkins and Fields were involved in the Vaughn/White double murder. (*Id*. at 38-39).

> **Response:** **Plaintiff admits.**

98. In mitigation, Fields and Hawkins called Randy Langston, who recanted his trial testimony regarding his identification of the two defendants as the gunmen. (*Id*. at 39).

> **Response:** **Plaintiff admits.**

99.     Randy Langston testified at the death sentence hearing that he identified Fields and Hawkins as the two shooters because Detective O'Callaghan told him to do so, and he was afraid of O'Callaghan. **(Exhibit 32, R. Langston 8/22/86 Trial Testimony in *People v. Fields*, at 1295-1300).**

> **Response:** **Plaintiff admits.**

100.     The jury returned verdicts finding there were no mitigating factors sufficient to preclude the imposition of death. Judge Maloney then sentenced Hawkins and Fields to death. **(*Fields I*, 135 Ill. 2d at 39).**

> **Response:** **Plaintiff admits.**

## VIII.    POST-TRIAL EVENTS

101.     In early 1987, Earl Hawkins sent a letter to Detective Brannigan from prison requesting a meeting before February 2nd of that year. **(Exhibit 13, Brannigan Deposition, pp. 270-72; Exhibit 29, Hawkins Deposition, pp. 89-91).**

> **Response:     Plaintiff admits that in early 1987 Hawkins sent Brannigan a letter asking that Brannigan and Hawkins develop a mutual "understanding." (Pl. Ex. 105).**
>
> **Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

102.     When Brannigan went to meet him, Hawkins related that he wanted to cooperate with authorities. Brannigan returned to Chicago and advised the SAO and the United States Attorney's Office that Hawkins wanted to cooperate. **(Exhibit 13,**

Brannigan Deposition, pp. 274–76).

> **Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Stating further, when Brannigan went to Menard to meet with Hawkins, Brannigan helped convince Hawkins to cooperate by assuring Hawkins that he would only serve 20 years in prison, a period which Hawkins considered "doable." (Pl. Ex. 109).**

103. The SAO and the United States Attorney's Office took care of the necessary arrangements with Hawkins. Brannigan was not part of making those arrangements. (*Id*. at pp. 276).

> **Response:** **Plaintiff objects to the word "necessary" as it does not appear in the citation. Stating further, Plaintiff objects to this proposition as vague as to "necessary arrangements".**

104. Murphy also met with Hawkins on a number of occasions. When Murphy initially met with Hawkins in Menard, he told Hawkins he couldn't make any promises to him. Hawkins eventually was brought up from Menard to the United States Attorney's Office. (**Exhibit 15, Cmdr. Murphy Deposition, pp. 267-69**).

> **Response:** **Plaintiff admits that Murphy so testified. Stating further, promises were made to Hawkins. Earl Hawkins has testified that defendant Brannigan helped convince him (Hawkins) to cooperate by assuring him that he would only serve 20 years in prison, a period which Hawkins considered "doable." (PASF ¶270).**

105. In or around April 1987, Hawkins was transferred to the Metropolitan Correctional Center and began cooperating with federal prosecutors. (**Exhibit 1, Plaintiff's Third Amended Complaint, ¶49**).

> **Response:** **Plaintiff admits that Hawkins left Menard in the spring of 1987 but denies that is when Hawkins "began" cooperating with federal prosecutors because Brannigan was acting as a member of the federal law enforcement team at the time of his earlier**

meetings with Hawkins. **(PSF ¶31).**

106.     Hawkins worked out a plea deal with the government, but Murphy was not part of those negotiations. He did not talk to Hawkins about what Hawkins' expectations might be  regarding a plea deal.  **(Exhibit 15, Cmdr. Murphy Deposition, pp. 300-01)**.

> **Response:     Plaintiff admits that Murphy so testified.**

107.     On or around July 1, 1987, Hawkins provided information to the federal authorities  about the El Rukn attempt to bribe Judge Maloney. **(Exhibit 29, Hawkins Deposition, pp. 234-37)**.

> **Response:     Plaintiff denies. Stating further, the citation does not discuss any "El Rukn attempt" to bribe Maloney; the cited pages refer to Swano wanting to bribe Maloney. Moreover, Plaintiff denies that Hawkins first provided information to federal authorities about the El Rukn attempt to bribe Judge Maloney on or about July 1, 1987, because Brannigan was a "federal authority" since 1983 as a member  of the federal El Rukn task force and he learned of Hawkins attempt to bribe judge Maloney while Hawkins was still at Menard. Hawkins testified that the Maloney bribe was one of the first things he told defendant Brannigan about when he started to "cooperate." (PSF ¶119; PASF ¶236).**
>
> **Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

108.     Hawkins' cooperation with the government investigation of the El Rukns included  testifying in state and federal proceedings, including the federal RICO trials starting in about  1991. **(*Id*. at 241; 247)**.

> **Response:     Plaintiff admits.**

> **Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

109.    Hawkins testified for the government at least ten times, including multiple times about the Smith/Hickman murders. (*Id.*; **Exhibit 33, Kelley Deposition, pp. 41-42**).

> **Response:    Plaintiff admits that Hawkins so testified. Plaintiff objects to Hawkins's 2013 testimony in its entirety because he received time off of his State sentence in exchange for his testimony against Fields at Fields's Innocence Petition hearing, which is a civil proceeding. (PASF ¶273).**

110.    Hawkins also testified on behalf of the federal government in the prosecution of Judge Maloney. (*United States v. Maloney*, **71 F.3d at 652**).

> **Response:    Plaintiff admits.**

111.    In 1990, the Illinois Supreme Court affirmed Fields' and Hawkins' convictions for the Smith/Hickman murders and their death sentences. (*Fields I*, **135 Ill. 2d at 77**).

> **Response:    Plaintiff admits.**

112.    On June 26, 1991, a federal grand jury returned a four-count indictment against Judge Maloney and William Swano alleging, among other criminal acts, that Swano forwarded the $10,000 bribe to Maloney to acquit Fields and Hawkins in the 1986 trial. Maloney was found guilty on all counts of the indictment on April 16, 1993. (*People v. Hawkins*, **181 Ill. 2d at 45-46, 48**).

