IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | Magistrate Judge Geraldine Soat Brown |

## CITY DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS SUPPLEMENTING PLAINTIFF'S LOCAL RULE 56.1 STATEMENT

Defendants, City of Chicago, David O'Callaghan, Thomas Richardson, Stephen Casto, James Minogue, Joseph Bogdalek, Joseph Murphy, Stephen Hood, Robert Evans, and Daniel Brannigan (jointly, the "City Defendants"), submit this Response to Plaintiff's Statement of Additional Facts Supplementing Plaintiff's Local Rule 56.1 Statement:

236. From 1983 through 1993, defendant Brannigan was a lead investigator in the task force targeting the El Rukn organization; in a sworn statement Brannigan described the investigation as complicated by "many unique investigative obstacles" and that cultivating informants was "extraordinarily difficult." Brannigan described Anthony Sumner as the first major cooperating witness who emerged from that effort of law enforcement. (Exhibit 111: Brannigan 8-16-1995 Affidavit, pp. 1-2.)

**RESPONSE**: Not disputed.

237. On May 9, 1985, defendant Brannigan flew to Cleveland Ohio; the next day he participated in the arrest of Earl Hawkins, Anthony Sumner, and others individuals at an East Cleveland house; it was after these arrests that defendants Brannigan and Wharrie interrogated Sumner in what ATF Agents Thomas O'Brien and Lewis Wolfe described as an "extensive interview" and secured assurances from Sumner that he would cooperate with law enforcement. (Exhibit 28: ATF May of 1985 Report of Investigation).

**RESPONSE**: Not disputed.

238. In the aftermath of the Vaughn-White murders, Anthony Sumner and Earl Hawkins fled to a house in Milwaukee, Wisconsin, where they told a confidential police informant that "they went to the victim's house because the victim 'Joe' owed them some

money" and that Hawkins had ultimately shot Joe and the wife in a struggle – the informant made no mention of Fields. (Exhibit 112: 8-31-1985 Supp. Report).

**RESPONSE**: The City Defendants object to Paragraph 238 as vague and argumentative ("in the aftermath"). Without waiving these objections, the City Defendants do not dispute the August 31, 1985 Supplementary Report (Plaintiff's Ex. 112) reflects the information asserted in this paragraph and that the report does not indicate the informant mentioned Fields' name.

239. In April and May of 1985, Nathson Fields was in Chicago, working as a manager of the African Hut building; around that same time Fields evicted Anthony Sumner from that building because of Sumner's failure to pay the rent. (Exhibit 113: Affidavit of Nathson Fields; Exhibit 114: 3-30-1985 Vaughn/White General Progress Report.)

**RESPONSE**: The City Defendants do not dispute plaintiff's affidavit (Plaintiff's Ex. 113) reflects the information set forth in paragraph 239. The City Defendants object to plaintiff's reliance on Plaintiff's Exhibit 114 as irrelevant; it does not support any of the facts asserted in this paragraph.

240. In the wake of the Vaughn-White murders, Clarence Glenn told police that he had seen Sundown (i.e. Anthony Sumner) approximately a week before the murders, at the 1016 E. 41st street building where Vaughn and White were later killed; Sumner told Glenn that he needed money for rent because he was being "put out." (Exhibit 114: 3-30-1985 Vaughn/White General Progress Report; Exhibit 32: 3-31-1985 Vaughn/White Supp. Report.)

**RESPONSE**: The City Defendants object to Paragraph 240 as vague and ambiguous ("in the wake of …"). Without waiving these objections, the City Defendants do not dispute the referenced exhibits (Plaintiff's Exhibits 114 and 32) support the assertions in Paragraph 240.

241. Defendants Murphy and O'Callaghan swore out complaints for preliminary examination against Fields – Murphy for the Vaughn White murder, and O'Callaghan for the Hickman-Smith murder. (Exhibit 115: Complaints for Preliminary Examination dated 5-17-1985 and 6-14-1985).

**RESPONSE**: Not disputed.

242. On June 25, 1985, defendant Murphy testified before a grand jury regarding Fields's supposed role in the Vaughn-White murders, describing the account of cooperator Anthony Sumner which implicated Fields; Detective O'Callaghan has admitted that he knew of

2

no evidence which corroborated Sumner's account. (Exhibit: 116: 6-25-1985 Murphy Grand Jury Testimony, Exhibit 103: O'Callaghan Deposition, pp. 67-68.)

