**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATHSON FIELDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 1168** |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

This case concerns Nathson Fields's prosecution, conviction, incarceration, and subsequent acquittal for the 1984 murders of Talman Hickman and Jerome Smith. Fields has sued the City of Chicago and a number of Chicago police officers, at least some of whom are now retired, as well as two former Cook County prosecutors and the County. Fields asserts claims under 42 U.S.C. § 1983 for violation of due process, failure to intervene, and conspiracy, and state law claims for malicious prosecution, intentional infliction of emotional distress, conspiracy, and indemnification.

The City of Chicago and the remaining police officer defendants[1] have moved for summary judgment on Fields's claims against them. Fields has moved for partial summary judgment as to liability on a part of his claim that defendants violated his due process rights. For the reasons stated below, the Court grants defendants' motion for

---

[1] Fields's claims against defendants Robertson, Kobel, and Kolovitz were recently dismissed pursuant to stipulation.

summary judgment in part and denies it in part and denies Fields's motion for partial summary judgment.

## Background

The Court first provides an overview of the background for Fields's claims and then will discuss the facts as necessary in the Discussion section of this decision.

On April 28, 1984, Hickman and Smith were shot to death outside of a public housing complex in Chicago. Both men belonged to the Black Gangster Goon Squad, a street gang that was a rival of the El Rukn street gang. Witnesses reported seeing two masked men approach Hickman and Smith from behind and shoot them in the back of their heads. An investigation by the Chicago Police Department ensued, but no arrests were made. Several eyewitnesses to the shooting were interviewed; none of them identified Fields as a shooter.

In the meantime, federal law enforcement authorities, together with Chicago police and other local law enforcement agencies, were conducting a wide-ranging investigation of the El Rukn gang, of which Fields allegedly was a member. In the course of that investigation, law enforcement identified an El Rukn "safe house" near Cleveland, Ohio and raided it in May 1985. There they arrested, among others, an El Rukn member named Anthony Sumner. Fields contends that Sumner had fled there along with El Rukn member Earl Hawkins after murdering Joe White and Dee Eggers Vaughn during a drug-related robbery in Chicago. Fields alleges that certain of the defendants in this case induced Sumner to falsely implicate him in both the Smith/Hickman and White/Vaughn murders and to fabricate a story that he had confessed to Smith/Hickman murders.

Fields also contends that in May 1985, certain of the defendants induced Randy Langston and Gerald Morris, who had witnessed the Smith/Hickman murders, to falsely identify Fields as one of the perpetrators. Fields alleges that certain of the defendants induced Randy Langston, Eric Langston, Gerald Morris, and perhaps others to falsely identify him in a lineup as one of the perpetrators. Fields was charged with the Smith/Hickman murders in June 1985, along with Earl Hawkins and George Carter, though the charges against Carter were dropped just before trial.

According to Fields, the defendants concealed their fabrication of the inculpatory evidence, including the identifications; concealed information containing leads that pointed toward other possible perpetrators and away from Fields; and failed to memorialize exculpatory information and information otherwise helpful to the defense. He points to, among other things, a Chicago Police Department "street file" containing information of this sort that, despite his repeated requests, was never produced in connection with the criminal case and did not surface until discovery in the present civil case.

Fields and Hawkins went to trial in June 1986 before Cook County Circuit Judge Thomas Maloney. The prosecution sought a death sentence. Both defendants waived a jury for both the guilt phase of the trial. Fields was represented by an attorney named Jack Smeeton, and Hawkins was represented by William Swano. Before the trial, Swano, dealing with an intermediary named Robert McGee, offered to pay Maloney $10,000 to fix the case. McGee reported that Maloney agreed, and Swano delivered the bribe to McGee after the first day of the trial. Two days later, McGee contacted Swano and said he wanted to give the money back because the case was going too

well for the prosecution. Swano told McGee to keep the money and wait for the defense to put on its case. He then told Hawkins that the fix might not go through and that the judge was concerned that federal law enforcement was watching him. The next day, Swano spoke to Maloney, telling him he should live up to his bargain. Maloney told Swano, "We'll see." After closing arguments, Maloney took the case under advisement. Later that day, McGee told Swano that Maloney would not go through with the deal, and the next morning, the bribe money was returned to Swano. Maloney entered a guilty finding as to both Hawkins and Fields later that day. *See generally People v. Hawkins*, 181 Ill. 2d 41, 46-48, 690 N.E.2d 999, 1001-02 (1998).

Both Fields and Hawkins waived their right to a jury for purposes of determining their statutory eligibility for the death penalty but insisted on a jury for the remainder of the penalty phase of the trial. During the penalty phase, Randy Langston, who had testified for the prosecution during the guilt phase of the trial, testified that defendant O'Callaghan, a Chicago police officer, had induced him to falsely identify Fields as one of the perpetrators. Eric Langston testified that O'Callaghan had induced him to do the same. During the penalty phase, prosecutors also offered testimony by Anthony Sumner implicating Fields in the White/Vaughn murders.

The jury found no mitigating circumstances sufficient to preclude imposition of a death sentence. Maloney then sentenced both Fields and Hawkins to death. In February 1990, the Illinois Supreme Court affirmed Fields's conviction and sentence. See *People v. Fields*, 135 Ill. 2d 18, 552 N.E.2d 791 (1990).

