# EXHIBIT 2

1    STATE OF ILLINOIS    )
                          )  SS:
2    COUNTY OF C O O K    )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

4          COUNTY DEPARTMENT - CRIMINAL DIVISION

5    THE PEOPLE OF THE        )
     STATE OF ILLINOIS        )
6                             )
            vs.               )  No. 85 C7651
7                             )
     NATHSON FIELDS           )
8

9              REPORT OF PROCEEDINGS at the hearing of

10   the above-entitled cause, had before the HONORABLE

11   PAUL P. BIEBEL, JR., on the 8th day of October 2013.

12

13   A P P E A R A N C E S:

14       THE STATE'S ATTORNEY OF COOK COUNTY
         BY:  MR. BRIAN SEXTON and
              MR. PATRICK COGHLIN and
15            MR. AARON BOND
              Assistant State's Attorneys
16            Appeared on behalf of the People;

17       MS. MELISSA MATUZAK
         MR. LEONARD GOODMAN
18       MS. CANDACE GORMAN
         MR. ADRIAN BLEIFUSS
19            Appeared on behalf of the Defendant.

20

21

22

23   JO ANN KROLICKI, CSR
     Official Court Reporter
24   Illinois License No. 084-002215

1

DAILY COPY TRANSCRIPT — NOT FOR APPEAL PURPOSES

```
 1                    I N D E X

 2

 3      People vs. Nathson Fields

 4      Date of Hearing:  10-8-13

 5      Page Numbers:  1 through 95

 6

 7                    PROCEEDINGS

 8                                              PAGE

 9    WITNESSES:              DX    CX   RDX   RCX
      DERRICK KEES (Cont.)     5
10

11

12

13

14                    EXHIBITS
                               ID        REC.
      None
15

16

17

18

19

20

21

22

23

24
```

                                                    2

1    what you knew concerning various shootings and drug

2    operations of the El Rukns; correct?

3         A.    Yes, I did give complete and full

4    information.

5         Q.    Now, we started talking about in 1983 you

6    knew you were going to be called as a witness in

7    United States versus Tom Maloney; correct?

8         A.    Yes.

9         Q.    And this is the same Tom Maloney that was a

10   judge presiding over the bench trial for Fields and

11   Hawkins concerning the Smith/Hickman case in June of

12   '86; correct?

13        A.    Yes.

14        Q.    Did you go over recorded conversations

15   between Jeff Fort and other members of the El Rukns?

16        A.    Yes.

17        Q.    Did you go over line by line with U.S.

18   Attorney, AUSA Bill Hogan each and every

19   conversation?

20        A.    Yes, we listened to the whole tape, and

21   then we went through different lines all the way

22   through it.

23        Q.    And did you first make sure that -- well,

24   did you eventually have a transcript -- or was there

8

DAILY COPY TRANSCRIPT -- NOT FOR APPEAL PURPOSES

1    a transcript that you were working off of when you

2    were going over that?

3         A.    Yes.

4         Q.    On the left-hand portion of that

5    transcript, was that a verbatim, meaning word for

6    word, what was being said on the conversation?

7         A.    Yes.

8         Q.    And on the right-hand portion, was that a

9    translation of what was being said?

10        A.    Yes.

11        Q.    Why would -- why was it necessary for a

12   translation to be made?

13        A.    Because the El Rukns spoke in a code

14   language sort of like -- it's like a homemade code

15   from experiences and things that the El Rukns do as

16   far as some of the lessons and stuff like that, as

17   far as their literature and stuff like that.

18        Q.    When you say, literature, you mean the

19   Islamic or Muslim literature?

20        A.    Yes.

21        Q.    And were you familiar with that code?

22        A.    Yes.

23        Q.    In fact, when you eventually testified in

24   United States versus Maloney, were you qualified as

DAILY COPY TRANSCRIPT       NOT FOR APPEAL PURPOSES

```
 1      an expert in that code?

 2          A.   Yes.   They did qualify me as an expert,

 3      yes.

 4          Q.   Now, I believe you testified -- in fact, on

 5      those transcripts, you testified on the right-hand

 6      portion there was already a translation when you were

 7      going over it with Mr. Hogan; correct?

 8          A.   Yes.

 9          Q.   Was that from you when you first started

10      going over it with Bill Hogan, all these recordings?

11          A.   No.

12          Q.   Do you know, to your knowledge, who it was

13      from?

14          A.   Henry Harris.

15          Q.   And as you went through the conversations

16      with Mr. Hogan, did you basically agree with many of

17      the translations that Mr. Harris already had made?

18          A.   Yes, I did.

19          Q.   Did you differ in some respects?

20          A.   Yes, I did.

21          Q.   And did you note that to Mr. Hogan?

22          A.   Yes.

23          Q.   And approximately -- did you go through

24      many, many recorded conversations with Mr. Hogan?
```

