# EXHIBIT 4

DAILY COPY - NOT CERTIFIED FOR APPEAL

1   STATE OF ILLINOIS )
                      ) SS:
2   COUNTY OF COOK    )

3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    PEOPLE OF THE       )
5   STATE OF ILLINOIS,  )
                        )
6        Plaintiff,     )
                        )
7        vs.            ) Case No. 85 C 7651
                        )
8   NATHSON FIELDS,     )
                        )
9        Defendant.     )

10
            REPORT OF PROCEEDINGS had in the
11  above-entitled cause, before the HONORABLE
    PAUL P. BIEBEL, Judge of said Court, on the 11th
12  day of October, 2013.

13          APPEARANCES:

14          HON. ANITA ALVAREZ,
            State's Attorney of Cook County,
15          BY:   MR. BRIAN SEXTON, MR. PATRICK COGHLIN
                  and MR. AARON BOND,
16                Assistant State's Attorneys,
                  appeared for the People;
17
            MR. LEONARD GOODMAN,
18          MS. MELISSA MATUZAK,
            MS. CANDACE GORMAN and
19          MR. ADRIAN BLEIFUSS,
                  appeared on behalf of the Defendant,
20                Nathson Fields.

21

22
    Sharon E. Thompson, CSR 084-004429
23  Official Court Reporter
    2650 S. California, Room 4-C02
24  Chicago, Illinois 60608

I

1               INDEX

2

3    People vs. Nathson Fields

4

5

6

7    Witnesses              DX      CX     RDX    RCX

8    Gene Wolfe              4       29      37     37

9    William Hogan          40      138    228    235

10   Nathson Fields        239

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DAILY COPY - NOT CERTIFIED FOR APPEAL

1      THE WITNESS:  Chicago Police Department,

2  Your Honor.

3  BY MR. COGHLIN:

4      Q.    And over time would it be fair to say this

5  task force grew in numbers as more agents and

6  officers were dedicated to it?

7      A.    Yes, sir, it did.

8      Q.    During this investigation of the El Rukns,

9  did you and federal agents receive authority to

10  intercept certain telephone calls from Jeff Fort?

11      A.    Yes, sir.

12      Q.    And in late '85 was such an order

13  issued?

14      A.    Yes, sir it, was.

15      Q.    Would it be a Title 3 or wiretap order

16  issued by the Federal courts?

17      A.    Yes, sir.

18      Q.    In late '85 where was the first set of

19  wiretaps?  Where were they located or which phones?

20      A.    In Bastrop, Texas at the Federal prison

21  where Jeff Fort was incarcerated.

22      THE COURT:  Where is it in Texas?

23      THE WITNESS:  Bastrop, Texas, Your Honor.

24  BY MR. COGHLIN:

6

DAILY COPY - NOT CERTIFIED FOR APPEAL

1       Q.    And this was in late '85, around November
2    '85?
3       A.    Yes, sir.
4       Q.    Were there any problems or obstacles that
5    developed by trying to listen to the phones from
6    the Federal institution or prison where Jeff Fort
7    was at?
8       A.    The phones that were available for him to
9    use were also available to other inmates there.
10      Q.    And did that make it difficult isolating
11   just -- Did you have to listen to all the calls to
12   determine which of the phone calls Jeff Fort was
13   actually on?
14      A.    Any call that went out at that time was a
15   collect call and the person would have to give
16   their name.  If it was not Mr. Fort on the phone,
17   it would be turned off.
18      Q.    So there were a lot of other additional
19   phone calls being made that were not just Jeff
20   Fort?
21      A.    Yes, sir, that's correct.
22      Q.    And were you able to get an idea of
23   anything other than just the phone calls from the
24   prison?

DAILY COPY - NOT CERTIFIED FOR APPEAL

1        A.    I am not clear, sir.

2        Q.    Were you able to pick up any additional

3    phone calls other than just the phone calls that

4    were originated from Jeff Fort?

5        A.    That was all that were picked up on, yes,

6    sir.

7        Q.    And so would it be fair to say you weren't

8    getting a full picture of what was happening after

9    those phone calls?

