# EXHIBIT 9

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff vs. NATHSON FIELDS, Defendant | Case No. 85 - C - 7651 |

JUDGE CRIMINAL DIVISION
CLERK OF CIRCUIT COURT
SEP 08 1992
ENTERED

FIRST AMENDED PETITION FOR POST CONVICTION RELIEF

Defendant, Nathson Fields, by his attorneys, John L. Stainthorp and Michael A. Babiarz, respectfully petitions this Court for post conviction relief pursuant to Article 122 of the Illinois Code of Criminal Procedure of 1963, as amended (Ill. Rev. Stat. Ch. 38 Sec. 122-1). Specifically, inter alia, Nathson Fields ~~seeks the following relief: a hearing on this petition and vacation~~ of his convictions and sentences and a new trial. Alternatively, Fields seeks a hearing on this petition and vacation of his sentence of death and a new sentencing hearing.

In support of the Petition, Nathson Fields states as follows:

STATEMENT OF FACTS AND PROCEDURAL HISTORY

1. On April 28, 1984, Jerome "Fuddy" Smith and Talman Hickman, members of the Black Gangster Goon Squad were shot and killed. The shooting took place on a Saturday morning in front of a 14 story CHA building. Two gunman wearing ski masks fired several shots and fled through a breezeway to a waiting car.

2. Detective Bogdalek did the initial investigation. The day of the shooting, he interviewed Randy, James, and Sharon Langston, who lived in the CHA building. Randy Langston told him that he saw

a lone gunman wearing a ski mask. Randy stated that the gunman removed his mask, but gave the detective no description of the man's face. Detective Bogdalek also interviewed Cleveland Ball, Cornell Jefferson, and Carlos Willis. All three told the detective that they saw the gunman or gunmen, but that the assailant(s) never removed the ski masks worn.

3. 13 months later, Detective O'Callaghan conducted several lineups relating to the Smith-Hickman shooting. Gerald Morris and Randy Langston identified Nathson Fields and his co-defendant, Earl Hawkins, as the assailants. Carlos Willis told the detective he could not identify anyone, but the detective offered to secure preferred public housing for Willis' grandmother, and suggested that Willis look more intently at co-defendant Hawkins. Torrence White was offered a move out of the housing projects if he would identify Hawkins. Eric Langston identified the defendants because the detective promised to secure an early release for his brother from jail. Randy Langston also identified both Fields and Hawkins, but testified that he did so only out of fear of the detective.

4. These identifications resulted in the arrest and subsequent indictment of Nathson Fields, a high ranking member of the El Rukn organization.

5. In June of 1986, the trial of Nathson Fields and his co-defendant Earl Hawkins began. Nathson Fields waived his right to a jury trial and pleaded not guilty.

6. The State introduced the evidence of 4 occurrence witnesses:

A. Randy Langston, who was a member of the Black Gangster Goon Squad testified. On direct examination, Randy testified that he saw 2 masked men shoot the victims, then step into the sunlight, raise their ski masks, and remain there for 15-20 seconds. On cross examination, Randy admitted that he initially claimed he saw only one gunman. At trial, Randy identified Hawkins as someone he had known by name, yet on cross, he admitted that he did not tell police Hawkins' name. Randy admitted never seeing Nathson Fields prior to the day of the shooting, and admitted giving no description that matches Fields' physical appearance to police on the day of the shooting. A month later, at the death penalty hearing, Randy recanted his testimony. He claimed he never saw the gunmen's faces and that he made his identifications out of fear of the police.

B. Richard Buckles also testified at trial. Buckles was also a member of the Black Gangster Goon Squad. He was not interviewed by the police, nor did he come forward, until 2 years after the shooting. He identified Hawkins as one of the gunman, but could not positive identify Nathson Fields. He stated at trial that he had never seen Fields before in his life.

C. Gerald Morris, Randy Langston's brother-in-law and a fellow Black Gangster Goon Squad member, was the State's third occurrence witness. He testified that he was interviewed by police the night of the shooting, and that he told the police he had seen the gunmen, and could identify them. (The police who testified at trial contradicted this, stating that they never interviewed Morris

until a year later.) Morris was questioned at trial about an identification he made of one George Carter, who he stated drove the getaway car. Morris admitted at trial that he really did not see the driver's face, and that his identification of Carter was false. Morris conceded that the victims were good friends of his, yet he did not contact police. Morris admitted that he received housing or lodging from police prior to trial, and that he was told of employment opportunities. He identified Nathson Fields at a lineup and at trial.

