# EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                        EASTERN DIVISION
 4
 5   NATHSON E. FIELDS,
 6        Plaintiff,
 7
 8     vs.                              Case No. 10 C 1168
 9
10   CITY OF CHICAGO, et al.,
11        Defendants.
12   ~~~~~~~~~~~~~~~~~~~~~~~~~~~
13
14                         DEPOSITION OF
15
16                          LOU REITER
17
18                       October 23, 2013
19                          12:35 p.m.
20
21                     2700 Centennial Tower
22                      101 Marietta Street
23                       Atlanta, Georgia
24
25           Maxyne Bursky, RPR, CRR, CCR-2547
```



1  something is exculpatory or not?
2      A.  No, it is from a police practices standpoint.
3  We look at it from a police practices standpoint.  But
4  as far as whether the prosecutor is going to turn it
5  over believing it is exculpatory, that's a decision the
6  prosecutor makes.
7          Then in the end, it is really the court that
8  makes a determination, if a certain piece of evidence
9  or document is exculpatory or not.  They make that
10 final decision.
11         From a police practices standpoint, the entire
12 investigation is exculpatory because it has specific
13 information that has to be turned over to the
14 prosecutor so the prosecutor can make a proper
15 deliberation on whether they believe it is sufficient
16 that they have to turn it over to the criminal defense.
17     Q.  Are you saying that it would be impossible for
18 you to ever look at a file and say that the material in
19 that file was not exculpatory?
20     A.  From my perspective, that's true.
21     Q.  So you can say something is exculpatory --
22 strike that.  So you are qualified to say something is
23 exculpatory but you are not qualified to say something
24 is not exculpatory; is that true?
25     A.  I guess we are at a pass roads here, because



```
 1   the investigator, we are the good guys.  We are the
 2   ones that develop.  We have got all the facets to do an
 3   investigation.  Our job is to simply do an
 4   investigation, complete it, and turn that over to the
 5   prosecutor whose responsibility it is then to make that
 6   decision of this entire file which is exculpatory,
 7   which has to be turned over to the criminal defense.
 8           That's the prosecutor.  From my point of view
 9   as a police practices expert, if you have got a file,
10   if you have got handwritten notes, if you have got a
11   piece of evidence, yes, you must turn that over,
12   disclose that to the prosecutor so the prosecutor can
13   make a reasonable decision on whether he or she wants
14   to disclose it.
15       Q.  So if there was a handwritten note in the
16   Smith Hickman file -- strike that.
17           You were living in Tallahassee, Florida in
18   April 1984; is that right?
19       A.  I was.
20       Q.  If there was a handwritten note in the Smith
21   Hickman file that an anonymous caller said that Lou
22   Reiter killed Smith and Hickman; and that the
23   detectives checked it out; and that you had a rock
24   solid alibi.  If that written note was in the Smith
25   Hickman file, would you consider that exculpatory
```



```
 1   information?
 2        A.   Yes.
 3        Q.   Why do you need to characterize something as
 4   exculpatory when it seems to me you are saying that
 5   every scrap of paper, every iota of information needs
 6   to be turned over to the prosecutors?
 7        A.   Right, because it all has the potential to be
 8   exculpatory.  If law enforcement decides what they are
 9   going to turn over to the prosecution, you can see they
10   could be hiding stuff.  And that's what many of the
11   court cases have said.
12             It is not the role of the police to decide
13   what they are going to turn over to the prosecutor.
14   The police are required to turn everything over to the
15   prosecutor and then the prosecutor has to make that
16   determination of what is exculpatory and should be
17   turned over to the criminal defense.
18        Q.   So when you say that there is certain material
19   in the file that you review, the police file that the
20   plaintiff says was not turned over is exculpatory, you
21   used that word, is that word unnecessary to your
22   opinion, because in fact your opinion is that
23   everything needs to be turned over regardless of
24   whether or not it turns out to be exculpatory?
25        A.   From the police practices standpoint, yes, the
```



