**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO; former and current | ) | Judge Matthew F. Kennelly |
| Chicago Police Officers DAVID | ) | |
| O'CALLAGHAN, JOSEPH MURPHY, and | ) | Magistrate Judge Geraldine Soat Brown |
| DANIEL BRANNIGAN, | ) | |
| | ) | |
| Defendants. | ) | |

## CITY DEFENDANTS' MOTIONS *IN LIMINE*

Defendants, City of Chicago, David O'Callaghan, Joseph Murphy, and Daniel Brannigan ("City Defendants"), by their attorney, Terrence M. Burns of Dykema Gossett, PLLC, for their motions *in limine* state:

### MEET AND CONFER PROCESS

Defendants have conferred with plaintiff on issues to be addressed in defendants' motions *in limine*. The following matters upon which rulings are sought are actually in dispute.

## MOTION 1: TO ADMIT TRANSLATED TRANSCRIPTS OF THE WIRETAPS

The City Defendants intend to offer into evidence approximately 22 telephone calls which were intercepted pursuant to Title III wiretaps at telephones located at 3947 S. Drexel, the El Rukn headquarters known as The Fort, and at Bastrop Federal Prison. Most of these conversations are between Jeff Fort, who was in the penitentiary, and six of his Generals, Alan Knox, Bernard Green, Jeff Boyd, Thomas Bates, Melvin Mayes, and Trammel Davis, and they relate to the efforts by the El Rukns and William Swano, with plaintiff's knowledge, to fix the

1986 trial in *People v. Nathson Fields and Earl Hawkins* relating to the Smith/Hickman homicides, to intimidate witnesses, to fabricate evidence, and other relevant matters.

These conversations are in a coded language developed by Fort and the El Rukns for the purpose of maintaining the secrecy of their activities. They were translated by cooperating former El Rukn Generals and introduced into evidence during the federal El Rukn prosecutions of the late 1980s and 1990s. They were also introduced into evidence against Judge Maloney in the Government's case against him which proceeded to trial before Judge Leinenweber in 1993. Furthermore, they were introduced into evidence against plaintiff during the August 2013 and October 2013 hearings before Judge Paul Biebel on plaintiff's petition for a certificate of innocence ("COI"). During the testimony of Derrick Kees, Earl Hawkins, Jackie Clay, and/or Trammel Davis (via Davis's videotaped deposition), defendants will seek to play these audiotaped conversations and also provide to the jury, for their convenience in listening to the tapes, these translated transcripts, which contain both the original "El Ruknese" language and the translation, side by side. This is the procedure utilized during the El Rukns trials, the trial of Judge Maloney, and the COI hearing. Copies of the subject transcripts/translations are attached as Exhibit 1.

Derrick Kees previously translated the coded telephone conversations, converting them from El Rukn to English, for purposes of *U.S. v. Maloney*, 91 CR 477. In order to expedite his testimony, the Government prepared transcripts for each of the conversations it played during *U.S. v. Maloney*. (See Exhibit 1). The right hand portions of the transcripts are Kees' translations. In fact, Exhibit 1 consists of exact copies of the transcripts/translations introduced into evidence in *U.S. v. Maloney* and in plaintiff's recent COI hearing. Judge Biebel allowed the translations into evidence during Kees' testimony while the recordings were played at the COI

2

hearing. (Exhibit 2, excerpt of Kees testimony, at 8-27). Likewise, giving the jury the transcripts in this case will not only expedite Kees' testimony, but will be critical to the jury as an aid in listening to and understanding the tapes.

AUSA Bill Hogan explained the transcription and translation process in his recent testimony on October 11, 2013 before Judge Biebel during plaintiff's COI hearing. (See Exhibit 3, excerpt of Hogan testimony at 64-75). AUSA Hogan and former ATF Agent Eugene Wolfe also testified relative to the foundation for the wiretaps in their current form before Judge Biebel on October 10, 2013. (Exhibit 3 at 104-24; Exhibit 4, excerpt of Wolfe testimony, at 6-29). In summary, AUSA Hogan and Agent Wolfe explained as follows: the Title III wiretaps were originally recorded on reel to reels in 1986; the reel to reel recordings were sealed on a daily basis and impounded pursuant to Court order along with the call logs every 30 days; a working copy of the reel to reel recordings was also created; the reel to reel recordings were put onto cassette tapes for the El Rukn and Judge Maloney trials in the late 1980s and early 1990s; pursuant to Judge Leinenweber's order in November 2012, the Government retrieved the original reel to reel recordings introduced into evidence during the *U.S. v. Maloney* trial and sent them to Quantico, Virginia where they were transferred onto CDs, returned to the Government, and tendered to the State (who gave them to Fields' lawyers) for use in the COI hearing; the relevant excerpts of the CDs corresponding to the recordings and transcripts introduced during *U.S. v. Maloney* were placed onto a thumb drive, which was introduced into evidence in the COI hearing as Exhibit 36; Wolfe reviewed the CDs and the thumb drive, and testified the transcripts (Exhibit 1 hereto; Exhibit 37 during the COI hearing) were true and accurate transcriptions of the audio recordings. Mr. Kees, Mr. Hawkins, Mr. Clay, AUSA Hogan, and Mr. Wolfe are expected to be available for cross-examination regarding the wiretaps and the translations during the trial of this

3

matter, and plaintiff has already had the opportunity to cross-examine Trammel Davis during his deposition in this case.

This Court has "wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to tape recordings." *United States v. Cheek*, 740 F.3d 440, 450 (7th Cir. 2014); *United States v. Keck,* 773 F.2d 759, 766 (7th Cir. 1985). The Seventh Circuit has consistently upheld the use of written transcripts interpreting taped conversations conducted in a foreign language. *See United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004)("we have previously permitted transcripts to be admitted at trial and used by the jury during their deliberations when the underlying tapes are actually played during the trial (as was the case here)")*;United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990) (affirming the use of written transcripts containing interpretive translations of taped conversations conducted in the Yoruban language); *United States v. Zambrana*, 841 F.2d 1320, 1335-39 (7th Cir. 1988) (affirming the use of written transcripts translating telephone calls conducted in Spanish to English). In this case, the El Rukn code is clearly a "foreign language." Without the written translations, the conversations would be impossible for the jury to understand without consuming a tremendous amount of time in virtual word-by-word, line-by-line oral explanations. The use of the translations introduced into evidence in *U.S. v. Maloney* and plaintiff's COI hearing will save extensive trial time in this case.

In *Zambrana*, the court set forth the following procedure for resolving challenges to the accuracy of transcripts:

> Initially, the district court and the parties should make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides. If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on

evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

This procedure is well suited to cases such as that before us, where the transcript is an English translation of a foreign language conversation. Such a procedure does not tie a defendant to an 'official' transcript prepared by the prosecution, nor does it 'usurp' the fact finder's function. If there is a dispute as to the contents of a foreign language recording the burden will lie with the respective parties to present transcripts or other evidence to support their version of the conversation.

841 F.2d at 1335-36, *quoting United States v. Llinas*, 603 F.2d 506, 509-10 (5th Cir. 1979).

The Government made identical motions regarding the use of translations in multiple El Rukn trials conducted during the 1990s. In each of the cases the Government's motion was granted: by Judge Holderman in *United States v. Bingham* and *United States v. Burnside* (89 CR 909); by Judge Aspen in *United States v. Boyd*; by Judge Conlon in *United States v. Andrews*; by Judge Mills in *United States v. Bates*; by Judge Baker in *United States v. Crowder*; and by Judge Tinder in *United States v. Franklin* (89 CR 908). Attached as Exhibit 5 is an excerpt of the *Bingham* proceedings before Judge Holderman in which the court held that the El Rukn coded language qualifies as a foreign language and that the Government's translations are therefore appropriate and admissible. Judge Holderman ruled that the translations "are substantive evidence of the opinion of the witness" (*Id.* at 6732; 7309), and instructed the jury to this effect both while the tapes were being played and at the conclusion of the case (*Id.* at 7443; 7490). (See Exhibit 6 Jury instruction on tape transcripts from *United States v. Bingham*). Similarly, attached as Exhibit 7 is Judge Mills' written opinion granting an identical motion in *United States v. Bates*.

