IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHSON FIELDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10 C 1168 |
| ) | |
| CITY OF CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER ON DEFENDANTS' MOTIONS IN LIMINE

This order memorializes in shorthand form the Court's oral rulings on defendants' motions *in limine* 2 through 16, which the Court made at the final pretrial conference held on March 6-7, 2014. The order also addresses motion *in limine* 1, in greater detail. At the pretrial conference, the Court deferred ruling on that motion pending its review of additional materials thereafter submitted by the parties.

1. In their first motion, defendants seek admission of "translated" transcripts of recorded conversations involving persons other than Fields. The conversations were intercepted pursuant to wiretaps conducted by federal law enforcement authorities on telephones at the headquarters of the El Rukn street gang. Defendants characterize the conversations as follows:

> Most of these conversations are between [El Rukn leader] Jeff Fort, who was in the penitentiary, and six of his Generals, Alan Knox, Bernard Green, Jeff Boyd, Thomas Bates, Melvin Mayes, and Trammel Davis, and they relate to efforts by the El Rukns and William Swano, with plaintiff's knowledge, to fix the 1986 trial in *People v. Nathson Fields and Earl Hawkins* relating to the Smith/Hickman homicides, to intimidate witnesses, to fabricate evidence, and other relevant matters.

Defs.' Mots. *In Limine* at 1-2. Fields is not claimed to have been a party to any of the recorded conversations.

The conversations are conducted, in part, in language claimed to be coded by the El Rukns. Defendants' motion regarding the conversations focused on the foundation for the translations provided in the transcripts that were used in the federal criminal trials at which these conversations, and others, were introduced. Defendants did not address the relatively obvious hearsay issues concerning the conversations. Fields asserted a hearsay objection in his response to the motion. *See* Pl.'s Resp. to Defs.' Mots. In Limine at 1-2. He argued that defendants cannot establish the predicate for admissibility of the conversations as co-conspirator declarations under Federal Rule of Evidence 801(d)(2)(E). *Id.* In argument at the final pretrial conference, defendants contended that the conversations are in fact admissible under Rule 801(d)(2)(E). They did not cite any other basis to find the conversations are not hearsay or are subject to an exception to the rule excluding hearsay.

Under Rule 801(d)(2)(E), a statement is not hearsay if it is offered by the opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (internal quotation marks omitted). If the facts relevant to admissibility under this rule are disputed, "the offering party must prove them by a preponderance of the

2

evidence." *Id.* at 176. When the admissibility of purported co-conspirator declarations is challenged prior to trial, the Court may make a pretrial determination of admissibility based on material proffered by the offering party, though if the Court admits the evidence this is conditioned on the party actually laying the foundation at trial. *See, e.g., United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001); *United States v. McClellan*,m165 F.3d 535, 553 (7th Cir. 1999).

Defendants contend that the evidence supports a determination that Fields was a member of a conspiracy to bribe the judge presiding over his criminal trial, Thomas Maloney, and that the recorded conversations took place during the conspiracy and were in furtherance of it. The Court notes that although some of the conversations, assuming they are "translated" accurately, are evidently offered by defendants to show efforts to intimidate and influence witnesses in the trial of Hawkins and Fields, they have made no argument, and have cited no evidence other than the recorded conversations themselves, that Fields was involved in or even aware of such activities. Rather, they have focused entirely on the bribery of Judge Maloney. In support of admissibility, defendants cite the recorded conversations themselves; Earl Hawkins's testimony, and the fact that Fields waived a jury in the criminal trial on the day trial began, at the same time as Hawkins, despite Maloney's purported reputation as a prosecution-oriented judge.

The law is clear that statements offered under Rule 801(d)(2)(E) may be considered in determining whether the Rule's requirements are met but cannot by themselves establish the existence of a conspiracy or participation in it by the party against whom the evidence is offered. *See* Fed. R. Evid. 801(d)(2); *Bourjaily*, 483 U.S.

3

at 176. Accordingly, the disputed statements alone are not "sufficient to demonstrate a conspiracy and the [party's] participation therein without independent supporting evidence in the record." *United States v. Harris*, 585 F.3d 394, 399 (7th Cir. 2009). A court considers "the circumstances surrounding the statement[s], such as the identity of the speaker[s], the context in which the statement[s] [were] made, or evidence corroborating the contents of the statement[s]." *Smith v. Bray*, 681 F.3d 888, 905 (7th Cir. 2012).

