UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHSON E. FIELDS, ) | |
| Plaintiff, ) | |
| ) | No. 10 CV 1168 |
| v. ) | |
| ) | Hon. Matthew F. Kennelly |
| CITY OF CHICAGO, et al., ) | |
| Defendants. ) | |

**REPLY TO NOTICE OF CLAIM REMOVAL**

Now comes the plaintiff, Nathson Fields, by and through his attorneys, and hereby replies to his attempt to modify his claim for malicious prosecution[1] as follows:

**BACKGROUND**

Plaintiff filed the notice of claim removal partially in an effort to eliminate, or at least limit, the testimony by several witnesses who the city claims will show that Mr. Fields is actually guilty of the murders of Talman Hickman and Jerome Smith. The city puts forward these witnesses notwithstanding the fact that these witnesses did not testify against Mr. Fields in either of his criminal trials, and notwithstanding the fact that Mr. Fields was found not guilty at his criminal trial and is, like every other American acquitted of a crime, presumed innocent as he was not found guilty. The fact that Mr. Fields seeks to amend his complaint to withdraw the claim that the 2009 retrial constituted a malicious prosecution also comports with the facts in this case. Fields was found not guilty at the 2009 trial. His acquittal satisfies an element necessary to prevail on his malicious prosecution claim – that his criminal case resolved a manner favorable

---

[1] Plaintiff agrees that procedurally he erred in filing a notice of claim instead of a motion to amend the complaint prior to trial under Federal Rule of Civil Procedure 15. Plaintiff files that motion simultaneously with this reply.

1

to him.[2] The defendants cannot now attempt to cure the malicious prosecution of the first trial by saying that they had some additional "evidence" that supported the decision to go forward with the second trial, especially where, as here, the additional "evidence" was never presented at the second trial, and does not appear in the Cook County State's Attorney' Office file. The fact that Fields's does not want to maintain his claim that the 2009 trial itself was a malicious prosecution does not contradict Fields' claim that his due process rights continued to be violated with the withholding of exculpatory material, the subornation of perjury and fabricating of evidence that tainted his second trial ( as well as his first).

The City claims that these four witnesses are necessary to show Mr. Fields's *actual guilt,* although such a defense does not rebut the fact that the criminal trial was terminated in Plaintiff's favor; more fundamentally, the City cannot invoke this "actual guilt defense" to somehow suggest that the abrogation of Nathson Fields' civil rights doesn't matter. The City also argues that the state *would have* gone forward with the 2009 trial, even if its prosecutors had known about the missing street file, and that somehow the testimony of these witnesses who, although apparently known by the prosecutor at the time of the second trial, were never called in that proceeding; indeed, their transcripts appear nowhere in the state's attorney's file as of July, 26, 2011 (Ex. A). According to the city, this somehow establishes that the missing street file is not material. This argument is nothing more than an improper after-the-fact attempt by parties in this lawsuit to buttress their defense, and should not be allowed under Federal Rules of Evidence 403. Finally, Plaintiff addresses below the City's argument that the testimony of these witnesses is probative to understand everything that the city defendant's knew at the time of the 2009 trial and that this testimony goes to rebut Plaintiff's IIED claim. These arguments are non-starters.

---

[2] Plaintiff did not include a claim for malicious prosecution for the 2009 trial in his proposed jury instructions.

What was in the mind of the defendants sometime after Fields wrongful convictions is not at issue and has no probative value in understanding the motivations behind defendants' actions. Defendants raise this defense despite the fact that none of the city defendants were involved in the decision to retry Mr. Fields, as that determination is the prerogative of the state, and the only defendant that was still employed by the CPD in 2009 was defendant Murphy who was employed in a civilian capacity. Of the named defendants, only Mr. O'Callaghan (who was retired from the police department at that time) testified at the second trial; there was absolutely no testimony by O'Callaghan regarding his knowledge of the four individuals that the defendants now claim are so crucial to somehow vindicating their behavior, and showing the jury that the plaintiff is really guilty of the murders. Defendants' clear objective is to parade some really bad gang members before the jury, in an attempt to have the jury equate those thugs with Mr. Fields. As shown below, their testimony is of little, if any, probative value, while being extremely prejudicial.

In essence the defendants are saying that these witnesses are crucial because they support the defendants' subjective belief that Fields is guilty -- despite the fact that this "evidence" was never presented at either of Mr. Fields criminal trials. In short, defendant police officers are attempting to impeach the judge's decision finding Mr. Fields not guilty, with extraneous evidence that was never utilized by the state despite being available to the assistant state's attorneys assigned to Fields's prosecution; evidence which, and as further show below, is inherently unreliable and prejudicial.

