# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLLINOIS
# EASTERN DIVISION

| NATHSON FIELDS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 10 C 1168 |
|  | ) |  |
| CITY OF CHICAGO, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## ORDER ON PLAINTIFF'S "NOTICE OF CLAIM REMOVAL"

MATTHEW F. KENNELLY, District Judge:

Plaintiff Nathson Fields was prosecuted for murder in connection with the shooting of Jerome Smith and Talman Hickman in 1984. In 1986, Fields was convicted after a bench trial before Judge Thomas Maloney, and he was sentenced to death after a penalty-phase trial before a jury. The conviction and sentence were affirmed on appeal in 1990. *See People v. Fields*, 135 Ill. 2d 18, 552 N.E.2d 791 (1990). Fields thereafter filed a state post-conviction petition. Among the grounds he cited was that Judge Maloney had been bribed before the trial, had returned the bribe money, and had convicted Fields and his co-defendant Hawkins to deflect suspicion. In 1996, a Cook County judge vacated Fields's conviction on the ground that his due process rights had been violated due to the bribery episode. The Illinois Supreme Court upheld that ruling in 1998. *See People v. Hawkins*, 181 Ill. 2d 41, 690 N.E.2d 999 (1998). The prosecution continued to pursue the case, the retrial of which was delayed for an extended period, partly due to interlocutory appeals following the remand for a new trial.

In 2009, Fields was acquitted after a second bench trial, held before Judge Deborah Dooling.

In the present case, filed in 2010, Fields asserts claims against three former and present Chicago police officers, the City of Chicago, and a former Cook County prosecutor under 42 U.S.C. § 1983 for violation of due process and conspiracy to violate his due process rights and under state law for malicious prosecution and intentional infliction of emotional distress. Trial before a jury began on March 10, 2014. The Court declared a mistrial on March 18, 2014 and then set the case for retrial on April 7, 2014.

Fields thereafter filed a document entitled "Notice of Claim Removal" in which he said he was "modif[ying] his claim for malicious prosecution," by "withdraw[ing] his claim for malicious prosecution for the 2009 trial." Pl.'s Notice of Claim Removal (dkt. no. 610) at 1. Fields went on to state in this filing that as a result of the modification, the testimony of defense witnesses Trammel Davis, Jackie Clay, Eugene Hunter, and Derrick Keys should not be allowed at the retrial, because it concerns, at most, the 2009 retrial. The latter request echoed a request to exclude that same testimony in a motion *in limine* that Fields had filed during the first trial (his motion *in limine* 11).

Following receipt of Fields's notice, the Court entered an order stating that it did not believe Fields was entitled under Federal Rule of Civil Procedure 41(a) to unilaterally withdraw a claim at this stage of the case. The Court proposed to address this at the pretrial conference held on April 3, 2014, but the City of Chicago defendants asked to file a written response, so the Court deferred ruling. In their response, the Chicago defendants argue that Fields cannot withdraw what they contend is just part of

a single claim of malicious prosecution and that in any event, the withdrawal of the supposed "claim" relating to the 2009 trial would not affect the admissibility of the testimony of Davis, Clay, Hunter, and Keys. Fields has filed a reply to the response. The Court has considered all of these submissions.

**1.    Fields's request to withdraw a claim**

The first question is whether Fields can do what he says he wants to do, namely "withdraw his claim for malicious prosecution for the 2009 trial." The problem is that there is no such "claim." Fields has not asserted two separate malicious prosecution claims. Rather, he has asserted a single malicious prosecution claim, challenging his prosecution for murder in state court. There was a single prosecution of him for murder, albeit one that ultimately involved two trials. There were not two separate criminal cases.

Fields cannot logically split his malicious prosecution claim in two based on the fact that there were two trials, even though the second was held long after the first. The vacating of his 1986 conviction did not terminate the criminal proceedings. Rather, it put the proceedings back where they had been before the first trial. The criminal prosecution continued after that. The continued proceedings were part of the original case, not a separate case. It is worth noting that were one to treat the murder case as two separate cases, one tried in 1986 and the other tried in 2009, Fields would not be able to prevail on his malicious prosecution claim, because the first "case" did not end in his favor in the way required to prevail on a claim of malicious prosecution. Rather, Fields was still at jeopardy of conviction for the same murders for which he was first tried in 1986.

