# EXHIBIT A

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATHSON E. FIELDS, )
)
Plaintiff, )
)
vs. ) No. 10 CV 1168
)
CITY OF CHICAGO; COUNTY OF COOK, ) Hon. Matthew F.
RICHARD J. DALEY; Former Assistant ) Kennelly
State's Attorneys: LARRY WHARRIE )
and DAVID KELLEY; Former and )
Current Chicago Police Officers: )
DAVID O'CALLAGHAN, THOMAS )
RICHARDSON, STEPHEN CASTO, )
JAMES MINOGUE, JOSEPH BOGDALEK, )
JOSEPH MURPHY, STEPHEN HOOD, )
JAMES DELANEY, ROBERT EVANS, )
DANIEL BRANNIGAN, JOHN ROBERTSON, ) Jury Trial
RICH KOBEL, and RICHARD KOLOVITZ, ) Demanded
)
Defendants. )

The deposition of DAVID J. KELLEY, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 53 West Jackson Boulevard, Suite 1650, in the City of Chicago, Cook County, Illinois, commencing at 10:25 a.m. on the 22nd day of March, 2013.

**Page 2**

1       There were present during the taking
2   of this deposition the following counsel:
3
4       LEN GOODMAN LAW OFFICE
5       BY: MR. LEONARD C. GOODMAN
        (53 West Jackson Boulevard
6        Suite 1650
         Chicago, Illinois 60604)
7        (312) 986-1984
           Appeared on behalf of
8          the Plaintiff;
9       LEN GOODMAN LAW OFFICE
        BY: MS. MELISSA ANN MATUZAK
10      (53 West Jackson Boulevard
         Suite 1650
11       Chicago, Illinois 60604)
         (312) 986-1985
12          Appeared on behalf of
            the Plaintiff;
13
14      DYKEMA GOSSETT, P.L.L.C.,
        BY: MR. PAUL A. MICHALIK
15      (10 South Wacker Drive
         Suite 2300
16       Chicago, Illinois 60606)
         (312) 876-1700
17          Appeared on behalf of
            the Defendants;
18
19      OFFICE OF THE COOK COUNTY STATE'S
        ATTORNEY,
20      BY: MR. STEPHEN L. GARCIA
        (Assistant State's Attorney
21       Special Litigation Section
         Civil Actions Bureau
22       500 Richard J. Daley Center
         Chicago, Illinois 60602)
23       (312) 603-5440
            Appeared on behalf of
24          Larry Wharrie and David Kelley;

**Page 3**

1       There were present during the taking
2   of this deposition the following counsel:
3
4       OFFICE OF THE COOK COUNTY STATE'S
        ATTORNEY,
5       BY: MR. PATRICK T. DRISCOLL JUNIOR
        (Bureau Chief
6        Civil Actions Bureau
         500 Richard J. Daley Center
7        Chicago, Illinois 60602)
         (312) 603-5365
8           Appeared on behalf of
            Larry Wharrie and David Kelley;
9
10
11
12
13
14  ALSO PRESENT:
15      MR. NATHSON FIELDS, Plaintiff.
16
17
18
19
20
21
22
23
24

**Page 4**

1               I N D E X
2
3   WITNESS:                    PAGE:
4   DAVID J. KELLEY
5
6       Examination by Mr. Goodman:      5
        Examination by Mr. Garcia:     214
7
8
9
10              E X H I B I T S
11      Fields No. 1            160
        Fields No. 3            207
12      Fields No. 28           165
        Fields No. 92            64
13      Fields No. 93            71
        Fields No. 94            83
14      Fields No. 95            85
        Fields No. 96            86
15      Fields No. 97           110
        Fields No. 98           117
16      Fields No. 99           121
        Fields No. 100          129
17      Fields No. 101          134
        Fields No. 102          150
18      Fields No. 103          151
        Fields No. 104          159
        Fields No. 105          196
19
20
21
22
23
24

1    (WHEREUPON, the Witness was
2    sworn.)
3    DAVID J. KELLEY,
4    called as a witness herein, having been first
5    duly sworn, was examined and testified as follows:
6        EXAMINATION
7    BY MR. GOODMAN:
8    Q    Why don't we begin with state your
9    full name.
10   A    David Joseph Kelley, K-e-l-l-e-y.
11   Q    Have you had your deposition taken
12   before?
13   A    No.
14   Q    You've probably taken depositions
15   before?
16   A    I have.
17   Q    And, again, obviously, you know, if
18   you don't understand a question, ask me to repeat it
19   and I will. If you want to take a break at any time,
20   just let me know.
21   A    Okay.
22   Q    Have you reviewed any documents in
23   preparation for this deposition?
24   A    No.

5

1    Q    Have you spoken with any current
2    state's attorneys or county employees in preparation
3    for the deposition?
4    A    Just Mr. Driscoll and Mr. Garcia.
5    Q    Okay. Have you spoken to any current
6    or former state's attorneys or county employees in
7    regards to the lawsuit?
8    A    Over what time period?
9    Q    Oh, over the last -- how long has this
10   thing been -- three years, over the last three years.
11   A    I mean, I'm sure I've talked to people
12   and told them I am involved in a lawsuit. But as far
13   as specific facts, not really.
14   Q    In terms of gathering information?
15   A    No.
16   Q    Have you spoken with any current or
17   former state's attorneys or county employees with
18   regard to the location of the street file or other
19   documents related to the Smith/Hickman murders?
20   A    Again, over what --
21   MR. MICHALIK: Object to the --
22   THE WITNESS: -- time frame?
23   MR. MICHALIK: -- form of the question,
24   argumentative.

6

1    MR. GOODMAN: Let me try to rephrase it, then.
2    BY MR. GOODMAN:
3    Q    Over the last two years, have you
4    spoken with any current or former state's attorneys
5    or county employees in regards to the location of the
6    street file?
7    MR. GARCIA: Let me just interject. You're
8    using the term, generally speaking, as state's
9    attorneys, and he's indicated the state's attorneys
10   he has spoken with include his counsel here today.
11   Of course, any conversations with us would be
12   privileged. So --
13   MR. GOODMAN: Right.
14   MR. GARCIA: -- do you want to either clarify
15   the question to exclude his counsel in this case
16   or --
17   BY MR. GOODMAN:
18   Q    Yeah. Excluding your counsel.
19   MR. GARCIA: Okay.
20   THE WITNESS: In the last two years, I've
21   talked to Brian Sexton about documents that you've
22   provided to us.
23   MR. GARCIA: Given that, let me just interject
24   as well, as you're aware of, Mr. Kelley was also

7

1    assigned to the petition, for instance, the
2    Certificate of Innocence proceedings that the
3    plaintiff filed, and was representing the state in
4    response to that petition in those matters.
5        We're going to be asserting a work
6    product privilege to any questions regarding his work
7    in connection with that. I believe the petition was
8    filed August 25th of 2009, so anything, discussions
9    or anything, having to do with the case, which would
10   specifically refer to the innocence proceedings,
11   after that point, we would want to assert a privilege
12   for --
13   MR. GOODMAN: After what point?
14   MR. GARCIA: August 25, 2009, is when the
15   petition was filed, and Mr. Kelley was assigned to
16   that. So we may have to go on a question-by-question
17   basis. I don't want to have to keep interrupting
18   you.
19   MR. GOODMAN: I was going to get to the
20   innocence petition later on.
21   MR. MICHALIK: Well, his answer seemed to
22   indicate to me that he was about to relate
23   discussions recently, which would fall within that
24   time period.

8

2 (Pages 5 to 8)

1      So to the extent that any
2 conversations are going to involve working on the
3 actual innocence proceedings, I would object on the
4 basis of work product privilege and instruct the
5 witness not to answer.
6      MR. GOODMAN: Okay. All right. I think the
7 issue of the street file is unrelated to the
8 innocence petition, but we'll come back to the street
9 file.
10 BY MR. GOODMAN:
11      Q   Let me just ask you some background.
12      A   Okay.
13      Q   Can you tell me, where did you go to
14 law school?
15      A   John Marshall.
16      Q   When did you graduate?
17      A   1981.
18      Q   What was your first job out of law
19 school?
20      A   I worked for two weeks for a law firm,
21 Gilmartin, Hallenbeck & Schroeder, and then I quit.
22      Q   Then where did you go?
23      A   I worked part-time while I was looking
24 for a prosecutor's job, and I was hired with the

9

---

1 Rockford state's attorneys in Winnebago County in
2 1982.
3      Q   Are you from Rockford?
4      A   No.
5      Q   Where are you from?
6      A   Originally born in Michigan.
7      Q   So that was your first state's
8 attorney's job --
9      A   Yes.
10      Q   -- in Rockford?
11      A   Yes.
12      Q   When were you hired in Rockford?
13      A   I think April of 1982. I'm not sure
14 of the month, but that was the year.
15      Q   Okay. So you were just a year out of
16 law school then --
17      A   Pretty much. Yes.
18      Q   -- when you got the job? And how long
19 did you work in the Rockford State's Attorney's
20 Office?
21      A   A little over three years.
22      Q   Then where did you go after that?
23      A   Directly to Cook County.
24      Q   When did you start at the Cook County

10

---

1 State's Attorney's Office?
2      A   I think May of 1985.
3      Q   And tell us how that works when you
4 start at the Cook County State's Attorney's Office.
5 Where do you start and where did you go?
6      A   I started in the First Municipal
7 Division, I was given some credit for the fact that I
8 had been a prosecutor for three years, so I didn't
9 start at the initial point where new prosecutors
10 start.
11      Q   Where generally do new prosecutors --
12 do they start in traffic court?
13      A   Nowadays they start generally in
14 Appeals, Child Support.
15      MR. GARCIA: But your question is to when he
16 started?
17      MR. GOODMAN: Yeah. I was just curious.
18 BY MR. GOODMAN:
19      Q   But you started in --
20      A   First Municipal, Misdemeanors.
21      Q   Where was that?
22      A   They have courts around the city. I
23 worked in different branch courts.
24      Q   Which ones did you work in?

11

---

1      A   I started out in Branch 28, which was
2 Guns court, and I --
3      Q   Where was that?
4      A   11th and State.
5      Q   Okay.
6      A   I worked at some point a domestic
7 violence courtroom at 13th and Michigan, and I worked
8 some of the other branch courts, and I can't remember
9 offhand which ones they were?
10      Q   Okay. That was between what years?
11      A   Basically in 1985. I wasn't there
12 that long and I was moved to Felony Review in 1986.
13      Q   In 1986 --
14      A   Yes.
15      Q   -- Felony Review? How long did you
16 work in Felony Review?
17      A   About nine months maybe.
18      Q   And then after that?
19      A   I was assigned to the Preliminary
20 Hearings Division.
21      Q   When you're assigned to the
22 Preliminary Hearings Division, are you again assigned
23 to one particular branch court?
24      A   At that time they had a north side,

12

1  south side, and central Bond court, or Preliminary
2  Hearing courts.
3      Q    Um-hum.
4      A    They also had what was called Branch
5  66, which was the Homicide Section, and I worked at
6  all three of those at one point in time.
7      Q    How long did you work in Preliminary
8  Hearings courts?
9      A    Until, I think it was, September of
10  '97 -- or '87. I'm sorry, '87.
11      Q    Oh, '87. Where did you go in
12  September of '87?
13      A    Felony Trial court.
14      Q    Was that your first job at 26th
15  Street?
16      A    Yes -- well, actually it wasn't. I
17  worked Branch 66, which was Homicide/Sex, and they're
18  based out of 26th and California.
19      Q    And that was Misdemeanors or --
20      A    That was when I was in the Preliminary
21  Hearings.
22      Q    Okay. Got you. When you went to 26th
23  Street, were you assigned to a courtroom?
24      A    Yes. My first courtroom was Judge

13

1  first chair, which means you're the lead attorney in
2  that courtroom.
3      Q    When did you become first chair?
4      A    Judge Crilly.
5      Q    Judge Crilly? What year was that?
6      A    In '98, maybe.
7      Q    In '98?
8      A    '88. I'm sorry, '88. I want to skip
9  those ten years.
10      Q    So '88, you became the first chair?
11      A    As best I can recall, yes. Judge
12  Crilly was my first assignment as first chair.
13      Q    When did you then leave the felony
14  courtrooms and go to Special Pros?
15      A    Around 1991, '92.
16      Q    So then when you're in Special Pros,
17  you're no longer assigned to a specific courtroom?
18      A    No. You're assigned specific cases
19  for prosecution.
20      Q    Can you explain a little bit how that
21  works? How does a case became a Special Pros case
22  rather than a general courtroom case?
23      A    Generally cases that came in, and
24  primarily they would be murders that had gang

15

1  Durkin -- actually, could I ask a question, because
2  I've got this medication --
3      Q    Oh, sure.
4      A    -- do you have, like, water or
5  something? My throat gets dry when I talk a lot.
6      MR. GARCIA:  Off the record.
7          (WHEREUPON, there was a brief
8          pause in the proceedings.)
9  BY MR. GOODMAN:
10      Q    So I don't know if you know exactly,
11  but just give me a brief rundown of the courtrooms
12  that you were in, starting with Judge Durkin.
13      A    Started with Judge Hourihane, then I
14  was sent to Judge Haida. From there I went to Judge
15  Reyna, Judge Singer, Judge Mannion, and then I was
16  transferred to Special Prosecutions, Gang Crimes.
17      Q    Okay. During -- before you got
18  transferred to Special Prosecutions when you were in
19  the felony trial courtroom, how does that work? Do
20  you get promotions? Are you a first chair? A second
21  chair?
22      A    You start out as the third chair; each
23  courtroom generally three assistants. Then you get
24  promoted to second chair, and from there you become

14

1  involvement, would be cases that we would look at,
2  possibly pick up, and prosecute.
3          You would pick up cases, depending on
4  what your current caseload was. If you had some
5  space where you could pick up extra cases, you would
6  try to pick up those cases.
7      Q    And what determines whether a case is
8  going to be handled by the line assistants in the
9  courtroom or the Special Pros?
10      A    Generally in the Gang Crimes Unit, if
11  we felt a case was gang-related, we had the
12  opportunity to pick it up.
13      Q    Okay. So when you said you got
14  transferred to Special Pros, was that part of the
15  Gang Crimes Unit?
16      A    Gang Crimes Unit is under the Special
17  Prosecutions Bureau. Yes. It's separate from the
18  Felony Trial Division.
19      Q    So you got assigned to Special Pros
20  Gang Crimes Unit?
21      A    Yes.
22      Q    And there's other divisions in Special
23  Pros. There's sex crimes, there's --
24      A    Actually, there's Arson, there's

16

4 (Pages 13 to 16)

1   Public Integrity, there's Financial Crimes, there's
2   Stolen Motor Vehicles, at least it was then.  I don't
3   know if they still have that, but -- and Official
4   Misconduct.  I think those are the units.
5       Q    And Gang Crimes?
6       A    Yes.
7       Q    In '91, '92, when you got transferred
8   to Special Pros, you went right to Gang Crimes?
9       A    Yes.
10      Q    Did you have any training at that
11  point?
12      A    At that point, I had been a first
13  chair for a number of courtroom assignments, and I
14  tried a number of juries.  But other than that
15  specific training, no.
16      Q    Why Gang Crimes rather than Financial
17  Crimes or Arson?  How -- how do they determine it?
18  Did you apply for that?
19      A    They requested me.
20      Q    They requested you?
21      A    Yes.
22      Q    Was that because you had had
23  experience in prosecuting gang cases?
24      A    I really couldn't tell why you.  I

17

1   assume because I had done a lot of jury trials.
2       Q    But, again, if you could just shed
3   some light, if you know, as to why Gang Crimes, why
4   you went into Gangs rather than one of the other
5   units?
6       A    They requested me and offered me the
7   spot.  That's why I went.
8       Q    I mean, was it just that there was a
9   spot available, or was it that you had some --
10      A    No.
11      Q    -- specific expertise?
12      A    No.  When there's a spot available,
13  they look for a replacement, and they ask people that
14  they're interested in whether they're willing to come
15  up; I was.
16      Q    And at the time that you went into
17  Gang Crimes, had you had any -- other than your
18  regular jury trial experience as a first chair and a
19  second chair and a third chair, had you had any
20  specific training with respect to gangs?
21      A    No.  I tried numerous gang cases in
22  the trial courts, but, no, there's no specific
23  training that they give you outside of that.
24      Q    Have you ever had any specific

18

1   training with respect to gangs?
2       A    After I was in the unit, I went to
3   various seminars; some of them were gang-related.
4       Q    Let's go through that real quick, what
5   you recall about the training that you've had.
6       A    You know, I've been to numerous
7   capital litigation seminars, and some of the courses
8   taught in those seminars involved gangs.  I've been
9   to numerous trial advocacy courts -- or seminars,
10  excuse me -- and some of those, I think, they were
11  gang-related-type case training.
12      Q    Okay.  If you could just be a
13  little -- as specific as you can about training
14  seminars that you've done that were related to gangs,
15  just starting from the first one you remember --
16      A    You know, I --
17      Q    -- where and when.
18      A    -- couldn't give you specifically what
19  the courses would be.  I mean, I've been to probably
20  nine or ten capital litigation trainings.  I've been
21  to several trial advocacy or trial technique courses.
22      Q    Right.  I want you to just focus on
23  ones where you received specific training about
24  gangs.

19

1       A    To tell you the truth, I couldn't
2   specifically list one and tell you what course it
3   would be.  It's been so long.
4       Q    Do you know who taught the course
5   where there was specific training about gangs?
6       A    They would have people from around the
7   country come in and teach.  I don't recall specific
8   names of who they were.  Some people from our office
9   that came in, Murray, I think, taught things, and Jim
10  McKay.
11      Q    Had you had any specific training as
12  to the El Rukns --
13      A    No.
14      Q    -- in any of these courses?
15      A    No.
16      Q    And you are now retired; is that
17  correct?
18      A    I am.  Yes.
19      Q    When did you retire?
20      A    December 21st of 2012.
21      Q    What was your position when you
22  retired?
23      A    I was a supervisor in the Juvenile
24  Delinquency Division of the Juvenile Justice Bureau.

20

1 Q I guess I should -- well, let me
2 finish with your career at the state's attorney's
3 office.
4 A Okay.
5 Q So you went into Special Prosecutions,
6 Gang Crimes --
7 A Yes.
8 Q -- in 1991 or 1992 --
9 A Yes.
10 Q -- as far as you remember?
11 A Yes.
12 Q How long were you in Special
13 Prosecutions?
14 A About ten years.
15 Q So until approximately 2001, 2002?
16 A Yes.
17 Q What was your next assignment after
18 Special Prosecutions, Gang Crimes?
19 A Supervisor in the Delinquency
20 Division.
21 Q And that was considered a promotion --
22 A Yes.
23 Q -- because you were then a supervisor?
24 A That's correct.

21

1 Q And, again, what experience had you
2 had in juvenile delinquency cases?
3 A Actually, specifically other than
4 prosecuting them on automatic transfers, none.
5 Q But you had prosecuted some over at
6 Ham -- Ogden and Hamilton?
7 A No. I prosecuted some over at 26th
8 Street that had been transferred to adult court.
9 Q But when you become supervisor, you're
10 then supervisor -- is your office then over at Ogden
11 and Hamilton?
12 A Yes.
13 Q I don't know if that's the right
14 address, but --
15 A It is.
16 Q -- that's what I call it. I'm just
17 curious how that works, how you become supervisor if
18 you really --
19 A It's more --
20 Q I'm sorry. Let me just finish.
21 A Okay.
22 Q You said you really didn't have
23 experience trying delinquency cases other than
24 transfers over to 26th Street; is that correct?

22

1 A It's more supervisory in terms of
2 trial work, working with the assistants in preparing
3 trials. The juvenile law isn't much different as it
4 applies to juveniles as it does to adults in criminal
5 law.
6 Q At that point did you have some
7 training as to juvenile law and delinquency?
8 A No.
9 Q No? So you just had to learn it?
10 A It wasn't hard to pick up.
11 Q Okay. So basically you're there
12 because of your experience trying cases?
13 A Correct.
14 Q How long did you have that job as
15 supervisor of -- what exactly -- so you're
16 supervising state's attorneys?
17 A They just call you "supervisor."
18 Q But you're -- there's just one
19 supervisor?
20 A No. In the Juvenile, there were two
21 supervisors that dealt with the Chicago courtrooms,
22 and there was one supervisor that dealt with the
23 suburban courtrooms.
24 Q As a supervisor, do you try cases?

23

1 A Yes.
2 Q How does that work? How would you
3 become directly involved in a case as a supervisor?
4 A If the assistants I supervise ask me
5 to help them, I would become involved; if I saw a
6 case that struck my interest, I would become
7 involved.
8 Q How long did you have that position
9 of --
10 A Until --
11 Q -- supervisor?
12 A -- I retired.
13 Q So 2002 to 2012?
14 A Yes.
15 Q How many cases did you try during that
16 time, approximately? A lot?
17 A A lot.
18 Q During that period of time -- well, I
19 guess I know the answer to this, because during that
20 period of time, you also tried cases at 26th Street;
21 is --
22 A I did.
23 Q -- that correct? How many other
24 than -- you tried Nate's case. So how many --

24

1    A    When I left, I had several gang cases
2  that I took with me because I was deeply involved
3  with them. I was assigned and picked up cases
4  after I left. I did maybe 12, 15 juries after I
5  left, on adult cases.
6    Q    Well, Nate's case was a bench trial.
7    A    Yes.
8    Q    Did you do other bench trials?
9    A    Other than Nate's case, I think almost
10 all the cases I tried ended up being either pleas or
11 jury trials.
12   Q    Let's start with -- well, let me ask
13 you about your first involvement in Nate's case.
14 Tell me the first thing you ever did or heard
15 regarding Nate Fields' case.
16   A    The first thing where I became
17 involved is after his case came back from the
18 appellate court, the supervisor of the Gang Crimes
19 Unit was asking if people would be willing to pick up
20 the case now that it was coming back for a retrial,
21 and I volunteered.
22   Q    Can you tell me what month and year
23 that was?
24   A    No. It was shortly after it came back

25

---

1  from the appellate court, two-thou -- or, I mean,
2  1998, 1999, sometime around there.
3    Q    I think January of '98 is when the
4  Illinois Supreme Court affirmed the new trial.
5    A    Okay. It was shortly after that.
6    Q    It wasn't before?
7    A    No.
8    MR. GOODMAN: Do you know -- do you think it
9  would have been -- do you know what date that was?
10   MS. MATUZAK: I don't.
11 BY MR. GOODMAN:
12   Q    Would it have been within a month of
13 the opinion coming down?
14   A    I don't know. All I know is from when
15 I volunteered to take it, it was about a month before
16 I first appeared in court on it, so whatever date it
17 was first back in front of the chief judge.
18   Q    So it was early -- we would say early
19 '98?
20   A    I don't specifically recall.
21   MR. GOODMAN: You don't remember? Okay.
22        Do you know, Nate, when your case
23 first came back to court?
24   MR. FIELDS: That was February of '98.

26

---

1    MR. GOODMAN: Okay.
2  BY MR. GOODMAN:
3    Q    So then it would have probably been
4  January. You don't recall, I understand, but if
5  Nate's correct --
6    A    Whatever the first court date was, it
7  was about a month before that.
8    Q    What is the first thing you
9  remember -- what is the first thing you did? You
10 reviewed the file?
11   A    After I volunteered to take it, I did
12 what I could to collect the file. I ordered the file
13 from the warehouse. I talked to Post Convictions to
14 see what paperwork they had because it was
15 postconviction. I also talked to Appeals because I
16 knew the case had been appealed, and I tried to
17 collect the file as best I could.
18   Q    After collecting -- I assume you then
19 reviewed the file?
20   A    While I was doing that, I also called
21 out to the attorneys that were listed on the
22 appellate record for Earl Hawkins and Nathson Fields
23 to let them know that the case was coming up in front
24 of the chief judge and to find out whether they were

27

---

1  still going to follow the case for the retrial.
2    Q    So you called -- let's start with
3  Hawkins. You called the attorney who --
4    A    I called McDermott, Will & Emory, and
5  I don't recall who I talked to.
6    Q    What did you learn?
7    A    They weren't sure whether they were
8  going to follow the case now that the appeal was
9  over. I told them when it was going to be in front
10 of the chief judge, and I don't recall whether
11 someone showed up that first appearance for them or
12 not.
13   Q    Okay. At that point in time, when you
14 spoke to some lawyer at McDermott, Will, had you met
15 Earl Hawkins?
16   A    No.
17   Q    And the first appearance when it came
18 back was in front of the chief judge?
19   A    Yes.
20   Q    And prior to that first appearance,
21 other than ordering the file, collecting the file,
22 reviewing the file, and calling the attorneys for
23 Earl Hawkins and Nate Fields, had you done anything
24 else?

28

1       A       No.
2       Q       What attorney for Nate Fields did you
3   call?
4       A       John Stainthorp, I think, was listed
5   on the appellate record. I don't know whether I
6   talked to him or not; he may have been on trial. But
7   I talked to someone with the People's Law Office, and
8   they told me they were not sure whether they were
9   going to stay back on the case now that it was back
10   for retrial.
11       Q       So then the next thing that happened
12   is the case went in front of the chief judge?
13       A       Right. And the mandate was spread of
14   record.
15       Q       Then what happened? It got assigned?
16       A       It got assigned to a courtroom. Yes.
17       Q       Did you again get assigned to Judge
18   Gaughan right away, if you recall?
19       A       I think so. Yeah.
20       Q       Was Hawkins there at that first court
21   appearance?
22       A       No. I found out later he was in
23   federal protective custody.
24       Q       Was Nate there at the first court

29

1       A       That was several months, just
2   everybody collecting all the documents. I issued
3   subpoenas for records, and, again, the case was
4   continued for status.
5       Q       Who did you issue subpoenas to?
6       A       The medical examiner's office, the
7   Chicago Police Department Records Division, the Area,
8   Area 1; to the crime lab. I issued records (sic),
9   for, I think, ambulance records from the paramedics.
10       I also issued requests for photographs
11   from the police department. And I don't recall what
12   else, but basically everything I would have if I was
13   just starting fresh with the case.
14       Q       Is that common on a retrial to issue
15   new subpoenas?
16       A       That's how I do it. Yes.
17       Q       But I'm assuming that when you
18   collected the files, you had a lot of that material
19   already?
20       A       I did, but I didn't know, you know,
21   what the file was. That's why I resubpoenaed it
22   myself.
23       Q       I see. You didn't know if you had
24   everything?

31

1   appearance?
2       A       I don't believe he had been brought up
3   for that first appearance.
4       Q       What's the next thing that you did
5   after that first court appearance?
6       A       I issued a writ for Nathson Fields to
7   be brought up for the next court date, and, again,
8   was still working on collecting the file.
9       Q       And what about Hawkins?
10       A       I found out when I was trying to writ
11   him up that he was in protective custody with the
12   U.S. Government, and at that point I wasn't able to
13   get him into court for the next court date.
14       Q       What's the next thing that you did
15   after issuing a writ?
16       A       Court basically carried the case along
17   for status for a period of time while everyone was
18   getting prepared and we were finding out who was
19   going to represent whom.
20       It turned out that the People's Law
21   Office did originally come in to represent Nathson
22   Fields and McDermott, Will & Emory did come in to
23   represent Hawkins.
24       Q       Okay. What's the next thing?

30

1       A       It had been around to a lot of
2   different place in the office, Appeals, Post
3   Convictions, so I wanted to do everything I could to
4   make sure I had everything.
5       Q       What's next? What's the next thing
6   you remember after issuing the subpoenas?
7       A       Again, the case continued on status
8   for a number of months. At some point, the defense
9   filed a Fourth Term motion, and that was litigated
10   over a period of time.
11       Q       What was the motion?
12       A       Fourth term.
13       Q       I'm not familiar with that.
14       A       Basically that we had not tried the
15   case within the prescribed limits.
16       Q       Like a speedy trial?
17       A       Yes.
18       Q       Okay. What's the next thing after
19   litigating the speedy trial?
20       A       Then we were going through motions.
21   We filed motions regarding gang evidence, we filed
22   motions regarding the testimony of Richard Buckles, a
23   deceased witness. We filed motions regarding bribery
24   evidence involving Judge Maloney at the trial. Those

32

8 (Pages 29 to 32)

1  were litigated, and after those were litigated, we
2  filed an appeal.
3      Q      Was there also litigation over Sumners
4  (sic)?
5      A      I don't recall ever -- any litigation
6  over Sumner.
7      Q      So the three issues you recall were
8  gang evidence, bribery evidence, and Buckles?
9      A      There might have been another one, but
10 I don't recall.
11     Q      The issue with Buckles is he was
12 deceased?
13     A      He was deceased; we were asking to use
14 his transcript, and the defenses were objecting.
15     Q      And then any other significant --
16     A      Well, the case was under appeal for a
17 couple of years.
18     Q      Were you involved in the appeal?
19     A      No.
20     Q      When is the first time you met Nate
21 Fields?
22     A      The first court date he appeared in
23 court where he was writted up.  I think it might have
24 been the second court date.

33

1      Q      All of these court appearances are in
2  front of Judge Gaughan?
3      A      Other than the first one in front of
4  the chief judge.  He may have kept it for the second
5  appearance just to find out who was going to
6  represent people, because it was still up in the air,
7  and then sent it to Judge Gaughan.  But after that,
8  they were all in front of Judge Gaughan.
9      Q      And while the case was up on appeal on
10 these, I guess you call them, interlocutory
11 appeals --
12     A      Yes.
13     Q      -- while it was up there, you
14 continued to work on the case?
15     A      Not a lot.  There wasn't much to do at
16 that point.  But, yeah, I still had the case.
17     Q      Let me ask you about -- and then
18 eventually it came back and you tried the case?
19     A      Well, it came back and then we filed
20 additional motions, because after it came from the
21 first appeal, Earl Hawkins decided to testify for the
22 state.  We filed a second motion to use bribery
23 evidence against specifically Nathson Fields.
24     Q      So after it came back from the

34

1  appellate court, is your recollection -- well, I'll
2  get to Hawkins --
3      A      Okay.
4      Q      -- in a little bit.  So let's hold off
5  on that.  But just for the timeline, so when it came
6  back is when Hawkins became a state witness?
7      A      Sometime after that, his attorneys
8  agreed to have him testify.  Yes.
9      Q      Who was representing Hawkins?
10     A      I don't remember the guy's name from
11 McDermott, Will & Emory.
12     Q      So it was that firm that represented
13 him during all these proceedings?
14     A      Yes.
15     Q      So after he became a state witness,
16 then there was new motions filed with respect to
17 bribery?
18     A      That's correct.
19     Q      And the reason for those new motions?
20     A      We had new information about Nathson
21 Fields' direct involvement in the bribery from Earl
22 Hawkins.  That's what the appellate court said was
23 lacking in our first motion regarding Nathson Fields
24 and bribery evidence.

35

1          After Earl Hawkins testified for us,
2  or agreed to testify, he gave us specific information
3  regarding Nathson Fields' involvement and knowledge.
4      Q      Okay.  Were you present when he gave
5  that new information?
6      A      Yes.
7      Q      Where did that interview take place?
8      A      Until the U.S. attorneys tell me it's
9  okay to tell you, I can't tell you.  He was in
10 protective custody.
11     Q      Okay.
12     A      He was in a federal prison.
13     Q      As long as we're on the topic of Earl
14 Hawkins, why don't we stay on there.
15     A      Okay.
16     Q      Let me ask you the first time you met
17 Earl Hawkins.
18     A      I don't recall the specific year.  It
19 was sometime after the appeal came back from the
20 appellate court.  It was several months after, but I
21 don't recall.
22     Q      Was it at 26th and California?
23     A      No.  It was in a federal facility.
24     Q      When you met him -- okay.  So sometime

36

9 (Pages 33 to 36)

1   after the interlocutory --
2       A    Yes.
3       Q    -- appeal came back?  So you had not
4   met him prior to that?
5       A    No.
6       MR. GOODMAN:  Do you know, Nate, when the
7   first round of appeals came back on the inter --
8       MR. FIELDS:  About two years after we had
9   filed it.
10      MR. GOODMAN:  Okay.
11      MR. FIELDS:  So 2000.
12      MS. MATUZAK:  You're asking him what?
13      MR. GOODMAN:  When the first interlocutory
14  appeals came back.  It's confusing.
15  BY MR. GOODMAN:
16      Q    So it was '98 when the case first came
17  back, and then interlocutory appeals were filed, so
18  it would have been sometime in 2000?  Does that sound
19  right?
20      A    You know, I'd have to look at the
21  motions themselves.  I can't tell you.  I don't
22  remember.
23      Q    But it was sometime after the
24  interlocutory appeals came back?

37

1       A    Yes.
2       Q    And when you went --
3       MS. MATUZAK:  It was 2001 -- well, the opinion
4   was 2001.
5       MR. GOODMAN:  In 2001?  Okay.
6   BY MR. GOODMAN:
7       Q    When you went to visit him, when you
8   met him for the first time, you visited him at this
9   federal facility?
10      A    Yes.
11      Q    At that point, you had been informed
12  that -- you were aware that he was cooperating?
13      A    We had a tentative agreement with his
14  attorneys.  Before we finalized deals, we wanted to
15  talk specifically to Earl Hawkins ourselves to get a
16  proffer as to what he would testify to.
17      Q    Okay.  So prior to meeting him, you
18  had had discussions with his lawyers?
19      A    That's correct.
20      Q    Can you tell me about those
21  discussions?
22      A    Basically they stated they were
23  possibly interested in Earl Hawkins now reaching a
24  plea agreement after the appellate court came back

38

1   with their opinion.  We discussed that.
2       Q    Was this in person or over the phone?
3       A    I think it was both.
4       Q    Who participated in -- let's start
5   with the first discussion.
6       A    You know, it was Earl's attorney, and
7   it was myself and Brian Sexton, as best I recall.
8       Q    Tell me the -- who approached who?
9       A    I don't recall specifically whether
10  they brought it up first or we did.
11      Q    They said he was interested in
12  cooperating?
13      A    They said he might be.  Yes.
14      Q    Tell me what else you remember about
15  that discussion.
16      A    They asked us what we would possibly
17  be willing to offer if he did agree to cooperate.  We
18  had conversations regarding that.  They said that
19  they would talk to Earl and get back to us.
20      Q    And what did you tell them -- the two
21  people involved from the state's side were you and
22  Mr. Sexton; is --
23      A    Right.
24      Q    -- that correct?  And what did you

39

1   guys tell them that you might be willing to offer?
2       A    We told them it depended on what he
3   was able to testify to, but that depending on what
4   the information was, that we would possibly consider
5   something less than murder time.
6       Q    What is the next -- did they get back
7   to you at some point?
8       A    At some point they got back to us and
9   said he would be possibly interested, and we said
10  that we wanted to hear what he would say, and that's
11  kind of the stage when we went out and first talked
12  to Earl Hawkins.
13      Q    So when you went out to talk to him,
14  you had been given no information as to what he might
15  say?
16      A    General information, as I recall, but
17  we wanted him to be more specific.
18      Q    What was the general information that
19  you had been given?
20      A    Just that would testify as to his
21  direct involvement in the murders, Nathson Fields'
22  direct involvement, and he would also give us
23  evidence regarding the bribery and both his and
24  Nathson Fields' involvement and knowledge of it.

40

10 (Pages 37 to 40)

1    Q    Did you have any more specific
2  information when you went to see him other than --
3    A    Not that I recall.
4    Q    Did you know -- at some point he told
5  you that he was not one of the shooters; is that
6  correct?
7    A    When we sat down with him -- well, I
8  had known that from reading his prior transcripts of
9  his testimony in federal court.  He had testified
10  multiple times, so I knew that before.
11    Q    So you were aware when you went to see
12  him that he was --
13    A    I was aware of --
14    Q    -- saying that he was not one of the
15  shooters?
16    A    I was aware of his prior testimony.
17  Yes.
18    Q    When -- okay.  Do you know how many
19  times he had testified prior to the time you went to
20  see him?
21    A    I think about 10 or 11.
22    Q    Around how many times had he testified
23  about the Smith/Hickman murders?
24    A    Three or four.

41

1    Q    As far as you recall, his testimony
2  about the Smith/Hickman murders was fairly consistent
3  on those three or four -- did you read those three or
4  four?
5    A    I read all his testimony.  Yes.
6    Q    Was it consistent?
7    A    Pretty much.  Yes.
8    Q    So when you had these discussions
9  before you met him with Earl's attorneys, did they
10  indicate to you that he was going to testify
11  consistent with his prior testimony?
12    A    Pretty much.  Yes.
13    Q    And did you tell him that if he -- did
14  you tell the attorneys that if he testified
15  consistent with his prior testimony, that you would
16  be willing to offer less than murder time?
17    A    Well, actually, we said we wanted to
18  find out more specific information regarding the
19  bribery, because he never really testified directly
20  regarding Nathson Fields' knowledge at any of the
21  other trials.
22    Q    So you knew what he was going to say
23  as to the Smith/Hickman murders?
24    A    Yes.

42

1    Q    But you did not know what he was going
2  to say with respect to the bribery?
3    A    That's correct.
4    Q    And tell me exactly what you said
5  to -- what you and Mr. Sexton said to Earl's
6  attorneys regarding the bribery?
7    A    I don't recall specifically what I
8  said.
9    Q    The gist of it.
10    A    I said we wanted -- we would want to
11  talk to him and hear what he had to say regarding
12  that before we would consider making any offers to
13  him.
14    Q    Did you indicate to the attorneys
15  that -- that Earl would have to implicate Nate in the
16  bribery --
17    A    No.
18    Q    -- in order to get less than murder
19  time?
20    A    No.
21    Q    But you said that he would have to
22  talk about Nate's involvement in the bribery?
23    A    We wanted to talk to him about it.
24  Yes.

43

1    Q    But you specifically told the
2  attorneys that you wanted to talk to Earl about
3  Nate's involvement in the bribery; is that correct?
4    A    Yes.
5    Q    Let me ask you:  At that point in
6  time, prior to visiting Earl Hawkins, did you have
7  any information, either wiretaps, witnesses, that
8  implicated Nate in the bribery of the judge?
9    A    We had testimony at the Maloney trial
10  which didn't specifically go to Nathson Fields'
11  involvement, but it gave you a pretty good idea what
12  went on, but he wasn't specifically questioned, and
13  I'm talking about Earl Hawkins regarding Nathson
14  Fields' direct involvement.
15    Q    Other than the testimony from the
16  Maloney trial, did you have anything else?
17    A    I -- we had talked during the course
18  of this case to another El Rukn in federal custody
19  who had given us information about Nathson Fields.
20    Q    Okay.  Who was that?
21    A    Derrick Kees.
22    Q    When is the first time you talked to
23  Derrick Kees?
24    A    I don't remember.  It was sometime, I

44

1    think, before the appeal.
2        Q    Before which appeal?
3        A    The first appeal.
4        Q    Before the first interlocutory appeal?
5        A    Yes.
6        Q    Where did that interview take place?
7        A    Again, he was in a federal facility in
8    Witness Protection.
9        Q    And who was present for that
10   interview?
11       A    Myself, Brian Sexton, and an
12   investigator with our office.
13       Q    So this would have been in the late
14   '90s?
15       A    I don't know specifically.
16       Q    But it was before it came back and
17   before Earl Hawkins cooperated?
18       A    Yes.
19       Q    Do you have notes of that interview?
20   Did you take notes?
21       A    No.
22       Q    Did anyone take notes?
23       A    No.
24       Q    No?  Did the investigator take notes?

45

1        A    No.  We talked to Derrick Kees and
2    decided that we were not going to use him as a
3    witness.
4        Q    What did he tell you?
5        A    He basically told us information about
6    how the murder went down, who was involved in it with
7    the El Rukns.
8        Q    What murder?
9        A    The murders of Talman Hickman and
10   Jerome Smith.
11       Q    What did he tell you?
12       A    He told us that Earl Hawkins and
13   Nathson Fields were involved in the murder with
14   George Carter and Hank Andrews; that they had been
15   ordered to do it by Jeff Fort as a result of an
16   ongoing dispute with the Goon Squad, and that
17   afterwards, they worked in terms of submitting a
18   bribe to Judge Maloney on behalf of Earl Hawkins and
19   Nathson Fields.
20       Q    And the investigator didn't take notes
21   during this interview?
22       A    No.  We decided we weren't going to
23   use him as a witness.
24       Q    You said you --

46

1        A    To be honest with you, I don't know
2    whether the investigator took notes or not.  I wasn't
3    really paying attention to what the investigator was
4    doing.  But we didn't -- after we talked to Derrick
5    Kees, we determined that we were not going to use him
6    as a witness because he wanted us to cut his sentence
7    in federal court, and we were not going to do that.
8        Q    Why were you not going to do that?
9        A    For one, we had no control over his
10   sentence in federal court, and, two, we were not
11   going to do anything regarding Derrick Kees to have
12   him testify.
13       Q    If you had been inclined to cut his
14   sentence in federal court, would there be a way you
15   could have done that or attempted to do that?
16       A    Not without the cooperation of the
17   U.S. Government.
18       Q    But you could have sought the
19   cooperation of the U.S. Government?
20       A    I guess we could have tried; I don't
21   know how it would have worked out.
22       Q    Have you done that on other occasions?
23       A    No.
24       Q    Did you ever have discussions with the

47

1    federal government with respect to Earl Hawkins?
2        A    Yes.
3        Q    Did you have discussions with the
4    federal government about Earl Hawkins' federal
5    sentence?
6        A    No.
7        Q    What discussions did you have with the
8    federal government about Earl Hawkins?
9        A    That if he pled guilty to the state
10   charges, how would we work his incarceration.  And if
11   he stayed in federal custody, how would our charges
12   apply to the time he already served.
13       Q    How much time was Earl Hawkins
14   serving, federal time was he serving?
15       A    I think 55 years.  I'm not sure on
16   that, but I think that's a ballpark number.
17       Q    In your discussions with Earl Hawkins,
18   was there ever any discussion about the possibility
19   that that 55 number could come down?
20       A    No.
21       Q    Did Hawkins ever ask you whether there
22   was anything that you could do to make that 55 number
23   come down?
24       A    Probably did.

48

12 (Pages 45 to 48)

1    Q    What did you tell him?
2    A    "No."
3    Q    When you went to see Derrick Kees, was
4  he represented by counsel?
5    A    At that point, his appeals were over
6  with.  I don't think he was.  No.
7    Q    So there was no communications with an
8  attorney with respect to Derrick Kees as, far as you
9  recall?
10    A    I don't remember.  I just honestly
11  don't remember who we called to let him know.
12    Q    But there was no attorney present when
13  you interviewed him in the federal --
14    A    No.  He agreed to talk to us.
15    Q    And when he was in a federal
16  penitentiary, he wasn't in any sort of protective
17  custody, was he?
18    A    He was.
19    Q    Oh, he was.  Was he in the same type
20  of protective custody as Earl Hawkins?
21    A    He -- he was in the Witness Protection
22  but a different facility.  Yes.
23    Q    So you had to get the cooperation of
24  the federal officials in order to visit Derrick Kees?

49

1    A    We did.
2    Q    And were there any federal officials
3  present when you interviewed him?
4    A    No.
5    Q    How many times did you interview
6  Derrick Kees?
7    A    Once.
8    Q    Did you have any other communication
9  with him by phone or letter?
10    A    No.
11    Q    Do you know if Mr. Sexton did?
12    A    I don't believe so.
13    Q    If you could just -- because I'm
14  confused now, because it sounds like what Derrick
15  Kees told you would have been helpful testimony at
16  Nate's retrial.  What was the reason -- were there
17  any other reasons why you didn't pursue Derrick Kees'
18  testimony?
19    A    He basically said he wasn't going to
20  testify for us unless we did something on his federal
21  sentence, and we told him we weren't, so that was the
22  end of it.
23    Q    What was your understanding of what he
24  would do if you writted him in as a trial witness?

50

1    A    I assumed he would testify truthfully
2  to what he told us.
3    Q    So why didn't you do that?
4    A    We weren't going to cut him a deal or
5  try to cut him a deal on his federal sentence.  And
6  if we --
7    Q    Okay.
8    A    He basically said, "If I don't get a
9  deal, I ain't saying nothing."  So we didn't even try
10  to bring him up.
11    Q    So it's your understanding if you did
12  writ him in without a deal, he would just refuse to
13  testify?
14    A    Yes.
15    Q    And that was the reason why you didn't
16  bring him?
17    A    That's the reason we didn't use him as
18  a witness.  Yes.
19    Q    So I think we got sidetracked -- oh,
20  because I was asking you whether there was any other
21  evidence you had that implicated Nate Fields in the
22  bribery and you said Derrick Kees --
23    A    Yes.
24    Q    -- right?  Was there anything else?

51

1    A    Nothing specific.  No.
2    Q    Did you have any wiretap evidence
3  related to the investigation of Maloney?
4    A    At that point, no.
5    Q    At some point did you get that?
6    A    Yes.
7    Q    When was that?
8    A    After the Certificate of Innocence was
9  filed.
10    Q    So sometime after Nate was acquitted?
11    A    Yes.
12    Q    What specifically did you get with
13  respect to Maloney?
14    A    We got transcripts of the wires that
15  they had one with the El Rukns and William Swano.
16    Q    And this was sometime in 2009, 2010?
17    A    Sometime in that time frame.  Yeah.
18    Q    So let me ask you about that
19  information, then, starting with the wiretaps of --
20  well, let's go through it.  So the first one was
21  wiretaps of -- from the Fort?
22    A    They had wires on the Fort, on one of
23  the other El Rukn locations; I don't recall the name
24  of it, and I think they also had wires on William

52

13 (Pages 49 to 52)

1  Swano at some point.
2      Q    So you recall three different wires?
3      A    I think there were three that I'm
4  aware of, but I can't tell you for sure.
5      Q    Well, let's start with the Fort.
6      MR. GARCIA: Can we just take a break?
7      MR. GOODMAN: Sure.
8      MR. GARCIA: I would like to consult.
9      MR. GOODMAN: Okay. Let's take a break, then.
10          (WHEREUPON, there was a brief
11          recess had in the proceedings.)
12  BY MR. GOODMAN:
13      Q    Let me go back to --
14      MR. GARCIA: Just before you begin, I just
15  want to clarify: As I stated at the outset, we're
16  going to be asserting the work product privilege to
17  his work in the Certificate of Innocence proceedings.
18          You're starting to ask questions that
19  go into that. Certainly I think you're entitled to
20  ask about notes, physically what he got and -- and as
21  you're aware, there's discussions between you and the
22  state in that case as far as discovery and production
23  and things like that. So factual things like that
24  are okay.

53

1      But to the extent it starts getting
2  into -- I'm just going to ask that maybe you can
3  tailor your questioning to stay away -- having to
4  keep interrupting, I don't want to do that --
5      MR. GOODMAN: Well, I think --
6      MR. GARCIA: -- so you would just stay away
7  from, you know, the deliberative process,
8  significance of evidence, that kind of thing.
9      MR. GOODMAN: Well, I mean, if I ask, you'll
10  just object, and if you instruct him not to answer --
11      MR. GARCIA: Okay.
12      MR. GOODMAN: -- that's fine.
13      MR. GARCIA: Right. I just want to make it
14  clear for the record. That's all.
15  BY MR. GOODMAN:
16      Q    So when we broke, we were talking
17  about the information you had about wiretaps.
18      A    Okay.
19      Q    So you had -- there was a wiretap of
20  the Fort.
21      A    Yes.
22      Q    And specifically what did you review,
23  what did you see?
24      A    I saw transcripts of conversations

54

1  and, actually, now that I'm thinking about it, I
2  think there was also a wire on the phone at Fort's
3  prison. But I saw transcripts of conversations had
4  between Jeff Fort and other members of the El Rukn
5  street gang and William Swano.
6      Q    I'm sorry. I spaced out for a second.
7  You said there were other -- there was another
8  transcript?
9      A    I think they had another wire on
10  Earl -- I mean, Jeff Fort's phone at his prison in
11  Colorado.
12      Q    You're talking about the regular
13  prison phone, or did he have a cell phone in the
14  prison?
15      A    No. He had the regular phones in the
16  prison.
17      Q    So you reviewed transcripts of
18  conversations from the Fort?
19      A    Yes.
20      Q    And this was all after 2009 or --
21      A    It was after --
22      Q    -- after Nate's acquittal?
23      A    Yes.
24      Q    Did you ever listen to any of the

55

1  taped conversations?
2      A    No. At the time I retired, we had not
3  received any of the tapes.
4      Q    Other than the transcripts of
5  conversations from the wiretap at the Fort, was there
6  any other wiretap information that you reviewed?
7      A    Again, there were wires, I believe,
8  that were from William Swano and from --
9      Q    Let's go to that, then. Tell me about
10  those.
11      A    I remember that there were several
12  conversations between William Swano and members of El
13  Rukns where they talked about --
14      Q    Well, let me just ask: What was this
15  wire?
16      A    The ATF and the federal government had
17  wires on the El Rukns at various locations at that
18  point as part of an ongoing investigation, and we
19  received transcripts of some of those conversations
20  as they related to the Maloney trial and the bribery.
21      Q    Let's go back to the Fort. From your
22  understanding, when was that wire at the Fort active?
23      A    I don't know when it started; I don't
24  know how long it went. I saw transcripts in the

56

14 (Pages 53 to 56)

1   months before the trial of Earl Hawkins and Nathson
2   Fields and wires of conversations taking place during
3   the trial itself, and shortly after the trial.
4       Q       Okay. So the ones you're aware of --
5   this trial was 1985; isn't that correct?
6       MS. MATUZAK: In '86.
7       MR. FIELDS: Yes, '86.
8       MR. GOODMAN: Oh, '86?
9       MR. FIELDS: Yes.
10      MR. GOODMAN: The first trial was in 1986.
11  BY MR. GOODMAN:
12      Q       So the earliest transcripts you saw
13  from the Fort were from '85, '86?
14      A       I think they were either -- a couple
15  months before the actual trial when I remember
16  seeing transcripts, which would have been, I think,
17  the spring of '86.
18      MS. MATUZAK: Yeah. The trial was in June.
19      MR. GOODMAN: The trial was in June.
20  BY MR. GOODMAN:
21      Q       And do you have any knowledge as to
22  whether that wiretap was running in 1984?
23      A       No.
24      Q       You don't know?

57

1       A       No.
2       Q       Then you said there was some other
3   wiretaps that you were aware of and that you saw some
4   reports where Swano was on; is that correct?
5       A       Right. There were conversations from
6   other locations that William Swano was on talking to
7   members of the El Rukns.
8       Q       To your understanding, were these
9   phone wiretaps or were these --
10      A       Phone.
11      Q       -- building wiretaps, as far as you
12  know?
13      A       Phone, as far as I'm aware.
14      Q       Do you know which phones?
15      A       Specifically, no.
16      Q       Were these Swano phones or El Rukn
17  phones?
18      A       I think they were primarily El Rukn
19  phones. I'm not sure about whether one of Swano's
20  phones was actually under the wire or not.
21      Q       And the ones that -- and, again, did
22  you listen to any of these, or did you only see
23  transcripts?
24      A       I just saw transcripts.

58

1       Q       And the transcripts, can you just
2   describe what you viewed that had any relation to the
3   Smith/Hickman murder, any relation to Nate Fields at
4   all. When I say "to Nate Fields," I mean the
5   Smith/Hickman murder, the Vaughn/White murder, or the
6   bribery allegation?
7       A       Basically all the transcripts I saw
8   were in relation to the Jerome Smith/Talman Hickman
9   trial. It was regarding conversations about the
10  bribes that were being solicited and offered on the
11  behalf of Earl Hawkins and Nathson Fields.
12      There were conversations about whether
13  Nathson Fields and Earl Hawkins were aware that the
14  bribes were being offered on their behalf, and what
15  people were doing to facilitate the bribes.
16      Q       If you could be as specific as you can
17  regarding this, tell me what conversations you
18  remember reviewing transcripts of that related to the
19  bribes.
20      A       I mean, I think there were probably
21  close to 60 conversations that I saw transcripts of.
22  A lot of them were dealing with Jeff Fort talking
23  about the mechanics of the bribe.
24      Q       Hang on a second because -- now, some

59

1   of these are from the Fort?
2       A       To my knowledge, yes.
3       Q       So let's just separate them. So you
4   said some were from the Fort that you reviewed and
5   some were from some phone wiretaps; is that correct?
6       A       They were all phones, phones at the
7   Fort and phones at other locations, and I can't tell
8   you offhand where they were.
9       Q       Got you.
10      A       But I think I've seen transcripts from
11  three separate wires.
12      Q       I see. They were all -- I'm probably
13  confused, because my impression was that the wire at
14  the Fort was a monitor in the room, but you're saying
15  it was on the phone.
16      A       From my understanding, it was where
17  the phones were wired.
18      Q       Got you. I guess we could talk about
19  these collectively then.
20      A       Okay.
21      Q       They are all -- because all the
22  wiretap information that you reviewed all related
23  to -- was all in the time period of Nate's 1986
24  trial?

60

15 (Pages 57 to 60)

1     A     A few months before the trial, during
2  the trial itself, and just for a short period after
3  the trial was over with.
4     Q     And all of the conversations you
5  reviewed were related to bribery?
6     A     They all related to bribery or the
7  trial itself in one way or another.
8     Q     Did any of them relate to the
9  shooting?
10    A     As far as specific gen -- specific
11 information, no.  Generally, yes.
12    Q     What type of general information about
13 the shooting?
14    A     Jeff Fort talking to make sure that
15 his guys were taken care of, the fact that people
16 were out talking to witnesses, and how the testimony
17 was going.  They would get updates each day from the
18 courtroom or the courthouse.
19    Q     Anything else?  Well, let's go to the
20 bribery.  What do you recall from these --
21    A     Transcripts.
22          There were a lot of conversations with
23 Jeff Fort about the amount to be paid, what it was to
24 be paid for, whether it was the Hickman case or the

                                                   61

1  Eggers (sic) Vaughn case, or both, the mechanics of
2  how it was to be paid.
3          Jeff Fort didn't trust Bill Swano.
4  There were conversations about make sure that Earl
5  Hawkins and Nathson Fields were aware that they were
6  doing this on their behalf and --
7     Q     Tell me what you recall about
8  conversations that related to Nate's awareness of the
9  bribe.
10    A     I remember a conversation; I believe
11 it was -- Jeff Fort was talking about making sure
12 that both were aware of what was going on.
13    Q     Who was he talking to?
14    A     I don't recall, and that people had
15 said that they had told them.
16    Q     Do you recall why Fort was concerned
17 that Nate be aware?
18    A     There were conversations where he was
19 concerned about the fact that Anthony Sumner was
20 testifying against him, and he wanted to make sure
21 that these guys understood they were doing everything
22 on their behalf because he was afraid that they would
23 testify, at least that's the impression I got.
24    Q     I'm sorry.  I didn't understand that.

                                                   62

1     A     Jeff Fort was concerned -- there were
2  several transcripts where he talks specifically about
3  Anthony Sumner testifying against the El Rukns in
4  that trial.
5          He wanted to make sure that Earl
6  Hawkins and Nathson Fields were aware that he was
7  doing everything on their behalf, and that
8  would be Nathson Fields and Earl Hawkins.
9     Q     Okay.  Your understanding is that Jeff
10 Fort was locked up at this time?
11    A     He was in Colorado.
12    Q     And some of these calls that you
13 recall reviewing might have been recordings from the
14 Colorado prison?
15    A     They could have been.  Again, I don't
16 recall specifically where the wires were outside the
17 Fort.
18    Q     But you do recall reviewing some
19 recordings from the Colorado prison; is that correct?
20    A     I -- reviewed recordings of Jeff
21 Fort's conversations with people.  I can't tell you
22 specifically that they were recorded from the phone
23 in the prison.  I think might have been, but that's
24 just my vague recollection.

                                                   63

1     Q     Okay.  But it's your understanding
2  that at that time, 1985, '86, the prison where Jeff
3  Fort was in was routinely recording phone calls?
4     A     I don't know if this was a retur -- a
5  routine of that, or whether it was all part of the
6  ongoing investigations of the El Rukns and targeted
7  Jeff Fort specifically.  I don't know.
8     Q     Well, today, am I correct -- wait.
9  Jeff Fort was in -- he was in state custody.
10    A     No.  I believe he was in federal
11 custody.
12    Q     He was in federal custody.  Today
13 federal prisons routinely record all calls.  Are you
14 aware of that?
15    A     No.
16    Q     But you're not aware of back in 1986
17 whether federal prisons were recording?
18    A     No, I'm not.
19    Q     So let's go back to -- let me go back
20 to Derrick Kees.  I want to show what we'll mark as
21 Exhibit Number 92.
22          (WHEREUPON, Fields Exhibit 92 was
23           marked and tendered to Witness.)
24 BY MR. GOODMAN:

                                                   64

16 (Pages 61 to 64)

1    Q    I'm going to show you a letter and ask
2  you to review it, and then I'm going to ask you some
3  questions about it.
4         (WHEREUPON, the Witness complied.)
5    A    Okay.
6    Q    Do you recognize this letter?
7    A    It appears to be a letter that I
8  wrote.
9    Q    And it's not dated?
10   A    No.
11   Q    Do you have an approximate idea of
12  when it was written?
13   A    I do not.
14   Q    It's written to Dan Gillogly, who was
15  an Assistant United States Attorney --
16   A    Okay.
17   Q    -- is that correct?
18   A    Yes.
19   Q    And in the letter, let me just read
20  the first sentence.  It says, "I am requesting the
21  assistance of your office in arranging a visit and
22  interview with Derrick Kees, who is in your Witness
23  Protection Program."
24        The second sentence:  "As you know,

65

1  Derrick has already talked with me about information
2  he has regarding Nathson Fields and Earl Hawkins, and
3  the double murder they are currently set to be
4  re-tried on."
5        So let me ask you first:  This letter
6  is requesting to set up an interview with Derrick
7  Kees; is that correct?
8    A    Yes.
9    Q    Do you know if, in fact, one was set
10  up after that letter was sent to Dan Gillogly?
11   A    I know I visited Derrick Kees one
12  time.
13   Q    Well, according to the letter, you had
14  already -- it says "As you know, Derrick has already
15  talked with me about information he has regarding
16  Nathson Fields."
17        Do you know -- does this refresh your
18  recollection as to when that initial conversation
19  with Nate -- with Derrick Kees was?
20   A    No.
21   Q    Was it in person or on the phone?
22   A    As far as I remember, I saw him one
23  time only, so it must have been on the phone.
24   Q    And you spoke to Derrick Kees only one

66

1  time?
2    A    I don't remember talking to him on the
3  phone, to be honest with you, but it appears I did.
4    Q    Well, the second paragraph says,
5  "Derrick himself has called me and requested to once
6  again talk to me regarding that case, and his
7  attorney for appeal is also aware of these
8  conversations."
9    A    Okay.
10   Q    So does that refresh your recollection
11  as to whether you talked to Derrick Kees on the
12  phone?
13   A    Again, I don't specifically recall.
14  Apparently I did.
15   Q    It's still your recollection that you
16  only talked to him one time, and that was in person?
17   A    I only visited him, as I recall, one
18  time.
19   Q    And that visit was arranged by the
20  Feds; is that correct?
21   A    Yes.  I had to go through Washington.
22   Q    So this letter, would you agree, is
23  setting up that visit?
24   A    It appears to.

67

1    Q    And it appears from this letter that
2  you had already spoken to him prior to this?
3    A    It appears to.
4    Q    But you have no recollection of that
5  initial call?
6    A    Specifically?  No.
7    Q    From this first sentence of the second
8  paragraph, again, "Derrick himself has called me and
9  requested to once again talk to me regarding that
10  case."  "That case" refers to the Nathson Fields/Earl
11  Hawkins prosecution; isn't that correct?
12   A    Yes.  That's the only conversation I
13  would have had with him.
14   Q    In this -- in the final paragraph you
15  say that if approved, I would be visiting with my
16  partner, Brian Sexton, and an investigator from my
17  unit who would be either Thomas Pack or William
18  Pavlik.
19        In fact, when the visit was arranged,
20  do you recall whether it was Thomas Pack or William
21  Pavlik that was the investigator?
22   A    You know, actually, as I'm thinking
23  about it, what I think happened is I had already gone
24  out to visit him the first time and talk to him, and

68

17 (Pages 65 to 68)

1  we had decided we were not going to use him as a
2  witness.
3      He called me afterwards to somehow ask
4  us what was going to go on, whether we were going to
5  use him, that he wanted to talk to us. I don't think
6  I ever went out and visited him this second time. I
7  think I might have sent this letter trying to make
8  arrangements, but we decided that we were not going
9  to go back out and talk to him.
10     Q    Well, the first time you talked to
11 him, he was in federal protective custody; is that
12 correct?
13     A    Yes.
14     Q    Witness Protection?
15     A    Yes.
16     Q    So that would have had to have been
17 arranged --
18     A    It was arranged through Washington.
19     Q    So you would have had to have written
20 a similar letter to this in order to arrange the
21 visit, correct?
22     A    I would have had to write some letter
23 asking to visit. Yes.
24     Q    So it's your recollection that there

69

1  is another letter to the U.S. Attorney requesting to
2  set up an earlier visit with Derrick Kees?
3      A    I would assume so. Yes.
4      Q    Do you know if that was also to Dan
5  Gillogly?
6      A    To tell you the truth, I don't know
7  why I wrote a letter to Dan Gillogly. I don't
8  remember him specifically being involved in this. So
9  I -- I don't know, to be honest with you.
10     Q    Well, if Derrick Kees was in federal
11 protective custody -- prior to the time you first
12 contacted Derrick Kees, had he testified for --
13     A    He testified --
14     Q    -- the Feds?
15     A    -- in federal cases. Yes.
16     Q    So would it be a fair assumption that
17 Dan Gillogly was the federal prosecutor on the
18 federal case that --
19     A    He had --
20     Q    -- Derrick Kees testified?
21     A    He would have had some connection with
22 the El Rukn cases. Normally I would go through
23 William Hogan of the U.S. Attorney's Office, or there
24 was another female assistant that was involved in the

70

1  El Rukn -- Vickie Peters, that I dealt with. I don't
2  know why I sent a letter to Dan Gillogly, to be
3  honest with you.
4      Q    You say, "I am hoping to arrange this
5  visit for Friday, November 5th." In this letter you
6  say -- there's no year. Do you know what year this
7  letter was written?
8      A    No.
9      Q    Well, this letter would have been
10 written before Earl Hawkins had decided to cooperate;
11 is that correct?
12     A    Yes.
13     Q    Let me show you a second letter
14 related to Earl Hawkins and ask you to review it.
15         (WHEREUPON, Fields Exhibit 93 was
16          marked and tendered to Witness.)
17     Go ahead and review it, Mr. Kelley,
18 and let me know when you're ready.
19         (WHEREUPON, the Witness complied.)
20     A    Okay.
21     Q    So I'm asking about this letter. The
22 first sentence of the letter -- and do you recognize
23 this letter?
24     A    Yes, I recognize my signature.

71

1      Q    That's your signature?
2      A    Um-hum.
3      Q    And this letter is dated July 11th,
4  2002?
5      A    Yes.
6      Q    And this letter is written to William
7  Hogan?
8      A    Yes.
9      Q    And he was an assistant U.S. attorney
10 back then?
11     A    Yes.
12     Q    And he was involved, if you recall, in
13 the El Rukn prosecutions?
14     A    He was.
15     Q    The first sentence says, "As we have
16 previously discussed, it now appears that Earl
17 Hawkins has agreed to testify for the State in its
18 prosecution of his codefendant Nathson Fields."
19     When you sent this letter -- and then
20 the next sentence says, "We would therefore be
21 requesting your assistance in arranging for the
22 opportunity of interviewing Earl Hawkins in
23 preparation for his eventual testimony."
24     When you sent this letter to him, had

72

18 (Pages 69 to 72)

**Page 73**

1  you spoken to Earl Hawkins?
2      A    If this was the letter from my first
3  visit, no.
4      Q    So the agreement for Earl Hawkins to
5  testify was something that had been arranged between
6  you and the McDermott, Will & Emory lawyers; is that
7  correct?
8      A    Yes.
9      Q    And your testimony earlier today was
10 that your discussions with the McDermott, Will &
11 Emory lawyers said that there would be no agreement
12 whether or not to use Earl Hawkins until you found
13 out -- until you had an opportunity talk to him about
14 the bribery.
15      A    Right.  We had a tentative agreement,
16 but we had nothing solid until we talked to him.
17      Q    Does this letter change your
18 recollection at all, because now it says that "Earl
19 Hawkins has agreed to testify for the State in its
20 prosecution of his co-defendant Nathson Fields"?
21      A    No.
22      Q    So it's still your tes -- so tell me
23 again exactly what the agreement was at the time you
24 sent this letter between you and Earl Hawkins'

**Page 74**

1  lawyers.
2      A    As I recall, it was he agreed to
3  testify to us -- or he agreed to testify for us
4  contingent on our talking to him about what evidence
5  he had to make a final decision.
6      Q    Okay?
7      A    That's why we went out to talk to him.
8      Q    In any of your discussions for that
9  agreement between you and the McDermott, Will & Emory
10 lawyers, was any of that in writing?
11      A    At that point, no.
12      Q    At some point there was a written plea
13 agreement --
14      A    After it was --
15      Q    -- between your office --
16      A    -- finalized, yes.
17      Q    As a result of this letter, was a
18 visit arranged?
19      A    I visited Earl three times out there,
20 so at three points I went out and visited him.
21      Q    And each time you visited him, did you
22 send a letter like this to Bill Hogan or somebody,
23 some U.S. attorney involved in the case?
24      A    I don't remember whether Washington

**Page 75**

1  wanted one each time or whether they just wanted one
2  the first time.
3      Q    But your recollection is this letter
4  was prior to the first visit?
5      A    I don't remember the dates of when I
6  visited, so I can't say.  But I assume it was.
7      Q    Okay.  Based on your letter, it says,
8  "We would therefore be requesting your assistance in
9  arranging for the opportunity of interviewing Earl
10 Hawkins."  It doesn't say "reinterviewing."  Would
11 you have said "reinterviewing" if this was to be a
12 second?
13      A    No.  I just would use "interviewing."
14      Q    Let's talk about the three interviews
15 with Earl Hawkins.  The first one, we're presuming --
16 if this letter was July 11th, 2002, do you recall how
17 quickly that visit was arranged?
18      A    No.
19      Q    Tell me what you recall about the
20 first visit with Earl Hawkins.
21      A    The first interview with Earl Hawkins,
22 we went out with his attorney from McDermott, Will &
23 Emory, myself and Brian Sexton.  We talked to him at
24 the facility.

**Page 76**

1      Q    Do you remember the name of the
2  attorney?
3      A    No, I don't.
4      Q    Go ahead.
5      A    We talked to him at the facility
6  regarding his knowledge of the murder.
7      Q    Did you begin with any discussions
8  about arrangements that you had made with his
9  attorney?
10      A    His attorney talked to him about that.
11      Q    In your presence?
12      A    I don't remember if he talked to him
13 before we talked to him or not.
14      Q    What is the first thing you remember
15 about the interview?
16      A    We just basically asked him what he
17 knew about the murder; he went through it.  We asked
18 him what he knew about the bribery, in particular as
19 it applied to Nathson Fields at that point, and he
20 went through it, and that was pretty much the
21 conversation.
22      Q    And what did he tell you about the
23 bribery in that first conversation?
24      A    That Jeff Fort had approved the bribe

19 (Pages 73 to 76)

1    for him and Nathson Fields, that he had talked
2    numerous times with Nathson Fields regarding the
3    bribe in the bullpen while they were in court, that
4    both were aware of what was going on, that members of
5    the El Rukns would visit them in jail and update
6    them; I believe Alan Knox was the person that he
7    mentioned coming at least once, that they would talk
8    about it amongst themselves in deciding what they
9    were going to do.
10       Q    Did you or Mr. Sexton take notes?
11       A    At that point, no.
12       Q    And there was no one else present
13   other than -- there was no investigator present?
14       A    Not at that first interview, no.
15       Q    After that -- okay. After that
16   interview, were there then -- did you then have
17   further discussions with McDermott, with Earl's
18   lawyer?
19       A    After that conversation, it was pretty
20   quick where we finalized the agreement, and then we
21   had to run that agreement by our supervisors for
22   final approval.
23       MR. GOODMAN: Do we have that agreement --
24       MS. MATUZAK: No.

77

1       MR. GOODMAN: -- the plea agreement?
2       MS. MATUZAK: From 2002? No.
3       MR. GOODMAN: What agreement do we have?
4       MS. MATUZAK: An undated plea agreement
5    between Earl Hawkins, the U.S. Attorney's Office, and
6    the Cook County State's Attorney's Office.
7       MR. GOODMAN: Well, why don't we look at that.
8    BY MR. GOODMAN:
9       Q    So it was after this first interview?
10   You said there were three interviews with Earl
11   Hawkins; is that correct?
12       A    Three -- three before he testified on
13   the trial. There's been one since regarding the
14   Certificate of Innocence. So I've had a total of
15   four interviews with Earl Hawkins.
16       Q    But the plea agreement that you worked
17   out was between the first and the second interview?
18       A    I think so. Yeah.
19       MS. MATUZAK: Okay. This will be marked as
20   94, or do you want to --
21   BY MR. GOODMAN:
22       Q    Well, tell me about the plea
23   agreement, because I'm not sure this is the right
24   one. Tell me about the plea agreement that you then

78

1    worked out between the first and second interview?
2       A    Well, originally we talked generally
3    about a plea agreement. We wanted to talk to Earl,
4    we talked to Earl. After we talked to Earl, we had
5    to go in front of our supervisors in the office,
6    which is why we went to talk to Earl first because
7    they would have asked us what he was going to testify
8    to. We then went in front of our supervisors for a
9    decision on whether we could make this offer, and
10   that was approved. Then we finalized the agreement
11   with their attorneys.
12       Q    What supervisor did you talk to?
13       A    We had a meeting with several
14   supervisors, including the State's Attorney.
15       Q    Who was the State's Attorney?
16       A    Dick Devine at the time.
17       Q    And were Earl Hawkins' lawyers
18   involved in those meetings, or no?
19       A    They weren't present. No.
20       Q    What was the result of the discussion
21   with your supervisors and with Dick Devine?
22       A    They agreed to allow us to make an
23   offer to Earl Hawkins.
24       Q    And what was the offer that you made

79

1    to Earl Hawkins?
2       A    It was a plea to two counts of armed
3    violence, that he would serve 42 years on each count,
4    those counts to be consecutive, that that period of
5    84 years would run concurrent with his federal
6    sentence, that because of his Witness Protection
7    position, he would serve his full sentence in federal
8    custody as opposed to state.
9       Q    And the two counts of armed violence
10   were based on the shootings of Smith and Hickman; is
11   that correct?
12       A    Yes.
13       Q    Okay. You then communicated that
14   agreement to Hawkins' lawyers?
15       A    Well, we, again, had a parameter of
16   what the agreement would be. But once we had the
17   approval, yes.
18       Q    And then did you draft a written plea
19   agreement?
20       A    You know, I don't think we actually
21   got around to drafting until he actually came in to
22   testify and we presented to the court, but we had an
23   agreement, and I don't recall whether we -- what
24   writing we did to, you know, signify that.

80

20 (Pages 77 to 80)

1    Q    But at some point there was a written
2  plea agreement?
3    A    Yes.
4    Q    You're saying it was worked out, as
5  far as you recall, between the first and second time
6  you interviewed Earl Hawkins?
7    A    Well, again, we pretty much set the
8  parameters before we went out and talked to Earl.
9  But it was finalized, yes, after.
10    MR. GOODMAN:  Is this it?  It's not.
11    MS. MATUZAK:  No, that's not.
12  BY MR. GOODMAN:
13    Q    The finalized plea agreement, it
14  would -- was it entered in court?
15    A    We filed it in court during the trial.
16  Yes.
17    Q    And it was signed by Earl Hawkins?
18    A    Yes, it was signed by Earl.
19    Q    Were the Feds a party to that
20  agreement, do you recall?
21    A    Only to the extent that they agreed
22  that he would serve his time in federal custody.
23  They were aware of the agreement.
24    Q    Did they -- did any federal official

81

1    A    I don't know if he was in court when
2  the actual plea went down.  He was in court that day,
3  because that was the day that Earl Hawkins testified.
4    Q    So you entered the plea on the same
5  day as his testimony?
6    A    Yes, because that's the day we had
7  Earl Hawkins sign off on it, because we didn't have
8  him available to sign off before that.
9    Q    And you entered the plea in front of
10  Judge Gaughan?
11    A    Yes.
12    Q    I'm going to show you what we're going
13  to mark as 94, and I'll ask you to review this and
14  tell me if it's a document that you're familiar with.
15         (WHEREUPON, Fields Exhibit 94 was
16          marked and tendered to Witness.)
17    A    I am.
18    Q    Okay.  Tell me what this is.
19    A    This is his plea agreement in federal
20  court.
21    Q    Is this the plea agreement that had
22  been entered before the plea agreement that you just
23  described in front of Judge Gaughan?
24    A    Yes.  This was his plea agreement to

83

1  sign the agreement?
2    A    No.
3    Q    Okay.
4    A    Not that I'm aware of.
5    Q    And the agreement was -- the caption
6  of the plea agreement would have been the case
7  caption for the People v. --
8    A    Yes.
9    Q    -- Earl Hawkins; is that correct?
10    A    Yes.
11    Q    And the case number --
12    A    Yes.
13    Q    -- would have been Smith/Hickman?
14    A    Yes.
15    MR. GOODMAN:  We don't have copies.
16    MS. MATUZAK:  I've never seen a copy of that
17  agreement.  I would like to, but I haven't.
18  BY MR. GOODMAN:
19    Q    When was the last time you saw that
20  agreement?
21    A    Probably when we were in court
22  presenting it.
23    Q    Was Nate Fields in court when Hawkins
24  pled?

82

1  the federal charges.
2    Q    Do you know the approximate date when
3  this one was -- there's no date on it that we can
4  find.
5    A    I don't know.
6    Q    Do you know when Cecil Partee was the
7  state's attorney?
8    A    Whew.  Good question, '87, '88, '89,
9  that time frame.  I don't know exactly.
10    Q    Okay.  I won't hold you to it.
11    A    Thanks.
12    Q    So you were aware of this plea
13  agreement when --
14    A    Yes.
15    Q    -- you entered your agreement?
16    A    Ours was run consecutive -- or
17  concurrent with that.
18    Q    All right.  Tell me about the second
19  visit with Earl Hawkins.
20    A    The second visit I went out with Brian
21  Sexton and an investigator, and at that point, we
22  memorialized and did an investigator's report
23  regarding what Earl Hawkins had told us, specifically
24  regarding the bribery evidence.

84

21 (Pages 81 to 84)

1    Q     Did you bring an investigator with?
2    A     Yes.
3    Q     Do you remember his name?
4    A     I believe it was Norfie DeCiolla.
5    Q     Who else was present for that?
6    A     Myself and Brian Sexton.
7    Q     And Hawkins' lawyers weren't present
8 for that?
9    A     No.
10   Q     But you had approval from them?
11   A     Right.  We had already had an
12 agreement at that point.
13   Q     We have two handwritten reports.  I'm
14 going to show them to you --
15   A     Okay.
16   Q     -- and see if you recognize them.  So
17 this is the first one.
18         (WHEREUPON, Fields Exhibit 95 was
19              marked and tendered to Witness.)
20         Let me ask you if you recognize that,
21 if you recognize the handwriting.
22   A     I don't recognize the handwriting, but
23 I'm assuming these are Norfie DeCiolla's notes.
24   Q     Do you want to review it and see does

85

1    MR. GOODMAN:  They are?  December 17th, 2002.
2    THE WITNESS:  They appear to be.  I think one
3 is the original notes from when he was there at the
4 facility; these are more formalized for his written
5 report.
6 BY MR. GOODMAN:
7    Q     Let me ask you a couple questions
8 about these notes and ask you whether you recall --
9 or did you take notes during this second interview?
10   A     No.
11   Q     I'm just going to skip ahead.
12   MR. GARCIA:  Which interview do you have?
13   MS. MATUZAK:  It's 96.
14   MR. GOODMAN:  Exhibit 96, the second one.
15 BY MR. GOODMAN:
16   Q     On page 2, let me just ask you a
17 couple questions about it.  So the paragraph that
18 begins on the bottom of the page, "During the
19 mid-80's," and then it says, "1984, a rival gang
20 known as the 'Goon Squad' a faction of the Black
21 Gangster Disciples began selling drugs in and around
22 the project building located at 706 East 39th
23 Street."  Do you remember Hawkins talking about that?
24   A     Yes.

87

1 this appear to be notes from that second interview?
2    A     Yes.
3    Q     How can you tell?
4    A     The fact that just myself and Brian
5 Sexton and the in -- the person taking the notes were
6 present.
7    MR. GOODMAN:  Let me show him the second one,
8 then.
9    MS. REPORTER:  This is 96.
10         (WHEREUPON, Fields Exhibit 96 was
11              marked and tendered to Witness.)
12 BY MR. GOODMAN:
13   Q     I'll ask if you recognize it.
14   A     They appear to be Norfie DeCiolla's
15 notes a little more put together.
16   Q     So this is the same handwriting as the
17 first, as far as you can tell?
18   A     It appears to be, but I'm not a
19 handwriting expert.
20   Q     Okay.  Do you know why there's two
21 separate sets of notes from the same interview?  Do
22 they appear to be from the same interview -- strike
23 that.  Let me --
24   MS. MATUZAK:  Yes.

86

1    Q     Then on this top of the third page, it
2 says, "During that period in 1984 Earl Hawkins stated
3 that he had telephone conversations with his leader,
4 Jeff Fort, about the situation with the 'Goon
5 Squad.'"  Do you see that?  Do you recall him talking
6 about that?
7    A     Yes.
8    Q     By the way, is there anything in the
9 second interview that changed from the first
10 interview in terms of Hawkins' --
11   A     No.  We were just documenting what he
12 told us this time, because the first time we didn't
13 have an agreement so we didn't take notes.
14   Q     The second sentence says, "These
15 conversations took place over the phone because Jeff
16 Fort was incarcerated in federal custody."
17   A     Yes.
18   Q     And that's what he told you with
19 the -- about these conversations where Jeff Fort
20 would call in and --
21   A     He would --
22   Q     -- he was concerned --
23   A     -- three-way call and he would talk to
24 Jeff Fort.  Yes.

88

22 (Pages 85 to 88)

1   Q    And he was concerned about the Goon
2   Squad, the --
3   A    Yes.
4   Q    -- situation with the Goon Squad?
5   A    That's correct.
6   Q    Do you know whether any of these
7   conversations from that time period were ever
8   obtained by the state or the Feds?
9   A    To my knowledge, I don't know.
10  Q    Then sort of a third of the way down,
11  it says, "Hawkins asked one of his fellow gang
12  members who knew Fuddy fairly well to start watching
13  Fuddy with him." Do you recall Hawkins saying that?
14  A    Yes. Rodell Banks.
15  Q    So he did identify the gang member who
16  knew "Fuddy" as Rodell Banks?
17  A    Yes.
18  Q    And eventually Fort told Hawkins to
19  "'take care of business' and kill Fuddy." That's
20  what Hawkins told you?
21  A    Yes.
22  Q    And then farther down --
23  A    What page?
24  Q    The same page. Well, let me just

89

1   finish from there. The next sentence says, "Fort
2   told Hawkins that he didn't want Hawkins directly
3   involved because he was too well known around the
4   area." Is that what Hawkins told you?
5   A    "So after Hawkins spoke to other
6   Q    "So after Hawkins spoke to other
7   generals in the gang and then to Jeff Fort, it was
8   agreed they would select some El Rukns who were less
9   known in the area." Is that what he told you?
10  A    Yes, that the generals selected people
11  from outside that specific area.
12  Q    Then it says, "That is when they chose
13  three El Rukns who," and then it's sort of scratched
14  out, but it says, "were living in the suburbs,
15  Nathson Fields, George Carter, and Hank Andrews.
16  They then discussed the 'setup hit' with the three
17  and all agreed to participate." Is that what he told
18  you?
19  A    Yes.
20  Q    Then on the last page -- not the last
21  page, but the next page, "Hawkins then stated they,"
22  and I'm not sure what that says, "them and went to
23  the location where he pointed out 'Fuddy' to the
24  others." Do you remember him saying that?

90

1   A    Yeah, that "the four of them went to
2   the location." He was with them at that point.
3   Q    Who was the one that pointed him out
4   to the --
5   A    Earl Hawkins.
6   Q    So Earl Hawkins was the one that knew
7   "Fuddy"; is that right? Is that --
8   A    Yes.
9   Q    -- your understanding? And "He stated
10  that Carter and Fields then carried out the shooting
11  of Fuddy and another person who happened to come out
12  of the building by the name of Talman Hickman."
13  A    Yes.
14  Q    That's what he told you? Before I
15  forget, let me ask you a question about -- were there
16  any plea offers made to Nate during the proceedings
17  of your involvement in front of Judge Gaughan?
18  A    I think we might have brought it up
19  with his attorneys, but they weren't interested.
20  Q    What was the offer?
21  A    We never even got to that point.
22  Q    So what was the discussion that you
23  had with Nate's attorneys about --
24  A    Just was he interested.

91

1   Q    Was he interested in a plea?
2   A    And they said no.
3   Q    Was there any discussion as to what he
4   would plea to?
5   A    No.
6   Q    I mean, was it said that he would have
7   to plea to the murder, or what was --
8   A    We never even discussed that or asked
9   that.
10  Q    All right. Let me ask you about
11  James -- Randy Langston. What was your first contact
12  with Randy Langston?
13  A    At some point we located where Randy
14  Langston was staying, and I went and talked to him.
15  Q    Let me -- I'm sorry. Could you say
16  that one more time?
17  A    At some point we found out where Randy
18  Langston was staying, and I went and talked to him.
19  Q    And just to be clear: Was there ever
20  an offer to Nate Fields, communicated to Nate Fields
21  or to his attorney, that the charges would be dropped
22  if he would agree not to sue?
23  A    No, not from me.
24  Q    From anyone, to your knowledge?

92

23 (Pages 89 to 92)

1    A    No.

2    Q    All right. So you said at some point

3  you learned where Randy Langston was staying?

4    A    Right.

5    Q    Tell me about that. Do you recall

6  when?

7    A    After I got the case, I had

8  investigators try to locate as many of the witnesses

9  as I could, and at some point they located Randy

10  Langston, and I went to talk to him.

11    Q    Do you remember where he was staying?

12    A    The first time I talked to him, I

13  think he was out of custody and he was staying at a

14  house in Chicago.

15    Q    Do you remember what part of town?

16    A    West side, I think, but I'm not sure.

17    Q    When you went to see him, who was

18  present?

19    A    Myself and another investigator.

20    Q    Do you remember the name of the

21  investigator?

22    A    No.

23    Q    Was this your first communication with

24  Randy Langston?

93

1    A    As far as I can remember, yes. I

2  don't think I talked to him on the phone beforehand.

3    Q    So it was a surprise visit?

4    A    I don't know if -- investigators found

5  him first. I don't remember whether they said, "Are

6  you going to be around so we can talk to you later"

7  or not. I just don't --

8    Q    You don't know if he was expecting

9  you?

10    A    I don't remember.

11    Q    Tell me what you remember about that

12  first visit.

13    A    Not much. I just introduced myself,

14  told him I was there, said I wanted to talk to him,

15  asked him if he heard about what happened, and he

16  told me he did and he went through it, which was

17  pretty consistent with his testimony from the trial.

18  I told him he may have to testify if this case went

19  back to trial again, and that was pretty much it.

20    Q    Did you have any transcripts with you

21  when you went?

22    A    When I first talked to him, no. I

23  might have had police reports.

24    Q    Do you remember if you showed him

94

1  police reports?

2    A    I don't remember.

3    Q    Then what's the next communication

4  with Randy Langston that you recall?

5    A    I don't really remember. I mean, I

6  talked to him several times on the phone and in

7  person.

8    Q    Did you -- during this first interview

9  when you said he gave a consistent statement, did you

10  discuss with him the testimony that he had given at

11  the sentencing hearing of Nate's original trial?

12    A    Yeah.

13    Q    What did he say about that?

14    A    He said that he testified that way

15  because from the time of the trial until the

16  sentencing, he was in the Illinois Youth Center, that

17  two members of -- or, actually, no, this is the time

18  that his brother James Langston came down and told

19  him that the family was receiving intimidation from

20  the El Rukns about this case and that they were

21  worried, and he testified the way he did because he

22  was afraid for him and his family.

23    Q    And this was during the first meeting

24  with him?

95

1    A    I don't know if we got into all that

2  much detail in the first meeting, but he -- yeah, he

3  mentioned that he had been intimidated.

4    Q    By El Rukns?

5    A    Well, his brother told him the first

6  time he changed his testimony was during the

7  sentencing and that was when he was in St. Charles.

8  I think it was St. Charles Juvenile Facility, and

9  that's why he testified the way he did at the

10  sentencing, he told me.

11    Q    Did he say he was threatened by El

12  Rukns while he was at St. Charles?

13    A    No. His brother, I think it was

14  James, told him that their family members outside of

15  Chicago were the ones receiving pressure.

16    Q    So while he was in St. Charles, he

17  got -- he told you that James had communicated to him

18  that the family was getting threats?

19    A    I believe it was his older brother

20  James that came down to visit him.

21    Q    Did you do anything -- and you recall

22  you received this information during your first visit

23  with him at that house on the west side?

24    A    I think so. I don't specifically

96

1     remember all the conversation.
2          Q     But you did ask him about his prior
3     testimony where he had said --
4          A     Yes --
5          Q     -- something different?
6          A     -- I did.
7          Q     And he told you that that was false
8     and that that was because he had been threatened; is
9     that correct?
10          A     He told me what he testified at the
11     sentencing hadn't been true, and what he was telling
12     me at that point was.
13          Q     And he said the reason why he gave
14     that false testimony is because he got a visit while
15     he was at St. Charles from James, who told him about
16     the threats?
17          A     I believe it was James.  Yes.
18          Q     Did you at any point in time receive
19     any information or do anything to corroborate this
20     thing that you were hearing, that there were threats
21     made to the family around that time, 1986?
22          A     At some point I talked to his brother
23     Eric Langston; he had been listed in the police
24     reports.  We tracked him down, and he had testified

97

1     at the sentencing, I think; I'm not sure he testified
2     at the trial.  But we talked to him and he said he
3     wasn't going to get involved in this, that he had
4     received threats, and basically was very
5     uncooperative with us.
6          Q     What did he tell you -- well --
7          A     That he wasn't --
8          Q     -- where did you find Eric?
9          A     We found him, I think, at a place on
10     the west side.
11          Q     Do you recall approximately when this
12     was?
13          A     No.
14          Q     But it was after you talked to Randy?
15          A     I don't even remember if it was before
16     or after, which one we found first.
17          Q     Tell me what -- was there an
18     investigator with you?
19          A     Yes.
20          Q     What was the name of that
21     investigator?
22          A     I don't recall.
23          Q     Was it just you and the investigator?
24          A     Yes.

98

1          Q     Tell me everything you remember about
2     what Eric told you.
3          A     He was basically very uncooperative.
4     I just said, "I'm not getting involved in this; you
5     ain't going to make me come to court.  And if you do,
6     I'm ain't saying nothing."
7          I said, "Why?"
8          He said, "I'm not getting involved
9     with the El Rukns.  They been hass" -- you know, I
10     forget his exact words, but basically he felt
11     threatened.
12          Q     And said he didn't want to get
13     involved because he felt threatened?
14          A     He said he didn't want to get involved
15     with the El Rukns, or words to that effect.  I don't
16     recall specifically what he said.
17          Q     What did he say about threats?
18          A     I took it from what he said that he
19     was afraid, and he was afraid of testifying against
20     the El Rukns, that he had -- I didn't ask him
21     specific -- he wouldn't tell me any specifics.
22          Q     So he didn't give you any specific
23     information --
24          A     No.

99

1          Q     -- about any threats?
2          A     He was pretty uncooperative.
3          Q     Other than that conversation with
4     Eric, was there anything else, any other information
5     you had, related to threats against any member of the
6     Langston family?
7          A     You know, I don't think I could ever
8     track down James.  I tried to.  I'm not sure whether
9     he's deceased or what, but the bottom line is I
10     couldn't find James.  I tried to find him and I was
11     unsuccessful.  He might have been dead.
12          Q     Did you talk to any other Langstons?
13          A     The only other one that I was aware of
14     was Sandra, and I found out later that she was in
15     prison and she wasn't talking to us.
16          Q     Did you attempt to talk to Sandra?
17          A     I located her, and I don't know
18     whether I talked to her attorneys, because she was up
19     in Wisconsin, and they told me she don't want nothing
20     to do with us.  I -- I don't recall specifically.
21          Q     So you never actually spoke to her?
22          A     In person, no.
23          Q     On the phone?
24          A     No.

100

25 (Pages 97 to 100)

1    Q    So the only Langston -- other than
2  your conversation with Randy, the only other Langston
3  you ever spoke to was Eric, and that was just on one
4  occasion?
5    A    As far as I remember, those are the
6  only two I talked to.  There was a bunch of Langstons
7  out there.  I just. . .
8    Q    And did you do anything else to
9  corroborate his story about him getting threats or
10  his family getting threats?
11    A    I couldn't think of anything else to
12  do.  No.
13    Q    Were there any threats reported to the
14  Chicago Police Department that you --
15    A    Not that I'm aware.
16    Q    -- knew of?  Did you check?
17    A    I asked Randy if he said it to anybody
18  else, and he said no.
19    Q    Do you know where the family was
20  living at the time of Nate's sentencing back in 1986?
21    MR. GOODMAN:  Was it '86?  Your sentencing was
22  in '86?
23    MR. FIELDS:  '86.  Yes.
24  BY MR. GOODMAN:

101

1    Q    You don't know?
2    A    No.
3    Q    They were living in Chicago?
4    A    I don't know.
5    Q    Did you ever get the names of any El
6  Rukns that issued threats to the Langston family?
7    A    The name James Spates came up, but not
8  from Randy.
9    Q    Who brought that name up?
10    A    Earl Hawkins.
11    Q    What did Earl Hawkins say about James
12  Spates?
13    A    He said James Spates was the person
14  assigned by the El Rukns to deal with the witnesses,
15  and he also mentioned that he had tried to talk to
16  "the boys" that were witnesses.  In fact, that was
17  mentioned in one of the wire transcripts.
18    Q    So there's a tran -- tell me what you
19  remember about this transcript that related to
20  talking to "the boys."
21    A    There's a transcript out there where
22  James Spates' street name -- and I don't recall what
23  it is offhand -- is mentioned as trying to talk to
24  "the little ones," or words to that effect, which

102

1  Earl told me was in regard to talking to Randy
2  Langston.
3    Q    Was it clear from this transcript that
4  that conversation related to the Smith/Hickman case
5  or to Nate and Earl's prosecution?
6    A    It didn't specifically mention the
7  case, but it was pretty clear to me what it was
8  about.
9    Q    So during your conversations, you had
10  three conversations with -- well, let me go back to
11  Earl Hawkins for a second.
12    A    Okay.
13    Q    We talked about the second one, and
14  that's the one we have those notes from, right?
15    A    Correct.
16    Q    And then there was a third one?
17    A    Yes.
18    Q    Tell me about the third one.
19    A    The third one was when we were getting
20  close to trial, and myself and an investigator went
21  back out to talk to Earl Hawkins to go over his
22  testimony and get him ready to testify at trial.
23    Q    You said at some point -- strike that.
24    Was there anything else in that third

103

1  conversation that he told you that was different from
2  what he said in the first two conversations?
3    A    No.  He was pretty consistent in the
4  third conversation about everything he had testified.
5    Q    At some point you had a conversation
6  with Earl Hawkins about transcripts of overheard
7  conversations involving Jeff Fort and the others; is
8  that correct?
9    A    That was after we received the
10  transcripts that's the Certificate of Innocence visit
11  that I did with Earl Hawkins.
12    Q    And that was sometime in what year?
13    A    The end of 2012.
14    Q    Who was present for that visit?
15    A    Myself and Brian Sexton.
16    Q    No investigator?
17    A    No.
18    Q    Did you bring transcripts with you at
19  that visit?
20    A    We brought copies of the wire
21  transcripts that we had.  We wanted him to help us
22  understand some of the names and what they were
23  talking about.
24    Q    How long did that visit last?

104

26 (Pages 101 to 104)

A Three, four hours.
Q What else did you talk about during that visit that was different than -- well, tell me what you talked about with --
A We told him that he may have to come back and testify at the Certificate of Innocence hearing, so we went over again generally what he remembered about the murder. Again, he was consistent with his previous testimonies and what he had told us.
We then went over the transcripts of the wires, ones where he specifically was speaking and ones where we wanted him to give us a little help with nicknames and what they were talking about.
Q Did you take notes during that meeting?
A No.
Q Anything else you talked about other than the wires?
A Just the case and that he'd have to come back and testify.
Q Did you talk about his -- any -- did you talk about any deals with Earl Hawkins or anything related to how much time he was going to

105

serve?
A He was complaining about how much time he was serving, but that was it.
Q And what did you tell him?
A I told him I couldn't do anything about it. He made the deal.
Q Let's go back to Randy Langston.
THE WITNESS: Can I just get a little more water?
MR. GOODMAN: Sure, sure. Do you want to take a break?
THE WITNESS: No. That's fine.
BY MR. GOODMAN:
Q Okay. So let's go back to Randy Langston. The next -- so you talked about your first meeting with him, and that was at some house on the west side?
A I think so. Yes.
Q Tell me the next contact you had with Randy Langston that you recall.
A I really don't recall the specific contacts I had with him. You know, at one point he got rearrested and sent down to the Department of Corrections where he was for a period of time. I had

106

con -- or he sent me letters a couple times.
Q But all of this was after that initial meeting?
A Yeah. He spent a lot of time in custody, either state or federal, along the way.
Q He would send you letters. Did you have additional meetings with him when he was locked up?
A I know I didn't see him when he was in federal custody. I don't know whether I went down and talked to him when he was in state custody. I don't recall.
Q So you recall visiting him the first time on the west side, or you believe it was on the west side, someplace in Chicago?
A Yeah, and I had him come to our office on occasion where I had an investigator bring him.
Q How many times did he come to your office?
A A couple maybe.
Q And those would be times when he was not in custody?
A Yes.
Q And that was after the initial meeting

107

at --
A Yes.
Q -- the house, at his house?
A Um-hum.
Q What was the name of the investigator that would bring him?
A I don't remember.
Q Where would he be brought up?
A Up to the Gang Unit.
Q What floor is that on?
A That's on 13.
Q Is there any record of those interviews at the Gang Unit?
A I don't believe so.
Q There's no -- when you bring a witness in, there's no documentation?
A There may have been investigative requests for someone to go out and pick him up, but a lot of times we didn't even do that. We just said, "Can you go pick him up?"
Q There's no book or anything that you have to sign --
A No.
Q -- when you bring a witness in?

108

BREHON REPORTING (708) 442-4522

1    A    No.

2    Q    Are there notes from each of those

3  interviews?

4    A    No. The only time I take notes is if

5  someone tells me something that's not already

6  documented.

7    Q    What about the investigators that

8  brought him in? Did they sit in on those interviews?

9    A    No.

10    Q    So this was a private interview

11  between you --

12    A    That was just to go over -- like, show

13  him photographs of the scene, get him prepared to

14  testify when I thought we were going to go to trial.

15    Q    So when were these times when he was

16  brought up to the 13th floor?

17    A    I don't recall.

18    Q    But they were in preparation for

19  trial?

20    A    Yes.

21    Q    And how many times was Nate's case set

22  for trial?

23    A    I don't even know. I think it was set

24  for trial before we appealed. After we lost the

109

---

1  motions, there was some kind of trial date. Before

2  the fourth-term motions, there was a demand for

3  trial, so we had trial dates then, but I really don't

4  recall.

5    Q    Let me ask you, then, about some of

6  the -- and, again, do you recall -- your testimony is

7  you don't recall whether you ever visited him when he

8  was locked up?

9    A    I know I didn't visit him when he was

10  in federal custody. I don't think I visited him when

11  he was in state custody, but I don't specifically

12  recall a hundred percent sure.

13    Q    Okay. But you do recall receiving

14  letters from him?

15    A    Yes.

16    Q    Let me ask you about those letters.

17  We have a bunch of letters, and we'll just start with

18  what we think is the first one.

19    A    Okay.

20    MS. REPORTER: This is 97.

21          (WHEREUPON, Fields Exhibit 97 was

22          marked and tendered to Witness.)

23    MR. GOODMAN: This is Exhibit 97. Go ahead

24  and review it and see if it refreshes your memory.

110

---

1          (WHEREUPON, the Witness complied.)

2    A    Okay.

3    Q    I'm just going to start reading it and

4  I'm going to ask you some questions about it. First

5  of all, there's some handwriting up at the top,

6  "Randy Langston" and then there's an arrow,

7  "reaffirmation of original trial testimony." Is that

8  your handwriting?

9    A    No.

10    Q    Do you know whose it is?

11    A    No.

12    Q    All right. So it says, "Hello

13  Mr. Kelly [sic]." By the way, do you recognize -- do

14  you remember receiving this letter?

15    A    I remember receiving letters from him,

16  and this looks like one of the ones I received. Yes.

17    Q    He says, "I know this letter will come

18  as a shock, cause I know you wasn't expecting me to

19  write you, anyway, I'm glad to be writing it.

20        "I just made it back to Menard CC

21  yesterday and decided to write you to let you know

22  that the conversation we had that day stayed on my

23  mind.

24        "First I would like to apologize for a

111

---

1  lie I told you and that detective. I didn't get 30

2  years, I got 12 years plus the 4 years I got for the

3  drug case I caught while incarcerated! Sorry! But a

4  lot of what I said was only because of them

5  correctional officers was sitting in that room with

6  us."

7    A    Okay.

8    Q    I'm going to ask you whether you

9  remember the conversation that he's talking about

10  that you had where there was a detective present and

11  correctional officers sitting in the room.

12    A    I'm sorry. What part about the

13  detective -- oh, okay, "that detective." No. It

14  sounds like something where we writ him up to our

15  office. That's the only reason correctional officers

16  would have been sitting in with him is if we brought

17  him up on the writ.

18    Q    Would this have been after that first

19  meeting you had with him when --

20    A    Yes.

21    Q    -- you talked to him on the west side?

22    A    I believe so.

23    Q    So the first time you talked to him,

24  he wasn't locked up, but then after that, he got

112

---

28 (Pages 109 to 112)

1  locked up?
2      A      I mean, it's hard to keep straight
3  when he was locked up, when he wasn't. I don't think
4  he was locked up the first time I talked to him, but
5  it was -- he was locked up a lot type of thing. But,
6  no, I think this was after I first talked to him.
7      Q      And in this letter, he then says at
8  the bottom of page 1, he says, "I also would
9  appreciate it if you can tell Detective Calohan [sic]
10  that I said I'm deeply sorry for letting him down and
11  that I will make it up to him if I have to testify
12  again at the retrial."
13      A      Okay.
14      Q      And then the next -- I mean, that's
15  fairly self-explanatory, right? He wanted to let you
16  know that if he testified at the retrial, he was
17  going to testify consist -- he was going to testify
18  and implicate Nate in the murders. Is that your
19  understanding of that?
20      A      Yeah.
21      Q      And the next paragraph says, "Mr.
22  Kelly [sic] what I'm trying to say to you is that if
23  there is a retrial, I would be glad come to testify
24  exactly the way I did in the first trial."

113

1      A      Um-hum.
2      Q      Now, when you received this letter,
3  you testified earlier that the first time you met him
4  was when he was not in custody, and that during that
5  initial meeting, he told you that he was going to
6  testify consistent with his testimony from the first
7  trial. Is that your recollection?
8      A      As I recall, yeah.
9      Q      So this letter where he's telling you,
10  "that if there is a retrial, I would be glad to come
11  testify exactly the way I did in the first trial,"
12  it's your recollection that he had already made this
13  agreement to you prior to receiving this letter?
14      A      It wasn't an agreement, but that was
15  before he was back in custody.
16      Q      Does reading this letter change your
17  recollection at all as to whether the first time you
18  met him on the west side, he was telling you he was
19  going to testify consistent with his testimony from
20  the first trial?
21      A      Randy was always cooperative with me.
22  He never said he wouldn't testify. He didn't want
23  to, but he said he would.
24      Q      And then he says, "Don't worry about

114

1  question [sic] 'Why did I come back to the sentencing
2  hearing and change my testimony?'"
3          And your understanding of that meant
4  don't worry about if I'm asked by the defense lawyer?
5  Is that your understanding of that sentence, "Don't
6  worry about question [sic] 'Why did I come back to
7  the sentencing hearing and change my testimony?'" Do
8  you see where I'm at?
9      A      I see the line. Yeah.
10      Q      Is that your understanding?
11      A      I'm sorry. Could you repeat?
12      Q      When he said, "Don't worry about
13  question," and then it's in quotes, "'Why did I come
14  back to the sentencing hearing and change my
15  testimony?'" is he telling you you don't worry about a
16  question if I'm asked by the defense lawyer?
17      A      I mean, I don't know what he was
18  thinking. To be honest with you, I didn't really
19  worry about it one way or the other.
20      Q      Okay. But then he has an explanation
21  for -- an answer for that question.
22      A      Right. That's what it is.
23      Q      "Well, I was threatened by members of
24  the El Rukin [sic] while incarcerated, they

115

1  threatened the life of my son & family, so I did it
2  to protect them!"
3      A      Um-hum.
4      Q      Okay. Now, is that consistent with
5  what he had told you earlier, that some El Rukns had
6  threatened the Langston family?
7      A      Yeah.
8      Q      Okay. Do you know -- or tell me what
9  you know about Randy having a son.
10      A      I know he does have a son. But other
11  than that, I really don't know much about it.
12      Q      Do you know when that son was born?
13      A      Not offhand, no. Young. Randy was
14  very young.
15      Q      So he may have had a son at the time
16  he testified at the sentencing hearing?
17      A      I don't know.
18      Q      I don't think I have any other
19  questions on this. I'm going to show you the next
20  letter that we have. Not all of them are dated, so
21  we have them in the order that we think is
22  chronological. This one is dated, though.
23      MS. REPORTER: This one is 98.
24          (WHEREUPON, Fields Exhibit 98 was

116

29 (Pages 113 to 116)

1    marked and tendered to Witness.)
2  BY MR. GOODMAN:
3    Q    By the way, going back to that first
4  letter that I showed you -- what exhibit is that?
5    MS. REPORTER:  That's 97.
6    MS. MATUZAK:  Exhibit 97.
7  BY MR. GOODMAN:
8    Q    The date that that was mailed out
9  appears to be February 27th, 1998.  Do you see that?
10   A    That's the envelope that's attached.
11 Yeah.
12   Q    Okay.  The second letter, if you look
13 at the first page the first one was -- by the way,
14 the first one was from Menard, right?
15   A    That's how it's addressed.  Yeah.
16   Q    In February of '98.  Do you know when
17 Randy Langston got sent to Menard?
18   A    Offhand, I don't remember.
19   Q    Do you know what case he was at Menard
20 for?
21   A    I think it was drugs and maybe a gun.
22 I'm not sure.
23   Q    Do you know when he went to trial?
24   A    I mean, I have all that information in

117

1  the file.  But off the top of my head, I really don't
2  remember.
3    Q    Okay.  The second letter is dated June
4  of '98, and it's from Danville.  That's also a
5  penitentiary?
6    A    Right.  That's how the letter is
7  addressed.
8    Q    And it says, "E. Langston," which
9  would be Eric Langston.  If you recall, was he using
10 his brother's name?
11   A    He was using his brother's name on
12 several of his arrests.
13   MR. GOODMAN:  Let me just ask if you recall --
14   What number is this, Carm?
15   THE WITNESS:  I remember this letter.
16   MS. REPORTER:  This is 98.
17 BY MR. GOODMAN:
18   Q    You remember this letter?
19   A    Yeah.
20   Q    He starts out with "Happy Father's
21 Day."  Are you a father, by the way?
22   A    No.
23   Q    The second paragraph -- tell me when
24 you're finished reviewing it and I'll ask some

118

1  questions.
2    A    That's okay.  I'm ready.
3    Q    In the first paragraph he says, "I
4  know you probably thought I forgot to write you when
5  I got transferred from Menard."
6    Did you have some agreement with him
7  that he was supposed to write you?
8    A    No.
9    Q    He said, "I didn't forget, it's just
10 that thing [sic] have been a little hard.  But as you
11 can see from the envelope, they sent me to Danville
12 instead of Dixon!  I'm just writing cause I'm just
13 running across a write-out."  Do you understand what
14 that means?
15   A    No.
16   Q    Then the next paragraph says, "I been
17 thinking about that case alot [sic] and can't wait to
18 get it over with."  It's your understanding that
19 "that case" means Nate Fields' case?
20   A    That's his testifying.  Yes.
21   Q    Okay.  And then he talks about how
22 he's given his life to Christ.  On the next page,
23 skipping ahead, he talks about I'm "paying for my
24 crime."  Again as you sit here today, you don't

119

1  specifically recall what crime that is he's paying
2  for?
3    A    No.
4    Q    Then he asks for a favor.  Do you see
5  that, on page 2?
6    A    Um-hum.
7    Q    It says, "Mr. Kelly [sic], can you do
8  me a favor if possible.  Remember by Brother-n-law
9  [sic] Gerald.  I wanted to know if you could get in
10 touch with him for me and give him my information or
11 you can send me his information and I'll write him
12 myself.  I'll appreciate that very much."
13   Did -- did you know his
14 brother-in-law, Gerald.
15   A    That's Gerald Morris.
16   Q    Gerald Morris?
17   A    Yes.
18   Q    Okay.  Were you able to get him
19 information about Gerald Morris, do you recall?
20   A    You know, I think we might have given
21 Gerald his information.  We wouldn't have sent
22 Gerald's information by mail to anybody who was
23 relocated.
24   Q    Do you know if Randy communicated with

120

30 (Pages 117 to 120)

1  Gerald Morris?
2      A  I don't.
3      Q  Then the last paragraph says, "Basicly
4  [sic] I just wanted to write an [sic] let you know I
5  haven't forgot about you. Can you also tell
6  Detective Callahan [sic] I said hi!"
7          Is that what he says here in the
8  letter?
9      A  Yeah.
10     Q  Between the first and the second
11 letters, this doesn't refresh your recollection about
12 any other meetings you had with him?
13     A  No.
14     MR. GOODMAN:  This will be the next one, 99.
15         (WHEREUPON, Fields Exhibit 99 was
16             marked and tendered to Witness.)
17         From the front page, it's dated July
18 11th, 2000. Do you see that?
19     MR. GARCIA:  June?
20     MR. GOODMAN:  Is it June?
21     MR. GARCIA:  Do you mean June 5th, 2000?
22     MR. GOODMAN:  Where do you see that?
23     MR. GARCIA:  Right here (indicating).
24     MR. GOODMAN:  Oh, I didn't notice that. The

121

1  postmark appears to be June?
2     MR. GARCIA:  No. I'm looking at the top of
3  the letter that says June 5th, 2000.
4     MR. GOODMAN:  Oh, okay.
5  BY MR. GOODMAN:
6     Q  Well, let's look at where it says --
7  it appears to be a postmark. I can't read it.
8     A  I can't read it either.
9     Q  It's either June or July. But it
10 appears to be sent from the county jail, Cook County
11 Jail. Is that what it looks like?
12    A  That's an inmate number, so. . .
13    A  Yeah. And it's 60608.
14    A  Um-hum.
15    Q  And then it says at the beginning of
16 the letter that he's writing from the county jail.
17 Do you remember this letter, receiving this letter?
18    A  Hang on. I have to read this one.
19    Q  Sure.
20       (WHEREUPON, the Witness was
21           reading Exhibit 99.)
22    A  Okay.
23    Q  Do you remember receiving this letter?
24    A  I do.

122

1     Q  Let me ask you whether between the
2  second letter, which was summer of '98, and this
3  letter, which is spring/summer of 2000, whether you
4  recall any meetings or conversations with Randy
5  Langston.
6     A  Specifically, no -- excuse me.
7  Specifically, no, but I'm pretty sure I had one with
8  him.
9     Q  And that would have been on the 13th
10 floor?
11    A  I don't know. Randy always seemed to
12 check in with me when he got out of prison. And, you
13 know, I can't tell you where, but I'm betting money I
14 talked to him or saw him sometime between these two
15 letters.
16    Q  So sometime between these two letters
17 he got released? The first letter was in early -- in
18 '98, he was in Menard?
19    A  Um-hum.
20    Q  And the second letter, he was in
21 Danville in the summer of '98. Then at some point,
22 your recollection --
23    A  He picked up this case. Yeah.
24    Q  -- he got released and then he picked

123

1  up a drug case?
2     A  Yes.
3     Q  And during the time he was released,
4  you believe you may have had contact with him?
5     A  I'm sure I probably did.
6     Q  And that would have been?
7     A  Either on the phone or in person. I
8  don't really remember.
9     Q  And if it was in person, where would
10 it have been?
11    A  Probably Randy coming to see me. I
12 think I only went out to his place once.
13    Q  That was the first meeting?
14    A  I think it was the first meeting. I
15 don't recall, again, the order of things.
16    Q  So in this one, he specifically is
17 talking about his drug case; is that --
18    A  It was --
19    Q  -- correct?
20    A  -- a drug and gun case. Yes.
21    Q  When you received this letter, were
22 you already aware of his drug case, his --
23    A  No.
24    Q  -- gun and drug case?

124

31 (Pages 121 to 124)

1      A     No.  That's my writing, "7/11," so
2  I -- what I think I did was I tracked down the file
3  to see what the police report said.
4      Q     Is that your writing, "OOCR 870" --
5  something?
6      A     Yeah.  That looks like mine, too.
7      Q     So you looked up the case?
8      A     Yeah.
9      Q     So that would appear to be the case
10  number of his new case that he picked up?
11     A     I don't know, but probably, yeah.
12     Q     Probably.  Okay.  He specifically says
13  that he's got a trial date of July 11th on his case?
14     A     Yes.
15     Q     And he specifically asks you for help?
16     A     Yes.
17     Q     Did you give him any help on this
18  case?
19     A     No.  Actually, he got charged
20  federally with this.
21     Q     Had you ever in any of your
22  conversations with him given him any indication that
23  you could help him with any of his criminal troubles?
24     A     Well, I told him we would relocate him

                                                    125

1      A     Oh, I'm sure he was thinking I could
2  do something to help him, but I told him no, and,
3  like I said, he got charged federally.
4      Q     Do you know what happened with that
5  federal case?
6      A     He ended up going to a federal
7  penitentiary.
8      Q     Do you know --
9      A     He got more on that case than he would
10  have gotten in state court.
11     Q     Do you know how much time got?
12     A     Oh, God, 15 years, 12 years.
13     Q     You know if it was a plea or a trial?
14     A     I think it was a plea.  I'm not sure.
15     Q     Was that in the year 2000, because --
16     A     I don't recall.
17     Q     -- he hadn't been charged federally
18  when he wrote you this letter; is that --
19     A     Right.  He was still in the state
20  system at that point.
21     Q     Do you know approximately when he got
22  charged federally?
23     A     No.  It was relatively soon.
24     Q     And did you have any involvement in

                                                    127

1  as far as his testimony, but as far as any of his
2  cases, no, I never told him I would help him.
3      Q     So other than agreements to relocate
4  him -- when did you first have the agreement to
5  relocate him?
6      A     When I first talked to him, it was "If
7  you're still frightened or afraid, we'll relocate
8  you."  When I specifically had other conversations, I
9  don't know.  We did relocate him or help him relocate
10  at one point.
11     Q     So your first conversation with him
12  would have been right after you got assigned to this
13  case?
14     A     No.  It took me a while to find these
15  guys.  I don't recall specifically when.  We were
16  looking for them for a while.
17     Q     When did you first officially get
18  assigned to Nate's case?
19     A     When I volunteered to take it, just
20  shortly before it came back in front of the chief
21  judge.
22     Q     And we've already asked you that
23  question.  So you don't know why he would think you
24  could help him with his criminal case?

                                                    126

1  the federal case at all, discussions with the
2  prosecutor?
3      A     No.
4      Q     No?  Did you help him at all with his
5  federal case, like, write a letter for him or do
6  anything?
7      A     No.
8      Q     Did he ask you to?
9      A     No.
10     Q     So once he got charged federally,
11  he -- did you have any discussions with him after he
12  got charged federally?
13     A     Yeah, when he testified, at that
14  point.  I never talked to him while he was in federal
15  custody that I recall, and I don't think he sent me
16  any letters from the federal penitentiary.  When he
17  got out, I talked to him.
18     Q     Between the time that he got charged
19  federally and either pled or went to trial and got
20  sentenced, you didn't have any conversations with
21  him?
22     A     After this letter, I think I told
23  him -- and I don't know how I did that, whether I
24  writted him over or how I did that, but I told him I

                                                    128

1    can't help him on it. I didn't know that he was
2    going to get charged federally until after it
3    happened.
4        Q    So after you got this letter, you
5    believe you writted him over to the 13th floor?
6        A    I don't recall. I might have.
7        Q    Again, after reading these letters, do
8    have any better recollection as to how many times you
9    may have writted him over to the 13th floor?
10       A    No.
11       Q    Okay. Let's look at the next letter.
12           (WHEREUPON, Fields Exhibit 100 was
13           marked and tendered to Witness.)
14           This one, as far as we can tell,
15   doesn't have a date, but go ahead and read it. We
16   can't find a date on it.
17           (WHEREUPON, the Witness complied.)
18       A    Okay.
19       Q    Do you remember this letter?
20       A    Specifically, no, but it sounds like
21   the letters Randy would send me.
22       Q    Well, let's just start at the
23   beginning. He says in the letter in the third
24   paragraph, "Mr. Kelly [sic] as I told you when you

129

1    came down here to see me, I said that God has changed
2    my life." Do you know where "down here" is?
3        A    It would have been either the jail or
4    the Illinois Department of Corrections. I never
5    visited him in federal custody.
6        Q    Does this now refresh your
7    recollection as to whether you visited him in the
8    Department of Corrections?
9        A    I could have. I don't know.
10       Q    Do you know which facility that was?
11       A    I specifically don't recall visiting
12   him in the Department of Corrections, but I could
13   have.
14       Q    So then you don't recall what
15   discussions you had when he talks about "as I told
16   you when you came down here to see me"?
17       A    I know Randy at some point found
18   religion and he talked about that a lot.
19       Q    But you still have no recollection of
20   the conversation he's --
21       A    The specific -- no.
22       Q    -- talking about? Then he says in the
23   next sentence there, "Even though I thought this case
24   was behind me, somehow it bothered me very much."

130

1        Do you know what he's talking about
2    there?
3        A    Having to testify again.
4        Q    And then he says, "Therefore
5    Mr. Kelly [sic] I'm ready for this challenge whenever
6    the case is ready to hit the court!"
7        A    Um-hum.
8        Q    Do you know what he's talking about
9    there?
10       A    About coming to court and testifying.
11       Q    In the next paragraph, he again asks
12   for help; is that correct? Is that your
13   understanding? He says, "Remember I was telling you
14   I was attempting to parole to a Christian discipline
15   program? Well, that have been denied [sic].
16   Therefore, I was wondering if you are still able to
17   locate me in assisting in my new start at life." Do
18   you see that?
19       A    Yeah.
20       Q    Do you recall that conversation you
21   had where he was saying he was trying to get paroled
22   into a Christian discipline program?
23       A    You know, I kind of remember him
24   saying something about that at some point, and there

131

1    really wasn't anything I could do about that.
2        Q    But if he was talked about getting
3    paroled, he would have been in a penitentiary, right?
4        A    He would have been in some custody to
5    be paroled. Yes.
6        Q    But you still don't recall that
7    conversation in the penitentiary where he said --
8    talked about getting paroled?
9        A    As far as this letter, it's in this
10   letter, but I don't recall specifically talking to
11   him in person about this.
12       Q    And when he says, "if you are still
13   able to locate me in assisting," what is he talking
14   about, your ability to locate him in assisting in his
15   new start at life? What --
16       A    I'm not sure --
17       Q    -- discussions did you have about
18   that?
19       A    -- but I would assume that's a
20   reference to relocation.
21       Q    How many times did you discuss
22   relocation with him?
23       A    A couple.
24       Q    And in the very first conversation you

132

33 (Pages 129 to 132)

1    had with him, you had that discussion?
2        A    I believe I explained to him that if
3    he was afraid or anyone threatened him that, yes, we
4    could relocate him.
5        Q    Did you, in fact, relocate him?
6        A    At some point we did.
7        Q    When was that?
8        A    We relocated him once he got out of
9    federal custody, I think.
10       Q    Do you know about what year that was?
11       A    Offhand, no. One time I specifically
12   remember helping him was after the trial. We helped
13   him get set up, but then he got in trouble again.
14       Q    At the time of Nate's trial, was he
15   locked up?
16       A    Oh, God, was he? Yes. He was in
17   federal custody, I believe. When you say, "Nate's
18   trial," you're talking about the trial I did?
19       Q    Yes.
20       A    Yeah. I believe he was in federal
21   custody.
22       Q    Was that still the case that we talked
23   about earlier where it was a drug case?
24       A    That was the case that was originally

                                            133

1    a state case that went federal.
2        Q    Is that the only federal case that
3    he's had that you know of?
4        A    As far as I'm aware of, yeah.
5        Q    So he was in federal custody when he
6    testified against Nate in 2009?
7        A    I believe so.
8        MR. GOODMAN: What was the last one, Carm?
9        MS. REPORTER: Exhibit 100.
10       (WHEREUPON, Fields Exhibit 101 was
11       marked and tendered to Witness.)
12   BY MR. GOODMAN:
13       Q    Oh, I'm sorry. I want to go back to
14   that last one for a sec. Do you have that?
15       A    Yeah.
16       Q    I'm just wondering if you have an
17   approximate idea of the date of this letter.
18       A    I don't, but Randy kind of found
19   religion when he was in state custody as opposed to
20   federal, as far as I remember. So I think it was
21   more in that time frame, but I don't know.
22       Q    So what time frame are you talking
23   about?
24       A    When he was in state custody as

                                            134

1    opposed to federal custody.
2        Q    Do you know when he went into federal
3    custody?
4        A    Specific dates, no.
5        Q    Approximately?
6        A    Offhand, I would just be guessing.
7        Q    Well, look at the last page that has
8    the photocopy of the envelope.
9        MR. GARCIA: Still on 100?
10       MR. GOODMAN: Yeah, on 100.
11   BY MR. GOODMAN:
12       Q    Do you see where it says "Mr. Dave
13   Kelly [sic], Assistant State's Attorney, 2650 South
14   California Avenue," and that's crossed out?
15       A    Yes.
16       Q    And then it says "Juvenile"?
17       A    Um-hum.
18       Q    So was that after you had taken that
19   job as supervisor?
20       A    I'm assuming that would have been
21   after or in 2001.
22       Q    And you took that job as supervisor, I
23   thought you said, in 2002?
24       A    Yeah, 2001/2002.

                                            135

1        Q    Okay. Then this last one, this is
2    101. We're back on 101. Do you want to take a
3    minute and look at that one?
4        A    Sure.
5        (WHEREUPON, the Witness complied.)
6        Okay.
7        Q    Do you remember this letter?
8        A    Not specifically, no.
9        Q    But it does appear to be a letter to
10   you --
11       A    It does.
12       Q    -- from Randy Langston?
13       A    Um-hum.
14       Q    Let's start with the date on the last
15   page. Do you see the envelope?
16       A    Okay.
17       Q    Do you see this one is postmarked
18   February 3rd, 2004?
19       A    Um-hum.
20       Q    And at the time Randy writes this
21   letter, he's at the county jail; is that correct?
22       A    It appears so. Yes.
23       Q    And it sounds from this letter like
24   he's got a new case?

                                            136

                                  34 (Pages 133 to 136)

1    A   It does.

2    Q   Okay.  So I'm going to ask you whether

3 this changes your memory about what you said earlier,

4 because --

5    MR. GARCIA:  Objection, form.

6 BY MR. GOODMAN:

7    Q   Well, the last letter we looked at

8 where he was asking for your help, do you remember

9 that, in the --

10    A   Okay.

11    Q   -- case you had written 00CR?

12    A   Right.

13    Q   It was a 2000 drug case, and your

14 recollection is that that one had gone federal and he

15 had gotten a lot of time?

16    A   I may have been wrong.

17    Q   Okay.  That's what I'm asking you.

18    A   It's hard to keep his gun cases

19 straight.

20    Q   So would you say that the case that

21 he's talking about now that he's not locked up in the

22 county jail is the one that went federal?

23    A   You know, I'd have to look at his rap

24 sheet to give you a specific answer.  I don't recall.

137

---

1 I think the last gun case is the one that went

2 federal, but. . .

3    Q   Your recollection it was a gun case or

4 drugs case or both?

5    A   He went federal because it was a gun

6 case, and I don't know how we originally charged it,

7 but he got charged federally as basically a

8 three-time loser with a gun, career criminal, as I

9 recall.

10    Q   I thought you said that you helped him

11 out after he got out of federal custody?

12    A   We helped relocate him.

13    Q   After he got out of federal custody?

14    A   I believe so.  Yes.

15    Q   After Nate's trial?

16    A   Yes.

17    Q   So then how much time -- do you know

18 how much time he got on the federal case?

19    A   I think it was 12, 15 years.  I'm not

20 sure.

21    Q   This letter is dated -- again, I don't

22 want to waste your time with this, because I'm sure

23 we can get the records.  It's just confusing, because

24 if he's -- if he's at county jail in 2004 and the

138

---

1 case goes federal and he got 12 years --

2    A   I'm not sure of his exact sentence.

3 That's just what I recall.  It could have been less.

4    Q   Okay.

5    A   He didn't get -- he got out not that

6 long ago, you know, a year, year and a half maybe, as

7 I recall.

8    Q   So he could have done eight, nine

9 years.

10    A   So. . .

11    Q   All right.  In the first paragraph

12 there, the end of the first paragraph, he's

13 talking -- well, let me just read it.  He says,

14 "Sorry that I have to be once again writing to you

15 from behind the county doors.  But I've ran into

16 another problem and need your help if possible.  See,

17 Mr. Kelly [sic] I've done a lot of things in which

18 I've been deserving of being locked uped [sic].  But

19 this time I think an exception should be made.  You

20 know what manner of lifestyle I had begun to live

21 when I came home."  So when he says, "when I came

22 home," he's talking about his last case?

23    A   I believe that's referring to when he

24 was paroled from whenever his last case was.

139

---

1    Q   And his last case appeared to be a

2 drug case, right?

3    A   You know, I would have to look at his

4 rap sheet.  I'm just guessing at this point.

5    Q   Well, in that last letter, do you

6 remember that last letter, where he's talking about

7 he wants you to help him with his drug case?

8    A   And he mentions a gun.  Yes.

9    Q   I don't remember the gun.  Let's go

10 back to that one.  That's 100 that talks about

11 relocating him, but it must be the one before.

12 That's 99; 99 is the one where he's asking for help,

13 Exhibit 99.

14    He says he's got a trial date of July

15 11th and he's nervous.  I'm now on Exhibit 99.  Do

16 you see where he says, "I wasn't out there selling

17 drug" [sic]?

18    A   Yeah.  And in that first full

19 paragraph he says something about he got jumped and

20 he had a gun, talking about what he was going to do.

21    Q   Exhibit 99?

22    A   Yeah.  Page 2 of the letter, first

23 full paragraph; one, two, three, four, five, six

24 lines down there's mention of a gun.

140

---

35 (Pages 137 to 140)

1    Q    Okay. So that's your recollection,
2 that the case that was going to trial in July of 2000
3 was a gun case?
4    A    You know, I'd have to look at his rap
5 sheet. I don't specifically recall.
6    Q    But your testimony is that you didn't
7 help him one way or the other with this case?
8    A    I didn't help him on a single case.
9    Q    So he -- so we've got the
10 two-thousand -- Exhibit 99 talks about a case going
11 to trial in the summer of 2000, right?
12         And then Exhibit 100 is the one that's
13 undated, and he's talking about -- but we know it was
14 after you were in Juvenile, and he's talking about
15 "when you came down here to see me," which we're
16 assuming was in a prison.
17    A    Okay.
18    Q    Then 101, Exhibit 101, is from
19 February of 2004; is that correct, a letter that he
20 sent you?
21    A    Let's see. That's the date on the
22 envelope attached, February 3rd, 2004.
23    Q    Okay. Then going back to the first
24 paragraph, he says, "I've done a lot of things in my

141

1 life which I've been deserving of being locked uped
2 [sic]. But this time I think an exception should be
3 made. You know what manner of lifestyle I had begun
4 to live when I came home. Left the streets
5 completely, joined church, worked 6 days a week,
6 didn't get high and to top it off you moved me into
7 my own apartment in which I was enjoying very much
8 until I made one big mistake that landed me in here!"
9         So let me just ask you about that, the
10 moving into an apartment, if you can tell me what you
11 remember about that and --
12    A    It sound --
13    Q    -- when and where the apartment was.
14    A    It sounds like we helped relocate him
15 when he got out of prison on that other case, and
16 generally we give him one month's rents and a
17 security deposit.
18    Q    Where was this apartment that you
19 relo --
20    A    I don't really pick out the apartment.
21 He finds it, and he deals with our relocation people
22 who get the money.
23    Q    Was it in the city of Chicago?
24    A    I would be guessing. I think so, but

142

1 I don't know.
2    Q    Then he says that you would remember
3 that he was working and off the streets and all of
4 this. Is that something that you were aware of?
5    A    Like I said, he had his stage where he
6 found religion, and he was big into that.
7    Q    But would he give you regular updates
8 about how his life was going?
9    A    He would call me on the phone when he
10 was out of custody once every couple of months just
11 to check in, just to say hi, just to talk. Half the
12 time it was just to let me know what he was up to.
13    Q    Was it you specifically or was it also
14 Sexton?
15    A    It was me.
16    Q    So he liked you better than Sexton?
17         (WHEREUPON, there was laughter.)
18    A    I won't comment on that.
19    Q    On page 2 of this letter that's from
20 2004, he wants you to help, bail him, and he says,
21 "help me out of this one."
22    A    Um-hum.
23    Q    But at this point, the case was not
24 federal, as far as you know, because he's sitting in

143

1 the county jail?
2    A    Whichever letter he sent me that went
3 federal, originally he was in state court. I looked
4 into it to see what the facts of it were, and
5 basically he got charged federally.
6    Q    But if he's writing you from the
7 county jail in 2004, the case had not gone federal
8 yet. Would that be fair --
9    A    I would --
10    Q    -- to say?
11    A    -- assume that's true.
12    Q    But as far as your recollection, this
13 2004 case that he's sitting in the county jail on,
14 that's the one that went federal?
15    A    Whatever his last gun case was before
16 the trial is the one that went federal.
17    Q    And, again, he asks you to help him
18 out. He says it many times in this letter, right,
19 asking you to help him out?
20    A    (Witness nodding head.)
21    Q    And what you're saying is you never
22 did help him out?
23    A    No.
24    Q    And you never gave him any indication

144

36 (Pages 141 to 144)

1  that you could help him out other than with
2  relocation expenses?
3       A    That's correct.
4       Q    By the way, this apartment that you
5  set him up in sometime, we're not sure when, sometime
6  between 2000 and 2004, what was the reason for
7  helping him with relocation at that time?
8       MR. GARCIA:  Objection, form.  You said "you
9  set him up," and I think he testified that the
10  Relocation Department did, he didn't, set him up.
11  BY MR. GOODMAN:
12       Q    Well, you approved of it, right, the
13  relocation?
14       A    Yes.  We started the process and made
15  the request.
16       Q    And what was the reasoning behind
17  that?
18       THE WITNESS:  Excuse me.  Could I get water?
19       MS. MATUZAK:  Sure.
20       THE WITNESS:  The fact that he had been
21  intimidated in the past by El Rukns, and members of
22  his family had.
23  BY MR. GOODMAN:
24       Q    When you say, "in the past," are you

145

1  talking about what he had told you about when he
2  was -- what he had heard from his family members when
3  he was at St. Charles?
4       A    And also at one point he signed
5  another written recant while he was in the Department
6  of Corrections.  When we asked him about that, he
7  told us he did because he had been approached by two
8  members of the Blackstone P's gang, which was
9  basically the El Rukns before they became the El
10  Rukns, and had been threatened.
11       Q    So you had another conversation with
12  him besides the time when he told you about -- you
13  already told us about the conversation where he told
14  you about threats while he was at St. --
15       A    Right.
16       Q    -- Charles.  And that was in, like,
17  1986?
18       A    That was regarding his testimony at
19  the sentencing hearing of the original trial.
20       Q    But you said there was another
21  occasion when he reported threats to you?
22       A    At some point, and, again, I would
23  have to see the file and the paperwork, he was in the
24  Department of Corrections on one of his cases.  While

146

1  he was there, one of the defense attorneys went down
2  and talked to him and he signed a recantation of his
3  testimony that Nathson Fields was involved in this
4  case.
5       We talked to him at some point after
6  that recantation.  I think he actually -- he sent a
7  letter to Brian Sexton, the one and only time,
8  regarding the recantation.  And the reason he said
9  that he signed that was because he had been
10  approached by these two old Blackstones or P Stones,
11  whatever they are, and that he felt threatened.  And
12  because of that, he signed the recantation when the
13  attorneys came down and presented it to him.
14       Q    Okay.  And this conversation where he
15  told you he had been approached by two Blackstones,
16  where did that take place?
17       A    He was in the Department of
18  Corrections; I don't know which facility.
19       Q    But you went to visit him at that
20  facility?
21       A    To tell you the truth, I don't know if
22  we visited him or writted him up.  Usually it was
23  easier to writ him up than visit.
24       Q    And who was present for that

147

1  conversation when he said that he had been approached
2  by two Blackstones?
3       A    I don't recall if Brian was present or
4  not.  I -- I don't remember the specifics.
5       Q    Do you know if there was an
6  investigator present?
7       A    I don't.
8       Q    Do you know if notes were taken?
9       A    Of that?  No, I don't believe so.
10       Q    Did he identify the names of the
11  Blackstones that had approached him?
12       A    He never gave us the names.  I don't
13  even know if he knew them.  He just said he knew what
14  gang they were in.
15       Q    Where was he when he was approached?
16  Was he locked up or --
17       A    He was --
18       Q    -- on the street?
19       A    -- in the Department of Corrections.
20  As to specifically where it was, I don't recall.
21       Q    What did he say that the Blackstones
22  said to him?
23       A    He said they threatened him and he was
24  afraid, and that's why he gave the recantation to the

148

37 (Pages 145 to 148)

1  defense attorneys.
2      Q     What did they say to him?  Did you ask
3  him?
4      A     I'm sure I did.  I don't remember
5  specifically what he said.
6      Q     Well, other than, "They threatened
7  me," they threatened him about what?
8      A     They threatened to hurt him.
9      Q     Relating to what?
10     A     Relating to his being a witness
11 against Nathson Fields.
12     Q     So he told you that the Blackstones
13 told him that they were going to hurt him if he
14 testified against Nathson Fields?
15     A     Again, I don't remember the specifics
16 of what he said.  He did tell me that basically the
17 reason he gave the recantation was because he was
18 afraid after these people approached him.  He saw
19 them in the penitentiary.
20     Q     Other than he told you the people
21 approached him and that's why he gave the
22 recantation, did you get any more details from him?
23     A     There really weren't any other details
24 to get.

149

1      Q     The names of the people?
2      A     I'm sure we asked.  I just don't
3  remember, and I don't think he was able to provide
4  them.
5      Q     And you don't remember what they said
6  to him in particular that made him feel threatened?
7      A     Specifically, as I sit here now, no.
8      Q     Do you know if you asked him?
9      A     I'm sure I did.
10     Q     But you're not sure -- you don't
11 recall?
12     A     Not specifically.  No.
13     Q     That's it with those letters.  I
14 wanted to ask you a little more about Randy.
15     MR. GOODMAN:  Let's mark this letter.  What
16 number is it?
17     MS. REPORTER:  This is 102.
18         (WHEREUPON, Fields Exhibit 102 was
19         marked and tendered to Witness.)
20 BY MR. GOODMAN:
21     Q     I'll ask you if you remember receiving
22 this letter from attorney John Stainthorp.
23     A     I don't remember seeing this letter.
24     Q     In the letter -- let me just read it.

150

1  It says, "On February 23, 2000, you told me that you
2  had reinterviewed Randy Langston and that he had told
3  you that his previous testimony that the shooters had
4  pulled up their masks after the shooting so that he
5  could identify them was incorrect and that in fact
6  the shooters never pulled up their masks."
7      Did you ever have a conversation with
8  Randy Langston where he told you that, in fact, the
9  shooters had not pulled up their masks?
10     A     I don't recall Randy ever telling me
11 that.
12     Q     And did you ever have a conversation
13 with John Stainthorp where you told him that Randy
14 had changed his testimony?
15     A     Not that I recall.
16     Q     And you have no recollection of
17 receiving this letter?
18     A     No.
19     Q     Okay.  Let me ask you about this next
20 exhibit.
21         (WHEREUPON, Fields Exhibit 103 was
22         marked and tendered to Witness.)
23     Did you have a chance to review this
24 document that's titled "Investigative Report,"

151

1  Exhibit 103?
2      A     I did.  Yes.
3      Q     Do you recognize that report?
4      A     I recognize it as a report that
5  appears to be done by one of our investigators.
6  Yeah.
7      Q     It states that based on an interview
8  with Randy Langston, which appears to be a February
9  18th, 2000, interview with Randy Langston --
10     Q     Okay.
11     Q     -- is that what it appears to you?
12     A     It does.
13     Q     Okay.  It says, State's Attorney
14 Investigator Marc Bowers was assigned to assist
15 Assistant State's Attorney David Kelly [sic] in the
16 trial preparations of Nathson Fields.  ASA Kelly
17 [sic] requested that SAI Bowers interview the
18 following witness:  Randy Langston.  Do you see that?
19     A     Um-hum.
20     Q     Were you present during this
21 interview?
22     A     It appears I was.  Yes.
23     Q     And according to this Investigative
24 Report, let me just read the answer, because it says,

152

38 (Pages 149 to 152)

1  "Do you remember the shooting...706 East" -- by the
2  way, do you know where this interview took place?
3       A    At his residence.
4       Q    Was this the first interview you had
5  with him?  This couldn't have been the first
6  interview you had with Randy Langston.
7       A    I don't know, to be honest with you.
8       Q    Well, does this remind you that there
9  was more than one visit at Randy's residence?
10      A    I talked to Randy a lot.  I mean, I
11 can't tell you specifically.
12      Q    Okay.  Well, the question was asked to
13 him, and let me ask you if you recall this -- well,
14 first I'll ask you if this is what it says.  So he's
15 asked about the shooting on April 28th, 1984, at 706
16 East 39th Street, and he says, "Yes, I was across the
17 street getting ready to play baseball with Carlos,
18 Kevin and Kelly.  Randy Langston saw two men with
19 masks come through the breezeway.  Randy Langston saw
20 the masked men shoot Talman first.  Randy Langston
21 said Fuddy tried to run away and the masked men shot
22 him.  The masked men then stood over Fuddy and shot
23 him again.  Randy Langston saw the masked men run
24 back through the breeze way."  Is that what it says?

153

1       A    Yes.
2       Q    Do you recall that statement from
3  Randy Langston?
4       A    Specifically, no.
5       Q    And it does appear in this one, he has
6  no recollection of the men pulling their masks off;
7  am I correct in that?
8       A    Well, I would disagree with that.  It
9  doesn't specifically state one way or the other.
10      Q    Well, it says that he saw the masked
11 men running away after the shooting through the
12 breezeway; is that correct?
13      A    That's what he says.
14      Q    Okay.  Then he says later --
15           "What occurred next?"
16      He says, "A few minutes later, a blue
17 four door car drove Westbound on 39th Street with the
18 aforementioned males sitting inside the car," and
19 that "the men were not wearing masks at that time."
20      A    Yes.
21      Q    And you -- and you don't recall this
22 statement?
23      A    Well, I remember him telling me that.
24 But as far as this specific interview, I don't recall

154

1  it.
2       Q    But you do recall a statement that he
3  gave where he said that the masked men ran away and
4  he later saw them in the car without masks?
5       A    He always said that they had masks
6  when they came out.  Yeah.
7       Q    But in this interview, he says that
8  when they ran away, they were masked; is that
9  correct?
10      A    That's what it says, but it doesn't
11 say anything about whether the mask was pulled up or
12 down.
13      Q    Well, if he had said the mask was
14 pulled up or down, wouldn't that have been included
15 in the report?
16      A    I didn't write it.  All I know is
17 Randy never told me that they had the masks on all
18 the time.
19      Q    So you don't recall him saying that
20 when they ran away from the scene, they were still
21 wearing the masks?
22      A    They were.  The hats were on their
23 head when they ran away from the scene.  As they were
24 getting in the car, they took it off.

155

1       Q    And from your discussions with him, he
2  was watching them the whole time when they ran from
3  the scene all the way to the car?
4       A    Once the shooting stopped, he watched.
5       Q    Let me ask you about his trial
6  testimony.  Now, his trial testimony -- were you
7  the -- did you put him on?  Were you the --
8       A    Yes.
9       Q    In his trial testimony, he said that
10 after the shooting, they lifted their mask.  Is that
11 your recollection of his trial testimony?
12      A    Yes.  They looked around.
13      Q    And he testified that he was across
14 the street in a park; is that correct, getting ready
15 to play baseball?
16      A    A vacant lot is basically what it was,
17 but, yeah, they were getting ready to play ball.
18      Q    Do you know how far away he was from
19 the scene of the shooting?
20      A    Directly across the street.
21      Q    Do you know about how many feet away
22 he was?
23      A    I would be guessing.
24      Q    Did you ever go to the scene?

156

39 (Pages 153 to 156)

1    A    Yes.
2    Q    What would be your guess?
3    A    Assuming regular streets maybe 30 feet
4    across, he was in the range of 60 feet, 50 to 60 feet
5    maybe.
6    Q    And he testified at trial that he saw
7    their faces for a few seconds; is that your
8    recollection?
9    A    Yes.
10   Q    And that he recognized one of the
11   shooters as "Man Sur"; do you --
12   A    -- remember that? And "Man Sur" you
13   Q    -- remember that? And "Man Sur" you
14   knew to be Earl Hawkins; is that right?
15   A    Yes.
16   Q    And the other shooter he said he
17   didn't know?
18   A    At that point, he didn't know him.
19   No.
20   Q    And he identified him at trial as Nate
21   Fields?
22   A    Yes.
23   Q    One of the first things you did on
24   this case was to collect all the files; is that

157

1    correct?
2    A    Yes.
3    Q    And that would include the supp
4    reports and the general progress reports?
5    A    Yes.
6    Q    So you were aware that the Chicago
7    Police Department investigated this murder shortly
8    after it occurred in --
9    A    Yes.
10   Q    -- April of 1984 and interviewed
11   people?
12   A    Yes.
13   Q    And you reviewed those reports?
14   A    I did.
15   MR. GOODMAN: I may introduce these, but let
16   me ask about them. If you need to look at them --
17   well, we might as well introduce them. I guess these
18   are already marked as exhibits.
19   MS. MATUZAK: Yeah.
20   MR. GARCIA: I can't imagine they haven't been
21   by now.
22   MR. MICHALIK: They may be part of a group
23   exhibit.
24   MR. GOODMAN: Well, one of them is not marked.

158

1    MS. MATUZAK: Right. That one is not. This
2    one is Exhibit 1 --
3    MR. GOODMAN: Exhibit 1, Exhibit 28, and then
4    one needs to be marked.
5    MR. GARCIA: Do you want to take a break while
6    you're doing that?
7    MR. GOODMAN: Sure.
8           (WHEREUPON, there was a brief
9           recess had in the proceedings.)
10   MR. GOODMAN: These have been marked?
11   MS. MATUZAK: Two are, yes, already marked,
12   Exhibits 1 and 28, and this one (indicating) has to
13   be marked the next number.
14   MR. GARCIA: They're already numbered.
15   MS. MATUZAK: Yeah, basically they are, and
16   the third one is not.
17   MR. GARCIA: The first one is 1?
18   MS. MATUZAK: Number 1, and this is Number
19   104.
20          (WHEREUPON, Fields Exhibit 104 was
21          marked and tendered to Witness.)
22   BY MR. GOODMAN:
23   Q    I'm going to ask you some questions
24   about the -- it looks like we have three

159

1    supplementary Chicago Police Department Detective
2    Division reports from the 1984 investigation, right?
3    MS. MATUZAK: Yes, Exhibit 1.
4    MR. GOODMAN: Exhibit 1, Exhibit 28, and
5    Exhibit 104.
6    MS. MATUZAK: Which is a new exhibit.
7    MR. GOODMAN: I guess we'll start with Exhibit
8    Number 1.
9           (WHEREUPON, Fields Exhibit 1 was
10          tendered to Witness.)
11   BY MR. GOODMAN:
12   Q    I'm just going to ask you a few
13   questions about it. In Exhibit 1, it lists on
14   page --
15   A    When you say "Exhibit 1," is this the
16   one you're talking about (indicating)?
17   Q    Yes. Exhibit 1 is the --
18   A    Report of Evans and Hood?
19   MR. GARCIA: It's already been marked
20   previously in other deps.
21   THE WITNESS: All right. I've got it.
22   BY MR. GOODMAN:
23   Q    And I'm looking at, it appears to be,
24   page 6. It starts with "Personnel Assigned," and

160

40 (Pages 157 to 160)

1 then "Witnesses" and "Interviewed"?
2     MR. GARCIA: Handwritten 6?
3     MR. MICHALIK: Yeah. It's actually Page Four
4 on the top.
5     MR. GOODMAN: It is. It says "Page Four" on
6 the top. Sorry.
7     THE WITNESS: Okay "Personnel Assigned:
8 Richardson and Williams."
9 BY MR. GOODMAN:
10     Q     Yes, yes.
11     A     Got it.
12     Q     So there it indicates that -- this
13 particular supp indicate two witnesses, Eric Benson
14 and Cleveland Ball. Do you see that?
15     A     Yes.
16     Q     And then under "Interviewed," it has
17 what appears to be seven additional names: Martha
18 Robinson, Kenya Robinson, Inetter [sic] Watts, Willie
19 Lang -- Willie Mae Langston, Dorthy Benson, Louis J.
20 Carter, and Delbert Edwards. Do you see that?
21     A     Um-hum.
22     Q     This is a report that you've reviewed?
23     A     I've seen this report.
24     Q     Okay. Well, let me ask you this: It

161

1 appears that Eric Benson and Cleveland Ball are the
2 only ones -- well, let's start with Eric Benson.
3          At the very end, it just says, "Male
4 black, 9 years of age," and it gives an address and
5 then it says "Eye-Oral." Do you see that?
6     A     Yes.
7     Q     The "Eye," does that indicate that he
8 was an eyewitness?
9     MR. GARCIA: Objection, foundation.
10          You can answer if you know.
11 BY MR. GOODMAN:
12     Q     Do you know?
13     A     That's what the police appear to
14 think, but I don't know.
15     Q     And then for Cleveland Ball, it says
16 "Circ-Oral." Do you know what "Circ" is?
17     A     I would assume "circumstantial," but,
18 again, I don't know.
19     MR. GARCIA: Objection, foundation.
20 BY MR. GOODMAN:
21     Q     And then the "Oral" appears to be that
22 he might have heard something, right?
23     A     No. I believe that means they gave an
24 oral statement in the police.

162

1     Q     Oh, oh. Got you. Do you know if Eric
2 Benson was -- ever viewed any lineups?
3     A     To tell you the truth, I'm not a
4 hundred percent sure, but I always thought that Eric
5 Benson might have been Eric Langston, really.
6     Q     Would that be about the right age for
7 Eric Langston?
8     A     He was younger than Randy.
9     Q     And how old was Randy at the time?
10     A     He was close to being a teenager, a
11 young teenager, I think.
12     Q     So you think that might have been a
13 mistake?
14     A     I think that might have been the name
15 he gave the police, I'm not a hundred percent sure on
16 that.
17     Q     And Cleveland Ball, it doesn't appear
18 that he was an eyewitness, as far as you know?
19     A     According to the report, he heard
20 shots and looked out the window, saw people carrying
21 handguns.
22     Q     But it doesn't appear that he had any
23 opportunity to view the faces; is that your
24 recollection?

163

1     A     It doesn't --
2     MR. GARCIA: Objection, foundation.
3     THE WITNESS: -- appear from the police
4 report. No.
5 BY MR. GOODMAN:
6     Q     Okay. So the only person in this supp
7 report that appears to have seen any faces is this
8 guy Eric Benson, who we think might be Eric Langston?
9     MR. MICHALIK: Objection, form, foundation.
10 BY MR. GOODMAN:
11     Q     Is that your reading of the report?
12     A     From the report, yeah, he appears to
13 be the one person listed as eyewitness.
14     Q     Okay. And then on the front page of
15 the report, there's a wanted -- I'm sorry, page 2, it
16 says "Wanted," and then there's a description of two
17 male blacks?
18     A     Yes.
19     Q     That appears to -- that description
20 appears to have come from that guy Eric Benson, if
21 you can tell.
22     MR. GARCIA: Objection, foundation.
23     MR. MICHALIK: I'll join that objection.
24     THE WITNESS: You know, I would just be

164

41 (Pages 161 to 164)

1    guessing.
2    BY MR. GOODMAN:
3        Q    Okay. Let's move on to the second
4    one, Exhibit 28. This is a report of a guy named
5    Carlos Willis?
6            (WHEREUPON, Fields Exhibit 28 was
7            tendered to Witness.)
8        A    Yes.
9        Q    That's a name you're familiar with,
10   right?
11       A    I've heard that name before. Yes.
12       Q    Did you ever interview Carlos Willis?
13       A    Oh, God. I don't remember if -- I
14   tried to find him, and I don't recall if I ever found
15   him or not. I don't think so.
16       Q    You did interview Eric Langston and
17   you --
18       A    Yes.
19       Q    -- said he was uncooperative?
20       A    Yes.
21       Q    And that was just one occasion?
22       A    (Witness nodding head.) Yes.
23       Q    You're not sure if you interviewed
24   Carlos?

165

1        A    I would have to look at the file. I
2    don't remember if we found him or not. I know I was
3    looking for him.
4        Q    But it was your understanding that
5    Carlos Willis was with James Langston at the time of
6    the shooting?
7        A    You mean Randy?
8        Q    I'm sorry. Randy Langston.
9        A    Yes. They were all going to play
10   ball.
11       Q    And do you know if Carlos Willis ever
12   viewed a lineup?
13       A    I don't believe so, but I'm not sure.
14       Q    Then the next one is Exhibit 104.
15   This is a report that's also from 1984; is that
16   correct, a supp report?
17       A    Yes.
18       Q    It appears to be from shortly after
19   the shootings. It says "Date This Report Submitted"
20   is April 30th, 1984?
21       A    Yes. It appears they interviewed them
22   on the 28th, though.
23       Q    So that would have been the day of the
24   shooting?

166

1        A    Yes.
2        Q    And this report indicates that four
3    people are interviewed; is that correct?
4        A    Yes.
5        Q    Minnie White, Sandra Langston, Randy
6    Langston, and James Langston?
7        A    Yes.
8        Q    And you see that Minnie White doesn't
9    give any description of the shooters in this report;
10   is that correct?
11       A    Yes.
12       Q    But Sandra Langston does give a
13   description of the shooters. Do you see that?
14       A    I would disagree with the term
15   "shooter." She describes two people she saw before
16   the shooting.
17       Q    All right. She describes two male
18   blacks in their early 20s, light complexion, wearing
19   a red ski -- I'm sorry -- male black, one early 20s,
20   light complexion and wearing a red ski mask and a
21   white jacket.
22       A    Yes.
23       Q    Now, black male number 2, early 20s,
24   light complexion, wearing a blue jacket.

167

1        A    That's what the report says.
2        Q    And, again, I think I asked you this,
3    but I can't remember your answer. Did you ever --
4    you said you never spoke to Sandra Langston?
5        A    I tracked her to the Wisconsin
6    correctional system. I think I might have talked to
7    her attorney, but I don't remember. But, no, I never
8    talked to her personally.
9        Q    Why was it that you never spoke to
10   her?
11       A    I don't think she wanted to talk to
12   us.
13       Q    That was communicated to you through
14   her attorney or by attempting to see her?
15       A    I don't remember, but I know I was
16   trying to track her and I found her.
17       Q    Did you physically go out to the
18   institution where she was at in Wisconsin?
19       A    No. I think somehow or another it was
20   conveyed to us that she wasn't going to talk to us.
21       Q    Did you writ her in for the trial?
22       A    No. We didn't do material witness
23   papers on her. She was out of state. We couldn't
24   just writ her.

168

42 (Pages 165 to 168)

1    Q    So what is the process if you want to
2  bring in a witness that is out of state?
3    A    She's out of state and we have to file
4  what's called material witness papers.  We have to
5  have the judge find that she's a material witness,
6  that she is going to add something significant to our
7  case.  He then enters an order finding her a material
8  witness, and then we have to file paperwork in
9  Wisconsin, asking Wisconsin to recognize that finding
10 and produce her.
11   Q    And you didn't do that --
12   A    No.
13   Q    -- for Sandra Langston?  And then the
14 next person interviewed is Randy Langston?
15   A    Yes.
16   Q    In his statement, according to this
17 report, it says he was interviewed -- and, again,
18 this is an interview on April 28th, to your
19 understanding, the --
20   A    That's what the report indicates.
21   Q    -- day of the shooting.  He says he
22 was playing baseball across the street from 705 East
23 39th Street with his brother James and friend Carlos,
24 when he observed a man with a red ski mask shooting

169

1  police was not true?
2    A    Well, he said he didn't tell the
3  police everything because he was afraid.  He didn't
4  want to identify "Man Sur."
5    Q    And that's why he didn't provide any
6  description to the police, because --
7    A    That's what he told me.
8    Q    -- he was afraid of "Man Sur"?
9    A    And the El Rukns.
10   Q    And then the last person interviewed
11 is James Langston, and he told the police that he was
12 playing baseball across the street with his brother
13 Randy, and Carlos, when he heard a man's voice say,
14 "What are you going to do now?"
15        Upon turning around to see what was
16 going on, he observed a man in a red mask shooting at
17 the victims, who was standing in front of 706 East
18 39th.  After the two victims fell to the ground, the
19 man with the red ski mask continued to shoot as they
20 lay on the ground.  He heard approximately six shots.
21 The man wearing the ski mask then rolled it up from
22 his face and then ran through the breezeway.
23       Did you ever -- well, is that what it
24 says?

171

1  at the victims, who was standing, and continued to
2  shoot as they lay on the ground.  He then rolled the
3  ski mask up from his face and ran away.  Do you see
4  that?
5    A    Yes.
6    Q    Did you ever ask Randy Langston about
7  that statement --
8    A    Yes.
9    Q    -- from the night -- what did he tell
10 you?
11   A    He told me he was afraid to get
12 involved because he knew "Man Sur," and "Man Sur"
13 lived in the building and was an El Rukn, and he
14 didn't want to talk to the police.
15   Q    I guess I don't understand that.
16 Exactly what did he tell you about this first
17 statement?  If he didn't want to get involved, why
18 did he say he observed a man with a red ski mask
19 shooting the victims?
20   A    Because the police came to them, and
21 the police had information that he was outside when
22 the shooting happened, so he had to tell them
23 something.
24   Q    So he told you that what he told the

170

1    A    Yes.
2    Q    I can't remember.  Again, did you ever
3  speak to James Langston?
4    A    I tried to find him.  By the time I
5  got involved, I think he was already deceased.  I
6  never spoke to him.
7    Q    It appears from this report also that
8  James Langston did not provide any description of the
9  man with the red ski mask who pulled it up; is that
10 correct?
11   A    Nothing specific appears.  No.
12   Q    In fact, the only person in this
13 interview report that provides a description is
14 Sandra Langston.
15   A    Yes.
16   Q    Let me ask you whether in your review
17 of the file there are any other reports that you
18 recall seeing from the 1984 investigation that were
19 significant, relating to the Smith/Hickman murders
20 other than these three supp reports?
21   MR. GARCIA:  Objection, form.
22       You could answer.
23   THE WITNESS:  Yes.
24 BY MR. GOODMAN:

172

43 (Pages 169 to 172)

1    Q    What other reports from the 1984
2  investigation?
3    A    I saw reports from the police
4  regarding later interviewing Randy Langston, Gerald
5  Morris, Eric Langston. I saw the reports regarding
6  their identifying Nathson Fields and Earl Hawkins in
7  photographs.
8    Q    Okay. Let me just stop you for a
9  second.
10    MR. GARCIA: Let -- I was going to say, was he
11  finished with his answer?
12  BY MR. GOODMAN:
13    Q    Yeah, because I -- those reports, I'll
14  ask you about those in a second.
15    A    Okay.
16    Q    But those reports are all from 1985.
17    A    I thought you were talking about the
18  case. But 1984?
19    Q    Yes.
20    A    I don't recall. I think there might
21  have been another supp or two in here; I don't
22  recall, I would have to look, but nothing of any
23  significance.
24    Q    So no other descriptions of the

                                                    173

1    A    No. I never worked with them
2  directly.
3    Q    Based on your understanding of the new
4  information that was received, what is the first --
5  you know, chronologically, what's the first piece of
6  information that was obtained that linked Nate Fields
7  to these shootings?
8    A    I don't recall offhand who was talked
9  to first, but the police talked to Randy Langston,
10  Eric Langston, Gerald Morris. All three provided
11  information regarding offenders.
12    Photographs were put together which
13  were shown, and Nathan (sic) was identified by
14  individuals in those photographs. Lineups were later
15  held, and he was identified in lineups.
16    Q    Based on your review of the file as a
17  prosecutor of Nate, do you recall whether there was
18  any information that the police had prior to
19  obtaining those identifications of Nate Fields?
20    A    In terms of?
21    Q    Did Nate -- did the police obtain
22  information about Nate Fields from anyone prior to
23  Randy Langston
24    MR. GARCIA: Ob --

                                                    175

1  offenders?
2    A    Not that I recall offhand.
3    Q    Let me ask -- I'm just going to ask
4  you in general about -- so your understanding is at
5  some point in 1985, there was additional evidence
6  obtained relating to these shootings?
7    A    I don't recall the exact dates, but,
8  yes, they did come up with new information.
9    Q    And let me just ask you: There was an
10  El Rukn Task Force that was established around that
11  time?
12    A    That's my understanding.
13    Q    Did you have any connection to that El
14  Rukn Task Force?
15    A    No.
16    Q    Do you know anything about it, when it
17  was set up?
18    A    I just know what I've been told by
19  others. I don't know specifically when it was set
20  up.
21    Q    Is that something that you were
22  cooperating with in your work --
23    A    I --
24    Q    -- as a state's attorney at any point?

                                                    174

1  BY MR. GOODMAN:
2    Q    --and Buckles?
3    MR. GARCIA: -- jection, foundation.
4    You can answer.
5    THE WITNESS: You know, as far as Nathson
6  Fields' name directly involved in this murder, I
7  think it first came up when they showed photographs
8  of El Rukns to people. But, again, I'm not a hundred
9  percent sure.
10  BY MR. GOODMAN:
11    Q    Were you aware that Anthony Sumner had
12  brought -- had been picked up and had implicated Nate
13  in the case?
14    A    At some point I saw reports regarding
15  Anthony Sumner and what his statements were about,
16  comments he heard Nathan Fields (sic) make.
17    Q    And what's your recollection of that?
18    A    My recollection is that Anthony Sumner
19  told the police that after the shooting, he saw and
20  talked to Nate Fields that Nathan Fields (sic)
21  basically told them that they had a good exhibition,
22  a good operation, something like that, when they were
23  discussing the shooting.
24    Q    And is it your recollection that the

                                                    176

44 (Pages 173 to 176)

1 police had this information from Anthony Sumner when
2 they went and reinterviewed Randy Langston?
3 A I don't know the order offhand of who
4 was talked to first.
5 Q That wasn't something that was
6 significant to you?
7 A Well, they were reports that showed
8 off the timeline. Just as I sit here now, I can't
9 tell you what it was.
10 Q But you were satisfied as a trial
11 prosecutor with Randy Langston's testimony since you
12 put him on, right?
13 A Yeah. After I talked to Randy
14 Langston, yes.
15 Q You were satisfied from his testimony
16 that he saw from across the street a person's face
17 for a few seconds? You were satisfied that that was
18 sufficient to be able to pick him out of a photo
19 array a year later?
20 A Randy Langston was sure.
21 Q And you were satisfied that the reason
22 why he didn't provide a description of the -- when he
23 first talked to police, the reason why he didn't
24 provide any description is because he was afraid of

177

1 "Man Sur"? That's what he told you?
2 A And the El Rukns, yes. I mean, I see
3 that quite often in gang cases.
4 Q And did he tell you why in his initial
5 statement to the police he said that they lifted up
6 their masks if he was afraid?
7 A I'm sorry. Could you repeat that?
8 Q Did he explain to you why he said they
9 lifted up their masks if he was lying to the police
10 in the original statement?
11 MR. GARCIA: Objection, foundation.
12 THE WITNESS: I don't know why he said that.
13 BY MR. GOODMAN:
14 Q He didn't explain that?
15 A No.
16 Q Did he explain why he said that he
17 only saw one of the shooters?
18 A He just said that he didn't want to
19 identify "Man Sur." I didn't delve more than that.
20 Q Then it's your understanding that --
21 by the way, did you ever review any of the reports
22 from the murders of Vaughn and White?
23 A I read through them at one point.
24 Yes.

178

1 Q Were you involved at all in that
2 investigation?
3 A In the investigation, no. When the
4 case came back, the Fields case involving Jerome
5 Smith and Talman Hickman, that case also came back,
6 or I had the files on that case.
7 Q Tell me what you remember about that
8 case just in terms of --
9 MR. GARCIA: Objection, form.
10 BY MR. GOODMAN:
11 Q I'm just talking about procedurally
12 what you remember about the Vaughn/White case.
13 A That they were killed, I think stabbed
14 multiple times.
15 Q I -- I'm not talking about the facts
16 of the case, I'm talking more about the procedure.
17 A I think neither one of Hawkins or
18 Fields went to trial on that case. It was used in
19 aggravation at their death sentencing.
20 Q Right.
21 A And that's pretty much what I remember
22 about it.
23 Q But you said it came back. When you
24 picked up the case in -- whenever it was that you

179

1 volunteered after Nate's case came back from the
2 Illinois Supreme Court --
3 A Um-hum.
4 Q -- you said that the Vaughn/White case
5 came back, too?
6 A Well, the file came back with all the
7 stuff I collected, yes. I think that case just kind
8 of was nollied way back when after they received the
9 death sentence. But I -- I'd have to look at the
10 file to tell you specifically what happened.
11 Q When you say it came back, it was
12 never assigned to you to prosecute that case?
13 A To tell you the truth, I'm not even
14 sure if it was an active case when it came back to
15 us. It was just part of what I collected when I was
16 putting together all the files.
17 Q Do you have any understanding of why
18 that case wasn't -- didn't proceed forward against
19 Nate Fields?
20 A My understanding was they used it in
21 aggravation at the death sentencing. Once they
22 received death, they didn't proceed further.
23 Q Were you aware that the two witnesses
24 that implicated Nate in that case had recanted?

180

45 (Pages 177 to 180)

1   A   I know Anthony Sumners (sic) recanted.
2   I don't know about the second one.
3   Q   Did you know that Earl Hawkins had
4   also implicated Nate in that case?
5   A   Vaguely I remember that, but I'd have
6   to look through the reports again.
7   Q   So you weren't aware of -- did you put
8   Hawkins on?
9   A   Yes.
10   Q   When you put Hawkins on, were you
11   aware that he had implicated Nate in that case and
12   then recanted?
13   A   I don't remember Hawkins necessarily
14   doing that, but that's not to say it didn't happen.
15   Q   Did you ever have a conversation with
16   Hawkins about the Vaughn/White case or why he
17   implicated Nate in it?
18   A   Not really. I wasn't really dealing
19   with that case.
20   Q   But you would have been concerned with
21   Hawkins' credibility as a witness, right?
22   A   I'm always concerned with credibility
23   of my witness, yes.
24   Q   But that wasn't something that ever

181

1   A   They told me that basically they had
2   been part of the El Rukn Task Force, that they were
3   going back reinvestigating a number of El Rukn
4   murders, that, as a part of that, they collected a
5   series of photographs of known El Rukn members. They
6   talked to witnesses again on several murders; they
7   showed these photographs to witnesses in several of
8   these cases.
9       In my case, this group of photographs
10   was used with Randy Langston, Gerald Morris, and Eric
11   Langston, that they were not inventoried under any
12   specific case that they recall, and they did not know
13   where the photographs were at this time.
14   Q   And based on your experience, is that
15   a standard procedure, to inventory a photo array if
16   an identification is made?
17   MR. MICHALIK: Objection, lack of foundation.
18   MR. GARCIA: Join.
19   THE WITNESS: On a specific case perhaps, but
20   they were doing multiple investigations with the
21   federal government, so I didn't know their
22   procedures.
23   BY MR. GOODMAN:
24   Q   Do you know how many photos were in

183

1   came up in your discussions with him?
2   A   I would have to look at the reports.
3   If it's in the reports where he recanted, I'm sure I
4   asked him about it. I just don't recall.
5   Q   Okay. When Randy Langston was brought
6   back in 1985 and picked out Nate's -- well, what's
7   your understanding, that he first looked at photos?
8   A   He was first shown a group of
9   photographs and then shown lineups.
10   Q   Did you ever review the photographs
11   that he was shown when he picked out --
12   A   I could never find them.
13   Q   Did you do anything to try to find
14   them?
15   A   Yes.
16   Q   What did you do?
17   A   Sent subpoenas out, I think I talked
18   to the lab regarding photography, if they had photos.
19   I ordered photos again under that RD, I talked to
20   detectives involved in the investigations.
21   Q   Who did you talk to?
22   A   Detectives O'Callaghan and Brannigan.
23   Q   And what did they tell you about that
24   photo array?

182

1   the array that were shown to Randy Langston?
2   A   Specifically? No. No one could tell
3   me an exact number, but it was a group.
4   Q   That's the words that you were told,
5   "a group"?
6   A   I think I was given an approximation
7   of 15 to 20 maybe, but, again, I don't recall
8   specific number.
9   Q   Who gave you that approximation?
10   A   The detectives.
11   Q   O'Callaghan or Brannigan?
12   A   I don't recall which one.
13   Q   When you talked to them, were they
14   together or did you talk to them separately?
15   A   I talked to them at different times,
16   but I don't recall when.
17   Q   Did you specifically direct a subpoena
18   to them or was it just to the Records Division?
19   A   To them specifically? No. They
20   didn't have photographs.
21   Q   You asked them personally?
22   A   I asked them personally.
23   Q   Did you look at the lineup reports --
24   A   The lineup reports?

184

46 (Pages 181 to 184)

1    Q    -- for Randy Langston?
2    A    Supplements?  Yes.
3    Q    And Gerald Morris?
4    A    Yes.
5    Q    In reviewing those lineup reports, do
6 you recall if any other witnesses viewed lineups with
7 Nate Fields in them --
8    A    I have --
9    Q    -- including -- let me just finish the
10 question --
11    A    Okay.
12    Q    -- and you can answer, any other
13 witnesses, and then I'm going to say including
14 Carlos, Carlos Willis; or Sandra Langston or Eric
15 Langston?
16    A    I don't believe Sandra Langston ever
17 looked at lineups.  I believe there was another
18 individual who did, but I would have to look through
19 reports to tell you, though.
20    Q    What about Carlos Willis?
21    A    He might have been one of the ones.
22 But, again without the reports, I can't tell you.
23    Q    Did you ever ask O'Callaghan and
24 Brannigan why Sandra Langston wasn't brought in to

185

1 view a lineup?
2    A    No.
3    Q    Did you think about bringing her in?
4    A    Again, I tried to find her and talk to
5 her.  But, as I recall, she wasn't going to
6 cooperate.
7    Q    What about Vaughn/White?  Did you ever
8 look at any lineup reports on Vaughn/White?
9    A    I read the whole file.
10    Q    Do you remember that there were two
11 eyewitnesses who were young children?
12    A    Specifically, no.  I mean, I can't
13 even begin to tell you what specifically the
14 witnesses were in that case.
15    Q    Did you ever see any report as to
16 whether those witnesses viewed a photo array or a
17 lineup containing Nate Fields?
18    A    No.
19    Q    You have no recollection?
20    A    No.  I would have to look at the
21 reports.
22    Q    Okay.
23    A    I know I've read them all and I've
24 seen them if they're in there; I just don't recall.

186

1    Q    Let me ask you about Gerald Morris.
2 Tell me what -- what you recall about Gerald Morris.
3 When is the first time you met him, contacted him?
4 Did he write you letters?
5    A    No, actually, he didn't.  Randy was
6 the guy who loved to write letters.  Gerald we found,
7 and I don't recall specifically where we found him.
8 At some point he moved up to Milwaukee and we talked
9 to him up there, and then he moved to Missouri and we
10 talked to him there.  I didn't deal with Gerald as
11 much as my partner.  That was his witness.
12    Q    When is the first time you met Gerald
13 Morris?
14    A    Again, I can't give you a specific
15 time.
16    Q    Did you ever interview him at his home
17 or prison?
18    A    We went up to Milwaukee one time to
19 talk to him and we met him at a coffee shop.  He
20 didn't want to talk at his home.
21    Q    Is that the first time you met him?
22    A    I had met him before then.
23    Q    When is the first time you met him?
24    A    I, again, don't recall.

187

1    Q    Where was it?
2    A    I don't remember.
3    Q    How many times did you meet him before
4 you met him in Milwaukee?
5    A    I would be guessing, but not many.
6 Maybe one or two.
7    Q    Were they in Chicago?
8    A    Yes, as far as I remember.
9    Q    Was he in custody or was he not in
10 custody?
11    A    I don't believe Gerald was ever in
12 custody that I recall.
13    Q    Were the meetings at the state's
14 attorney's office or were they outside of the state's
15 attorney's office?
16    A    At some points we had meetings with
17 him at the state's attorney's office when we were
18 ready for trial.  Again, we talked to him up in
19 Milwaukee one time, but I don't remember too much
20 about other meetings.  I'm sure we met with him, but
21 Brian Sexton dealt with him more than I did.
22    Q    But the initial meetings you had with
23 him before Milwaukee, do you remember whether they
24 were at the state's attorney's office or outside of

188

47 (Pages 185 to 188)

1   the state's attorney's office?
2        A    At this point, no.
3        Q    Who was present for the initial
4   meeting?
5        A    I don't even remember.
6        Q    Did you have an investigator with you
7   when you went to meet him?
8        A    I don't remember.  I usually did, but
9   I can't tell you specifically.
10       Q    So the first one you remember is the
11  one in Milwaukee?
12       A    The first one specifically I remember
13  is in Milwaukee, but I'm sure I met with him
14  beforehand, because we went up there to Milwaukee to
15  talk to him about something in regard to a
16  recantation, so we would have already talked to him
17  before then.
18       Q    Tell me what you remember him telling
19  you the first time you met him.
20       A    Specifically, I don't remember much
21  about what he said.  I think it was pretty much
22  consistent about what he said at the trial,
23  otherwise, I would remember something specifically.
24  Again, I know he didn't want to get involved in the

189

1   case.
2        Q    Again, were -- he said he didn't want
3   to get involved in the case?  Did you talk to him
4   about his recantation?
5        A    Yes.
6        Q    And what did he say about that, do you
7   remember?
8        A    That, I remember.
9        Q    Okay.  What did he say about the
10  recantation?
11       A    When we went up to Milwaukee and
12  talked to him, he said that he had given the
13  recantation because defense attorneys had come to his
14  home where he had moved to Milwaukee to get away from
15  all this.
16            He was scared when they found out --
17  or when they appeared at his home and obviously knew
18  where he lived, that he talked to them and told them
19  what was in the recantation basically because he
20  wanted to get rid of them, get them away from his
21  family.
22       Q    The defense attorneys?
23       A    Yes.
24       Q    And other than that, him telling you

190

1   that, is there anything else you remember him --
2   anything else he told you that you remember?
3        A    That was basically what I remember.
4        Q    And then were you aware of any -- any
5   help given to him with respect to rent or relocation?
6        A    We helped him in some relocation.
7   Specifically, again, I would have to look at the
8   sheets to tell you what.
9        Q    Was that before or after your visit to
10  Milwaukee?
11       A    I want to say we helped him get up to
12  Milwaukee, but I'm not sure.  Again, I'd have to look
13  at the relocation reports.
14       Q    Do you know how many times you helped
15  him?
16       A    Off the top of my head, maybe two.
17  But, again, without the reports, I don't want to tell
18  you an exact number.
19       Q    And both times were only relocations?
20       A    As far as I know, we helped him set up
21  where he was going to stay with rent and security
22  deposit.  We might have helped with moving, but I
23  don't recall.
24       Q    And then when you helped him, is it

191

1   just a security deposit and one month's rent, or what
2   do you do?
3        A    That's normally what we do.  Again,
4   for each individual, there's a sheet that lists what
5   we've spent and what it's for.  Without that, I don't
6   want to tell you specifically.
7        Q    But other than that, the security
8   deposit and first month's rent or whatever the sheet
9   says, there's nothing else you remember that you did
10  for --
11       A    I'm sure --
12       Q    -- him, you or Sexton did, for Gerald
13  Morris?
14       A    I'm sure we helped him out with travel
15  when he came in to testify, because he was out of
16  state at that point, in Missouri, and whether we gave
17  him emergency living expense at some point in time,
18  I -- I don't remember.
19       Q    What about Randy Langston?  Did you
20  ever give him emergency living expenses?
21       A    We might have.  Again, I would have to
22  look at the sheet.
23       Q    But that would all be documented?
24       A    Yes.

192

48 (Pages 189 to 192)

1    Q    I'm going to ask you -- I want to ask
2  you about the Certificate of Innocence.  Again, I
3  understand that -- let me first ask about the
4  Certificate of Innocence.  After Nate was acquitted,
5  he filed a petition for a Certificate of Innocence.
6    A    Yes.
7    Q    You were aware of that?
8    A    Yes.
9    Q    And at some point the state made a
10 decision to oppose it; is that correct?
11   A    Yes.
12   Q    And were you involved in that
13 decision-making?
14   A    Yes.
15   Q    Tell me how that takes place.
16   MR. GARCIA:  I'm going to object at this
17 point.  As I said earlier, he was involved with the
18 Certificate of Innocence, which is ongoing, as you're
19 aware, and now you're getting into the process and
20 decision-making, which is work product, which, I
21 think, are out of bounds for these proceedings.  So
22 I'm going to instruct the witness not to answer.
23   MR. GOODMAN:  I'll keep asking questions, and
24 if you instruct him not to answer, then it will be

193

1  Nate had filed a lawsuit earlier?
2    MR. GARCIA:  Same objection, instruct the
3  witness not to answer.
4  BY MR. GOODMAN:
5    Q    Who makes the final decision as to
6  whether to oppose it or not?
7    MR. GARCIA:  That's okay.
8    THE WITNESS:  The state's attorney.
9  BY MR. GOODMAN:
10   Q    Which was -- was it Anita Alvarez?
11   A    Yes.
12   Q    Did you have a view on it?
13   MR. GARCIA:  Same objection.  Instruct the
14 witness not to answer.
15 BY MR. GOODMAN:
16   Q    But you had discussions with Anita
17 Alvarez about the decision to oppose?
18   MR. GARCIA:  Same objection, instruct him not
19 to answer.
20 BY MR. GOODMAN:
21   Q    What about the decision to take an
22 appeal -- can I ask about that, the decision to take
23 an appeal after Nate was granted a Certificate of
24 Innocence?

195

1  clear on the record.
2    MR. GARCIA:  Just so it's clear on this
3  record, just so I don't have to repeat the entire
4  objection --
5    MR. GOODMAN:  Right.
6    MR. GARCIA:  -- "Same objection" is understood
7  to be the objection --
8    MR. GOODMAN:  Understood.
9    MR. GARCIA:  -- I just made?  Okay.  Fine.
10 BY MR. GOODMAN:
11   Q    So who was involved -- what members of
12 the state's attorney's office were involved in making
13 the decision to oppose Nate's Certificate of
14 Innocence?
15   MR. GARCIA:  I think that's okay.
16   MR. GOODMAN:  That's okay?  Okay.
17   THE WITNESS:  The people I met with were the
18 State's Attorney at the time, Anita Alvarez; Alan
19 Spellberg, Chief Appeals, myself, Brian Sexton, the
20 chief of staff at the state's attorney's office, and
21 I don't recall anyone else, but there may have been.
22 BY MR. GOODMAN:
23   Q    Okay.  In discussions about whether to
24 oppose it or not, did anyone bring up the fact that

194

1    MR. GARCIA:  Same objection, instruct the
2  witness not to answer.
3  BY MR. GOODMAN:
4    Q    I don't know if I need to show this to
5  you, but -- yeah, I suppose I should put it in the
6  record.
7    MS. MATUZAK:  So that's Exhibit 105?
8    MS. REPORTER:  Yes.
9         (WHEREUPON, Fields Exhibit 105 was
10        marked and tendered to Witness.)
11 BY MR. GOODMAN:
12   Q    I'll just ask you if you recognize
13 this exhibit.
14   A    I do.
15   Q    It appears to be a letter from William
16 Swano's attorney, dated February 21st, 2000?
17   A    That's correct.
18   Q    Did you, in fact, receive this letter?
19   A    I did.
20   Q    Okay.  In the letter it says, "With
21 regard to" -- the second sentence:  "With regard to
22 Mr. Swano's potential testimony in the upcoming trial
23 of Nathson Fields, please be advised as follows."
24   Let me ask you what discussions you

196

1    had with -- well, let's start there. Had you had any
2    discussions with William Swano about his testifying
3    at the trial?
4        A    No. We went through his attorney.
5        Q    And that attorney was Greg
6    Schlesinger?
7        A    Yes.
8        Q    Tell me about your discussions with
9    Greg Schlesinger.
10       A    We got hold of him and told him that
11   we may be subpoenaing his client, William Swano, to
12   testify at the trial. We had already talked to the
13   U.S. Attorney's Office regarding producing William
14   Swano. He was under an obligation to cooperate in
15   all --
16       Q    He was what?
17       A    He was under an obligation as part of
18   his federal sentence to cooperate in all related
19   matters to Judge Maloney's case, and basically
20   letting him know that his client may be required to
21   come to court.
22       Q    Was Mr. Swano in federal prison at --
23       A    He --
24       Q    -- the time?

                                                    197

1        A    No. Over the phone.
2        Q    Other than that one conversation, were
3    there any other discussions with Swano?
4        A    You know, we had a couple with him,
5    letting him know again that we may call him when the
6    case would probably be set for trial, and that we may
7    want to talk to his client beforehand, and he said he
8    would cooperate.
9        Q    He said what?
10       A    He will cooperate.
11       Q    Swano?
12       A    Yes -- well, his attorney did, said he
13   and Swano would cooperate.
14       Q    Did you ever ask the attorney if you
15   could sit down with Swano?
16       A    We never made the decision that we
17   specifically wanted to sit down with Swano and
18   discuss things. No.
19       Q    Was that -- in this letter,
20   Schlesinger says that Swano would -- it basically
21   explains what Swano would testify to, and that his
22   testimony would not be helpful to you?
23       A    He was -- he basically said his
24   testimony would be consistent with what he testified

                                                    199

1        A    -- was -- at that point? No, he was
2    released.
3        Q    In February of 2000?
4        A    I don't know the exact date.
5        Q    At the time you had the discussions
6    with Schlesinger, he was released?
7        A    My understanding is he was out of
8    custody. Again, he was in Witness Relocation.
9        Q    Did you ever meet Swano?
10       A    I've met him on other occasions, but
11   not in relation to this case.
12       Q    When he was --
13       A    An attorney.
14       Q    When you were a state's attorney, did
15   you ever try a case against him?
16       A    You know, I think I did, but I don't
17   even remember, but I met him in the hallways.
18       Q    Was he a good lawyer?
19       A    I have my opinion on that. No.
20       Q    Okay. So other than that -- your
21   conversation with Schlesinger, was that over the
22   phone or in --
23       A    Yes.
24       Q    -- in person?

                                                    198

1    to in the Maloney trial. I think he put that in just
2    to try and keep us from calling Swano. But the
3    bottom line is once the court ruled on the bribery
4    evidence as far as Nathson Fields, there really was
5    no need to call Swano.
6        Q    Right. But prior to that ruling, did
7    you make attempts to get additional information from
8    Mr. Swano related to Nathson Fields and the bribery?
9        A    As far as talking to him specifically?
10   No.
11       Q    But the only discussions you had with
12   respect to Swano were with Schlesinger?
13       A    Yes.
14       Q    Okay.
15       A    Well, actually, let me take that back.
16   We also talked to the U.S. attorneys about the
17   procedure of producing him if we needed him.
18       Q    But not substantively about what his
19   testimony might be?
20       A    No.
21       Q    And did you talk with Schlesinger --
22   other than what he writes in this letter, did you
23   have discussions with him about what his testimony
24   might be with respect to Nate Fields and the bribe?

                                                    200

                              50 (Pages 197 to 200)

1    A    No.  He basically said he was going --
2  as set out in the letter, he would testify
3  consistently with what he testified in Maloney.
4    MR. GOODMAN:  I don't think I have anything
5  else about that.  I'm going to ask you some questions
6  about the street files.
7    Is there anything else you have?
8    MS. MATUZAK:  No.
9  BY MR. GOODMAN:
10   Q    So let me ask you some general
11 questions, and I guess we're going to show you some
12 files and ask you.  Basically we're just trying to
13 clear up some confusion with respect to the street
14 files or general progress reports that were available
15 when you prosecuted Nate and you retrieved all those
16 records.
17   THE WITNESS:  Before we start, can we just
18 take a quick break?
19   MR. GOODMAN:  Sure.
20   MR. MICHALIK:  Just before we do that, for the
21 record, I'm going to object to the use of the term
22 "street file" on the basis that it's vague and
23 argumentative, unless the witness can provide a
24 definition as to what a "street file" is.

201

1  that Randy Langston told you -- or what you explained
2  is that he told you from the beginning that he had
3  recognized "Man Sur"; is that correct?
4    A    Yes.
5    Q    As one of the shooters?
6    A    Yes.
7    Q    And he testified -- in fact, on direct
8  he testified that "Man Sur" was one of the shooters;
9  is that correct?
10   A    Yes.
11   Q    And that Nate was the other shooter?
12   A    Yes.
13   Q    And Earl Hawkins testified.  Also, you
14 put him on as well?
15   A    I did.
16   Q    And he testified that he was not one
17 of the shooters.
18   A    That is correct.
19   Q    Let me just ask you how you reconcile
20 those two conflicting testimonies as a prosecutor.
21   A    I reconciled it in that I was trying
22 Nathson Fields and Nathson Fields alone at that
23 point.  Also, when I looked at photographs, there is
24 a resemblance between George Carter and Earl Hawkins,

203

1  BY MR. GOODMAN:
2    Q    Well, maybe before we take a break,
3  let me ask you that.
4    A    Okay.
5    Q    Do you have a definition of "street
6  file"?
7    A    I have a definition that I believe is
8  correct for "street file."
9    Q    Okay.  What is your definition?
10   A    My definition is it would be the
11 working case file that would include all the
12 supplemental reports prepared, all the general
13 progress reports prepared up to that point, all the
14 crime lab reports in the murder case, Medical
15 Examiner's reports, basically any information
16 documented the police had on the case that would be
17 contained in their working file, which I consider the
18 street file.
19   MR. GOODMAN:  Okay.
20   (WHEREUPON, there was a brief
21   recess had in the proceedings.)
22 BY MR. GOODMAN:
23   Q    Before we talk about this, let me go
24 back to the prosecution of Nate.  My understanding is

202

1  as far as how they looked in their general build.
2    And based on everything I had learned
3  from Earl Hawkins, Derrick Kees, I believe what Earl
4  Hawkins was telling me at that time was what happened
5  and that Randy Langston may have misidentified "Man
6  Sur" was the shooter.
7    Q    Did you ever ask Randy Langston
8  whether it's possible that it was George Carter?
9    A    I asked him was he positive in his
10 identification, and he told me yes.  So I put it out.
11   Q    Did you ever show him a picture of
12 George Carter and say, "Could you have confused these
13 two faces?"
14   A    I believe I did.
15   Q    What did he say?
16   A    He said he believed it was "Man Sur."
17   Q    Have you ever had any other case in
18 your career as a prosecutor where your two
19 eyewitnesses conflicted in that way?
20   MR. GARCIA:  Objection, form.
21   You can answer.
22   THE WITNESS:  Offhand, I can't think of one,
23 but it doesn't mean it didn't happen.
24 BY MR. GOODMAN:

204

51 (Pages 201 to 204)

1    Q    So let me ask you about what, I guess,
2  we'll call the working file basically.  Let me ask
3  you some general questions.  I didn't write these
4  questions so I'm a little confused by some of them,
5  but just sort of a general question about file
6  maintenance procedures in the state's attorney's
7  office.
8    A    Okay.
9    Q    You were describing how when you first
10 got the case you subpoenaed a whole bunch of stuff --
11   A    Yes --
12   Q    -- and you called some people and you
13 ordered the file up from --
14   A    The warehouse.
15   Q    -- the warehouse.  Was that the court
16 file or was that the state's attorney file?
17   A    State's attorney file.  I wasn't sure
18 where exactly the file was, as far as the complete
19 file, where it was when I first got the case.  It's
20 been around through so many departments.
21   Q    So on closed cases, the state's
22 attorney's file gets filed away in a warehouse; is
23 that --
24   A    Yes.

205

1    Q    -- correct?  Where is that warehouse?
2    A    They have got a couple.  I think one,
3  as far as some cases, are in the building, in the
4  basement, at least I believe they are now.  Back
5  then, they had a warehouse over at Rockwell and 24th
6  Street or something like that, a big old warehouse,
7  part of the sheriff's building where they've got the
8  gas pumps.
9    Q    Have you ever been to the state's
10 attorney's warehouse?
11   A    Yes.
12   Q    You have?
13   A    I have.
14   Q    So sometimes you go yourself and
15 retrieve the file and other times you --
16   A    Actually, I was there for another
17 reason unrelated to getting a file.  You also had to
18 go there to get your pagers fixed.
19   Q    But generally if you're retrieving a
20 file, you wouldn't go yourself?
21   A    No.  You would call or send a request.
22   Q    And what about Chicago Police
23 Department files?  Tell me, do you have any personal
24 knowledge from years of experience of warehouses of

206

1  old files that the Chicago Police Department uses?
2    MR. GARCIA:  Object --
3    MR. MICHALIK:  Objection to foundation.
4    MR. GARCIA:  Join.
5    You can answer if you know.
6    THE WITNESS:  I know they have a listing for
7  old files in their FOP book, handbook.  As far as
8  their exact location, I don't recall offhand.
9  BY MR. GOODMAN:
10   Q    Have you ever been to any of those
11 warehouses for old Chicago Police Department files?
12   A    No.
13   Q    We're almost done here.  I want to ask
14 you about what's been marked, previously marked, as
15 Fields Exhibit 3 for identification.  This is the
16 investigative file related to the Smith/Hickman
17 murders.
18    (WHEREUPON, Fields Exhibit 3 was
19     tendered to Witness.)
20    When was the first time you saw that
21 file?
22   A    As far as this group of documents, if
23 I'm not mistaken, this is copies of what were
24 provided by you some time ago to us.  This would not

207

1  be what I call the street file.  This would be some
2  documents that would be contained in --
3    MR. GARCIA:  Why don't you --
4    THE WITNESS:  -- the street file.
5    MR. GARCIA:  -- just wait for the question and
6  listen --
7    THE WITNESS:  Okay.
8    MR. GARCIA:  -- to the question and then
9  follow up if you need to.
10    THE WITNESS:  Okay.
11 BY MR. GOODMAN:
12   Q    So the question was:  When was the
13 first time you saw that particular file?
14   A    As far as a total group, when you gave
15 it to him (indicating).  I've seen some of these
16 reports previously, though.
17   Q    You don't -- what would you call the
18 documents that are in --
19    By the way, is it clear what we're
20 showing him on the record?
21    MS. MATUZAK:  Yeah, it's Exhibit 3.
22    MR. GOODMAN:  Exhibit 3.  Okay.
23 BY MR. GOODMAN:
24   Q    And you said you don't call that a

208

52 (Pages 205 to 208)

1  street file.  What would you call that?
2      A    A group of documents.
3      Q    You've looked through it?
4      A    I've looked through it before, yes.
5      Q    And those are documents that relate to
6  the Smith/Hickman murder investigation; am I correct?
7      A    Some of them are.  Some of them, I
8  don't recognize the names or I can't tell you one way
9  or the other whether they are.
10     Q    And you understand that Mr. Fields
11 claims that this file was not provided to him until
12 this lawsuit?
13     A    Okay.
14     Q    Is that your understanding of
15 Mr. Fields' allegation?
16     A    I understand that's one of his claims.
17 Yes.
18     Q    Are there specific documents in that
19 file that you had in your prosecution file when you
20 prosecuted Nate in 2009?
21     A    Yes.
22     Q    Okay.  Which documents?
23     A    The eight-page supplemental report of
24 Detective Evans and Detective Hood, dated April 28th,

                                              209

1  1984.  We had that and we tendered that to the
2  defense.
3      Q    Let's just make sure.  I think it's
4  the one I have in my hand here.
5      A    Okay.  The --
6      MR. GARCIA:  If I may interject, can we just
7  have him identify the Bates number?
8      MR. GOODMAN:  Yeah.
9      THE WITNESS:  CITY-NF-1044.
10     MS. MATUZAK:  Right.
11     MR. GOODMAN:  Is that the one I have in my
12 hand?  What number was that?  That was a Bates
13 number?
14     MR. GARCIA:  Yeah.
15         (WHEREUPON, there was an
16          off-the-record discussion had by
17          Mr. Goodman and Ms. Matuzak.)
18 BY MR. GOODMAN:
19     Q    Let me just ask you about that file
20 there.  Do you see where it says "Permanent Retention
21 File"?
22     A    No.
23     Q    It doesn't say that?
24     MS. MATUZAK:  No.

                                              210

1      MR. GOODMAN:  Can we go off the record for a
2  minute?
3         (WHEREUPON, there was an
4          off-the-record discussion had by
5          Mr. Goodman and Ms. Matuzak.)
6  BY MR. GOODMAN:
7      Q    Just hold on to that for one second.
8  I'm not going to show this (indicating) to you.
9      MR. MICHALIK:  Off the record for a second,
10 please.
11         (WHEREUPON, there was an
12          off-the-record discussion had by
13          Counsel.)
14 BY MR. GOODMAN:
15     Q    So could you take a look at Exhibit 1?
16     A    Okay.
17         (WHEREUPON, Fields Exhibit 1 was
18          tendered to Witness.)
19     Q    Does that appear to be the same supp
20 report as the one you just identified?
21     A    It appears to be, yeah.
22     Q    Is there any difference on it?  Do you
23 see where it says "Permanent Retention File"?
24     A    Yeah, and then there's a date entered,

                                              211

1  April 30, bottom left corner.
2      Q    In Exhibit 3, the one that's part of
3  Exhibit 3, does it have the same marking of
4  "Permanent Retention File" on it?
5      A    No.
6      Q    So there appears to be some
7  difference; is that correct?
8      A    Right.  But the report itself, I know
9  we had.
10     MR. GOODMAN:  Is that clear?
11     MS. MATUZAK:  Yeah.
12 BY MR. GOODMAN:
13     Q    Go ahead.  See if there's anything
14 else in there that you had.
15         (WHEREUPON, the Witness complied.)
16     A    The rap sheet of Jerome Smith; it's
17 CITY-NF-1060, and we had that and we tendered that.
18     Q    The rap sheet of who?
19     A    Jerome Smith, the victim.
20     Q    Okay.  Thank you.
21     A    Then there's an arrest report for Earl
22 Hawkins that's stamped NF-1094 on another offense.  I
23 think we collected all of his prior arrests.  I'm not
24 sure specifically on this thing, but I know we

                                              212

                                    53 (Pages 209 to 212)

**Page 213**

1 collected his old arrests. There's a rap sheet of
2 Earl Hawkins, CITY-NF-1096, that I know we had and
3 tendered.
4      MR. GARCIA: Just to be fair, I just want to
5 lodge an objection. He's doing this out of his
6 memory. I know you've also submitted a request on
7 basically the same subject, or it was the subject of
8 the request that were submitted in the Innocence
9 proceedings.
10      Just the fact that he's trying to do
11 this all off the top of his head while sitting here
12 as opposed to, say, a chance to look at the file more
13 carefully, I just don't want any discrepancy to
14 reflect --
15      THE WITNESS: Actually, I was going to
16 mention, there is in here one GPR that I think we
17 listed in our response in the Certificate that we had
18 a copy of. I just offhand can't tell you which one
19 it is, but that's listed in what we filed and
20 tendered to you guys.
21      MR. GOODMAN: Got it.
22      THE WITNESS: But I think that's the only ones
23 I recall seeing.
24      MR. GOODMAN: Anything else?

**Page 214**

1      MS. MATUZAK: No. I think we're done.
2      MR. GARCIA: I just want to ask one question
3 on follow-up.
4           EXAMINATION
5 BY MR. GARCIA:
6      Q    Mr. Goodman asked you both at the
7 beginning and more towards the end of his questioning
8 about your attempt to collect the files, the state's
9 attorney's files, from various places in the state's
10 attorney's office.
11      A    Yes.
12      Q    To your satisfaction, did you collect
13 everything that existed regarding the Smith/Hickman
14 murders, or at least the files from the state's
15 attorney's office, to do the job that you needed to
16 do as --
17      A    To the best of my knowledge, I
18 collected everything I could. Yes.
19      Q    Is that still contained in the file
20 that you had at the time it was made available for
21 viewing in the Innocence proceedings?
22      A    I believe so. Yes.
23      MR. GARCIA: That's all I have.
24      We're going to reserve signature.

**Page 215**

1      MR. GOODMAN: I think that's it.
2      Thank you.
3
4      FURTHER DEPONENT SAYETH NAUGHT
        SIGNATURE RESERVED
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 216**

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION
3
4 NATHSON E. FIELDS,          )
5        Plaintiff,     )
6                       )
   vs.            ) No. 10 CV 1168
7                ) Hon. Matthew F.
   CITY OF CHICAGO, et. al.    ) Kennelly
8                )
        Defendants.    )
9
10
11      WITNESS CERTIFICATION
12      I hereby certify that I have read the
   foregoing transcript of my deposition, given on the
13 22nd day of March, 2013, at the time and place
   aforesaid, consisting of pages 1 through 218; and I
14 do again subscribe and make oath that the same is a
   true, correct, and complete transcript of my
15 deposition so given.
16
17      I have _____ not _____ submitted errata sheets.
18      Signed: _____
              DAVID J. KELLEY, Deponent
19
20 SUBSCRIBED AND SWORN TO
   before me this _____ day
21 of _____A.D., _____.
22
23 _____
      NOTARY PUBLIC
24

54 (Pages 213 to 216)

1    STATE OF ILLINOIS  )
                          )  ss:
2    COUNTY OF C O O K  )

3

4           I, CARMELLA T. FAGAN, a Certified
5    Shorthand Reporter and Notary Public within and for
6    the County of Cook and State of Illinois, do hereby
7    certify that heretofore, to-wit, on the 22nd day of
8    March, 2013, personally appeared before me at 53 West
9    Jackson Boulevard, Suite 1650, Chicago, Illinois,
10   DAVID J. KELLEY, a witness in a certain cause now
11   pending and undetermined in said Court.
12          I further certify that the said DAVID
13   J. KELLEY was by me first duly sworn to testify to
14   the truth, the whole truth, and nothing but the truth
15   in the cause aforesaid; that the testimony then given
16   by said witness was reported stenographically by me,
17   in the presence of said witness, and afterwards
18   reduced to typewriting via computer-aided
19   transcription, and the foregoing is a true and
20   correct transcript of the testimony so given by said
21   witness as aforesaid.
22          I further certify that the signature of
23   the witness to the foregoing deposition was reserved
24   by agreement of counsel for the respective parties.

217

1           I further certify that the taking of
2    this deposition was pursuant to notice, and that
3    there were appearances as heretofore noted.
4           I further certify that I am not counsel
5    for nor in any way related to any of the parties to
6    this suit, nor am I in any way interested in the
7    outcome thereof.
8           In testimony whereof I have hereunto
9    set my hand and affixed my notarial seal this _____
10   day of _____, 2013.
11
12          _____
13          Carmella T. Fagan, C.S.R., R.P.R.
14
15          My notary expires:
16          _____
17
18
19
20
21
22
23
24

218

55 (Pages 217 to 218)

## A

**ability**
132:14
**able**
30:12 40:3 120:18
131:16 132:13
150:3 177:18
**acquittal**
55:22
**acquitted**
52:10 193:4
**actions**
2:21 3:6
**active**
56:22 180:14
**actual**
9:3 57:15 83:2
**add**
169:6
**additional**
34:20 107:7 161:17
174:5 200:7
**address**
22:14 162:4
**addressed**
117:15 118:7
**adult**
22:8 25:5
**adults**
23:4
**advised**
196:23
**advocacy**
19:9,21
**affirmed**
26:4
**affixed**
218:9
**aforementioned**
154:18
**aforesaid**
216:13 217:15,21
**afraid**
62:22 95:22 99:19,19
126:7 133:3
148:24 149:18
170:11 171:3,8
177:24 178:6
**age**
162:4 163:6
**aggravation**
179:19 180:21
**ago**
139:6 207:24
**agree**
39:17 67:22 92:22
**agreed**
35:8 36:2 49:14
72:17 73:19 74:2,3
79:22 81:21 90:8
90:17
**agreement**
38:13,24 73:4,11,15
73:23 74:9,13
77:20,21,23 78:1,3
78:4,16,23,24 79:3
79:10 80:14,16,19
80:23 81:2,13,20
81:23 82:1,5,6,17
82:20 83:19,21,22
83:24 84:13,15
85:12 88:13
114:13,14 119:6
126:4 217:24
**agreements**
126:3
**ahead**
71:17 76:4 87:11
110:23 119:23
129:15 212:13
**aint**
51:9 99:5,6
**air**
34:6
**al**
216:7

**alan**
77:6 194:18
**allegation**
59:6 209:15
**allow**
79:22
**alot**
119:17
**alvarez**
194:18 195:10,17
**ambulance**
31:9
**amount**
61:23
**andrews**
46:14 90:15
**anita**
194:18 195:10,16
**ann**
2:9
**answer**
8:21 9:5 24:19 54:10
115:21 137:24
152:24 162:10
168:3 172:22
173:11 176:4
185:12 193:22,24
195:3,14,19 196:2
204:21 207:5
**anthony**
62:19 63:3 176:11,15
176:18 177:1
181:1
**anybody**
101:17 120:22
**anyway**
111:19
**apartment**
142:7,10,13,18,20
145:4
**apologize**
111:24
**apparently**
67:14
**appeal**
28:8 33:2,16,18 34:9
34:21 36:19 37:3
45:1,2,3,4 67:7
195:22,23
**appealed**
27:16 109:24
**appeals**
11:14 27:15 32:2
34:11 37:7,14,17
37:24 49:5 194:19
**appear**
86:1,14,22 87:2
125:9 136:9 154:5
162:13 163:17,22
164:3 211:19
**appearance**
28:11,17,20 29:21
30:1,3,5 34:5
**appearances**
34:1 218:3
**appeared**
2:7,1,2,17,23 3:8
26:16 33:22 140:1
190:17 217:8
**appears**
65:7 67:3,24 68:1,3
72:16 86:18 117:9
122:1,7,10 136:22
152:5,8,11,22
160:23 161:17
162:1,21 164:7,12
164:19,20 166:18
166:21 172:7,11
196:15 211:21
212:6
**appellate**
25:18 26:1 27:22
29:5 35:1,22 36:20
38:24
**applied**
76:19

**applies**
23:4
**apply**
17:18 48:12
**appreciate**
113:9 120:12
**approached**
39:8 146:7 147:10,15
148:1,11,15
149:18,21
**approval**
77:22 80:17 85:10
**approved**
68:15 76:24 79:10
145:12
**approximate**
65:11 84:2 134:17
**approximately**
21:15 24:16 98:11
127:21 135:5
171:20
**approximation**
184:6,9
**april**
10:13 153:15 158:10
166:20 169:18
209:24 212:1
**area**
31:7,8 90:4,9,11
**argumentative**
6:24 201:23
**armed**
80:2,9
**arrange**
69:20 71:4
**arranged**
67:19 68:19 69:17,18
73:5 74:18 75:17
**arrangements**
69:8 76:8
**arranging**
65:21 72:21 75:9
**array**
177:19 182:24
183:15 184:1
186:16
**arrest**
212:21
**arrests**
114:12 212:23 213:1
**arrow**
111:6
**arson**
16:24 17:17
**asa**
152:16
**asked**
39:16 76:16,17 79:7
89:11 92:8 94:15
101:17 115:4,16
126:22 146:6
150:2,8 153:12,15
168:2 182:4
184:21,22 204:9
214:6
**asking**
25:19 33:13 37:12
51:20 69:23 71:21
137:8,17 140:12
144:19 169:9
193:23
**asks**
120:4 125:15 131:11
144:17
**assert**
8:11
**asserting**
8:5 53:16
**assigned**
8:1,15 12:19,21,22
13:23 15:17,18
16:19 25:3 29:15
29:16,17 102:14
126:12,18 152:14
160:24 161:7
180:12

**assignment**
15:12 21:17
**assignments**
17:13
**assist**
152:14
**assistance**
65:21 72:21 75:8
**assistant**
1:7 2:20 65:15 70:24
72:9 135:13
152:15
**assistants**
14:23 16:8 23:2 24:4
**assisting**
131:17 132:13,14
**assume**
18:1 27:18 70:3 75:6
132:19 144:11
162:17
**assumed**
51:1
**assuming**
31:17 85:23 135:20
141:16 157:3
**assumption**
70:16
**atf**
56:16
**attached**
117:10 141:22
**attempt**
100:16 214:8
**attempted**
47:15
**attempting**
131:14 168:14
**attempts**
200:7
**attention**
47:3
**attorney**
2:19,20 3:4 15:1 28:3
29:2 39:6 49:8,12
65:15 67:7 70:1
72:9 74:23 75:22
76:2,9,10 79:14,15
84:7 92:21 135:13
150:22 152:13,15
168:7,14 174:24
194:18 195:8
196:16 197:4,5
198:13,14 199:12
199:14 205:16,17
**attorneys**
1:7 6:2,6,17 7:4,9,9
10:1,8,19 11:1,4
21:2 23:16 27:21
28:22 35:7 36:8
38:14 42:9,14 43:6
43:14 44:2 70:23
78:5,6 79:11 91:19
91:23 100:18
147:1,13 149:1
188:14,15,17,24
189:1 190:13,22
194:12,20 197:13
200:16 205:6,22
206:10 214:9,10
214:15
**august**
8:8,14
**automatic**
22:4
**available**
18:9,12 83:8 201:14
214:20
**avenue**
135:14
**aware**
7:24 38:12 41:11,13
41:16 53:4,21 57:4
58:3,13 59:13 62:5
62:12,17 63:6
64:14,16 67:7 77:4
81:23 82:4 84:12

100:13 101:15
124:22 134:4
143:4 158:6
176:11 180:23
181:7,11 191:4
193:7,19
**awareness**
62:8

## B

**b**
4:9
**back**
9:8 25:17,20,24
26:17,23 28:18
29:9,9 34:18,19,24
35:6 36:19 37:3,7
37:14,17,24 38:24
39:19 40:6,8 45:16
53:13 56:21 64:16
64:19,19 69:9
72:10 94:19
101:20 103:10,21
105:6,21 106:7,14
111:20 114:15
115:1,6,14 117:3
126:20 134:13
136:2 140:10
141:23 153:24
179:4,5,23 180:1,5
180:6,8,11,14
182:6 183:3
200:15 202:24
206:4
**background**
9:11
**bail**
143:20
**ball**
156:17 161:14 162:1
162:15 163:17
166:10
**ballpark**
48:16
**banks**
89:14,16
**baseball**
153:17 156:15
169:22 171:12
**based**
13:18 75:7 80:10
152:7 175:3,16
183:14 204:2
**basement**
206:4
**basically**
12:11 23:11 30:16
31:12 32:14 38:22
46:5 50:19 51:8
59:7 76:16 98:4
99:3,10 138:7
144:5 146:9
149:16 156:16
159:15 176:21
183:1 190:19
191:3 197:19
199:20,23 201:1
201:12 202:15
205:2 213:7
**basicly**
121:3
**basis**
8:17 9:4 201:22
**bates**
210:7,12
**began**
87:1
**beginning**
122:15 129:23 203:2
214:7
**begins**
87:18
**begun**
139:20 142:3
**behalf**
2:7,12,17,23 3:8

46:18 59:11,14
62:6,22 63:7
**believe**
8:7 30:2 50:12 56:7
62:10 64:10 77:6
85:4 96:19 97:17
107:14 108:14
112:22 124:4
129:5 133:2,17,20
134:7 138:14
139:23 148:9
162:23 166:13
185:16,17 188:11
202:7 204:3,14
206:4 214:22
**believed**
204:16
**bench**
25:6,8
**benson**
161:13,19 162:1,2
163:2,5 164:8,20
**best**
15:11 27:17 39:7
214:17
**better**
129:8 143:16
**betting**
123:13
**big**
142:8 143:6 206:6
**bill**
62:3 74:22
**bit**
15:20 35:4
**black**
87:20 162:4 167:19
167:23
**blacks**
164:17 167:18
**blackstone**
146:8
**blackstones**
147:10,15 148:2,11
148:21 149:12
**blue**
154:16 167:24
**bogdalek**
1:10
**bond**
13:1
**book**
108:21 207:7
**born**
10:6 116:12
**bothered**
130:24
**bottom**
87:18 100:9 113:8
200:3 212:1
**boulevard**
1:21 2:5,10 217:9
**bounds**
193:21
**bowers**
152:14,17
**boys**
102:16,20
**branch**
11:23 12:1,8,23 13:4
13:17
**brannigan**
1:11 182:22 184:11
185:24
**break**
5:19 53:6,9 106:11
159:5 201:18
202:22
**breeze**
153:24
**breezeway**
153:19 154:12
171:22
**brian**
7:21 39:7 45:11
68:16 75:23 84:20

85:6 86:4 104:15
147:7 148:3
188:21 194:19
**bribe**
46:18 59:23 62:9
76:24 77:3 200:24
**bribery**
32:23 33:8 34:22
35:17,21,24 40:23
42:19 43:2,6,16,22
44:3,8 51:22 56:20
59:6 61:5,6,20
73:14 76:18,23
84:24 200:3,8
**bribes**
59:10,14,15,19
**brief**
14:7,11 53:10 159:8
202:20
**bring**
51:10,16 85:1 104:18
107:17 108:6,15
108:24 169:2
194:24
**bringing**
186:3
**broke**
54:16
**brother**
95:18 96:5,13,19
97:22 169:23
171:12
**brotherinlaw**
120:14
**brotherinlaw**
120:8
**brothers**
118:10,11
**brought**
30:2,7 39:10 91:18
102:9 104:20
108:8 109:8,16
112:16 176:12
182:5 185:24
**buckles**
32:22 33:8,11 176:2
**build**
204:1
**building**
58:11 87:22 91:12
170:13 206:3,7
**bullpen**
77:3
**bunch**
101:6 110:17 205:10
**bureau**
2:21 3:5,6 16:17
20:24
**business**
89:19

**C**

**c**
1:19 2:4,14 217:2
218:13
**california**
13:18 36:22 135:14
**call**
22:16 23:17 29:3
34:10 68:5 88:20
88:23 143:9 199:5
200:5 205:2
206:21 208:1,17
208:24 209:1
**callahan**
121:6
**called**
5:4 13:4 27:20 28:2,3
28:4 49:11 67:5
68:8 69:3 169:4
205:12
**calling**
28:22 200:2
**calls**
63:12 64:3,13
**calohan**

113:9
**cant**
12:8 36:9 37:21 53:4
60:7 63:21 75:6
119:17 122:7,8
123:13 129:1,16
153:11 158:20
168:3 172:2 177:8
185:22 186:1,12
187:14 189:9
204:22 209:8
213:18
**capital**
19:7,20
**caption**
82:5,7
**car**
154:17,18 155:4,24
156:3
**care**
61:15 89:19
**career**
21:2 138:8 204:18
**carefully**
213:13
**carlos**
153:17 165:5,12,24
166:5,11 169:23
171:13 185:14,14
185:20
**carm**
118:14 134:8
**carmella**
1:19 217:4 218:13
**carried**
30:16 91:10
**carrying**
163:20
**carter**
46:14 90:15 91:10
161:20 203:24
204:8,12
**case**
7:15 8:9 15:21,22,22
16:7,11 19:11 24:3
24:6,24 25:6,9,13
25:15,17,20 26:22
27:16,23 28:1,8
29:9,12 30:16 31:3
31:13 32:7,15
33:16 34:9,14,16
34:18 37:16 44:18
52:3 61:24 62:1
67:6 68:10,10
70:18 74:23 82:6
82:11 93:7 94:18
95:20 103:4,7
105:20 109:21
112:3 117:19
119:17,19,19
123:23 124:1,17
124:20,22,24
125:7,9,10,13,18
126:13,18,24
127:5,9 128:1,5
130:23 131:6
133:22,23,24
134:1,2 136:24
137:11,13,20
138:1,3,4,6,18
139:1,22,24 140:1
140:2,7 141:2,3,7
141:8,10 142:15
143:23 144:7,13
144:15 147:4
157:24 169:7
173:18 176:13
179:4,4,5,6,8,12
179:16,18,24
180:1,4,7,12,14,18
180:24 181:4,11
181:16,19 183:9
183:12,19 186:14
190:1,3 197:19
198:11,15 199:6
202:11,14,16
**chief**

204:17 205:10,19
**caseload**
16:4
**cases**
15:18,23 16:1,3,5,6
17:23 18:21 22:2
22:23 23:12,24
24:15,20 25:1,3,5
25:10 70:15,22
126:2 137:18
146:24 178:3
183:8 205:21
206:3
**casto**
1:9
**caught**
112:3
**cause**
111:18 119:12
217:10,15
**cc**
111:20
**cecil**
84:6
**cell**
55:13
**center**
2:22 3:6 95:16
**central**
13:1
**certain**
217:10
**certainly**
53:19
**certificate**
8:2 52:8 53:17 78:14
104:10 105:6
193:2,4,5,18
194:13 195:23
213:17
**certification**
216:11
**certified**
217:4
**certify**
216:12 217:7,12,22
218:1,4
**chair**
14:20,21,22,24 15:1
15:3,10,12 17:13
18:18,19,19
**challenge**
131:5
**chance**
151:23 213:12
**change**
73:17 114:16 115:2,7
115:14
**changed**
88:9 96:6 130:1
151:14
**changes**
137:3
**charged**
125:19 127:3,17,22
128:10,12,18
129:2 138:6,7
144:5
**charges**
48:10,11 84:1 92:21
**charles**
96:7,8,12,16 97:15
146:3,16
**check**
101:16 123:12
143:11
**chicago**
1:6,8,22 2:6,11,16,22
3:7 23:21 31:7
93:14 96:15
101:14 102:3
107:15 142:23
158:6 160:1 188:7
206:22 207:1,11
216:7 217:9

3:5 26:17 27:24
28:10,18 29:12
34:4 126:20
194:19,20
**child**
11:14
**children**
186:11
**chose**
90:12
**christ**
119:22
**christian**
131:14,22
**chronological**
116:22
**chronologically**
175:5
**church**
142:5
**circ**
162:16
**circoral**
162:16
**circumstantial**
162:17
**city**
1:6,22 11:22 142:23
216:7
**cityf1044**
210:9
**cityf1060**
212:17
**cityf1096**
213:2
**civil**
1:16 2:21 3:6
**claims**
209:11,16
**clarify**
7:14 53:15
**clear**
54:14 92:19 103:3,7
194:1,2 201:13
208:19 212:10
**cleveland**
161:14 162:1,15
163:17
**client**
197:11,20 199:7
**close**
59:21 103:20 163:10
**closed**
205:21
**codefendant**
72:18 73:20
**coffee**
187:19
**collect**
27:12,17 157:24
214:8,12
**collected**
31:18 180:7,15 183:4
212:23 213:1
214:18
**collecting**
27:18 28:21 30:8
31:2
**collectively**
60:19
**colorado**
55:11 63:11,14,19
**come**
9:8 18:14 20:7 30:21
30:22 48:19,23
91:11 99:5 105:5
105:21 107:16,18
111:17 113:23
114:10 115:1,6,13
153:19 164:20
174:8 190:13
197:21
**coming**
25:20 26:13 27:23
77:7 124:11
131:10

**commencing**
1:23
**comment**
143:18
**comments**
176:16
**common**
31:14
**communicated**
80:13 92:20 96:17
120:24 168:13
199:2
**communication**
50:8 93:23 95:3
**communications**
49:7
**complaining**
106:2
**complete**
205:18 216:14
**completely**
142:5
**complexion**
167:18,20,24
**complied**
65:4 71:19 111:1
129:17 136:5
212:15
**computeraided**
217:18
**con**
107:1
**concerned**
62:16,19 63:1 88:22
89:1 181:20,22
**concurrent**
80:5 84:17
**conflicted**
204:19
**conflicting**
203:20
**confused**
50:14 60:13 204:12
205:4
**confusing**
37:14 138:23
**confusion**
201:13
**connection**
8:7 70:21 174:13
**consecutive**
80:4 84:16
**consider**
40:4 43:12 202:17
**considered**
21:21
**consist**
113:17
**consistent**
42:2,6,11,15 94:17
95:9 104:3 105:9
114:6,19 116:4
189:22 199:24
**consistently**
201:3
**consisting**
216:13
**consult**
53:8
**contact**
92:11 106:19 124:4
**contacted**
70:12 187:3
**contacts**
106:22
**contained**
202:17 208:2 214:19
**containing**
186:17
**contingent**
74:4
**continued**
31:4 32:7 34:14
170:1 171:19
**control**
47:9
**conversation**

62:10 66:18 68:12
76:21,23 77:19
97:1 100:3 101:2
103:4 104:1,4,5
111:22 112:9
126:11 130:20
131:20 132:7,24
146:11,13 147:14
148:1 151:7,12
181:15 198:21
199:2
**conversations**
7:11 9:2 39:18 54:24
55:3,18 56:1,5,12
56:19 57:2 58:5
59:9,12,17,21 61:4
61:22 62:4,8,18
63:21 67:8 88:3,15
88:19 89:7 103:9
103:10 104:2,7
123:4 125:22
126:8 128:20
**conveyed**
168:20
**convictions**
27:13 32:3
**cook**
1:6,20,22 2:19 3:4
10:23,24 11:4 78:6
122:10 217:6
**cooperate**
39:17 71:10 186:6
197:14,18 199:8
199:10,13
**cooperated**
45:17
**cooperating**
38:12 39:12 174:22
**cooperation**
47:16,19 49:23
**cooperative**
114:21
**copies**
82:15 104:20 207:23
**copy**
82:16 213:18
**corner**
212:1
**correct**
20:17 21:24 22:24
23:13 24:23 27:5
35:18 38:19 39:24
41:6 43:3 44:3
57:5 58:4 60:5
63:19 64:8 65:17
66:7 67:20 68:11
69:12,21 71:11
73:7 78:11 80:11
82:9 89:5 97:9
103:15 104:8
124:19 131:12
136:21 141:19
145:3 154:7,12
155:9 156:14
158:1 166:16
167:3,10 172:10
193:10 196:17
202:8 203:3,9,18
206:1 209:6 212:7
216:14 217:20
**correctional**
112:5,11,15 168:6
**corrections**
106:24 130:4,8,12
146:6,24 147:18
148:19
**corroborate**
97:19 101:9
**couldnt**
17:24 19:18 20:1
100:10 101:11
106:5 153:5
168:12
**counsel**
2:2 3:2 7:10,15,18
49:4 211:13

217:24 218:4
count
80:3
country
20:7
counts
80:2,4,9
county
1:6,20,22 2:19 3:4
6:2,6,17 7:5 10:1
10:23,24 11:4 78:6
122:10,10,16
136:21 137:22
138:24 139:15
144:1,7,13 217:2,6
couple
33:17 57:14 87:7,17
107:1,20 132:23
143:10 199:4
206:2
course
7:11 20:2,4 44:17
courses
19:7,19,21 20:14
court
1:1 11:12 12:2,23
13:1,13 22:8 25:18
26:1,4,16,23 27:6
29:20,24 30:5,7,13
30:13,16 33:2,23
33:24 34:1 35:1,22
36:20 38:24 41:9
47:7,10,14 77:3
80:22 81:14,15
82:21,23 83:1,2,20
99:5 127:10 131:6
131:10 144:3
180:2 197:21
200:3 205:15
216:1 217:11
courthouse
61:18
courtroom
12:7 13:23,24 14:19
14:23 15:2,17,22
16:9 17:13 29:16
61:18
courtrooms
14:11 15:14 23:21,23
courts
1:17 11:22,23 12:8
13:2,8 18:22 19:9
credibility
181:21,22
credit
11:7
crilly
15:4,5,12
crime
31:8 119:24 120:1
202:14
crimes
14:16 16:10,15,16,20
16:23 17:1,5,8,16
17:17 18:3,17 21:6
21:18 25:18
criminal
23:4 125:23 126:24
138:8
crossed
135:14
curious
11:17 22:17
current
1:8 6:1,5,16 7:4 16:4
currently
66:3
custody
29:23 30:11 36:10
44:18 48:11 49:17
49:20 64:9,11,12
69:11 70:11 80:8
81:22 88:16 93:13
107:5,10,11,22
110:10,11 114:4
114:15 128:15

130:5 132:4 133:9
133:17,21 134:5
134:19,24 135:1,3
138:11,13 143:10
188:9,10,12 198:8
cut
47:6,13 51:4,5
cv
1:5 216:6

**D**

d
4:1 216:21
daley
1:7 2:22 3:6
dan
65:14 66:10 70:4,7
70:17 71:2
daniel
1:11
danville
118:4 119:11 123:21
date
26:9,16 27:6 30:7,13
33:22,24 84:2,3
110:1 117:8
125:13 129:15,16
134:17 136:14
140:14 141:21
166:19 198:4
211:24
dated
65:9 72:3 116:20,22
118:3 121:17
138:21 196:16
209:24
dates
75:5 110:3 135:4
174:7
dave
135:12
david
1:8,9,15 2:24 3:8 4:4
5:3,10 152:15
216:18 217:10,12
day
1:23 61:17 83:2,3,5,6
111:22 118:21
166:23 169:21
216:13,20 217:7
218:10
days
142:5
dead
100:11
deal
51:4,5,9,12 102:14
106:6 187:10
dealing
59:22 181:18
deals
38:14 105:23 142:21
dealt
23:21,22 71:1 188:21
death
179:19 180:9,21,22
deceased
32:23 33:12,13 100:9
172:5
december
20:20 87:1
decided
34:21 46:2,22 69:1,8
71:10 111:21
deciding
77:8
deciolla
85:4
deciollas
85:23 86:14
decision
74:5 79:9 193:10
194:13 195:5,17
195:21,22 199:16
decisionmaking
193:13,20

deeply
25:2 113:10
defendants
1:13 2:17 216:8
defense
32:8 115:4,16 147:1
149:1 190:13,22
210:2
defenses
33:14
definition
201:24 202:5,7,9,10
delaney
1:11
delbert
161:20
deliberative
54:7
delinquency
20:24 21:19 22:2,23
23:7
delve
178:19
demand
110:2
demanded
1:12
denied
131:15
department
31:7,11 101:14
106:23 130:4,8,12
145:10 146:5,24
147:17 148:19
158:7 160:1
206:23 207:1,11
departments
205:20
depended
40:2
depending
16:3 40:3
deponent
215:4 216:18
deposit
142:17 191:22 192:1
192:8
deposition
1:15 2:2 3:2 5:11,23
6:3 216:12,15
217:23 218:2
depositions
1:18 5:14
deps
160:20
derrick
44:21,23 46:1 47:4
47:11 49:3,8,24
50:6,14,17 51:22
64:20 65:22 66:1,6
66:11,14,19,24
67:5,11 68:8 70:2
70:10,12,20 204:3
describe
59:2
described
83:23
describes
167:15,17
describing
205:9
description
164:16,19 167:9,13
171:6 172:8,13
177:22,24
descriptions
173:24
deserving
139:18 142:1
detail
96:2
details
149:22,23
detective
112:1,10,13,13 113:9
121:6 160:1

209:24,24
detectives
182:20,22 184:10
determine
17:17
determined
47:5
determines
16:7
devine
79:16,21
dick
79:16,21
didnt
11:8 22:22 31:20,23
44:10 46:20 47:4
50:17 51:3,9,15,17
62:3,24 83:7 88:12
88:13 90:2 99:12
99:14,20,22 103:6
107:9 108:19
110:9 112:1
114:22 115:18
119:9 121:24
128:20 129:1
139:5 141:6,8
142:6 145:10
155:16 157:17,18
168:22 169:11
170:14,17 171:2,3
171:5 177:22,23
174:18,19
180:18,22 181:14
183:21 184:20
187:5,10,20
189:24 190:2
204:23 205:3
difference
211:22 212:7
different
11:23 23:3 32:2
49:22 53:2 97:5
104:1 105:3
184:15
direct
35:21 40:21,22 44:14
184:17 203:7
directly
10:23 24:3 42:19
90:2 156:20 175:2
176:6
disagree
154:8 167:14
disciples
87:21
discipline
131:14,22
discovery
53:22
discrepancy
213:13
discuss
95:10 132:21 199:18
discussed
39:1 72:16 90:16
92:8
discussing
176:23
discussion
39:5,15 48:18 79:20
91:22 92:3 133:1
210:16 211:4,12
discussions
8:8,23 38:18,21 42:8
47:24 48:3,7,17
53:21 73:10 74:8
76:7 77:17 128:1
128:11 130:15
132:17 156:1
182:1 194:23
195:16 196:24
197:2,8 198:5
199:3 200:11,23
dispute
46:16
district

1:1,1,17 216:1,1
division
1:2 11:7 12:20,22
16:18 20:24 21:20
31:7 160:2 184:18
216:2
divisions
16:22
dixon
119:12
document
83:14 151:24
documentation
108:16
documented
109:6 192:23 202:16
documenting
88:11
documents
5:22 6:19 7:21 31:2
207:22 208:2,18
209:2,5,18,22
doesnt
75:10 121:11 129:15
154:9 155:10
163:17,22 164:1
167:8 204:23
210:23
doing
27:20 47:4 59:15
62:6,21 63:7 159:6
181:14 183:20
213:5
domestic
12:6
dont
5:8,18 8:17 14:10
17:2 20:7 22:13
26:10,14,20,21
27:4 28:5,10 29:5
30:2 31:11 33:5,10
35:10 36:14,18,21
37:21 39:9 43:7
44:24 45:15 47:1
47:20 49:6,10,11
50:12 51:8 52:23
54:4 56:23,23
57:24 62:14 65:15
64:4,7 67:2,13
69:5 70:6,7,9 71:1
74:24 75:5 76:3,12
78:7 80:20,23
82:15 83:1 84:5,9
85:22 89:9 94:2,4
94:5,7,8,10 95:2,5
96:1,24 98:15,22
99:15 100:7,17,19
100:20 102:1,4,22
106:21 107:10,12
108:7,14 109:17
109:23 110:3,7,10
110:11 113:3
114:24 115:4,5,12
115:15,17 116:11
116:17,18 117:18
118:1 119:24
121:2 123:11
124:8,15 125:11
127:16 128:15,23
129:6 130:9,11,14
132:6,10 134:18
134:21 137:24
138:6,21 140:9
141:5 142:20
143:1 147:18,21
148:3,4,7,9,12,20
149:4,15 150:2,3,5
150:10,23 151:10
153:7 154:21,24
155:19 162:14,18
166:2,13 168:7,11
168:15 170:15
173:20,21 174:7
174:19 175:8

177:3 178:12
181:2,13 182:4
184:7,12,16
185:16 186:24
187:7,24 188:2,11
188:19 189:5,8,20
191:17,23 192:5
192:18 194:3,21
196:4 198:4,16
201:4 207:8 208:3
208:17,24 209:8
213:13
door
154:17
doors
139:15
dorthy
161:19
double
66:3
draft
80:18
drafting
80:21
driscoll
3:5 6:4
drive
2:15
dropped
92:21
drove
154:17
drug
112:3 124:1,17,20,22
124:24 133:23
137:13 140:2,7,17
drugs
87:21 117:21 138:4
dry
14:5
duly
5:5 217:13
durkin
14:1,12
dykema
2:14

**E**

e
1:3 4:1,9 118:8 216:4
earl
27:22 28:15,23 34:21
35:21 36:1,13,17
38:15,23 39:19
40:12 43:15 44:2,6
44:13 45:17 46:12
46:18 48:1,4,8,13
48:17 49:20 55:10
57:1 59:11,13 62:4
63:5,8 66:2 68:10
71:10,14 72:16,22
73:1,4,12,18,24
74:19 75:9,15,20
75:21 78:5,10,15
79:3,4,4,6,17,23
80:1 81:6,8,17,18
82:9 83:3,7 84:19
84:23 88:2 91:5,6
102:10,11 103:1
103:11,21 104:6
104:11 105:23
157:14 173:6
181:3 203:13,24
204:3,3 212:21
213:2
earlier
70:2 73:9 114:3
116:5 133:23
137:3 193:17
195:1
earliest
57:12
earls
39:6 42:9 43:5 77:17
103:5
early

26:18,18 123:17
167:18,19,23
**easier**
147:23
**east**
87:22 153:1,16
169:22 171:17
**eastern**
1:2 216:2
**edwards**
161:20
**effect**
99:15 102:24
**eggers**
62:1
**eight**
139:8
**eightpage**
209:23
**either**
7:14 25:10 44:7
57:14 68:17 107:5
122:8,9 124:7
128:19 130:3
**el**
20:12 44:18 46:7
52:15,23 55:4
56:12,17 58:7,16
58:18 63:3 64:6
70:22 71:1 72:13
77:5 90:8,13 95:20
96:4,11 99:9,15,20
102:5,14 115:24
116:5 145:21
146:9,9 170:13
171:9 174:10,13
176:8 178:2 183:2
183:3,5
**emergency**
192:17,20
**emory**
28:4 30:22 35:11
73:6,11 74:9 75:23
**employees**
6:2,6,17 7:5
**ended**
25:10 127:6
**enjoying**
142:7
**entered**
81:14 83:4,9,22
84:15 211:24
**enters**
169:7
**entire**
194:3
**entitled**
53:19
**envelope**
117:10 119:11 135:8
136:15 141:22
**eric**
97:23 98:8 99:2
100:4 101:3 118:9
161:13 162:1,2
163:1,4,5,7 164:8
164:8,20 165:16
173:5 175:10
183:10 185:14
**errata**
216:17
**established**
174:10
**et**
216:7
**evans**
1:11 160:18 209:24
**eventual**
72:23
**eventually**
34:18 89:18
**everybody**
31:2
**evidence**
32:21,24 33:8,8
34:23 35:24 40:23

51:21 52:2 54:8
74:4 84:24 174:5
200:4
**exact**
99:10 139:2 174:7
184:3 191:18
198:4 207:8
**exactly**
14:10 23:15 43:4
73:23 84:9 113:24
114:11 170:16
205:18
**examination**
4:5,6 5:6 214:4
**examined**
5:5
**examiners**
31:6 202:15
**exception**
139:19 142:2
**exclude**
7:15
**excluding**
7:18
**excuse**
19:10 123:6 145:18
**exhibit**
64:21,22 71:15 83:15
85:18 86:10 87:14
110:21,23 116:24
117:4,6 121:15
122:21 129:12
134:9,10 140:13
140:15,21 141:10
141:12,18 150:18
151:20,21 152:1
158:23 159:2,3,3
159:20 160:3,4,4,5
160:6,7,9,13,15,17
165:4,6 166:14
196:7,9,13 207:15
207:18 208:21,22
211:1,5,17 212:2,3
**exhibition**
176:21
**exhibits**
158:18 159:12
**existed**
214:13
**expecting**
94:8 111:18
**expense**
192:17
**expenses**
145:2 192:20
**experience**
17:23 18:18 22:1,23
23:12 183:14
206:24
**expert**
86:19
**expertise**
18:11
**expires**
218:15
**explain**
15:20 178:8,14,16
**explained**
133:2 203:1
**explains**
199:21
**explanation**
115:20
**extent**
9:1 54:1 81:21
**extra**
16:5
**eye**
162:7
**eyeoral**
162:5
**eyewitness**
162:8 163:18 164:13
**eyewitnesses**
186:11 204:19

**F**

**f**
1:6 216:7
**face**
170:3 171:22 177:16
**faces**
157:7 163:23 164:7
204:13
**facilitate**
59:15
**facility**
36:23 38:9 45:7
49:22 75:24 76:5
87:4 96:8 130:10
147:18,20
**fact**
11:7 61:15 62:19
66:9 68:19 86:4
102:16 133:5
145:20 151:5,8
172:12 194:24
196:18 203:7
213:10
**faction**
87:20
**facts**
6:13 144:4 179:15
**factual**
53:23
**fagan**
1:19 217:4 218:13
**fair**
70:16 144:8 213:4
**fairly**
42:2 89:12 113:15
**fall**
8:23
**false**
97:7,14
**familiar**
32:13 83:14 165:9
**family**
95:19,22 96:14,18
97:21 100:6
101:10,19 102:6
116:1,6 145:22
146:2 190:21
**far**
6:12 21:10 42:1 49:8
53:22 58:11,13
61:10 66:22 81:5
86:17 94:1 101:5
126:1,1 129:14
132:9 134:4,20
143:24 144:12
154:24 156:18
163:18 176:5
188:8 191:20
200:4,9 204:1
205:18 206:3
207:7,22 208:14
**farther**
89:22
**father**
118:21
**fathers**
118:20
**favor**
120:4,8
**february**
26:24 117:9,16
136:18 141:19,22
151:1 152:8
196:16 198:3
**federal**
1:16 29:23 36:12,23
38:9 41:9 44:18
45:7 47:7,10,14
48:1,4,4,8,11,14
49:13,15,24 50:2
50:20 51:5 56:16
64:10,12,13,17
69:11 70:10,15,17
70:18 80:5,7 81:22
81:24 83:19 84:1
88:16 107:5,10

110:10 127:5,6
128:1,5,14,16
130:5 133:9,17,20
134:1,2,5,20 135:1
135:2 137:14,22
138:2,5,11,13,18
139:1 143:24
144:3,7,14,16
183:21 197:18,22
**federally**
125:20 127:3,17,22
128:10,12,19
129:2 138:7 144:5
**feds**
67:20 70:14 81:19
89:8
**feel**
150:6
**feet**
156:21 157:3,4,4
**fell**
171:18
**fellow**
89:11
**felony**
12:12,15,16 13:13
14:19 15:13 16:18
**felt**
16:11 99:10,13
147:11
**female**
70:24
**fields**
1:3 3:15 4:10,11,11
4:12,12,13,13,14
4:14,15,15,16,16
4:17,17,18,18
25:15 26:24 27:22
28:23 29:2 30:6,22
33:21 34:23 35:21
35:23 36:3 37:8,11
40:21,24 42:20
44:10,14,19 46:13
46:19 51:21 57:2,7
57:9 59:3,4,11,13
62:5 63:6,8 64:22
66:2,16 68:10
71:15 72:18 73:20
76:19 77:1,2 82:23
83:15 85:18 86:10
90:15 91:10 92:20
92:20 101:23
110:21 116:24
119:19 121:15
129:12 134:10
147:3 149:11,14
150:18 151:21
152:16 157:21
159:20 160:9
165:6 173:6 175:6
175:19,22 176:6
76:23 77:14 78:9
78:17 79:1,6 81:5
85:17 86:17 88:9
88:12 92:11 93:12
93:23 94:5,12,22
98:16 104:2
106:15 107:13
110:18 111:4,24
112:18,23 113:4,6
113:24 114:3,6,11
114:17,20 117:3
117:13,13,14
119:3 121:10
123:17 124:13,14
126:4,6,11,17
132:24 139:11,12
140:18,22 141:23
153:4,5,14,20
157:23 159:17
170:16 175:4,5,9
176:7 177:4,23
182:7,8 187:3,12
187:21,23 189:10
189:12,19 192:8

212:4 213:12
214:19
**fixed**
8:3,8,15 32:9,21,21
32:23 33:2 34:19
34:22 35:16 37:9
37:17 52:9 81:15
193:5 195:1
205:22 213:19
**files**
31:18 157:24 179:6
180:16 201:6,12
201:14 206:23
207:1,7,11 214:8,9
214:14
**final**
68:14 74:5 77:22
195:5
**finalized**
38:14 74:16 77:20
79:10 81:9,13
**financial**
17:1,16
**find**
27:24 34:5 42:18
84:4 98:8 100:10
100:10 126:14
129:16 165:14
169:5 172:4
182:12,13 186:4
**finding**
30:18 169:7,9
**finds**
142:21
**fine**
54:12 106:12 194:9
**finish**
21:2 22:20 90:1
185:9
**finished**
118:24 173:11
**firm**
9:20 35:12
**first**
5:4 9:18 10:7 11:6,20
13:14,24 14:20
15:1,3,10,12,12
17:12 18:18 19:15
25:13,14,16 26:16
26:17,23 27:6,8,9
28:11,17,20 29:20
29:24 30:3,5 33:20
33:22 34:3,21
35:23 36:16 37:7
37:13,16 38:8 39:5
39:10 40:11 44:22
45:3,4 52:20 57:10
65:20 66:5 68:7,24
69:10 70:11 71:22
72:15 73:2 75:2,4
75:15,20,21 76:14
76:23 77:14 78:9
78:17 79:1,6 81:5
85:17 86:17 88:9
88:12 92:11 93:12
93:23 94:5,12,22
98:16 104:2
106:15 107:13
110:18 111:4,24
112:18,23 113:4,6
113:24 114:3,6,11
114:17,20 117:3
117:13,13,14
119:3 121:10
123:17 124:13,14
126:4,6,11,17
132:24 139:11,12
140:18,22 141:23
153:4,5,14,20
157:23 159:17
170:16 175:4,5,9
176:7 177:4,23
182:7,8 187:3,12
187:21,23 189:10
189:12,19 192:8

193:3 205:9,19
207:20 208:13
217:13
**five**
140:23
**fixed**
206:18
**floor**
18:10 109:16
123:10 129:5,9
**focus**
19:22
**follow**
28:1,8 208:9
**following**
2:2 3:2 152:18
**follows**
5:5 196:23
**followup**
214:3
**fop**
207:7
**force**
174:10,14 183:2
**foregoing**
216:12 217:19,23
**forget**
91:15 99:10 119:9
**forgot**
119:4 121:5
**form**
6:23 137:5 145:8
164:9 172:21
179:9 204:20
**formalized**
87:4
**former**
1:7,8 6:6,17 7:4
**fort**
46:15 52:21,22 53:5
54:20 55:4,18 56:5
56:21,22 57:13
59:22 60:1,4,7,14
61:14,23 62:3,11
62:16 63:1,10,17
64:3,7,9 76:24
88:4,16,19,24
89:18 90:1,7 104:7
**forts**
55:2,10 63:21
**forward**
180:18
**found**
29:22 30:10 73:12
92:17 94:4 98:9,16
100:14 130:17
134:18 143:6
144:14 166:2
168:16 187:6,7
190:16
**foundation**
162:9,19 164:2,9,22
176:3 178:11
187:17 207:3
**four**
41:24 42:3,4 78:15
91:1 105:1 140:23
154:17 161:3,5
167:2
**fourth**
32:9,12
**fourthterm**
110:2
**frame**
6:22 52:17 84:9
134:21,22
**fresh**
31:13
**friday**
71:5
**friend**
169:23
**frightened**
126:7
**front**
26:17 27:23 28:9,18

29:12 34:2,3,8
79:5,8 83:9,23
91:17 121:17
126:20 164:14
171:17
**fuddy**
89:12,13,16,19 90:23
91:7,11 153:21,22
**full**
5:9 80:7 140:18,23
**further**
77:17 180:22 215:4
217:12,22 218:1,4

**G**

**gang**
14:16 15:24 16:10,15
16:16,20 17:5,8,16
17:23 18:3,17,21
21:6,18 25:1,18
32:21 33:8 55:5
87:19 89:11,15
90:7 108:9,13
146:8 148:14
178:3
**gangrelated**
16:11 19:3
**gangrelatedtype**
19:11
**gangs**
18:4,20 19:1,8,14,24
20:5
**gangster**
87:21
**garcia**
2:20 4:6 6:4 7:7,14
7:19,23 8:14 11:15
14:6 53:6,8,14
54:6,11,13 87:12
121:19,21,23
122:2 135:9 137:5
145:8 158:20
159:5,14,17
160:19 161:2
162:9,19 164:2,22
172:21 173:10
175:24 176:3
178:11 179:9
183:18 193:16
194:2,6,9,15 195:2
195:7,13,18 196:1
204:20 207:2,4
208:3,5,8 210:6,14
213:4 214:2,5,23
**gas**
206:8
**gathering**
6:14
**gaughan**
29:18 34:2,7,8 83:10
83:23 91:17
**gen**
61:10
**general**
15:22 40:16,18 61:12
158:4 174:4
201:10,14 202:12
204:1 205:3,5
**generally**
7:8 11:11,13 14:23
15:23 16:10 61:11
79:2 105:7 142:16
206:19
**generals**
90:7,10
**george**
46:14 90:15 203:24
204:8,12
**gerald**
120:9,14,15,16,19,21
121:1 173:4
175:10 183:10
185:3 187:1,2,6,10
187:12 188:11
192:12
**geralds**

**120:22**
**getting**
30:18 54:1 96:18
99:4,8 101:9,10
108:19 132:2,8
153:17 155:24
156:14,17 193:19
206:17
**gillogly**
65:14 66:10 70:5,7
70:17 71:2
**gilmartin**
9:21
**gist**
43:9
**give**
14:11 18:23 19:18
40:22 99:22
105:13 120:10
125:17 137:24
142:16 143:7
167:9,12 187:14
192:20
**given**
7:23 11:7 40:14,19
44:19 95:10
119:22 120:20
125:22 184:6
190:12 191:5
216:12,15 217:15
217:20
**gives**
162:4
**glad**
111:19 113:23
114:10
**go**
8:16 9:13,22 10:22
11:5 13:11 15:14
19:4 44:10 52:20
53:13,19 56:9,21
61:19 64:19,19
67:21 69:4,9 70:22
71:17 76:4 79:5
103:10,21 106:7
106:14 108:18,20
109:12,14 110:23
129:15 134:13
140:9 156:24
168:17 202:23
206:14,18,20
211:1 212:13
**goes**
139:1
**going**
8:5,19 9:2 16:8 28:1
28:8,9 29:9 30:19
32:20 34:5 42:10
42:22 43:1 46:2,22
47:5,7,8,11 50:19
51:4 53:16 54:2
61:17 62:12 65:1,2
69:1,4,4,8 77:4,9
79:7 83:12,12
85:14 87:11 94:6
98:3 99:5 105:24
109:14 111:3,4
112:8 113:17,17
114:5,19 116:19
117:3 127:6 129:2
137:2 140:20
141:2,10,23 143:8
149:13 159:23
160:12 166:9
171:14,16 173:10
174:3 183:3
185:13 186:5
191:21 193:1,16
193:22 201:1,5,11
201:21 211:8
213:15 214:24
**good**

**44:11 84:8 176:21,22**
198:18
**goodman**
2:4,4,9 4:5 5:7 7:1,2
7:13,17 8:13,19
9:6,10 11:17,18
14:9 26:8,11,21
27:1,2 37:6,10,13
37:15 38:5,6 53:7
53:9,12 54:5,9,12
54:15 57:8,10,11
57:19,20 64:24
77:23 78:1,3,7,8
78:21 81:10,12
82:15,18 86:7,12
87:1,6,14,15
101:21,24 106:10
106:13 110:23
117:2,7 118:13,17
121:14,20,22,24
122:4,5 134:8,12
135:10,11 137:6
145:11,23 150:15
150:20 158:15,24
159:3,7,10,22
160:4,7,11,22
161:5,9 162:11,20
164:5,10 165:2
172:24 173:12
176:1,10 178:13
179:10 183:23
193:23 194:5,8,10
194:16,22 195:4,9
195:15,20 196:3
196:11 201:4,9,19
202:1,19,22
204:24 207:9
208:11,22,23
210:8,11,17,18
211:1,5,6,14
212:10,12 213:21
213:24 214:6
215:1
**goon**
46:16 87:20 88:4
89:1,4
**gossett**
2:14
**gotten**
127:10 137:15
**government**
30:12 47:17,19 48:1
48:4,8 56:16
183:21
**gpr**
213:16
**graduate**
9:16
**granted**
195:23
**greg**
197:5,9
**ground**
170:2 171:18,20
**group**
158:22 182:8 183:9
184:3,5 207:22
208:14 209:2
**guess**
21:1 24:19 34:10
47:20 60:18 157:2
158:17 160:7
170:15 201:11
205:1
**guessing**
135:6 140:4 142:24
156:23 165:1
168:7
**guilty**
48:9
**gun**
117:21 124:20,24
137:18 138:1,3,5,8
140:8,9,20,24
141:3 144:15
**guns**

**12:2**
**guy**
164:8,20 165:4 187:6
**guys**
35:10 40:1 61:15
62:21 126:15
213:20

**H**

**h**
4:9
**hadnt**
97:11 127:17
**haida**
14:14
**half**
139:6 143:11
**hallenbeck**
9:21
**hallways**
198:17
**ham**
22:6
**hamilton**
22:6,11
**hand**
210:4,12 218:9
**handbook**
207:7
**handguns**
163:21
**handled**
16:8
**handwriting**
85:21,22 86:16,19
111:5,8
**handwritten**
85:13 161:2
**hang**
59:24 122:18
**hank**
46:14 90:15
**happen**
181:14 204:23
**happened**
29:11,15 68:23 91:11
94:15 127:4 129:3
170:22 180:10
204:4
**happy**
118:20
**hard**
23:10 113:2 119:10
137:18
**hass**
99:9
**hats**
155:22
**havent**
82:17 121:5 158:20
**hawkins**
27:22 28:3,15,23
29:20 30:9,23
34:21 35:2,6,9,22
36:1,14,17 38:15
38:23 40:12 44:6
44:13 45:17 46:12
46:18 48:1,4,8,13
48:17,21 49:20
57:1 59:11,13 62:5
63:6,8 66:2 68:11
71:10,14 72:17,22
73:1,4,12,19,24
75:10,15,20,21
78:5,11,15 79:17
79:23 80:1,14 81:6
81:17 82:9,23 83:3
83:7 84:19,23 85:7
87:23 88:2,10
89:11,13,18,20
90:2,2,4,6,21 91:5
91:6 102:10,11
103:11,21 104:6
104:11 105:23
157:14 173:6
179:17 181:3,8,10

**181:13,16,21**
203:13,24 204:3,4
212:22 213:2
**head**
118:1 144:20 155:23
165:22 191:16
213:11
**hear**
40:10 43:11
**heard**
25:14 94:15 146:2
162:22 163:19
165:11 171:13,20
176:16
**hearing**
13:2 95:11 97:20
105:7 115:2,7,14
116:16 146:19
**hearings**
12:20,22 13:8,21
**hed**
105:20
**held**
175:15
**hello**
111:12
**help**
24:5 104:21 105:13
125:15,17,23
126:2,9,24 127:2
128:4 129:1
131:12 137:8
139:16 140:7,12
141:7,8 143:20,21
144:17,19,22
145:1 191:5
**helped**
133:12 138:10,12
142:14 191:6,11
191:14,20,22,24
192:14
**helpful**
50:15 199:22
**helping**
133:12 145:7
**heretofore**
217:7 218:3
**hereunto**
218:8
**hes**
7:9 100:9 112:9
114:9 119:22
120:1 122:16
125:13 130:20
131:11 134:23
136:21,24 137:21
137:21 138:24,24
139:12,22 140:6
140:12,14,15
141:13,14 143:24
144:6,13 153:14
213:5,10
**hi**
121:6 143:11
**hickman**
6:19 41:23 42:2,23
46:9 59:3,5,8
61:24 80:10 82:13
91:12 103:4
172:19 179:5
207:16 209:6
214:13
**high**
142:6
**hired**
9:24 10:12
**hit**
90:16 131:6
**hogan**
70:23 72:7 74:22
**hold**
35:4 84:10 197:10
211:7
**home**
139:21,22 142:4
187:16,20 190:14

**190:17**
**homicide**
13:5,17
**hon**
1:6 216:7
**honest**
47:1 67:3 70:9 71:3
115:18 153:7
**honestly**
49:10
**hood**
1:10 160:18 209:24
**hoping**
71:4
**hourihane**
14:13
**hours**
105:1
**house**
93:14 96:23 106:16
108:3,3
**hundred**
110:12 163:4,15
176:8
**hurt**
149:8,13

**I**

**id**
37:20 137:23 141:4
180:9 181:5
191:12
**idea**
44:11 65:11 134:17
**identification**
183:16 204:10
207:15
**identifications**
175:19
**identified**
157:20 175:13,15
211:20
**identify**
89:15 148:10 151:5
171:4 178:19
210:7
**identifying**
173:6
**ill**
35:1 83:13 86:13
118:24 120:11,12
150:21 153:14
164:23 173:13
193:23 196:12
**illinois**
1:1,21,22 2:6,11,16
2:22 3:7 26:4
95:16 130:4 180:2
216:1 217:1,6,9
**im**
6:11 10:13 13:10
15:8 22:16,20
31:17 32:13 44:13
48:15 50:13 53:3
54:2 55:1,6 58:13
58:19 60:12 62:24
64:18 65:1,2 68:22
71:21 78:23 82:4
83:12 85:13,23
86:18 87:11 90:22
92:15 93:16 98:1
99:4,6,8 100:8
101:15 111:3,4,19
112:8,12 113:10
113:22 115:4,8,11
115:16 116:19
117:22 119:2,12
119:12,23 122:2
123:7,13 124:5
127:1,14 131:5
132:16 134:4,13
134:16 135:20
137:2,17 138:19
138:22 139:2
140:4,15 149:4
150:2,9 159:23

160:12,23 163:3
163:15 164:15
166:8,13 167:19
174:3 176:8 178:7
179:11,15,16
180:13 181:22
182:3 185:13
188:20 189:13
191:12 192:11,14
193:1,16,22 201:5
201:21 205:4
207:23 211:8
212:23
**imagine**
158:20
**implicate**
43:15 113:18
**implicated**
44:8 51:21 176:12
180:24 181:4,11
181:17
**impression**
60:13 62:23
**incarcerated**
88:16 112:3 115:24
**incarceration**
48:10
**inclined**
47:13
**include**
7:10 158:3 202:11
**included**
155:14
**including**
79:14 185:9,13
**incorrect**
151:5
**indicate**
8:22 42:10 43:14
161:13 162:7
**indicated**
7:9
**indicates**
161:12 167:2 169:20
**indicating**
121:23 159:12
160:16 208:15
211:8
**indication**
125:22 144:24
**individual**
185:18 192:4
**individuals**
175:14
**inetter**
161:18
**information**
6:14 35:20 36:2,5
40:4,14,16,18 41:2
42:18 44:7,19 46:5
52:19 54:17 56:6
60:22 61:11,12
66:1,15 96:22
97:19 99:23 100:4
117:24 120:10,11
120:19,21,22
170:21 174:8
175:4,6,11,18,22
177:1 200:7
202:15
**informed**
38:11
**initial**
11:9 66:18 68:5
107:2,24 114:5
178:4 188:22
189:3
**inmate**
122:12
**innocence**
8:2,10,20 9:3,8 52:8
53:17 78:14
104:10 105:6
193:2,4,5,18
194:14 195:24
213:8 214:21

**inside**
154:18
**instance**
8:1
**institution**
168:18
**instruct**
9:4 54:10 193:22,24
195:2,13,18 196:1
**integrity**
17:1
**inter**
37:7
**interest**
24:6
**interested**
18:14 38:23 39:11
40:9 91:19,24 92:1
**interject**
7:7,23 210:6
**interlocutory**
34:10 37:1,13,17,24
45:4
**interrupting**
8:17 54:4
**interview**
36:7 45:6,10,19
46:21 50:5 65:22
66:6 75:21 76:15
77:14,16 78:9,17
79:1 86:1,21,22
87:9,12 88:9,10
95:8 109:10 152:7
152:9,17,21 153:2
153:4,6 154:24
155:7 165:12,16
169:18 172:13
187:16
**interviewed**
49:13 50:3 81:6
158:10 161:1,16
165:23 166:21
167:3 169:14,17
171:10
**interviewing**
72:22 75:9,13 173:4
**interviews**
75:14 78:10,15
108:13 109:3,8
**intimidated**
96:3 145:21
**intimidation**
95:19
**introduce**
158:15,17
**introduced**
94:13
**inventoried**
183:11
**inventory**
183:15
**investigated**
158:7
**investigation**
52:3 66:18 160:2
172:18 173:2
179:2,3 209:6
**investigations**
64:6 182:20 183:20
**investigative**
108:17 151:24
152:23 207:16
**investigator**
45:12,24 46:20 47:2
47:3 68:16,21
77:13 84:21 85:1
93:19,21 98:18,21
98:23 103:20
104:16 107:17
108:5 148:6
152:14 189:6
**investigators**
84:22 93:8 94:4
109:7 152:5
**involve**

9:2
**involved**
6:12 19:8 24:3,5,7
25:2,17 33:18
39:21 46:6,13 70:8
70:24 72:12 74:23
79:18 90:3 98:3
99:4,8,13,14 147:3
170:12,17 172:5
176:6 179:1
182:20 189:24
190:3 193:12,17
194:11,12
**involvement**
16:1 25:13 35:21
36:3 40:21,22,24
43:22 44:3,11,14
91:17 127:24
**involving**
32:24 104:7 179:4
**isnt**
23:3 57:5 68:11
**issue**
9:7 31:5,14 33:11
**issued**
30:6 31:2,8,10 102:6
**issues**
33:7
**issuing**
30:15 32:6
**ive**
6:11 7:20 14:2 19:6,8
19:19,20 60:10
78:14 82:16
139:15,17,18
141:24 142:1
160:21 161:23
165:11 174:18
186:23,23 198:10
208:15 209:4

***J***
**j**
1:7,15 2:22 3:6 4:4
5:3 161:19 216:18
217:10,13
**jacket**
167:21,24
**jackson**
1:21 2:5,10 217:9
**jail**
77:5 122:10,11,16
130:3 136:21
137:22 138:24
144:1,7,13
**james**
1:10,11 92:11 95:18
96:14,17,20 97:15
97:17 100:8,10
102:7,11,13,22
166:5 167:6
169:23 171:11
172:3,8
**january**
26:3 27:4
**jection**
176:3
**jeff**
46:15 55:4,10 59:22
61:14,23 62:3,11
63:1,9,20 64:2,7,9
76:24 88:4,15,19
88:24 90:7 104:7
**jerome**
46:10 59:8 179:4
212:16,19
**jim**
20:9
**job**
9:18,24 10:8,18
13:14 23:14
135:19,22 214:15
**john**
1:11 9:15 29:4
150:22 151:13
**join**

164:23 183:18 207:4
**joined**
142:5
**joseph**
1:10,10 5:10
**judge**
13:24 14:12,13,14,14
14:15,15 15:4,5,11
26:17 27:24 28:10
28:18 29:12,17
32:24 34:2,4,7,8
44:8 46:18 83:10
83:23 91:17
126:21 169:5
197:19
**july**
72:3 75:16 121:17
122:9 125:13
140:14 141:2
**jumped**
140:19
**june**
57:18,19 118:3
121:19,20,21
122:1,3,9
**junior**
3:5
**juries**
17:14 25:4
**jury**
1:11 18:1,18 25:11
**justice**
20:24
**juvenile**
20:23,24 22:2 23:3,7
23:20 96:8 135:16
141:14
**juveniles**
23:4

***K***
**k**
217:2
**keep**
8:17 54:4 113:2
137:18 193:23
200:2
**kees**
44:21,23 46:1 47:5
47:11 49:3,8,24
50:6,15,17 51:22
64:20 65:22 66:7
66:11,19,24 67:11
70:2,10,12,20
204:3
**kelley**
1:8,15 2:24 3:8 4:4
5:3,10,10 7:24
8:15 71:17 216:18
217:10,13
**kelly**
111:13 113:22 120:7
129:24 131:5
135:13 139:17
152:15,16 153:18
**kennelly**
1:7 216:7
**kenya**
161:18
**kept**
34:4
**kevin**
153:18
**kill**
89:19
**killed**
179:13
**kind**
40:11 54:8 110:1
131:23 134:18
180:7
**knew**
27:16 41:10 42:22
76:17,18 89:12,16
91:6 101:16
148:13,13 157:14

170:12 190:17
**know**
5:17,20 14:10,10
17:3 18:3 19:6,16
20:4 22:13 24:19
26:8,9,14,14,22
27:23 29:5 31:20
31:20,23 37:6,20
39:6 41:4,18 43:1
45:15 47:1,21
49:11 50:11 54:7
56:23,24 57:24
58:12,14 64:4,7
65:24 66:9,11,14
66:17 68:22 70:4,6
70:9 71:2,6,18
80:20,24 83:1 84:2
84:5,6,9 86:20
89:6,9 94:4,8 96:1
99:9 100:7,17
101:19 102:1,4
106:22 107:9,10
109:23 110:9
111:10,17,18,21
113:16 115:17
116:8,9,10,11,12
116:17 117:16,19
117:23 119:4
120:9,13,20,24
121:4 123:11,13
125:11 126:9,23
127:4,8,11,15,18,21
128:23 129:1
130:2,9,10,17
131:1,8,23 133:10
134:3,21 135:2
137:23 138:6,17
139:6,20 140:3
141:4,13 142:3
143:1,12,24
147:18,21 148:5,8
148:13 150:8
153:2,7 155:16
156:18,21 157:17
157:18 162:10,12
162:14,16,18
163:1,18 164:24
166:2,11 168:15
174:16,18,19
175:5 176:5 177:3
178:12 181:1,2,3
183:12,21,24
186:23 189:24
191:14,20 196:4
197:20 198:4,16
199:4,5 207:5,6
212:8,24 213:2,6
**knowledge**
36:3 40:24 42:20
57:21 60:2 76:6
89:9 92:24 206:24
214:17
**known**
41:8 87:20 90:3,9
183:5
**knox**
77:6
**kobel**
1:12
**kolovitz**
1:12

***L***
**l**
2:14,14,20
**lab**
31:8 182:18 202:14
**lack**
183:17
**lacking**
35:23
**landed**
142:8
**lang**
161:19
**langston**

92:11,12,14,18 93:3
93:10,24 95:4,18
97:23 100:6 101:1
101:2 102:6 103:2
106:7,15,20 111:6
116:6 117:17
118:8,9 123:5
136:12 151:2,8
152:8,9,18 153:6
153:18,19,20,23
154:3 161:19
163:5,7 164:8
165:16 166:5,8
167:5,6,6,12 168:4
169:13,14 170:6
171:11 172:3,8,14
173:4,5 175:9,10
175:23 177:2,14
177:20 182:5
183:10,11 184:1
185:1,14,15,16,24
192:19 203:1
204:5,7
**langstons**
100:12 101:6 177:11
**larry**
1:7 2:24 3:8
**late**
45:13
**laughter**
143:17
**law**
2:4,9 9:14,18,20
10:16 23:3,5,7
29:7 30:20
**lawsuit**
6:7,12 195:1 209:12
**lawyer**
28:14 77:18 115:4,16
198:18
**lawyers**
38:18 73:6,11 74:1
74:10 79:17 80:14
85:7
**lay**
170:2 171:20
**lead**
15:1
**leader**
88:3
**learn**
23:9 28:6
**learned**
93:3 204:2
**leave**
15:13
**left**
25:1,4,5 142:4 212:1
**len**
2:4,9
**leonard**
2:4
**letter**
50:9 65:1,6,7,19 66:5
66:10,13 67:22
68:1 69:7,20,22
70:1,7 71:2,5,7,9
71:13,21,22,23
72:3,6,16,19 73:2
73:17,24 74:17,22
75:3,7,16 111:14
111:17 113:7
116:20 117:4,12
118:3,6,15,18
121:8 122:3,16,17
122:17,23 123:2,3
123:17,20 124:21
127:18 128:5,22
129:4,11,19,23
132:9,10 134:17
136:7,9,21,23
137:7 138:21
140:5,6,22 141:19
143:19 144:2,18
147:7 150:15,22

150:23,24 151:17
196:15,18,20
199:19 200:22
201:2

**letters**
107:1,6 110:14,16,17
111:15 121:11
123:15,16 128:16
129:7,21 150:13
187:4,6

**letting**
113:10 197:20 199:5

**lie**
112:1

**life**
116:1 119:22 130:2
131:17 132:15
142:1 143:8

**lifestyle**
139:20 142:3

**lifted**
156:10 178:5,9

**light**
18:3 167:18,20,24

**liked**
143:16

**limits**
32:15

**line**
16:8 100:9 115:9
200:3

**lines**
140:24

**lineup**
166:12 184:23,24
185:5 186:1,8,17

**lineups**
163:2 175:14,15
182:9 185:6,17

**linked**
175:6

**list**
20:2

**listed**
27:21 29:4 97:23
164:13 213:17,19

**listen**
55:24 58:22 208:6

**listing**
207:6

**lists**
160:13 192:4

**litigated**
32:9 33:1,1

**litigating**
32:19

**litigation**
2:21 19:7,20 33:3,5

**little**
10:21 15:20 19:13
35:4 86:15 102:24
105:13 106:8
119:10 150:14
205:4

**live**
139:20 142:4

**lived**
170:13 190:18

**living**
90:14 101:20 102:3
192:17,20

**locate**
93:8 131:17 132:13
132:14

**located**
87:22 92:13 93:9
100:17

**location**
6:18 7:5 90:23 91:2
207:8

**locations**
52:23 56:17 58:6
60:7

**locked**
63:10 107:7 110:8
112:24 113:1,3,4,5

---

133:15 137:21
139:18 142:1
148:16

**lodge**
213:5

**long**
6:9 10:18 12:12,15
13:7 20:3 21:12
23:14 24:8 36:13
56:24 104:24
139:6

**longer**
15:17

**look**
16:1 18:13 37:20
78:7 117:12 122:6
129:11 135:7
136:3 137:23
140:3 141:4
158:16 166:1
173:22 180:9
181:6 182:2
184:23 185:18
186:8,20 191:7,12
192:22 211:15
213:12

**looked**
125:7 137:7 144:3
156:12 163:20
182:7 185:17
203:23 204:1
209:3,4

**looking**
9:23 122:2 126:16
160:23 166:3

**looks**
111:16 122:11 125:6
159:24

**loser**
138:8

**lost**
109:24

**lot**
14:5 18:1 24:16,17
31:18 32:1 34:15
59:22 61:22 107:4
108:19 112:4
113:5 130:18
137:15 139:17
141:24 153:10
156:16

**louis**
161:19

**loved**
187:6

**lying**
178:9

---

**M**

**m**
1:23

**mae**
161:19

**mail**
120:22

**mailed**
117:8

**maintenance**
205:6

**making**
43:12 62:11 194:12

**male**
162:3 164:17 167:17
167:19,23

**males**
154:18

**maloney**
32:24 44:9,16 46:18
52:3,13 56:20
200:1 201:3

**maloneys**
197:19

**man**
157:11,13 169:24
170:12,12,18
171:4,8,16,19,21

---

172:9 178:1,19
203:3,8 204:5,16

**mandate**
29:13

**manner**
139:20 142:3

**mannion**
14:15

**mans**
171:13

**marc**
152:14

**march**
1:23 216:13 217:8

**mark**
64:20 83:13 150:15

**marked**
64:23 71:16 78:19
83:16 85:19 86:11
110:22 117:1
121:16 129:13
134:11 150:19
151:22 158:18,24
159:4,10,11,13,21
160:19 196:10
207:14,14

**marking**
212:3

**marshall**
9:15

**martha**
161:17

**mask**
155:11,13 156:10
167:20 169:24
170:3,18 171:16
171:19,21 172:9

**masked**
153:20,21,22,23
154:10 155:3,8

**masks**
151:4,6,9 153:19
154:6,19 155:4,5
155:17,21 178:6,9

**material**
31:18 168:22 169:4,5
169:7

**matters**
8:4 197:19

**matthew**
1:6 216:7

**matuzak**
2:9 26:10 37:12 38:3
57:6,18 77:24 78:2
78:4,19 81:11
82:16 86:24 87:13
117:6 145:19
158:19 159:1,11
159:15,18 160:3,6
196:7 201:8
208:21 210:10,17
210:24 211:5
212:11 214:1

**mcdermott**
28:4,14 30:22 35:11
73:6,10 74:9 75:22
77:17

**mckay**
20:10

**mean**
6:11 18:8 19:19 26:1
54:9 55:10 59:4,20
92:6 95:5 113:2,14
115:17 117:24
121:21 153:10
166:7 178:2
186:12 204:23

**means**
15:1 119:14,19
162:23

**meant**
115:3

**mechanics**
59:23 62:1

**medical**
31:6 202:14

---

**medication**
14:2

**meet**
188:3 189:7 198:9

**meeting**
38:17 79:13 95:23
96:2 105:16
106:16 107:3,24
112:19 114:5
124:13,14 189:4

**meetings**
79:18 107:7 121:12
123:4 188:13,16
188:20,22

**melissa**
2:9

**member**
89:15 100:5

**members**
55:4 56:12 58:7 77:4
89:12 95:17 96:14
115:23 145:21
146:2,8 183:5
194:11

**memorialized**
84:22

**memory**
110:24 137:3 213:6

**men**
153:18,20,21,22,23
154:6,11,19 155:3

**menard**
111:20 117:14,17,19
119:5 123:18

**mention**
103:6 140:24 213:16

**mentioned**
77:7 96:3 102:15,17
102:23

**mentions**
140:8

**met**
28:14 33:20 36:16,24
37:4 38:8 42:9
114:3,18 187:3,12
187:19,21,22,23
188:4,20 189:13
189:19 194:17
198:10,17

**michalik**
2:14 6:21,23 8:21
158:22 161:3
164:9,23 183:17
201:20 207:3
211:9

**michigan**
10:6 12:7

**mid80s**
87:19

**milwaukee**
187:8,18 188:4,19,23
189:11,13,14
190:11,14 191:10
191:12

**mind**
11:23

**mine**
125:6

**minnie**
167:5,8

**minogue**
1:10

**minute**
136:3 211:2

**minutes**
154:16

**misconduct**
17:4

**misdemeanors**
11:20 13:19

**misidentified**
204:5

**missouri**
187:9 192:16

**mistake**
142:8 163:13

---

**mistaken**
207:23

**money**
123:12 142:22

**monitor**
60:14

**month**
10:14 25:22 26:12,15
27:7

**months**
12:17 31:1 32:8
36:20 57:1,15 61:1
142:16 143:10
192:1,8

**morris**
120:15,16,19 121:1
173:5 175:10
183:3 185:3
187:1,2,13 192:13

**motion**
32:9,11 34:22 35:23

**motions**
32:20,21,22,23 34:20
35:16,19 37:21
110:1,2

**motor**
172:7

**move**
165:3

**moved**
12:12 142:6 187:8,9
190:14

**moving**
142:10 191:22

**multiple**
41:10 179:14 183:20

**municipal**
11:6,20

**murder**
40:5 42:16 43:18
46:6,8,13 59:3,5,5
66:3 76:6,17 92:7
105:8 158:7 176:6
202:14 209:6

**murders**
6:19 15:24 40:21
41:23 42:2,23 46:9
113:18 172:19
178:22 183:4,6
207:17 214:14

**murphy**
1:10

**murray**
20:9

---

**N**

**n**
4:1

**name**
5:9 35:10 52:23 76:1
85:3 91:12 93:20
98:20 102:7,9,22
108:5 118:10,11
163:14 165:9,11
176:6

**named**
165:4

**names**
20:8 102:5 104:22
148:10,12 150:1
161:17 209:8

**nate**
25:15 26:22 28:23
29:2,24 33:20 37:6
43:15 44:8 51:21
52:10 59:3,4 62:17
66:19 82:23 91:16
92:20,20 103:5
113:18 119:19
134:6 157:20
175:6,17,19,21,22
176:12,20 180:19
180:24 181:4,11
181:17 185:7
186:17 193:4
195:1,23 200:24

---

201:15 202:24
203:11 209:20

**nates**
24:24 25:6,9,13 27:5
43:22 44:3 50:16
55:22 60:23 62:8
91:23 95:11
101:20 109:21
126:18 133:14,17
138:15 180:1
182:6 194:13

**nathan**
175:13 176:16,20

**nathans**
1:3 3:15 27:22 30:6
30:21 34:23 35:20
35:23 36:3 40:21
40:24 42:20 44:10
44:13,19 46:13,19
57:1 59:11,13 62:5
63:6,8 66:2,16
68:10 72:18 73:20
76:19 77:1,2 90:15
147:3 149:11,14
152:16 173:6
176:5 196:23
200:4,8 203:22,22
216:4

**naught**
215:4

**necessarily**
181:13

**need**
139:16 158:16 196:4
200:5 208:9

**needed**
200:17 214:15

**needs**
159:4

**neither**
179:17

**nervous**
140:15

**never**
42:19 82:16 91:21
92:8 100:21
114:22 126:2
144:21,24 148:12
151:6 155:17
168:4,7,9 172:6
175:1 180:12
182:12 199:16

**new**
11:9,11 26:4 31:15
35:16,19,20 36:5
125:10 131:17
132:15 136:24
160:6 174:8 175:3

**nf1094**
212:22

**nicknames**
105:14

**night**
170:9

**nine**
12:17 19:20 139:8

**nodding**
144:20 165:22

**nollied**
180:8

**norfie**
85:4,23 86:14

**normally**
70:22 192:3

**north**
12:24

**northern**
1:1 216:1

**notarial**
218:9

**notary**
1:19 216:23 217:5
218:15

**noted**
218:3

notes
45:19,20,22,24 46:20
47:2 53:20 77:10
85:23 86:1,5,15,21
87:3,8,9 88:13
103:14 105:15
109:2,4 148:8
notice
1:16 121:24 218:2
november
71:5
nowadays
11:13
number
17:13,14 32:8 48:16
48:19,22 64:21
82:11 118:14
122:12 125:10
150:16 159:13,18
159:18 160:8
167:23 183:3
184:3,8 191:18
210:7,12,13
numbered
159:14
numerous
18:21 19:6,9 77:2

O

o
217:2,2
oath
216:14
ob
175:24
object
6:21 9:3 54:10
193:16 201:21
207:2
objecting
33:14
objection
137:5 145:8 162:9,19
164:2,9,22,23
172:21 178:11
179:9 183:17
194:4,6,7 195:2,13
195:18 196:1
204:20 207:3
213:5
obligation
197:14,17
observed
169:24 170:18
171:16
obtain
175:21
obtained
89:8 174:6 175:6
obtaining
175:19
obviously
5:17 190:17
ocallaghan
1:9 182:22 184:11
185:23
occasion
101:4 107:17 146:21
165:21
occasions
47:22 198:10
occurred
154:15 158:8
offenders
174:1 175:11
offense
212:22
offer
39:17 40:1 42:16
79:9,23,24 91:20
92:20
offered
18:6 59:10,14
offers
43:12 91:16
offhand

12:9 60:8 102:23
116:13 117:18
133:11 135:6
174:2 175:8 177:3
204:22 207:8
213:18
office
2:4,9,19 3:4 10:20
11:1,4 20:8 21:3
22:10 29:7 30:21
31:6 32:2 45:12
65:21 70:23 74:15
78:5,6 79:5 107:16
107:19 112:15
188:14,15,17,24
189:1 194:12,20
197:13 205:7
214:10,15
officers
1:8 112:5,11,15
official
17:3 81:24
officially
126:17
officials
49:24 50:2
offthrecord
210:16 211:4,12
ogden
22:6,10
oh
6:9 13:11 14:3 49:19
51:19 57:8 112:13
121:24 122:4
127:1,12 133:16
134:13 163:1,1
165:13
okay
5:21 6:5 7:19 9:6,12
10:15 12:5,10
13:22 14:17 16:13
19:12 21:4 22:21
23:11 26:5,21 27:1
28:13 30:24 32:18
35:3 36:4,9,11,15
36:24 37:10 38:5
38:17 41:18 44:20
51:7 53:9,24 54:11
54:18 57:4 60:20
63:9 64:1 65:5,16
67:9 71,20 74:6
75:7 77:15 78:19
80:13 82:3 83:18
84:10 85:15 86:20
103:12 106:14
110:13,19 111:2
112:7,13 113:13
115:20 116:4,8
117:12 118:3
119:2,21 120:18
122:4,22 125:12
129:11,18 136:1,6
136:16 137:2,10
137:17 139:4
141:1,17,23
147:14 151:19
152:10,13 153:12
154:14 161:7,24
164:6,14 165:3
173:8,15 182:5
185:11 186:22
190:9 194:9,15,16
194:16,23 195:7
196:20 198:20
200:14 202:4,9,19
205:8 208:7,10,22
209:13,22 210:5
211:16 212:20
old
147:10 163:9 206:6
207:1,7,11 213:1
older
96:19
once
50:7 67:5 68:9 77:7
80:16 124:12

128:10 133:8
139:14 143:10
156:4 180:21
200:3
ones
11:24 12:9 19:23
57:4 58:21 96:15
102:24 105:12,13
111:16 162:2
185:21 213:22
ongoing
46:16 56:18 64:6
193:18
oocr
125:4
operation
176:22
opinion
26:13 38:3 39:1
198:19
opportunity
16:12 72:22 73:13
75:9 163:23
oppose
193:10 194:13,24
195:6,17
opposed
80:8 134:19 135:1
213:12
oral
162:21,24
order
43:18 49:24 69:20
116:21 124:15
169:7 177:3
ordered
27:12 46:15 182:19
205:13
ordering
28:21
original
87:3 95:11 111:7
146:19 178:10
originally
10:6 30:21 79:2
133:24 138:6
144:3
outcome
218:7
outset
53:15
outside
18:23 63:16 90:11
96:14 170:21
188:14,24
overheard
104:6

P

p
1:19 2:14 147:10
218:13
pack
68:17,20
page
4:3 87:16,18 88:1
89:23,24 90:20,21
90:21 113:8
117:13 119:22
120:5 121:17
135:7 136:15
140:22 143:19
160:14,24 161:3,5
164:14,15
pagers
206:18
pages
216:13
paid
61:23,24 62:2
papers
168:23 169:4
paperwork
27:14 146:23 169:8
paragraph
67:4 68:8,14 87:17

113:21 118:23
119:3,16 121:3
129:24 131:11
139:11,12 140:19
140:23 141:24
paramedics
31:9
parameter
80:15
parameters
81:8
park
156:14
parole
131:14
paroled
131:21 132:3,5,8
139:24
part
16:14 56:18 64:5
93:15 112:12
158:22 180:15
183:2,4 197:17
206:7 212:2
partee
84:6
participate
90:17
participated
39:4
particular
12:23 76:18 150:6
161:13 208:13
parties
217:24 218:5
partner
68:16 187:11
parttime
9:23
party
81:19
patrick
3:5
paul
2:14
pause
14:8
pavlik
68:18,21
paying
47:3 119:23 120:1
pending
217:11
penitentiary
49:16 118:5 127:7
128:16 132:3,7
149:19
people
6:11 18:13 20:6,8
25:19 34:6 39:21
59:15 61:15 62:14
63:21 82:7 90:10
142:21 149:18,20
150:1 158:11
163:20 167:3,15
176:8 194:17
205:12
peoples
29:7 30:20
percent
110:12 163:4,15
176:9
period
6:8 8:24 24:18,20
30:17 32:10 60:23
61:2 80:4 88:2
89:7 106:24
permanent
210:20 211:23 212:4
person
39:2 66:21 67:16
77:6 86:5 91:11
95:7 100:22
102:13 124:7,9
132:11 164:6,13
169:14 171:10

172:12 198:24
personal
206:23
personally
168:8 184:21,22
217:8
personnel
160:24 161:7
persons
177:16
pertaining
1:18
peters
71:1
petition
8:1,4,7,15,20 9:8
193:5
phone
39:2 50:9 55:5,10,13
55:13 58:9,10,13
60:5,15 63:22 64:3
66:21,23 67:3,12
88:15 94:2 95:6
100:23 124:7
143:9 198:22
199:1
phones
55:15 58:14,16,17,19
58:20 60:6,6,7,17
photo
177:18 182:24
183:15 186:16
photocopy
135:8
photographs
31:10 109:13 173:7
175:12,14 176:7
182:9,10 183:5,7,9
183:13 184:20
203:23
photography
182:18
phos
182:7,18,19 183:24
physically
53:20 168:17
pick
16:2,3,5,6,12 23:10
25:19 108:18,20
142:20 177:18
picked
25:3 123:23,24
125:10 176:12
179:24 182:6,11
picture
204:11
piece
175:5
place
32:2 36:7 45:6 57:2
88:15 98:9 124:12
147:16 153:2
193:15 216:13
places
214:9
plaintiff
1:4 2:7,12 3:15 8:3
216:5
play
153:17 156:15,17
166:9
playing
169:22 171:12
plea
38:24 74:12 78:1,4
78:16,22,24 79:3
80:2,18 81:2,13
82:6 83:2,4,9,19
83:21,22,24 84:12
91:16 92:1,4,7
127:13,14
pleas
25:10
please
196:23 211:10
pled

48:9 82:24 128:19
plus
112:2
point
8:11,13 11:9 12:6
13:6 17:11,12 23:6
28:13 30:12 32:8
34:16 38:11 40:7,8
41:4 44:5 49:5
52:4,5 53:1 56:18
74:11,12 76:19
77:11 81:1 84:21
85:12 91:2,21
92:13,17 93:2,9
97:12,18,22
103:23 104:5
106:22 123:21
126:10 127:20
128:14 130:17
131:24 133:6
140:4 143:23
146:4,22 147:5
157:18 174:5,24
176:14 178:23
187:8 189:2
192:16,17 193:9
193:17 198:1
202:13 203:23
pointed
90:23 91:3
points
74:20 188:16
police
1:8 31:7,11 94:23
95:1 97:23 101:14
125:3 158:7 160:1
162:13,24 163:15
164:3 170:14,20
170:21 171:1,3,6
171:11 173:3
175:9,18,21
176:19 177:1,23
178:5,9 202:16
206:22 207:1,11
position
20:21 24:8 80:7
positive
204:9
possibility
48:18
possible
120:8 139:16 204:8
possibly
16:3 38:23 39:16
40:4,9
post
27:13 32:2
postconviction
27:15
postmark
122:1,7
postmarked
136:17
potential
196:22
preliminary
12:19,22 13:1,7,20
preparation
5:23 6:2 72:23
109:18
preparations
152:16
prepared
30:18 109:13 202:12
202:13
preparing
23:2
prescribed
32:15
presence
76:11 217:17
present
2:1 3:1,14 36:4 45:9
49:12 50:3 77:12
77:13 79:19 85:5,7
86:6 93:18 104:14

112:10 147:24
148:3,6 152:20
189:3
**presented**
80:22 147:13
**presenting**
82:22
**pressure**
96:15
**presuming**
75:15
**pretty**
10:17 42:7,12 44:11
76:20 77:19 81:7
94:17,19 100:2
103:7 104:3 123:7
179:21 189:21
**previous**
105:9 151:3
**previously**
72:16 160:20 207:14
208:16
**primarily**
15:24 58:18
**prior**
28:20 37:4 38:17
41:8,16,19 42:11
42:15 44:6 68:2
70:11 75:4 97:2
114:13 175:18,22
200:6 212:23
**prison**
36:12 55:3,10,13,14
55:16 63:14,19,23
64:2 100:15
123:12 141:16
142:15 187:17
197:22
**prisons**
64:13,17
**private**
109:10
**privilege**
8:6,11 9:4 53:16
**privileged**
7:12
**probably**
5:14 19:19 27:3
48:24 59:20 60:12
82:21 119:4 124:5
124:11 125:11,12
199:6
**problem**
139:16
**procedurally**
179:11
**procedure**
1:17 179:16 183:15
200:17
**procedures**
183:22 205:6
**proceed**
180:18,22
**proceedings**
8:2,10 9:3 14:8 35:13
53:11,17 91:16
159:9 193:21
202:21 213:9
214:21
**process**
54:7 145:14 169:1
193:19
**produce**
169:10
**producing**
197:13 200:17
**product**
8:6 9:4 53:16 193:20
**production**
53:22
**proffer**
38:16
**program**
65:23 131:15,22
**progress**
158:4 201:14 202:13

**project**
87:22
**promoted**
14:24
**promotion**
21:21
**promotions**
14:20
**pros**
15:14,16,21 16:9,14
16:19,23 17:8
**prosecute**
16:2 180:12
**prosecuted**
22:5,7 201:15 209:20
**prosecuting**
17:23 22:4
**prosecution**
15:19 68:11 72:18
73:20 103:5
202:24 209:19
**prosecutions**
14:16,18 16:17 21:5
21:13,18 72:13
**prosecutor**
11:8 70:17 128:2
175:17 177:11
203:20 204:18
**prosecutors**
9:24 11:9,11
**protect**
116:2
**protection**
45:8 49:21 65:23
69:14 80:6
**protective**
29:23 30:11 36:10
49:16,20 69:11
70:11
**provide**
150:3 171:5 172:8
177:22,24 201:23
**provided**
7:22 175:10 207:24
209:11
**provides**
172:13
**ps**
146:8
**public**
1:19 17:1 216:23
217:5
**pulled**
151:4,6,9 155:11,14
172:9
**pulling**
154:6
**pumps**
206:8
**pursuant**
1:15,16 218:2
**pursue**
50:17
**put**
86:15 156:7 175:12
177:12 181:7,10
196:5 200:1
203:14 204:10
**putting**
180:16

**Q**

**question**
5:18 6:23 7:15 11:15
14:1 84:8 91:15
115:1,6,13,16,21
126:23 153:12
185:10 205:5
208:5,8,12 214:2
**questionbyquestion**
8:16
**questioned**
44:12
**questioning**
54:3 214:7
**questions**

8:6 53:18 65:3 87:7
87:17 111:4
116:19 119:1
159:23 160:13
193:23 201:5,11
205:3,4
**quick**
19:4 77:20 201:18
**quickly**
75:17
**quit**
9:21
**quite**
178:3
**quotes**
115:13

**R**

**r**
1:19,19,19 218:13,13
218:13
**ran**
139:15 155:3,8,20,23
156:2 170:3
171:22
**randy**
92:11,12,13,17 93:3
93:9,24 95:4 98:14
101:2,17 102:8
103:1 106:7,14,20
111:6 114:21
116:9,13 117:17
120:24 123:4,11
124:11 129:21
130:17 134:18
136:12,20 150:14
151:2,8,10,13
152:8,9,18 153:6
153:10,18,19,20
153:23 154:3
155:17 163:8,9
166:7,8 167:5
169:14 170:6
171:13 173:4
175:9,23 177:2,11
177:13,20 182:5
183:10 184:1
185:1 187:5
192:19 203:1
204:5,7
**randys**
153:9
**range**
157:4
**rap**
137:23 140:4 141:4
212:16,18 213:1
**rd**
182:19
**reaching**
38:23
**read**
42:3,5 65:19 122:7,8
122:18 129:15
139:13 150:24
152:24 178:23
186:9,23 216:12
**reading**
41:8 111:3 114:16
122:21 129:7
164:11
**ready**
71:18 103:22 119:2
131:5,6 153:17
156:14,17 188:18
**reaffirmation**
111:7
**real**
19:4
**really**
6:13 17:24 22:18,22
42:19 47:3 95:5
106:21 110:3
115:18 116:11
118:1 124:8 132:1
142:20 149:23

163:5 181:18,18
200:4
**rearrested**
106:23
**reason**
35:19 50:16 51:15,17
97:13 112:15
145:6 147:8
149:17 177:21,23
206:17
**reasoning**
145:16
**reasons**
50:17
**recall**
15:11 19:5 20:7
26:20 27:4 28:5,10
29:18 31:11 33:5,7
33:10 36:18,21
39:7,9 40:16 41:3
42:1 43:7 49:9
52:23 53:2 61:20
62:7,14,16 63:13
63:16,18 67:13,17
68:20 72:12 74:2
81:5,20 87:8 88:5
89:13 93:5 95:4
96:21 98:11,22
99:16 100:20
102:22 106:20,21
107:12,13 109:17
110:4,6,7,12,13
114:8 118:9,13
120:1,19 123:4
124:15 126:15
127:16 128:15
129:6 130:11,14
131:20 132:6,10
137:24 138:9
139:3,7 141:5
148:3,20 150:11
151:10,15 153:13
154:2,21,24 155:2
155:19 165:14
172:18 173:20,22
174:2,7 175:8,17
182:4 183:12
184:7,12,16 185:6
186:5,24 187:2,7
187:24 188:12
191:23 194:21
207:8 213:23
**recant**
146:5
**recantation**
147:2,6,8,12 148:24
149:17,22 189:16
190:4,10,13,19
**recanted**
180:24 181:1,12
182:3
**receive**
97:18 196:18
**received**
19:23 56:3,19 96:22
98:4 104:9 111:16
114:2 124:21
175:4 180:8,22
**receiving**
95:19 96:15 110:13
111:14,15 114:13
122:17,23 150:21
151:17
**recess**
53:11 159:9 202:21
**recognize**
65:6 71:22,24 85:16
85:20,21,22 86:13
111:13 152:3,4
169:9 196:12
209:8
**recognized**
157:10 203:3
**recollection**
35:1 63:24 66:18

67:10,15 68:4
69:24 73:18 75:3
114:7,12,17
121:11 121:23,22
129:8 130:7,19
137:14 138:3
141:1 144:12
151:16 154:6
156:11 157:8
163:24 176:17,18
176:24 186:19

67:10,15 68:4
69:24 73:18 75:3
114:7,12,17
121:11 121:23,22
129:8 130:7,19
137:14 138:3
141:1 144:12
151:16 154:6
156:11 157:8
163:24 176:17,18
176:24 186:19
**reconcile**
203:19
**reconciled**
203:21
**record**
14:6 27:22 29:5,14
54:14 64:13
108:12 194:1,3
196:6 201:21
208:20 211:1,9
**recorded**
63:22
**recording**
64:3,17
**recordings**
63:13,19,20
**records**
31:3,7,8,9 138:23
184:18 201:16
**red**
167:19,20 169:24
170:18 171:16,19
172:9
**reduced**
217:18
**refer**
8:10
**reference**
132:20
**referring**
139:23
**refers**
68:10
**reflect**
213:14
**refresh**
66:17 67:10 121:11
130:6
**refreshes**
110:24
**refuse**
51:12
**regard**
6:18 103:1 189:15
196:21,21
**regarding**
8:6 25:15 32:21,22
32:23 35:23 36:3
39:18 40:23 42:18
42:20 43:6,11
44:13 47:11 59:9
59:17 66:2,15 67:6
68:9 76:6 77:2
78:13 84:23,24
146:18 147:8
173:4,5 175:11
176:14 182:18
197:13 214:13
**regards**
6:7 7:5
**regular**
18:18 55:12,15 143:7
157:3
**reinterviewed**
151:2 177:2
**reinterviewing**
75:10,11
**reinvestigating**
183:3
**relate**
8:22 61:8 209:5
**related**
6:19 19:14 52:3
56:20 59:18 60:22
61:5,6 62:8 71:14

100:5 102:19
103:4 105:24
197:18 200:8
207:16 218:5
**relating**
149:9,10 172:19
174:6
**relation**
59:2,3,8 198:11
**relatively**
127:23
**released**
123:17,24 124:3
198:2,6
**religion**
130:18 134:19 143:6
**relo**
142:19
**relocate**
125:24 126:3,5,7,9,9
133:4,5 138:12
142:14
**relocated**
120:23 133:8
**relocating**
140:11
**relocation**
132:20,22 142:21
145:2,7,10,13
191:5,6,13 198:8
**relocations**
191:19
**remember**
12:8 19:15 21:10
26:21 27:9 32:6
35:10 37:22 39:14
44:24 49:10,11
56:11 57:15 59:18
62:10 66:22 67:2
70:8 74:24 75:5
76:1,12,14 85:3
87:23 90:24 93:11
93:15,20 94:1,5,10
94:11,24 95:2,5
97:1 98:15 99:1
101:5 102:19
108:7 111:14,15
118:2,15,18 120:8
122:17,23 124:8
129:19 131:13,23
133:12 134:20
136:7 137:8 140:6
140:9 142:11
143:2 148:4 149:4
149:15 150:3,5,21
150:23 153:1
154:23 157:13
165:13 166:2
168:3,7,15 172:2
179:7,12,21 181:5
181:13 186:10
188:2,8,19,23
189:5,8,10,12,18
189:20,23 190:7,8
191:1,2,3 192:9,18
198:17
**remembered**
105:8
**remind**
153:8
**rent**
191:5,21 192:1,8
**rents**
142:16
**repeat**
5:18 115:11 178:7
194:3
**rephrase**
7:1
**replacement**
18:13
**report**
84:22 87:5 125:3
151:24 152:3,4,24
155:15 160:18

161:22,23 163:19
164:4,7,11,12,15
165:4 166:15,16
166:19 167:2,9
168:1 169:17,20
172:7,13 186:15
209:23 211:20
212:8,21
**reported**
101:13 146:21
217:16
**reporter**
86:9 110:20 116:23
117:5 118:16
134:9 150:17
196:8 217:5
**reports**
58:4 85:13 94:23
95:1 97:24 158:4,4
158:13 160:2
172:17,20 173:1,3
173:5,13,16
176:14 177:7
178:21 181:6
182:2,3 184:23,24
185:5,19,22 186:8
186:21 191:13,17
201:14 202:12,13
202:14,15 208:16
**represent**
30:19,21,23 34:6
**represented**
35:12 49:4
**representing**
8:3 35:9
**request**
145:15 206:21 213:6
213:8
**requested**
17:19,20 18:6 67:5
68:9 152:17
**requesting**
65:20 66:6 70:1
72:21 75:8
**requests**
31:10 108:18
**required**
197:20
**resemblance**
203:24
**reserve**
214:24
**reserved**
215:4 217:23
**residence**
153:3,9
**respect**
18:20 19:1 35:16
43:2 48:1 49:8
52:13 191:5
200:12,24 201:13
**respective**
217:24
**response**
8:4 213:17
**resubpoenaed**
31:21
**result**
46:15 74:17 79:20
**retention**
210:20 211:23 212:4
**retire**
20:19
**retired**
20:16,22 24:12 56:2
**retrial**
25:20 28:1 29:10
31:14 50:16
113:12,16,23
114:10
**retried**
66:4
**retrieve**
206:15
**retrieved**
201:15

**retrieving**
206:19
**retur**
64:4
**review**
12:12,15,16 54:22
65:2 71:14,17
83:13 85:24
110:24 151:23
172:16 175:16
178:21 182:10
**reviewed**
5:22 27:10,19 55:17
56:6 60:4,22 61:5
63:20 158:13
161:22
**reviewing**
28:22 59:18 63:13,18
118:24 185:5
**reyna**
14:15
**rich**
1:12
**richard**
1:7,12 2:22 3:6 32:22
**richardson**
1:9 161:8
**rid**
190:20
**right**
7:13 9:6 17:8 19:22
22:13 29:13,18
37:19 39:23 51:24
54:13 58:5 73:15
78:23 84:18 85:11
91:7 92:10 93:2,4,4
103:14 111:12
113:15 115:22
117:14 118:6
121:23 126:12
127:19 132:3
137:12 139:11
140:2 141:11
144:18 145:12
146:15 157:14
159:1 160:2,21
162:22 163:6
165:10 167:17
177:12 179:20
181:21 194:5
200:6 210:10
212:8
**rival**
87:19
**robert**
1:11
**robertson**
1:11
**robinson**
161:18,18
**rockford**
10:1,3,10,12,19
**rockwell**
206:5
**rodell**
89:14,16
**rolled**
170:2 171:21
**room**
60:14 112:5,11
**round**
37:7
**routine**
64:5
**routinely**
64:3,13
**rukin**
115:24
**rukn**
44:18 52:23 55:4
58:16,18 70:22
71:1 72:13 170:13
174:10,14 183:2,3
183:5
**rukns**
20:12 46:7 52:15

56:13,17 58:7 63:3
64:6 77:5 90:8,13
95:20 96:4,12 99:9
95:15,20 102:6,14
116:5 145:21
146:9,10 171:9
176:8 178:2
**ruled**
200:3
**rules**
1:16
**ruling**
200:6
**run**
77:21 80:5 84:16
153:21,23
**rundown**
14:11
**running**
17:22 119:13 154:11

--------

**S**

**s**
1:19 4:9 30:12 36:8
47:17,19 70:1,23
72:9 74:23 78:5
197:13 200:16
218:13
**sai**
152:17
**sandra**
100:14,16 167:5,12
168:4 169:13
172:14 185:14,16
185:24
**sat**
41:7
**satisfaction**
214:12
**satisfied**
177:10,15,17,21
**saw**
24:5 54:24 55:3
56:24 57:12 58:3
58:24 59:7,21
66:22 82:19
123:14 149:18
153:18,19,23
154:10 155:4
167:15 173:3,5
176:14,19 177:16
178:17 207:20
208:13
**sayeth**
215:4
**saying**
41:14 51:9 60:14
81:4 89:13 90:24
99:6 131:21,24
144:21 155:19
**says**
65:20 66:14 67:4
72:15,20 73:18
75:7 87:19 88:2,14
89:11 90:1,12,14
90:22 111:12,17
113:7,8,21 114:24
118:8 119:3,16
120:7 121:3,7
122:3,6,15 125:12
129:23 130:22
131:4,13 132:12
135:12,16 139:13
139:21 140:14,16
140:19 141:24
143:2,20 144:18
151:1 152:13,24
153:14,16,24
154:10,13,14,16
155:7,10 161:5
162:3,5,15 164:16
166:19 168:1
169:17,21 171:24
192:9 196:20
199:20 210:20

211:23
**scared**
190:16
**scene**
109:13 155:20,23
156:3,19,24
**schlesinger**
197:6,9 198:6,21
199:20 200:12,21
**school**
9:14,19 10:16
**schroeder**
9:21
**scratched**
90:13
**seal**
218:9
**sec**
134:14
**second**
14:20,24 18:19 33:24
34:4,22 55:6 59:24
65:24 67:4 68:7
69:6 71:13 75:12
78:17 79:1 81:5
84:18,20 86:1,7
87:9,14 88:9,14
103:11,13 117:12
118:3,23 121:10
123:2,20 165:3
173:9,14 181:2
196:21 211:7,9
**seconds**
157:7 177:17
**section**
2:21 13:5
**security**
142:17 191:21 192:1
192:7
**see**
27:14 31:23 41:2,11
34:20 49:3 54:23
58:22 60:12 85:16
85:24 88:5 93:17
107:9 110:24
119:11 120:4
121:18,22 124:11
125:3 130:1,16
135:15,17 139:16
140:16 141:15,21
144:4 146:23
152:18 161:14,20
162:5 167:8,13
168:14 170:3
171:15 178:2
186:15 210:20
211:23 212:13
**seeing**
57:16 150:23 172:18
213:23
**seen**
60:10 82:16 161:23
164:7 186:24
208:15
**select**
90:8
**selected**
90:10
**selfexplanatory**
113:15
**selling**
87:21 140:16
**seminars**
19:3,7,8,9,14
**send**
74:22 107:6 120:11
129:21 206:21
**sent**
14:14 34:7 66:10
69:7 71:2 72:19,24
73:24 106:23
107:1 117:17
119:11 120:21
122:10 128:15

211:23
**141:20 144:2**
147:6 182:17
**sentence**
47:6,10,14 48:5
50:21 51:5 65:20
65:24 68:7 71:22
72:15,20 80:6,7
88:14 90:1 115:5
130:23 139:2
180:9 196:21
197:18
**sentenced**
128:20
**sentencing**
95:11,16 96:7,10
97:11 98:1 101:20
101:21 115:1,7,14
116:16 146:19
179:19 180:21
**separate**
16:17 60:3,11 86:21
**separately**
84:14
**september**
13:9,12
**series**
183:5
**serve**
80:3,7 81:22 106:1
**served**
48:12
**serving**
48:14,14 106:3
**set**
66:3,6,9 70:2 81:7
109:21,23 133:13
145:5,9,10 174:17
174:19 191:20
199:6 201:2 218:9
**sets**
86:21
**setting**
67:23
**setup**
90:16
**seven**
161:17
**sex**
13:17 16:23
**sexton**
7:21 39:7,22 43:5
45:11 50:11 68:16
75:23 77:10 84:21
85:6 86:5 104:15
143:14,16 147:7
188:21 192:12
194:19
**shed**
18:2
**sheet**
137:24 140:4 141:5
192:4,8,22 212:16
212:18 213:1
**sheets**
191:8 216:17
**sheriffs**
206:7
**shes**
169:3,5
**shock**
111:18
**shoot**
153:20 170:2 171:19
**shooter**
157:16 167:15
203:11 204:6
**shooters**
41:5,15 151:3,6,9
157:11 167:9,13
178:17 203:5,8,17
**shooting**
61:9,13,19 91:10 151:4
153:1,15 154:11
156:4,10,19 166:6
166:24 167:16
169:21,24 170:19

170:22 171:16
176:19,23
**shootings**
80:10 166:19 174:6
175:7
**shop**
187:19
**short**
61:2
**shorthand**
217:5
**shortly**
25:24 26:5 57:3
126:20 158:7
166:18
**shot**
153:21,22
**shots**
163:20 171:20
**show**
64:20 65:1 71:13
83:12 85:14 86:7
109:12 116:19
196:4 201:11
204:11 211:8
**showed**
28:11 94:24 117:4
176:7 177:7 183:7
**showing**
208:20
**shown**
175:13 182:8,9,11
184:1
**sic**
31:8 33:4 62:1
111:13 113:9,22
115:1,6,24 119:10
119:17 120:7,9
121:4,4,6 129:24
131:5,15 135:13
139:17,18 140:17
142:2 152:15,17
161:18 175:13
176:16,20 181:1
**side**
12:24 13:1 39:21
93:16 96:23 98:10
106:17 107:14,15
112:21 114:18
**sidetracked**
51:19
**sign**
82:1 83:7,8 108:22
**signature**
71:24 72:1 214:24
215:4 217:22
**signed**
81:17,18 146:4 147:2
147:9,12 216:18
**significance**
54:8 173:23
**significant**
33:15 169:6 172:19
177:6
**signify**
80:24
**similar**
69:20
**singer**
14:15
**single**
141:8
**sit**
109:8 119:24 150:7
177:8 199:15,17
**sitting**
112:5,11,16 143:24
144:13 154:18
213:11
**situation**
88:4 89:4
**six**
140:23 171:20
**ski**
167:19,20 169:24
170:3,18 171:19

171:21 172:9
**skip**
15:8 87:11
**skipping**
119:23
**smith**
6:19 41:23 42:2,23
46:10 59:3,5,8
80:10 82:13 103:4
172:19 179:5
207:16 209:6
212:16,19 214:13
**solicited**
59:10
**solid**
73:16
**somebody**
74:22
**someplace**
107:15
**son**
116:1,9,10,12,15
**soon**
127:23
**sorry**
13:10 15:8 22:20
55:6 62:24 92:15
112:3,12 113:10
115:11 134:13
139:14 161:6
164:15 166:8
167:19 178:7
**sort**
49:16 89:10 90:13
205:5
**sought**
47:18
**sound**
37:18 142:12
**sounds**
50:14 112:14 129:20
136:23 142:14
**south**
2:15 13:1 135:13
**space**
16:5
**spaced**
55:6
**spates**
102:7,12,13,22
**speak**
172:3
**speaking**
7:8 105:12
**special**
2:21 14:16,18 15:14
15:16,21 16:9,14
16:16,19,22 17:8
21:5,12,18
**specific**
6:13 15:17,18 17:15
18:11,20,22,24
19:13,23 20:5,7,11
36:2,18 40:17 41:1
42:18 52:1 59:16
61:10,10 90:11
99:21,22 106:21
130:21 135:4
137:24 154:24
172:11 183:12,19
184:8 187:14
209:18
**specifically**
8:10 19:18 20:2 22:3
26:20 34:23 38:15
39:9 43:7 44:1,10
44:12 45:15 52:12
54:22 58:15 63:2
63:16,22 64:7
67:13 68:6 70:8
84:23 96:24 99:16
100:20 103:6
105:12 110:11
120:1 123:6,7
124:16 125:12,15
126:8,15 129:20

130:11 132:10
133:11 136:8
141:5 143:13
148:20 149:5
150:7,12 153:11
154:4,9 174:19
180:10 184:2,17
184:19 186:12,13
187:7 189:9,12,20
189:23 191:7
192:6 199:17
200:9 212:24
**specifics**
99:21 148:4 149:15
**speedy**
32:16,19
**spellberg**
194:19
**spent**
107:4 192:5
**spoke**
28:14 66:24 90:6
100:21 101:3
168:4,9 172:6
**spoken**
6:1,5,16 7:4,10 68:2
73:1
**spot**
18:7,9,12
**spread**
29:13
**spring**
57:17 123:3
**squad**
46:16 87:20 88:5
89:2,4
**ss**
217:1
**st**
96:7,8,12,16 97:15
146:3,14
**stabbed**
179:13
**staff**
194:20
**stage**
40:11 143:5
**stainthorp**
29:4 150:22 151:13
**stamped**
212:22
**standard**
183:15
**standing**
170:1 171:17
**start**
10:24 11:4,5,9,10,12
11:13 14:22 25:12
28:23 39:4 53:5
89:12 110:17
111:3 129:22
131:17 132:15
136:14 160:7
162:2 197:1
201:17
**started**
11:6,16,19 12:1
14:13 56:23
145:14
**starting**
14:12 19:15 31:13
52:19 53:18
**starts**
54:1 118:20 160:24
**state**
1:20 5:8 8:3 12:4
34:22 35:6,15 48:9
53:22 64:9 72:17
73:19 80:8 89:8
107:5,11 110:11
127:10,19 134:1
134:19,24 144:3
154:9 168:23
169:2,3 192:16
193:9 217:1,6
**stated**

38:21 53:15 88:2
90:21 91:9
**statement**
95:9 154:2,22 155:2
162:24 169:16
170:7,17 178:5,10
**statements**
176:15
**states**
1:1,7,17 2:19,20 3:4
6:2,6,17 7:4,8,9
10:1,7,19 11:1,4
21:2 23:16 39:21
65:15 78:6 79:14
79:15 84:7 135:13
152:7,13,15
174:24 188:13,14
188:17,24 189:1
194:12,18,20
195:8 198:14
205:6,16,17,21
206:9 214:8,9,14
216:1
**status**
30:17 31:4 32:7
**stay**
29:9 36:14 54:3,6
191:21
**stayed**
48:11 111:22
**staying**
92:14,18 93:3,11,13
**stenographically**
217:16
**stephen**
1:9,10 2:20
**stolen**
17:2
**stones**
147:10
**stood**
153:22
**stop**
173:8
**stopped**
156:4
**story**
101:9
**straight**
113:2 137:19
**street**
6:18 7:6 9:7,8 13:15
13:23 22:8,24
24:20 55:5 87:23
102:22 148:18
153:16,17 154:17
156:14,20 169:22
169:23 171:12
177:16 201:6,13
201:22,24 202:5,8
202:18 206:6
208:1,4 209:1
**streets**
142:4 143:3 157:3
**strike**
86:22 103:23
**struck**
24:6
**stuff**
180:7 205:10
**subject**
213:7,7
**submitted**
166:19 213:6,8
216:17
**submitting**
46:17
**subpoena**
184:17
**subpoenaed**
205:10
**subpoenaing**
197:11
**subpoenas**
31:3,5,15 32:6
182:17

**subscribe**
216:14
**subscribed**
216:20
**substantively**
200:18
**suburban**
23:23
**suburbs**
90:14
**sue**
92:22
**sufficient**
177:18
**suit**
218:6
**suite**
1:21 2:5,10,15 217:9
**summer**
123:2,3,21 141:11
**sumner**
33:6 62:19 63:3
176:11,15,18
177:1
**sumners**
33:3 181:1
**supervise**
24:4
**supervising**
23:16
**supervision**
20:23 21:19,23 22:9
22:10,17 23:15,17
23:19,22,24 24:3
24:11 25:18 79:12
135:19,22
**supervisors**
23:21 77:21 79:5,8
79:14,21
**supervisory**
23:1
**supp**
158:3 161:13 164:6
166:16 172:20
173:21 211:19
**supplemental**
202:12 209:23
**supplementary**
160:1
**supplements**
185:2
**support**
11:14
**suppose**
196:5
**supposed**
119:7
**supreme**
26:4 180:2
**sur**
157:11,13 170:12,12
171:4,8 178:1,19
203:3,8 204:6,16
**sure**
6:11 10:13 14:3 28:7
29:8 32:4 48:15
53:4,7 58:19 61:14
62:4,11,20 63:5
78:23 90:22 93:16
98:1 100:8 106:10
106:10 110:12
117:22 122:19
127:5 124:5 127:1
127:14 132:16
136:4 138:20,22
139:2 145:5,19
149:4 150:2,9,10
159:7 163:4,15
165:23 166:13
176:9 177:20
180:14 182:13
188:20 189:13
191:12 192:11,14
201:19 205:17
210:3 212:24
**surprise**

94:3
**swano**
52:15 53:1 55:5 56:8
56:12 58:4,6,16
62:3 197:2,11,14
197:22 198:9
199:3,11,13,15,17
199:20,21 200:2,5
200:8,12
**swanos**
58:19 196:16,22
**sworn**
5:2,5 216:20 217:13
**system**
127:20 168:6

-----

**T**

**t**
1:19 3:5 4:9 217:4
218:13
**tailor**
54:3
**take**
5:19 26:15 27:11
36:7 45:6,20,22,24
46:20 53:6,9 77:10
87:9 88:13 89:19
105:15 106:10
116:2,24 129:16
136:2 147:16
159:5 195:21,22
200:15 201:18
202:2 211:15
**taken**
1:18 5:11,14 61:15
135:18 148:8
**takes**
193:15
**talk**
14:5 38:15 39:19
40:13 43:11,22,23
44:2 49:14 60:18
67:6 68:9,24 69:5
69:9 73:13 74:7
75:14 77:7 79:3,6
79:12 88:23 93:10
94:6,14 100:12,16
102:15,23 103:21
105:2,22,23
143:11 168:11,20
170:14 182:21
184:14 186:4
187:19,20 189:15
190:3 199:7
200:21 202:23
**talked**
6:11 7:21 27:13,15
28:5 29:6,7 40:11
44:17,22 46:1 47:4
56:13 66:1,15
67:11,16 69:10
73:16 75:23 76:5
76:10,12,13 77:1
79:2,4,4 81:8
92:14,18 93:12
94:2,22 95:6 97:22
98:2,14 100:18
101:6 103:13
105:4,18 106:15
107:11 112:21,23
113:4,6 123:14
126:6 128:14,17
130:18 132:2,8
133:22 147:2,5
153:10 168:6,8
175:8,9 176:20
177:4,13,23
182:17,19 183:6
184:13,15 187:2
189:9,18 191:8,17
192:6 193:15
197:8 206:23
209:8 213:18
**talking**
44:13 54:16 55:12
58:6 59:22 61:14
61:16 62:11,13

67:2 74:4 87:23
88:5 100:15
200:10 103:1
104:23 105:14
112:9 124:17
130:22 131:1,8
132:10,13 133:18
134:22 137:21
139:13,22 140:6
140:20 141:13,14
146:1 160:16
173:17 179:11,15
179:16 200:9
**talks**
63:2 119:21,23
130:15 140:10
141:10
**talman**
46:9 59:8 91:12
153:20 179:5
**taped**
56:1
**tapes**
56:3
**targeted**
64:6
**task**
174:10,14 183:2
**taught**
19:8 20:4,9
**teach**
20:7
**technique**
19:21
**teenager**
163:10,11
**telephone**
88:3
**tell**
9:13 11:3 17:24 20:1
20:2 25:14,22 36:8
36:9,9 37:21 38:20
39:8,14,20 40:1
42:13,14 43:4 46:4
46:11 49:1 53:4
56:9 59:17 60:7
62:7 63:21 70:6
73:22 75:19 76:22
78:22,24 83:14,18
84:18 86:3,17 93:5
94:11 98:6,17 99:1
99:21 102:18
103:18 105:3
106:4,19 113:9
116:8 118:23
121:5 123:13
129:14 142:10
142:17 149:16
153:11 163:3
164:21 170:9,16
170:22 171:2
177:9 178:4 179:7
180:10,13 182:23
184:2 185:19,22
186:13 187:2
189:9,18 191:8,17
192:6 193:15
197:8 206:23
209:8 213:18
**telling**
97:11 114:9,18
115:15 131:13
151:10 154:23
189:18 190:24
204:4
**tells**
109:5
**ten**
15:9 19:20 21:14
**tendered**
64:23 71:16 83:16
85:19 86:11
110:22 117:1
121:16 129:13
134:11 150:19
151:22 159:21

160:10 165:7
196:10 207:19
210:1 211:18
212:17 213:3,20
tentative
38:13 73:15
term
7:8 32:9,12 167:14
201:21
terms
6:14 23:1 46:17
88:10 175:20
179:8
tes
73:22
testified
5:5 36:1 41:9,19,22
42:14,19 70:12,13
70:20 78:12 83:3
95:14,21 96:9
97:10,24 98:1
104:4 113:16
114:3 116:16
128:13 134:6
145:9 149:14
156:13 157:6
199:24 201:3
203:7,8,13,16
testify
34:21 35:8 36:2
38:16 40:3,20
42:10 47:12 50:20
51:1,13 62:23
72:17 73:5,19 74:3
74:3 79:7 80:22
94:18 103:22
105:6,21 109:14
113:11,17,17,23
114:6,11,19,22
131:3 192:15
197:12 199:21
201:2 217:13
testifying
62:20 63:3 99:19
119:20 131:10
197:2
testimonies
105:9 203:20
testimony
32:22 41:9,16 42:1,5
42:11,15 44:9,15
50:15,18 61:16
72:23 73:9 83:5
94:17 95:10 96:6
97:3,14 103:22
110:6 111:7 114:6
114:19 115:2,7,15
126:1 141:6
146:18 147:3
151:3,14 156:6,6,9
156:11 177:11,15
196:22 199:22,24
200:19,23 217:15
217:20 218:8
thank
212:20 215:2
thanks
84:11
thats
18:7 21:24 22:13,16
31:16,21 35:18,22
38:19 40:10 43:3
48:16 51:17 54:12
54:14 62:23 63:23
68:12 72:1 74:7
81:11 83:6 88:18
89:5,19 91:14 96:9
103:14 104:10
106:12 108:11
109:5 112:15
113:14 115:22
117:5,10,10,15
118:4,6 119:2,20
120:15 122:12
125:1 132:19
135:14 137:17

139:3,23 140:10
140:12 141:1,12
141:21 143:19
144:11,14 145:3
148:24 149:21
150:13 151:24
154:13 155:10
162:13 165:9
166:15 168:1
169:20 171:5,7
174:12 178:1
179:21 181:14
184:4 192:3
194:15,16 195:7
196:7,17 209:16
212:2,22 213:19
213:22 214:23
215:1
thereof
218:7
theres
16:22,23,23,24,24
17:1,1 18:12,22
23:18 53:21 71:6
78:13 84:3 86:20
102:18,21 108:15
108:16,21 111:5,6
140:24 164:15,16
192:4,9 211:24
212:13,21 213:1
theyre
13:17 18:14,14
159:14 186:24
theyve
206:7
thing
6:10 25:14,16 27:8,9
29:11 30:4,14,24
32:5,18 54:8 76:14
97:20 113:5
119:10 212:24
things
20:9 53:23,23 124:15
139:17 141:24
157:23 199:18
think
9:6 10:13 11:2 13:9
17:4 19:10 20:9
25:9 26:3,8 29:4
29:19 31:9 33:23
39:3 41:21 45:1
48:15,16 49:6
51:19 52:24 53:3
53:19 54:5 55:2,9
57:14,16 58:18
59:20 60:10 63:23
68:23 69:5,7 78:18
80:20 87:2 91:18
93:13,16 94:2 96:8
96:13,24 98:1,9
100:7 101:11
106:18 109:23
110:10,18 113:3,6
116:18,21 117:21
120:20 124:12,14
125:2 126:23
127:14 128:15,22
133:9 134:20
138:1,19 139:19
142:2,24 145:9
147:6 150:3
162:14 163:11,12
163:14 164:8
165:15 168:2,6,11
168:19 172:5
173:20 176:7
179:13,17 180:7
182:17 184:6
186:3 189:21
193:21 194:15
198:16 200:1
201:4 204:22
206:2 210:3
212:23 213:16,22
214:1 215:1
thinking

55:1 68:22 115:18
119:17 127:1
third
14:22 18:19 88:1
89:10 103:16,18
103:19,24 104:4
129:23 159:16
thomas
1:9 68:17,20
thought
109:14 119:4 130:23
135:23 138:10
163:4 173:17
threatened
96:11 97:8 99:11,13
115:23 116:1,6
133:3 146:10
147:11 148:23
149:6,7,8 150:6
threats
96:18 97:16,20 98:4
99:17 100:1,5
101:9,10,13 102:6
146:14,21
three
6:10,10 10:21 11:8
13:6 14:23 33:7
41:24 42:3,3 53:2
53:3 60:11 74:19
74:20 75:14 78:10
78:12,12 90:13,16
103:10 105:1
140:23 159:24
172:20 175:10
threetime
138:8
threeway
88:23
throat
14:5
time
5:19 6:8,22 8:24
12:24 13:6 18:16
24:16,18,20 28:13
30:17 32:10 33:20
36:16 38:8 40:5
41:19 42:16 43:19
44:6,22 48:12,13
48:14 52:17 56:2
60:23 63:10 64:2
66:12,23 67:1,16
67:18 68:24 69:6
69:10 70:11 73:23
74:21 75:1,2 79:16
81:5,22 82:19 84:9
88:12,12 89:7
92:16 93:12 95:15
95:17 96:6 97:18
97:21 101:20
105:24 106:2,24
107:4,14 109:4
112:23 113:4
114:3,17 116:15
124:3 127:11
128:18 133:11,14
134:21,22 136:20
137:15 138:17,18
138:22 139:19
142:2 143:12
145:7 146:12
147:7 154:19
155:18 156:2
163:9 166:5 172:4
187:3,12,15,18,21
187:23 188:19
189:19 192:17
194:18 197:24
198:5 204:4
207:20,24 208:13
214:20 216:13
timeline
35:5 177:8
times
41:10,19,22 50:5
74:19 77:2 95:6

107:1,18,21
108:19 109:15,21
129:8 132:21
144:18 179:14
184:15 188:3
191:14,19 206:15
titled
151:24
today
7:10 64:8,12 73:9
119:24
told
6:12 28:9 29:8 40:2
41:4 44:1 46:5,12
50:15,21 51:2
62:15 84:23 88:12
88:18 89:18,20
90:2,4,9,17 91:14
94:14,16,18 95:18
96:5,10,14,17 97:7
97:10,15 99:2
100:19 103:1
104:1 105:5,10
106:5 112:1 114:5
116:5 125:24
126:2 127:2
128:22 129:24
130:15 146:1,7,12
146:13,13 147:15
149:12,13,20
151:1,2,8,13
155:17 170:11,24
170:24 171:7,11
174:18 176:19,21
178:1 183:1 184:4
190:18 191:2
197:10 203:1,2
204:10
top
88:1 111:5 118:1
122:2 142:6 161:4
161:6 191:16
213:11
topic
36:13
total
78:14 208:14
touch
120:10
towit
217:7
town
93:15
track
100:8 168:16
tracked
92:16 93:12 95:15
95:17 96:6 97:18
traffic
11:12
training
17:10,15 18:20,23
19:1,5,11,13,23
20:5,11 23:7
trainings
19:20
tran
102:18
transcript
33:14 55:8 102:19,21
103:3 216:12,14
217:20
transcription
217:19
transcripts
41:8 52:14 54:24
55:3,17 56:4,19,24
57:12,16 58:23,24
59:1,7,18,21 60:10
61:21 63:2 94:20
102:17 104:6,10
104:18,21 105:11
transferred
14:16,18 16:14 17:7
22:8 119:5
transfers
22:4,24

travel
192:14
trial
1:11 13:13 14:19
16:18 18:18,22
19:9,21,21 23:2
25:6 26:4 29:6
32:16,19,24 44:9
44:16 50:24 56:20
57:1,3,3,5,10,15
57:18,19 59:9
60:24 61:1,2,3,7
63:4 78:13 81:15
94:17,19 95:11,15
98:2 103:20,22
109:14,19,22,24
110:1,3,3 111:7
113:24 114:7,11
114:20 117:23
125:13 127:13
128:19 133:12,14
133:18,18 138:15
140:14 141:2,11
144:16 146:19
152:16 156:5,6,9
156:11 157:6,20
168:21 177:10
179:18 188:18
189:22 196:22
197:3,12 199:6
200:1
trials
18:1 23:3 25:8,11
42:21
tried
17:14 18:21 24:20,24
25:10 27:16 32:14
34:18 47:20 100:8
100:10 102:15
153:21 165:14
172:4 186:4
trouble
133:13
troubles
125:23
true
97:11 144:11 171:1
216:14 217:19
trust
62:3
trustee
20:1 70:6 147:21
163:3 180:13
217:14,14,14
truthfully
51:1
try
7:1 16:6 23:24 24:15
51:5,9 93:8 182:13
198:15 200:2
trying
22:23 23:12 30:10
69:7 102:23
113:22 131:21
168:16 201:12
203:21 213:10
turned
30:20
turning
171:15
two
7:3,20 9:20 23:20
37:8 39:20 47:10
80:2,9 85:13 86:20
95:17 101:6 104:2
123:14,16 140:23
146:7 147:10,15
148:2 153:18
159:11 161:13
164:16 167:15,17
171:18 173:21
180:23 186:10
188:6 191:16
203:20 204:13,18
twothou
26:1

twothousand
141:10
type
49:19 61:12 113:5
typewriting
217:18

U

u
30:12 36:8 47:17,19
70:1,23 72:9 74:23
78:5 197:13
200:16
unhum
13:3 72:2 108:4
114:1 116:3 120:6
122:14 123:19
131:7 135:7
136:13,19 143:22
152:19 161:21
180:3
uncooperative
98:5 99:3 100:2
165:19
undated
78:4 141:13
understand
5:18 27:4 62:24
104:22 119:13
170:15 193:3
209:10,16
understanding
50:23 51:11 56:22
58:8 60:16 63:9
64:1 91:9 113:19
115:3,5,10 119:18
113:3 166:4
169:19 174:4,12
175:3 178:20
180:17,20 182:7
198:7 202:24
209:14
understood
62:21 194:6,8
undetermined
217:11
unit
16:10,15,16,20 19:2
25:19 68:17 108:9
108:13
united
1:1,17 65:15 216:1
units
17:4 18:5
unrelated
9:7 206:17
unsuccessful
100:11
upcoming
196:22
update
77:5
updates
61:17 143:7
uped
139:18 142:1
use
33:13 34:22 46:2,23
47:5 51:17 69:1,5
73:12 75:13
201:21
uses
207:1
usually
147:22 189:8

V

v
82:7
vacant
156:16
vague
63:24 201:22
vaguely
181:5
various

19:3 56:17 214:9
**vaughn**
59:5 62:1 178:22
179:12 180:4
181:16 186:7,8
**vehicles**
17:2
**vickie**
71:1
**victim**
212:19
**victims**
170:1,19 171:17,18
**view**
163:23 186:1 195:12
**viewed**
59:2 163:2 166:12
185:6 186:16
**viewing**
214:21
**violence**
12:7 80:3,9
**visit**
38:7 49:24 65:21
67:19,23 68:19,24
69:21,23 70:2 71:5
73:3 74:18 75:4,17
75:20 77:5 84:19
84:20 94:3,12
96:20,22 97:14
104:10,14,19,24
105:3 110:9
147:19,23 153:9
191:9
**visited**
38:8 66:11 67:17
69:6 74:19,20,21
75:6 110:7,10
130:5,7 147:22
**visiting**
44:6 68:15 107:13
130:11
**voice**
171:13
**volunteered**
25:21 26:15 27:11
126:19 180:1
**vs**
1:5 216:6

**W**

**wacker**
2:15
**wait**
64:8 119:17 208:5
**want**
5:19 7:14 8:11,17
15:8 19:22 43:10
53:15 54:4,13
64:20 78:20 85:24
90:2 99:12,14
100:19 106:10
114:22 134:13
136:2 138:22
159:5 169:1
170:14,17 171:4
178:18 187:20
189:24 190:2
191:11,17 192:6
193:1 199:7
207:13 213:4,13
214:2
**wanted**
32:3 38:14 40:10,17
42:17 43:10,23
44:2 47:6 62:20
63:5 69:5 75:1,1
79:3 94:14 104:21
105:13 113:15
120:9 121:4
150:14 164:15,16
168:11 190:20
199:17
**wants**
140:7 143:20
**warehouse**

27:13 205:14,15,22
206:1,5,6,10
**warehouses**
206:24 207:11
**washington**
67:21 69:18 74:24
**wasnt**
12:11 13:16 23:10
26:6 30:12 34:15
44:12 47:2 49:16
50:19 98:3,7
100:15 111:18
112:24 113:3
114:14 132:1
140:16 168:20
177:5 180:18
181:18,24 185:24
186:5 205:17
**waste**
138:22
**watched**
156:4
**watching**
89:12 156:2
**water**
14:4 106:9 145:18
**watts**
161:18
**way**
47:14 61:7 88:8
89:10 95:14,21
96:9 107:5 111:13
113:24 114:11
115:19 117:3,13
118:21 141:7
145:4 153:2,24
154:9 156:3
178:21 180:8
204:19 208:19
209:8 218:5,6
**wearing**
154:19 155:21
167:18,20,24
171:21
**week**
142:5
**weeks**
9:20
**went**
13:22 14:14 17:8
18:4,7,16 19:2
21:5 29:12 38:2,7
40:11,13 41:2,11
41:19 44:12 46:6
49:3 56:24 69:6
74:7,20 75:22
76:17,20 79:6,8
81:8 83:2 84:20
90:22 91:1 92:14
92:18 93:10,17
94:16,18,21
103:20 105:7,11
107:10 117:23
124:12 128:19
134:1 135:2
137:22 138:1,5
144:2,14,16 147:1
147:19 177:2
179:18 187:18
189:7,14 190:11
197:4
**west**
1:21 2:5,10 93:16
96:23 98:10
106:17 107:14,15
112:21 114:18
217:8
**westbound**
154:17
**weve**
126:22 141:9 192:5
**wharrie**
1:7 2:24 3:8
**whats**
30:4,14,24 32:5,5,18
95:3 169:4 175:5

176:17 182:6
207:14
**whereof**
218:8
**whew**
84:8
**whichever**
144:2
**white**
59:5 167:5,8,21
178:22 179:12
180:4 181:16
186:7,8
**william**
52:15,24 55:5 56:8
56:12 58:6 68:17
68:20 70:23 72:6
196:15 197:2,11
197:13
**williams**
161:8
**willie**
161:18,19
**willing**
18:14 25:19 39:17
40:1 42:16
**willis**
165:5,12 166:5,11
185:14,20
**window**
163:20
**winnebago**
10:1
**wire**
55:2,9 56:15,22
58:20 60:13
102:17 104:20
**wired**
60:17
**wires**
52:14,22,24 53:2
56:7,17 57:2 60:11
63:16 105:12,19
**wiretap**
52:2 54:19 56:5,6
57:22 60:22
**wiretaps**
44:7 52:19,21 54:17
58:3,9,11 60:5
**wisconsin**
100:19 168:5,18
169:9,9
**witness**
4:3 5:1,4 6:22 7:20
9:5 32:23 35:6,15
45:8 46:3,23 47:6
49:21 50:24 51:18
64:23 65:4,22 69:2
69:14 71:16,19
80:6 83:16 85:19
86:11 87:2 106:8
106:12 108:15,24
110:22 111:1
117:1 118:15
121:16 122:20
129:13,17 134:11
136:5 144:20
145:18,20 149:10
150:19 151:22
152:18 159:21
160:10,21 161:7
164:3,24 165:7,22
168:22 169:2,4,5,8
172:23 176:5
178:12 181:21,23
183:19 187:11
193:22 194:17
195:3,8,14 196:2
196:10 198:8
201:17,23 204:22
207:6,19 208:4,7
208:10 210:9
211:18 212:15
213:15,22 216:11
217:10,16,17,21
217:23

**witnesses**
44:7 61:16 93:8
102:14,16 161:1
161:13 180:23
183:6,7 185:6,13
186:14,16
**wondering**
131:16 134:16
**wont**
84:10 143:18
**words**
99:10,15 102:24
184:4
**work**
8:5,6 9:4 10:19 11:24
12:16 13:7 14:19
23:2 24:2 34:14
48:10 53:16,17
174:22 193:20
**worked**
9:20,23 11:23 12:6,7
13:5,17 46:17
47:21 78:16 79:1
81:4 142:5 175:1
**working**
9:2 23:2 30:8 143:3
202:11,17 205:2
**works**
11:3 15:21 22:17
**worried**
95:21
**worry**
114:24 115:4,6,12,15
115:19
**wouldnt**
99:21 114:22 120:21
155:14 206:20
**writ**
30:6,10,15 51:12
112:14,17 147:23
168:21,24
**write**
69:22 111:19,21
119:4,7 120:11
121:4 128:5
155:16 187:4,6
205:3
**writeout**
119:13
**writes**
136:20 200:22
**writing**
74:10 80:24 111:19
119:12 122:16
125:1,4 139:14
144:6
**writted**
33:23 50:24 128:24
129:5,9 147:22
**written**
65:12,14 69:19 71:7
71:10 72:6 74:12
80:18 81:1 87:4
137:11 146:5
**wrong**
137:16
**wrote**
65:8 70:7 127:18

**X**

**x**
4:1,9

**Y**

**yeah**
7:18 11:17 29:19
34:16 52:17 57:18
78:18 91:1 95:12
96:2 107:4,16
113:20 114:8
115:9 116:7
117:11,15 118:19
121:9 122:13
123:23 125:6,8,11
128:13 131:19

133:20 134:4,15
135:10,24 140:18
142:20 152:6
155:6 156:17
158:19 159:15
161:3 164:12
173:13 177:13
196:5 208:21
210:8,14 211:21
211:24 212:11
**year**
10:14,15 15:5 25:22
36:18 71:6,6
104:12 127:15
133:10 139:6,6
177:19
**years**
6:10,10 7:3,20 10:21
21:14 33:17 37:8
48:15 80:3,5 112:2
112:2,2 127:12,12
138:19 139:1,9
162:4 206:24
**yesterday**
111:21
**youll**
54:9
**young**
116:13,14 163:11
186:11
**younger**
163:8
**youre**
7:7,24 12:21 15:1,16
15:17,18 22:9
23:11,15,18 37:12
53:18,19,21 55:12
57:4 60:14 64:16
71:18 81:4 83:14
118:24 126:7
133:18 144:21
150:10 159:6
160:16 165:9,23
193:18,19 206:19
**youth**
95:16
**youve**
5:14 7:21 19:5,14
161:22 209:3
213:6

**Z**

**0**

**00cr**
137:11

**1**

**1**
4:10 31:8 113:8
159:2,3,12,17,18
160:3,4,8,9,13,15
160:17 211:15,17
216:13
**10**
1:5,23 2:15 41:21
216:6
**100**
4:16 129:12 134:9
135:9,10 140:10
141:12
**101**
4:16 134:10 136:2,2
141:18,18
**102**
4:17 150:17,18
**103**
4:17 151:21 152:1
**104**
4:18 159:19,20 160:5
166:14
**105**
4:18 196:7,9
**11**

41:21 125:1
**10**
4:14
**1168**
1:5 216:6
**117**
4:15
**11th**
12:4 72:3 75:16
121:18 125:13
140:15
**12**
25:4 112:2 127:12
138:19 139:1
**121**
4:15
**129**
4:16
**13**
108:11
**134**
4:16
**13th**
12:7 109:16 123:9
129:5,9
**150**
4:17
**151**
4:17
**159**
4:18
**160**
4:10
**165**
4:11
**1650**
1:21 2:5,10 217:9
**17th**
87:1
**18th**
152:9
**196**
4:18
**1981**
9:17
**1982**
10:2,13
**1984**
57:22 87:19 88:2
153:15 158:10
160:2 166:15,20
172:18 173:1,18
210:1
**1985**
11:2 12:11 57:5 64:2
173:16 174:5
182:6
**1986**
12:12,13 57:10 60:23
64:16 97:21
101:20 146:17
**1991**
15:15 21:8
**1992**
21:8
**1998**
26:2 117:9
**1999**
26:2

**2**

**2**
87:16 120:5 140:22
143:19 164:15
167:23
**20**
184:7
**2000**
37:11,18 121:18,21
122:3 123:3
127:15 137:13
141:2,11 145:6
151:1 152:9

196:16 198:3
**2001**
  21:15 38:3,4,5
    135:21,24
**2002**
  21:15 24:13 72:4
    75:16 78:2 87:1
    135:23,24
**2004**
  136:18 138:24
    141:19,22 143:20
    144:7,13 145:6
**2009**
  8:8,14 52:16 55:20
    134:6 209:20
**2010**
  52:16
**2012**
  20:20 24:13 104:13
**2013**
  1:24 216:13 217:8
    218:10
**207**
  4:11
**20s**
  167:18,19,23
**214**
  4:6
**218**
  216:13
**21st**
  20:20 196:16
**22nd**
  1:23 216:13 217:7
**23**
  151:1
**2300**
  2:15
**24th**
  206:5
**25**
  1:23 8:14
**25th**
  8:8
**2650**
  135:13
**26th**
  13:14,18,22 22:7,24
    24:20 36:22
**27th**
  117:9
**28**
  4:11 12:1 159:3,12
    160:4 165:4,6
**28th**
  153:15 166:22
    169:18 209:24

---
**3**
---
**3**
  4:11 207:15,18
    208:21,22 212:2,3
**30**
  112:1 157:3 212:1
**30th**
  166:20
**312**
  2:6,11,16,23 3:7
**39th**
  87:22 153:16 154:17
    169:23 171:18
**3rd**
  136:18 141:22

---
**4**
---
**4**
  112:2
**42**
  80:3

---
**5**
---
**5**
  4:5
**50**
  157:4

**500**
  2:22 3:6
**53**
  1:21 2:5,10 217:8
**55**
  48:15,19,22
**5th**
  71:5 121:21 122:3

---
**6**
---
**6**
  142:5 160:24 161:2
**60**
  59:21 157:4,4
**6035365**
  3:7
**6035440**
  2:23
**60602**
  2:22 3:7
**60604**
  2:6,11
**60606**
  2:16
**60608**
  122:13
**64**
  4:12
**66**
  13:5,17

---
**7**
---
**7**
  125:1
**705**
  169:22
**706**
  87:22 153:1,15
    171:17
**71**
  4:12

---
**8**
---
**83**
  4:13
**84**
  80:5
**85**
  4:13 57:13
**86**
  4:14 57:6,7,8,13,17
    64:2 101:21,22,23
**87**
  13:10,10,11,12 84:8
**870**
  125:4
**8761700**
  2:16
**88**
  15:8,8,10 84:8
**89**
  84:8

---
**9**
---
**9**
  162:4
**90s**
  45:14
**91**
  17:7
**92**
  4:12 15:15 17:7
    64:21,22
**93**
  4:12 71:15
**94**
  4:13 78:20 83:13,15
**95**
  4:13 85:18
**96**
  4:14 86:9,10 87:13
    87:14
**97**
  4:14 13:10 110:20,21
    110:23 117:5,6

**98**
  4:15 15:6,7 26:3,19
    26:24 37:16
    116:23,24 117:16
    118:4,16 123:2,18
    123:21
**9861984**
  2:6
**9861985**
  2:11
**99**
  4:15 121:14,15
    122:21 140:12,12
    140:13,15,21
    141:10