<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3

 4   NATHSON E. FIELDS,              )
                                     )
 5                   Plaintiff,      )   Docket No. 10 C 1168
                                     )
 6            vs.                    )
                                     )
 7   CITY OF CHICAGO, et al.,        )   Chicago, Illinois
                                     )   March 6, 2014
 8                   Defendants.     )   3:35 p.m.

 9                         TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12

13   For the Plaintiff:     LAW OFFICES OF H. CANDACE GORMAN
                             BY:  MS. H. CANDACE GORMAN
14                           220 South Halsted Street
                             Suite 200
15                           Chicago, Illinois  60661

16

17                          LEN GOODMAN LAW OFFICE, LLC
                            BY:  MR. LEONARD C. GOODMAN
                                 MS. MELISSA A. MATUZAK
18                          Suite 1650
                            53 West Jackson Boulevard
19                          Chicago, Illinois  60604

20

21

22   For the Defendant:     DYKEMA GOSSETT PLLC
                            BY:  MR. TERRENCE M. BURNS
23                               MR. DANIEL M. NOLAND
                                 MR. PAUL A. MICHALIK
24                          10 South Wacker Drive
                            Suite 2300
25                          Chicago, Illinois  60606
</pre>

1                    LAURA M. BRENNAN - Official Court Reporter
2                    219 South Dearborn Street - Room 2102
                            Chicago, Illinois  60604
3                           (312) 435-5785

1    (The following proceedings were had in open court:)

2         THE COURT:  10 C 1168, Fields v. City of Chicago.

3    Can I get the lawyers' appearances for the record, please?

4         MS. GORMAN:  Candace Gorman for Mr. Fields.

5         THE COURT:  Just one person can say everybody's name.

6    That's fine.

7         MR. NOLAND:  Did you want --

8         THE COURT:  One person can say everybody's name.

9         MS. GORMAN:  And Melissa Matuzak for Mr. Fields, and

10   Len Goodman.

11        THE COURT:  I thought you were going to check the

12   names.

13        MR. NOLAND:  Good afternoon, your Honor; Dan Noland,

14   Paul Michalik and Terry Burns for the City defendants.

15        THE COURT:  Okay.  So we're going to start with the

16   defendants' motions in limine because they concern the

17   plaintiff's case.  I know there is some overlap.  I get that.

18        So the first motion has to do with the translated

19   transcripts of the wiretaps.  So the first issue I want to

20   talk about there is the hearsay issue which isn't addressed in

21   the motion.  It's raised in the reply.  I mean, you're

22   offering the transcripts for the truth of what's said on them.

23        So I want to know how you get past the hearsay

24   objection.  I assume it's a coconspirator declaration issue.

25        MR. NOLAND:  Your Honor, under 801(d)(2)(E),

1    statements made by coconspirator during the course of and in
2    furtherance of the conspiracy.
3         THE COURT:  So normally the way that gets decided,
4    and the best -- this issue comes up most commonly in criminal
5    cases -- the judge has to make a preliminary ruling by a
6    preponderance of the evidence whether, A, there is a
7    conspiracy; B, that the defendant, or the plaintiff in this
8    case, was a member of the conspiracy at the relevant time and
9    the statements are in furtherance of the conspiracy.
10         So how do you propose to prove those things?
11         MR. NOLAND:  First of all, plaintiff has admitted an
12    officer, a high ranking member of the El Rukns.
13         Secondly --
14         THE COURT:  Just because he's a member of the El
15    Rukns does not make him a member of the conspiracy that you're
16    talking about here, which is a conspiracy to bribe Judge
17    Maloney.  That is the basis on which --
18         MR. NOLAND:  Yes.
19         THE COURT:  That's what these transcripts concern.
20         MR. NOLAND:  Mr. Fields, it's our allegation, was the
21    hit man on this particular case.  At the trial the El Rukns
22    gave $10,000 on behalf of both Fields and Hawkins to acquit
23    them.
24         THE COURT:  So it's late in the afternoon.  We have
25    limited time, and you have given me a couple of truckloads of

1    material here.  So I'm going to ask my question again.  I

2    don't want your conclusion.  I know what your conclusion is.

3    I want to know what the evidence is that you have to establish

4    it.

5              MR. NOLAND:  Mr. Hawkins testified Fields knew.  The

6    transcripts stated that Hoom or Zoom has put Hukm, who is

7    Fields, in tune with the star situation.  That's the bribe.

8              THE COURT:  The person who is saying that on the

9    transcript is Mr. Hawkins?

10             MR. NOLAND:  It is Alan Knox --

11             THE COURT:  Mr. Knox.

12             MR. NOLAND:  -- who is one of the highest ranking

13    members speaking with Jeff Fort, who asks:  What about Hukm?

14             Jeff Fort is on the transcripts specifically ordering

15    his men to pass a note to Nathson Fields letting him know

16    about the bribe.

17             There is a statement on the transcripts stating the

18    brothers from Medina, who are two El Rukns from Milwaukee, put

19    Nathson Fields in tune with the --

20             THE COURT:  Back up on that one again.  Give it to me

21    again, about the brothers from Medina.

22             MR. NOLAND:  There is a statement on the transcripts,

23    I believe it's Alan Knox, stating Nathson Fields -- the

24    brothers from Medina who are -- Medina is Milwaukee in El Rukn

25    parlance -- have put Nathson Fields in tune with the star

1   situation, or in tune with --

2       THE COURT:  They have told him about it, in other

3   words.

4       MR. NOLAND:  They have told him about it.

5       The transcripts --

6       THE COURT:  Is there any indication, at least as you

7   read them, of who the brothers from Medina are?

8       MR. NOLAND:  Roger Bowman and Louis Lomas.

9       THE COURT:  Bowman and?

10      MR. NOLAND:  Louis Lomas, L-o-m-a-s.

11      THE COURT:  Okay.  What else?  I'm not saying there

12  has to be more, but I'm just asking.  I want sort of the

13  complete catalog.

14      MR. NOLAND:  I started out with the statement that he

15  is a high ranking member of the El Rukns, and the nature of

16  the organization is such that it was being done for his

17  benefit which --

18      There's several lines on the transcripts where Jeff

19  Fort says:  This is for all of them.  Everybody must be set

20  free or else I get my money back.  And so it's for his benefit

21  as well.

22      It is also that in January he says he didn't know

23  about it.  Corroboration that he did know and was involved and

24  didn't reveal it and was part of the cover-up, in January 1990

25  he wrote to Bill Swano asking Swano.

1           THE COURT:  Who is he?

2           MR. NOLAND:  Nathson Fields wrote to Bill Swano

3   asking Swano to visit him at Menard.  Swano visited him at

4   Menard.

5           THE COURT:  That is years after the conspiracy.

6           MR. NOLAND:  That is four years later.

7           THE COURT:  Yeah.  So what did he allegedly say at

8   that time?  He asks Swano to come visit him at Menard?

9           MR. NOLAND:  Swano asked Hawkins what he knew -- I'm

10  sorry.  Swano asked Fields and brought up the bribe.  Hey, did

11  you see --

12          THE COURT:  How are you going to get this in?  Is

13  Mr. Swano going to come testify?

14          MR. NOLAND:  Nathson Fields admits it.

15          THE COURT:  Where does he admit it?

16          MR. NOLAND:  In his deposition.

17          THE COURT:  I'm not disagreeing with you.

18          MR. NOLAND:  In his deposition.

19          THE COURT:  In his deposition Mr. Fields says what?

20          MR. NOLAND:  He says that Swano came down, brought up

21  a bribe:  Did you see me pass any money to the judge?

22          Mr. Fields says:  No, I didn't.  Fields then does not

23  bring that to anybody's attention, his attorney, at his

24  postconviction, and instead he waits until after, after

25  Maloney is indicted and is public knowledge.  And then our

1   contention is he is then safe to rely upon the bribe.

2          THE COURT:  Okay.  Anything else, or have you given

3   me a complete list?

4          MR. NOLAND:  Hawkins has testified as well that

5   Fields was present with him in the lockup when Bill Swano

6   talked to them about the bribe, which I mentioned earlier that

7   Hawkins told him about it, but Hawkins also said that they

8   were all together talking about it.

9          And Mr. Fields has admitted that Judge Maloney was a

10  prosecution-minded judge, that he wanted to have a jury trial,

11  and he ultimately waived his right to a jury at about noon on

12  June the 17th, the start of the trial, when, at the very same

13  time, Swano was picking up the money at the Fort or was at the

14  Fort trying to arrange to get the money.  Fields and Hawkins

15  were waiting to waive the jury until the money came through

16  from the El Rukns to Swano.  The timing of it also suggests

17  strongly that Fields was aware of the bribe.

18         And then, finally, there was a finding two days ago

19  by Judge Biebel that Fields was complicit in the bribe.

20         THE COURT:  Yes, I saw that.  I mean, I'm assuming

21  you are familiar with the fact that the Illinois Supreme Court

22  has said that collateral estoppel doesn't apply to matters

23  that are on appeal, and there hasn't even been an opportunity

24  to file a notice of appeal.  That has been the law in Illinois

25  for decades.  You know that, right?

1          MR. NOLAND:  Judge --

2          THE COURT:  It's just a question.  You know that,

3    right?

4          MR. NOLAND:  Judge, do I know that?  I do not doubt,

5    your Honor, that that is what it is.

6          THE COURT:  Just a second.  I will tell you the

7    cases.  Just bear with me.

8        (Brief interruption.)

9          THE COURT:  So what we're talking about here is what

10   in Illinois courts is still called collateral estoppel

11   although it's more commonly called issue preclusion in federal

12   court.  And under federal law, there is a statute.  The full

13   faith and credit statute says that a federal court has to give

14   a state court's judgment the same full faith and credit that a

15   state court would have to give it.  I forget what that statute

16   is.  I think it's 28 USC 1783, if I recall correctly.

17         In -- let's see -- Ballweg, B-a-l-l-w-e-g, v. City of

18   Springfield -- I will give you just the N.E. cite.  499 N.E.2d

19   1373.  Quote:

20         "For purposes of applying the doctrine of collateral

21   estoppel, finality requires that the potential for appellate

22   review must have been exhausted.  That is repeated by the

23   Illinois Supreme Court in the case of In Re: A.W., 896 N.E. 2d

24   316, which was decided in 2008.  So collateral estoppel

25   doesn't apply.

1      MR. NOLAND:  As we sit here today, the plaintiff has

2  not filed a notice of appeal.

3      THE COURT:  The decision was issued when?

4      MR. NOLAND:  Tuesday.

5      THE COURT:  And you heard --

6      Perhaps you did not hear the quote as I read it to

7  you.  The quote says:

8      "The potential for appellate review must have been

9  exhausted."

10      So logically if the time for filing a notice of

11  appeal hasn't run, the potential for appellate review hasn't

12  been exhausted.

13      MR. GOODMAN:  I can assure the Court that we will be

14  filing a notice.

15      THE COURT:  It's kind of a no-brainer.  I assume he's

16  going to file one.

17      So there is no collateral estoppel.  That motion is

18  utterly lacking in merit.  It's barred by binding authority, I

19  might add.

