```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4    NATHSON E. FIELDS,              )
                                      )
 5                    Plaintiff,      )    Docket No. 10 C 1168
                                      )
 6              vs.                   )
                                      )
 7    CITY OF CHICAGO, et al.,        )    Chicago, Illinois
                                      )    March 7, 2014
 8                    Defendants.     )    11:15 a.m.

 9                    TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13    For the Plaintiff:     LAW OFFICES OF H. CANDACE GORMAN
                             BY:  MS. H. CANDACE GORMAN
14                           220 South Halsted Street
                             Suite 200
15                           Chicago, Illinois  60661

16
                             LEN GOODMAN LAW OFFICE, LLC
17                           BY:  MR. LEONARD C. GOODMAN
                                  MS. MELISSA A. MATUZAK
18                           Suite 1650
                             53 West Jackson Boulevard
19                           Chicago, Illinois  60604

20

21

22    For the Defendant:     DYKEMA GOSSETT PLLC
                             BY:  MR. TERRENCE M. BURNS
23                                MR. DANIEL M. NOLAND
                                  MR. PAUL A. MICHALIK
24                           10 South Wacker Drive
                             Suite 2300
25                           Chicago, Illinois  60606
```

1     LAURA M. BRENNAN - Official Court Reporter
2         219 South Dearborn Street - Room 2102
3               Chicago, Illinois  60604
                    (312) 435-5785

1    (The following proceedings were had in open court:)

2              THE COURT:  10 C 1186, Fields v. City of Chicago.

3              Can I have the lawyers' appearances for the record,

4    please?

5              MS. GORMAN:  Candace Gorman, Melissa Matuzak and Len

6    Goodman for the plaintiff Mr. Fields.

7              MR. NOLAND:  Dan Noland, Terry Burns and Paul

8    Michalik for the City defendants.

9              Your Honor, we apologize.

10             THE COURT:  And what is the explanation?  Why are you

11   strolling in the door at 11:15?  Is it because I did the

12   courtesy of saying I might be a little late?

13             MR. NOLAND:  We do appreciate it, your Honor, and --

14             THE COURT:  I want an answer to my question.

15             MR. NOLAND:  My paralegal was in the courtroom and

16   she sent us updates of what was going on with your trial.

17             THE COURT:  I'm imposing a fine of $500 for the waste

18   of time.  I have been sitting here for 10 minutes.  Each

19   defendant's attorney who is in the room is fined $500 payable

20   to the Clerk of the Court by Monday.

21             MR. NOLAND:  Judge, we do apologize.

22             THE COURT:  It's contempt of Court.  I'm not going to

23   call it that.  I'm going to call it a sanction, but it's

24   contempt of Court.

25             Defendants' motion in limine 14.  I think that the

1    plaintiff is entitled to get in the nature and, in general,

2    the contents of the file cabinet where the street file was

3    found though probably not the specifics of all of the other

4    files that are in there.

5            And so my question is:  What is the best mechanism

6    for doing that?  That's a question for both sides.  So let me

7    hear from the defendants first.

8            If you take that as a given, what is the best way for

9    that to happen, in your view?

10            MR. MICHALIK:  Well, your Honor, I guess in terms of

11    the nature and the contents of the files as to whether they

12    are open, closed, et cetera --

13            THE COURT:  No, I just --

14            So let me repeat what I said.  This will be the last

15    time I repeat anything today.  I think the plaintiff is

16    entitled to get in the nature of the file cabinet and,

17    generally speaking, the contents of it though probably not the

18    specifics that it was the Smith file, the Jones file from 1943

19    or whatever it is.  I'm not sure about the dates.

20            And so the question is what is the best way of

21    accomplishing that.  Are pictures sufficient or should the

22    file cabinets be here?

23            MR. MICHALIK:  I would think that a picture would be

24    sufficient.

25            THE COURT:  Do you have the pictures?

 1          MR. MICHALIK:  Plaintiff's counsel has taken pictures

 2     of the file cabinets.

 3          THE COURT:  Does somebody have the pictures here?

 4          MS. GORMAN:  I have them on my computer.

 5          THE COURT:  Can I see them?

 6       (Brief interruption.)

 7          MR. MICHALIK:  The cabinets themselves indicate the

 8     date range of the files within those file cabinets.

 9          THE COURT:  Let me see them.  You can come over here.

10       (Brief interruption.)

11          THE COURT:  Okay.  I've just looked at the photos, at

12     least the ones that Ms. Gorman had on her laptop, at sidebar.

13     So the question that was -- there was a point made in the

14     plaintiff's response over on page 33 --  I don't know how

15     significant this is, but that, you know, the only way you can

16     tell what the files look like is to open -- the file cabinets

17     look like is to open the drawers and see if there is anything

18     stuffed in there and so on.  So it doesn't look like there's a

19     picture of any of the file cabinets open.

20          MS. GORMAN:  No, I don't believe there is, your

21     Honor.

22          THE COURT:  What about that?

23          MS. GORMAN:  We didn't see it when we were looking

24     just now.  I don't have a recollection that we did a photo

25     like that.

1    THE COURT:  What about that?

2    MR. MICHALIK:  We can certainly provide pictures and

3  have them available.

4    THE COURT:  So let me ask you this question.  In

5  looking at those, how many file cabinets are there altogether?

6  It looked like there's about a couple of dozen of them.

7    MS. GORMAN:  There's more than 20 in the basement.

8  We're only asking for the one to be brought to the courthouse.

9    THE COURT:  Oh, okay, just the one.

10    And, you know, we were having trouble finding which

11  one it was over there.  If we're talking about the one, does

12  everybody know what the one is?

13    MS. GORMAN:  Yes.

14    THE COURT:  Okay.

15    MS. GORMAN:  It was one that --

16    THE COURT:  Why shouldn't I just have you bring that

17  one here and then use the photographs to illustrate the rest

18  of it?

19    MR. MICHALIK:  Well, it's part of a series of file

20  cabinets that are over at the Area central currently right

21  now, and I don't know how often detectives need to access

22  those files, whether or not that would be --

23    THE COURT:  Well, my guess is if they were accessing

24  them directly, I would have seen that in something you all had

25  filed in one of the prior things, or in this thing.

1    So the file cabinet's going to be brought here.  You

2  will figure out what date.  It's not going to sit here the

3  whole trial.

4    MS. GORMAN:  I would like it for opening, your Honor.

5    THE COURT:  Well, you're probably not going to get it

6  for opening.  You're going to get it for when it's used during

7  the testimony of, you know, the witness who is going to

8  testify about it.  So for opening you're just going to have to

9  work with pictures.  So it will be brought here at most two

10  days, and I don't know if the witnesses carry over -- the

11  witness or witnesses carry over days.

12    So you're going to need --

13    What that means is you are going to need to make

14  arrangements with the marshals service to bring it in through

15  the basement, and I'm not sure exactly how it works from

16  there, but that's in your hands at this point.  I've made the

17  order.  And so if you need --

18    If, when you talk to them -- and I would not wait

19  much past Monday.  When you talk to them, if they need some

20  sort of a piece of paper from me, I'm going to leave it to the

21  defendants, who are the people who are going to be bringing it

22  in, to tell me that, and I will get the piece of paper done.

23    MR. MICHALIK:  Your Honor, if I could ask one point

24  on that issue?  If the file cabinet's going to be here

25  overnight, there is a concern for its security.

1    THE COURT: Yes. So we can put it -- we can do one

2 of two things. We can put it in the lockup there because I

3 don't think it's likely that there will be -- depending on

4 what day, I don't think I'm going to have much going on in the

5 way of criminal cases, and that you can't even get in from

6 here. It's only accessible from the marshals lockup.

7    The second possibility would be to put it in my

8 chambers. And, you know, nobody gets in there other than the

9 cleaning staff, and the cleaning staff isn't going to look at

10 anything. I mean, I leave money sitting out on the table and

11 they don't take it. And it may be that we can get it all done

12 within one day, which would be the ideal way to do it.

13    So I'm not sure I quite am getting completely, Ms.

14 Gorman, what you want to or what you're proposing to go into

15 regarding the contents of it. What do you want to do? What

16 are you asking to do?

17    MS. GORMAN: I know your Honor doesn't want me to go

18 through the names.

19    THE COURT: Well, I don't know. I mean, that's why

20 I'm asking you what you're asking me to do.

21    MS. GORMAN: Well, I would like to be able to point

22 out the names of files for cases that are left in there as

23 open but they're not actually open, so the ones that we talked

24 about.

25    THE COURT: Say that again. Well, we have talked

1  about a lot of stuff, so remind me.  What are the four?

2          MS. GORMAN:  Should I say those names on the record?

3          THE COURT:  Yes, I am directing you to say it.

4          MS. GORMAN:  Thank you.  The Bibbs file.

5          THE COURT:  Bibbs.

6          MS. GORMAN:  The Charmange Nathan.

7          THE COURT:  Nathan.

8          MS. GORMAN:  And I think those would be the only two.

9          THE COURT:  So it's not four, it's two?

10          MS. GORMAN:  There's four that we discussed, but one

11  of them it's unclear whether it was open or not.

12          THE COURT:  And so the point you're trying to make

13  out of those is that they're in a cabinet that is purportedly

14  for open files and those are not open cases?

15          MS. GORMAN:  Right.  The other thing --

16          THE COURT:  And where does that get you?  I'm not

17  disagreeing that it gets you anywhere; I just want to know

18  what it is.

19          MS. GORMAN:  That they're using this file cabinet as

20  a place to hide files, hide files that were not tendered that

21  we don't --

22          THE COURT:  You know, the only way you get in the

23  "were not tendered" is you trot in some lawyer from that other

24  case and that lawyer says, or there may be some other way of

25  doing it, but the most obvious way would be to bring in a

1   lawyer to say:  I've looked at this, I've never seen this
2   thing.

3          I don't know that there is anybody like that on the
4   witness list, so you're not going to be in a position to argue
5   that the other stuff wasn't tendered to someone.

6          MS. GORMAN:  Your Honor, I could never approach any
7   of those lawyers because of the protective order, so I --

8          THE COURT:  Yes, but you know what, I'm just going to
9   tell both sides this here.  I am through redoing history here,
10  I mean, because I'm constantly being asked to revisit stuff in
11  this case.  I'm getting sick and tired of it.

12         What I am virtually certain what I said is that if
13  you had something to do, you needed to come back to me and ask
14  me, and you did not.  And I've pointed that out to you on
15  multiple occasions, and this is going to be the last time.

16         So you could have come back to me and said, okay,
17  Judge, here is exactly what I want to do with this and here is
18  why.  You did not do that.

19         MS. GORMAN:  Okay.

20         THE COURT:  Discovery is done, okay.  That's it.  So
21  you're not going to be able --

22         I mean, unless you have got some evidence that is
23  going to be admitted that something wasn't tendered to
24  somebody that is related to another case, then you're not
25  going to be able to make that argument.

1          MS. GORMAN:  I can make the argument with the
2    witnesses that we have that these files should not have been
3    in that cabinet.
4          THE COURT:  That's a different question.
5          MS. GORMAN:  Okay.
6          THE COURT:  Okay.  So why do you --
7          Okay.
8          MS. GORMAN:  Your Honor, the other thing I would like
9    to use the cabinet for, one of the things we raised in our
10   summary judgment was that the actual physical file for the
11   street file violates the special order.
12         THE COURT:  No, I noticed that.  That is on
13   page 30 -- it's on 32, I think.
14         32, you're arguing --
15         Actually that was another question I had for the
16   defendant.  The plaintiff argues on page 32 of the response:
17         "This is significant because its maintenance" -- it
18   being the street file -- "maintenance in that file room
19   violates special order 86-3, which, according to the letter of
20   the order and 30(b)(6) witness Hickey, required that if the
21   case was considered, quote, 'cleared and open with an offender
22   at large,' close quote, as allegedly herein, the Area was
23   required to send a copy of the investigative note to the
24   records division until either the case is completely closed or
25   ten years had passed.  Neither procedure was followed in this

1  case."

2          Is that what you're talking about?

3          MS. GORMAN:  Well, that's part of it.  The other part

4  is the physical look of the file because 83-1 and 86-3 both

5  say how the street file is supposed to look --

6          THE COURT:  I see.

7          MS. GORMAN:  -- physically.

8          And there are files in that cabinet that conform to

9  that, but the file in Mr. Fields' case does not.  So I would

10  like to be able to show one of those files even if we block

11  the name or something.

12          THE COURT:  Okay.  Well, I mean, if the file cabinet

13  is here, what you're talking about is in that same file

14  cabinet.

15          MS. GORMAN:  Yes.

16          THE COURT:  I mean, that sounds okay to me.  I can

17  address the particulars of it once I actually see what we're

18  talking about live.

19          So just to deal with the particulars of motion 14, I

20  mean, I don't think that the plaintiff is entitled to argue,

21  as I said, that other files relating to other matters were not

22  turned over.  I'm sort of reluctant to have particular names

23  of files discussed at the trial, but I'm not necessarily

24  ruling it out.

25          And the file cabinet's to be here.  I think

1   presumptively the plaintiff is entitled to show the jury what

2   it looks like.  And the point that Ms. Gorman was just making

3   with regard to, you know, comparing the look of the files to,

4   you know, what is in the general order, I think presumptively

5   that's okay.

6          And I think that unless somebody thinks there is

7   something I have not ruled on, I think that covers number 14.

8          MR. MICHALIK:  Well, your Honor, I guess that -- you

9   know, my only comment on that would be that whether or not

10  that file looks like it complies with a special order or

11  whether that file looks like -- it looks like another file,

12  doesn't really advance the ball in the Monell claim, which is

13  that files were withheld from criminal suspects.

14         THE COURT:  Yes.  Well, but, you know, not every

15  piece of evidence has to prove the case beyond a reasonable

16  doubt.  I think it's relevant.

17         So we're moving on to number 15.  Okay.  So this is

18  the one where I had asked the defendants to provide more -- or

19  the plaintiff to provide more information regarding what

20  evidence the plaintiff wanted to put in regarding the finding

21  of the street file or the discovery process.  And so I got

22  this document here.  It's called Proffer Regarding Finding the

23  Street File.  It's document number 537.  It's about seven or

24  eight pages.  I looked through it, and it looks like there's

25  basically two -- most of it doesn't really relate to the

1  process of discovery in the lawsuit.  It relates to the

2  process of discovery of the file, and those are -- there's

3  some overlap.

4        But the two things that I thought related to

5  discovery in the case is over on page 2 in the middle of the

6  page.  There is a sentence that reads:

7        "In 2010 Fields filed this lawsuit, and attorneys at

8  Dykema sought all of the files related to the case."

9        So that sort of implies that the plaintiff wants to

10  put in that there was a request from the law firm representing

11  the defendants for files relating to the case.  And I don't

12  know how you --

13        Is that a witness?  Is it a document?  Is it one of

14  the deps?

15        MS. GORMAN:  I'm hoping we can stipulate to it

16  because it came out in the transcript that I showed you.

17        THE COURT:  Okay.

18        MS. GORMAN:  I'm sorry.  We also have the email chain

19  that we can put in with Sergeant Loughran.

20        THE COURT:  Okay.  And then the other part is on the

21  top of page 2 in the discussion of Sergeant --

22        How is it pronounced?  Loughran?

23        MR. MICHALIK:  Loughran.

24        THE COURT:  Loughran, L-o-u-g-h-r-a-n.

25        So evidently she's going to say -- you know, she was

1   told that -- well, I'm actually starting at the bottom of

2   page 2.  She was told via emails that somebody was checking

3   with the Area to see if it had the file.  She went on leave.

4   When she got back around June the 23rd of I'm not sure what

5   year --

6           MS. GORMAN:  I'm sorry.  That was 2010.

7           THE COURT:  -- 2010, the file was there.  "There"

8   means like what, on her desk or something?

9           MR. MICHALIK:  On her desk.

10          THE COURT:  On her desk.  Okay.

11          She arranged for it to be sent to the Dykema firm.

12  Then when you get to -- the next part is more directly

13  involving, you know, things that happened in court or the

14  discovery process.

15          February 20th of 2013, I asked Mr. Noland if he had

16  any idea who found it.  Noland said that Loughran would

17  testify that she called down to the area of the violent crimes

18  unit.  Her understanding is she spoke to Detective Sam Brown,

19  who was the person in charge of the homicide files and the

20  organizing of the homicide files.

21          Noland further stated that Loughran would state that

22  Brown or someone in his stead would pull the file and make a

23  copy and bring it to her.  Noland further stated that Brown

24  would say that he drove the file to headquarters, dropped it

25  off and then it was produced.

1    Loughran was deposed as a 30(b)(6) witness only.

2    Plaintiff didn't know at the time of her deposition that she

3    played a role in the recovery of the file.

4         So the recitation of what you think Loughran would

5    testify there is not from her deposition because you were

6    deposing her in a different capacity comes from what Mr.

7    Noland said in court.

8         MS. GORMAN:  Correct.

9         THE COURT:  Is there any reason to think --

10        Is she on the witness list?

11        MS. GORMAN:  Yes.

12        THE COURT:  Is there any reason -- I'm asking the

13   defendants' counsel this.  Is there any reason to think that

14   if Loughran were called to testify, that she would say

15   something different from this?

16        MR. MICHALIK:  No, your Honor.  The only possible

17   quibble was how Brown got the file to her, whether he drove it

18   over there or whether it was in her office mail.  But, no,

19   that's what she would testify to.

20        THE COURT:  So it doesn't sound like to me then,

21   aside from the one little thing of, you know, the law firm

22   requested the file at a certain point in time, that you are

23   really proposing to put anything in about the discovery -- the

24   discovery process under the discovery rules in court.  I mean,

25   you want to put in evidence about how the file was discovered,

1  but that's a different matter.

2  Am I missing something?

3  MS. GORMAN:  Well, the point that is important about

4  Loughran's testimony is that it's contradicted by Sam Brown.

5  THE COURT:  No, no, you're missing my point.

6  MS. GORMAN:  I'm sorry.

7  THE COURT:  The motion that was filed here, it's

8  motion number 15 -- the title of motion number 15 by the

9  defendants is to bar evidence and testimony arising from

10  discovery issues involving the subject file.  Okay.  And so

11  the contention is that, at least as I'm reading it, that the

12  plaintiff wanted to put in stuff that happened in court in the

13  discovery motions and things like that.  And it doesn't sound

14  like you want to do that.

15  MS. GORMAN:  No.

16  THE COURT:  That's not what you're trying to do.

17  MS. GORMAN:  No.  I think I misread their motion.

18  THE COURT:  Maybe I misunderstood it.  So what is it

19  exactly you're trying to keep out by this motion?

20  MR. MICHALIK:  Well, your Honor, as you well know,

21  there was extensive discovery into the chain of custody of

22  this file.

23  THE COURT:  Just get to my question, please --

24  MR. MICHALIK:  The City said --

25  THE COURT:  -- way quicker.

1           MR. MICHALIK:  We can't establish a chain of custody.

2   You allowed plaintiff to challenge that assertion.

3           THE COURT:  Right.

4           MR. MICHALIK:  And all of these witnesses that we

5   have listed in the motion were deposed specifically for that

6   reason.  We can't admit it.  None of those witnesses are going

7   to shed any light on that.  And so for them to testify as to

8   something that we have already acknowledged, there is really

9   no point in doing that.  It all goes to the chain of custody

10   of the file.

11           THE COURT:  Oh, so you're not asking to keep out

12   things about discovery motions.  You're asking to keep out

13   anything about the attempt to locate or where the file was or

14   anything like that.

15           MR. MICHALIK:  No.  Once the file is found in 2010 --

16           THE COURT:  Do you know what my question was?

17           MR. MICHALIK:  What is this motion asking?

18           THE COURT:  What are you asking me to keep out?

19           MR. MICHALIK:  We're asking you to keep out from

20   trial testimony pertaining to the investigation into the chain

21   of custody of this file after it was located in 2010 by the

22   City.

23           THE COURT:  So, in other words, you think that the

24   plaintiff shouldn't be able to call Sergeant Loughran,

25   Detective Brown, Commander Walsh, et cetera, et cetera.

1          MR. MICHALIK:  Correct.

2          THE COURT:  Okay.  And I'm assuming that --

3          I mean, at least my sense of this is that part of

4   what the plaintiff is trying to prove is that:  Okay, this is

5   really strange.  This file just showed up on somebody's desk

6   one day after it had been requested going back to 1980

7   whatever and had been requested in this case.  It just showed

8   up on somebody's desk and nobody can explain where it was and

9   where it came from and how it got there.  And all of that

10  tends to support the notion that it was concealed.

