**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATHSON FIELDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 1168** |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Nathson Fields was prosecuted, along with Earl Hawkins, for the 1984 murders

of Talman Hickman and Jerome Smith. After a bench trial held before Cook County

Circuit Court Judge Thomas Maloney in 1986, Fields and Hawkins were convicted and

sentenced to death. During the penalty phase of the trial, prosecutors introduced

evidence that Fields and Hawkins had also murdered Dee Eggers Vaughn and Joe

White. Fields's conviction and sentence were affirmed on appeal in 1990. In 1998,

however, the convictions of both Fields and Hawkins were overturned on post-

conviction review based on evidence that Judge Maloney had been bribed by Hawkins's

trial attorney and had, during the trial, returned the bribe allegedly out of concern that he

was being investigated by law enforcement. Evidence regarding the bribery allegation

(which also became a part of federal corruption charges against Maloney) came from

Hawkins, who began to cooperate with federal law enforcement authorities in or about

1987.

Cook County prosecutors determined to retry Fields for the murders of Hickman and Smith, this time relying in part on the testimony of Hawkins, who made a deal to testify for the prosecution in return for a reduced sentence on lesser charges.[1]  At the second trial, prosecutors changed their theory, contending (based on Hawkins's testimony) that Fields and another individual had shot Hickman and Smith and that Hawkins, who at the first trial had been identified as one of the shooters, had actually been the getaway driver.  Fields was acquitted in 2009.

In 2010, Fields filed the present lawsuit.   He alleged that Chicago police detectives David O'Callaghan, Joseph Murphy, and Daniel Brannigan violated his due process rights in connection with the 1986 trial and the reprosecution by, among other things, fabricating evidence, engaging in suggestive identification procedures, and withholding exculpatory evidence.  Fields also alleged that exculpatory evidence was withheld from him due to a policy of the City of Chicago of withholding "street files" compiled by police detectives that contain exculpatory evidence.  Fields also asserted state-law claims of malicious prosecution, intentional infliction of emotional distress, and civil conspiracy.

The case went to trial before a jury in March 2014.  After seven days of trial, the Court declared a mistrial following testimony by defendant O'Callaghan that ran afoul of a pretrial *in limine* ruling by the Court.  Trial began anew in April 2014.  A jury found in favor of Fields and against defendant O'Callaghan on Fields's due process claim and against Fields on all of his other claims against O'Callaghan and the other defendants.  The jury awarded Fields damages of $80,000.

---

[1] At some point, Hawkins told prosecutors that Fields had not been involved in the murders of Vaughn and White.

Both sides have filed post-trial motions. O'Callaghan has moved for entry of judgment as a matter of law on Fields's due process claim. Fields has moved for entry of judgment as a matter of law, or alternative for a new trial, on his claim against the City. He has also moved for a new trial on the claims on which he did not prevail, and for a new trial as to damages on the due process claim against O'Callaghan. Fields has separately moved for a new trial based on evidence he contends came to light only after the trial, and for additional discovery. The Court addresses all of these motions in this decision.

1.      **O'Callaghan's Rule 50 motion**

A court may enter judgment as a matter of law in a party's favor only if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is [not] sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). A jury's verdict may be overturned "only if no reasonable juror could have found in the [prevailing party's] favor." *Id.* The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier–Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).

O'Callaghan argues that Fields failed to introduce evidence from which a reasonable jury could find in his favor on his due process claim. A due process claim of this type "can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'"

*Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).

With regard to the 1986 criminal trial, O'Callaghan argues that Fields offered no evidence that any allegedly withheld or fabricated evidence was material. More specifically, O'Callaghan argues that the evidence shows that Judge Maloney was acting purely in his perceived self-interest when he convicted Fields and sentenced him to death. O'Callaghan contends that there was no reasonable likelihood that Judge Maloney would have reached a different decision absent the alleged fabrication or concealment of evidence.

With regard to Fields's 2009 trial, O'Callaghan argues that Fields, having been acquitted, cannot show the prejudice needed to maintain a due process claim. O'Callaghan also argues that Fields failed to offer evidence sufficient to permit a reasonable jury to find the requisite materiality of the withheld or fabricated evidence, because there is no basis to believe that the prosecutor's decision to take the case to trial would have been altered absent the alleged misconduct.

