**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Nathson Fields, | ) | |
| Plaintiff, | ) | Case No: 10 C 1168 |
| | ) | |
| v. | ) | |
| | ) | Judge Kennelly |
| City of Chicago, et al., | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

For the reasons stated below, the Court grants plaintiff's motion for sanctions [dkt no. 586] in part and directs the City defendants' counsel to pay plaintiff's counsel attorney's fees and expenses in the amount of $68,618.

**STATEMENT**

On March 18, 2014, the seventh day of a jury trial that began on March 10, 2014, defendant David O'Callaghan gave testimony while under examination by his attorney that the Court concluded ran afoul of a pretrial *in limine* ruling. Plaintiff Nathson Fields moved for a mistrial, and the Court granted the motion. This required the trial to start afresh. Fields then filed a motion for sanctions, seeking among other things to recover attorney's fees and other expenses that were incurred as a result of the conduct of defendant O'Callaghan and his counsel.

The Court initially deferred ruling pending the outcome of the do-over of the trial. In the retrial, Fields prevailed against O'Callaghan on one claim under 42 U.S.C. § 1983, presumptively entitling Fields to an attorney's fee award under 42 U.S.C. § 1988. For this reason, the Court deferred ruling on the present motion for sanctions, figuring that the fee award Fields sought on the present motion would be subsumed in the section 1988 fee award. Later, the Court granted Fields a new trial on the claims on which he had lost (save his claims against a particular defendant), but left standing the verdict favorable to Fields against O'Callaghan. The Court continued to defer ruling on the present motion for the reasons just noted. More recently, on a motion to reconsider filed by O'Callaghan, the Court concluded that the new trial should include the claim on which Fields had prevailed. As a result, the fees Fields seeks via the present motion for sanctions are no longer subsumed in a likely section 1988 fee award; it is an open question whether Fields will prevail on retrial. For this reason, the Court now proceeds to rule on the motion for sanctions.

The Court made a series of *in limine* rulings prior to trial that excluded certain evidence regarding criminal conduct by and criminal prosecutions of members of the El Rukn street gang that did not involve Fields.   One of these was a terrorism-related prosecution of gang leader Jeff Fort.   The Court also clearly and unequivocally instructed counsel in writing and orally, on more than one occasion, to instruct witnesses regarding the Court's *in limine* rulings before they testified.   *See, e.g.*, Order of Mar. 14, 2014 at 5 (dkt. no. 535) ("Finally, the Court reminds the parties that it expects and directs counsel for both sides to advise witnesses in advance of their testimony of *in limine* rulings that may impact the witness's testimony – in particular, rulings that preclude or limit admission of evidence about which the witness might otherwise testify.").

During the testimony of defendant O'Callaghan, under questioning by his counsel, O'Callaghan was asked about a defense exhibit dating from 1985 in which the chief of detectives of the Chicago Police Department wrote to the special agent in charge of the Federal Bureau of Investigation and the United States Attorney for this district seeking an "unlawful flight to avoid prosecution" warrant for Fields on then-pending state homicide charges.   The letter contained a notation, "file with AUSA Pat Deady."   Defendant's counsel asked O'Callaghan, "Who was AUSA Pat Deady, Assistant United States Attorney Pat Deady?"   The Court overruled Fields's relevance objection.   O'Callaghan responded, "Pat Deady was one of the attorneys involved in the terrorism cases of –," and plaintiff's counsel objected.   The Court sustained the objection, directed the jury to disregard the testimony, and had the jury removed.   *See* Mar. 18, 2014 Trial Tr. 1738-40.

The following exchange then occurred outside the jury's presence, during which the Court asked questions of defendant O'Callaghan and his attorney to ascertain whether the Court's orders had been complied with:

> THE COURT:   Did your lawyer tell you about the rulings that I had made on the terrorism case against Mr. Fort?
>
> THE WITNESS:   Just a wiretap.   I'm aware of we weren't to refer to wiretap evidence.

*Id.* 1740.   After O'Callaghan's reply, the Court turned to his attorney, and the discussion proceeded as follows:

> THE COURT:   Is what he just said right?
>
> THE WITNESS:   I apologize.

THE COURT:   No, no, no.   You can go have a seat.   I'm not talking to you right now.   I'm talking to these guys.   Is what he just said right?

