1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3

 4    NATHSON E. FIELDS,                )    Docket No. 10 C 1168
                                        )
 5                     Plaintiff,       )
                                        )
 6            vs.                       )
                                        )
 7    CITY OF CHICAGO, et al.,          )    Chicago, Illinois
                                        )    June 6, 2016
 8                     Defendants.      )    2:20 o'clock p.m.

 9
                   TRANSCRIPT OF PROCEEDINGS - MOTION
10          BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13
      For the Plaintiff:     LAW OFFICE OF H. CANDACE GORMAN
14                           BY:  MS. H. CANDACE GORMAN
                             220 South Halsted Street, Suite 200
15                           Chicago, IL  60661
                             (312) 441-0919
16

17                           LOEVY & LOEVY
                             BY:  MR. JONATHAN I. LOEVY
18                                MR. STEVEN EDWARDS ART
                                  MS. SARAH LYNNE GRUSIN
19                           311 North Aberdeen Street, 3rd Floor
                             Chicago, IL  60607
20                           (312) 243-5900

21

22

23    Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639
```

1    APPEARANCES CONTINUED:

2    For Defendant
     City of Chicago:        DYKEMA GOSSETT PLLC
3                            BY:   MR. TERRENCE MICHAEL BURNS
                                   MR. DANIEL MATTHEW NOLAND
4                                  MR. PAUL A. MICHALIK
                             10 South Wacker Drive, Suite 2300
5                            Chicago, IL  60606
                             (312) 627-2100
6

7

8
     For Defendant           KULWIN, MASCIOPINTO & KULWIN, LLP
9    David O'Callaghan:       BY:   MR. SHELLY BYRON KULWIN
                                    MS. RACHEL ANNE KATZ
10                            161 North Clark Street, Suite 2500
                              Chicago, IL  60601
11                            (312) 641-0300

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 10 C 1168, Fields v. City of

3     Chicago.

4          THE COURT:  Good afternoon.

5          MR. KULWIN:  Good afternoon, your Honor.  Shelly

6     Kulwin and Rachel Katz on behalf of David O'Callaghan.

7          MR. NOLAND:  Good afternoon, your Honor.  Dan Noland,

8     Paul Michalik, and Terry Burns on behalf of the City, Joe

9     Murphy, and Dan Brannigan.

10         MS. GORMAN:  Candace Gorman on behalf of Mr. Fields.

11         MR. LOEVY:  Jon Loevy, also for the plaintiff.

12         MR. ART:  Steve Art for the plaintiff.

13         MS. GRUSIN:  Sarah Grusin for the plaintiff.

14         THE COURT:  Okay.  So I think the best place to start

15    is with -- the thing I am looking at right here is entitled

16    Plaintiff's Supplemental Non-Monell Motions in Limine,

17    document number 970, was filed on the 25th of May.

18         So I am going to have to -- for my own purposes

19    because I want to completely get what it is you're doing, we

20    are going to have to go through this kind of step by step.

21         Currently, before anybody dismisses anything, the

22    claims in the case are there is a federal due process claim

23    under 1983, right?

24         MR. LOEVY:  Correct, your Honor.

25         THE COURT:  Basically relating to fabricated evidence

1   and undisclosed evidence.

2           MR. LOEVY:  Correct.

3           THE COURT:  There is a Monell aspect of that same

4   claim, but it only involves the undisclosed evidence, not the

5   fabricated evidence.  Right so far?

6           MR. LOEVY:  Yes.

7           THE COURT:  There is a state law malicious

8   prosecution claim.

9           MR. LOEVY:  Correct.

10          THE COURT:  And I think there is a state law

11  intentional infliction of emotional distress claim.

12          MR. LOEVY:  Also correct.

13          THE COURT:  Is there anything else?

14          MS. GORMAN:  Conspiracy.  It's a separate --

15          THE COURT:  Conspiracy what?

16          MS. GORMAN:  Under 1983.

17          THE COURT:  State, federal?  Yeah, but that doesn't

18  add anything to the -- I mean, it's a conspiracy to violate

19  due process.

20          MS. GORMAN:  Yes.

21          THE COURT:  Yes.  So it's still all part of the same

22  thing.

23          All right.  And so what you're proposing to do is to

24  drop which claim exactly?

25          MR. LOEVY:  The state law malicious prosecution,

1    intentional infliction of emotional distress, and that's it.

2           THE COURT:  And that's it.  Okay.  So it would leave

3    the federal claims; namely, the Brady/fabrication claim and

4    the Monell thing and the conspiracy aspect, right?

5           MR. LOEVY:  Correct, your Honor.

6           THE COURT:  So now I get to sort of this motion here,

7    or the supplemental motion.  And in terms of -- I mean, you

8    have provided me a list, and there are some, I guess,

9    complaining about whether it's specific enough.  Things can

10   always be more detailed, but I think there is at least a

11   couple of lists in here of the things that you think would not

12   be admissible.

13          But part of what I need to know is kind of what

14   the -- in other words, if you end up -- if you dismiss these

15   state claims, you are just going with the federal claims,

16   what's the plaintiff's case in chief going to involve?

17          MR. LOEVY:  Well, we would show that there was a

18   Brady violation at trial, primarily surrounding the street

19   file that wasn't produced, we would show that that

20   Constitutional violation happened pursuant to a pattern and

21   practice on the part of the City, and that as a result of that

22   Constitutional violation, Mr. Fields suffered damages,

23   obviously primarily focused on the 20-plus years he spent in

24   prison.

25          MR. KULWIN:  I'm sorry.  I didn't hear the last one.

1  THE COURT:  He said primarily focused on the 20-plus

2  years he was in prison.

3  Okay.  So at the previous trial, and I am talking

4  about the one that got all the way through, what I will call

5  the fabricated evidence part of the claim had to do with what

6  I guess I would generically refer to the contention that the

7  defendants had influenced witnesses to testify falsely.  You

8  didn't mention that just now.

9  MR. LOEVY:  And that was an inadvertent omission.

10  That's part of the case.

11  THE COURT:  That's still part of the case.

12  MR. LOEVY:  Yes.  You know, I guess it used to be

13  more commonly thought of as a Newsome claim, but I think the

14  Seventh Circuit case law is very clear that fabrication is a

15  standalone part of due process.

16  THE COURT:  Okay.  So that's still in there.

17  MR. LOEVY:  Yes.

18  THE COURT:  All right.  And then, presumably,

19  Mr. Fields is going to testify in this case?

20  MR. LOEVY:  Yes.

21  THE COURT:  And is somebody going to ask him the

22  question on direct, did you commit the murders?

23  MR. LOEVY:  Yes.

24  THE COURT:  Okay.  And he is going to say no, as he

25  did before?

1    MR. LOEVY:  He is.

2    THE COURT:  All right.  So the -- now I get to I

3    guess a couple of lists that are in the motion.

4    So when you say over on -- and I know you provide

5    some detail later, but when you say here on page 3 in about

6    the middle of the page -- and, again, predicated on the

7    dropping of the state law malicious prosecution and

8    intentional infliction claims -- that what's not at issue and

9    what defendant should not be able to introduce is evidence

10   offered for the sole purpose of establishing probable cause to

11   a suspected plaintiff might have been involved in a crime,

12   what happened at plaintiff's sentencing, or what happened at

13   the second criminal trial at which plaintiff was acquitted.

14   Does that three-point list of what you think the

15   defendant should not be able to introduce, does that have any

16   content beyond the list that's on page 4, carrying over to the

17   top of page 5, and then the material on pages 5 and 6 about

18   gang evidence and some detailed points about that?  It

19   actually goes over to page 7.

20   In other words, if I were to look at the list, this

21   is the stuff that the plaintiff says should not come in if the

22   state law claims are dropped, you've got items A through I,

23   but there are actually two I's.

24   MR. LOEVY:  And no A.

25   THE COURT:  You're right.  There is no A.  So B

1   through I, as well as the second I on pages 4 to the top of

2   page 5, then you sort of generally say gang evidence, but then

3   you provide kind of a list of bullet points on pages 6 and 7,

4   it has eight bullet points.

5           So does B through I and the second I and the eight

6   bullet points, does that describe the universe of the material

7   that you think should not come in?

8           MR. LOEVY:  Your Honor, to answer your question, that

9   is the stuff that was obvious to us that shouldn't.  However,

10  we do ask your Honor to adopt what you characterized as the

11  page 3 part because, for example, we wouldn't want the defense

12  counsel to get up in opening and say, you wouldn't believe

13  about this or that gang evidence or something that was totally

14  unrelated to the claims, but when you ask them at sidebar, why

15  did you mention that, they said, well, it went to probable

16  cause.

17          In other words, we aren't purporting to anticipate

18  every single thing that they could say was probable cause, but

19  we do think we've made an analytical case that if it went

20  solely to probable cause, they cannot rely on that as a

21  good-faith basis to talk about it.

22          So we think both halves of the motion should be

23  granted.

24          THE COURT:  Okay.  I think I follow what you are

25  saying.

1          Okay.  I need to ask the defendants a couple

2    questions.  So I am looking at the document that you filed

3    on -- it's docket number 978, which is filed on the 1st of

4    June, defendants' joint response to plaintiff's non-Monell

5    motions in limine.

6          Over on page 2, you make the comment that, Neither

7    the Court nor the defendant should be required to try to

8    decipher -- well, at the top of that same paragraph, you talk

9    about plaintiff's ongoing failure to explain what specific

10   probable cause evidence he seeks to bar, but then you go on to

11   say that, Neither the Court nor the defendant should be

12   required to try to decipher the specific evidence at issue and

13   plaintiff's overly broad conclusory and seemingly deliberately

14   vague motion and supplement.

15         So what is it you think is vague about it?  I mean,

16   usually things with -- I mean, not to be flip about it, but

17   usually things with a bunch of bullet points tend not to be

18   vague.  What do you think is vague?  And I am looking at

19   Mr. Noland, but I don't care who answers it.

20         MR. NOLAND:  We addressed the specific items

21   throughout our response that the Court specified at those

22   pages; but beyond that, things as to solely probable cause,

23   they have not -- we are not aware of a single piece of

24   evidence that would relate solely to proximate cause.  They

25   did not --

```
 1              THE COURT:  You said "proximate."  You meant
 2   probable.
 3              MR. NOLAND:  Probably cause.  I'm sorry, your Honor.
 4   Probable cause.
 5              They did not identify, despite the Court's order that
 6   they supplement any such evidence.  We then --
 7              THE COURT:  Let me tell you what I think I heard you
 8   say.  You will tell me if you think I got it wrong.
 9              So you addressed all the bullet points --
10              MR. NOLAND:  Yes.
11              THE COURT:  -- as best as you could, but aside from
12   those bullet points, you can't come up with anything that
13   solely would be admissible to show probable cause aside from
14   that.  Am I --
15              MR. NOLAND:  They haven't identified anything for us
16   to respond to.
17              THE COURT:  Right.  And you couldn't -- I mean, you
18   are not in a position to figure it out on your own.
19              MR. NOLAND:  We're not in a position to figure it out
20   on our own, and we pointed out in footnote 2 some categories
21   with respect to admissibility of evidence such as guilt versus
22   innocence, such as fabrication in general, such as the
23   decision of the prosecutors to proceed to trial in 2009 for
24   purposes of the Brady claim, the due process claim that
25   extends -- apparently continues to extend through 2009,
```

1  despite the plaintiff's statement that -- somewhere in the
2  brief that the -- what happened at the 2009 trial should fall
3  by the wayside in light of their procedural move here.

4         So those are categories which -- general categories,
5  and there could be more, that we have simply identified that
6  would capture the things that essentially came in at the last
7  trial before this Court.

8         THE COURT:  Okay.  So the last brief I got on this by
9  design was the defendants', so I'd like to hear from the
10 plaintiff on I guess what we are calling motion in limine
11 No. 1.  It may kind of bleed into some other things, the stuff
12 we have been talking about.  I guess I want to hear what you
13 have to tell me.

14        MR. LOEVY:  Well, your Honor, I guess the first thing
15 I would say is it sounds like nobody disagrees that neither
16 side should be able to introduce evidence solely for the
17 purpose of showing probable cause to suspected plaintiff who
18 was involved in the crime, or this is what happened at the
19 sentencing so we can show it because it happened at the
20 sentencing, and that the third one is disputed.  So that, it
21 sounds like --

22        THE COURT:  So pause for a second there on the
23 sentencing thing --

24        MR. LOEVY:  Right.

25        THE COURT:  -- because we didn't talk about this in

1    much detail a second ago.

2            So one of the things you said somewhere in this, it

3    was either in your first -- or the original non-Monell motions

4    in limine or the second one was that you were not -- it's in

5    the second one, page 2 -- plaintiff is relinquishing any claim

6    or argument that he experienced in aggravation of his sentence

7    as a result of defendants' alleged misconduct.

