1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4    NATHSON E. FIELDS,                   )   Docket No. 10 C 1168
                                           )
 5                        Plaintiff,       )
                                           )
 6              vs.                        )
                                           )
 7    CITY OF CHICAGO, et al.,             )   Chicago, Illinois
                                           )   August 17, 2016
 8                        Defendants.      )   10:50 o'clock a.m.

 9
                      TRANSCRIPT OF PROCEEDINGS - MOTION
10             BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13
      For the Plaintiff:     LAW OFFICE OF H. CANDACE GORMAN
14                           BY:  MS. H. CANDACE GORMAN
                             220 South Halsted Street, Suite 200
15                           Chicago, IL  60661
                             (312) 441-0919
16

17                           LOEVY & LOEVY
                             BY:  MR. JONATHAN I. LOEVY
18                                MS. SARAH LYNNE GRUSIN
                                  MS. KATIE ROCHE
19                           311 North Aberdeen Street, 3rd Floor
                             Chicago, IL  60607
20                           (312) 243-5900

21

22

23    Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639
```

```
1   APPEARANCES CONTINUED:

2   For Defendant
    City of Chicago:        DYKEMA GOSSETT PLLC
3                           BY:  MR. TERRENCE MICHAEL BURNS
                                 MR. DANIEL MATTHEW NOLAND
4                                MR. PAUL A. MICHALIK
                            10 South Wacker Drive, Suite 2300
5                           Chicago, IL  60606
                            (312) 627-2100
6

7

8   For Defendant          KULWIN, MASCIOPINTO & KULWIN, LLP
    David O'Callaghan:      BY:  MR. SHELLY BYRON KULWIN
9                                MS. RACHEL ANNE KATZ
                            161 North Clark Street, Suite 2500
10                          Chicago, IL  60601
                            (312) 641-0300
11

12
    Also Present:          COOK COUNTY STATE'S ATTORNEY'S OFFICE
13                         BY:  MS. LISA MARIE MEADOR
                                MR. DONALD J. PECHOUS
14                         50 West Washington Avenue
                           Chicago, IL  60602
15                         (312) 603-3369

