1

1        IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3

4   NATHSON E. FIELDS,                )   Docket No. 10 C 1168
                                      )
5                     Plaintiff,      )
                                      )
6            vs.                      )
                                      )
7   CITY OF CHICAGO, et al.,          )   Chicago, Illinois
                                      )   September 23, 2016
8                     Defendants.     )   2:00 o'clock p.m.

9

            TRANSCRIPT OF PROCEEDINGS - MOTION
10       BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

    APPEARANCES:
12

13

14  For the Plaintiff:   LAW OFFICE OF H. CANDACE GORMAN
                         BY:  MS. H. CANDACE GORMAN
15                       220 South Halsted Street, Suite 200
                         Chicago, IL  60661
16                       (312) 441-0919

17                       LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
18                            MR. STEVEN EDWARDS ART
                              MR. ANAND SWAMINATHAN
19                       311 North Aberdeen Street, 3rd Floor
                         Chicago, IL  60607
20                       (312) 243-5900

21

22

23  Court Reporter:      MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                         Official Court Reporter
24                       219 S. Dearborn Street, Suite 2102
                         Chicago, Illinois  60604
25                       (312) 435-5639

```
1    APPEARANCES CONTINUED:

2    For Defendant
     City of Chicago:        DYKEMA GOSSETT PLLC
3                            BY:   MR. TERRENCE MICHAEL BURNS
                                   MR. DANIEL MATTHEW NOLAND
4                                  MR. PAUL A. MICHALIK
                            10 South Wacker Drive, Suite 2300
5                           Chicago, IL  60606
                            (312) 627-2100
6

7

8    For Defendant          KULWIN, MASCIOPINTO & KULWIN, LLP
     David O'Callaghan:      BY:   MR. SHELLY BYRON KULWIN
9                            161 North Clark Street, Suite 2500
                             Chicago, IL  60601
10                           (312) 641-0300

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 10 C 1168, Fields v. City of

3   Chicago.

4          THE COURT:  Good afternoon.

5          Hang on just a second.  I am going to disappear

6   momentarily here.

7          Okay.  Go ahead.

8          MR. NOLAND:  Good afternoon, your Honor.  Dan Noland,

9   Paul Michalik, and Terry Burns on behalf of the City,

10  Mr. Brannigan, and Mr. Murphy.

11         MR. KULWIN:  Shelly Kulwin on behalf of

12  Mr. O'Callaghan.

13         MR. LOEVY:  Jon Loevy for the plaintiff.

14         MS. GORMAN:  Candace Gorman for the plaintiff.

15         MR. SWAMINATHAN:  Anand Swaminathan for the

16  plaintiff.

17         MR. ART:  Steve Art for the plaintiff.

18         THE COURT:  So you got the order, I assume, talking

19  about time and whatnot.  So my hunch is that probably a good

20  deal of what people are going to be talking about are their

21  replies to the responses to the motions, since I didn't have a

22  reply on the schedule, and I said we'd be talking about the

23  defendants' motions first, so I think it makes sense to give

24  Mr. Noland and his colleagues the floor first, assuming that's

25  what you're -- but you can talk about anything you want to.  I

1    am really going to -- I am really going to hold to the limits.

2    If I think people are repeating themselves, I might cut them,

3    just so you know.

4          So everybody who is not talking can sit down.  And if

5    at some point, you want to stop, Mr. Noland, and say, I

6    relinquish the floor, then let me know that, and somebody else

7    can talk.

8          MR. NOLAND:  Very well, your Honor.

9          THE COURT:  All I want you to do is just identify

10    which motion or motions you are talking about at the

11    particular time.

12          MR. NOLAND:  Okay.  Judge, I -- we'd like to start

13    with the defendants' motions in limine No. 1 and 2, which

14    are -- we think fold into each other, which would be the

15    motion to exclude from evidence plaintiff's disclosures and

16    the motion to bar Mr. Brasfield, the plaintiff's expert

17    witness.

18          THE COURT:  All right.

19          MR. NOLAND:  And what I think the plaintiffs lost

20    sight of in the response is the -- really, Mr. Brasfield's

21    actual opinion.  They have a certain characterization of it.

22          But Mr. Brasfield's opinion is this.  He cannot say

23    that any specific page was withheld in any specific case .  He

24    admits he's got no foundation to say that there's no evidence

25    to say that any specific page for a particular investigative

1  file was not tendered by the CPD during any particular

2  criminal case.

3          He says -- and this would be at page 48 of his

4  deposition and elsewhere -- what he says is that, I can't say

5  that, but what I did do is I looked at a lot of material, I

6  looked at approximately 50 cases, 51 cases, and that in the

7  aggregate -- that's the word he uses -- in the aggregate,

8  there were a number of pages missing from the criminal defense

9  files that he compared and the plaintiff's counsel compared

10  with the investigative files --

11          THE COURT:  And is he able to identify those pages

12  that are missing?

13          MR. NOLAND:  Yes.

14          THE COURT:  Okay.

15          MR. NOLAND:  And that is based on a cold examination

16  of the papers, just comparing investigative file here,

17  criminal defense file here, and saying, in the aggregate,

18  these are -- these pages are missing, so when I total them all

19  up -- and there's pages missing on pretty much every case,

20  there are -- that when you total them all up, that leads me to

21  conclude and opine that the CPD had a practice of withholding

22  material -- not only withholding material, at the conclusion

23  of his report and elsewhere, he talks about exculpatory

24  material.

25          The problem with that is that there's absolutely no

1    foundation for the completeness of the criminal defense files.
2    And even for starters, Mr. Brasfield's reliance upon the
3    criminal defense files, without looking at the state's
4    attorney files, without conducting any critical analysis of
5    criminal defense files --
6              THE COURT:  What do you mean by "critical analysis"
7    of the defense files?
8              MR. NOLAND:  For instance, in case number 14, in the
9    criminal defense file, and it's Exhibit -- I can't remember
10   what exhibit it is that we attached -- it's Exhibit 6 to our
11   support --
12             THE COURT:  Okay.
13             MR. NOLAND:  -- supportive documentation.
14             So by way of example -- and that's really all that we
15   provided to the Court, that's what we could provide in our
16   pages; we tried to provide representative examples, we think
17   there's lots more, so we could explain it to the Court --
18   there's a request for fingerprint comparisons.  And that
19   document, the actual request without a handwritten note of
20   what the result was, was not in the criminal defense file.
21   But the exact same document with the no comparison note from
22   the CPD crime lab examiner who found no comparison is in the
23   criminal defense file.  So the criminal --
24             THE COURT:  So a different document that shows the
25   same thing is what you --

1          MR. NOLAND:  Exactly.  It's the same, exact document.

2   It's the same document.  It's just there's a handwritten note

3   in the defense file that said -- so that's just one example.

4          There's other examples where there's handwritten

5   notes maybe of a name of a person or of a -- some type of a

6   statement that while that note may not have been produced, the

7   content is in a supplementary report, so they had the

8   information.

9          So -- and that leads to the -- in addition to the --

10  you know, relying on the wrong data, not looking at the

11  state's attorney's files, relying on data with no foundation,

12  the criminal defense files, that he had no evidence, none at

13  all, that those files are complete and what existed at the

14  time of trial.  Zero.

15         And then relying upon his faulty legal predicate that

16  every single page from the investigative file needs to be

17  produced, ultimately, in a criminal case to the criminal

18  defense attorney regardless of relevance, regardless of

19  content.

20         The plaintiffs, I think, have characterized it or --

21  as the underproduction of documents or not producing every

22  piece of paper.  We don't believe that's the law.  We don't

23  believe that --

24         THE COURT:  Does he say in his report or in his

25  deposition, this is Brasfield, that that's his view, that

1    everything has to be produced, or is he just saying everything

2    wasn't produced and not giving an opinion about whether that's

3    proper or improper or not?

4         MR. NOLAND:  So in his report -- we believe he does

5    say that, and he does say it, and there's about several pages

6    of our motion where we talk about the hundred percent

7    disclosure requirement.  And the plaintiffs say that that's

8    not in his report.

9         But he may not say it, the hundred percent disclosure

10   requirement, but it absolutely is the foundation of his

11   opinion because when I said at the outset that he can't say

12   that any specific page was withheld in any specific case, he's

13   relying in the aggregate.  So that's what he's doing.  He's

14   relying upon counting pages, total pages, without reference or

15   differentiation to content or otherwise and saying that that

16   supports my opinion, ultimate conclusion, which he wants to

17   tell the jury, which is that CPD had a practice of withholding

18   Brady material, exculpatory material.

19        We don't think it's proper.  It's a flawed

20   methodology.  He's looking -- not looking at the -- and

21   that's -- so -- and that would be counting -- there's, I

22   think, 1700 or 1800 pages, I don't know exactly, that we were

23   able to locate in the state's files that the plaintiffs were

24   not able to locate in these criminal defense files.  So

25   Mr. Brasfield wants to rely upon all 1800 of those pages too.

1   We don't think he should be able to because the evidence is
2   that they were produced.
3        He wants to -- in addition to the types of things
4   that he's relying --
5        THE COURT:  Can I ask you a question about that?
6   And, I mean, probably all this stuff is answered in the papers
7   somewhere.
8        On your end of it, assuming we get to that point, on
9   the state's attorney end of it, what's going to be the
10  testimony or evidence that if something is in the state's
11  attorney's file, that indicates that it was produced, or is
12  there some more direct evidence than that?
13       MR. NOLAND:  Well, I think there's two answers to
14  that, Judge.  Number one is that we believe that the law says
15  that if the police gave it to the prosecutors --
16       THE COURT:  Then it's done.
17       MR. NOLAND:  -- then it's done; the law says that the
18  police obligation is to the prosecutor --
19       THE COURT:  Okay.  I follow what you are saying --
20       MR. NOLAND:  -- so it really doesn't matter, which is
21  one of the arguments we advanced to the Court, which is that
22  it really doesn't matter what's in the criminal defense files.
23  We don't understand why the plaintiffs only got the criminal
24  defense file.  We believe it's a flawed methodology for
25  Mr. Brasfield to rely upon and for the plaintiffs to advance

1  in this case, because it doesn't really mean anything because
2  from a constitutional perspective, if that piece of paper, if
3  that document, is in the prosecutor's file, then the police --
4  the CPD is -- the City is not responsible for a constitutional
5  violation.
6         And that's really what they're trying to rely upon is
7  they're trying to rely upon non- -- or constitutional conduct
8  in order to prove an unconstitutional practice.  So I'm sure
9  the Court will remember -- well, I know I've said that before.
10 Let me withdraw that.  Strike that.
11        THE COURT:  Yeah, right, is my answer.
12        MR. NOLAND:  At an April hearing we've attached as
13 Exhibit 2, the plaintiff's counsel told you that they are not
14 making any contention of a Brady claim in any other case.  So
15 they acknowledge that to the Court, and they said the theory
16 they're pursuing is this underproduction of pages.  And so
17 that's what is at issue, or that's what they made at issue.
18 We don't agree that that's proper to pursue it and to present
19 that to the jury, but that's the evidence that they've
20 developed.
21        And then that goes into a lot of the types of papers
22 that Mr. Brasfield relied upon to come up with this grouping
23 of pages that are not in the criminal defense file.  He relies
24 upon pages that -- or like statements taken by a felony
25 assistant, felony review assistant state's attorney, so

1    there's reliance upon statements that that felony review
2    assistant took, that that felony review assistant would have
3    taken back to his office with him, and would have been part of
4    the criminal -- I'm sorry -- the prosecutor's files.  They are
5    also in the investigative file.  But when Mr. Brasfield
6    doesn't find it in the criminal defense file, he criticizes
7    the police and he adds that to his total.
8                   THE COURT:  I see.
9                   MR. NOLAND:  He can't rely on it.  There's no
10   basis -- that's part of his flawed methodology.  He relies
11   upon documents in the investigative files that were created
12   after the trials or during the -- or one example would be
13   court attendance sheets.  So an officer, when he has to go to
14   court, fills out a court attendance sheet, and sometimes they
15   slip it into the investigative file.  That's the paper that he
16   counts.
17                  He relies upon civil complaints that were put into
18   the investigative file after the trials, subpoenas from civil
19   cases that were put into the investigative file after the
20   trials.  That's when -- earlier when the Court asked about the
21   assessment, any critical assessment of it, there was none
22   done.  It was a cold comparison of --
23                  THE COURT:  Of what papers are in this file versus
24   what papers are in that file.
25                  MR. NOLAND:  Exactly.  And if this Court had a

1    Brady -- if any one of these were a Brady case presented to
2    this Court, we would be flyspecking, we would be arguing over
3    the nuance of every single piece of information that allegedly
4    was not withheld that would have been available at the time of
5    trial.  And that's what the discussion would be, and that's
6    what we think the discussion needs to be for the plaintiffs to
7    attempt to assert a practice of withholding Brady material by
8    the police department.

9            There's all sorts of other examples.  There's
10   Illinois State Police reports that have cc's to the state's
11   attorneys.  There's --

12           THE COURT:  Which would indicate that the state's
13   attorney got them.

14           MR. NOLAND:  That the state had it, and they couldn't
15   find it -- plaintiffs couldn't find it in the criminal defense
16   file now, but it was sent to the prosecutor.  He or she had
17   it.

18           There's files that are relied upon in which there is
19   no criminal defense file.  So the plaintiffs made disclosures,
20   and there is no criminal defense file.  The plaintiffs have --

21           THE COURT:  That's motion No. 2 -- there was one
22   specifically on that, I think.

23           MR. NOLAND:  Okay.

24           THE COURT:  I am not telling you not to talk about
25   it.  I'm just --

1    MR. NOLAND:  No, I appreciate it.  There's actually
2    two aspects to that.  That is part of both motions.  There is
3    a bigger motion which is later on in the paper where --
4         THE COURT:  Yeah.
5         MR. NOLAND:  -- Mr. Brasfield is talking about where
6    there -- there's like 440 or so other investigative files
7    which --
8         THE COURT:  That's No. 5.
9         MR. NOLAND:  Yes.  Where he is saying we didn't
10   comply with our own practices, that we -- that things in the
11   files looked inconsistent.  That's a separate motion.  That is
12   simply that they can't -- that would be completely irrelevant
13   because nobody made any effort to see whether or not any of
14   that material was produced.
15        What I am talking about right now are several cases
16   that the plaintiff has identified as trial exhibits where
17   they --
18        THE COURT:  Of the 50, in other words.
19        MR. NOLAND:  Of the 50 or of the 60.
20        THE COURT:  Sixty.  Right.
21        MR. NOLAND:  So the plaintiffs had a total of -- I
22   think it was 59, Mr. Brasfield relied on 51.  There's a number
23   of them where there was no criminal defense file produced by
24   the plaintiffs to us.  We don't know how they possibly could
25   say the stuff was not produced in the criminal process, and

1    there's been no answer to that from Mr. Brasfield.

2         I did want to point out, earlier, the Court asked

3    how -- and I did make the point that it doesn't matter

4    legally.  The Court asked how are we going to show the

5    documents were produced.

6         THE COURT:  Yep.

7         MR. NOLAND:  I said that it's our position it doesn't

8    matter.

