# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATHSON FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| DAVID O'CALLAGHAN, | ) | |
| and JOSEPH MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |

## CORRECTED
## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Nathson Fields sued Chicago police detectives David O'Callaghan and Joseph Murphy and the City of Chicago[1] under 42 U.S.C. § 1983 and state law for claims arising from his prosecution for the 1984 murders of Talman Hickman and Jerome Smith. Fields was convicted and sentenced to death in 1986. His convictions were affirmed on appeal but were overturned on post-conviction review in 1998. Fields was acquitted on retrial in 2009. He filed this lawsuit in 2010.

The first trial in this case, held in March 2014, resulted in a mistrial after seven days of trial when defendants introduced prejudicial testimony that the Court had excluded in a pretrial *in limine* ruling. *See Fields v. City of Chicago*, No. 10 C 1168, 2015 WL 12806567 (N.D. Ill. Nov. 6, 2015) (imposing a sanction on defendants'

---

[1] Fields dismissed his claims against former detective Joseph Brannigan shortly before the 2016 trial in this case.

counsel).[2] The second trial, held in April 2014, ended in a finding for Fields on one of his claims against O'Callaghan and for the defendants on the other claims. The jury awarded Fields $80,000. The Court later ordered a new trial. The Court's ruling was based on newly-discovered evidence concerning a key defense witness, who had been released on parole shortly after the trial even though he has been expected to remain in prison for 13 more years, as well as the Court's conclusion that it had erroneously limited discovery on Fields's *Monell* claim against the City and had given the jury an erroneous instruction on the *Monell* claim. *Fields v. City of Chicago*, No. 10 C 1168, 2015 WL 13578989 (N.D. Ill. Apr. 7, 2015).

Fields then retained new, additional counsel to represent him. O'Callaghan also retained new counsel. The case was retried in November-December 2016. The jury found for Fields against O'Callaghan and Murphy on one of his claims against them under section 1983; for Fields against the City on his *Monell* claim under section 1983; for Fields against O'Callaghan only on a state-law claim for intentional infliction of emotional distress (IIED); and for the defendants on the remaining section 1983 and state law claims. The jury awarded Fields compensatory damages of $22 million, as well as punitive damages of $30,000 against O'Callaghan and $10,000 against Murphy.

Defendants have moved under Federal Rule of Civil Procedure 50(a) for entry of judgment as a matter of law and under Federal Rule of Civil Procedure 59(a) for a new trial.

---

[2] The Court's opinion imposing a sanction on defendants' counsel was later vacated at the joint request of defendants' counsel and Fields, who advised the Court that the monetary sanction had been paid. *See* Order of Dec. 8, 2015 (dkt. no. 901).

**A.      Motion for entry of judgment[3]**

A court may enter judgment as a matter of law in a party's favor only if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is [not] sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011).  A jury's verdict may be overturned "only if no reasonable juror could have found in the [prevailing party's] favor." *Id.*  The court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier–Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).  In addressing defendants' motion, the Court assumes general familiarity with the case.

**1.      Claims against individual defendants**

The evidence, viewed in the light most favorable to Fields, amply supported the jury's verdicts on the claims on which it found in his favor against O'Callaghan (due process and IIED) and Murphy (due process).  First of all, the Court rejects defendants' attempt to divide Fields's due process claim into two separate claims, one involving his prosecution through the 1986 criminal trial and one involving his continued prosecution through the retrial in 2009.  Fields asserted a single due process claim; the jury was instructed accordingly; and defendants interposed no objection to that instruction.

Fields contended, and the evidence supported, that O'Callaghan and Murphy falsified incriminating evidence and concealed favorable evidence, and that he was

---

[3] Fields contends that a number of defendants' arguments in support of their motion for entry of judgment have been forfeited because they were not argued or were argued in cursory fashion at trial.  Certain of these points have merit, but to ensure a complete record on appeal the Court will bypass forfeiture issues and will, with an exception of two, address the merits of defendants' contentions.

deprived of his liberty as a result. This includes evidence from which the jury reasonably could infer, among other things, that Murphy pulled a group of suspects, including Fields, more or less out of the air and turned them over to O'Callaghan; O'Callaghan in turn fabricated identifications by witnesses who had no real opportunity to see the perpetrators; Murphy caused the fabrication of a purported admission by Fields to Anthony Sumner; O'Callaghan had responsibility—perhaps along with others— to review a police investigative "street file" and provide it to Cook County prosecutors; Murphy, too, had information placed in the street file (a request for photographs used to purportedly identify the perpetrators); and the street file, which was never turned over, contained information that a reasonably competent defense attorney could have used to show the existence of reasonable doubt. This, along with other evidence introduced by Fields, plainly supported due process claims against O'Callaghan and Murphy. *See, e.g., Avery v. City of Milwaukee*, 847 F.3d 433, 439-40 (7th Cir. 2017).

Defendants contend that the bribery of Judge Maloney in connection with the 1986 criminal trial eliminates any possibility that defendants' misconduct caused Fields's injury. The 1986 trial may have been corrupted by bribery, but that does not wipe out defendants' liability for the foreseeable results of their conduct—specifically, Fields's conviction for murder. As the court of appeals stated in an earlier appeal in this case, "[h]e who creates the defect is responsible for the injury that the defect foreseeably causes later." *Fields v. Wharrie*, 740 F.3d 1107, 1111-12 (7th Cir. 2014). In any event, direct evidence of Judge Maloney's *specific* motivation was not introduced. What was introduced is evidence that he was bribed; returned the bribe and convicted the defendants; and that the corruption undermined confidence in the outcome, requiring

the vacating of the convictions. The jury reasonably could find that absent the defendants' misconduct, there would have been no evidence at all to support a conviction. The evidence against Fields consisted of eyewitness identifications, which the jury reasonably could find had been fabricated by O'Callaghan, and the testimony of Sumner, which the jury reasonably could find had been fabricated by Murphy.[4] The jury reasonably could conclude that without this evidence, the charge against Fields would have been dismissed or Maloney would have felt compelled to acquit him irrespective of the bribery scheme, and that this same evidence was what enabled him to convict Fields.