> **Response:    Plaintiff admits. Stating further, Robert McGee was also indicted in that case, and the indictment alleged that "Swano, with McGee**

> acting as a go-between, forwarded a $10,000 bribe to Maloney to acquit defendants in the Hawkins/Fields trial." (*People v. Hawkins*, 181 Ill. 2d at 47).

113.    Fields filed his first amended post-conviction petition in September 1992, arguing in part that Maloney's acceptance of the bribe, its return, and Maloney's suspicion the FBI was investigating his conduct resulted in a deprivation of Fields' due process rights. (*Id.* at 48-49; Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, ¶¶51-53).

> **Response:    Plaintiff admits that one of the grounds for relief cited in his First Amended Post-Conviction Petition was the alleged attempt by Hawkins and Swano to bribe Maloney. Plaintiff clarifies that ¶50 notes that Maloney had recently been indicted, and that ¶51 actually reads: "The bribe was accepted by Judge Maloney pursuant to an agreement with Fields' co-defendant, Earl Hawkins, and Hawkins' attorney, William Swano, whereby Maloney would find Hawkins not guilty. When Judge Maloney learned that the FBI was aware of the agreement and the bribe he returned the money to Swano during the course of the trial." (Def. Ex 20, ¶¶ 50, 51).**
>
> **In addition, Plaintiff's Petition requested relief on the basis that certain post-trial comments by Maloney indicated "bias on the part of the trier of fact," because they showed "that the court presumed Fields and his co-defendant to be guilty." (Def. Ex 20, ¶¶ 47-48).**

114.    Judge Deborah Dooling entered an order on September 18, 1996, granting Fields' post-conviction petition and ordering a new trial. Judge Dooling ruled Fields was denied a fair trial because Judge Maloney had a "direct, personal, substantial, pecuniary interest" in the outcome of Fields' trial. Judge Dooling also found that post-conviction relief would not be barred by Hawkins' and Fields' own participation in the bribery scheme. (*People v. Hawkins*, 181 Ill. 2d at 49).

**Response:** **Plaintiff admits that after learning of Judge Maloney's acceptance of a bribe Fields's attorney amended his post-conviction petition in September 1992 to add that as a ground for relief.**

115. Sometime between the summer of 1991 and December 1991, Sumner recanted his statement that Fields was involved in the Vaughn/White homicides to AUSA William Hogan. **(Exhibit 13, Brannigan Deposition, pp. 220-26; Exhibit 23, Wharrie Deposition, pp. 146-50; Exhibit 61, Hogan Certificate of Innocence Testimony, at p. 103)**.

**Response:** **Plaintiff denies. Stating further, in the citations to Brannigan's and Wharrie's depositions, the witnesses describe Sumner's handwritten recantation dated January 3, 1992. (Def. Ex. 13, pp. 225-26; Def. Ex. 23, pp. 149-150) Sumner's recantation indicates that he discussed his false statements and testimony about Fields with Hogan in the Summer of 1991. (Def. Ex. 34, p. 5) (Sumner recantation also marked as Pl. Ex. 27). AUSA William Hogan has testified learned that Anthony Sumner had falsely implicated Nathson Fields in the Vaughn-White murders in May or June of 1991, that that he waited until December of 1991 to notify the Cook County State's Attorney because, he (Hogan) was busy. (PASF ¶250).**

116. Sumner also provided a written statement to ASA Jack Hynes and Investigator Norfie DiCiolla on January 3, 1992, in which he confirmed his statements regarding the Vaughn/White murders were correct except that Fields was not involved in those murders. Sumner further indicated the first time he told anyone Fields was not involved in the Vaughn/White murders was when he talked to AUSA Hogan in 1991. Before that, he never told any AUSAs, ASAs, or police officers. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶51; Exhibit 23, Wharrie Deposition, pp. 149-50; Exhibit 34, ASA O'Brien Letter attaching Sumner Statement).**

> **Response:** **Plaintiff admits that Sumner signed a statement in early January, 1992 admitting that he lied about Fields's involvement in the Vaughn/White murders because "[he] was confused and afraid. Nathson Fields had put [his] family out of one of the El Rukn buildings and [he] did not like [Fields]", and that he told AUSA Hogan in the summer of 1991 that Fields was not involved in that murder. (PASF ¶249).**
>
> **Stating further, ASA Hynes admitted at his testimony at Fields's Innocence hearing that during the January 1992 recantation Sumner was not asked about any other specific statements that he made regarding other individuals, or about the Smith and Hickman murders. (PSF ¶108).**

117. On January 10, 1992, the State's Attorney's Office provided a copy of Sumner's written statement of January 3, 1992, to Fields' then criminal counsel, John Stainthorp. **(Exhibit 34).**

> **Response:** **Plaintiff admits.**

118. Plaintiff's First Amended Petition for Post-Conviction Relief, filed September 8, 1992, attached Sumner's January 3, 1992 written statement to ASA Hynes as an exhibit. **(Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, ¶58).**

> **Response:** **Plaintiff admits.**

119. Brannigan first learned of Sumner's recantation concerning Fields' involvement in the Vaughn/White murders from AUSA Hogan. **(Exhibit 13, Brannigan Deposition, pp. 208, 223).**

> **Response:** **Plaintiff admits that Brannigan testified that he learned of Sumner's recantation from Hogan. Stating further, Brannigan did not recall when he learned this information. (Def. Ex. 13, pp. 225-26).**

120.    Sumner did not recant any portion of his testimony regarding Fields' involvement in the Smith/Hickman double homicide. **(Exhibit 23, Wharrie Deposition, p. 147).**

>    **Response:    Plaintiff admits that Sumner's written recantation statement does not include a recantation regarding the Smith and Hickman murders. Stating further, according to (former) ASA Hynes, Sumner was not asked about any of the other accusations he made against Fields or anyone else. (PSF ¶108).**

121.    Sumner was killed in an automobile accident in Atlanta, Georgia, in January, 1992. **(Exhibit 13, Brannigan Deposition, pp. 218; 226)**.