**RESPONSE**: Not disputed, except to clarify Detective O'Callaghan testified he knew of no evidence which corroborated Sumner's identification of Fields as an offender in the Vaughn/White murders. (Plaintiff's Ex. 103, pp. 67-68).

243. Defendant Brannigan has testified that he did nothing to corroborate the statements of Anthony Sumner implicating Fields in the Vaughn-White murders – and that he knows of nobody who did. (Exhibit 117: Brannigan Deposition, pp. 207-208.)

**RESPONSE**: Not disputed.

244. A report dated March 31, 1985 (two days after the Vaughn and White murders) and signed by defendant O'Callaghan reveals that Sheree Vaughn (age 12) and James Michael Vaughn (age 8) witnessed two men murder Joe White and Dee Eggers Vaughn through a partially open door – and that Sheree Vaughn identified Anthony Sumner as a perpetrator from a photograph array. (Exhibit 32: 3-31-1985 Supp. Report).

**RESPONSE**: Not disputed, except to clarify the report indicates Sheree Vaughn was shown a photographic array and indicated the photograph of Anthony Sumner "looked like" one of the offenders.

245. Felony screening memos in relation to the arrest of Fields for the Vaughn-White murder indicate that Assistant State's Attorneys were (falsely) told that there were no eyewitnesses to the Vaughn-White murders. (Exhibit 118: Vaughn-White Felony Screening Memo.)

**RESPONSE**: The City Defendants object to Paragraph 245 on the basis it is argumentative, lacks foundation, and assumes facts not in evidence. Without waiving these objections: Disputed; Plaintiff's Exhibit 245 does not indicate if Assistant State's Attorneys were "told" anything about the existence of eyewitnesses, and the written statement "No eyewitnesses to incident" in the memo is not attributed to anyone. Further, the State's Attorney's Office was aware of Sheree Vaughn and Michael Vaughn by March 31, 1985. (Plaintiff's Exhibit 32, CITY-NF-001138).

3

246. On April 25, 1985, the Vaughn children viewed a lineup for the Vaughn-White Murders and identified two men, whom police were pursuing as offenders in the Vaughn/White murders. (Exhibit 19: 4-25-1985 Vaughn/White Supp. Report., Exhibit 120: Arrest Warrant for Robert Jackson, Exhibit 121: Arrest Warrant for Counsial Glenn).

**RESPONSE**: The City Defendants object to Paragraph 246 as argumentative ("pursuing an offender"). Without waiving this objection: Not disputed.

247. Defendant Wharrie has testified that he had no recollection of the Vaughn children being brought in for a line-up of Fields, but Wharrie testified that it was something that ought to have been done, given that they were eyewitnesses. (Exhibit 122: Wharrie Deposition, pp. 81-82).

**RESPONSE**: Not disputed.

248. Defendant Brannigan is listed on Plaintiff Fields's arrest warrant, on a June 17, 1985 Supplementary Report, describing Fields arrest and lineup identification, and on an August 31, 1985 Supplementary Report recounting a confidential informant's statement that Hawkins and Sumner (and not Fields) fled to Milwaukee following their role in the Vaughn-White murders. (Exhibit 97: Fields Arrest Warrant, Exhibit 123: 6-17-1985 Supp. Report, Exhibit 112: 8-31-1985 Supplementary Report.)

**RESPONSE**: Not disputed, except to clarify that the August 31, 1985 Supplementary Report does not specifically state the confidential informant said Fields did not flee to Milwaukee with Hawkins and Sumner.

249. In Anthony's Sumner's January 3, 1992 statement given to ASA Jack Hynes; Sumner admitted that he named Fields as a participant in the murders because "[he] was confused and afraid. Nathson Fields had put [his] family out of one of the El Rukn buildings and [he] did not like him." (Exhibit: 27 Sumner Recantation to Hynes).