In 1987, while Fields's direct appeal was pending in the Illinois courts, Hawkins began cooperating with the authorities, including federal law enforcement. One of the

matters he reported to the authorities was the bribery of Maloney, who was later indicted on federal charges. Eventually a deal was negotiated to remove Hawkins from death row in return for his testimony against other El Rukn members.

In 1991, Anthony Sumner told certain of the defendant police officers and a federal prosecutor who was investigating the El Rukns that he and Hawkins had committed the Vaughn/White murders and that his claim of Fields's involvement was fabricated. In January 1992, Sumner provided a signed statement to that effect to Chicago police and Cook County prosecutors.

In April 1993, former Judge Maloney was convicted on federal charges of conspiracy, racketeering, extortion, and obstruction of justice. Fields, who was still on death row, filed a petition for post-conviction relief. A state court judge granted Fields's petition in January 1996, ordering a new trial on the ground that Maloney's corrupt conduct prevented Fields from receiving a fair trial. Cook County prosecutors appealed, and the Illinois Supreme Court affirmed the grant of post-conviction relief in January 1998. *See People v. Hawkins*, *supra.*

Fields's retrial was delayed for a number of years, evidently due in significant part to interlocutory appeals by the prosecution of unfavorable rulings. Fields remained in custody until 2003, when he was released on bond.

Fields was retried for the Hickman/Smith murders in 2009. In the interim, Sumner had died. The authorities made a deal with Hawkins to dismiss the Smith/Hickman murder charges against him and not to prosecute him for the Vaughn/White murders, in return for his cooperation against Fields. Hawkins testified for the prosecution against Fields' at his retrial on the Smith/Hickman case. At this trial,

the prosecution's theory was that George Carter, another El Rukn, had done the shooting along with Fields. Randy Langston, who by this time had recanted his recantation, again testified against Fields. The state trial judge, Vincent Gaughan, found that both Hawkins and Langston lacked credibility. He acquitted Fields of the murder charges. Fields's application for a certificate of innocence is currently pending in state court.

Fields has asserted three claims under 42 U.S.C. § 1983. First, he contends that defendants violated his due process rights by, among other things, fabricating evidence, engaging in suggestive identification procedures, and withholding exculpatory evidence in violation of *Brady v. Maryland* and its progeny. This claim includes an allegation that the City maintained a policy of failure to disclose exculpatory evidence in criminal cases. Second, Fields alleges that certain defendants failed to intervene to protect his constitutional rights. Third, Fields claims that the individual defendants conspired to frame him for the Smith/Hickman murders. In addition, Fields asserts claims under Illinois law for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification.

### Discussion

Both sides have filed summary judgment motions. Fields's summary judgment motion concerns the aforementioned "street file," the non-production of which is part of the basis for his due process claim. Fields contends that he has proven all of the elements of a *Brady* violation with regard to the street file. It is unclear whether Fields seeks summary judgment just against the City or also against other defendants.

In their motion for summary judgment, defendants argue, first, that they are entitled to summary judgment on the part of Fields's due process claim that concerns his 1986 conviction on the ground that, given the Maloney bribe, Fields cannot prove the outcome of the trial would have differed absent the alleged constitutional violation. Second, defendants seek summary judgment on Fields's due process claim insofar as it relates to his second trial, on the ground that his acquittal precludes him from showing the requisite prejudice. Third, defendants contend there is no evidence that any individual defendant withheld the street file that Fields contends was never produced. Fourth, each individual defendant argues that Fields cannot prove the requisite personal involvement in the purported due process violations. Fifth, the individual defendants argue that Fields cannot show the predicate for a claim of failure to intervene. Sixth, they argue that his federal conspiracy claim is deficient because there is no evidence of a conspiratorial agreement. Seventh, the City argues that Fields cannot show that it had a policy or practice that caused a constitutional violation. Eighth, the individual defendants argue that Fields cannot show sufficient involvement on their part to render them liable for malicious prosecution, and they also argue that probable cause existed for the prosecution of Fields. Ninth, the defendants seek summary judgment on Fields's other state law claims on grounds parallel to certain of their arguments on the federal claims.

Summary judgment is proper if the moving party shows that there is no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Conversely, summary judgment is inappropriate "if a material issue of fact exists that would allow a reasonable jury to find in favor of the non-

moving party." *Spurling v. C & M Fine Pack, Inc.*, ___ F.3d ___, No 13-1708, 2014 WL 107968, at *3 (7th Cir. 2014) .

## A.    Due process claim (Count 1)

Fields' due process claim is assessed, at least for the most part, under the now-familiar rubric of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.[2]  There are "three basic elements:  (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'"  *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).  And as one of the Supreme Court cases relied upon by defendants holds, the disclosure obligation under *Brady* extends to the police, not just prosecutors.  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *see Carvajal*, 542 F.3d at 566.

### 1.    The 1986 conviction

Defendants' first argument is that Fields cannot maintain a due process claim relating to his conviction in 1986, because the conviction was the result of the bribery episode, not any claimed violation of Fields's due process rights by the police.  At oral argument, defendants also suggested that the state courts' determination, in connection with Fields's post-conviction petition, that the bribery of Maloney had rendered the trial unfair precludes a contrary finding here, and/or that Fields's advocacy of that position in the state post-conviction case estops him from claiming here that a due process violation caused his conviction.