1      A.   Yes, I did.

2      Q.   In fact, at the trial when you testified as

3 a witness in United States versus Maloney, you

4 testified to over 60 or so conversations that you had

5 listened to and gone over and translated for

6 Mr. Hogan; correct?

7      A.   Correct.

8      Q.   And did you also have occasion then to --

9 and were those recordings as well as the transcripts,

10 did you testify to those in the United States versus

11 Maloney?

12     A.   Yes, I did.

13     Q.   Were those entered into evidence?

14     A.   Yes, they were.

15     Q.   And did you have an opportunity to talk to

16 myself and Mr. Coghlin back in the facility that

17 you're at several weeks ago on September 24th and

18 25th?

19     A.   Yes.

20     Q.   Did we have occasion to go over about a

21 third or so of those transcripts that you testified

22 to in the United States versus Maloney?

23     A.   Yes.

24

```
1                        (WHEREUPON, People's Exhibit
2                        Number 36
3                        was marked for identification.)
4    BY MR. SEXTON:
5        Q.   Did we listen to those recorded -- did you
6    listen to each and every one of the -- well, strike
7    that.
8                        Judge, for purposes -- if I can move
9    the podium.  I'll refer to this as People's Exhibit
10   36.
11                       Judge, I have what I'll refer to as
12   People's Number 36.
13                       Do you see that device in the laptop
14   computer?
15       A.   Yes.  I see everything, yes.
16       Q.   Did we listen to all the conversations that
17   were contained in that memory device that's in the
18   computer right now?
19       A.   Yes.
20                       (WHEREUPON, People's Exhibit
21                       Group Exhibit Number 37
22                       was marked for identification.)
23   BY MR. SEXTON:
24       Q.   Did we also have -- showing the witness
```

```
 1     what I'll refer to as People's Group Exhibit 37.  And

 2     Judge, for the record, showing the witness People's

 3     Group Exhibit Number 37.

 4             THE COURT:  Is that the same book I had

 5     yesterday essentially?

 6             MR. SEXTON:  Yes.

 7             THE COURT:  Okay.

 8             MR. SEXTON:  One moment, Judge.

 9                    (Brief pause.)

10     BY MR. SEXTON:

11        Q.    As we listened to those conversations, did

12     the left-hand portion in Group Exhibit -- in those

13     transcripts match the conversations that we listened

14     to in People's 36 on that memory device?

15        A.    Yes.

16        Q.    And do you recall -- and at the time that

17     you testified -- or I'm sorry.

18                    At the time that you went over --

19     these are the same conversations that you went over

20     with AUSA Bill Hogan; correct?

21        A.    Yes.

22        Q.    And when you went over it with Bill Hogan

23     and you testified later on in United States versus

24     Maloney, did you recognize the voices that are
```

ROUGH COPY - TRANSCRIPT - NOT FOR APPEAL PURPOSES

1    contained in those recorded conversations?

2       A.   Yes.

3       Q.   And on that transcript in People's -- in

4    those transcripts in People's Group Exhibit 37, are

5    those the voices that -- I'm sorry -- are the names

6    that are attributed to that portion of the

7    conversations, did you recognize that as those being

8    the parties that were giving that side of that

9    conversation or speaking those words?

10      A.   Yes.

11      Q.   Did you recognize their voices --

12      A.   Yes.

13      Q.   -- who was talking?

14      A.   Yes.

15      Q.   You talked to Jeff Fort numerous times;

16   correct?

17      A.   Yes.

18      Q.   Have you spoken to Alan Knox before as

19   well?

20      A.   Of course, yes.

21      Q.   How long had you known Alan Knox?

22      A.   Alan Knox?  A real long time, since I was

23   kind of young.