10       A.    No, sir.

11       Q.    Was there a decision made to discontinue

12   listening to the phone calls from the prison phones

13   in Bastrop, Texas?

14       A.    Yes, sir, it was.

15       Q.    And where was the next set of wiretap

16   phones set up on?

17       A.    It was set up at the El Rukn headquarters.

18       THE COURT:  How long was that phone up in

19   Texas, can you tell me?

20       THE WITNESS:  I am sorry, sir?

21       THE COURT:  How long was the phone up in Texas

22   intercepting Jeff Fort?

23       THE WITNESS:  I believe it was just the 30

24   days, Your Honor.

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    THE COURT:  Okay.  Then what happened?

2    THE WITNESS:  They were shut off and at that

3    time I new application was made for a Title 3

4    wiretap at the El Rukn headquarters, which was in

5    the 3900 block of Drexel Avenue in Chicago,

6    Illinois.

7    BY MR. COGHLIN:

8    Q.    And specifically was that at 3947 South

9    Drexel?

10    A.    Yes, sir.

11    Q.    And those wiretaps on the phones at The

12    Fort, were those authorized by Chief Judge John

13    Grady for two phones in The Fort?

14    A.    Yes, sir.

15    Q.    Specifically did those wiretaps at the

16    Fort for those phones, were they in effect between

17    March 27th of 1986 through August 18th of '86?

18    A.    Yes, sir.

19    Q.    Was that when the Court authorization ran

20    out?

21    A.    Yes, sir.

22    Q.    How long was each Order good for?

23    A.    It was good for 30 days.

24    Q.    And then could they be renewed after the

1    30 day period?

2        A.    Yes, sir, they could.

3        Q.    And obviously since they ran through

4    August 18th, several of these phones were

5    renewed?

6        A.    Yes, sir.

7        Q.    Were there any reporting requirements in

8    addition besides 30 day renewals that were done for

9    these phones that you are aware?

10        A.    There were 10 day reporting periods at

11    which time it was reported to the courts the

12    overview of the calls that were being

13    intercepted.

14        Q.    And the two phones that were being

15    intercepted at The Fort, do you know where inside

16    The Fort those phones were at?

17        A.    One was from a pay phone, which was in the

18    hallway on the second floor, and the other was in a

19    room on the second floor.

20        Q.    And this room on the second floor, did you

21    later learn that's referred to as Phase 2 and

22    that's where the intercom was in The Fort?

23        A.    Yes, sir.

24        Q.    Specifically for the Phase 2 room with the

DAILY COPY - NOT CERTIFIED FOR APPEAL

```
 1      intercom, was the wiretap authorizations issued

 2      under number NDI346?

 3           A.    That is correct.

 4           Q.    For telephone number 312-536-2816?

 5           A.    Correct, sir.

 6           Q.    And was the other Title 3 authorization

 7      for the pay phone and the calls issued under Title

 8      3 No. NDI347 for the telephone number 312-285-9481?

 9           A.    Yes, sir.

10           Q.    How did the actual interception or

11      monitoring of those calls take place?

12           A.    They were monitored at an office at that

13      time in the U.S. Custom building in Chicago.  There

14      were two reel to reels for each phone line that

15      would automatically go on when the phone was

16      activated and they were monitored by agents or

17      police officers 24 hours a day, 7 days a week.

18           Q.    So for each line you said there's two reel

19      to reels running whenever there's a call being

20      placed on that particular line?

21           A.    Yes, sir.

22           Q.    And what would happen?  What would be the

23      monitors' responsibilities as a call was coming in

24      and they were sitting in the wire room listening to
```

1    these calls?

2         A.    There were agents or police officers on

3    each separate phone.  When the phone line was

4    activated, there would be a counter number that

5    would show up and a time, which they would log on

6    to a sheet.  Also on that sheet they would log in

7    to who was on the telephone at that time and a

8    brief synopsis of the conversation that was being

9    held.

10        Q.    Was also the duration of the call and the

11   number that was being dialed out from The Fort or

12   coming into The Fort, was that also recorded?

13        A.    Yes, sir, it was.

14        Q.    And were these sheets or dictations

15   referred to as log sheets?