D. Anthony Sumner, a former member of the El Rukn organization, made a deal with the State's Attorney's office in return for testimony in this and other cases involving El Rukn members. At trial, Sumner admitted to lying to and deceiving the police on numerous occasions, and stated that he lied when he told the police that Nathson Fields told him that he was involved in the Smith-Hickman shootings. Nevertheless, Sumner testified that Fields told him that the Smith-Hickman shootings were "good exercise". Sumner admitted that Fields had never admitted to him that he had shot anyone.

7. Carlos Willis, Torrence White, Cleveland Ball, and Cornell Jefferson testified on behalf of the defense. All testified that they were not affiliated with any gang. Testimony from these witnesses indicated that the 2 gunmen never removed their masks. Torrence White testified that immediately following the shooting, he and Randy Langston ran away from the scene.

8. The Court found both defendants guilty of the murder of Smith and Hickman. Defense filed motions for a new trial and for separate sentencing juries. Both motions were denied. Both defendants waived a jury as to death penalty eligibility, and both were found eligible by the court. The court then conducted jury selection for the penalty phase of the sentencing hearing.

9. At the hearing, the State called Detective Richardson to summarize the case. When the defense attempted to cross examine the detective regarding weaknesses in the case, they were barred by the court from doing so.

10. At the hearing, Randy Langston recanted his trial testimony, now stating he did not see the gunmen. James and Eric Langston testified that the gunmen were masked the entire time. Several witnesses testified in mitigation for Nathson Fields, recounting how he was a good student, good athlete, and good father to his children.

11. At the States closing argument at the hearing, the prosecutor misstated that the jury would only be making a recommendation to the judge and that the jury wasn't killing anyone. The prosecution also implied that Nathson Fields could be released at some point from prison if he was not given the death penalty. The prosecutor brought in "impact evidence" of the decedents' families. The prosecutor implied that the defense attorneys were attempting to mislead the jury, and that Nathson Fields' membership in the El Rukns was an aggravating factor.

12. The jury instructions were given. The court refused an instruction that the jury could consider mercy, and instead allowed an instruction that sympathy should not be a factor. A mistake was also made in the jury instructions: the instruction stated: "Your agreement on a verdict must be unanimous": The court orally corrected this instruction after the jury began deliberations, and denied a defense motion for a mistrial. Then, the judge told the jury that they had 30 minutes to deliberate or they would be sequestered for the night. The judge denied that he was attempting to intimidate the jury into reaching a verdict. Nevertheless, the jury shortly thereafter returned a verdict of death for each defendant.

13. The Court denied motions for a new trial, and sentenced Nathson Fields and his co-defendant to death.

14. The Illinois Supreme Court affirmed Fields conviction and sentence. People v. Fields, No. 64276, 64277 cons. (1990). Field's petition for rehearing in that court, and Petition for Writ of Certiorari with the United States Supreme Court were denied.

15. On December 11, 1990, Illinois Supreme Court Justice Michael A. Bilandic stayed the issuance of the mandate in this matter until March 1, 1991, pending the filing of a petition for post conviction relief in this court. Justice Bilandic further ordered that the stay would be continued pending final disposition of this petition.

16. On January 22, 1991, the State Appellate Defender, through the Capital Resource Center contracted with Michael A.

Babiarz to represent Fields in the post conviction proceedings. Shortly thereafter, John L. Stainthorp similarly contracted to represent Fields.

17. Fields seeks post conviction relief on the grounds, as enumerated below, that the proceeding that resulted in his conviction and sentence substantially denied him his rights under the Constitutions of the State of Illinois and United States.

18. Counsel has not had adequate time to investigate thoroughly all the circumstances surrounding this case. Consequently, counsel is contemporaneously requesting a motion for continuance to file an amended petition, as set out more fully in the motion accompanying said request.

19. No previous post conviction petition has been filed by Nathson Fields.

GROUNDS FOR RELIEF

COUNT 1

NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

A. NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS TRIAL ATTORNEY'S FAILURE TO INVESTIGATE THE FACTS OF THE CASE AND MITIGATION EVIDENCE.