```
 1   entire file is exculpatory, has the potential to be of
 2   some degree of assistance for a criminal defendant.  It
 3   is a term we use.  It is a term of practice as well as
 4   a legal term.
 5           Now, we know from enough court cases, the
 6   court makes the determination whether the degree of
 7   exculpatory material would have some degree of
 8   prejudice toward the criminal defendant.  But that's
 9   for the court to make that decision, not for the
10   police.  Otherwise, you could see the police could hide
11   a whole bunch of stuff and say, well, I didn't think it
12   was exculpatory.
13       Q.  Is your use of the term exculpatory in your
14   report, is that unnecessary then?
15       A.  No.
16       Q.  Why do you need to characterize the material
17   in the subject file, the file that plaintiff says he
18   didn't get, as exculpatory at all if it is your opinion
19   simply that everything must be turned over to the
20   prosecutor?
21       A.  Because it all has the potential to assist the
22   criminal defendant to prove his or her innocence, so it
23   all has the potential to be exculpatory.
24       Q.  So as a result of that, there is no reason to
25   even use the word exculpatory, you could also have
```



```
 1  1983 or 1984 that had a similar written policy to
 2  Chicago's as of 1983, 1984 as documented in Detective
 3  Division Special Order 83-1?
 4      A.  No.
 5      Q.  Let's talk about the concept of exculpatory
 6  again that we talked about earlier.  Would it be your
 7  opinion that if there was a piece of information in the
 8  file that was demonstrably false, that everybody agreed
 9  to be false information, would it be your opinion that
10  that was information that should be turned over to the
11  prosecutor as well?
12          MS. GORMAN:  Could we have a description what
13      everybody means?
14          THE WITNESS:  I don't understand what your
15      question is.
16      Q.  (By Mr. Noland)  What don't you understand
17  about it?
18      A.  I don't understand who, a good example, as Ms.
19  Gorman says, who is saying it is false?
20      Q.  That was not clear enough.  Is that your
21  problem with my word, everybody?
22      A.  Sure.
23      Q.  Everybody means everybody involved in the
24  criminal process, the prosecution, the police, the
25  judge and the criminal defendant's attorney and the
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1  criminal defendant?
 2         MS. GORMAN:  Can I clarify how long the
 3     criminal defendant didn't know about it?
 4         MR. NOLAND:  No.
 5         THE WITNESS:  I have to have a specific
 6     example.  I was surprised the position the Ninth
 7     Circuit took in the Goff Tennison case, that the
 8     scrap of paper with a street name of a female and
 9     a phone number was known to the criminal
10     defendants and the Ninth Circuit made a specific
11     point saying the fact that they knew of that
12     person's name was not adequate, because I was
13     surprised they said sometimes criminal defendants
14     don't trust their criminal defense attorneys and
15     it had to be turned over even though the criminal
16     defendants in that case knew who this person was.
17         Also, the issue is, when you say demonstrated
18     to be false, it could be that there wasn't a
19     reasonable or adequate investigation done to
20     determine whether in fact it was false.  So
21     everybody may have believed it was false, but had
22     more investigation been done, could it have been
23     shown to be truthful.  So just because everybody
24     assumes that something is false doesn't
25     necessarily mean that it is false.
```