The transcribed and translated transcripts have been in plaintiff's attorneys' possession for many years, and they have had all the recordings themselves for many months. If the

plaintiff wants to challenge the accuracy of those transcripts and translations he can do so through cross-examination or by submitting his own versions. These procedures will adequately ensure the validity of the transcripts used at trial. Thus, defendants respectfully request that this Court allow the use of the translations of the El Rukn language in this case and for a pre-trial ruling that a foundation has been laid for the transcriptions, the translations, and the recordings.[1]

## MOTION 2: TO BAR REFERENCE TO JON BURGE AND OTHER UNRELATED CASES OR ALLEGATIONS OF POLICE MISCONDUCT

Plaintiff should be barred from offering testimony, evidence, or argument regarding unrelated allegations of police misconduct and should be barred from referencing Jon Burge pursuant to Federal Rules of Evidence 401 and 403. There is no evidence Jon Burge played any role in the investigating the Smith/Hickman or Vaughn/White murders and therefore plaintiff should be barred from referencing him in this case. Burge's name appears on a small number of documents produced in this case because he was an Area Commander and he therefore received copies of some reports. There are no allegations in any way relating to Burge. This case did not arise out of Area 2. Given his lack of involvement in the Smith/Hickman investigation, there is no relevant purpose in referring to Burge during this trial. Whether Burge's name appeared on a report sheds no light on whether there was probable cause to charge plaintiff for the Smith/Hickman murders or whether these defendants fabricated evidence. It also has nothing to do with plaintiff's *Monell* claim, which is based solely on an alleged City practice of withholding material exculpatory evidence from criminal defendants. Referencing Burge would be highly and unfairly prejudicial to the City defendants given the widespread media attention relating to his

---

[1] Plaintiff's attorneys advised they are filing a motion to bar evidence of the bribery as well as the wiretaps based on relevance. The City will respond to that motion in accordance with the Court's scheduling order.

conviction and the allegations of abuse asserted against him. The City Defendants therefore request that plaintiff be barred from referencing or offering evidence, testimony, or argument pertaining to Burge.

## MOTION 3: TO BAR REFERENCE TO PLAINTIFF'S 1988 LAWSUIT AND A DOCUMENT REQUEST IN *HOUSTON V. PARTEE*.

Defendants move to bar reference to plaintiff's 1988 lawsuit as it is inadmissible hearsay and irrelevant. Plaintiff's 1988 complaint alleged the defendants intentionally withheld exculpatory material from him during his 1986 trial. The defendants' motion to dismiss the suit was granted.

Reference to the suit should be barred as plaintiff's 1988 allegations are hearsay. The allegations are prior consistent statements and there is otherwise no applicable exception to the hearsay rule.

The 1988 lawsuit is also irrelevant. Plaintiff has claimed the 1988 lawsuit alerted the defendants that he did not receive the subject file, but there is no reason why it would have. The defendants did not file an answer to the complaint and there was no discovery conducted as the case was dismissed at the pleading stages. *Fields v. City*, 1991 WL 59453 (7th Cir. 1991). Furthermore, even if the defendants were made aware that plaintiff was claiming he did not receive exculpatory material, they would not have known he was referring to the subject file. Defendants Brannigan and O'Callaghan's names are not listed anywhere in the subject file and there is no evidence linking them to it in any way. Defendant Murphy's name appears on only one document in the subject file that plaintiff claims he did not receive, (CITY-NF-001038) which is a form requesting identification photos that is not exculpatory. There is nothing to suggest that plaintiff claiming he did not receive exculpatory material should have alerted the

defendants to the existence of the subject file or to the truth of plaintiff's allegations, and therefore, plaintiff's 1988 lawsuit is irrelevant. Any potential relevance would also confuse the jury as to the meaning of a Rule 12(b)(6) motion and the reasons why the Corporation Counsel's office would have filed such a motion.

Plaintiff should also be barred from introducing evidence regarding a document request in the case *Houston v. Partee* as it is irrelevant. In *Houston*, there was a request made to the CPD's Office of Legal Affairs by the attorneys for the City (David Zinder) for files related to several cases, including Smith/Hickman. The individual tasked with performing the search at CPD was John Gholar. Mr. Gholar has testified he does not recall anything about the request or what actions he took with respect to it. Nonetheless, plaintiff has identified Mr. Gholar on his witness list for trial. If Mr. Gholar is called, not only does he not remember anything relevant to this case, defendants will have to call Mr. Zinder to testify that the case settled before discovery began and therefore, the City did not gather the requested documents. Calling these two witnesses would serve no useful purpose, and plaintiff should be barred from introducing evidence regarding the document request in the *Houston* case.

**MOTION 4: TO BAR REFERENCE TO COMPLAINT REGISTER 170712.**

Complaint Register 170712 was generated as a result of plaintiff's 1988 lawsuit. Defendants move to bar reference to Complaint Register 170712 as it is irrelevant. As with his 1988 lawsuit, plaintiff has claimed Complaint Register 170712 alerted the defendants that plaintiff did not receive exculpatory material contained in the subject file. While it is true the defendants were presented with plaintiff's claim they deliberately withheld exculpatory material from him and were required to respond, there is nothing to suggest this made the defendants aware of the existence of the subject file or that it alerted them it contained exculpatory material

8

that was not produced.  As explained in defendants' motion number three regarding the 1988 lawsuit, Defendants O'Callaghan and Brannigan's names do not even appear in the subject file and Defendant Murphy's name appears on only one document that is not exculpatory. Plaintiff's allegations did not alert the defendants to the existence of the documents contained the subject file and therefore it is irrelevant.

**MOTION 5: TO BAR PLAINTIFF'S MALICIOUS PROSECUTION CLAIM BASED ON CHARGES BROUGHT AGAINST HIM FOR THE VAUGHN/WHITE MURDERS.**

In his proposed final pretrial order and proposed jury instructions, plaintiff for the first time appears to assert a claim for malicious prosecution based on his being charged with the Vaughn/White murders. Such a claim is not found in plaintiff's third amended complaint and has never been a part of this case.  Plaintiff has consistently alleged defendants fabricated evidence in the investigation of the Vaughn/White murders, but those allegations were part of the claims plaintiff was asserting with respect to the Smith/Hickman charges and trial. Specifically, plaintiff alleged that fabricated Vaughn/White evidence was presented in plaintiff's sentencing hearing in the Smith/Hickman case. Furthermore, even if plaintiff had a malicious prosecution claim based on the being charged for the Vaughn/White murders, the claim would be time-barred.

Plaintiff explains the basis for his claims in the first paragraph of the introduction to his third amended complaint, stating: "On June 27, 1986, Nathson Fields … was found guilty of the murders of Talman Hickman and Jerome Smith and two months later was sentenced to death for the double murder that he did not commit." (Dkt. 105, ¶ 1). In the introductory portion of his complaint in which he outlines the basis for the lawsuit, plaintiff does not even mention the Vaughn/White case. The only times the Vaughn/White case is referenced in the third amended

complaint is in relation to evidence of those murders being used in the sentencing phase of the Smith/Hickman case. There is no stand-alone claim based on the Vaughn/White case.

Notably, in filings related to defendants' motion to dismiss plaintiff's third amended complaint, the defendants and the Court characterized plaintiff's lawsuit as being based on the Smith/Hickman case without reference to Vaughn/White, yet plaintiff never brought it to the attention of the Court or the defendants that this case purportedly also included a malicious prosecution claim based on the Vaughn/White case. In their motion to dismiss plaintiff's third amended complaint defendants summarized plaintiff's suit, stating: "Plaintiff alleges he was wrongfully convicted in 1986 of two murders he did not commit." (Dkt. # 111, ¶ 2). Fields' response never states the defendants were incorrect and his complaint also included a malicious prosecution claim for Vaughn/White. (Dkt. # 113). This Court's Memorandum Opinion and Order denying the defendants' motion to dismiss describes the basis for the lawsuit, stating: "Nathson Fields has sued the [defendants] for claims arising from his wrongful conviction of the murders of Talman Hickman and Jerome Smith." (Dkt. 132, p.1).