The Court asked for, and has reviewed, Hawkins's deposition testimony taken in connection with the present case, his testimony at a state court hearing on a petition by Fields for a "certificate of innocence" (COI), and an FBI memorandum of an interview that Hawkins gave in July 1987. In each of these statements, Hawkins recounts discussions with William Swano, his lawyer in the murder trial, regarding Swano's proposal to bribe the judge. Hawkins told the FBI that he discussed Swano's proposal with his co-defendants, Fields and George Carter, and that all three of them agreed to take a bench trial. Hawkins also told the FBI that Swano discussed the bribe proposal openly in front of Fields and Carter but not their lawyers. During the trial, Hawkins told the FBI, Swano advised him that the judge had returned the money because someone had leaked information about the bribe to the FBI and he felt it was too risky to fix the case. Hawkins also told the FBI that he had discussed the fix with various other El Rukn members, one of whom, Alan Knox, obtained the bribe money and passed it on to Swano.

During Hawkins's deposition in the present case (actually it was a joint deposition that also pertained to the COI hearing), held just a few days before his testimony at the

4

COI hearing, Hawkins testified that Fields "knew that we had a fix in," "[b]ecause I told him." Hawkins Dep. at 113. Hawkins stated that while the case was pending and they were both in the Cook County Jail (though in different divisions), he periodically kept Fields apprised of developments, including about the bribe. *Id.* He also stated that other El Rukns told him they had discussed the bribe with Fields too. *Id.* at 114-15. Hawkins also claimed that Swano discussed the bribe in a joint meeting at the Cook County Jail that included Hawkins, Fields, and Carter, and two other men, James Williams and Jeff Boyd, though not the other men's lawyers—even though Fields was housed in a completely different division of the jail from Hawkins (Division 6 vs. Division 1, these being two completely separate buildings in the jail complex). *Id.* at 115-18. Under questioning at the deposition by the prosecutor handling the COI hearing, Hawkins stated that Swano also talked to him, in the presence of Fields and Carter, in the "bullpen" near the judge's courtroom, *id.*at 206-07, though he was not asked and did not say that these particular conversations included discussions of the bribe. Hawkins did recount a conversation with Fields and Carter about whether to have a jury trial or a bench trial that, depending on how one interprets Hawkins' deposition testimony, might have included an oblique reference to the bribe, *see id.* at 211-12, but he did not provide particulars about where this conversation occurred. Later in the deposition, under questioning by the lawyer for the defendants in the present case, Hawkins reaffirmed his statement to the FBI that before the trial, he, Fields, and Carter talked about paying off the judge and that they all agreed to take a bench trial. *Id.* at 235-36. He also stated that he, Fields, and Carter openly discussed the bribe and that he and Fields did not waive a jury trial until just after Swano gave the money to the judge. *Id.* at

237-39.

At the COI hearing, in response to questions by the Cook County prosecutor who had questioned him at the deposition a few days earlier, Hawkins testified that he had a number of conversations with Swano regarding the bribe. He stated that one of these occurred in a visiting room at the Cook County Jail. Carter and Fields were present because "[w]e called them down." Hearing Tr. at 168. Swano said he could "work with" Judge Maloney "because he worked with him before, and the only case he lost with him, the guy, he didn't give the guy no money or something like that." Id. at 169. As the murder case got closer to trial, Hawkins said, he, Carter, and Fields talked among themselves about what Swano had said. Id. at 170. Swano told Hawkins how much money he needed, and Hawkins made arrangements to get the money. Id. at 171-75.

The following questioning by the prosecutor then occurred:

Q: . . . Did you have court dates in Judge Maloney's courtroom?

A: Yes.

Q: On those court dates, would you be brought over with Fields and with Carter?

A: Yes.

Q: Would you talk to Swanno [sic] in the bull pin [sic] during these court dates?

A: Yes.

. . .

Q: . . . [Y[our case was first set for trial in April 12th of 1986, correct?

A: Yes.

Q: Between January of '86 and April 12th of '86, did you have several dates in between in Judge Maloney's courtroom?

6

    A:      Yes.

    Q:      Would all three of you, you, Fields, and Carter go to court?

    A:      Yes, sir.

    Q:      Would you talk to Swanno about what was going on with the bribe?

    A:      Yes, sir.

    Q:      And were Carter and Fields present for those conversations that you had with Swanno?