### A. PROCEDURAL ISSUES SURROUNDING MALICIOUS PROSECUTION

Defendants suggest, without supporting case law, that Fields can only sue on the entire malicious prosecution from 1985 through the finding of not guilty in 2009 or not at all. This

argument ignores the fact that what Fields is attempting to do is to withdraw that part of the claim alleging that the second trial was a malicious prosecution- Plaintiff is not attempting to wipe out the 2009 trial. In an attempt to superficially adorn their argument with something resembling legal backing, defendants cite the elements of malicious prosecution. Fields agrees that the elements are as shown in the case law cited by defendants (*Gonzalez v. City of Elgin* 578 F3d 526 (7th Cir. 2009)) and further asserts that he has met those elements, the elements being: a) the commencement of criminal proceedings by the defendants; b) termination of the proceeding in favor of the Plaintiff; c) the absence of probable cause for the proceedings; d) the presence of malice; and, e) damages.

The defendants' attempt to retroactively cloak their actions as having been founded on probable cause by utilizing the false testimony of cooperators who were turned into prosecution witnesses long after Nathson Fields' 1985 arrest and 1986 conviction. However, the law is clear that an officer only has probable cause to arrest a person if, at the time of the arrest, the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Defendants lacked probable cause when they arrested Fields and framed him for two double murders – the witnesses they "turned" subsequent to Fields's conviction were merely used to compound and perpetuate that injustice. As to the effect the narratives produced by cooperators had on the decision-making of prosecutors assigned to Mr. Fields' second trial, Fields has demonstrated that the Hickman-Smith file at the State's Attorney's Office contained no transcripts from their testimonies in the RICO trials; moreover these witnesses were never called by the state for the 2009 trial and the state's

attorney never stated anything to that effect in his affidavit. (Doc. 449.4 pg. 6-10) All defendants are proving is that they are still willing to fabricate evidence to support their defense in this case. As such, the probative value of their testimony with respect to the mindset of prosecutors is insufficiently probative to outweigh its prejudicial effect under Rule 403; therefore their testimony should be excluded.

Similarly, with respect to the malice element, City defendants contend that the later lies of cooperators somehow retroactively cures defendants' improper motivations in 1985 and 1986. Malice in Illinois is defined as the initiation of a prosecution for any reason other than to bring a party to justice. *Mack v. First Security Bank*, 158 Ill.App.3d 497, 501, 110 Ill.Dec. 537, 511 N.E.2d 714 (1987). By the time Davis, Clay, Kees, and Hunter had become cooperators, Nathson Fields had been convicted, and was sitting on death row; thus, under the standards of *Mack*, the testimony of these cooperators could not have been employed to bring Fields to justice, because the criminal justice system had already reached its final and terrible conclusion in his case.

Nothing requires Fields to allege that the 2009 trial was a part of the malicious prosecution -- but Fields does have to show that the termination was in his favor; an element which his 2009 acquittal satisfies. Defendants apparently think the testimony of the four witnesses rebuts Fields claim that the proceedings were terminated in a manner not indicative of innocence. (Res. Br. at 3) However, Plaintiff was found not guilty, and defendants attempt to undermine that finding by marching in people who did not testify in the underlying proceeding is not a proper defense to this prong of the claim of malicious prosecution. The Seventh Circuit has found a not-guilty finding to be sufficiently indicative of innocence for the purposes of a malicious prosecution claim, "an acquittal [being] clearly sufficient to show favorable

termination." *Logan v. Caterpillar*, Inc., 246 F.3d 912, 926 (7th Cir. 2001). This Court also rebuffed the City defendants contentions to the contrary in the pre-trial conference, observing: "you're not going to find a case that says that somebody who was acquitted and found not guilty, that there's the least doubt that he has met that element of malicious prosecution." (March 7, 2014 Pretrial Conf. Tr. 195).