Fields addresses this point in a way that effectively undermines his own argument that he can split the malicious prosecution claim in two. He argues on the one hand that in pursuing a malicious prosecution case just based on the original conviction in 1986, he should be permitted to put in evidence of his 2009 acquittal in order to satisfy the favorable termination requirement. On the other hand, he argues that additional evidence, not available in 1986, that is claimed to have supported his ongoing prosecution after the post-conviction reversal is irrelevant, because it was not available at the time of his 1986 conviction. In other words, Fields essentially is trying to have it both ways. He is not entitled to do so. Either the entire criminal case was a single proceeding, in which case Fields cannot cut it off at a point he finds favorable from an evidentiary standpoint, or it was two separate proceedings, in which case his malicious prosecution claim as to the first of the two proceedings would fail because that proceeding did not result in a favorable termination (rather, it resulted only in an order for a new trial).

The Court concludes that there was just one criminal proceeding, which did not terminate until Fields was acquitted in 2009. It is worth noting in this regard that a malicious prosecution claim does not even accrue until the underlying proceeding is terminated in the favor of the malicious prosecution plaintiff. *See, e.g., Ferguson v. City of Chicago*, 213 Ill. 2d 94, 99, 820 N.E.2d 455, 459 (2004). In short, Fields did not even have a viable malicious prosecution claim until he was acquitted in 2009.

In his reply, Fields cites a case saying that probable cause to arrest exists only if, at the time of the arrest, the matters known to the officer are sufficient to warrant a reasonable person to believe that the suspect had committed, was committing, or is

4

about to commit an offense. *See* Fields Reply at 4. That is true, but it is beside the point. Malicious prosecution and false arrest are two different types of claims. A claim of false arrest is focused on the arrest and thus necessarily is determined based on what is known at that time. Malicious prosecution, by contrast, concerns whether there is probable cause to support the prosecution, and not necessarily just at the outset. The law is clear that the tort of malicious prosecution concerns not only the commencement of criminal proceedings but also the continuation of such proceedings. *See, e.g., Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996) (reciting elements of malicious prosecution)

For these reasons, the Court concludes that Fields cannot modify his claim in the way he proposes.

## 2. Admission of testimony by Davis, Clay, Hunter, and Kees

The Court will, however, go on to address the remaining points raised by Fields and the Chicago defendants, concerning the admissibility of the testimony of Davis, Clay, Hunter, and Kees. As noted earlier, this request echoes a motion *in limine* that Fields filed during the first trial. Thus the request touches upon issues that will come up in the trial one way or the other. Indeed, had the first trial continued beyond March 18, the Court would have had to rule upon the motion *in limine* within the next day or two. Thus the issues are not hypothetical or "advisory," as the Chicago defendants contended at the pretrial conference.

The Chicago defendants contend that the testimony of Davis, Clay, Hunter, and Kees is properly admissible for various purposes. By way of background, the testimony of these witnesses bears on Fields's claimed involvement in the Smith/Hickman

murders. The Chicago defendants make several arguments regarding the admissibility of these witnesses' testimony:

- The testimony is admissible to rebut Fields's contention and testimony that he did not commit the murders and was framed by the defendants.

- The testimony is admissible on Fields's federal due process claim, because it bears on whether the evidence Fields contends was not disclosed is material, in the sense of whether it would have made a difference in the decision by prosecutors to pursue a retrial in 2009.

- The testimony is admissible because it corroborates Anthony Sumner and thus rebuts Fields's contention that the defendants knew or should have known Sumner was lying when he implicated Fields.

- The testimony is admissible to rebut Fields's contention, pertinent to his claim of intentional infliction of emotional distress (IIED), that the defendants' conduct was extreme and outrageous.