20      So aside from that, have you given me your whole

21  basis under 801(d) because, once you do, I want to give the

22  plaintiff a chance to respond to it.

23      MR. NOLAND:  There are additional reasons to admit

24  the wiretaps.  They show the manner in which Jeff Fort ran the

25  gang.  His orders went --

1    THE COURT:  But, I mean, you're bootstrapping

2  bootstraps with bootstraps that are tied to bootstraps there.

3  You're offering this for the truth of the matter asserted.

4  You have to get past the hearsay objection.

5    I mean, the rest of it, to show that, well, the El

6  Rukns were bad people and they operated this way, you're all

7  offering this to prove the truth of the matter asserted.

8  That's the predominant purpose for which it's offered, and you

9  have got to get past the hearsay objection.

10    MR. NOLAND:  And I had some additional points to

11  make.  There are examples that the El Rukn James Speights, who

12  is a friend of --

13    THE COURT:  James?

14    MR. NOLAND:  James Speights.

15    THE COURT:  Spell it.

16    MR. NOLAND:  S-p-e-i-g-h-t-s, General Mish Ma, and

17  Jackie Clay, who is Doc Ishmael, who we expect to be

18  testifying, were out with William Swano seeking to find and

19  intimidate witnesses, and there are references to that in the

20  transcript as well.

21    THE COURT:  What does that have to do with the

22  bribery?

23    MR. NOLAND:  It does --

24    THE COURT:  The stuff that is covered in Exhibit 1 is

25  largely about the bribery.  At least that's the way it's

1    described.

2         MR. NOLAND:  It's also about -- it's all the

3    wiretaps.  And so our argument is --

4         THE COURT:  Fair enough.

5         MR. NOLAND:  Not only the bribery, but the

6    intimidation, Jeff Fort's running of the gang, the monitoring

7    of the trial as it proceeded was all in the conspiracy.  The

8    entire trial was corrupted by the El Rukns, and that is our

9    argument is that Mr. Fields was -- for his benefit, he was

10   knowledgeable about it.  He was told about the bribe.  He

11   participated in government meetings and knew what would

12   happen.

13        And those are our arguments in support of the

14   application of the coconspirator exception.

15        THE COURT:  Mr. Goodman.

16        MR. GOODMAN:  To address the points, and I will try

17   not to miss any.

18        THE COURT:  I will hit you with the stuff that you

19   miss.

20        MR. GOODMAN:  First, the wiretap transcripts, Mr.

21   Noland has cited two excerpts which they claim support Fields'

22   knowledge of the bribe.

23        THE COURT:  This is the thing about -- this is the

24   thing about the brothers from Medina.

25        MR. GOODMAN:  I have the transcript right here,

1  Judge.

2         First of all, it's our position that there is

3  absolutely no credible evidence linking Fields even to

4  knowledge, must less participation.

5         THE COURT:  I understand that's the position.  As I

6  said with Mr. Noland, we really need to focus on the issues.

7         MR. GOODMAN:  The transcript that Mr. Noland refers

8  to, it's a conversation between Mr. Knox and Fort.

9         THE COURT:  Where in the big binder of Exhibit 1 is

10  this?  Which subexhibit is it, I guess?

11         MR. NOLAND:  It's Exhibit 1, your Honor.

12         THE COURT:  Yes, I know, but there's like 20 sub-

13  exhibits in there.  Which one?

14         MR. GOODMAN:  I'm seeing People's Exhibit 6.  Is that

15  right?

16         THE COURT:  It's D.  It's D.  Does it say 5/10/86 at

17  2:57 p.m. at the very top of the first page?

18         MR. GOODMAN:  Yes.

19         THE COURT:  Okay, I've got it.  Go ahead.

20         MR. GOODMAN:  Correct.  And if you look at page 2.

21         THE COURT:  Page 2.

22         MR. GOODMAN:  Judge, Fort says -- I'm sorry.

23         MS. MATUZAK:  It's 6/24/86.

24         MR. GOODMAN:  I'm sorry.  It's the wrong one, Judge.

25  It's 6/24/86.

1          THE COURT:  Let me just get to that.

2      (Brief interruption.)

3          THE COURT:  It's the exhibit at 9:30 p.m.?

4          MR. GOODMAN:  Yes.

5          THE COURT:  That's Exhibit U.

6          MR. GOODMAN:  9:30 p.m.

7          THE COURT:  It's Exhibit U under Exhibit 1.  Okay, go

8  ahead.

9          MR. GOODMAN:  So what we have is Fort says:  What

10  about Hukm?  It's been established that that was Nate's

11  nickname.

12          And G.G., who is Alan Knox, says, "ah-ah, the

13  brothers from Medina, they demonstrated with Hukm."

14          THE COURT:  Right.

15          MR. GOODMAN:  We don't know what they demonstrated

16  about.  And Mr. Fields has testified that he never got any

17  visit from any people from Milwaukee.  We don't have any

18  visitors logs.

19          THE COURT:  Do visitors logs exist and there is no

20  mention of this or is it that the visitors logs don't exist?

21          MR. GOODMAN:  I don't know that we have ever seen

22  any.

23          MS. GORMAN:  They don't exist.

24          MR. GOODMAN:  They don't exist from the Cook County

25  Jail.

1          So the second comment, right below that is --

2          THE COURT:  Zoom, he said he had put him in tune with

3   the star situation.

4          MR. GOODMAN:  Right.  Zoom is Earl Hawkins.  The star

5   situation is the money situation.  So that does appear to

6   refer to the bribe.  So we have Knox telling Fort that Zoom

7   said he put Hukm in tune with the star situation.  That's

8   their evidence.

9          THE COURT:  Correct.

10         MR. GOODMAN:  It's corroborated by Hawkins' testimony

11  which was incredible because, as we mention in the motion,

12  we're talking --

13         THE COURT:  Yes.  There was a reference in the motion

14  to they wouldn't have been at the same place at the same time,

15  and I needed you to flesh that out a little bit.

16         MR. GOODMAN:  So Hawkins testified that there were

17  two times that Fields was present during discussions.  One

18  would have been in the bullpen.  And his testimony was that --

19         He said that present for the conversation between

20  Hawkins and Swano in the bullpen outside the courtroom was

21  Nathson Fields and George Carter.  Mr. Sexton then corrected

22  Fields -- then corrected Hawkins and said, well, but Carter's

23  case had been severed.

24         THE COURT:  Where is Mr. Hawkins giving the testimony

25  that you are referring to?

1        MR. GOODMAN:  At the innocence hearing.

2        THE COURT:  It was an evidence deposition, right,

3   that you took, or did he actually come into court and testify?

4        MR. GOODMAN:  He actually came into court and

5   testified.

6        THE COURT:  Okay, so he was there.

7        So what you're telling me now about Mr. Sexton is

8   during the hearing in front of Judge Biebel?

9        MR. GOODMAN:  Yes.

10        THE COURT:  Okay, go ahead.

11        MR. GOODMAN:  Mr. Sexton corrects him and says, but

12   George Carter's case was severed, and had Hawkins then correct

13   his testimony to say, no, it was only Fields and Hawkins

14   standing with each other talking to Mr. Swano.

15        THE COURT:  Okay.

16        MR. GOODMAN:  So the testimony was not credible on

17   its face because I don't think lawyers, when they talk to

18   their clients in the bullpen, especially if they're talking

19   about a bribe, aren't going to be talking in earshot of the

20   codefendant.

21        THE COURT:  I don't know that they wouldn't; I don't

22   know that they would.  I mean, I suppose it's like most other

23   things in the law.  The answer is it depends.

24        MR. GOODMAN:  The second thing that Hawkins said to

25   corroborate this that he actually -- that Fields knew was that

1   he said that when Swano came to visit Hawkins to have a

2   discussion about the bribe at the county jail prior to trial,

3   he called Nate down, too, and Nate participated in this

4   conversation.

5           Now, first of all, Nate was represented by his own

6   counsel, Smeeton.

7           THE COURT:  Right.

8           MR. GOODMAN:  So this would seem improbable, but,

9   secondly, they were in separate buildings.  One was in

10  Division 1, one was in Division 6.

11          So as far as I know, it would have been physically

12  impossible for a lawyer to request a meeting with two clients

13  that are -- with two inmates that are in separate buildings at

14  the jail.

15          Moving on.

16          THE COURT:  Okay.

17          MR. GOODMAN:  Mr. Noland mentioned that there are

18  some wiretaps where Fort orders someone to pass a note to

19  Fields.  I've never seen that.

20          THE COURT:  Which one is that, Mr. Noland?

21          MR. NOLAND:  June the 18th, 1996, 10:59 a.m.

22          THE COURT:  Which tab?

23          MR. NOLAND:  Exhibit S --

24          THE COURT:  S.

25          MR. NOLAND:  -- as in Sam, to Exhibit 1.

1          THE COURT:  Which page of this should we be looking

2  at?  It's not very long.

3          MR. NOLAND:  It's page 261.  These are the ones they

4  used in the Maloney trial.

5          And they're talking about it being Hukm's visiting

6  day.  Both are on Mondays.  Fort says on the left side of the

7  page:  That transcription, I want to get -- get through their

8  peep and show them a note and the signs of what a system we

9  draw in terms of the parry and the signs of the star, I mean,

10  in the signs of the robe --

11          THE COURT:  So that sounds like he's telling him to

12  get him a note, not that a note was given.  He tells him --

13          Which is what you told me actually.  He tells --

14          So the interpretation is this is Mr. Fort telling

15  whoever he's talking to here, which is -- well, whoever it

16  is -- to get a note to Mr. Fields to tell him about the bribe,

17  okay.

18          Is there any later conversation where somebody in

19  code reports back to Mr. Fort they did that, that you're aware

20  of?

21          MR. NOLAND:  The later conversation -- there is one

22  other conversation where Fort said, did you get him that note,

23  did you get him the note, talking about Hukm.  And then there

24  is the conversation where --

25          THE COURT:  That we talked about before.

| | |
|---|---|
| 1 | MR. NOLAND:  No.  I think that's a different one. |
| 2 | THE COURT:  A different one. |
| 3 | MR. NOLAND:  There's the two about the note, and |
| 4 | there is the last one where they say the brothers from Medina |
| 5 | put him in tune.  And then also -- |
| 6 | But then they say, but Hawkins had told him about the |
| 7 | bribe earlier.  So he already knew about the bribe. |
| 8 | THE COURT:  Okay, I see what you're saying. |
| 9 | Okay.  Keep going then, Mr. Goodman, now that you |
| 10 | know what he's talking about. |
| 11 | MR. GOODMAN:  This one, Judge, I don't know that I |
| 12 | read it that he's ordering them to visit both Hawkins and |
| 13 | Fields.  I don't read it that way, this transcript. |
| 14 | He's informing him that the visiting days are both on |
| 15 | Monday, and he says:  You all get a chance, I want to get |
| 16 | through there and peep and show them a note. |
| 17 | I suppose "them" could be both of them.  It could be |
| 18 | interpreted that way. |
| 19 | THE COURT:  Yes. |
| 20 | MR. GOODMAN:  Next, Fields, being a high-ranking |
| 21 | member, the testimony, even from the cooperating witnesses, |
| 22 | was that Nate was not a general in the El Rukns at the time. |
| 23 | THE COURT:  Does a general in the El Rukns mean kind |
| 24 | of what it does in the general in the Army?  I mean, there's |
| 25 | not that many of them, in other words, and they boss a lot of |

1  other people around?