11         MS. GORMAN:  Correct.

12         THE COURT:  I mean, can you give me a straight-faced

13  argument as to why that isn't a viable theory that they ought

14  to be able to get in evidence of?

15         MR. MICHALIK:  Well, many of these witnesses would

16  have absolutely no bearing on that question.

17         THE COURT:  Well, you know, one of the things about

18  time limits is that people can blow their time however they

19  want to.  And so if somebody wants to waste an hour of their

20  time calling somebody who's not going to say anything, then

21  that's an hour that they can't use on something else.  And I

22  guess I'm not prepared to go through --

23         You know, Ms. Gorman has identified eight people

24  here.  I mean, I'm not really prepared to -- I'm not really

25  prepared to go through and say you can call 1, 3, 5, 7 and 9

1   and not 2, 4, 6 and 8, and that's not what the motion said.

2   The motion has to preclude everything regarding this.  That

3   motion is denied.  It is relevant on the Monell claim, and

4   it's relevant on the issue of whether the materials were

5   disclosed and probably on other issues as well.

6          As far as particular people are concerned, I mean,

7   you know, I'm going to assume that people are cognizant of the

8   time constraints that they have on them and are going to, you

9   know, try to focus on what is important.  But, you know, if

10  there's -- if as we get into this and you want to make another

11  run at, you know, you shouldn't be able to call Officer Betts

12  for the following reasons, then I will deal with that when it

13  happens.  But motion number 15 is denied.

14         MR. MICHALIK:  If I may raise one more issue with

15  respect to motion 15?

16         THE COURT:  Yes.

17         MR. MICHALIK:  We also in that motion referenced some

18  of the letters back and forth between the City and plaintiff.

19  Mr. Noland's letters, for example, letters back and forth

20  regarding setting up meetings, none of that goes to the issue

21  of whether or not this file was withheld or suppressed or

22  anything.

23         THE COURT:  What are the letters that you're wanting

24  to put in that he's talking about?

25         MS. GORMAN:  I don't know.  I didn't know I was

1    putting in any letters.

2         MR. MICHALIK:  It's in the proposed exhibit list,

3    your Honor.  We filed objections to those.  Those include

4    internal emails, letters from Mr. Noland, a transcript.  In

5    fact, one of the exhibits was a transcript of a hearing in

6    this court.

7         THE COURT:  Well, that's not coming in.  I mean, I

8    think what you ought to endeavor to do, the two sides ought to

9    endeavor to do, is to try to come up with some sort of a

10   general time line that you can do by stipulation so as to

11   avoid the need to prove it up in some other way that, you

12   know, the file was requested by the attorneys representing the

13   City and the defendants on such and such a date.  And, you

14   know, I don't know whether other dates are relevant beyond

15   that.  That one probably is.  I don't know the others that are

16   relevant.

17        My suggestion is that, you know, the plaintiff

18   proposes something to the defendant:  These are the dates that

19   we want to -- dates and events we want to propose to establish

20   by stipulation.  See if you can work something out.  If you

21   can't, then I will address, you know, to the extent it is

22   necessary, whether particular exhibits should come in.  But I

23   think the goal should be to try to forego putting in

24   something, you know, an email or a letter that's got a

25   lawyer's name on it.

1          MS. GORMAN:  Your Honor, the issue with the email

2   chain I think is important, and we want to have that in

3   because that shows the finding of the file, and the email

4   chain also shows that it was given by Walsh, her office, to

5   Dykema.  But there's not like emails.  They're just copied to

6   the Dykema people.  I don't believe there is any email

7   exchange.

8          The letter that was in there from Mr. Noland was in

9   there for a particular purpose that is not necessary if we can

10  stipulate to the fact that they gave -- they didn't give us

11  the Area file until 2012.  That was the only reason that was

12  in there.  So I feel certain --

13         THE COURT:  I'm just going to repeat what I said.

14  See if you can come up with a stipulation that avoids the need

15  to put in correspondence with lawyers.

16         MS. GORMAN:  Okay, thank you.

17         THE COURT:  And I will rule on it if I have to.  Let

18  me just make a note here.

19         (Brief interruption.)

20         THE COURT:  Okay.  So the last one on the defense

21  side has to do with issues relating to Mr. Hogan.  And in the

22  response, what I guess I'm being told that the plaintiff wants

23  to put in are a series of statements from -- I don't know if

24  that's Judge Holderman's opinion in the Andrews case.

25         MR. GOODMAN:  I think that's Judge Conlon.

1          THE COURT:  Judge Conlon's opinion.

2          Well, on page 37 the plaintiff says, this is what we

3   want to put in.  And there's five little quotes listed which

4   essentially consist of findings by whoever the judge is

5   regarding credibility of Mr. Hogan, making false statements,

6   having personal knowledge, et cetera.

7          So here is my question for the plaintiff.  How is

8   that not hearsay?

1    MR. GOODMAN:  Well, it is hearsay, but it's -- you

2    know, we cited the law apparently is that if there's judicial

3    findings, judicial determinations, that's what we consider

4    those to be, they're judicial determinations, and the Court

5    has discretion to allow --

6         THE COURT:  But Dawson is a case about 608(b).  It's

7    not a case about hearsay.

8         So, I mean, basically what you're wanting to put in

9    is Judge Conlon on such and such a date in the year 1993 said

10   that Bill Hogan was not credible.  Okay.  That's hearsay

11   because you're wanting to put in an out-of-court statement, in

12   other words, Judge Conlon's statement in the opinion, to prove

13   the truth of what she said, which is that Mr. Hogan isn't

14   credible.

15        MR. GOODMAN:  Maybe we were unclear, but all we're

16   talking about is impeachment.  We're not talking about putting

17   this in as substantive evidence.

18        THE COURT:  I understand, but how do you get it in

19   otherwise?  You want to ask him isn't it a fact that Judge

20   Conlon found you not to be credible.

21        MR. GOODMAN:  Correct.

22        THE COURT:  It's still hearsay, so how do you get

23   around the hearsay argument?

24        MR. GOODMAN:  I don't know, Judge.  My understanding

25   was if there was a finding that somebody --

1         THE COURT:  I mean, it's going to be the same deal,

2    by the way, on Judge Biebel's findings, even if you didn't

3    have the whole collateral estoppel thing I talked about

4    yesterday, on Judge Biebel's findings regarding Mr. Fields.

5    It's hearsay.  It's hearsay.  I mean, there's several other

6    reasons why that isn't coming in.

7         MR. GOODMAN:  Okay.

8         THE COURT:  But it's hearsay.  And, frankly, I think

9    I would likely exclude it under 403 anyway, but I don't think

10   I even need to get to that point because I think it's hearsay,

11   and I'm not hearing any exception to the hearsay rule that

12   allows Judge Conlon's findings to come in.

13        Let me ask this question.  And this may be sort of a

14   nice segue into the plaintiff's motions in limine.  So what's

15   the topic or topics of Mr. Hogan's testimony?

16        By the way, while I'm thinking of it, I should say

17   Ted Poulos is listed as a witness.  He's a former partner of

18   mine.  So I'm just telling you that.  I don't think it has

19   anything to do with anything other than it had best not be

20   elicited by anybody at the trial.  You won't need to instruct

21   Mr. Poulos on this because he's as good as they come, but

22   somebody needs to tell him that he shouldn't be saying he's,

23   you know, a former partner of mine or whatever.

24        But, anyway, so what's the subject of Mr. Hogan's

25   testimony?

1    MR. NOLAND:  Mr. Hogan is going to be testifying on a

2    variety of matters.  One would be how the wiretaps, the

3    transcripts, the translations were created.

4    THE COURT:  So one is the creation of the transcripts

5    of the wiretaps.

6    MR. NOLAND:  Yes.

7    THE COURT:  Okay.  What else?

8    MR. NOLAND:  Two will be Mr. Hogan dealt with all the

9    cooperating witnesses who we are planning on calling during

10   this trial and interviewed them extensively without any of our

11   officers around.  He would testify that they said the same

12   things with respect to Nathson Fields' involvement in this

13   case.  And that would be to rebut that our clients coerced or

14   otherwise suggested that these officers --

15   THE COURT:  So, in other words, it's essentially

16   prior consistent statements to rebut an inference of coercion

17   or --

18   MR. NOLAND:  Yes.

19   There are allegations that Mr. Earl Hawkins lied

20   about Fields on the Vaughn-White case before the grand jury in

21   1989.  Mr. Hogan will explain what happened with respect to

22   that situation.

23   THE COURT:  What's he going to say?

24   MR. NOLAND:  It was his mistake.  He put Hawkins on

25   the grand jury.  It was a 50-page statement that Hogan wrote

1    for -- Hogan wrote to read to Hawkins while he was in the

2    grand jury.  He would read two pages and say to Mr. Hawkins,

3    and is that true, and, you know, Hawkins' role was to confirm

4    it.  And Hogan will testify how that went down.  And it's our

5    position that Earl Hawkins never said that Nathson Fields was

6    involved in Vaughn-White and Hogan made that mistake by

7    including Vaughn-White in his statement based on the record

8    that Hogan had read and that in fact -- and that's where

9    Mr. Poulos comes in as well.  In April of 1991, all this time

10   Hogan -- I'm sorry, Hawkins did not have immunity.  He could

11   not testify about or talk about the Smith-Hickman and

12   Vaughn-White matters because he was on death row and the State

13   was not making any deal on that, and in April of '91 Judge

14   Holderman gave Mr. Hawkins immunity, and so Mr. Poulos and

15   Mr. Hogan then debriefed Mr. Hawkins for the first time about

16   the Vaughn-White case, and that's when they learned that

17   Nathson Fields was not, or Earl Hawkins said Nathson Fields

18   was not there.  That started the process of how Fields was

19   taken out of the Vaughn-White case.

20            THE COURT:  Okay.  You gave me a lot there, and I

21   just want to walk back through it.

22            So the episode where Mr. Hogan is reading two pages,

23   the statement two pages at a time and Mr. Hawkins is

24   confirming it, is that before or after he got immunity?

25            MR. NOLAND:  Two years before.

1        THE COURT:  Okay.  So it's like '89-ish or something

2  like that?

3        MR. NOLAND:  Yes.

4        THE COURT:  And so it's in the grand jury.  Mr. Hogan

5  reads something.  Mr. Hawkins is there.  And Hogans reads

6  something and says is that true, and Mr. Hawkins says yes, or

7  something to that effect.

8        MR. NOLAND:  Yes.

9        THE COURT:  Okay.  And do you have the written

10  statement, or do you just have the transcript of it?

11        MR. NOLAND:  Either have the statement or the

12  transcript.  I can't remember which it is.

13        THE COURT:  And so sort of the backdrop of this is,

14  is in that statement that Mr. Hogan is reading to Mr. Hawkins

15  and Mr. Hawkins is confirming periodically, there's a

16  statement that Mr. Fields was involved in the Vaughn and White

17  murder?

18        MR. NOLAND:  Yes.

19        THE COURT:  Okay.  And does Mr. Hogan say that he

20  misread the statement or that it was in the statement but it

21  shouldn't have been?

22        MR. NOLAND:  It was in the statement.  It should not

23  have been.

24        THE COURT:  And what does he say about how it got in

25  the statement to begin with?

1        MR. NOLAND:  He bases it on the record he -- the

2   record -- they -- Fields had -- they had used that in

3   aggravation against Fields in 1986, and what Anthony Sumner

4   had said at that time was that Fields was involved, so he

5   based it on the record in preparing the statement, not based

6   on his interviews of Earl Hawkins, because Hawkins did not

7   have immunity, was on death row, the State wasn't --

8        THE COURT:  So had he interviewed Hawkins yet at that

9   point?

10       MR. NOLAND:  He had interviewed Hawkins at length to

11  get the 50 pages worth of information.  He had not interviewed

12  Hawkins on the Vaughn-White case.  And in fact --

13       Yeah.

14       THE COURT:  Okay.  Now I understand the backdrop.

15  Okay.  And so what I've got in terms of Hogan's testimony is

16  creation of the transcripts of the wiretaps, prior statement

17  of various El Rukns to rebut the claim of coercion because

18  they made similar statements when the defendants weren't

19  there.  I've got this whole Hawkins thing.  What else is in

20  his -- Mr. Hogan's testimony?

21       MR. NOLAND:  Mr. Hogan will explain that the

22  cooperating government witnesses were kept separate,

23  interviewed separately at different times when they were

24  brought in, et cetera, no collusion, in other words.

25       Mr. Hogan would explain he tried Judge Maloney as

1    well for this case, the Smith-Hickman bribe, and so there

2    would be matters there with respect to --

3         THE COURT:  He's going to talk about what the trial

4    was like?

5         MR. NOLAND:  No.  The evidence that was put in.  We

6    have the exact transcripts and translations and the wiretaps

7    and the process.  And this kind of goes to that first issue I

8    said because he worked with Derrick Kees on the translation,

9    so it probably overlapped with respect to that.

10        THE COURT:  Okay.

11        MR. NOLAND:  He was the lead prosecutor on the RICO

12   prosecutions, and there would be background involved with that

13   that we'd be seeking to elicit.

14        THE COURT:  Like.  Give me a for instance.  And the

15   reason I'm asking this is I suspect that some of this is going

16   to sort of edge over into some of the motions in limine I have

17   to deal with in a second here.

18        MR. NOLAND:  Timelines, what happened, the

19   investigation went from, when he got involved, how the

20   cooperating witnesses came forward, when the grand jury

21   indictment was, what was the task force that my clients were

22   working on, what my clients' role was.  Moving forward to the

23   indictment, the prosecution, our clients' role, all the

24   cooperating witnesses' roles.  The trials themselves.  There

25   were a series of trials.  I think it was six or eight trials

1    in 1991 where all -- you know, many of the cooperating

2    witnesses testified from trial to trial to trial in this

3    building, providing information, testifying about, you know,

4    Fields' involvement in it.

5              And so it would be -- he had --

6              THE COURT:  All right.  I have a general sense at

7    this point.  That's good enough.

8              So I guess I think I've made a ruling on number 16.

9    Items that the plaintiff says at page 37 of the motion that

10   they want to put in I think are hearsay.  They're excluded for

11   that reason.

12             So I think we're done with the defense motions in

13   limine, at least the ones that were filed in the original set.

14   So we're going to flip over to the plaintiff's motions in

15   limine.

16             And just so you know, so unfortunately, I went

17   until -- we're going to go until about 12:15.  Then we're

18   going to stop.  At 1:00 I have to hear an oral argument on a

19   motion for class certification.  At 1:30 I'm taking a guilty

20   plea.  And I want you back here at 1:45, and then we'll just

21   plow our way through the rest of it.

22             Okay.  So the first general topic, which has five

23   subtopics, in the plaintiff's motion has to do with expert

24   testimony.  Some of this I believe that I have dealt with, and

25   I'm going to skip around a little bit.

1           On William -- is it pronounced "alley" or "allay"?

2          MR. NOLAND:  "Ali."

3          THE COURT:  "Ali."  Neither of the above.  Okay.

4           I think I've pretty much told you what I think he can

5  talk -- what I think he and correspondingly the plaintiff's

6  expert, Mr. Reiter I think it was, R-e-i-t-e-r, can and can't

7  talk about.  So I don't think he can talk about materiality.

8  I don't think he can use the word that the policy is lawful.

9  But he can talk about appropriate police practice.

10         I mean, the lawfulness conclusion I'm excluding under

11  Rule 403 because it would be very difficult to instruct a jury

12  in a way that would allow them to sort it out.

13         But materiality, no.

14         And then there's some quotes over on the top of page

15  8 of the plaintiff's motion where -- and I -- believe me, I

16  recognize -- well, let me ask this:  He says in his opinion,

17  "The world is not perfect."  I suppose I could take judicial

18  notice of that.  But anyway, "The world is not perfect, and in

19  my opinion, unintentional nonconspiratorial events can and do

20  happen."  I mean, are you really planning to elicit that from

21  him?

22         MR. NOLAND:  It's his manner of speaking, I think.  I

23  mean, you get the gist of what he's saying.  Is he going to

24  say it that way?  Probably not.

25         THE COURT:  You can't because, I mean, it's basically

1    drawing a conclusion that completely overlaps with what the

2    jury is going to have to find.  And I recognize that the rules

3    permit -- they don't preclude ultimate issue opinions, but

4    it's still subject to 403, and so I'm not going to permit him

5    to say that.

6         And so I think I've pretty much covered the rest of

7    that, of Allee.  And so now let's kind of skip back around a

8    little bit.

9         I think that I have talked about the issue of the

10   translations, the "translations" of the recordings, which I

11   gather is the purpose for which there were 26(a)(2)

12   disclosures on Trammel Davis, Derrick Kees, Earl Hawkins and

13   Jackie Clay.  And what I said yesterday, and I don't know if I

14   said it exactly this way, but it's probably pretty close, I

15   mean, I think you'd need to lay found --

16        They're all going to be live witnesses, I assume,

17   right?

18        MR. NOLAND:  Except for Trammel Davis.  We have a

19   videotape deposition.

20        THE COURT:  It's a videotape.  Okay.

21        You're going to need to lay the foundation as to how

22   it is that they know what the code words mean, but, you know,

23   I think it's likely you're going to be able to do that.  I'm

24   going to have to wait and hear it, until I hear it.  And if

25   the --

1            And there's a decent amount of law on this, virtually

2   all of it in criminal cases, about, you know, witnesses

3   testifying about coded lingo.  There's several dozen at least

4   Seventh Circuit opinions about that that sort of define the

5   meets and bounds of what can and can't be done.  But I think

6   as a general rule, if the particular witness gives an adequate

7   foundation for how it is that he is aware of what these

8   statements mean, then it's admissible and, obviously, subject

9   to cross examination and what not but -- so I think the odds

10  are you're going to be able to lay that foundation.

11           And I'm pretty sure, I'm willing to bet that it was

12  done in pretty much that way in the criminal cases in which

13  they testified.  In other words, somebody walked him through,

14  okay, you listened to these things.  You were in these

15  conversations.  How do you know what happened?  You know, code

16  words and so on.

17           MR. NOLAND:  That's pretty much it.  And actually in

18  our motion number 1 we did tender some of Kees' testimony with

19  respect to how that has been done.  And one of the reasons we

20  did that in advance, your Honor, is, maybe this would be a

21  good time, we would like to play a few of the wiretaps in the

22  opening statement, and that's why we brought that, we provided

23  that information, laying the foundation.

24           THE COURT:  So are we talking about the ones that

25  talk about the -- that are claimed to be about the bribe of

1    Judge Maloney and Mr. Fields' involvement in that, or are we
2    talking about other wiretaps?
3        MR. NOLAND:  Pretty much the ones that we talked
4    about yesterday are the ones that I would like to play.
5        THE COURT:  I've still got that under advisement.  I
6    mean, I did not have time to read all of Mr. Hawkins'
7    testimony, it wouldn't surprise you, so you're going to get
8    that ruling over the weekend.
9        Yeah, so the risk there would be, the risk that you
10   are taking, I guess, it's a double risk.  So there's two
11   elements of risk.  So the law on admissibility of
12   coconspirator declarations requires me to make this
13   preliminary determination, as I talked about yesterday, but it
14   is subject to an ultimate determination at the trial.  So, for
15   example, let's say somebody tells me before the trial, well,
16   the way we're going to prove that so and so was involved in
17   the conspiracy is we're going to bring in John Jones to
18   testify about that.  And I say, okay, based on your proffer
19   that you're going to do that, it's -- I think it's
20   provisionally admissible because that would establish his
21   involvement by a preponderance of the evidence.  And then you
22   don't bring in the guy, or the guy comes in and he says, well,
23   he wasn't involved.  Then the opposing party says, well,
24   Judge, now we object to this because they haven't actually
25   laid the foundation at trial under 801.  And in that

1  situation, in that hypothetical you wouldn't have.

2  And then the judge -- and you'll see cases about
3  this, U.S. versus Santiago, which is in 582 F.2d.  It's from
4  like -- I think it's 582 F.2d.  It's from about 1978.  And the
5  other big one was from about 1983 or so.  I want to say it's
6  called U.S. versus Adkins, but I'm not a hundred percent
7  positive of that.  So what they basically say is that at that
8  point the judge then has to exclude the evidence if the
9  foundation isn't actually laid at the trial and may have to
10  declare a mistrial.

11  So the risk -- and so when a judge -- when you're
12  talking about whether a judge declares a mistrial or not,
13  okay, it's not a bright line test.  It's a -- you know, you
14  consider a lot of factors.  And I'm just kind of thinking out
15  loud here, which is usually a bad thing to do, but you're
16  asking me to predict something, so I kind of have to do that.