As Fields notes, the jury was not asked to make separate findings on the *Brady* claim regarding the 1986 trial before Judge Maloney and the continued prosecution following the reversal leading to retrial in 2009. Thus for purposes of O'Callaghan's Rule 50 motion, it is sufficient for Fields to show that evidence on one part of his *Brady* claim or the other was sufficient.

The 1986 trial. O'Callaghan says that the only evidence regarding the result of Fields' 1986 criminal trial shows that the outcome was dictated by the abortive bribery scheme involving Hawkins's attorney William Swano and Judge Maloney. The judge, O'Callaghan contends, convicted the defendants in order to conceal his involvement in

the bribery scheme.  It is patently clear, he argues, that no amount of additional exculpatory or impeachment evidence would have made any difference at all.

This certainly was a viable argument for defendants to make to the jury, but the evidence did not and does not require the jury to make such a finding.  First of all, there was no direct evidence regarding Judge Maloney's motivations or what role the bribery scheme *actually* played in the outcome of the 1986 trial.  The evidence that O'Callaghan points to came not from Judge Maloney but rather from contentions in briefs that attorneys for Fields filed in an effort to overturn his conviction.  These arguments were inferential in nature; Maloney never said he convicted Hawkins and Fields to deflect suspicion.  O'Callaghan refers to the arguments in these briefs as "admissions," but the jury was not told that it had to accept them as binding.  Rather, the jury was entitled to discount these statements and did not have to accept them as the final word on the subject.

On the flip side, the jury was entitled to find from the nature of the allegedly concealed and fabricated evidence that, in the words of the Court's instruction, it "would have had a reasonable likelihood of affecting the outcome of the case."  Jury Instructions at 11 (dkt. no. 668).  There was no need for Fields to offer direct evidence on this point.  The law does not require *any* element of a claim to be proven by direct evidence; circumstantial evidence is sufficient.  "From the relevant standpoint—that of probative value—direct and circumstantial evidence are the same in principle." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (internal quotation marks omitted).

Here the circumstantial proof came from the inherent value of the concealed or

fabricated evidence itself, as well as its value when compared with what prosecutors had or offered against Fields at the 1986 trial. Fields offered testimony from his criminal defense and appellate attorneys regarding the allegedly withheld and fabricated evidence, as well as testimony from defendant Larry Wharrie. A reasonable jury could have found that if all of what Fields contends was the truth had been out there—in other words, if no evidence had been withheld or fabricated—there was a reasonable likelihood of an acquittal at the first trial, irrespective of the abortive bribery scheme.

The reprosecution. There was also evidence sufficient for a reasonable jury to find in Fields's favor on the *Brady* claim with regard to his reprosecution following reversal, even if the jury did not find in his favor on the claim as it related to the 1986 trial. First, the Court overrules, as it did at the summary judgment stage, O'Callaghan's argument that the *Brady* claim is legally infirm with respect to the retrial phase of the criminal case because Fields was acquitted. The Court adopts its discussion of this issue in the summary judgment ruling and adds the following. Though the Seventh Circuit has "suggested, without squarely holding, that a trial that results in an acquittal can never lead to a claim for a *Brady* violation because the trial produced a fair result, even without the exculpatory evidence," *Whitlock v. Brueggeman*, 683 F.3d 567, 588 (7th Cir. 2012), this is not a simple case of an alleged *Brady* violation preceding a trial in which the defendant was acquitted despite the violation. Fields was convicted after a trial, and he remained incarcerated for eleven years and under bond restrictions for another six before he was ultimately acquitted in the retrial. And as Fields points out, in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), a case that the Seventh Circuit has never overruled, the court upheld a *Brady*-based judgment against police officers

despite the fact that prosecutors dropped the charges after a mistrial was declared, and thus the plaintiff was never convicted. This suggests the matter is not quite as simple as O'Callaghan argues.

With regard to the materiality issue concerning the reprosecution, the jury was instructed that concealed or fabricated evidence was material if there is a reasonable likelihood that it would have altered the prosecutors' decision to proceed to trial. Jury Instructions at 11. O'Callaghan contends that the only evidence regarding materiality was the testimony of the trial prosecutor, Brian Sexton. *See* O'Callaghan R. 50(b) Mot. at 7. Sexton testified that the evidence allegedly withheld would not have altered his decision to take the case to trial. O'Callaghan argues that there was no contrary evidence.