DEFENSE COUNSEL:   Judge, I tried to explain to him all of your rulings relative to –

THE COURT:   What about this one specifically . . .?

DEFENSE COUNSEL:   Your Honor, I expected – honestly when I asked that question –

THE COURT:   I didn't ask you that question.   Now, that's unresponsive, and you are going to respond directly, and I am prepared to sit here until hell freezes over until I get a responsive answer to the question that I have now asked you twice.

DEFENSE COUNSEL:   All right, Judge.   I will tell you your rulings I shared with my clients so that they would be aware –

THE COURT:   Did you tell him about this ruling specifically about the – I mean, the question about the Libyan terrorism case against Mr. Fort was specifically referenced in the written decision that I issued on the motions in limine.   Did you tell him about that?

DEFENSE COUNSEL:   I believe I did.   Let me think.

THE COURT:   When?

DEFENSE COUNSEL:   Judge, from the time that you ruled on it we had discussions about what we would get into and what we would not get into. We let my clients know that we would not have discussions relative to any of that, that you had excluded information regarding Jeff Fort anything beyond.   We told them specifically that there is limited information that you would allow and that I've been –

*Id.* 1740-41.   Further discussion followed, during which the Court raised the possibility of a citation for contempt.   *See id.* 1742-43.   The Court concluded that O'Callaghan's testimony was severely and unfairly prejudicial to Fields and declared a mistrial.   A new trial was held starting on April 7, 2014.

Following the Court's declaration of a mistrial, Fields moved for sanctions.   In terms of harm, Fields cited the fact that seven trial days were wasted, including the time spent in court and in preparation by his three attorneys; the attorneys were forced to re-prepare for the second trial; and the expenses associated with an expert witness's

testimony and travel and the subpoenaing and travel of other witnesses were likewise wasted. Fields contended that O'Callaghan and/or his counsel deliberately flouted the Court's order. In this regard, Fields cited the Court's *in limine* rulings and other occasions during the trial before the events in question where the Court advised defense counsel that they were getting dangerously close to violating one or more of those rulings. In his motion, Fields sought a variety of sanctions, including striking all defendants' jury demands for the liability phase of the trial; barring O'Callaghan from testifying at the retrial; a finding of contempt against O'Callaghan and his attorney; and monetary sanctions. (The Court advised the parties prior to restarting the trial in April 2014 that the first and second of these requests were unsupported in the case law and were otherwise inappropriate.)

On March 31, 2014, defendants filed a response that included an affidavit from O'Callaghan but not one from his attorney. In his affidavit, O'Callaghan stated that he did not intend to violate any court order or to offer testimony that had been barred, and that he had not "collude[d] with anyone to violate any of the Court's orders." City Defs.' Resp. to Pl.'s Mot. for Sanctions, Ex. B ¶ 1. He provided a list of the topics that he understood he was permitted to testify about concerning the El Rukn street gang and a list of the topics he understood, based on conversations with his attorneys, that he "should not testify about." *Id.* ¶ 4. O'Callaghan also stated that at the time the Court sustained the objection to his testimony,

> I did not immediately understand why my testimony was objectionable. I was then asked by the Court, "Did your lawyer tell you about the rulings that I had made on the terrorism case against Mr. Fort" and I stated I was aware we were not to refer to the wiretap evidence. *I could have explained I was also made aware of certain other rulings, as set forth above, however the Court began questioning my attorneys at that point.*

*Id.* ¶ 6 (emphasis added). The Court notes that this affidavit and response were filed a little short of two weeks after the events in question, after counsel had access to the trial transcript, which they were receiving about three to four days after each court day.

As the Court advised counsel at the next court date after the response was filed, O'Callaghan's suggestion that the Court had not permitted him to give a complete answer to the Court's question was inaccurate. The Court listened to the court reporter's audio recording of the proceedings and reported as follows regarding O'Callaghan's statement:

> THE COURT: . . . That's just not accurate. It's not accurate. I know it's not accurate because I knew it at the time, and I've also listened to the

4

tape, which I'm going to direct the court reporter, which is Mary, she's in Rockford, to preserve. It's just not what happened.