8            MR. LOEVY:  Correct, your Honor.  The usual --

9            THE COURT:  So that's the death penalty thing that

10   you were referring --

11           MR. LOEVY:  Exactly.  And as I understood at the last

12   trial, there was something of a trade, that, you know,

13   plaintiff took the ante and said we want to be able to prove

14   that he got the death penalty and that caused him injury.  And

15   the Court ruled that if you are going to do that, then they

16   have to be able to show why he got the death penalty, and,

17   therefore, evidence that otherwise probably would not have

18   been admissible was admissible for that limited purpose --

19           THE COURT:  So what do you think that evidence is?

20           MR. LOEVY:  There was quite a bit of -- it's a matter

21   of record.  It came in as --

22           THE COURT:  It's the stuff that came in at the death

23   penalty sentencing at the first criminal trial?

24           MR. LOEVY:  Right.

25           THE COURT:  Okay.  So you were about to go on to your

1   third point, and I interrupted you.  So you talked about

2   solely for probable cause, you talked about what happened at

3   the death penalty sentencing.

4           MR. LOEVY:  And then the third one was what happened

5   at the second trial.  And our position on that, your Honor, is

6   because there was an acquittal at the second trial, the

7   materiality inquiry is not the evidence that was admitted at

8   the second trial, it's, as your Honor put it in an opinion in

9   May of 2014, what was material to the prosecutor's decision to

10  pursue those charges.  And we have an affidavit from the

11  prosecutor Sexton who lays out in a couple of pages what it

12  was he regarded as material to pursue those charges.

13          THE COURT:  What is it that came in at the second

14  criminal trial that you think would -- ought not to have come

15  in at this trial?

16          MR. LOEVY:  Well, and that's going to overlap, I

17  guess, with some of our other motions; but, for example,

18  the '72 conviction came in, Candace informs me.  So that would

19  be an example --

20          THE COURT:  It came in at the second trial?

21          MS. GORMAN:  I'm sorry?

22          THE COURT:  My question was what --

23          MS. GORMAN:  Oh, I'm sorry.

24          THE COURT:  -- came in at Fields' second criminal

25  trial that you think ought not to come in as evidence in this

1   case based on the arguments that you've just made?

2        I would be surprised if the '72 conviction had come

3   in at the second trial.

4        MS. GORMAN:  No, I misunderstood your question.

5        THE COURT:  Yeah, okay.

6        MR. LOEVY:  Your Honor, we believe Hawkins testified

7   at the second trial but not the first.

8        THE COURT:  Yeah, that's true, because he was on

9   trial on the first one.  He didn't testify in the first trial.

10       So Hawkins' testimony at the second criminal trial

11  shouldn't come in.

12       MR. LOEVY:  Although we recognize that there may be

13  other admissible bases, like, you know, if they say that -- if

14  they can get it in on a different reason.

15       What we're asking for on page 3 is just it cannot be

16  the defendants' sole argument that whatever they're trying to

17  introduce -- and, you know, there's an infinite amount of

18  things they can introduce, it was a long trial, there are a

19  lot of transcripts -- but that your Honor should rule as a

20  matter of law that the fact that it came in at the second

21  trial is not an admissible basis standing alone.

22       THE COURT:  Okay.  I'm just trying to process that

23  for a second.

24       Yeah, I just got to tell you, I -- you know, this

25  trial, the trial of this case occurred like most trials;

1   evidence doesn't come in kind of rank order and sequence.  So

2   evidence comes in when -- a witness may testify about

3   different topics, so it doesn't all come in like a bullet

4   point outline or something like that.

5        I guess I could, in theory -- I, in theory -- could

6   go through the transcript of the trial in this case and try to

7   figure out what was put in about criminal trial number two,

8   about what happened at criminal trial number two, and try to

9   figure out whether it was admissible just to show what

10  happened in criminal trial number two or whether it happened

11  for some other purpose, but that would not be an easy task.

12       MR. LOEVY:  Your Honor, we feel like we have gone

13  through in B through double I and told you what we see as

14  issues that are realistic issues, but we are trying to have

15  two bites at this motion because we do believe that you also

16  should hold that it is not an admissible basis that it came in

17  so that later if they try to bring something in, they can't

18  say, well, this is our only basis.

19       THE COURT:  Would you like to react to that?

20       MR. NOLAND:  Judge, your Honor just made the point we

21  were making, which was that you asked them to identify

22  something for you, they did identify Earl Hawkins' testimony

23  at the 2009 trial.  If we had had that in their paper, we

24  could have responded.

25       I don't remember what came in as to Earl Hawkins --

1       THE COURT:  I don't either.  I just don't remember.
2  I mean, he testified, and so I -- but I don't recall whether
3  somebody put in this is what he testified to in the trial, and
4  it may honestly have come in during his testimony.

5       MR. LOEVY:  Yeah.

6       THE COURT:  My guess is, yeah, I mean, he had this
7  whole -- you know, the whole sequence of events where the
8  first trial happened, you know, he ultimately agrees to
9  cooperate, he provides information to the authorities, he
10 testifies at the trial, and I got to figure that somewhere in
11 there, he was asked on the witness stand, is what you just
12 said what you testified to during the trial, or something to
13 that effect.  But the thing about that is it's also part of --
14 well, it's also, I think, arguably, and maybe more than
15 arguably, admissible for other reasons.

16      MR. NOLAND:  And that's our point, so that's my
17 reaction.  You asked for reaction.  Our reaction, I think, is
18 that they need to specify these things.  We can't in a vacuum
19 agree to something like that.  They need to have concrete
20 pieces of evidence they are seeking to bar to which we can
21 respond to for the Court to evaluate admissibility.  We don't
22 think it's proper, the manner in which they are doing it,
23 trying to get some global ruling that anything solely on
24 probable cause when we simply can't agree to that.

25      THE COURT:  Let me ask you this question

1 conceptually. So on the Brady -- and I am not talking about
2 the fabricated evidence issue on trial too. That, as you just
3 said, was a standalone claim. Actually, we do need to talk
4 about that. Is it the plaintiff's contention that fabricated
5 evidence was introduced against him at trial two? Honestly, I
6 kind of thought that was part of the case, right?

7 MR. LOEVY: When I say standalone, I guess it's maybe
8 one jury instruction --

9 THE COURT: Well, it's, I think, likely all going to
10 be one jury instruction, but it's going to be a separate part
11 of the jury instruction.

12 So one of the difficulties with what you're saying
13 here is that since you've got this two-headed due process
14 claim, part of it is non-disclosure of evidence, part of it is
15 fabrication of evidence, the non-disclosure by definition
16 happens before the trial. The fabrication may happen before
17 the trial, but it's manifest during the trial. I just think
18 it's going to be kind of hard to say, even on this probable
19 cause issue, that relevant stops the day that the jury is
20 sworn in in criminal trial number two because part of your
21 fabricated evidence claim, I would think, is that they kept
22 trying to do it even in the second trial, right?

23 MR. LOEVY: Your Honor, you are correct. And I
24 think, you know, the C point here is getting us hung up with
25 an undue amount of the attention because --

1          THE COURT:  C, letter C.

2          MR. LOEVY:  Yes.  The C point is what came in at the

3    second trial.  I think analytically, though, the idea that the

4    defendants cannot seek to introduce evidence solely to prove

5    probable cause is right as a matter of law because that's not

6    an issue in the trial.

7          So I don't understand the defendants' objection.

8    They cannot say, well, here's a really bad fact that you

9    didn't know we'd get into, but it showed us -- you know, why

10   did you put this in?  Well, it was probable cause.

11         But the defendants, you can see without malicious

12   prosecution, that can't be the basis for what you're doing.

13   So that should be something they don't have a problem with if

14   that's their only basis for bringing it in.

15         THE COURT:  Give me a second.  I just want to look up

16   something just briefly here.

17         So what I'm looking at is the current tentative draft

18   of the pattern instruction -- well, there was a -- you may

19   have not noticed, but there was a -- it was probably six

20   months ago or maybe it was four months ago, a tentative draft

21   of revised Section 1983 instructions that was posted on the

22   Seventh Circuit's website for comment.  And I happen to be a

23   chair of the subcommittee.  One of those is an instruction

24   entitled Fair Trial, Concealment of Exculpatory

25   Evidence/Fabrication of Evidence.  I actually think that it

1  may have been based on the instruction that I gave in this
2  case originally.

3       MR. NOLAND:  Judge, you passed that out at a hearing
4  a couple months back.

5       THE COURT:  And there may be another tweak to it
6  because we got some comments back, maybe a very small tweak to
7  it that we are going to make.

8       But one of the tricky issues, and I know I am
9  skipping ahead a little bit here, is that that has both Brady
10  and fabrication being dealt with in a single jury instruction,
11  because in most situations, there wouldn't be the kind of
12  difference between them that you are talking about here.

13       So in this case, though, because of the acquittal at
14  the second trial, the Brady aspect of it, as you described,
15  you are focusing in on the decision to bring the prosecution
16  and so on.  I am not sure -- I am not sure -- it's going to be
17  a trickier enterprise to instruct on that, and whether it can
18  all be done in a single elements instruction, I honestly don't
19  know at this point.  But that's jumping ahead.

20       Okay.  So continue on.  I mean, there was a lot of
21  stuff -- Mr. Loevy, there was a lot of stuff said in the
22  defendants' response on the motions in limine, so what else do
23  you want to talk to me about?

24       MR. LOEVY:  Your Honor, you directed us to the first
25  motion in limine, which was just based on the theory that

1    probable cause should be out of the trial.

2           Two is not disputed.  Would you like us to argue the
3    specifics --

4           THE COURT:  Two.

5           MR. LOEVY:  Because there is no longer going to be a
6    phasing of the trial.

7           THE COURT:  Oh, right, right.  You are withdrawing
8    the request for bifurcation.

9           MR. LOEVY:  Right.

10          THE COURT:  Yeah.  And as I said, but the other
11   motions in limine kind of all -- in some ways, they all kind
12   of interrelate to the first one.  So evidence introduced at
13   the sentencing hearing.

14          MR. LOEVY:  This is B on our list that we were just
15   talking about it.

16          THE COURT:  Right.  But it was also motion in limine
17   No. 3.

18          MR. LOEVY:  Right.  Because the B was the supplement
19   where we were explaining it a little more.

20          But the motion says --

21          THE COURT:  The defendants are saying, though, that
22   at least some of that material is relevant to damages.

23          MR. LOEVY:  And, your Honor, we argue later in
24   specific points what we think should come out.  What we are
25   just asking for in this motion in limine, whether you are

1  inclined to give it or not, is you cannot say that our only

2  basis to get it in is because it happened at the sentencing.

3  That was admissible at the last trial because plaintiff put

4  the death penalty into play, but it is not an independently

5  admissible basis to say to the jury that we are going to prove

6  to you what happened at the sentencing. That's all we are

7  seeking at No. 3. If things that happened at the sentencing

8  are or are not relevant, those are covered by later motions in

9  limine because the motion doesn't dispute that it could be

10  relevant for other purposes although certain things aren't.

11      THE COURT: Okay. So in terms of testimony that was

12  offered at the sentencing, a portion of the testimony offered

13  at the sentencing in Mr. Fields' first criminal trial had to

14  do with the Smith (inaudible). So I take it that the

15  plaintiff's contention is that that should not be admitted at

16  all.

17      MR. LOEVY: Correct, your Honor.

18      THE COURT: Okay. So I guess I need to hear more

19  from the defendants about that because, I mean --

20      MR. MICHALIK: Did you mean Vaughn White, your Honor?

21      THE COURT: My mistake. I always make that mistake.

22  Right.

23      MR. LOEVY: The first one, not the second one.

24      THE COURT: Second -- right. That's what I want to

25  hear more about.

1      MR. NOLAND:  So, your Honor, if the plaintiffs are --
2  if the Vaughn White case and the issues with respect to
3  Vaughn/White and those killings --
4      THE COURT:  Vaughn/White is the thing that was
5  offered in aggravation at sentencing.
6      MR. NOLAND:  Correct.
7      THE COURT:  Right.
8      MR. NOLAND:  If that is barred and there is no
9  mention at the upcoming trial of the Vaughn/White case, then
10  we have no objection to the entire Vaughn/White case, any
11  reference to Vaughn/White being barred.
12      MS. GORMAN:  But we would not agree to that, your
13  Honor.
14      THE COURT:  What would you not agree to?
15      MS. GORMAN:  Well, Vaughn/White -- we don't want to
16  bring it up as an aggravating factor in sentencing, but we do
17  want to bring it up for the fabrication because Anthony Sumner
18  is the one who accused Nate Fields of being --
19      THE COURT:  But it's your position that you ought to
20  be able to bring it up and they shouldn't be able to talk
21  about it?