16

17

18

19

20

21

22

23

24

25
```

1     (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 10 C 1168, Fields v. City of

3 Chicago.

4          MR. LOEVY:  Good morning, your Honor.  Jon Loevy for

5 the plaintiff.

6          THE COURT:  Let's get everybody in a spot first

7 before everybody starts talking.

8          Okay.  So the usual protocol, starting over there.

9          MS. MEADOR:  Good morning, your Honor.  Lisa Meador

10 and Don Pechous on behalf of the State's Attorney's Office

11 subpoena respondent.

12          MR. KULWIN:  Shelly Kulwin and Rachel Katz on behalf

13 of David O'Callaghan.

14          MR. NOLAND:  Good morning, your Honor.  Dan Noland,

15 Paul Michalik, and Terry Burns on behalf of the City of

16 Chicago, Mr. Brannigan, and Mr. Murphy.

17          MR. LOEVY:  Jon Loevy for the plaintiff, your Honor.

18          MS. GRUSIN:  Sarah Grusin for the plaintiff.

19          MS. ROCHE:  Katie Roche for the plaintiff.

20          THE COURT:  Spell your last name.

21          MS. ROCHE:  R-o-c-h-e.

22          THE COURT:  Thanks.

23          Okay.  While I got you here, there's, in the scheme

24 of things, a relatively ancient motion that's still kind of

25 lurking out there, but I think it's moot at this point.  It

1　was filed back in April, plaintiff's motion to quash

2　defendants' subpoenas for privileged documents.  Like we are

3　miles past that, right?

4　　　　　　MS. GRUSIN:  Yes.  I thought that you had denied

5　that.

6　　　　　　THE COURT:  Well, I mean, I ruled on it.  So we can

7　terminate that one, Pam.  It's 953.

8　　　　　　Okay.  So I actually thought about hiring a small

9　pack animal to carry these things out here.  As a recent

10　recipient of back surgery, I am really not supposed to be

11　carrying stuff this heavy, but anyway.  That's a joke, by the

12　way.

13　　　　　　Yeah, it doesn't help if you only laugh after I tell

14　you it's a joke.

15　　　　　　MS. KATZ:  That's what I was laughing at.

16　　　　　　THE COURT:  It was counterproductive, actually.

17　　　　　　You know, I read all of this stuff, and I guess my --

18　looking at big picture of 30,000-foot view, there's a number

19　of things that I guess I would like to have explained, and I

20　know -- and I know the State's Attorney's Office is only a

21　respondent to the subpoena, some of it is -- probably the

22　explanation lies in the hands of somebody at the State's

23　Attorney's Office.

24　　　　　　And I guess what I was kind of wondering was whether

25　it might make more sense to just say, okay, I am going to have

1   a hearing on this, it's going to start on X, bring in the

2   people, and what I want to have is essentially an audit trail

3   from point A to -- point A being the point at which documents

4   started being taken out of the basement files either before

5   this agreement with the, quote, unquote, committee or after

6   and what happened to them, and then once things got to the

7   State's Attorney's Office, what happened in the course of

8   production of things.

9          Because I guess, you know, after I read all of this

10  stuff several times, and, you know, I got about 50 pages of

11  briefs here, 45 or something like that, and God only knows how

12  many exhibits, I come out of it at the end with some questions

13  that I think I have answers to but with other questions that

14  have popped up during the course of briefing.  And you see all

15  these tabs here, I've got like probably a dozen questions,

16  things that I want to find out about, and I just have a

17  sneaking suspicion that it's better to -- it might be better

18  to do that by way of a hearing rather than by me just kind of

19  going through and trying to dope it out on my own.  So that's

20  kind of where I start off.

21         The last thing that got filed was by the plaintiff.

22  And by the way, so I let you provisionally file it under seal.

23  I just want to relook at something here.

24         The only parts of it that ought to be maintained

25  under seal -- I'm looking at the wrong thing.  That's part of

1    the problem.

2           Did you file the memorandum in the public record?

3           MS. GRUSIN:  Yes, your Honor.

4           THE COURT:  Okay.  And all of the attachments are

5    documents from one or another file.

6           MS. GRUSIN:  Exactly.

7           THE COURT:  Yeah.  So then you have done what you

8    need to do.

9           So the last brief I got was from them.  Who wants to

10   talk over on this side of the room?

11          MR. NOLAND:  Well, Judge, I think the big picture,

12   from our perspective, the 30,000-foot view is this Donell

13   Johnson file.  And, yes, it got cut off when it was printed by

14   the State, a clerk over at the State's office when it was