9         THE COURT:  Your position is it doesn't matter.

10        MR. NOLAND:  However, there are a number of -- and

11   our expert addresses this in his report -- there are a number

12   of cases in which the state did produce things where that can

13   be proved, not all of them, but some of them, such as the blue

14   back --

15        THE COURT:  Yeah, I saw a reference to the blue back.

16        MR. NOLAND:  And I think we attached some of the

17   references to the blue back to our paper.  Like, for

18   instance -- I can't find it right now, but there's a reference

19   in one of the blue backs that we attached where it's written

20   by the assistant state's attorney that tendered in court --

21        THE COURT:  Yeah, I saw that --

22        MR. NOLAND:  -- 181-page street file.

23        THE COURT:  I saw that reference.

24        MR. NOLAND:  And it has a reference to maybe 17 or 18

25   GPRs, including the backs of pages.  And the paper now --

1     actually, both the criminal defense file and the prosecutor's

2     files -- don't have 181 pages from the CPD, so we draw the

3     conclusion based on that that both files are actually

4     incomplete now that that would establish that the entirety of

5     our investigative file, the CPD investigative file, was

6     produced during that trial, but now the criminal defense file

7     is incomplete.  So that would be actually two points that we

8     are addressing.  But that would be an example of a case where

9     we can establish specifically that went from the prosecutor to

10    the criminal defense attorney, although, as we pointed out, we

11    don't believe that's our burden.

12         There's also answers to discovery.  From time to

13    time, we found the State's Attorney's Office, according to our

14    disclosed expert, Bernie Murray, started doing answers to

15    discovery in some criminal cases later on, not so much in

16    the '80s, but possibly in the '90s.  There wasn't Bates

17    stamping --

18         THE COURT:  In other words, where it was more

19    detailed what was being produced.

20         MR. NOLAND:  Exactly.

21         And then there could be, potentially, other ways to

22    establish that.

23         THE COURT:  Okay.

24         MR. NOLAND:  So -- and I would defer to our papers,

25    Judge, there's so much information, but on these motions,

1    that's what -- when the plaintiffs say, Judge, you know, this
2    is a motion for summary judgment, the defendants keep on
3    bringing that up.  You've already denied that.  That's a
4    Rule 50 motion.  That's how you need to handle it.  It's a
5    fact question.  We can just get into it.  It's not.
6    Brasfield's entire opinion is based upon his statement that
7    it's this material in the aggregate.  He doesn't contend,
8    because he can't because he doesn't have the evidence, that
9    any specific pages were withheld in any specific cases.
10            The issue of --
11            THE COURT:  I mean, you wouldn't take the position,
12   would you, that an expert has to give an opinion on the
13   ultimate issue in order for his testimony to be admissible?
14            MR. NOLAND:  No, I would not take that position.  I
15   don't think he --
16            THE COURT:  Basically, what the plaintiff is arguing
17   is that he is -- maybe he is giving an opinion on it, but he
18   doesn't have to, and whether Brasfield can or can't say that
19   there was a Brady violation isn't the point.  That's not the
20   way they're building the case, I think.  I mean, you've
21   alluded to this already.
22            MR. NOLAND:  The point that we're saying is that an
23   expert under Daubert or Daubert --
24            THE COURT:  It's Daubert.  Somebody did research on
25   this, by the way.  It's Daubert.

1   MR. NOLAND:  Thank you.

2   Under Daubert, the material an expert relies upon has

3   to be reasonably reliable.  For the expert to simply take a

4   cold comparison of criminal defense files, many of which are

5   blatantly incomplete, to accept that when it's not even the

6   law of whether or not it went from the criminal defense

7   attorney, when it's not the law that every single page needs

8   to be turned over, when it's clear that pages were turned over

9   that are not in the file, that he is relying upon pages that

10  have no substance whatsoever, blank pieces of paper,

11  administrative documents, things of that nature, that is a

12  flawed methodology, in our opinion, and it can't be just

13  carved out by "we don't think" or it would be hard to by just

14  saying, okay, Mr. Brasfield can't rely on these cases, he can

15  rely on some of these other cases.

16  THE COURT:  Okay.

17  MR. NOLAND:  The plaintiffs say, Judge, we're not --

18  we're not -- don't worry, we're not relying upon pages that

19  were obviously produced, like the ASA statements, we're not

20  relying upon pages where there was a cc to the state's

21  attorney, we're not going to waste the jury's time with that,

22  we're relying on the important stuff, the investigative stuff.

23  Well, Judge, first of all, they told you at the hearing in

24  April that's not what they're doing, they're not making any

25  Brady claim.  And, secondly, that's not Mr. Brasfield's

1  opinion because he doesn't have the evidence to say that.
2  He's relying in the aggregate.

3          He does say at pages 19 through 23 of his report, he
4  identifies some specific cases, 19 cases I believe it is, in
5  which he specifies specific pages.  And he goes case by case,
6  and he says, this page wasn't produced and this could have
7  been important because.

8          Judge, what we can tell -- say in response to that is
9  in addition to the fact that we believe that that had been
10  withdrawn by the plaintiffs, any contention that they were
11  trying to present some type of -- a claim in that fashion,
12  those 19 cases, of them, 7 of them, the pages are actually in
13  the state's attorney's files that we were able to find, two of
14  them, we think, are the pages that he cites are misfiled, one
15  of them is a reference to an attorney's business card who
16  stopped by the area while one of the suspects was in custody,
17  which the defense attorney would know about, another one has
18  to do with efforts to find the defendant and not guilt or
19  innocence, and then 7 of them relate to files that the state
20  has not been able to locate, which is a separate part of our
21  motion which I need to address.

22          THE COURT:  Okay.

23          MR. NOLAND:  So if that's all they rely upon,
24  that's -- that is the type of thing we believe they were
25  required to have disclosed to us back in January or February

1  pursuant to the Court's Monell discovery plan.  They didn't do

2  that.  They just disclosed pages.

3          Later on when Mr. Brasfield identified that material,

4  that is -- those disclosures were made.

5          THE COURT:  He disclosed it, I assume, before his

6  deposition?

7          MR. NOLAND:  Yes, he did.

8          THE COURT:  Okay.

9          MR. NOLAND:  And then -- but then it was after that

10 where the plaintiff's attorneys advised the Court in Exhibit 2

11 that they are not contending that there is any Brady violation

12 in any other case, and he also admitted at deposition this

13 issue that he didn't have the proof.

14         So if that was the disclosure that was made back in

15 January or February and we had -- and that was entirely what

16 was at issue, that would have made this entire investigation a

17 lot more streamlined and probably more reasonable where there

18 wouldn't have been this massive material.  It could have been

19 a focus on that.  There could have been actual witnesses in

20 the case who investigated that material.  That wasn't done.

21 That was, we believe, withdrawn by the plaintiff at that

22 hearing and not something they are advancing but, in any

23 event, non-supportive of the ultimate conclusion that

24 Mr. Brasfield is making, which is based on the aggregation of

25 data that the City had a practice of withholding material.

1           If I could move on --

2           THE COURT:  Yeah, sure.

3           MR. NOLAND:  -- to the issue of the missing state's
4    files.

5           THE COURT:  This is No. 5, in other words.  Yeah.

6           MR. NOLAND:  Judge, the issue there is all the other
7    arguments we made in Nos. 1 and 2 motions apply to that motion
8    as well.  The additional arguments we would make is that --
9    are that based upon what we found in the state's files that
10   were available, and there's 16 missing files, and there's
11   somewhere in the number of 40, 41, 42 prosecutor's files that
12   were located, that approximately 93 percent of the pages or 94
13   percent that were in the investigative file are in the
14   prosecutor's files or that can be assumed were in the
15   prosecutor's files based on the plaintiff's disclosure and our
16   review.  So 94 percent.

17          I think it's about 68 percent or so of the documents
18   in the 16 missing cases plaintiff contends were contained in
19   the file, that there were approximately 30 or 32 percent that
20   are missing.  Well, if -- we don't believe the plaintiff
21   should be able to rely upon those because it would -- I
22   think we -- we think it would be severely prejudicial and
23   unfairly so to us, to the City, because of something outside
24   of our control --

25          THE COURT:  So it's a Rule 403 argument, basically.

1    MR. NOLAND:  It is a Rule 4- -- yes.

2    THE COURT:  Do you know -- do you have any sense

3    about -- I know I'm asking to sort of prove a negative -- any

4    sense about why the state's attorney's files weren't

5    available?  Did you get any kind of a feel for what kind of a

6    search they did --

7    MR. NOLAND:  It was a -- we assisted in the search.

8    The search was substantial.  There's a couple of warehouses

9    where we spent days, two days combing through trying to find

10   these files, and other than to describe it as -- and I'm sure

11   another -- the warehouses are enormous, the paper is

12   government paper, and it's difficult to find, we don't have a

13   specific answer why these files couldn't be found.  Most of

14   them are from 19- -- mid 1980s.

15   THE COURT:  Okay.

16   MR. NOLAND:  Very old files.

17   THE COURT:  So they're like 30 years old at this

18   point.

19   Anyway, I interrupted you.

20   MR. NOLAND:  No, that was simply -- that was the

21   point, Judge, is that it would be -- we don't think -- in

22   addition to the 403, we think that it's -- as before, those

23   would be the same arguments we're making in Nos. 1 and 2, that

24   it's a flawed methodology.  Mr. Brasfield, as an expert,

25   wouldn't reasonably rely upon just the criminal defense file.

1   And many of those files, as our expert points out, are clearly
2   incomplete.  So because he doesn't conduct a critical analysis
3   of them and just accepts them hook, line, and sinker --
4          THE COURT:  So, basically, what you are saying in
5   this argument is that even if it's okay for Mr. Brasfield to
6   rely just on the comparison between the police department's
7   files and the defense files, it's not fair to let them do it
8   for these 16 because you basically don't have the
9   corresponding state's attorney's files to show what was in
10  those files and wasn't in the defense files that might have
11  actually been turned over.
12         MR. NOLAND:  Yes.  That is the separate argument
13  we're making for these files.
14         THE COURT:  Right.  You have the other arguments too.
15  I get that.  Okay.
16         MR. NOLAND:  Judge, there's a -- we have a motion
17  with respect to the Jones litigation, the Palmer litigation --
18         THE COURT:  So I had a question about that.  And I
19  confess I have not gone back to look at the transcript of the
20  previous trial.
21         I thought that I made a ruling about what could and
22  could not be introduced about that at the trial, and nobody
23  bothered to remind -- at least from what I could find, nobody
24  bothered to remind me of it, which, I will point out, I told
25  everybody to do.

1      MR. NOLAND:  That would be a mistake on our part

2   then.  I know we had looked into it.  Yes, the Court had

3   barred it.  The Court had barred it --

4      THE COURT:  I don't think I barred it entirely.  I

5   think we came up with -- excuse me.  I am on grandchild watch

6   here.

7      I think what -- my vague recollection, without

8   looking for it, is what I permitted was some sort of what I'll

9   call sanitized reference to the earlier litigation that would

10  enable putting in context the adoption of the policy or the

11  alleged policy that was challenged.

12     MR. NOLAND:  Yes.  And Jim Hickey --

13     THE COURT:  Who was the witness or witnesses that

14  this came in through?

15     MR. NOLAND:  Jim Hickey.

16     THE COURT:  Hickey.

17     MR. NOLAND.  He was the 30(b)(6) witness from the

18  City on the issue of investigative files and street files.

19  And part of the basis -- and the Court did allow the

20  plaintiff's attorneys to ask questions on this, I think

21  something to the effect of the policy change as a result of

22  litigation, or litigation was filed and the policy changed and

23  there was an issue, something like that.

24     Part of the Court's ruling, we believe, my

25  recollection, had to do with the plaintiff had not identified

1    this Jones/Palmer issue as a 30(b)(6) topic in Mr. Hickey's
2    notice, so I do -- I have a recollection of looking at that at
3    sidebar with the Court.
4                THE COURT:  Okay.
5                MR. NOLAND:  But, ultimately, it's our position that
6    the way the Court handled it at the first trial -- actually,
7    it was both of them -- was appropriate.
8                THE COURT:  Did we get to that in the first one too?
9    Probably did.  Probably pretty early on.
10               MR. NOLAND:  Yeah, Mr. Hickey testified both times,
11   and it came up both times, I think.
12               THE COURT:  Okay.
13               MR. NOLAND:  And it would be our position that that
14   was an appropriate ruling, that --
15               THE COURT:  I'm sorry to interrupt you again.  So
16   what I am going to actually ask both sides to do is after
17   today and hopefully by Monday, if you could collectively like
18   send me something that says, here's where this was discussed,
19   whether it was at the in limine hearings before the first
20   trial or at the first trial or at the second trial or all of
21   the above so I can -- I have all the stuff.  I just need to
22   know where to look.  There's thousands of pages of transcript.
23               So, anyway, go ahead.
24               MR. NOLAND:  And so we do have a number of
25   addition -- in addition to that, the basic argument that it

1  was done right the first time, no reason to change it, it
2  would be unfairly prejudicial to allow the circumstances of
3  Jones and Palmer in, it would open a case within a case and
4  under an old policy, under a former policy.

5         And, in fact, while the plaintiffs want to introduce
6  certain court rulings from that case, the class action, we
7  cited it for the Court -- we call it Palmer 2 because there
8  were all sorts of rulings on this -- Palmer 2 in the Seventh
9  Circuit in 1987 found that the plaintiffs had not established
10  that there was anything in those street files at issue in that
11  litigation.

12         So while, yes, the City changed its policy, the Court
13  ultimately said that the plaintiff had not been the prevailing
14  party in that case.

15         So our view, like it was then, is the same now, that
16  the --

17         THE COURT:  You are not asking me to allow in
18  anything less.  You are just saying don't allow in anything
19  more than I did before.

20         MR. NOLAND:  Yes.

21         THE COURT:  Okay.

22         MR. NOLAND:  There are then some additional other
23  cases, three cases pending in the building right now, that
24  we've moved to bar reference to --

25         THE COURT:  Motion No. 4.

1       MR. MICHALIK:  Yes.

2       MR. NOLAND:  Kluppelberg is one case, Rivera is

3   another case, and Taylor is another case.  The plaintiff has

4   identified some exhibits, trial exhibits, relative to those

5   three matters.  We believe they should be barred.  They are

6   not relied upon by -- those specific cases are not relied upon

7   by Mr. Brasfield, so there's -- otherwise, we don't see any --

8   and there haven't been any witnesses identified relative to

9   that.  The plaintiff didn't --

10      THE COURT:  So one of my questions for the plaintiff

11  is going to be how do you propose to get those in, but I get

12  your point.  Go ahead.

13      MR. NOLAND:  The plaintiff didn't bring that up in a

14  discovery plan where we -- it could have been litigated,

15  discussed with the Court whether or not --

16      THE COURT:  So one of the things the plaintiff says

17  in their response on this, which is missing numbers on the

18  pages, so I think it's about page 20, but I am not sure, they

19  say that on the 5th of February, they supplemented their

20  interrogatory responses and said what they were relying on, at

21  least from Kluppelberg, K-l-u-p-p-e-l-b-e-r-g, and Rivera, I

22  guess not Taylor, but -- so they say that they disclosed at

23  some point in time that they were planning to rely on this.

24      MR. NOLAND:  That is true.  They did do that.  They

25  didn't receive leave of Court to do that.  And then --

1           THE COURT:  Did they need it?

2           MR. NOLAND:  We think they did because the judge

3    limited -- there was discovery in the case --

4           THE COURT:  That would be me?

5           MR. NOLAND:  The Court.

6           THE COURT:  You could say "you."

7           MR. NOLAND:  Your Honor had limited discovery in

8    certain things that the defendants had asked for --

9           THE COURT:  I completely get that I limited

10   discovery.