Assuming it was necessary for Fields to demonstrate that the fabricated and withheld evidence was material to his reprosecution after the reversal of his 1986 conviction, the evidence supported that.[5] Cook County prosecutor Brian Sexton testified otherwise, but the jury was entitled to find that he was biased and, that aside, was not required to accept his testimony. The question—as the Court's instructions told the jury, without objection by defendants—was what would influence a reasonable prosecutor, not what Sexton said influenced him. There was evidence that the primary evidence used against Fields to continue the prosecution after the reversal included

_____

[4] Even though Fields may have known the witnesses were lying, "the material question is whether [plaintiff] was aware of the impeachment evidence." *Avery*, 847 F.3d at 443. If "he did not have the evidence that would help him prove that the [witnesses'] statements were false," then his due process rights were violated. *Id.*

[5] The evidence also supported a finding for Fields on the theory that defendants were liable because he was prosecuted through 2009 and held in custody through 2003 based on material fabricated and withheld evidence, and that the corruption of the 1986 trial, which ultimately was declared in effect a nullity, was not a significant event in this process in terms of liability or causation.

significant fabricated identifications and also that Sexton would have turned over the "street file"—which a jury reasonably could find contained material exculpatory evidence that a competent defense attorney could have used to show reasonable doubt—had he known about it. The jury was entitled to infer from this that the fabricated and withheld evidence was material irrespective of Sexton's denial.[6]

Finally, defendants' contention that Fields's acquittal bars his claim lacks merit. Unlike a defendant who is released after his arrest and is later acquitted, Fields *was* deprived of his liberty; he was held in custody from 1984 through 2003. This is more than sufficient to support his due process claim. *See, e.g., Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016). The key to a due process claim is not a conviction but rather a deprivation of liberty. *See id.* at 833; *Armstrong v. Daily*, 786 F.3d 529, 553-55 (7th Cir. 2015) (affirming denial of dismissal where destruction of exculpatory evidence caused accused to spend three more years in prison pending retrial until charges against him were dismissed). The Court also notes that defendants interposed, and still interpose, no objection to the instructions to the jury on the due process claim, which did not suggest that the 2009 acquittal undermined Fields's claim or any part of it.

With regard to the claim of intentional infliction of emotional distress, the same points discussed above likewise support the jury's verdict against O'Callaghan. In addition, defendants argue that O'Callaghan could not possibly have had the intent to inflict emotional distress upon Fields because he did not know Fields before 1985. This misses the point. The jury reasonably could find that O'Callaghan essentially pinned the

---

[6] The Court rejects defendants' contention that Fields was required to present expert testimony on this point; they offer no authority that supports this proposition.

case on Fields because he was a member of the El Rukn gang, in willful disregard of whether he was an actual perpetrator. Finally, even if O'Callaghan did not participate in making the decisions to charge or retry Fields, a tortfeasor is liable for the natural and probable consequences of his wrongdoing.

### 2. Claim against City

The City also challenges the sufficiency of the evidence to support the jury's finding of liability on the *Monell* claim.[7]

The City contends there was no evidence that any *other* street file containing material exculpatory or impeachment evidence was withheld. It is true that to prove an official policy, custom, or practice under *Monell*, a plaintiff "must show more than the deficiencies specific to his own experience." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). But the plaintiff "need not present evidence that these systemic failings affected other specific [persons]." *Id.* at 735. Fields's evidence, including evidence of systematic underproduction of police reports,[8] was sufficient to show a systemic failing that went beyond his own case. The City and police department were on notice, via the *Jones/Palmer* litigation and the department's own subsequent internal inquiry, of deficiencies in its recordkeeping and record-production practices that, at least in some

---

[7] Again, the Court will bypass the issues of forfeiture asserted by Fields, at least some of which have merit, and deal with defendants' arguments on their merits to ensure a full record on appeal.

[8] The Court overrules, as it did before and during the trial, defendants' contention that Fields's comparison methodology was fatally flawed. Defendants' attack on the methodology involved its weight, not a fundamental deficiency that rendered it insufficient to support Fields's claims. The jury reasonably was entitled to infer from this and other evidence introduced by Fields that there was systematic underproduction of exculpatory materials to prosecutors and defense counsel.

situations, led to harm. And Fields offered evidence that permitted a reasonable jury to find that the policies instituted to deal with these problems were insufficient to correct them. Under *Daniel*, policymakers' knowledge of deficiencies and failure to correct them suffices; "[a]n unconstitutional policy can include both implicit policies as well as a gap in expressed policies." *Daniel*, 833 F.3d at 734, 735. The gaps here include, but are not limited to, insufficient or unnecessarily subjective instructions regarding what materials had to be maintained, insufficient instructions on producing materials to prosecutors, and the absence of any supervision or after-the-fact auditing.

The verdict on the *Monell* claim is also sustainable on other bases, as Fields argues, *see* Pl.'s Resp. at 14-25, but the Court need not deal with those points expressly, as the verdict need only be sustained on a single basis.

**B.     Motion for new trial**

In seeking a new trial, defendants do not challenge any of the instructions that the Court gave to the jury. Rather, they argue that the jury's verdict was against the manifest weight of the evidence, and they assert a lengthy laundry list of purportedly erroneous rulings by the Court before and during trial, mostly concerning the admissibility of evidence or the propriety of counsel's arguments. A new trial is appropriate under Federal Rule of Civil Procedure 59 only "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).

**1.     Weight of the evidence**

A court may set aside a verdict as against the manifest weight of the evidence "only if no rational jury could have rendered the verdict. The . . . court must view the

evidence in the light most favorable to the prevailing party, leaving issues of credibility and weight of the evidence to the jury." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444–45 (7th Cir. 2009). The verdict must be upheld so long as there is a "reasonable basis in the record" to support it. *Flournoy v. City of Chicago*, 829 F.3d 869, 874 (7th Cir. 2016) (internal quotation marks omitted).

The Court overrules defendants' challenge regarding the weight of the evidence for the same reasons it overruled their motion for judgment as a matter of law. As the Court has discussed, there was a more-than-reasonable basis in the record to support the jury's liability findings.

## 2. Claimed errors on evidentiary and other pretrial and trial rulings

Defendants' remaining grounds for seeking a new trial largely involve challenges to rulings by the Court admitting or excluding evidence. A new trial is warranted on such grounds only if the Court's ruling on the particular point was erroneous and the error had "a substantial or injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis*, 590 F.3d at 440; *see also Doornbos v. City of Chicago*, ___ F.3d ___, 2017 WL 3574812, at *4 (7th Cir. Aug. 18, 2017).

As indicated earlier, defendants cite a laundry list of alleged errors by the Court. The Court will address them in the sequence in which defendants argue them in their opening memorandum, with some exceptions.

### a. *Jones/Palmer* evidence

The Court permitted Fields to introduce, via retired Chicago police lieutenant James Hickey, the following points that related directly or indirectly to the case of

*People v. Jones* and the case of *Palmer v. City of Chicago* (in summary):

- In or about 1982, in *Jones*, a homicide detective disclosed the existence of undisclosed police investigative files.