>    **Response:    Plaintiff admits that the defendants have stated that Sumner was killed in an automobile accident in Georgia. Stating further, upon information and belief, no defendant did any investigation of Sumner's death, including Defendant Brannigan who claimed that he was unsure about details of Sumner's death, despite the fact that Brannigan's name and contact information appear in the medical examiner's file. (Def. Ex. 13, pp. 219-222).**

122.    Plaintiff's First Amended Petition for Post-Conviction Relief, as one of the asserted grounds for relief, claimed Fields' trial counsel was ineffective for failing to pursue the investigation of a "potentially important" witness, Sandra Langston, who had been disclosed in police reports. **(Exhibit 20, Plaintiff's First Amended Petition for Post-Conviction Relief, ¶20).**

>    **Response:    Objection to the mischaracterization of the citation. Stating further, ¶20 raises an ineffective assistance claim for failure to pursue the investigation of Sandra Langston and "other potentially important witnesses."**

123.    David Kelley, one of the prosecutors assigned to Nathson Fields' retrial, brokered a plea agreement with Earl Hawkins regarding the Smith/Hickman matter. **(Exhibit 33, Kelley Deposition, pp. 41-49)**.

**Response:     Plaintiff admits that Kelley so testified.**

124.   In 1999, Randy Langston had provided an affidavit to Fields' criminal defense  counsel in which he stated his testimony at the sentencing hearing was "the truth." **(Exhibit 35,  Langston 1999 Affidavit)**.

> **Reponse:     Plaintiff admits that in 1999 Field's attorney Timothy Lohraff interviewed Langston in the presence of a paralegal and Langston signed an affidavit admitting that he saw 2 masked men shoot Smith and Hickman, that he couldn't see their faces well enough or long enough to be able to identify them, and that he did not tell the truth when he testified at Field's trial that he saw Fields and Hawkins shoot Smith and Hickman (Def. Ex. 35).**
>
> **Stating further, Langston testified at the sentencing phase of Fields's trial that O'Callaghan had pressured him to testify falsely against Fields. (Def. Ex. 32, pp. 1295-1300).**

125.   Kelley located and talked with Randy Langston about his testimony at the 1986  trial and his recantation during the sentencing hearing. Langston provided Kelley with a  statement that  was  consistent  with  his  trial  testimony. **(Exhibit 33, Kelley Deposition, pp. 92- 95)**.

> **Response:     Plaintiff admits that Kelley so testified. Stating further, At some point after the Illinois Supreme Court granted Fields a new trial, (state appeals prolonged the start of Fields's retrial until 2009) the assistant state's attorneys assigned to Mr. Fields' case moved witness Randy Langston into an apartment and paid more than $2,000 on Langston's behalf – in order to cover rent and security deposit expenses. (Pl. Ex. 104: Randy Langston Testimony of 2-24-2009, pp. 95-96.)**

126.   Langston told Kelley he recanted his testimony at the sentencing hearing because  his  older  brother James told him El Rukns were pressuring his family and making threats. **(*Id*. at  95-97)**.

**Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Stating further, Plaintiff denies, as Mr. Langston testified that defendant O'Callaghan had pressured him to falsely testify against Mr. Fields. (Def. Ex. 32: Randy Langston aggravation Hearing Testimony, pp. 1295-1300).**

127.    Kelley also interviewed Eric Langston, who said he did not want to get involved with the El Rukns. Kelley believed Eric felt threatened and was afraid to testify against the El Rukns. **(*Id.* at 97-100)**.

**Response:** **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay. Plaintiff objects to what Kelley "believed" as pure speculation.**

128.    As the federal RICO investigation of the El Rukns proceeded, a number of El Rukns in addition to Hawkins and Sumner began to cooperate with the prosecutors. These cooperating El Rukn witnesses included Derrick Kees, Eugene Hunter, Jackie Clay, and Tramell Davis, each of whom along with Hawkins and Sumner implicated Nathson Fields in the Smith/Hickman homicides. **(Exhibit 24, Sumner 1986 Trial Testimony in *People v. Fields*, pp. 375-80; Exhibit 36, Hawkins Trial Testimony (August 1991) in *United States v. Andrews*, pp. 2147-89; Exhibit 37, Kees Trial Testimony (3/12/93) in *United States v. Maloney*, pp. 1018-25; Exhibit 38, Hunter Trial Testimony (8/6/91) in *United States v. Andrews*, pp. 4744-46; Exhibit 39, Clay Trial Testimony (10/8/91) in *United States v. Bates*, at 1260-65; Exhibit 40, Tramell Davis Deposition, pp. 30-35; 54-56, 172, with Tramell Davis Deposition Exhibit #1).**

**Response:** **Plaintiff objects to SOF #128 as an improper fact under Local. R. Civ. P. 56, which requires short, numbered paragraphs with specific references to the parts of the record relied upon.**

44

> **Plaintiff objects to Trammel Davis's testimony in its entirety because between 2012 and 2013, the Cook County State's Attorney's Office covered at least three rental payments for Tramell Davis, saving him from eviction, in exchange for testifying against Mr. Fields in this proceeding and in the civil innocence hearing. (PASF ¶275).**

## VIII.  2009 CRIMINAL RETRIAL BEFORE JUDGE GAUGHAN

129.    On January 29, 1998, the Illinois Supreme Court affirmed Judge Dooling's order that vacated Fields' and Hawkins' convictions for the Smith/Hickman murders and ordered a new trial. (*People v. Hawkins*, **181 Ill. 2d 41**).

> **Response:     Plaintiff admits.**

130.    On remand, the matter was assigned to Judge Vincent M. Gaughan. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶59; Exhibit 33, Kelley Deposition, p. 29)**.

> **Response:     Plaintiff admits.**

131.    In or around December 2002, Earl Hawkins agreed to plead guilty to two counts of armed violence based on the shootings of Smith and Hickman, and the prosecution agreed to recommend a sentence to run concurrently with Hawkins' prior federal sentence on his guilty plea to bribery charges, to be served in full in federal custody. (*People v. Fields*, **357 Ill. App. 3d 780, 782, 829 N.E.2d 917 (1st Dist. 2005)** (*"Fields II"*); **Exhibit 33, Kelley Deposition, pp. 78-83**).