**RESPONSE**: The City Defendants object to Paragraph 249 as it is vague and ambiguous as to which of the two double murders it refers to. Without waiving the objection, and to the extent this paragraph refers to the Smith/Hickman murders: Disputed. Sumner's January 3, 1992 statement says his statement to the federal grand jury on or about March 23, 1987 was true except for the information specified in the January 3, 1992 statement regarding the Vaughn/White and Barnett Hall murders. (Plaintiff's Exhibit 27). Further, AUSA Hogan advised the State's Attorney's Office on December 10, 1991, that Sumner's prior testimony

4

regarding the Smith/Hickman murders was "completely truthful." (Plaintiff's Exhibit 66). To the extent this paragraph refers to the Vaughan/White murders: Not disputed, with the clarification Sumner stated he named Fields as a participant in the Vaughn/White murders because "I was confused and afraid. Nathson Fields had put my family out of one of the El Rukn buildings and I did not like him." (*Id*.)

250. AUSA William Hogan has testified learned that Anthony Sumner had falsely implicated Nathson Fields in the Vaughn-White murders in May or June of 1991, that that he waited until December of 1991 to notify the Cook County State's Attorney because, he (Hogan) was busy. (Exhibit 110: 10-11-2013 Hogan Testimony, pp. 167-168.)

**RESPONSE**: The City Defendants dispute the assertions contained in paragraph 250 as they are unsupported by the cited portion of the record. AUSA William Hogan testified that in late May or early June 1991 Earl Hawkins told him Nathson Fields was not involved in the Vaughn/White murders. He testified he confronted Sumner about Hawkins' claim that Fields was not involved in the Vaughn/White murders in December 1991. He testified he did not confront Sumner sooner because he was on trial and/or supervising El Rukn trials during that time frame and Sumner was out of town. He testified his recollection was he talked to Sumner on December 9, 1991 and wrote a letter to the Cook County State's Attorney's Office regarding the misinformation about Fields' involvement in the Vaughn/White murders on December 10, 1991. (Plaintiff's Ex. 110).

251. On June 25, 1985, defendant O'Callaghan testified before a grand jury regarding Fields's supposed role in the Hickman-Smith murders – O'Callaghan testified that Fields had been identified by eyewitnesses as a shooter in the Hickman-Smith murder. (Exhibit 124: 6-25-1985 O'Callaghan Grand Jury Testimony).

**RESPONSE**: The City Defendants object to this paragraph as argumentative ("supposed role"). Without waiving the objection: Not disputed.

252. Defendant O'Callaghan testified that in the course of the Hickman-Smith investigation, he "knocked on every door in the complex; including a "hundred apartments," and that the police were "going after" people who had been identified on the scene "and

5

hundreds more, every door on every floor was knocked on." (Exhibit 103: O'Callaghan Deposition, pp. 112, 177, 182.)

**RESPONSE**: Not disputed.

253. In the wake of Fields's arrest, Assistant State's Attorney Jack Hynes wrote a memo to Assistant State's Attorney Tim Quinn, who held a supervisory role at the time, informing Quinn that defendant O'Callaghan had information on the Hickman-Smith witnesses and that, according to detectives, the witnesses to the Hickman-Smith shooting were not gang members. (Exhibit 125: Hynes Note to Quinn; Exhibit 122: Wharrie Deposition, pp. 84-86)

**RESPONSE**: The City Defendants object to this paragraph as argumentative ("in the wake of …") and not relevant to any issue on summary judgment. Without waiving these objections: Not disputed, except to clarify there is nothing in the memo to suggest it was written "in the wake of Fields' arrest" or that Quinn "held a supervisory role."

254. A Crime lab report purporting to relate to a Hickman-Smith lineup, and signed by defendant Joseph Murphy, indicates that one Ray Fergerson was identified by persons viewing the lineup; later the detective division version of this document shows Fergerson's name was crossed; a supplementary report drafted three days later shows Hawkins name being inserted as the person identified in the line-up. (Exhibit 126: Crime Lab Lineup Reports with Fergerson identified and later scratched out, Exhibit 127: 5-21-1985 Supp. Report.)