---

[2]  Fields's due process claim also includes allegations of fabrication of evidence and suggestive identification procedures.  The Court need not decide definitively at this point whether these aspects of the claim are assessed under the same standard quoted in the text.

Defendants cited no authority supporting the latter arguments in their briefs, and they were unable to identify any when asked to do so at oral argument. Both arguments are unavailing. The doctrine of judicial estoppel requires a party's later position to be "clearly inconsistent with its earlier position," among other things. *See, e.g., Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013). There is nothing inconsistent in Fields claiming earlier that his due process rights were violated because the judge in his criminal trial had been bribed and claiming now that his due process rights were violated because exculpatory evidence was concealed and withheld. As the Seventh Circuit has recognized, there can be more than one proximate cause for an injury. *See, e.g., Whitlock v. Brueggeman*, 682 F.3d 567, 583 (7th Cir. 2012). For essentially the same reason, the doctrine of issue preclusion, or collateral estoppel, does not bar Fields from claiming a *Brady* violation based on the state courts' findings regarding the effect of the bribery on his trial. The collateral estoppel doctrine in Illinois (which governs the effect here of an Illinois judgment, *see Rock Energy Coop. v. Vill. of Rockton*, 614 F.3d 745, 750 (7th Cir. 2010)) "bars relitigation of an issue already decided in a prior case." *People v. Tenner*, 206 Ill. 2d 381, 396, 794 N.E.2d 238, 247 (2002). Because there can be more than one proximate cause, that issue was not decided in the post-conviction case in a way that bars Fields here.

Defendants' more serious contention is that given the events surrounding the bribe, Fields cannot prove that the criminal case would have come out differently, i.e., that he would have been acquitted, absent the due process violations claimed in this case. Defendants say, "[b]ecause it is impossible to say what the outcome of the trial would have been absent the bribe, it is similarly impossible for a trier of fact in this case

to find there is a reasonable probability the outcome of that trial would have been different absent the alleged *Brady* violation." City Defs.' Jt. Mem. in Support of Mot. for Summ. J. at 7-8. Defendants also argue that "[t]he bribe was an intervening, superseding event that severed any causal link between the alleged suppression of evidence and the trial result." *Id.* at 8.

There is a genuine factual dispute that precludes granting summary judgment for defendants on this point. As Fields points out in response to defendants' motion, Maloney evidently attributed his initial inclination to return the bribe money—and thus, arguably, his determination to convict—to the strength of the prosecution's case at the criminal trial. And Fields has a straight-faced argument that the strength of the prosecution's case was, in turn, directly attributable to the police officers' fabrication of inculpatory evidence and concealment of exculpatory evidence. This suggests that things might have, in fact, happened differently absent the claimed due process violation. In this regard, it is important to recall that Fields is not required to prove beyond a shadow of a doubt that he would have been acquitted, but rather by a preponderance of the evidence that there is a "reasonable probability" that the outcome of the trial would have been different had the authorities not violated his rights. *Carvajal*, 542 F.3d at 567.

There are, of course, problems with this argument. It can be understood to suggest that if due process had been complied with and the prosecution's evidence had been weaker as a result, Maloney would have kept the bribe and acquitted. That is, to say the least, a rather unpalatable backdrop for a due process claim. Putting that argument aside, however, one cannot rule out that Fields will be able to show that if the

prosecution's evidence had been weaker, the bribe would not have been perceived by Hawkins's lawyer to be "necessary" at all. In addition, it is also important to keep in mind that Fields has resolutely denied any awareness of the bribe. This suggests the possibility that a jury reasonably could find that it was meant to buy only Hawkins's acquittal, not Fields's. In that event, Fields's proximate cause argument would be stronger still.

In denying summary judgment on the basis argued by defendants, the Court expresses no view regarding whether or how the events surrounding the bribe, Maloney's expressed doubts, Swano's discussions with McGee, and the bribe's return will be admitted into evidence at the trial. Defendants do not address evidence-admissibility issues but rather paint with a broader brush, arguing that the bribe evidence makes Fields' *Brady* claim impossible to prove on causation grounds. The Court overrules that argument for the reasons stated. On the record before the Court, both the impossibility-of-proof argument and the supervening-cause argument present genuine factual disputes that the Court cannot appropriately resolve on summary judgment.

The Court also notes Fields's repeated reference to the proposition that *Brady* imposes continuing duties and the fact that he was incarcerated for an extended period following his 1986 conviction. This suggests a separate theory of causation, in which (contrary to defendants' argument) the alleged ongoing *Brady* violations supersede whatever causative effect on the outcome of Fields's trial the Maloney bribery episode might be considered to have. As the Seventh Circuit has noted, the obligation imposed by *Brady* "does not cease to exist at the moment of conviction." *Whitlock*, 682 F.3d at

588.  Thus defendants' obligation to disclose the materials claimed to be exculpatory continued even *after* Fields's conviction, while his case was on appeal, and perhaps even after the appeal was decided.  The factual scenario in this case suggests that even if causation issues involving the outcome of the trial itself end up impossibly complicated by the Maloney bribe, Fields still could establish that his conviction—which was affirmed in 1990 and not overturned until several years later—would have been vacated sooner but for the continued concealment of *Brady* material.  This alternate theory, which appears to be legally viable, likewise permits Fields to proceed with his *Brady* claim as it relates to his 1986 conviction.  Again, the Court hastens to note that it has not been called upon by defendants' motion to assess the evidence in this regard.  Rather, the Court has addressed the only materiality/causation argument defendants have made concerning the 1986 conviction, namely that the Maloney bribery episode eliminates, as a matter of law, Fields's ability to prove proximate causation.  The Court concludes that it does not, for the reasons discussed.