24      Q.   About how many years?

14

DAILY COPY TRANSCRIPT — NOT FOR APPEAL PURPOSES

```
1          A.    Including now?

2          Q.    No.  Say back in --

3          A.    Personally, I knew Alan Knox since about

4    1976 personally, personally.

5          Q.    Did you know Tramell Davis?

6          A.    Tramell Davis, yes, I know Tramell Davis.

7          Q.    How long have you known Tramell Davis?

8          A.    Since around about that same time, '76.

9          Q.    Now, what was Tramell Davis -- did you have

10   a nickname?

11         A.    Trim.  We called him Trim or sometimes we

12   called him Tacu.

13               THE COURT:  Spell that, please.

14               THE WITNESS:  T-a-r-q-u, something Tarqu.

15   I never had to spell it before.

16               MR. SEXTON:  I believe it's T-a-c-u,

17   Judge.

18   BY MR. SEXTON:

19         Q.    Was he also referred to as Tac?

20         A.    Sometimes, yes.

21         Q.    Let me ask you this.  You testified about

22   certain meetings that the -- government meetings that

23   Fort would conduct; correct?

24         A.    Yes.
```

15

DAILY COPY TRANSCRIPT -- NOT FOR APPEAL PURPOSES

1    Q.    And that was for the officers and generals?

2    A.    Yes.

3    Q.    And I believe you testified -- where would

4    these meetings take place?

5    A.    Those meetings would take place at the

6    Fort.

7    Q.    And back at the -- I'm sorry.  Strike that.

8              Back in '84, '85, and '86, Mr. Fort

9    was in custody; correct?

10   A.    Yes, he was.

11   Q.    So how would you conduct the meetings then,

12   the government meetings over there at the Fort at

13   39th and Drexel?

14   A.    All the generals and officers would

15   assemble at the Fort, and we'd wait for Jeff Fort to

16   call, and we'd talk to him over the intercom.

17   Q.    And was there a direct -- there was a

18   speaker phone that was there in that room?

19   A.    Yes, sir.

20   Q.    And I believe he calls it the Phase 2 room

21   or whatever?

22   A.    Yes, Phase 2.

23   Q.    Was there also a pay phone that was located

24   inside the Fort as well?

16

```
 1          A.    Yes.

 2          Q.    Would Jeff sometimes call that pay phone as

 3    well?

 4          A.    Yes, he would.

 5          Q.    The main phone when he talked to the

 6    generals and when he talked to certain people would

 7    be that phone, however, that speaker phone; correct?

 8          A.    Yes.    That would be in Phase 2, the speaker

 9    phone.

10          Q.    And I believe you testified that when he

11    spoke, he would speak in this coded language;

12    correct?

13          A.    Yes.

14          Q.    Why would he speak in this coded language?

15    What was -- why?

16          A.    Well, he didn't want anybody else --

17    well, he knew that the feds were listening, so he

18    didn't want them to know actually what we was talking

19    about.

20          Q.    And he was speaking from a prison; correct?

21          A.    Yes.

22          Q.    Do you know where Fort was at the time that

23    these conversations were made back in 1986?

24          A.    Yes.    He was in federal prison in Bastrop,
```

```
 1    Texas.

 2              THE COURT:   In where?

 3    BY THE WITNESS:

 4         A.   Bastrop, Texas.

 5    BY MR. SEXTON:

 6         Q.   Now, directing your attention to -- if you

 7    could look at the conversation, People's Group

 8    Exhibit 37A.  Are you on that page?

 9         A.   37A.

10         Q.   Yes.

11         A.   Yes.

12         Q.   If we can play that conversation?  And then

13    I'm going to a series of questions.

14         A.   I have Exhibit Number 3, 4-10-86, 5:55 p.m.

15         Q.   Right.  And the tab indicates it's Exhibit

16    A, the tab on the right?

17              THE COURT:   No.

18              THE WITNESS:   No.

19              THE COURT:   Oh, yes, it does.

20              THE DEFENDANT:   Right here?  Yes.

21    BY MR. SEXTON:

22         Q.   Yes.

23         A.   Right here.

24         Q.   So don't regard what the exhibit sticker
```

1    states.  It's the tab that I'll refer to when I say

2    Exhibit A; okay?

3          A.    Okay, right.

4          MR. SEXTON:  If we can play that, Judge?

5    BY MR. SEXTON:

6          Q.    Than is a conversation that we reviewed and

7    you went over and listened to back on September 24th

8    and 25th; correct?  Of this year?

9          A.    (No audible response.)

10           (People's Exhibit 37A playing.)

11    BY MR. SEXTON:

12          Q.    Now, did you recognize Fort's voice?

13          A.    Yes.

14          Q.    And when he says Ban, what's that the

15    nickname of?  Who is that?

16          A.    That's Bernard Green.

17          Q.    Was he a general?

18          A.    Yes.

19          Q.    And it says -- you hear the term, Perry.

20    What did Perry stand for?

21          A.    Perry means lawyer.

22          Q.    And when they're talking about Swan, who

23    are they referring to?