16        A.    Yes, sir.  That's correct.

17        Q.    Was there ever a determination made at

18   that time, the determination about the relevancy

19   of the call, whether it was pertinent or not

20   pertinent?

21        A.    There was, yes, sir.

22        Q.    And did that ever change?

23        A.    Yes, sir, it did.

24        Q.    Why was that?

DAILY COPY - NOT CERTIFIED FOR APPEAL

1      A.    The majority of the speakers would talk in
2   code and the code was not always readily available
3   to the people that were monitoring the meaning of
4   the code.
5      Q.    And were there also times when subsequent
6   calls that came after a particular call that was
7   reviewed and changes were made to the determination
8   of whether a call was pertinent or not pertinent
9   once you had a more complete picture?
10     A.    Yes, sir.
11     Q.    You said the speakers were also
12  identified?
13     A.    Yes, sir, they were.
14     Q.    Do you know how that was done?
15     A.    Anyone calling in on a collect call, the
16  operator would advise who the call was coming from.
17  The people on the phone would at the time identify
18  themselves.  There were times when a caller would
19  ask if someone was at the location and ask to speak
20  to them by name.
21     Q.    Now, you said that each call was recorded
22  on two reel to reels?
23     A.    Yes.
24     Q.    What happened at the end of each shift to

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    one of the reel to reel tapes containing the calls?

2         A.    It was sealed in an envelope.  It was

3    marked accordingly and it was placed in secure

4    storage.

5         Q.    And at the end of the 30 day period for

6    that particular Court order, what happened to those

7    tapes?

8         A.    They were put under seal and securely

9    stored.

10        Q.    Was that also in the FBI vault?

11        A.    Yes, sir.

12        Q.    And these log sheets that were completed,

13   were they also sealed at the same time in the vault

14   at the end of the 30 day period?

15        A.    The original sheets were, yes, sir.

16        Q.    You said there were two reel to reels.

17   What was the other reel to reel containing the

18   exact same information used for?

19        A.    That was used as a working copy of

20   anything that we need to go back over to listen to.

21   It would be off of that reel to reel.

22        Q.    And were mini cassettes or full size

23   cassettes made from that reel to reel tape?

24        A.    Yes, sir, there were.

1    Q.    As one of the main agents on the task
2  force, did you review the log sheets?
3    A.    Yes, sir, I did.
4    Q.    Did you have conversations with the
5  monitors who were actually listening to the
6  calls?
7    A.    Yes, sir.
8    Q.    Did you in fact listen to phone calls that
9  were intercepted pursuant to the wire?
10    A.    Yes, sir, I did.
11    Q.    Did you become familiar with some of the
12  code that was being used?
13    A.    Yes, sir.
14    Q.    And did you also become familiar with the
15  voices on the tapes?
16    A.    At that time, yes, sir.
17    Q.    Had you spoken to some of the people being
18  intercepted personally on the street as part of the
19  investigation?
20    A.    Yes, sir.
21    Q.    And did you recognize the voices from your
22  own personal contact?
23    A.    Yes, sir.
24    Q.    And to your knowledge, Detective Brannigan

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    and Kolovitz, were they also familiar with some of
2    the voices just from their personal interactions?
3        A.   Yes, sir, they were.
4        Q.   Now, did the actual interception of the
5    calls stop on August 8th, 1986?
6        A.   Yes, sir, it did.
7        Q.   Why was that?
8        A.   That was when the LAW rocket was -- the
9    dummy LAW rocket was purchased by members of the
10   El Rukns.
11       Q.   Why do say dummy LAW rocket?
12       A.   It was inactive.
13   THE COURT:  It was a what kind of rocket?
14   THE WITNESS:  It was a LAW rocket, Your Honor,
15   l-a-w.
16   THE COURT:  What does that mean?
17   THE WITNESS:  At this time I forget what it
18   was.  It was basically a shoulder fired projectile
19   would come out of there.  At the time it had been
20   used in different action films.
21   BY MR. COGHLIN:
22       Q.   Did it stand for light anti-tank weapon?
23       A.   That is it.
24       Q.   LAW was an acronym for that?

1      A.    Yes, sir.

2      Q.    And this was inactive and the El Rukns was

3  trying to purchase one of these?