20. Numerous witnesses could have testified on Nathson Fields behalf at trial and at sentencing. Field's trial counsel did not thoroughly investigate what these witnesses could have said on Field's behalf, and therefore, omitted considering these witnesses. (See accompanying Affidavit 'A'). Police reports indicate that one witness, Sandra Langston, stated that both assailants were light

skinned. Field's co-defendant is light skinned, while Fields is dark skinned. Counsel did not pursue the investigation of Sandra Langston and other potentially important witnesses.

21. Nathson Field's counsel did not fully investigate what evidence could have been used on Field's behalf at sentencing. Counsel did not investigate Field's childhood, to learn that Fields was abused as a child, and evicted from his home at age 15. Counsel failed to inquire as to this issue, and consequently did not present this evidence as mitigation.

B. NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S CONFLICT OF INTEREST DURING THE TRIAL AND SENTENCING PROCEEDINGS.

22. Nathson Field's counsel, as well as his co-defendant's counsel, told the court after the defendants were convicted, that both attorneys had received death threats from within the El-Rukn organization. Counsel at that time requested a special prosecutor to investigate these threats. Counsel's request of this special prosecutor indicates a conflict of interest with the interest of his client. This conflict impaired his continued representation of Nathson Fields.

C. NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT VOIR DIRE FOR THE SENTENCING JURY.

23. Nathson Field's trial counsel did not request individually sequestered voir dire for the selection of the death penalty jury, nor did he request that he participate in said selection. The failure of counsel to request the above

fundamentally denied Nathson Fields a fair and impartial sentencing jury.

D. NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILING TO CONTEST CERTAIN IDENTIFICATION EVIDENCE.

24. Nathson Field's trial counsel did not make a motion to challenge the validity of certain pre-trial line up identifications of Fields. The record shows that the police line ups were conducted in a manner to create a substantial likelihood of misidentification at trial. Witnesses testified that the police "encouraged" the identification of Fields and his co-defendant, and that the police promised witnesses benefits such as better housing, etc., if they would identify Fields. The record shows a probability that the police infected these pre-trial identifications with suggestions. Because identification of the victim's assailants was the critical issue at trial, failure to challenge these identifications was especially harmful.

E. NATHSON FIELDS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT OR OTHERWISE TIMELY PRESERVE ISSUES FOR APPEAL.

25. Counsel failed to object, at times, and failed to include in his post-trial motions, the issue of numerous improper remarks by the prosecutor at the sentencing hearing. Specifically, the prosecution diminished the role the jury would play in sentencing the defendants. The prosecution indicated that the jury would be making a "recommendation" to the judge for sentencing.

26. The prosecution also mislead the jury into thinking that Fields could get a sentence other than natural life as an alternative to the death penalty. The prosecution implied that Fields, who had served 12 years for a previous murder conviction, could serve a similar sentence in this case. Nathson Field's attorney did not object nor raise this issue in a post trial motion.

27. Counsel failed to object to and failed to include in his post trial motions, at least five other improper arguments made by the prosecution to the jury: (1) that the defendants "ducked out" of the death sentence on at least five prior occasions; (2) that the defendant's attorneys were trying to "cloud the issues" and deliberately mislead the jury; (3) that the defendant's membership in the El Rukn organization was to be considered, impliedly, as an aggravating factor in their sentencing; (4) that the impact of the murders on the victim's families could be considered as an aggravating factor; and (5) that the defendants had the burden of persuading the jury that there were sufficient factors to preclude the imposition of the death penalty.

28. Counsel failed to properly attempt to exclude evidence at the sentencing hearing regarding Field's alleged participation in another murder, that of Eggers-Vaughn and White. This is made even more egregious by the fact that subsequently, Fields was dismissed as a defendant in that case.

29. Counsel failed to object to, or raise in post trial motions, the fact that the judge attempted to intimidate the jury.

The judge, late at night, gave the jury 30 more minutes to reach of verdict or be sequestered for the night. The judge even opined at that point that he was not doing this to intimidate the jury! Shortly thereafter, the jury returned its verdict.

WHEREFORE, in light of the foregoing, Nathson Fields was denied effective assistance of counsel, and his conviction and sentence should be vacated.

COUNT II

THE ILLINOIS DEATH PENALTY STATUTE IS UNCONSTITUTIONAL.