```
 1        Q.   (By Mr. Noland)  That wasn't part of my
 2   question so I am going to ask it again.  I want you to
 3   assume this hypothetical, that the information is
 4   demonstrably false, not just assume, it is demonstrably
 5   false.  Would it be your opinion that that information
 6   in the police file must be turned over to the
 7   prosecutor as potentially exculpatory information even
 8   though all parties involved in the case agreed that it
 9   was demonstrably false?
10        A.   Yes.
11        Q.   What's the basis of that opinion?
12        A.   The basis is because the prosecutor has to
13   know who has made that determination that this is
14   false.  And the prosecutor then has to have the
15   independent ability to come up with the same
16   conclusion.  If you don't turn it over to him and you
17   as investigator say this is false and you say,
18   therefore I don't have to turn it over to the
19   prosecutor, you are in fact inhibiting the prosecutor's
20   ability to make that independent determination of what
21   might be exculpatory.
22        Q.   Referring you to Paragraph 22 of your report,
23   the first bullet point, you mention, "materials in the
24   subject file involving 30 mug shots and IDs and
25   numerous additional criminal histories (rap sheets)
```



1  with no investigative followup or information," and you
2  say that, "Materials should have been turned over."  Is
3  that right?
4       A.  Yes.
5       Q.  How did the material, the mug shots, et cetera
6  in that sentence tend to indicate, if at all, that
7  Nathson Fields did not do the Smith and Hickman
8  murders?
9       A.  That's not my opinion.  My opinion is that it
10 is exculpatory material, potential exculpatory material
11 which should have been turned over.  I have no opinion
12 on, therefore this material would have disproved the
13 allegations against Mr. Fields.  I have no opinion on
14 that area.
15      Q.  You don't know whether or not the material in
16 those 30 mug shots and IDs, et cetera, tended to
17 indicate whether or not Fields was guilty; is that
18 right?
19      A.  I have no opinion on that.
20      Q.  You don't know?
21      A.  I have no opinion on that.  I can't say I
22 don't know.  It is just I have no opinion one way or
23 the other.
24      Q.  Do you know?
25      A.  No, I don't.  I have no opinion on that.



1    Q.  Same question for the next paragraph beginning
2    with specific notes for ballistic checks on weapons, et
3    cetera?
4    A.  Yes.
5    Q.  Isn't it true you don't know one way or the
6    other whether or not that material tended to indicate
7    that Nathson Fields was guilty or innocent of the Smith
8    Hickman murders?
9    A.  That's correct, I have no opinion on that.
10   Q.  Same question for that last bullet point which
11   states, "Numerous tips and anonymous caller notes with
12   specific suspect identification with no followup notes
13   or reports with names of Edwards brothers, Ronald and
14   Donald, as drivers of vehicle; a We T.I.P. name of
15   Sabash; Edward Stewart and Morris Heyward; with no
16   investigative notations or followup or results."
17        It is your opinion that that material should
18   have been turned over; is that right?
19   A.  Yes.
20   Q.  But isn't it true that you don't know one way
21   or the other whether or not that material tended to
22   indicate that Fields was guilty or innocent of the
23   Smith Hickman murders?
24   A.  I have no opinion on that.
25   Q.  You don't know one way or the other?



```
 1        A.   That's true.
 2        Q.   That would be the same answer for everything
 3   contained in the so-called street file; is that right?
 4        A.   Yes.
 5        Q.   Since the CPD implemented Special Order 83-1,
 6   other than this Nathson Fields file, are you aware of
 7   any other case where it was alleged that the CPD
 8   withheld Brady or Giglio material from a criminal
 9   suspect?
10        A.   I'm not, no.
11        Q.   Turn to Paragraph 14.  You state that
12   "Kathleen Loughren stated in her deposition that she
13   believed an annual audit of investigative" -- strike
14   that.
15             Paragraph 14, you write that, "Loughren
16   believed an annual audit of investigative files was
17   supposed to be done but didn't know whether this was
18   done and documented."
19             Do you see that?
20        A.   Yes.
21        Q.   You got that from Ms. Loughren's deposition,
22   right?
23        A.   Yes.
24        Q.   Do you know whether or not there was any type
25   of audit done of the files at CPD?
```



1    A.   I vaguely remember something about that.
2    Q.   Please, if you can go to 83-1.  Here you go,
3  Exhibit 4.
4    A.   I have it here.
5    Q.   You are looking at your copy of 83-1.  My
6  question is whether or not that Special Order requires
7  an audit to be done.
8         (Witness reviewing document.)
9    A.   No, there's no indication that an audit is
10 required to be done.
11   Q.   As of the 1980s, was there any written
12 material that would have indicated to police
13 departments anywhere that an audit of recordkeeping of
14 Detective Division files should be done, and if so,
15 please tell me what that is.
16   A.   Actually, there was quite a few for staff
17 inspections, and that would be under two areas.  One
18 would be OW Wilson's book on police administration, had
19 a whole section on investigative practices where a
20 staff inspection would be to determine whether they
21 were maintaining the documentation in a way consistent
22 with accepted practice.
23        Also, there was a green book which was by the
24 International City Management Association.  It was
25 called Police Management, and it had a section on staff