Because plaintiff alleged the defendants fabricated evidence regarding the Vaughn/White murders that was introduced against plaintiff in the Smith/Hickman sentencing proceedings, the parties have engaged in discovery that deals with the Vaughn/White case and in summary judgment filings addressed the evidence against plaintiff in the Vaughn/White murders as it was known to the defendants at the time of plaintiff's 1986 Smith/Hickman trial. The argument regarding the evidence is made in the context of the claims arising from the Smith/Hickman proceedings, not in the context of a non-existent Vaughn/White malicious prosecution claim.

To the extent plaintiff claims he has asserted a malicious prosecution claim for the Vaughn/White, that claim is time-barred. Plaintiff was indicted for the Vaughn/White murders

10

and the charges were nolle'd by the State in 1986. The statute of limitations for a malicious prosecution claim in Illinois is one year. *See* 745 ILCS 10/8-101; *Day v. Conwell*, 244 F.Supp.2d 961, 964 (N.D. Ill. 2003). Therefore, the statute of limitations expired years ago for a possible claim for malicious prosecution based on the Vaughn/White charges, and therefore, even if plaintiff had asserted such a claim, it would be time-barred.

**MOTION 6: SEEKING JUDICIAL NOTICE OF ADJUDICATIVE FACTS**

Defendants request that this Court take judicial notice of certain adjudicative facts related to plaintiff's 1986 trial, the bribe of Judge Maloney, and plaintiff's conviction being vacated. These adjudicative facts are relevant to plaintiff's due process claim and meet the criteria for judicial admission under Federal Rule of Evidence 201(b)(2). As explained in defendants' summary judgment filings, the bribe of Judge Maloney is relevant to the materiality analysis of plaintiff's *Brady* claim, among other issues.

The adjudicative facts set forth below meet the criteria for judicial admission under Federal Rule of Evidence 201(b)(2). Under Rule 201(b)(2), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." All of the adjudicative facts defendants seek judicial notice of come directly from judicial opinions and court filings and none are subject to reasonable dispute. "The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records." *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). Federal courts can take notice of proceedings in other courts, including state courts, "if the proceedings have a direct relation to the matters at issue." *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983). "[I]f the finding taken from the prior proceeding is not subject to reasonable dispute, then the court

11

has satisfied the evidentiary criteria for judicial notice." *General Elec. Capital Corp.*, 128 F.3d at 1082.

Defendants request this Court take judicial notice of the eight adjudicative facts listed below. Defendants have included the sources of these adjudicative facts from the court records.

1.      Judge Thomas Maloney presided over Nathson Fields' and Earl Hawkins' June 1986 murder trial for the Smith/Hickman homicides.

Sources:
*U.S. v. Maloney*, 71 F.3d 645, 651 (7th Cir. 1996). "In June 1985, Earl Hawkins and Nathan [sic] Fields, members of the El Rukns, were charged with murdering two men. Judge Maloney was assigned to the case and Swano represented Hawkins."

Judge Dooling's Ruling on Petitioners' Motion for Post-Conviction Relief (attached hereto as Exhibit 8) at 2. "Following closing arguments, Thomas J. Maloney found the defendants guilty of the murders of Jerome Smith and Talman Hickman."

2.      William Swano represented Earl Hawkins in the June 1986 Smith/Hickman murder trial.

Sources:
*U.S. v. Maloney*, 71 F.3d 645, 651 (7th Cir. 1996). "In June 1985, Earl Hawkins and Nathan [sic] Fields, members of the El Rukns, were charged with murdering two men. Judge Maloney was assigned to the case and Swano represented Hawkins."

Ex. 8 at 2. "Defendant Hawkins was represented by William Swano."

3.      Judge Maloney initially accepted a $10,000 bribe from William Swano and the El Rukns to acquit Fields and Hawkins in the Smith/Hickman murder trial.

Sources:
*U.S. v. Maloney*, 71 F.3d at 651. "Swano assured Hawkins that he could win a decision in his favor in a bench trial if Hawkins could raise enough money for the Judge. Hawkins referred him to Alan Knox, a 'senior' El Rukn general, who approved of the fix. Swano testified that he met with McGee in January or February of 1986 to discuss the fix and they arrived at a figure of $10,000."

Ex. 8 at 6. "The jury specifically found that Maloney had engaged in acts of racketeering and had conspired to commit extortion when he accepted and later returned a $10,000 bribe in the trial of Earl Hawkins and Nathson Fields."

Ex. 8 at 6. "The potential bribe was first discussed between Swano and Hawkins in either December 1985 or January 1986. Hawkins later contacted Alan Knox, who spoke with the El Rukn leader, Jeff Fort, who approved the potential bribe. Around the same time, January or February 1986, Swano met with McGee to see if Maloney would take a bribe in the relevant case. Swano suggested that he could probably get $10,000 from the El Rukns. (From similar previous dealings with Maloney, Swano knew the contact McGee.) Shortly thereafter, McGee got back to Swano and told him that Maloney had agreed to take $10,000 for the fix. Swano subsequently told the El Rukns that the judge would need $20,000. The trial of Hawkins and Fields was continued a number of times due largely in part to Swano's inability to obtain the bribe. After wrangling with the El Rukns, Swano received $10,000 on June 17, 1986. Alan Knox had brought the money to the courthouse and passed it to Swano at the public defender's office."

     4.    Judge Maloney became concerned that he was the subject of a federal

investigation and returned the bribe money. Thereafter, on June 27, 1986, Judge Maloney found

Nathson Fields and Earl Hawkins guilty of the charged offenses.

Sources:
*People v. Hawkins*, 181 Ill.2d at 52. "That Maloney subsequently returned the money did not render his interest in the outcome any less acute. … [h]e wanted to insure that he did not lose his judicial post and salary as a result of a criminal indictment, and therefore was motivated to return a verdict that would not spark the suspicions of authorities."

*U.S. v. Maloney*, 71 F.3d 645, 651 (7th Cir. 1996). "When Swano went to the Judge's chambers, Maloney handed Swano the file of money he had passed to McGee at the start of the trial. Hawkins and Fields were found guilty by the Judge and subsequently sentenced to death."

Plaintiff's Third Amended Complaint, Dkt. #105, ¶ 40. "Judge Maloney later became concerned that he was the subject of a federal investigation and he returned the bribe money. Thereafter, on June 27, 1986, Judge Maloney found Fields and his co-defendant guilty of the charged offenses."

Ex. 8 at 6. "The jury specifically found that Maloney had engaged in acts of racketeering and had conspired to commit extortion when he accepted and later returned a $10,000 bribe in the trial of Earl Hawkins and Nathson Fields."

     5.    On June 26, 1991, William Swano and Thomas Maloney were indicted on charges

of racketeering conspiracy, racketeering, and extortion under color of official right. Part of the

basis for the charges was the bribe in Fields' and Hawkins' 1986 murder trial.

Sources:
*U.S. v. Maloney*, 71 F.3d 645, 649 (7th Cir. 1996). "Thomas J. Maloney, a former judge in the Circuit Court of Cook County, appeals from his conviction on charges of racketeering

conspiracy, racketeering, extortion under color of official right, and obstruction of justice … in connection with his taking bribes in cases before him."

*Id.* at 652. "The final bribe charged in the indictment took place a few years later. In June 1985 Earl Hawkins and Nathson Fields, members of the El Rukns, were charged with murdering two men."

*Id.* at 652. "On June 26, 1991, Maloney was indicted by a federal grand jury and the case proceeded to trial in March 1993."

Ex. 8 at 4-5. "On June 26, 1991, William Swano, Robert McGee and Thomas Maloney were indicted on charges of racketeering conspiracy, racketeering, and extortion under color of official right. 18 U.S.C. Secs. 1962(d), 1962(c), and 1951. Maloney was individually charged with a fourth count, obstruction of justice. 18 U.S.C. Sec 1503. As part and parcel of the three counts common to all individuals, the federal government alleged that Swano paid Maloney $10,000 to fix the trial of Earl Hawkins and Nathson Fields."