    A:      Yes, sir.

    Q:      After you had those conversations with Swanno regarding getting the money together to pay a bribe to Judge Maloney, did you subsequently then have conversations amongst yourselves, you, Carter and Fields about the bribe?

    A:      Yes, sir.

    Q:      Specifically, did you also have conversations regarding whether to take a jury or a bench trial?

    A:      Yes, sir.

*Id.* at 175-76. After further testimony about arrangements for the bribe and a series of continuances, Hawkins testified as follows:

    Q:      Did [Swano] finally appear to court on June 17th?

    A:      Yes.

    Q:      On that day, did you finally take or elect to take a bench trial, finally?

    A:      Yes, sir.

    Q:      Did Fields take a bench trial on that date as well?

    A:      Yes, sir.

    Q:      In fact, you recall the jury being assembled outside as you were

7

waiving jury trial?

A:    Yes, sir.

. . .

Q:    Did you both waive jury together?

A:    Yes.

Q:    Did you talk to each other in the bull pin on June 17th of '86?

A:    Yes.

Q:    And were you constantly – did you also talk in the bull pin together on June 16th, 1986?

A:    Yes.

Q:    On June 17th, 1986, before you went out and waived jury trial, did you talk to Swanno when he finally appeared on that day?

A:    Yes.

Q:    What did he tell you that made you want to take a bench trial?

A:    He said he got the money and got to talk to the judge. He said he got – he could make it work.

Q:    Was Fields present when Swanno told you this in the bull pin?

A:    Yes.

Q:    Was Carter present?

A:    Yes.

Q:    Did you then come out in court and waive jury trial?

A:    Yes.

Q:    Did Fields waive jury trial?

A:    Yes.

Q:    And that day, Sir, did the trial actually begin? Witnesses were

8

actually presented on June 17th, 1986?

A: Yes.

*Id.* at 181-83.

Later, still under questioning by the prosecutor, Hawkins testified as follows:

Q: June 20th. Later on in your trial, approximately June 20th, did Mr. Swanno indicate or verify what the judge did with that money?

A: He said he went in the judge's chambers to pick up a package and the money was in it. The judge gave him the money back

Q: Where did he tell you this?

A: In the bull pin.

Q: And again, was Carter and Fields present for that?

A: Yes.

*Id.* at 190. In short, Hawkins unequivocally placed Carter in conversations he said he had with Swano, also in Fields's presence, at the courtroom bullpen during the murder trial.

Shortly after this testimony, however, the prosecutor appears to have realized that Carter, having been severed from Hawkins and Fields for purposes of trial, could not have been present at the bullpen conversations during trial, and he attempted, in a leading fashion (and over objections, which the Court has omitted from the quotation below), to get Hawkins to revise his earlier testimony:

Q: Now, maybe I misspoke. When George got severed, -- I apologize. This is my mistake. When George got severed, was George in the bull pin, at this time, when the trial was going on, or his case just wasn't even there anymore?

A: When he got severed, they stopped calling him over to go to court with us.

9

. . .

Q: So, these conversations that you had while the trial was going on, only Fields was present, correct?

A: Yes.

*Id.* at 191-92.

The Court has also reviewed the voluminous transcripts of the recorded conversations from the wiretap of the telephones at the El Rukn headquarters. These are the materials that defendants seek to admit pursuant to Rule 801(d)(2)(E). As the Court has indicated, Fields was not a party to any of these conversations. El Rukn leader Jeff Fort, who was incarcerated elsewhere at the time, was a party to nearly all of the conversations. They include extensive discussions about what attorney Swano was promising in regard to the bribery of Judge Maloney, including discussion of whether the bribe would cover the Smith/Hickman murder charges, the Vaughn/White murder charges, or both, and whether there was assurance of an acquittal. In addition, at various points, there is discussion about asking for the return of the money that the El Rukns had provided to Swano. The conversations offered by defendants both predate and postdate the start of Hawkins and Fields's trial, and certain later conversations reference their conviction by Judge Maloney.