Defendant did not cite and Counsel for Fields have been unable to find any case law that allows defendants to argue that the proposed witnesses can be utilized to establish probable cause retroactively when the witnesses were never utilized or relied upon in the criminal proceedings itself. What defendants are attempting to do is claim that somewhere, along the way, and literally years after Fields' arrest and conviction, probable cause was established based on secret evidence known to the prosecutors and defendants but withheld from the Judge, and Mr. Fields at his second trial. *Secret* probable cause has no place in our jurisprudence and defendant should not be allowed to confuse and mislead the jury on this point. In that same vein, and again because defendants have not articulated which element of malicious prosecution they think these witnesses are competent to testify, if they are attempting to utilize these witnesses to show that Fields cannot show malice, defendants have the same problem. Plaintiff's burden is to show that the initiation of a prosecution was motivated for reasons other than bringing a party to justice. These witnesses do not cure defendants' improper motivations in 1985 and 1986.

### B. FIELDS' DUE PROCESS CLAIM AND THE ISSUE OF GUILT VS. INNOCENCE

Plaintiff submits that given the fact that under our system of law there is a presumption of innocence unless proven guilty, that presumption rightfully applies to the Plaintiff as he was found not guilty of the murders of Hickman and Smith. The fact that the state of Illinois has raised an additional hurdle of "proving innocence" prior to getting a "certificate of innocence"

should not be utilized to take away the presumption of innocence that Mr. Fields enjoys based on the finding of not guilty at his 2009 trial.[3] As Justice Stewart once noted, "[no] principle is more firmly established in our system of criminal justice than the presumption of innocence that is accorded to the defendant in every criminal trial." *Kentucky v. Whorton*, 441 U.S. 786, 790 (1979) (Stewart, J., dissenting).

    Defendant police officers want to test Mr. Fields's not-guilty verdict by bringing in individuals who had no relationship with either of Fields's trials, and through these witnesses suggesting to the jury that the verdict finding Fields not guilty was wrong. This is not a defense to malicious prosecution as the trial was terminated in a manner that was favorable from Fields. It is also not a defense to due process violations. It is as though these police officers are saying "well, if *we* could have tried him *we* would have brought in these other people who would have shown probable cause and *we* would have had him proven guilty." Fortunately it is not the police who try cases. The police do not determine what evidence is to be utilized in a criminal trial (which is why they are required under the law to turn over all investigative documents to the state's attorneys) and their proclaimed subjective belief (coupled with witnesses that never testified) that Mr. Fields is guilty has no bearing on the ultimate issue -- which is that Fields was found not guilty. In short, the presumption of innocence found in the termination of Fields' criminal case should not be allowed to be rebutted by bringing forth evidence that was never produced at the commencement of the proceedings or at either of his criminal trials. The defendants should not now be allowed to second guess the prosecution and rely on evidence that prosecutors chose not to use, for whatever reason, in an effort to suggest to the jury that Mr. Fields is really guilty.

---

[3] *See,* Keith A. Findley, "*Defining Innocence*"(2010) 74 Alb. L. Rev.1157.

Fields believes that the testimony of these witnesses should not be allowed *whether or not* this Court allows Fields to withdraw that aspect of his malicious prosecution concerning the second trial. As shown below their testimony is not probative of the ultimate issue involving probable cause, does not prove guilt and is unduly prejudicial and confusing. Under our system of law there are legal standards that define guilt and, absent proof of guilt, innocence is presumed.[4] Defendants want to try Mr. Fields for yet a third time, with a trial within a trial, presenting new evidence under a lesser standard of proof. The attempts by the defendants to utilize this type of evidence would tend to mislead and confuse the jury and is not probative.

## C. THE TESTIMONY OF THE "WITNESSES"

Defendants provided in the response brief excerpts of the testimony they expected the four witnesses to testify to Fields' *guilt* in the Hickman Smith murders without any citation to testimony by those men. As a preliminary matter, Plaintiff requests that this Court not reconsider its ruling with respect to the inadmissibility of Alan Knox's plea agreement. The Seventh Circuit case cited by the City (*United States v. Volpendesto*, Nos. 11-3022, 12-1180, & 12-1656 (7th Cir. 2014)), involves a recording made by a government informant in which a defendant's co-conspirator, speaking against his own penal interests, explicitly implicates the defendant in a crime. By contrast, Alan Knox's plea agreement was entered into as a strategic decision on the part of Mr. Knox, based on his assessment of his own interests; his plea

---

[4] If the Plaintiff no longer enjoys the presumption of innocence because of his loss of the innocence petition this would also violate the very statute that provides for the innocence petition and would make the attempt to obtain the certificate an unfair form of relief if the effect of losing that petition results in the presumption of guilt. Perhaps that is the reason that the Illinois legislature made clear that the decision to grant or deny the petition has no res judicata effect on any other proceedings. (see, 735 ILCS 5/2-702 at j) *The decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings.* Plaintiff submits that to find otherwise would create two classes of innocents- -- those found not guilty who *did not* seek a certificate of innocence, and those found innocent. While leaving those who lost their innocence petitions in the nebulous land of not guilty but not innocent.