- Defendants also challenge Fields's assertion that the testimony of Davis, Clay, Hunter, and Kees should be excluded because it is based on hearsay, speculation, and conjecture and that it should be barred under Federal Rule of Evidence 403 in any event.

The Court will address each of these points, but in a different sequence.

*a. Due process claim relating to 2009 trial.* Fields has asserted a due process / *Brady*-type claim relating to the 2009 trial. The Court denied the Chicago defendants' motion for summary judgment on this claim, a motion in which they argued that Fields could not assert a due process claim relating to the 2009 trial because he was

6

acquitted. The Court suggested in its decision that Fields could prevail if he could prove that "'the decision to go to trial would have been altered by the desired disclosure.'" *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *6 (N.D. Ill. Feb. 6, 2014) (quoting *Carvajal v. Dominguez*, 542 F.3d 561, 569 (7th Cir. 2008)).

Given this basis for the claim, evidence bearing on whether the prosecution's decision to take Fields's criminal case to retrial would have been altered by the disclosure of the evidence he says was concealed or fabricated is relevant. Such evidence would be relevant even were it appropriate for Fields to subdivide his malicious prosecution claim as he proposed.

It is important to be clear, however, regarding what this means and what it does not mean. The testimony that is relevant on this point is that of the Cook County prosecutor(s) who made the decision to go to trial concerning what they relied on in that regard and whether the allegedly undisclosed or concealed evidence would have made a difference in their decision. This theory of relevance would not warrant admission of testimony at the present trial by Davis, Clay, Hunter or Kees themselves regarding Fields's involvement in the Smith/Hickman murders.[1] What those witnesses might say today has no bearing on the theory of relevance argued by the City defendants, namely the effect on the decision to go to retrial of what prosecutors knew about these witnesses' statements at the time. This theory of relevance also would not warrant admission of testimony from any of the City of Chicago defendants regarding what

---

[1] Nor, to be clear, does it warrant testimony by those persons regarding Fields's purported involvement in or awareness of the bribery of Judge Maloney. Fields's malicious prosecution claim concerns his prosecution for murder. He was not prosecuted for bribery. Thus the testimony is not relevant for this purpose argued by the City defendants.

7

Davis, Clay, Hunter, and Kees had said, unless there is a claim by Fields that a particular defendant influenced the decision to go to retrial. The same would be true of defendant Wharrie.

In addition, although the Court has found that testimony along these lines by prosecutors passes the relevance test, that does not mean it is automatically admissible. Federal Rule of Evidence 403 still applies. Indeed, Fields also seeks to exclude the evidence under Rule 403, saying in substance that the claim that prosecutors actually relied on the statements of Davis, Clay, Hunter, and Kees in deciding whether to pursue the case cannot withstand scrutiny and thus the evidence has little or no probative value. Fields points out that the prosecutors did not call any of these witnesses to testify at his retrial and that the witness's statements or testimony are nowhere to be found in the prosecutors' case files.

The fact that documentation is lacking, by itself, does not carry the day for Fields; there is no rule of evidence that requires documentary corroboration as a prerequisite to admissibility of evidence of this sort. Nor is the fact that the prosecutors did not call the witnesses to testify at the retrial a determinative factor by itself; as the Chicago defendants argue, the prosecutors could have made a strategic decision not to use these witnesses at trial even though they were aware of the witnesses' statements and had considered them in deciding to press ahead.

Closer to the mark for Fields, however, are previous statements and court filings by Brian Sexton, the lead prosecutor for the retrial. Sexton submitted an affidavit in the present case, in support of defendants' motion for summary judgment on Fields's due process and other claims. In that affidavit, he described why the disclosure of materials

8

in the "street file" that Fields's criminal defense attorneys evidently did not receive would not have made a difference in the prosecution's decision to proceed to retrial. In his affidavit, Sexton made no mention of the statements of Davis, Clay, Hunter, or Kees as a factor, though he did identify other factors. In addition, Sexton attached to his affidavit a memorandum that the prosecution had filed in Fields's certificate of innocence proceeding addressing essentially the same materiality argument in even greater detail. That memorandum likewise made no mention of the statements of Davis, Clay, Hunter, or Kees as having been considered. Finally, there is no indication that Cook County prosecutors interviewed any of those witnesses in the run-up to Fields's retrial.