2       MR. NOLAND:  They are the leaders.

3       THE COURT:  Yes.

4       MR. NOLAND:  And there is evidence, at least from two

5  or three people that have testified in this case, that he was

6  a general.

7       THE COURT:  Okay, and I gather from others that he

8  wasn't.

9       MR. GOODMAN:  Others that he wasn't.

10       The letter, if I may move on to the letter to Swano?

11       THE COURT:  Yes.

12       MR. GOODMAN:  In, I believe January of 1990 --

13       Candace is showing me the letter.

14       THE COURT:  I've got to tell you that it doesn't

15  strike me that a conversation that would --

16       The trial was in '86?

17       MR. GOODMAN:  '86, yes.

18       THE COURT:  It doesn't strike me that a conversation

19  four years after the fact where Mr. Fields says that Swano

20  mentioned the bribe to him really contributes at all to the

21  question of whether these particular statements made four

22  years earlier were part of -- were in furtherance of a

23  conspiracy that Mr. Fields was then a part of.  So I don't

24  think you need to spend much time on that.  I think it's

25  really about the other stuff.

1      MR. GOODMAN:  And Fields' testimony was not that
2  Swano mentioned the bribe to him.  I think what Swano said to
3  Fields was, you didn't see me bribe anyone.  He said, you
4  didn't see anything unusual, or something like that.  He got
5  some statement from Fields that he thought he could use.  That
6  was my impression of that.

7      And Fields' testimony was that it passed right over
8  him.  He didn't know what he was talking about.  And I think
9  the greatest -- the strongest evidence, Judge, that Fields
10  didn't know is the postconviction petitions because he filed
11  the original postconviction petition, was it '91?  He raised
12  many, many claims about the fairness of the trial, nothing
13  about a corrupt judge.

14      THE COURT:  So '91 after he has the conversation with
15  Fields.

16      MR. GOODMAN:  Yes.

17      THE COURT:  When did Judge Maloney get indicted?  I
18  don't remember.

19      MR. NOLAND:  June of 1991.

20      THE COURT:  Did the PC get filed before or after?
21      MR. GOODMAN:  Before.

22      THE COURT:  So the theory that I thought I heard Mr.
23  Noland expressing before was that until it's out in the open
24  that there was a bribe, Mr. Fields would not have talked about
25  it because that would have proved he knew about it.  That's

1   the theory.  I mean, I'm not sure that that can proven, but, I
2   mean, that's at least a theory as to why the fact that it
3   wasn't in the PC petition doesn't really mean much.

4           MR. GOODMAN:  That's a theory.  I mean, he was on
5   Death Row.

6           THE COURT:  So I think this is really all about these
7   conversations that are on tape, and it seems to kind of all
8   funnel back to Mr. Hawkins.  Okay.

9           MR. GOODMAN:  Judge, may I say one other thing?
10          THE COURT:  Go ahead.

11          MR. GOODMAN:  It comes back to the tapes, these
12  hearsay statements that Hawkins put him in touch.  Now, even
13  if there were a credible evidence that somebody told him about
14  it, that would not necessarily make him part of a conspiracy.
15  The fact that he knew, which we suggest that it's clear that
16  he didn't know, because if he had known, he certainly would
17  have told his attorney Stainthorp, who became appointed to do
18  his PC in '91, and he didn't because it doesn't show up in his
19  first PC.  And as soon as Maloney gets indicted, he and
20  Stainthorp talked about it, and they do an amended PC and talk
21  about this new information that's come to light.

22          And I would say that the appellate courts, Illinois
23  appellate courts, in final judgments have looked at this and
24  did say that there was no evidence that Nate participated.

25          THE COURT:  Which appellate court decision are you

1  referring to?

2        MR. GOODMAN:  The interlocutory appeal prior to

3  Nate's final -- prior to Nate's retrial.  This is People v.

4  Earl Hawkins and Fields, 326 Ill. App. 3d at 992.  And PLA was

5  denied, rehearing denied.

6        THE COURT:  And there is someplace in there where

7  you're saying that there's something favorable to Mr. Fields

8  on the question of whether he was aware of the bribe --

9        MR. GOODMAN:  Yes.

10        THE COURT:  -- scheme?  Just give me a page

11  reference.

12        MR. GOODMAN:  They say the evidence with respect to

13  Fields' involvement in the bribe is tenuous at best, and then

14  they make a ruling.  And this is on page -- well, page 999.

15        THE COURT:  999.

16        MR. GOODMAN:  And then they make a ruling.

17        "Accordingly, we find because of the evidence of

18  Fields' participation in the bribe is weak, it is insufficient

19  to outweigh the extreme prejudicial effect."

20        THE COURT:  Oh, so they're probably dealing with some

21  version of a waiver or forfeiture defense or forfeiture

22  argument.  In other words, if he was involved in the bribe, he

23  can't use the bribe to vacate his conviction.  That's probably

24  what --

25        MR. GOODMAN:  No, no, no.  This was whether it could

1    be used at his retrial.

2             THE COURT:  Oh.

3             MR. GOODMAN:  The prosecution wanted to use the bribe

4    as evidence at his retrial.

5             THE COURT:  And the appellate court says they can't

6    or the appellate court says that certain findings have to be

7    made or what happens?

8             MR. GOODMAN:  They cannot.

9             THE COURT:  Did it come in at the retrial?

10            MR. GOODMAN:  It does not come in at the retrial.

11   They said there was insufficient evidence.

12            Now, I don't know that the issue of coconspirator

13   hearsay came up.  That was not the issue.  The issue was

14   whether it was sufficiently probative to demonstrate

15   consciousness of guilt.

16            THE COURT:  So do we know what all --

17            And, again, I mean, I don't know that that is binding

18   on anybody here on the other side of the "v," but do we know

19   what was presented to the Court, you know, that was in the

20   record on appeal that it was considering?  Do we know whether

21   the transcripts were in there, whether Mr. Hawkins' testimony

22   was part of it or any of that?

23            MR. GOODMAN:  Well, they looked at the testimony from

24   the Maloney trial.  So they looked -- I believe Hawkins

25   testified at the Maloney trial.  I believe Swano testified.

1        THE COURT:  There wouldn't necessarily have been a

2   reason to ask him at the Maloney trial whether Fields knew

3   about it.  I mean, that is sort of a side issue.

4        Do you know, Mr. Noland?

5        MR. NOLAND:  Yes, I do.

6        THE COURT:  Go ahead and tell me.

7        MR. NOLAND:  This information in these wiretaps I do

8   not believe were presented to the appellate court.  Hawkins'

9   testimony that Fields knew was not presented to the appellate

10  court.

11       What happened is that at the first interlocutory

12  appeal after he got a new trial in 1998, Judge Gaughan barred

13  it.  It went to the appellate court.  The appellate court said

14  it can come in as to Hawkins, it can't come in as to Fields.

15       THE COURT:  You haven't shown me enough.

16       MR. NOLAND:  You haven't given me enough.

17       They went back down.  The State said:  Wait a minute,

18  Judge.  They went to Gaughan, Judge Gaughan.  We have got a

19  ton.  We have everything I'm telling your Honor about now.

20       Judge Gaughan said:  You waived that.  You're too

21  late now, guys.  You should have said it before.

22       THE COURT:  Okay.  That strikes me as a --

23       I mean, even if I were to put no weight on what you

24  just said, that strikes me as a relatively logical description

25  of what likely would have happened in that situation.  They

1  wouldn't have necessarily presented all the wiretaps and
2  whatnot on the first go-round.

3         Well, this is a bit of a toughie, folks.  There's a
4  lot of tough -- there are a lot of tough issues in this case,
5  a lot of really tough issues.  And that's not a criticism.
6  It's a complicated matter and a lot of tough issues.  I'm
7  going to have to think about it is the short answer.

8         So I've got to make --

9         And so part of what is tough about it is that I have
10  to make a finding, as I said, by a preponderance of the
11  evidence that there was a conspiracy.  That part I think I can
12  probably find.  It's really, number two, whether Mr. Fields
13  was a member of the conspiracy; and then number three is
14  whether the statements were in furtherance of it.

15         And I think three probably isn't all that hard
16  because I suspect -- and I know that there is an objection
17  made to, you know, whether people should be able to interpret
18  these tapes, but I think -- you know, although you would have
19  to lay the foundation at trial, I think that foundation can be
20  laid.  There may be an argument that they're not to be
21  believed.  There may be an argument that you're not to give it
22  any weight, but that's not a basis to exclude it.  So this
23  really all boils down to whether I am persuaded by a
24  preponderance of the evidence of Mr. Fields' involvement in
25  the conspiracy.  And that really, I think to a very

1   significant extent, boils down to the believability of

2   Mr. Hawkins on this point.  And, of course, I have not heard

3   Mr. Hawkins.  So that's why it's difficult.

4          Does somebody -- can somebody give me in extremely

5   short order the testimony --

6          Do you have the transcript of the testimony of

7   Hawkins from the proceeding in front of Judge Biebel?  Can

8   somebody get to that me?

9          MR. GOODMAN:  I probably attached it.

10         THE COURT:  Maybe you did.  I don't know.  I mean, I

11  was -- I tend to look at all of this stuff electronically.  So

12  if it's an exhibit over here already --

13         Let's see.

14         MR. GOODMAN:  I thought that went in that footnote.

15         MR. NOLAND:  Judge, if I could ask if we could send

16  over relevant pages that we would be relying on?

17         THE COURT:  You know, I have a feeling that what I've

18  got is excerpts.  I want the entirety of his testimony.  And

19  so what I'd like you to do --

20         So the quickest way to get it to me is to email it to

21  me.  And so email me a PDF of it.

22         Actually, while I'm thinking of it, is anybody

23  ordering the transcript of this?

24         The blank looks tell me no.  Okay, not yet at least.

25  Okay.  That informs me as to how careful my notes have to be.

1   All right.

2           MR. GOODMAN:  Your Honor, can I just address one last

3   issue on that?

4           THE COURT:  Yes.

5           MS. GORMAN:  When Mr. Hawkins started to cooperate,

6   which was early 1987, when he wrote a letter to Mr. Brannigan

7   and Mr. Brannigan came to visit him --

8           THE COURT:  Yes.

9           MS. GORMAN:  -- the first thing -- one of the very

10  first things Mr. Hawkins talked about was the bribe to Judge

11  Maloney.  And I think that is significant because he knew that

12  was the ticket or thought it might be his ticket off of Death

13  Row.  And the fact that Mr. Fields knew nothing about this and

14  never raised it with anybody until it became public I think is

15  also very probative.  He didn't want to die.

16          THE COURT:  Maybe he's not as smart as Mr. Hawkins.

17          MS. GORMAN:  Maybe, but he didn't want to die.

18          THE COURT:  I mean, I'm just saying.  There's more

19  than one explanation for not telling somebody something.