17  If you were to say in opening statement we're going
18  to prove through Mr. Hawkins and through some tape recordings
19  that Mr. Fields knew about the bribe, okay, that would be one
20  thing.  And if you then ultimately for whatever reason weren't
21  able to prove up the predicate for admissibility of the
22  coconspirator declarations under 801(d), the plaintiff then
23  says exclude them, I exclude them, and the plaintiff then
24  says, well, Judge, now you got to declare a mistrial, at that
25  point I would have, well, I've got a lawyer's statement in

1    opening statement, which I've already told the jury isn't

2    really evidence.  They didn't really put the evidence in.  If

3    on the other hand, instead of saying it in open statement, you

4    actually play the stuff and I later conclude that it's not

5    admissible, that might be a different story.  Okay.  So that's

6    the first element of risk.

7            The second element of risk is that, as I said, you're

8    going to have to lay the foundation on, you know, these guys

9    translating the things.  And I think you're likely going to be

10   able to do that, but you might not be able to do it.  And if

11   you don't do that, then they don't come in.  You know, the

12   translations don't come in.

13           So I guess if I were in your shoes I'd just talk

14   about it and not play it, because, you know, what you're going

15   to get from me, assuming that I rule it's admissible, it's by

16   definition a provisional ruling, and it's subject -- and I

17   think it's 104, Rule 104(a) or 104(b).  Let me just look it up

18   here.  Well, it's 104.  It's -- yeah, it's 104(b).  "When the

19   relevance of evidence depends on whether a fact exists, proof

20   must be introduced sufficient to support a finding that the

21   fact does exist.  The Court may admit the proposed evidence on

22   the condition that the proof be introduced later."  So any

23   pretrial ruling I make that the stuff is admissible is one of

24   those rulings under 104(b).

25           So, I mean, it's going to be an interesting trial.

1    I'd try it four times, okay.  I'm just joking.  But I'm

2    guessing you don't want to do that, so if I were in your

3    shoes, I wouldn't play it in opening statement, because, I

4    mean, I think, you know, just on paper, and I have not read

5    Mr. Hawkins' testimony, but the arguments on paper about it --

6    because really Mr. Fields' involvement in this doesn't

7    entirely rise or fall on the credibility of Mr. Hawkins'

8    testimony, but it does to a significant extent.  When I say

9    "this," I mean his participation in the conspiracy to bribe

10   Judge Maloney.  On paper it could go either way.  I mean, I

11   don't know what I'm going to say.

12          And I was just talking to my law clerks about this

13   this morning.  One of the difficulties is, is that I'm going

14   to read Mr. Hawkins' testimony.  I'm going read all of his

15   testimony.  That's why I asked you for it.  And, you know,

16   that's different from seeing it.  And so it's a provisional

17   ruling.

18          I guess I've said pretty much all I can say about

19   that, so I'm going to move on to another topic.  So on item 1

20   A, I think provisionally and based on the kind of questioning

21   that was done that you've provided from the trial in whichever

22   underlying criminal case it was, you know, these people will

23   be able to testify, assuming the recordings are otherwise

24   admissible, about the code and what it means, but you're going

25   to have to lay the foundation at trial.

1   Okay.  So then B is the three defendants, three

2   remaining defendants, O'Callaghan, Murphy and Brannigan and

3   then two others, Kolovitz and Richardson, were also identified

4   as giving opinion testimony.  I think that it is better to

5   talk about that because the opinion testimony in question has

6   to do with how this fits into what's referred to as a pattern

7   of El Rukn conduct.  I think it's better to talk about that

8   after we talk about motion in limine number 3, which is the

9   sort of El Rukn one, so we're going to skip over 1 B.

10  1 C are various current and former assistant state's

11  attorneys.  So I had a question for you based on the response.

12  Okay.  So the response to the plaintiff's motions in limine on

13  page 3, these witnesses should be permitted to testify on the

14  clearly relevant topics of why they approved charges against

15  the plaintiff and why they prosecuted him.  So my question to

16  you is what's the relevance of why they approved charges?

17  They're not defendants in the case, so what's the relevance of

18  why they approved charges?

19  MR. NOLAND:  There's a malicious prosecution claim

20  that contends that our officers maliciously prosecuted

21  plaintiff when these prosecutors -- this would go to rebut

22  that, that these prosecutors had the information, the

23  information was provided by the police to the prosecutors and

24  then they make the decision based on a review of the facts and

25  the evidence that they review to move forward with the

1  prosecution.

2      And so it's really a fact -- we did this out of an

3  abundance of caution to say the opinion just in case --

4      THE COURT:  Okay.  So just sort of play it through

5  with me.  So you've got Mr. Wharrie up on the witness stand.

6  What's the question that's going to be ask of him that sort of

7  comes within your -- the umbrella of your abundance of

8  caution?

9      MR. NOLAND:  I think we'd start out with felony

10  review, the felony review process at the state's attorney's

11  office, what is that.  Well, the officers have to call us when

12  they want to, you know, suggest a murder charge.  We come

13  down.  We interview witnesses.  We talk to witnesses.  We

14  talked to Sumner.

15      Larry Wharrie was involved in that process with

16  respect to the debriefing of Sumner originally.  Larry Wharrie

17  then put Mr. Sumner on the stand at the 1986 trial, would have

18  had involvement in preparing him for trial, moving forward

19  with the trial.  And, you know, so that would be the questions

20  of him.

21      THE COURT:  I didn't hear in there about why he

22  approved charges against Mr. Fields, which is the thing you

23  have in the response.

24      MR. NOLAND:  I think it would be why did you move

25  forward with charges, why did you prosecute.

1    THE COURT:  What would his answer be?

2    MR. NOLAND:  Well, we had Anthony Sumner.  I met with

3    him.  He told me that Nathson Fields made an admission to him

4    that it was a good exercise.  He told me that Earl Hawkins

5    made admissions to him.  I talked to him separately.  It was

6    independent.  I also met with and prepared witnesses,

7    eyewitnesses who identified Mr. Fields as the offender.

8    And those witnesses, plaintiff contends in this case,

9    were coerced.  Mr. Wharrie would have met with them in advance

10   of trial.  He's always reviewing it as an attorney.  If

11   somebody tells him that Detective O'Callaghan coerced or

12   otherwise suggested something, of course he has certain

13   obligations, and Mr. Wharrie or Mr. -- his trial partner was

14   Randy Rueckert, moved forward with the prosecution having all

15   of that information.

16   And then the same type of discussion would be for

17   Mr. Sexton, Mr. --

18   THE COURT:  Are you proposing to have him give any

19   opinions on whether particular people are credible or not?

20   Because that would be an opinion.

21   MR. NOLAND:  We may ask questions with respect to

22   reliability, was there anything that -- for you to question

23   the reliability of Mr. Sumner?  Were you aware of anything?

24   Is that something you'd take into consideration with respect

25   to moving forward with your prosecution?

1    So obviously we understand that he can't say, yeah,

2   Sumner is a truth teller.  I don't think he would say that

3   anyway.  But certainly as to at that point in time reliability

4   I think is an issue.

5        THE COURT:  Now I've got a handle on it.  Thank you.

6        Let me hear from the plaintiff.

7        MR. GOODMAN:  I think our main concern was vouching

8   for the credibility of witnesses, which -- and I think we also

9   threw the U.S. attorney in here because that's really the way

10  Hogan was used at the innocence hearing, was to vouch for the

11  credibility of all these informants, that he had worked with

12  them, that they'd made all these cases, that they'd

13  prosecuted, they'd convicted all these people over, you know,

14  so I think that was our main concern here, was the vouching,

15  bolstering the testimony of witnesses.

16       THE COURT:  We'll talk about Mr. Hogan in a second.

17  We'll come back to Mr. Hogan in a second.  Let's just confine

18  it to the former, or I guess one of them is current, state's

19  attorneys and the kind of thing that Mr. Noland was talking

20  about.

21       MR. GOODMAN:  Judge, I'm not sure.  In terms of

22  opinion, I think, again, our --

23       THE COURT:  Let me just sort of, just to give you

24  something to work from here.  What Mr. Noland described to me,

25  of course there's some -- there's some opinions in there

1    because, you know, people are describing this is what caused

2    me to go forward with the prosecution, I relied on A, B, C and

3    D, and I thought there was sufficient evidence to go ahead.

4    But that's more occurrence testimony than it is the kind of

5    thing you're talking about.

6              MR. GOODMAN:  And I don't think we object.

7              THE COURT:  Yeah, I think that's appropriate.  The

8    kind of thing that Mr. Noland talked about I think is

9    appropriate.

10             So I'm going to table the thing you mentioned about

11   Mr. Hogan when we get to the El Rukn stuff.  Okay.  So let me

12   just make a note of that.

13             D is Mr. Allee.  We've already talked about him.

14             F is Mr. McMahon.  And that also is part of -- that's

15   also part of the El Rukn thing, so we're going to table that

16   too.

17             So I want to skip ahead a little bit and talk about

18   one or two other things, and then we're going to take our

19   break, and then we'll come back to other stuff.  Give me just

20   a second here.

21             Okay.  On number 2, motion number 2, so one of them

22   has to do with Mr. Fields' conviction in 1972 and I guess a

23   false alibi or an alleged false alibi, subornation of perjury

24   about the alibi, and I'm told in response to the motion that

25   Mr. Fields has admitted lying under oath about the alibi, and

1  I need you to explain to me some context.  You need to tell me

2  when, how, what, et cetera.

3              MR. NOLAND:  During his deposition in this case, I

4  was cross examining him about the statement he'd provided to

5  the assistant state's attorney, ASA Montemurro.  During the

6  course of that cross examination he admitted certain things in

7  that statement, he denied certain things in that statement.

8  So I said -- so I further asked, well, in fact at your trial

9  you claimed that you were not even there, you were not

10  present, so in fact you lied at your trial.  Yes.

11             THE COURT:  And he said yes.

12             MR. NOLAND:  He admitted it, yes.

13             THE COURT:  Okay.

14             MR. NOLAND:  And then also I got into the -- I think

15  I got into at the deposition and also at the certificate of

16  innocence hearing I know I got into the subornation of

17  perjury, that he got three of his friends to --

18             THE COURT:  And did Mr. Fields admit that as well?

19             MR. NOLAND:  He admitted that he sat there and

20  watched them testify to his false alibi.

21             THE COURT:  Okay.

22             MR. NOLAND:  Did he admit that he asked them to lie

23  on his behalf?  He did not say yes to that question.

24             MR. BURNS:  Judge, did you want what he said?

25             THE COURT:  I just want to break this down a little

1   bit.

2          So let's start off with the first thing.  So

3   Mr. Noland tells me that Mr. Fields admitted that he gave

4   false testimony under oath at the trial on this thing.  What's

5   your argument -- are you arguing that that's not admissible?

6          MR. GOODMAN:  Yes, Judge.

7          THE COURT:  Why?

8          MR. GOODMAN:  Because, as we say in the motion, it

9   happened -- it is correct.  He did admit that.  It's a 403

10  issue.  I agree that certainly the fact that he gave false

11  testimony could be admitted.  This was 40 years ago, and I

12  think what was significant --

13         So the question is, is this relevant as to his

14  credibility today?  That's the issue.  And we don't think that

15  it is because, first of all, when the case came back, he

16  was -- this was --

17         THE COURT:  When which case came back?

18         MR. GOODMAN:  So he was 17 or 18 years old at the

19  time of his first initial trial.  The case was reversed for an

20  unrelated reason because of some improper evidence that came

21  in.  He came back, he was 23 at that point, and he did not

22  repeat the mistake that he made.  He put on no case.  The

23  judge found him guilty on the basis of credibility -- I'm

24  sorry, on the basis of accountability.  And he was sentenced

25  and did his time.

1      So there is no pattern, if there was some evidence of

2    a pattern of deceptive behavior by Mr. Fields over the years.

3    This is one incident.  I agree it's a serious incident.  He

4    lied under oath.  But he was a teenager.  And I just don't see

5    how that's probative of his credibility today.  He's a

6    60-year-old man.  That single instance.

7          THE COURT:  Hang on one second.

8      So 403 -- and so basically the argument is it's

9    ancient and he was a kid at the time.  403 -- and it's a Rule

10   403 argument.  An admission of false testimony is certainly

11   relevant on credibility, so it's a question of weighing the

12   probative value against the other factors in Rule 403.  And

13   403 says I can exclude relevant evidence if its probative

14   value is substantially outweighed by, and then it lists

15   factors.

16        I don't think it's substantially outweighed.  I think

17   it's a question of weight.  I think false testimony under

18   oath, even if you're only 17, has reasonably significant

19   probative value.  I think all of the things that Mr. Goodman

20   talked about are things that can be used to explain it,

21   detract from it, minimize it, mitigate it, whatever.  But I

22   don't think that the, you know, potential for unfair prejudice

23   or the age of it substantially outweighs its probative value.

24        Now, and so we're going to stop right here, and then

25   we got the other piece of this, which is whether the

1  defendants can try to prove that he suborned perjury by other

2  people about the same alibi or whether it's relevant that he

3  sat and listened to people giving false testimony and didn't

4  do anything about it.

5       And we'll talk about that after, you know, when you

6  come back, but I guess one, you know, question on this is

7  going to be that if I allow you to get in his false testimony

8  but not the rest of it, which, to be blunt, is kind of the way

9  I'm leaning at this point, is how much of the surrounding

10  circumstances are you going to be able to get in.  So that's

11  where we'll pick up when we start back.

12       So I would like you back here at 1:45.  Okay.  See

13  you then.

14          MR. NOLAND:  Thank you, your Honor.

15          (Luncheon recess taken from 12:45 p.m. until 1:45

16  p.m.)

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
|   | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3

 4   NATHSON E. FIELDS,              )
                                     )
 5                    Plaintiff,     )    Docket No. 10 C 1168
                                     )
 6             vs.                   )
                                     )
 7   CITY OF CHICAGO, et al.,        )    Chicago, Illinois
                                     )    March 7, 2014
 8                    Defendants.    )    1:30 p.m.

 9                        TRANSCRIPT OF PROCEEDINGS
10             BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiff:    LAW OFFICES OF H. CANDACE GORMAN
                             BY:  MS. H. CANDACE GORMAN
14                           220 South Halsted Street
                             Suite 200
15                           Chicago, Illinois  60661

16
                           LEN GOODMAN LAW OFFICE, LLC
17                           BY:  MR. LEONARD C. GOODMAN
                                  MS. MELISSA A. MATUZAK
18                           Suite 1650
                             53 West Jackson Boulevard
19                           Chicago, Illinois  60604

20

21

22   For the Defendant:    DYKEMA GOSSETT PLLC
                             BY:  MR. TERRENCE M. BURNS
23                                MR. DANIEL M. NOLAND
                                  MR. PAUL A. MICHALIK
24                           10 South Wacker Drive
                             Suite 2300
25                           Chicago, Illinois  60606
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois   60604
(312) 435-5785

1    (The following proceedings were had in open court:)

2    THE COURT:  Okay.  Now that I have had a chance to

3    cool down, the fine is vacated, but don't do that again.

4    MR. NOLAND:  We appreciate that, your Honor.

5    MR. MICHALIK:  Again, we apologize to both the Court

6    and counsel.

7    THE COURT:  Yes, so don't have anybody sitting in

8    court saying he's almost ready.  Just assume it's going to be

9    earlier.

10    Okay.  So picking up where we approximately left off,

11    we were on the Mr. Fields' conviction, and I concluded that

12    the conviction was admissible -- this is the '72 conviction --

13    over the false alibi, or over the 403 objection.  And so then

14    the second topic related to that is what was described as --

15    I don't know whether there is a contention that Mr.

16    Fields actually suborned perjury, in other words, importuned

17    people to lie, or whether it was, as Mr. Noland described,

18    sort of basically sat there and let it happen.

19    MR. NOLAND:  It's a contention that he suborned

20    perjury.

21    THE COURT:  Okay, so what's the evidence --

22    Aside from the fact that he heard it happening in the

23    courtroom, what is the evidence that he did that?

24    MR. BURNS:  Judge, if I may, your Honor?

25    THE COURT:  Fine.

1      MR. BURNS:  I have a copy for counsel.

2      There's transcripts, your Honor, from his testimony,

3 and that is Mr. Fields' testimony before Judge Biebel and --

4      THE COURT:  So this is in the recent proceeding.

5      MR. BURNS:  Yes, sir.

6      THE COURT:  Okay.

7      MR. BURNS:  And there are two excerpts.  I can read

8 them and I will provide a copy to the Court as well.

9      If I may approach?

10      THE COURT:  Yes.

11      MR. BURNS:  This is on the first one.  Counsel has a

12 copy.  Beginning on page 143, your Honor.

13      THE COURT:  Okay.  Okay.  So let me just -- I just

14 need to --

15      MR. BURNS:  It's only two pages.  It's 143 and 144,

16 just those two pages, your Honor.

17      THE COURT:  Yes, I just want to read a couple of

18 pages in front of it for some context.  So I'm going back to

19 page 137 here.

20      (Brief interruption.)

21      THE COURT:  Okay.  So I read 137 and 144.

22      Is it fair to assume, Mr. Burns, that the questioning

23 would be -- that you would do here would be similar to what

24 Mr. Sexton did in that case?

25      MR. BURNS:  Yes, sir.

1    THE COURT:  Okay.  Let me hear your argument, Mr.
2    Goodman.
3    MR. GOODMAN:  Judge, could we just back up for one
4    second because I just heard you say that you had decided to
5    allow in the prior conviction?
6    THE COURT:  I said that before the break.  I
7    overruled your 403 objection.
8    MR. GOODMAN:  My understanding is that you were
9    letting in the prior false testimony.  I didn't know that you
10   were letting in the 1972 murder.
11   THE COURT:  You know what, I misspoke.  I am allowing
12   in the admission by Mr. Fields that he had given false
13   testimony.  Yes, you're absolutely right.  I misspoke.  Yes.
14   Okay, so talk about this then.
15   MR. GOODMAN:  Judge, again, I mean, I think it's a
16   403 objection.  Yes, he sat by.  This was when he was 17,
17   18 years old.  He sat by.  He was -- I would say that he was
18   locked up prior to trial.  So he had very limited opportunity
19   to go out and investigate and cook up an alibi.  He admits
20   responsibility for it.  These people came in and gave false
21   testimony at his trial.  I don't believe that that is -- it's
22   incredibly prejudicial.  And I think it has very limited
23   probative value as to a 60-year-old Nate Fields credibility.
24   And, again, Judge, if this was a pattern, if this was
25   a repeated pattern of false testimony or cooking up witnesses,

1  then I would agree it would have some probative value.  This

2  is something that happened when he was 17, 18 years old.  The

3  case was retried five years later when he was 23.  And none of

4  this was repeated.  He put on no evidence, no false evidence

5  and no evidence whatsoever, stood on the State's case,

6  argued -- his lawyer argued accountability, and the judge

7  found that he was accountable.  So it's a 403 objection,

8  Judge.

9          THE COURT:  Mr. Burns.

10         MR. BURNS:  Your Honor, just to highlight some of the

11  points, he knew they were going to testify before they began.

12  He testified consistent with the false alibi that he gave.  He

13  said he knew it was a lie.  And to quote again:

14         "You let each one of your friends come in and lie to

15  that jury, didn't you?"

16         Answer:  "Yes."  That's on 144.

17         Prior to that on page 143, he said, again

18  Mr. Fields -- this is a question to him by Mr. Sexton:

19         "You knew they were going to testify as to an alibi

20  before the trial even began, isn't that correct?

21         Yes."

22         I think these are fair questions to ask, and I think

23  at a minimum, Judge, circumstantially this proves that he

24  certainly was aware of and allowed this testimony, and it's

25  suborning perjury.

1    THE COURT:  Well, that part isn't circumstantial.  He

2  admits that.  The circumstantial part would be that he got him

3  to do it, and I don't think you can make that argument based

4  on this.  But I'm overruling the 403 objection to this.

5    MR. BURNS:  Okay.

6    THE COURT:  So there's a couple of things, though,

7  that I just want to highlight in here that I don't think you

8  can do.  And, again, I just --

9    No disrespect intended, obviously, to Judge Biebel,

10  who is one of the finest judges I have ever had the privilege

11  to meet or know, but just because something happened there

12  doesn't mean it's going to happen here.

13    And, you know, this whole thing about the jury didn't

14  buy your alibi, who knows, maybe the defense will want to

15  bring that out, that the alibi didn't work anyway.  But it

16  gets a little bit into, I think, too much hyperbole for me

17  here.  But I think you can appropriately elicit that he was

18  aware -- I mean, as he testified, as Mr. Fields testified in

19  the case, that he was aware before trial that these witnesses

20  were going to testify to an alibi that he knew was not true.