Again, however, Fields was not required to prove this element via direct evidence; the jury was permitted to make the necessary finding inferentially, based on the nature of the withheld or concealed evidence itself. There was sufficient evidence to permit the jury to draw this inference. The law did not require the jury, or the Court, to accept Sexton's testimony.[2]

For these reasons, the Court denies defendant O'Callaghan's Rule 50 motion.

## 2. Fields's Rule 50 motion

Fields, for his part, also seeks judgment as a matter of law on his *Monell* claim against the City of Chicago. He is not entitled to that relief. There was sufficient evidence, taken in the light most favorable to the City, to permit a reasonable jury to find

---

[2] On this point, the Court notes that Fields has also challenged the jury instruction on the ground that it should have required the jury to find what a reasonable prosecutor would have done, not to the particular prosecutor who handled the case. The Court need not address this issue now but will do so at the retrial ordered later in this decision.

that the City did not have an express policy or an established practice of concealing exculpatory or impeachment evidence that caused the concealment of such evidence in his case.

### 3. Fields's motions for new trial

Fields has moved for a new trial pursuant to Rule 59(e) and 60(b). His submissions make the scope of his request a bit less than crystal clear. In his post-trial motion filed under Rules 50 and 59, Fields raised issues regarding all of the claims on which and defendants against which he did not prevail, as well as on the issue of damages on the single claim on which he prevailed against a single defendant, O'Callaghan. *See* Pl.'s R. 50 Mot. for Judg. as a Matter of Law and R. 59 Mot. for a New Trial (dkt. no. 701). In the text of that motion, Fields sought a new trial on his *Monell* claim if the Court denied his request for entry of judgment, *see id.* at 3-7; he sought a new trial on damages on the single claim on which he prevailed, *see id.* at 9-10; and he made a number of other arguments that seemed to address all of the claims against the individual defendants on which he had lost. *See id.* at 7-8 (argument that bifurcation prejudiced him on the liability phase); 10-11 (argument regarding improper testimony by prosecutor Sexton and improper instructions regarding the due process claim); 12-19 (claiming errors regarding the due process claim against defendant Murphy and the malicious prosecution claim against defendants O'Callaghan and Murphy); 19-20 (arguing that giving defendants an extra peremptory strike was error).

Fields then filed a motion for a new trial under Rule 60 based on newly discovered evidence. *See* Pl.'s R. 60 Mot. for a New Trial (dkt. no. 746). That motion, on its face, did not say whether Fields was requesting a new trial on all claims, or just

some of them.  When Fields filed his memorandum in support of both of his post-trial motions, however, he said in the opening paragraph and the closing paragraph that in addition to seeking entry of judgment on the *Monell* claim, he "seeks a new trial on [the *Monell*] claim . . . [and] also seeks a new trial on damages on his claim against defendant O'Callaghan"—not on all of his claims.  *Id.* at 1; *see also id.* at 31.  At the start of the memorandum, however, Fields dropped a footnote saying that he "is not waiving other issues raised in his Motion."  *Id.* at 1 n.1.  This indicated that Fields was not limiting his new trial request to the specific claims and issues he identified at the outset of the motion.  In his reply memorandum, Fields again said in opening and closing the brief that he was seeking "a new trial on the Monell claim and . . . a new trial on damages against defendant O'Callaghan."  Pl.'s Reply in Support of Post-Trial Mots. at 21; *see also id.* at 1.  But at the start of the memorandum, he again hedged this, saying that he was simply limiting the issues to be discussed in the brief, without giving up on his other arguments.  (And, to be fair, Fields discussed all of his arguments at some length in his initial motion for new trial even though he did not discuss them all of them in his later-filed briefs).

The Court believes that the best interpretation of what Fields seeks is the following.  He does not challenge the liability verdict against O'Callaghan on the due process claim but instead seeks a new trial only as to damages on that claim; he seeks a new trial on both liability and damages on his remaining claims against O'Callaghan and the other individual defendants; and he seeks a new trial on his *Monell* claim against the City.