I listened to it yesterday. And if you listen to it, you will see that after Mr. O'Callaghan gave the answer that is on page I think it's 1749 of the transcript – I could be wrong about, maybe 1740 – yeah, 1740 of the transcript, "I'm aware we weren't to refer to wiretap evidence," he pauses, and then he says something else. It's not in the transcript, but if and when you listen[ ] to it, you'll hear he says the word, "that's," and it's either "that's it," or "that's all," but the second word is garbled. He says "that's," and I did not cut him off. I did then turn to [defense counsel], who was standing over there, and said is what he just – it was Judge Pallmeyer's courtroom. Is what he just said right? Then Mr. Brannigan [sic] said, I apologize. And I said, no, no, no. You go have a seat. I'm not talking to you right now. I'm talking to these guys.

So the suggestion in there that he wasn't permitted to give a complete answer is false.

Apr. 3, 2014 Tr. 55-56. The Court also noted the absence of an affidavit from defense counsel regarding whether and how he had instructed O'Callaghan regarding the Court's *in limine* rulings. Later that day, counsel filed an affidavit that essentially tracked that of O'Callaghan regarding discussions between him and counsel about the Court's rulings.

The Court finds that the contemporaneous statements that O'Callaghan and counsel made on March 18, immediately after the events in question, are more credible and that those statements are appropriately given greater weight than their later statements, made two weeks after the fact. When asked in court, moments after the events in question, whether his lawyer had told him "about the rulings that [the Court] had made on the terrorism case against Mr. Fort?," O'Callaghan replied, "Just a wiretap. I'm aware of we weren't to refer to wiretap evidence." And that is all he said. When the Court then turned to O'Callaghan's attorney and asked whether he had advised O'Callaghan about that particular ruling, counsel initially gave non-responsive answers; then, when asked again more pointedly, counsel gave an equivocal answer—"I believe I did"; and, finally, he gave an answer that was virtually incomprehensible. The more direct and unequivocal statements of compliance with the Court's rulings given in affidavits filed two weeks later (counsel filed one only after the Court pointedly noted the absence of an affidavit from him) are not entitled to the same degree of credit and weight as the contemporaneous, unrehearsed answers that were given on March 18.

A good deal of O'Callaghan's testimony prior to the events recounted in this order consisted of expansive, non-responsive answers in which it was relatively apparent that

he was attempting to score points rather than simply respond to the questions asked. This arguably would support Fields's contention that O'Callaghan deliberately violated the Court's *in limine* ruling regarding the terrorism case. But upon consideration of the record in its entirety, the Court is not persuaded of that proposition. Rather, the Court finds, based on the record presented, that O'Callaghan was not properly and sufficiently instructed before testifying regarding the Court's *in limine* rulings, in particular the ruling regarding the terrorism case. Instead, the Court finds that he was given an incomplete description of those rulings—and that a description of the terrorism ruling was likely omitted altogether—likely because defense counsel had no intention of going into that topic during his examination of O'Callaghan.

The Court also does not believe that O'Callaghan's counsel purposefully elicited the answer that prompted the mistrial. The Court credits in this regard counsel's second (albeit unresponsive) answer to the Court's inquiry on March 18, where counsel explained that he had not expected the answer and terrorism reference that O'Callaghan gave to his question about AUSA Deady.

That said, as indicated above the Court finds that contrary to the Court's clear and unambiguous directive, counsel did not properly and sufficiently instruct O'Callaghan regarding the Court's ruling concerning the terrorism matter before he testified. The Court finds that this has been shown by clear and convincing evidence.

Fields's motion cites three sources of authority for his request for monetary sanctions: 28 U.S.C. § 1927, the Court's inherent power, and the contempt power. The Court's inherent power to punish for violations of its orders does not authorize imposition of sanctions here. That requires a showing of a willful disobedience or, to put it another way, with "subjective bad faith." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (inherent power authorizes sanction against party or attorney who "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" (internal quotation marks omitted)); *Badillo v. Cent. Steel & Wire Co.*, 717 F.2d 1160, 1165 (7th Cir. 1983). The Court does not believe that the record supports a finding that deliberate misconduct occurred.