22      MS. GORMAN:  We don't want to bring it up -- we want
23  to bring it up for very limited reason, and that's to talk
24  about the credibility of Anthony Sumner because he admitted he
25  lied about that.  He signed an affidavit.  But then he died

1  before anyone could question him about it.  And we think we
2  need to be able to show that aspect.  They're going to come up
3  and --
4          THE COURT:  When you say "show that aspect," you want
5  to show that Mr. Sumner was importuned to testify -- falsely
6  implicate Mr. Fields in the Vaughn/White murder?
7          MS. GORMAN:  Correct.
8          THE COURT:  And your -- I just want to make sure I am
9  getting this right.  You want to be able to show that
10 Mr. Sumner was importuned to falsely implicate Mr. Fields in
11 the Vaughn and White murders, but you are asking me to
12 preclude the defendants from offering testimony that would
13 tend to show that Mr. Sumner had actually told the truth about
14 those things?
15         MS. GORMAN:  I don't think they have anything to say.
16 He told the truth about it.  He signed a statement saying he
17 lied, and he signed it for the State's Attorney's Office.
18         THE COURT:  So what is it that the defendants have
19 put in in the prior trial about the Vaughn/White murders that
20 you think I shouldn't permit them to put in in this trial?
21         MS. GORMAN:  We don't want to talk about
22 Vaughn/White -- Nate being, you know, sentenced to death
23 because of the Vaughn/White murders.
24         THE COURT:  Let me ask my question again.  I really,
25 really need a very direct and specific answer to this.

1          Assuming that you put on your case the way you want
2  to put it on, including testifying -- or putting on testimony
3  or evidence to show that Mr. Sumner was importuned to falsely
4  implicate Mr. Fields in the Vaughn/White murders.  What is it
5  that the defendants put in in the previous trial of this case,
6  10 C 1168, that you think I should preclude them from putting
7  in in this trial?

8          MS. GORMAN:  Well, they -- in their opening
9  statement, they said seven people have said Mr. Fields is
10  guilty, and one of those seven is Mr. Anthony Sumner.  And we
11  want to be able to show that he's a known liar, that he
12  fabricated Nate being involved in one murder, and that no one
13  ever got to question him about anything else because he died
14  two weeks later.

15          So we would just want to put it in for the
16  credibility of Mr. Sumner.

17          THE COURT:  I am looking up something because before
18  I -- okay.  I am going to quote Strother Martin.  What we have
19  here is a failure to communicate.  I wanted to look up who
20  played Captain in Cool Hand Luke, and it's Strother Martin.

21          I understand what you want to do.

22          MS. GORMAN:  Right.

23          THE COURT:  What I am trying to figure out is what
24  you want me to prevent the other side from doing.  And so,
25  presumably -- and maybe you don't, and if so, tell me.

1   Presumably, the plaintiff's side of the case thinks that in
2   trial number one -- at the previous trial of the civil case,
3   that the defendants put in something about the Vaughn and
4   White murders that I ought to preclude them from putting in at
5   this trial.

6          So is that right or is it not right?  And if it's
7   right, what is it that you want me to preclude them from
8   doing?  So stop telling me about what you are going to do.  I
9   want you to tell me -- I want somebody, I don't care who it
10  is, I want somebody to tell me what it is you want me to
11  preclude the other side from doing.

12         MS. GORMAN:  From saying that Mr. Sumner was one of
13  the people that accused Mr. Fields --

14         THE COURT:  It sounds like you're going to put that
15  in, though.

16         MS. GORMAN:  No, no.

17         THE COURT:  You are going to put in that he falsely
18  accused him.  So if he falsely accused him, that means he
19  accused him.

20         MS. GORMAN:  Maybe I'm not explaining it right, and I
21  apologize.

22         THE COURT:  You are not.  You aren't.

23         MS. GORMAN:  They are the ones who put it in in the
24  opening the last time, that there were seven people --

25         THE COURT:  Okay.  Let's forget about opening

1   statements.  Let's talk about evidence.  What is the evidence
2   that the defendants put in at the civil trial, the previous
3   trial in this case, about the Vaughn and White murders that
4   you want me to keep them from putting in?

5          By the way, this is the fourth time I have asked that
6   question in pretty much the same words, and I still am waiting
7   for an answer.

8          MS. GORMAN:  The testimony of Mr. Sumner at the
9   trial, at the first trial they put it in the first time,
10  implicating Mr. Fields, and --

11         THE COURT:  But doesn't that testimony at the trial
12  have to come in on the issue of materiality?  I mean, it's
13  sort of the -- it's sort of the -- it almost goes without
14  saying on a Brady claim that one of the things that the jury
15  has to determine is whether the either withheld or fabricated
16  evidence was material, that, in turn, depends, at least in
17  part, on the other evidence that was offered at the trial.

18         MS. GORMAN:  But if they're going to use Mr. Sumner
19  as one of the persons who has been relied on for Mr. Fields --
20  I'm sorry, I guess --

21         THE COURT:  You're talking in circles.

22         MS. GORMAN:  Yeah.

23         THE COURT:  I mean, if you want to show, as you told
24  me you did, that Mr. Sumner falsely accused him, the only way
25  that even makes sense to anybody is if it comes in that he

1  accused him.  I mean, you'd probably put it in, he accused
2  him, it was false.  He said -- you know, he said at a later
3  point in time it was false, and here's why it was false.  So
4  what -- I don't think I'm missing something --

5           MS. GORMAN:  If they're not going to bring that up
6  that Sumner was one of the -- you know, one of people that,
7  you know, said that Mr. Fields did it, then we have nothing to
8  complain about, but I felt like we would be boxed in there.

9           MR. NOLAND:  We will bring it up that Mr. Sumner --
10 and we're talking about now Smith/Hickman --

11          THE COURT:  Yes.

12          MR. NOLAND:  -- and, Judge, Mr. Sumner, just as a --
13 it's been a couple years.  If you would like -- his role in
14 this is he was the fellow that was in East Cleveland that
15 Brannigan and Wharrie were sent out, he was on the run, along
16 with -- in an El Rukn safe house.  In mid May, he started
17 cooperating and providing information.  He said that Nathson
18 Fields killed Smith and Hickman.  He testified in the
19 liability phase of Fields' '86 trial before Maloney that
20 Fields --

21          THE COURT:  As they call it, the guilt phase.

22          MR. NOLAND:  The guilt phase.

23          -- (continuing) as to that.  And so we will be
24 seeking to rely upon, and it's our position that our -- the
25 defendants in the case, that's how this investigation got

1    started, that's part of their fabrication claim in order to

2    rebut it, certainly that has to come into evidence.  And those

3    are the allegations against Brannigan in particular, actually,

4    that he coerced a false statement out of --

5              THE COURT:  What Mr. Noland is saying kind of sounds

6    like it's right on the money to me.  I don't understand how

7    you -- putting aside -- putting aside the question of whether

8    there is a contention that Mr. Sumner fabricated something or

9    not, I am not sure how the question of materiality even gets

10   discussed if somebody doesn't put in, this is what happened

11   during the trial that we allege was an unfair trial.  I mean,

12   that's like -- that's like wrongful conviction trials 101.

13   When you're talking about materiality, it's material in

14   relation to what's material in relation to what came in at the

15   trial.

16             So I guess I am missing something fairly obvious

17   here, but I'm done asking about it.  I have tried enough.  You

18   wore me out.

19             MR. LOEVY:  Your Honor, on page 4 of our supplemental

20   motion, we have -- there is a list of the things that we think

21   are irrelevant under motion in limine 3 because they were

22   introduced at the sentencing and that that should not be the

23   sole basis --

24             THE COURT:  Then you referenced Sumner, but you

25   referenced Sumner as it relates to Vaughn and White, not Smith

1    Hickman.

2    MR. LOEVY:  And I believe that's been resolved, your
3    Honor.

4    THE COURT:  Yeah.

5    MR. LOEVY:  But the first one, the missing A, is
6    the '72 conviction.

7    THE COURT:  Oh, there should be an A in front of it.

8    MR. LOEVY:  Yes, just a drop in A.

9    THE COURT:  All right.

10   MR. LOEVY:  But that conviction didn't come in at the
11   guilt phase.  It did come at the sentencing.  Therefore, you
12   know, for the same reasoning your Honor just said, since the
13   jury is going to be focused on materiality, bringing in
14   extraneous things that the criminal jury didn't --

15   THE COURT:  But the things that are in the bullet
16   points you responded to in your response to the motion, right,
17   Mr. Noland?

18   MR. NOLAND:  Yes.

19   THE COURT:  At least I saw it that way.  Okay.

20   MR. LOEVY:  That's all I am writing then, your Honor.

21   THE COURT:  So I guess let me get back to where I
22   was.  The last brief on that was filed by the defendants, so
23   is there more stuff that you want to tell me?

24   MR. LOEVY:  May we have a moment, your Honor?

25   THE COURT:  Yes.  So there's a couple of things here,

1    I mean, that if I were in your shoes, I guess I would want to
2    address because there are points that you might not have
3    anticipated.  For example, when you get to -- and it's other
4    motions in limine, you know, the people from the parole
5    commission and so on and so forth.
6              MR. LOEVY:  Do you want to speak to the parole,
7    Candace?
8              May we have a moment, your Honor?
9              THE COURT:  Yeah, sure.
10     (Brief pause.)
11             MR. LOEVY:  Ms. Gorman is going to speak to the
12   parole witnesses, your Honor.
13             THE COURT:  Okay.  That's Snow and -- I forget the
14   second person.  Let me just get to that part of the -- Vela,
15   V-e-l-a, and Snow.
16             Well, let me ask this question.  So these are both
17   people that the defendants anticipate calling; am I right
18   about that?
19             MR. NOLAND:  They would be called in rebuttal,
20   depending on the evidence that the plaintiffs introduce at
21   trial.
22             THE COURT:  That's an interesting use of the term
23   "rebuttal."  That's not normally what rebuttal means.  The
24   defendants' case normally is rebuttal.  It just is.
25             MR. NOLAND:  I hear what your Honor is saying, but it

1  would be in the event to -- it would be purely possibly for
2  impeachment or to prove up impeachment.  If I could, I am
3  going to let counsel address --
4          THE COURT:  Prove up what impeachment?  I don't care
5  if you talk -- prove up what impeachment?
6          I don't care who talks.
7          MS. KATZ:  I guess the first issue is with the parole
8  officer who presided over Mr. Hawkins' parole hearing.
9          THE COURT:  That's Vela, right?
10         MS. KATZ:  Correct.
11         Which the parties involved were in as well.  The
12  issue is that, from our understanding, the whole parole
13  hearing is going to be at her -- introduced to show that the
14  defendants were complicit in helping Hawkins get out early,
15  there was some sort of agreement in which if Hawkins was
16  called to testify -- to testify at the second and first trial,
17  that he would receive some sort of reduction on his overall
18  sentence.
19         Now, if that's what they intend --
20         THE COURT:  You believe that they are going to
21  contend that there was some sort of express agreement?
22         MS. KATZ:  Yes, absolutely, or --
23         THE COURT:  Express -- did you hear what I said?
24  Listen --
25         MS. KATZ:  Not necessarily an express agreement.

1    THE COURT:  Listen to me.  Every word is important.
2    I said it the way I said it for a reason.  So do you want me
3    to repeat my question?
4         MS. KATZ:  No, your Honor.  No, I do not believe they
5    are going to argue there was an express --
6         THE COURT:  You are going to argue that you infer
7    from the circumstances that there was an understanding about
8    what was going to happen.
9         MS. KATZ:  Correct, as well as the letters that were
10   submitted --
11        THE COURT:  You want to call Vela to say what,
12   exactly?
13        MS. KATZ:  What was actually considered during the
14   parole hearing.  White's parole hearing was actually going on
15   at that time, it was switched to a mandatory parole hearing
16   based on the calculations, what things were considered in
17   reducing the sentence or granting him parole, whatever it may
18   be, and whether those factors included any particular motive
19   on behalf of the defendants or any letters submitted in
20   conjunction with that or his testimony in the previous cases
21   here.
22        THE COURT:  Okay.  That's not a rebuttal witness.
23   I'm sorry.  That's not an impeachment witness.  I'm sorry.
24   You're trying to contradict the impeachment.  The impeachment
25   is coming from the plaintiff's side.  They are attempting to

1    impeach Mr. Hawkins, and maybe other people, with the
2    proposition that they testified as they did because they kept
3    getting benefits.  That's the impeachment.
4           There's no witness that Vela is going to impeach, is
5    there?  Mr. Kulwin, name the witness that Mr. Vela is going to
6    impeach as that term is commonly used by lawyers, or anybody
7    else, for that matter.
8           MR. KULWIN:  I yield to you, Judge, on that point, on
9    the --
10          THE COURT:  There isn't one.
11          MR. KULWIN:  I yield to you on the --
12          THE COURT:  Okay.
13          MR. KULWIN:  So this is all in my understanding
14   issue.  If the plaintiff can put in evidence or argue
15   circumstantially that the reason Mr. Hawkins is fingering
16   Mr. Fields all these years later is because the government,
17   the federal government, at the urging of the city government,
18   cut him some kind of slack to get him out early --
19          THE COURT:  They are going to argue that because they
20   argued it at the first trial.