15   getting ready to be produced, and that happened, and we

16   figured out that happened.  And Ms. Meador has actually

17   brought the original of that with her.

18          THE COURT:  The original of what?

19          MR. NOLAND:  The -- well, she's got the original

20   print-off from the disk.  And that's why we kept on asking the

21   plaintiffs to go look at it, begging at the originals, because

22   a review of it shows that it's a one-off isolated mistake and

23   that it is highly unlikely that it happened on any other

24   occasion.  And, in fact, ASA Meador and her team looked at all

25   the other disks from which documents were getting printed in

1   preparation for this production, and there is no other area
2   central basement stamps on any of those disks that this
3   mistake could have been made.

4           And we have already ruled out that our copy service
5   was cropping anything to omit anything.  And so from our
6   perspective, we thought that answered the question.  And if
7   the Court would like to review the original now, I think we
8   would appreciate that because we think that looking at the
9   bottom of the pages, which shows the ink on the actual bottom
10  of the pages shows how this was an isolated, really goofy, I
11  think, mistake on this one occasion, that there's no evidence
12  it occurred at any other time.  And certainly there's no
13  evidence it occurred on some regular basis at the State's
14  Attorney's Office at 26th Street in connection with the -- all
15  the files that they got on disk from CPD with the area central
16  basement stamp.

17          So if the Court would look at that, we would
18  appreciate it.

19          THE COURT:  Stop.  What am I going to see?  I mean,
20  what difference does it make?

21          MR. NOLAND:  Well, because it shows --

22          THE COURT:  That's not the only issue that's been
23  raised here.  I mean, you have this other issue about -- that
24  you guys dealt within a footnote where I had to squint to read
25  it, this thing about why the documents -- and I understand

1   it's only two -- two documents with ACB Bates stamps were in

2   the Colbert -- the Verna Colbert file, and there really isn't

3   an answer.

4           And then there's another -- there's at least one

5   other problem.  I don't understand what this SAO/NF stamp is.

6   I don't really have a clear picture.  And I am not trying to

7   give you a complete laundry list, this is why I think I need

8   to have a hearing.  I don't really have a clear picture about

9   the 24 or 25 files that got transferred from the city to the

10  State's Attorney's Office, understanding that that wasn't

11  objected to by anybody but before there was an agreement that

12  would allow an audit trail.  And what happened to those files

13  when they got wherever they got, who handled them, where they

14  got put, did any of them get looked at by any of the experts

15  in this case, I mean, I could cross-examine on that without a

16  single note for about 45 minutes, okay, just off the top of my

17  head.

18          MR. NOLAND:  Judge --

19          THE COURT:  But that -- what I don't want to do this

20  morning, because for me, who is the person who has got to

21  decide this, it is not productive to have an oral argument

22  that involves 15 issues.  It just isn't productive.  It's more

23  productive to me to have in some sort of organized way

24  somebody on the -- maybe it's a bunch of people on the defense

25  side of the case, put witnesses up on the stand, raise their

1    hands, and talk about from point A to point X exactly what

2    happened to all of this stuff, who touched it, what happened

3    to it, where it went, who looked at it, et cetera, et cetera,

4    et cetera, and then I have it in a clean and coherent way

5    rather than a group of nine, ten lawyers standing up here

6    bouncing stuff back and forth at me after I read 40 pages of

7    brief and I still don't get it.  And I am a pretty quick

8    study.  I still don't get it.

9         MS. MEADOR:  If I might, your Honor, what I would

10   recommend or offer, I think that many of these issues that

11   have been raised would fall away, at least for purposes -- if

12   you want to conduct a hearing, I think many of these issues

13   would fall away if the plaintiff's counsel came and viewed the

14   actual documents in my office.

15        THE COURT:  You are talking about the Johnson file.

16        MS. MEADOR:  I'm talking about many of these issues.

17   So, for example, the Johnson file, which, at the risk of

18   getting too far in the weeds, but there were --

19        THE COURT:  Well, I am going to stop you when I can't

20   see the sky.

21        MS. MEADOR:  That's fair.  There were disks that were