11          Here's basically what my question comes down to on

12   this.  So I don't know that there -- I mean, I know the basis

13   on which I granted a new trial -- the bases on which I granted

14   a new trial on the Monell claim, and part of it was that I had

15   unreasonably limited discovery, and this thing that we are

16   talking about right now, Kluppelberg and Rivera and Taylor,

17   was not part of the discovery that I said that I had

18   unreasonably limited.

19          However, I think the question, or at least a way of

20   looking at it, would be does that mean that that's the only

21   additional evidence that gets to be put in?  I mean, in other

22   words, I don't know that there is any rule of court that says

23   that when a case has to be retried, you kind of -- to borrow a

24   word my first-year civil procedure professor used, you don't

25   pickle the first trial and just introduce that at the second

1 | trial.

2 | I mean, I assume that the normal rules about
3 | supplementation and timeliness and all that apply, and I guess
4 | what I'm getting at is would this have been after -- first of
5 | all, do you disagree with that, and even if you do disagree
6 | with that, would this have been after any kind of
7 | supplementation deadline, you know, in Rule 26 or wherever
8 | those things are found?

9 | MR. NOLAND:  Two responses to that would be, one, we
10 | disagree in the context of this case because the Court entered
11 | the discovery plan about what we're going to be doing in this
12 | case, and --

13 | THE COURT:  Refresh my memory a little bit on that.
14 | After the trial --

15 | MR. NOLAND:  In connection -- I believe it was in the
16 | Court's -- it may have been in the Court's order granting the
17 | new trial.  There was --

18 | THE COURT:  Tell me what the discovery plan was.

19 | MR. NOLAND:  -- an order to submit a discovery plan
20 | about what the -- what's going to happen.

21 | THE COURT:  I apologize for displaying my ignorance
22 | in such a public way here, but that discovery plan is going to
23 | be on the docket somewhere?

24 | MR. NOLAND:  Yes, in approximately June or May.

25 | THE COURT:  Of?

1          MR. NOLAND:   2015.

2          THE COURT:   Of 2015.   Okay.

3          MR. NOLAND:   And there is no reference to any of that

4    information.

5          Most of that material could have been identified

6    before the first trial if the plaintiff wanted to rely upon

7    it, and it certainly should have been done before February if

8    the plaintiff was going to rely upon it.   It should have been

9    done through a motion for leave where we could have either

10   opposed it or engaged about what we're going to do, can we

11   identify in response.

12         And then when Mr. Brasfield isn't relying upon those

13   three cases as cases where information was allegedly withheld

14   from the criminal defense attorney or the prosecutor, then we

15   believe that the plaintiffs were -- while they had put in

16   their answer to interrogatory, it wasn't being advanced.   Now

17   they have added it to their trial exhibit list, and that's why

18   we brought it to the Court's attention.

19         THE COURT:   Have you gotten any sense from any

20   exchanges you've had with the plaintiff's attorneys about how

21   they propose to get it into evidence?

22         MR. NOLAND:   No, we have not reached out for them in

23   that regard.

24         THE COURT:   But there hasn't been an expert's

25   supplement report saying, hey, I am relying on this too, or

1  anything like that?

2  MR. NOLAND:  No.  No.  The only thing -- there is

3  some reliance in Mr. Bridges', the statistical expert, report,

4  I think, on Monell discovery done in Kuppelberg, not on the

5  underlying actual facts.  What the plaintiffs are seeking to

6  do with these trial exhibits at issue in the current

7  discussion is rely upon those three cases as additional cases

8  where the City allegedly withheld exculpatory material.

9  THE COURT:  Okay.

10  MR. NOLAND:  So the last motion I wanted to talk

11  about was this -- the one the Court alluded to earlier where

12  Mr. Brasfield is relying upon -- this is where there's no

13  criminal defense files.

14  So part of Mr. Brasfield's report is a comparison or

15  a review of 434 investigative files for which the plaintiff

16  did not disclose a criminal defense file.  So Mr. Brasfield

17  was not asserting -- while he actually -- Mr. Brasfield does

18  it in the conclusion of his report, use that as part of his

19  predicate to argue that documents weren't produced on a

20  regular basis by CPD, but there is no evidence -- and I don't

21  know if he necessarily is saying the documents -- he can't

22  prove because there's no criminal -- we don't have any

23  prosecutor in the defense file.

24  THE COURT:  Right.

25  MR. NOLAND:  We believe it's their contention that

1    it's -- that the City didn't comply with its own special

2    order 83-1 with these because the investigative file inventory

3    was incomplete or one of Mr. Brasfield's points is that

4    sometimes I'll find -- he'll find a handwritten note on the

5    back of a page or that's not on a general progress report

6    form.

7            Our response to that is that will mislead and confuse

8    the jury, and it is irrelevant because it does not go to the

9    claim of whether exculpatory materials was withheld in

10   violation of the Brady rule.  So we think that -- we think all

11   of that information should be barred.

12           THE COURT:  Okay.

13           MR. NOLAND:  And I believe that on our motions to --

14           THE COURT:  What do you want to say about the

15   plaintiff's -- or about your motion?

16           MR. NOLAND:  This would be on our motion.

17           THE COURT:  You can pause right there then.  And you

18   can decide what you want to and don't want to respond to.  I

19   don't care.  You can use your time however you want to.

20           So Mr. Noland used 34 minutes.  And so I am turning

21   over the floor.  Again, we are just still talking about the

22   defendants' motions in limine.

23           MR. SWAMINATHAN:  Anand Swaminathan for the

24   plaintiff.

25           MR. ART:  And Steve Art for the plaintiff.

1          MR. SWAMINATHAN:  So what we're doing, Judge, is
2    we're showing through Brasfield -- I want to start with the
3    Brasfield Exhibit No. 8 and the criminal defense file issues
4    -- we're showing that they had a set of policies and practices
5    that resulted, essentially, in an ad hoc process by which
6    investigative material was being denied to criminal defendants
7    and that that has major constitutional risks associated with
8    it.
9          And so I think before I delve into the specific
10   issues related to Brasfield in the criminal defense files,
11   it's worthwhile for us to lay out a little bit of what our
12   Monell claim would look like, and I think it animates a lot of
13   the issues.  And Steve is going to handle that.
14          THE COURT:  Okay.
15          MR. ART:  So, Judge, I think the important thing to
16   talk about is that there are multiple Monell theories at stake
17   here.  Everybody has been talking about a policy or a custom
18   thus far.  With respect to that branch of proving a Monell
19   theory against the defendants, the Seventh Circuit has said
20   very recently in the Daniel against Cook County case that to
21   establish the policy or custom, you have to have evidence
22   showing a general pattern of repeating behavior that causes
23   the harm at issue in the individual case.  So we are certainly
24   pursuing that path.
25          We don't think that Brasfield needs to show that

1  every single instance where materials were withheld were, in

2  fact, Brady violations provable in court, but we think that in

3  some instances, he can talk about that.  We are relying on the

4  general repeating pattern of behavior being non-disclosure of

5  criminal investigative files, and we are going to prove that

6  that was the moving force behind the constitutional violation

7  in this particular case.

8          But in addition to that theory, there are other

9  Monell theories at stake; primarily, the theory that there was

10  an actual official policy of the City of Chicago not to

11  promulgate procedures, rules, that would ensure that

12  investigative files were created, maintained, and produced to

13  criminal defense attorneys, to the State's Attorney's Office,

14  to anyone in a way that reliably made sure that in criminal

15  prosecutions, criminal defendants would have access to

16  investigative materials.  That official policy theory has no

17  requirement of showing other incidents.

18          It is the theory at issue in the Glisson against

19  Indiana Department of Corrections case the Seventh Circuit

20  will hear shortly en banc, and it's a theory that -- it is an

21  intentional decision of City policymakers not to promulgate

22  policies in a particular area that would have avoided the

23  constitutional violation in this particular case.

24          So those two theories are certainly both at stake in

25  this case, as is a theory which is sort of a version of the

1  policy or custom theory that police officers and other
2  employees of the City of Chicago were not trained and were not
3  supervised to adequately turn over investigative materials,
4  both at the areas and at the records division which would
5  receive subpoenas and requests for records.

6          THE COURT:  Let me ask you this question, and I am
7  not asking this to suggest that it's critical or important or
8  necessary.  Was -- when the case was tried the last time, was
9  it tried on all of those theories or some of them or none of
10 them?

11         MR. ART:  There was likely an emphasis on the policy
12 and custom theories.  The evidence --

13         THE COURT:  That's the second one that you talked
14 about.

15         MR. ART:  Right.

16         THE COURT:  Okay.

17         MR. ART:  I'm not sure that all of the theories were
18 clearly set out at any point in time.  What I can say is that
19 the evidence used in support of all of these theories has been
20 disclosed all along and has been disclosed in this
21 supplemental discovery period.

22         The evidence concerning the policy and custom claim
23 is, obviously, more expansive, and that is, obviously, a lot
24 of what Brasfield is talking about, but I just want to make
25 clear that there are these other theories at play in the case.

```
1        THE COURT:  And your point about that or at least
2   part of your point about that is that on what you described as
3   the second theory, you don't have to show an effect in a bunch
4   of other cases.
5        MR. ART:  Exactly.
6        THE COURT:  Because it's the policy itself.
7        MR. ART:  Exactly.
8        THE COURT:  Yeah.  Okay.
9        MR. ART:  And with that, I think Mr. Swaminathan will
10  go on to Mr. Brasfield's report.
11       THE COURT:  Okay.
12       MR. SWAMINATHAN:  So I think with that, we can talk
13  about some of the things that Brasfield does in his opinions.
14       And so they have a motion to bar Brasfield that at
15  least I think as it reads is to bar him entirely, but let's
16  talk about what Brasfield really does in his report, and let's
17  start with one of the points that Steve just made.
18       There is an -- one of the policy claims we have is
19  that an official policy, in effect, not to promulgate the kind
20  of rules they needed to promulgate to ensure that
21  investigative material was going to be turned over, and that
22  relates to the fact pattern here that flows from the Jones and
23  Palmer litigation and the fact that they knew -- they were on
24  notice of a particular problem and they knew they needed to
25  promulgate certain sets of rules and they didn't promulgate
```

1 rules that were going to do anything to ensure the problem was
2 fixed.

3        And so Brasfield has a whole lot of opinions about
4 the idea that you need to do certain things to ensure that
5 you're going to provide information and investigative material
6 to the criminal justice process.  And he has a bunch of
7 opinions about that that are not related to any specific file
8 comparison project, which is really what defendants have
9 focused their argument on.  So I just want that to be clear.

10        The other thing he does, of course, is he does do an
11 analysis that really delves into the specific files to show
12 that, in fact, not just that -- looking at the policies
13 themselves and the lack of training surrounding those policies
14 that there was nothing to ensure that they were going to be
15 enforced and they were actually going to be turning material
16 over, but then he also does engage in this process that really
17 is the subject of this debate, which is can we show that, in
18 fact, these ad hoc -- this ad hoc system they had in place
19 did, in fact, result in investigative material not getting
20 turned over and disclosed.  All right?  And that's the process
21 in which we are having a big debate.

22        And what he essentially says is, all right, I will do
23 a comparison of criminal defense files and these investigative
24 files, as the City calls them, that are found in the basement.
25 And he compares the basement files and the criminal defense

1   files to see are we finding that, in fact, criminal defendants
2   are not getting substantial materials from these investigative
3   files.
4            And so his analysis consists of two components, and
5   the first component is what counsel for the City has called
6   sort of a cold comparison.  And he's right.  He did a cold
7   comparison in which he basically says, page by page, what
8   pages are in this basement file that are not in this criminal
9   defense file.  And he identifies all of them.  He's not
10  engaged in a subjective analysis.  And that was part of our
11  approach on purpose.  We don't want -- if we did it the other
12  way and said, I'll only take certain pages, then we'd be
13  accused of engaging in subjective determinations about which
14  pages and this and that.  So instead, his point was, I will
15  identify everything that was not disclosed or, essentially,
16  that was missing from the criminal defense file that's in the
17  basement file.
18           And then he doesn't dwell on every single page of the
19  file, and he doesn't say, oh, look, you didn't turn over court
20  attendance reports, gotcha.  We hone in on specific sets of
21  types of documents:  GPRs, handwritten notes not on GPRs,
22  to/from memos and other types of handwritten notes, the
23  inventories that were purportedly going to be part of the
24  process to fix the street files problem, according to Hickey
25  and special orders and so on.  And what he says is, let's hone

1   in on that really important investigative material and see is
2   this stuff missing from the criminal defense files.  And the
3   answer is in the vast majority of cases, yes; the vast
4   majority of criminal defense files were missing this important
5   investigative material.

6           So the bottom line is what they do then is they say,
7   well, he did identify all this other unimportant stuff like
8   court attendance files and so on, and so this is really a
9   bogus process and it's not working.  That's not the case at
10  all.  I mean, the reality is if our case entirely came down to
11  us coming into court and trying to prove that a bunch of court
12  attendance files and other administrative documents and
13  miscellanea were not turned over, we're going to get hammered.

14          But he didn't do that.  He focused in his report on
15  the specific types of materials that were important.  And just
16  to point it out, on page 17 and on of his report is where he
17  hones in on specific types of important investigative
18  materials.

19          So the other thing that they do in their response or
20  in their argument here is they say, ah, but we identified
21  certain instances in which he screwed it up, and he said
22  something was in there that really wasn't in there, and he
23  identifies stuff like court attendance sheets and he shouldn't
24  have identified them.  And they had these kinds of arguments.
25  But those are all cross-examination points.  Those are

1   points -- I mean, really, their motion, if you read it, it
2   reads like a cross-examination, not a Daubert challenge to the
3   kinds of things Brasfield is doing.

4           And let me just say one other point about the general
5   idea that everything he identifies has to be investigative
6   material.  There is a point to be made about these comparisons
7   separate and apart from looking at the specific types of
8   investigative materials, and that is the City has a defense in
9   this case that is going to be -- and they've said this
10  before -- we've promulgated these rules after Jones and Palmer
11  like special order -- the 1983 special order, and these were
12  supposed to solve the problem.

13          And so these things do solve the problem, and those
14  new rules that they put in place that they claim solve these
15  problems do things like, say, no more to/from memos,
16  everything needs to be on GPRs, use these inventories.  And
17  what they say is the entire investigative file, this new thing
18  called an investigative file, will be a so-called centralized
19  file that gets produced in its entirety, no picking and
20  choosing, to the criminal justice process, including the
21  criminal defendants.

22          So anything missing -- now, put aside the things that
23  went into the file years later, but anything in there,
24  including administrative documents from the time period of the
25  investigation, sure, they're not Brady material, but they are

1  evidence that they are not engaging in a process that they are
2  claiming they engaged in to fix the problem because they're --
3  all of that material should be in there because, according to
4  them, they are not picking and choosing.  They have one
5  investigative file that they're copying in its entirety and
6  producing.

7           And so Brasfield spends a lot of time as part of his
8  report explaining all of these different types of problems.
9  And, yes, he goes on to identify specific documents, not just
10 to say there are handwritten notes and GPRs and other
11 investigative material that are missing, but also to say --
12 and I'll show you some of these specific examples, and counsel
13 identified them on page 19 and on -- where this is the kind of
14 important investigative material that really matters.

15          And he has an opinion that's generally accepted
16 police practices that these are all the types of materials
17 that you should be producing to criminal defendants, that
18 should be getting produced.

19          So that's, essentially, the argument on Brasfield and
20 Brasfield's opinions and his ability to argue these things.
21 And to the extent they've identified some number of files --
22 they've identified about a handful of files where they've
23 identified some problem, they believe, or some error, they're
24 right; I know at least one typo that resulted in us
25 identifying a hundred pages that we shouldn't have identified

1   -- that's cross-examination.  We looked at hundreds of files,
2   tens of thousands of pages, so, sure, there are a few errors.