- This put the City on notice that there was a problem that needed to be addressed, sometimes involving pertinent information not being recorded in official police reports and not being turned over to the criminal justice system.

- Hickey was tasked with attempting to identify current practice and report to the superintendent of police.

- The superintendent issued a directive in 1982 to preserve all investigative files.

- Hickey drafted a proposed policy change that was adopted in 1983, requiring recordation and preservation of any relevant information obtained by a detective during the course of a violent crime field investigation. This included a specific format, called a "general progress report," for recording a detective's notes. These were to be maintained in an investigative file and turned over to the criminal justice system in connection with an ensuing court case.

The Court permitted Fields to introduce, via its police practices expert Michael Brasfield, the following points related to *Jones* and *Palmer* (in summary):

- In 1982, George Jones was prosecuted for a murder. A detective obtained information exculpatory of Jones, wrote it up, and put it into an investigative file. The information was not disclosed to Jones's attorney. When the detective learned that the case was proceeding, he went to the defense attorney and shared the exculpatory information.

- There was litigation in 1982-1983, the *Palmer* case, in which the plaintiffs alleged

that the Chicago police had a practice of suppressing investigative information similar to what had occurred in the *Jones* case. In 1982, a federal judge entered an order requiring all investigative documents to be retained.

- The City's policymakers were called upon to testify and were put on notice of the lawsuit. In response to the litigation, the City instituted policies requiring preservation, retention, and non-disposal of investigative files and making them available in criminal matters.

- The problem persisted after this, and the City did not do an adequate job of remedying the problem. It left too much leeway to detectives to determine what was relevant, and it did not establish guidelines regarding how materials were to be produced or for after-the-fact auditing. There was also inadequate training. This was a problem given the department's practice of creating parallel files that had become ingrained.

As indicated, this testimony included limited and circumscribed evidence regarding the *Jones* and *Palmer* cases, all of it predating the relevant events in this case. This was admitted, in a series of rulings the Court made after extensive argument, for the purpose of showing that the City had notice of claimed deficiencies in the police department's prior practices. *See* dkt. no. 1076 at 8. The Court excluded, on defendants' objections, a significant amount of additional evidence that Fields wanted to introduce regarding the *Jones* and *Palmer* matters.

The Court excluded, over defendants' objection, a ruling made by the Seventh Circuit in the *Palmer* case in 1986, *after* the events relevant to the creation of the policy challenged in Fields's case and *after* the creation of the street file in Fields's case.

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1986). The ruling was made on an appeal from an attorney's fee award. The City wanted to introduce the court of appeals' statement that the plaintiffs in the *Palmer* case had not uncovered any situation in which a class member had been convicted in violation of the constitution or in which there was exculpatory material in street files. Contrary to defendants' argument, the Court properly excluded this. It had no bearing on the question of notice at the relevant time. And the exclusion did not leave the jury with an unfairly erroneous understanding of the relevant points concerning *Palmer*. The Court did not admit any finding from *Palmer* that was contrary to the points defendants cite from the court of appeals' ruling. Rather, plaintiffs' evidence regarding *actual* exculpatory material in street files concerned *Jones*—which was summarized in an accurate and even-handed way—Fields's own case, another particular case offered by Fields, and analysis by Fields's expert of discrepancies between police files and materials obtained by criminal defense attorneys. The Court also notes that defendants have offered no argument challenging the Court's determination that the court of appeals' later findings amounted to inadmissible hearsay (contrary to the limited evidence from *Palmer* offered by Fields, which was offered for a non-hearsay purpose).

b.    **Defendants' "skewed picture" contention**

Contrary to defendants' contention and unlike in *Cobige v. City of Chicago*, 651 F.3d 780 (7th Cir. 2011), the evidence did not portray Fields as a role model or even as a law-abiding person of peaceful character. Evidence was admitted that he had:

- joined the El Rukn street gang;

- committed a serious crime for which he served 12 years in prison;

- concocted a false alibi and suborned others to assist in an unsuccessful attempt to avoid conviction for that crime;

- was involved in violent incidents in prison;

- became an officer in the street gang;

- resumed activities in the gang after getting out of prison; and

- and voluntarily associated with killers and drug dealers in the El Rukn gang.

Defendants also introduced a significant amount of evidence regarding the illegal and violent activities of the El Rukn gang. This included evidence that the gang was run by a leader who operated from prison and ordered killings; it was involved in narcotics dealing and violent crime; it protected its narcotics business by using violence; it included "sociopaths" and "killers"; some gang members' roles involved killing people; and there were numerous criminal prosecutions involving El Rukn members, including for murder. This evidence tainted Fields given his membership and rank in the gang.

The Court did not admit a good deal of the bad-character evidence that defendants wanted to offer, but the evidence the Court barred was excluded for appropriate reasons. Just as importantly, the picture painted for the jury was not unfairly skewed, as defendants contend.

c.     **Wiretap evidence**

The Court reaffirms its rulings excluding certain recorded wiretap evidence obtained during the federal government's investigation of the El Rukn gang. The Court need not repeat here its detailed pretrial rulings discussing this evidence and finding that defendants had not established its admissibility as co-conspirator statements. *See*

dkt. no. 549 at 1-13; dkt. 1084 at 1-5.  In addition:

- The Court overrules defendants' contention that this evidence was appropriately admissible to show intimidation of witnesses at the criminal trial.  A significant amount of witness intimidation evidence *was* admitted, including evidence that El Rukns had intimidated and pressured Anthony Sumner.  Given this background, what the wiretaps added on this score was minimal.

- The Court overrules, as it did during the trial, defendants' contention that Jeff Fort's alleged directions on the recordings were not hearsay and therefore were admissible.  Each of the purported directions by Fort (which were all in unintelligible code)[9] contained embedded factual statements, including about the existence of a scheme to bribe Judge Maloney, that defendants plainly were offering for their truth.  This constituted inadmissible hearsay that did not have a separate basis of admissibility.  *See* Fed. R. Evid. 805.  The Court also notes that witness Earl Hawkins was permitted to testify that he told Fields directly about the bribery scheme.  Defendants got in significant evidence of Fields's purported involvement.

- Finally, the Court overrules defendants' contention that the recordings should have been admitted under the residual hearsay exception, Fed. R. Evid. 807, for the reasons discussed in its prior ruling on that point.  *See* dkt. no. 1084 at 4-5.[10]

---

[9] The Court notes that defendants failed to lay a foundation in this case regarding the admissibility of their "translations" of the coded language in the recorded conversations.