> **Response:      Plaintiff denies. Stating further, although the citation to *Fields II* indicates that a few months *after* the State agreed to drop murder charges against Hawkins he was interviewed—which interview it claims occurred in December 2002—and then entered in to an agreement to plead guilty to armed violence, former ASA Kelley**

**testified that Hawkins's plea agreement was not signed and entered in to until the day of his testimony in Fields's retrial, which was in 2009. (Def. Ex. 33, p.83) (See also PASF ¶ 272).**

132.  The State took two separate appeals from pretrial rulings made by Judge Gaughan, resulting in appellate court opinions issued in 2001 and 2005. (*People v. Fields*, 2011 IL App (1st) 100169 ("*Fields III*"), ¶¶ 6-7). Fields' retrial took place in the Spring of 2009, and was a bench trial. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶59)**.

　　**Response:　Plaintiff admits.**

133.  In the 2009 trial, Randy Langston testified Fields and Hawkins (a/k/a "Mansur") were the two shooters. **(Exhibit 33, Kelley Deposition, pp. 177-78; 202-04)**.

　　**Response:　Plaintiff admits.**

134.  In the 2009 trial, Randy Langston testified he did not testify truthfully at the death penalty hearing because he had been threatened by the El Rukns. **(Exhibit 41, R. Langston 2/24/09 Trial Testimony in *People v. Fields*, at 35-36)**.

　　**Response:　Plaintiff admits that Randy Langston so testified at the retrial.**

135.  In the 2009 trial, Randy Langston also testified he provided the 1999 affidavit to Fields' criminal defense attorneys because he was afraid for his family and himself. **(*Id.* at 37- 38; 99)**.

　　**Response:　Plaintiff admits that Randy Langston so testified at the retrial.**

136.  In the 2009 trial, Gerald Morris testified he saw Fields and Hawkins follow Fuddy Smith into the breezeway of the Ida B. Wells housing complex shortly before he heard gunshots, and then saw the same two men run out of the breezeway

and throw guns into a waiting car before getting in that car. **(Exhibit 42, Morris 3/25/09 Trial Testimony in *People v. Fields*, at 9-19)**.

> **Response:** **Plaintiff admits that Gerald Morris so testified at the 2009 retrial.**

137.    In the 2009 trial, Earl Hawkins testified Fields and George Carter were the two shooters. **(Exhibit 33, Kelley Deposition, pp. 202-04; Exhibit 1, Plaintiff's Third Amended Complaint, ¶58)**.

> **Response:** **Plaintiff admits that Hawkins so testified.**

138.    On April 8, 2009, Judge Gaughan found Fields not guilty of the Smith/Hickman murders. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶59)**. Judge Gaughan determined the State failed to prove Fields guilty beyond a reasonable doubt. **(*Fields III*, 2011 IL App (1st) 100169, ¶8)**.

> **Response:** **Plaintiff admits that Judge Gaughan found him not guilty. Stating further, the citation indicates that in announcing his decision Judge Gaughan noted that "there was no unimpeached witness identifying [Fields] as one of the gunmen. Under these circumstances, the court found the State failed to prove defendant guilty beyond a reasonable doubt."**

139.    In this civil proceeding, Plaintiff's counsel produced an affidavit of Gerald Morris dated 12/13/11. **(Exhibit 43, Morris Affidavit)**.

> **Response:** **Plaintiff denies. Stating further, Plaintiff's counsel produced two affidavits from Gerald Morris dated 12/13/11. (See PSF ¶111-116).**

140.    According to the Affidavit, Morris heard gunshots and saw two men running from the scene to a car on the street on the day of the Smith/Hickman murders. Morris further stated in the affidavit he did not see Fields on that date or at any other time. **(*Id.*)**

**Response:** **Plaintiff admits that in one of the Affidavits Morris states that he heard gunshots and saw two men running.**

**Plaintiff denies that the affidavit states that the two men were running "from the scene." the complete paragraph is as follows: "That on April 28, 1984, I was staying at Sandra Langston's apartment. At the time of the incident I was inside the apartment getting ready to go out with Fuddy. Fuddy was waiting for me downstairs. I was ironing a shirt when I heard several gun shots. From the window I saw two men wearing masks running to a car on the street. I believe that the car was a light blue 4 door Cadillac with a white top. I ran downstairs and saw Talman Hickman shot and on the ground next to the janitors closet. Just around the comer I saw Fuddy shot on the ground. I then began to call out that people had been shot. I never saw the faces of the two men." (PSF ¶111-116).**

141.    Morris also claims in the affidavit about a year after the Smith/Hickman shootings, O'Callaghan asked him to go to the police station because they had the guys that shot Fuddy. According to the affidavit, O'Callaghan and another detective mentioned Fields by name, said he was an El Rukn, and took Morris to the police station to look at some photos. Morris states in the affidavit: "From the photos I was shown, I picked out Nate Fields even though I never saw Nate Fields the day of the murder or at any other time. Detective O'Callaghan indicated that I made the right decision and that Nate Fields was the guy." (*Id.*)

**Response:** **Plaintiff admits.**

142.    The affidavit further asserts O'Callaghan and Morris knew Morris' testimony was not true, but Morris was afraid to speak up against O'Callaghan and the other detectives. (*Id.*)

**Response:** **Plaintiff admits. Stating further, Morris stated that the reason O'Callaghan knew Morris's testimony was not true is because**

> **"[That] when I first spoke to Detective O'Callaghan and the other detective, I told them that although I did see the men running away to a Light Blue Cadillac I could not see their faces." (Def. Ex. 43).**

## IX.    CERTIFICATE OF INNOCENCE PROCEEDINGS

143.    In August 2009, Fields filed a petition for certificate of innocence under 735 ILCS 5/2-702. Judge Paul Beibel granted Fields a certificate of innocence on December 10, 2009. (*Fields III*, **2011 IL App (1ˢᵗ) 100169, ¶¶ 9, 12)**.