**RESPONSE**: The City Defendants object to Paragraph 254 as argumentative ("Hawkins' name being inserted") and not relevant to any issue raised on summary judgment. Without waiving these objections: Not disputed, with the following clarifications. On May 18, 1985 during the Smith/Hickman investigation, witnesses viewed a line-up that included Earl Hawkins and Ray Fergerson (DSOF ¶51); the witnesses identified Earl Hawkins as an offender in the Smith/Hickman murders, but Detective Coffman, who was not present at the line-up mistakenly noted on a Crime Laboratory Report form that Ray Fergerson had been identified (DSOF ¶52); when Murphy, who had been present at the line-up, saw the report erroneously indicated Fergerson had been identified, he scratched out the word "identified" that had been placed next to Fergerson's name (DSOF ¶53); the Crime Laboratory Report form that Coffman filled out consists of a set of duplicate pages, with the Detective Division copy on top, and the

6

Detective Division copy reflects Murphy's crossing out of the word "identified" next to Fergerson's name (DSOF ¶54); and the supplementary police report pertaining to the May 18, 1985 line-up reflects that Hawkins was identified by the witnesses. (DSOF ¶55).

255. Defendant Murphy has admitted that it was "absolutely" impossible for Ray Fergerson to have been involved in the Hickman Smith shooting. (Exhibit 128: Murphy Deposition, pp. 183-185)

**RESPONSE**: The City Defendants object to Paragraph 255 as not relevant to any issue raised on summary judgment. Without waiving this objection: Not disputed.

256. A general progress report, signed by defendant Murphy concerning the Hickman-Smith homicide, purportedly dated May 14, 1985, appears in neither the eight pages of notes tendered to Fields at trial, or in the CPD's permanent retention file for the Hickman-Smith shooting, nor the recently tendered street file. (Exhibit 1: Street File, Exhibit 129: Permanent Retention File, Exhibit 43: 8 pages of notes from the State's Attorney's Office, Exhibit 33: Murphy GPR dated May 14.)

**RESPONSE**: The City Defendants object to Paragraph 256 as argumentative ("street file") and as unsupported by the record to the extent it implies Mr. Smeeton received a total of only eight pages of police department records in response to his subpoena (*see* City Defendants Response to Plaintiff's Rule 56.1 Statement of Fact, ¶56). Without waiving these objections: The City Defendants do not dispute the general progress report identified as Plaintiff's Exhibit 33 is not contained in the eight pages identified as Plaintiff's Exhibit 43, the permanent retention file identified as Plaintiff's Exhibit 129, or the subject file identified as Plaintiff's Exhibit 1.

257. In a body of handwritten notes which defendant Murphy has acknowledged to be his own, taken during interviews with Earl Hawkins in 1988, Murphy appears to review a series of crimes which were pinned on the El Rukns; on page 19 of these notes, Murphy makes an entry for "Talman Hickman + Jerome Smith" and below this makes the notation "Refer to the notes I took in April 1986 in <u>Special Notes</u>." (Exhibit 130: Murphy Notes from 2-9-1988, Exhibit 128: Murphy Deposition, pp. 283-286).

**RESPONSE**: The City Defendants object to paragraph 257 as argumentative ("pinned on"), unsupported by the record (same), and vague ("appears to review …"). Without waiving these objections: the City Defendants do not dispute Murphy acknowledged the handwritten

7

notes identified as Plaintiff's Exhibit 130 were his own and were taken during interviews with Earl Hawkins in 1988, and they do not dispute page 19 of those notes says "Talman Hickman + Jerome Smith" and below that, "Refer to the notes I took in April 1986 in <u>Special Notes</u>."

258. Murphy has testified that the April 1986 "Special Notes" referenced above, refer to a general progress report, which is double-dated May 14, 1985 and May 14, 1986. Exhibit 128: Murphy Deposition, pp. 283-286).

**RESPONSE**: Not disputed, except to clarify Murphy testified the general progress report (Plaintiff's Exhibit 33) was prepared on May 14, 1985. (Plaintiff's Exhibit 128, at 284-85).

259. In a May 1, 1991 memorandum to the Commanding Officer of Area 2 Detective Division, and a sergeant in Internal Affairs, defendant Murphy conceded that he had interviewed Anthony Sumner on May 14, 1985 about the Ronnie Bell murder. (Exhibit 131: 5-1-1991 Murphy Memo re: *Houston v. Partee*).

**RESPONSE**: The City Defendants object to Paragraph 259 as argumentative ("conceded") and not relevant to any issue raised on summary judgment. Without waiving the objection: Not disputed.

260. The City contends that it has lost its litigation file in *Houston v. Partee* in which Murphy, Brannigan, and Wharrie were all named as defendants. (Exhibit 52: City's Answers to Second Request to Admit, No 12).