### 2.     The retrial

Defendants also argue that Fields cannot maintain a due process claim concerning his retrial because he was acquitted and thus cannot prove that the outcome would have been different, which as noted earlier is typically an element of a claim of this type.

"The Seventh Circuit has expressed doubt "that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." *Carvajal*, 542 F.3d at 570.  It has not, however, ruled out the possibility of such a claim.  *See Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) ("Our circuit has not directly resolved whether a

plaintiff can assert a claim for a *Brady* violation when the trial resulted in an acquittal."). And in a series of cases, the Seventh Circuit has not simply dismissed such claims out of hand but rather has analyzed whether the plaintiff could show that "the decision to go to trial would have been altered by the desired disclosure." *Carvajal*, 542 F.3d at 569; *see also, e.g., Mosley*, 614 F.3d at 397-99; *Bielanski v. County of Kane*, 550 F.3d 632, 644-45. The Court believes that, given these circumstances, the appropriate course is to permit Fields to pursue his claim regarding the reprosecution. The Court therefore assesses whether a reasonable jury could find the materiality/causation element to be met.

As of the second trial, some of the matters cited by Fields had come to light. Some testimony that Fields contends was fabricated was, however, presented at that trial. And the street file containing what the Court concludes below contained *Brady* material had not yet surfaced. Defendants nonetheless argue that Fields cannot show that his case would have been dismissed or dropped sooner had the street file been disclosed. In this regard, they cite an affidavit from the lead trial prosecutor to this effect. Fields has, however, shown a genuine issue regarding the credibility of this contention.

Defendants also note that the State's Attorney's Office is currently fighting Fields's application for a certification of innocence, and they argue that this demonstrates that the street file's production would not have led to the charges being dropped before the conclusion of the 2009 trial. But the fact that the State's Attorney's Office does not want Fields to be declared innocent—a determination in which that office has a direct interest, because it could well have an unfavorable impact on the

13

claims against the former prosecutors sued in the present case—does not suffice to eliminate a genuine factual dispute. In addition to what the Court has just noted, there are significant differences between a declaration that a charged person is innocent and a determination to drop charges against him before trial.

### 3. The street file

In this section, the Court deals with the Smith/Hickman street file that recently surfaced and the arguments the parties make about the file's contents.

Prior to his first and second trials, Fields's defense counsel made requests for discovery of street files maintained by the police. The term is a reference to a practice that the Chicago Police Department once had of maintaining investigative records that were "withheld from the state's attorney and therefore unavailable as a source of exculpatory information that might induce him not to prosecute or, failing that, would at least be available to defense counsel under *Brady v. Maryland* . . . ." *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). This practice came to light in the early 1980s, and in or about 1987, it contributed to a liability finding against the City in *Jones*, a case in which the underlying criminal trial was held in 1982. The practice was supposedly eliminated by police department internal rules just before Fields's first trial.

As the Court has indicated, Fields's defense counsel sought production of all police investigative records, specifically including street files, before both of his trials. There is every reason to believe that they thought at the time they had received everything they requested. During discovery in the present case, however, a file of over a hundred pages of police reports concerning the Smith/Hickman murders was located in a nondescript file cabinet at the Area 1 police station, along with files relating to other

murders.  A reasonable jury could find the file's contents were not produced before either of his trials.

During discovery in the present case, Fields's counsel engaged in what is fairly described as a herculean effort to try to ascertain where the file came from, where it had been in the intervening years, and why it had not been produced in the criminal case. This effort included significant motion practice before the Court.  The outcome of all of this was less than satisfactory.  No one connected with the City or the Police Department was able to provide any sort of an explanation for how the file came to exist in the first place, why it was in the aforementioned file cabinet in 2011, where it had been in the interim, or even how or why it surfaced.[3]

A reasonable jury could find that the Smith/Hickman street file included documents that were within the *Brady* disclosure obligations of the police and prosecutors.  *See generally* Pl.'s Mem. in Support of Mot. for Partial Summ. J. at 11-12 (discussing the file's contents and their implications).  Among other things, the documents disclosed leads that might have enabled Fields to cast doubt on the prosecution's theory of his guilt.  (Defendants say the materials were nothing but otherwise available information or dead ends that, in some instances, were shown to be such, but a reasonable jury could find otherwise.)  If nothing else, as Fields argues, this information would have enabled him to "attack the thoroughness and even the good faith of the investigation" that led to his indictment and retrial.  *Kyles*, 514 U.S. at 445;

---

[3]  There were significant proceedings before the Court regarding files on other murders, some quite ancient, that were found in the same file cabinet as the Smith/Hickman street file or nearby file cabinets.  The Court permitted Fields's counsel to inspect certain of these files but not to make public their contents or the cases they involved. The Court has reserved the question of whether the other files' existence and contents are relevant and admissible regarding Fields's *Monell* claim against the City.