24          A.    They talking about William A. Swano.  He

```
 1    was our attorney.

 2          Q.    Did Swano represent many of the El Rukns?

 3          A.    Yes, he did.

 4          Q.    You already testified yesterday some of the

 5    El Rukns that he testified to (sic); correct?

 6          A.    Yes.

 7                MR. SEXTON:  Go ahead.

 8                      (People's Exhibit 37A playing.)

 9    BY MR. SEXTON:

10          Q.    Who is number one?

11          A.    Jeff Fort is talking about himself, number

12    one.

13          Q.    Could you tell who he's talking to?

14          A.    He's talking to Mau.  He's talking to

15    Melvin Mayes, Mau.

16          Q.    His nickname is Mau or Maumee?

17          A.    Yeah.

18          Q.    Who is he referring to as Toom?

19          A.    He's talking about Harry Harris.

20                MR. SEXTON:  Move on to Page 2.

21                      (People's Exhibit 37A playing.)

22    BY MR. SEXTON:

23          Q.    Stop.

24                      When he says Raffi, who is that the
```

```
 1    nickname for?

 2         A.    That's Jeff Boyd, B-o-y-d.

 3         Q.    Who is Rico?

 4         A.    Rico is Rico Crenshaw.

 5         Q.    Who is GG?

 6         A.    That's Gang, Alan Knox.

 7         Q.    What does the GG stand for?

 8         A.    General Gang.

 9         Q.    When he says emir, what does that refer to

10    as?

11         A.    That also means general.

12                     (People's Exhibit 37A playing.)

13    BY MR. SEXTON:

14         Q.    Who is Omar?

15         A.    That is Roland Lewis.

16         Q.    And was that one of the ones that was one

17    of the guerillas you testified to that was in

18    charge of one of the air conditioners at 64th and

19    Harper?

20         A.    Yes.

21                     (People's Exhibit 37A playing.)

22    BY MR. SEXTON:

23         Q.    When you say -- or "what Swan

24    demonstrated."  What does that mean?
```

21

1      A.    He's asking about William Swano, what did

2    he have to say.

3      Q.    Was demonstrate another way of saying say

4    or tell?

5      A.    Yes.   At this point in the translation,

6    yes.

7      Q.    Okay.   And it would be -- demonstrate could

8    mean something else given a certain context?

9      A.    Yes.

10                   (People's Exhibit 37A playing.)

11   BY MR. SEXTON:

12     Q.    When he says, "new ink," what did that

13   translate to be?

14     A.    That means a new statement.   They talking

15   about a new statement.

16     Q.    And when they're talking about Knob, do you

17   know who they're referring to?

18     A.    They're talking about Anthony Sumner.

19     Q.    Why was he called Knob?

20     A.    Because he took the door -- he's the one

21   that opened the door when it came to cooperating.

22     Q.    Opened the door to the El Rukns?

23     A.    He's the first one that went though the

24   door.   He turned the doorknob and went through the

22

DAILY COPY - TRANSCRIBED - NOT FOR APPEAL PURPOSES

1     door and started cooperating.

2          Q.    Okay.

3                      (People's Exhibit 37A playing.)

4     BY MR. SEXTON:

5          Q.    Do you recognize Omar's voice?

6          A.    Yes.

7          Q.    And who -- when they refer to Zoom, who are

8     they referring to?

9          A.    They referring to Earl Hawkins.

10         Q.    When they say, "Zoom had put him in tune

11    with the demonstration that had unfolded there," what

12    basically is he saying?

13         A.    He was talking about -- he's actually

14    talking about the -- the thing with -- let me hear

15    that again.  I have to hear exactly what he's talking

16    about.

17               MR. SEXTON:  Go ahead.

18                      (People's Exhibit 37A playing.)

19               MR. SEXTON:  Stop.

20    BY MR. SEXTON:

21         Q.    What's he basically saying there?

22         A.    He's talking about -- he's saying Jeff now

23    put a -- something in motion for them as far as

24    the case, and the case is the one with Hickman and

23

```
 1    Smith.

 2         Q.    And is he talking about Sumner's ink or

 3    Sumner's statement?

 4              MS. GORMAN:   Objection, your Honor,

 5    leading.

 6              MR. SEXTON:   Judge, he's already testifying

 7    to what the ink is and who Doorknob is.

 8              MS. GORMAN:   You're trying to tell him what

 9    he needs to be saying here because you didn't like

10    his last answer.

11              MR. SEXTON:   No, that's not it, Judge.

12    It's not even a question.

13              THE COURT:   Ask the question again, please.

14    BY MR. SEXTON:

15         Q.    Again, in the previous conversations,

16    they're talking about Knob and his ink; correct?

17         A.    Yes, they are.

18         Q.    And are they talking about the ink meaning

19    statements of Sumner?

20         A.    Yes.

21         Q.    And what they contained?

22         A.    Yes.

23              MS. GORMAN:   It's leading, your Honor.

24              MR. SEXTON:   It's not leading, Judge.  He's
```