4      A.    Yes, sir, it was.

5      THE COURT:  Was it bought or was it attempted

6  to be bought?  I wasn't clear.

7      THE WITNESS:  It was bought, sir.

8      THE COURT:  Thank you.

9  BY MR. COGHLIN:

10     Q.    And based on the telephone calls and the

11  conversations regarding the sale, are you aware of

12  why the El Rukns wanted this?

13     A.    At the time Elijah Muhammad with the

14  American Muslims reportedly was given $1 million by

15  Muammar Qaddafi from Libya.  And the El Rukns had

16  talked about attempting to try and receive money

17  also and to show that they were more or less

18  militant and capable of performing actions to

19  disrupt the United States Government.

20     MR. GOODMAN:  Judge, I am going to object to

21  the relevance and ask that it be stricken.

22     THE COURT:  What's the relevance, please?

23     MR. COGHLIN:  Judge, it goes to why the wiretap

24  was taken down at that particular time rather than

1    listening to calls and getting more -- letting the

2    wire run, why there was an urgency to end it at

3    that time.

4         THE COURT:  With that limitation I will take

5    the evidence.  Thank you.

6    BY MR. COGHLIN:

7         Q.   Following the sale of the Law rocket, were

8    individuals within the El Rukns subsequently

9    arrested and charged with several Federal

10   indictments?

11        A.   Yes, sir.

12        Q.   And did you then work along with fellow

13   agents beginning to initially transcribe the calls

14   that were intercepted?

15        A.   Yes, sir.

16        Q.   Before trial would you work with the

17   ASA's -- I am sorry, the Assistant United States

18   Attorneys to determine which of all the calls

19   intercepted were going to be played for each of the

20   various trials?

21        A.   Yes, sir.

22        THE COURT:  Let's go back.  You said the

23   El Rukns were arrested.  They were arrested for

24   what? They were arrested for the LAW rocket or

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    arrested for --

2         THE WITNESS:  They were arrested on the LAW

3    rocket, charges basing out of the LAW rocket

4    purchase, Your Honor.

5    BY MR. COGHLIN:

6         Q.   And that was one of the indictments

7    relating to the purchase of the LAW rocket; is that

8    correct?

9         A.   Yes, sir.

10        Q.   Were there other indictments relating to

11   narcotic sells and murder -- conspiracy to commit

12   murder?

13        A.   Yes, sir.  It was racketeering.

14        Q.   And also a bribery indictment as well

15   relating to Judge Maloney?

16        A.   Yes, sir.

17        Q.   Showing you what's been marked as People's

18   Exhibit No. 37 for identification.  I ask you to

19   take a look at what's depicted in People's 37.  I

20   ask if you recognize what those pages are in the

21   binder.

22        A.   Yes, sir.  These are copies of transcripts

23   that were made from recordings off the Title 3

24   wiretap.

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    Q.    And specifically are those transcripts --
2  a portion of the transcripts that were used in the
3  Federal indictment against Judge Maloney?
4    A.    Yes, sir.
5    Q.    Were you involved in preparing the initial
6  drafts of the actual transcripts, the word-for-word
7  transcriptions on the left hand size of that
8  document?
9    A.    Yes, sir.
10    Q.    And you stated you were familiar with the
11  voices based on call content, self identification
12  and your own personal conversations with various
13  different people?
14    A.    Yes, sir.
15    Q.    Between 1986 and 1991 were there also
16  individuals cooperating who you used to be members
17  of the El Rukns?
18    A.    Yes, sir.
19    Q.    And did they also become a basis for
20  identifying voices?
21    A.    Yes, sir.
22    Q.    The right hand side of that document, is
23  that a translation from the code into what the
24  various El Rukn members believed was being said?

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    A.    Yes, sir.

2    Q.    And was that prepared with the U.S.

3 Attorney's Office and those cooperators?

4    A.    Yes, sir.

5    Q.    You did not prepare the right hand side of

6 that document?

7    A.    No, sir, I did not.

8    Q.    All the transcripts that you were working

9 on, did that come from the working reel to reel set

10 of the tapes, the ones that had not been

11 impounded?