30. The Illinois statute under which Nathson Fields was sentenced provides that once a statutory aggravating factor was proved, then the jury must impose a sentence of death unless there are mitigating factors sufficient to preclude death.

31. This statute prevents a jury from properly exercising its discretion because it erects a presumption in favor of death that is irrebuttable in the absence of mitigation in violation of the eighth and fourteenth amendments to the United States Constitution and analogous provisions of the Illinois Constitution.

32. By requiring the defendant to present mitigating factors sufficient to preclude the death sentence, the statute shifts the burden of persuasion to the defendant, in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

33. The statute does not provide sufficient notice to a defendant that the State will seek the death penalty and will attempt to prove aggravating factors, in violation of the sixth,

eighth, and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

34. The statute on its face fails to safeguard adequately against discriminatory, arbitrary and capricious application of the death penalty in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

35. The statute permits the prosecutor sole and unfettered discretion to convene a death penalty hearing following conviction and in so doing vests a judicial function in a prosecutor in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution, as well as the separation of powers clauses in said documents.

36. The statute is impermissibly vague and devoid of objective standards to guide prosecutors and sentencing authorities in their respective decisions whether to seek and apply the death penalty in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

37. The statue fails to provide for written findings by the sentencing authority of non-aggravating factors or otherwise to ensure the recording of data to allow meaningful appellate review in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

38. The statute fails to provide a means to assure that all non-statutory aggravating factors relied upon by the sentencer were

relevant or constitutionally permissible in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

39. The statute impermissibly mandates death because the Illinois statute and pattern jury instructions mandate death when aggravating circumstances outweigh mitigating ones in violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

WHEREFORE, in light of the foregoing, Nathson Fields' sentence should be vacated and a new sentencing hearing held.

COUNT III

NATHSON FIELDS DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE THERE WAS NO PROOF BEYOND A REASONABLE DOUBT THAT NATHSON FIELDS INTENDED TO KILL TWO INDIVIDUALS.

40. The trial court found Nathson Fields eligible for the death penalty because he was convicted of the death of 2 individuals. However, in order for Nathson Fields to be eligible for the death penalty, the State was required to prove beyond a reasonable doubt that Nathson Fields actually killed both Smith and Hickman or intended to kill both men.

41. Evidence adduced at trial shows that there is no reliable evidence that Nathson Fields was positively identified as the killer of the victims.

WHEREFORE, in light of the foregoing, Nathson Fields' sentence should be vacated, and a new sentencing hearing held.

COUNT IV

NATHSON FIELDS WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO AN INDIVIDUALIZED SENTENCING DETERMINATION WHEN THE COURT REFUSED HIM A SENTENCING HEARING SEPARATE FROM HIS CO-DEFENDANT.

42. Prior to the penalty phase in this case, the court denied Nathson Fields' motion to have his sentencing hearing separate from his co-defendant, Earl Hawkins.

43. The court order requiring a joint sentencing hearing prejudicially affected the jury's determination as to whether to sentence Nathson Fields to death.

44. This joint sentencing hearing deprived Nathson Fields of his right to an individualized sentencing determination as guaranteed by the eighth and fourteenth amendments to the U.S. Constitution, and analogous provisions of the Illinois Constitution, as well as his right to Due Process of Law under the fifth, sixth, and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

WHEREFORE, Nathson Fields' sentence should be vacated and a new sentencing hearing held.

COUNT V

NATHSON FIELDS WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A RELIABLE CAPITAL SENTENCING DETERMINATION WHERE THE JURY WAS NOT INSTRUCTED THAT IF THEY DID NOT IMPOSE DEATH, THAT NATHSON FIELDS WOULD BE SENTENCED TO MANDATORY NATURAL LIFE IMPRISONMENT.

45. The Illinois Supreme Court in People v. Gacho, 122 Ill 2d 221, 522 N.E.2d 1146 (1988) recognized that a natural life

instruction was a necessary procedural safeguard and required juries to be so instructed. The jury in Nathson Fields' trial was not so instructed. The Illinois Supreme Court, however, has refused to apply the Gacho ruling retroactively. Failure to do so is a denial of equal protection of the law under the fourteenth amendment to the U.S. Constitution and analogous provisions of the Illinois Constitution.