```
 1   inspections as well.  Part of that was the
 2   investigative practices.
 3           Now, there may not have been specific, in
 4   either of those textbooks to say you look at individual
 5   files, but a requirement that you do annual inspections
 6   of the investigative practices.
 7       Q.  So you are not aware of any written textbooks
 8   or materials with respect to suggesting an audit of the
 9   recordkeeping; is that true?
10       A.  Other than what I have testified, that's
11   correct.
12       Q.  What you testified to were audits of the
13   investigatory practices in general, not specific to
14   recordkeeping practices; is that right?
15       A.  That's part of an audit.  If you go in and do
16   an audit of an investigative practice or a special ops
17   unit or a property evidence room, you have to look at
18   the actual practice of maintaining documents and
19   maintaining files.  That's part of the whole process of
20   doing a staff inspection.
21       Q.  Were those addressed in Mr. Wilson's book or
22   the green book that you referenced?
23       A.  Both of them.  It may not have specifically
24   said, you will look at investigative files, but you
25   will do an annual staff inspection of the investigative
```



1  process. Part of that is that you would look at files.
2      Q. But you can't recall one way or the other
3  whether or not Wilson's book or the green book talk
4  about investigative files at all?
5      A. Not specifically.
6      Q. You have a sentence in Paragraph 23 that says,
7  "The acknowledgment that there is no documentation of
8  any subsequent audits of the control measures for these
9  investigative files is an indication that the city and
10 police department had made a choice to allow the
11 investigative practices to revert to unreasonable
12 investigatory file maintenance, and discovery practices
13 that existed before the implementation of Special Order
14 83-1."
15          Are there any written materials that you are
16 relying upon that would require the audit referenced in
17 that sentence?
18     A. I think I have already answered that several
19 ways. I said I didn't find it in 83-1.
20          We do know that Mr. Hickey did an audit in the
21 development of that policy. We know that he said he
22 was unaware that there was any done since that time.
23 If you don't audit and hold your personnel accountable
24 for maintaining files in a reasonable manner so that
25 they could be produced, reasonably disclosed during



```
 1   production to the prosecutor, there is a high
 2   likelihood that you will revert to the ways that we are
 3   seeing right in this case where a file was lost for
 4   24 years.
 5        Q.   My question was, whether or not there is any
 6   written support outside the CPD to require that audit,
 7   some type of audit like that be done.
 8        A.   Other than what I have said, no.
 9        Q.   You haven't said anything that I am aware of.
10        A.   I have.  I told you the staff inspection role,
11   I do that regularly when I do audits of agencies.
12   We'll actually get into the files to make sure that
13   they are maintaining the files in a proper, orderly
14   fashion and determine whether there are operational
15   files that are kept at locations other than the slick
16   copies that might be given to a prosecutor or to anyone
17   within the department.
18        Q.   I want you to give me chapter and verse of any
19   written materials you are relying upon outside the CPD
20   to support your statement that audit or control measure
21   should have been in place after the implementation of
22   83-1?
23        A.   I can't give you any more than what I have
24   testified to already.
25        Q.   Are you relying upon any specific sections of
```



```
 1   Wilson's book or the green book that you referenced
 2   with respect to this sentence in Paragraph 23 that we
 3   are talking about?
 4        A.   No.
 5        Q.   Are you aware of any city in the 1980s that
 6   did audits of its investigatory files with respect to
 7   the production of those files, like in this case?
 8        A.   Not specifically, no.
 9        Q.   Are you aware of any city or municipality up
10   until this day that does audits of its investigatory
11   files?
12        A.   I know I have done them for agencies when I
13   have gone in for insurance pools to look at them.
14        Q.   You have done audits for what purpose?
15        A.   To determine the practices of the agency from
16   a civil liability potential.  And I do anywhere from
17   two to five of those a year.
18        Q.   When is the first time you did an audit like
19   that?
20        A.   '85.
21        Q.   Who did you do that for?
22        A.   I believe one of the first ones I did was
23   Arizona Department of Public Safety.
24        Q.   Isn't it true you weren't evaluating or
25   looking at whether or not the files had been produced
```