6.     On April 16, 1993, a jury convicted Thomas Maloney, finding he had engaged in

acts or racketeering and had conspired to commit extortion when he accepted and later returned a

$10,000 bribe in the trial of Earl Hawkins and Nathson Fields.

Sources:
*U.S. v. Maloney*, 71 F.3d 645, 652 (7th Cir. 1996). "On April 16, 1993, the jury convicted Maloney on all counts."

Ex. 8 at 6. "The jury specifically found that Maloney had engaged in acts of racketeering and had conspired to commit extortion when he accepted and later returned a $10,000 bribe in the trial of Earl Hawkins and Nathson Fields."

Ex. 8 at 13. "Maloney was convicted for accepting and then returning a bribe in this very cause."

7.     On September 8, 1992, Nathson Fields filed his first amended petition for post-

conviction relief in which he alleged, as a result of the bribe of Judge Maloney, he was denied

his right to trial before an impartial trier of fact.

Sources:
Plaintiff's First Amended Post-Conviction Petition (attached hereto as Exhibit 9), ¶ 53-55.

Ex. 8 at 8. "On September 8, 1992, Nathson Fields filed his 'first amended petition for post-conviction relief.' Therein, he alleged, among other claims, that he was denied his right to trial before an impartial trier of fact. The petition specifically mentioned that Judge Maloney had recently been indicted for accepting and then returning a bribe in his cause."

8.    Nathson Fields' conviction was overturned in 1997 when the Circuit Court of

Cook County Judge Deborah Dooling granted plaintiff's post-conviction petition because Judge

Maloney's acceptance and return of the bribe denied Fields his due process right to a fair trial.

Sources:
Ex. 8 at 13. "Not only did Judge Maloney have a 'direct, personal, substantial, pecuniary interest' in the trial of Hawkins and Fields, justice did not satisfy 'the appearance of justice' by the farthest stretch of one's imagination. Accordingly, petitioners Hawkins and Fields were deprived of their respective rights to due process of law."

Ex. 8 at 21-22. "The petitioners here were denied a fair trial before an impartial trier of fact. Said right is rooted in the constitutional guaranty of due process of law and entitles a defendant to a fair and impartial trial before a court which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial. … If this most basic and fundamental right has not been afforded a defendant during trial, then that defendant has been denied due process of law and is entitled to a new trial. … Accordingly, the convictions and sentences of Earl Hawkins and Nathson Fields are vacated, and the petitioners are granted a new trial."

9.    The Illinois Supreme Court affirmed Judge Dooling's ruling that Fields' due

process rights were violated as a result of the bribe to Judge Maloney, and found it was

impossible for the court to know whether a verdict would have been the same if rendered by an

uncorrupted judge.

Source:
*People v. Hawkins*, 181 Ill.2d at 1007. "Having determined that due process was lacking in the criminal proceedings, it is impossible for this court to know whether the verdict would have been the same if rendered by an uncorrupted judge."

**MOTION 7: TO BAR LOU REITER AND TO BAR REITER'S OPINION**

Plaintiff has disclosed Lou Reiter as a Rule 26(a)(2) witness relative to police practices.

In his report and at his deposition, Reiter opined that the material in the Subject File was

"exculpatory." Reiter should be barred as a witness because his opinion is on a legal issue that is

determinative and because his opinion is not based on any apparent methodology. Reiter

admitted he made no analysis or determination how or why the Subject File was exculpatory, but

that he simply (and incorrectly) believes the law requires that all material be turned over, regardless of its content. (Reiter Deposition, attached hereto as Exhibit 11, at 42-45, 80-82.)

Opinions are inadmissible under Rule 702 where they are "simply characterizations of the law" and "it is the rule of the judge, not the witnesses to instruct the jury on the applicable principles of the law." *See Davis v. Duran*, 277 F.R.D. 362, 371 (N.D. Ill. 2011) (barring an expert witness from opining that there was "no lawful basis" for an officer to use deadly force.) As the court in *Davis* stated: "[the expert] is simply telling the jury how to decide the case, and that he cannot do." *Id*. at 372. "Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury." *United States v. Sinclair*, 74 F.3d 753, 758, n.1 (7th Cir. 1996). *See also Klaczak v. Consolidated Medial Transport, Inc.*, 2005 WL 1564981, at *2 (N.D. Ill.). Reiter's opinion that the material in the Subject File was "exculpatory" takes an issue away from the jury that the Court will instruct the jury on and that the jury should properly decide.

Reiter's opinion that the Subject File is "exculpatory" should also be barred because that is not his opinion at all. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)("In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.") Reiter admitted he made no attempt to analyze how or why the Subject File was exculpatory, but simply believes that every piece of information should be turned over to the prosecutor to allow them to analyze whether it must be produced. (Exhibit 11, at 42-45.) Reiter further admitted that he does not know whether any of the specific information in the subject file indicated that Fields was guilty or innocent of the Smith/Hickman

16

murders. (*Id*. at 82-85.) Reiter even opined that a piece of information that was demonstrably false is "exculpatory." (*Id*. at 82.) Reiter's conclusion makes no sense and would confuse the jury because it mistates *Brady*. Reiter's opinion is an incorrect statement of the law and would mislead the jury into believing that the mere fact the Subject File was allegedly not produced constitutes a violation of plaintiff's constitutional rights.

Reiter further opines that the CPD should have included an audit mechanism in Special Order 83-1. Reiter provides no support for that opinion. (*Id*. at 87-91). Indeed, Reiter admits he is not aware of any City in the entire United States in the 1980s that required an audit of its investigatory files to ensure their production in criminal cases. (*Id*. at 91). Reiter's opinion with respect to audits is unsupported by any basis or evidence of general practices.

## MOTION 8: TO BAR TESTIMONY REGARDING PLAINTIFF'S MOTHER'S "BROKEN HEART"

During his deposition, plaintiff's brother, Nathaniel Fields, testified that his and plaintiff's mother died of a heart attack as a result of her worry about plaintiff being in prison. (Nathaniel Fields Deposition, attached hereto as Exhibit 12, at 57:6-62:24.) Any such testimony should be barred at trial. It is undisputed that neither Nathaniel Fields nor plaintiff possesses any scientific, technical or other specialized knowledge regarding the diagnosis, etiology, or causation of complex physical medical conditions, such as a heart attack. Rule 701 of the Federal Rules of Evidence provides that opinion testimony by lay witnesses is limited to only "those opinions or inferences which are: (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge" within the scope of expert testimony. (*See* Fed. R. Evid. 701). In addition, the Seventh Circuit pattern jury

17

instruction regarding compensatory damages states that a jury's award of compensatory damages "must be based on evidence and not on speculation and guesswork." *See* Seventh Cir. Pattern Jury Instruction 7.23. Because plaintiff has not offered any foundation or expert witness to testify regarding the cause of his mother's death, any testimony that causally links plaintiff's mother's death to plaintiff's imprisonment or his claims in this case should be barred.

## MOTION 9: TO BAR ARGUMENT REGARDING PLAINTIFF BEING PLACED IN A LINE-UP BEFORE WITNESSES TO THE VAUGHN/WHITE MURDERS

Plaintiff should be barred from arguing witnesses to the Vaughn/White murders viewed a line-up that included plaintiff on the same day as the Smith/Hickman line-up or at any time. There is no evidence of a line-up that included plaintiff and was viewed by any witnesses to the Vaughn/White murders. Plaintiff has disclosed no witness who will testify he or she viewed plaintiff in a line-up pertaining to the Vaughn/White murders. During his deposition, plaintiff admitted that he could not see any of the people were who were standing on the other side of the glass during his line-up. (Plaintiff's Deposition, attached hereto as Exhibit 13, at 219:24-221:9, 233:4-10.) Plaintiff also testified that he did not know why he was at the police station or what case the line-up pertained to, but he assumed the first line-up pertained to the Smith/Hickman murders. (Ex. 13 at 237:11-17.) Because plaintiff had no ability to view the witnesses on the other side of the glass and he purportedly was not told what each line-up was for, his testimony that the Vaughn/White witnesses viewed one of his line-ups is based only on speculation. Plaintiff's testimony that he was in a line-up that was viewed by witnesses to the Vaughn/White murders should be barred as purely speculative. *See* Fed. R. Evid. 401, 402, 403. Moreover, plaintiff's counsel should not be permitted to argue plaintiff stood in a line-up pertaining to the Vaughn/White murders.