Assuming the "translation" of the coded language is correct, Fort and the other El Rukns who were recorded understood that the deal was for the acquittal of both Hawkins and Fields (as well as, perhaps, Carter). There are repeated statements to the effect that Fields's attorney Jack Smeeton was unaware of the bribery. There is not a great deal of discussion about Fields and next to none about his knowledge or awareness of the plan to fix the trial. In a conversation on June 18, 1986, after the trial

10

had started, according to the translation Fort tells others on the call, including two high-ranking El Rukns (Knox & Mayes), to make sure that Hawkins tells Fields that Fort had paid the bribe to fix their case. This arguably suggests that, at least as far as Fort knew, Fields was at that point unaware of the bribe activity. In a conversation on June 23, Fort allegedly tells Knox to visit Hawkins and Fields at the jail to let them know that the fix is in. In a conversation on June 24, Knox allegedly tells Fort that Hawkins reported that he had told Fields about the fix, though he does not say when. Finally, on June 27, after the judge had found Hawkins and Fields guilty, Fort allegedly opines that there is no way that they would have agreed to a bench trial had they not been assured the fix was in.

The Court has also considered the other evidence cited by defendants, including the fact that Hawkins and Fields both waived a jury at the same time. The simultaneous nature of the waiver is not, in itself, sinister or suggestive of Fields's participation in the conspiracy to bribe the judge; as co-defendants in a joint trial, one would expect their jury waivers to be taken simultaneously. The fact that this was done on the morning of trial, however, suggests concerted activity on their part, though not necessarily Fields's awareness of the bribe.

The law authorizes a court assessing a preliminary admissibility question of this type to consider the credibility of the testimony offered in support of the Rule 801(d)(2)(E) factors. *See United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009). Hawkins's credibility on the question of Fields's knowledge of the bribe and participation in the scheme is suspect, to say the least. Hawkins has had a motive to fabricate at all relevant times, due to his desire (initially) to get off death row and then to improve the

terms and conditions of his prison sentence. In addition, during his testimony at the COI hearing, he freely testified—at least at one point, in response to a non-leading question—that George Carter was present during bullpen conversations about the bribe during the trial, occasions on which Carter actually could not have been present. Then Hawkins took this all back in the blink of an eye, after the fact, when he was reminded by the prosecutor that Carter could not have been there and then was given a leading question inviting him to revise his earlier testimony. Hawkins's testimony at the deposition and the COI hearing about a joint meeting at the jail involving detainees from different divisions who were somehow brought to a single spot for a meeting with the lawyer for only one of them is likewise suspect, and Hawkins gave arguably varying testimony at the deposition and the COI hearing regarding whether other detainees were also present. In addition, the disputed hearsay statements on the recorded conversations—which courts do not view as terribly strong evidence of conspiracy to begin with, *see Harris*, 585 F.3d at 399—are not suggestive that Fields was in on the scheme while it was being hatched and carried out.

Given Hawkins's dubious credibility on this point and the scant additional evidence of Fields's knowledge and participation, the Court cannot find that defendants have shown by a preponderance of the evidence that the recorded conversations were in furtherance of a conspiracy to bribe the judge of which Fields was a member. The Court also notes that none of the evidence cited by defendants on the admissibility of the recorded conversations supports a determination that Fields was a member of a conspiracy to intimidate or influence witnesses.

Hawkins may, of course, testify (subject to cross-examination) regarding

12

conversations about the bribe scheme that he says took place in Fields's presence. The fact that the Court did not find his testimony on this score credible or persuasive does not mean that a jury would not or could not do so. In addition, other evidence regarding intimidation or influencing of witnesses conceivably may be relevant and admissible on issues pertaining to Fields's claims. The recorded conversations, however, are inadmissible, and thus defendants' request to qualify certain witnesses as interpreters of those conversations is moot.

2. The Court grants defendants' motion to bar reference to Jon Burge and other unrelated cases or allegations of police misconduct.

3. The Court denies defendant's motion to bar reference to plaintiff's 1988 lawsuit. Defense counsel affirmed that the suit was served on the defendants. The suit is relevant for the purposes addressed in plaintiff's response to the motion. The Court will entertain an appropriate limiting instruction if defendants propose one. Plaintiff has disavowed any intention to offer evidence relating to a document request in the case of *Houston v. Partee*, so the Court grants the motion to that extent.

4. The Court denies plaintiff's motion to bar reference to Complaint Register (CR) 170712. The suit is relevant for the purposes addressed in plaintiff's response to the motion.

5. The Court denies defendants' request to bar plaintiff from alleging malicious prosecution with respect to the Vaughn/White murder charge / allegations. The complaint sufficiently put defendants on notice that plaintiff was advancing a claim along these lines. Exactly how the matter can appropriately be argued can be addressed *in limine* before closing arguments and in connection with the final jury

instructions.