8

agreement mechanically reiterates a wide range of allegations contained in the indictment and should not be read as an incrimination of Nathson Fields. Plaintiff also asks this Court to not allow the defendants to bring forth the testimony of Tramell Davis, Jackie Clay, Eugene Hunter and Derrick Kees as none of these men testified in either criminal trial, none can provide any relevant testimony much less testimony capable of establishing Fields's guilt -- not only because these men did not provide any information to law enforcement implicating Fields until well after Fields's 1986 conviction, when each of these witnesses began cooperating in the federal El Rukn trials and had a motive to fabricate evidence against Fields and others, but also because the testimony is inconclusive, contradictory and extremely prejudicial. The testimony that these individuals offer is substantially made up of hearsay, speculation and improper conjecture, and the limited personal knowledge should be barred under Federal Rule of Evidence 403. Below are summaries of testimony of the four witnesses as they relate to the Hickman Smith murders.

    a.  **Trammel Davis**

The testimony offered by Mr. Davis in relation to the Hickman Smith murders calls for hearsay and speculation. Davis, who was potentially facing 200 years in prison given the charges he was facing pleaded guilty to three counts, for which he could have received 35 years – he untimely received two years in prison and five years' probation. (Ex. B, p. 236.) In return for his testimony that defendants seek to use, the state's attorney paid several months of past due rent for him including helping him get out of an eviction case. (Ex. B, pp. 157-158, 241) Mr. Davis testified that he was at the El Rukn headquarters (the "Fort") the day prior to the murders of Hickman and Smith and that Melvin Mays, Nathson Fields, George Carter and Hank Andrews were also at the "Fort." Davis testified that he heard Jeff Fort over a speaker phone give the "green light" to kill Jerome "Fuddy" Smith the day prior to the murders. (Exhibit B, pp. 174-75)

9

Davis said that Fort was speaking in code and when confronted at his deposition with prior testimony admitting he did not learn the code until 1985 Davis testified that he "would have said anything back then." (Exhibit B, p. 175) Davis also testified that the conversation between Jeff Fort and Melvin Mays took place, not at the El Rukn headquarters but in Melvin Mays car and the Melvin Mays apparently had a car phone back in 1984 and that Mr. Mays spoke on the telephone (in the car) with Jeff Fort about the plan to kill Jerome Smith, and that when the conversation was over, Mr. Mays explained to Davis the plan to kill Mr. Smith (Exhibit B, pp 30-33). Davis further testified that the only other information he knew about the Hickman and Smith murders was what he learned from listening to the wiretap tapes. (Exhibit B, pp 176-180, 206-210). The testimony from Mr. Davis is composed of hearsay and speculation. Under Rule 403 analysis, his testimony is more prejudicial than probative and should be barred. The fact that Plaintiff can impeach Mr. Davis regarding his testimony will not cure the prejudice and confusion caused by his testimony. His testimony should not be allowed.

    **b. Jackie Clay**

Jackie Clay initially received a sentence of 80 years to life for the crimes he was involved in. For his cooperation Clay received a reduction in sentence first to 22 years, and then to 14. The testimony offered by Jackie Clay in relation to the Hickman and Smith murders is that approximately one half hour after the shooting of Smith and Hickman took place, he was at the El Rukn headquarters ("Fort") with Alan Knox, and Alan Knox told him that Hank Andrews, George Carter, Fields, and Hawkins "took care of that." (Exhibit C, pp. 16-17.) Later on that same day, Clay stated that he spoke with Earl Hawkins who was at a building called the "Alahambra" and that Fields was standing next to Hawkins. Clay claims he asked Hawkins "did ya'll take care of business. Earl said yeah, I had to take my man to school on this; he did a real