The Court does not know whether Sexton had his deposition taken in the present case and, if so, whether he gave testimony about what he did or did not consider in deciding to take the case against Fields to retrial. Any deposition testimony about this topic by Sexton or other prosecutors from the 2009 trial could influence the Court's judgment regarding the Rule 403 balance. Based on the record currently before the Court, however, any reasonable judge would have to come away with a high degree f skepticism about testimony offered now, in the face of these prior statements, that Cook County prosecutors *actually* took the statements of Davis, Clay, Hunter, or Kees into account in deciding whether to retry the case. Though no one of the individual factors cited by Fields precludes admissibility on its own, collectively they greatly minimize the probative value of present-day testimony that prosecutors relied on these witnesses' statements or that they did so to any significant extent.[2]

---

[2] The Court also notes that were this testimony to pass muster under Rule 403, defendants would, of course, be required to lay a foundation for the Cook County prosecutors' knowledge of the statements of these witnesses. The Court's impression

9

The Court will withhold a final determination on the Rule 403 issue vis-à-vis the Cook County prosecutors' testimony, while awaiting discussion of whether Sexton or other prosecutors involved in the 2009 trial had their depositions taken in the present case and what, if anything, they said in those depositions about relying on the statements of Davis, Clay, Hunter, or Kees. But on the present record, such testimony would have very little probative value, if it has any at all.

*b. Corroboration of Anthony Sumner.* The argument that the four witnesses' testimony corroborates that of Anthony Sumner does not support admission of the four witnesses' testimony. Defendants argue that the testimony would rebut Fields's assertion that "the defendants knew or should have known that Anthony Sumner was lying when he implicated plaintiff in the Smith/Hickman murders." Chicago Defs.' Resp. to Pl.'s Notice of Claim Removal at 8. But Sumner's statements in that regard took place in the mid-1980s; he was not involved in the retrial. What is relevant regarding the Chicago defendants' state of mind as to Sumner's veracity is what was on the table at the time, not evidence that surfaced a number of years later.

*c. IIED claim.* A plaintiff asserting an IIED claim must prove, among other things, that the defendant's conduct was extreme and outrageous. The Chicago defendants characterize Fields's IIED claim as premised on the contention that he was innocent of the murders and the defendants framed him. They argue that the testimony

---

from other disputed matters in the present case is that Davis, Clay, Hunter, and Kees gave their statements to authorities as part of the federal El Rukn investigation, which some or all of the City defendants evidently participated in via their work on a federal task force. The Court has no idea when and how the witnesses' statements were made known to local prosecutors. To the extent the statements were obtained as part of federal grand jury proceedings, an order pursuant to Federal Rule of Criminal Procedure 6(e) likely would have been required to disclose the statements to local prosecutors.

10

of Davis, Clay, Hunter, and Kees rebuts this. This argument is indistinguishable from defendant's argument that the testimony is admissible to rebut Fields's testimony and his attorneys' argument that he was innocent and framed. The Court will deal with that point below.

The Chicago defendants also argue, with regard to the IIED claim, that because they learned of the statements by these witnesses prior to the 2009 trial, the witnesses' statements are admissible as evidence that defendants did not intend to inflict severe emotional distress on Fields but instead "intended to bring him to justice for the crimes he committed." Chicago Defs.' Resp. to Pl.'s Notice of Claim Removal at 9. The Court is unclear regarding the extent to which Fields's IIED claim is premised upon conduct by the Chicago defendants that they are claimed to have engaged in after learning of the testimony of Davis, Clay, Hunter, and Kees. If the claim is not premised upon such conduct, then the evidence is irrelevant for this purpose. If the claim is premised upon conduct by the Chicago defendants after they became aware of the testimony of these witnesses, then what would be relevant to their state of mind is what they learned at the relevant time regarding Fields's involvement in the murders. This would warrant allowing the Chicago defendants to testify about that point, but it would not warrant the admission of testimony by Davis, Clay, Hunter, and Kees themselves. As discussed earlier with regard to the due process claim, what is claimed to be relevant in this regard is what the Chicago defendants were aware of at the relevant time, not what the witnesses say now.