20          MR. NOLAND:  Judge, I think it would be relevant, if

21  I can tender to your Honor Defendants' Exhibit 113.  It's FBI

22  Agent Marie Dyson's 302 report of her interview with Hawkins,

23  back in 1987 where she says Hawkins told her right then and

24  there that Fields knew.

25          THE COURT:  Okay.  I mean, I will look at that, but

1  what I really want to see is --

2         Because I assume he was cross-examined during the

3  hearing in front of Judge Biebel, right?

4         MS. GORMAN:  We have his deposition, too.  I don't

5  know if you want that.

6         THE COURT:  Give me the deposition, too.  I'm

7  assuming you have got an electronic copy.

8         MS. GORMAN:  Yes.  I've got them on my computer here.

9         THE COURT:  Okay.  So I think the better thing to do,

10  Mr. Noland, is rather than handing that to me now, just attach

11  that to your email.  If you have got a PDF of that, the thing

12  that you were about to give me, the 302, attach that to the

13  email, too.  Okay.

14         And I know that's a gigantic issue.  I know that's a

15  gigantic issue, but we're going to have to move on because I'm

16  going to have to read this stuff in order to decide it.  So

17  let me just make a note.  So I'm going to get Hawkins'

18  testimony, Hawkins' deposition and a 302 regarding the Hawkins

19  interview.

20         MR. GOODMAN:  Before we move on, may I make one more

21  comment?

22         THE COURT:  Yes, just so you realize that we have

23  used up 40 of our minutes talking about the first motion in

24  limine.

25         MR. GOODMAN:  I just want to point out that even if

1  the Court gets past the coconspirator issue, there is still an

2  issue of relevance, as we set forth.

3      THE COURT:  Yes.  I have to say I did not find the

4  plaintiff's argument on that particularly persuasive.  I mean,

5  it's relevant for a whole bunch of purposes, I mean, most of

6  which I think is either discussed or inferable from the

7  decision on the summary judgment motion.  And, you know, there

8  may be other bases on which it's relevant, but, I mean, I

9  think -- I think the question --

10      I mean, if one assumes, or if one assumes that Mr.

11  Fields was aware of the bribe --

12      I want to choose my words carefully here, so give me

13  a second.

14      (Brief interruption.)

15      THE COURT:  Well, no.  The underlying question is the

16  admissibility of the bribe.  So if one assumes that the bribe

17  was to acquit both people, I think it pretty clearly has a

18  bearing on the question of materiality of what is referred to

19  as the Brady material.  And it may be relevant to other

20  things, but it only needs to be one thing.  And so I don't --

21      There is not a relevance issue here.  And as I said,

22  I think that --

23      Although, as I say, you would have to lay the

24  foundation at trial, I think that a foundation can be laid for

25  somebody to translate coded lingo.  I mean, they would have to

1   say why -- you would have to explain why they are qualified

2   and you would have to elicit that.  You would have to elicit

3   that it is coded, and you would have to elicit whatever the

4   code is.  But that's a relatively routine thing in criminal

5   cases, as it was presumably done in the trials of Hawkins and

6   others in this thing.

7            MR. GOODMAN:  And I know we need to move on, but if

8   it comes in, then there's additional wiretaps which show very

9   clearly that Fort's intention was to pass the bribe on the

10  Vaughn-White case, and he's -- it's very clear that he thought

11  that was the strong case.  He didn't think this case meant

12  anything because that was a year later, the eye witnesses.

13  And then --

14           THE COURT:  Well, a bribe's a bribe, and it's given

15  right before the trial of the --

16           MR. GOODMAN:  I understand.

17           THE COURT:  -- other one.

18           MR. GOODMAN:  But he's then an informant.  He's

19  informed by Swano that, in fact, Swano had passed it on the

20  other case, and there's a discussion about getting the bribe

21  money back.  And then Swano says, no, trust me.  That's the

22  important case.

23           THE COURT:  Those strike me as all weight issues, not

24  admissibility issues.

25           MR. NOLAND:  Judge, I would make one additional

1  argument that --

2       THE COURT:  What I really should have put time limits

3  on was the arguments on the motions in limine, not the trial.

4       MR. NOLAND:  This will be a one-sentence, which is

5  that obviously we feel strongly that Mr. Fields knew about

6  this and this shows he's involved in the conspiracy.

7       However, an alternative argument would be that the

8  plaintiff contends this trial was unfair because of the

9  police.  These wiretaps would be additional evidence that the

10 trial was corrupted by the El Rukns and Bill Swano and Judge

11 Maloney regardless.

12      THE COURT:  I completely get that.  And I have agreed

13 with you on the relevance issue.  I am not necessarily

14 adopting what you just said, but relevance is not an exception

15 to the hearsay rule, nor is we feel really strongly about it,

16 okay.  If it was, there wouldn't be any hearsay rule.

17      So we're moving on to item number 2, which is Burge.

18 You got two sentences to convince me that Mr. Burge and his

19 misconduct has something to do with this case because I'm not

20 seeing it in the response to the motion.

21      MS. GORMAN:  Your Honor, the only relevance with

22 Mr. Burge would be the fact that he was part of the task

23 force.  If all of this information --

24      THE COURT:  I understand, but what you want to put

25 in -- presumably what you're wanting to put in is you want to

1  trot his name in front of the jury, hoping that some of them

2  will know what it is.  And just to cover the possibility that

3  they don't, you want to put in that he tortured people, okay.

4          So what does that have to do with this case?  Is

5  there any allegation that Mr. Fields was tortured by Burge?

6          MS. GORMAN:  No, your Honor, but what I'm saying is

7  this goes to the task force itself and how they were trying

8  to --

9          THE COURT:  That they were really bad guys?

10         MS. GORMAN:  Yes.

11         THE COURT:  And this from the people who are telling

12 me to exclude all of the El Rukn evidence on the ground --

13 which they want to put in to show that Mr. Fields is a really

14 bad guy.

15         MS. GORMAN:  And I said, you know --

16         THE COURT:  Maybe I should just let everything in.

17         MS. GORMAN:  I said if they don't get to bring in all

18 the El Rukn stuff, we don't need the task force stuff, but if

19 they get to bring all that in --

20         THE COURT:  I just think that the links in the chain

21 between Burge and other people who were on the task force and

22 this case are really two attenuated.  So motion number 2 is

23 granted.

24

25

1    THE COURT:  Number 3 is the 1988 lawsuit by
2  Mr. Fields, that was the pro se lawsuit, and the documents
3  request in Houston versus Partee.  So I have a question for
4  the defense on this.  Were the defendants in this case, in my
5  case, were any of them served with the complaint and summons
6  in the '88 case?

7    MR. NOLAND:  I believe so.

8    THE COURT:  And so if this is offered, as I'm
9  understanding it here, among other things, to show that they
10  were on notice of, you know, the withholding of evidence, then
11  why isn't -- if they were served with the thing, why isn't
12  that enough and everything else is just a matter of weight?

13    MR. NOLAND:  There's no predicate that they would
14  have known that anything was being withheld, so if Mr. Fields
15  says he didn't get something, that wouldn't mean anything to
16  them just by virtue of him saying it.  This wasn't their file.

17    THE COURT:  And you've also made an argument at
18  various points in time that Mr. Fields kind of sat on all of
19  this stuff until, you know, the coast was clear, so to speak.
20  Why wouldn't the '88 lawsuit be relevant, as the plaintiff
21  argues, to show that, you know, he was diligent in trying to
22  obtain these things?

23    MR. NOLAND:  That argument relates to sat on the
24  bribe.  We have not made an argument that he was -- did not
25  use due diligence in trying to seek relevant discovery

1   documents in his criminal process.

2       THE COURT:  And the plaintiff has told me that you're

3   not intending to use the document request from the Houston

4   versus Partee, so it's just about the lawsuit.

5       All right.  Let me just look at one thing here.

6       I'm denying that.  I think it's relevant to show

7   notice, as the plaintiff argues, notice that he was alleging

8   that materials had been withheld from him.

9       And, you know, I'm absolutely willing to entertain an

10  appropriate limiting instruction regarding the purpose for

11  which it can be offered.  I'm also willing to entertain the

12  option of, you know, some sort of a stipulation.  And, I mean,

13  you wouldn't be giving up your relevance objection.  A

14  stipulation that, you know, in 1988 Mr. Fields filed a lawsuit

15  which was served on the defendants that alleged the following

16  so that we don't have to put the whole lawsuit in or the

17  complaint in.  So I'm willing to entertain those things, but

18  that motion is denied.  So let me just make a note of that.

19      So I'm just going to leave it to you all to get back

20  to me on that, so for now it comes in unless you come up with

21  some other alternative.

22      Number 4 has to do with the CR that was generated in

23  response to the lawsuit, CR being Chicago Police Department

24  lingo for complaint register, which in turn is lingo for a

25  file that's created when somebody makes a complaint about a

1   police officer. So give me just a second here.

2         So what exactly is it, if the plaintiff's attorneys

3   can tell me, what exactly is it that you want to put in about

4   this? Do you want to put in the whole file? Is it something

5   about the file? What is it exactly?

6         MS. GORMAN: Yeah, we want to put in the whole file,

7   and there's two reasons, your Honor. One is that there's no

8   longer a court file.

9         THE COURT: No longer a court file for the 1988 case.

10         MS. GORMAN: Correct.

11         THE COURT: And the complaint's in the file?

12         MS. GORMAN: Complaint's in the file.

13         THE COURT: Okay.

14         MS. GORMAN: But also, your Honor, I think it goes to

15   the Monell claim because the City contends that they did an

16   investigation.

17         THE COURT: Then.

18         MS. GORMAN: Then.

19         THE COURT: And so this is part of the story about

20   where the file was and what not.

21         MS. GORMAN: Correct.

22         THE COURT: And I made a note when -- on page 7 of

23   your motion to ask the defendants' attorneys why isn't this

24   relevant on the Monell claim, so why don't you address that,

25   Mr. Noland.

1    MR. NOLAND:  Because we've acknowledged that -- or we

2    are acknowledging that the file wasn't produced to Mr. Fields,

3    and the Monell claim would be whether or not the City --

4    there's a practice, a widespread practice and that the City

5    was deliberately indifferent in not following the policy that

6    was implemented in February 1983, which is Detective Division

7    Special Order 83-1.  And so the fact that the file wasn't

8    produced in this case, you know, that's not going to be an

9    issue and so --

10    THE COURT:  Yeah.  I think those are arguments that

11    go to weight, not admissibility, so I'm going to deny motion

12    in limine number 4.

13    Number 5.  Okay.  So this is judicial notice, and --

14    MS. GORMAN:  No.  That's number 6.

15    THE COURT:  Oh, that's right.  Number 5 is -- oh,

16    this is the thing about whether there is or isn't a malicious

17    prosecution claim based on the Vaughn-White murders.  And the

18    response that the plaintiff makes to that is we aren't making

19    one.

20    MS. GORMAN:  Well, it's part of the malicious

21    prosecution, and it's in the complaint.

22    THE COURT:  Oh, okay.  So it's not that you're not

23    arguing.  It's the defendants have been on notice of it.