21  He let his lawyer put them on the stand and essentially didn't

22  do anything to stop it.  That you can do.

23    This questioning about how you tried to pull one over

24  on the jury, you're going to leave that for argument.  It's

25  not going to be part of the questioning.  So that's the

1  ruling.

2       MR. BURNS:  Thank you.

3       THE COURT:  I'm going to hang onto this, if you don't

4  mind, this transcript, because it just will help me as I'm

5  sort of making notes on the ruling here.

6       MR. BURNS:  Do you need anything further by way of an

7  identifier?

8       THE COURT:  That's fine.  I know it's from that

9  hearing.

10       MR. BURNS:  Thank you.

11       THE COURT:  So the next point -- hang on a second.

12     (Brief interruption.)

13       THE COURT:  I think I skipped over the conviction,

14  and this is the point that Mr. Goodman was making.  So it was

15  a conviction for what exactly?

16       MR. GOODMAN:  Murder.

17       THE COURT:  It's a murder conviction.

18       MR. GOODMAN:  Eventually the judge found him

19  accountable.  He wasn't the shooter.

20       THE COURT:  Yes, yes.  No, I get it.  So he was

21  convicted of murder in 1972.  The conviction was overturned on

22  some ground unrelated to what we have been talking about here.

23  Then there was a retrial and he was found guilty on an

24  accountability theory.

25       MR. GOODMAN:  Correct.

1       THE COURT:  All right.  And what is it exactly that

2   the defense wants to put in on that?

3       MR. NOLAND:  That he was convicted of murder.  It was

4   a part of the aggravating factors that put him on Death Row.

5   It's why he was in prison from 1971 to 1983.  It is why he was

6   chosen for this hit in the Smith-Hickman case because he was

7   unknown at the 706 building where the murders occurred.

8       THE COURT:  You started off simple and then it kind

9   of took off from there.  So let's break this down into little

10  pieces, okay.

11      So you want to put in his murder conviction initially

12  to impeach his credibility or not?

13      MR. NOLAND:  Yes, we do.

14      THE COURT:  It's too old probably for that purpose.

15      MR. NOLAND:  I understand it's a ten-year.  However,

16  I think the rule has that under circumstances, it can be

17  admissible, and in this particular case.

18      THE COURT:  So if the conviction is more than -- if

19  more than ten years have passed since the witness' conviction

20  or release from confinement, whatever is later, it's

21  admissible only if its probative value supported by specific

22  facts and circumstances substantially outweighs its

23  prejudicial effect -- so it sort of flips the Rule 403

24  analysis -- and advance notice is given.  We have satisfied

25  that, obviously.  So that's the first purpose.  It's

1  impeachment.

2  Okay. So I just want to make sure I have a complete

3  list because then you start talking about other stuff. What

4  are the other things, because it sounds like you're arguing

5  that it's relevant for more things than just impeachment?

6  MR. NOLAND: Yes.

7  THE COURT: Okay. Go through the other things.

8  MR. NOLAND: Plaintiff's contention is that he was

9  put on Death Row for the Smith-Hickman case in part because of

10  the Vaughn-White case, which we acknowledge was -- he was

11  falsely excused of by Anthony Sumner. In fact, he had

12  qualifying factors to go on Death Row anyway because he had a

13  prior conviction for murder. So that would be one reason that

14  we would argue.

15  THE COURT: Okay. So let me make sure I'm getting

16  it. So was the '72 conviction for murder cited as a

17  qualifying factor when he was put on -- when he was given the

18  death penalty in the '84 case, '86, or whatever we're calling

19  it?

20  MR. NOLAND: Yes.

21  THE COURT: Okay. And is that --

22  That's an eligibility criteria, in other words, in

23  death penalty lingo; no?

24  MR. BURNS: Actually, Judge, the qualifier in this

25  case was his age 21 and the fact he had been convicted of a

1   double homicide.  Those were the qualifiers.

2           THE COURT:  Okay.  So where did the 1972 conviction

3   come in?

4           MR. BURNS:  That comes in then by way of aggravation.

5           THE COURT:  It was an aggravating factor.  It wasn't

6   the trigger that made him eligible for the death penalty.

7           MR. BURNS:  That's correct, your Honor.

8           THE COURT:  Okay.

9           MR. BURNS:  So the certification you begin with is is

10  he eligible, and then the next phase after the jury returns

11  that is that you proceed to the aggravation.

12          THE COURT:  Right, okay.  All right.  And then you

13  said some other things.

14          MR. NOLAND:  Yes.  Mr. Fields was chosen by the El

15  Rukns to participate in the present homicide, the Smith and

16  Hickman homicides, because he had been in prison from 1971 to

17  1983 and then was there for unknown at this particular

18  building, which was just a block way from the El Rukn Fort.

19          THE COURT:  What is the evidence of that?

20          MR. NOLAND:  Earl Hawkins will testify that's why he

21  was chosen.  I believe Derrick Kees and at least one, maybe

22  two, other cooperating El Rukns will testify.

23          THE COURT:  But, I mean, you could establish that by

24  saying that he was unknown.  I mean, the fact that he was in

25  prison is just kind of the whipped cream on top of the ice

1  cream, and the fact that it was for murder is the cherry on

2  top of the whipped cream.  I mean, you really wouldn't need

3  any of those second or third things in order for Mr. Hawkins

4  to say that.  He could just say, well, we picked him because

5  he wasn't known.  He had been in prison.  Maybe he would say

6  he had been in prison.  Why would he have to say he had been

7  in prison for murder?

8         The fact that he was in prison for murder doesn't

9  make him any more or less unknown.  He could have been in

10  prison for armed robbery for 12 years or, you know, other

11  things.  I don't think that gets the murder in.

12         So were there other things besides --

13         That's Hawkins testimony.

14         MR. NOLAND:  Yes, and others.

15         THE COURT:  Hawkins and others.

16         MR. NOLAND:  Others.

17         THE COURT:  Who all say roughly the same thing.

18         MR. NOLAND:  They don't all, I don't think, have that

19  information, but a couple others do.  I can't remember which

20  ones.

21         THE COURT:  Fair enough.  All right.

22         Other bases on which you're offering this?

23         MR. NOLAND:  There is a visitor list and actually two

24  visiting documents from the prison, one in 1980 when the

25  getaway driver on this case, Hank Andrews, visited Mr. Fields.

1        THE COURT:  Getaway driver on?

2        MR. NOLAND:  On the Smith-Hickman murders, visited

3   Fields in Stateville.

4        THE COURT:  Okay.

5        MR. NOLAND:  And also at that same time, Derrick

6   Kees, who is one of our witnesses, cooperating witnesses,

7   visited Mr. Fields at Stateville.  That's 1980.

8        Then we also have a visitor list, his visitor list,

9   where he puts the names of the persons that are authorized to

10  visit him or otherwise proves the list.  And it's a two-page

11  document.  It's got lots and lots of El Rukns including

12  witnesses in this case:  Trammell Davis, Earl Hawkins, Anthony

13  Sumner, Jackie Clay.

14       THE COURT:  Okay.  So what's the relevance of the

15  fact that all these people visited him?

16       MR. NOLAND:  Because he contests now that they're

17  lying on him.  It shows he had a prior relationship with not

18  only the people he was on this hit team with for the

19  Smith-Hickman case, so he knew them before.  He put them as

20  friends and brothers, so he had this relationship with him.

21  It makes sense.  It corroborates why he would be chosen to

22  participate in this, and also because they contend that these

23  corroborating witnesses are now lying today, or were lying,

24  you know, for -- they're now lying on Nathson Fields when, it

25  fact, three years before the murders they were his friends.

1   They were his co-gang members.

2           THE COURT:  Okay.  So generically speaking, you want

3   to put in the prison visiting records to show that these other

4   people were friends of his, had a relationship with him,

5   ongoing relationship and so on.  Is that a fair general

6   characterization?

7           MR. NOLAND:  Yes.  And, in fact, Jeff Fort is on that

8   list.  Mr. Fields will say that he was ordered to put all of

9   these El Rukns on this list on orders of Jeff Fort.  And it

10  also then would go to his participation in the El Rukns.

11          I mean, there's -- I don't know how many El Rukns are

12  on this list, but it's dozens and dozens of them.  And they

13  also list the El Rukn Fort as the location where they -- their

14  residence.  They list him as a brother and a friend.  It goes

15  to his --

16          THE COURT:  Okay.  You're kind of getting off the

17  point of the murder conviction, I think, at some point there.

18          So have we got a complete list of the reasons why

19  you're wanting to put in the murder conviction?

20          MR. NOLAND:  Oh, finally damages.  Dr. Silberberg

21  opines that he now has post-traumatic stress disorder.

22          THE COURT:  You want to argue it's because of the

23  other -- at least contributed to by the other stuff.

24          MR. NOLAND:  Because of the other incarceration, and

25  then also he says that, you know, for PTSD you have to have

1  trauma events.

2          THE COURT:  What other traumatic events?

3          MR. NOLAND:  He was at a -- when a guy got killed.

4          THE COURT:  Maybe this is some of the stuff that Ms.

5  Gorman had in mind the other day when she alluded to the

6  possibility of bifurcation.  I don't know, but, okay.

7          So let's just pause on the damages thing for the

8  moment, Mr. Goodman.  Let's talk about the other stuff,

9  although I will say there is a very recent Seventh Circuit

10  decision about the admissibility of priors for damages in

11  wrongful imprisonment cases, which, if I'm remembering -- I

12  mean, in the last couple of months.

13         If I'm remembering it correctly, I think I regarded

14  it as a relatively dramatic change in the law, sort of towards

15  keeping it out.  But that was all focused on damages, and I

16  don't have the name of it.  I may have it sitting back on a

17  table in there.  So let's just put damages to the side for a

18  second, and let's put impeachment to the side for a second,

19  and let's just talk about the other things.

20         So basically what I'm getting from the defense is

21  that they want to put in the prior conviction because it was

22  used as an aggravating factor in his sentencing hearing.  They

23  want to put it in because it shows, you know, that he would

24  have been in prison and it ties in with the testimony of

25  Hawkins and perhaps others that that's why they tapped him to

1  do this particular murder of Smith and Hickman.  And the fact

2  that he's in prison is going to come in, or would come in, if

3  I let in the visitor list, which they want to put in in order

4  to show that he had this sort of significant relationship with

5  various other people who were either involved in the murder or

6  testified about his involvement in it.

7              So talk to me about that.

8              MR. GOODMAN:  Well, in terms of aggravation, I think

9  it adds very little.  I don't think the jury is going to be

10  misled at all without this information.  I mean, the

11  aggravation --

12              At his death penalty sentencing hearing, they put

13  in -- they put in, first of all, it was a double homicide, and

14  they put in evidence of another double homicide.  So I think

15  that the fact that he had a prior conviction for murder, while

16  it was an aggravating factor, I think it has very little

17  probative value, and I don't think the jury is going to be

18  deprived of important evidence if they don't have that.

19              Should I move on, Judge?

20              THE COURT:  Yes, keep going.

21              MR. GOODMAN:  In terms of the fact that he was

22  chosen, the testimony was that he was -- Hawkins' testimony

23  and maybe someone else testified that he was unknown in the

24  area.  I don't think they need to get in that he was convicted

25  of murder and in prison to establish he was unknown.  As your

1    Honor has said, there's other ways that that can be
2    established.

3           And, third, with respect to the visiting list, first
4    of all, the visitation list was a two-page document.  The
5    testimony was that you can see there's different handwriting
6    on it.  The first -- I don't know, I can't remember exactly --
7    but the first, you know, maybe eight or ten names were in Nate
8    Fields' handwriting, his family, his brother.  All of these
9    people that Mr. Noland is talking about were in a different
10   handwriting.  There was testimony that these people were put
11   on his visiting list so that they were eligible to visit him
12   so that they could get in the facility, not necessarily to
13   visit Nate but to visit other members of the El Rukns, and
14   that was the practice back then.

15          There is no testimony that these were his close
16   friends or that they ever actually visited him.  In fact, none
17   of them even say --

18                 THE COURT:  Pause for a second.

19                 MR. GOODMAN:  Yes.

20                 THE COURT:  Mr. Noland, any of the people who were on
21   the visitors log, are any of them going to be witnesses here?

22                 MR. NOLAND:  Yes.

23                 THE COURT:  Are any of them going to say, oh, yeah, I
24   visited the guy down in Stateville or wherever?

25                 MR. NOLAND:  No, I don't think so.

1          THE COURT:  Does that mean that, if asked, they would

2     say, "no, I didn't"?

3          MR. NOLAND:  You know what, I don't know if we asked

4     him that.  So I probably shouldn't say a hundred percent, but

5     I --

6          THE COURT:  Okay.  Go ahead, Mr. Goodman.

7          MR. GOODMAN:  So this is not evidence that they were

8     close friends or would not have any probative value in this

9     case.

10          And as for damages, again, I'm not familiar with the

11     case your Honor is talking about.

12          THE COURT:  Apparently.

13          MR. GOODMAN:  But, you know, the one thing that I

14     would point out is that his prior experience in prison was

15     quite different from his experience on Death Row.  I mean,

16     this was back in the days when there was actually

17     rehabilitation.  He ended up in the Stateville honor farm.  He

18     learned a trade.  He got education.  He took classes.  So I

19     don't know that this would -- this was an experience that

20     contributed to any trauma or post-traumatic stress that he's

21     observing now.

22          (Brief interruption.)

23          MR. GOODMAN:  And plus he was there for something

24     that he had done, and I think I think the experts would say

25     that's a different type of experience when you're actually

1  there unjustly than when you're there for something that you
2  had done.

3      THE COURT:  Mr. Noland, what else would you like to
4  tell me?

5      MR. NOLAND:  The fact he was in prison from '71 to
6  '83 corroborates the testimony of the El Rukn who said he was
7  unknown at the building, as to that point.

8      As to the visitor list, it's his list.  He approved
9  all the names on those lists and he admits it.  Judge, we also
10  would be seeking to admit it.

11      In addition, you pointed out the first thing is his
12  credibility.  And there is a ten-year issue on that under 609.
13  However, Mr. Fields, it's our contention, continues to lie
14  about his involvement in that homicide, or in the 1971 murder,
15  to this day.

16      THE COURT:  Yes, but that's bootstrapping.  I mean,
17  you can't get in the homicide to prove that he lied about the
18  homicide.  I mean, it's a circular argument.  Okay.

19      MR. NOLAND:  Could I just explain what he did say
20  about it?  There's two things he lied about.

21      THE COURT:  My point is that if you don't get to ask
22  him about it, if it's not relevant, then he's lied about
23  something that I found is collateral, and that's probably not
24  admissible.  Okay.

25      In other words, you don't get to it --

1    If I say the conviction doesn't come in through the

2  front door and you say, well, wait a second, Judge, when we

3  asked him about this inadmissible conviction in his

4  deposition, he lied about it, you don't get to get in through

5  the back door something that I didn't let you put in through

6  the front door.

7    But tell me what you have.

8    MR. NOLAND:  Thank you.

9    He said in his court reported statement to the

10  assistant state's attorney that he shot into the car.  He now

11  says he just shot one time into the air.

12    THE COURT:  Okay.

13    MR. NOLAND:  He said that the court reported

14  statement was beaten by the police out of him.  There is a

15  photo.  The evidence is inconsistent with that.  We feel that

16  he's lying about that to this day.

17    The fact that he did all these things relative to a

18  false alibi and sitting idly by or with respect to his others

19  is also consistent with his pattern of corrupting judicial

20  cases that he's involved in.  He corrupted that case.  He,

21  it's our contention, corrupted this case with others.  He

22  corrupted that case with three other friends who were, by the

23  way, gang members, Stones, the Black Stones.  The Black P

24  Stone nation was the predecessor to the El Rukns.  Those were

25  Stones.

1          The '86 trial is, it's our contention, as you know,

2     about the bribe and his involvement and with respect to his

3     involvement in murders themselves.  And then there is another

4     incident in 2000 where he and four other inmates in the Cook

5     Count Jail intentionally instigated a riot and attacked jail

6     guards so they could sue the prison guards.

7          THE COURT:  Yes.  This is later.

8          MR. NOLAND:  This is that Michael Nieto fellow.

9          THE COURT:  This is one of the guys -- well, this is

10    the guy I writted in.

11         MR. NOLAND:  This is the guy, or this is one of the

12    two or three.

13         And Mr. Nieto has testified, and we expect will

14    testify, that Mr. Fields approached him prior to that

15    incident, said this was his plan, this is what we're going to

16    do.

17         THE COURT:  I want to stick with this first.  I

18    understand that you're arguing there is a pattern.  I get

19    that.

20         MR. NOLAND:  That's the additional point.

21         THE COURT:  You know, you still have to evaluate each

22    one of these things separately.  I don't think it's a

23    situation where the whole is greater than the sum of the

24    parts.

25         So let me just sort of go through this item by item.

1    Because this is an old conviction and a very old conviction at

2    this point, 609(b)(1) applies.  The probative value supported

3    by specific facts and circumstances has to substantially

4    outweigh a prejudicial effect -- the prejudicial effect.  And

5    we're not talking about the false alibi.  I've already let

6    that in.  We're talking about the value of the conviction

7    itself.

8              I think a 40-year-old conviction by definition

9    doesn't have terribly significant value.  A big problem with

10   this is that it is a murder conviction, and there is a

11   significant likelihood that the jury would draw what is, I

12   think, a fair argument.  It could be that there's an unfair

13   inference from that:  Well, it's like if you did one murder,

14   you must have done other murders.  And I know that that's part

15   of the theory of the case on the defendants' side, but, you

16   know, for purposes of admissibility, I just don't think that

17   you have satisfied the 609(b) criteria and for the conviction

18   itself.  So when you --

19             And I'm going to come back to the other stuff in a

20   second.  But for the other topics that you mentioned, with

21   possibly one exception, the fact that it's a murder conviction

22   doesn't make a difference.

23             Actually, let me go through the other three things

24   not in the order you gave them to me.  I have not seen the

25   transcript of Mr. Hawkins' testimony where he talks about this

1    is why we picked or this is why Mr. Fields was picked to do

2    the Smith and Hickman shootings.  The argument is made by the

3    plaintiff that, well, it's enough to say that he hadn't been

4    around.  You don't have to get in the fact that he was in

5    prison.  You absolutely don't have to get in the murder for

6    that, and it's, frankly, not even relevant.  What is relevant

7    is that he wasn't there.  So that doesn't get the nature of

8    the conviction in.  I will come back to that in a second.

9        As far as the visitor list is concerned, you

10   wouldn't, again, need the nature of the conviction to get that

11   in to establish that he's in prison.  And I guess, you know,

12   unless I have somebody telling me that Mr. Fields -- that

13   there is going to be some competent evidence that Mr. Fields

14   was the guy that added these people to the list other than the

15   fact that there are names on there -- Mr. Goodman tells me

16   it's different handwritings -- and if these people didn't say

17   that they visited him, I mean, I don't think that comes in.  I

18   mean, I'm just not seeing the hook that gets it in.

19       So that gets me then to the aggravating factor, and I

20   guess I'm just not understanding why, given what the claims

21   are in the case, the jury needs to hear the totality of the

22   evidence that was put in in aggravation and mitigation.  I

23   mean, I understand the significance of the Vaughn-White thing

24   because it's one of the things that is disputed here.  But I

25   think that goes out under 403, too, because, again, you're

1   essentially getting in a prior conviction for something very

2   similar to what he's charged with in the case that is under

3   review in a sense in this case.

4           So where I come out is the fact that it was a murder

5   conviction doesn't come in.  And so what that means, just to

6   put a fine point on it, is that when there is questioning

7   about the false alibi and allowing the other people to

8   testify, you are not going to be able to get in that it was a

9   murder charge.  You're going to be able -- you're going to be

10  able to get in that he was on trial for a crime, but you're

11  not going to be able to get in that it's a murder charge

12  because, again, that would be getting in the back door what I

13  said you couldn't get in through the front.

14          So now getting into the question of whether you can

15  bring out that he was in prison, and so here is my question

16  for you on that, Mr. Goodman.  It kind of sounds like to me --

17  and I understand you disagree with my ruling about the false

18  alibi coming in, but I've said it's going to come in.  It kind

19  of sounds like to me that you're going to want to explain

20  that.  In other words, you're going to want to explain, well,

21  you know --

22          What are you going to do to try to explain it?  I

23  guess here's where I'm coming from.  I just have a sense that

24  in the explanation of that, the fact that Mr. Fields ended up

25  in prison is likely to come out as part of the explanation.