### a.     The *Monell* claim

Fields is entitled to a new trial on his *Monell* claim against the City.  He was unfairly prejudiced at trial by rulings the Court made during the discovery process that effectively prevented him from ascertaining whether evidence in files found in the so-called "basement" file cabinets had been withheld from criminal defense attorneys in other cases.  Looking back, it is clear that Fields sought this evidence, at least in part, to attempt to show a pattern or established practice of withholding evidence, as needed to prove his *Monell* claim.  When the Court denied motions addressing this point that Fields filed during the discovery phase of the case, the Court focused, unfairly, on the fact that Fields' counsel wanted to "make public" the names of those involved in the other murder investigations or cases at issue.  In fact, Fields's counsel said in her submissions that what she wanted was to investigate these matters further, including by contacting the persons involved in the other cases.  Among other arguments, counsel contended—correctly—that the protective order the Court entered concerning these files precluded her from doing that.

A discovery violation or ruling entitles a party to a new trial only if it denied the moving party a fair trial.  *See, e.g., Pickens v. Runyon*, 128 F.3d 1151, 1155 (7th Cir. 1997).  The Court's ruling did so; it unfairly prejudiced Fields at trial.  The ruling rendered it impossible for Fields to attempt to show that the Chicago Police Department's practice of file maintenance and disclosure affected anyone other than him.  This, in turn, made it virtually impossible for him to establish that the City had a "policy" of concealing exculpatory evidence, an element required to prove his *Monell* claim.  And this was not just a side issue on the *Monell* claim.  Defense counsel

emphasized this particular failure of proof during his closing argument:

> There was no evidence presented as to any file, not one, that information was withheld from anyone. Their own expert, Mr. Reiter, said to you, I only looked at one case. I don't know. He said the policy is an outstanding policy. It's a very good policy. But to suggest there's a widespread practice that exists that we withhold exculpatory or impeaching information, what case? We didn't hear a word about it. . . . Is there evidence to support a widespread practice? No. No, there's not.

Trial Tr. 3082. This particular error by the Court, without more, entitles Fields to a new trial on the *Monell* claim.

Fields also seeks a new trial based on the Court's response to a question by the jury during its deliberations about the instruction on the *Monell* claim. The Court's instruction stated as follows:

> The plaintiff's fifth claim is that the City of Chicago had a policy or widespread practice that caused a violation of his right to due process of law.

> To succeed on this claim, the plaintiff must prove each of the following things by a preponderance of the evidence:

> 1.      Material exculpatory or impeachment evidence in the possession of the Chicago Police Department was concealed. These terms have the same definitions that I provided in connection with the plaintiff's first claim.

> 2.      At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence. As used in this case, the term policy means: (a) an express policy that causes a constitutional deprivation when enforced, or (b) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice.

> 3.      The policy as I have described it in paragraph 2 caused the concealment of material exculpatory or impeachment evidence.

Jury Instructions at 17.

During deliberations, the jury asked the following question: "In regards to Claim

5, item 1, does the concealment need to be intentional or can it be unintentional?" Trial Tr. 3191. Fields's counsel proposed to tell the jury that intent was not an element of the claim. Trial Tr. 3192-93. The Court did not adopt this suggestion. Largely because the parties, at the time, disputed what the jury should be told, the Court took the plain vanilla approach and advised the jury that "[t]he instruction on Claim 5 as worded in the written instructions and as clarified in the note that I previously sent to you, states all of the requirements that the plaintiff must prove to succeed on that claim." Trial Tr. 3192.

The instruction on the *Monell* claim did not by its language require intentional concealment, nor should it have done so. *Monell* liability is established by a municipality's establishment or maintenance of a policy that causes a constitutional deprivation. *See, e.g., Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012). There is no separate requirement to prove that the municipal policy caused someone to act intentionally. But because the instruction—indeed, the same element of the instruction that the jury focused on—had a cross-reference back to the instruction on Fields's due process claim, which *did* require intent, there was a potential for jury confusion. More to the point, the jury's question indicated actual confusion.