The next basis that Fields cites is 28 U.S.C. § 1927. As this Court has stated elsewhere,

> [s]ection 1927 permits a court to sanction an attorney "where that attorney has acted in an objectively unreasonable manner by engaging in a 'serious and studied disregard for the orderly process of justice' . . . or where a 'claim [is] without a plausible legal or factual basis and lacking in justification.'" *Badillo*, 717 F.2d at 1166 (citations omitted). Sanctions

> may be imposed under § 1927 for vexatious conduct based on a showing
> of either subjective or objective bad faith.   *Pacific Dunlop Holdings, Inc. v.
> Barosh*, 22 F.3d 113, 120 (7th Cir. 1994) (quoting *Walter v. Fiorenzo*, 840
> F.2d 427, 433 (7th Cir. 1988) (internal quotation marks omitted)).   The
> objective standard is satisfied by "extremely negligent conduct, like
> reckless and indifferent conduct."   *Id.* at 120.

*Dowe v. Nat'l RR. Passenger Corp.*, No. 01 C 5808, 2004 WL 1375692, at *5 (N.D. Ill.
May 28, 2004).   The record, as just indicated, does not support a finding of subjective
bad faith, but it does support a finding of "extremely negligent" or reckless conduct, as
described in *Pacific Dunlop Holdings*, in counsel's failure to properly and sufficiently
instruct O'Callaghan, as the Court unambiguously ordered, regarding the *in limine* ruling
on the terrorism evidence.

The civil contempt power is the last basis that Fields cites in his motion.   As the
Seventh Circuit has stated:

> A court's civil contempt power rests in its inherent limited authority to
> enforce compliance with court orders and ensure judicial proceedings are
> conducted in an orderly manner.   To hold a party or witness in civil
> contempt, the district court must be able to point to a decree from the court
> which sets forth in specific detail an unequivocal command which the party
> or witness in contempt violated.   Civil contempt proceedings are coercive
> and remedial, but not punitive, in nature and sanctions for civil contempt
> are designed to compel the contemnor into compliance with an existing
> court order or to compensate the complainant for losses sustained as a
> result of the contumacy.

*Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 737-38 (7th Cir. 1999) (internal quotation
marks, citations, and bracketing omitted).   The Court has found, earlier in the present
order, that its order directing counsel to instruct witnesses regarding the Court's *in limine*
rulings was clear and unambiguous and that clear and convincing evidence shows that
counsel failed to comply with it.   Civil contempt does not require scienter.   *See
McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *SEC v. McNamee*, 481
F.3d 451, 455-56 (7th Cir. 2007).   The Court has found that its order directing counsel
to instruct witnesses regarding the Court's *in limine* rulings, an order that was
unquestionably known to all counsel, was violated.   To the extent something other than
a completely inadvertent violation is required as the basis for a contempt finding, it
certainly exists here, as the Court found in the preceding paragraph.

The Court concludes that an award of attorney's fees and expenses against
O'Callaghan's attorney is an appropriate remedial sanction under the two alternative

bases cited above.   Fields suffered a clear and unmistakable harm, consisting of wasted effort and expense by his counsel and the need to prepare for a second trial; a monetary sanction can effectively remedy this; and the harm was preventable by compliance with the Court's clear directives.   The Court has indicated that there was no willful violation, but willfulness is only a factor in determining the appropriate sanction; scienter is not a prerequisite, as the Seventh Circuit and the Supreme Court have held. And O'Callaghan's counsel cites no financial hardship.

Fields's counsel say, in a supplement to the motion filed on March 23, 2014, they incurred about $126,000 in attorney's fees (multiplying the time involved by hourly rates they contend are reasonable) as well as about $5,600 in witness-related expenses.   In his response to the motion for sanctions, filed on March 30, 3014, O'Callaghan did not dispute the time, hourly rate, or expenses requested.   Imposition of this full amount, or of the doubled fees that Fields requests, would be an excessive remedial sanction given the absence of a purposeful violation on counsel's part.   In addition, not all of the time spent was wasted; Fields's attorneys learned some things from the abortive first trial and took them into account in structuring their case somewhat differently at the retrial.

Taking these and the other referenced factors into account, the Court will award one-half of the legal fees that Fields seeks, plus all of the out-of-pocket expenses.   The Court therefore directs counsel for defendant O'Callaghan to pay Fields's counsel $63,000 in attorney's fees and $5,618 in expenses, for a total of $68,618.   It is so ordered.

Date:   October 30, 2015                    _____
                                            MATTHEW F. KENNELLY
                                            United States District Judge