21          MR. KULWIN:  Exactly.  Well, then it seems to me that
22   the (inaudible) in their case in chief doesn't have to be in
23   rebuttal.  It can be in their case in chief.  They can call
24   Mr. Vela to testify that that's not true.
25          THE COURT:  My assumption is that the plaintiff's

1   argument is a little bit more refined than that.  I mean, it's

2   basically that every time Hawkins testifies, he gets something

3   else.  He testifies, he gets something else.  He testifies, he

4   gets something else.  He testifies in the civil trial, lo and

5   belold, he gets out of couple months later.

6              MR. KULWIN:  Right.

7              THE COURT:  That much I get.  And I get that you want

8   to be able to refute that by calling Vela.  And I don't

9   remember where Ms. Snow fits in.  Where does she fit in?  Who

10  is she?

11             MR. KULWIN:  Ms. Snow or Mr. Snow?

12             MS. KATZ:  It's Mr. Snow.

13             THE COURT:  Mr. Snow.  I apologize.  So where does

14  Snow fit in?

15             MR. KULWIN:  Mr. Snow is an unrelated issue.

16             THE COURT:  That's not related to Hawkins?

17             MR. KULWIN:  No.

18             THE COURT:  Let's put it aside then.

19             You want to call Vela, basically, to say, I didn't

20  have any deals with anybody.  This is what happened.  It got

21  changed from this type of a hearing to this type of a hearing.

22             The issue that's been raised is a disclosure issue,

23  right?

24             MS. GORMAN:  Correct.

25             THE COURT:  The issue that's been raised is a

1   disclosure issue.  In other words, where was the

2   supplementation to the Rule 26(a) disclosures.  So that would

3   be my question as well.  There wasn't any, right?

4           MR. KULWIN:  To quote Mr. Loevy, can I have one

5   moment?

6           THE COURT:  Yeah, sure.

7           MR. KULWIN:  So having consulted with my co-counsel,

8   this is how it played out.  The plaintiff, after getting the

9   file, produced the audio with Mr. Vela on it, and so they were

10  really well aware of his existence and that he is a potential

11  witness.  They gave it to us.  So there's no --

12          THE COURT:  So in terms of Rule 37, which is the rule

13  that talks about what happens when somebody doesn't comply

14  with Rule 26(a), in terms of Rule 37 -- let me just get the

15  subpart here -- Rule 37(c)(1), if a party fails to provide

16  information or identify witnesses required by Rule 26(a) or

17  (e), a party is not allowed to use that information or

18  witnesses to supply evidence, blah, blah, blah, unless the

19  failure was substantially justified or was harmless.  You're

20  arguing it was harmless because they knew about it.

21          MR. KULWIN:  Correct.

22          THE COURT:  Okay.  So here is my response to that.  I

23  acknowledge, of course, that this issue only came up after the

24  trial by definition because that's when Mr. Hawkins was

25  released on parole.  I made my ruling on the motion for new

1   trial on April the 7th of 2015.  That was 14 months ago.

2           I reopened discovery -- and everybody knows this -- I

3   reopened discovery for one purpose and one purpose only, and

4   that was on the Monell stuff because I concluded that I had

5   erred in shutting it down in an inappropriate way.

6           So the problem is is that it's all well and good that

7   they knew he was out there, but in the cases in which that

8   makes a difference, the person has the opportunity to take the

9   deposition of the person.

10          And so without knowing that you were going to call

11  this person, how would they have known that they should come

12  in and file a motion asking me to reopen discovery so they can

13  go depose those people?  And by the way, who knows whether the

14  government would even permit them to be deposed.  But

15  whatever.  Let's assume that the government would permit them

16  to be deposed.  How were they to know that?

17          It's one thing to know that somebody is out there.

18  It's another thing to know that they are going to be called as

19  a witness at a trial.

20          MR. KULWIN:  Well, that could be the case, Judge.  I

21  don't disagree with that, having been in that situation

22  myself.  But when --

23          THE COURT:  Is it -- has anybody looked -- on the

24  defense side looked into the question of whether one can take

25  the deposition of somebody like Mr. Vela?

1       MR. KULWIN:  I have not.

2       THE COURT:  Because the whole process of just
3  subpoenaing the file from the parole commission was a
4  labyrinth.  It was a complete labyrinth.  I mean, I had
5  prosecutors -- I had assistant U.S. attorneys from the civil
6  division in here telling me it was Jim Kuhn, I think --

7       MR. KULWIN:  It was Jim Kuhn.

8       THE COURT:  -- saying you can't do that.  You got to
9  do this first, you got to do that first, you have to go
10  through all these processes, and so on.

11       MR. KULWIN:  Having tried to depose people from the
12  government, especially at the Department of -- the Bureau of
13  Prisons, I have had a lot of experience with that for -- many,
14  many years ago, it's extremely difficult in this context.

15       So I think you are right about that.  It would be a
16  Goliathan task, so to speak.

17       However, in response to your other question about how
18  were they supposed to know that's what we were going to try to
19  do, I think when the defense gets a transcript in which --
20  when the plaintiff gets a transcript in which -- it would be
21  one thing if -- and I can be wrong about this, but someone
22  will correct me, I'm sure -- but it was one thing if Mr. Vela
23  was one of nine people, we picked him out of the blue.  As I
24  recall it, it was a one-on-one --

25       THE COURT:  No, he was the guy.  I listened to the

1    thing myself.  He was the guy --

2         MR. KULWIN:  He was the only guy we could possibly
3    call.  And I guess a backup position, Judge, is that if
4    nothing else, the transcript of the proceeding or all the
5    background proceedings should come in, because here is the
6    bottom line on all of it.  The bottom line of it is that if
7    the plaintiff wants to argue inferentially and
8    circumstantially that Hawkins testified this time in the
9    second trial and now the third trial because he got some
10   additional consideration over and above everything he got to
11   testify in all these other trials, the criminal trial and in
12   all the federal cases -- in which, by the way, in every one of
13   those federal criminal trials, I believe Mr. Hawkins
14   identified Mr. Fields in this case as well.  I can't guarantee
15   that, but I'm pretty confident, relatively confident.

16        So now they want to say, well, he was doing all that
17   just because the G was giving him a cut, a break, and then he
18   came back in '09 because there was this other break, and then
19   now he is testifying in the civil trial because there is yet
20   another break, and now he is going to testify in this trial
21   because of that other break, it seems if they are going to
22   argue that, then if we are trying to get at the truth here and
23   what's fair and what's reasonable, I don't see how they're
24   prejudiced for what actually happened to come in.

25        Now, if the Court says, well, that's fine, you can

1   put the transcript in, you can put all the documents in, but

2   he can't call Vela, because I don't know if we could force him

3   to come, I'm not sure, keep in mind, they won't be able to

4   depose him.  I don't know if we would be able to pretry him.

5   So we are kind of both in the same place here.  It's like,

6   hello, let me introduce myself.  And, you know, you hope it's

7   kind of like an English trial where the witnesses don't get to

8   meet the barristers, so to speak.

9          So if that's the point, then it seems only fair that

10  they shouldn't be -- they should either be barred from arguing

11  that this --

12         THE COURT:  Well, if you think that there is a

13  snowball's chance in you know what that the reason why I

14  granted a new trial is not going to come into evidence, I

15  mean, seriously.

16         MR. KULWIN:  Hope springs eternal.

17         THE COURT:  No, I mean, what would be the point?  I

18  am granting a new trial based on this, and then to say this

19  isn't admissible.

20         MR. KULWIN:  Okay.  So then let's assume -- so then

21  given that, then it seems only fair that it shouldn't go out

22  there unchallenged.

23         THE COURT:  So let me ask you this.  You just

24  alluded -- where is he located?  He's not here, I'm assuming.

25         MR. NOLAND:  I do not know.

1          MR. KULWIN:  If I can just wait one moment?

2          THE COURT:  I'm not talking about where he did the

3    hearing for Mr. Hawkins.  I am talking about where his office

4    is.

5          MR. KULWIN:  We might not know that.

6          THE COURT:  So even if -- even if they were to try to

7    take the deposition, and since you, as the person who is

8    calling the witness, are required under Rule 26(a) had you

9    complied with it to provide the address, you are saying you

10   wouldn't be able to do that?  That would make it really kind

11   of ridiculous, wouldn't it?

12         MR. KULWIN:  I can't comment on that one way or the

13   other, Judge.  I can say that what we would do is we would

14   enlist the Bureau of Prisons or U.S. Parole Commission, and I

15   think we could --

16         THE COURT:  Well, my point was a simpler one.

17         MR. KULWIN:  We could issue it to them, and they

18   could as well.

19         THE COURT:  You are planning to call him.  How are

20   you going to do that?

21         MR. KULWIN:  I haven't crossed that bridge yet,

22   Judge.

23         THE COURT:  What do you mean?

24         MR. KULWIN:  Well, you know, Judge, as you said, it

25   takes a lot of work to get that done, and if you are going to

1   bar it, let's wait and see what you're going to do.  And I
2   think that that's fair.

3           THE COURT:  I mean, I'm sorry.  Because -- I think
4   I'm entitled to figure out whether this is an illusory issue
5   before I spend a lot of time and effort on it.

6           MR. KULWIN:  Okay.

7           THE COURT:  And if you're not going to be able to get
8   him in here and testify, then for crying out loud, I am not
9   going to waste time dealing with a motion in limine.  And, I
10  mean, to me it's not altogether clear that somebody like this,
11  whether they're going to be in a position to even come in and
12  testify.

13          I mean -- so I gather you haven't talked to the U.S.
14  Attorney's Office.

15          MR. KULWIN:  I have, Judge.  I did talk to the U.S.
16  Attorney's Office when I first got this to find out like
17  what's the deal on this.  And, you know, I have not finalized
18  those discussions.  I can find out --

19          THE COURT:  Then that's what's going to happen.  You
20  are going to find out, and you are going to find out in the
21  next few days so that I can figure out whether I actually need
22  to deal with this issue or not.

23          MR. KULWIN:  Absolutely, Judge.  No problem on that.
24          THE COURT:  I mean, I don't know if that means
25  calling Mr. Kuhn and kind of getting the ball rolling that

1 / 10

1    way, at least getting some interaction.

2         MR. KULWIN:  I will certainly call Mr. Kuhn and, if

3    necessary, call --

4         THE COURT:  There might be some DOJ or parole

5    commission policy that, you know, they resist having their

6    people called in to testify in cases in which don't directly

7    involve the parole.

8         MR. KULWIN:  I will tell you that, my experience,

9    albeit it's over 20 years now, when I was trying to get people

10   from BOP in those hearings --

11        THE COURT:  Yeah.

12        MR. KULWIN:  -- it was --

13        THE COURT:  It's hard.  It's beyond hard.

14        MR. KULWIN:  It was a big deal.  It was very

15   difficult.

16        THE COURT:  All right.

17        MR. KULWIN:  But I will have that.  Do you want me to

18   just -- how do you want me to communicate that to the Court

19   and all of their counsel?  I mean, any way you want.

20        THE COURT:  Well, you are going to come back here,

21   and you are going to tell them before you tell me.  So we will

22   figure that out kind of a little later on.

23        MR. KULWIN:  Okay.

24        THE COURT:  Well, so let me turn back to the

25   plaintiffs again.  Again, is there more -- is there anything

1    you want to tell me -- let me just kind of throw it open.  Is

2    there anything you want to tell me about anything that's in

3    the defendants' response to your non-Monell motions in limine

4    that you haven't told me already in one way or another?

5            MR. LOEVY:  One thing, your Honor, is I think we

6    might have filed our motion on the tattoo without thinking it

7    through.

8            THE COURT:  The tattoo.

9            MR. LOEVY:  We filed a motion to bar the tattoo.

10   That's actually part of the picture of the lineup, so we can't

11   bar the picture.

12           What happened at the first trial -- at the civil

13   trial that we found objectionable was Mr. Noland say, hey --

14   he focused the jury's attention is that was an El Rukn tattoo,

15   and that seems to us on the wrong side of the case law on --

16           THE COURT:  Refresh my memory about how the tattoo

17   relates to the lineup.

18           MR. LOEVY:  It's a picture of him.  So the picture

19   has the tattoo.  And so we don't have a problem with showing

20   the picture.  But what he did, which we object to, is he

21   brought the jury's attention to, hey, isn't that a gang

22   insignia on his arm?  Which, in our view, violates the case

23   law that you don't try to inflame on gang testimony.

24           MS. GORMAN:  And it also had Mr. O'Callaghan holding

25   his shirt up to show the tattoo in the lineup.

```
 1            MR. LOEVY:  So, in other words, the picture is
 2   admissible and should come in --
 3            THE COURT:  And the picture is where O'Callaghan is
 4   holding the shirt up, right?