22   in many of these criminal files.  And so what we did was print

23   off documents that we could off the disks, if they were

24   printable and we could do so.  And so that was the cause of

25   this Donnell Johnson, which the Bates --

1          THE COURT:  Where stuff got cut off.

2          MS. MEADOR:  Actually, if you look, it's on the

3    bottom of the page.  They literally like fell off the pages.

4          And this was -- the disks were 1 percent of the

5    documents that were produced out of the entirety of the

6    production.  It's a very, very small number.  And we did

7    review -- this is the one case where this one was the basement

8    files.  In looking at the file, it's from the post-conviction

9    file jacket in the file.  So, again, you know, kind of in

10   viewing what counsel could view if they had, you know, come

11   over and what we would suggest that they do is that's where

12   it's coming from, and in a review of the post-conviction blue

13   back actually documents the --

14         THE COURT:  Okay.  You have used a term of art which

15   I believe that I understand, but explain what you mean by

16   post-conviction blue back.

17         MS. MEADOR:  Okay.  So in the criminal -- the State's

18   Attorney's Office in the criminal files, a type of document is

19   maintained that has an actual blue piece of paper stapled to

20   the back of it which then the courtroom ASAs utilize to track

21   the activities of the case.

22         THE COURT:  Right.  Okay.  They still use blue backs?

23         MS. MEADOR:  They do.

24         THE COURT:  Even now?

25         MS. MEADOR:  Even now, yes.  Even now.  And there is

1   a separate blue back for the trial file.  That's not this one.

2   This is the post-conviction blue back.  And at the end of the

3   blue back, it documents that discussions between the public

4   defender in the case and the state's attorney that -- where

5   they believed that this was an Area 1 case where paperwork

6   might be available.  And then the documents were obtained off

7   of the hard drive -- strike that, I'm sorry, the flash drive

8   production from the City, those are Bates stamped, and copies

9   were made onto the disk and tendered to the public defender.

10  That's this disk that was then maintained in the

11  post-conviction file is the State's Attorney's Office's copy

12  of that same disk that was tendered to the PD's office, the

13  public defender.

14          So, you know, that's kind of one example of why we

15  would, you know, recommend that they take a view of it.

16  Another -- of the files.

17          THE COURT:  Pause.

18          MS. MEADOR:  Sure.

19          THE COURT:  So tell me why, just in as nice and

20  succinct a way as you are capable of, tell me why nobody on

21  the plaintiff's side of the case -- I am not saying you should

22  have, but why you didn't accept the invitation to go look at

23  stuff at the State's Attorney's Office.

24          MR. LOEVY:  Your Honor, as I was listening, what I

25  understand she's saying, is if we had looked at the printed

1   pages, we would see that the bottoms trailed off, some were

2   partially cut off, some were cut off altogether.  The answer

3   to your question is that is exactly what we have in electronic

4   version.  And I keep saying what am I missing, but the PDF has

5   a picture of a page --

6           THE COURT:  Right.

7           MR. LOEVY:  -- that looks identical to what she says

8   I could look at in hard copy.  And I keep saying, what am I

9   missing?  Why do I need to see the hard copy of exactly what

10  looks identical on the computer screen?

11          This blue book she's talking about, blue back, we

12  have that, your Honor.  We have it in PDF form.  We've read

13  it.  We understand it.  We think it doesn't help their case.

14  They've explained it to us.

15          So I will repeat what we said in our brief.  What are

16  we missing?  Why does seeing the hard copy change the fact

17  that we've seen exactly what you want us to go look in

18  electronic form?  What are we missing?

19          THE COURT:  So what's the answer to his question?

20          MS. MEADOR:  The answer is putting it all in context

21  of it being part of the post-conviction file and not the trial

22  file.

23          THE COURT:  The post-conviction file being what,

24  exactly?

25          MS. MEADOR:  The post-conviction file is if a case is

1 tried and then goes up, comes -- and it comes back for an

2 issue -- a post-conviction issue, then that's a separate file

3 that's created. It is not commingled with the trial file.

4 And that's why -- so I brought with me the trial file.

5         THE COURT: So what exactly did the City's Monell