3          But the rates we're talking about here -- and
4   Brasfield testified to this -- 80 percent of files missing
5   having handwritten notes that aren't turned over to the
6   criminal defendants, the other kind of numbers he has in
7   there, more than 50 percent without inventories, et cetera,
8   these are rates of problems at which he says, I accepted there
9   are going to be some errors in this overall review that I'm
10  engaged in, but these numbers are just -- are at levels where
11  even if you show me that we got some things wrong on 5 or 10
12  of these, I still have a problem.
13         So that's the issue on Brasfield.
14         In terms of the completeness of the criminal defense
15  files, I mean, the point is we take criminal defense files and
16  we say what is in the criminal defense files today is the best
17  evidence of what was in the criminal defense files.
18         The state does the same thing -- I mean the City does
19  the same thing.  They say, look at the State's Attorney's
20  Office's files.  What's in the State's Attorney's Office's
21  files is the best evidence of what's in the state's attorney's
22  files.
23         We disclosed record keepers from the Public
24  Defender's Office.  We've disclosed public defenders.  Those
25  are all people who can come in and provide foundation for

1   what's been done.  We've disclosed public defenders and they
2   haven't deposed them.  So we've got a process.

3           And what's interesting here is we've done some things
4   that provide the City with the benefit of the doubt.  We're
5   taking the criminal defense files and saying, everything in
6   the criminal defense file we're going to say was in there at
7   the time of the criminal trial.  In other words, we're going
8   to give you the benefit of the doubt.

9           The City does something similar.  They take the
10   state's attorney files, they lay no more or no less foundation
11   for those being complete files, and they don't lay any
12   foundation for the idea that when they look at the state's
13   attorney files, they're looking at only portions that were
14   from the trial and not from post-conviction processes and so
15   on, but they give themselves the benefit of the doubt.  They
16   say the entirety of this file is, essentially, stuff that's in
17   the state's attorney file.  That's fine.

18           THE COURT:  Let me ask you this.  One of the things
19   Mr. Noland said is that, well, if something is in the state's
20   attorney's files, that means that the police have complied
21   with whatever their obligations are, and if it somehow doesn't
22   get to the defendant -- the defense counsel's files, it's not
23   on the police, it's on the state's attorney.

24           MR. SWAMINATHAN:  Well, we have a couple problems
25   with that.  One is it may be the case that if they can

1   ultimately show that material was produced from the Chicago

2   Police Department to the State's Attorney's Office, that there

3   may not be a constitutional injury in that case caused by the

4   Chicago Police Department.  But it is not proof that they

5   don't have an ad hoc set of policies and practices that we

6   believe caused these kinds of constitutional risks and,

7   ultimately, the constitutional harm to Nathson Fields.  So

8   that's one point of it.

9           The other point is there are subpoenas in a number of

10  instances in these files directly from criminal defendants to

11  the Chicago Police Department, and there are Chicago Police

12  Department responses to the criminal defendant directly, and

13  they're not getting complete files.

14          So we don't think that simply saying the fact that

15  some of this stuff got produced to the State's Attorney's

16  Office resolves the problem for purposes of the Chicago Police

17  Department.

18          THE COURT:  That was -- I mean, that certainly was --

19  at least when I was familiar with it and maybe still is -- you

20  know, a common thing for defense attorneys to do is send a

21  subpoena directly to the police department because, you know,

22  in a way, you are cutting out the middle person in that

23  situation.

24          And I know this question really hasn't been raised in

25  the briefs, and it frankly just occurred to me as you were

1    saying this:  So how does that fit in with Brady?  I mean, in
2    other words, if I send the police a subpoena saying, give me
3    your files on this case, and the police have a practice or a
4    policy, as you describe it, it's this ad hoc policy which
5    results in the production being incomplete, is that a Brady
6    problem, or is it some other kind of a problem?

7            MR. SWAMINATHAN:  Well, if the production is from the
8    City, the Chicago Police Department, back to the criminal
9    defendant, which we've seen in some of these instances, and
10   they don't produce the entirety of the investigative file, we
11   think it is a -- assuming there's Brady material in there, but
12   it is a problem of the type that creates a constitutional risk
13   that we care about in this case.

14           THE COURT:  All right.  Go ahead.

15           MR. SWAMINATHAN:  I don't want to use up all of our
16   time, so let me move on.

17           The last thing I'll really say about the overall
18   argument --

19           THE COURT:  Fifteen minutes so far.

20           MR. SWAMINATHAN:  -- on the criminal defense files
21   and on the sort of first half of the arguments on Brasfield is
22   that really what they have identified for the Court are a
23   series of really cross-examination points that they can make
24   with Brasfield if they want, and, ultimately, what we have is
25   we have a Brasfield on one side and we say, look at Brasfield,

1   look at the criminal defense file analysis that he does, and
2   the jury can reach some conclusions about what's missing and
3   not being turned over.

4           They have State's Attorney's Office files on their
5   side, and they're going to use those to defend against the
6   claims, and they're going to make certain arguments based on
7   that, and we're going to cross Bernard Murray on those files,
8   and we'll see what happens.  But the idea of barring Brasfield
9   or our side of the story is not appropriate.
10  Cross-examination is the way to resolve this.

11          Turning to the other arguments they make about
12  Brasfield, I'll just address a couple of them really quickly.

13          They have one about these 16 files for which there is
14  not a State's Attorney's Office file, so we shouldn't get to
15  rely on those.  You know, obviously, it's not a legal
16  argument.  There's not some legal basis for that request.
17  It's really sort of a fairness argument of sorts.

18          THE COURT:  Yeah, it's 403.

19          MR. SWAMINATHAN:  And the reality is it's not -- you
20  know, the fairness argument ends up hurting us.  Why should we
21  be in the position of not being able to rely on these files
22  and we're really the ones who ultimately suffer?  The simple
23  fact is their position all along, or at least the theory that
24  they've put out there, is the State's Attorney's Office files
25  are the really good stuff.  That's what everybody should care

1    about.

2           They could have subpoenaed any or all of these

3    State's Attorney's Office files anytime in the last two years.

4    They knew which 400-some files were the basement files.

5           THE COURT:  Well, what's the reason to think that

6    they would have gotten them two years ago as opposed to six

7    months ago?

8           MR. SWAMINATHAN:  It's not.  And I'm not trying to

9    really make a temporal argument.  What I'm really trying to

10   say is they could have easily gone and requested State's

11   Attorney's Office files for public defender -- where we didn't

12   have criminal defense files, and they could made arguments

13   based on State's Attorney's Office files where we didn't have

14   a criminal defense file, and they could -- so there's no real

15   reason they couldn't have put themselves in equal footing to

16   us which is to have the benefit of some number of state's

17   attorney files or criminal defense files.

18          THE COURT:  Yeah, you said -- that was said in the

19   response.

20          MR. SWAMINATHAN:  Yeah.  And so that's something very

21   straightforward that they can do.

22          The other point I want to make is they're not totally

23   hopeless here.  If they really think they have an argument

24   that all of this stuff is turned over to the state's attorney

25   anyway in the 40 or so of the 51 files -- sorry -- call it 35

1    of the files.  And they're going to be able to say to the

2    jury, you should assume the exact same thing for the other 60.

3    They're not going to -- they're not going to lose anything

4    there, and they could have made extrapolations and arguments

5    based on that.  They didn't do that.

6         So it's not -- from a fairness perspective, I don't

7    think that's a basis to prevent us from being able to rely on

8    information contained in these files.

9         THE COURT:  So which one are you talking about,

10   Mr. Loevy?

11         MR. LOEVY:  Your Honor, I'm going to -- if it's okay

12   with the Court, I just want to make a few miscellaneous points

13   based on what's been said so far, beginning with the question

14   you asked about Mr. Noland's point that if it's in the state's

15   attorney file, why do we care if it was in the criminal

16   defense file.

17         And I want to add a point to that, which is we don't

18   know when it got into the state's attorney's file.  We know

19   from the stipulation that got worked out some documents got

20   into the state's attorney's file, say, in post-conviction

21   litigation.

22         So it is some evidence that it's in the state's

23   attorney's file, that the state's attorney had it at the time

24   of the trial, but that's not conclusive evidence.  What we

25   argue is the better evidence about whether it was, in fact,

1   given to the -- in the state's file at the time of the trial
2   is whether the state gave it to the criminal defense attorney,
3   because unless they're arguing that the Cook County State's
4   Attorney's Office had a massive policy and practice of
5   withholding Brady material, then whatever made it to the
6   criminal defense attorney is, in fact, the best evidence of
7   what the state had at the relevant time.  And that's a point
8   worth making.
9           At the end of the day, you know, it is not this
10  conclusive that it wasn't in the criminal defense attorney's
11  file, but it is some evidence, if it wasn't in the criminal
12  defense attorney's file, that the state's prosecutor didn't
13  have it, and, therefore, it's admissible.
14          Another miscellaneous point I want to hit is this
15  argument about the files for which the -- the files are
16  missing, and I want to echo on --
17          THE COURT:  The state's attorney or the defense
18  files?
19          MR. LOEVY:  This is the one where the state's missing
20  the files.
21          THE COURT:  Okay.  The 403 argument.
22          MR. LOEVY:  Exactly.
23          And Anand was putting it in terms of fairness.  I
24  mean, this is their defense.  They're saying, no, we didn't --
25  you have evidence that there was a Brady -- policy and

1 practice of Brady problem. We have a defense --

2 THE COURT: It would kind of be like -- I roughly

3 analogize this -- and, again, I didn't think about this

4 before, but there may be law on this. I roughly analogize it

5 to a situation where somebody says, you have a witness on

6 this, my witness died, maybe adds on, it's because you waited

7 so long, and, therefore, you shouldn't be able to use your

8 witness.

9 MR. LOEVY: I think that's what it is. And our

10 argument, I guess it's an abstract question, but that doesn't

11 mean we shouldn't be able to put on our witness. Your witness

12 is dead. You guys can't find it in the warehouse, although

13 these things are in numerical order, your Honor. I mean, the

14 jury doesn't even have to -- the files.

15 THE COURT: Oh, by file number?

16 MR. LOEVY: Yeah. Let them convince the jury that

17 the Cook County State's Attorney's Office literally can't find

18 all these files.

19 So then the witness died. Does that mean we

20 shouldn't be able to put on our witness? That would be unfair

21 to us. We'd be the ones being penalized for the fact that the

22 Cook County State's Attorney's Office apparently doesn't keep

23 these in numerical order.

24 And, your Honor, it is a fact that they can't do the

25 Cook County state's attorney's comparison, and the jury will

1    hear that.  And the numbers in the response were for files for

2    which they were able to find the corresponding file, 74

3    percent were in the criminal defense attorney's file, and for

4    the ones where they couldn't find the criminal defense

5    attorney -- they couldn't find the file in the state's

6    attorney's, it was 68 percent.  Those numbers -- it wasn't 94

7    percent.  We're saying 68 and 74 were in the files, and then

8    the rest were missing.

9          So, you know, this is roughly analogous.  The jury

10   can make of this evidence what it will.  It can give it more

11   weight or less weight, as the jury sees fit.

12         I want to move on quickly, and I always get in

13   trouble when I'm in hurry because I start talking fast, but

14   the idea --

15         THE COURT:  No, you always talk fast.

16         MR. LOEVY:  I talk faster.

17         THE COURT:  You start talking faster, right.

18         MR. LOEVY:  I want to talk about the Brady -- the

19   fact that we're -- you know, Mr. Noland says we've disavowed

20   proving other Brady claims.  And he cites a transcript in

21   April.  He's misunderstood.  What we're saying is we don't

22   have to prove that in every example Mr. Brasfield found where

23   investigative materials didn't make it to the criminal defense

24   attorneys, we don't have to prove that there was a Brady

25   violation because that would involve mini-trials and it would

1    be an unwieldy trial.

2          What we're saying we have -- as Mr. Swaminathan said,

3    we have to show a practice that investigative materials got

4    withheld, that that was the moving force of our violation, and

5    then that their practice creates the risk of the kind of

6    violations that happen here.

7          So that's our position, and it is a red herring to

8    say that we're going to prove 97 Brady violations.  We don't

9    have to, and we're not going to.

10          I want to talk about the Palmer motion quickly.  Our

11   recollection --

12          THE COURT:  You guys didn't tell me either.  I sort

13   of equally fault both sides on not telling me what -- not

14   reminding me what I did on the first trial when I was pretty

15   insistent about that.

16          MR. LOEVY:  And it gets a little worse, your Honor,

17   because our recollection differs from theirs.

18          THE COURT:  Well, but the advantage is we will know.

19          MR. LOEVY:  Yep.

20          THE COURT:  Because when you guys all collectively

21   get to me the page references or the motions or whatever, I'll

22   know the answer.

23          MR. LOEVY:  We will.  And, hopefully --

24          THE COURT:  So what's your recollection?

25          MR. LOEVY:  Well, Mr. Swaminathan's recollection is

1  you barred it on a narrow ground, that Hickey was a 30(b)(6)

2  witness and that wasn't one of the 30(b)(6) topics, so it

3  wasn't fair to ask him about it.  That's why it came out.

4  That's not a substantive ruling.  So if that's true, then I

5  think Mr. Noland's recollection failed him because you didn't

6  say that it was irrelevant.

7          And, you know, our real point, your Honor, is not

8  only is it not irrelevant, but there's no reason to sanitize

9  it.  I mean, this is straight up the middle, extremely

10  relevant, extremely important evidence.

11         What it is is this.  In 1982 there was a class action

12  that brought to the attention of the federal courts and Judge

13  Shadur -- or I guess it was Judge McMillan at the time that

14  there was a real problem at the City for withholding evidence.

15  And it's a notice argument.  You know, they argue hearsay.

16  It's a notice argument.  There was a temporary restraining

17  order hearing, and testimony was taken, and Judge Shadur made

18  the findings that the City has a problem getting street files

19  to criminal defense attorneys.  That was 1982.

20         Now, what this trial is going to be about is having

21  been put on notice that there was a problem, did they fix it.

22  And we have a bunch of evidence that they didn't fix it, that

23  the problem continued.  And you're going to -- you know, the

24  trial, we're going to put on witnesses that say that they

25  didn't fix it, they made this solution, this DS 83101 or

1    whatever it was, we're going to say it didn't work.

2            So notice is an important element of some of the

3    strands of the Monell claim.  There's no reason to sanitize

4    any of this.  This is all straight relevance.

5            THE COURT:  Let me ask you this question.  And I have

6    no idea how I am going to end up ruling on this partly because

7    I don't, you know, have a clear recollection of what I did two

8    years ago.  Or it's actually more like two and a half years

9    ago.

10           But let's say that some reference to what happened in

11   what we'll call the early stages of that litigation ends up

12   coming in.  I take it that part of what -- whether it's

13   explicit or implicit in the defendants' argument is that

14   it's -- there's an element of unfairness in suggesting that

15   what Judge Shadur said was the final word on the topic,

16   there's this later ruling by the Court of Appeals.

17           So if I let you put that in, should I let them put in

18   what ended up happening in the litigation just to blunt any --

19   on the theory that it blunts any kind of unfair inference from

20   it?

21           MR. LOEVY:  Well, what happened in Palmer 2, by the

22   way, is hearsay.  It's Judge Posner pontificating on what he

23   believed happened, and we think he was wrong, but if we're

24   only putting it in not for the substance, we're putting it in

25   for notice, that was in 1982, and then the conviction

1   was 1986, Palmer 2 was 1988, so, you know, it wouldn't

2   technically be relevant what Judge Posner thought did or

3   didn't happen at the time.