[10] The Court also observes that there is a disconnect between defendants' contention that the recordings should have been admitted because the persons being recorded did not know they were being recorded and the fact that they were speaking in otherwise unintelligible code.

- Defendants' separate contention that the wiretap evidence was admissible on Fields's credibility, *see* Defs.' Mot. at 40, lacks merit. This is simply a backhanded way of trying to avoid the hearsay and other problems with this evidence. Defendants quite plainly were offering the wiretap evidence to attempt to demonstrate Fields's complicity in the bribe, that is, for the truth of the matter asserted. The "credibility" issue they cite is simply the flip side of this, specifically, his denial of complicity.

### d. Randy Rueckert testimony

The Court appropriately barred criminal trial prosecutor Randy Rueckert from testifying regarding Fields's alleged behavior during the 1986 criminal trial, over 30 years earlier. As the Court ruled, defendants' Rule 26(a) disclosures were inadequate to put Fields on notice that Rueckert would testify on this topic. (The Court notes that it made a similar determination in limiting the testimony of a witness called by Fields, criminal defense attorney Herschella Conyers.) In any event, the probative value of Rueckert's testimony, if relevant at all, had at best minimal probative value that was significantly outweighed by its unfairly prejudicial effect.

### e. 1971 murder conviction

Defendants wanted to introduce that Fields was convicted of murder in 1972. It appears to be undisputed that he was convicted on an accountability theory. The Court permitted defendants to introduce that Fields was convicted of a crime. The Court also allowed defendants to introduce evidence that Fields presented a false alibi defense at the 1972 trial and induced others to do so, concluding that this was a prior deceptive act that bore on his credibility. And even though the Court excluded evidence regarding the

length of Fields's prison term, defense counsel violated the ruling and said during opening statement that Fields had served 12 years. The Court later reversed the ruling and permitted evidence of the length of the prison term on the ground that it was relevant regarding damages. *See* dkt. no. 1095 at 7-8. This evidence, quite obviously, made it very clear to the jury that the crime for which Fields had been convicted was quite serious. In short, the only point the Court excluded was the nature of the conviction. Given the age of the conviction and the potential for unfair prejudice— specifically, the use of the murder conviction as inappropriate propensity evidence—the Court's ruling was appropriate.

Defendants also seem to contend that they should have been able to get in the underlying circumstances of the 1972 murder case, but they never made a proffer regarding what exactly this entailed, so they have forfeited the point. Even if that were not the case, the details were not relevant for any basis other than a prohibited propensity inference.

The 1972 murder also was not properly admissible regarding damages. The Court reaffirms its ruling on this issue made in connection with the 2016 trial. Defendants contend that it would have helped show why Fields got the death penalty for the Smith/Hickman murders. But Fields became eligible for the death penalty based on his conviction for the Smith/Hickman murders. If that conviction was wrongfully obtained as a result of defendants' tortious conduct, then they are responsible for the damages proximately caused; the precise reasons why Fields got the death penalty after his conviction for the Smith/Hickman murders are immaterial. And the 1972 murder conviction did not *separately* render him eligible for the death penalty; it was

simply part of the aggravating evidence offered after the conviction for the Smith/Hickman murders. Fields was not called upon to prove materiality separately for the death sentence imposed as a result of the conviction he contended was wrongfully obtained. In any event, the potential for an inappropriate propensity reference significantly outweighed its minimal probative value (at the death penalty sentencing, the prosecution used two far more recent double murders in aggravation, specifically the Smith-Hickman and Vaughn-White murders).

**f.     Prison visitor list / purported visit by Hank Andrews**

The Court appropriately excluded a prison visitor list that included a number of El Rukn gang members. Defendants had no evidence that Fields added these names to the list; they were in a different handwriting than that used to list Fields's relatives. Defendants' argument in their post-trial motion that Fields "approved" the additional names is a contention they did not advance before or during trial and is thus forfeited, and in any event they did not lay a foundation for this contention before or during the trial.[11] Defendants also had no admissible evidence of any actual visits by any persons on the list; the Court appropriately ruled that their contention that Hank Andrews had visited Fields was premised on inadmissible multiple-level hearsay.

**g.     April 1985 arrest / Treddest Murray incident**

The Court did not err in excluding evidence of Fields's April 1985 arrest for possession of a weapon. Fields was not convicted; the charge was dismissed. This by itself rendered the arrest and surrounding circumstances inadmissible; the general rule

---

[11] The proposition that another fact finder (the state court judge who decided Fields's certificate of innocence petition) made a finding along these lines is not an appropriate foundation.

is that arrests that do not lead to convictions are inadmissible.  *See, e.g., Cruz v. Safford*, 579 F.3d 840, 845 (7th Cir. 2009).

Defendants argue that the evidence was admissible to show "the lack of plaintiff's credibility, and for his damages."  Defs.' Mot. at 39.  Their contention is that other evidence that they also wanted to admit—the testimony of Derrick Kees—would have shown that Fields's version of the April 1985 arrest was false.  But the fact that a party supposedly lied about an otherwise irrelevant or inadmissible episode does not render evidence about that episode admissible.  A witness typically may not be impeached by contradiction on collateral matters elicited on cross-examination, in other words matters on which the impeaching fact cannot be introduced into evidence for any purpose other than to show the contradiction, which is the case here.  *See, e.g., Taylor v. Nat'l R.R. Passenger Corp.,* 920 F.2d 1372, 1375 (7th Cir. 1990).  In other words, a party may not "contradict for the sake of contradiction."  *United States v. Bitterman,* 320 F.3d 723, 727 (7th Cir. 2003).

Finally, defendants do not articulate a cogent theory of how evidence that Fields had a firearm possession arrest that did not result in a conviction or prison time had any plausible bearing on his damages.  On the argument that it rebutted his claim of being a "peaceful El Rukn," the Court has dealt with that point previously, and again, what we are talking about here was an arrest without a conviction.

### h.    Firearms found at "African Hut"

The Court properly barred evidence of firearms found during a May 1985 search of the "African Hut," the apartment building owned by the El Rukn gang that Fields managed for the gang.  The firearms were found during a raid to execute warrants for

the arrest of Fields and Earl Hawkins, Fields's co-defendant in the Smith/Hickman murder case (Hawkins was arrested, but Fields was not there and was not arrested). Defendants had no evidence connecting the firearms to Fields himself. They pointed to no evidence that the firearms were found in open or common areas; all defendants could say was that they were found "in the building." Defendants contended that as the building manager Fields would have had to be aware of these weapons, but that argument was speculative and lacked foundation.