**Response:    Plaintiff admits.**

144.    The Illinois Appellate Court reversed Judge Beibel's order granting Fields a certificate of innocence and remanded the matter for further proceedings. (*Id.* **at ¶¶ 19-20)**.

**Response:    Plaintiff admits.**

145.    Fields' petition for certificate of innocence is currently pending before Judge Beibel. **(Exhibit 60, Sexton Affidavit, ¶4)**.

**Response:    Plaintiff admits.**

146.    In the 2013 evidentiary hearing on Fields' petition for a certificate of innocence, Randy Langston reaffirmed his 2009 trial testimony that he did not testify truthfully at the death penalty hearing because he had been threatened by the El Rukns. **(Exhibit 62, R. Langston Certificate of Innocence Testimony, at pp. 223-35)**.

**Response:    Plaintiff admits that Randy Langston so testified.**

## X.    "SUBJECT FILE"

147.    On September 13, 2011, the City produced to plaintiff as part of

discovery in this lawsuit a copy of an area file labeled "Smith + Co." consisting of documents pertaining to the CPD's Smith/Hickman investigation (hereinafter for ease of reference, the "Subject File"). These documents were Bates stamped City-NF-001028–001117. **(Exhibit 44, Subject File (also designated during discovery as "Plaintiff's Exhibit 3"))**.

> **Response:** **Plaintiff denies. The full file is Bates-stamped CITY-NF 00972-001117. (PSF ¶128).**

148.     The Subject File contains investigative notes and miscellaneous items generated between April 28, 1984 and June 1984. **(*Id.*)**

> **Response:** **Plaintiff admits that the subject file as produced to Plaintiff in discovery in this case contains investigative notes commencing on April 18, 1984 (the day of the murders). Plaintiff denies that there are no notes after June 1984, as some notes are not dated.**

149.     The Subject File contains investigative notes attributable to Detectives Bogdalek, Minogue, Hood, and Evans. **(Exhibit 4, Hood Deposition, p. 155; Exhibit 5, Evans Deposition, pp. 105-06; Exhibit 7, Bogdalek Deposition, pp. 146-47; Exhibit 8, Minogue Deposition, pp. 57-58)**.

> **Response:** **Plaintiff admits that there are notes from the named detectives in the file. Stating further, there are notes that are unidentified in the file.**

150.     Plaintiff is claiming he never received the Subject File prior to its September 2011 production in this case, despite numerous subpoenas requesting such materials issued throughout the criminal proceedings. Plaintiff claims he did not have certain documents found within the Subject File during his criminal trials in 1986 or 2009. **(*See, e.g.*, Plaintiff's Motion to Compel, Dkt. #201)**.

**Response:** **Plaintiff admits he claims he never received the file prior to September 2011, and that he did not have documents found within the file at either of his criminal trials. Stating further, the City has admitted that it has no evidence that the file was ever tendered to the plaintiff and the State's Attorneys have admitted that they never had the file until it was tendered by the City to Plaintiff. (PSF ¶233-34).**

151.    The names of James Langston, Randy Langston, Carlos Willis, and Cleveland Ball are referenced in documents found in the Subject File, and they were called as witnesses at the 1986 trial. **(Exhibit 44, at Bates CITY-NF-001047, 001075; *Fields I*, 135 Ill. 2d at 29-39)**.

**Response:** **Plantiff admits. Stating further, those names appear in a version of a document that is also in the "street file." (PSF ¶232). Stating further, James Langston was called as a defense witness during the sentencing phase.**

152.    Detectives Hood, Evans, Bogdalek and Minogue did not withhold or destroy any notes pertaining to the Smith/Hickman homicide investigation. **(Exhibit 4, Hood Deposition, p. 121; Exhibit 5, Evans Deposition, pp. 17-18, 96, 104; Exhibit 7, Bogdalek Deposition, pp. 80, 103-04; Exhibit 8, Minogue Deposition, pp. 182-83)**.

**Response:** **Plaintiff denies. Stating further, the citations do not support the proposition. The citations support only the following propositions: Hood testified that he did not destroy his notes; Evans testified that it was his practice to turn his notes in to the sergeant's in-box; Bogdalek testified that in response to Fields's 1988 complaint that he he did not suppress any notes; and Minogue testified that in response to Fields's 1988 complaint he stated that he did not destroy notes or withhold information. Further, Bogdalek testified that he knew at the time of Field's first trial in 1986 that some of his notes were missing from the file.**

153.    Detective O'Callaghan testified he did not suppress written notes or withhold any exculpatory information of a written nature pertaining to the

Smith/Hickman homicide investigation. **(Exhibit 9, O'Callaghan Deposition, pp. 201-02)**.

> **Response:** **Plaintiff admits that O'Callaghan so testified. Stating further, O'Callaghan also testified that he thinks that "in this particular one" it would be his determination as to whether information is exculpatory. (Def. Ex. 9, p. 203).**

154.    Detective O'Callaghan testified he did not know of any information that would have exonerated Nathson Fields in the Smith/Hickman homicides. **(Exhibit 9, O'Callaghan Deposition, p. 203)**.

> **Response:** **Plaintiff admits that O'Callaghan so testified.**

155.    The Subject File contains a form entitled "Request for Identification Photos," which reflects a request for photographs of Gerald Green, Rodell Banks, and Edward Stewart made by Detective Bogdalek, and approved by then-Sergeant Murphy, and dated April 29, 1984.  **(Exhibit 44, at Bates CITY-NF-001038)**.

> **Response:** **Plaintiff admits that the form approved by Sergeant Murphy is dated April 29, 1984, the day after the murders.**

156.    Gang Specialist Casto testified he never saw the Subject File prior to preparing for his deposition in this case, and he had no knowledge whether the Subject File was withheld from Fields.  **(Exhibit 12, Casto Deposition, pp. 14; 72; 75)**.