**RESPONSE**: The City Defendants object to Paragraph 260 as partially unsupported by the record cited and not relevant to any issue raised on summary judgment. Without waiving these objections, the City Defendants do not dispute Murphy, Brannigan, and Wharrie were named defendants in the *Houston v. Partee* litigation. The City Defendants do not dispute the City has been unable to located the litigation file from the 1990 *Houston v. Partee* civil lawsuit.

261. A General Progress Report signed by defendant Murphy and describing Sumner's account of the Hickman-Smith murders implicating Fields, shows the date of May 14, 1985 at the head of the page but it shows the date of May 14, 1986 as the date he signed it. (Exhibit 33: Murphy May, 14 GPR.)

8

**RESPONSE**: Not disputed, except to clarify Murphy prepared the general progress report on May 14, 1985, and the insertion of "May 14, 1986" in a box at the bottom of the form was a mistake. (Plaintiff's Exhibit 128, at 284-86).

262. In June of 1986, while Fields's trial was ongoing, federal law enforcement communicated to the Cook County State's Attorney's Office, their suspicions that William Swano was arranging a bribe with Judge Thomas Maloney. (Exhibit 132: 6-18-1986 FBI Teletype, pp. 4-5.)

**RESPONSE**: Not disputed.

263. As he has previously testified, Nathson Fields knew nothing about the attempt to bribe Judge Maloney before the attempted bribe became public knowledge; Nathson Fields was never contacted or questioned by law enforcement personnel about the bribe. (Exhibit 113: Affidavit of Nathson Fields.)

**RESPONSE**: Disputed. *See* City Defendants' Response to Plaintiff's Local Rule 56.1 Statement, ¶120). The City Defendants do not dispute Exhibit 113 indicates Fields claims he was never contacted or questioned by law enforcement personnel about the bribe.

264. As the Hickman-Smith murder trial was about to commence, George Carter, initially one of Fields's co-defendants, was dismissed from the case and walked free. (Exhibit 133: Deposition of George Carter, pp. 97-98.)

**RESPONSE**: The City Defendants object to Paragraph 264 as vague and argumentative ("walked free"). Without waiving these objections, and to the extent "walked free" means Carter was released from custody: Not disputed.

265. A Supplemental Report signed by defendants Murphy and O'Callaghan and describing a supposed identification of George Carter in a Hickman-Smith lineup, shows Carter was identified by witnesses on May 18, 1985 – days before Carter's actual arrest on May 21, 1985 – the day his arrest warrant was issued. (Exhibit 134: Carter Warrant, Exhibit 135: ASA Memo on George Carter's Arrest, Exhibit 136: 5-21-1985 George Carter Arrest Supp. Report).

**RESPONSE**: The City Defendants object to Paragraph 265 as not relevant to any issue raised on summary judgment. Without waiving this objection: The City Defendants do not dispute Carter was arrested on May 21, 1985, and was identified by witnesses in a line-up held on that date. The City Defendants do not dispute a Supplementary Report signed by

9

O'Callaghan and Murphy (Plaintiff's Exhibit 136) erroneously lists the date of the Carter line-up as May 18, 1985. The City Defendants do not dispute the Carter arrest warrant was issued May 21, 1985.

266. George Carter was later charged with the Smith-Hickman murders in the federal indictment brought against Carter and dozens of other El Rukns; Derrick Kees and Earl Hawkins testified against Carter but he was acquitted on the Hickman and Smith murder charges. (Exhibit 133: Deposition of George Carter, p. 58.)

**RESPONSE**: The City Defendants object to Paragraph 266 as not relevant to any issue raised on summary judgment. Without waiving this objection: Not disputed that Carter so testified.

267. In 1984, Carlos Willis lived with his grandmother near the scene of the Hickman-Smith murders. At the Willis [*sic*] heard the gunshots and looked out his window, saw the bodies and then saw two men running from the scene of the murder with masks on, because of the masks he was unable to identify the men. Willis testified that defendant O'Callaghan tried to get him to identify Hawkins in the line-up by repeatedly asking Willis if he recognized Hawkins, which Willis was unable to do. (Exhibit 137: 6-23-1986 Testimony of Carlos Willis, pp. 526-534)

**RESPONSE**: The City Defendants object to Paragraph 267 as hearsay and not relevant to any issue raised on summary judgment. Without waiving these objections: The first sentence is not disputed. As to the second sentence, the City Defendants dispute Willis' cited testimony supports the assertions that he looked out his window, saw the bodies, and saw two men running from the scene. The City Defendants do not dispute Willis testified as indicated in the third sentence.