*see also id.* at 448-49 (evidence that could be used to attack integrity of investigation is subject to *Brady* disclosure obligations).

This does not mean that Fields is entitled to summary judgment regarding his due process claim to the extent it involves the street file. He is not, for two reasons. First, his allegations involving the street file are not a separate claim for relief; rather they constitute a piece of the due process claim asserted in Count 1 of his third amended complaint. Although Federal Rule of Civil Procedure 56(g) permits a court, when it does not grant summary judgment, to identify facts not genuinely in dispute and treat them as established, the rule makes this discretionary, saying that a court "may" enter an order identifying any material fact not genuinely in dispute. The Court sees no good reason, and Fields has offered none, to single out this particular slice of his due process claim and take it out of the jury's hands. Second, and more importantly for summary judgment purposes, the Court agrees with defendants that a reasonable jury could find the information immaterial as *Brady* and its progeny define that term. The Court will address elsewhere in this decision whether the allegations regarding the street file form a basis for denying summary judgment as to particular defendants.

### 4.    Personal involvement of individual defendants

Liability under section 1983 "requires personal involvement in the alleged constitutional deprivation." *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (internal quotation marks omitted). Each individual defendant argues that Fields cannot prove this. The Court deals with each in turn.

*David O'Callaghan.* Fields has offered evidence from which a jury reasonably could find that defendant O'Callaghan participated in inducing Randy Langston, Gerald

Morris, and perhaps others to fabricate evidence of Fields's involvement in the Smith/Hickman murders. First, Morris has submitted an affidavit that, despite defendants' attempts to reinterpret it, describes what a jury reasonably could conclude was a concerted effort by O'Callaghan and an unnamed detective to get Morris to falsely identify Fields as a participant, even though Morris had told police he had not seen the faces of the shooters. Second, Langston testified at the penalty phase of Fields's first trial that he had been induced by O'Callaghan to falsely implicate Fields. The veracity of this claim is hotly disputed—defendants say that this particular statement by Langston was itself false and induced by El Rukn gang members—but a reasonable jury could believe it and disbelieve Langston's statements to the contrary.

Defendants argue that Langston's testimony at the penalty phase should be disregarded because it is inadmissible. The Court disagrees. First, if Langston testifies at the trial in this case and again implicates Fields or denies being induced to name him, his former testimony under oath is not hearsay and is admissible. *See* Fed. R. Evid. 804(d)(1)(A). Fields's counsel has stated that she intends to call Langston as a witness, and Federal Rule of Evidence 607 permits the party calling a witness to impeach the witness.

Second, if Langston—who evidently is in prison—turns out to be beyond the subpoena power or otherwise unavailable within the meaning of Federal Rule of Evidence 804(a), then his former testimony will be admissible under Rule 804(b)(1).[4]

---

[4] If Langston does not testify at the trial and is not shown to be unavailable, then his former testimony will be inadmissible under either of the rules the Court has cited (the Court is unaware of any other potential basis for admissibility). At this point, however, it is overwhelmingly likely that Langston either will testify or will be shown to be unavailable.

Defendants argue that the prosecution in Fields's criminal case is not a predecessor in interest who had an opportunity and similar motive to develop his testimony by cross-examination, *see* Fed. R. Evid. 804(b)(1)(B), but the facts and circumstances show otherwise. The Rule's predecessor-in-interest proviso does not require privity or some other form of legal relationship; a like motive to develop testimony about the same material facts is sufficient. *See, e.g., Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1185-87 (3d Cir. 1978); *see also, Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 128 (4th Cir. 1995); *O'Banion v. Owens-Corning Fiberglas Corp.*, 968 F.2d 1011, 1015 (10th Cir. 1992). "Circumstances or factors which influence motive to develop testimony include (1) the type of proceeding in which testimony was given, (2) trial strategy, (3) the potential penalties or financial stakes, and (4) the number of issues and parties." *United States v. Reed*, 227 F.3d 763, 768 (7th Cir. 2000) (internal quotation marks and brackets omitted). The prosecutors at Fields' trial were every bit as motivated to cross-examine him vigorously regarding his claims about O'Callaghan as the defendants are here. Langston's testimony inculpating Fields which was a significant part of the prosecution's case at the guilt phrase, had been given before then-judge Maloney during the bench trial, so the jury hearing the penalty phase had not observed Langston's inculpatory guilt-phase testimony. And that jury was being called upon to decide on a death sentence, a question of paramount importance to both sides in the case. When Langston testified at the penalty phase that he had been induced by O'Callaghan to fabricate inculpatory testimony, this reasonably would have been perceived to be highly significant testimony by a critical prosecution witness—a witness whose earlier testimony the jury would have a hard time weighing in a vacuum,

because it had not observed that testimony.  This gave the prosecution a significant motive to cross-examine Langston vigorously to try to cast doubt on his story about O'Callaghan, which is exactly what the prosecution actually did.  Its motive to cross-examine Langston on that story was essentially the same as O'Callaghan's here.[5]

In addition, there is evidence from which a reasonable jury could find that O'Callaghan engaged in suggestive procedures in connection with a lineup conducted in connection with the Smith/Hickman murders.  Fields also makes other allegations regarding O'Callaghan, but the Court need not deal with them separately at this stage; there is sufficient evidence of O'Callaghan's participation in a due process violation that he is not entitled to summary judgment.