DAILY COPY - TRANSCRIPT - NOT FOR APPEAL PURPOSES

```
 1    translating.  He's already testified to this.

 2              THE COURT:  Move on, please.

 3              MS. GORMAN:  Your Honor, can I ask if the

 4    book can be closed so we can have a real translation

 5    instead of him reading?

 6              MR. SEXTON:  And I would object, because,

 7    Judge, he's already testified that the right-hand

 8    portion is his translation so he is allowed to

 9    testify to that.

10              THE COURT:  I would ask you not look at the

11    book.  If you are, indicate that.  Listen to what you

12    hear, and if you need to hear it again, we'll play it

13    again.  Okay?

14              THE WITNESS:  Okay.

15              THE COURT:  Thank you.

16    BY MR. SEXTON:

17       Q.   Just so we're clear, that right-hand

18    portion that's contained in there, that's your

19    translation of what you have already translated when

20    you went over it with U.S. Attorney Bill Hogan;

21    correct?

22       A.   Yes.

23       Q.   And that's what you testified to in

24    United States versus Maloney?
```

DAILY COPY TRANSCRIPT — NOT FOR APPEAL PURPOSES

1      A.    Right.

2      Q.    That's your translation of what the

3   conversations meant, and that's what you went over

4   back in 1993; correct?

5      A.    That's correct.

6            THE COURT:   Let me be clear.   These

7   translations here are his translations, not the

8   translations of someone else?

9            MR. SEXTON:   Yes, correct.

10  BY MR. SEXTON:

11     Q.    Just so we're clear, when you went over it

12  with Mr. Hogan, it had previously been translated by

13  somebody else; correct?

14     A.    That's correct.

15     Q.    And you either agreed with the translation

16  or made some changes to that; correct?

17     A.    Yes, we made changes.

18     Q.    And this version that you have, Group

19  Exhibit 37, that's your translation; isn't that

20  correct?

21     A.    That's correct.

22           MR. SEXTON:   Judge, I would ask -- since

23  it's his translation, I would ask that he be allowed

24  to review that when he's testifying.

```
 1                    THE COURT:  Under those circumstances, I'll
 2       allow it over the objection.
 3                    MR. SEXTON:  Go ahead.
 4                         (People's Exhibit 37A playing.)
 5                    MR. SEXTON:  Stop that.
 6       BY MR. SEXTON:
 7            Q.    When he's saying that the demonstration had
 8       come from the end there, what is he referring to?
 9            A.    That was the word came from Jeff Fort.
10                    MR. SEXTON:  Go ahead.
11                         (People's Exhibit 37A playing.)
12       BY MR. SEXTON:
13            Q.    Stop that.
14                    Are they talking about the dates on
15       the statements?
16            A.    Yes.
17            Q.    And back then --
18                    THE COURT:  Who is Bantu?  Is that Ban,
19       Bernard Green.
20                    THE WITNESS:  Yes, Bernard Green.
21       BY MR. SEXTON:
22            Q.    Did you recognize his voice?
23            A.    Yes, I did.
24            Q.    How long did you know Bantu or Bernard
```

27

DAILY COPY TRANSCRIPT -- NOT FOR APPEAL PURPOSES

```
 1      STATE OF ILLINOIS  )

 2                         )

 3             MR. SEXTON: :

 4      COUNTY OF C O O K  )

 5             I, JO ANN KROLICKI, an Official Shorthand

 6      Reporter for the Circuit Court of Cook County, County

 7      Department, Criminal Division, do hereby certify that

 8      I reported in shorthand the proceedings had in the

 9      above-entitled cause, and that the foregoing is a

10      true and correct transcript of my shorthand notes so

11      taken before Judge Paul P. Biebel, Jr., on October 9,

12      2013.

13

14                          _____

15                          JO ANN KROLICKI, CSR, RPR
                            OFFICIAL COURT REPORTER
16                          ILLINOIS LICENSE NO. 084-002215

17

18

19

20

21

22

23

24
```