12    A.    Yes, sir.

13    Q.    In preparation of your testimony here

14 today, did you review certain CDs of those same

15 calls?

16    A.    Yes, sir, I did.

17    Q.    And were these CDs based on, to your

18 knowledge, the original reel to reels that had been

19 impounded in the FBI vault?

20    A.    Yes, sir.

21    Q.    Showing you what's been previously marked

22 as Group Exhibit Number 40 and 41.  Specifically

23 showing you People's Group 40, which is 11 CDs or

24 DVDs.  Do you recognize what's in People's No. 40?

1    A.    Yes, sir.

2    Q.    What's that?

3    A.    These are the CDs that I listened to on

4    these transcripts.

5    Q.    And do those CDs contain the actually

6    audio files for all the calls that's in People's

7    37, the book of transcripts?

8    A.    Yes, sir.

9    Q.    Now, these transcripts, were there

10   additional calls that were played in the

11   U.S. v. Maloney case which are not in People's 37,

12   this book of transcripts?

13   A.    Yes, sir.

14   Q.    So this is only a portion of the calls

15   introduced in Maloney?

16   A.    Yes, sir.

17   Q.    Showing you People's No. 41, 15 additional

18   disks.  Do you recognize what that is?

19   A.    Yes, sir.  These were the other disks of

20   conversations from the Title 3 wiretap.

21   Q.    And People's No. 41, does that contain

22   additional calls that were played for the Maloney

23   trial that are not in the transcript?

24   A.    Yes, sir.

DAILY COPY - NOT CERTIFIED FOR APPEAL

1      Q.   But this is everything that came out of --

2    To your understanding they were made from the

3    original reel to reels when they were pulled out of

4    evidence?

5      A.   Yes, sir, it is.

6      THE COURT:  Are you saying People's Exhibits 40

7    and 41 are not included in People's 37, that binder

8    you have there?  Is that what you are saying?

9      THE WITNESS:  Yes, sir.

10     THE COURT:  Some are, some aren't or do they go

11   beyond it?  I am not clear.

12   BY MR. COGHLIN:

13     Q.   When you were asked to review all of these

14   CDs, what's contained in People's 40 and 41, were

15   you you asked to look for the calls on these disks

16   that corresponded to the calls from that transcript

17   book?

18     A.   Yes.  I was asked to look for these

19   calls.

20     Q.   And in People's Group Exhibit No. 40, are

21   these the disks that contain the calls relating to

22   those transcripts in front of you?

23     A.   Yes, sir.

24     Q.   People's 41, this group exhibit, are these

DAILY COPY - NOT CERTIFIED FOR APPEAL

1   additional calls that were played for the Maloney

2   trial which are not being introduced or are not in

3   this book before you today?

4        A.   Yes, sir.

5        Q.   Did you listen to the calls in People's

6   Group Exhibit No. 40 that corresponded to these

7   calls, which there is a transcript in front of

8   you?

9        A.   Yes, sir, I did.

10       Q.   And did you recognize those calls?

11       A.   Yes, sir, I did.

12       Q.   How did you recognize them?

13       A.   I recognized them as matching up with the

14  transcripts of what was previously copied here.

15       Q.   So even though these came from the

16  original reel to reels that were inside the FBI

17  vault, you recognized them from listening to the

18  other original that became the source for the

19  working copies?

20       A.   Yes, sir.

21       Q.   When listening to those calls on the

22  compact disk, you were also following along with

23  the transcript?

24       A.   Yes, sir.

1        Q.    And is that transcript a fair and accurate

2   transcription of what you heard on the tapes

3   again?

4        A.    Yes, sir.

5        Q.    On the left hand side?

6        A.    Yes, sir.

7        Q.    Did you make any notations on People's 37

8   on the actual transcripts?

9        A.    Yes, sir, I did.

10       Q.    What -- In general what notations did you

11  make on the transcripts?

12       A.    I would make on the transcript the tape ID

13  number, which was the CD there.  And on there these

14  various lines printed out as they were being played

15  and I would make a notation of which line it was

16  and the time from the counter of the calls.