46. Moreover, the instruction that informs the jury that the alternative to death is natural life without parole is in itself a mitigation factor that the jury is entitled to consider. Failure to give such an instruction is a violation of the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

WHEREFORE, for this reason, it is not possible for Nathson Fields to be eligible for the death penalty under the applicable Illinois statute, and therefor his death sentence violates the eighth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution, and should be vacated, with a new sentencing hearing held.

COUNT VI

NATHSON FIELDS WAS DENIED HIS RIGHT TO A TRIAL BEFORE AN IMPARTIAL TRIER OF FACT.

47. Nathson Fields was convicted in a bench trial. After convicting Fields, while in an in camera hearing with counsel, the court, in responding to allegations that the defense attorneys had received death threats, said: "How could it possibly come about?

* * * Usually people know that when they have a jury trial that the odds are against them so how could anyone expect that there would be an acquittal? * * * Trials that are not jury trials, generally not juries, juries, bench trials, whatever. The prosecution has year in and year out has the highest percentage so how could this come about?"

48. The above comments indicate bias on the part of the trier of fact. These remarks show that the court presumed Fields and his co-defendant to be guilty.

49. At the time Nathson Fields' trial was conducted, there was in place in this particular court system a non-random assignment of judges to serious murder cases. As a result of this system, this case was assigned to a judge who favored the prosecution.

50. Furthermore, the trial judge, Judge Thomas Maloney, has recently been indicted by federal authorities for accepting and then returning a $10,000 bribe in this case.

51. The bribe was accepted by Judge Maloney pursuant to an agreement with Fields' co-defendant, Earl Hawkins, and Hawkins' attorney, William Swano, whereby Maloney would find Hawkins not guilty. When Judge Maloney learned that the FBI was aware of the agreement and bribe he returned the money to Swano during the course of the trial.

52. Judge Maloney did not recuse himself from this case, nor did he give any notice to Fields or his counsel regarding the acceptance and later return of this bribe, or his agreement with

Hawkins and Swano.

53. The initial acceptance of the bribe, its subsequent return, and the Judge's knowledge of the FBI investigation created a conflict of interest for Judge Maloney. After he learned of the FBI's suspicions concerning the fix, Judge Maloney had a significant self-interest in finding Fields guilty, since he could then claim the case had never been fixed and could point to the guilty verdict as evidence of this. This conflict of interest denied Fields a fair trial.

54. Judge Maloney was not an impartial judge of the facts in this matter by reason of his agreement to take a bribe, his knowledge of the FBI investigation, and his subsequent return of the bribe.

55. Because of the foregoing, Nathson Fields was denied his right to due process under the fifth and fourteenth amendments to the U.S. Constitution and analogous provisions of the Illinois Constitution.

WHEREFORE, for this reason, Nathson Fields' conviction and sentence should be vacated.

COUNT VII

NEW EVIDENCE MANDATES A NEW SENTENCING HEARING FOR NATHSON FIELDS.

56. At Nathson Fields' sentencing hearing, Anthony Sumner, a member of the El Rukn organization, testified that Nathson Fields was one of the parties who participated in the murder of Joe White and Dee Eggers-Vaughn.

57. This testimony was considered by the jury sentencing Nathson Fields, and was critical in their decision to recommend the death penalty.

58. In Anthony Sumner's sworn statement (a copy of which is attached) recently provided Nathson Fields' counsel, he states that Mr. Fields was not involved in the Joe White and Dee Eggers-Vaughn murders.

WHEREFORE, for this reason, Nathson Fields' sentence should be vacated.

RELIEF SOUGHT

NOW, THEREFORE, Nathson Fields requests that this court:

1. Vacate his sentence and conviction;

2. Conduct a hearing in which proof may be offered concerning the allegations of this Petition;

3. Grant Nathson Fields the authority to obtain subpoenas for witnesses, documents and other discovery necessary to prove the facts alleged in this Petition;

4. Grant Nathson Fields' attorneys, John L. Stainthorp and Michael A. Babiarz, sufficient time and leave to amend this Petition, as more fully stated in the accompanying motion for continuance to file amended petition for post conviction relief.

5. Grant such other and further relief as may be appropriate.

Respectfully Submitted:

Michael A. Babiarz, one of
Nathson Fields' attorneys

John L. Stainthorp
1180 N. Milwaukee
Chicago, Il 60622
(312) 235-0070

Michael A. Babiarz
800 E. Northwest Hwy., Suite 700
Palatine, IL 60067
(708) 705-2150