**MOTION 10: TO BAR REFERENCE TO PLEA DISCUSSIONS**

City Defendants anticipate that plaintiff will seek to admit evidence regarding his plea discussions, including that he allegedly refused a plea offer by the States Attorney before his 2009 criminal trial. Any evidence or argument regarding plea discussions or that plaintiff rejected an alleged plea offer by the States Attorney should be excluded in this case for at least three reasons.

First, any alleged plea offer made to plaintiff would be analogous to a settlement offer and is inadmissible under Federal Rule of Evidence 408. Rule 408 excludes evidence, offered by either party, of compromises and offers to compromise to prove the validity of a disputed claim. Fed. R. Evid. 408. Although Rule 410 addresses the inadmissibility of plea bargain discussions against the defendant who made or participated in plea discussions, courts have found that any compromise discussions (including plea bargains) are inadmissible against either party because they are most akin to settlement negotiations, which are covered under Rule 408. *See United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir. 1976)("Under the rationale of Fed. R. Evid. 408, which relates to the general inadmissibility of compromises and offers to compromise, government proposals concerning pleas should be excludable"); *U.S. v. Greene*, 995 F.2d 793, 798 (8th Cir. 1993)(affirming the exclusion of statements made during plea negotiations based on the *Verdoon* holding.) In *Verdoorn*, the defendants sought to admit evidence that they rejected a plea deal offered by the prosecution in exchange for their testimony. *Id.* The defendants argued that this evidence would challenge the credibility of the government's case. *Id.* The *Verdoorn* court excluded the evidence under Rule 408 and found that plea discussions are like evidence of compromise offers under Rule 408, and "meaningful dialogue between the

parties would, as a practical matter be impossible if either party had to assume the risk that plea offers would be admissible in evidence." *Id.*

The *Verdoorn* court's reasoning for excluding evidence relating to plea bargaining applies with equal force to the case at bar. Here, admitting evidence that plaintiff rejected a plea bargain in his prior criminal proceeding to bolster plaintiff's later civil suit would chill talks of compromise from the start. Any attempts at plea deals would be rendered useless if "the prosecutor must bargain with a defendant whose responses are framed with an eye toward their self-serving use at trial." *State v. Davis*, 434 N.E.2d 285, 287 (Ohio Ct. App. 1980). No party, including the States Attorney, would make earnest compromise offers if they risked having their statements used against them in either the same proceeding or a later proceeding. "Destroy confidentiality, and negotiators tend to make speeches and assume postures, tendencies inherently inimical to compromise." *Id.* at 287-88. Any evidence relating to plea discussions during plaintiff's prior criminal proceeding should be excluded under Rule 408 as "inimical" to good faith compromises.

Second, plaintiff's alleged rejection of a plea deal is a prior consistent statement, as it merely restates his not guilty plea, and therefore will not be helpful to the trier of fact. Courts have excluded evidence of criminal defendants' rejections of plea offers for this reason. See *Greene*, 995 F.2d at 798 ("all the defendant is offering is a prior statement consistent with his plea of not guilty."); See also, *State v. Woodsum*, 624 A.2d 1342, 1344 (N.H. 1993)("The rejection of a plea offer is, in effect, nothing more than a prior statement consistent with the defendant's plea at trial, and thus adds little to the information before the jury.")

Third, evidence that plaintiff rejected a plea deal should be excluded under Federal Rule of Evidence 403. Rule 403 prohibits the admission of relevant evidence where the probative

value [of that evidence] is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Plaintiff's decision to reject the State's Attorney's plea offer proves nothing about his consciousness of innocence or the strength of the government's case in the criminal proceeding. Plaintiff could have rejected the State's Attorney's plea offer for a myriad of reasons (including the advice of his counsel), none of which would relate to plaintiff's alleged consciousness of innocence. "It seems obvious that any testimony concerning such negotiations will far more likely than not reflect such legally extraneous considerations, rather than anything relevant to, or probative of, the ultimate issue on trial." *Davis*, 434 N.E.2d at 288. And, even if the Court were to permit a discussion of the various reasons the State's Attorney bargained with plaintiff, such evidence would only add confusion and distract the trier of fact from the claims raised in Plaintiff's Third Amended Complaint. *Woodsum*, 624 A.2d at 1345 ("A jury may be led far afield by such evidence, for "[t]he considerations involved in plea bargaining are infinitely variable and complex"). Any evidence of plea discussions in the prior criminal proceeding must therefore be excluded under Federal Rules of Evidence 408 and 403.

## MOTION 11: FOR LEAVE TO REVIEW POTENTIAL JURORS' CHICAGO POLICE DEPARTMENT CRIMINAL HISTORY REPORTS

Defendants respectfully request leave to perform a good faith investigation into the backgrounds of potential jurors to assure they are not misrepresenting themselves to the Court in an effort to conceal any law enforcement related biases they may have. All potential jurors' criminal histories would be run to ensure that no specific jurors are targeted. The reports would be generated during voir dire and all information obtained by the defendants as a result of the proposed criminal history checks would be shared with opposing counsel and this Court.

This issue has been recently raised and considered by judges sitting in this District, including this Court. In *Butler v. George, et al.*, Case No. 09 C 2465, this Court permitted a background check similar to that requested here.

In *Wade v. City of Chicago, et al.,* No. 08 C 3063, Docket No. 232, Judge Pallmeyer granted defendants' motion allowing criminal background checks to be run on potential jurors. The stated purpose of the motion was to ensure juror impartiality for both sides, where, in cases like these, a juror's experience with the police and the criminal justice system is equally important to both sides. (*See Wade*, Case No. 08 C 3063, Docket No. 184). The court's order in *Wade* adopted defendants' procedure in which background checks were performed on all potential jurors and the results shared with opposing counsel and the court. *Id.*

In *Richardson v. City of Chicago, et al.*, Case No. 08 C 4824, Docket No. 307, Judge Kendall denied plaintiff's motion *in limine* seeking to bar the use of juror background checks. The results in that case illustrate the importance of allowing criminal background checks to ensure an impartial jury. During voir dire, all of the potential jurors' criminal history reports were obtained through the Chicago Police Department. The reports were shared by counsel for both plaintiff and defendants and the Court and it was discovered that three jurors did not disclose arrests after being specifically asked whether they had ever been arrested.

*Anderson, et al. v. City of Chicago, et al.,* Case No. 09 C 2311, also illustrates the importance of the background checks. In *Anderson*, a juror was not forthcoming when asked about his criminal record. The juror's behavior during voir dire raised the suspicion of defense counsel, who requested a report of the juror's criminal history. That report revealed that juror had an extensive arrest history with the Chicago Police Department. (*See Butler v. George, et al.*, Case No. 09 C 2465, Docket No. 71). Judge St. Eve dismissed the juror for concealing his

background, explaining the juror lied about an issue that would have been a basis for a valid challenge for cause. *Id. See also Logwood v. City of Chicago*, 2013 WL 1385559 (N.D. Ill. 2013) (J. Der-Yeghiayan) (denying plaintiff's motion to bar juror background checks during voir dire).

Defendants recognize the use of juror background checks is less common in civil trials than criminal trials, but ensuring that potential jurors have not been unduly biased by their experience with the police or the criminal justice system (either negatively or positively) is critical in cases like these, where the plaintiff is claiming misconduct on the part of police officers. Running background checks not only provides a check against bias, but provides a safeguard, as illustrated in *Anderson*, *supra*, that a juror is not lying to conceal their biases.