      6.     Many of the points on which defendants ask the Court to take judicial notice are not appropriate subjects for judicial notice, specifically point 3, the first sentence of point 4, and point 9. Others are, including points 1 and 2, the second sentence of point 4, and points 7 and 8.

At the final pretrial conference, the Court stated that it could not determine without reviewing documents relating to *United States v. Maloney* whether points 5 and 6 are appropriate subjects for judicial notice. At the Court's request, defendants' counsel thereafter provided copies of the indictment, jury instructions, and verdict form from the *Maloney* case. The indictment reflects that the charges against Thomas Maloney included a charge of extortion under color of official right to fix the outcome of *People v. Hawkins and Fields* (Count 3) and a charge of racketeering in which one of the racketeering acts alleged was bribery, conspiracy to commit bribery, and extortion in connection with the payment of money by William Swano to fix the outcome of *People v. Hawkins and Fields* (Count 2, racketeering act 5). The jury verdict reflects a finding of guilty on Count 3 and a finding that the prosecution had proven racketeering act 5.

The Court concludes that it can appropriately take judicial notice that in 1991, William Swano and Thomas Maloney were indicted on criminal charges that included charges that Swano paid Maloney money to fix the outcome of *People v. Earl Hawkins & Nathson Fields* and that the jury at Maloney's criminal trial found that Maloney had engaged in these acts.

The Court has not been called upon in this motion to address other issues concerning the admissibility of these matters and thus does not do so in this section of

14

the present order.

The Court encouraged the parties to attempt to agree upon a stipulation regarding relevant historical and undisputed events relating to plaintiff's state court trial(s), conviction, post-conviction petition, and appeal.

7.     The Court denies defendants' motion to bar plaintiff's expert Lou Reiter and his opinions.  That said, as discussed more fully at the final pretrial conference, Reiter and defendants' corresponding expert (William Allee) may not render opinions that certain items or evidence were "exculpatory" in connection with the criminal charges against plaintiff.  That does not mean, however, they may not testify at all regarding that subject.  Rather, they may testify (again, as more fully and completely explained at the conference) regarding the circumstances under which, as a matter of appropriate police practice, material generated by or in the hands of police should be provided to prosecuting attorneys or defense counsel and whether and why, as a matter of appropriate police practice, the materials in question fit within such requirements.

In addition, these witnesses may not render opinions that particular materials or evidence were or were not "material," as more fully explained at the final pretrial conference, or that plaintiff's rights were or were not violated by the non-production of the materials or evidence in question.

8.     The Court grants motion 8 in part and denies it in part and refers the parties to its specific determinations given orally at the final pretrial conference on March 7.

9.     The Court denies defendants' motion to bar argument regarding plaintiff having been placed in a line-up relating to the Vaughn / White murders.

15

10. The Court denies defendants' motion to bar reference to plea discussions in his state court murder case.

11. The Court grants defendants' motion 11, subject to strict compliance with the terms and conditions described in open court. Given defense counsel's response to the Court's show cause order dated March 8, 2014, the Court declines to reconsider this ruling.

12. The Court denies defendants' motion to bar evidence of statements that Anthony Sumner is claimed to have made to Chuck Murphy and William Swano.

13. With regard to defendants' motion to bar plaintiff's expert Dr. Silberberg from testifying regarding the interview of plaintiff conducted by or for defendants' corresponding experts, the Court grants the motion in part and denies it in part and refers the parties to its more detailed oral ruling at the pretrial conference.

14. With regard to defendants' motion to bar argument or discussion regarding other files in the file cabinet containing the "street file" at issue in this case, the Court grants the motion in part and denies it in part and refers the parties to its more detailed oral ruling at the pretrial conference. In addition, defendants' counsel are directed to promptly make arrangements to bring the file cabinet to court on a date to be agreed upon by counsel for both sides.

15. The Court denies defendants' motion to preclude evidence regarding the discovery of the street file, for the reasons described more fully in open court at the pretrial conference. The Court directed counsel to attempt to reach a stipulation regarding certain points, to avoid the need to introduce correspondence involving the attorneys in the present case.

16. The Court grants defendants' motion to bar certain allegations regarding Assistant United States Attorney Hogan. The matters identified in plaintiff's response that he wishes to introduce are not properly admissible.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 9, 2014