10

good job". Clay testified that Hawkins put his arm around Fields after making that remark. (Exhibit C, pp. 18-19). In notes from interviews between Clay and the three named defendants after Clay started cooperating (April 3, 1989) Clay stated that the conversation between Hawkins and himself took place *the day after the shooting* and was at the "Fort" (not the Alahambra building) (Ex. D) Clay testified at his deposition that the defendants' notes were in error. (Exhibit C, pp. 37-40) There was no indication from Clay's testimony that even if this conversation took place as Clay testified and even if Clay and Hawkins were referring to the murders of Hickman and Smith that Fields would have any indication what the conversation was about. Clay did not testify that Fields said anything. Clay also testified that the feud in 1984 between Fuddy Smith's gang (the goon squad) and the El Rukn's stemmed, in part from a shooting of El Rukn Joe Mannie. (Exhibit C., pp 11-13) Clay said that Jeff Fort ordered the killing of Fuddy (over the speaker phone) a week or two prior to the killing at a general meeting. (Exhibit C, pp. 13-16) However, in Clay's testimony in another trial Clay testified that he shot a goon squad member in 1981 or 1982 named Bruce Davis after Davis shot Joe Mannie. (Exhibit C. pp. 42-50) The testimony offered by Clay is at best inconsistent and confused, hearsay, calls for speculation insofar as it calls for what Clay *thought* Hawkins meant, and is more prejudicial than probative.

    c. **Eugene Hunter**

Hunter testified at his deposition that he didn't know if Fields was involved in the Hickman and Smith murders and that he had no independent recollection of the events surrounding the murders of Hickman and Smith. Hunter also testified that he didn't know that the murder was a double murder. (Exhibit E, pp. 154-156.) Hunter stated that he was at the apartment of Charles Green on an occasion when Hawkins and Fields were also at the apartment,

11

and that Charles Green handed one of them (he didn't know which one) masks and gun. Hunter said he did not know when the incident occurred or whether not it was on the same day the Hickman and Smith murders took place (Exhibit E, pp. 105-106) Hunter testified that he had no knowledge of Fields killing anyone and no one ever told him that Fields killed anyone. (Exhibit E, pp. 155-56). Hunter also testified that he never spoke with Hawkins or Anthony Sumner about the Hickman Smith murders and that if Hawkins sent him off to look for a gun that he discarded he has no idea if that was in relation to the Hickman and Smith murders. (Ex. E pp. 159-60)

The testimony offered by Mr. Hunter is not probative of anything related to this case and is more prejudicial than probative.

### d. Derrick Kees

In exchange for testifying against Fields last summer, Kees received five years off of his state sentence, putting an end to his state time (commencing his federal time). Exhibit F, pp. 28-29. Kees testified at his deposition that Fields approached him in the summer of 1983 to see if he could join the "hit squad." (Exhibit F, 13-19) Fields was still in prison during the summer of 1983. Kees went on to testify that Fields was living at that time in the African Hut and the conversation took place about a week or so after Fields got out of prison. However, Fields never lived in the African Hut and when he was released from prison he lived at his mother's home for a few months. (Exhibit G, pp. 18-19) Kees testified that the dispute with the Jerome "Fuddy" Smith and the goon squad was in relation to the fact that Jerome Smith was "taking action" against younger members of the El Rukns – this was after Smith had interfered with El Rukn drug operations. According to Kees the El Rukns had no problem with Fuddy's gang selling drugs – but they had a problem with interference with their own drug sales. Kee's also testified that Jerome "Fuddy" Smith was putting his hand on younger members of the El Rukns, including

12-year-olds, (Exhibit F, pp. 89-90). According to Kees about a week or 10 days prior to the Hickman and Smith murder Jeff Fort gave the order to kill Smith and that Kees was on the original hit team along with Anthony Sumner, Earl Hawkins and Harry Evans. Kees testified that they were going to murder Smith two days prior to the real hit but that the hit was called off because Kees got out of the car "to take a water break" which spooked the other men and the hit was called off. (Exhibit F, p. 90-92) That testimony contradicts the testimony of both Sumner and Hawkins. Sumner testified before the grand jury in 1989 that he, Derrick Kees, Earl Hawkins and *Rodell Banks*, went out to do the hit one or two days prior to the actual murders of Hickman and Smith. That they watched for Smith for about an hour but never saw Smith come out the building and then the police came and raided the place. (Exhibit H, p. 28-31.) As stated above, Kees testified that the fourth person involved in the attempted hit was Harry Evans. Kees also testified that he had no knowledge of Rodell Banks playing any role in the Hickman Smith murder (Exhibit F, p. 128). Hawkins testified that he never went looking for Smith prior to the day of the killings and he had no knowledge of Sumner being involved in watching for Smith (Exhibit I. 45-49) Hawkins also testified that Carter and Andrews were brought down to the city a couple of days in advance to be ready for the hit on Smith which also contradicts Kees testimony that this other team (including Hawkins) was on the scene and prepared to do the hit a day or two prior. (Exhibit F, pp. 42-43; 51-52) Kees testified the successful hit took place a day or two after the stalking by Evans, Sumner, Hawkins and himself but again that contradicts both Hawkins who said such a stalking never took place, and Sumner who had a different team member . (Ex. H. p. 28-31) According to Kees he ran into Earl Hawkins, Nathson Fields, George Carter, and Hank Andrews, the day after the shooting at the Alhambra building and that Charles Green was also there. Kees testified that all of the men confessed to him about the murders in