*d. Rebutting Fields's claim of innocence.* Fields's attorney emphasized in opening statement, and elicited from Fields during his testimony on direct examination,

11

that he was innocent and had no involvement in the Smith/Hickman murders. There is certainly nothing inappropriate about that. But if Fields is going to claim he is innocent, then he cannot expect the Court to preclude defendants from rebutting that by offering evidence of his involvement in the crime. Again, this would be true even if the Court were to permit Fields to subdivide his malicious prosecution claim as he proposed.

Fields argues that the testimony of Davis, Clay, Hunter, and Kees should not be admitted because, among other things, it was not offered against him at the 1999 retrial. That may affect the weight to be given the testimony, and the failure to offer this testimony against him in 1999 may permit Fields to argue that it should not be believed, but it does not render the testimony irrelevant or inadmissible. The same is true regarding Fields's argument that the testimony is not believable because it has been given as a result of guilty plea deals and sentence reductions. This may affect the weight to be given the testimony, but it does not render it inadmissible.

Rule 403, of course, applies to this evidence as it does to other evidence. But the testimony, or at least some of it, has a reasonably significant amount of probative value to rebut Fields's claim of innocence. Fields has not shown on a blanket basis that the probative value of evidence along these lines is, in the terms of Rule 403, significantly outweighed by the danger for unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, that might result from admission of such evidence.

e. *Particulars of testimony by Davis, Clay, Hunter and Kees.* The Court next addresses which aspects of the testimony of Davis, Clay, Hunter and Kees are admissible and which are not.

12

*Davis.* Davis may testify regarding a meeting he evidently says happened at the El Rukn "Fort" the day before the Smith/Hickman murders at which he contends Fields was present, during which he says that Jeff Fort, who was participating via speaker phone, ordered the murder of Smith in coded language. This is probative of the background and motive for the murders. If the Court is operating under a misconception regarding where and when Davis says this conversation took place, the parties should promptly advise the Court, orally, at the next session of the trial.

Davis may not testify regarding a conversation between Fort and Melvin Mayes that evidently is claimed to have taken place by telephone from Mayes's car, followed by statements by Mayes to Davis regarding what Fort the plan to kill Smith. This is second-level hearsay whose admissibility has not been established by defendants. Davis's testimony that Andrews said that his car had to be painted, as described in defendants' submission, is likewise inadmissible hearsay.

Finally, Davis may testify that he obtained $10,000 from the basement of the El Rukn "Fort" and gave it to Alan Knox and then observed Knox give it to William Swano. That is probative of the bribery of Judge Maloney, which is relevant for reasons described in previous rulings. Defendants say that they wish to elicit from Davis that he understood this was "for the bribe to acquit Fields, Hawkins, and Carter," but they have not shown a proper basis for admissibility of that testimony, so the Court excludes it.

*Clay.* Clay may testify regarding the background for the Smith/Hickman murders, as described in the first five and one-half lines of the first full paragraph of page 13 of the Chicago defendants' response to Fields's submission. This testimony is relevant because it bears upon the motive for the murders.

13

Clay may not testify about what he says Alan Knox told him after the murders about who committed them and how. That testimony is inadmissible hearsay not subject to any exception established by defendants. The Court reaffirms its earlier ruling regarding the inadmissibility of a statement regarding the murders contained in Alan Knox's federal plea agreement. In addition to the Court's previous comments on this point, Knox's statement in the plea agreement about the background of and motive for the murders is unduly cumulative of live testimony to be offered by others, and his statement regarding who committed the murders is not just hearsay, it is hearsay-within-hearsay whose admissibility has not been established by defendants.