24    MS. GORMAN:  Correct.

25    THE COURT:  What about that?

1      MS. GORMAN:  And I put in the paragraphs from the
2   amended complaint.

3      MR. NOLAND:  We're on notice that it is part of
4   allegations that there was a malicious prosecution of
5   Smith-Hickman.  However, we're not on notice, there is no --
6   there can be no claim for the Vaughn-White.  The charges were
7   dropped.

8      THE COURT:  Let me ask you this question:  You guys
9   know how the case is going to get tried.  I don't.  Okay.  So
10  I can imagine somebody saying, ladies and gentlemen,
11  Smith-Hickman doesn't make a bit of difference because even if
12  there had never been a Smith-Hickman charge, there was
13  Vaughn-White.  He was guilty as sin of that.  He would have
14  gone to the same place.  Is anything like that going to be
15  hinted, argued, winked or nodded?

16     MR. NOLAND:  No.  The Vaughn-White charges were
17  nolle'd in 1986 and then --

18     THE COURT:  So right after the conviction on the
19  other one.

20     MR. NOLAND:  Right.  They used it in aggravation.
21  The State used it in aggravation.

22     THE COURT:  They used it in aggravation.

23     MR. NOLAND:  Yeah.  And then they nolle'd it.

24     THE COURT:  So there's not -- I take it there's not,
25  though, a separate claim for malicious prosecution on

1  Vaughn-White, or is there?

2          MS. GORMAN:  No, there's not.  It's all part of the

3  same claim.

4          THE COURT:  I guess maybe where I was and when I read

5  both sides' stuff on this is, like, I'm not sure what the

6  dispute is exactly, so maybe since it's your motion you can

7  enlighten me.

8          MR. NOLAND:  Thank you, your Honor.

9          THE COURT:  Or whoever.  I don't care who it is.

10          MR. MICHALIK:  Your Honor, frankly, we didn't think

11  that there was that claim, but in looking at the proposed

12  pretrial order that was sent to us, in the statement of the

13  case it appeared that they were in fact making a malicious

14  prosecution claim based on Vaughn-White.  That's why we filed

15  the motion.

16          THE COURT:  You're not proposing on the plaintiff's

17  side to when I instruct the jury on the claims that there's

18  going be a claim that says he was maliciously prosecuted for

19  the Vaughn-White murders and you should find in favor of the

20  plaintiff and against the defendants and award him damages for

21  that?

22          MS. GORMAN:  Just like we wouldn't do the same for

23  Hickman-Smith.  It's all part of the --

24          THE COURT:  It's going to be malicious prosecution,

25  period.

1    MS. GORMAN:  Correct, your Honor.

2    And, no, your Honor.  That's been part of the claim

3    all along.  He was arrested on both claims.  He was charged on

4    both claims.  It went before the grand jury on both double

5    murders.

6    THE COURT:  What else would you like to tell me about

7    this on the defense side?

8    MR. NOLAND:  Your Honor, I would say that the

9    evidence would be whether on malicious prosecution was there

10   probable cause to support the Smith and Hickman prosecution

11   and that they're -- we're seeking to bar them from arguing

12   that if there was no probable cause for the Vaughn-White case

13   that they have a malicious prosecution claim.

14   And the other elements of malicious prosecution

15   relative to that claim, if they were going to bring that --

16   THE COURT:  Yeah, so I think, honestly I think that

17   that is going to all sort out in the wash as the case is tried

18   and it's really a question of what the final instructions

19   should say.  And there's not going to be anything, at least

20   I'll tell you that there's not going to be anything that

21   specific in the preliminary instructions, which I will read to

22   the jury but they won't have a copy of, at the beginning of

23   the case.

24   And so, you know, the motion asks to bar a claim.

25   There isn't a separate claim.  I'm denying the motion.  We

1   still have the issue of the extent to and how -- the extent to

2   which and how it can be argued, and that I think is

3   appropriately taken up later.

4            So pause.  I just got to make a note on that.

5            MS. GORMAN:  Thank you.

6            THE COURT:  Next is the judicial notice thing.  So I

7   have to say that I think at least a good deal of what's

8   offered in the defendants' motion that I should take judicial

9   notice of really blurs the distinction that exists in the law

10  between issue preclusion and judicial notice.

11           I mean, among other things, and let me just get back

12  to your motion here.  You've given me this list of things.  I

13  mean, I don't think there's any dispute and I think I could

14  take judicial notice that Judge Maloney presided over the

15  trials.  I don't think there's any dispute and I think I could

16  take notice that Mr. Swano represented Mr. Hawkins.  Then you

17  ask me to take judicial notice that Judge Maloney accepted a

18  bribe to acquit Fields and Hawkins, which is a disputed fact.

19  It's not an adjudicative fact because there hasn't -- you

20  know, it's not the kind of thing that people take judicial

21  notice of.

22           And to the extent that you're relying on findings

23  that have been made in other cases, I mean, that's really

24  about collateral estoppel.  It's not judicial notice.

25           You're essentially asking me to look at the jury and

1   say, ladies and gentlemen, I instruct you that the bribe was

2   to acquit both of them, when in fact that's a disputed fact.

3   I can't take judicial notice of that.  I mean, it's just a

4   nice way of saying, Judge, this is the dry run for the real

5   trial that you'll be doing in two years when it gets remanded.

6          And I think the same is true of -- I mean, the

7   farther the list goes along, or at least in some places, we're

8   talking about sort of very sort of particularized facts.

9   Number four:  Judge Maloney became concerned that he was the

10  subject of a federal investigation and returned the bribe

11  money; thereafter that he found Fields and Hawkins guilty.

12  Well, the second part of that of course I can take judicial

13  notice.  Judge Maloney found Fields and Hawkins guilty of the

14  charged offenses.  The first part of it I couldn't possibly

15  because it's a theory.  I mean, Judge Maloney never testified

16  to that.  It's been essentially the theory, and adopted by

17  many Courts, I grant you, and maybe even I would buy into it

18  as a theory, but, you know, attaching a theory to what

19  happened, to explain what happened isn't something that a

20  judge can take judicial notice of.  So the first sentence of

21  four I couldn't possibly do.

22          Number 5, I can absolutely take judicial notice,

23  assuming that, you know, we get past the admissibility issues

24  on the bribe stuff generally.  All right.  I can absolutely

25  take judicial notice that Swano and Maloney were indicted.  I

1   assume that it's not disputed that part of the basis for the

2   charges against them was a claim of bribery in connection with

3   the case.  That's not disputed, right?  Just look at an

4   indictment, that tells you that, right?

5            MR. GOODMAN:  That's correct.

6            THE COURT:  So then we get to number 6.

7            MR. GOODMAN:  I think our objection to that just had

8   to do with the second sentence.

9            THE COURT:  The attribution of it to --

10           MR. GOODMAN:  There were other charges.  Part of

11  the --

12           THE COURT:  Well, so let me ask you this:  And I know

13  that there was some discussion about this.  Was there a

14  separate count in the Maloney case that related to the bribe,

15  or was it a racketeering act in the racketeering count?

16           MR. GOODMAN:  I know there were four bribes in the

17  trial.  That's all I remember.

18           THE COURT:  I know, but we're talking about what was

19  found in the case, and so was there a separate -- I'm willing

20  to bet that there was not a count, because I don't -- as

21  opposed to a separate racketeering act, because I don't think

22  bribery of a state judge likely would even be by itself a

23  federal crime.  Now, it gets incorporated into RICO as one of

24  the types of racketeering acts that can be charged, so I'm

25  assuming that there's a racketeering act for it.

1          MR. GOODMAN:  I'm assuming that it was an overt act.

2          THE COURT:  Well, no, I'm talking about even more

3     than an overt act.  I'm assuming that on the RICO count

4     there's a list of these are the acts of racketeering, bribery

5     is one of them.

6          Does anybody have the Maloney indictment?  Okay.  So

7     let's just skip over that.  Let's get to the really the core

8     of it.

9          Was there a special verdict where the jury had to go

10    through and find racketeering acts?

11         MR. NOLAND:  I don't believe so.

12         THE COURT:  So here's the problem.  And that is

13    logical to me because until fairly recently, actually, the

14    government in criminal cases has tended to take the position

15    that there shouldn't be special verdicts.  And there's all

16    sorts of criminal law reasons for that or criminal procedure

17    reasons for that.  And so I'm guessing that back, you know, at

18    the era we're talking about there would not have been a

19    special verdict form, which creates a problem, is that how do

20    I know that they were found guilty on something relating to

21    that?  The answer is I think I don't.  If there was a finding,

22    in other words, if the jury returns a verdict form where

23    they're asked racketeering act let's say 47, bribery of

24    Maloney for the murder trial, and the jury checks yes, we

25    found that beyond a reasonable doubt, then I could probably

1  take judicial notice that a jury found that beyond a

2  reasonable doubt that that racketeering act had been

3  committed.  Otherwise I'm not sure I could.

4          MR. NOLAND:  I think I have something to add to this

5  discussion.  US v Maloney, 71 F3d at --

6          THE COURT:  You're talking about an appellate

7  opinion, keep in mind.

8          MR. NOLAND:  Judge, I can't be sure what --

9          THE COURT:  I thought I was told in the response that

10  there was no special verdict.

11          MR. GOODMAN:  What I said is upon information and

12  belief.

13          THE COURT:  Oh, okay.  You said information and

14  belief.

15          MR. GOODMAN:  The Maloney jury made no special

16  findings of fact.

17          THE COURT:  I now know that Ms. Gorman has wireless

18  here because she's already emailed me the deposition.

19          MR. NOLAND:  I don't know if this is from Maloney.  I

20  don't know where this is from, where I'm reading from.  It's

21  Exhibit 8 at 6, and I'm trying to figure out what our Exhibit

22  8 --

23          THE COURT:  Ms. Gorman, you need to resend that email

24  and copy defense counsel on it.  You just sent it to me.

25          MS. GORMAN:  Okay.

1  MR. GOODMAN:  I think Exhibit 8 is Judge Dooling?

2  It's a state court opinion, I believe, which refers to the

3  Maloney opinion.

4  MR. NOLAND:  And Judge Dooling -- Judge Dooling said

5  the jury specifically found that Maloney had engaged in acts

6  of racketeering and had conspired to commit extortion when he

7  accepted and later returned a $10,000 bribe in the trial of --

8  THE COURT:  Okay.  So maybe --

9  MR. NOLAND:  -- Earl Hawkins and Nathson Fields.

10  THE COURT:  Maybe there's a conspiracy to extort

11  count that specifically relayed this.  You guys are going to

12  need to show me more.  As I sit here, I don't know that

13  there's something that's concrete enough that I can take

14  judicial notice of, so here's what I think I need from you.

15  What I think I need from you is really three things.  Number

16  one would be the version of the indictment on which the trial

17  was held.  Number two would be the jury instructions.  And

18  number three would be the verdict form.  And then I can figure

19  that out.

20  Okay.  So let's just kind of move along here.  Number

21  7:  November -- or September 8, 1992, Mr. Fields filed his

22  First Amendment petition for post-conviction in which he

23  alleged as a result of the bribe he was denied his right to

24  trial.  So, I mean, of course I could take judicial notice of

25  that, but why do you need me to?  You're going to ask somebody

1  that question, right?