1    The jury is already going to hear it, and so it's not going to

2    be any great shakes that they know that he was in prison

3    because they're going to hear it because you're going to have

4    to explain it, or might have to explain it, in order to

5    explain, or to minimize the effect of the false alibi.

6              MR. GOODMAN:  I think I would defer to Candace

7    because she's going to put Nate on.

8              THE COURT:  So what about that?

9              MS. GORMAN:  Your Honor, I think we can put on the

10   fact that he made this false statement when he was 17 years

11   old in a court proceeding and that it was serious, and, you

12   know, and then I would ask him:  Is everything you're saying

13   here today the truth?

14             THE COURT:  So you're not going to try to bring out

15   that, and it didn't work, by the way, because you got

16   convicted anyway?

17             MS. GORMAN:  No.

18             THE COURT:  And all this stuff about coming back and

19   only getting convicted on an accountability theory, you're not

20   going to try to put that in?

21             MS. GORMAN:  No.  I mean, you know, I have to say

22   right now I'm not because I think we can talk about this

23   without it.

24             And I want to also talk about the fact that these

25   witnesses supposedly said it was because he was in jail or

1  prison that that's why they said he was unavailable.  They

2  also said it was because he was from the suburbs.

3          THE COURT:  Well, see, this is the problem.  I don't

4  have this testimony.  Where do I find it?  Does somebody have

5  it?

6          MR. NOLAND:  Your Honor, the argument I made with

7  respect to that is it corroborates that he hasn't been around.

8  So right now it would just be them while, in fact, he was --

9          THE COURT:  Wait, wait, wait a second.  I guess maybe

10  I heard it wrong.  I thought you were saying that Hawkins is

11  going to say, well, he's been in prison, so he hasn't been

12  around and so that's why we picked him.

13          Is there going to be any dispute that he wasn't

14  around?  Of course not.  He was in prison.  He's not going to

15  dispute that.

16          Well?

17          MR. NOLAND:  Because they're questioning everything

18  Earl Hawkins is saying.  So every piece of corroborative

19  information we have is probative of Mr. Hawkins' credibility.

20          MS. GORMAN:  Your Honor, Mr. Hawkins, unless he's

21  going to say something new this time, has only said that Nate

22  was picked because he wasn't around because he was from the

23  suburbs.

24          MR. NOLAND:  And I don't know, Judge.  I have not

25  reviewed his testimony lately on that point.  I don't know if

1    he said it's suburbs or --

2         THE COURT:  Well, that means you and me are in the

3    same boat although we actually shouldn't be because you should

4    be in a different boat from that.  Hang on one second.

5         (Brief interruption.)

6         THE COURT:  Yes, I guess I am inclined to say that

7    for --

8         Putting aside the damages thing, I guess that I'm

9    inclined to say that the conviction and the imprisonment

10   aren't admissible.  I guess I would really need to see

11   something a lot more, you know, pointed, a lot more to the

12   point, I guess is the better way of putting it, on this

13   Hawkins question.

14        MR. NOLAND:  Judge, there are --

15        THE COURT:  And it may be that as I am reading --

16        And like I say, I haven't read his testimony.  If I

17   have got everything, maybe I will see it when I read it over

18   the weekend.  Is it in his testimony?  Do I have in all of the

19   stuff that everybody sent me --

20        MR. BURNS:  Yes.

21        THE COURT:  I'm sort of shuddering to download it all

22   because I'm afraid it's going to be a lot.  It's going to be

23   in there somewhere?

24        MR. NOLAND:  Judge, another El Rukn named Derrick

25   Kees is expected to testify before the jury here, and he --

1          First of all, Fields said that he became more

2     entrenched in the El Rukns while he was in prison, and then

3     when he got out of prison --

4          THE COURT:  Go ahead.

5          MR. NOLAND:  He becomes more entrenched when he's in

6     prison.

7          When he gets out of prison, Derrick Kees will testify

8     that Mr. Fields asked to join the hit team of the El Rukns,

9     the hit squads, and he did that because he saw that Jeff Fort

10    had respect for those members of the hit team members of the

11    El Rukns; that Derrick Kees said that happened after Nathson

12    Fields got out of prison.  I believe he said he knew that he

13    was in prison for a prior murder.

14         So as a result of those things, it is corroborative

15    of Derrick Kees, and it also shows why he --

16         THE COURT:  It isn't the way you're explaining it to

17    me.  I mean, I didn't hear you say in there that, oh, we took

18    into account the fact that he had done murder time in putting

19    him on the hit team.

20         MR. NOLAND:  Well, I think Kees -- again, I can't

21    remember exactly the way Mr. Kees phrased it, but I know it

22    had to do -- he got out of prison.  I believe he said he knew

23    that he was in for murder.  He asked to be on the hit team and

24    said, okay, and I think he said, yeah, we knew he was in for a

25    prior murder.

1    THE COURT:  Well, I understand, but the fact that

2    they know that, that's just another way of saying that it's

3    true.  I mean, that's not a way of saying that it's relevant,

4    you know.

5    MR. NOLAND:  Just the point that it's corroborative

6    of why he comes out, he joins the hit team, and he is then

7    chosen to be on this hit team just six months later, which

8    Derrick Kees will say --

9    THE COURT:  Okay.  Let me real clear.  The murder

10   conviction is inadmissible.  Okay.  You have not persuaded me.

11   It's not relevant.  It's not admissible under 609(b) because

12   the probative value supported by specific facts and

13   circumstances doesn't substantially outweigh its prejudicial

14   effect.  So it's not admissible to impeach.

15   MR. NOLAND:  There's two arguments.

16   THE COURT:  It's not admissible.  I'm ruling.

17   Mr. Noland, you had 20 minutes to argue about this.

18   I'm ruling on it now and then we're moving on to something

19   else.  It's not admissible for the basis that it was used in

20   aggravation.  Under Rule 403 I'm not persuaded that the jury

21   needs to hear the entirety of the evidence on that, and the

22   unfairly prejudicial value outweighs whatever probative effect

23   it might have had on that given the other evidence that was

24   admitted in aggravation.

25   On this question about Hawkins, I'm not seeing -- as

1    I sit here right now and as it's being described to me, I'm
2    not seeing anything in which Mr. Hawkins ties the fact that
3    Mr. Fields was chosen to do Smith-Hickman to the fact that he
4    was in prison or the fact that he had been convicted of
5    murder.

6         And, by the way, just to be clear about it, I think I
7    can fairly rely on people's deposition testimony on that
8    because they were deposed, and some of them have testified on
9    other occasions.  And I'm not going to have somebody, just to
10   be real clear because I know I'm dealing with people who have
11   served a lot of time here -- I'm not going to have somebody
12   coming in here and blurting something out on the witness
13   stand.  And there was a line in that trial time order that was
14   intended, you know, for this, among other purposes, that the
15   parties are expected to instruct their witnesses regarding the
16   rulings in limine.

17        And on the last thing, on the visitor list, for the
18   reasons that I described before, which I'm not going to
19   repeat.

20        On the damages thing, subject to me finding this case
21   that I referred you to, which I haven't yet found -- I may be
22   closing in on it here.  Just give me another second.

23      (Brief interruption.)

24        THE COURT:  Yes.  It may be within the last six
25   months as opposed to the last three.  I'm going to have to

 1   find that, I guess.  Well, we're going to come back to that at

 2   the end because there's going to be other things that people

 3   are arguing is relevant for damages.  So we're moving on.

 4            MR. NOLAND:  Judge --

 5            THE COURT:  Unless there was something unclear about

 6   what I just said, we're moving on.

 7            MR. NOLAND:  Not rearguing, simply pointing out two

 8   arguments that we don't think the plaintiff should be able to

 9   make as a result of these rulings.

10            THE COURT:  Okay.

11            MR. NOLAND:  One would be the plaintiff cannot be

12   able to say that the false alibi and allowing these other

13   three men to testify falsely about him was a youthful

14   indiscretion because once he --

15            THE COURT:  You mean like Henry Hyde?

16            MR. NOLAND:  I do remember that.

17            THE COURT:  Okay.

18            MR. NOLAND:  That was at the age of 40, wasn't it?

19            THE COURT:  Yes, it was a little less youthful.

20            MR. NOLAND:  No offense, Congressman.

21            But that has been what his defense to that has been.

22   But if he says that, then our cross examination would be, and

23   the evidence would be, that you're still lying about it.  And

24   then the details of, you know, denying that he shot into the

25   car, claiming that he had police abuse --

1    THE COURT:  Wait a second.  Wait a second.  Run that

2    past me again.  I want to make sure I have it.

3    MR. NOLAND:  So the explanation that Fields advanced

4    at the certificate of innocence hearing was that was a

5    youthful indiscretion, that I've now grown up and am mature

6    and would not make that lie again.

7    THE COURT:  And did that come in through his

8    testimony or through arguments by lawyers?

9    MR. NOLAND:  Testimony.

10   THE COURT:  Okay.

11   MR. NOLAND:  I believe.

12   THE COURT:  So you don't want him to be able to

13   testify to that.

14   MR. NOLAND:  Testify or argue.  They shouldn't be

15   able to do either one because --

16   THE COURT:  People can make arguments that are

17   consistent with the evidence, you know.  And sometimes what

18   happens when evidence gets excluded is that somebody can make

19   an argument based on evidence, you know, based on other

20   evidence that's in the record that if the evidence hadn't been

21   excluded, you wouldn't be able to make, but that's part of the

22   consequence of not persuading the judge that evidence can come

23   in.  Okay.  People are allowed to argue the evidence that is

24   there and the reasonable inferences from the evidence.

25   So what about the proposition that Mr. Fields

1  shouldn't be able to say, well, I only did this because I was
2  a dumb-ass kid?  Pardon my French.
3          MS. GORMAN:  It's true, and I think he should be able
4  to testify to that.
5          THE COURT:  What is it you think that opens up, Mr.
6  Noland?
7          MR. NOLAND:  He's still lying about it to this day.
8  They say he's no longer lying --
9          THE COURT:  Lying about what, though?  So the "it" is
10 the false alibi.  Is he still lying about the false alibi?
11 No.  You said he admitted it.  That's the whole reason I let
12 it in.
13         MR. NOLAND:  But he's lying about the murder.  He's
14 lying about what he did and how he lied on the police.
15         THE COURT:  And he's probably lying about the time of
16 day, too.  I mean, no.
17         No.  The fact that he lied about -- that he tries to
18 explain one thing does not allow you to get in, you know,
19 other lies that you say he is telling about other things.  So
20 that's the end of that.
21         What was your second point?  God, we spent an hour on
22 this.
23         MR. NOLAND:  Plaintiff should not be able --
24         THE COURT:  And just so you know, we are starting the
25 trial on Monday morning even if I haven't ruled on all the

1    motions in limine.  And what that means is that stuff that is

2    subject to a motion in limine you're not going to get to talk

3    about.  So if you want to use up my time, keep using it.

4           Okay.  So what was the other thing you wanted to say?

5           MR. NOLAND:  We would ask that plaintiff be barred

6    from contending that he was on Death Row because of the

7    Vaughn-White murders.

8           THE COURT:  That's what he was convicted of.

9           MR. NOLAND:  No, that was --

10           THE COURT:  No, that was Smith-Hickman.

11           MR. NOLAND:  That was used in aggravation just like

12    this homicide from '71.

13           THE COURT:  And the reason you're saying that is that

14    if he says that, then you want to be able to say, well, no,

15    it's because of other stuff, too?

16           MR. NOLAND:  And because it's a 1971 murder.

17           THE COURT:  What about that?

18           MR. GOODMAN:  Well, I mean, it was -- I think the

19    evidence would be that it was offered in aggravation at his

20    sentencing hearing, and the jury convicted him and sent him to

21    Death Row.  I don't think he can say why the jury -- he is not

22    going to be testifying that the jury --

23           THE COURT:  No.  I think what Mr. Noland is saying

24    is, wait a second, wait a second, wait a second.  You know,

25    you're challenging the conviction on Smith-Hickman and you're

1　challenging Vaughn-White which was used as an aggravating

2　factor.　You're saying Mr. Fields was framed for both of those

3　things.

4　　　　And if you get up and say, and, ladies and gentlemen,

5　he was convicted because he was framed on Smith-Hickman and he

6　was put on Death Row because he was framed on Smith-Hickman

7　and framed on Vaughn-White, they want to be able to say, wait

8　a second, there's other reasons why this man was on Death Row.

9　He had other aggravating stuff against him, and one of them

10　was this murder conviction from 1972.

11　　　　So what would be wrong with that argument?

12　　　　MS. GORMAN:　Your Honor, I think there's a couple

13　things wrong with it.　First, they put on multiple witnesses

14　on the Vaughn-White murder, including some of the defendants

15　coming in and testifying and family members testifying about

16　Vaughn-White.　It was a brutal -- gory, brutal murder.

17　　　　The fact that they mention --

18　　　　THE COURT:　There aren't too many pretty murders.

19　　　　MS. GORMAN:　I know, but this was particularly

20　gruesome with the children watching through a crack in the

21　door and stuff.

22　　　　The fact that they also mentioned that he had this

23　prior conviction, there was no detail gone into about that.

24　It was just mentioned.　But, you know, the Vaughn-White, it

25　was a substantial part of the aggravation hearing.

1          THE COURT:  What else was offered in aggravation?  So

2  we have got Vaughn-White, we have got 1972.  What else have we

3  got?

4          MS. GORMAN:  They brought in the gang stuff, you

5  know, that he was a member of the gang.  They brought in --

6          THE COURT:  So the issue about him being on Death

7  Row, is that -- that's a damages issue, right, or is it a

8  liability issue?

9          MS. GORMAN:  I think it's both, your Honor.  I'm just

10  trying to --

11          THE COURT:  I found the case.  Barber v. City of

12  Chicago, 725 F.3d 702.

13          MR. NOLAND:  F. 725?

14          THE COURT:  F.3d 702.

15          The head note says:

16          "Risk of unfair prejudice in permitting defendant

17  municipality and police officers to question arrestee about a

18  subsequent arrest and resulting incarceration substantially

19  outweighed minimal probative value of that arrest on narrowly-

20  focused claim for emotional distress damages."

21          It may turn not to be relevant, but you should read

22  it anyway.

23          MR. NOLAND:  Thank you, your Honor.

24          THE COURT:  Keep going.  You were saying, Ms. Gorman.

25          MS. GORMAN:  I was just trying to figure out --

1       THE COURT:  So you were saying that there was all
2    sorts of other stuff.  I asked you whether it's a liability
3    question or a damages question.  You think it's both.
4       MS. GORMAN:  I think it is, but I'm just trying to
5    think it out as I'm standing here because, I mean, it's part
6    of what happened to him as, you know, as part of the malicious
7    prosecution, that they were trying to execute him.  So to me
8    it's not only damages because he was on Death Row for
9    12 years, but the fact that they were trying to execute him.
10       THE COURT:  We have got to parse that out.
11       So the malicious prosecution claim, it requires a
12    showing of absence of probable cause, you know, the intent
13    requirement, the favorable termination and damages, and there
14    may be another requirement in there.
15       So the question of whether there was something else,
16    you know, arguably would be less important.  On the Brady
17    question, there is always a question of materiality.  And the
18    materiality inquiry almost necessarily involves comparing
19    what's there, or comparing the either undisclosed evidence or
20    fabricated evidence, on the one hand, against everything else.
21    And so that would be the reason why one would argue that the
22    everything else that was offered, if you're challenging the
23    Vaughn-White thing, too, which you told me the other day that
24    you were yesterday, and the way that Vaughn-White got used
25    here is a factor in aggravation to get in the death penalty.

1    The materiality inquiry, at least as far as the first

2  trial is concerned, you would at least think that it might

3  have something to do with how significant that was.  And, I

4  mean, obviously it was significant, but if you can sort of

5  hypothesize a situation where somebody is a serial killer and

6  you pull out one murder, he's still got nine others.  They

7  ought to be able to put in the nine others and say, ladies and

8  gentlemen, it's one murder.  This is nothing.  It was just one

9  of the ten he did.

10    Now, that's not this situation, obviously, but it

11  illustrates the point that at some level, in order to try to

12  refute the argument about materiality, the defendant, you

13  would think, would be able to put in what the other evidence

14  was to try to minimize the effect of this one thing.  And I

15  understand your point is that, come on, we're talking about a

16  current murder as opposed to one that was already 15 years old

17  at that point.  But, I mean, I get that.  It's a good

18  argument, but I'm not sure that it's a basis for excluding it.

19    And that is why I'm asking whether it's a liability

20  issue or a damages issue, and it kind of sounds like it might

21  be a liability issue.

22    MS. GORMAN:  You know, I think -- I actually think

23  it's both.

24    THE COURT:  No, it's clearly a damages issue, but I'm

25  thinking it's also the other.  And so I can't solve this

1   problem by saying I'm bifurcating the trial, this particular

2   problem at least.

3           MS. GORMAN:  Right.

4           THE COURT:  But here is the problem, though, and I

5   guess maybe it's time to talk about all of the El Rukn

6   evidence that the defendants want to put in because I guess

7   the way I read the response to that motion in limine, which I

8   think is number 3, is that you basically want to put in, you

9   know, all sorts of evidence about not things that Mr. Fields

10  did ostensibly for the gang but things that other gang members

11  did.  You know, they were selling drugs and they were

12  murdering people and they were, you know, putting out hits on

13  people they didn't like and so on and so forth.

14          Am I pretty much getting that right because that's

15  what one of your experts want to do, right, McMahon or

16  whatever his name is?

17          MR. NOLAND:  That is McMahon, but it's tied into some

18  of what Fields did and some of what the gang did and

19  explanations about why people got deals.

20          THE COURT:  I'm just going to tell you, you know, at

21  some point Rule 403 kicks in there.  And, I mean, this is not

22  a trial of the El Rukn gang.  It's a trial of whether Mr.

23  Fields was maliciously prosecuted for particular crimes.  It's

24  a trial about whether, you know, evidence was excluded from

25  him.  And, I mean, I guess I can see the point, but if you

1    take it to its logical extreme, it's kind of like you're

2    saying, well, he was a really bad guy that was part of a

3    really bad gang, and so what does it matter what we did to

4    him, which, frankly, might actually be the plaintiff's theory

5    of the case, which I was sort of wondering why the plaintiff

6    wanted to keep all that stuff out, but I guess I get it on

7    some level.

8         I mean, that just doesn't fly.  And, I mean, I'm not

9    trying a certificate of innocence proceeding, and I'm not

10   trying a case at 26th and California; I'm trying a case under

11   the Federal Rules of Evidence.  And I just -- I'm not seeing

12   why you should be entitled to basically try the El Rukns here.

13   You're trying the question of whether Mr. Fields was

14   maliciously prosecuted and whether his due process rights were

15   violated in connection with a certain thing.  So give me the

16   hook.  Why should all that stuff come now?

17        MR. NOLAND:  I will give you my closing argument, I

18   think, your Honor.

19        THE COURT:  Give me the executive summary of the

20   closing argument.

21        MR. NOLAND:  Much of it is responding to their

22   arguments and their credibility questions of the El Rukns, but

23   let me just start from, I guess, the beginning of our story.

24   Can I just give you our story?

25        THE COURT:  Yes.

1  MR. NOLAND:  So Mr. Fields gets out of prison in

2  1983.  He asked to join the El Rukn hit team of Derrick Kees.

3  He does join that team.

4  The El Rukns had been having a history of problems

5  with the Goon Squad and other gangs.  This hit was as a result

6  of the dispute between the Goon Squad and the El Rukns.  Jeff

7  Fort ordered Earl Hawkins to run this hit on Fuddy Smith of

8  the Goon Squad.  You know, the others were picked.  Fields was

9  picked.  That was a gang dispute.  It was simply because the

10  El Rukn Fort was one block away.

11  Witnesses were intimidated during this trial by the

12  El Rukns.  While Anthony Sumner, the witness, was on the

13  stand, the El Rukns put his son -- they pushed his son into

14  the courtroom, and we have the transcript.  He stood up and

15  said:  "Judge, that's my son."  The El Rukns were talking to

16  Brenda Sumner, his wife, and we believe threatening her as

17  well.

18  The plaintiff has said that three of the eye

19  witnesses were coerced by Dave O'Callaghan, defendant

20  O'Callaghan, when, in fact, the opposite is true.  It was the

21  El Rukns.  One had to be relocated.

22  THE COURT:  Just a second.  Can you guys come up here

23  for a second and just look at this tiny, little thing?  Think

24  about it for a couple of minutes and then I will call your

25  case.