Seen in this context, the Court's response to the jury's question—in which the Court essentially just repeated the original instruction—was inappropriately uninformative. "[A] cryptic answer to a question submitted to the judge by the jury [ ] can undermine the reliability of the verdict even if there is no actual error in the instructions. Clarity is as important as accuracy given the limitations of jurors' comprehension." *Balthazar v. City of Chicago,* 735 F.3d 634, 638 (7th Cir. 2013). When faced with a question from a jury, "the court has an obligation to dispel any

confusion quickly and with concrete accuracy." *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). The Court does not believe that it satisfied this obligation in this particular instance. It should have told the jury that the answer to its question was no and that to establish liability on Count 5, Fields did not have to prove intentional concealment. The Court's error prejudiced Fields.

For these reasons, Fields is entitled to a new trial on his *Monell* claim. The Court therefore does not address his remaining arguments concerning that claim at this time. It will do so, if and as necessary, in connection with the retrial.

**b.     The claims against the individual defendants**

The primary issue Fields has raised regarding his remaining claims, as well as the issue of damages on the claim on which he prevailed, concerns the trial testimony of Earl Hawkins, Fields's co-defendant in the 1986 murder trial. As indicated earlier, Hawkins ultimately made a deal with both federal and state prosecutors, and he testified against Fields in his 1999 retrial. Still later, in 2013, Hawkins obtained further benefits when he testified against Fields in the state court proceeding on his petition for a certificate of innocence. The deposition of Hawkins in connection with the state court proceeding was conducted jointly with his deposition in the present case.

To be more specific, in 1989, Hawkins entered into an agreement to plead guilty to federal racketeering, narcotics, and conspiracy charges and to cooperate with law enforcement, in return for a 60 year prison sentence. As part of the plea agreement, the Cook County State's Attorney agreed not to oppose allowing Hawkins to serve his time for his state murder conviction in federal custody. In 2002, Hawkins entered into a plea agreement with the Cook County State's Attorney. He agreed to plead guilty to armed

violence charges in connection with the murders for which he had previously been convicted. He also agreed to cooperate with law enforcement and testify, in return for two consecutive 42-year prison terms—for a total of 84 years—to run concurrently with his federal prison term. The plea agreement stated that it was both sides' intent that Hawkins would remain in custody until age 72—that is, until the year 2027 (Hawkins was born in 1955).

In December 2013, Hawkins entered into a revised plea agreement with the Cook County State's Attorney. At the Court has indicated, this took place in connection with Hawkins's testimony against Fields in connection with his petition for a certificate of innocence, a proceeding that essentially ran in tandem with the present case, though Fields was opposed by different parties in the two matters. The new plea agreement reduced Hawkins's prison sentence to two consecutive 39-year terms, for a total of 78 years—six years less than his previous state sentence. In addition, the new plea agreement eliminated the statement about Hawkins serving until age 72 and replaced it with a statement that "[i]t is the intent of both parties that defendant Hawkins not serve any additional time in state custody beyond what he is already serving on his federal sentence. Defendant Hawkins will receive credit for time spent in state custody dating back to his original arrest on May 18, 1985." City Defs.' Resp. to Pl.'s Proposed Discovery Plan for Post-Trial Motions (dkt. no. 770), Ex. 3 ¶ 14(c).

Fields obtained all of these plea agreements during discovery in the present case. In August 2013, before Hawkins signed the revised Cook County plea agreement but evidently after he and Cook County had reached a mutual understanding, Hawkins gave a deposition that, as indicated above, covered both the present case and the state

14

certificate of innocence petition. Hawkins was represented at the deposition by attorney

David Stetler. At the outset of the deposition, Cook County prosecutor Sexton made the

following statement regarding the anticipated revised Cook County plea agreement:

MR. SEXTON: Yes. I know there was some confusion as to when your out date was, that you originally thought it was 2016, or received some paperwork from the Bureau of Prisons that reflects that. I tendered, for the record, and I think you already had a copy of it, but a letter from 2003 from AUSA William Hogan that clarifies that it's not 2016, that your actual out date on the federal sentence is 2027.

Our understanding was when you originally reached a plea agreement and when this case came back on remand, that the federal and state time would be served concurrently. I know that the two counts would be consecutive, the armed violence counts, but those would be concurrent with your federal sentence. I know there was some confusion as to the -- I believe the cross-examination during the original trial that you would serve approximately 11 years of additional time.