 5            MS. GORMAN:  Yeah.
 6            THE COURT:  All right.
 7            MR. LOEVY:  For the witness?  I mean, what the
 8   witness was shown seems to be relevant, not --
 9            THE COURT:  The witness to the lineup?
10            MR. LOEVY:  Yes.
11            THE COURT:  The person who was at the lineup?
12            MR. LOEVY:  Yes.
13            If he held up the --
14            THE COURT:  Who put in the picture at the first
15   trial, the civil trial?  I don't remember.
16            MS. KATZ:  Plaintiff did.
17            MR. KULWIN:  Plaintiff did.
18            THE COURT:  Kind of what I would have assumed.
19            MR. KULWIN:  I believe they put it in to show that
20   Mr. O'Callaghan was rigging the line-up.
21            THE COURT:  That Mr.?
22            MR. KULWIN:  O'Callaghan was rigging the lineup.  I
23   think it came in through Mr. Fields.
24            THE COURT:  I do know that Mr. Fields gave testimony
25   about the lineup and about how it was done.
```

1    MR. KULWIN:  I'm sorry?

2    THE COURT:  I thought -- yeah, I don't want to --

3    MR. KULWIN:  I believe he testified, as I recall --

4    THE COURT:  I thought that he said he showed that to

5  the witness who was seen in the lineup.  No?

6    MR. KULWIN:  No, Mr. Fields -- according to

7  Mr. Fields, what happened was that during the lineup,

8  Mr. O'Callaghan pulled up the sleeve to show --

9    THE COURT:  That's what I meant.  That's what I

10  meant.  That's how I remembered it.

11    MR. KULWIN:  That's exactly how I believe it

12  happened, Judge, and that's how it came into evidence.

13    MR. LOEVY:  All right.  Well, your Honor, if

14  that's --

15    THE COURT:  So your point has to do not so much with

16  the showing of the tattoo but with the commentary.  That's the

17  way I wrote it down.

18    MR. LOEVY:  Correct, your Honor, although I might be

19  understanding the issue which you guys have already

20  acknowledged are farther past.  If that picture --

21    THE COURT:  Well, I am going to hope that you've read

22  the trial transcript more recently than I have.

23    MR. LOEVY:  I have page 567 in front of me, and

24  Mr. Noland asked, That's an El Rukn tattoo?  And the answer

25  was yes.  That's the kind of thing where -- but I might have

1  misunderstood the context.

2          We don't have an objection to the jury seeing the

3  photograph --

4          THE COURT:  Okay.

5          MR. LOEVY:  -- that was the basis of the ID.

6          THE COURT:  I get that.  So that's a tweak to your

7  motions.

8          MR. LOEVY:  Yes.

9          THE COURT:  Anything else you want to say?

10         MS. KATZ:  Your Honor, there is one other --

11         THE COURT:  I am still on them for a second.

12         Is there anything else you want to say in reply to

13  the defendants' response to the motions in limine?

14         MR. LOEVY:  Your Honor, I guess, as you know, an

15  important issue to us is this issue about the alleged bribe --

16  I guess the bribe of the judge, and Mr. Art is going to speak

17  to that one as well.

18         THE COURT:  Okay.

19         MR. ART:  I think our rebuttal to what is laid out in

20  the briefs and what the defendants say is they talk repeatedly

21  about how they are offering this to show materiality, and I

22  guess our response would be it's not being offered to show

23  materiality.  It's not being offered to evaluate whether the

24  alleged fabrications or suppressions were material in the

25  context of other evidence presented in a trial.

1      THE COURT:  So let me -- so I think, and Mr. Noland

2   or one of the other defense lawyers will correct me if they

3   think I'm wrong, but I believe that the reason or at least a

4   significant part of the reason why the defendants want to put

5   in the bribery of Judge Maloney is that the defendants'

6   position has been and it's always been that what happened

7   during the trial didn't really matter all that much.

8      MR. ART:  Right.

9      THE COURT:  And that the conviction happened because

10  of the whole bribery episode.

11     MR. ART:  And that's a superseding cause, and to

12  prove --

13     THE COURT:  And therefore what?

14     MR. ART:  Well, so defendants always have the burden

15  in the case of showing superseding cause.

16     THE COURT:  Right.

17     MR. ART:  And in a case where the allegation is you

18  committed wrongdoing, fabricating evidence and suppressing

19  evidence, that caused a conviction, to show that something is

20  a superseding cause, you have to say that consequence was made

21  unforeseeable by the superseding cause.  In other words, by my

22  misconduct, I couldn't have foreseen --

23     THE COURT:  What you are telling me right now, where

24  do I see that, in which motion in limine?

25     MR. ART:  That is in our motion to reconsider --

1          THE COURT:  You mean your response to their motion to
2   reconsider?
3          MR. ART:  I think that we started this one, didn't
4   we?
5          MS. GRUSIN:  Yes, it's our plaintiff's non-Monell
6   motions in limine docket 963, number 5.
7          MR. ART:  Motion in limine No. --
8          THE COURT:  So it's not the motion to reconsider,
9   it's the motions in limine.
10          MR. ART:  That's right, your Honor.
11          THE COURT:  Docket number 963.  Which page again?
12          MR. ART:  14.
13          THE COURT:  14.
14          I am just rereading that section.
15          So if I am understanding your argument correctly,
16   you're arguing that the bribery of Judge Maloney is
17   irrelevant.
18          MR. ART:  Correct.
19          THE COURT:  And the reason that it's irrelevant is
20   that you're contending that it's admissible, if at all, only
21   as a superseding cause that would cut off liability, and in
22   order for something to be a superseding cause, it would have
23   to make -- you quote Witlock (phonetic).
24          MR. ART:  Right.
25          THE COURT:  It would have to, quote, Make the

1 | plaintiff's injury an unforeseeable consequence of the
2 | defendants' negligence.
3 | What's the defendants' negligence that they're
4 | referring to in there?
5 | MR. ART: In Fields, I believe it's fabrication of
6 | witness testimony.
7 | THE COURT: That's negligence?
8 | MR. ART: Sorry, in Witlock, it's fabrication --
9 | THE COURT: Still not negligence.
10 | MR. ART: Right.
11 | THE COURT: What did they mean when they said
12 | "negligence"?
13 | MR. ART: I think all they're talking about is all of
14 | these tort concepts are imported from, you know, common law
15 | tort principles in the Section 1983, and so in due process
16 | cases, we ask whether fabrication or suppression caused the
17 | harmful result.
18 | And so it's fabrication or suppression in the 1983
19 | context where -- when these principles about intervening or
20 | superseding causes were being played out, it's usually in
21 | negligence cases. So I think Witlock is quoting a common law
22 | negligence case there and saying these common law tort
23 | principles apply.
24 | THE COURT: So if we plug in what's at issue in the
25 | present case, so the bribery would have to make Mr. Fields'

1  conviction in 1980-whatever-it-was an unforeseeable

2  consequence of the withholding or fabrication of evidence.

3       MR. ART:  Exactly.  And the defendants obviously are

4  entitled to prove at trial that they did no such withholding

5  and no such fabrication, but they are not allowed to point to

6  what is actually a parallel proximate cause and say, we are

7  not liable because of that proximate cause.

8       THE COURT:  Just a second.  I just want to refresh my

9  memory on something in the defendants' response to this.

10      So when I look at the defendants' response -- this is

11  plaintiff's motion in limine No. 5.  When I look at the

12  defendants' response to this, I mean, I really don't see you

13  as even responding to this argument about superseding causes.

14  In other words, you don't discuss Witlock and why it doesn't

15  apply or why it doesn't have anything to do with this.

16      So what should I make of that?

17      MR. NOLAND:  Judge, we don't fully understand what

18  they are saying.  The Court's ruled on this --

19      THE COURT:  I know, but it's a motion to reconsider.

20      MR. NOLAND:  Thank you.  Yes.

21      So as to materiality, the issue as to materiality is

22  what's before the jury.  Whether or not they allegedly

23  withheld evidence, had a reasonable likelihood of changing the

24  outcome of the trial, it's relevant for the jury to hear the

25  evidence of the bribe.  And it -- in particular and as it was

1    introduced and as the Court described in docket 550 in its

2    ruling denying his prior motion is that the way it came in was

3    through plaintiff's briefs on appeal during the

4    post-conviction process, which ultimately led to his new

5    trial.

6         THE COURT:  Right.  You elicited that from

7    Mr. Stainthorp, if I am recalling correctly, that there was

8    this statement in the briefs that what led to the new trial

9    was the discovery of the bribery to Judge Maloney.

10        MR. NOLAND:  Yes, your Honor.  So it was clear,

11   direct evidence on the issue of materiality that the jury had

12   to consider.  And while I suppose on this intervening,

13   superseding cause, that they're claiming that we can't -- or

14   that the jury doesn't want -- doesn't have to believe it --

15   well, I guess they can argue that, but it is evidence for the

16   jury to consider on the issue of materiality.

17        I think you will -- I do want to -- just for the

18   record, we moved for summary judgment on this --

19        THE COURT:  Yes.

20        MR. NOLAND:  -- claim as a matter of law.  And so now

21   we are kind of going full circle.  Not only -- and the Court

22   denied it, and obviously -- but now it's full circle, and they

23   are actually seeking to bar the -- just a crucial item of

24   evidence in the case that goes to materiality, that the case

25   was fixed and the case was fixed as a result of the El Rukns

1   and Swano and Judge Maloney and the evidence that Nathson

2   Fields himself was complicit and knowledgeable about this

3   bribe, which would go to the secondary point of its

4   admissibility as to the consciousness of guilt which we have

5   also raised, as well as I think some other arguments.

6           But the reason the Court allowed it in, just -- was

7   materiality.

8           MR. ART:  May I, your Honor, respond to that?

9           THE COURT:  Yeah.  So in other words, Mr. Noland's

10  point is that it's not about causation, it's about

11  materiality.  And I recognize that there is -- that

12  materiality is more or less what stands in for causation in

13  these types of cases.

14          MR. ART:  That was going to be my point number two.

15          My first point was going to be when we're talking

16  about materiality, take it on face value in the due process

17  context, we're talking about whether the -- say, the

18  fabrication of piece of evidence A matters to the result at

19  trial or undermines competence in the verdict.

20          And usually what we're talking about is a piece of

21  evidence B admitted at the same trial, right, renders piece of

22  evidence A irrelevant.  Here, that is absolutely not what they

23  are offering this to show.  They are saying no matter what

24  happened at that trial --

25          THE COURT:  What they are basically saying is that

1    the decisionmaker was -- that the decisionmaker didn't really
2    care what happened during the trial.

3         MR. ART:  Right.  And that is only an argument that
4    it's a supervening cause.  That is an argument that something
5    else happened that cuts off our liability such that we cannot
6    as a matter of tort law be held liable.

7         And so the first argument is that they are not
8    offering it for materiality.  They are saying materiality over
9    and over again, but that's not its relevant purpose.

10        Second, echoing what you just said, your Honor, is
11   that materiality develops in the criminal context in Brady
12   cases because we don't have normal issues of causation there,
13   so the Supreme Court is trying to decide, well, when does this
14   kind of violation matter.  Let's import the causation context
15   and say it affected the result.

16        And so really, you know, you can say it's not for
17   causation, it's for materiality, but either way, they're
18   saying this prevented our misconduct from having any effect,
19   or our alleged misconduct.  So even if the plaintiff shows
20   we're engaged in misconduct, this supervenes to cut off our
21   liability.  And our response to that -- and it really is a
22   true motion to reconsider; we don't think we presented it
23   correctly the first time around -- is there is nothing about
24   the judge being on the take that renders the consequence here,
25   the wrongful conviction, an unforeseeable result of the

1   misconduct that's being alleged.

2         THE COURT:  I guess I -- I understand the arguments

3   on both sides.  Now, at least.  I am not sure I did before,

4   but I think I understand the arguments on both sides now.

5         So in terms of case law about this on the plaintiff's

6   side, is there anything other than Witlock that actually talks

7   about this issue?

8         MR. ART:  I mean, there are a few cases in the common

9   law tort context decided by the Seventh Circuit that talk

10   about what it takes to be a superseding cause.  I would say

11   that's number one.  Witlock is really the only one that talks

12   about it in this exact context.

13         THE COURT:  In this context.

14         MR. ART:  Right.  And then --

15         THE COURT:  Well, you cited the restatement of torts,

16   you cited this insurance case, Scottsdale Insurance.

17         MR. ART:  Right.  And so that's sort of moving from

18   Section 1983 to the common law tort concept to, you know, what

19   the restatement says about the idea of superseding cause in

20   general.  And basically what it's asking is, you know, is it

21   fair to hold defendants liable for the misconduct that's

22   alleged and proved, right?  And the answer to that question

23   is, yes, unless something comes in the path of causation that

24   really makes the consequence an unforeseeable result of what

25   they have done.  And that's exactly what this bribe is.

1    THE COURT:  Mr. Noland, what else would you like to
2  say?

3    MR. NOLAND:  Judge, I don't think we have anything
4  else to say.  Well, maybe Mr....