6 experts look at?

7         MR. NOLAND: The City's Monell expert, he -- after --

8         THE COURT: In other words, when he is saying

9 documents were in the state's attorney file and, therefore,

10 there's no problem from the City's end.

11         MR. NOLAND: Yes. So we reviewed the documents at

12 the State's Attorney's Office, and we flagged the documents

13 that the plaintiffs claimed were not in the criminal defense

14 files as being found in the criminal defense -- in the state's

15 attorney files. And then we provided that information to our

16 expert. So that's what he relied upon.

17         THE COURT: You did not answer my question.

18         MR. NOLAND: And so he looked --

19         THE COURT: No, I am going to ask the question again.

20 What documents did they look at?

21         MR. NOLAND: So --

22         THE COURT: In other words --

23         MR. NOLAND: Okay.

24         THE COURT: -- some examples of what the possible

25 answers might be: They went to the State's Attorney's Office

1    and they looked at the ASA's file; they reviewed a summary

2    that the law firm gave them --

3            MR. NOLAND:  I see.

4            THE COURT:  -- they went to the police department and

5    they looked at the basement files.  What documents did they

6    look at?

7            MR. NOLAND:  So we put a blue slash through the ACB

8    Bates stamped page of the document -- corresponding document

9    that we found in the state's attorney file, and we provided

10   that kind of the old-fashioned way.  We provided those hard

11   copies to the expert of all the ACB files.

12           THE COURT:  When you say "blue slash," I'm sorry.

13           MR. NOLAND:  A blue highlighting marker, we would

14   just put a slash through it --

15           THE COURT:  And that signified what?

16           MR. NOLAND:  That that document was found in the

17   state's attorney file.

18           THE COURT:  By whom?

19           MR. NOLAND:  By us; by me and others working with me.

20           THE COURT:  Okay.

21           MR. NOLAND:  And we also gave him the state's

22   attorney production when they ultimately were able to make

23   their production in accordance with the Court's order.

24           MS. MEADOR:  If I may, your Honor?

25           THE COURT:  No, not yet.  I got to absorb what

1 | Mr. Noland just said.

2 | So if I can kind of back up a little bit. I probably

3 | have all these reports in one place or another because of I

4 | have so many gosh darn motions filed in this case, but I don't

5 | recall them.

6 | You got a report from the plaintiff's expert saying

7 | these documents that were in the basement files weren't in the

8 | state's attorney files.

9 | MR. NOLAND: No. No. The plaintiff's expert did not

10 | look at any state's attorney files.

11 | THE COURT: My mistake. My mistake. You are

12 | absolutely right, and I knew that.

13 | You got a report from the plaintiff's expert saying

14 | that these documents that were in the basement files were not

15 | in the defense attorney's files from the criminal case, right?

16 | MR. NOLAND: Correct. And actually, initially --

17 | initially, it was the plaintiff's second supplemental

18 | disclosure issued February 18th.

19 | THE COURT: You know what? When I ask you what time

20 | it is, do not tell me what the entire history of watchmaking

21 | is. Okay? Just answer my question.

22 | So it was a yes, right? I am not going to repeat the

23 | question.

24 | MR. NOLAND: Then the answer is no, your Honor. The

25 | answer is we gave him initially the plaintiff's second

1 | supplement --

2 | THE COURT:  You got from the -- I am going to repeat

3 | the question now.  So unless you want to sit down and I am

4 | going to move on to the next person, answer it directly and

5 | with a one-word answer that it calls for; it's either a yes or

6 | a no.

7 | You got from the plaintiff an expert report that

8 | says, I, the expert, have looked at the basement files and I

9 | have looked at the criminal defense attorney's files and these

10 | documents from the basement files are not in the criminal

11 | defense attorney's files, yes or no?

12 | MR. NOLAND:  Yes, we did that.

13 | THE COURT:  Then at some later point in time, you

14 | went and got the state's attorney files for those same cases,

15 | correct?

16 | MR. NOLAND:  No.

17 | THE COURT:  No.  What is right?

18 | MR. NOLAND:  May I?

19 | THE COURT:  Yes.

20 | MR. NOLAND:  The plaintiff made their initial Monell

21 | disclosures in accordance with this Court's order.

22 | THE COURT:  Yeah.

23 | MR. NOLAND:  And once they were finally done with

24 | that on February the 18th, that was the last document where

25 | the plaintiffs, they didn't have an expert yet, made the