4          THE COURT:  So if it's put in for notice, you're

5   saying the ultimate result of the litigation, even if it comes

6   out the other way, doesn't really matter because later on,

7   it's after the fact, and if it's put in for notice purposes,

8   presumably with some kind of a limiting instruction, it's what

9   happened earlier that matters.

10         MR. LOEVY:  Exactly, your Honor.

11         And, you know, we recognize that you considered this

12  question two and a half years ago, but -- you know, and I --

13  and we also believe it was limited on a narrow basis, but when

14  you talked about even a sanitizing, we don't see a reason to

15  sanitize it, Judge.  Mr. Brasfield's opinion explains it,

16  explains how the City was put on notice in detail, because

17  it's a really important part of the case, and then he says,

18  you didn't fix it.

19         So whatever you ruled two and a half years ago, in

20  light of the experts that have been disclosed, we would urge

21  you to take a fresh look at it now.

22         And I don't have much time, but I'd like to move to

23  the fourth motion, the Kuppelberg motion, and just give you

24  our understanding of what's going on here, your Honor.

25         THE COURT:  Okay.

1    MR. LOEVY:  You know, you understand now that Roberts

2 was disclosed by them as a statistics expert who says, you

3 know, you didn't show a citywide practice because the numbers

4 aren't statistically significant.

5    In rebuttal to that, we disclosed Bridges, who

6 says -- first of all, we say it doesn't matter if it's

7 citywide or not.  We think -- you know, just to be clear, we

8 think that showing that the practice existed just as we've

9 shown it is why enough.  But if you accept their argument that

10 we have to show it's citywide, Bridges says, actually, I'm a

11 statistician too, and the funny thing about numbers is they

12 actually support the plaintiffs, not defendants.  Just

13 competing experts on that.

14    But what Bridges relies on, in part, is disclosure

15 made by Mr. Brasfield -- and this is the important part --

16 during the continued fact discovery period.  So Brasfield,

17 during the time you allowed for discovery, made a supplement

18 to the defendants based on the work he had done on another

19 case against the City of Chicago, Kluppelberg -- so it's a

20 little confusing talking about Rivera and Taylor; we're

21 talking about Kluppelberg --

22    THE COURT:  Okay.

23    MR. LOEVY:  -- in Kluppelberg, after the trial you

24 did with Ms. Gorman, the City turned over a street file.  So

25 that didn't even exist at the time of the first trial.

1          THE COURT:  That information -- the street file

2    existed.  The information about the non-production didn't.

3          MR. LOEVY:  Exactly.

4          So we learned about it after.  And then we hired

5    Brasfield, the same expert in Kluppelberg, and he did a

6    statistical analysis, and he disclosed that during the

7    discovery period that based on 400 files, that a certain

8    number of inventories was missing.

9          THE COURT:  Pause for a second, or at least breathe

10   for a second.

11         MR. LOEVY:  Sure.

12         THE COURT:  Facetiously, I'm saying that.

13         So did I hear you say somewhere in there that there

14   was a supplement to Brasfield's original report?

15         MR. LOEVY:  Isn't that correct?

16         May I confer?

17         THE COURT:  Your lawyer is saying no.  Go talk to

18   him.

19         MR. LOEVY:  May I confer?

20         THE COURT:  Yeah, that's fine.

21         MR. LOEVY:  All right.  I have the clarification.

22         THE COURT:  Go ahead.

23         MR. LOEVY:  What we did was in discovery in this

24   case, we produced the Brasfield's report from Kluppelberg to

25   them, and --

1    THE COURT:  Okay.  So you produced his report from
2    the other case.  And when was that produced in connection with
3    when his report in this case was produced?  Before, after, or
4    at the same time?

5    MR. LOEVY:  It would have been after.  That much, I
6    can answer.  And it would have been during the discovery
7    period but maybe not --

8    THE COURT:  Was it before -- was it before Brasfield
9    was deposed in this case or after?

10   MR. LOEVY:  Before, your Honor.

11   THE COURT:  Okay.  Again -- I know I'm taking up some
12   of your time.  I want to make sure I have this straight.

13   So Brasfield's report in the Kluppelberg case which
14   refers to the other cases was produced in this case before
15   Brasfield was testifying.

16   MR. LOEVY:  That's correct.

17   And then what Bridges did in rebuttal was Bridges
18   says, I'm going to rely on some of the analysis in the
19   Brasfield report, and it shows that in a certain percentage of
20   the cases, the inventories were missing, and that is
21   consistent with what I saw in the Nathson Fields area, so,
22   therefore, I am drawing citywide statistical inferences that
23   it was a similar problem everywhere.

24   And I'd like to reserve the rest of my time.

25   THE COURT:  So I need to ask you two questions --

1       MR. LOEVY:  Sure.

2       THE COURT:  -- and they're about motion in limine

3  No. 4.  Motion in limine No. 4 is the one that has to do with

4  the -- I forget which one it has to do with.

5       One second.

6       MR. LOEVY:  We had 4 as the Kluppelberg one.

7       THE COURT:  That's this one.  Okay.  So how do you

8  plan to get it in?

9       MR. LOEVY:  Bridges is going to testify that he

10  relied on data assembled by Brasfield showing just

11  statistically in this number of cases, the inventory was

12  missing, in this number of cases, they weren't.  And he will

13  say -- and based on that, I'll run some numbers and I'll show

14  you statistics, and when all the numbers settle and the dust

15  settles, guess what?  The problem that they showed in Nathson

16  Fields area was consistent with other areas too.

17       THE COURT:  But is anybody going to talk about -- I

18  guess the real question was is anybody going to talk about the

19  Kluppelberg, Rivera, or Taylor cases other than just saying,

20  you know, I reviewed 50 cases and this was one of them?  Is

21  somebody going to talk about the details or what happened or

22  didn't happen in those cases?

23       MR. LOEVY:  I guess in Kluppelberg, we would say yes,

24  just that one case.

25       THE COURT:  Who is that?

1    MR. LOEVY:  That would be Brasfield.

2    THE COURT:  That's Brasfield.  Okay.

3    MR. LOEVY:  So just one case.

4    THE COURT:  All right.  All right.  And then my other

5    question was one of the arguments that Mr. Noland made is that

6    we had this -- we had this -- what he says -- and I'm not

7    necessarily agreeing or disagreeing with him, we had this

8    discovery plan, comprehensive discovery plan, adopted in May

9    or June of 2015 and this wasn't part of it and so I should

10   limit you to that.

11   MR. LOEVY:  Well, may I?  I'm not the one who is the

12   expert on that.

13   THE COURT:  I am not sure you were in at that point

14   in time, not that that matters.

15   MR. LOEVY:  It sounds like Candace was the one who

16   was in it, and this would have been not on anybody's radar

17   except that, as I said, there was a cutoff, and this was

18   pre-cutoff.

19   THE COURT:  When did this information get -- when did

20   the previously unproduced information in Kluppelberg, in his

21   criminal case, get produced?  Do you know historically what

22   the time frame of that one was?

23   MR. LOEVY:  That's a hard one, but I'm going to guess

24   August 2014 because I read a brief recently, and that might be

25   right.

1          THE COURT:  Okay.  Thanks.  Let me give you a quick
2   calculation here.
3          Okay.  So so far, the defendants have used 34
4   minutes, and the plaintiff has used 31.
5          So, Mr. Noland, if you want to talk anymore -- are
6   you still talking over here?
7          MR. LOEVY:  I'm sorry.
8          THE COURT:  I see Mr. Swaminathan --
9          MR. SWAMINATHAN:  I'll just tell you real quick.  On
10  motion in limine 5, we have motion in limine 5 and 6 that they
11  have and we still haven't responded to, so let me give you
12  just a two-second version of a --
13         THE COURT:  Just so you know, you're eating in the
14  time --
15         MR. SWAMINATHAN:  I'm using -- on motion in limine
16  No. 5, they're saying --
17         MR. LOEVY:  Do you want to just stand on what we did?
18         MR. SWAMINATHAN:  Yeah, we're fine standing on the
19  brief.  That's fine.
20         THE COURT:  All right.  So, Mr. Noland, do you want
21  to say anything -- in your remaining 11 minutes, do you want
22  to use them to talk about your motions in limine?
23         MR. NOLAND:  A couple minutes, your Honor.  I'm going
24  to go backwards on my notes.
25         Kluppelberg, it wasn't disclosed by Brasfield in his

1   report in this case. They, in a document, I think included
2   his report from another case but then otherwise didn't
3   identify anything --

4           THE COURT: No, that's consistent with what Mr. Loevy
5   just said.

6           MR. NOLAND: Bridges is not rebuttal on -- there's
7   really two Kluppelberg issues. There's one that -- there's
8   the facts of the underlying case which is really -- which was
9   part of that motion, and then there's this other reliance upon
10  Bridges to the whole host of other files that were never
11  produced in our case that are at issue in Kluppelberg where
12  there's an -- the plaintiff's expert looked at some
13  investigative files in that case, apparently hundreds
14  different from this case, and Bridges is seeking to rely upon
15  it in so-called rebuttal -- and I put that in air quotes -- of
16  Ms. Roberts. That's not rebuttal of Ms. Roberts. Her opinion
17  goes to the statistical flaws and lack of a proper sample set.

18          THE COURT: There's other parts of his report that
19  rebut Roberts but not this part, is what you are saying?

20          MR. NOLAND: Definitely not this part.

21          THE COURT: Maybe you're saying none of it. I don't
22  know.

23          MR. NOLAND: I think there are some parts that do
24  rebut -- certainly not this part. I'm drawing a blank on what
25  the other stuff was.

1       On this particular part, it does not rebut Roberts

2   because she didn't address the statistical validity of that

3   study that Brasfield did which we're seeking to bar as far as

4   just an evaluation of the investigative files.

5       What she talked about is the sample size of the

6   investigative files compared with criminal defense files.

7   That's Roberts' report, and that's what actually Bridges did

8   not respond to --

9       THE COURT:  Okay.

10      MR. NOLAND:  -- or rebut.

11      Palmer 2, as to this issue of notice, so what the

12  plaintiffs would be seeking to introduce is that the City was

13  put on notice of a defective problem that, in fact, did not

14  exist, according to the Seventh Circuit.  So it would be

15  extremely unfair if the one was let in and then the other

16  wasn't.  We don't think any of this should come in.  We think

17  the Court, in the way it came in last time, was appropriate.

18  It's a different policy, different case, and so we don't think

19  it should come in.

20      Just to clarify a point Mr. Loevy made, when I was

21  talking about the percentages, when I said the 93 or 94

22  percent, those are the pages that would be located in the

23  state's attorney's files from the 43 files.

24      THE COURT:  Okay.

25      MR. NOLAND:  As for the 16 -- oh, as to the -- the

1   plaintiffs said that they've got a number of witnesses to lay

2   the foundation from the criminal defense files.  We addressed

3   this in our paper and identified the exhibits.  The witnesses

4   they identified, most of them, there's -- they're paragraphs 1

5   through 8 of their witness list, six of them is where there's

6   no criminal defense file at all, so those six would be

7   irrelevant.  The other two would be where those two criminal

8   defense attorneys are post-conviction attorneys, so wouldn't

9   be able to say what was in at the time of trial.

10          And then as far as a record keeper from the public

11  defender, somebody to simply say that these files were pulled

12  from the warehouse we don't believe establishes the foundation

13  in any way.

14          The issue of subpoenas, the Court had asked a

15  question bout whether it would be a Brady issue.  Our position

16  would be it would be not if the documents were tendered to the

17  prosecutor.  Otherwise --

18          THE COURT:  Well, that's the if, though.  So you're

19  saying it's not if.  In other words, if the only thing that

20  had happened in the underlying criminal case was that a

21  subpoena had gone out from the defense attorney to the Chicago

22  Police Department and they produced some, but not all, of the

23  records, and let's say that some that weren't produced were

24  exculpatory and they weren't otherwise produced by the police

25  to the State's Attorney's Office, then it would be a Brady

1    violation.

2              MR. NOLAND:  Yes.

3              THE COURT:  On the other hand, what you're saying is

4    that if they produced them to the state's attorney and, for

5    whatever reason, didn't produce them to the defense attorney

6    in response to the subpoena, so what?

7              MR. NOLAND:  Yes.

8              THE COURT:  They have already given them to the

9    state's attorney.

10             MR. NOLAND:  They fulfilled their constitutional

11   obligations.

12             THE COURT:  I understand.

13             MR. NOLAND:  Also, just to add a point to that, as

14   Mr. Brasfield acknowledged, there is no evidence in the case

15   that no particular subpoena was not complied with.

16             Plaintiff has offered a new theory, we believe, as to

17   this official policy, beginning with --

18             THE COURT:  Does that matter?

19             MR. NOLAND:  -- with Mr. Art's comment.

20             We believe it matters.

21             THE COURT:  Why does it matter?

22             MR. NOLAND:  It's a surprise to us.  There hasn't

23   been any litigation on it.  There hasn't been any disclosure

24   of it.  We filed -- our motion in limine No. 1 and 2, we talk

25   all about what their theory is, and they didn't bring this

1  issue up at all, so we didn't --

2  THE COURT:  What's the one you think is new?

3  MR. NOLAND:  That there is an official policy within

4  the CPD that would not require the establishment of a practice

5  of other cases to prove a constitutional violation, that there

6  is an official policy by, apparently, the failure to act in

7  some particular way.

8  The plaintiff's theory heretofore and at the last

9  trial was that our policy was state of the art and that -- but

10  that there was a failure to do an audit to make sure that we

11  pursued that.  That's what the allegations in the complaint --

12  that's what this case has been about.  This, we believe, is

13  the first time we're hearing about it now and would have to

14  reevaluate how we're going to be defending the claim,

15  witnesses, et cetera, as to that issue.  So we believe that's

16  new and would be improper.

17  And that is -- we'll reserve the remainder.

18  THE COURT:  All right.

19  MR. NOLAND:  Oh, one more point, your Honor.  We did

20  want to -- there was a ruling that came out in the Kluppelberg

21  case, actually, last week, Judge Lefkow, which the plaintiffs

22  or the plaintiffs -- the plaintiffs here are the same

23  attorneys.  We do not represent the City.  We just reference

24  it to the Court for relevance to the issue of whether or not

25  you can have a claim for underproduction of materials.  It's

1    docket number 359 --

2            THE COURT:  Could I just get your copy of it?

3            MR. NOLAND:  Yeah.

4            THE COURT:  That would be way easier.

5            It's docket number 359 in that case, though?

6            MR. NOLAND:  Yes.

7            THE COURT:  All right.  Thanks.  Okay.

8            MR. NOLAND:  That's it, your Honor.  Thank you.

9            THE COURT:  All right.  So that was another five

10   minutes.

11           MR. SWAMINATHAN:  Let me address this motion in

12   limine 6 --

13           THE COURT:  You guys understand that there's

14   basically going to be no time to talk about the plaintiff's

15   motions.  All of you understand.  You are down to like a

16   handful of minutes left.

17           MR. LOEVY:  What is the score on time, your Honor?

18           THE COURT:  Okay.  I got to turn the clock off right

19   now.  So the defense has used 39 minutes.  The plaintiff has

20   used 32.