       **i.**     **2000 incident at Cook County Jail**

The Court reaffirms its ruling precluding admission of an incident at the Cook County Jail in 2000 in which defendants contended Fields instigated an attack on guards so that he could sue them for excessive force. *See* dkt. no. 557 at 1-5; Defs.' Ex. 12. The written ruling (dkt. 557) and a subsequent oral ruling (Defs.' Ex. 12) were detailed and dealt sufficiently with defendants' contentions. In addition, defendants do not make a cogent or supportable argument regarding how this episode impacted the damages Fields claimed. Even if they had, this would not alter the Court's determination that the evidence was appropriately excluded under Rule 403.

       **j.**     **Hunter / Clay testimony about plaintiff's building manager position**

The Court properly excluded testimony by Eugene Hunter and Jackie Clay regarding what Fields did as an El Rukn building manager. No foundation, or an inadequate foundation, was laid at Hunter's deposition or in connection with Clay's testimony regarding what Fields's responsibilities were. The Court did permit defendants to elicit from Clay what *his own* responsibilities were as a building manager; he testified that he collected rent, made sure there was security at the building, and

"ma[de] sure there was narcotics at the building."  Defendants were perfectly free to use this to argue, inferentially, what Fields' own responsibilities were.  They were not prejudiced, let alone unfairly prejudiced, by the Court's ruling.

### k.    Other El Rukn evidence

Defendants were able to introduce a very large amount of "evidence regarding the criminal nature" of the El Rukn gang, Defs.' Mem. at 41-42, notwithstanding their contention to the contrary.  Evidence and argument was admitted that:

- the El Rukns were run by a leader who operated from a prison and ordered killings;

- the gang was involved in coordinated narcotics dealing and violent crime;

- they protected their narcotics business from other gangs by using violence;

- they were "sociopaths" and "killers";

- several gang members testified that their role with the gang involved killing people;

- a large law enforcement task force was established to investigate their activities, including over 200 officers who participated in a takedown;

- there were numerous prosecutions and trials involving members of the El Rukn gang; and

- a number of gang members were brought up on murder charges.

And the evidence also made it abundantly clear that Fields was a ranking member of the gang.  In short, the evidence in this regard was anything but "sanitized," as defendants falsely contend.  Defense counsel were able to make effective use of this evidence, including arguing in closing that the El Rukns had been "running the South

Side" and that the law enforcement officers who took them down were "heroes."

The Court did exclude particular items of evidence, and these rulings were correct. The Court overrules defendants' contention that the following evidence was improperly excluded or that they were unfairly prejudiced by the exclusion:

- The Court properly excluded evidence of specific other crimes, not involving Fields, on which Anthony Sumner was claimed to have provided reliable information. This evidence was at best tangentially relevant, and the admission of these other crimes would have unfairly prejudiced Fields in a way that far outweighed its probative value. In addition, evidence that raids and arrests followed Sumner's cooperation was introduced, as well as the fact that high-ranking El Rukn members went to prison. This was more than sufficient to make defendants' point.

- Earl Hawkins testified that Fields was a shooter in the Smith/Hickman murders and that he knew that Judge Maloney was being bribed. The Court properly excluded Hawkins's prior consistent statement to a prosecutor about Fields's involvement in the murders. Federal Rule of Evidence 801(d)(1)(B) permits statements of this type—which are otherwise hearsay—where the statement was made before the declarant's motive to fabricate arose. Here it was not; Hawkins's motive to fabricate arose at the point in time when he agreed to cooperate with law enforcement, which was before he made the statement to the prosecutor. The same basis warranted exclusion of Hawkins's prior consistent statement to law enforcement about Fields's knowledge of the bribe.

- The Court properly excluded evidence that the U.S. Attorney's Office, in seeking

a further sentence reduction for Derrick Kees, opined that Kees had testified truthfully against Fields at the previous trial in this case. This out-of-court opinion would have amounted to improper vouching, via hearsay, by a non-party regarding the particular testimony whose credibility the jury was called upon the determine. In addition, explaining the context of the sentence reduction motion would have required a significant detour from the relevant issues. Defendants *were* permitted to introduce the fact that the U.S. Attorney had moved to reduce Derrick Kees's sentence and that it did so because it found his cooperation to be reliable and valuable. Defendants' introduction of this evidence entitled Fields to introduce an earlier statement by the U.S. Attorney's Office that Kees had lied under oath. The admission of the latter point by Fields's counsel did not open the door to admission of further evidence about the sentence reduction motion. The Court addressed this point in detail both in advance of and after the questioning by Fields's counsel.

- The Court properly barred federal prosecutor William Hogan from testifying regarding why Earl Hawkins was granted parole in 2014. Hogan is not a member of the Parole Commission and was not involved in the decision-making. His account, or that of Hawkins, would have been inadmissible hearsay, speculation, or both. And defendants never stated that they would call or were able to call as a witness a representative from the Parole Commission with personal knowledge on this point.

- The Court properly barred defendants from introducing a document belatedly produced—*during* the 2016 trial—constituting a purported prosecution

memorandum ("pros memo") regarding the federal El Rukn indictments. Prior to the testimony of certain defense witnesses who were El Rukn cooperators, the government had refused to produce the document(s), citing privilege. During trial, it reversed course and produced one such document, apparently at the urging of the defense in the present case, once evidence was introduced that arguably suggested, somewhat obliquely in the Court's view, that the cooperators had used the document(s) as a basis for later testimony in the criminal El Rukn trials. Given the circumstances—including the late production and the fact that there was at least some reason to believe that what was produced was not the totality of what the cooperators had actually seen—the Court properly excluded the document under Federal Rule of Evidence 403. The Court did, however, permit prosecutor Hogan to testify about the contents of the document. Thus even if the document itself was admissible, defendants were not harmed by its exclusion.

- The Court did not err in excluding, under Rule 403, a prior out-of-court statement made by witness George Carter to an informant during a drug deal that "I kill people." Carter was claimed to have been involved in the Smith/Hickman murders. This had little, if any, probative value on whether Carter was involved in killing Smith and Hickman. And Carter's credibility was adequately impeached in other ways.

- Defendants were permitted to introduce that Gerald Morris and his family were put into witness protection, as well as evidence from the state criminal trial regarding intimidation of Anthony Sumner. Defendants were also able to

introduce evidence that one of the reasons Earl Hawkins received certain benefits for his cooperation involved his concern for his family's safety vis-à-vis the El Rukn gang. This was more than sufficient to enable defendants to make the points they wanted to make about threats to witnesses. Evidence of other benefits provided by Cook County and federal prosecutors to witnesses in El Rukn trials had only limited additional probative value, would have unfairly prejudiced Fields, and would have led to a significant diversion in explaining the background and context.