> **Response:** **Plaintiff admits that Casto so testified. Plaintiff denies that Casto had no knowledge whether the Subject File was withheld from Fields because Casto was served with a pro se complaint filed by Fields in 1988 putting Casto on notice that Fields was only provided with 8 pages of materials. (SOF ¶74)**

157.    Gang Specialist Brannigan testified he never saw the Subject File prior to preparing for his deposition in this case, and he had no knowledge of its existence

before that time. Brannigan testified he never ordered the destruction of any police evidence. **(Exhibit 13, Brannigan Deposition, pp. 51, 303-04)**.

> **Response:** **Plaintiff admits that Brannigan so testified.**

158.    According to Gang Specialist Kolovitz, none of the documents in the Subject File were familiar to him. **(Exhibit 14, Koloviz Deposition, pp. 141-42)**.

> **Response:** **Plaintiff has voluntarily dismissed Kolovitz. (See Docket Entry #454).**

159.    Other than a copy of a Supplementary Report also found in the Permanent Retention file, none of the documents in the Subject File were familiar to Gang Specialist Richardson or in his handwriting. **(Exhibit 6, Richardson Deposition, p. 164)**.

> **Response:** **Plaintiff denies. Nothing in the cited document supports this proposition.**

160.    Detective Kobel had no recollection of doing anything on the Smith/Hickman investigation. **(Exhibit 10, Kobel Deposition, p. 109)**.

> **Response:** **Plaintiff has voluntarily dismissed Kobel. (See Docket Entry #454).**

161.    No documents in the Subject File reference or are attributed to Detectives Kobel or Robertson, or Gang Specialists Richardson, Casto, Brannigan, or Kolovitz. **(Exhibit 44)**.

> **Response:** **Plaintiff denies this proposition as unsupported. Stating further, most of the cited documents have no identifiers. Plaintiff has voluntarily dismissed Robertson, Kobel and Kolovitz. (See Docket Entry #454).**

162.    James Hickey, Assistant Director of Research and Development for

the CPD, testifying as a Rule 30(b)(6) witness for the City, explained the process involved when the State's Attorney's Office requested a file from the CPD. **(Exhibit 45, Hickey Deposition, pp. 4; 44-45)**.

> **Response:    Plaintiff admits.**

163.    The request would go directly to the Records Division, which would then contact the various units within the CPD that might be able to respond to the SAO's request. Someone in the units would find what the SAO was looking for and make copies. The units would send the information to the Records Division, which would bundle up the documents from the responding units and give it to the requester. The process was clerical in nature. **(*Id*. at 44-45)**.

> **Response:    Plaintiff admits that Hickey so testified. Stating further, Hickey also testified that those persons in these receiving units would do a good-faith search, and that if something is found make copies — hopefully both sides, if it's a two-sided report. Def. Ex. 45, p. 45).**

164.    The Records Division also would handle subpoena requests for a file made by a defense attorney during the course of a criminal proceeding. **(*Id*. at 48-49)**.

> **Response:    Plaintiff admits that Hickey so testified. Stating further, the Records Division would make a determination of which unit best could respond to the subpoena and put the request in interdepartmental mail to the unit of investigative responsibility or the person who may have the unit information. Hickey does not know if the request would be sent to the commanding officer, he only knows that it is sent to the investigative unit of responsibility. Hickey does not know if the Records Division keeps a record of requests sent to investigative units. (Def. Ex. 45, pp. 48-49.)**

165.    Assistant State's Attorney Brian Sexton was one of the prosecutors in Fields' 2009 trial. **(Exhibit 60, Sexton Affidavit, at ¶¶ 2-3)**.

**Response:** **Plaintiff admits. Stating further, ASA Sexton was one of the prosecutors representing the State's Attorney's Office in its opposition to Fields's Innocence Petition hearing, and was a defendant in this case until Plaintiff voluntarily dismissed him.**

166.   The State's decision to proceed to trial in 2009 against Fields for the Smith/Hickman murders would not have been altered by disclosure of the Subject File. There was nothing in the Subject File of evidentiary value inconsistent with the sworn testimony of the three eyewitnesses that Fields was one of the two shooters of Smith and Hickman. (*Id.* at ¶6).

**Response:** **Plaintiff objects to the self-serving testimony of the ASA.**

**Plaintiff admits that ASA Sexton so testified in his affidavit.**

**ASA Sexton was only able to bring the matter to trial again by coercing witnesses to falsely testify and by offering perks to witnesses to testify against Fields. (PASF ¶272-275).**

167.   The State would not have dismissed the charges against Fields had the Subject File been disclosed earlier. If the Subject File had been disclosed earlier, the State still would have proceeded to trial against Fields based on the sworn testimony that he was one of the shooters of Smith and Hickman. (*Id.*)

**Response:** **See response to 166.**

## XI.   *MONELL* CLAIMS

168.   Plaintiff alleges the CPD had a policy and practice to withhold exculpatory information in so-called "street files." **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶63)**.

**Response:** **Plaintiff denies. Stating further, Plaintiff's complaint alleges that constitutional violations occur because of the CPD's policies and practices. Specifically, that "The unconstitutional withholding of exculpatory information from Fields' defense in this case, as well as the possible destruction of the same, was all undertaken pursuant to, and proximately caused by, policies and practices on the part of the Chicago Police Department and acquiesced to by the State's Attorney of Cook County. (Def. Ex. 1, ¶63).**

169.     Plaintiff alleges it was the policy of the CPD to record and preserve investigative materials, including so-called "street files" and "General Progress Reports," in an investigative file case folder. **(*Id.* at ¶64)**.

**Response:** **Plaintiff admits. Stating further, the Constitution and court precedent requires that the City preserve those materials for production to criminal defendants. Brady v. Maryland, 373 U.S. 83 (1963).**

170.     Detective Division Special Order 83-1 was the governing directive concerning detectives' retention of notes of homicide investigations in the 1984-85 time frame. **(Exhibit 17, CPD Special Order 83-1; Exhibit 45, Hickey Deposition, p. 27)**.

**Response:** **Plaintiff admits.**

171.     Detective Division Special Order 83-1 requires the maintenance and retention of working files, investigative documents, and personal notes generated by homicide detectives during an investigation. **(Exhibit 17, CPD Special Order 83-1; Exhibit 45, Hickey Deposition, pp. 50-51)**.