268. Evelyn Custer, Carlos Willis' grandmother, testified that she overheard O'Callaghan tell her grandson "don't worry about anything" and "just to agree with, you know, what he was saying." Custer also testified as to improper suggestions of favors by O'Callaghan. (Exhibit 138: 6-23-1986 testimony of Evelyn Custer, pp. 546-550).

**RESPONSE**: The City Defendants object to Paragraph 264 as hearsay, vague ("suggestions of favors"), argumentative ("improper"), and not relevant to any issue raised on summary judgment. Without waiving these objections, the City Defendants do not dispute

10

Custer testified "I didn't hear all of it, but my grandson didn't want to go in there and he, you know, told him don't worry about anything and just to agree with, you know, what he was saying." The City Defendants dispute Custer's cited testimony supports the assertion in the second sentence.

269. In Earl Hawkins' initial meetings with defendant Brannigan at Menard (upon Hawkins' decision to cooperate with law enforcement in 1987) Earl Hawkins offered statements concerning the murder of Willie Bibbs; Hawkins felt comfortable raising the Bibbs murder because he had already been unsuccessfully prosecuted for that crime, and he believed that he was now safe from prosecution under the double jeopardy rule; Hawkins testified that Brannigan told Hawkins "You got to show something that would show good face (sic) ... You better come up with something quick.." (Exhibit 109: Hawkins Deposition, pp. 101-103.)

**RESPONSE**: Not disputed that Hawkins so testified.

270. Earl Hawkins has testified that defendant Brannigan helped convince him (Hawkins) to cooperate by assuring him that he would only serve 20 years in prison, a period which Hawkins considered "doable." (Exhibit 109: Hawkins Deposition, pp. 186-187.)

**RESPONSE**: Not disputed.

271. Earl Hawkins has repeatedly testified that he would say anything to avoid the death penalty. (Exhibit 139: Hawkins Testimony of 2-25-2009, p. 87, Exhibit 140: Hawkins Testimony in *People v. Fort* date: 10-18-1988, p. 224)

**RESPONSE**: The City Defendants object to Paragraph 271 as vague and argumentative. Without waiving these objections: Not disputed Hawkins testified he would lie to get off death row, and "you could say" that he would say anything to get off of death row.

272. In exchange for his testifying for the state in Fields's 2009 murder trial, Earl Hawkins entered into an agreement with the Cook County State's Attorney's Office whereby his murder charges were dismissed and he pleaded guilty to two counts of armed violence, for which he would serve 42 consecutive years per count. (Exhibit 139: Hawkins Testimony of 2-25-2009, pp. 5-7.)

**RESPONSE**: Not disputed, with the clarification the term of 84 years would run concurrently with his federal sentence of 60 years.

273. On December 9, 2013, in exchange for testifying against Fields in this proceeding and in the civil innocence hearing, Earl Hawkins had his sentence reduced from two consecutive 42 year sentences in Illinois state prison time to two consecutive 39 year sentences, with an

11

understanding that he would not serve any state time beyond his 60-year federal sentence. (Exhibit 141: Hawkins 12-9-2013 Plea Agreement, Exhibit 142: Hawkins Testimony 8-21-2013, pp. 202-207)

**RESPONSE**: Disputed; the Plea Agreement expressly indicates it is limited to the Cook County State's Attorney's Office, and reflects Hawkins' agreement to "fully and truthfully cooperate with the People of the State of Illinois." The State's agreement with Hawkins was not made with respect to this lawsuit.

274. On October 9, 2013, in exchange for testifying against Fields in this proceeding and in the civil innocence hearing, Derrick Kees received a five-year reduction in his Illinois state prison sentence. (Exhibit 143: Derrick Kees 10-9-2013 Plea Hearing, p. 10.)

**RESPONSE**: Disputed; the agreement between the State and Kees was for his truthful testimony in the certificate of innocence proceeding. (Plaintiff's Exhibit 43, at 8-9). The State's agreement with Kees was not made with respect to this lawsuit.