*Daniel Brannigan*.  Fields has evidence sufficient to permit a reasonable jury to find that Brannigan participated in fabrication of evidence, specifically, getting Sumner and Hawkins each to make up a story regarding Fields's involvement.  With regard to Sumner, defendants argue that Fields's evidence, which consists of an audio-recorded interview by criminal defense counsel, is inadmissible.  Sumner is deceased and thus unavailable.  The Court believes the interview is properly admissible under the residual hearsay exception, Federal Rule of Evidence 807(a), in that it is offered as evidence of a material fact, Fields can obtain no other evidence regarding this fact because Sumner is deceased, and it was given under circumstances (at least a tacit understanding that it could be used in court) that give it circumstantial indicia of trustworthiness that are

---

[5] For these reasons, *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3876915 (N.D. Ill. Sept. 1, 2011), cited by defendants, is distinguishable.  To the extent it is indistinguishable, the Court respectfully disagrees with that decision.

equivalent to those in other exceptions to the hearsay rule.[6]  With regard to the alleged importuning of Hawkins, the evidence of Brannigan's involvement is thinner as compared to Fields's other contentions, but it is sufficient to give rise to a genuine issue of fact that the jury must decide.

As he did with O'Callaghan, Fields makes other allegations regarding Brannigan, but the Court need not deal with them separately at this stage for the reasons noted earlier.

*Joseph Murphy*.  Fields has likewise offered evidence from which a reasonable jury could find that Murphy was involved in an effort to frame him.  The evidence includes the arguable backdating of a police report regarding Anthony Sumner and involvement in the creation of false reports (and/or the alteration of one report) regarding lineups concerning the Hickman/Smith murders.  The evidence concerning Murphy, a sergeant at Area 1, also is sufficient to permit a reasonable jury to find that he had some involvement in non-preservation or non-production of police reports, including, perhaps, the Smith/Hickman street file.  Because these points are more than sufficient to preclude summary judgment in favor of Murphy, the Court need not address Fields's other arguments about him.

*Thomas Richardson, Stephen Casto, James Minogue, Joseph Bogdalek, Steven Hood, and Robert Evans.*  The most that Fields can say about any of the remaining defendants is that reports they prepared were not preserved or interviews that some of them conducted during the initial stages of the Smith/Hickman investigation were not reduced to writing.  Fields has no evidence, however, from which a reasonable jury

---

[6] There may be other bases upon which to admit the interview, but only one is necessary for present purposes.

could find that any of the matters not reduced to writing were exculpatory or otherwise

helpful to his defense, or that any of these defendants had any involvement in any

failure of preservation or production or was aware that some other state actor had failed

to preserve or produce anything that was exculpatory or otherwise helpful to Fields.

Each of these defendants is entitled to summary judgment on Fields's federal claims.

**B.     Failure to intervene claim (Count 2)**

Though Fields asserted "failure to intervene" as a separate claim in his complaint

(Count 2), that is a misnomer.  Failure to intervene is not a claim for relief; rather, it is a

theory of liability under section 1983, specifically, a way to prove the liability of a state

actor who was not a direct participant in the challenged wrongdoing.  *See Sanchez v.*

*City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012); *Padilla v. City of Chicago*, 932 F.

Supp. 2d 907, 921 & n.9 (N.D. Ill. 2013).  It requires the plaintiff to show that a

defendant who did not directly participate in the alleged constitutional wrong was aware

it was happening or about to happen and had a realistic opportunity to prevent it, but

instead stood by.  *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir.

2005); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  The Court has already taken

this standard into account in addressing the arguments regarding personal involvement

and thus need not address "failure to intervene" as a separate point.

**C.     Conspiracy claim (Count 3)**

Defendants also seek summary judgment on Fields's section 1983 conspiracy

claim, arguing there is no evidence of an agreement.   Agreement is an essential

element of conspiracy, and in this case that means an agreement or understanding that

the participants would frame Fields or otherwise violate his constitutional rights.  *See,*

*e.g., Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). That said, a formal agreement is not required, nor is direct evidence necessary. "[A] conspiracy need not be based on an express agreement . . . its existence can be inferred from circumstantial evidence." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981). *Cf. Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 422 (7th Cir. 2000) (quoting a district judge's ruling that the fact that the defendants met after the incident in question to "discuss [its] circumstances" amounted to circumstantial evidence from which a jury reasonably could infer a conspiracy).

Fields's response, in substance, is that one can reasonably infer that it is not just a coincidence that different police officers each were involved in an effort to frame him. The law permits, in certain situations, a reasonable inference from the circumstances alone that they could have happened only as the result of a conspiracy. For example, the Seventh Circuit recently concluded that the "[r]eceipt of 24 bogus parking tickets from several officers in one police department," some of which indicated that plaintiff's car was parked in two places at once, made it a "challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy." *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012).