17       Q.    For example, if I asked you to turn to

18  People's Exhibit No. A before you, the handwritten

19  notes underneath the speakers where it says tape ID

20  15, line 44 and then there's a notation of 113.

21       A.    Yes, sir.

22       Q.    Did you make that notation?

23       A.    Yes, sir, I did.

24       Q.    And was that a notation of where you found

DAILY COPY - NOT CERTIFIED FOR APPEAL

1    this transcript on the disk containing the audio
2    file?
3        A.    Yes, sir.
4        Q.    And so out of all of these, did you
5    include a disk where these calls could be found as
6    well as a time associated with where the audio
7    actually appeared on the wave files or on the audio
8    file?
9        A.    Yes, sir, I did.
10       Q.    Now, you mentioned that you were comparing
11   the transcripts with the CDs that came from the
12   original reel to reels?
13       A.    Yes, sir.
14       Q.    Were you also given later --
15   MR. COGHLIN:   Can I have a second, Judge?
16   THE COURT:   Yes, sir.
17                        (Short break taken.)
18   BY MR. COGHLIN:
19       Q.    Was there also a DVD produced from actual
20   cassette tapes that were found by the U.S.
21   Attorney's Office that had been the working copies
22   in the U.S. vs. Maloney trial?
23       A.    Yes, sir.
24       Q.    Showing you what's marked as People's

1    Exhibit 42 for identification.  Do you recognize

2    this disk marked People's Exhibit No. 42 for

3    identification?

4        A.    Yes, sir, I do.

5        Q.    What is that?

6        A.    This is a copy from the United States

7    Attorney's Office that pertained to calls that were

8    made on Title 3 wiretap.

9        Q.    And were you able to find some of the same

10   calls not only on the CDs that came from the

11   original reel to reel tapes, but also that were on

12   this disk from the working copy or the other reel

13   to reel?

14       A.    Yes, sir.

15       Q.    And did you make notations in the

16   transcripts of when the call was found on both the

17   master CD, which I will refer to as People's 42, as

18   well as the other 11 CDs?

19       A.    Yes, sir.

20       Q.    And specifically I ask you to turn to

21   People's Group Exhibit No. E in 37.  Is that one of

22   the calls -- Actually People's F, Exhibit F.  Is

23   that a call where you also found the call not only

24   on the tape identified as 22 X2A cuts, but was also

1  referred to on the disk as master copy?

2  A.  Yes, sir.

3  Q.  So you were able to, even though it came

4  from two different sources from the two different

5  reel to reels running at the same time, find the

6  same call?

7  A.  Yes, sir.

8  Q.  Were the calls that you found on the 11

9  disks actually calls corresponding to these

10  transcripts People's Exhibit No. A through V and

11  were those calls then transferred to a thumb

12  drive?

13  A.  Yes, sir, they were.

14  Q.  And specifically People's Exhibit No. 36,

15  is this green and silver thumb drive a CD that just

16  contains the audio files relating to the calls in

17  People's 37?

18  A.  Yes, sir.

19  Q.  Now, when you were making these

20  transcripts or starting on the rough drafts for the

21  initial drafts of these transcripts, you were

22  making them only a couple of years, if that, after

23  the calls took place?

24  A.  Yes, sir.

1      Q.   And when you listened to these calls in

2   2012, 2013, 20 plus years later, were there calls

3   where the audio had degraded a little bit?

4      A.   Yes, sir.

5      Q.   And to your understanding was that just

6   because of the length of time and because these

7   were originally recorded on reel to reel cassette

8   tapes?

9      A.   Yes, sir.

10      Q.   But when you listened to them back in

11   preparation for preparing the transcripts, was the

12   sound quality better?

13      A.   Yes, sir, it was.

14   MR. COGHLIN:  Can I have a second, Judge?

15   THE COURT:  Yes.

16                     (A short break was taken.)

17   MR. COGHLIN:  Judge, nothing further.

18                 CROSS EXAMINATION

19   BY MR. GOODMAN:

20      Q.   Agent Wolfe, you testified that the

21   wiretap in Texas was up in late 1985 for 30 days;

22   is that correct?

23      A.   Yes, sir.

24      Q.   And you said there were some problems with