## MOTION 12: TO BAR STATEMENTS BY ANTHONY SUMNER TO CHUCK MURPHY AND WILLIAM SWANO

It is expected that plaintiff will seek to introduce evidence of Anthony Sumner's statements to El Rukn attorneys Chuck Murphy and William Swano, in which he suggested police officers beat and threatened him unless he cooperated. Those statements should be barred as inadmissible hearsay.

Out of court statements that are offered in evidence for the truth of the matter asserted constitute hearsay and are inadmissible unless they fit within a recognized exception to the hearsay rule. Fed. R. Evid. 801, 802. The proponent of the out-of-court statement bears the burden of showing that an exception applies. *United States v. Robbins*, 197 F.3d 829, 838 (7th Cir. 1999). Here, plaintiff has not shown, and cannot show, that any of the exceptions under Rule 803 or Rule 804 apply.

The Sumner statements also should not be admitted under Rule 807(a)'s residual exception to the hearsay rule. Under that Rule, "[f]ive elements must be satisfied before hearsay

is admitted in evidence: '(1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice.'" *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 631 (7th Cir.2006), quoting *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir.1999). A court's finding that a statement is trustworthy is critical to the statement's admissibility under Rule 807. *See id. See also United States v. Romo*, 914 F.2d 889, 896 (7th Cir.1990) ("Statements which the district court finds not to have such guarantees of trustworthiness cannot be admitted under this Rule."). Also, "a witness's death is not enough to justify discarding the trustworthiness requirement of the residual hearsay exception." *Stolarczyk ex re. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F.Supp.2d 834, 842 (N.D.Ill. 2005)

Plaintiff has not established the reliability—and therefore the admissibility under Rule 807—of Sumner's statements. Indeed, Sumner's statements were subsequently discredited by Sumner himself when he testified, under oath and subject to cross-examination, at plaintiff's 1986 criminal trial. Sumner specifically testified that his statements to Murphy and Swano about Defendant Brannigan were untrue. (Sumner 1986 Trial Testimony in *People v. Fields*, attached hereto as Exhibit 14, at 452-53; 456-63; 485.) According to Sumner, he had been instructed by General Samuel Knox of the El Rukn hierarchy to "make something up" to explain his cooperation with authorities. (Ex. 14, at 452-53, 482-85). Sumner also testified that he made the statements to Murphy while in Knox's mother's house and Knox and Michael Hunter personally took Sumner to see Swano and make the statement to him. (*Id.*) Sumner has never recanted that aspect of his trial testimony.

Sumner's statements to discredited El Rukn attorneys Murphy and Swano are not trustworthy based on a number of factors, including the circumstances under which they were

24

made and the significant fact that Sumner later testified under oath at trial, when he was subject to cross-examination by El Rukn attorneys, that his statements were not true. Because the statements about Brannigan do not fall under any exception to the hearsay rule, including the residual hearsay exception, they should be barred.

## MOTION 13: TO BAR DR. SILBERBERG'S OPINION RELATING TO THE DEFENDANTS' EXPERT'S INTERVIEW OF PLAINTIFF

As this Court may recall, Defendants filed a motion for mental health examination and testing of plaintiff, and a supplement to their motion (Dkt. 408, 416), requesting this Court allow their retained forensics psychiatrist Dr. Cavanaugh and psychologist Dr. Wasyliw to conduct separate interviews of plaintiff. Plaintiff objected to Defendants' motion, contending that "subjecting the plaintiff to two separate series of testing and exams by two separate doctors is both unnecessary and harassing." (Dkt. 412 at 3). This Court eventually denied Defendants' request for two separate interviews. In lieu of a joint interview by Drs. Cavanagh and Wasyliw,[2] which this Court allowed, Dr. Wasyliw's interview was transcribed and videotaped for later review by Dr. Cavanaugh.

Plaintiff is now seeking to utilize this Court's ruling in an attempt to undermine Drs. Cavanaugh and Wasyliw for failing to conduct two separate interviews. Defendants bring this motion to prevent plaintiff from gaining such an unfair tactical advantage. In pertinent part, plaintiff's expert, Dr. Silberberg, testified at deposition that "I am the only one right now to have done a psychiatric evaluation of plaintiff." (Dr. Silberberg Deposition, attached hereto as Exhibit 15, at 129). According to Dr. Silberberg, "three and a half hours is not possible to do all those

---

[2] Pursuant to ethical rules of his profession, Dr. Wasyliw could not administer psychological testing of plaintiff without interviewing him.

[psychological] tests and a forensic psychiatric evaluation. It's physically not possible." (*Id.* at

130) He stated:

> The fact the interview was three and a half hours and all the psychological tests were done. And if you add up the amount of time that the psychological tests were done, there was no time for any interview. So no forensic evaluation was done by Dr. Cavanaugh. (*Id.* at 135).

Plaintiff's counsel then elicited the following from Dr. Silberg:

> Q. Let me ask you a little bit about your evaluation of Nate Fields. You've conducted two diagnostic interviews; is that correct?
>
> A. Yes.
>
> Q. They were separated by some period of time?
>
> A. Yes.
>
> Q. Can you explain what the thinking was in doing those techniques?
>
> A. The thinking was, No. 1, in terms of getting an initial interview. Then being able to think about the case and having a better understanding where I wanted to follow up. Made the second interview more productive. Also separating the time, it helps to look for inconsistencies, which is one of the hallmarks of malingering, and I didn't understand -- I mean, you didn't ask me that. So that would be the reason why I separated it.
>
> Q. Was that one of the things you do look for is evidence of malingering?
>
> A. One of the things would be inconsistencies, yes.
>
> Q. Did you find evidence of malingering with respect to your work with Nathan Fields?
>
> A. No.
>
> Q. And these techniques of doing more than one diagnostic interview separated by some period of time -- are those techniques commonly used and relied upon by a forensic psychiatrist?
>
> A. I would say I heard it from many of the most respected forensic psychiatrists in the country that it's often used.

Later in the deposition, upon realizing Dr. Wasyliw's interview itself was 3½ hours and that the psychological testing was separate, Dr. Silberberg stated "still, in my opinion, [that] would not be enough time for a forensic psychiatric evaluation." (*Id.* at 163). Dr. Silberberg stated: "To do that in an interview in one day I think you'd start to have questions about validity and reliability because the person would be getting extremely tired either during the testing or during the interview. That's a lot to ask for somebody in one day."[3] (*Id.* at 164).

When asked additionally whether he has any criticisms of Drs. Cavanaugh and Wasyliw for not conducting a second interview of plaintiff, Dr. Silberberg stated "Dr. Cavanaugh never did any interview. He just observed an interview that was done by somebody else." (*Id.* at 171). Dr. Silberberg further stated:

> My understanding is sometimes judges will rule that counsel could only have one interview and you have to pick. And in my opinion, to render an opinion to a reasonable degree of medical certainty, they pick (sic) wrong. And if Dr. Cavanaugh is going to give an opinion to a reasonable degree of medical certainty, he should have reviewed the records himself and interviewed Nate for a substantial period of time to be able to give an opinion to a reasonable degree of medical certainty. They chose wrong. (*Id.* at 173).

It would be fundamentally and grossly unfair to allow Dr. Silberberg to testify in any respect about the interview of plaintiff by Dr. Wasyliw and/or to criticize Dr. Cavanaugh for not conducting his own interview. Dr. Cavanaugh and Dr. Wasyliw each requested their own separate interviews. Having successfully opposed Defendants' request for two interviews, plaintiff is now unfairly attempting to capitalize on his success by contending the single interview conducted by Dr. Wasyliw and relied upon by Dr. Cavanaugh was insufficient. The

---

[3] Dr. Silberberg offered these opinions though he did not read the transcript or watch any of the video of Dr. Wasyliw's interview, and he further criticized Dr. Cavanaugh for reading the transcript and watching relevant sections of the videotape, rather than the entire videotape.

Defendants do not believe this is the result intended by this Court with its ruling. Worse, plaintiff opposed defendants' request for two separate interviews even though Dr. Silberberg utilized that very procedure (two separate interviews) to be "more productive" and "to look for inconsistencies."

Finally, Dr. Silberberg did not review the transcript or watch any of the video of Dr. Wayliw's interview of plaintiff, so he necessarily has no basis to offer any opinion regarding it.