13

great detail and that Fields said "it was a good exercise." (Exhibit F, pp. 91-93). As stated above with respect to other witnesses, the proposed testimony of Kees is full of contradictions, and is more prejudicial than probative.

### D. THE TESTIMONY OF THE ABOVE-REFERENCED COOPERATORS DOES NOT SUPPORT THE TESTIMONY OF SUMNER, NOR IS IT RELEVANT OR ADMISSIBLE AS TO ANY OF THE CLAIMS

Defendants want to continue to use fabricated evidence to have Fields determined to be guilty. The above is what would go in front of a jury if defendants were allowed to put on evidence to prove that Fields was in fact guilty. With the exception of the testimony of Anthony Sumner and Earl Hawkins, none of the proposed testimony is relevant or of consequence as to whether exculpatory or impeachment evidence was concealed, whether evidence implicating Fields was fabricated, or whether there was probable cause to arrest and charge Fields. In addition, this testimony would be highly prejudicial to Fields and would only serve to confuse the issues in this case, and should be barred under Federal Rules of Evidence 401, 402, and 403.

Plaintiff's claims are that exculpatory or impeachment evidence was concealed or evidence was fabricated, and that probable cause to charge him was lacking. That is, that the first trial was a malicious prosecution, commenced without probable cause. Plaintiff seeks to amend his complaint to clarify that he is not claiming that the 2009 trial was malicious. The 2009 trial is of course relevant and necessary to show the "termination in a manner indicative of innocence" when Mr. Fields was acquitted.

It is undisputed that by the time of the 2009 retrial, all of the parties knew that Anthony Sumner's prior statements and testimony regarding Mr. Fields's alleged involvement in the Vaughn and White murders was false. Fields' Complaint does not include any claim relating to

the offered testimony of Derrick Kees, Trammell Davis, Jackie Clay, or Eugene Hunter because it was never an issue at Fields's criminal proceedings.

At the 2009 trial, Defendant O'Callaghan testified consistent with his testimony at Fields's first trial in 1986. Neither O'Callaghan nor any other witness at Fields's 2009 trial testified about the allegations from Kees, Davis, Clay, or Hunter. Furthermore, Fields was not involved in the federal El Rukn prosecution where these purported statements came to light, and so he never had an opportunity to challenge the testimony.

In short, the testimony of Kees, Davis, Clay, and Hunter was never relied upon in any way in the criminal proceedings against Fields. Nevertheless, the defendants assert that they expect "the prosecutor [in the second trial] [to] testify he was aware of the statements made by Clay, Hunter, and Kees, (as well as Harry Evans' statements and Alan Knox's plea) that implicated plaintiff in the Smith/Hickman murders." (Def. City R., p. 2). This assertion was not included in the prosecutor's previously tendered affidavit (Docket #449-4, pp. 7-10), and there is nothing in the inventory of the State's Attorney's file to support this new position that the defendants had some additional information to justify Fields's continued prosecution. The defendants ask this Court to now allow them to inject this *fabricated* testimony in to the civil proceeding at bar as an attempt to "cure" the malicious prosecution from the first trial.

### CONCLUSION

Fields ask this Court to allow him to amend the complaint as stated herein and to bar the four witnesses from testifying at this trial.

Respectfully Submitted,

/s/H. Candace Gorman

## CERTIFICATE OF SERVICE

      I, H. Candace Gorman, hereby certify that the foregoing Reply was served to the parties by the Court's Electronic Filing System.

Dated: April 5, 2014

                                            Respectfully Submitted,

                                            /s/H. Candace Gorman
                                            One of the Attorneys for Fields

For Fields:

| | |
|---|---|
| Leonard C. Goodman | H. Candace Gorman |
| Melissa Matuzak | 220 S. Halsted |
| 53 W. Jackson Boulevard | Suite 200 |
| Suite 1650 | Chicago Illinois 60661 |
| Chicago, Illinois 60604 | 312-427-2313 |
| 312-986-1984 | |