Clay may testify regarding an encounter that he says he had with Hawkins and Fields on the day of the murders. Clay says he asked Hawkins if he had "take[n] care of business" and that Hawkins replied yes, and that he "had to take my man to school on this" and "he did a real good job," and then put his arm around Fields. This testimony, regarding an event that Clay says took place in Fields's presence, is probative of Fields's guilt, and it is not hearsay. In Fields's reply, he makes several points regarding the timing of his encounter and exactly what it involved. Those are appropriate points for cross-examination or presentation of contrary evidence, but they are not a basis to exclude Clay's testimony. The Court wishes to make clear, however, that although Clay may relate these incidents, he may not provide his interpretation of what Hawkins was referring to, because his opinion or conclusion in this regard is not properly admissible.

*Kees.* The Court believes it previously, before or during the first trial, made a ruling regarding the admissibility of Kees's testimony that in 1983, Fields approached him and asked if he could join an El Rukn "hit squad." Neither side has indicated one

14

way or the other whether or how the Court ruled on this, and given the unusually high volume of contested evidentiary rulings made in this case, the Court simply does not recall. If the Court has ruled on this point, the ruling stands; if the Court has not ruled, defendants should promptly advise the Court, orally, at the next session of the trial and should be prepared to identify where in the transcript the ruling appears.

Kees may testify regarding the background for the Smith/Hickman murders as described in the first six and one-half lines of the last paragraph of page 11 of the Chicago defendants' response to Fields's submission (and the corresponding events described in Fields's submission). This testimony is relevant because it bears upon the motive for the murders.

Kees may not testify regarding what he heard the next day about who had committed the murders or why certain persons, including Fields, were chosen for the assignment. That testimony is hearsay, and possibly second or third-level hearsay, not subject to any exception established by defendants.

Kees may, however, testify regarding an encounter that he says he had with Hawkins, Fields, Carter, Andrews, and Green on the day after the Smith/Hickman murders. He says that, in Fields's presence, Hawkins said they had killed Smith and described how the murders occurred, and that Fields said words to the effect that "we got him" and "it was good exercise." Fields's arguments against the admissibility of this testimony may affect the weight to be given to it, but they do not affect its admissibility.

Finally, the Court reemphasizes a point it has made earlier: Kees may not testify regarding what he contends Alan Knox told him about bribery of Judge Maloney. The

15

testimony is inadmissible hearsay not subject to any exception established by defendants.

*Hunter.*  According to defendants, Hunter has testified that on the day of the Smith/Hickman murders, he was at Charles Green's apartment and saw Green give Earl Hawkins (Fields's co-defendant) and Fields ski masks and firearms.  According to Fields, however, Hunter stated that he does not know when this incident occurred or whether it was on the same day as the Smith/Hickman murders.  Hunter's testimony regarding the ski masks and guns is admissible only if the appropriate foundation is laid connecting it with the Smith/Hickman murders.  Given the highly prejudicial nature of this testimony, defendants will be required to make an appropriate offer of proof outside the jury's presence to lay the foundation before the Court permits Hunter to testify before the jury on this point.

Defendants also contend that Hunter will testify that during the same encounter at Green's apartment, George Carter and Henry Andrews were present, along with Andrews's blue Cadillac, and that the next time Hunter saw the Cadillac, it had been painted white.  The admissibility of this testimony is subject to the same foundational requirement just stated.

The Court excludes testimony by Hunter regarding a conversation that, according to defendants, he says he had with Hawkins after the murders in which Hawkins asked him to look for a gun.  This is not probative of Fields's guilt or innocence, the only subject on which the testimony conceivably would be admissible.

The remaining testimony by Hunter summarized by defendants at the bottom of page 12 of their response to Fields's submission, regarding statements by Rodell

Banks, may bear on the motive for the murders, but it is unduly cumulative of testimony offered by others on this point. The Court rules this testimony inadmissible under Rule 403.

## Conclusion

In summary, the Court overrules Fields's request to carve the 2009 retrial out of his malicious prosecution claim and makes the further rulings described in the text of this opinion regarding the admissibility of the testimony of and about Trammel Davis, Jackie Clay, Derrick Kees, and Eugene Hunter.

                                                  MATTHEW F. KENNELLY
                                               United States District Judge

Date: April 8, 2014