2          MR. NOLAND:  Fair enough, Judge.

3          THE COURT:  You're going to ask him.

4          MR. NOLAND:  Yes.

5          THE COURT:  So I don't really think you need it.

6          Conviction was overturned in 1997.  So, I mean, I

7  certainly -- what's your position on number 8, Mr. Goodman?

8          MR. GOODMAN:  The fact that Judge Dooling granted

9  plaintiff's post-conviction petition is undisputed.  However,

10  the reason why Fields was granted post-conviction relief is

11  not a proper subject for judicial notice.

12          THE COURT:  Is there more to it than what's stated

13  here?

14          MR. GOODMAN:  It's a lengthy opinion.

15          THE COURT:  Yeah, right.  No, I mean, somebody's

16  citing page 22, so I can tell it's pretty long.

17          MR. GOODMAN:  It says that she did it because.  I

18  don't know that this Court could take judicial notice as to

19  why she did it.  I think you could take judicial notice about

20  some language from the opinion.

21          THE COURT:  Let me ask you this question, Mr. Noland:

22  So is there some witness that you're planning to call -- if

23  you don't get judicial notice on this, how would you put it

24  in?  Who would you put it in through?

25          MR. NOLAND:  Possibly through the plaintiff.

1        THE COURT:  Okay.

2        MR. NOLAND:  Possibly through state's attorneys.

3        THE COURT:  Mr. Sexton maybe, somebody like that.

4   Although that, you know, I mean, that actually maybe gets a

5   little trickier than even doing it through some sort of a --

6        I know it is an extremely contested case.  I know

7   that.  And I know that there's, you know, a lot of baggage all

8   over the place here.  I guess what I'd -- you know, in the old

9   days we used to make people go through and try to stipulate to

10  facts that aren't contested.  I'd like you to make an effort

11  to see if you can come up with -- and it's going to

12  necessarily be relatively plain vanilla, but to see if you can

13  come up with sort of a sort of pithy, short, to the point

14  stipulation of kind of the procedural history of Mr. Fields'

15  state court case.

16       I can certainly understand if somebody doesn't want

17  me to summarize in a sentence or two the basis for a 30 plus

18  page ruling that was then reviewed on appeal and resulted in

19  another 30 plus page ruling, but I'd like you to see if you

20  can come up with a stipulation, and then I'll at least know

21  what's in dispute and I can deal with it.

22       MR. GOODMAN:  I don't think that will be a problem,

23  Judge.

24       THE COURT:  I think you ought to be able to do that.

25       Okay.  So let me just make a note.

 1          Motion in limine 7, which is Mr. Reiter, R-e-i-t-e-r.

 2   So and I know that there is some overlap here between this and

 3   a motion that's made by the plaintiff with regard to

 4   essentially a corresponding expert, Allee or Albee or

 5   something like that, on the defense side.

 6          So I want to make sure that I'm understanding exactly

 7   what Mr. Reiter is going to say.  I don't think I got his

 8   opinion.  I think I've got some of the other ones.  I think

 9   I've got Allee and I've got the other guy.

10          MR. MICHALIK:  McMahon.

11          THE COURT:  McMahon.  I was going to say McLaughlin.

12   McMahon.  I don't think I have Reiter's.

13          MS. GORMAN:  I believe we attached it as Exhibit F.

14          THE COURT:  F.  Indeed you did.  Okay.  That means I

15   looked at it at some point.

16          So what's being zeroed in on here is the

17   characterization of the file as exculpatory.  And the way I

18   understood the response to the motion is that, well, when

19   Mr. Reiter says exculpatory, he doesn't really mean

20   exculpatory.  He means that pretty much anything ought to get

21   turned over to the prosecutors.

22          MS. GORMAN:  That's correct, your Honor.

23          THE COURT:  But he says in his opinion there are

24   numerous examples of what's exculpatory evidence.  I don't see

25   in the opinion anything that sort of defines that as -- he may

1    have done it in his deposition.

2          MS. GORMAN:  That's where it is, your Honor.  And his

3    deposition is Exhibit E.

4          THE COURT:  Exhibit E.  Oh, it's an excerpt, okay.

5          So let me just talk to you a little bit generally

6    about the police practices opinion testimony on both sides.

7    Okay.  I acknowledge that there are problems with people

8    putting conclusions on things that maybe have slightly

9    different meanings in different contexts and that overlap to

10   some extent with things that the jury will be called upon to

11   decide.  And I acknowledge, of course, that the rules allow

12   ultimate issue opinions.  But that's also subject to Rule 403

13   balancing.

14         So, you know, you've got an expert on the plaintiff's

15   side saying stuff's exculpatory.  I've got an expert on the

16   defendants' side saying it's not exculpatory or it's not

17   material or both.  And I guess I have a problem with all of

18   those opinions worded in that way.  And I have a problem with

19   at least some of them worded in any way.  But I think as far

20   as exculpatory and not exculpatory, you know, you have a

21   little bit different -- the jury is going to be given a

22   definition of what exculpatory means.  Okay.  That's not

23   really, I don't think, the question that the police practices

24   experts on either side are actually opining on.  I think what

25   they're opining on, or at least can appropriately opine on, is

1    what a police officer, whether it's a reasonable police

2    officer or whatever, what a police officer would view as maybe

3    we call it potentially exculpatory in the sense of it ought to

4    be turned over, it ought to be made available to the

5    prosecutors in the case.  Okay.  And I think, because that's a

6    subject on which a jury is not going to have a clue, how

7    police officers are supposed to deal with prosecutors when it

8    comes to evidence, I think that's a subject on which there can

9    be proper opinion testimony on both sides.  And to me it's

10   really more of a question of how it's expressed and how it's

11   worded.

12            Now, materiality I think is a different story because

13   I would be surprised if you had an expert that would say,

14   okay, I got this thing here where this witness was shown a

15   picture of the guy we've charged and said it wasn't him, he

16   wasn't the shooter, and the police officer -- and a police

17   officer expert, a police practices expert says, well, since

18   the evidence against this guy was otherwise so strong, the

19   police really didn't have to turn that over to the

20   prosecutors.  I mean, I suppose anything is possible, but I

21   would be pretty shocked if any person who is an actual police

22   practices expert would ever come into court and say that.

23            Is your person going to say that, anything like that?

24            MR. NOLAND:  No.

25            THE COURT:  Okay.  I don't think these people can

1    testify about materiality.  I think they can testify about

2    what's appropriate police practice for turning over stuff to

3    the prosecutors who are going be, you know, handling the

4    discovery in the case and prosecuting the case.  I think that

5    we'd need to come up with some other wording other than just a

6    bare exculpatory, or maybe it could be dealt with by way of an

7    instruction that I would give the jury at the appropriate time

8    during the testimony or during the trial, and maybe you could

9    come up with something there.  But I think that's really the

10   way to handle it.  I don't think it's inappropriate for

11   somebody like Mr. Reiter on the one hand or is it Mr. Allee?

12              MR. NOLAND:  Yes.

13              THE COURT:  -- Mr. Allee on the other hand to say no,

14   this is not the kind of thing that police officers are

15   supposed to turn over to prosecutors and here's why, or this

16   is the kind of thing that police officers are supposed to turn

17   over to prosecutors and here's why, without trying to put the

18   bottom line conclusion on it that essentially tracks what the

19   jury has to find in the case.

20              Okay.  So what I'm hoping here is that I'm giving you

21   enough guidance so that you can sort of go back, ponder it and

22   maybe even talk and come back to me and say, okay, here's what

23   we propose to do on that.  Have I given you enough to do that?

24              MR. NOLAND:  Yes.

25              I think we have an additional point with respect to

1  Reiter.

2       THE COURT:  Okay.  What's the additional point?

3  That's what I was going to ask.

4       MR. NOLAND:  The point is that his testimony is

5  basically --

6       THE COURT:  This is Reiter?

7       MR. NOLAND:  This is Mr. Reiter, the plaintiff's

8  expert, is basically if there's a note in the file that says

9  that the Pope committed these murders, that that's potentially

10  exculpatory information that should be turned over.  If the

11  jury hears anything like that, it will only cause confusion.

12  It's just a false statement.  It's incorrect.

13       THE COURT:  Okay.  And I noticed you didn't put it

14  quite -- you didn't have quite as colorful an example in the

15  brief.  So the note that I made on that is what is the rule of

16  evidence that says that false testimony isn't admissible.  I'd

17  like to know it because it would make all of my trials way

18  shorter.  I could keep a lot of stuff out.

19       MR. NOLAND:  It goes to the foundation.  It is the

20  Daubert issue with respect to the basis of his opinion.  He

21  doesn't have a foundation to say that because it's

22  inconsistent completely with the law.

23       THE COURT:  Yeah.  I think that's -- honestly, if I

24  had an expert on the other side of that case, about the last

25  thing I would do would ask him -- would be to ask the judge to

1　exclude it.  I'd say come on.  I could do ten minutes of cross

2　just on that point without even preparing.

3　　　　So I think it's a weight issue.  I think it's an

4　issue for cross examination.  I mean, there's that language in

5　Daubert about, you know, the best way of testing weak opinions

6　is by cross examination.  I think it's a weight issue.  I

7　don't think I can find as a matter of law that that

8　disqualifies him from testifying.

9　　　　So I'm going to move on from number 7, although I got

10　to make a note first.

11　　　　Okay.  Number 9, bar argument regarding plaintiff

12　being placed in a lineup.

13　　　　MS. GORMAN:  Number 8.

14　　　　THE COURT:  I keep doing that.  The broken heart

15　testimony.  All right.  So let me just get to the response

16　because I think I had a question for the plaintiff on that.

17　Bear with me.

18　　　　Okay.  What's the relevance of this?  What's the

19　relevance of the testimony that his mother died in his arms?

20　I mean, it's a sad thing, obviously, but what's the relevance

21　of it in this case?

22　　　　MS. GORMAN:  No, it's not in his arms.  He was in

23　prison.  He's just talking about his losses, the things he

24　missed while he was in prison, and one was that his mother

25　died and he was not allowed to go to the funeral.

1        THE COURT:  Okay.  Stop right there.

2        What about that?  If that's what I let him put in and

3  he's talking about the things I missed from being in prison, I

4  mean, and that's clearly an appropriate subject of damages

5  testimony.

6        MR. NOLAND:  That's admissible.

7        THE COURT:  That's admissible.  That's what you can

8  do.  Nothing about how I could have prevented it.  Nothing

9  about, you know, I would have liked to hold her, things like

10  that.  It's like she died and I wasn't there and I wasn't able

11  to be there when she was in her final days and that kind of

12  thing.  You can put that in.

13        Okay.  So now we're on to 9.  Let me just make a note

14  about 8, though.

15        Number 9 is -- oh, okay.  So testimony about the

16  Vaughn-White.  So the question I had, I had two questions for

17  the defendant based on the response that was filed by the

18  plaintiff.  Number one, the plaintiff tells me that there is a

19  form that was filled out or that was prepared by Detective

20  O'Callaghan and approved by I don't know if it's Sergeant

21  Murphy, I think it's Sergeant Murphy, which requests that

22  Nathson Fields be held past his court call so that he could be

23  held in a lineup, da-da-da.  The form read, or at least

24  initially read the victims were Vaughn and White.