1      Go ahead, Mr. Noland.  The son was brought in.

2      MR. NOLAND:  Randy Langston.  Yes, it was

3   intimidation of the son.  That is what the El Rukns did in

4   this case and in the past.  That is why it's difficult to

5   solve El Rukn murders because that is their pattern.  They

6   routinely intimidate witnesses, and we have all sorts of

7   examples of that.

8      They shot at Anthony Sumner's mother.  They hit her

9   in the leg.  There is a reported decision in the Seventh

10  Circuit about that.  They shot at Trammell Davis' sister.  So

11  there is all that intimidation.

12     It explains why our clients were involved in this

13  process in the first place.  Detective Brannigan was detailed

14  to the presidential organized crime task force specifically to

15  investigate the El Rukns.  He was brought over here to work

16  with the federal government because of the El Rukns.  That's

17  why he is even involved.  His whole career had been

18  investigating the El Rukns.  They knew who he was.  His

19  nickname was Blondie, and we have it on the wiretaps.  And his

20  partner, Kolovitz, was Lumberjack.

21     They threatened to blow up Blondie and Lumberjack

22  with -- they threatened to kill him two weeks after this

23  homicide -- I'm sorry -- two weeks after Nathson was convicted

24  of this case.

25     We have all these cooperating witnesses.  The

1   plaintiff's contention is that they're lying on them, that

2   they got deals, and because they got deals, that's the only

3   reason they're saying he did it.  They got deals, all five of

4   these or six of these guys, got deals with the federal

5   government during the RICO prosecution.  Fields wasn't even

6   part of that.  So these men were testifying that Fields did

7   these matters when they were giving up, as I said, with Earl

8   Hawkins, 50-page statements of the universe of El Rukn

9   criminal activity.

10          Plaintiff criticizes Earl Hawkins, saying that you

11  can't believe him because he is a murderer.  When you hear

12  Earl Hawkins testify and go through the murders he's

13  committed, that explains why his testimony here is reliable,

14  explains why the officers -- the prosecutors relied upon him

15  at that time because he wasn't just talking about this case.

16  He was putting cases on himself.

17          The officers will explain that supports the

18  credibility of those witnesses.  None of these individuals got

19  deals at that time because of Nathson Fields, because of

20  testifying against Nathson Fields.  The witnesses were

21  protected.  There was a reason why they were relocated.  They

22  were given benefits.  Some of them were moved to Milwaukee and

23  other places.

24          And it also supports why Nathson Fields would do this

25  murder on behalf of Jeff Fort on the El Rukns.  What Jeff Fort

1   said was the word in the El Rukns.  You had to follow it.  It

2   is amazing when you hear these wiretaps how he ran this gang.

3   You wonder why would they do this when this guy is in prison,

4   and you listen to him --

5           THE COURT:  This is the executive summary, right?

6           MR. NOLAND:  I knew this was coming, and I was trying

7   -- I knew exactly what your Honor wanted, and I'm trying to

8   articulate as best as I can.  We tried to put all these points

9   in our paper.

10          THE COURT:  Okay.  I have a flavor of it.

11          I have got to take a break for a second so I can deal

12  with my other case.  So you ponder how you want to respond to

13  that while I take this little break.

14          MR. BURNS:  Do you want us to stay here?

15          THE COURT:  No, no, you can stay right there.  That's

16  fine.

17          (Brief recess.)

18          MR. NOLAND:  I have two more concluding points, if I

19  could.

20          THE COURT:  If it's two, by definition it's not a

21  conclusion.  A conclusion would have to be one.  I'm just

22  saying.

23          Go ahead.

24          MR. NOLAND:  It also --

25          In essence, Judge, it's our position you cannot

1    separate this murder from the El Rukn conspiracy.  This was

2    part and parcel of it.  It touches on every aspect of the

3    case.  It touches on every witness in the case.

4           And then, finally, it goes to plaintiff's

5    credibility.  First of all, he's made allegations that we had

6    a -- that part of this malicious prosecution was to bring down

7    the El Rukns.  He said they were a peaceful and religious

8    organization.

9           THE COURT:  Well, okay.  So just to be clear on this,

10   generally speaking, the jury does not get the complaint at the

11   trial.  In fact, I've never seen it happen.  They get

12   indictments in civil cases.  They don't get complaints in

13   criminal cases.  So the question is going to be how this case

14   is going to be tried.

15          So is the plaintiff -- I mean, there have been

16   suggestions in at least some of the stuff that I have seen,

17   summary judgment papers or whatever, and maybe in versions of

18   the complaint, that the plaintiff's theory of the case, their

19   story, in other words, to give sort of the counterpoint to

20   your story, is that they just picked on Mr. Fields because he

21   was one of the usual suspects, he was part of this street

22   gang, they had it in for the street gang, and any old El Rukn

23   would do, and they just kind of said, okay, that one.

24          Is there anything like that that I'm going to hear

25   from your side in this trial?

1    MR. GOODMAN:  No, Judge.  We're going to be very

2  careful not to open the door to that type of testimony.

3    MS. GORMAN:  I mean, the testimony is really that

4  Anthony Sumner -- I mean, it has to come out that he's a

5  member of this organization, but we weren't planning on

6  getting any further than --

7    THE COURT:  Okay.  So that's item 1.  Item 2 is, you

8  know, you're going to have all these people on the witness

9  stand, Earl Hawkins and other people and so on, who, you know,

10  my sense is, is that the plaintiff is going to try to show --

11  it's not my sense.  You're going to try to show that

12  they're lying about Mr. Fields and that one of the reasons

13  they're lying is that, you know, they had something to gain

14  and he was what they were selling in return for something.

15  And the reason for that was, you know, Hawkins was on death

16  row and this guy had committed this murder and that guy had

17  committed that murder and so on.

18    I am going to hear that, right?

19    MR. GOODMAN:  Yes.

20    THE COURT:  So there's going to be murders other than

21  the ones at issue on trial that are going to be coming in in

22  some way, if only to cross examine people who are testifying

23  for the defense.

24    MS. GORMAN:  Actually, we were just talking about

25  that today at lunch, how much we would have to go into that to

1    impeach them before the jury, and I don't know if we, you

2    know -- we're trying not to get into all of that because we

3    just think it's so prejudicial, and so I don't think we have a

4    firm decision on how we're going to do their impeachment

5    without getting -- you know, obviously it's very different

6    than in an innocence hearing where we just went through all of

7    the brutal murders.  We don't want to do that in front of this

8    jury.

9            THE COURT:  Okay.  So respond to Mr. Noland's

10   argument.

11           MR. GOODMAN:  Yes, Judge.

12           And I think just generally almost everything he said

13   was unrelated to Nate Fields.  And I'll respond to it

14   specifically, but maybe I could just --

15           THE COURT:  When you say "unrelated to Nate Fields,"

16   I know Mr. Noland's position it's all related.  What you're

17   really saying is that he wasn't involved in those others.

18           MR. GOODMAN:  Right.  And I'll address them

19   separately, but if I could first maybe just lay out what our

20   position is with respect to gang evidence.  Because we're not

21   coming here saying that it's completely irrelevant and there

22   should be no mention of the El Rukns.  I mean, we understand

23   there's going to be cooperating witnesses who are going to

24   come in here and say that I was an El Rukn, Nate was an El

25   Rukn, Jeff Fort was the leader, I was at a meeting of the El

1  Rukns in April of 1984, and I remember Jeff Fort ordered this
2  hit of Fuddy, and the next day I saw Nate Fields with a gun
3  and he told me it was a good exercise.  There's going to be
4  that testimony.
5          THE COURT:  That's going to come in.
6          MR. GOODMAN:  That's going to come in.
7          THE COURT:  Yeah.
8          MR. GOODMAN:  What we object to is testimony from
9  cooperating witnesses that all -- Nate was a building manager
10  when he got -- he got a job managing one of the buildings that
11  was owned by the El Rukns; that all building managers, the
12  pattern and practice of building managers, they kept guns,
13  they sold drugs, they did enforcement for the gang.
14          Testimony, other testimony we would object to, early
15  1985, this would be 404(b) evidence, that I saw a witness
16  coming in and saying I saw Nate standing on the street in, you
17  know, February of 1985 with a machine gun under his coat
18  because he was there as part of some hit team.  It was the
19  pattern and practice of the El Rukn to intimidate witnesses,
20  to do this and that.  This we think is absolutely improper.
21          Also for detectives or former prosecutors to come in
22  here and say the El Rukns were the most violent gang in the
23  city; they like to shoot rivals in the back of the head with a
24  .9 millimeter, which has been testimony we've heard at all
25  these depositions; you can tell an El Rukn hit because of

1    these various earmarks; we could tell right away what was a El

2    Rukn murder.

3              Testimony that there was this massive federal

4    prosecution, while Nate was on death row, in the late '80s,

5    early '90s, where fifty members of the El Rukns were

6    prosecuted and sent away for serious crimes.

7              All of this is not reliable, especially when these

8    prosecutors and experts are basically -- their information

9    comes from cooperating witnesses who were given deals.

10             Now, to respond to Mr. Noland's specific points,

11   first of all, that there's this pattern of intimidation.

12   There is no testimony that Nate was involved in any

13   intimidation of any witnesses even if your Honor believes Earl

14   Hawkins' testimony and every word of it, even if you look at

15   all of the -- if you let them play all of their tapes, you

16   won't hear any evidence that Nate Fields was involved in any

17   sort of witness intimidation, nothing.  For them to come in

18   and just say this is what the El Rukns did, that is just so

19   unfair for them to be able to defend this case in this way.

20             The statement, well, there's -- there was some

21   evidence that Anthony Sumner's mother was shot.  That was in

22   October of 1987 while Nate -- long after Nate got sent to

23   death row.

24             The testimony that Brannigan was brought in to go

25   after the El Rukns because they were so bad, how could that

1  possibly be probative of anything, why Brannigan was brought

2  in or that the City was worried about the El Rukns or that

3  they were public enemy number one?  That has nothing to do

4  with Nate Fields.

5         The fact that other witnesses got deals.  Mr. Noland

6  is saying, well, we need this to show because Nate's saying

7  that these witnesses are compromised somehow because they got

8  deals.  You know, and this is again a little tricky because

9  we're going to have to put this in without opening the door,

10  but what the testimony is in all of the depositions is, yes,

11  there was this El Rukn task force, we were -- the detectives,

12  we were specifically targeting El Rukns, we went back and

13  pulled old case files of any area where they had a murder that

14  they thought --

15         THE COURT:  You're saying that's something you're

16  going to elicit?

17         MR. GOODMAN:  No.  I'm just telling you what the

18  story is, Judge, and I'm saying we're going to have to be very

19  careful, and we're going to depend on your Honor's rulings,

20  but this is what the testimony was, that they pulled all these

21  old case files, and then once they got Sumner and other

22  cooperating witnesses, who got incredible deals -- Sumner had

23  just committed a brutal murder and double homicide where they

24  tied up a husband and wife, fled the city, got picked up,

25  never was even prosecuted for that crime, never did a day in

1   jail for any murders after he began to cooperate.  So, yes,
2   these witnesses.

3        And it will also come out that the reason why Sumner
4   implicated Nate in both of these crimes, and he's the one that
5   actually -- Nate's name never had come up until -- it was
6   Anthony Sumner.  He did it because he had a grudge against
7   Nate because Nate was his building manager and evicted him for
8   nonpayment of rent.  And this is undisputed.  He admits that
9   later.

10       So, yes, these witnesses got deals.  They don't need
11  to put in the whole history of the El Rukns.

12       And, in fact, when Mr. Noland is talking about
13  there's this evidence that when Nate got out he wanted to join
14  a hit squad, that's evidence from a fellow named Jackie Clay.
15  The first time that has ever come out was -- I'm sorry.
16  Derrick Kees.  The first time that ever came out was in
17  preparation for the innocence hearing when Jackie Clay was
18  offered five years off of his state sentence.  We're talking
19  about 2012.  That's the first time he ever made that
20  statement.  So, yes, we don't need to get into the whole
21  history of the El Rukns to say that Jackie Clay was offered a
22  five-year reduction in his sentence in connection with a
23  noncriminal proceeding in court where we had the burden of
24  proof in front of Judge Biebel.  We don't need to get into the
25  whole history of the El Rukns to put in that -- to show that

1    these witnesses are biased.

2          And as for the fact that witnesses are relocated and

3    put in the Witness Protection Program, how can that have

4    anything to do with Nate Fields, the fact that the State

5    decided to protect these witnesses or the State believed that

6    there was some threat?

7          THE COURT:  Mr. Fields, was he not in custody when

8    these people were put in, in protective custody?  He was

9    already in prison, right?

10          MR. GOODMAN:  He was in prison from the day he was

11    arrested in 1985.

12          THE COURT:  Nobody is going to be able to say that

13    they're in protective custody because of Mr. Fields; is that

14    right?

15          MR. GOODMAN:  No.  And there's no allegation of

16    anyone that -- the first we ever heard that Nate was part of

17    any hit team was something that came out of Jackie Clay's

18    mouth in -- I'm sorry, Derrick Kees' mouth in 2012.

19          And the fact that Nate says this is a religious and

20    peaceful organization, that's not what he says, Judge.  What

21    he says is, you know, he came back to Chicago and started

22    going to Friday night services.  He had very limited knowledge

23    of what the El Rukns were about when he came back.

24          THE COURT:  Well, but really for me the question on

25    that, though, is that is the plaintiff going to introduce the

1    proposition that the El Rukns, or whatever the full name was,

2    the Moorish Science Temple or whatever, was a -- that he was a

3    member of that because it was a, you know, it was a religious

4    organization or a peaceful organization?

5          MR. GOODMAN:  No, Judge.

6          THE COURT:  Flat, unadulterated no.

7          MR. GOODMAN:  No.

8          THE COURT:  Okay.

9          MR. GOODMAN:  No.

10         THE COURT:  So I guess, you know, I'm looking at the

11   clock here, and it's 3:15, and we've still got other stuff to

12   talk about.  I think here's what I want to do.  And I think,

13   you know, we've spent a lot of time here, and it's largely

14   been productive time, but I want to make sure that people, you

15   know, have a reasonable opportunity to make whatever

16   additional arguments they want to make on the stuff that I

17   haven't ruled on yet, including what we have now.

18         And I've been doing this so far that you make some

19   arguments, I rule on something, you make some arguments, I

20   rule on something.  That's not the efficient way to finish

21   this.  So the way we're going to do it is we're going to take

22   a five-minute break.  I'm going to give each side 20 minutes

23   to talk about anything that's open.  Whatever you want to talk

24   about, you can talk about.  Whatever you don't want to talk

25   about, you don't have to talk about.  You don't have to use

1    the whole 20 minutes, but you get 20 minutes.  And I'm just

2    going to take it all under advisement, and I'm going to have

3    just a really fun and joyous weekend, you know, ruling on all

4    this stuff.  So that's what we're going to do.  Okay.

5         So I'm going to give you five or so minutes to kind

6    of collect your thoughts and think about these are the things

7    I want to talk about and --

8         MR. BURNS:  Could we make it ten, Judge?

9         THE COURT:  Pardon?

10        MR. BURNS:  Could we make it ten if you want us just

11   to address all that's left on the motions, to give some

12   thought?

13        THE COURT:  Okay.  Fine.

14        MR. BURNS:  Good.

15        THE COURT:  Ten minutes.  So when the big hand hits

16   the five I'm going to come back out.

17        (Recess taken.)

18        THE COURT:  All I ask is that you tell me what you're

19   going to talk about, which like motion this, or this motion or

20   that motion.

21        Did you, like, arm wrestle or draw straws as to who's

22   going to go first?

23        MS. GORMAN:  We did not.

24        MR. BURNS:  It's their motion, Judge.

25        THE COURT:  Okay.  Fine.

1    MS. GORMAN:  Thanks.

2    THE COURT:  That would usually mean they would go

3    last.  But anyway, go ahead.  Clock's running.

4    MS. GORMAN:  Your Honor, there's two that I'd like to

5    address.  The plaintiff's number 5.

6    THE COURT:  Okay.

7    MS. GORMAN:  And this is asking you to bar evidence

8    regarding legal actions that Mr. Fields filed while he was in

9    prison.

10   THE COURT:  This is the prison lawsuit thing?

11   MS. GORMAN:  Yes.  There's actually two.

12   THE COURT:  Okay.

13   MS. GORMAN:  And we don't think it's probative of

14   anything in this case.  The defense wants to use it to show

15   he's litigious.  Mr. Fields would testify if this was let in

16   that one of the things that he did while he was on death row

17   and while he was in prison was try to help other prisoners

18   file actions, do grievances, and that he was picked on because

19   of these, because of the help he was providing.

20   One of the cases was the one that Mr. Noland

21   mentioned earlier, this Cook County case that Mr. Nieto, they

22   would like to bring him in to talk about.  Mr. Nieto testified

23   during that trial that Nate and his lawyer, Jean Snyder from

24   the University of Chicago, cooked up this whole thing, caused

25   the riot to happen so that they could sue.  We think this is

1    not only inflammatory but also has nothing to do with the

2    civil rights violations that Mr. Fields is alleging.

3          THE COURT:  Jean Snyder, you said?

4          MS. GORMAN:  Yes.

5          THE COURT:  She was in here at some point.

6          MS. GORMAN:  Yeah.  Because they --

7          THE COURT:  Subpoenaed.

8          MS. GORMAN:  Subpoena, yes.

9          And the other one was a lawsuit when he was -- I

10   think it was when he was at Menard regarding a beating that he

11   had alleged happened.

12          He lost both those case, and so they're trying to say

13   that this was just stuff that he made up and was trying to put

14   forward in order to make money while he was in jail.

15          In fact, the Cook County one, the one that he

16   supposedly concocted with Jean Snyder, actually happened after

17   he was given a new trial.  He's waiting to get out.  So, I

18   mean, the whole idea that he's doing something like that when

19   he's trying to get a new trial or was already offered a new

20   trial, told he could have a new trial we just think is

21   preposterous too, but mostly it's not probative.

22          The only other one I'm going to mention before Len

23   takes over our time is the disciplinary infractions that he

24   had while he was in jail.

25          THE COURT:  That's number 7.

1    MS. GORMAN:  Number 7.

2         And, again, you know, it's just a very short section

3    in our motion, but, again, we don't think these are relevant.

4    We don't think they're probative.  And we think they're

5    prejudicial to bring these up.

6         THE COURT:  So the argument that's made by the

7    defense is that he was -- it's relevant, if nothing else, it's

8    relevant on damages because he was put in segregation as a

9    result of that, and that's something that's referenced in

10   Dr. Silberberg's report, and it's potentially relevant to the

11   level of the degree of harm that he's -- emotional harm and

12   whatever that he suffered from being in prison.  What about

13   that?

14        MS. GORMAN:  Well, it is probative -- I mean, not

15   probative.  He was put in administrative segregation for nine

16   months right at the time he was granted a new trial, and it

17   was because he was -- he says it was because he was helping

18   other prisoners.  There was a new policy that went into effect

19   where everyone was having anal searches every time they went

20   to visit with family and before the meetings and after the

21   meetings, and it was a new policy that was just enacted, and

22   that he got a petition going, and he was fighting this new

23   policy and trying to get publicity about what was going on,

24   and as a result he ended up in this administrative

25   segregation.

1          I mean, you know, we don't think the fact that he was

2    punished -- the fact that he was in administrative segregation

3    we do think is relevant, but to start talking about what they

4    were accusing him of I don't think is relevant.

5          And, you know, there's some very prejudicial

6    information that they want to put in regarding the Cook County

7    cases and this allegation that Mr. Fields was making threats.

8    There is a poster they want to put in that they claim --

9          THE COURT:  That's number 6.

10          MS. GORMAN:  Right.  Sorry.

11          That they claim Mr. Fields had made threats to other

12    detainees or other men at Cook County Jail to stick with the

13    program for the suit that they say he concocted up with Jean

14    Snyder.

15          THE COURT:  So the note is claimed to have something

16    to do with the allegedly phony lawsuit?  Is that your

17    understanding?

18          MS. GORMAN:  Yes.

19          THE COURT:  Okay.

20          MR. BURNS:  I'm sorry, Judge.  I didn't hear that

21    last part.

22          THE COURT:  I asked her if the note that's attached

23    to something here is claimed to have something to do with the

24    allegedly phony lawsuit, and she said yes.

25          MR. BURNS:  Yes.  Thank you.

1    MS. GORMAN:  I'm going to turn over to Mr. Goodman.

2    THE COURT:  Okay.  Go ahead, Mr. Goodman.

3    MR. GOODMAN:  Two issues, Judge.

4    I think the 1985 arrest, he was arrested on a gun

5    charge.  We move to bar this evidence.  Basically the facts

6    were he was in the backseat of a car getting a ride home.  The

7    driver had stopped -- the driver and the passenger stopped and

8    went in somewhere.  He remained in the car.  The police came.