Just to make it clear, I've talked to your attorney, Mr. Stetler, and I believe Mr. Stetler talked to you alone. What we are offering is the exact same plea agreement, only instead of 42 years on each count of armed violence as to Mr. Hickman and Mr. Smith, it would be 39 now, 39 consecutive with each other, just to ensure that your out date on your state time would be -- or you would be doing less time on your state time than you would your federal, just so you would not be doing -- just to make it clear for the Bureau of Prisons and everyone that you would not be doing additional time on your state sentence, that it would be under your federal sentence.

And I believe that's our agreement, right, Mr. Stetler?

MR. STETLER: That's correct.

MS. GORMAN: We would like to clarify whether this is an agreement or just a clarification of what actually was agreed.

MR. SEXTON: It's more of a clarification, but I wanted to put it -- I don't have anything drafted. We just reached -- we talked this morning; I wanted to talk to Mr. Stetler. And I will draft the -- it's the same-type plea agreement, only I will put "39" in there with the date now just to make sure that that reflected our original understanding of what the agreement was.

MS. GORMAN: So, again, just to clarify: This is not something that

was being offered to Mr. Hawkins today for his testimony, but it's a clarification of what was --

MR. SEXTON: Right.

MS. GORMAN: -- agreed to in the past?

MR. SEXTON: Because there was confusion, and I know there was confusion at the trial, we wanted to make it clear that that was what our original intent was at the time back in 2009.

MS. GORMAN: Thank you.

MS. REPORTER: I'm sorry. May I get your name, please?

MR. SEXTON: Oh, I'm sorry. Brian Sexton with the Cook County State's Attorney's Office.

MS. REPORTER: Thank you.

MR. STETLER: Let me just clarify from my perspective, because I wasn't around when the original plea agreement was entered into: As far as I'm concerned, just in terms of the numbers, regardless of the original intent, this is a revision of the numbers down from 42 plus 42, down to 39 plus 39, and the result is making sure that he's not going to have state time on top the federal. That's just the pure logistics, mechanics, and numbers of it, which is all I care about.

MS. GORMAN: Thank you.

*Id.*, Ex. 4 at 5-7.

As just quoted, Cook County prosecutor Sexton stated at the August 2013 deposition that his understanding was that Hawkins's "out" date—his release date— would be 2027. And this was likewise the stated understanding of federal prosecutors. At the same deposition, Sexton produced a letter from Assistant United States Attorney William Hogan dated August 4, 2003 that accompanied documents from the US Bureau of Prisons and included the following summary by Hogan:

As we discussed, the BOP calculates Hawkins's statutory release date as January 1, 2027, at which time he will have served 40 years of his

60 year federal sentence (i.e., his mandatory expiration date under the pre-guidelines law with credit for time served from September 19, 1987, the date of imposition of his Illinois murder sentence by Judge Maloney, and 10 days per month statutory "good time" pursuant to the provisions of former 18 U.S.C. § 4161). The "two-thirds date" and "projected satisfaction date" of 9-18-2016 shown on page 2 of the Sentencing Monitoring Computation memo have no bearing on Hawkins's actual release date under former 18 U.S.C. §§ 4205 and 4206; as you have been advised by both me and Tony Merola of the BOP when we contacted him in approximately February 2002 on this issue, Hawkins will be "continued to expiration" (i.e., "max out" on his sentence) based on his criminal history, Offense Severity Rating and Salient Factor Score, and the provision in § 4206 that "there is a reasonable probability that he will commit any Federal, State, or Local crime" if released before mandatory expiration.

*Id.*, Ex. 5.

At trial in the present case, defense counsel, who called Hawkins to testify,

inquired how long Hawkins would be incarcerated. The following exchange occurred:

Q:     And is it true that you will not be released from the penitentiary until you are 72 years of age?

A:     I never agreed to that. That's what they said. I thought my time would be up when my 60 years was up in 2016.

Q:     You have come to learn that you actually will remain in custody, isn't that true?

A:     If nothing don't happen, that's what they're saying.

Q:     Is that until 2028, do you know?

A:     No. I thought my paper said that I'm in jail until 2026, and at one time we went to –

Q:     We don't want to go into other matters.