5    THE COURT:  Or Mr. Kulwin.

6    MR. KULWIN:  Judge, I mean, the concept, the notion,
7  that -- the fact that -- and these are fact questions for the
8  jury to decide -- that Mr. Fields was involved in trying to
9  bribe a judge and that the judge's ultimate decision
10  convicting him was tainted by that whole effort, the notion
11  that that doesn't come into evidence in a trial where
12  Mr. Fields is claiming that alleged misconduct is what caused
13  his conviction, it just seems to me on its face absurd.  At a
14  minimum, even if everything plaintiff's counsel says is right,
15  even if they're right right down the line, it's clearly
16  admissible on the question of whether Mr. Fields is at all
17  credible about anything.  And those are fact questions that a
18  jury decides.

19    Now, I don't agree with their foreseeability argument
20  because, you know, it seems to me that if you're going to try
21  to bribe a judge, it's foreseeable you might end up getting
22  convicted inadvertently.

23    So I don't agree with their original argument, but at
24  a minimum, even if they are right, they are wrong on the
25  credibility issue.

1   MR. ART:  We don't concede, and nothing in our new
2   brief should be taken --

3   THE COURT:  You don't agree that Mr. Fields was
4   involved.

5   MR. ART:  Right.  And we think the Court's decision
6   on consciousness of guilt is right.

7   Putting that to the side, defense counsel and I agree
8   completely.  What he is saying is I should be able to put the
9   judge's bribe in to show that that's the reason that Nathson
10  Fields was convicted and not the misconduct of my clients.
11  That is a superseding cause.

12  MR. KULWIN:  No, it's materiality, Judge.  I disagree
13  with that.

14  THE COURT:  Okay.  Well, like I say, I understand
15  both sides' arguments.  I'm not going to rule on any of this
16  stuff here on --

17  MR. NOLAND:  Judge, if I could state one more point
18  on that.  It is also the reason why Mr. Fields received a new
19  trial by Judge Dooling granting him a new trial in the Supreme
20  Court of Illinois.  So I think that would be a separate and --
21  the reason he -- the sole reason was because of the bribe.

22  MR. ART:  It still has to be relevant to something in
23  this civil case.

24  THE COURT:  Explaining to the jury why there was a
25  second trial 22 years later?

1     MR. ART:  It's not clear to us that the reason that

2   that happened is relevant to the case, independent of the

3   superseding cause argument that's trying to be made, and it's

4   not a superseding cause.

5     MR. LOEVY:  Maybe an analogy would be when we were

6   going to do damages, we weren't going to say he was guilty or

7   innocent.  Sometimes that's just not part of it.

8     The reason why he got a new trial is not relevant.

9   In fact, if it had been he got a new trial because of a Brady

10   violation, some judges would say, I'm not going to let that

11   in.  That's somebody else's conclusion why he got a new trial.

12   The issue is he got a new trial and he was released.  Why he

13   got the new trial is not what's at issue.

14     MR. KULWIN:  Of course, under that argument then,

15   isn't the jury just going to presume that the reason he got

16   the new trial was the misconduct of the defendants?  Why else

17   would they get a new trial?

18     Here they are in front of a jury knowing they

19   withheld evidence, they fabricated evidence, they did all

20   these things --

21     THE COURT:  Most jurors assume that people get a new

22   trial because of what the common -- of what most people call

23   technicalities.

24     MR. KULWIN:  They may.  They may assume that.  They

25   may assume the opposite of that.

```
 1              THE COURT:  Yeah, but if that was the only issue,
 2    there would be other ways of dealing with that.
 3              MR. KULWIN:  It goes --
 4              THE COURT:  Limine instructions and so on and so
 5    forth.  Let's move on to something else.
 6              Are there other issues in their response to your
 7    motions in limine?
 8              MR. LOEVY:  Not from the plaintiff, your Honor.
 9              THE COURT:  So I want to flip over to the question of
10    the recording.
11              So it's been a while since I have looked in detail at
12    the transcripts of the recordings, and this is in defendants'
13    motion in limine No. 1 and No. 2 -- motion to reconsider No. 1
14    and No. 2.  It's been a while since I've looked at them.  My
15    memory of them is that if one were to just play the recordings
16    or even show the transcript, no human being would be able to
17    tell what they were saying.  They only come -- they only make
18    sense with a translation.  Am I right about that?
19              MS. GORMAN:  Yes.
20              MR. NOLAND:  At the start, but then as you listen to
21    them, and I know the Court listened to them before, you can
22    attempt to try to understand what they're saying.
23              Now, that's me personally --
24              THE COURT:  Only because -- how?
25              MR. NOLAND:  You're probably right.  It's probably
```

1    only because we have the translations, and I know that --

2            THE COURT:  Yeah.  So without the translations, the

3    recordings are essentially incomprehensible, aren't they?

4    That's the whole point as to why they were talking in this

5    so-called code.

6            Anybody use the word "bribe" in the conversations?

7            MR. NOLAND:  No.

8            THE COURT:  Anybody use the words "give money to

9    somebody"?

10           MR. NOLAND:  No, they used things like "put the robe

11   in tune with star situation."

12           THE COURT:  Right.  Exactly.  So nobody knows what

13   that means unless there is somebody translating it.

14           Next question:  Who is the translator?

15           MR. NOLAND:  In the combination --

16           THE COURT:  In this trial, who is the translator?

17           MR. NOLAND:  The combination of Derrick Kees, Earl

18   Hawkins, and Jackie Clay, as well as they would be --

19           THE COURT:  And they were participants in the

20   conversation?

21           MR. NOLAND:  No.  They might be --

22           THE COURT:  They are giving opinion testimony.

23           MR. NOLAND:  Yes.

24           THE COURT:  Have you disclosed that under

25   Rule 26(a)(2)?

1    MR. NOLAND:  Yes.

2    THE COURT:  When?

3    MR. NOLAND:  Before the -- I can't specifically say

4  exactly when we did it, but I'm pretty sure they are in our

5  26(a)(2)s.

6    THE COURT:  Can I see it?  The disclosure.  I want to

7  see it.

8    MR. NOLAND:  I do not have the 26(a)(2) disclosure.

9    THE COURT:  What would it take to get it?

10    MR. NOLAND:  To call my assistant and try to pull it

11  off our system.

12    THE COURT:  Go for it.  They can just forward it to

13  you, and -- you know, on your device.  You can forward it to

14  me, and I can print it out.

15    MR. NOLAND:  Thank you.

16    THE COURT:  So we will take a five-minute break while

17  we do that.  We have been going for a while anyway.  We will

18  take a five-minute break while you do that.

19    (Short break.)

20    MR. MICHALIK:  Judge, there is something too that I

21  can point out.  The Court actually ruled -- plaintiffs had

22  brought a motion in limine to exclude that testimony, that

23  expert testimony.

24    THE COURT:  Previously?

25    MR. MICHALIK:  Previously.

1      THE COURT:  And I ruled on it?

2      MR. MICHALIK:  Yes, you did.  I will show that to

3  you --

4      THE COURT:  No, that, I can find quickly.  Which --

5      MR. MICHALIK:  The motion, it's docket number 517.

6  It's where we discuss their --

7      THE COURT:  What's the docket number of the ruling?

8      MR. MICHALIK:  The docket number of the ruling is

9  550, and it's 1-A of 550.

10      THE COURT:  Just a minute.  550, 1-A.

11      Oh, I just said it was moot.

12      MR. MICHALIK:  Right.

13      THE COURT:  Okay.  So there was a -- it wouldn't

14  be -- yeah, it was moot because I excluded it.  And so if I

15  unexcluded it, then I have to go back and look at that.

16  Lovely.  Okay.

17      All right.  Mr. Noland is back in the room.  Does

18  anybody remember what the motion in limine that related to

19  what I'll call the translation testimony at the first trial

20  that I concluded was moot because I had kept out the

21  recordings, what the basis for that motion was?

22      MR. ART:  I am told just now that it was an improper

23  disclosure of a report by an expert.

24      THE COURT:  Okay.  Were you able to get the place to

25  send it to me, Mr. Noland, so I can have it?

1        MR. NOLAND:  Yes, your Honor, I would say maybe a
2  minute ago.

3        Just in case it doesn't come, I also sent it to Pam.
4        THE COURT:  Okay.  The email address that she gave
5  you, did it have the words "proposed order" in it?

6        No, it's my regular email address.  I now have it.
7  Let me pull this up here.

8        So which -- okay.  Trammel Davis, is that one of the
9  people?

10        MR. NOLAND:  Yeah, Trammel, Derrick Kees.

11        THE COURT:  Said he may use the testimony of former
12  El Rukn cooperating witness Trammel Davis to support the
13  admissibility of the Title III wiretaps as well as the
14  transcripts and translations of Title III wiretaps produced in
15  this case and Bates stamped 1 through 440.  To the extent it's
16  determined that the transcription of the Title III wiretaps,
17  the translation and interpretation of the El Rukn code on the
18  Title III wiretaps or elsewhere, or the identity of the voice
19  on the Title III wiretaps are considered opinion testimony,
20  Federal Rule of Evidence 702, 703, 705, Trammel Davis is
21  identified as an opinion witness as to those subjects.
22  Trammel Davis is expected to -- sorry.  I'll stop reading.  I
23  don't need to read the rest of it anyway.

24        THE COURT:  Okay.  So, basically, what the disclosure
25  -- what the expert disclosures say is that these individuals

1  may be used to support the admissibility of the wiretaps and
2  the transcripts, including translation or interpretation, and
3  if that's opinion testimony, then we're identifying them as
4  opinion witnesses.

5        Do you recall -- and, I mean, I'd have to go dredge
6  this up myself, but does anybody recall more specifically what
7  the basis was for the contention that it hadn't been
8  adequately disclosed?

9        MR. ART:  I don't think that we -- do we recall -- I
10  don't think we recall as we stand here, but I think that we
11  can say that this is a 26(a)(2)(C) disclosure of a treater,
12  right?  And treaters are allowed to testify within their
13  expert knowledge about things that they actually did.

14        THE COURT:  It's a 26(a) -- I thought it was a
15  26(a)(2)(A), but whatever.  Keep going.

16        MR. ART:  So it's a disclosure of a treater, a
17  non-report-writing treater.

18        THE COURT:  A non-report-writing expert.

19        MR. ART:  Right.  They are allowed to testify.  And I
20  thought it was (C), and I may be incorrect, your Honor.  But
21  they're allowed to talk about what they actually did in the
22  underlying case so long as that reflects upon their expert
23  knowledge.

24        What treaters aren't allowed to do under the rule and
25  under Seventh Circuit case law is come to trial and offer new

1    opinions based on their expertise.

2              THE COURT:  Well, see, but the problem is you are

3    trying to force these people into a medical rubric, which

4    really isn't what they are.  I mean, they are basically

5    being -- they're basically there -- they're being

6    identified -- and I think it's 26(a)(2)(C) now, but it may

7    be --

8              MR. ART:  Was (A)?

9              THE COURT:  -- it was (A), I think, probably at the

10   time you did this disclosure because (C) is relatively newer.

11             The contention is that -- so 26(a)(2)(A) says you

12   have to disclose the identity of any witness that you are

13   going to use to present opinion testimony.  (B) says it has to

14   be a written report if the person -- there has to be a written

15   report if the witness is retained or specially employed to

16   provide expert testimony or whose duties as employee involved

17   that.

18             And then (C) says if (B) doesn't apply, basically,

19   there is no written report, then you have to identify the

20   subject matter in a summary of the facts and opinions on which

21   the witness is expected to testify.

22             MR. ART:  Right.  And what the Seventh Circuit says

23   is (B) applies to anybody who is offering opinions at trial

24   that are not opinions that they reached in their regular

25   course of their expert knowledge during the course of whatever

1    facts are at issue in the trial, right?

2            So if you have someone coming in who has specialized

3    knowledge, as these guys do, purportedly, about, you know,

4    gang code, they got to write a report.  And they have to issue

5    the report ahead of time, they have to say, here is what we

6    are going to say, here is the 702 basis for our opinion, here

7    is why it's rigorous, and here is why I should be allowed to

8    provide this expert testimony to a jury that has no idea what

9    these words mean.

10           And that's not the kind of disclosure that they gave

11   in this case.  They gave a disclosure that said, these guys

12   are going to talk about the tapes, and to the extent it

13   implicates expert knowledge, we are disclosing it.  That's

14   good enough if they are going to talk about just things that

15   happened in the natural course of things, but it's not --

16           THE COURT:  If I can kind of take the reference to

17   treaters out of what you are describing, because, again, I

18   think you are just in some ways trying to force a square peg

19   into a round hole, your point is that the witnesses that don't

20   have to provide reports are witnesses who, in the course of

21   something they have done before, have effectively already said

22   what it is that they are going to come in and say.