1   comparison, and that's what the plaintiff's lawyer said was
2   not in the criminal defense files.  We gave that to our
3   expert.  That's what we started working with and were working
4   with throughout until we got the plaintiff's expert's report.
5         And then -- but, yes.
6         THE COURT:  Some day you will look back at the
7   transcript of this hearing and you, like me, will say, what in
8   the heck did he just tell me?  Okay?
9         So my first question, which you answered yes, was you
10  got a report from the plaintiff's expert saying, I've looked
11  at the basement files and I've looked at the criminal defense
12  lawyer files and these things were missing.  You answered that
13  question yes.
14        Now, when you just answered this, what you just said
15  to me, as a listener trying to absorb what you are saying, it
16  sounded like you said something different from yes.  It
17  sounded like you changed the yes to, well, no, we got this
18  first and we only got that later and then it was this and
19  that.
20        This -- this -- I'm telling you, this is why I want
21  people sitting up there on the witness stand, raising their
22  hand, taking an oath, and telling me what happened here,
23  because I don't -- basically, what this boils down to, I know
24  what this motion is called.  It's called a sanction motion.
25  It is a Daubert motion.  It's a Daubert motion.  It's a

1    Daubert motion that says that the stuff that the defendants'
2    experts are relying on is not reliable and I ought to exclude
3    it or I ought to exclude the opinions that are based on it.
4    That's what it is.  It wasn't called that, but that's what it
5    is.  Okay?  And there is more than one, more than two, and
6    possibly more than three reliability issues that are raised
7    either in the opening brief or the reply or some combination
8    of the two.  There's multiple issues.  I have not sat down and
9    tried to catalog those issues, I suppose I could do that, but
10   you can do that just as well as I could.

11           I have a Daubert motion.  I have something that says
12   that I should exclude an expert opinion or the basis for an
13   expert opinion.  I have to decide that motion.  Okay?  And the
14   way those motions get decided oftentimes is by way of a
15   hearing.  And if there is a reliability issue that's been
16   raised, oftentimes -- and I don't often do it, but I have done
17   it before, sometimes judges hold hearings on that where people
18   get up and testify about the reliability of the data or other
19   things.

20           And that's the issue that's being raised here.  I
21   mean, I'm being told that, you know, we can't be sure about
22   what was in the state's attorney's files for a variety of
23   reasons; number one, because there was 24, 25 files that got
24   sent out of the basement files before there was any agreement,
25   okay; number two, because there was this copying problem with

1   the state's attorney files; number three, there was this thing
2   where -- there was this thing that I am still not sure that I
3   am completely comprehending about the Colbert file; number
4   four, there is this thing about the SAO-NF file or stamp.  And
5   it's -- anyway.

6          So -- and, honestly, I am not going to sit here for
7   an hour and a half and have people argue it and just make it
8   more confusing.  I am not.  So that's the deal.

9          An evidentiary hearing is ordered on what I'm calling
10  the Daubert motion.  It's going to start on Monday.  I don't
11  care who is available.  I've got 15 lawyers on both sides of
12  this case.  It's going to start on Monday.

13         Monday is the 25th -- 22nd of August, and it's going
14  to start right after my morning call at 10:30 in the morning,
15  and it's going to keep going until it's done.

16         MR. BURNS:  What day, your Honor?

17         THE COURT:  Monday.  It would be the 22nd of August,
18  at 10:30 in the morning, let's say, just to be on the safe
19  side so you don't have to sit around for the call.

20         So you are going to have to figure out who these
21  people are, you are going to have to -- and some of them may
22  be lawyers.  I don't know.  I don't care.  They are going to
23  have to get in here, and they are going to have to be prepared
24  to testify.  And we are not going to do depositions before
25  that.  It's going to be like a pool game:  We are going to

1  rack 'em and go.

2  So people are going to question them.  I will cut off
3  the questioning when I think it's gone beyond the point of
4  appropriateness.  I'll probably have some questions.  And
5  that's what we're going to do.

6  And so, basically, what I am looking for, what I am
7  looking for, is -- the only way I can describe it is an audit