21           MR. LOEVY:  Your order said 40, I believe, your

22   Honor, not 45.  What is your intention?

23           THE COURT:  Did I -- I thought my order said 45.

24           MR. LOEVY:  Forty-five.  My mistake.  My mistake.

25           THE COURT:  I said 45.  Yeah.

1    MR. SWAMINATHAN:  I will give you the very short
2  version.  Their motion in limine 6 seeks to bar Bridges.  They
3  just made the point that Roberts is not challenging certain
4  parts of Brasfield's opinions, and, therefore, some part of
5  Bridges should be excluded.
6        It's not clear to me what concession they're making
7  about where Roberts is not challenging Brasfield, but let me
8  be very clear about what Bridges is doing.
9        First, Roberts --
10       THE COURT:  I think what Mr. Noland said, if I caught
11  it right, was that Roberts didn't address the validity, the
12  statistical validity, of Brasfield's report in the other case.
13       MR. SWAMINATHAN:  Okay.  Fair.  So let me --
14       THE COURT:  I got that right, right?  More or less?
15       MR. NOLAND:  That and that issue of the other 440
16  files in this case.
17       THE COURT:  Yeah.  Right.
18       MR. SWAMINATHAN:  So let me be clear about what
19  happened.
20       Roberts discloses an opinion for their side as a
21  statistician that says, you can't --
22       THE COURT:  It's not a good enough sample.
23       MR. SWAMINATHAN:  It's not a good enough sample, and,
24  essentially, you cannot do any extrapolation from the sample
25  to citywide policies for various reasons.

1      Bridges responds by saying, we can show that, in
2  fact, the problems that we're seeing within these basement
3  files in this area apply citywide, and I can do that because I
4  can look at the rate at which there are certain problems in
5  these basement files, and I can look at the rate at which
6  these same problems occur in the Kluppelberg files -- in other
7  words, files from other areas -- and find that the rates are
8  sufficiently similar that when you apply --
9      THE COURT:  So what you're telling me is that even
10  though -- your guy's name is, again, what?
11      MR. SWAMINATHAN:  Bridges.
12      THE COURT:  Bridges.  Even though Bridges relies
13  partly on a different data set than Roberts relied on, it's
14  still rebuttal?
15      MR. SWAMINATHAN:  Absolutely.  That's absolutely
16  right.
17      THE COURT:  Okay.
18      MR. ART:  Your Honor, I'm going to move on to
19  plaintiff's motions in limine.
20      THE COURT:  Okay.
21      MR. LOEVY:  Okay.  Yeah.
22      MR. ART:  And you go at the end.
23      MR. LOEVY:  All right.
24      MR. ART:  And I'm going to speak briefly about motion
25  in limine No. 1 that has to do with Roberts, and the thing

1    that I want to make really clear is everything that's in

2    section 4 of her report on pages 3, 4, and 5, we're saying

3    that she should be able to opine about those issues.  They're

4    within her expertise.  They're based on materials that she has

5    knowledge of.

6           Everything else is both outside of her expertise and

7    contains an awful lot of discussion and critique about

8    Brasfield:  observations about the files, observations about

9    the City's policies and practices when it came to file keeping

10   and production.  It's all based on materials that she never

11   even received.  Her report makes clear she never even reviewed

12   them.  How she came up with these opinions is a total mystery,

13   and besides that, it's way outside of her area of expertise.

14   So she should be limited to what's in section 4 of her report.

15          Motion in limine No. 3 involves Murray's opinions,

16   and the -- we've learned more about Murray since we filed

17   this, and I think it's important to talk about the things that

18   we've learned.

19          THE COURT:  This is motion No. 3?

20          MR. ART:  That's right.

21          THE COURT:  Okay.

22          MR. ART:  So section B of that motion involves

23   Murray's comparison of investigative files to Cook County

24   state's attorney's files.  And the argument we made there is

25   there are 104 pages of discussions about these comparisons

1  with almost no citation to these Cook County state's attorney

2  files that were produced in this case.  Instead, there's a lot

3  of citation to area central basement file Bates stamps, right?

4          And when we were discussing the motion for sanctions

5  that we filed and then withdrew, we learned that what happened

6  is plaintiff identified pages from investigative files that

7  were missing from criminal defense files; defense counsel took

8  those pages to the State's Attorney's Office and tried to find

9  those pages in the Cook County state's attorney's files, where

10  a page was found, a slash was made on them, and then those

11  pages were sent to Murray; and Murray made observations about

12  things that we said were missing from criminal defense files

13  which were, in fact, in the Cook County state's attorney's

14  files.

15          His report curiously does not mention -- you know, it

16  will say seven of the 25 pages that plaintiff says are missing

17  from the criminal defense file are, in fact, in the state's

18  attorney's files, but it doesn't cite those pages at all.  And

19  we think that the reason --

20          THE COURT:  Did somebody ask him that when his

21  deposition was taken?

22          MR. ART:  His deposition is on Wednesday.

23          THE COURT:  Okay.

24          MR. ART:  Of next week.

25          THE COURT:  That answers that.

1          MR. ART:  And we will ask him why that is.

2          We have been told -- so we sent a subpoena asking for

3    all of the materials on which Murray relied.  And in response,

4    we got little snippets of investigative files for each case,

5    let's call it, little snippets of state's attorney files, and

6    little snippets of files from other sources.

7          But Murray's report, which is issued in June, I

8    believe, says, here's what I relied upon.  I relied upon all

9    of these complete investigative files from the CPD, and I

10   relied upon excerpts from, among other things, state's

11   attorney's files.  It doesn't identify what the excerpts were,

12   and I'm told by Mr. Noland that in the large portion of cases,

13   he wasn't provided with state's attorney excerpts until after

14   he issued his report.

15         What it looks like happened is he received just pages

16   from the investigative file that we had identified as missing

17   with an indication from defense counsel about which ones were

18   found in the Cook County State's Attorney's Office.  Okay?

19   And that causes a couple of problems.  It causes the problem

20   we identified in our motion, which is that it's impossible to

21   evaluate the methodology of this expert when we don't know

22   what Cook County state's attorney pages he's relying on.  He

23   says, you know, these seven pages were present, but doesn't

24   identify the pages in his report.  There's no way for us to

25   tell in the vast majority of those 104 pages of case analysis.

1       But the bigger problem, it appears to us now, is that

2   this expert is opining about what happened in the criminal

3   investigations of these cases, what happened in the criminal

4   prosecutions of these cases, what was turned over, what wasn't

5   turned over, whether those things were important, whether they

6   were material in the Brady sense, but he doesn't have the

7   files, so we can't -- he doesn't have the context to tell.  We

8   think all of those opinions should be excluded on that ground.

9       THE COURT:  He doesn't have the whole file, he just

10  has excerpts --

11      MR. ART:  He doesn't have the whole investigative

12  file, he doesn't have the whole state's attorney file, he

13  doesn't have the complete other files.  And we'll ask him

14  about some of these things at his deposition, but we think at

15  the very best, as far as the defense is concerned, this

16  witness needs to be voir dired before he testifies about any

17  of this purported analysis.

18      So that is our principal argument on Murray.

19      There is a separate argument, which is section A of

20  motion in limine No. 3, which is that Murray gives some

21  specific criticisms about Brasfield's comparison of

22  investigative files to criminal defense files.  There are --

23  you know, they are countable, and we set out the pages where

24  those specific criticisms occur.

25      From those, he says lots of things like, so, in

1    general, we can tell, or, in a high percentage of cases, we

2    can tell that Brasfield's wrong.  We think he shouldn't be

3    able to testify about that comparison of investigative files,

4    criminal defense files, in general because he didn't perform

5    that analysis and he didn't audit Brasfield's entire analysis.

6    He picked a number of lines from Brasfield's spreadsheet,

7    which is attachment G to Brasfield's report, and he criticized

8    those.  And he can criticize those at trial, but he should be

9    limited -- and it's sort of a truism -- he should be limited

10   to what he actually put in his report.  And where he didn't

11   show his work, he shouldn't be able to opine generally.

12          And so that's what we have to say about motion in

13   limine No. 3, and I think Mr. Loevy is going to address motion

14   in limine No. 2.

15          MR. LOEVY:  How much time do we have left, your

16   Honor?

17          THE COURT:  Oh, whatever I said before minus 8.  That

18   would be -- you've used 40 minutes.

19          MR. LOEVY:  All right.  Then I'm going to try to talk

20   for two minutes.

21          I just wanted to go back on what Steve was talking

22   about, just to make it totally clear.  Their expert, Murray,

23   wrote a report, 104 pages, with lots of stories, lots of

24   analysis.  Somebody saying like, I have great familiarity with

25   the files, and let me tell you what I think.  This was

1    material.  This was missing.

2           We asked Mr. Noland.  He confirmed on the -- I'm

3    putting on the record right now just today, he said -- I'm

4    sorry.  I left out a step.

5           Murray says in his report, when I made these

6    conclusions, I relied on excerpts from the SAO files.

7           We asked Mr. Noland when did he get the excerpts, and

8    he said, in large part, he got the excerpts after his report

9    was written.  And we said -- and then Mr. Noland said, well,

10   tell us when you gave the stuff to Brasfield.  And we said,

11   well, actually, we gave it to Brasfield before the report was

12   written.

13          So if that's true -- and Mr. Noland will have a

14   chance to put on the record whatever his own version is -- but

15   what he told us was the excerpts were given to Murray

16   afterward.  Then Murray couldn't have written this great

17   report.  His methodology is no good.

18          As far as Roberts, to be clear, you know, I think

19   what could be clarified here is we're only seeking to bar

20   sections 5, 6, and 7.

21          THE COURT:  No, that was made clear.

22          MR. LOEVY:  Okay.  Then Palmer 2.  Palmer 2,

23   Mr. Noland says that the Seventh Circuit said that there was

24   no problem.  That's not true.  That's a hearsay purpose.

25          THE COURT:  Wait a second.  Are we now going back to

1   their motions in limine?

2        MR. LOEVY:  I went out of order, but I just want to
3   talk about Palmer 2 for a second.

4        THE COURT:  Okay.

5        MR. LOEVY:  They cannot say that Palmer 2 stands for
6   their no problem existed.  That's a hearsay purpose.  Judge
7   Palmer, we think, got it completely wrong.  He doesn't know.
8   Palmer 2 was decided on standing grounds, and it might have
9   had something to do with attorneys' fees.  So the fact that
10  Palmer 2 believes that there was no problem doesn't do
11  anything to change the notice.

12       Finally, on the City's hypothetical -- I'm sorry,
13  your hypothetical and the City's response, we do think it's
14  relevant.  Even if the state's attorney had the stuff, if the
15  CPD has a policy of when they get a subpoena from criminal
16  defense attorneys for the street file and they basically say,
17  screw you, we're not turning it over, if in a particular case
18  they had given it to the state's attorney, that might absolve
19  them of the constitutional violation in that case, but it is
20  nonetheless relevant evidence at our trial that they were
21  trying to hide their street files when they give defense
22  attorneys subpoenas for street files, they sometimes said, you
23  know what?  This is not what -- they don't deserve this stuff
24  because we're still stuck in the pre-Brady world.

25       As far as motion in limine No. 2, your Honor, we're

1   going to stand on our papers and reserve our few remaining
2   minutes.
3               THE COURT:  Okay.  Mr. Noland.
4               MR. MICHALIK:  Judge, just very briefly --
5               THE COURT:  Oh, Mr. Michalik.  Sorry.
6               MR. MICHALIK:  -- on motion in limine No. 1 regarding
7   Roberts, they've conceded that section 4 is appropriate, and
8   then they attack some of the other ones.  We will essentially
9   stand on our brief on that.  I just want to make a couple of
10  observations about the arguments that they make.
11              Judy Roberts is a statistician, and as we point out
12  in our response, she is not offering opinions on police
13  practices, she's not offering opinions on completeness of
14  defense files.  What she is doing is she is challenging the
15  assumptions that Brasfield makes in his analysis and his data.
16  She's critical of Brasfield's methodology.  And she point to
17  his deviations from the accepted practice, and she provides
18  examples of that.
19              The other point that I wanted to bring up is they
20  talk about how she comes up with her conclusions is a mystery
21  because she hasn't reviewed any of the underlying files
22  themselves, while everything that she's relying on is in
23  Brasfield's report, and we point that out in our response as
24  well.
25              To the extent that there are any further criticisms

1  that the plaintiffs raise, we'll rely on our response to that.
2          THE COURT:  Okay.
3          MR. NOLAND:  And just as to a couple points as to
4  Mr. Murray, to clarify, Mr. Murray was provided with the
5  entire investigative files, all of them.
6          THE COURT:  When?
7          MR. NOLAND:  Before his report.
8          THE COURT:  Okay.
9          MR. NOLAND:  Long before his report.
10          THE COURT:  The investigative files is what you're
11  referring to as the police department files.
12          MR. NOLAND:  Yes.
13          He was also provided with all of the state's
14  attorney's production, all of -- before he issued his report.
15          THE COURT:  Okay.
16          MR. NOLAND:  The excerpts that we're talking about,
17  this excerpt, he didn't read all of the hundred thousand
18  pages.  That's why we put excerpts in his report -- that's why
19  he put excerpts.  He didn't read through every single page.
20  He had those materials and would review those, and he'll
21  describe his process at his deposition.
22          The excerpts that we're talking about is we had given
23  him the blue slashes as well before the report to identify
24  what was in the state's files that we could locate.  For some
25  of the files before his report, we actually printed off the

1 | SAO Bates page, and he had those, but that was for a minority
2 | of the files.
3 | THE COURT:  Okay.
4 | MR. NOLAND:  For all of them, since then, getting
5 | ready for trial and otherwise, we have printed off all the
6 | pages, and we gave those to him, so that's these excerpts that
7 | I was explaining.
8 | THE COURT:  So, basically, if I am getting it right,
9 | if I can kind of step back from the leaves on the trees and
10 | talk about the forest for a second, what you're saying is he
11 | wasn't just given excerpts before he did his report.  He was
12 | given everything, and all of the post-report stuff that is
13 | happening is more like pretrial due diligence just to double,
14 | triple, and quadruple check everything.
15 | MR. NOLAND:  Yes.
16 | THE COURT:  Okay.
17 | MR. NOLAND:  For trial purposes, we may need those
18 | documents, and also, as your Honor pointed out, to
19 | double-check.
20 | THE COURT:  All right.
21 | MR. NOLAND:  So then the argument that Mr. Murray
22 | should be limited -- his report, in great detail in every
23 | single one of the 59, 60 cases, goes through and evaluates the
24 | actual information which Mr. Brasfield didn't do, and he also
25 | criticizes Mr. Brasfield.  Simply because he went above and

1   beyond what Brasfield did doesn't mean that his opinions, to

2   the extent that Mr. Brasfield isn't barred, wouldn't be

3   admissible.  They're admissible in their own right for the

4   opinions that he's offering.  And, otherwise, I didn't -- it

5   was kind of non-specific as to what they argued as to Murray

6   in that respect.  We think his methodology was perfectly

7   clear, as explained in his report.

8               THE COURT:  Okay.

9               MR. NOLAND:  Thank you, your Honor.

10              MR. LOEVY:  Do we have a remaining minute, your

11  Honor?

12              THE COURT:  Let's see.  So the defense has used 43

13  minutes, and you have used 42.

14              MR. LOEVY:  All right.  Let's go back to Murray.

15  They gave him the investigative files and the state's

16  attorney's production.  All of it had Bates numbers on it.