- Cook County prosecutor Brian Sexton, who led the state prosecution team in Fields's second, 2009 trial on the Smith/Hickman murders, testified at trial. Prior to trial, the Court had excluded testimony by a defense "gang expert" on various grounds. *See* dkt. no. 550 at 2-7. At the present trial, O'Callaghan's counsel asked Sexton why he had introduced at the 2009 trial a statement by Fields. Sexton gave a run-on answer, including that he believed the statement showed that Fields was trying to rise up in the El Rukn gang, "which our gang crimes expert had testified the only way you rise up is through violence."[12] Fields's counsel objected, and O'Callaghan's attorney compounded the problem by saying, incorrectly, "that testimony had already been elicited, Judge, in this case." The Court admonished counsel about making "speaking objections" and then held a lengthy discussion outside the jury's presence. During this

_____

[12] Sexton, though called by Fields at trial, was clearly aligned with the defense. But at the colloquy outside the jury's presence, O'Callaghan's counsel claimed that he had not talked to Sexton before the trial and thus had never posed the question he asked at trial. He characterized Sexton's testimony about the gang crimes expert as "volunteered."

discussion, the Court asked to review the 2009 trial testimony by the Cook County prosecutor's expert witness.  After reviewing the testimony, the Court determined that the expert had not, in fact, given the testimony that Sexton had claimed during the state criminal trial.  Rather, the witness had testified that Fields had been promoted to a general; that one got promoted in the gang by Jeff Fort; and that was based on how one ran different narcotic locations and not letting the location get pushed around by any outside gangs and by violence. The Court determined that a curative instruction was needed.  Defendant O'Callaghan's counsel—who had elicited the erroneous testimony—*himself* proposed a curative statement to the effect that the gang crime expert "did not make that statement.  He made a different statement."  Counsel for the City and Murphy agreed with this proposal.  The Court said that it would give an instruction that Sexton's statement about the gang crime expert's testimony "was not correct.  There was no such testimony at the 2009 trial"—in other words, *almost exactly what defense counsel had proposed.*  No one objected to the proposed curative instruction.  The Court then gave the instruction, adding only the words, "I have read it myself."   Defendants now challenge the Court's ruling. This is entirely meritless, for a number of reasons:  defendants elicited evidence that misstated the testimony at the 2009 trial; defendants themselves proposed a curative instruction to the effect that the witness in question had not made the statement Sexton attributed to him; the Court gave an instruction that did not materially differ from this; and defendants did not contemporaneously object to the Court's proposed curative instruction.  Moreover, the Court's instruction was

a fair and balanced resolution of this episode. In addition, as defendants concede, they were later permitted to read the gang expert's actual testimony on this point to the jury. The fact that the Court reread its curative instruction at this point did not "compound[ ]" the prejudice as defendants contend, *see* Defs.' Reply at 19; there was no error, and no prejudice, at all, let alone unfair prejudice.

**I.      State court ruling on certificate of innocence proceeding**

The Court correctly excluded the state court judge's finding—made on a different record—denying Fields's state-court petition for a certificate of innocence (COI), a ruling that, as of the writing of this decision, is on appeal. Even if it would be appropriate to introduce another fact-finder's rulings on issues the jury in this case was called upon to determine for the very purpose of influencing the jury's determination of those same issues—a proposition that the Court seriously doubts—countering this would have required a detailed explanation of the differences between the record in the state court proceeding and the evidence admitted in the present case. This would have driven the entire trial into a lengthy sidetrack. And it would have required a discussion of evidence this Court excluded, which would have had the effect of defeating the Court's evidentiary rulings. Second, there was no basis, and no need, to introduce the result of the COI proceeding, or even its existence, for the purpose of explaining the sentence-cutting deals that defense witnesses Earl Hawkins and Derrick Kees got. The Court permitted introduction of evidence showing that those deals were made by Assistant State's Attorney Brian Sexton and not by defendants, and it also admitted evidence that the deals were made in connection with a state-court proceeding involving Fields. That

was more than sufficient.  Third, the fact that a state trial judge denied Fields's COI

petition in 2014 had no logical bearing on his compensatory damages, which were

almost entirely premised on the lengthy period he served in prison long before that date.

Nor do defendants articulate a viable argument for why this evidence is relevant on

Fields's request for punitive damages.

The Court also notes that, as it stated in excluding this evidence as to both

liability and damages,

> the Illinois statute governing COI petitions unambiguously provides that a
> decision on such a petition 'shall not have a res judicata effect on any
> other proceedings' aside from a proceeding in the Illinois Court of Claims.
> 735 ILCS 5/2-702(j).  Allowing the state trial judge's findings in evidence
> would essentially end-run this prohibition.

Dkt. no. 685 at 8-9.

Finally, defendants' contention that evidence regarding the COI proceeding was

necessary to rebut Fields's claim that he was innocent of the Smith/Hickman and

Vaughn/White murders is meritless.  Defendants were given a full and fair opportunity to

attempt to demonstrate Fields's involvement in those murders, and they took full

advantage of the opportunity.

### m.   Gerald Morris affidavits

The Court properly admitted affidavits executed in 2011 by Gerald Morris, who

gave identification testimony at Fields's criminal trials.  Defendants relied on Morris's

testimony from the criminal trials for, among other things, a hearsay purpose: to prove

Fields's guilt on the underlying crimes.  The Court concluded that as a result, Morris's

affidavits were admissible under Federal Rule of Evidence 806 to impeach his account

as given in the criminal trials.  (Morris's residence placed him outside the subpoena

power for purposes of trial.)

The Court also notes that the affidavits were admissible for another purpose, specifically as circumstantial evidence of intent (malice) on the part of defendant O'Callaghan, an element of Fields's malicious prosecution claim. This was a non-hearsay purpose for which the affidavits were admissible.

Defendants were not unfairly prejudiced by the admission of the affidavits such that they should have been excluded under Rule 403. They were permitted to present their own out-of-court statements by Morris disavowing statements in the affidavits, and they were able to introduce evidence regarding the circumstances under which the affidavits were obtained, which they then relied upon to argue that the affidavits should be discredited.

Defendants made a last-minute request before the 2014 trial to take Morris's deposition, but this came too late, after the close of discovery and close to trial, and the Court properly refused the request. Though defendants requested to take the deposition again after the Court ordered a new trial, the Court concluded, correctly, that it had not reopened discovery generally, but rather only with regard to the *Monell* claim on which the Court had concluded, in granting a new trial, that it had improperly barred or limited discovery. This was not unfairly differential treatment, as defendants contend; they are comparing apples and oranges. Finally, Fields proposed to call Morris live at the 2016 trial, but defendants objected to this and thus bypassed the opportunity to question him directly.