**Response:** **Plaintiff denies Stating further, Special Order 83.1 outlines the requirements for control and retention of "all violent crime field investigation documents and files, which previously may have been referred to as working files, running files or detective's personal files and notes," among other related requirements and guidelines. (Def. Ex. 17).**

172.    Detective Division Special Order 83-1 expressly states it is the policy of the CPD that detectives "preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved." **(Exhibit 17, CPD Special Order 83-1, at Section III)**.

Response:    **Plaintiff admits that Special Order 83-1 so states.**

173.    Plaintiff's disclosed police practices expert, Lou Reiter, did not know whether any other municipality in the country had a written policy like Special Order 83-1 as of 1984. Reiter opined CPD's implementation of Special Order 83-1 was good police practice. **(Exhibit 46, Reiter Deposition, pp. 79-80, 94)**.

Response:    **Plaintiff admits that Lou Reiter stated that he did not know one way or the other whether any other municipalities in the country had a written policy like Special Order 83-1. Stating further, Reiter stated that he understood the reason behind that policy which was the *Palmer* case, wherein the Chicago Police Department was found to be hiding investigative materials from defendants. (Pl. Ex. 149, Report of Lou Reiter, p. 8).**

174.    Special Order 83-1 does not require an audit of CPD's investigative files. **(*Id.* At 87)**.

Response:    **Plaintiff admits that Special Order 83-1 did not require an audit or any procedure to check to see if the "special order" was working or being followed.**

175.    Mr. Reiter was unaware of any evidence that would have suggested to CPD that an audit was required after the implementation of Special Order 83-1. **(*Id.* at 94-95)**.

**Response:** **Plaintiff admits that special order 83-1 had no language suggesting that the CPD should do an audit or otherwise check to see if the special order was actually being followed. Stating further, Mr. Reiter went on to clarify that the lack of any language requiring an audit "[It] basically says that there was a deliberate indifference, they didn't care about these files or the requirement to adhere to 83-1. If you don't audit, then you are going on hope and faith that the people do the job properly. Experience in law enforcement has shown that doesn't always work." (Def. Ex. 46, p. 95).**

176.    Other than this litigation, Mr. Reiter was unaware of any other case since the implementation of Special Order 83-1 in which it was alleged the CPD withheld *Brady* or *Giglio* material from a criminal suspect. **(*Id*. at 85)**.

**Response:** **Plaintiff admits that Mr. Reiter was not called upon to provide expertise on other possible cases.**

177.    Detective Division Special Order 86-3 became effective May 29, 1986, and provided guidelines for the retention and preservation of investigatory materials gathered and generated in certain criminal investigations, including all homicide investigations. **(Exhibit 47, CPD Special Order 86-3)**.

**Response:** **Plaintiff admits that the City enacted rule 86-3 less than three weeks prior to Fields's first trial. Stating further rule 86-3 required the preservation of "documentary materials," not the preservation of "investigatory materials." (Def. Ex. 47)**

178.    Detective Division Special Order 86-3 expressly states it is the policy of the CPD that detectives "preserve and record information and materials obtained in the course of an investigation to ensure not only that information and material incriminating the accused are preserved, but that information and material that might aid in the defense of the accused are preserved as well." **(*Id*. at Section II)**.

**Response:** **Plaintiff admits that Detective Division Special Order 86-3 so**

states.

179.     Plaintiff alleges the CPD had a policy and practice of securing false convictions through flawed investigations. Specifically, plaintiff alleges the CPD in conjunction with other agencies targeted El Rukn street gang members regardless of guilt or innocence and facilitated the malicious prosecutions of those gang members. **(Exhibit 1, Plaintiff's Third Amended Complaint, ¶¶ 68-69; 72-74)**.

> **Response:     Plaintiff denies. Stating further, this proposition suggests that Plaintiff's complaint alleges that it is the CPD's policy to do false investigations. This is false and not supported by the record. Plaintiff is alleging that the CPD policies allow for false investigations. (Def. Ex. 1).**

180.     The federal government became interested in investigating the El Rukns, particularly because of the RICO statute. **(Exhibit 23, Wharrie Deposition, pp. 14-15)**.

> **Response:     Plaintiff admits that Defendant Wharrie so testified at his deposition.**

181.     The Justice Department developed a regional task force known as the Organized Crime Drug Task Force ("OCDTF") made up of Assistant United States Attorneys and agents from various law enforcement agencies in the Northern District of Illinois to jointly investigate and prosecute drug cases. **(Exhibit 16, Deady Deposition, pp. 44-45)**.

> **Response:     Plaintiff admits that Deady so testified at his deposition.**

182.     An investigation of the El Rukns for racketeering and drugs was assigned to the OCDTF. Chicago police officers were assigned to the investigation, along with a member of the Cook County State's Attorney's Office ("SAO") and federal agents from the Bureau of Alcohol, Tobacco & Firearms ("**ATF**"). **(*Id.* at pp. 6-8;**

45-47).

> **Response:** **Plaintiff admits that Deady so testified. Stating further, Deady testified that Brannigan and Kolovitz were Chicago Police officers assigned to the Task Force, and that in various cases there were also DEA agents, FBI agents, customs agents, and U.S. Marshals working on various cases. (Def. Ex. 16, pp. 8, 45).**

183. At various times, CPD officers Brannigan, Kolovitz, Murphy, O'Callaghan, Kobel, and Robertson were detailed to the ATF, SAO, and/or OCDTF as part of the joint investigations of the El Rukns. **(Exhibit 9, O'Callaghan Deposition, pp. 7-8; Exhibit 15, Murphy Deposition, pp. 50-51; Exhibit 13, Brannigan Deposition, p. 110; Exhibit 14, Kolovtiz Deposition, p. 9; Exhibit 10, Kobel Deposition, p. 99; Exhibit 11, Robertson Deposition, pp. 164-67**).

> **Response:** **Plaintiff admits that the above were part of the task force for periods of time.**
>
> **Plaintiff has voluntarily dismissed Robertson, Kobel and Kolovitz. (See Docket Entry #454).**

184. The OCDTF investigated information about the El Rukns provided by cooperating witness Anthony Sumner. **(Exhibit 10, Kobel Deposition, p. 99)**.