275. Between 2012 and 2013, the Cook County State's Attorney's Office covered at least three rental payments for Tramell Davis, saving him from eviction, in exchange for testifying against Fields in this proceeding and in the civil innocence hearing. (Exhibit 144: Tramell Davis Deposition, pp. 137-138)

**RESPONSE**: Disputed; according to the portion of the testimony cited in this paragraph, the State provided rent assistance to Davis so he would not get evicted and financial assistance for him to come to Chicago for a deposition. There is no evidence anything was provided to Davis in exchange for him testifying against Fields in this lawsuit.

276. On May 4, 2012, this Court entered a minute order granting a motion for a protective order brought by witness Gerald Morris's attorney Heather Winslow, and barring the parties or their attorneys from contacting Gerald Morris, other than through questions in a duly noticed deposition. The order states in part: "absent prior order of court, no party in this case, no attorney for any party in this case, and no person acting on behalf of or in concert with any party or attorney for any party may have contact with Morris other than to question him at a duly noticed deposition;" the Court directed all counsel to communicate the order to their clients. Docket 225.

**RESPONSE**: The City Defendants object to Paragraph 276 as not relevant to any issue raised on summary judgment. Without waiving this objection: Not disputed.

277. On July 2, 2013, at the request of ASA Brian Sexton, investigators for the Cook County State's Attorney's Office drove to Jefferson City, MO to contact Gerald Morris and question him about the Nathson Fields case. When Morris refused to identify himself to the detectives they obtained a photo of Morris and returned to his home with a uniformed Jefferson City police officer. Morris identified himself but refused to be interviewed (Exhibit 145: 7-9-2013 SAO Investigative Report).

**RESPONSE**: The City Defendants object to Paragraph 277 as not relevant to any issue raised on summary judgment. Without waiving this objection, the City Defendants do not dispute Exhibit 145 contains information supporting the assertions in this paragraph.

278. As of January 9, 2014 Heather Winslow, Gerald Morris' attorney, has never been contacted by Brian Sexton or any personnel from the Cook County State's Attorney's Office regarding their outreach to Morris; after learning of the state's attorneys attempts to contact Morris she made at least two calls to ASA Sexton, leaving messages specifically inquiring about the contacts with Gerald Morris, and received no response. (Exhibit 146: Affidavit of Heather Winslow).

**RESPONSE**: The City Defendants object to Paragraph 278 as not relevant to any issue raised on summary judgment. Without waiving this objection, the City Defendants do not dispute Exhibit 146 contains information supporting the assertions in this paragraph.

279. As a result of Fields's wrongful conviction, his time on death row, his time incarcerated, and his time spent out of jail awaiting a new trial, Fields has [*sic*] Some of the symptoms he has include: trouble sleeping (and when sleeping having nightmares about his time in prison on death row); trouble concentrating; constant fear because of how easy it was for the police to frame him. He also has trouble keeping the thoughts out of his head of his imprisonment, the conditions he was subjected to, and, the men he watched walk to their death while on death row. He has been diagnosed with post-traumatic stress disorder. (Exhibit 113: Affidavit of Nathson Fields.)

**RESPONSE**: Disputed. (*See* DSOF, ¶128).

13

Dated: January 24, 2014					Respectfully submitted,

						By: s/ Paul A. Michalik
						    One of the Attorneys for City Defendants

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
(312) 876-1700 (telephone)
(312) 876-1155 (facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2014, I electronically filed the foregoing **City Defendants' Response to Plaintiff's Statement of Additional Facts Supplementing Plaintiff's Local Rule 56.1 Statement** with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to:

| | |
|---|---|
| H. Candace Gorman | Stephen L. Garcia |
| Law Office of H. Candace Gorman | Office of the Cook County State's Attorney |
| 220 S. Halsted | 500 Richard J. Daley Center |
| Suite 200 | Chicago, IL 60602 |
| Chicago, IL 60661 | 312.603.5475 |
| 312.427.2313 | stephen.garcia@cookcountyil.gov |
| hcgorman1@gmail.com | |

and

Leonard C. Goodman
Melissa A. Matuzak
Law Offices of Leonard C. Goodman
53 W. Jackson
Suite 1220
Chicago, IL 60604
312.986.1984
lcgoodman@rcn.com
melissamatuzak@gmail.com

s/ Paul A. Michalik