The Court concludes that a reasonable inference of this sort may be drawn from the circumstances alleged by Fields. He contends that several witnesses made false statements and gave false testimony that he was involved in murders that he had nothing to do with and that they were importuned to do so by certain of the defendants. Of course, Fields has not proven at this point that the statements were false, and even if they were false there are other possible explanations. But the circumstances,

particularly the involvement of different witnesses who dealt with a group of defendants who were co-workers, are unusual enough that a jury reasonably could conclude that the defendants acted in concert and that these were not independent actions. For these reasons, defendants O'Callaghan, Brannigan, and Murphy are not entitled to summary judgment on Fields's conspiracy claim. The other individual defendants, who are not claimed to have been involved in the events just described, are entitled to summary judgment.

**D.    *Monell* claim (part of Count 1)**

The City of Chicago seeks summary judgment on Fields's *Monell* claim, that is, his claim that the City had an official policy or practice that caused the violation of his due process rights. This is part of Count 1 of Fields's complaint. The claim involves the previously-discussed street file, which (as the Court has previously concluded) that a reasonable jury could find contained *Brady* material that should have been produced, but was not, during the course of the criminal proceedings. Fields has cross-moved for summary judgment as to liability on this claim.

"To establish municipal liability, a plaintiff must show the existence of an official policy or other governmental custom that not only causes but is the moving force behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012). A plaintiff can show the existence of an official policy through "an express policy that causes a constitutional deprivation when enforced," "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice," or "an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 834. "The word 'custom' generally implies a habitual

practice or a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990).

The City maintains that Fields's claim is unsustainable at least in part because of Chicago Police Department Special Order 83-1, adopted in 1983. Special Order 83-1 "provides guidelines for the proper retention of official Department reports, notes, memoranda and miscellaneous documents of potential evidentiary value accumulated during the course of a particular violent crime field investigation." Defs.' Ex. 17 at 1. Defendants argue that this existence of this rule defeats any contention that the City had, after the date it was adopted, a policy or widespread practice of withholding investigatory records.

As Fields points out, however, Special Order 83-1 lacked any semblance of an auditing or compliance mechanism until just a few weeks before Fields's first trial, when Special Order 86-3 went into effect. By that time, the materials in question arguably were already in a file or location from which they would not be produced to prosecutors or defense counsel. Fields argues that the absence of a check enabled the established practice of maintaining separate investigatory files that were not turned over to prosecutors or defense counsel to continue during the periods relevant to this case. The fact that the Smith/Hickman street file was not produced provides circumstantial support for the contention that Special Order 83-1 amounted to window dressing, while the previous practice continued unabated. In addition, a reasonable jury could find, based on the evidence, that Special Order 86-3's compliance mechanism had little or no effect on previous practices, at least insofar as they concerned street files that might have already been in existence.

The City argues that Fields has offered only a single incident and that this is insufficient to sustain a *Monell* policy claim. The Court disagrees. The fact that the Smith/Hickman street file was found in a file cabinet with numerous other files regarding murder cases suggests that the occurrence was not isolated. And the non-production of these documents in Fields's case, together with the circumstances suggesting they were secreted beyond the reach of prosecutors and defense attorneys,[7] took place on a backdrop of a previously-longstanding police department custom or practice, found to exist by the jury in the *Jones* case, that made withholding of such records part of a regular way of doing business. Though a single incident is insufficient in most situations to establish a policy, *see generally, e.g., Calhoun v. Ramsey*, 408 F.3d 375, 380-81 (7th Cir. 2005), more is involved here. The City is not entitled to summary judgment on this claim.

Fields, for his part, likewise is not entitled to summary judgment on this claim. A reasonable jury could find that Fields suffered no injury from the nondisclosure of the information in the Smith/Hickman street file. The Court also rejects Fields's contention that the City should be estopped from challenging the *Monell* claim at all. He bases this argument on *Jones* and previous class action litigation regarding street files. But *Jones*, strictly speaking, concerned the state of affairs that existed before the adoption of Special Orders 83-1 and 86-3 and thus involved a different issue from the one addressed in *Jones*, and the street files class action litigation ended without a formal ruling.

---

[7] In this regard, it is perhaps noteworthy that the records were not produced in Fields's criminal cases despite the fact that they had been subpoenaed from the police department.

**E.     Malicious prosecution claim (Count 4)**

Defendants also seek summary judgment on Fields's state law claim for malicious prosecution.  "The elements of malicious prosecution in Illinois are (1) commencement of criminal proceedings by the defendants; (2) termination of that matter in favor of the plaintiff; (3) the absence of probable cause for the proceedings; (4) the presence of malice; and (5) resulting damages."  *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013).

The individual defendants argue that each of them had insufficient involvement in the criminal case to be liable for malicious prosecution.  Under Illinois law, "liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present."  *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233, 1240 (1988).  "Illinois law provides that, in order to be liable for malicious prosecution, a defendant must have initiated a criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation."  *Denton v. Allstate Ins. Co.*, 152 Ill. App. 3d 578, 583, 504 N.E.2d 756, 760 (1986).

The Court overrules the contentions of Murphy, O'Callaghan, and Brannigan in this regard.  Murphy swore out the complaint against Fields for the Vaughn/White murder, and O'Callaghan swore out the complaint against Fields for the Smith/Hickman murder.  A reasonable jury could find this and their other activity relating to the claimed fabrication or concealment of evidence sufficient to render them liable for malicious prosecution.  The same is true of Brannigan, who (among other things) is claimed to have caused witnesses to fabricate testimony against Fields.