WHEREFORE, the City Defendants respectfully request that this Court bar plaintiff from arguing and Dr. Silberberg from testifying at trial that the interview of plaintiff by Dr. Wasyliw was insufficient, that two interviews of plaintiff should have been conducted, that Dr. Cavanaugh and Dr. Wasyliw "chose wrong," that Dr. Cavanaugh should have interviewed plaintiff, or otherwise to argue or testify in any way that would mislead the jury into believing Dr. Cavanaugh and Wasyliw did not both request separate interviews of plaintiff, and for any other relief this Court deems appropriate.

## MOTION 14: TO PROHIBIT PLAINTIFF'S COUNSEL FROM ARGUING OR DISCUSSING BEFORE THE JURY THE CONTENTS OF OTHER FILES MAINTAINED IN THE SUBJECT FILE CABINET

The City Defendants move this Court for an order *in limine* precluding plaintiff's counsel from arguing or discussing before the jury the contents of other homicide files maintained in the Area Central file cabinet where the so-called "street file" is believed to have been found in 2010. The subject file cabinet and the files therein have been the subjects of several motions before this Court. Despite multiple motions, briefs, and opportunities to investigate, plaintiff's counsel has failed to disclose or provide competent evidence that any other file maintained within the cabinet contained exculpatory material that was not disclosed to a criminal defendant. Allowing plaintiff's counsel to "discuss" the contents of other files before the jury, without presenting any

specific evidence, testimony from a witness, or expert opinion connecting those files to the putative *Monell* claim, would be improper.

The issues pertaining to the file cabinet have been extensively litigated before this Court. The earlier litigation history is set forth in the City Defendants' Response to Plaintiff's Supplemental Motion to Make Public (Dkt. #418, pp. 1-4), and need not be recounted here. Pertinent to this motion, plaintiff's counsel inspected the subject file cabinet and identified five files they believed relevant to this case. (*See* Plaintiff's Supplemental Motion to Make Public the Names of Victims ("Supplemental Motion"), Dkt. #414, at p. 3). According to plaintiff, these five files were selected based on three criteria: (1) the files had overlapping issues with plaintiff's case; (2) the files contained information suggesting suspects have been identified, charged, prosecuted and convicted in criminal proceedings, indicating the investigations were not open; and (3) several of the files were familiar to plaintiff's counsel, and documents within those files suggested to her some of the materials were exculpatory and likely never tendered in the underlying criminal litigation. (*Id*. at 3-4).

In the Supplemental Motion, plaintiff's counsel offered the reasons they believed the complete investigative files in those five cases were "most likely" never tendered to those criminal defendants. The City Defendants provided a response to each of plaintiff's contentions regarding those five files.[4] With respect to the W.B. file, plaintiff hypothesized some of the information in that file must not have been tendered to the criminal defendants because those defendants did not utilize what appeared to be *Brady* material from the file. Specifically,

---

[4] As the files in question are still potentially subject to a protective order, this motion *in limine* will utilize the initials of the victim to protect against the disclosure of the identities of the victims and witnesses. As an additional safeguard, this motion relies on some of the information filed under seal, which is not restated here.

plaintiff referred to an individual nicknamed "Duke" as a suspect. As the City's response pointed out, information concerning that individual was found in a supplemental report, which was available to defense counsel at trial. Further, the individual was not actually a suspect at all, but the potential target of an El Rukn hit. (*See* City's Response to Supplemental Motion to Make Public, at pp. 7-9). Plaintiff was unable to provide any evidence to support his speculative claim that exculpatory material was withheld from the W.B. file. Even with the limited information provided in the Supplemental Motion, the City Defendants were able to establish plaintiff's speculative inferences concerning the W.B. file were unjustified.

Even though it was not their burden, City Defendants also were able to demonstrate the other files provided no evidence or support for plaintiff's speculative conclusions that the files contained exculpatory information not tendered to a criminal defendant in violation of *Brady*. No defendant was ever charged or convicted of the murder that was the subject of the investigation in the T.A. file. (*See* City Defendant's Response to Supplemental Motion, pp. 11-12). The G.K. file failed all three of plaintiff's self-selected criteria identified in the Supplemental Motion: there were no overlapping issues with plaintiff's case; the file was properly classified as open; and, there was no evidence or factual information that identified exculpatory material or established it was not tendered in an underlying criminal prosecution. (*Id*. at 13-14). Similarly, plaintiff failed to demonstrate any "overlap" with the issues in the D.S. file, and he provided no evidence or factual basis to support a claim that exculpatory information from that file was improperly withheld from a criminal defendant in violation of *Brady*. (*Id*. at 12-13).

30

Analysis of the fifth file identified by plaintiffs, involving Charmaine Nathan, has yielded the same conclusion.[5]   In the Supplemental Motion, plaintiff described information obtained from victim/witness Sheila Jackson concerning her initial identification of a suspect, which plaintiff's counsel concluded was withheld from criminal defendants.   According to plaintiff, information in the file indicated Jackson immediately recognized the person who shot into the car as an individual nicknamed "Bear."   Ms. Jackson purportedly stated at the time, "Bear, why are you doing this?"   (Supplemental Motion, at 9).   Ms. Jackson subsequently testified for the government at trial against four El Rukn defendants, despite having earlier identified "Bear" (who was not an El Rukn or one of the criminal defendants) as the individual who shot her.   (*Id.* at 10).   According to the Supplemental Motion (at 10-11), plaintiff's counsel "read as much of the record as she could obtain and concludes that the file (or parts thereof) that was in the basement of 51st and Wentworth – and designated as an open file – was most likely never tendered to the defendants in the federal racketeering trial."   Plaintiff's counsel concluded the information from the file was never provided to defense counsel because the exculpatory information discussed in the motion (*i.e.*, Ms. Jackson's prior identification of "Bear" as the individual who shot her), was never raised by any of the accused defendants in the federal proceeding.   (*Id.* at 11).

As recently noted in Defendant City's response in opposition to plaintiff's motion regarding the file cabinet issues (Dkt. #495, at 5-7), the representations concerning Ms. Jackson appeared to cause this Court some concern.   As set forth in that response, however, the speculative assertions by plaintiff's counsel that Ms. Jackson's identification of Bear was not

---

[5] The names of victim Charmaine Nathan and witness Sheila Jackson were disclosed publicly in earlier El Rukn trials, so these individuals are discussed by name in this motion.

mentioned by any of the El Rukn defense counsel were unfounded and demonstrably wrong. Ms. Jackson was cross-examined on at least three different occasions by El Rukn defense counsel on numerous details from a police department memorandum found within the allegedly withheld file, including her initial identification of Bear as the shooter. (*Id*. at 6-7). The transcripts submitted by the City Defendants refuted plaintiff's speculation and stand in stark contrast to the absence of any transcripts or evidence supporting plaintiff's position. In short, the underlying criminal records contradicted the speculative conclusion urged by plaintiff's counsel that information contained in the Nathan file was not produced to the criminal defendants.

To this day, plaintiff has failed to disclose or produce any evidence from the other files contained in the file cabinet supporting a claim that exculpatory information from those files was not produced to those criminal defendants. Each time plaintiff's counsel has raised a suspicion that something may not have been produced, the City has been able to refute that contention with the actual evidence.

At the court hearing of February 18, 2014, this Court invited a motion *in limine* regarding the admissibility/inadmissibility of the other files and/or the file cabinet. According to the Court, it did not yet have enough information to say there was nothing in the file cabinet that could possibly be relevant or admissible at trial. (February 18, 2014 Transcript of Proceedings, at pp. 12-13) (attached as Exhibit 16). The Court suggested a motion *in limine* on the issue because plaintiff's then-pending motion regarding the file cabinet contents "was kind of a broad brush motion, and the response was partly a broad brush response because it was a broad brush motion, and part of it was specific." (*Id*., at 13).