25        Why wouldn't that document be a sufficient basis to

1  allow the plaintiff to get into this issue?

2  MR. NOLAND:  Because there's no evidence that a

3  Vaughn-White lineup was held.  It's speculation.

4  THE COURT:  Well, but then farther down the page

5  Mr. Fields says he's going to testify that he recalls being

6  put into two separate lineups.

7  MR. NOLAND:  And he recalls that they were in close

8  proximity to each other, and in fact the lineups for the

9  Smith-Hickman case, according to the lineup report and our

10  clients' testimony, took place one hour apart.

11  THE COURT:  So there were more than one lineup for

12  Smith-Hickman?

13  MR. NOLAND:  I guess depends how you look -- it was

14  the same fillers and everything.  They just had them wait

15  around for an hour for another witness to come in.

16  THE COURT:  The lineup was -- the identification

17  procedure was conducted more than once for Smith-Hickman.

18  MR. NOLAND:  Yes.

19  THE COURT:  In other words, once for some witnesses,

20  once, and not a good time for other witnesses, and that

21  happened close in time.

22  MR. NOLAND:  An hour later and with the same fillers,

23  so they just -- everybody stuck around.

24  THE COURT:  What you're saying, then, is that what

25  Mr. Fields must have been talking about when he talked about

1　　two lineups was the two Smith-Hickman lineups.

2　　　　　　MR. NOLAND:　Right.

3　　　　　　THE COURT:　What about that?

4　　　　　　MS. GORMAN:　Two things, your Honor.　First, the

5　　report that we're talking about is at Exhibit I.

6　　　　　　THE COURT:　I.

7　　　　　　MS. GORMAN:　Yes.

8　　　　　　That shows that he was being held over for the

9　　Vaughn-White lineup.

10　　　　　　THE COURT:　Wait a second.　It's not I.　I is an

11　　excerpt from the testimony of the hearing before Judge

12　　Biebel.

13　　　　　　MS. GORMAN:　I'm sorry.　It's H.

14　　　　　　THE COURT:　H.　Okay.

15　　　　　　So I don't know what the reports on the actual

16　　lineups are, but is there a lineup that happened on or about

17　　the 14th of June at 1300 hours or around that time?

18　　　　　　MS. GORMAN:　There is, your Honor.

19　　　　　　And getting to what counsel said about this all being

20　　one lineup, Mr. Fields recalls being taken to a lineup room on

21　　two separate occasions that day with different groups of

22　　people.　So that's different than just sitting around waiting

23　　in that same room with that same group of people for an hour

24　　while different witnesses come in.

25　　　　　　THE COURT:　Mr. Noland.

1      MR. NOLAND:  I don't recall that testimony.

2      THE COURT:  Anything else on this?

3      MR. NOLAND:  Nothing else on that.

4      I don't recall the testimony Mr. Field saying that

5  there were different fillers in the lineup with him.

6      MS. GORMAN:  That's because it wasn't asked by

7  counsel, your Honor, but what he did say was he recalled two

8  separate lineups.  And if he had asked further how do you

9  know --

10      THE COURT:  Here's what I think about this.  I think

11  that, first of all, the question of whether there actually was

12  a lineup for Vaughn-White, again, is not a question that's

13  appropriate for me to decide on a motion in limine.  I mean, I

14  think that the existence of this document, Exhibit 8 to the

15  plaintiff -- H, H as in Henry, to the plaintiff's response

16  signed by O'Callaghan and Murphy that asked to hold him past

17  the court call to be put in a lineup for Vaughn-White is at

18  least evidence that they intended to do that, and evidence

19  that somebody intended to do something plus reasonable

20  inferences from what Mr. Fields happened I think would permit

21  somebody to conclude, wouldn't compel it, maybe it wouldn't

22  even compel it all that strongly, but would permit somebody to

23  conclude okay, yeah, he really was put in a lineup for Vaughn

24  and White.

25      So I'm not going to exclude the evidence.  And I

1    think the better way to deal with this is -- I mean, again,

2    it's going to become clearer I think as the trial goes along

3    exactly where Vaughn-White fits into this whole thing, and you

4    can raise it again before closing argument.

5         MS. GORMAN:  Thank you.

6         THE COURT:  Okay.  We're getting kind of close to

7    when I'm going to have to stop here.

8         Number 10, Fields' rejection of a plea offer for time

9    served.  Jeez, I can't think of anything more relevant.  What

10   am I missing?  I mean, the argument is that that's not

11   relevant.  It's hard for me to imagine anything more relevant.

12   You know, you had an opportunity to walk out of jail today and

13   I turned it down because -- and I turned it down.  I mean,

14   that's evidence that's --

15        I agree with the cases you cite, but those are all

16   cases about the admissibility of a plea offer in a criminal

17   prosecution where there's a rule that says it can't be offered

18   or admitted in a criminal prosecution.  That's not what's

19   being talked about here.  So what am I missing?

20        MR. NOLAND:  It's inadmissible under Rule 408, and

21   it's a prior consistent statement as well that's inadmissible.

22   He pled guilty to these crimes years ago, and that is simply a

23   reaffirmation of that.

24        THE COURT:  Pled not guilt.

25        MR. NOLAND:  I'm sorry.  He pled not guilty.  Excuse

1 me.

2       THE COURT: It's not simply a reaffirmation because

3 pleading not guilty in the first instance means you're going

4 to trial. Pleading not guilty in this context means you walk

5 out of jail. Those are two massively different things. It

6 goes to weight, not admissibility. Motion 10 is denied.

7       Number 11. Oh, so this is the issue about the jury

8 selection. Okay. Frankly, the material that was submitted by

9 the City in response to this is consistent with what I have

10 been told in other cases, but I thought it was important to

11 make a record of it in this case. And that's the statement in

12 further support of motion in limine number 11, which is docket

13 entry number 538. It's an affidavit from Sergeant Harris and

14 so on.

15       So basically the way I've always understood -- and, I

16 mean, I've had this issue kind of hashed out before me.

17 There's probably three or four trials of where I've allowed it

18 to be done under some fairly strict procedural constraints.

19       What I've been told is it's not NCIC, which is the

20 federal database, it's not L-E-A-D-S, LEADS, which is the

21 state database, both of which have very strict controls on how

22 it can be used. It's an internal Chicago Police Department

23 database. It's populated with Chicago arrests, and then there

24 are some suburbs, not all but some suburbs in Cook County that

25 also contribute information to it, and so it contains some but

1    not all suburban arrests.  And that there's, you know,

2    internal City rules about how this can be used, and, you know,

3    Mr. Noland and his colleagues attached those as an exhibit to

4    their supplemental submission.

5         And so what else would you like to tell me about this

6    on the plaintiff's side?

7         MS. GORMAN:  Your Honor, the only other thing I would

8    say if you're going to allow them to do that, because I think,

9    as I said in the response, I think it's not fair to the jury.

10   We take their word for following the law but not for --

11        THE COURT:  So here's the problem as I've always seen

12   it, and it largely is a practical problem, and it really comes

13   from the experience that Judge St. Eve had in the case that's

14   cited on the -- I think in somebody's paper's here.  I think

15   it's the defendants' papers.  Judge St. Eve had a case where

16   it wasn't done at the beginning.  And maybe there wasn't even

17   a request to do it at the beginning.  And then during the

18   trial people found it out, and then there was a massive

19   problem because it was determined that a juror had said

20   something that was untrue.

21        And I don't believe, and I have said this on other

22   occasion in other cases, I don't believe that I have the

23   authority to preclude somebody from doing an investigation

24   about something.  I mean, there's all sorts of public

25   databases where you can come up with conviction information.

1    And, frankly, that's what happened during Judge Pallmeyer's

2    trial in the George Ryan case.  It was publicly available

3    information from which the press initially found out that

4    there were jurors that had convictions that they quite clearly

5    had not disclosed, and there it came out during jury

6    deliberations, again, leading to a massive problem.

7         So since I can't preclude that, and since nobody in

8    my position, at least, in their right mind would want to find

9    out something like this in the middle of trial, basically in

10   the same way that it could be found out before trial in a way

11   that I really can't prevent, I don't think, then my conclusion

12   has been that the better way to do it is to put procedural

13   controls on it as to how and when it's going to be done and I

14   front it with the jury.

15        So what I've done with this in at least two of -- I

16   think I've done this -- I've allowed this in three cases.  And

17   there's certainly an argument to be made -- and I know for a

18   fact that Judge St. Eve has not done it in some cases more

19   recently.  There's an argument to be made that it has a

20   chilling effect on jurors.  Okay.  The problem is it has a

21   chilling effect -- what kind of chilling effect does it have

22   when it comes out in the middle of the trial and the juror is

23   told and other jurors find out, other people in the community

24   find out that they're investigating the jury in the middle of

25   the trial and bumping them off the jury?  It's the same

1  chilling effect.

2       So what I have done in other cases, so procedurally
3  the way this tends to work for me is there's a written
4  questionnaire, and we're going to talk about that later, which
5  they fill out somewhere else.  Usually my law clerks are
6  administering it to them.  In these situations what I have
7  done is I've gone down to where they're doing it, it's usually
8  another courtroom, with the court reporter, I think wearing
9  the robe, and I've basically given them a little introduction.
10 I'm going to tell you more in the courtroom, but you're going
11 to fill out a questionnaire, and just want to talk to you a
12 little bit about the questionnaire.  And I talk to them about
13 the importance of being accurate, and I do not specifically
14 say somebody's going to run a background check on you, but
15 what I do say is that what you have to understand and what you
16 have to keep in mind when you're filling out this
17 questionnaire is that it's important to be a hundred percent
18 candid and accurate because if you're not, you have to figure
19 that somebody's going to find it out, and then we're going to
20 have a real problem because then somebody is going to be
21 coming back to me and saying that a juror lied about something
22 or left something off, and it's going to be very problematic
23 if I don't find this out now, and so it's really important for
24 you to be candid.

25       And I'm not going say that that eliminated all the

1   problems because I don't know whether it eliminated all the

2   problems.  And I can't say that it even eliminated the

3   problems that I know about because I think in one of those

4   cases there was still a little bit of an issue.  There was

5   something that popped up that it wasn't clear whether it was

6   an arrest or not.  Anyway, but I think that's the better way

7   of doing it.

8          And so the procedural thing that I have done in other

9   cases -- and I don't think your firm has been in any of them.

10  I think a couple of the outside firms representing the City

11  have, but not your firm.  What I'd say is, okay, the jury list

12  is going to be available for you, for both sides, at my

13  courtroom deputy's office at X.  X is like 9:00.  You have --

14  you can come get it then.  You have to run every name.  You

15  have to run every name.  You have to bring to court by no

16  later than 11:00 the complete results of everything you have.

17  In other words, if there's any hits at all, you must print out

18  all the hits, and you have to come in with a copy for the

19  other side.  We address it before I've completed the

20  questioning of any jurors, and I address it with them at side

21  bar if there's something that turns out that doesn't show up

22  on the questionnaire.  And then, you know, that way everybody

23  knows about it.