9    He got out of the car.  They searched the car and found a gun.

10   He went to court.  The case was thrown out.  So this was an

11   arrest without a conviction.  We think it's prejudicial

12   because of the gun.

13   Also at the innocence hearing the State used this to

14   try to bootstrap the testimony of Derrick Kees, who said that

15   coincidentally Nate was out doing some hit or stalking

16   somebody to do a hit and he saw Nate with a machine gun under

17   his coat and approached him and saw the police arrest him.

18   This is -- and they're trying to tie that to Nate's arrest.

19   And so what I would say about that is that, of course,

20   assuming that your Honor lets that in, this other crime

21   evidence that Nate -- that Derrick Kees is going to say that

22   he saw Nate with a machine gun under his jacket, they don't

23   need this arrest, and this arrest doesn't corroborate Derrick

24   Kees anyway because --

25   THE COURT:  You don't necessarily have a problem with

1    Kees testifying he saw Mr. Fields carrying a gun around.

2              MR. GOODMAN:  We do.  We do.  That's 404(b).  It's

3    improper.  But we're saying if you're going to let it in, we

4    don't think that they need this arrest to corroborate Derrick

5    Kees.  But, yes, I should have mentioned that as well, that we

6    do.  The fact that Derrick Kees is going to say he saw -- he

7    remembers seeing Nate out on the street in April of 1985 with

8    a machine gun under his coat is -- it's other crimes evidence.

9    It's improper.  Whatever little probative value it has would

10   be outweighed by the incredible prejudice for the jury to hear

11   that testimony.

12             THE COURT:  Okay.

13             MR. GOODMAN:  One other matter that I would address

14   with my remaining time would be the bribe.  And, again, our

15   position is, Judge, that the fact that there was a bribe of

16   Judge Maloney can come in.  We would stipulate to it.  But the

17   details are simply not relevant.

18             And if I may just say, just to give the Court a

19   little bit of context about these tapes that they want to

20   play.  What we heard at the innocence hearing is that

21   basically there's four thousand conversations involving Jeff

22   Fort that were recorded by wiretap.  We have never had access

23   to those conversations, and what we were told prior to the

24   innocence hearing is they were not playable because these were

25   old tapes and they needed to be rehydrated.  Prior to the

1    innocence hearing we got I think 22 tapes on a thumb drive

2    which were, I believe, similar to the ones or the same ones

3    that were played at the Maloney trial.  These are the only

4    ones we've gotten to listen to.  And what I would say is that

5    it's our belief that if we had access to all four thousand

6    tapes, and we've asked for them repeatedly, but we don't have

7    access to them, if we had access, we believe there'd be Brady

8    material in there because it's our theory that this wasn't

9    even an El Rukn hit, and based on the new evidence, the street

10   files that came up, they were pursuing other leads.  It does

11   not appear that this was an El Rukn hit.  We don't know.  We

12   don't know who did it.  But the leads suggest it was not.  And

13   I would suggest that if we had access to those four thousand

14   tapes we would probably hear Jeff Fort making statements

15   suggesting that this was not something that he had ordered.

16           And, in fact, if all we get are these 22 tapes, the

17   jury is just going to assume that Jeff Fort -- that it's a

18   foregone conclusion that this was an El Rukn hit and that Jeff

19   Fort had ordered it.

20           And just to give the Court a little bit more --

21           THE COURT:  You're off the bribe now, though?  You

22   started off talking about the bribe.  Now you're talking

23   about --

24           MR. GOODMAN:  But that's how they're going to prove

25   up the bribe, is with all of these tapes, and that is what we

 1    think is -- we heard them all at the innocence hearing, and we

 2    think that it's unfair.  Again, like I say, we don't object to

 3    the fact of the bribe, but it's the details, whether or not

 4    Swano met with Maloney and whether or not --

 5              THE COURT:  Can I ask you this about that because I'm

 6    not sure I have a complete understanding of it.  Are those

 7    details on the El Rukn tapes?  Or are we talking about tapes

 8    other than El Rukn tapes?

 9              MR. GOODMAN:  No.  I'm talking about the El Rukn

10    tapes.

11              THE COURT:  So the El Rukn people, are they

12    talking -- I mean, in other words, how are we going to -- how

13    is --

14              I'll wait.  I'll save this for the defendants.  Never

15    mind.  Go ahead.

16              MR. GOODMAN:  No.  You will hear.  There's tapes with

17    Swano on there talking to people at the Fort.

18              THE COURT:  Okay.

19              MR. GOODMAN:  There's conversations.

20              THE COURT:  I did not know that.  Okay.

21              MR. GOODMAN:  But just one thing that you won't hear.

22    First of all, in these four thousand tapes, there's not one

23    call with Nate Fields on it.  There are several calls with

24    Earl Hawkins calling into the Fort from jail.  Not one time

25    does Nate Fields call in.

1    And you'll also hear lots of calls where Fort asks

2  about Hawkins and talks about Hawkins and where the generals

3  who are back at the Fort -- you know, I'm sorry.  Jeff Fort is

4  in prison.  The generals at the Fort will report -- I'm sorry,

5  at the headquarters will report to Jeff Fort:  Oh, I just saw

6  Earl Hawkins.  We talked to him.  They'll report about that.

7  There's nothing about Nate Fields of anyone actually going to

8  visit Nate.

9    Earl Hawkins was represented by Bill Swano, who was

10  an El Rukn lawyer.  Nate was not.  And the reason is, is

11  because Nate was not a general.  He was not an important

12  person.

13    It's true that when Jeff Fort talks about the bribe

14  he says, I want it to cover both.  But these tapes, I just

15  think it's a very misleading picture when you just look at

16  these 22 tapes.

17    The other thing that I would say is --

18    That's all, Judge.  There's simply no -- they're

19  incredibly prejudicial.  It would be a huge waste of time, all

20  of these details about that Swano thought this bribe was for

21  this or for that.

22    THE COURT:  You're not intending to put in, the

23  plaintiff is not intending to put in anything about the bribe.

24  In other words, you're not going to put in that his conviction

25  was overturned because of this whole episode about the bribe,

1    anything like that at all.

2          MR. GOODMAN:  I think it's in our complaint, but, I

3    mean, I don't --

4          THE COURT:  You notice I didn't say complaint.  Are

5    you intending to put it in?

6          MR. GOODMAN:  I don't think --

7          MS. GORMAN:  I think what we were willing -- I'm

8    sorry, your Honor.  What we were willing to do was to

9    stipulate to certain facts about the bribe.  That's what we

10   put in our issue, which is that there was a bribe, Maloney was

11   convicted.

12         THE COURT:  Let's say there was no stipulation.

13   Would you be putting it in?

14         MS. GORMAN:  No.

15         THE COURT:  Okay.  That was my question.

16         MS. GORMAN:  No.

17         THE COURT:  All right.  Thanks.

18         Did you have anything else, Mr. Goodman?

19         MR. GOODMAN:  No.

20         THE COURT:  So just so everybody knows, he used up

21   12.  You don't get his extra three, though.

22         MR. NOLAND:  Thank you, your Honor.

23         Just to start where they left off, on the bribe.  Of

24   course it's relevant to the due process claim.  The claim is

25   that the outcome of the 1986 trial would have been different

1    because of the street file.  It's our argument that --

2          THE COURT:  So let me ask you this question:  How are

3    you going to get -- I mean, I understand you've got these

4    recordings where Jeff Fort and all these other people are

5    talking in code about the bribe.  Is that the only way that

6    evidence is going to come in?  Is there some other way

7    evidence about the bribe is going to come in?  How are you

8    going to get it in?

9          You don't have Mr. Swano coming in here.

10         MR. NOLAND:  We have admissions that plaintiff has

11   made in pleadings throughout the years post conviction this

12   case, other cases where he had said it.  So we have admissions

13   by the plaintiff.  We have the wiretaps themselves.  We have

14   FBI agents and, you know, United States attorneys as well.

15         THE COURT:  Who have personal knowledge of what?  Did

16   they see a bribe being passed?

17         You still have to get past the rules of evidence, and

18   there's more rules than relevance.  Okay.

19         MR. NOLAND:  We have evidence of Joe Murphy, who saw

20   in the hallway Alan Knox give an envelope to Bill Swano, and I

21   believe that's the afternoon when Trammel Davis, an El Rukn,

22   has testified that he went into the --

23         THE COURT:  What's the name of the guy?

24         MR. NOLAND:  Trammel Davis.

25         THE COURT:  The guy who saw the envelope being

1  passed.

2  MR. NOLAND:  Joe Murphy, one of the defendants.

3  THE COURT:  Oh, okay.

4  MR. NOLAND:  There's a memo about it.

5  Trammel Davis has already testified in the case that

6  he went into the basement of the Fort to get ten thousand

7  dollars and he gave it to Alan Knox, who gave it to Swano, in

8  the presence of all three of them.

9  THE COURT:  You said?

10  MR. NOLAND:  Trammel Davis testified as to that and

11  that that was the bribe for this case.  And that's also

12  supported by, then, the wiretaps.  So there's all sorts of

13  corroborating information in addition to the taps.

14  THE COURT:  You've answered my question.

15  MR. NOLAND:  Okay.

16  Then the wiretaps, just to respond to Mr. Goodman's

17  argument, Jeff Fort asked about Yukm, I think we talked about

18  it yesterday, Hukm or -- several occasions.  Make sure you

19  tell Hukm.  We told Hukm, Jeff, we got you.  The wiretaps

20  themselves show that the bribe was for all three.  It shows

21  that it was for the Smith-Hickman case and not the

22  Vaughn-White case.

23  In fact, there was that debate on the wiretaps where

24  Fort -- anyway, that's on there.  So that's all relative to

25  the bribe.

1    Then there is actually some things on the wiretaps
2  which are consistent with Trammel Davis's testimony.  Trammel
3  testified that Jeff Fort had ordered this hit in the signs of
4  the rider.  Signs of the rider is to wear masks during the
5  hit.  Trammel Davis has explained that there was a picture on
6  the wall of the Fort with a masked man like Zorro, and that's
7  the testimony, and that Fort uses that phrase, I thought this
8  case was in the signs of the rider, on the tapes.

9    So I want to go back now to the what -- it is part of
10  our case, it's our theory of the case as to the El Rukn
11  information.  It is plaintiff's contention this isn't an El
12  Rukn operation.  It is our response that it is an El Rukn hit
13  and that all the signs point to it.  Not only the way it
14  happened, the location where it happened, a block away from
15  the Fort, the information we developed.  Plaintiff's statement
16  to -- the lawyers to the Court and is going to be to the jury
17  is I'm a building manager.  What they neglected to mention, he
18  was a building manager for a building named the African Hut.
19  It was one of many El Rukn buildings they took over either
20  illegally by force to control the drug trade in the city in
21  those buildings.  That's the building that he managed, the
22  African Hut.

23    It is impossible to separate the El Rukns from this
24  case.  It touches on every single witness and aspect of the
25  case.  The whole thing starts with -- Fields was identified in

1    the case because of Anthony Sumner.  What happened is that

2    there was a triple homicide that the El Rukns committed at

3    54th and Halsted, a guy named General Walker.

4            THE COURT:  What you're telling me is that in order

5    to explain why Sumner identified Fields, you got to explain

6    why he's there to begin with.

7            MR. NOLAND:  Yes.

8            So you got this triple homicide.  Brannigan and

9    Kolovitz get the -- or Kolovitz gets the arrest warrant for

10   that case.  They can't find Walker.  They can't find General

11   Walker in Chicago.  The FBI picks up a wiretap that Walker's

12   hiding out in Cleveland.  Pat Deady of the U.S. Attorney's

13   Office says, Brannigan, get your butt out there and go into

14   the raid with the FBI.  Walker is there, and who else is

15   there?  Anthony Sumner.  That's how this starts.

16           Sumner is brought into the East Cleveland police

17   station.  He agrees to cooperate.  He comes back with

18   Brannigan.  He is debriefed for hours and hours by United

19   States Attorney Pat Deady, by Assistant State's Attorney Larry

20   Wharrie.  He's providing all sorts of information about the El

21   Rukns.

22           Yes, he did not do any time for the Vaughn-White

23   case.  And that's their argument, that he was let off for

24   that.  But he was the first major cooperating El Rukn witness,

25   and that is the whole reason why he did get a good deal.

1       And -- but he didn't just provide information about

2  Nathson Fields on the Smith-Hickman case.  He provided

3  information on this triple case that I was just telling you

4  about.  There was another triple shooting that very day.

5  There's memos, very lengthy memos of all the information he

6  provided.  It goes to why -- and he provided information on

7  himself.  It therefore goes to his reliability, why he cut the

8  deal or why the prosecutors gave him this particular deal.

9       It also explains why O'Callaghan and Murphy are even

10 involved in this thing.  In addition to this task force that

11 Brannigan was on, the presidential task force, our clients

12 O'Callaghan and Murphy were on a state task force to

13 investigate the El Rukns and a bunch of violence that had

14 occurred.  That's why Murphy and O'Callaghan were even

15 investigating this case.  That's why Joe Murphy is

16 interviewing Anthony Sumner when he comes back from East

17 Cleveland and provides this massive information.

18      The witnesses issue and the witness intimidation.  It

19 is their contention that Dave O'Callaghan, defendant

20 O'Callaghan coerced witnesses, told them who to pick out in

21 this case.  That's their contention.  It is our contention

22 that the El Rukns and Bill Swano put them up to that.  Those

23 are the witnesses in this case.

24      THE COURT:  Put who up to what?

25      MR. NOLAND:  Put the eyewitnesses up to claiming that

1    O'Callaghan had coerced them.

2                THE COURT:  Okay.  I get it.

3                MR. NOLAND:  And there's on the wiretaps as well,

4    there is information that one of Nathson's friends, a guy

5    named James Spates, was going out looking for these witnesses.

6                There's also information on the wiretaps that Doc

7    Ishmael, that's Jackie Clay, another witness who's going to

8    testify, was going out with Swano looking for witnesses.

9                THE COURT:  People who are going to -- okay, so I

10   just want to make sure I'm getting this right.  The plaintiff

11   is going to contend that certain people who implicated

12   Mr. Fields were basically put up to that by O'Callaghan, that

13   he either coerced them, suborned them, whatever.

14               MR. NOLAND:  And Brannigan.

15               THE COURT:  And Brannigan.

16               And part of the response to that is, well, no, in

17   fact the coercion or the subornation is that people in the El

18   Rukns suborned or coerced the witnesses to falsely say that

19   O'Callaghan and Brannigan put them up to it.

20               MR. NOLAND:  Exactly.  And in fact Anthony

21   Sumner's --

22               THE COURT:  Here's the question:  Those people, in

23   other words, the people who the plaintiff says that

24   O'Callaghan and Brannigan coerced or suborned and that the

25   defendants say the El Rukns suborned, are those people

1       witnesses, and who are they?

2                MR. NOLAND:  One is Randy Langston.

3                THE COURT:  Langston.

4                MR. NOLAND:  And Randy has recanted a couple of

5       times.

6                THE COURT:  He's gone back and forth.

7                MR. NOLAND:  Another is actually Anthony Sumner.

8                THE COURT:  The deceased person.

9                MR. NOLAND:  He's the one who claims that

10      Brannigan -- those are those statements we talked yesterday.

11               THE COURT:  Right.

12               MR. NOLAND:  When in fact he testified that the El

13      Rukns --

14               THE COURT:  Just give me the list.

15               MR. NOLAND:  Okay.

16               THE COURT:  I don't want you to use up your time.

17               MR. NOLAND:  The others are Gerald Morris.

18               THE COURT:  Gerald Morris.

19               MR. NOLAND:  And they have him on their will-call

20      witness list.  I don't know if he's going to be coming in to

21      testify.

22               And then another one is Eric Langston.  Again, he's

23      on their will-call witness list.

24               THE COURT:  He's related to the other Langston.

25               MR. NOLAND:  Yes, he is.

1    THE COURT:  Okay.  Keep going.

2    MR. NOLAND:  Earl Hawkins.  Again, they questioned

3 his credibility and reliability and say that the only reason

4 he's saying these things now is to either to get off death row

5 or to get a better deal or to get out of jail.  Well, he was

6 provided this -- the deal he has with the government during

7 the federal prosecutions based on all the information he

8 provided, not based on what he said about Nathson Fields.  He

9 was testifying about Nathson Fields back in the early '90s

10 that Nathson did the Smith-Hickman case.

11    The plaintiff says that he shouldn't be believed

12 because he has killed 15 people, he has killed ten people or

13 whatever it is.  When Earl Hawkins explains how those hits

14 went down, which were for the benefit of the organization, it

15 explains the organization.  It explains why he's testifying

16 here.  It explains why Nathson Fields was involved and how

17 Jeff Fort orders these hits.

18    The El Rukns are inextricably intertwined with just

19 about every single witness.  Same thing for all the other

20 witnesses and the deals that they got.

21    As to Derrick Kees and this arrest and seeing

22 Mr. Fields with the small machine gun at 70th and Clyde, that

23 was while the El Rukns were stalking a rival gang member or a

24 rival gang named the King Cobras.  Again, Jeff Fort gave the

25 orders, take on these guys.  Derrick Kees testified.  He

1    testified to this back in the early '90s, that they were back
2    at one of the El Rukns buildings, it might have been Nathson's
3    building, having a conversation about it, and Nathson said --
4    and this was when he wasn't testifying against Nathson.  And
5    Nathson said Jeff Fort made the order, he ordered us to do
6    this, we've got to do it, and that's why -- and the "it," by
7    "it," meaning the hit -- and that's why Nathson was out that
8    evening with that machine gun.

9            And the arrest part of it, yes, he was not convicted
10   of it, but that corroborates what Derrick Kees says.  It's not
11   just he's saying it out of the blue.  In fact, Nathson Fields
12   was arrested at that very time and spot that Kees testified
13   about it, which then explains why that Nathson is part of the
14   hit team, which explains why and it corroborates that he was
15   picked for the hit in this case, that Jeff Fort wanted him to
16   be involved or the El Rukns wanted him to be involved.

17           And then, of course, this is a Goon Squad hit.  It's
18   the whole -- this was a gang dispute, the whole -- our theory
19   of the case, the whole reason that they killed them was --
20   killed Fuddy Smith was because he was the leader of the Goon
21   Squad.  They were having a dispute with the El Rukns.

22           THE COURT:  You got four minutes.

23           MR. NOLAND:  Thank you, Judge.

24           Then again as well, it refutes -- plaintiff is trying
25   to paint this picture of himself as this building manager,

1  getting his life in order, he was just doing the drywall,

2  making the repairs.  In fact, he said that he was at a peace

3  conference for the El Rukns, that they were trying to get all

4  the gangs to make peace in the city.  Our position is that is

5  just a lie.  Nothing could be further from the truth.  He was

6  not doing that.  He was an integral part of the El Rukns.  He

7  was an officer by his own admission.  He admits that officers

8  were the law men, are the enforcers of the gang.  Or at least

9  there's evidence that they were the enforcers.

10          It all corroborates why Nathson's involved in this

11 case and corroborates our probable cause, corroborates our

12 theory of the case, corroborates why this prosecution went

13 forward all these years up to 2009.

14          The final point I'd like to make is, Judge, I know

15 that the Court has made some comments about the certificate

16 of -- finding by Judge Biebel, and I understand what you said

17 about the collateral estoppel effect of it.

18          THE COURT:  Those would be called rulings, but

19 just -- I don't want to quibble with you over details, but

20 yeah.  Anyway.

21          MR. NOLAND:  And the ruling that he made.  And it

22 would be our position that it is relevant as to the

23 termination of the proceedings and that they were not

24 terminated in his favor because he asked for a certificate of

25 innocence and did not get it.

1    THE COURT:  I'm going to explain to you why I think

2  you're completely wrong about that.

3    So the requirement of malicious prosecution is that

4  the criminal proceeding was terminated in a manner consistent

5  with innocence.  It was.  He was acquitted.  Okay, now, the

6  fact that he goes back there ten years later and asks to get a

7  piece of paper that says that he's innocent doesn't detract

8  from the fact that the criminal proceeding was terminated,

9  because the acquittal is a termination.  It has consequences

10  under the Fifth Amendment's double jeopardy clause.  Okay.  It

11  was terminated in a manner consistent with innocence.  I defy

12  you to find any case that says that an acquittal is the least

13  bit ambiguous.