THE COURT:      2026. He said he thought it was 2026.

MR. BURNS:      Very well, Judge.

Trial Tr. 2679. In short, Hawkins indicated that he would be in prison until 2026, "[i]f

nothing don't happen."

Something *did* happen, however.  Less than three months after Hawkins testified, he had a hearing before a hearing examiner of the U.S. Parole Commission.  The examiner noted that Hawkins had listed federal prosecutor Hogan as his representative to appear at the hearing but that Hogan was unable to attend, though he would be sending a letter in support of Hawkins.  Hawkins also reported that his co-defendant (Fields) was suing the City of Chicago and the State of Illinois and that he had testified for the state in the lawsuit.  Hawkins also presented his revised plea agreement with Cook County prosecutors.  Other points were also discussed.

The hearing examiner concluded by recommending that Hawkins be granted parole immediately.  Parole Commission documentation indicates that the signatures of all of the commissioners were required to approve the examiner's recommendation. The commissioners signed the pertinent order on various dates from July 21 through 24, 2014.  The final approval came after the Parole Commission received letters supporting Hawkins not just from federal prosecutor Hogan but also from defendants Brannigan and O'Callaghan and Cook County prosecutor Sexton.  Hogan's letter, dated July 9, 2014, said that it was submitted in support of Hawkins for his parole hearing on July 11; detailed Hawkins's crimes and his cooperation with law enforcement, including his testimony at the trial in Fields's civil case; and concluded by saying, "I recommend that Earl Hawkins be given full consideration by this Commission for parole."  Sexton's letter (dated July 14) also summarized the charges against Hawkins and his cooperation, and it specifically referenced Hawkins's testimony at trial in the present case.  Brannigan's letter (dated July 6) also noted Hawkins's testimony at proceedings

in 2013 and 2014.  O'Callaghan's letter (dated July 1) said he was writing in support of Hawkins "for consideration in his forthcoming parole hearing," and it closed by asking that any consideration that Hawkins could receive "should seriously be considered," and that he believed that "Earl Hawkins deserves to have some time that is left in his life to be outside a prison facility."

Once Hawkins was released on federal parole, the terms of his revised Cook County plea agreement apparently kicked in—specifically, the newly-created term stating that "[i]t is the intent of both parties that defendant Hawkins not serve any additional time in state custody beyond what he is already serving on his federal sentence."  Thus rather than going into state custody upon his federal parole, Hawkins was released from prison outright in September 2014 and is now a free man.  To paraphrase Hawkins, "something happened"; it happened very shortly after his trial testimony in the present case; and a reasonable inference can be drawn from the evidence summarized above that there was a connection these events.

Fields cites Hawkins's accelerated release from prison, resulting from a deal that one reasonably could infer is interrelated with his testimony against Fields in the present case, as newly discovered evidence that warrants granting a new trial.  Fields contends that the jury likely would have assessed Hawkins's testimony—which touched on both liability and damages issues—in a different way had it known he would be released just a few months hence.

To obtain a new trial based on newly discovered evidence, a party must show that it has evidence that was discovered after trial; it exercised due diligence; the evidence is not merely cumulative or impeaching; it is material; and it is such that a new

trial would probably produce a different result. *See, e.g., Envtl. Barrier Co. v. Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008). First of all, there is no question that the evidence of Hawkins's release arose after trial; his parole hearing happened post-trial, and he was released after that.

Second, there is no viable claim of lack of due diligence. Fields's attorney was told by Cook County prosecutor Sexton at Hawkins's August 2013 deposition in the present case that Hawkins would be in prison until 2027. At the same deposition, counsel was given an earlier letter from federal prosecutor Hogan that said the same thing. Finally, defense counsel advanced the same view in questioning Hawkins at trial and arguing the case to the jury. Knowing what she knew at the time, Fields's counsel would have had no basis to doubt these statements. And there is no basis to believe that further inquiry on counsel's part during discovery, or prior to trial, would have turned up anything different.

Finally, though the new evidence might be considered as impeachment, it hardly can be considered "*merely* impeaching." The evidence appears to indicate that Hawkins's restructured deal made in the state court proceeding, which on its face seemed to make only a modest adjustment to his prison time, actually was a bonanza for him. And, given the temporal and practical connection between the state proceeding and the present case, including Hawkins's deposition testimony that covered both proceedings at the same time, the bonanza arguably had a direct connection to Hawkins's testimony against Fields in the present case.