23           MR. ART:  Right.  So it would eliminate the medical

24   context, right, the repair person who knows something very

25   special about the suspension of a car who in the underlying

1  tort dispute said, this is this kind of suspension, and, here
2  is how it should have been fixed, and, I am going to refix it
3  now, that person can get disclosed under what is now (C), come
4  in and talk about that.

5       THE COURT:  Ms. Gorman, when you were doing
6  depositions -- I know that you took the deposition of
7  Mr. Hawkins.  I recall that because it was done in conjunction
8  with the certificate of innocence proceeding.

9       What about the other folks that are mentioned here,
10  Clay and Kees and Davis?

11       MS. GORMAN:  I believe we took all three of them.

12       THE COURT:  Same deal?

13       Do you recall whether you asked them about the
14  recorded conversations?

15       MS. GORMAN:  Trammel Davis is the one I remember
16  asking about it.

17       THE COURT:  Okay.

18       MS. GORMAN:  And he could not -- I might be confusing
19  him with Jackie Clay, but it was one of the two, and I had
20  them translate without being able to view the other side of
21  the translation, and they couldn't do it.  That's what I
22  recall about the deposition, that they had to agree to how it
23  was translated before in order to testify.

24       THE COURT:  Do you know who -- in the criminal trials
25  who put it in?

1    MR. KULWIN:  Yes, Judge, I believe I did.  I can't
2    guarantee it, but as I recall it, Mr. Kees was one of the main
3    translators.  I believe Mr. Clay also translated.  I can
4    double-check and have that answer within --

5    THE COURT:  Well, it would stand to reason that it
6    was somebody that was affiliated --

7    MR. KULWIN:  It was all of them.  The different
8    trials, there were multiple trials going on, I think they
9    might have been moving from courtroom to courtroom, but I
10   think they were all accepted and all gave that.  They were all
11   accepted as either experts on it or opinion --

12   THE COURT:  That's neither here nor there.  I was
13   just curious who it was.

14   MR. KULWIN:  And they all testified.

15   MR. NOLAND:  Derrick Kees did it for the Judge
16   Maloney trial before Judge Leinenweber.  We did set that forth
17   at docket 512, which we attached as -- you had asked us a
18   couple weeks ago to supplement.

19   THE COURT:  That's one of these --

20   MR. NOLAND:  Yeah, Exhibit 9.  It's our first motion,
21   and we go through some of the history of how this was done at
22   the federal trials.

23   THE COURT:  Oh, I have that right here.  Okay.

24   MR. NOLAND:  And then we also attached the
25   plaintiff's response, which I did not see them making any

1  quarrel with our actual disclosure. Maybe they did that in
2  some other paper. They're representing to the Court that they
3  did. I just don't remember it.
4        THE COURT: Okay. So the -- let me just get the
5  right motion in front of me here.
6        So the motion to reconsider, this particular motion
7  to reconsider on the ruling on motion in limine No. 1 doesn't
8  really say that there's anything new. It just says I was
9  wrong the first time, right?
10       MR. NOLAND: There's new argument. We do try to
11  point out as to how --
12       THE COURT: There is a contention that some of it
13  isn't really hearsay.
14       MR. NOLAND: That's a new argument.
15       THE COURT: That's a new argument.
16       MR. NOLAND: Yes. What happened, Judge, if I could?
17       THE COURT: Yeah.
18       MR. NOLAND: The plaintiffs did not file a motion in
19  limine to bar the wiretaps based on hearsay, so what we did is
20  we filed a motion, our motion No. 1 --
21       THE COURT: Yeah.
22       MR. NOLAND: -- and the Court observed us that we
23  should have foreseen that this would have been an objection as
24  to hearsay. So we didn't have a reply, so we didn't make all
25  the arguments in --

1    THE COURT:  You argued -- probably three days of
2  motion in limine hearings, for crying out loud.

3    MR. NOLAND:  We did, and that was the first argument
4  the Court brought up, and so the Court did give us that
5  opportunity to argue it orally in that way.

6    So, this we would just say, is the first kind of
7  false legal brief, there had been some stuff in the motion to
8  reconsider during the trial, but -- that was struck as
9  procedurally defective.

10    So in the paper, I would -- the two -- a couple
11  points would be that the law we have on orders not being
12  hearsay.  Then we talk about the -- and it's really kind of
13  the nature -- I think -- I don't do much criminal work, but in
14  the nature of a Santiago proffer where we get into the
15  conspirator's ideas, and we make two arguments there.  One is
16  that -- the one we focused on at the hearing, I think, was
17  Fields' complicity in the bribery scheme.  An additional
18  argument we make here is we think there is a preponderance of
19  the evidence that he was part of the larger scheme to kill
20  Smith and Hickman.  And so the bribery scheme would carry over
21  as a natural flow as far as they're going to do -- the El
22  Rukns would do what they could not to get caught for this
23  particular homicide, and that would be part and parcel for the
24  conspiracy.

25    So in our motion to reconsider, we lay those out.

1     And then we also make an argument relative to the
2   residual hearsay exception, and we cite a case, I believe it's
3   from the Second Circuit.

4     THE COURT:  Yeah, okay.  And so when you say at the
5   end of the motion, Allow the wiretaps as evidence at trial,
6   does that mean -- does that mean Exhibit 1, this compilation
7   of -- I don't know, it's probably a couple hundred pages of
8   transcripts?

9     MR. NOLAND:  This would be a lot -- this would be it.
10  Would it be all of it?  We probably wouldn't seek to introduce
11  all of it, but it would be much of it.  Much of this was
12  introduced at the certificate hearing for the testimony of
13  Mr. Kees and Mr. Clay and I think possibly -- I do know that
14  Ms. Gorman is correct that Trammel Davis was asked about this
15  at his evidence deposition, so that was introduced.  We would
16  obviously try to do it in an efficient manner and without
17  being duplicative and redundant.  And that was part of our
18  motion in limine No. 1 is to avoid some of the foundational
19  reasons.  And we wanted to do that up front, and that's why we
20  set forth in our motion No. 1 the manner in which it was done
21  before, the benefits of doing it with the transcriptions and
22  the translations side by side as it was done at the federal
23  trials, and so forth.

24    MS. GRUSIN:  Well, your Honor, realistically, there
25  are no new facts or evidence that would alter the Court's

1 │ previous conclusion, and I am sure the Court remembers better
2 │ than any of us, the Court has spent a tremendous amount of
3 │ time reviewing the tapes, the relevant transcripts, and
4 │ concluding that there simply was no evidence of Fields'
5 │ purported involvement in the bribes.
6 │        The conspiracy argument is, I think, a non-starter.
7 │        And, obviously, we would just like to note briefly
8 │ that this hinges on the previous motion in limine we were
9 │ discussing about whether the bribe is admissible at all,
10 │ and --
11 │        THE COURT:  No, I get that.
12 │        MS. GRUSIN:  Right.  So setting that aside.
13 │        And I think the only other seriously new argument
14 │ that -- new argument again, not new evidence, is this orders
15 │ argument.  And I guess it seems like what's happening here is
16 │ that the translations simply insert tell him before an X in
17 │ the transcript, but that X is still being offered for the
18 │ truth of the matter asserted.  I mean, the cases that they
19 │ cite suggest that -- you know, the key question, the central
20 │ question, as is always the case for hearsay questions,
21 │ admissibility, is what it's being offered for.  And I don't
22 │ think the defendants have identified what they're offering
23 │ these hearsay statements for other than to prove that there
24 │ was, in fact, a bribe that happened in the way described in
25 │ the alleged translations.

1    So I think that the sort of fallback on orders is a
2  red herring.

3    THE COURT:  And if -- I am not -- what I am about to
4  say -- well, you're going to think what you're going to think.
5  I am not going to tip my hand as to how I am going to rule,
6  okay, but if I were to let you do this, why would I let you
7  put in this translation that was prepared by the U.S. -- the
8  physical translation that was prepared by the U.S. Attorney's
9  Office and let you do it side by side rather than do it in
10  what I think a normal way would be is if you play a recording
11  and you say, what does that mean?  That is the way it is
12  done -- it's pretty common.  It doesn't really happen much in
13  civil cases, but it happens pretty commonly in criminal cases.

14    For a witness to come in and interpret code, coded
15  language or allegedly coded language on recordings, the way it
16  most commonly happens is that it's usually some law
17  enforcement person who has some expertise in the area and
18  there is a conversation where people are talking about tickets
19  or ladies or girls or whatever and you have a guy up on the
20  witness stand, it's usually a guy -- it's usually the same
21  guy, actually, his name is Coleman; he's testified in front of
22  me like nine times -- says that this is what this means and
23  it's a commonly used phrase and so on and so forth.  You don't
24  have -- you don't have in front of the jury a transcript that
25  basically gives the translation; in other words, the person

1 that's delivering it from the witness stand.  Why would I let
2 you do it that way here?

3          MR. NOLAND:  We address these points in docket 512 at
4 pages 4 and 5 of Exhibit 9 of this.  And, in essence, the law
5 discusses in the Seventh Circuit, there's several cases on it,
6 that when -- for efficiency and understandability for the
7 jury, it would be near impossible for what -- as the Court
8 pointed out -- points out, is the whole purpose of this is for
9 it to be coded and for them to understand that it's very
10 similar to a foreign language, and that under those
11 circumstances, it's routine and admissible to do it in the
12 manner in which the government did it before all the judges
13 back in the '90s, which we cited and as we are proposing to do
14 it now, that's --

15          THE COURT:  What was the docket number that you're
16 referring to?

17          MR. NOLAND:  It's docket 512, your Honor.  We did --
18 it is at Exhibit 9 in the supplement we did --

19          THE COURT:  It's still in Exhibit 9?

20          MR. NOLAND:  Yes, your Honor, pages 4 and 5.

21          THE COURT:  Just a minute.

22          So it's the series of criminal cases that you cite
23 here.

24          MR. NOLAND:  Yes, your Honor.

25          THE COURT:  I am going to make an educated guess that

1   what those cases say is that it wasn't an abuse of

2   distribution for the judge to do that, because that's what

3   usually opinions on evidence rulings in criminal cases --

4          MR. NOLAND:  It's talking about discretion, your

5   Honor.  You are correct.

6          THE COURT:  Yes.  So the reason that I should do it

7   is that it makes it easier to understand.  I mean, I will tell

8   you, honestly, the foreign language thing, I mean, maybe it

9   was done that way in the '80s, it isn't done that way now.

10          Here is how it's done -- in fact, it's determined to

11   be error to do it any other way, I think.  They don't even

12   play the recordings.  You just -- you have a witness in a case

13   in which -- for example, they're in Spanish, and the

14   government wants to introduce Spanish-language recordings.  A

15   witness gets on the stand and says, we recorded these things,

16   here's the disc.  Another witness gets on the stand and says,

17   I am an interpreter, here are my qualifications, I went

18   through and I prepared a translation of this, here is the

19   translation.  Nothing gets played for the jury.  The

20   translation and only the translation gets handed to the jury

21   because you have this person who has testified that this is an

22   appropriate translation of that.

23          So you don't have this kind of side by side thing.

24   It just doesn't happen that way.  And, you know, that's the

25   way -- in fact, there is even a pattern instruction on this.

1   We don't give the jury the foreign language because part of
2   the reason being is you don't want the jurors -- you don't
3   want the jurors applying their own knowledge of the language
4   in order to make their own translation, as opposed to relying
5   on their assessment of the credibility and veracity of the
6   interpreter who has prepared the translation.

7          And, you know, I wasn't involved in any of these
8   cases in this case, but I have never seen one, I don't think,
9   where it was done this way.  And, I mean, it's not -- it
10  really isn't -- these people are speaking in what purports to
11  be English, albeit coded English.  I don't know.  It just
12  seems to me to be odd that I would -- that you'd give them
13  that kind of a transcript.

14         Well, you are telling me, though, that this was
15  briefed already way back in the day, so that's number 512.
16  And I have a response from the plaintiff to that too.  That's
17  number 518.  So I got to dredge up all this stuff.  That's
18  fine, I guess.

19         Let me see what the plaintiff says about the
20  translation.

21         No, I don't want to waste time here doing that.
22  Forget it.

23         All right.  Is there more you want to tell me on
24  this?

25         MR. LOEVY:  Not from the plaintiff, your Honor.

1    THE COURT:  All right.  Then the other one is the --
2   oh, it's the Morris thing.  I don't need to hear anything more
3   on that.  I will make a ruling on that at the appropriate
4   point in time.  Both sides' arguments were relatively clear.
5   I don't need to hear more about that.
6    Okay.  So we need to talk, and we are going to talk
7   off the record.  So off the record.
8     (Discussion off the record.)
9     (The following proceedings were had in open court:)
10    THE COURT:  Basically, I told the parties that
11  because of some personal matters, the odds are that I won't be
12  able to rule on these motions until the latter part of July,
13  at best.
14    Part of the problem is that the motions on both sides
15  have the potential for some significant impact on the length
16  of the trial, and I am thinking on the defense side, if these
17  transcripts and testimony about them is going to come in,
18  that's going to add some significant amount, I think, to the
19  trial.  And on the plaintiff's side, depending on how I deal
20  with the revised motion that you filed, that might result in
21  it being shortened.  And I just can't tell you as I sit here
22  what the ruling is going to be on any of that stuff.