8  trail, an audit trail of the basement file documents and what
9  happened to them when, when they got into what files, and what
10  was -- and what -- and the ultimate part of it being what
11  exactly was looked at by the defense experts who are
12  testifying in this because that is really the ultimate issue,
13  I think, and that is whether the database or part of the
14  database that they relied on is unreliable for some reason.  I
15  am not saying it is, I am not saying it isn't; I'm saying I'm
16  left with questions after I read all of this stuff and after I
17  hear you talking here this morning.

18  So that's the only way I can figure out to come up
19  with an answer to it.

20  MR. NOLAND:  Judge?

21  THE COURT:  Questions?

22  MR. NOLAND:  Our expert, Mr. Murray, my understanding
23  is in Montana on vacation.

24  THE COURT:  Okay.  Did Mr. Murray come to Chicago and
25  go out to the State's Attorney's Office or look at stuff or

1    did he look at what you sent him?

2           MR. NOLAND:  He looked at it in my office.

3           THE COURT:  Okay.  But he looked at something that

4    you or somebody in your office gave him?

5           MR. NOLAND:  Yes, we could -- yes.

6           THE COURT:  Okay.  So he can testify about that.  Or

7    whoever it was that did it for you can testify about that.  Or

8    we can get -- or if I don't think that's good enough, we can

9    get Mr. Murray on the phone and he can testify over the phone.

10          MR. NOLAND:  Very well.

11          THE COURT:  Presumably, they have phones in Montana.

12   So there you go.

13         So I'd like it to be in as organized a way as

14   possible, but that's probably unrealistic since it's only

15   three days from now.  That's the only thing I can come up

16   with.

17         So it's set for an evidentiary hearing starting at

18   10:30 on the 22nd of August.

19         So I consider -- you guys are effectively a party to

20   this motion.

21         MR. PECHOUS:  Are we witnesses?

22         THE COURT:  I don't know.  Maybe all of the above, I

23   don't know.  I don't know.

24         MR. PECHOUS:  I want to talk with Mr. --

25         THE COURT:  Some of the witnesses are probably going

1  to be from the State's Attorney's Office, whether they are

2  paralegals or whatever.

3  MR. PECHOUS:  I'm going to talk with Mr. Loevy.  I do

4  think there are some issues that we can --

5  THE COURT:  If there's stuff that you can agree to,

6  if you can say to me, okay, we all agree to A, B, C, D through

7  whatever, I am perfectly okay with that.  I mean, it's

8  conceivable I might have a question about something, but

9  that's okay.

10  MS. MEADOR:  I think if we speak with plaintiff's

11  counsel, some of these issues may fall away.  For example, the

12  SAO Bates numbering, I actually brought the disks that we

13  produced, and they're on there.

14  THE COURT:  So what I'm expecting from you all is

15  that -- and I am not saying you got to go over to the State's

16  Attorney's Office and look at every scrap of paper, but if I

17  were in your shoes, I would not want to be on the rear end of

18  somebody telling me on Monday morning, Judge, we told them

19  they could come look at A, B, C, and D and they told us go

20  jump in the lake.  Go look, okay, so at least you can say you

21  looked.

22  MR. LOEVY:  Your Honor, might we entertain a witness

23  list before Monday, maybe by the end of the week?

24  THE COURT:  Work it out.  Here is the deal.  You are

25  here until we are done.  You don't get to go anywhere until we

1    are done.  And so it's in everybody's interest -- I am

2    standing up partly because I am getting up ready to leave and

3    I am standing up partly because if I sit in one place too

4    long, I start hurting.

5          It's in everybody's interest on your end -- because I

6    don't get paid by the hour, and I am here all the time.  And I

7    don't have anything to do next week other than this.  Okay?  I

8    can sit here and stand here as long as I have to.  It's in

9    your interest to have this move as smoothly as possible, and

10   so it would probably be a good idea for you to talk about

11   ahead of time who is going to come in and testify or who ought

12   to come in and testify.  Okay?  So I'll leave it to you.

13          MR. LOEVY:  Thank you, Judge.

14          MS. MEADOR:  Thank you, Judge.

15     (Which were all the proceedings had in the above-entitled

16   cause on the day and date aforesaid.)

17     I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
18

19   _____          _____
     Carolyn R. Cox                       Date
     Official Court Reporter
20   Northern District of Illinois

21   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

22

23

24

25