17              THE COURT:  Yeah.

18              MR. LOEVY:  So here's the concern.  When he wrote his

19  report, he didn't put any Bates numbers on it.  In other

20  words, when he wrote all the stories, the detailed, contextual

21  stories, he could have said, and I found this page missing,

22  and here's the Bates number.  He wrote --

23              THE COURT:  So you're saying there is a flaw in his

24  report?

25              MR. LOEVY:  No.  What I'm saying is he got what he

1    called the blue slash pages.  Let's say on a given file,

2    there's seven pages that were withheld.  Okay?  You can't

3    tell --

4              THE COURT:  From his report which seven.  I get that.

5              MR. LOEVY:  No.  I'm saying you can't tell the

6    meaning of those seven if you're just looking at the seven.

7              Let me back up.

8              THE COURT:  It's not so much about what he thought

9    was or wasn't missing.  It's his opinion about the

10   significance of it?

11             MR. LOEVY:  Yes.

12             And what happened was maybe he truly digested the

13   entire state's attorney's files, and maybe he truly digested

14   the entire basement files and he wrote these stories.  But

15   what I think happened was -- and we'll have to -- you know,

16   probably you should reserve ruling until we depose Mr. Murray.

17             THE COURT:  Yeah, well, I am going to disabuse you of

18   the proposition that any rulings are going to happen before

19   Wednesday right now.  They are not.

20             MR. LOEVY:  When he got from Mr. --

21             THE COURT:  But --

22             MR. LOEVY:  Mr. Noland did --

23             THE COURT:  I will come back to the "but" in a

24   second.

25             MR. LOEVY:  Mr. Noland did the comparison.  He found

1    the seven pages.  Okay?  Mr. Noland's got the key to the lock.
2    Those seven missing pages are what makes the story interesting
3    because when you actually look at the seven pages, you can
4    tell the story, you know?
5          And maybe Mr. Murray figured out the story on his
6    own, right?  Maybe he read the whole state's attorney file and
7    every one of these cases, maybe he read the whole basement
8    file in every one of these cases, but, your Honor, the reason
9    we think he didn't is because then he would have cited Bates
10   numbers.  If he wrote the story based on the Bates stuff, he
11   would have cited Bates numbers.
12         We think that he did not have the key that would have
13   allowed him to write the story until after he disclosed his
14   reports when he got the excerpts.  But time will tell.  We
15   will take his deposition.  If it turns out to be the case,
16   then his methodology is flawed.  That's basically it.
17         THE COURT:  Anything else you want to tell me?
18         MR. NOLAND:  Just briefly, your Honor, he had the
19   missing -- the pages that they claimed were in the criminal
20   defense file that were found in the state's attorney's files.
21   He read -- he had those pages to read.  He didn't evaluate
22   them as missing in his report because the pages he evaluated
23   one by one were the pages that couldn't be located in the
24   criminal defense file, and he explained one by one either that
25   doesn't matter, that was blank, that information was otherwise

1    found.  And so the report is very detailed case by case about
2    what's in there, and he had those pages to review.

3           To us, I got to tell your Honor, we see it as a
4    criticism of Mr. Murray because he didn't cite pages in an
5    expert report.  We don't think that there's a basis for moving
6    to bar an expert.

7           THE COURT:  Okay.  You have about 28 seconds.  I'm
8    being only partly facetious.

9           MR. SWAMINATHAN:  I think the take-home point from
10   our perspective on Murray is that there is no indication in
11   his report that he performed a comprehensive analysis of every
12   single investigative file to every single Cook County state's
13   attorney file.

14          We were told in the litigation about the sanctions
15   motion that that work was done by defense counsel.  We were
16   told exactly how it was done, and then we were told that the
17   excerpts of the investigative files were sent to Murray for
18   his review.  And guess what?  In Murray's report, what do we
19   see?  Citations to excerpts of investigative files.  We don't
20   see anything about the Cook County state's attorney's files or
21   what he observed in those.  And we will take his deposition,
22   and we will find out exactly when he received these -- those
23   excerpts, but there certainly is nothing in his report that
24   indicates that his methodology was to review both files side
25   by side, page by page, and make determinations about what was

1    present in one and missing in the other.

2          THE COURT:  Thank you.  Okay.  Everybody is done now.

3          So let me just ask a couple of questions here.  I

4    know that I had entered a schedule at some point.  It was

5    maybe modified before this, and I don't know if it was

6    modified after it.  I entered a schedule at some point about

7    when witnesses had to be disclosed, when motions in limine had

8    to be filed.  I broke that down between the non-Monell motions

9    in limine and the Monell motions in limine.  I set deadlines

10   for when the expert reports were to be submitted and when the

11   experts' depositions were going to be taken and so on.  And I

12   don't recall -- I could be mistaken about this because the

13   docket in this case has about 1100 entries, I think, maybe

14   more, so why is it that this gentleman's deposition is only

15   being taken now?

16         MR. SWAMINATHAN:  We wanted to resolve the issue

17   relating to the production of state's attorney's files that

18   was the subject of our sanctions motion before taking his

19   deposition.

20         THE COURT:  You wanted to or I wanted to?

21         MR. SWAMINATHAN:  We wanted to.

22         THE COURT:  You wanted to .  All right.  So his

23   report was produced when it was supposed to be produced?

24         MR. SWAMINATHAN:  Correct.

25         THE COURT:  You wanted to get this other issue

1   resolved.

2          So here's the deal, folks.  There's no -- there's no
3   obligation under the rules of civil procedure to take a
4   person's deposition.  It is particularly true for experts
5   because when the Congress -- when the rules advisory committee
6   approved by Congress rewrote the rule in I think it was 1991
7   when they put in the requirement for expert reports, they
8   thought honestly, in retrospect, foolishly, not knowing
9   lawyers, that if the expert report was done properly, maybe
10  the lawyers wouldn't have to take the deposition at all.
11  Okay?

12         So how often does that happen?  Almost never, right?
13  I've seen it maybe twice in 17 years.

14         But if you take the deposition, you're taking the
15  deposition.  And, I mean, this whole issue of unfair surprise
16  and whatnot, some of those issues fall by the wayside and you
17  lose them.  I mean, if you think that his report is deficient
18  in a way that you think is going to convince me to exclude
19  something at the trial, then maybe you shouldn't be taking a
20  deposition.  All right?  If you do, then maybe you're going to
21  be stuck with that.

22         And what is not going to happen -- everybody listen
23  carefully -- is there is not going to be any supplementation
24  of the briefs on these motions in limine.  None.  There will
25  not be any.  People chose to do the deposition when they chose

1  to do it.  You don't have the authority, and I didn't give you
2  the authority, and to the extent I talked about it, I made it
3  clear that you didn't have the authority to alter my
4  deadlines, which is what you would be doing if you filed more
5  briefs.
6        So I don't care what happens in the guy's deposition,
7  or at least I don't care for purposes of whatever you want to
8  file, because you don't get to file anything else, period.
9        That's item number one.
10       Item number two is what I think I want on this
11  question about what rulings I made and what discussion we had
12  in the earlier two trials about the Palmer and Jones issue, I
13  want that filed by way of a joint status report, and I would
14  like it by Wednesday of next week.  That's the 28th of
15  September.
16       There's not going to be any rulings on any of the
17  stuff before you take this guy's deposition.  There's just too
18  much there.  And I still have all the material, the Monell
19  motions, too.  I am not going to even try to give you a target
20  date on when all of this stuff is going to get ruled on
21  because, you know, there's a lot here to go through.  So don't
22  be relying on when you think rulings are going to come out on
23  any of this.
24       So the one other thing that I wanted to talk about --
25  I think it was just one other thing, but let me just check my

1    notes to be sure here.  One second.

2         Ah, yes.  So the issue of time limits, which I put in

3    the order that I entered yesterday on this.

4         So I went back and looked -- since I entered that

5    order, I went back and looked at the April 6, 2014, order,

6    which talked about -- that was between trial one and trial

7    two, I think, or partial trial one and full trial two, about

8    time limits and how the presence in trial two of Mr. Wharrie

9    did or didn't affect things.  Of course, he is now not present

10   in this trial.

11        So I think what I asked you is whether the overall

12   time limits for the previous trial should be altered for this

13   trial.  If so, why and by how much.

14        So let me hear first from the plaintiff on that.

15        MR. LOEVY:  Your Honor, we believe that we can put on

16   our case, both the liability and the Monell, in 10 trial days

17   or less, with a hopeful of less, and by our calculation, 10

18   trial days is about 60 hours.  And we would -- you know, we

19   would be hoping for less, but --

20        THE COURT:  So is that a yes, or -- so --

21        MR. LOEVY:  Yes, we want to modify the order.

22        THE COURT:  You think it should be less?

23        MR. LOEVY:  No, 60.  I thought it was 40.

24        THE COURT:  No.  What was it before?

25        MR. MICHALIK:  You said 38 apiece, I think, last

1   time, Judge.

2          THE COURT:  That was 38 apiece.

3          You want it to be what?

4          MR. LOEVY:  We're asking for 60.

5          THE COURT:  Is this where I get to start citing

6   people back to themselves?  Because I know we discussed this

7   at an earlier date.  And I can go looking for it, but my

8   recollection was that you thought that the case could be tried

9   in the same amount of time it was tried before.

10         When I say "you," I mean you, not you collectively.

11  I mean you personally.

12         MR. LOEVY:  No, I agree.

13         Three weeks -- well, your Honor, we think if we took

14  ten trial days, we're calling most of the witnesses, and I do

15  believe it's a three-week trial.  So I'm not being

16  inconsistent with that.

17         But, you know, usually the defense goes shorter than

18  the plaintiff.  If they were going to insist on --

19         THE COURT:  Sometimes that happens.  Not all the

20  time.

21         MR. LOEVY:  You know, as you may be aware, your

22  Honor, we usually call all the witnesses.  So when I'm

23  saying 10 trial days, I'm talking about most of the action.

24         THE COURT:  Okay.  Mr. Noland or Mr. Michalik?

25         MR. NOLAND:  I think we would want the same amount of

1    time.  If they got 60 --

2         THE COURT:  Yeah.  Well, obviously, you want the same

3    amount of time.  I mean, that's kind of a no-brainer.

4         MR. NOLAND:  We actually thought -- we do remember

5    the hearing before.  We thought that it was going to be in the

6    discussion of 38.  The only caveat we would say on this issue

7    is we think it could be affected --

8         THE COURT:  And I'm asking you this question on the

9    assumption that none of the motions in limine get granted and

10   that everything comes in.  I understand that there is more to

11   the Monell -- under that scenario, there is more to the Monell

12   case in this trial than there was in the previous trial.  I

13   completely understand that.  And so that might call for some

14   addition of time.

15        MR. NOLAND:  So if it was 60, yes, we could do it

16   in -- if we had 60 as well, we could do it.

17        THE COURT:  Yeah.  Sixty per side means a -- you

18   know, really it means a five-and-a-half-week trial because

19   there is no way I get six-hour days every day.  I mean, I can

20   do that on some days, but there is no way I get it every day.

21        And this -- I mean, you know, this is something I

22   have to figure out, but, honestly, and I will be blunt about

23   this, today is what, September the 23rd?  If somebody had

24   suggested to me before that this was going to be a six-week

25   trial --

1        MR. LOEVY:  No.

2        THE COURT:  You just did.  You said 60 hours.

3        MR. LOEVY:  I said 10 days for us, 10 days -- 10 days

4   is two trial weeks, and then their case, since we've called

5   all the witnesses, is the third week because we've called all

6   the witnesses.  They've got some experts.

7        THE COURT:  You said you could put on your case in 10

8   trial days.

9        MR. LOEVY:  Right, which is calling every witness in

10  the case except their experts.

11       THE COURT:  So does that assume they don't ask any

12  questions of any of them?

13       MR. LOEVY:  No.  I'm saying -- I was including their

14  questions.

15       It's still a three-week trial.  It would be --

16  plaintiff would be making a mistake to make this longer than a

17  three-week trial.

18       THE COURT:  Your numbers don't add up.

19       MR. LOEVY:  Ten trial days for all the witnesses,

20  both sides questions, and then they get 10 days to finish --

21       MR. SWAMINATHAN:  Five.

22       THE COURT:  Five.

23       MR. LOEVY:  I'm more looking at -- five.  Sorry.

24  Five days.

25       I'm looking at more as weeks.  We anticipate being

1    able to put on --

2         THE COURT:  Yeah, but that's not how I did it before,

3    and, quite honestly, it does not help me for you to sort of

4    change the method of calculation.

5         So let's say 15 days, 10 hours a day.  That's 90

6    hours.  That means it's 45 and 45, not 60 and 60.  So your

7    numbers don't add up.  The math doesn't work.

8         MR. LOEVY:  All right.  Well, we are --

9         THE COURT:  Which is right?

10        MR. LOEVY:  We're negotiating with you to get as many

11   hours as you will give us.

12        THE COURT:  This is not a negotiation.  I asked a

13   question, and I want an answer to the question.  I am going to

14   decide it at some point.

15        To finish the thought, on anything longer than four

16   weeks, I wouldn't do it without asking for a special panel.

17   It's too late for me to ask for a special panel.  You haven't

18   given me enough time to do that because that requires the

19   clerk's office to pull a whole bunch of names, it requires me

20   to send out pre-advanced notification to everybody saying,

21   there is going to be this four- to five-week trial, are you

22   available, are you not available.  And I don't have enough

23   time to do it at this point.  We have six -- well, it's seven

24   weeks, I guess, before the trial.  Anything is possible, I

25   suppose, but I'm skeptical as to whether that's possible.

1    MR. LOEVY:  We're not proposing it, your Honor, and

2  we're certainly not going back on what we said.  We still view

3  it as a three-week trial.  I'm just not used to calculating

4  hours into trials.  I was thinking about it as a three-week

5  trial.

6    THE COURT:  Okay.  So, first of all, your nose is

7  growing because you've tried at least two cases in front of me

8  in which you have done exactly that.

9    MR. LOEVY:  And every time we end up, you know,

10  rushing and unclear, and it always works out.

11    THE COURT:  Okay.  Mr. Kulwin?

12    MR. KULWIN:  Well, Judge, I did do the hours just

13  based on knowing that the City was going to do most of the

14  witnesses, and I tried to figure out how much for opening, how

15  much for closing, how much to put Mr. O'Callaghan on after

16  they cross him, and then the few small witnesses that I would

17  be doing first, and then zero to 15, 20 minutes on any other

18  witness that's called throughout the case, mostly, I'll be

19  zero, but I don't know.  I came up with around 13 hours; 13

20  to 15 hours.

21    THE COURT:  For what?  Thirteen hours equals what?

22    MR. KULWIN:  Would be everything that I would be

23  doing in the case.

24    THE COURT:  Okay.  So just -- and I am going to

25  disabuse you of something.

1      MR. KULWIN:  Yeah, that's -- and without repeating --

2      THE COURT:  Do you want to hear what I want to

3  disabuse you of?

4      MR. KULWIN:  Sure.  Go ahead.

5      THE COURT:  All right.  So what I want to disabuse

6  you of is the fact that defendants who have been jointly

7  represented through the majority of this case made a voluntary

8  choice to change that does not mean that you are going to get

9  to double up on stuff --

10     MR. KULWIN:  Oh, no.

11     THE COURT:  -- period, end of that discussion.

12     MR. KULWIN:  No, I know.

13     THE COURT:  There is not going to be anything

14  repetitive.  And the fact that Mr. O'Callaghan is separately

15  represented now, to my way of thinking, affects exactly two

16  things, potentially, potentially:  the opening statement and

17  the closing argument, and that's it.  And I'm not sure it even

18  affects that because a part of the opening statement and

19  closing argument that was given by the defense counsel when

20  they jointly represented him would have been devoted to

21  Mr. O'Callaghan.  So maybe it affects it by some marginal

22  amount, but that's it.  It doesn't affect the amount of

23  testimony that's going to be offered because there isn't going

24  to be any duplication.