### n.    O'Callaghan statement about Morris's attorney

O'Callaghan testified, in a non-responsive add-on answer to a question asked by

Fields's attorney, that "your side hired an attorney [to represent Morris] and barred anybody from going back to get an honest assessment of what he had told." After a sidebar, the Court told the jury:

> I do need to correct something. So there was a statement that your side in reference to Mr. Loevy's side, you side hired an attorney and barred anybody from going back to give him an honest assessment of what Gerald had told him. That's an error. Mr. Morris had an attorney that obtained an order barring anybody from contacting him. It wasn't Mr. Loevy's side. It wasn't Mr. Fields's side.

The Court acted appropriately. There was no evidence—none—supporting O'Callaghan's statement that Fields or his counsel "hired" an attorney to represent Morris or that Fields or his counsel barred anyone from doing anything. As the Court told the jury in order to correct the record, Morris's attorney sought a protective order, not "Fields's side." The record *arguably* supports an inference that Fields's counsel made a referral of Morris to a lawyer, but as any lawyer knows (or at least most do), there's a clear and obvious difference between referring a person to a lawyer and hiring a lawyer to represent that person. O'Callaghan's volunteered, unresponsive statement left the jury with the false impression that Fields had *hired* a lawyer for Morris and that *his side* had barred contact with Morris. The Court acted properly in clearing up the false impression.

### o.    Vaughn/White evidence

On the question of the admission of evidence regarding the investigation of the Vaughn/White murders, defendants first sought to exclude it after jury selection in the 2016 trial. The Court quotes from a written ruling it made shortly thereafter:

> On the first afternoon of the trial, after opening statements, defendants asked the Court to exclude certain evidence relating to the Vaughn/White murders. They do not oppose admission of evidence that

Sumner's implication of Fields in those murders was false. But they argue that no other evidence regarding the Vaughn/White murders or the investigation into them should be admitted. Defendants argue that this is inadmissible propensity evidence.

The Court disagrees. The intent of the individual defendants is directly in issue on, if nothing else, Fields's malicious prosecution claim. He has to prove that they acted with malice, defined as acting for a purpose other than bringing the crime's true perpetrator to justice. Fields's claims attack, at least most directly, his conviction on the Smith/Hickman murders, but the two matters were closely linked. Sumner's implication of Fields in both sets of murders was part of what got the investigation of Fields that led to his indictment going. And the Vaughn/White murders were introduced as evidence in aggravation during Fields's capital sentencing hearing.[2] If Fields can show that an individual defendant deliberately took steps to fabricate or conceal evidence in connection with Vaughn/White, it tends to make it more likely that the same defendant acted deliberately—i.e., with malice—in connection with Smith/Hickman. This is not, at defendants contend, an impermissible "propensity" use of the Vaughn/White evidence. Federal Rule of Evidence 404(b) specifically permits use of other act evidence—if that is what this is, which is perhaps questionable given the intertwining of the matters—to show a party's intent or motive.

Defendant O'Callaghan's argument at the November 15 hearing against admission of this evidence largely amounts to an attack on its sufficiency to show malice, rather than its admissibility: he says that he had little involvement in the Vaughn/White investigation. But sufficiency is not the issue at this point. Even though O'Callaghan may not have been the lead detective on the Vaughn/White matter, there is enough evidence of his involvement in the investigation to pass the threshold needed to permit plaintiff to offer evidence relating to that investigation. O'Callaghan is, of course, entitled to offer evidence rebutting Fields's contentions and tending to show that he played only a bit part, or less, in the Vaughn/White investigation.

_____
[2] This should not be read as indicating any backtracking on the Court's ruling that "death penalty materiality" is not an issue in the case. The Court's point here is simply that the Smith/Hickman and Vaughn/White cases and investigations are closely intertwined.

Dkt. no. 1095 at 8-10. The Court reaffirms this ruling; the evidence was properly

admitted for the purposes cited, as well as others cited by Fields in his response to

defendants' post-trial motion. And, contrary to defendants' contention, plaintiff did not

make an improper use of this evidence.

**p.  The hallway distance demonstration**

There was evidence that one or more witnesses to the Smith/Hickman murders viewed the person claimed to be Fields from 155 feet away, or from 80 feet away.  The Court allowed plaintiffs' counsel to demonstrate how far these distances are, in the hallway outside the courtroom, a very well-lit area.[13]  This was done only after the distances to be marked were verified, and only after the Court instructed the jury as follows:

> You have heard testimony about distances.  You heard some testimony about 80 feet and you heard some testimony about 155 feet.  So what we are going to do is we are going to go out in the hallway and there is going to be a person standing at a particular place.  I am going to point that person out to you.  There is another person going to be standing 80 feet away and then I am going to tell the person to go to 155 feet away.  They have measured this in advance.  The lawyers have vetted it.  I will give everybody an opportunity to see those distances and how long they are and then we are going to come back in here.

> I want to say one thing in caution first.  First of all, this isn't intended to duplicate whatever the conditions were at the scene of the Hickman and Smith murders because they weren't committed in the hallway.  So nothing about the lighting, the angles of view, you know, how dark or how light it was and other things like that.  It's just purely to illustrate the distance, 80 feet and 155 feet.

This was not a "view," contrary to defendants' characterization; there was no visit to a scene outside the courthouse where relevant events occurred.  That aside, defendants' contention that this was inappropriate and unfairly prejudiced them is frivolous, particularly given the cautionary instruction that the Court provided to the jury.

---

[13] This could not be done within the confines of the undersigned judge's courtroom, because it is shorter than 155 feet from front to back.

### q.     The *Monell* claims

The individual defendants' contention that they were unfairly prejudiced by a single trial of the claims against the individual officers and the *Monell* claims against the City lacks merit.  There was sufficient overlap between the two sets of claims to make a joint trial a permissible exercise of judicial discretion.  And defendants cite no specific evidence that unfairly prejudiced them.  Finally, the jury was clearly instructed that it had to give separate consideration to each claim and to each party, and there is no reason to believe that it disregarded this instruction.  Indeed, the jury's verdict directly reflects separate and discerning consideration of each claim and party; the jury found for Fields on some claims and the individual defendants on others, and on one claim it split its verdict as between the two individual defendants.  This undercuts defendants' claim that the *Monell* evidence somehow overwhelmed the jury's ability to give the individual defendants a fair trial.