> **Response:** **Plaintiff has voluntarily dismissed Kobel. (See Docket Entry #454).**

## XII.    PLAINTIFF'S CLAIMS IN THE THIRD AMENDED COMPLAINT ("TAC")

185. Count I of the Third Amended Complaint ("TAC") is styled as a §1983 claim based on the alleged violation of Plaintiff's due process rights. Count I alleges due process violations arising from Defendant Officers' (1) suppression of and/or failure to disclose exculpatory evidence and (2) coercion of witnesses and/or fabrication of evidence. **(Exhibit A, TAC, ¶¶ 85-86).**

>**Response:** **Plaintiff denies, as there is no "Exhibit A." Stating further, Exhibit 1, Plaintiff's Third Amended Complaint alleges "In the manner described more fully above, the named Defendants' and its employees and agents deprived Fields of his constitutional right to a fair trial by withholding and/or destroying exculpatory evidence, engaging in subornation of perjury, the coercion of witnesses to produce false evidence against Fields and other actions as described herein. These individuals also engaged in the unduly suggestive identification procedures, as described above." (Def. Ex. 1, ¶86).**

186.    Count II of the TAC alleges "Defendants" failed to intervene to prevent the withholding of exculpatory evidence and the fabrication of evidence. **(TAC at ¶94)**.

>**Response:** **Plaintiff denies as incomplete. Stating further, Plaintiff's Third Amended Complaint alleges that "the individual Defendants stood by without intervening to prevent the misconduct, including but not limited to, the deliberate withholding of exculpatory evidence showing Fields actual innocence and the fabrication of evidence." (Def. Ex. 1, ¶94).**

187.    Count III of the TAC alleges "Defendants" conspired among themselves to deprive Plaintiff of his due process rights by fabricating evidence to frame him for the Smith/Hickman murders. Plaintiff also alleges "Defendants" conspired to deprive him of exculpatory evidence that would have led to his more timely exoneration. **(TAC at ¶¶ 99-100)**.

>**Response:** **Plaintiff denies as incomplete. Plaintiff alleges that the *individual* Defendants conspired to deprive Fields of his constitutional rights to a fair trial and liberty, subjected Fields to the death penalty, and delayed his exoneration by fabricating and withholding evidence.**

188.    Count IV of the TAC alleges "Defendant officers" were instrumental in initiating and/or perpetuating a prosecution of Plaintiff for which there was no probable cause. **(TAC at ¶¶ 107-08)**.

> **Response:** **Plaintiff objects to the characterization and rewording of the complaint.**

189.     Count V of the TAC alleges the misconduct described in the pleading constituted intentional infliction of emotional distress. **(TAC at ¶114)**.

> **Response:** **Plaintiff objects to the characterization and rewording of the complaint.**

190.     Count VI of the TAC alleges the misconduct of the "Defendants" described in the pleading constituted a civil conspiracy. **(TAC at ¶118)**.

> **Response:** **Plaintiff objects to the characterization and rewording of the complaint. Stating further, Plaintiff alleges that the individual Defendants acting in concert with other known and unknown co-conspirators engaged in a civil conspiracy. (Def. Ex. 1, ¶118).**

191.     Counts VII and VIII of the TAC allege the City of Chicago should be held liable for the actions of the defendant officers since their alleged misconduct occurred within the scope of their employment activities. **(TAC at ¶¶ 123, 129)**.

> **Response:** **Plaintiff objects to the characterization and rewording of the complaint.**

192.     In July 2011, Plaintiff served answers to interrogatories propounded by Defendants Bogdalek, Minogue, Evans, Hood, Brannigan, Kolovitz, Murphy, O'Callaghan, Casto, Richardson, Kobel , and Robertson. **(Exhibit 48, Plaintiff's Answers to Bogdalek's Interrogatories; Exhibit 49, Plaintiff's Answers to Minogue's Interrogatories; Exhibit 50, Plaintiff's Answers to Evans' Interrogatories; Exhibit 51, Plaintiff's Answers to Hood's Interrogatories; Exhibit 52, Plaintiff's Answers to Brannigan's Interrogatories; Exhibit 53, Plaintiff's Answers to Kolovitz's Interrogatories; Exhibit 54, Plaintiff's Answers to Murphy's Interrogatories;**

**Exhibit 55, Plaintiff's Answers to O'Callaghan's Interrogatories; Exhibit 56, Plaintiff's Answers to Casto's Interrogatories; Exhibit 57, Plaintiff's Answers to Richardson's Interrogatories; Exhibit 58, Plaintiff's Answers to Kobel's Interrogatories; Exhibit 59, Plaintiff's Answers to Robertson's Interrogatories)**.

  **Response: Plaintiff admits.**

  193. Plaintiff has never amended or supplemented his July 2011 answers to the defendants' interrogatories identified in the preceding paragraph. (*Id*.)

  **Response: Plaintiff denies. Over the course of discovery, Plaintiff has supplemented discovery with numerous documents. For example, documents Bates-stamped FIELDS 00151-00366, and two boxes of documents with Bates-stamp starting with FIELDS 00367. (Pl. Ex. 148).**

     Respectfully Submitted,

     /s/ H. Candace Gorman
     One of the Attorneys for Fields

For Fields:

     H. Candace Gorman
Leonard Goodman     220 S. Halsted
Melissa Matuzak     Suite 200
53 W. Jackson Boulevard  Chicago Illinois 60661
Suite 1650     312-427-2313
Chicago, Illinois 60604

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, hereby certify that the foregoing Response to Facts was served to the parties by pursuant to the Court's ECF filing system.

Dated: January 10, 2014

Respectfully Submitted,

 /s/H. Candace Gorman
One of the Attorneys for Fields

For Fields:

Leonard C. Goodman
Melissa Matuzak
53 W. Jackson Boulevard
Suite 1650
Chicago, Illinois 60604
312-986-1984

H. Candace Gorman
220 S. Halsted
Suite 200
Chicago Illinois 60661
312-427-2313