By contrast, Bogdalek, Evans, Hood, Minogue, Casto, and Richardson played relatively minor roles in the prosecution of Fields. Mere testimony as a witness is insufficient, and Fields offers nothing more of substance here. Those defendants are entitled to summary judgment on the malicious prosecution claim.

Defendants also argue that the evidence shows that probable cause to prosecute Fields existed as a matter of law. For purposes of a malicious prosecution claim, probable cause is "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Johnson v. Target Stores*, *Inc.*, 34 Ill. App. 3d 56, 72, 791 N.E.2d 1206, 1219 (2003) (internal quotation marks omitted). However,

> [i]n a malicious prosecution case in which the plaintiff contends that the defendant presented fabricated evidence or concealed exculpatory evidence, the issue of whether probable cause exists is evaluated by including the concealed exculpatory evidence but without considering the fabricated evidence. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1295 (10th Cir.2004) (Oklahoma law); *cf. Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996) (assessing a malicious prosecution claim under the Fourth Amendment; citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). *See also, Nugent v. Hayes*, 88 F. Supp. 2d 862, 869 (N.D.Ill.2000); *cf. Cervantes v. Jones*, 23 F. Supp. 2d 885, 889 (N.D. Ill. 1998) (assessing, in determining whether a defendant alleged to have testified falsely before a grand jury initiated the prosecution of the plaintiff, whether the prosecutor would have sought an indictment even without the alleged false statements).

*Manning v. United States,* No. 02 C 372, 2006 WL 3240112, at *23 (N.D. Ill. Sept. 28, 2006) (Kennelly, J.).

With that standard in mind, the Court concludes that defendants are not entitled to summary judgment on this basis. In particular, the presence (again, the Court stresses, not yet proven) of deliberately fabricated statements by witnesses would be sufficient to permit a reasonable jury to conclude there was no probable cause, even if

there were other witnesses inculpating Fields whose testimony is not claimed to have been made up at the behest of the police.

**F.     Other state law claims**

Defendants Richardson, Casto, Minogue, Bogdalek, Hood, and Evans are entitled to summary judgment on Fields's state law conspiracy claim, but O'Callaghan, Brannigan, and Murphy are not, for the reasons discussed in connection with Fields's section 1983 conspiracy claim.  Richardson, Casto, Minogue, Bogdalek, Hood, and Evans are also entitled to summary judgment on his state law claim for intentional infliction of emotional distress, due to their lack of sufficient involvement.  O'Callaghan, Brannigan, and Murphy are not, again for the reasons previously discussed (in addressing this claim, defendants essentially just adopt their earlier arguments).

**G.     Fields's request to bar testimony by certain witnesses**

Fields has asked the Court to exclude from trial in this case the testimony of certain witnesses, specifically, Earl Hawkins, Derrick Kees, and Trammell Davis.  His argument is that the witnesses' testimony was essentially purchased by promises of sentence reductions and/or rent payments.

Fields relies on the federal anti-gratuity statute, 18 U.S.C. § 201(c)(2), as well as Illinois Rule of Professional Conduct 3.4, which forbids a lawyer from offering an inducement that is prohibited by law, and the law of illegal contracts.  The Court has a hard time seeing what contract law has to do with the issue at hand and rejects that argument.  Rule 3.4 requires some other provision of law that renders conduct illegal, and for this Fields relies only on section 201(c)(2).  He cites, however, no authority supporting his reading of this statute.  The only authority in this regard that the Court is

aware of is *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), in which a panel of the Tenth Circuit ruled that a federal prosecutor's offer of leniency to a criminal defendant in return for testimony against a co-defendant amounted to the giving of something of value in violation of section 201(c)(2), requiring suppression of the testimony. The panel decision, however, was vacated by the Tenth Circuit sitting *en banc*. *United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999) (en banc). The *en banc* court ruled that the prosecutor was acting on behalf of the sovereign and that the statute should not be read to deprive it of "a recognized or established prerogative," *id.* at 1301, namely offering leniency in return for testimony. In short, there is no case, at least not one of which the Court is aware, that outlaws agreements of the type Fields cites here or bars testimony resulting from them. Rather, such agreements and benefits are factors considered in determining the weight to give to testimony that results. For these reasons, the Court overrules Fields's request.

The Court also notes that even if this were an appropriate basis to bar testimony, as opposed to a factor to be considered in weighing it, Fields has offered nothing to indicate that the City or the police officer defendants are responsible for the consideration provided to these witnesses. Rather, the consideration came from the State's Attorney's Office, which represented the state of Illinois in connection with Fields's pending petition for a certificate of innocence. Fields offers no authority, and the Court is aware of none, that would permit barring one party from calling a witness based on a different party's misconduct (assuming that is what this was).

**Conclusion**

For the foregoing reasons, the Court grants summary judgment in favor of defendants Thomas Richardson, Stephen Casto, James Minogue, Joseph Bogdalek, Steph Hood, and Robert Evans but denies defendants' motion for summary judgment as to defendants City of Chicago, David O'Callaghan, Daniel Brannigan, and Joseph Murphy [dkt. no. 436].  The Court also denies plaintiff's motion for partial summary judgment [dkt. no. 434].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 6, 2014