As plaintiff's counsel previously indicated, there are over 300 files contained in the subject cabinet. (Supplemental Motion, at 2). The City Defendants have responded and

specifically refuted each argument previously set forth by plaintiff with respect to the five identified files from the file cabinet. During the meet and confer process regarding motions *in limine*, defense counsel asked plaintiff's counsel for specifics as to the "other files" they intended to discuss before the jury. Plaintiff's counsel declined to identify any files or provide any specific information that they proposed to discuss with the jury. It is difficult, if not impossible, for the City Defendants to provide this Court with anything more specific by way of argument when they have been provided nothing to respond to. They cannot reasonably discuss all 300+ files in a vacuum, nor should they be required to. Plaintiff bears the burden of proof on its *Monell* claim, and they have yet to present this Court with a shred of competent evidence that any of the "other files" in the subject file cabinet were withheld from another criminal defendant. If this motion *in limine* also paints with a "broad brush," it is because the City Defendants have no information as to what other files plaintiff intends to "discuss," and they have no basis by which they can be more specific.

For the foregoing reasons, this Court should not permit plaintiff's counsel to discuss the contents of other homicide files before the jury. To do so would be highly misleading and allow plaintiff to substitute speculation and argument in place of actual evidence.

As there is no basis to conclude any of the "other" files in the subject cabinet are relevant or admissible to support plaintiff's *Monell* claim, there is no reason for this Court to grant plaintiff's request that the file cabinet be transported to the courtroom for trial. Plaintiff has failed to establish how any "exploration" of the file cabinet and its contents serves a legitimate evidentiary purpose, suggesting the likelihood of juror confusion or a possibility the jury would be misled. In addition, the physical appearance of the file cabinet has no relevance to plaintiff's

*Monell* claim. This Court should deny plaintiff's request for an order to allow the file cabinet to be brought to the courtroom during trial.

WHEREFORE, the City Defendants request that this Court enter an order *in limine* precluding plaintiff's counsel from arguing or discussing before the jury the contents of other files maintained in the subject file cabinet. Further, Defendant City requests that this Court deny plaintiff's prior request for an order allowing the file cabinet to be brought to the courtroom for trial.

**MOTION 15: TO BAR EVIDENCE AND TESTIMONY ARISING FROM DISCOVERY ISSUES INVOLVING THE SUBJECT FILE**

The City Defendants move this Court for an order *in limine* precluding plaintiff's counsel from arguing about or introducing evidence or testimony arising from discovery issues involving the subject file. As this Court is aware, there has been extensive litigation surrounding the so-called "street file" and its chain of custody. The City has acknowledged it has been unable to establish the chronological chain of custody of the subject file between June 1984 and May/June 2010, when the file was found in then-Area 1. The Court allowed plaintiff's counsel to conduct discovery to investigate the City's assertion, and they did so extensively.

It appears plaintiff intends to offer evidence at trial pertaining to that discovery, none of which is relevant or material to the ultimate issues in this case. Allowing such evidence during the trial of this matter will needlessly lengthen what will be an already long trial, as well as mislead and confuse the jury. This motion *in limine* seeks to prevent plaintiff from arguing about or seeking to introduce evidence or testimony arising from certain discovery issues involving the subject file.

34

In plaintiff's preliminary list of trial witnesses, he indicates he intends to call CPD witnesses Benita Betts, John Posluszny, Karen Williams, and Sharon Colby. The list of witnesses further indicates plaintiff may call former CPD employee Kevin O'Brien. Each of these witnesses was deposed as part of plaintiff's discovery into the chain of custody issue. There is no evidence any of these witnesses had anything to do with the subject file. They provided no testimony casting doubt on the City's acknowledgement regarding its inability to establish a chronological chain of custody. Any trial testimony from these witnesses would not tend to prove or disprove an ultimate issue in this case. Plaintiff should be barred from calling these witnesses at trial. Defendants also fail to see the relevance of, and object to, plaintiff's request for the trial testimony of Lt. Duffin, Commander Walsh, Sgt. Loughran, and Det. Sam Brown. At most their involvement relates to handling the subject file to respond to requests in this case, and it is undisputed they otherwise had no involvement prior thereto.

Plaintiff also has submitted a proposed exhibit list that contains a number of matters related to discovery issues involving the subject file that would be improper to be submitted to the jury. For example, plaintiff's proposed exhibit list includes multiple internal CPD emails, communications and letters from defense counsel Dan Noland, internal memoranda, and a transcript of a hearing in this matter regarding discovery issues pertaining to the subject file. The City Defendants will be objecting to the specific exhibits in the pretrial order, but raise this issue *in limine* so it can be considered prior to the trial itself. In addition to obvious questions regarding the admissibility of such items, they are related to *discovery* on the chain of custody, rather than the chain of custody itself (which the City has already acknowledged cannot be established). As items of evidence, they are of questionable relevance to the issues in this case. These proposed exhibits also are immaterial in that they do not tend to prove or disprove an

ultimate issue in this case. Indeed, most of these items involve events that occurred after the file was discovered at Area 1.

WHEREFORE, the City Defendants request that this Court enter an order *in limine* barring argument or the introduction of evidence and testimony arising from discovery issues involving the subject file.

**MOTION 16: TO BAR UNFOUNDED ALLEGATIONS AGAINST AUSA HOGAN**

The City Defendants intend to call former AUSA Bill Hogan as a witness in this case. AUSA Hogan was the lead prosecutor for the Government in the El Rukn RICO trials of the early 1990s as well as *U.S. v. Maloney* which was tried in 1993. It is anticipated plaintiff will attempt to ask AUSA Hogan about "findings" that the Office of Professional Standards made and about testimony AUSA Hogan gave concerning his conduct and the conduct of cooperating El Rukns in the federal investigations and trials. This matter was presented to Judge Biebel during the COI proceedings. Judge Biebel concluded as follows:

> Specifically, Petitioner [Fields] emphasizes that he is seeking to impeach Hogan's character by examining "his extensive history of prosecutorial misconduct in proceedings involving El Rukn defendants, his professional and ethical failures in prosecuting members of the El Rukn organization, and his inappropriate rapport with cooperating witnesses." This Court reviewed the extensive opinion of the Office of Professional Standards which cleared Hogan of all accusations of wrongdoing. Since Hogan's alleged misconduct has been fully investigated in past administrative proceedings those allegations of misconduct will not be further considered in the present action. (Exhibit 17 at 22, Judge Biebel March 28, 2013 Ruling in the COI Proceeding).

The City Defendants request that the same ruling would be appropriate in this case. The accusations of wrongdoing against AUSA Hogan were fully investigated and AUSA Hogan was

36

cleared of all accusations of wrongdoing. (*See* excerpt of MERIT Board Decision[6], attached as Exhibit 18). It is irrelevant and would be improper to relitigate those issues before this jury, would potentially confuse the jury, and could only seek to embarrass or harass AUSA Hogan on the witness stand.

WHERFORE, the City Defendants respectfully request that this Court grant its motions *in limine* 1-16 and for any other relief this Court deems appropriate.


Dated: February 20, 2014                    Respectfully submitted,


                                            By: s/ Daniel M. Noland
                                                One of the Attorneys for City Defendants

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
(312) 876-1700 (telephone)
(312) 876-1155 (facsimile)

---

[6] As the MERIT Board decision is nearly 200 pages long, the defendants have attached as an Exhibit only the first several pages, which include a very brief summary of the Board's decision. If the Court would prefer to view the complete decision, the defendants would be happy to provide a copy.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 24, 2014, I electronically filed the foregoing **City Defendants' Motions** *in Limine* with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to:

H. Candace Gorman
Adrian J. Bleifuss Prados
Law Office of H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
312.427.2313
Hcgorman1@gmail.com
ableifuss@gmail.com

Patrick T. Driscoll, Jr.
Stephen L. Garcia
Office of the Cook County State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
312.603.5475
pdriscoll@cookcountygov.com
sgarcia@cookcountygov.com

and

Leonard C. Goodman
Melissa A. Matuzak
Law Offices of Leonard C. Goodman
53 W. Jackson
Suite 1220
Chicago, IL 60604
312.986.1984
lcgoodman@rcn.com
melissamatuzak@gmail.com

s/ Daniel M. Noland