24         And if you can't comply with all of that, I'm deeming

25  you have forfeited the ability to raise the question because

1  I've been told in the past and it's happened in the past that

2  what I have just described is completely doable.

3        So that's what I propose to do in this case.

4        MS. GORMAN:  I would only ask that the jury be told

5  that the defendants are the ones doing it.  I mean, I think

6  that's fair that they know that they're being surveilled by

7  the defendants.

8        THE COURT:  That request is overturned.  I mean, so

9  where that would lead is that then I'd be basically forced to

10 ask lawyers in every case, okay, give me an affidavit as to

11 everything you're doing to inquire into the jurors, either the

12 prospective jurors or the actual jurors.  And then I'd go tell

13 the jury, oh, by the way, just so you know, you know, one side

14 is, you know, checking up on your -- is doing Google searches

15 on you.  Doing Google searches on you.

16       No.  I mean, come on.  That request is overruled.

17       MS. GORMAN:  Okay.  Thank you.

18       THE COURT:  So that's the conditions on which -- so

19 I'm granting number 11 under those terms and conditions.

20       All right.  We're almost down to the end, but I don't

21 think we're going to be able to get done.

22       Number 12, statements by Sumner to Murphy and Swano.

23 And I know that I know this, and I know that I should be able

24 to dredge it up from memory quickly.  Is Sumner the guy who's

25 dead?

1        MR. NOLAND:  Yes.

2        THE COURT:  Okay.  So is something about what Sumner

3   has said going to come in?  The stuff that Sumner has said

4   that is inculpatory of Mr. Fields, is something about that

5   going to come in in some way, shape or form at the trial?

6        MR. NOLAND:  Yes.

7        THE COURT:  In what way?

8        MR. NOLAND:  At least through the testimony of one or

9   more of my clients that Sumner provided them information that

10  Mr. Fields was involved in the Smith-Hickman homicides and

11  then --

12       THE COURT:  That that was part of the probable cause.

13  Or that was what led them to arrest and shows that they're not

14  malicious and so on and so forth.

15       MR. NOLAND:  Yes.

16       THE COURT:  Yes.  Okay.

17       MR. NOLAND:  So at least in that frame it will come

18  in.  I don't know if there would be anything else.

19       THE COURT:  Okay.  What's the manner -- assuming that

20  you get, on the plaintiff's side you get to put in the

21  statements that Sumner made to Chuck Murphy and Mr. Swano, how

22  are you going to put it in?  Has he testified, has Sumner

23  testified about it before?  How are you going to get it in?

24  That's the question.  I'm talking about nuts and bolts here.

25       MR. GOODMAN:  I can't remember if he --

1    THE COURT:  Well, you've thought about how you're

2  going to get it in, right, because you objected in the motion

3  in limine.

4    MR. GOODMAN:  Right.

5    THE COURT:  Okay.  So how are you going to get it in?

6  It's not going to be just in the air.  There's going to have

7  to be some way that it comes in.

8    MR. GOODMAN:  Well, I guess I was focused on

9  evidentiary reasons to put it in.  Exactly how we're going to

10  put it in, Judge, I don't know that I have an answer to that.

11    THE COURT:  Okay.  So here's the thing.  If the

12  defendants are putting in statements of Mr. Sumner,

13  out-of-court statements of Mr. Sumner for purposes of showing

14  their state of mind, which is what you've just told me, under

15  Rule 806, a hearsay declarant, which is what Mr. Sumner is,

16  can be impeached in any way.  Okay.  So he can be impeached

17  just as if he were in court.

18    It's not -- I think it's 806.

19    MR. GOODMAN:  It's 806.

20    THE COURT:  It's 806.  Okay.  So he can be impeached

21  in any way.  So assuming you can come up with a way to get

22  this in that otherwise gets over whatever foundational

23  requirements there are, then you've got it.

24    MR. GOODMAN:  Okay.  I think that we'd intend to call

25  the investigator, and if I'm remembering correctly, the

1    investigator was also present.  So we would probably put this

2    in through an investigator named Bleifuss, who was present

3    when the statement was taken.

4              THE COURT:  Okay.  So that's the way you'd impeach

5    Mr. Sumner if he were in court.

6              MR. GOODMAN:  Yes.

7              THE COURT:  And that would be an appropriate way of

8    doing it.  So I think that's why -- that's why 12 is denied.

9              The last one we're going to do is 13, Dr. Silberberg.

10   Okay.  And so this is a specific part of Dr. Silberberg's --

11   hang on a second.  This is a specific part of Dr. Silberberg's

12   testimony about the interview of Mr. Fields that was done by

13   the defendants' psychologist, Dr. Wasyliw, that I gather

14   Dr. Cavanaugh then relied on.  Is that basically the -- more

15   or less?  Wasyliw did the face-to-face interview, not

16   Cavanaugh.

17             MR. NOLAND:  Yes.

18             THE COURT:  And then what did Cavanaugh get about

19   that interview?  Did he get a report?

20             MR. NOLAND:  He read the transcript.

21             THE COURT:  There's a transcript.  Okay.

22             MR. NOLAND:  And he watched some of the videotape.

23             THE COURT:  Okay.  He watched some of the video;

24   there's a transcript.  Okay.

25             And so what is it exactly that you want to put in

1  from Silberberg about that?

2  MS. GORMAN:  Dr. Silberberg said in his deposition,

3  I'm the only one that's going to be testifying that actually

4  interviewed Mr. --

5  THE COURT:  So Wasyliw is not going to testify.

6  Cavanaugh is the witness.

7  MR. NOLAND:  That's the plan.

8  THE COURT:  Okay.  So why would a judge allow an

9  expert to sort of -- I mean, what's the relevance from -- I

10  can see it being an appropriate argument.  In other words, you

11  cross examine Dr. Cavanaugh to say, okay, you had this -- you

12  could have sat in on the -- there was nothing to preclude you

13  from sitting in on the interview, right?  And he's going to

14  have to say no.  There was nothing to preclude you from at

15  least watching the whole video of the interview.  He's going

16  to have to say no.  And then you argue it to your heart's

17  content.  So why should I let Silberberg testify about this?

18  MS. GORMAN:  Because I think it goes to the

19  reliability of his --

20  THE COURT:  Okay.  But Silberberg, I mean, I -- you

21  know, I can understand, I can see Silberberg saying, okay, I'm

22  going to explain to you why it's important to do a

23  face-to-face interview of a person, and here's why.  But it

24  seems to me that you then want to go the next step and say and

25  this is why Cavanaugh's opinion is bogus, because he didn't do

1  that.  It seems to me that's more appropriate for argument

2  rather than testimony by a witness.  I mean, am I missing

3  something?

4          MS. GORMAN:  Well, I mean, I think it goes to -- I

5  mean, I think it would be nice for him to be able to go into

6  detail why an interview that takes place in person is quite

7  different --

8          THE COURT:  I'm not precluding you from doing that.

9  What I'm saying is I don't -- I mean, basically what I'm

10  getting from this is you want to do all of that, plus then you

11  want to have Silberberg give a little mini closing argument

12  about Cavanaugh.

13          MS. GORMAN:  Well, actually what I want him to be

14  able to say is why, why what he is saying doesn't carry much

15  credibility at all because he never interviewed him and didn't

16  even watch the whole video.  I mean, that's really what we're

17  going at.

18          THE COURT:  Okay.  Now I get it.  Let me hear from

19  the defense on that.

20          MR. MICHALIK:  Judge, I think that even allowing the

21  plaintiff to argue that would be completely unfair under the

22  context in which the defense examination was --

23          THE COURT:  But timeout.  There was nothing to

24  prevent Cavanaugh from being there.  He made a choice that he

25  wasn't going to be there.  I didn't say Cavanaugh can't be

1    there.  I didn't say only one person can interview him.  I

2    said there can be only one interview.  I didn't control the

3    number of the people in the room.

4                MR. MICHALIK:  And part of what Dr. Silberberg says

5    is that he conducted two interviews and that was critical to

6    his decision.  We were precluded from doing exactly that.  In

7    his own words, Silberberg --

8                THE COURT:  Oh, I see what you're saying.

9                MR. MICHALIK:  -- said he utilized the very

10   procedure --

11               THE COURT:  Okay.  I get your point on that.  Let's

12   say I preclude Silberberg from saying two interviews versus

13   one is an important thing because I wouldn't let you do two.

14   What about the rest of it?  I mean, what's wrong with him

15   being able to testify that being there is what you need to do,

16   it's not good enough to just read a transcript?

17               MR. MICHALIK:  Because originally Dr. Cavanaugh did

18   request to do that very thing, conduct his own interview.

19               THE COURT:  But what you're saying is unfair, but

20   what you're saying is unfair is that I precluded you from

21   something.  I did not preclude Dr. Cavanaugh from being in the

22   interview.  Right?

23               MR. MICHALIK:  Well --

24               THE COURT:  Did I?  Well, did I?

25               MR. MICHALIK:  No.

1    THE COURT:  Okay.  So then that's not anything --
2  there's not anything unfair about that, so why -- so if we
3  boil down this issue, Ms. Gorman, to I'm not going to let you
4  go into two interviews versus one because I told them they
5  couldn't do two interviews.

6    MS. GORMAN:  And we already agreed to that in our
7  response.

8    THE COURT:  Oh, okay.  Fine.  That's where the line
9  gets drawn.  He can testify about why the live interview is
10  important.  He can testify about why it's important to be
11  there.  You know, all of the reasons for that he can testify
12  about, you know, that.  You can cross examine Cavanaugh on him
13  not being there.

14    And, by the way, if Cavanaugh -- and I'm familiar
15  with him.  I put him on as a witness in the trial of Hamlet
16  with Justice Kennedy presiding.  True story.  Anyway.  He's a
17  very qualified guy.  He's a very skilled guy.  And he's a very
18  good witness.  He'd best not be blurting out on the witness
19  stand the judge wouldn't let me do it, because what's going to
20  happen when he does that is I'm going to turn to the jury and
21  I'm going to say, ladies and gentlemen, Dr. Cavanaugh is
22  incorrect about that.  Here's what happened.  Okay.  So you'd
23  best be instructing him before the trial.

24    So, but he can't -- but Silberberg cannot testify
25  that two interviews is -- that it's the second interview

1  that's the, you know, critical factor.

2            And that's where we're going to stop.

3            MS. GORMAN:  Thank you, your Honor.

4            THE COURT:  So my closing arguments and instructing

5   the jury will be done, I believe, by 10:30, and that's when

6   I'd like you back, 10:30 tomorrow.  And I'm hoping to get

7   through the rest of -- we'll get through the rest of the

8   motions in limine tomorrow because we've done more than half

9   of them so far.

10           I think it's unlikely that I'll be able to give you a

11  decision on the big one, number 1, by then because I'm going

12  to have a lot to read.  But if you don't get it then, you're

13  going to get it over the weekend.  What you're going to find

14  is you're going to be getting rulings from me at all hours of

15  the day and all days of the week pretty much.  It's kind of a

16  mania of sorts.

17           Okay.  We're going to go off the record and then

18  we're going to talk about some logistical stuff.

19           (Said hearing was adjourned at 5:05 p.m., to resume

20  March 7, 2014, at 10:30 a.m.)

21

22

23

24

25