14    The case that you cited, I believe I'm right about

15  this, the case somebody cited about a COI coming in was a case

16  in which there was an ambiguous finding, and it came in by the

17  plaintiff because he wanted to show that it wasn't ambiguous

18  at all, that it was actually terminated in a way consistent

19  with innocence.  But you're not going to find a case that says

20  that somebody who was acquitted and found not guilty, that

21  there's the least doubt that he has met that element of

22  malicious prosecution.  At least you haven't cited it.  I bet

23  you won't find one.

24    MR. NOLAND:  The case we cited was the Logan, Alton

25  Logan case before Judge Bucklo.  Alton Logan was -- he was --

1    the charges again him, they were dismissed based on --

2         THE COURT:  No, no, no.  That term is not used in

3    state court.  What was the term that was used?

4         Wait for it.  Nolle prosed, right.

5         MR. NOLAND:  I believe so.

6         THE COURT:  Okay.  And there's all sorts of law about

7    nolle pros being an ambiguous determination in certain

8    circumstances.  That's what Swit versus Leotod (phonetic) is

9    about.  Okay.  And so the reason why Judge Bucklo let the COI

10   in in that case is that it removed the ambiguity.

11        In this case you do not have the predicate ambiguous

12   result.  You've got an acquittal.  It's an acquittal.  The

13   proceeding was terminated.  Mr. Fields was discharged from the

14   criminal proceeding at the moment of his acquittal.  It was

15   over.  He could never be prosecuted again for it.  It was

16   terminated.

17        And you can't say, it can't be said with a straight

18   face that an acquittal is not a termination consistent with

19   innocence.  You just can't.  So, I mean, I just don't buy that

20   argument.

21        So I used up about a minute of your time, which is

22   out, so I'll give you one more minute.

23        MR. NOLAND:  Okay.

24        MR. MICHALIK:  Your Honor, if I might, I think I'd be

25   done in less than that.  I just want to address our motions in

1   limine 5 and 6.

2          First off, motion in limine number 5.  That's the one

3   barring certain legal actions.  Plaintiff's argument here was

4   that we're attempting to introduce these just to show that

5   Mr. Fields is litigious.  That's not why we're trying to

6   introduce these.  We are trying to show that these reflect the

7   pattern and practice and his history of attempting to corrupt

8   the legal system through various filings.  We pointed out in

9   our response that there are four cases in which he has done

10  so, and those two incidents are two of them.

11         Another thing that counsel mentioned --

12         THE COURT:  So the rule of evidence under which

13  you're offering this is what?

14         MR. MICHALIK:  404(b).

15         THE COURT:  It's 404.  Okay.  So it's to show a

16  pattern and a practice of basically doing things to get phony

17  results in legal proceedings.

18         MR. MICHALIK:  Or corrupting the legal process.

19         THE COURT:  Largely unsuccessfully, but it doesn't

20  matter.

21         MR. MICHALIK:  That's correct.

22         I just wanted to also point out that there was some

23  reference to Mr. Nieto's testimony.  We are not alleging or

24  accusing or suggesting anything against Jean Snyder.  I just

25  wanted that to be clear.

1       THE COURT:  But isn't Mr. Nieto?  That's what I was

2   told.

3       MR. MICHALIK:  Well, Mr. Nieto is going to testify

4   about Mr. Fields and Mr. Fields coming up to him and telling

5   him what the plan was going to be.

6       The other reason why these things are relevant are to

7   damages, particularly the Orange Crush incident.  We mentioned

8   that in our response, and I'll just rely on that.

9       THE COURT:  What's the Orange Crush incident?  I'm

10  sorry.

11      MR. MICHALIK:  That was the one where he instigated

12  a -- this is the 1996 incident where he claims that he was

13  physically assaulted by the SWAT team at Menard.

14      THE COURT:  Oh, the SWAT team.  Oh, now I get it.

15      MR. MICHALIK:  Okay.  And that was something that

16  Dr. Silberberg is relying on, so that goes to the element of

17  damages.

18      And then just real quickly, your Honor, with respect

19  to motion in limine number 6, that's the intimidation of the

20  witnesses, we submitted as Exhibit C a note from Mr. Fields.

21      THE COURT:  I saw it.  I got it.

22      MR. MICHALIK:  And that goes to a couple of things.

23  First off, the damages, but also it relates to the earlier

24  pattern and practice that I mentioned as well as his

25  credibility.  He's going to say that he was a peaceful man,

1    just or -- just trying to, you know, get by.  This goes

2    directly against that.

3             And with that I think we are --

4             THE COURT:  Okay.

5             MR. MICHALIK:  We'll rely on our brief on number 7.

6             THE COURT:  Ms. Gorman or Mr. Goodman, you got a

7    couple of minutes left if there's anything that either of the

8    defense counsel said that you want to respond to.

9             MS. GORMAN:  I think I just want to respond to that

10   Mr. Nieto thing.  They want to back off from the claims that

11   he made about Jean Snyder now.

12            THE COURT:  So how does the Jean Snyder thing come

13   up?

14            MS. GORMAN:  It came up in the trial, the actual

15   trial about the beatings, the riot that took place at Cook

16   County Jail.

17            THE COURT:  In other words, did Mr. Nieto say --

18            MS. GORMAN:  Yes.

19            THE COURT:  He said that what?

20            MS. GORMAN:  That Mr. Fields and his attorney

21   concocted this whole thing.

22            THE COURT:  And did he explain how?

23            MS. GORMAN:  Yeah.

24            THE COURT:  Did he explain how he puts the attorney

25   in it?

1       MS. GORMAN:  Yeah.  That the attorney called -- I

2   can't remember the exact details, but the attorney called

3   Mr. Fields, and they set the time of this.

4       THE COURT:  Okay.  Okay.  And she's on your witness

5   list, right?

6       MS. GORMAN:  She is.

7       And, you know, the Orange Crush incident, you know,

8   they can make it sound like a frivolous case, but, you know,

9   he was again represented by -- he was represented by James

10  Chapman.  They deposed him.  You know, well-respected lawyer.

11  He testified that this was a case that he thought he got --

12  they got a fair trial, and they put on their best case and

13  they lost.

14      I don't understand why that should be used against

15  Mr. Fields that he tries to bring some justice to his

16  situation and the fact that he loses makes him a frivolous

17  filer or worse.

18      THE COURT:  I can't say this to a certainty, but I

19  think that for planning purposes you should probably assume

20  that there's a reasonably good chance I'll bifurcate damages.

21  I don't think that it solves or even defers all of the

22  problems for one of the reasons we discussed before because

23  this thing about the effect of the '72 conviction on

24  materiality as it relates to Vaughn and White is I think at

25  least in part a liability issue.  But there's enough other

1    stuff out there that I think that's probably the safer course.

2          It doesn't mean people are going to get extra time,

3    and so it's going to -- the reason I'm telling you this for

4    planning purposes is you need to make sure you save time to

5    put on the damages case.

6          So and I'll have to figure out how I finesse that

7    with the jury.  There's different ways of doing that.

8          Okay.  So I'm going to put this -- we're going to

9    bring this to a close.  And is there anything, sort of any

10   sort of procedural nuts and bolts logistical any kind of thing

11   that anybody think of you want to bring up?

12         MR. BURNS:  I do have at least one matter, if I may,

13   your Honor.

14         One of our clients, Joseph Murphy, who is a defendant

15   in this matter, has a spinal cord injury, and as a result of

16   that injury there's a protocol.

17         THE COURT:  Is he in a wheelchair?

18         MR. BURNS:  He is.  And I know you've given time to

19   each side, but he needs time every so often.  I can provide

20   the exact protocol to you.

21         THE COURT:  He needs breaks, in other words?

22         MR. BURNS:  He does, to go outside to manipulate and

23   do certain things that he's required to do.

24         THE COURT:  Okay.  But here's going to be the deal

25   about that.  He can leave.  He doesn't have to be here every

1    second of the trial.  There's no requirement of it.  And I'm

2    sympathetic to his problem, but we've got a finite amount of

3    time here.  I mean, I don't have unlimited time.  This is one

4    case of many that I have.  And I can -- I'm happy to explain

5    that to the jury at the beginning, that you might see

6    Mr. Murphy leaving, he's got an injury that he needs to, you

7    know, do.  You'll tell me what the term is for it, whether

8    it's stretching or something else.  You shouldn't hold that

9    against him.  I've said that we're going to -- it's my

10   decision that we're going to proceed with the trial because,

11   you know, I want to get this done within a certain amount of

12   time.

13           We may have to make accommodations when Mr. Murphy's

14   testifying.  That's a different story.  But when he's not

15   testifying, he should just go and do it.  Okay.  That's the

16   deal.

17           MR. BURNS:  All right, Judge.

18           THE COURT:  Thanks for bringing it up, though.

19           MR. NOLAND:  I would just add to that that

20   Mr. O'Callaghan actually would be -- I think he's going to be

21   caring for him.

22           THE COURT:  Give me a little bit more detail.

23   Mr. Murphy is in a wheelchair?

24           MR. BURNS:  He is, your Honor.  He has a spinal cord

25   injury.

1    THE COURT:  And is Mr. O'Callaghan his caregiver

2  normally?

3    MR. NOLAND:  His wife is, but his wife is out of

4  town, and so he's going to be caring for him.  And he has a

5  protocol in the morning, and I don't know can -- he had a

6  problem getting to certain a place at -- I've never met with

7  him before 11 a.m., and that's why they said there might be an

8  issue.  We're going to talk to them more about that.  But I

9  know because of his cleansing issues --

10    THE COURT:  You're just going to have to roll with

11  it, folks.  I'm not going to be on trial for three months in

12  this case, which means I'm not going to arrange the schedule

13  around Mr. Murphy.  I understand that there's issues, and I've

14  told you what the trial schedule is.  That's what it's going

15  to be.  I'm happy to explain things to the jury.  I'm happy to

16  do as much as necessary to make myself appear to be a

17  heartless SOB with the jury so that nobody else has to take

18  any heat for it, but, you know, and so if the choice is, and

19  it is a choice, if the choice is that one of the other parties

20  to the case is going to be the person to help him, then that's

21  the choice that people make, and he can leave too.  Okay.  And

22  that's fine.  But I am not going to rearrange the whole trial

23  schedule for this.  Okay.

24    MR. BURNS:  No, Judge.  And that's not what we want

25  you to do.  We want you to be aware of it, recognizing that

1  there may be that need.

2         THE COURT:  So what I'd suggest you do, if you want

3  to draft like a couple of sentences or something for me to

4  tell the jury at some appropriate point, I'm happy to do it.

5  Or I can just wing something.  One way or the other.

6         MR. MICHALIK:  One other thing, your Honor.  I think

7  we are going to need an order from the Marshal Service or to

8  the Marshal Service regarding the file cabinet issue.

9         THE COURT:  Okay.  I need you to draft something for

10 me.

11        MR. MICHALIK:  We'll talk to them.

12        THE COURT:  Draft something.  Send it to that

13 proposed order address.

14        But also if you do it over the weekend, it's okay for

15 you to send me an email to my regular email address telling me

16 you've sent it because I don't typically check that one over

17 the weekend.  I'll know to check it, and then I'll get it

18 done.

19        MR. MICHALIK:  Thank you.

20        THE COURT:  And then we'll get it up to them first

21 thing on Monday.  But, you know, you should figure out what

22 the date is that you're going to want or need it.

23        MR. BURNS:  We'll work on that.

24        Judge, I know your plan is and you gave us the order

25 relative to the length of each day, and I know there's some

1    days.  I'm wondering can exceptions be made on any day to

2    break a little bit earlier on a particular day.  I have two

3    dates in mind.  I'll tell you why I'm asking it.

4         I'm part of the Chicago Bar Association.  I'm on

5    their nominating committee.  They've had hearings.  I've asked

6    Mr. Clifford to move them back.  He is moving them back late

7    in the day, but there are two days in which he would like to

8    proceed beginning at 4:00.

9         THE COURT:  Nominating for what?

10        MR. BURNS:  Nominating for the officers and the board

11   of managers.

12        THE COURT:  Are you running for something?

13        MR. BURNS:  Actually, that's all behind me, Judge.

14        THE COURT:  Oh, you did that already.  Okay.

15        I don't know.  So tell you what, so just what are the

16   specifics?

17        MR. BURNS:  The 12th and the 19th about 4:00, your

18   Honor.

19        THE COURT:  I'm just telling you I'm disinclined to

20   do it.

21        MR. BURNS:  I understand, Judge.

22        THE COURT:  I'll think about it.  We'll see how it

23   goes.

24        I mean, honestly, in pretty much -- not in pretty

25   much.  In every single trial in which I've set time limits

1  people have come in under them, but I keep thinking that's not
2  going to happen.

3  So, all right, anything else?

4  MR. BURNS:  None from us, your Honor.

5  MS. GORMAN:  Just briefly just because of the Court
6  just saying that you would probably be doing the bifurcation
7  of damages, I just want to make sure that I understand that
8  means that any exhibit or witness that -- because --

9  THE COURT:  Somebody that's a damages only person,
10 that would mean -- I haven't decided this definitively.  It
11 will be in whatever order that I -- once I put all of the
12 remain motion in limine stuff in an order, I'll make sure to
13 included it in there.  But that would mean that anybody who's
14 a damages only witness, that you don't bring them in until
15 later.

16 MS. GORMAN:  Okay.  Because our expert was actually
17 coming in, our psychiatrist, for Wednesday, Dr. Silberberg.

18 THE COURT:  Silberberg, yeah.

19 MS. GORMAN:  So I just tell him --

20 THE COURT:  I mean, you know, I suppose there's a
21 theoretical possibility I could say, okay, you know, there's a
22 lot of stuff coming in that's probably only relevant to
23 damages but I let it come in in the case in chief, but, I
24 mean, I kind of thought that that's not what you were asking
25 me to do.

1           MS. GORMAN:  Well, my other question, your Honor, is

2    do we just take out all the documents and other material

3    that --

4           THE COURT:  So you're not going to be giving

5    notebooks to the jurors, are you?

6           MS. GORMAN:  No.

7           THE COURT:  No.  So don't worry about it.  You don't

8    have anything to worry about.

9           MS. GORMAN:  About damages?

10          THE COURT:  Yeah.  You're not going to be giving

11   notebooks to the jurors until they go back to deliberate.

12          MS. GORMAN:  Right.

13          THE COURT:  And so we're going to have a little bit

14   of time before that happens.  And yes, when they go back to

15   deliberate on liability if I bifurcate the trial, they will

16   only get the exhibits that are relevant to liability.

17          MR. NOLAND:  The one exception to that is that we are

18   asking in our motion that the -- and this is the way it was

19   done in all the RICO trials, in the Maloney trial -- that the

20   jurors have the wiretap transcripts and translations in front

21   of them because they are --

22          THE COURT:  You know, that would be liability

23   evidence anyway.

24          MR. NOLAND:  Oh, okay.

25          THE COURT:  No.  I thought Ms. Gorman was saying how

1  do we deal with the exhibits that are damages exhibits.

2          MR. NOLAND:  I apologize, your Honor.

3          THE COURT:  And what I'm saying is you're just going

4  to cull out the damages stuff.

5          I know how tapes and transcripts are handled.

6  Believe me, I've done that more times than I care to remember.

7  So that's fine.

8          MS. GORMAN:  And, your Honor, just one last question.

9          THE COURT:  Okay, now, so everybody's now said one

10  last question more than once.  This time you really mean it,

11  right?

12          MS. GORMAN:  I do.

13          THE COURT:  Okay.  Good.

14          MS. GORMAN:  It's about some exhibits.  And maybe you

15  dealt with this and I didn't quite understand it, but there's

16  exhibits that we're objecting to that they have.

17          THE COURT:  Yeah.

18          MS. GORMAN:  Like --

19          THE COURT:  So I haven't ruled on any of those yet

20  except to the extent they are encompassed in the in limine

21  ruling that I've made.  And, frankly, I got to stop ruling on

22  stuff somewhere and we got to start the trial.

23          MS. GORMAN:  I'm just worried about autopsy reports

24  and photos of the dead people that they've tried to put in as

25  exhibits.

1    THE COURT:  Well, I guess, so I think I said before,

2    and if I didn't I'll say it now, so any exhibit that's been

3    objected to that I haven't made a ruling on shouldn't be used

4    in opening statement.  And exhibits can't be shown to the jury

5    until I've ruled on them.  And so I guess what we're basically

6    going to have to do is -- and I think I put something about

7    this at least in general terms in the order on the trial time

8    thing, which is people are going to have to front stuff with

9    me and hopefully, you know, when we're on a break anyway.  By

10   the way, we're coming up on the question of when the autopsy

11   photos are going to come in, Judge.  You need to rule on that

12   stuff.  So that's the way we're going to handle it.

13   MS. GORMAN:  Thank you.

14   MR. BURNS:  9:00 here, then, Judge?

15   THE COURT:  So, yeah.

16   MR. BURNS:  Because the jury list you had mentioned

17   about --

18   THE COURT:  We're going to go off the record.  But,

19   yeah, it's about nine.  I'm going to find out for sure.

20   MR. BURNS:  All right.

21   (Brief pause.)

22   THE COURT:  So here's the deal.  The way it works is

23   when my law clerks go down to the jury room to get the jurors,

24   generally speaking the first thing that they get is the list.

25   And they get enough copies that we don't have to make extras.

1 We'll have spares for you. They're going to go down there at

2 9:15. So that means you should be in -- and what they're

3 going to do is they're going to run two of them back up here

4 and leave them with my assistant back here, Denise. So I

5 would say be here at 9:15. You may have to wait for five or

6 ten minutes. And then I'm going to give you, whatever time

7 you get them, it's two hours from then. So it's not 11:00.

8 It's two hours from then. Unless it's past 11:30. 11:30 is

9 kind of the drop dead date. So, in other words, we need to

10 have whatever the results are in the terms that I discussed

11 the other day need to be back in the courtroom for everybody

12 to see by 11:30.

13 And that ought to give you two hours and probably

14 plus a little bit.

15 MR. BURNS: From what I understand, Judge, we are

16 told that for each individual's name that comes out, we are

17 told there's a hit, what the charge is, and then we have to

18 write it down. We'll write it down, and we'll write it down

19 and bring it over and provide you and counsel a copy so you

20 know exactly.

21 THE COURT: I beg to differ with you. I have been

22 through this before. They have had the printouts in here in

23 court.

24 MR. BURNS: All right. Fine, Judge.

25 THE COURT: With the photographs on them. I mean,

1     they're not great photographs. It's a Xerox. With the

2     photographs and all the details and everything. So if they

3     are telling you that, they're selling you a bill of goods.

4             MR. BURNS: I'm learning about this for the first

5     time. So fine.

6             THE COURT: And I think it's way better to have the

7     actual stuff here anyway because then there's no dispute about

8     what it is.

9             MR. BURNS: We'll make sure it's done.

10            MR. NOLAND: Judge, how long do we contemplate for

11    opening?

12            THE COURT: See, this is the nice thing about time

13    limits. What's the total time? 38? You can use 38 hours on

14    your opening. Use all 38 and then --

15            MR. BURNS: In a row?

16            THE COURT: Then after that you say we rest and we

17    really don't have any closing argument because I just gave --

18            So I don't know. What do you want to use for

19    openings?

20            MS. GORMAN: About an hour.

21            MR. NOLAND: Maybe an hour and 15.

22            THE COURT: Okay. So we ought to be able to get it.

23    Yeah. That's fine.

24            I mean, seriously, I'm not -- unless something goes

25    awry, I mean, and as I say, I reserve the right to change

1   these things, I'm not going to say, well, you got five minutes
2   for this witness, ten minutes for that witness.  I'm just
3   going to run a clock.  I'm going to send you the spreadsheet
4   at the end of each day which will tell you how many hours
5   you've used and what percentage of your time and so on.
6             MR. NOLAND:  And just the photos that Miss Gorman
7   brought up, these are them.  We'd like to use in opening.
8             THE COURT:  These are the autopsy photos?
9             MR. NOLAND:  No.  We're not introducing the autopsy.
10            THE COURT:  These are the crime scene.
11            MR. NOLAND:  Yeah.  We're not introducing the
12  autopsy.
13            THE COURT:  And this is Smith and Hickman.
14            MR. NOLAND:  Hickman.
15            THE COURT:  Okay.  All right.  Thanks.  Okay.
16            (Which were all the proceedings had in the.
17            above-entitled cause on the day and date aforesaid.)
18                   C E R T I F I C A T E
19
20       I hereby certify that the foregoing is a true and
21  correct transcript of the above-entitled matter.
22
23  /s/ Laura M. Brennan                    03-21-2014
24  _____            _____
        Laura M. Brennan                      Date
25      Official Court Reporter
        Northern District of Illinois