Armed with this evidence, Fields's counsel could have argued that Hawkins's testimony, which as indicated concerned both liability and damages issues given that

Hawkins directly implicated Fields in the murders and the bribery scheme, should be disregarded in its entirety. Given Hawkins's significance as a witness, this would have cut at the heart of the defendants' case. Considering the critical role Hawkins played in the underlying events and as a witness at trial, the Court finds it reasonably probable that evidence tending to show that his 2013-2014 testimony against Fields would result in his near-immediate release would have produced a different result in the present case.

This newly discovered evidence entitles Fields to a new trial on all of his claims against the individual defendants on which he did not prevail, as well as a new trial on the issue of damages on the claim on which he prevailed against O'Callaghan. On the latter point specifically, part of defense counsel's argument to the jury in the damages portion of the bifurcated trial was that Fields actually committed the murders of Hickman and Smith and accordingly should recover nothing, or next to it. *See* Trial Tr. at 3470-71, 3476-77. Hawkins's testimony, in turn, was critical to the defendants' contention regarding Fields's involvement in the murders. One conceivable explanation for the jury's low damage award—indeed, the explanation urged by O'Callaghan in response to Fields's contention that the award is unconscionably low—is that the jury accepted defense counsel's argument regarding Fields's involvement in the murders and the Maloney bribery scheme. *See* City Defs.' Combined Resp. to Pl.'s Post-Trial Mots. at 30-32.

Because the Court has granted a new trial on this basis, it need not address Fields's other arguments in support of his request for a new trial. The Court will address those points if and as necessary in connection with the retrial.

### 4. Fields's motion to enforce subpoena

Consistent with the discussion in the previous section, the Court grants, at least in part, Fields's motion to enforce his subpoena to the U.S. Parole Commission. The Court will address the precise contours of the appropriate scope of this discovery, as well as appropriate redactions to protect legitimate privacy interests, at the upcoming status hearing.

### 5. Fields's petition for attorney's fees

Fields has petitioned for an award of attorney's fees pursuant to 42 U.S.C. § 1988 on the basis that he prevailed on his due process claim against O'Callaghan. Fields is indeed a prevailing party on that claim, and as such he will be entitled to recover attorney's fees. When and how much is another question. First, because the Court has granted Fields's request for a new trial on damages on that claim, there is no final judgment, even as to that particular claim. Second, acknowledging Fields's contention that what might be called an "interim" fee award might be appropriate, the amount of any award is likely to be affected by the amount of damages, if any, a jury awards on retrial. Specifically, under *Hensley v. Eckerhart*, 461 U.S. 424 (1983), a fee award as calculated by multiplying the attorney's reasonable hourly rate by the time reasonably expended may be adjusted based on, among other things, "the important factor of the results obtained." *Id.* at 434 (internal quotation marks omitted). More specifically, and as relevant here, a court must address whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.*

The Court will hold a status hearing at which it will inquire of Fields's counsel

whether she wishes to pursue her fee petition at this time or instead wait until the conclusion of the case following retrial.  Depending on the answer to that question, the Court will either terminate the fee petition without prejudice to renewal or will set a schedule for briefing it.

### Conclusion

For the reasons stated above, the Court denies both plaintiff's and defendant O'Callaghan's motions for judgment as a matter of law.  The Court grants plaintiff's motion for a new trial as to liability and damages on all claims except his due process claim against defendant O'Callaghan, on which the Court grants a new trial limited to the question of damages.  The Court also grants Fields's motion to enforce his subpoena to the U.S. Parole Commission, with the extent of appropriate disclosure to be determined.  The case is set for a status hearing on April 27, 2015 at 9:30 a.m. to address what further discovery is required given the Court's ruling that it erred in limiting discovery on the *Monell* claim; set a schedule for its completion; determine the appropriate scope of production pursuant to the subpoena to the Parole Commission; and set a date for the retrial.  Fields is directed to file, by no later than April 20, 2015, a specific and concrete discovery plan with regard to the previously-denied *Monell* discovery.

Date:  April 6, 2015