23    And I don't remember what we were -- the last one was
24  three weeks?
25    MS. GORMAN:  Correct.

1    THE COURT:  Three weeks.  And I had time limits, but
2    I ended up expanding them, I think, at some point.  But it
3    would be very difficult for me to even set time limits without
4    knowing how I rule on all these motions.  So I am going to
5    assume it's a three-week trial until I know otherwise.

6    So the other thing I told the parties when we were
7    offline a second ago is I that need to move the trial date a
8    little bit from the 1st of August.  So I am suggesting
9    the 15th.

10   And by the way, as everything, it's subject to change
11   if there is some complication and I can't even be back in six
12   weeks, but no way of predicting that.

13   MR. LOEVY:  We can do that, your Honor.  I mean for
14   the plaintiff.  Sorry.

15   MR. BURNS:  I'm sorry.  Can I ask?

16   THE COURT:  Yeah, go ahead.

17   MR. BURNS:  If you remember the last time --

18   THE COURT:  I don't remember.  That's why I am
19   asking.

20   MR. BURNS:  -- a brief discussion in chambers, and I
21   advised we have a trial -- I have a trial starting -- that we
22   have been working around the dates in this trial.  It's a
23   birth injury case.  It's set to begin September the 19th.  I
24   expect 10 experts on the plaintiff's side.  We will probably
25   have something comparable.

1          I mean, if the Court is considering following that we
2   would do this trial, I would work with whatever schedule you
3   set up, but I would be concerned, that one has been set,
4   Judge --

5          THE COURT:  A three-week trial starting August
6   the 15th would be over the 2nd of September.

7          MR. BURNS:  The reason I raised it, Judge, you said
8   it may be subject to change on that.

9          THE COURT:  Oh, I mean, yeah, if I end up becoming a
10  quadriplegic, you are going to get an order saying the trial
11  is put off for like 20 years.  But, I mean, I am actually --
12  you know, six weeks from when I am going to have this surgery
13  is August the 5th, and I've been led to believe that that's
14  kind of a worst case scenario, barring some unforeseen
15  complication.

16         So what I am talking about is moving the trial date
17  to August the 15th, and if we have a three-week trial starting
18  on August the 15th, it would be over by September the 2nd.

19         MR. KULWIN:  Judge, I mean, I rearranged my personal
20  schedule, it is my family, but I have rearranged my
21  schedule --

22         THE COURT:  Be specific.

23         MR. KULWIN:  Be specific?

24         THE COURT:  I was pretty specific with you just now,
25  okay?  So be specific.

1    MR. KULWIN:  I am treading lightly, to be honest with
2  you, because it's not a legal thing.
3          THE COURT:  No, I just need to know what it is.
4          MR. KULWIN:  It's our family vacation.  We do it
5  every year.  It was going to be the first two weeks of August,
6  we moved it to the last two weeks.  Also, the schedule has
7  been rearranged.  That's when it is.  It starts August 21st
8  and goes through Labor Day, and a lot of plans and changes
9  have been made to accommodate that.
10          THE COURT:  Okay.  But it's not like I am telling you
11  this on the 31st of July.
12          MR. KULWIN:  No, it's not, Judge, but it's
13  interdependent on other people, and -- it basically means I
14  don't go is what it means, and it's a problem for me and my
15  family.  But that's what it is.
16          THE COURT:  So wait a second.  You said you normally
17  do it on the 1st of August.  You moved it to what?
18          MR. KULWIN:  We have a place that we share --
19          THE COURT:  Yeah.  You normally do it on the 1st of
20  August, and you moved it to what?
21          MR. KULWIN:  We moved everything around, including
22  the people that --
23          THE COURT:  To what?
24          MR. KULWIN:  To August -- I believe it starts the
25  third week of August.  I can check my --

1    THE COURT:  The third week of August is the 15th.

2    MR. KULWIN:  No.

3    THE COURT:  So it's the 22nd.

4    MR. KULWIN:  Yes.  Right.  It goes the 22nd through

5    Labor Day.  That's how it's been rearranged with my kids'

6    schedule and my wife's schedule and the people that we share a

7    place schedule and other people that we are going to be

8    visiting schedule.  I apologize, but that's what we did once

9    we knew this was August 1st.

10   THE COURT:  So if I -- and I am just -- it's a

11   hypothetical question.  If I moved it to after Labor Day, that

12   runs into Mr. Burns' problem.  And that trial, your

13   September 19th trial, is supposed to run how long?

14   MR. BURNS:  I can estimate it to you, Judge, but

15   approximately three weeks --

16   THE COURT:  Three to four weeks?

17   MR. BURNS:  -- to four weeks, yes, sir.

18   THE COURT:  Okay.  So that gets us into October.

19   And then you moved a trial date based on what I did

20   before.  What else do you have going?

21   MR. LOEVY:  That's the trial, your Honor.  The 24th

22   of October is the criminal case that got set.

23   THE COURT:  The one that we talked about before that

24   you --

25   MR. LOEVY:  Moved.

1    THE COURT:  -- moved because I told you that we were

2  going on the 1st of August.

3    MR. LOEVY:  Yes.  That's exactly right, your Honor.

4    THE COURT:  And that's -- is that an out-of-state

5  criminal trial?

6    MR. LOEVY:  Criminal case in Quincy, Illinois, your

7  Honor.

8    THE COURT:  Yeah, out of the district.  Okay.  That's

9  right.  That's what I mean.

10    Okay.  So here's what I'm going to do.  I am just

11  going to take all of the information from everybody down,

12  basically your availability between the 15th of August and the

13  end of the calendar year, so the stuff that -- you know, that

14  I would have to work around if I moved it, with a big

15  underline under if.

16    So I have Mr. Kulwin's situation which starts on

17  August the 22nd to Labor Day, Labor Day being the 5th of

18  September.

19    I've got Mr. Burns' trial in the state court, it's a

20  medical malpractice case, starts on September the 19th,

21  potentially three weeks.  So if it was three weeks, that would

22  run it through the 7th of October.

23    I've got Mr. Loevy's criminal trial in Quincy

24  starting on what?  You said October the 24th?

25    MR. LOEVY:  Correct, your Honor.

1          THE COURT:  Running?

2          MR. LOEVY:  It's expected to take two weeks.  It took

3    two weeks last time.

4          THE COURT:  Okay.  So running through the 4th of

5    November.

6          What else?

7          MR. KULWIN:  I have a trial December 7th, Judge, but

8    it's in front of Judge Cox.  I am sure if I went to her and

9    said that you need to move this trial around that, she would

10   move it.  I'm sure the government wouldn't object.  Right now,

11   it's a jury trial, three- to four-day jury trial, that's

12   supposed to go.

13         THE COURT:  You said the government.  Is it a

14   criminal case?  It's not in front of Judge Cox then.

15         MR. KULWIN:  It is.

16         THE COURT:  It's a misdemeanor?

17         MR. KULWIN:  It is, Judge.

18         THE COURT:  Oh.  You are trying a misdemeanor?

19         MR. KULWIN:  It's the first and only, I'm told,

20   that's going to actually be tried in this building.

21         THE COURT:  And you said that's set for what?  The

22   12th?  5th of December?

23         MR. KULWIN:  I think it's December 5th or 7th.

24         THE COURT:  Probably the 5th.  That's a Monday.

25         MR. KULWIN:  It's December 5th, but I'm sure she --

1          THE COURT:  What else?  This is a

2   speak-now-or-forever-hold-your-peace moment.  Again, I am not

3   saying I am going to move anything.  I am just getting the

4   inventory.  So what else?

5          MR. BURNS:  There is a case before Judge Dow.  He

6   expects it about a week, at most.  I could ask Judge Dow to

7   change it, or I could try to find someone else to try it if we

8   are going to be going ahead.  I'll work with your schedule.

9          THE COURT:  What is the current trial date of it?

10          MR. BURNS:  November the 7th.

11          MR. LOEVY:  I have a trial on November the 7th as

12   well against the City, your Honor.

13          THE COURT:  Before whom?

14          MR. LOEVY:  That is before Judge Lefkow.

15          And, your Honor, I have about six trials in our book

16   for our firm, but I am not going to call trump on any of them

17   because we have a lot of lawyers in our firm that could --

18          THE COURT:  Is that a pun?

19          MR. KULWIN:  One that's particularly offensive to me.

20          THE COURT:  You could be calling somebody named

21   Trump.  I don't know.

22          MR. LOEVY:  Yes, if he wins --

23          MR. KULWIN:  I would move to have that name stricken

24   from the dictionary for personal reasons.

25          THE COURT:  Okay.

1          MR. LOEVY:  But if that date is bad for Mr. Burns,
2    it's bad for me too.
3          THE COURT:  Anybody else, anything?
4          All right.  Well, I am going to sort that all out,
5    and I am just going to -- I will make a decision, and it is
6    what it is.
7          So let's kind of circle back to this stuff.  There
8    was a thing earlier that I needed somebody to get back to me
9    on.
10          MR. KULWIN:  It's me, Judge.
11          THE COURT:  What was that?
12          MR. KULWIN:  I have to get back to you within a
13    couple of days on whether Vela can be subpoenaed or deposed.
14          THE COURT:  Okay.  Yeah.  So you are going to talk to
15    whoever, and I am going to have you come back next week.
16          I think probably the least bad day for you to be
17    called in would be Wednesday.
18          MR. KULWIN:  The 11th, Judge?
19          THE COURT:  Yeah.  And I -- Wednesday the 15th.
20          MR. KULWIN:  I mean the 15th.  I'm sorry.
21          THE COURT:  And I am going to tell my courtroom
22    deputy -- you are going to see a funny time.  It's going to
23    say 9:29.  And the reason it's 9:29 is that when the system
24    sorts everything, you will be before all the 9:30 cases, and
25    that's a nice way of saying I will call it first.

1          So that's a status.

2          MS. KATZ:  Judge, on the 14th, we have a motion to

3    file our response to the non-Monell motions in limine.  It's

4    up for Tuesday the 14th.

5          THE COURT:  The thing that I already considered?

6          MS. KATZ:  Exactly.  It's still on.

7          THE COURT:  You are never going to have to come in on

8    that.  That's fine.

9          MS. KATZ:  Okay.  Thanks.

10          MR. KULWIN:  And also, Judge, I think the state's

11    attorney had filed a motion to withdraw a stipulation.  I

12    think we can probably take care of that today.

13          THE COURT:  I have no idea what you are talking

14    about.  Withdraw what stipulation?

15          MR. ART:  There was a stipulation filed by the

16    State's Attorney's Office governing records.  It's going to be

17    withdrawn, and we are going to file a new one that will

18    replace it.

19          THE COURT:  So it's not a problem, in other words,

20    that they are withdrawing it.  You are just renegotiating it,

21    basically?

22          MR. ART:  Exactly.

23          THE COURT:  And what is it?

24          MR. MICHALIK:  I think the 14th, Judge.  So we have

25    two motions noticed up for the 14th.

1          THE COURT:  Motion to withdraw stipulation.

2          Oh, stipulation to maintain documents as

3    confidential.

4          Do you have a sense of what's going to happen?

5          MR. ART:  The only thing that's going to change -- it

6    was filed before we had worked out all the details of it.  The

7    only way it's going to change is that --

8          THE COURT:  This has to do with the files that are

9    being produced from the other cases?

10         MR. ART:  Correct, your Honor.  So all those

11   categories will remain, and it will just say they are going to

12   be maintained under this Court's current protective order in

13   this case rather than some additional restrictions.

14         THE COURT:  So nobody is going to have a problem with

15   me just granting the motion to withdraw the current

16   stipulation; is that right?

17         MR. KULWIN:  Correct, your Honor.

18         THE COURT:  Fine.  Okay.

19         All right.  So I will see you on the 15th then.

20         MR. LOEVY:  Thank you, Judge.

21         MR. KULWIN:  Judge, before we go, can I ask a

22   question?

23         THE COURT:  Yeah.  You just did, actually.  Do you

24   want to ask another one?

25         MR. KULWIN:  And maybe this will get played out in

1  the -- I am unclear.  Is the plaintiff now not proceeding on

2  Vaughn/White?  I mean, are you ruling on that --

3          THE COURT:  I haven't ruled on anything.  I guess

4  technically speaking, I have taken everything under

5  advisement.

6          MR. KULWIN:  Okay.

7          THE COURT:  So there you go.

8          MR. KULWIN:  Okay.

9          THE COURT:  All right.

10          MR. KULWIN:  See you next week.

11          THE COURT:  See you next week.

12          MR. ART:  Thank you, Judge.

13          MS. GORMAN:  Thank you, Judge.

14    (Which were all the proceedings had in the above-entitled

15  cause on the day and date aforesaid.)

16    I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.
17

18  _____          _____
   Carolyn R. Cox                    Date
   Official Court Reporter
19  Northern District of Illinois

20  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

21

22

23

24

25