25          It's kind of a nice thing, in a way.  It's like pages

1  in a brief.  When you have an hour's limitation, you can use
2  it however you want, and when it's gone, it's gone.

3         So, you know, I would say people don't have to
4  duplicate, but if you do, hey, you're just eating people's
5  time, and maybe you can arm wrestle as you go out the door
6  about why are you're using up my time here.

7         MR. KULWIN:  But I would say, Judge, the only reason
8  I added that to the discussion was that's without duplicating
9  anything.  Okay?  That's just only witnesses that I would put
10 on, only Mr. O'Callaghan, only --

11        THE COURT:  So who are these small witnesses that you
12 talked about?

13        MR. KULWIN:  There's like the couple Langston people,
14 you know.

15        THE COURT:  Were they people who were called in the
16 other trial?

17        MR. KULWIN:  Yes.  There's like a couple Langston
18 people.  They called Mr. Carter.  I might be examining him.
19 If not -- you know.

20        And then on every other witness -- and there's
21 Mr. O'Callaghan.  I'll tell you.  Given what's going on in
22 this case, I'm being very careful about how he's put on, and
23 it's going to take a while.  Depending on how you rule on the
24 motions in limine, I mean, it might be shorter or longer.
25 Right now, I'm working on the assumption that they're all

1    denied, everything is coming in --

2         THE COURT:  Fair enough.  Which is what I asked you

3    to do, which is --

4         MR. KULWIN:  I just wanted to elucidate it.  And

5    that's not duplicating anything because I have talked to the

6    City about what I could cover in opening statement or closing

7    argument.

8         THE COURT:  And what they would cover.  Okay.

9         MR. KULWIN:  I just wanted to throw that in.

10        THE COURT:  All right.  So let me just go back to a

11   calendar here for a moment.

12        So one way or another, you got to expect that this

13   case is extending, is straddling, Thanksgiving.  I am just

14   waiting for a calendar to pop up here, so give me just a

15   second for that.  Here we go.

16        MR. LOEVY:  That's kind of a bummer.  Have you ever

17   done a trial that straddled Thanksgiving, your Honor?

18        THE COURT:  As a lawyer or as a judge?

19        MR. LOEVY:  As a judge.

20        THE COURT:  Yes to both.  And it is a bummer.  And,

21   you know, life stinks sometimes.

22        There's no other way to do it unless you people tell

23   me you can try the case in like nine days.  Because the 14th

24   of -- actually, eight days, because the 14th of November

25   leaves you eight days before the Thanksgiving holiday.

1    So the plan will be we'll probably stop at -- we'll
2  probably stop at the lunch break on Wednesday the 23rd.  And
3  I'll put that in whatever order that I am entering.

4    But the difficulty was that I wasn't comfortable --
5  and I don't know that I'm reconstructing this correctly, but I
6  think the idea was -- so, first of all, I was trying to work
7  around a bunch of trial dates.  I had a whole bunch of lawyers
8  in this case, and you are all flinging trial dates at me.  I
9  was trying to work around trial dates.  That one seemed to
10  work.

11    Maybe in the back of my mind was the idea that if I
12  had you start the Monday after Thanksgiving, aside from the
13  fact that I am ruining everybody's Thanksgivings for a
14  separate reason -- which, you know, I can name you the judges
15  by name that did that to me over the years, even though some
16  of them were 34 years ago, 33 years ago -- I was not
17  comfortable that we would be finishing up -- in other words,
18  we might have a jury going out to deliberate like the Friday
19  before Christmas, which is on a Sunday this year, which I was
20  not comfortable with.

21    So, anyway, the trial date is what it is, and, yeah,
22  it's not great to go over Thanksgiving, but sometimes stuff
23  happens.

24    All right.  I steel myself before I ask this
25  question.  Are there other things you want to bring up with

1   me?

2           Sorry I asked.  Go ahead, Mr. Kulwin.

3           MR. KULWIN:  Just a point of curiosity, Judge.  And I

4   may be wrong.  Maybe you have done this already.  Are you

5   setting a pretrial conference date?

6           THE COURT:  We've had it.  That's been what we have

7   been doing here.  That's the arguments on motions in limine.

8           So, actually, let me tell you a few things to the

9   extent you don't know them.  Now, you would be the only person

10  who wouldn't have this experience -- actually, you came close

11  to trying a case before me.

12          MR. KULWIN:  Close.

13          THE COURT:  Close.  But we would have talked about

14  all this.

15          So I will bring in more than the normal number of

16  jurors for a civil case here because of the length of trial

17  and because of the subject matter.  I will prepare before

18  trial a draft of a written questionnaire that all of the

19  prospective jurors will fill out.

20          I need -- if you have given it to me already, but it

21  doesn't hurt to give it to me, somebody take out a sheet of

22  paper, and I need no more than two names per side, and

23  Mr. Kulwin is a side, so give me no more than two email

24  addresses, and at some point before the trial date, I will

25  send you a draft of that questionnaire asking for comments.

1       The jurors fill out that questionnaire somewhere
2  else.  We duplicate it, give copies.  Those copies are
3  organized in the sequence in which we get from the jury
4  department that the jurors are going to be called.

5       The jurors get brought up here.  I give them the
6  basic pep talk; and actually, in a longer case, more than the
7  basic pep talk.  And then the entire panel will be questioned
8  by me, unless we get to a point where it's obvious that we
9  don't need to question several people at the end, in which
10 case, we will stop.

11      There will be some things that we will have to cover
12 at sidebars on various subjects.  At some of those sidebars, I
13 may permit the lawyers to ask questions directly on those more
14 pointed things.  It tends to have to do with people with prior
15 experience with the legal system or with the police or things
16 like that.

17      At the end of -- once all the people are questioned
18 and the panel is qualified, we will do challenges for cause.
19 I will rule on all of those.  You will know who is left.  I
20 will give you some amount of time to do peremptories.  I am
21 not going -- how many did I give you last time around?

22      MS. GORMAN:  I want to say five.

23      THE COURT:  Well, somebody needs -- that needs to go
24 in the joint status report that you're giving me on this other
25 thing too, how many peremptories there were last time.  I

1   don't need guesses.  I want specifics.  It's not going to be
2   any more this time.  It will be the same.  And, arguably, it
3   should be less because Wharrie is not in this trial, and he
4   was a person with a distinct, separate interest because of the
5   potential for fingerpointing between the state's attorney and
6   the police department.

7        But there's not going to be any more than that.  We
8   will go back and forth on the peremptories, plaintiff,
9   defendant, plaintiff, defendant, until we are done.  Then the
10  first 12 people on the list who aren't struck will be the
11  jurors.  They are all regular jurors.  I always pick 12.

12       There's a good chance we will finish that by the
13  lunch break.

14       Did we do -- were there background checks done in
15  prior trials in this case?

16       MR. NOLAND:  Yes.

17       THE COURT:  The same procedure will apply.  And I am
18  pretty sure there would have been a written order about that,
19  so you need to go looking for that.  And, basically, I am
20  going to give you the nutshell version of that.

21       If -- my understanding is that what happens is that
22  the attorneys representing the City have access to what is
23  called the LEADS system, L-E-A-D-S, I think.  You have to run
24  every prospective juror.  You have to bring in all of the
25  material that is produced, that's generated, and it has to be

1   here before we get to the cause challenges.

2          If any one of those three conditions is not met, you
3   don't get to use it, period, and you have waived it, in my
4   view, or forfeited it or whatever the right lingo is.

5          Anyway, we'll be expecting that -- you will be
6   expecting that you will be doing opening statements in the
7   afternoon.  I instruct the jury before opening statements.
8   The instructions don't -- are not limited to the general
9   cautionary stuff, but they also include elements instructions,
10  which is another thing that I will get you at some point
11  before the trial, maybe just a couple of days before, by
12  email, a draft asking for comments back.  And I will give you
13  a chance to put any objections to those on the record before
14  they're given to the jury, probably early that morning while
15  we are waiting for the jury to come up.

16         The jurors will -- they will be displayed on the
17  screen.  The jurors will not have copies of them because there
18  is a chance, sometimes a decent chance, that the instructions
19  will change before the end of the case.  I don't want to have
20  competing paper versions of them running around out there.

21         So instructions, then openings, then witnesses.
22  Depending on how long or how short your openings are, we will
23  or won't get to witnesses on that first day.  Tell me.  I will
24  put something in the order about -- in the time allocation
25  order about the schedule, how late we will go.  Figure it's

1     going to be probably 5:00 o'clock.

2           You need to make some decisions, I think -- this is
3     just an aside -- make some decisions on are you going to be
4     ordering the transcript and under what means and mechanism and
5     speed and whatnot, and just let my court reporter know
6     sufficiently in advance so that she can make whatever
7     arrangements are necessary.

8           At the -- I allow jurors to ask questions.  They do
9     that by -- I give them an instruction about it at the
10    beginning of the trial.  They write them out.  We take them
11    all over to -- after the lawyers are finished questioning the
12    witnesses, I ask the jurors if they have questions.  We
13    collect them.  We take them over to sidebar.  We discuss them.
14    I hear any objections that the lawyers have to questions.  I
15    rule on the objections.  Sometimes I have to reword the
16    questions.  Any questions that I conclude are appropriately
17    asked, I put them to the witness.  And then I give everybody a
18    chance to follow up.

19          The time for the -- the time for us discussing the
20    jurors' questions and the time for the witnesses answering the
21    jurors' questions doesn't count against anybody's allocation,
22    but if you ask follow-up questions, it does.

23          At the end of the trial -- at the end of the trial, I
24    instruct the jury before closing arguments.  Again, display it
25    on the screen, but they also have copies at this point.  It's

1   okay to quote from, display, read from, et cetera,

2   instructions in your closing argument.  I don't recall whether

3   in 2014 we had the system by which the jurors saw all the

4   exhibits.  The individual --

5              MR. MICHALIK:  Yes.

6              THE COURT:  We did have them?  So the one thing I am

7   not sure that -- did we have the thing where they -- where you

8   had to give my courtroom deputy a thumb drive so they would

9   all get uploaded?  May not have had that.

10             So here's -- in some but not all the courtrooms quite

11  yet there is a gigantic screen back in the jury room, and the

12  exhibits that are admitted in evidence are uploaded.  There is

13  something on the court website about this.  It's called

14  J-E-R-S, jury evidence recording system, I think.  And there's

15  instructions on what you need to do.

16             Anyway, they all get uploaded.  We always have to

17  have a paper backup copy because systems go down, and they

18  have in at least one case that I tried.  But they call up the

19  exhibits that have been admitted in evidence back there.  What

20  that means is that before the trial, you have to get -- first

21  of all, there is a numbering convention, how things are to be

22  numbered.  You don't get to call exhibits -- you know, the

23  U.S. Attorney's Office used to call exhibits by cute little

24  names.  Nobody gets to do that anymore.  It's numbers and

25  letters and things like that.  That's all in the description.

1   It's on the website.

2           But you have to get a thumb drive or drives to my

3   courtroom deputy before trial so that she can preliminarily

4   upload everything.  And then what happens is when exhibits get

5   admitted in evidence, they get clicked on, and those are the

6   ones that the jury sees.  But then we have to have a backup

7   paper copy.

8           So that's all I can think about in terms of personal

9   quirks and foibles and stuff like that.

10          So any questions or anything else you want to bring

11  up?

12          MS. GORMAN:  Your Honor, I have one issue with the

13  file cabinet.

14          THE COURT:  Oh, we got that again.  I assume we are

15  going do the same thing we did the first go-around?

16          MS. GORMAN:  The only other problem with that is that

17  you gave the City permission to disburse the files.  And so

18  you entered an order --

19          THE COURT:  Well, I don't know whether what you just

20  said is exactly correct or not.  I don't recall what I did.  I

21  don't recall whether I did it before I granted the new trial

22  or after the new trial.

23          MS. GORMAN:  It was just before, and I have a copy of

24  the order.

25          THE COURT:  May I see it?

1          Oh, yeah.  I had a fail-safe in there.  If the Court
2   deems it necessary, the City of Chicago agrees it will
3   retrieve the logged files and return them to the file cabinet
4   in the order listed on the log.
5          Yeah, I am pretty sure I hadn't done something that
6   was -- put it beyond the point of no return.
7          MS. GORMAN:  So I think what I wanted to ask --
8          THE COURT:  You want me to tell them to do that.
9          MS. GORMAN:  Yes.
10         THE COURT:  Do that.
11         MR. MICHALIK:  All right.  I think last time, Judge,
12  we needed an order to actually have the thing brought over.
13         THE COURT:  Draft something and get it to me.  That's
14  not a problem.  Yeah, you have to have an order to get it in
15  the building and out of the building.
16         MS. GORMAN:  Thank you.
17         THE COURT:  Okay.  What other things?
18         MR. LOEVY:  Nothing from the plaintiff, your Honor.
19         THE COURT:  What?
20         MR. LOEVY:  Nothing from the plaintiff.
21         THE COURT:  Anything else you can think of?
22         MR. NOLAND:  No, your Honor.
23         THE COURT:  All right.  Fine.  So we need to have --
24  I'll ask this, although I know what the answer is.  I assume
25  there's no settlement discussions going on?

1       MR. LOEVY:  There was discussions.  We --

2       THE COURT:  You had some after one of the trials.  I

3    forget which one.

4       MR. LOEVY:  Maybe the City has a different

5    perspective, but from ours, twice now we've reached a point

6    where we communicated a demand, and twice now we've never

7    gotten any response, not the courtesy of a yes, no, or

8    nothing.

9       THE COURT:  Well, that means discussions haven't gone

10    anywhere.

11       MR. LOEVY:  Apparently.

12       THE COURT:  All right.  Well, if something changes

13    about that, let me know, because it would be nice to know

14    ahead of time, if possible, whether I can not set aside

15    however many weeks we are talking about now here.

16       MR. LOEVY:  That's what motivated my comment as well.

17       THE COURT:  So why don't I have -- I think I want to

18    have just a check date with you for a status in case there's

19    anything that comes up, but in terms of pretrial conference,

20    we have done it at this point.  There's nothing more to do.

21          So I've got to kind of wedge this in.  I'd say I'd

22    like you to come in on the 3rd of November at 9:30 for a

23    status.  That will be about 10 days before the trial date.

24       MR. KULWIN:  3rd of November?

25       THE COURT:  3rd of November.

1          MR. KULWIN:  I'm sorry.  What time, Judge?  9:30?

2          THE COURT:  9:30.

3          MR. KULWIN:  3rd of November?

4          THE COURT:  Correct.

5          MR. KULWIN:  Got it.

6          THE COURT:  Okay.  Everybody have a nice weekend.

7  Take care.

8          MR. LOEVY:  Thank you, Judge.

9          MS. GORMAN:  Thank you.

10   (Which were all the proceedings had in the above-entitled

11  cause on the day and date aforesaid.)

12    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

13

14  _____      _____
Carolyn R. Cox               Date
Official Court Reporter

15  Northern District of Illinois

16  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

17

18

19

20

21

22

23

24

25