### r.     Conduct by Fields's attorney

Nothing about the conduct of Fields's trial counsel, whether considered item-by-item or in the aggregate, impaired defendants' ability to fully and fairly present their case or unfairly prejudiced them.

During the trial, defendants objected to a number of questions posed and arguments made by Fields's counsel.  The Court sustained some of these objections and overruled others (the same was true of Fields's objections to questions and arguments by defendants' counsel).  The Court also instructed the jury that questions are not evidence and that it was required to disregard matters that the Court struck.  In addition, the Court gave instructions at appropriate points during the trial striking and/or

directing the jury to disregard particular matters. The jury is presumed to have followed those instructions. *See, e.g., Sanchez v. City of Chicago*, 700 F.3d 919, 932-33 (7th Cir. 2012). There is no basis to find the presumption overcome in this case.

Defendants' current challenge is based, overwhelmingly, on points in three categories: matters to which they made no objection at the time; matters on which the Court overruled their objection; and matters on which the Court sustained an objection and either did not permit the question to be answered or instructed the jury to disregard the point. Defendants have forfeited any challenges in the first category by the absence of contemporaneous objections. Their challenges in the second category lack merit (in this section of their brief, they do not separately attack the substance of any but a few of the Court's rulings in this category). With regard to their challenges in the third category, as indicated, the jury is presumed to have followed the Court's instructions to disregard these matters.

The Court need not and does not address each point separately but will discuss several that defendants highlight:

- Defendants take issue with the manner of counsel's examination of defendant O'Callaghan. The Court made the observation during the trial, and repeats here, that O'Callaghan was an extraordinarily unresponsive witness. This made his examination by Fields's counsel exceedingly difficult. Among other things, the Court was required to strike as non-responsive a significant number of O'Callaghan's answers to questions by Fields's counsel. As defendants argue, the Court also struck or sustained objections to a significant number of the questions by Fields's counsel as argumentative or on other grounds. But as

Fields points out, this represents a rather small proportion of a very long examination. Taken as a whole, counsel's examination of O'Callaghan—which was, unsurprisingly, adversarial given that he was a defendant—was not improper and did not unfairly prejudice the jury.

- Defendants complain that Fields's counsel acted inappropriately by implying that defendant Murphy had altered his report of his debriefing interview of Anthony Sumner. Their contention boils down to the proposition that the implication was untrue. Making that determination, however, would require viewing the evidence in the light *least* favorable to Fields, which is the opposite of the applicable standard. As Fields correctly points out, he was not required to accept defendants' interpretation of the evidence. Fields's counsel did not act improperly in eliciting evidence that supported an inference that the notes had been altered or fabricated.

- No ruling by the Court prevented O'Callaghan from explaining that he had, in fact, documented his interviews of various El Rukn cooperators. Rulings excluding *exhibits* or the contents of prior interviews (absent a proper evidentiary basis) did not bar *testimony* about documenting interviews.

- The Court sustained an objection to a question by Fields's counsel to a defense expert regarding whether other persons' convictions had been overturned due to *Brady* violations by the City of Chicago. But counsel was prompted to ask the question by defendants' elicitation of testimony from their expert witness that during his years of experience working with Chicago detectives while at the Cook County State's Attorney's Office, he never experienced any *Brady* violations.

34

Defendants suffered no harm from this question; the Court sustained the objection. If anyone was harmed, it was Fields: defendants' elicitation of this testimony arguably took unfair advantage of the Court's pretrial ruling granting defendants' request to bar plaintiffs from eliciting testimony about specific cases.

- Defendants' contentions that Fields's counsel's questions frequently "assumed facts not in evidence" are, quite simply, erroneous; there *was* evidence to support counsel's questions on these points. And although the Court sustained objections to a number of Fields's counsel's questions as argumentative, there was not an unduly high volume given the length of the trial and the fact that many of the witnesses were highly adverse to Fields.

- Defendants' contentions that Fields's counsel acted improperly in asking a question indicating that Earl Hawkins gestured toward defendants in answering a question are wrong. This happened; the Court observed it. Counsel likewise did not act inappropriately in asking Randy Langston about looking at defense counsel. This did not prejudice defendants in the least.

- Finally, Fields's counsel did not make an improper argument when he suggested the involvement of O'Callaghan and Murphy in securing Earl Hawkins's early release from prison. O'Callaghan wrote a letter supporting his release on parole. Fields's counsel erroneously stated in opening that Murphy also wrote a letter, but this was harmless; among other things, the jury was instructed that openings are not evidence. The closing argument by Fields's counsel did not include the same error; he awkwardly said "they" wrote letters but stated, "'they' being O'Callaghan." He did not attribute to Murphy a letter supporting Hawkins's early

parole.

The Court also overrules the other contentions made by defendants in this section of their memorandum. And from an overall perspective, there was not an unusually large number of sustained objections such that the cumulative effect of these matters unfairly prejudiced defendants or deprived them of the ability to fully and fairly present their case to the jury.

The Court concludes with an observation. The gist of defendants' motion is that counsel's objectionable conduct prejudiced the jury against them. The undersigned judge's own experience—derived from trying cases, presiding over trials, and talking to many, many juries during its tenure on the bench—is that when a trial attorney repeatedly has objections to his questions or arguments sustained, it tends to prejudice the jury against *him*. In such situations, the jury tends to perceive the attorney as trying to stretch the bounds of proper conduct, and this tends to be a negative factor for that attorney and his client. That aside, however, the Court is confident that its instructions to the jury to disregard particular questions or conduct and that "questions and objections or comments by the lawyers are not evidence" were followed in this case. Indeed, if the supposedly unfair or inappropriate conduct by Fields's counsel had the overwhelmingly prejudicial effect that defendants claim, one would not, under ordinary circumstances, to have expected the jury to reach the divided verdict that it returned on the various claims against defendants, in which it found in their favor on some claims. This, too, is a significant indication of the absence of unfair prejudice.[14]

---

[14] It is true that the Court lost patience with Fields's counsel at a few points during the trial—just as it did with defendants' counsel on occasion. But given the length of the

**Conclusion**

To the extent the Court has not expressly addressed any point made by defendants, it is because the Court has determined that the point lacks merit and does not require further discussion.  For this and the other reasons stated above, the Court denies defendants' motions for judgment as a matter of law or for a new trial [dkt. nos. 1145, 1146, 1147 & 1180].

Date:  September 11, 2017
          (corrected October 12, 2017)          _____
                                                                MATTHEW F. KENNELLY
                                                                United States District Judge

---

trial and its highly adversary nature, this, too, was not beyond the normal range of clashes.