```
1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4    NATHSON E. FIELDS,              )
                                     )
5                      Plaintiff,    )   Docket No. 10 C 1168
                                     )
6             vs.                    )
                                     )
7    CITY OF CHICAGO, et al.,        )   Chicago, Illinois
                                     )   April 30, 2014
8                      Defendants.   )   9:00 a.m.

9                         VOLUME 16
                   TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

11

12   APPEARANCES:

13

14   For the Plaintiff:    LAW OFFICES OF H. CANDACE GORMAN
                             BY:  MS. H. CANDACE GORMAN
15                           220 South Halsted Street
                             Suite 200
16                           Chicago, Illinois  60661

17                          LEN GOODMAN LAW OFFICE, LLC
                             BY:   MR. LEONARD C. GOODMAN
18                                 MS. MELISSA A. MATUZAK
                             Suite 1650
19                           53 West Jackson Boulevard
                             Chicago, Illinois   60604

20

21

22   For the Defendant:    DYKEMA GOSSETT PLLC
                             BY:   MR. TERRENCE M. BURNS
23                                 MR. PAUL A. MICHALIK
                                   MR. DANIEL M. NOLAND
24                           10 South Wacker Drive
                             Suite 2300
25                           Chicago, Illinois  60606
```

1                 COOK COUNTY STATE'S ATTORNEY
                   BY:  MS. LISA M. MEADOR

2                      MR. DONALD J. PECHOUS
               500 Richard J. Daley Center

3                Chicago, Illinois  60602

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23         LAURA M. BRENNAN - Official Court Reporter
        219 South Dearborn Street - Room 2102

24             Chicago, Illinois  60604
              (312) 435-5785

25

1    THE CLERK:  Case 10 C 1168, Fields versus City of
2  Chicago.
3    THE COURT:  Can I have lawyers' appearances for the
4  record, please.
5    MS. GORMAN:  Candace Gorman, Melissa Matuzak and Len
6  Goodman for Mr. Fields.
7    MR. NOLAND:  Dan Noland, Terry Burns and Paul
8  Michalik for Mr. O'Callaghan.
9    THE COURT:  May I ask what the video camera is over
10  at the side here?
11    MR. NOLAND:  Oh.  Judge, our witness, Lieutenant
12  Maue, had a family emergency.  We're requesting the Court
13  to -- he said he has to, I think, drive his mother or
14  mother-in-law and get her to the nursing home because of an
15  emergency, but he would be able to get to a facility where we
16  could do, if the Could would permit it, a video conference
17  testimony.  So it would be live testimony.  He hasn't given a
18  deposition except in Mr. Fields' initial case.
19    THE COURT:  When you say the initial case.
20    MR. NOLAND:  Mr. Fields' case against him back --
21    THE COURT:  Oh, way back then.
22    MR. NOLAND:  Yes.  And I think that's the situation.
23  So he would be available I believe at -- in our case.
24    THE COURT:  Okay.  Is there an objection to this?
25    MS. GORMAN:  No, I don't think so.

1      THE COURT:  Okay.  I mean, has somebody looked at
2   Rule 43?

3      Well, that's not the first thing that's going to
4   happen anyway.  So did you get the sound working on the other
5   thing?  I know that they were having some problems with it.

6      MS. MATUZAK:  We did.  Although I'm not sure.  Right
7   after you asked me if the sound was okay, it stopped working
8   again.

9      THE CLERK:  I put the auto publish off.

10      THE COURT:  So the deal is, if it doesn't work, then
11   you're just going to pop it on your computer.  We're going to
12   prop the computer up in some appropriate place.  You'll play
13   it for them.  And the jury will be told that it's available.

14      How much of it are you proposing to play?

15      MS. MATUZAK:  I would like to play 12 minutes and 45
16   seconds.

17      THE COURT:  The beginning or the end or the beginning
18   and the end.

19      MS. MATUZAK:  The very beginning right up until
20   Mr. Fields is put on the bed in the hospital.

21      THE COURT:  All right.  Any other issues we got to
22   take up?  The jurors are all here.  I'd like to get them out
23   and get them going.

24      MR. MICHALIK:  There is, your Honor, with one of our
25   witnesses, Mr. Maue.

1          THE COURT:  We're going to talk about that in a

2    little bit.  So let's get a witness on the stand.  Or the

3    video is the next thing.

4          MS. GORMAN:  Right.

5          And we're withdrawing Mr. Fields' brother.  We

6    decided it was too repetitive.

7          THE COURT:  So this your last?

8          MS. GORMAN:  No.  We have --

9          THE COURT:  You've got the reading of the deposition.

10         MS. GORMAN:  And we've got Mary Johnson.

11         THE COURT:  Okay.  Fine.  Bring the jury out.

12         MR. NOLAND:  Judge, if I may.

13         THE COURT:  You can until the jurors walk through the

14   door.

15         MR. NOLAND:  Just this issue with Lieutenant Maue.

16   Laura has advised that she's talked to the technology people

17   here, and they've said that this is set up for 11 a.m. today,

18   and I think our witness would be available at that time.

19         THE COURT:  Okay.  We'll talk about it a little bit

20   later.  The jury's coming in.

21             (The following proceedings were had in the presence

22              and hearing of the jury:)

23         THE COURT:  Okay.  Everybody can have a seat.  Good

24   morning.

25         The question is did anybody read anything, see

1    anything or hear anything about the case or about anybody

2    involved in the case?  So raise your hand.

3         No hands.  All right.

4         Next thing you're going to I guess see and hear is an

5    excerpt from a video, which should come across on your screens

6    there.  It's an excerpt from a longer video.  We haven't

7    talked about yet whether the whole video's going to be

8    available for you, so I'm going to worry about that with the

9    lawyers later.  I think you're going to hear about, see about

10   ten or twelve minutes of it.

11        And we were having some technical problems.  We're

12   kind of hoping it's going to work.  If it doesn't work, we've

13   got a plan B.

14        Let me just say this is an excerpt from the video

15   from the incident at Menard Correctional Center that you heard

16   some testimony about yesterday.

17        (Video played.)

18        THE COURT:  Okay.  That's the end of the excerpt?

19        MS. MATUZAK:  Yes.

20        THE COURT:  All right.  I think the next thing is

21   there's going to be deposition testimony that you're going to

22   read.

23        MS. GORMAN:  Your Honor, I have a witness.

24        THE COURT:  Oh.  A witness is going to testify.

25        MS. MATUZAK:  Yes.

1    The plaintiff calls Mary Johnson.

2    THE COURT:  Ma'am, you're going to be coming right up

3  here.

4    Would you please raise your right hand.

5    (Witness sworn.)

6    THE COURT:  Proceed.

7    MARY JOHNSON, PLAINTIFF'S WITNESS, DULY SWORN

8              DIRECT EXAMINATION

9  BY MS. MATUZAK:

10  Q   Good morning.

11  A   Good morning.

12  Q   Ma'am, could you please state your name and spell your

13  last name for the record.

14  A   My name is Mary, middle initial L, Johnson, J-O-H-N-S-O-N.

15  Q   Miss Johnson, without stating your address, just generally

16  where do you live?

17  A   I live near Roosevelt Road.

18  Q   You live in Chicago?

19  A   Yes.

20  Q   And who do you live with?

21  A   I live with my grandson.

22  Q   And are you currently employed?

23  A   Oh, no.

24  Q   What was -- are you retired?

25  A   Yes.  I -- well, I'm retired from a paying job.

Johnson - direct

1   Q   You do volunteer work?

2   A   All the time.

3   Q   What was your paying job?

4   A   I was a social worker for the state.

5   Q   How long ago did you retire?

6   A   Let's see.  It's been -- I think it was '94.

7   Q   Ma'am, when did you first meet Nathson Fields?

8   A   When did I first meet him?

9   Q   When did you first meet him?

10  A   I met him I think it was in '93, '93 or '94, one.

11  Q   Okay.  And where did you first meet Mr. Fields?

12  A   I met him in the penitentiary.

13  Q   Okay.  Do you recall which penitentiary?

14  A   No, I'm not sure, because I would go to Menard and

15  Pontiac.  I'm not sure which one I met him at.

16  Q   Why were you going to Menard and Pontiac?

17  A   Because there were men on death row, and I was with the

18  Coalition to End the Death Penalty.

19  Q   Would you go visit the men on death row?

20  A   Yes.

21  Q   And that was part of your volunteer work?

22  A   Every month.

23  Q   You went every month?

24  A   Yes.

25  Q   Is there another name for death row?  Do they call that

1  unit something else?  Do you know?

2  A   I don't know another name for it.

3  Q   Okay.  So approximately how many times did you visit

4  Mr. Fields while he was on death row?

5  A   Well, I would visit every -- I would visit every month,

6  but one month we'd go to Menard, and the next month we'd go to

7  Pontiac and --

8  Q   So six times a year you were at Pontiac?

9      Sorry.

10 A   Yes, approximately.

11     Sometimes I wouldn't see him because I'd be assigned

12 to a certain section and he wouldn't be on that section.  So I

13 didn't just go visit individuals.  I went wherever I was

14 assigned.

15 Q   And how long -- so when you would visit with an

16 individual, how much time would you be able to spend with each

17 individual man?

18 A   Well, you -- let's see.  How could I explain that?  Some

19 of them were very interesting as far as conversationalists,

20 and some of them I was just being polite because they would

21 rattle and I didn't really want to hear it.  But I tried to

22 space my time so I wouldn't -- I didn't want to seem like I

23 was favoring anyone.

24 Q   How much time did you typically spend with Mr. Fields when

25 you would visit?

Johnson - direct

1    A    Well, he was one of the most intelligent people, so I

2    enjoyed his conversation, but I had to break it off, you know.

3    So I didn't rush him, but I always moved on.  Everyone knew

4    that I only spent so much time with each one.

5    Q    And when you first -- when you first visited Mr. Fields,

6    do you recall was he housed in the general, you know, just on

7    death row with the other inmates?

8    A    Yeah.  He wasn't in seg or anything.  Some of them was in

9    seg, but he was in just a cell.  Because I would go from cell

10   to cell, and then when I'd go to the seg unit, it was back

11   farther.

12   Q    Okay.  If I could -- I didn't mean to interrupt you.  But

13   in the -- on the unit when you would go and visit Mr. Fields,

14   would you go into a separate visiting room?

15   A    No.

16   Q    Or would you go right to his cell?

17   A    I talked to him in his cell.

18   Q    Okay.  And was he -- was he in the cell, and were you in

19   the cell with him?

20   A    No.

21   Q    You were outside.  Okay.

22            Now, you talked about segregation.  Where is the

23   segregation unit?

24   A    Well, it's separate from the other part.  I couldn't tell

25   you exactly where it was, but the difference was that you

Johnson - direct

1    weren't at a cell.

2    Q   Okay.  Could you --

3    A   You was at this -- it was a thick door, and you'd have a

4    little space to talk through.

5    Q   Okay.  Could you tell if there were windows inside his

6    cell?

7    A   Inside the cell?

8    Q   Inside the cell in segregation?

9    A   No, I don't think it was any windows in that cell.  I

10   don't recall seeing any.

11   Q   So when Mr. Fields was, I guess in the general population

12   of death row, what were your observations of Mr. Fields?

13   A   Well, one thing about him that was different from so many

14   of the guys is that he was always fully dressed whenever the

15   coalition came in, and the reason why that's different because

16   some of them have on their undershirts, and, you know, they

17   don't make any special arrangements, but he was fully clothed

18   with sleeves on, just dressed neat.  He was -- like he was

19   expecting company, you know.

20   Q   And at some point Mr. Fields was moved?

21   A   Yes.

22   Q   And that was to the segregation unit?

23   A   No.  It was a different.

24   Q   It was different than segregation?

25   A   Yes, it was.

1    Q   Where was he moved?

2    A   He was moved to a isolated part.  It was different from --

3    he wasn't around anyone.  It was like a dungeon or something

4    like, you know.  I had to go out of the regular place where I

5    would visit and go down some stairs and then walk a ways and

6    then go up.  I think it was about three flights of stairs I

7    had to go up.  And then he was in this, it looked like a cave

8    like or something, you know.  It was no one else around him.

9    Q   Did you -- was Mr. Fields shackled when you saw him in

10   that -- in isolation?

11   A   I don't remember him being shackled.

12   Q   Did you observe any changes in Mr. Fields during that

13   visit, the first visit in isolation?

14   A   I definitely saw a change.

15   Q   Can you describe those changes?

16   A   I really don't like to.  That's something that I

17   actually -- I don't try to remember it because it was -- I

18   felt so helpless.  And, yeah, there was a change in him

19   because he was always so pleasant.

20   Q   And how was he different in this visit?

21   A   It's just like he was traumatized.  You know, I couldn't

22   see him good because I don't think there was a light in there,

23   but it was a little window I could see where I could see the

24   light from the little window, but I couldn't see him good

25   because it was, you know, no light.

1       And I never wanted him to know how I was feeling

2    because I was there to uplift him, and it was just such a -- I

3    tell you what it -- the onliest thing I -- the onliest way I

4    could maybe describe it was that it remind -- you know that

5    movie with Tom Hanks in it where he was out on the place with

6    all that FedEx stuff?

7    Q    When he was stranded on the desert island?

8    A    Yeah.  The change that he went through, that was like the

9    change that Nathson was in.  His hair was sticking all up, you

10   know.  I never saw him like that.

11      And I was so traumatized from it till -- and I was

12   there to uplift him, so I couldn't express how I felt because

13   I was afraid that if I said the wrong thing, they might take

14   it out on him.

15      THE COURT:  Excuse me.  Can we keep it down back

16   there a little bit, please.  Excuse me.  A number of the

17   jurors were being distracted.  We need to kind of keep it down

18   a little bit back there.

19      Can you repeat the last answer, please?  I apologize,

20   ma'am.

21      THE WITNESS:  I don't know what you asked me.

22      THE COURT:  Can you ask the question again?

23   BY MS. MATUZAK:

24   Q    I had asked generally how Mr. Fields appeared, and I

25   believe you were talking about how --

1    A    Well, he appeared traumatized, you know.  He was -- he was

2    just nervous.  He wasn't saying anything.  He didn't tell me

3    about what happened.  I had heard what happened from the other

4    parts of the penitentiary, people that I visited.  And I

5    didn't want him to know that I was going -- you know, it was

6    almost like he didn't want me to get him in anymore trouble or

7    something, you know.

8    Q    And do you recall approximately when this visit took

9    place?

10   A    It was either -- it was I think the end of '97 because he

11   was on the list to go to Tamms, and Tamms opened in '98, but

12   he didn't get to go to Tamms because he got -- what you call

13   that?  They know all the names of those.  Habeas corpus or

14   something, something like that.

15   Q    He got a new trial?

16   A    Yeah.  Yeah, he got a new trial, and that's what he had

17   been talking and looking forward to when he was over --

18   before he was put in that cave, you know.

19   Q    Did you see him -- how many times did you see him when he

20   was in isolation?

21   A    I know I saw him at least three times.

22   Q    Did you ever see Mr. Fields again outside of the isolation

23   unit before he left Menard?

24   A    No, no.  Uh-uh.  He was in there until they sent him back

25   to County I think it was, and I didn't go out there.

1  Q   And did he continue to appear the same --

2  A   When he was in the cave --

3  Q   -- as you described when he was in isolation?

4  A   Oh, the whole time, yeah.

5         I spent my time cheering him up, trying to cheer him

6  up and let him know that, I say, "Wherever you are, God is,"

7  and, "Don't give up," you know.  I would just say things to

8  inspire him because I didn't want him to lose faith and think

9  that we didn't care, but I couldn't say what I wanted to say

10 because the police was standing right there and I felt like I

11 could cause him some more harm.

12        MS. MATUZAK:  Can you just give me one moment?

13        THE COURT:  Sure.

14        MS. MATUZAK:  Thank you so much, Miss Johnson.  I

15 have no other questions.

16        THE COURT:  Mr. Michalik.

17        MR. MICHALIK:  No questions your Honor.

18        THE COURT:  All right.

19        Did you have something else?

20        MR. GOODMAN:  No, no.  I'm sorry.

21        THE COURT:  Do any of the jurors have any questions?

22        No questions.  Okay.

23        Ma'am, you can step down.

24        All right.  We'll just let Ms. Johnson get through

25 there, and next are we going to have the reading of part of a

1   deposition?

2          MS. MATUZAK:  Yes.

3          THE COURT:  Okay.  So we're going to do -- I think

4   this is going to be done where one person is going to read

5   questions, the other is going to read answers.

6          The name of the witness?

7          MS. GORMAN:  Dr. Silberberg.

8          THE COURT:  First name?

9          MS. GORMAN:  Joel.

10          THE COURT:  Okay.

11          MS. GORMAN:  Dr. Joel Silberberg.

12          THE COURT:  And so as with the depositions that you

13   heard during earlier parts of the trial, when a witness's

14   deposition has been taken and they're not able to appear in

15   court, under appropriate circumstances the deposition can be

16   read.  You're to -- or played if it's a video deposition, but

17   this wasn't a video.  So you're to take this testimony just as

18   if the person were here in court.

19          And I think that Mr. Bleifuss is going to --

20          Give your name for the record if you would.

21          MR. BLEIFUSS:  Adrian Bleifuss.  That's

22   B-L-E-I-F-U-S-S.

23          THE COURT:  Sorry for botching your last name.

24          I'm not going to swear him because he's not an actual

25   witness.  He's just reading testimony.  And Ms. Matuzak is

Silberberg - deposition

1  going to read questions.

2         And I'm just going to remind people don't speed up

3  just because you're reading.

4         Is the name of the witness going to be given again at

5  the beginning of what you're reading?

6         MS. MATUZAK:  Yes.

7         THE COURT:  All right.

8   JOEL SILBERBERG, PLAINTIFF'S WITNESS, THROUGH HIS DEPOSITION

9                        EXAMINATION

10  BY MS. MATUZAK:

11  Q   Please state your name and spell your last name for the

12  record.

13  BY MR. BLEIFUSS:

14  A   My first name is Joel J-O-E-L, Silberberg,

15  S-I-L-B-E-R-B-E-R-G.

16  Q   Doctor, what did you do to prepare for the deposition here

17  today?

18  A   I reviewed the documents that Candace Goodman -- I mean

19  Candace Gorman gave to me.  I reviewed the deposition -- I

20  reviewed the documents, which included the deposition of

21  Nathson Fields.

22         I did two interviews with Nate Fields.  The first one

23  was four hours.  The second one was for three and three

24  quarters hours.

25         Then I did two collateral interviews.  I think both

Silberberg - deposition

1    of them were an hour and 15 minutes, one with his older

2    brother Nathaniel Fields and one with a lady who visited the

3    prison -- the prison of Menard and Pontiac over a ten-year

4    period.  Her name is Nancy Johnson.  And she saw Mr. Fields

5    about 80 percent of the time she visited the facility where he

6    was at.

7    Q    So you reviewed the notes of those two collateral

8    interviews?

9    A    Well, I did the interview.  I reviewed the notices.  I

10   reviewed Nate Fields -- the notes of his interview.

11   Q    And did you review anything else to prepare for your

12   deposition here today?

13   A    Nothing specific because in terms of literature, I rely on

14   my general knowledge and training experience in a wide variety

15   of resources.

16   Q    Did you do any literature search relative to your opinions

17   in this case?

18   A    I just relied on my general knowledge, training and

19   experience.  I've been working in this field for a long time,

20   so I know a lot about it.

21   Q    You worked at the jail for a while?

22   A    I was director of Mental Health Services at Cook County

23   Jail from 1998 to 2002.

24   Q    What are you doing now?

25   A    I do a combination of things.  I'm a professor of

Silberberg - deposition

1    psychiatry at University of Nevada School of Medicine in the

2    Las Vegas branch.  And on Thursdays and Fridays I teach and

3    run the consult and emergency room service.  And I work with

4    residents and medical students.  It's two days a week.  But

5    with documentation and evaluations, et cetera, it comes out to

6    more than three days of work with all the paperwork I have to

7    do.  The rest of the time I have a forensic psychiatry

8    practice that I have cases all over the country.

9    Q    Are you currently working with any prison or jail?

10   A    I do surveys for the National Commission on Correctional

11   Health Care.  But I haven't done one for a while.

12   Q    When was the last time you did a survey for the national

13   commission?

14   A    Must have been two or three years ago.

15   Q    What are those surveys, if you could briefly explain what

16   those entail?

17   A    I'm a physician surveyor.  Basically, I look at the

18   documentation the facility has.  I look at the documentation

19   from the perspective of the physician and the psychiatrist.

20   And I give my findings to know as the lead surveyor, who then

21   is responsible for making the report.

22   Q    What's the purpose of the report?

23   A    That's a very good question.  The surveys used to be ten,

24   20 years ago much more putative in nature.  These are your

25   findings, et cetera, et cetera.  These are findings the

Silberberg - deposition

1    facilities have to correct.  But the approach is now much more

2    educational and trying to be helpful to the facility to

3    improve the competence and performance.

4    Q    With respect to the mental health services they provide at

5    the correctional institution?

6    A    The survey is about everything.  But I participate mainly

7    in regard to mental health.

8    Q    Have you ever provided an expert opinion in a case or been

9    asked to consult on a case involving long-term confinement?

10   A    Yes.

11   Q    What cases are those?

12   A    I have to look at my list.

13   Q    Please go ahead.

14        When you say your list, are you talking about a list

15   on page 2 and 3 of your report?

16   A    That's correct.

17        Looking at the list, I'd say in terms of long-term

18   confinement you're talking about in a correctional facility.

19   Q    What else would there be?

20   A    Forensic hospital.

21   Q    Let's talk about a correctional facility and you can tell

22   me which case.

23   A    Case No. 5, Carlock versus Sangamon County sheriff;

24   Ashoor, A-S-H-O-O-R, Rasho, R-A-S-H-O, versus Roger Walker, et

25   al.  That is case No. 13 in the report.  And then No. 16 would

1    be Sheila A. Keesey, special administrator of the estate of

2    Dan McElfresh, deceased, versus Illinois Department of

3    Corrections.  Those are the cases where I've testified.  I do

4    have other cases where I'm involved, and they are ongoing

5    right now, and I haven't testified yet.

6    Q    Any of these cases, paragraph 1 through 16 on your list --

7    did they involve cases where you disagreed with the finding of

8    PTSD by the expert for the plaintiff in the case?

9    A    I don't recall.

10   Q    Has that ever happened?  Have you ever done that?

11   A    Oh, experts will and do disagree, sure.

12   Q    I'm asking a more specific question, which is have you

13   ever offered an opinion on behalf of a defendant in the case

14   disagreeing with the plaintiff's expert opinion that the

15   particular plaintiff had PTSD?

16   A    Yes.

17   Q    How long have you been engaged in the practice of offering

18   expert consulting services?

19   A    Well, it's been in different formats.  Most of my career I

20   did it as a full-time faculty member at different

21   universities.

22   Q    And in 2013, 2012, 2011, what's your estimate in your

23   forensic consulting work how much has been on behalf of

24   plaintiffs and how much on behalf of defendants?

25   A    It varies.  But if you equal it out -- you're talking what

Silberberg - deposition

1  period of time?

2  Q   Last four years.

3  A   The last four years it has been more plaintiff.  Maybe 60

4  percent plaintiffs, 40 percent defense.

5  Q   Okay.  I want to talk about Mr. Fields now.  What was --

6  prior to Mr. Fields' June of 1985 arrest, what was his

7  relevant history?

8  A   I have it in the report.  It's a general question.  You'd

9  have to be more specific.

10  Q   How about his school history?

11  A   He did pretty good in school.  He got good grades.  He was

12  good in sports.  And then in an episode where apparently there

13  was zero tolerance at a school where he was at, he got into a

14  fight, and he was expelled.

15  Q   What was his gang history?

16  A   He -- again, looking at the deposition, and my interview

17  with him, he indicates that he got involved with gangs at the

18  beginning of when he was incarcerated at Stateville.  That's

19  when he really got involved.

20  Q   Do you know what age -- how old he was when he joined the

21  Black Peace Stone Nation?

22  A   He was a member before then, but he said that his gang

23  involvement became much more propound and active when he was

24  in Stateville in 1971, I believe.  He reported an episode of

25  his younger brother, according to Mr. Fields, who was put on a

1  street corner and attacked by a rival gang.  He did recall

2  that episode where he went to protect his younger brother, who

3  was a member of the Black Peace Stone Nation.  He was involved

4  with the Black Peace Stone Nation before he went to

5  Stateville.  But he reported in his deposition, at least the

6  way I read it, that he became much more actively involved in

7  the gangs after he was in Stateville in 1971.

8  Q   Would it be relevant to your analysis of his self-report

9  of his involvement in gangs before he went to prison in 1971

10  that he was kicked out of school for fighting with a Gangster

11  Disciple member?

12  A   I can't speculate.  I don't know if that's true or not.

13  Q   Presume it's true.

14  A   Presuming it's true, you know, it would be a relevant

15  piece of information.

16  Q   Why would that be relevant?

17  A   Sometimes young men get involved with gangs, but decent

18  young men, and they don't have any preexisting psychiatric

19  disorder, but there's peer pressure that may be involved.

20  Other times gangs may attract people who have some preexisting

21  psychiatric disorders.

22  Q   And that would be antisocial personality disorder?

23  A   Is that a hypothetical?

24  Q   Yes.

25  A   Yes.  It could be that, but often it's just peer pressure

Silberberg - deposition

1    and growing up in poor neighborhoods.  The gangs do provide

2    some sense of community, some sense of support.  So, yeah, I

3    mean, individuals join gangs for different reasons.

4    Q    Prior to his incarceration in 1971, did he have any

5    criminal background?

6    A    Yes, he did.

7    Q    Why did he go to prison in 1971?

8    A    He was present when I believe -- to the best of my

9    recollection, he was present when a murder was committed.  He

10   exhibited bad judgment, and he was present, and he was found

11   guilty and sent to jail from '71 to -- I believe it was 1983.

12   Q    Do you know whether or not he was convicted of murder for

13   that 1971 incident?

14   A    Again, I'm not sure if the exact legal term was murder.

15   But he was present when somebody was killed.  And I would

16   assume the charge was for murder.

17   Q    Is it relevant to your opinion of whether or not that

18   other matter, the other criminal conviction, other than the

19   one he claimed he shot in the air, would have been a violent

20   crime involving another rival gang member?

21   A    Hypothetically?

22   Q    Yes.

23   A    Again, as I said, sometimes young men, young black men in

24   particular in impoverished neighborhoods, may get involved

25   with gangs because of peer pressure and may have no

1  psychiatric disorder.  May actually be decent young men just

2  struggling to stay above the surface.  Other times the young

3  men may have significant psychopathology.

4  Q   Are you offering any opinions as to Mr. Fields'

5  psychological condition before he went into -- before he was

6  arrested in June of 1985?

7  A   Yes.

8  Q   And what opinion is that?

9  A   The opinion is that, based on the interview and based on

10  the deposition, is that he did join the gang.  But as I said,

11  not everyone who joins a gang has antisocial personality

12  disorder or significant psychopathology.

13  Q   And that opinion by you, though, in order to provide a

14  full opinion with respect to his pre-1985 psychological

15  condition, you would have needed to spend additional time

16  reviewing his criminal history; is that true?

17  A   An expert can spend additional time with somebody to form

18  an opinion.  But as I've said before, I've had long enough

19  time to form an opinion with a reasonable degree of medical

20  certainty about Mr. Fields.

21  Q   Isn't the job of a forensic psychiatrist to learn as many

22  facts as possible?

23  A   I focus more on his current functioning, his impairment,

24  and how the two different incarcerations affected him.  I look

25  at how Statesville one affected him, and I look at how the

Silberberg - deposition

1    subsequent incarceration in Pontiac and Menard on death row

2    affected him, the wrongful conviction.

3    Q    What are the operative facts in this case to support your

4    opinion that Nate Fields has got PTSD?

5    A    Well, I did an extensive two-part interview with him, four

6    hours for the first one and three and three quarters hours for

7    the second one.  And I asked him open-ended questions.  And

8    then after asking him open-ended questions, I plugged them

9    into the criteria for PTSD.  I did not ask him leading

10   questions.  I got collateral information basically from a

11   ten-year period of time from somebody who actually visited him

12   in the facility, reliable collateral information.  And she

13   observed behaviors that are classical of post-traumatic stress

14   disorder.

15        So I got the collateral information from the time

16   when he was in either Pontiac or Menard and wrongfully

17   convicted.  And then I got collateral information from a

18   source from his older brother.  Collateral information -- let

19   me put it the other way.  Collateral information is one of the

20   key aspects to making a diagnosis of post-traumatic stress

21   disorder.  And I got a significant amount of collateral

22   information from him -- from two sources at two different

23   points of time.

24        And in addition, I interviewed him over an extensive

25   period of time, seven and three quarter hours.

Silberberg - deposition

1   Q   That's a long interview.

2   A   And that is by design because it looks for

3   inconsistencies.  It looks for contradictions.  It looks for

4   behavior.  A consistent long interview like that with

5   collateral interviews is far superior to any kind of

6   psychological testing.

7   Q   Is that longer interview than what you would ordinarily

8   do?

9   A   I did it on purpose because I wanted to see if he was

10  malingering.

11  Q   I'm asking the question is that longer than you normally

12  do?

13  A   For PTSD I do long interviews because I want to look for

14  inconsistencies and malingering.  I want to have time to ask

15  open-ended questions.

16  Q   So that interview is a normal interview time for PTSD?

17  A   For PTSD, yes.

18  Q   I appreciate the information.  I was trying to ask

19  something a little bit different, which is what are the

20  operative facts.  I'm not asking now what -- I'm asking what

21  are the operative facts, not what you reviewed, but what are

22  the operative facts with Mr. Fields that support your

23  diagnosis of PTSD?

24  A   Well, it's a long report.  The facts are from page 21 all

25  the way to page 24.  I could read them to you.  It's all

1  there.

2  Q   So I'm asking you to summarize what the operative facts

3  are that support your diagnosis of Mr. Fields with PTSD.

4  A   First of all, in relation to -- I mentioned my two

5  separate opinions about PTSD.  Let me find it.  Nate Fields

6  has, one, PTSD secondary to the psychological effects of death

7  row on an innocent person.  And then my second opinion in

8  regard to PTSD is Nate Fields has an axis one diagnosis of

9  PTSD secondary to the psychological effect of long-term

10  confinement on an innocent person.

11          So his PTSD is related to being on death row, and

12  it's also related to the long-term confinement in the

13  conditions and, in my opinion, to the extremely harsh

14  treatment he was exposed to.

15  Q   Not everybody in long-term confinement has PTSD, do they?

16  A   Not everyone does.  But he had -- after I interviewed him,

17  he met the criteria.

18  Q   What are the facts that support your opinion that he's got

19  PTSD?

20  A   He reported recurrent dream behavior, distressing

21  memories, avoiding behavior, hypervigilance, hyperarousal,

22  cognitive issues that caused him significant distress, and

23  it's impaired his function ever since he was released.

24  Q   What happened in prison that caused him to have PTSD?

25  A   First of all, he was wrongfully committed.  So he was

Silberberg - deposition

1    there for something that, in his mind -- and you could argue

2    about it, he did not do.  So every day he was concerned about

3    when his time would come to be on death row.  And he witnessed

4    different people going to death row.  He met with people who

5    were in the courtyard the day before they were executed.

6   Q   So everybody or death row has got PTSD?

7   A   I didn't evaluate everybody else.  But you asked me about

8    Nate.  Now I'm telling you about Nate Fields.  He witnessed

9    what happened to them.  He witnessed when they did two

10   executions in a row.  He was a witness when people were on

11   death row.  Their care was neglected.  And we may argue about

12   this, but he -- from his perspective, he was wrongfully

13   committed.  He shouldn't have been there, and he was facing

14   death row -- he was facing death every day, and he saw other

15   people facing death.

16  Q   Is there any literature with respect to whether long-term

17   confinement on an innocent person is different than long-term

18   confinement on a guilty man?

19  A   Yes.

20  Q   What literature is that?

21  A   Well, there's a well-respected psychiatrist named Adrian

22   Grounds, and he has done some research on this.

23  Q   What's the name of the paper?

24  A   I'm not sure of the name of the paper.  It's in a Canadian

25   journal.  I think it's the Canadian Journal of Criminology,

1    Criminal Behavior.

2         There have been studies done by other people who have

3    looked at this population such as a name that comes to mind,

4    Curtis, C-U-R-T-I-S-S.  There's another psychologist.  If I'm

5    not sure I'm spelling it correctly, Kornvisser,

6    K-O-R-N-V-I-S-S-E-R.  Then when you look at these articles,

7    you'll see that they quote many other experts who have done

8    studies on this and have actually demonstrated -- actually

9    studied the effects of long-term confinement on an innocent

10   person.  So yes, there's significant studies done.

11   Q    How many people were they able to find that were

12   supposedly innocent?

13   A    Well, it's a small population, but they've studied it.

14   You asked me the question.

15   Q    Did you review those articles in order to provide your

16   opinion?

17   A    No.  I'm aware of them because it's an interest of mine.

18   I actually happen to know Adrian Grounds.  He's a very

19   reputable and respected member.  He comes to our meetings all

20   the time.  We go to the Royal College of Psychiatry meetings.

21   He's somebody that people take very seriously.

22   Q    What's the gist of his conclusion in his article?  That's

23   Grounds.

24   A    Well, similar to what Nate told me in the facing of

25   uncertainty.  First of all, just the fact that you're there

1   for something you didn't do creates a whole different -- a

2   whole lot of different stresses to somebody who is there for

3   somebody that they did do -- for something that they did do

4   because they know it.  But if they're there for something they

5   didn't do, it's a whole different scenario.

6           In addition, if it also relates to death row issues,

7   there's the tremendous fear of other people dying.  The fight

8   to survive.

9           And then like in Nate's case, there is the wrongful

10  conviction verdict.  There's release without preparation.

11  There's the destruction of the family.  There's the

12  destruction of the whole social network.

13  Q   What does avoidance mean for PTSD purposes?

14  A   It's avoiding places, avoiding old neighbors, don't hang

15  out with old crowds.  He avoids distressing memories, thoughts

16  and feelings due to his arrest and confinement.  They don't

17  define it.

18          I know fishing gets bad memories out of the mind.

19  Distressing thoughts and memories goes away.  That meets the

20  criteria.

21  Q   You talk about the issue of avoidance in your report; is

22  that right?

23  A   Yes.

24  Q   Your opinion is that Nate Fields does have some symptoms

25  consistent with avoiding some things?

Silberberg - deposition

1   A    Correct.

2   Q    What does he avoid?

3   A    He avoids -- sometimes he goes to activities to stop him

4   to experiencing the memories and thoughts and feelings in

5   regard to the traumatic events.  Speaking at conferences, high

6   schools, colleges about what happened in death row

7   confinement.  It's a defense mechanism called sublimation.  By

8   doing something constructive, he's helping to get the bad

9   memories out, get them out for a while.  By avoiding the old

10  neighborhood, not hanging out with the crowd, not going to

11  bars or taverns, trying to be in before dark, that's a way of

12  avoiding reminders that cause him distressing memories and

13  thoughts.

14          So either by activities to get his mind off it, or he

15  reported that fishing is one thing that really helps him calm

16  down to not think about that.

17  Q    I'm talking about avoidance right now.

18  A    That is avoiding.

19  Q    Fishing?

20  A    Doing some activity, keeping your mind off the bad things

21  you remember all the time.

22  Q    So your opinion within a reasonable degree of forensic

23  psychiatric certainty is that the fact that Nate Fields goes

24  around the country talking about these events meets the PTSD

25  criteria of avoidance?

1   A    It's one way of avoiding some of the thoughts, memories
2   and feelings.
3   Q    So talking about them to groups of dozens of people is
4   actually avoiding the issues?
5   A    It's a way of dealing with the bad feelings by doing
6   something, trying to do something constructive.
7   Q    Dealing with the bad issues is different than actually
8   avoiding the issue, though, isn't it?
9   A    It's a double-edged sword.  On the one hand, it's a way of
10  dealing with the bad feelings.  On the other hand, it's
11  something that could make his PTSD worse.
12  Q    Going and talking to groups of people in D.C. and Texas,
13  California, Chicago, and talking to them about his experiences
14  is the opposite of avoidance; isn't it true?
15  A    It's a way of dealing with feelings and memories and
16  thoughts of that.  It's a defense mechanism to decrease the
17  anxiety by actually doing positive activities that can
18  actually decrease the anxiety he feels because of the memories
19  and the thoughts and the feelings.
20  Q    His speaking about these issues in front of large
21  audiences is avoidance?  Yes or no?
22  A    Yes.
23  Q    That's because it makes him think about it less later?
24  A    It helps him cope with the feelings.  It's psychological.
25  It's called a defense mechanism, and it helps him cope with

1  the feelings.  By doing something constructive or acting -- or

2  active, whether it's fishing or going for a walk or staying by

3  himself or coming in early, that's his way of avoiding the

4  external reminders or the distressing memories, thoughts or

5  feelings.

6  Q    But fishing, going for a walk, reading a book, those are

7  not all talking about the issue?  We're talking about actually

8  going in front of large crowds and talking about the issue.

9  Those are the same things to you for avoidance?

10  A    He was saying after he does that, it gets the bad memories

11  out of his mind, and the distressing memories and thoughts go

12  away after he does.  It's a way of getting mastery over what

13  happened to him.  It's a way of getting control, getting his

14  self-esteem back.

15  Q    That's the way he says avoidance, but as a forensic

16  psychiatrist, to you, that would be the opposite of avoidance,

17  right?

18  A    I understand what he's saying, and I think that people

19  avoid bad memories and thoughts and feelings in different

20  ways.  And that is the way of -- and that is a way of avoiding

21  stuff that is actually doing something constructive to get a

22  blanket out of your mind.

23  Q    And he presented comfortably and coherent, calm when he

24  was with you?

25  A    At times, except when he was talking about certain things

Silberberg - deposition

1    relating to what he's been through.

2    Q    His mother?

3    A    That was certainly very stressful for him.

4    Q    That would be normal for anybody?

5    A    It's not normal for anybody not to be able to attend their

6    mother's funeral because they're in prison.

7    Q    But it would be normal for people to have distress and

8    emotional feelings for the loss of a parent?

9    A    Yes.

10   Q    I want to talk about Nate's current functioning.  Would

11   you agree with the following that his behaviors are positive

12   things, that Nate is doing what a well-functioning individual

13   would be doing?  He's in a ten-year relationship with his

14   girlfriend Maggie?

15   A    That's healthy.

16   Q    In a loving relationship?  They both love each other, and

17   that's healthy as well, right?

18   A    Yes.

19   Q    He has a close relationship with his brother Nathaniel;

20   that's healthy?

21   A    Yes.

22   Q    He has said he makes friends easy; that's healthy?

23   A    Yes.

24   Q    That when he first got out of jail in 2003, that he got a

25   job and worked construction for a number of years; that was a

Silberberg - deposition

1  healthy thing?

2  A   Yes.

3  Q   That he -- he goes on these speaking engagements and is

4  involved in the Witness to Innocence program?

5  A   These are all healthy things, and they're all things that

6  do not fit in any way the criteria for antisocial personality

7  disorder.

8  Q   But they are inconsistent with the diagnosis of PTSD

9  because he's a functioning individual, right?

10  A   No.  See, that's where I think you and I are not

11  understanding each other.  Personality disorder is a

12  chronic -- is chronic and enduring; whereas, PTSD is a chronic

13  and relapsing episodic disorder.  It comes and goes.  And

14  there are periods of time when he can hold his act together,

15  and there are periods of time when he is exposed to certain

16  stresses or memories that he decompensates.

17  Q   Isn't it true that an element criteria that is required

18  for PTSD is the disturbance causes clinically significant

19  distress or impairment in social, occupational or other

20  important areas of function?

21  A   Yes.  And he does have that.

22  Q   But wouldn't all those positive things we just discussed

23  be inconsistent with clinically significant distress?

24  A   No.  Because it's a chronic and relapsing condition.  And

25  he's making -- Nate is making a significant and determined

1   effort to move on with his life, reconnect with the community

2   as much as he can, reconnect with his family, try and be as

3   productive of a citizen as he can, try to help other people

4   that were in the same situation.  So he's making every effort

5   he can to move forward.  That doesn't mean he's healthy.

6   Q   Girlfriend, job, friendships, relationships with family

7   members, speaking engagements, all those things are healthy

8   activities you would expect to see in a healthy person, right?

9   A   In a healthy person you'd see them in a sustained manner

10  without the avoidance, without the hypervigilance, without the

11  distressing memories, without the nightmares, without the --

12  all the -- all the other symptoms that he has.  So he's doing

13  his best to move on, but he's still very injured and impaired

14  by what happened to him.  He's making an effort.  I think

15  that's --

16  Q   In what way does Nate Fields, in your opinion, meet the

17  criteria G of PTSD where the disturbance causes clinically

18  significant distress or impairment in social, occupational or

19  other areas of functioning?  In what ways does Nate Fields

20  meet that criteria?  I want to talk specifically about this

21  one, G, not others.

22  A   He's got hypervigilance.  He's not sleeping.  He's having

23  nightmares.  He feels estranged from others.  He's got at

24  times diminished interest in participation in significant

25  activities.  He doesn't like interacting with a lot of people

1   aside from speaking engagements, which is his way of trying to

2   make himself whole.  So he's got all of these symptoms, and

3   he's going to need extensive treatment with medications,

4   psychotherapy, group job training.  You name it, he needs it.

5   He's a chronic and relapsed condition.  And PTSD is determined

6   by the dose and duration of criterion A.  He has a horrendous

7   dose of stress, and it's been for a long period of time.  So

8   that's why he meets G.

9   Q   What is disassociation?

10  A   It's a way of coping with stress where a person kind of

11  detaches themselves from reality.  A good example of this

12  would be if there's a bomb, and some people will be running

13  around and screaming and shouting, and another person will be

14  sitting on the curbside and staring into space.  It's a way of

15  coping with stress by not doing anything, basically by having

16  thoughts and feelings of numbness or feelings that don't --

17  that don't experience what's going on.

18  Q   Do you have an opinion as you sit here today whether Nate

19  Fields experiences flashbacks?

20  A   Yes.  He does.  He remembers like when John Parsh was

21  denied medical care and then dying because, according to his

22  opinion, he was neglected; when he recalls meeting with people

23  in the yard, meeting persons going to be executed in the yard,

24  and the next day they're gone, and the helicopter comes and

25  takes them away, those are very -- a flashback is a vivid

1   memory.  And he has those, and it's distressing to him.

2   Q   So a vivid memory equals a flashback in your opinion?

3   A   They're similar.  A flashback is like I describe.  The

4   distressing -- I think a flashback is used more in like the

5   movies and stuff like that.  But it's a distressing memory

6   that causes the person to relive what's going on, whether it's

7   emotionally or cognitively, when they're walking up or --

8   waking up or going to sleep -- it can happen in different

9   circumstances, but I want to emphasize that I would not ask a

10  person do you have a flashback.  That's a leading question.

11  Q   Would a vivid memory be -- if someone -- if somebody tells

12  you somebody's name and that person's memory comes to your

13  mind and you visualize that person in your head, does that

14  equal a flashback?

15  A   No.  But if you did that and it comes to mind with that

16  person beating you up and you were in terrible fear for your

17  life and you started reliving it, that would be a flashback.

18  Q   So in what ways does Mr. Fields remembering these fellow

19  death row inmates constitute a flashback?

20  A   It causes him extreme distress, and he becomes tearful and

21  sad and feels hopeless.  It causes him extreme emotional

22  distress.

23  Q   He's not reliving anything?

24  A   When he talks about it, he is reliving it.

25  Q   How do you differentiate a bad memory from a flashback?

Silberberg - deposition

1   A   They are -- a bad memory, anyone can have bad -- anybody

2   can have bad memories.  But in terms of PTSD, a bad memory

3   versus a flashback, a flashback would be where a person is --

4   in the flashback where a person is so intense that they are to

5   a certain extent reliving it.

6   Q   Is there anything Nate Fields can't do because of his bad

7   memories?

8   A   I think it interferes with his ability just to move

9   forward with his life.  He's stuck right now.  He needs

10  therapy, job training, medication.  That's a lot of symptoms

11  that need to be taken care of.

12  Q   Isn't it true that there's nothing in the prison

13  records -- I know you haven't reviewed them, but there's

14  nothing in the prison records that would indicate he has a

15  psychological disorder?

16  A   I'm not surprised.  People are quiet.  Even if they're

17  suffering, they don't get called to the attention of mental

18  health.

19  Q   I guess that's kind of a presumptuous thing to say without

20  reviewing the records themselves.

21  A   Taking my experiences as surveying in mental health care,

22  it's only the people who have a history of mental health,

23  bipolar or schizophrenia, or people who are trying to hurt

24  themselves that get the attention of mental health in jails

25  and prisons.

1   Q   Now, you said you briefly reviewed Dr. Cavanaugh's report.

2   Do you have any opinions today about what Dr. Cavanaugh said

3   in his report?

4   A   I have some serious concerns.

5   Q   Okay.  What concerns do you have?

6   A   I don't know how to express this.  He's describing himself

7   instead of me.  Finally, Dr. Silberberg --

8   Q   Where are you looking at?

9   A   Page 3.

10          Finally, Dr. Silberberg assumes that false arrest and

11  prolonged incarceration result in the development of mental

12  illness while utilizing very minimal collateral data to

13  support his opinions, contrary to published recommendations.

14  That is blatantly untrue, and either he didn't review my

15  report or he's just writing -- I don't know why he's writing

16  this.

17          I interviewed somebody who for ten years came by and

18  saw Mr. Fields when he was in tremendous distress, saw

19  Mr. Fields when his mom passed away, saw Mr. Fields when

20  Mr. Parsh died, saw Mr. Fields when people were executed, saw

21  him, in her description, being like Tom Hanks in that movie

22  where he changed.  I forget what that movie is called, but it

23  was pretty clear to me.  Saw him looking like a wild animal,

24  saw him over a period of ten years.  And to say that I don't

25  have collateral, it doesn't make any sense.  That is an

Silberberg - deposition

1    outrageous statement.  And in addition --

2    Q    You don't think he's talking about all the records you

3    didn't review?

4    A    Collateral did that.  The most collateral data would be an

5    interview with somebody who saw Mr. Fields when he was

6    suffering.  Jail records are minimal.  If he didn't see mental

7    health -- the correctional officers are not even trained to

8    document about mental health issues.

9    Q    Okay.

10   A    So that is an outrageous statement.

11   Q    Okay.  Anything else?

12   A    In addition, I interviewed the older brother, and he has a

13   good idea of how Nate is doing currently.  They're pretty

14   close.  They're pretty tight.

15   Q    All right.  Go ahead.  Let me ask the question.  Are there

16   any other -- you said you had concerns that you noticed in

17   Dr. Cavanaugh's report when you briefly perused it?

18   A    The fact that the interview was three and a half hours and

19   all of the psychological tests were done.  And if you add up

20   that amount of time the psychological tests were done, there

21   was no time for any interview.  And so no forensic evaluation

22   was done by Dr. Cavanaugh.

23   Q    But, again, you haven't seen -- are you aware there's a

24   transcript of the interview?

25   A    I am aware.

Silberberg - deposition

1    Q    You haven't read it, have you?

2    A    I haven't.

3    Q    You are aware there's a video of the interview?

4    A    I am.

5    Q    But you haven't seen the video, have you?

6    A    I know how these tests are administered and how much time

7    they take.

8    Q    You're comfortable sitting here today making those

9    comments about the interview with the video and a transcript

10   without even actually reading it; isn't that true?

11   A    What's true is I'm saying that how long the tests take,

12   and those tests take about three and a half hours if they are

13   administered properly.

14   Q    So this interview must have been a half hour or something

15   like that is what you're talking about?

16   A    Yeah.

17   Q    That's your criticism?

18   A    If Dr. Wasyliw rushed through the tests, which makes you

19   concerned about the validity -- about the validity if you rush

20   through them.

21   Q    Go ahead.

22   A    That's my second one.  I'm only looking at the highlights.

23   The selected literature I wasn't provided.  But I would say

24   the literature that I provided would strongly dispute this.

25   The literature Dr. Cavanaugh quotes.  The people that I

1  mentioned.  In addition, there's another -- I'm blocking on

2  his name right now, but somebody has written extensively about

3  the facts of segregation and long-term segregation on inmates.

4  Q  Do you know the name of that individual?

5  A  Terry -- I'm blocking on his name.  K-U-P-E-R-S.

6        And the issue with Nate is over a period of time, he

7  developed PTSD.  He was continuously exposed to noxious stress

8  after stress after stress.  So he was seriously ill, and he

9  was continuously exposed to this.  And so Terry Kupers would

10  talk about the effect of segregation on somebody who does have

11  a serious illness, and Nate had and still has PTSD.

12        Again, I can't believe it.  Second to last page he

13  says therefore his collateral database is very limited.  The

14  most important thing I have is the interview with Mary

15  Johnson.  It's ten years.  It's much better than documentation

16  by correctional officers who have no understanding of mental

17  illness or minimal understanding.  I know that because I train

18  correctional officers, and you basically train them to

19  recognize if somebody is suicidal, if they have medication

20  side effects, minimal understanding of mental health.

21        And then he says by contrast on the last page,

22  Dr. Wasyliw, though he certainly did ask open -- close-ended

23  questions, primarily used open-ended questions to explore the

24  psychological status of Mr. Fields.  Dr. Cavanaugh, to the

25  best of my recollection, was not present at my interview, and

 1  I only used open-ended questions.

 2  Q   How different was Mr. Fields' incarceration from '71 to

 3  '83 from his incarceration of '85 to 2003?

 4  A   That's an excellent question.  They were dramatically

 5  different.  In 1983 he says I was there.  He says I didn't

 6  commit -- I did not commit the crime.  We were running away.

 7  I fired in the air.  We were covered -- we covered that.  But

 8  he said it was less traumatic because I knew it was something

 9  dumb.  I was willing to take responsibility.  I was not on

10  death row.  I was mainly at Stateville.  I had education

11  programs.  I got my GED.  I got two years of college.  I was

12  able to interact and -- can't read my own writing.  Able to

13  interact a lot.

14          He may be exaggerating, but he says he was a football

15  star on the prison team.  He was a running back.  They trusted

16  him enough to get to minimum security.  And he had hope.

17          So that is in stark contrast to the horrendous

18  conditions he had at Pontiac and Menard.

19  Q   On page 10 you quote Mr. Fields as saying that he thinks

20  often maybe I made a big mistake being El Rukn, but then I

21  kick myself and say they should not have framed me.  How does

22  that relate, if at all, to your psychological diagnosis?

23  A   Looking --

24  Q   Page 10, five paragraphs down.

25  A   I think it talks to facts contrary to what we just talked

Silberberg - deposition

1   about, that an antisocial person would not say that, I
2   shouldn't have been a member of a gang -- I shouldn't have
3   been a gang member.  That shows some reflection, some ability
4   to take responsibility for themselves.  On the other hand, it
5   also shows how he's being injured by the process if indeed he
6   is innocent.  That is, no matter what his affiliation was, he
7   should not have been framed, according to him.
8   Q   Would symptoms of antisocial behavior -- do they
9   ordinarily decrease as a person ages?
10  A   There is some literature to describe that, yes.  Around 45
11  to 55 range.  Patients don't obey textbooks, but it is
12  something that has been described by some experts.
13  Q   Did you ask Nate whether he had an exaggerated startle
14  response before he went into jail in 1985?
15  A   You know, startle response is not something I ask about
16  because I don't ask leading questions.  It's just something I
17  observed.  And it just so happened that for some reason there
18  was a muffler.  It must have happened for some reason.
19  Candace's assistant knocked on the door and was bringing in
20  some coffee, and his response was -- it couldn't be rehearsed
21  unless the assistant and him arranged it.  He was like
22  somebody was shooting at him.
23  Q   I thought I saw somewhere in your report you bang on a
24  table?
25  A   I do that too.  He did have a startled response in

1  addition to that.  But I don't rely on that only.  There are

2  some questions among forensic psychiatrists whether you should

3  or shouldn't -- I've been to lectures where people say it's

4  ethical and fine to do that.

5  Q    You mentioned previously a need for treatment for

6  Mr. Fields, correct?

7  A    Right.

8  Q    What would you do for it?

9  A    Help to get rid of the symptoms.  He has intrusive

10 memories, the startle response, the disturbed sleep, all the

11 PTSD symptoms perhaps being independent of what happens with

12 the case and less driven to cope with what he's going through

13 by being focused on his case.  So that's what we would do for

14 him.

15         He also needs some job and employment counseling and

16 some therapy in terms of just restoring his sense of self and

17 well-being.  He's just been a survivor after everything that's

18 happened.

19         Medications are often helpful for PTSD, and just to

20 have that given by somebody who knows about the medications

21 and who can monitor them.

22         And then there are different types of treatment for

23 PTSD besides the general counseling I referred to, more

24 specific cognitive therapies, imaginary therapies, different

25 kinds or therapies that he could benefit from.

1    Q   You were asked some questions about Nate's murder

2    conviction from 1971.  I want to follow up a little bit on

3    that.  Do you remember those --

4    A   Yes.

5    Q   Do you remember those questions that he was asking you?

6    A   Yes.

7    Q   Now, you have made -- not to oversimplify it, but you have

8    made a diagnosis.  It's sort of two parts.  One is that Nate

9    did not have, in your view, any major psychiatric disorder

10    prior to his incarceration in 1985, and part two would be that

11    he does have some current psychiatric illnesses or disorders?

12    A   Yes to both parts.

13    Q   And I want to ask -- I'll ask you a hypothetical question

14    related to the 1971 conviction and ask you whether these

15    facts, which I'm going to give you, would alter your diagnosis

16    in either one of those two parts.  Okay?

17        So if you had known that when he went to trial in

18    1971 related to the 1971 conviction, I think -- I believe he

19    was either 17 or 18 at the time of his trial.  If you had

20    known that he had put on false evidence and he testified under

21    oath that, in fact, he wasn't even there the night that it

22    happened and had lied in that trial, and if you had known that

23    after he was convicted in 1971 and his case went up on appeal,

24    it was reversed and sent back for a retrial some five or six

25    years later and that at the retrial he put on no evidence at

1   all and did not repeat any perjured testimony that he had

2   given at the first trial, would those facts alter your

3   diagnosis?

4   A   My diagnosis of what?

5   Q   Of either that he had -- that he had had a prior -- that

6   he had no prior psychiatric disorder prior to 1985 and your

7   current diagnosis of PTSD and related disorders?

8   A   It wouldn't have altered my -- it wouldn't have altered

9   whether he had PTSD.  It may have reenforced my opinion that

10   he didn't have antisocial personality disorder.  Of course, he

11   didn't lie again.

12   Q   You were asked a lot of questions about his earlier

13   incarceration and how that could have affected his current

14   diagnosis.  Do you recall those questions?

15   A   Yes.

16   Q   Does the fact that -- and you've answered that, and you've

17   said that he -- that some of the things that were significant

18   to you were that in his first incarceration he received an

19   education, he didn't experience the type of isolation and

20   brutality -- or at least he didn't report those types of

21   incidents; is that correct?

22   A   Yes.

23   Q   Would it also be significant to you that -- to know that

24   the last year or two of his first incarceration he was in an

25   honor farm where there were no walls in which he had a

Silberberg - deposition

1    significant amount of trust and responsibility?

2    A    Yes.  That is significant.  He worded to me like he got to

3    minimum security.  Again, that's significant.

4    Q    Does that support your finding that he did not have a

5    significant psychiatric disorder prior to 1985?

6    A    Yes.  I don't think somebody with a significant -- that

7    PTSD or antisocial personality disorder would go to minimum

8    security at Stateville.

9                 MS. MATUZAK:  Thank you.

10               THE COURT:  Then there's some more that's going to be

11   read.

12               Go ahead, Mr. Noland.

13               MR. NOLAND:  If Mr. Bleifuss could just read, I'd

14   appreciate it.

15               THE COURT:  Do you have the part?

16               MR. NOLAND:  I have a copy for you.

17   BY MR. NOLAND:

18   Q    What is that?

19               THE COURT:  So just to be clear, the "that" is

20   something that was handed to the witness during the

21   deposition.  He's not handing him anything right now.

22   BY MR. BLEIFUSS:

23   A    That is my billing as of August 6th, 2013.

24   Q    And what is the total as of that time?

25   A    $8,000.

1   Q   That line says 13,000.  Am I reading that wrong?

2   A   13,000.  The amount due in this bill was 8,000.  So a

3   total of 13,000 that I've billed so far.

4   Q   Have you billed any amounts since this time, August 6,

5   2013?

6   A   I have some pending bills, but I haven't billed it yet.

7   Q   How much pending billing do you have yet?

8   A   I don't know offhand.

9   Q   Can you estimate how many?

10  A   I'm not really sure.  I think it's eight, ten, 19 hours.

11  Q   What did that involve?

12  A   It didn't -- I didn't see the review of the billing.  The

13  video should be -- would be included.  The preparation for the

14  deposition today, and I believe I've had two -- one

15  substantial and one short conversation with Mr. Goodman.

16  Q   The items that you reviewed and considered in preparing

17  your opinions in your report are contained on pages 1 and 2 of

18  the report; is that right?

19  A   That is correct.

20          MR. NOLAND:  Judge, I would just now like to read

21  what's in page 1 and 2 of the report, which identifies the --

22          THE COURT:  So, in other words, you're going to read

23  a reference, and then you're going to ask him whether he

24  reviewed anything else essentially other than what the items

25  that you're going to read?

1          MR. NOLAND:  Yes.

2          THE COURT:  Yes, that's fine.

3    BY MR. NOLAND:

4    Q    So here are the materials, Dr. Silberberg, that you

5    identified as materials reviewed and considered in your

6    report.

7          Paragraph 1:  Memorandum and exhibits filed in court

8    by Fields' lawyer.

9          2:  Reply memorandum and exhibits filed in court by

10   Fields' lawyers.

11         3:  Discovery deposition of Nathson Fields taken in

12   Chicago on March 15th, 2012.

13         4:  Video from Menard Correctional Center, Fields v

14   Maue, et al.

15         5:  First session of forensic psychiatric evaluation

16   of Nathson Fields, [four hours] done on June 17th, 2013, at

17   220 South Halsted Street, Chicago, Illinois.

18         6:  Second session of forensic psychiatric evaluation

19   of Nathson Fields [three hours and 45 minutes] done on

20   Tuesday, July 23rd, 2013, at 220 South Halsted Street,

21   Chicago.

22         7:  Collateral interview of Nathaniel Fields [one

23   hour and 15 minutes] done on Tuesday, July 23rd, 2013, at 220

24   South Halsted Street.

25         8:  Collateral interview of Mary Johnson [one hour

Silberberg - deposition

1  and 15 minutes] done on Tuesday, July 24th, 2013, at 3830 West

2  Polk Street.

3          Those are the materials identified in your report?

4  A    Yes.

5  Q    You did not review anything else other than the items that

6  are identified in paragraphs 1 through 8 on pages 1 and 2?

7  A    I always request that I be given all pertinent

8  documentation.  This is what I was given.  This is what I

9  reviewed.  I felt comfortable making an opinion to a

10  reasonable degree of medical certainty certainly -- to a

11  reasonable degree of medical certainty based on what I was

12  given.

13  Q    This [the 1971 murder] would be an incident of a major

14  violent act with a rival gang of the most serious of nature.

15  Would you agree with that?

16  A    Yes.  And he took responsibility for it, and he did his

17  time.  And he did not claim that he was like -- he said I'm

18  responsible.  I had bad judgment.

19  Q    Would it have been consistent with him taking

20  responsibility for it for presenting a false alibi at his

21  trial for that matter?

22  A    I don't know the details of the trial, so I can't comment

23  on that.

24  Q    Presume that he presented a false alibi in his trial for

25  this.  Would that be entirely inconsistent with taking

1    responsibility for that event?

2    A    Assuming Mr. Fields did that or assuming anybody did that?

3    Q    Mr. Fields.

4    A    I'd have to know the totality of the circumstances.

5    Q    Mr. Fields says he wasn't there when the proof was he was

6    there.

7    A    Okay.

8    Q    Do you know whether or not Mr. Fields committed perjury at

9    his trial for the 1971 murder?

10   A    I have not reviewed that in detail.

11   Q    Would it be your opinion whether he had a disorder or any

12   symptoms with antisocial personality disorder?

13   A    It may be pertinent.  It's possibly pertinent.

14   Q    It's one of the criteria of an antisocial personality

15   disorder?

16   A    Not an isolated incident.  If there's a persistent pattern

17   of lying to a point of responsibility, then it would be

18   significant.

19   Q    You'd have to evaluate his record beyond what he just

20   tells you to see if there's a consistent pattern of lying;

21   isn't that true?

22   A    Again, you know, I review whatever I have been given.  And

23   based on what I have been given, I did not assess that he had

24   antisocial personality disorder.

25   Q    You didn't review anything from his records to see whether

1   or not he -- whether or not what he was telling you was true,

2   did you?

3   A   I reviewed his deposition.  I reviewed some of the other

4   information from his two petitions.  Gang members do lie.

5   There's no doubt about that.

6   Q   He's one of those gang members that lies, isn't he?

7   A   As you indicate and as I'm aware, he did tell some lies.

8   That's not uncommon for gang members to do.

9   Q   So because he tells lies, it would be particularly

10  important to verify the validity of his self-report; isn't

11  that true?

12  A   Collateral information can always help to enhance an

13  opinion.

14  Q   By the way, when did Fields take responsibility for the

15  1971 murder?  When did he first do that?

16  A   I don't know.  I just know he told me.  He said that he

17  takes responsibility for that because that was bad judgment

18  and he was in the wrong place at the wrong time.

19  Q   Did you read Mr. Fields' 1986 trial?

20  A   No.

21  Q   Did you read his 2009?

22  A   No.

23  Q   Do you know how many El Rukns have said Nate Fields did

24  those murders?

25  A   No idea.

Silberberg - deposition

1   Q   Do you know if any El Rukns have said Nate Fields did

2   those murders?

3   A   As I've stated, I have read those documents -- I haven't

4   read those documents.

5   Q   But it is a crucial aspect of your opinion that you're

6   presuming that Nate Fields is innocent; is that true?

7   A   Based on what I've reviewed, yes, and based on what he

8   told me, yes.

9       If, in fact, he's guilty, that you would not be able

10  to offer the --

11      I'm sorry.  I apologize.

12  Q   If, in fact, he is guilty, that you would not be able to

13  offer the opinion you are offering here today about Nate

14  having PTSD?  That you'd need to reevaluate your position to

15  see where you'd fall?

16  A   Yes.

17  Q   The Orange Crush video mentioned earlier.  I think you've

18  got that in your packet?

19  A   Yes.

20  Q   Is watching that video relevant to your opinions in any

21  way?

22  A   Yes.

23  Q   By criteria, you're talking about a traumatic event?

24  A   Yes.

25  Q   He, Fields, had symptoms consistent with persecutory

Silberberg - deposition

1    ideation by claiming throughout his incarceration the guards
2    were out to get him?
3    A    Sometimes -- as I said, I worked at Cook County Jail, the
4    mental health section, four or five years, and sometimes
5    that's the case.  Guards do pick on certain people.
6    Q    Presuming that wasn't the case and Mr. Fields in every
7    situation he was at, the guards were against him.  That would
8    be consistent with persecutory ideation?
9    A    I'd have to know the consistent details of each
10   interaction.
11              THE COURT:  Stop a second.  I think we have to talk
12   about the next thing.
13              Let me see the lawyers at side bar, please.
14              (The following proceedings were had at sidebar in the
15              presence but out of the hearing of the jury:)
16              THE COURT:  So what I have --
17              Oh, okay.  You skipped ahead.  I didn't have -- I
18   wasn't able to open that attachment.  Okay.  You're fine.
19   You've covered it.
20              (The following proceedings were had in the presence
21              and hearing of the jury:)
22              THE COURT:  That was my mistake.  I apologize for the
23   interruption.
24              MR. NOLAND:  May I, your Honor?
25              THE COURT:  Yes.  That's fine.

Silberberg - deposition

BY MR. NOLAND:

Q   Wouldn't it make it incredible what Nate is telling you if, in fact, my hypothetical is true that his co-offenders testified to the events and that one -- that these is one of these shooters?

A   If it's credible and it's backed up by the facts and it wasn't recanted, then it's possible.

Q   In fact, it would make it incredible if six other El Rukns who are also gang members also said he killed Smith and Hickman, true?

A   Again, if --

Q   Hypothetically speaking?

A   Yes.

Q   Let me ask this: As a forensic psychiatrist, are you comfortable here today offering opinions saying that snippets of information given to you by plaintiff's counsel, not the trial record, not what people actually said, but snippets of information about their claim of his innocence is reliable information for a forensic psychiatrist to rely upon in saying that the person's self-report of innocence is credible?

A   If I find out that snippets they provide me conceal or hide the truth, then my opinion would change.  My opinion would change.

        MR. NOLAND:  Nothing further.

        THE COURT:  Okay.  Mr. Bleifuss, you can step down.

1       Other witnesses or evidence for the plaintiff on

2   damages?

3           MS. GORMAN:  We rest, your Honor.

4           THE COURT:  Okay.  Let me just talk briefly to the

5   lawyers at side bar.  Don't need you over here.  It's about

6   scheduling.

7           (Side bar conference off the record.)

8           (The following proceedings were had in the presence

9           and hearing of the jury:)

10          THE COURT:  Okay.  We're going to take a ten-minute

11  break at this point.  Come with me, and we'll resume in ten

12  minutes.

13          (Recess taken.)

14          (The following proceedings were had out of the

15          presence and hearing of the jury:)

16          THE COURT:  We're back on the record.

17          So we moved the video so that -- I think the way it

18  was set up before, because the camera would have been shooting

19  the lawyers, it would have also shown the jury, which I don't

20  think is appropriate, so that's why we've moved it over there.

21          So when the lawyer's questioning a witness, I'll

22  change it so that it goes over to that setting there.  And

23  you'll decide how many people you want to have in the

24  background or whether you want to move to a different part of

25  the table.

1          MR. BURNS:  Oh, Mr. Maue.

2          THE COURT:  Yes.

3          So when we're going to do that, we're going to need

4   to get Mr. Gambozi back up here so that he can put in the call

5   to make the connection down there.  So do we have a sense of

6   about when?  Do you want to -- are we going to interrupt a

7   witness or --

8          MR. BURNS:  Our second witness would be

9   Dr. Cavanaugh.  We have the excerpt in Derrick Kees.

10         THE COURT:  Do you want to finish Dr. Cavanaugh

11  before doing this person?

12         What's the ballpark on the direct of Dr. Cavanaugh?

13         MR. BURNS:  Roughly about an hour or so.

14         THE COURT:  So we'd be into the afternoon, in other

15  words, pretty clearly, or pretty darn close to it.

16         MR. BURNS:  If we knew, for example, if we knew

17  that -- presumably Maue is going to be available right on the

18  11:00.  His would be shorter.  We'd be done with his, and then

19  we'd do Cavanaugh and be done.

20         THE COURT:  I mean, I can do it any way you want, but

21  Mr. Gambozi can't sit up here and wait for it, so I'll just

22  need to know.  When we finish Kees, I'm just going to turn to

23  you and say who's next, and if you say we'd like to do the

24  remote witness next, just call him the remote witness next,

25  then I'll know we need to take a short break so that I can get

1  Mr. Gambozi back up here.

2       MR. MICHALIK:  We've got someone monitoring to see.

3       THE COURT:  Okay.  If he's on his way to the place,

4  I'm assuming, or whatever.  All right.

5       MR. BURNS:  Maybe we could take just a side bar when

6  we finish with that first.  We'll talk about it at side bar

7  very quickly.

8       THE COURT:  Okay.  So since there's a good chance

9  that Dr. Cavanaugh is going to be starting, are there any

10  issues that anybody needs to take up that I haven't already

11  addressed that relate to Dr. Cavanaugh?

12       MR. BURNS:  I think we recognize the things that you

13  told us to stay away.  I'll use the ELMO just to put up his

14  opinions and just his bullet points so he can describe them to

15  the jury.  But given the other matters that you said he should

16  not be talking about, for example, certificate of innocence --

17       THE COURT:  So I'm assuming you've talked to him

18  about all that stuff.

19       MR. BURNS:  We have told him.

20       THE COURT:  And he's an experienced witness, so I'm

21  assuming he gets it.

22       MR. BURNS:  Okay.

23       THE COURT:  All right.  So the way this is looking to

24  me -- so you've got Dr. Cavanaugh.  You've got Mr. Maue.  And

25  said you're going to put Mr. O'Callaghan back on the stand.

1    You're going to be arguing this afternoon.  So, anyway, just

2    plan on that, and we'll deal with the jury instructions at

3    some point.  Not terribly complicated.  Okay.

4            MR. NOLAND:  If we could lead in with Kees and just

5    remind the jury that he was one of the incarcerated

6    individuals that had to go back to prison.

7            THE COURT:  I'll tell them.

8            MR. NOLAND:  Is that fine?

9            THE COURT:  I'll tell them.  That's fine.

10           (The following proceedings were had in the presence

11           and hearing of the jury:)

12           THE COURT:  Okay.  You can all have a seat.

13       So just so you know what this contraption over here

14   is, it's possible that there may be a witness testifying by

15   video from a remote location later.  The thing on top of it is

16   a camera which has two settings, one on me, the primary one

17   being on the questioner, and so that's what the person at the

18   other end will see.  And then you all will see him on your

19   screens, and then also I believe on the juror screen.

20       So the defendants are going to read some testimony

21   from Derrick Kees.  And you may recall that Mr. Kees, K-E-E-S

22   I believe is the spelling, was one of the incarcerated people

23   that testified earlier, and so as to not bring him back,

24   that's why we're doing it by way of his prior testimony.

25       So we're going to do it the same way.  And give your

1    name for the record so she's got it.

2            MR. PAYETTE:  Derek Payette, D-E-R-E-K,

3    P-A-Y-E-T-T-E.

4            THE COURT:  And, again, Mr. Payette, I'm not going to

5    swear him in because he's just reading Mr. Kees's testimony,

6    and Mr. Noland is going to read the questions.

7            Okay.

8            MR. NOLAND:  May I proceed, your Honor?

9            THE COURT:  Yes, you can.

10           MR. NOLAND:  Thank you.

11      DERRICK KEES, DEFENDANT'S WITNESS, THROUGH HIS DEPOSITION

12                          EXAMINATION

13   BY MR. NOLAND:

14   Q    Mr. Kees, several months later did a dispute develop

15   between the El Rukns and a gang called the King Cobras?

16   BY MR. PAYETTE:

17   A    The King Cobras' dispute developed in '85, the spring of

18   '85.

19   Q    Okay.  And who was the leader of the King Cobras?

20   A    Treddest Murray.

21   Q    And were the other members of the King Cobras Moose

22   Jackson, Theotis Clark and a number of other individuals?

23   A    Yes.

24   Q    And what was the nature of the dispute between the King

25   Cobras and the El Rukns at the time frame you described?

Kees - deposition

1   A   Okay.   The El Rukns had the operation called the Gorilla

2   Family, and the Gorilla Family was selling heroin and cocaine

3   at the corner of 67th Place and Stony Island.   Around that

4   same time, Treddest Murray had an operation going on on 67th

5   Street along Blackstone and Dorchester.

6            Now, the dispute started when Treddest Murray was on

7   the corner in the lounge on 67th Place and Stony Island, and

8   he had some guys with him, and it was reported to me by Rocky

9   Easton when I arrived on 67th Street that Treddest was up

10  there with a lot of body language, him and his guys.

11  Q   What did you mean by body language?

12  A   Being sort of bold and boastful up there, you know, as if

13  to say this is our corner and not y'all's.

14  Q   And what happened next with the dispute with the King

15  Cobras?

16  A   So as a result of all that, all the generals and officers

17  that was up there, we went back to the Morocco, and there was

18  a -- there was already a short discussion earlier.   Now there

19  was another discussion, and it was about what we about to do

20  to Treddest, and there was some people saying, look, we need

21  to hold up, and some people wanted to get into philosophical

22  and be diplomatic and all that, but myself -- well, and

23  Nathson Fields stood out from everybody, and he said what

24  Chief said is the demonstration and that's what we going to

25  do.

Kees - deposition

1    Q    And what does that mean when Fields said what Chief said
2    is the demonstration and that's --
3    A    That was in support of what I was saying, that now it's
4    time to take action against Treddest.
5    Q    What happens next in the dispute with the King Cobras?
6    A    What happened next?  Well, we continued looking for
7    Treddest Murray and we were looking for Treddest.  We spotted
8    his car on 71st Street.
9         So we were waiting for Treddest to come out of the
10   lounge.  It was myself, Floyd Davis, Edgar Cooksey, and we had
11   Nathson Fields on the same side of the street where Treddest's
12   car was, and we was waiting for Treddest to come out of the
13   lounge.
14   Q    And was Fields armed at that time?
15   A    Yes, Fields was armed.
16   Q    What type of firearm did he have?
17   A    He had a machine gun, Intratec 9.
18   Q    And what happened when you were out on 71st Street that
19   night when Fields also had the Intratec 9?
20   A    Fields got busted with the gun while he was waiting on
21   Treddest to come out.
22   Q    You saw Fields get taken by the police?
23   A    Yeah.
24        MR. NOLAND:  No further questions, Judge.
25        THE COURT:  So that covers the entirety of that.

Kees - deposition

1      MR. NOLAND:  Yes, it does.

2      THE COURT:  And there's some questions that you're

3   going to ask.

4      MS. MATUZAK:  Yes.

5      THE COURT:  That's right.  I forgot that.

6   BY MS. MATUZAK:

7   Q   Mr. Kees, you entered into this plea deal in 1990; is that

8   correct?

9   BY MR. PAYETTE:

10  A   That's correct.

11  Q   On January 23rd?

12      Second to last page?

13  A   January, looks like 23rd.

14  Q   And prior to reaching the plea deal you testified in the

15  grand jury; is that correct?

16  A   Yes, I did.

17  Q   And prior to testifying in the grand jury you met with

18  Officers O'Callaghan, Murphy, Brannigan and U.S. Attorney

19  Hogan to tell them everything you knew; is that correct?

20  A   That's right.

21  Q   In your direct testimony you stated that Mr. Fields went

22  with you to 67th and Stony to meet up with Treddest Murray; do

23  you recall that?

24      Do you recall saying that?

25  A   I recall saying Mr. Fields was with us when we went up

Kees - deposition

1    there to confront Treddest Murray.

2  Q   But you didn't tell that to the grand jury, did you?

3  A   If it's not in there, then it's not in there.

4  Q   And you did not tell that to Mr. Mr. Hogan, did you?

5  A   Oh, yeah, I told that to Mr. Hogan.

6  Q   Just wasn't put into the grand jury testimony?

7  A   I didn't write it.

8  Q   You were there at the grand jury, correct?

9  A   I didn't write it.

10 Q   The question is:  You were present at the grand jury; is

11   that correct?

12 A   I testified, yes.

13 Q   And didn't you also testify at the grand jury to any

14   mistakes or omissions in the testimony that Mr. Hogan already

15   had?  Didn't he ask you after every phrase, after every

16   paragraph of your statement, do you have anything more to add;

17   do you recall that?

18 A   I can't recall.

19         MS. MATUZAK:  That's all.

20         THE COURT:  Okay.  Let me just check quickly with the

21   lawyers at side bar.

22         Do you need to check with somebody, Mr. Michalik?

23         Why don't the lawyers come over here, and then

24   Mr. Michalik can join us when he finds out the situation.

25   He's just checking on availability of somebody.

 1              (Side bar conference off the record.)

 2              THE COURT:  Okay.  We're going to get the next

 3    witness.

 4              I will tell you that my expectation, having talked to

 5    the lawyers, is that we'll finish the testimony today, and

 6    we'll finish the arguments today, and you'll be deliberating

 7    on damages before the end of the day, or at least by the end

 8    of the day.

 9              The instructions that I'll be giving you are

10    relatively short.  It basically says you follow all of the

11    other instructions plus a couple of extras, which I'll give

12    you.

13              One thing I will need to know from you is if you

14    still have your copies of the other instructions, you can use

15    those.  If you need more copies, just let me know.  We can

16    print out more copies.

17              Right up here.

18              (Witness sworn.)

19              MR. BURNS:  Your Honor, just before I begin, I know

20    we had mentioned earlier about just switching.  I may be using

21    the ELMO, I know.

22              THE COURT:  Oh, the ELMO, not the computer.  Okay.

23    Sorry.  I didn't catch that.

24              MR. BURNS:  I apologize if I wasn't clear.

25              THE COURT:  You've got it.

1        MR. BURNS:  Thank you then.

2             With that, then, your Honor, may I proceed?

3        THE COURT:  Yes.

4        MR. BURNS:  Thank you.

5      JAMES LOUIS CAVANAUGH, DEFENDANT'S WITNESS, DULY SWORN

6                      DIRECT EXAMINATION

7  BY MR. BURNS:

8  Q   Good morning, sir.

9  A   Good morning.

10 Q   Would you kindly tell the ladies and gentlemen of the jury

   your name, and for the benefit of our court reporter, would

12 you please spell your last name?

13 A   James Louis Cavanaugh, C-A-V-A-N-A-U-G-H.

14 Q   Sir, would you tell us what your profession is?

15 A   I'm a physician specializing in general and forensic

16 psychiatry.

17 Q   Are you a medical doctor?

18 A   I am.

19 Q   Are you licensed to practice medicine and all its branches

20 in the state of Illinois?

21 A   I am.

22 Q   Doctor, would you tell us when you first became so

23 licensed?

24 A   After my medical training at the University of

25 Pennsylvania, I would have gotten my medical license in

Cavanaugh - direct

1    Illinois in approximately 1970.

2    Q    When did you graduate from -- is it the University of

3    Pennsylvania Medical School?

4    A    Yes.

5    Q    When did you graduate?

6    A    In 1967.

7    Q    When you graduated from medical school, did you pursue any

8    post-graduate training, education relative to your current

9    area of expertise and discipline, that being psychiatry?

10   A    Yes.

11   Q    Would you tell the jury?

12   A    The procedure in those days, which has changed a little

13   bit, after a individual graduates from medical school, they

14   had to do a one-year general medical internship, and I came

15   out here to Chicago for the first time and did that at the

16   Cook County Hospital.  I then returned to the University of

17   Pennsylvania and did a three-year residency in general

18   psychiatry.  And following that I was in the Navy as a

19   neuropsychiatrist for two years at the end of the Vietnam war.

20   Q    And once you completed your military commitment --

21              What year was that approximately, doctor?

22   A    My military commitment was from 1971 to 1973.

23   Q    And then did you engage in the private practice of

24   medicine?

25   A    I was involved in doing some private practice, but my

Cavanaugh - direct

1   primary affiliation from then until now is at Rush University

2   Medical Center, where I've been in the Department of

3   Psychiatry and in the medical school now as a professor of

4   psychiatry for many years.

5   Q   How long have you been on staff at -- is it Rush

6   University Hospital?

7   A   It's now called Rush University Medical Center.  Had a

8   name change a few years back.

9   Q   It's gone through several name changes?

10  A   Several.

11  Q   How long have you been on staff, then, at Rush going back

12  through the predecessor names?

13  A   Almost 45 years.

14  Q   And what position do you hold currently at the hospital?

15  A   I'm an attending physician in the hospital, and I have an

16  academic appointment in the medical school.

17  Q   Would you share with us a little bit more about the

18  academic appointment with the medical school, please?

19  A   I'm a professor of psychiatry, which means over the years

20  I've been involved in teaching medical students and residents.

21  I've been involved in developing a specialized division or

22  section of law and psychiatry for 25 years where we trained

23  graduate psychiatrists who are interested in becoming forensic

24  psychiatrists.

25          I have precepted residents.  Preceptorship is one of

1    the techniques of medical training where it's more of a

2    one-to-one mentoring of a undergraduate medical student or a

3    resident and as they learn more about how to practice good

4    medicine.

5    Q    Are you board certified, doctor?

6    A    Yes, I am.

7    Q    What is board certification, if you could explain that to

8    the ladies and gentlemen of the jury?

9    A    Board certification is the highest level of accomplishment

10   and recognition you can get in a subspecialty area.  So every

11   medical subspecialty in medicine, of which psychiatry is one,

12   has a board of that specialty, and among other things, that

13   board develops examinations to test a fully trained

14   practitioner in that subspecialty as to whether they are

15   worthy of obtaining a level of a board certified specialist in

16   internal medicine, psychiatry, whatever it may be.  So it's a

17   evaluation by your elder peers through either testing of your

18   knowledge base and/or interaction under their supervision as

19   to how skillful are you, or not, in dealing with patients,

20   talking with patients, doing physical exams, doing mental

21   status exams, that sort of thing.

22   Q    So you are, then, board certified.  What is the board that

23   certifies you?

24   A    I'm board certified by the American Board of Psychiatry

25   and Neurology, and I'm also board certified by the American

1    Board of Forensic Psychiatry.  Those are two separate boards.

2    Q    And how long have you held those board certifications,

3    doctor?

4    A    I was certified by the American Board of Psychiatry and

5    Neurology in approximately 1974 and the American Board of

6    Forensic Psychiatry in approximately 1983.

7    Q    Doctor, would you briefly tell us what is psychiatry?

8    A    Psychiatry is a subspecialty within general medicine that

9    deals with the diagnosis and treatment of nervous, emotional

10   and behavioral issues that we as human beings can develop.

11   Q    What is forensic psychiatry?  How does it differ from

12   general psychiatry?

13   A    First, it's a subspecialty within general psychiatry.  You

14   first have to be fully trained and boarded in general

15   psychiatry.  But forensic psychiatry deals on several levels

16   with interesting issues, one, civil and criminal litigation

17   matters where behavioral science, psychiatric or psychological

18   issues arise.  Another important area is in the emerging field

19   of correctional psychiatry and psychology, which is the care

20   and treatment of individuals who may have a mental illness or

21   psychological problem in a institutionalized correctional

22   environment.  And the third general area the forensic

23   psychiatrist gets involved in is behavioral risk assessment,

24   evaluating individuals on behalf of companies, corporations,

25   government for potentially risky behavior that may put the

1    workplace, for example, at risk if the individual isn't

2    assessed and dealt with appropriately.

3    Q    Have you consulted relative to forensic psychiatry not

4    only in the private sector but also with law enforcement?

5    A    I have.

6    Q    For example?

7    A    Well, I've been involved over the years in individual

8    criminal cases where I have been retained to look at issues

9    that come up such as issues of an insanity defense or the

10   psychological fitness of an individual who has a charge to

11   stand trial, because you must be psychologically fit to

12   proceed to trial.  Those would be some of the kinds of issues

13   that I can get involved in in the criminal area.

14          Also I've gotten involved in consulting with the

15   Catholic Church on a number of issues involving priests who

16   abuse children, how to evaluate those situations, how to try

17   to make something better out of something that's not so good.

18   Q    Do you consult with agencies such as the FBI or other law

19   enforcement agencies themselves?

20   A    Yes.  Over the years I've had long associations of a

21   consultantship with the U.S. Secret Service, the FBI, the

22   Illinois State Police and so on.

23   Q    What about with correctional facilities?  Do you consult

24   with them relative to mental health issues?

25   A    Yes, I do.  I have a small not-for-profit company called

1    the Isaac Ray Center that specializes in correctional health

2    care, and since 1994 we have been involved in providing mental

3    health services and staff to some very large correctional

4    facilities in the Chicagoland area.  For 16 years we provided

5    mental health services at Cook County Jail, taking care of the

6    ten thousand detainees there.  And since 2007 we've had a

7    contract with the County to provide a mental health service

8    program for detained youth at the Juvenile Temporary Detention

9    Center here in Chicago, which is the largest detention center

10   in the United States.

11   Q    So mental health well-being is a concern that you consult

12   with concerning prisoners who are in custody, whether it's an

13   adult facility or for a juvenile facility; am I correct in

14   saying that?

15   A    Absolutely.  This is a very important area of my work and

16   of the work of the group I have with me at the Isaac Ray

17   Center, and it's a very important issue in society today as we

18   have more and more individuals who are detained and

19   incarcerated in the United States.

20   Q    What about mental health facilities?  For example, the

21   Illinois Department of Mental Health?  Do you collaborate or

22   consult with them relative to the work that they do?

23   A    I more consult with them.  I have been on some

24   gubernatorial boards looking at issues related to statewide

25   mental health services and that sort of thing, but I have

1  never personally worked in a state mental health facility.

2  Q   What is psychology, and how does psychology differ from

3  psychiatry?

4  A   Psychology is a discipline within the field of liberal

5  arts that deals with human behavior and in which an

6  individual, through studying psychological issues, can obtain

7  either a bachelor's level degree, a master's level degree or a

8  Ph.D. level degree.  And psychologists certainly are qualified

9  to render therapies, evaluate individuals and so on, but

10  they're not physicians.  They have not gone to medical school.

11  They really don't have a background in the differential

12  diagnosis between a medical illness and a psychiatric illness,

13  where they can kind of look the same in certain cases.  And

14  they can't prescribe medications.

15  Q   In your professional experience, have you contributed to

16  literature within your area of discipline, that being

17  psychiatry, forensic psychiatry?

18  A   I have.

19  Q   And would you describe for those members of the jury what

20  you have contributed?  I would ask you to begin with papers

21  that you have authored.

22  A   Oh, probably in my career I've authored or coauthored 50,

23  70 papers and authored or coauthored half a dozen or more book

24  chapters in areas generally related to, you know, forensic

25  psychiatry and forensic psychology or the issues of behavioral

1   risk management and assessment, which I mentioned earlier, is

2   one of the areas that forensic psychiatrists get involved in.

3   Q   Have you also authored abstracts?

4   A   Oh, yes, many.  You know, an abstract is what is submitted

5   at a national meeting, and if it's accepted and you present it

6   at the national meeting, then that abstract can be published.

7   And I don't know how many but --

8   Q   I've looked at your CV.  I've counted --

9   A   I don't know.  Fifty, a hundred.  I've lost count.

10  Q   But those are submitted for what purpose?  Why do you

11  publish in -- whether it's related specifically to your field?

12  Why do physicians publish?

13  A   Well, physicians publish to hopefully advance the state of

14  the field, the knowledge that is emerging in the field.  So if

15  you have new knowledge, if you have new ideas about how to

16  treat or diagnose a condition, you try to get it published to

17  get the word out so your colleagues can benefit from that, or

18  challenge it if, you know, if it's really not really

19  worthwhile.  But assuming it's good material, people learn

20  about it in the field.  Then the idea is that all boats rise

21  in terms of care and skill given to the treatment of patients.

22  Q   So it's for the benefit of your peers within psychiatry?

23  A   Absolutely.  And by extension, their patients if my peers

24  learn something new and it helps the patient.

25  Q   Now, beyond -- you talked about your academic

Cavanaugh - direct

1  appointments, but do you lecture within your expertise?

2  A   I do.

3  Q   That being psychiatry.

4         Tell the ladies and gentlemen of the jury what types

5  of lectures you're involved with relative to your knowledge in

6  psychiatry and forensic psychiatry.

7  A   Well, I've lectured all over the country, also

8  internationally, on topics related to some of the subspecialty

9  issues in forensic psychiatry, behavioral risk assessment,

10  consultation to national law enforcement, issues related to

11  evaluation of standards of medical practice in the field of

12  general psychiatry.  Those would be some of the areas.

13  Q   In the course of your 40-some years of professional

14  experience, have you been called upon to testify in the

15  courts?

16  A   I have.

17  Q   And have you been qualified as an expert in the courts in

18  the field of psychiatry and forensic psychiatry?

19  A   I have, yes.

20  Q   And has that been in both the state and federal courts?

21  A   That is true, yes.

22  Q   Both here in Chicago and elsewhere in the country?

23  A   Yes.

24  Q   And just without giving a precise number, how many times

25  have you testified in those matters?

1    A    Recently not much because so many cases are --

2    Q    I'm just --

3    A    -- being settled.

4         I would say in my career I've probably testified in

5    court 20 times, 25 times, something of that ilk.

6    Q    Now, doctor, I contacted you to ask if you would consult

7    to review this case involving Nathson Fields; is that correct?

8    A    You did.

9    Q    What is it I asked of you, doctor, when I called you

10   relative to the consultation?

11   A    You asked me to review the report of Dr. Joel Silberberg,

12   who was retained by the plaintiffs in this matter, and you

13   asked me to review ultimately relevant records and documents

14   that would have or could have some bearing on my ability to

15   evaluate whether Mr. Fields in fact, one, has a specific

16   mental illness as a result of his experiences in

17   incarceration, post-traumatic stress disorder syndrome in

18   particular, and, two, if he does have an illness, a

19   significant serious mental illness, why, what's it caused by.

20        Those were the primary areas you asked me to focus

21   on.

22   Q    And you're being compensated, aren't you, doctor, for your

23   time?

24   A    Yes.

25   Q    Doctor, Dr. Silberberg.  Do you know Dr. Silberberg?

1    A   Yes, I do.

2    Q   Would you just tell us how it is you're familiar with or

3   know Dr. Silberberg?

4    A   I hired him.  This is several years ago.  For about four

5   years while we had this long contract that I mentioned at Cook

6   County Jail to provide mental health services, I hired him to

7   be the director of psychiatric services, and in that capacity

8   he reported to me, and I supervised his work.

9    Q   Now, in terms of time that you have spent relative to your

10   consultation in this matter leading up to today's testimony,

11   how much time -- aside from what we've looked at; we'll get to

12   that in a moment -- how much time have you spent in reviewing

13   this matter?

14    A   In the neighborhood of 70, 70 plus hours.

15    Q   Did you review documentation in order to prepare yourself

16   to render opinions in this case?

17    A   I did.

18    Q   And, doctor --

19        MR. BURNS:  Judge, if I may just approach the

20   witness.

21        THE COURT:  Sure.

22   BY MR. BURNS:

23    Q   Doctor, you have before you what's identified at the very

24   top to be a two-page document; am I correct?

25    A   That's correct.

1    Q    And would you tell the ladies and gentlemen of the jury

2    what you reviewed as part of your consultation in this matter.

3    A    It's on this list, starting with the excerpt of

4    proceedings from the People of the State of Illinois versus

5    Nathson Fields; a presentence investigation; records related

6    to his employment post release at the Pepper Construction

7    Company; school records; transcripts of proceedings in a --

8    Q    Another matter?

9    A    -- another matter; deposition of individual involved in

10   another matter; the deposition of Mary L. Johnson; transcripts

11   of proceedings in a matter; excerpt of report of proceedings

12   in another matter; evidence; excerpts of a report of

13   proceedings in another matter; evidence deposition of Thomas

14   Maue; miscellaneous case law issues; the deposition of Nathson

15   Fields; the deposition of Nathina Fields.

16   Q    Would you tell me, just if I may pause you right there,

17   who is Nathina Fields?

18   A    Nathina Fields is the daughter of Mr. Fields.

19   Q    All right.  And then would you continue on as to other

20   records?

21        We have a two-page document here; am I correct, sir?

22   A    Correct.

23        The deposition of Nathaniel Fields, who is

24   Mr. Fields' oldest brother, I believe, his oldest brother,

25   yes; excerpt of trial testimony of an individual; some arrest

1    reports; FBI interviews with another individual; police

2    reports; Illinois Department of Correction records of his;

3    direct testimony of Derrick Kees; records of his incarceration

4    at Cook County Jail, CCDOC; deposition of Mr. Kees;

5    Dr. Silberberg's report and deposition; I reviewed the Orange

6    Crush video; I reviewed the video deposition of March 2012 of

7    Mr. Fields; I reviewed the video of the interview of my

8    colleague Orest Wasyliw of Mr. Fields on 11/22/13, and I

9    reviewed the transcript of that video interview; and I

10   reviewed a video of Mr. Fields being interviewed by Fox News

11   in March of 2011.

12   Q    Based upon your review of those documents, were you

13   prepared at that time to render opinions just based on the

14   review of the documents themselves?

15   A    Based on the review of the documents themselves, I was

16   essentially prepared to render an opinion.

17   Q    Did you need additional information?

18   A    I had an extensive database, and I was comfortable with

19   it, and I felt it was the type of data and information I

20   needed to render opinions.

21   Q    Was further information obtained relative to your forming

22   and testifying as to opinions?  And specifically I'm referring

23   to Dr. Wasyliw.

24   A    Well, yes.  The information that I additionally received

25   but is noted here is the transcript of the video and the

1   actual review by me of the video of Dr. Wasyliw's interview of

2   Mr. Fields and his report, Dr. Wasyliw's extensive report in

3   this matter.

4   Q    Did doctor --

5        First of all, before we get too far, who is

6   Dr. Wasyliw?  Is he a psychiatrist such as yourself?

7   A    No.  Dr. Wasyliw is a colleague of mine for the last 30,

8   40 years.  He is a Ph.D. forensic psychologist who works with

9   me in a number of project areas that I have been involved in

10  over the years that I itemized a moment ago.

11  Q    Were certain tests administered as part of the overall

12  evaluation of Nathson Fields in this case?

13  A    Yes.

14  Q    And did you administer those tests?

15  A    No, I did not.

16  Q    Would you explain to us why you did not administer those

17  tests?

18  A    Psychological testing, which had never been done in this

19  case before, is the purview of the Ph.D. psychologist.

20  Psychiatrists are not trained and expert in the administration

21  and interpretation of psychological tests, and that's the

22  purview of the Ph.D. psychologist, and I very much wanted that

23  to be done in this case.

24  Q    Why was that important that it be done in this case?

25  A    One, it had never been done before; and two, in this case,

1    there's obviously a dispute as to is there a diagnostic issue,

2    a serious mental illness that Mr. Fields demonstrates; and if

3    he does demonstrate it, what are its characteristics.

4             Psychological testing is sort of like the clinical

5    laboratory for psychiatry, which, you know, doesn't have blood

6    levels of mental illness states like internists have of

7    pneumonia or infections and that sort of thing.  And so it

8    provides relevant additional information beyond what I can

9    ascertain through various records reviewed.

10   Q    Did Dr. Wasyliw administer psychological testing to

11   Nathson Fields?

12   A    Yes, he did.  He -- on the day that he did his clinical

13   interview, which lasted approximately three and a half to four

14   hours, he also administered an extensive battery of

15   psychological tests over an approximate three and a half to

16   four hour period additionally.

17   Q    So before I approach you relative to the tests, the tests

18   that were done, how long does it take to administer the

19   battery of those psychological tests?

20   A    It takes approximately four to six hours.

21   Q    Separate from that, was there an interview conducted by

22   Dr. Wasyliw of Nathson Fields?

23   A    There was.

24   Q    And how long did that last?

25   A    Approximately three and a half to four hours.

1   Q    And that was videotaped; is that correct?

2   A    That was videotaped.

3          MR. BURNS:  May I approach again, your Honor?

4          THE COURT:  Yes.

5          MR. BURNS:  Thank you.

6   BY MR. BURNS:

7   Q    I'm going to show you so you have those.  I'm going to put

8   it up on the screen for the ladies and gentlemen of the jury.

9          You talked about psychological tests.  I have a

10  two-page document here.  Does this document, two-page

11  document, identify the psychological tests and the results?

12  A    Yes, it does.

13  Q    And I don't want to go into great depth on these, but can

14  you briefly explain for me as well as the ladies and gentlemen

15  of the jury what these tests are intended to accomplish?

16  A    What they're intended to accomplish is to give us a

17  insight into the psychological functioning of an individual in

18  terms of personality traits and characteristics, in terms of

19  any evidence of presence or absence of major mental illness,

20  which we'll see was not the case here, gives a little insight

21  into the cognitive functioning, intellectual functioning of

22  the individual, and it provides information that's different

23  from information that you typically find in the kinds of

24  records that I reviewed earlier.

25          As I mentioned, it's sort of like a psychological

1  laboratory, give you insight, give you new data, give you

2  better understanding of what -- who is this individual now,

3  what makes them tick.

4  Q   Couldn't we simply establish all that by sitting down and

5  talking to the individual?

6  A   Well, of course, that was done, and the psychologist is

7  required to do an extensive clinical interview, but this is

8  additive.  This is in addition to what you learn.  And you do

9  learn from talking.  But just like the internist learns beyond

10 the physical exam and the history of the patient, he sends the

11 patient off to the laboratory.  You get new data.  That helps

12 your understanding.

13 Q   Now, I showed you --

14 A   This is new data.

15 Q   I'm sorry.

16     This is page 2 of the testing that was done, correct?

17 A   Correct.

18 Q   Did you rely upon the information that was obtained

19 through this psychological testing in forming your opinions

20 that you are prepared to offer here today?

21 A   Yes, I did rely upon it.

22 Q   Tell us how these tests and these test results benefit you

23 and help you in rendering your opinions, doctor.

24 A   They benefit me first and foremost by not providing any

25 substantive foundation that he is currently suffering with a

1    post-traumatic stress disorder syndrome or any other major

2    mental illness.

3            On the other hand, it does demonstrate that he has

4    certain personality traits and characteristics, you know, such

5    as some antisocial traits, some narcissistic sort of

6    self-involved traits, a pattern of blaming others for personal

7    difficulties.  But, interestingly, along with all that, he has

8    a very good sense of self-esteem and confidence and that in

9    another test that was done, the Rorschach --

10   Q   That's the one where you look at the blot or whatever they

11   call it?

12   A   Yeah.  Where there's no known way to go in terms of an

13   answer.  You see a picture, and you can't possibly know, hey,

14   this is the answer that they're looking for here.  And it's

15   very good in situations where we have some questions about is

16   everything that's being reported by the individual sort of

17   kosher, is it accurate, or maybe it's embellished a little bit

18   or whatever.

19           And the Rorschach, interestingly, says that there's

20   no indication of a significant depression, no long-term

21   emotional distress or acute distress, and he can effectively

22   deal with life stresses and can strive towards goals.  That's

23   to me very important because one of the hallmarks of a

24   significant major mental illness, it severely interferes with

25   and limits your social and occupational functioning and what

1    you can do on a day-to-day basis.

2           The testing, in sum, shows him to be a person who has

3    a good mind; he can deal in complex reasoning; he's got a

4    number of personality traits; he has no evidence of major

5    mental illness; and on a projective test, the Rorschach test,

6    he's not showing any kind of long-term emotional distress,

7    depression; and he can deal effectively with life stressors as

8    they arise.

9           So that's very relevant information for me.

10   Q   Does he have a definable disorder, antisocial disorder?

11   A   No.  I did not render that diagnosis.  He has antisocial

12   traits.  Everybody has traits.  I have traits; you have

13   traits.  And they are descriptions of the general way that you

14   interface yourself with the world around you and the behaviors

15   that you demonstrate.  One of those traits is antisocial

16   characteristics, not a disorder.  Narcissistic traits, not a

17   disorder but an indication of some real attention to one's own

18   best interests and preoccupation with one's self.

19   Q   Narcissism, what is that?

20   A   Well, comes from the Greek, Narcissus, who looked into a

21   pond of water, and the reflection of himself resulted in him

22   falling in love with himself.  So narcissistic means your

23   world is wrapped around yourself.  You have self-love.  Now,

24   we all have a degree of self-love, and you should have it, but

25   narcissistic traits mean it's more than just the average dose

1  that the average healthy person would have.

2  Q   And you also made a comment about being self-centered, I

3  thought?

4  A   Yes.

5  Q   Describe that a little bit more for the ladies and

6  gentlemen of the jury and how it applies to Mr. Fields.

7  A   Self-centered means that you are involved in understanding

8  and trying to interpret whatever is going along around you as

9  somehow it's got something to do with you, and from that

10 self-centered core you tend to blame or look for explanations

11 of why you are the way you are, why you have the problems you

12 have because you do not necessarily accept personal

13 responsibility for what you do.  You look for other

14 explanations other than yourself.

15 Q   Now, we conducted one interview of Mr. Fields, and I

16 believe that was in October of last year, correct?

17 A   That was correct.

18 Q   Now, that was conducted by Dr. Wasyliw?

19 A   That is correct.

20 Q   Let me try and spell his name so we have it.

21 A   W-A-S-Y-L-I-W.

22 Q   I have it right.  Thank, you doctor.

23      And you said he interviewed Mr. Fields on the same

24 date that he conducted the tests that we have seen and you

25 have been describing generally for us on the ELMO before the

Cavanaugh - direct

1  ladies and gentlemen, correct?

2  A   That is correct.

3  Q   On screen?

4  A   That is correct.

5  Q   You did not participate directly in that interview; am I

6  also correct?

7  A   That is correct.

8  Q   Dr. Wasyliw conducted the interview, correct?

9  A   He did.

10  Q   And did you have an opportunity to review a videotape of

11  that?

12  A   Yes.  I interviewed (sic) the entire videotape and now

13  more than once.

14  Q   Would your presence at that interview have created any

15  distractions or problems?

16  A    It could have.  And in my opinion, it was much more

17  preferable for me not to be there to potentially be a

18  distraction, and it's not standard practice to have a third

19  party in the room when you're doing this type of psychiatric

20  or psychological interview.

21  Q   And then you reviewed that information that Dr. Wasyliw

22  was able to obtain through his, what did you say,

23  approximately three and a half, four hour interview of Nathson

24  Fields?

25  A   Correct.

Cavanaugh - direct

1   Q    Based upon all of the information that you have been given

2   in this case, were you able to reach conclusions and opinions

3   relative to Nathson Fields?

4   A    I was.

5              MR. BURNS:  And if I may again, your Honor, approach.

6              THE COURT:  Sure.

7              MR. BURNS:  This is a two-page document.  I'm going

8   to show this to the jury.

9   BY MR. BURNS:

10  Q    Doctor, based upon your training, education, experience,

11  as well as your review of all that you described for the

12  ladies and gentlemen of the jury to this point in time, were

13  you able to reach opinions to a reasonable degree of medical

14  and psychiatric certainty as to Nathson Fields?

15  A    Yes, I was.

16  Q    And are these the opinions that will now be placed on the

17  ELMO for the ladies and gentlemen of the jury to see?  And

18  we'll go through them.  There are two pages?

19  A    They are.

20  Q    Let's begin, if we may, doctor, opinion number one.  What

21  is your first opinion relative to your evaluation of Nathson

22  Fields?

23  A    That there's no major mental disorder that he

24  demonstrates, and specifically no evidence for a diagnosis of

25  post-traumatic stress disorder.

1  Q   Are there criteria that must be identified in order to

2  reach a diagnosis of post-traumatic stress disorder?

3  A   Yes, there are.

4  Q   Before we get to that, what is post-traumatic stress

5  disorder?

6  A   Post-traumatic stress disorder is a complex anxiety stress

7  disorder that is typically related to an individual's exposure

8  to an overwhelming experience, a traumatic experience that

9  goes beyond their capacity to manage it or to deal with it,

10  and as a result, they develop certain types of psychological

11  symptoms that define the rest of the syndrome.  The most

12  important set of criteria is that as a result of the exposure

13  to that overwhelming trauma, they are having tremendous

14  difficulty with social and occupational functioning.

15  Q   Does everybody respond in the same way or manner to a

16  particular trauma?

17  A   Absolutely not.  One of the most important precepts of

18  psychiatry and psychology is everybody's different.  Everybody

19  can respond differently.  Different people can respond

20  differently to the same trauma, to the same stimulus.  And

21  what you have to do then is when, for example, you're talking

22  about a particular trauma, do you conclude that then anybody

23  who ever might have been exposed to that trauma automatically

24  goes on to develop a psychiatric disorder as a result, or do

25  you individualize it and say, look, we got to look at this

1    individual and see how this individual handled this particular

2    stress, which could be different than another person, who in

3    fact could develop a major mental illness, could have

4    attempted to commit suicide because they couldn't handle it,

5    could become psychotic because they just were driven out of

6    their mind, or is the individual we're looking at an

7    individual, though exposed to the same trauma, actually didn't

8    develop any of those very significant serious and potentially

9    dangerous psychological sequelae.

10   Q    And your opinion is that Mr. Fields does not meet the

11   criteria; is that correct?

12   A    Correct.

13   Q    Can you be more specific than a general statement?

14   A    Based on all the review that I did, the review of the tape

15   of -- Dr. Wasyliw created the videotape, and now a review of

16   his actions and capabilities and functions in the post-release

17   period, he doesn't have the criteria.

18          One of the important criteria is the criteria of

19   avoidance.  If you have been involved in a traumatic

20   situation, let's say you're a young lady who is sexually

21   molested in a certain location, and let's say you are that

22   person who goes on to develop a full-fledged post-traumatic

23   stress syndrome, one of the last things you're going to want

24   to do is go back to the site.  You want to avoid it.  And one

25   of the last things you want to do is talk about it.

1    Very important in my analysis of this case is

2  Mr. Fields is constantly talking about the issues that he

3  reports occurred while he was incarcerated.  He is giving

4  interviews.  He's lecturing over the United States.  He's

5  become a member of the board of directors of a project that is

6  involved in advocating for certain policy changes in our

7  country.  In short, it's the opposite of avoidance.  Continues

8  to reimmerse himself in the same issues that, if he were

9  really disordered and if he were really suffering, that would

10  be the last thing he would want to do is go out and talk to

11  people about all these bad things that have happened to me,

12  just like the lady who has been assaulted and doesn't want to

13  go out and start talking about, gee, what it was like to be

14  assaulted or go back to the place where the assault occurred.

15    And he attends all the legal proceedings, all the

16  depositions, all the trials, again, where all these issues are

17  brought up over and over and over again, presenting him with

18  what he is claiming are these very traumatic events that if he

19  had PTSD he'd be staying away from.

20  Q    What about flashbacks?  Are they part of post-traumatic

21  stress disorder?

22  A    They can be, sure.  A real flashback, which means not just

23  I have a memory and then when I have a memory it upsets me,

24  that's not a flashback.

25  Q    What is a flashback?

1    A    A flashback is, yeah, I have a memory, but then it's like

2    I dissociate and I move away from where I am right now in

3    terms of, you know, what I'm doing or thinking, and I actually

4    go back to the actual situation that occurred, and I'm

5    actually experiencing it again as if I were reliving it again.

6    Not just remembering it and say, oh, it was terrible, it was

7    terrible, and when I think about so and so and what happened

8    to them, I'm upset.  That's not a flashback.  A flashback is a

9    very specific complex psychological experience in which you

10   are actually at the time reliving the situation as if it were

11   occurring right then as you experience it.  That's a

12   flashback.

13   Q    So based upon this information, you then conclude, based

14   on your expertise and experience, he does not have

15   post-traumatic stress disorder?

16   A    I conclude he does not have it because, one, his

17   functioning is not consistent with a major mental illness, and

18   particularly PTSD.  He doesn't demonstrate avoidance

19   behaviors.  He doesn't have classic manifestations of reliving

20   things in the manner that I just described.  And the

21   psychological testing and other records that I have provide an

22   alternative explanation of, you know, what's going on with

23   him, and not that he has a disorder of any kind, but he has

24   certain personality traits and characteristics that in my view

25   explain some of his presentations.

1   Q   Doctor, did you have an opportunity to review any

2   psychological or psychiatric records from the Illinois

3   Department of Corrections relative to Nathson Fields?

4   A   Yes, I did.

5   Q   Do they have such records?

6   A   Sure they do.

7   Q   Is there information contained in the records from the

8   Illinois Department of Corrections relative to mental health

9   professionals' interaction with Nathson Fields?

10  A   Yes.

11  Q   Are there any of those that do suggest that he does have a

12  mental health -- excuse me, mental illness or defect?

13  A   No.  Every institution, the institutions he's in, the

14  institution I'm in now at the J.T.D.C or was at the Cook

15  County Jail, have mental health staff professionals,

16  psychologist, psychiatrists because they, the State, has the

17  duty, if you are incarcerating someone, to make sure that if

18  they begin to develop symptoms of significant medical or

19  physical -- medical or psychological, psychiatric illness that

20  you can be helped and not just stand by and, you know, watch

21  you go down the tube.

22          So the kinds of observations that were made about him

23  going back as far as 1972 when he came into the Stateville

24  system on a previous charge --

25  Q   That was his murder conviction you're referring to?

Cavanaugh - direct

1    A    The murder conviction, yeah.

2              He goes through a processing, psychological

3    processing at the Joliet reception center, and then typically

4    you go then out to one of the state facilities.  That was the

5    first of the psychological evaluations that were done of him

6    in which there was no indication that he had a mental illness,

7    rather, an indication he had antisocial characteristics, that

8    he was involved in gangs, that he was involved in dangerous

9    behavior, and that he was going to be put on a high-risk

10   status.

11   Q    Now --

12   A    Subsequent, subsequent assessments, you know, which are

13   not every day, obviously, but if you look at them in aggregate

14   over the period of time that he was there, there's not one

15   single notation by any psychologist, any psychiatrist that he

16   has a diagnosable mental illness, that he has symptoms

17   characteristic of PTSD, that he's acutely suicidal, that he's

18   psychotic, that he's profoundly depressed, and they

19   continually say no evidence of psychopathology.

20             Psychopathology is the technical word for presence of

21   a mental illness.

22   Q    Your point, then, and I think you are addressing that very

23   point here, evidence prior to 1985 of antisocial behavior,

24   you've told us now --

25   A    Yes.

Cavanaugh - direct

1    Q    -- what that behavior is, but it is not a definable

2    disorder?

3    A    No.  It's behavior, and psychological testing shows a

4    trait leading to that type of behavioral predisposition.

5    Q    Now, the next points we have I think you've already

6    explained to the ladies and gentlemen of the jury, the

7    psychological testing that was done by your colleague,

8    Dr. Wasyliw, and you've shared with us what those tests

9    resulted in, the findings, in other words, of narcissistic,

10   histrionic, antisocial personality traits and blaming others,

11   correct?

12   A    Correct.

13   Q    Let's get to this next --

14        And that's an opinion you hold to a reasonable degree

15   of psychiatric certainty, correct?

16   A    Correct.

17   Q    This next point, his self-report, "his" referring to

18   Nathson Fields?

19   A    Yes.

20   Q    Is unreliable.

21   A    Yes.

22   Q    What is the basis for that opinion?

23   A    The basis for that opinion is there's evidence through the

24   whole case as I review all these records that he says

25   different things to different people, and they are not always

1    consistent.

2          For example, at one point he will say I'm not working

3    myself up in the El Rukn gang structure.  At another time he

4    says, yeah, I was a -- I was either a general or an ambassador

5    in the El Rukn gang.

6          He says more recently in his deposition that he's

7    very troubled by the, quote, loss of his relationship with his

8    daughter, Nathina.

9          MR. BURNS:  Take one -- break right here, then, if we

10   may, and we'll go to that.

11         Judge, before we do get into that, it may be

12   appropriate.

13         THE COURT:  Yeah, side bar.  Okay.

14         (The following proceedings were had at sidebar in the

15         presence but out of the hearing of the jury:)

16         THE COURT:  Did your guy show up?

17         MR. BURNS:  No.

18         THE COURT:  Go ahead.

19         MR. BURNS:  This is -- we're getting into we heard

20   information from Mr. Fields relative to his daughter, lack of

21   the relationship.  He has information based upon all that has

22   been provided to him with regard to her view.  He said I tried

23   to get together.  He has information that he would share with

24   the ladies and gentlemen of the jury that it's different the

25   way she has reported it than has Mr. Fields has reported in

1    this courtroom, and we would be going into that briefly.

2          THE COURT:  What's the source of Dr. Cavanaugh's

3    information?

4          MR. BURNS:  I don't have it here.

5          THE COURT:  It's a deposition?

6          MR. BURNS:  Her deposition, yes, sir.

7          THE COURT:  Okay.  Give me the gist of what he's

8    going to say about it.

9          MR. BURNS:  Well, she feels at the end of all this

10   that it wasn't a meaningful reaching out to her, that it was

11   for the benefit of his litigation, that it all began at the

12   time of this litigation when he began to reach out for her and

13   that she does not feel that it was genuine.

14         This goes to the issue of the narcissism, the

15   self-centered.  And that's why we're on that topic, and I

16   don't want to get too far without at least raising it with

17   you, your Honor.

18         MR. GOODMAN:  Her opinion would not be relevant.

19         THE COURT:  He can say that she didn't meaningfully

20   reach out to him.  He's not going to be able to repeat her

21   testimony about, you know, what she thought it was about.  I

22   don't think that's -- I mean, she is an available witness.

23   It's hearsay.  He can rely on hearsay.  He can't necessarily

24   communicate it.  That's what Rule it's either 703 or -- I

25   think it's the last part of 703 is about.  You have to bring

1  her in here.

2          MR. BURNS:  Okay.

3          THE COURT:  So he can -- and you can lead him through

4  it, and I'd prefer that you do, frankly, so that we don't get

5  into it.  He can say did you ascertain -- maybe you preface

6  this by saying yes or no.  Did you ascertain from her

7  deposition, from Nathina I think is her name, from Nathina

8  Fields' deposition that she didn't believe that Mr. Fields had

9  meaningfully reached out to her.

10         MR. BURNS:  Okay.

11         THE COURT:  And then that's the extent of it.

12         MR. BURNS:  Thanks for the suggestion.

13         (The following proceedings were had in the presence

14         and hearing of the jury:)

15  BY MR. BURNS:

16  Q   Dr. Cavanaugh, I'm going to ask you a question, and it's a

17  yes or no question, and it's relative to Nathina, who is the

18  daughter of, biological daughter of Nathson Fields.

19  A   Correct.

20  Q   You read her deposition?

21  A   I did.

22  Q   Did you ascertain from your review of her deposition that

23  Mr. Fields' efforts to reach out to her were not meaningful?

24  And that's a yes or no.

25  A   Yes.

Cavanaugh - direct

1  Q  They were not meaningful?

2  A  They were not meaningful.

3       MR. BURNS:  Thank you.

4       Thank you, your Honor.

5  BY MR. BURNS:

6  Q  Let's go on.

7       You have an opinion relative to the brother, and is

8  this Nathaniel?  Is that who you're referring to when you say

9  his brother?

10 A  Yes.

11 Q  Nathaniel Fields?

12      Tell me the significance of this opinion.

13 A  The significance of the opinion is that in the report that

14 I read of Dr. Silberberg, he reports that he interviewed

15 Nathaniel and that Nathaniel talked about, you know, how bad

16 off Mr. Fields was as a result of what had happened, that he

17 really was, you know, quite disturbed, quite dysfunctional,

18 didn't do a lot of things, wouldn't go to family gatherings

19 and was really a quite changed man when he came out of

20 incarceration.

21      In the deposition of the brother, Nathaniel, what I

22 was struck by, which was quite consistent with what I was also

23 forming as my own opinions that he really was very functional,

24 is the brother says he's making generally a good post-release

25 adjustment, he's usually in good spirits, and additionally

1    most of the time he's in, you know, a pretty happy mood.  They

2    do things together.  He visits family.  He has a long-term

3    girlfriend.  He's basically -- he works, historically had

4    worked until litigated matters became more of a central focus.

5           And the brother reports that in his deposition, and I

6    thought that was important because it was an external

7    confirmation to me of what I'm concluding from, for example,

8    what he is learning, he, Dr. Wasyliw, is learning from

9    Mr. Fields when he interviews him when he asks him, well, tell

10   me what you do on a typical day, and basically Mr. Fields goes

11   on and tells him all the activities, involvements, behaviors

12   that, you know, constitute a kind of a normal, regular,

13   meaningful day.

14   Q    Let's turn, if we may, doctor, and I believe you have

15   before you, page 2 of your opinions.  Specifically, we begin,

16   and I'd like you to explain this, but you say there is no data

17   to support that falsely imprisoned inmates adjust with more

18   difficulty than properly imprisoned inmates or develop mental

19   illness states more frequently.  What does that mean?

20   A    What that means is there's no published peer reviewed

21   controlled studies in which you have an individual who has

22   been falsely imprisoned for a long time and/or on death row

23   with an individual who is properly convicted, so to speak,

24   under the same circumstances and data that definitely shows

25   the former person has a much more difficult time, does much

1    more poorly and has much more likelihood of developing mental

2    illness states, you know, such as post-traumatic stress

3    disorder, psychoses or profound depression.

4              The significance of the data there is, and there is a

5    fair amount of data about long-term incarceration, death row,

6    et cetera, is that individuals individually deal with it.

7    Some do terribly, ending up in some cases killing themselves,

8    becoming psychotic, bashing their heads against the wall and

9    trying to knock their brains out.  That's horrible.  Some

10   people in those situations do that.  At the other end are

11   people, as bad as these pains of imprisonment are, they do

12   reasonably well.  They don't end up with any of these stigmata

13   of major illness, major dysfunction, suicidality, profound

14   depression.

15             So the point I'm trying to make is you take an

16   individual and you study that individual and you see what the

17   data shows you, and I objected to Dr. Silberberg's implication

18   through his report that because he is allegedly there

19   inappropriately, at least that's what Dr. Silberberg believes,

20   that he suffered more and that there's data out there that

21   would show that anybody under those circumstances would go on

22   to develop post-traumatic stress disorder or serious mental

23   illness.  I just profoundly disagree with that, and the data

24   and the evidence that I believe have been able to develop in

25   this actual case of Mr. Fields doesn't support that.

Cavanaugh - direct

1    Q    Now, and that's because your opinion is based upon your

2    assessment of how he's doing now?

3    A    How he's doing now, absolutely.  And the interview with

4    Dr. Wasyliw, the psychological testing reports, the testimony

5    at least by deposition of his brother and so on.

6    Q    And his deposition as well?

7    A    And of course his deposition as well, in which he

8    basically says the same thing that he told Dr. Wasyliw about

9    all the things he does and the talks he gives and the

10   interactions he has with people and his long-term relationship

11   with Maggie.

12   Q    Now, going on to your next opinion, you began to talk

13   about this a little bit earlier, but let's just for the

14   purpose of completeness, you do not believe that he is in need

15   of post-release psychiatric or psychological treatment?

16   A    I do not.

17   Q    And you believe that he has functioned well since his

18   release over the past ten years?

19   A    I do.

20   Q    And more?

21   A    I think the evidence is very clear about that.

22   Q    And you shared with us, the ladies and gentlemen of the

23   jury, your basis and opinions for that; is that correct?

24   A    I have.

25   Q    Final opinion that you have is relative to

1   Dr. Silberberg's reports and opinions are foundationally
2   flawed.  I think foundationally becomes the keyword there?
3   A    Yes.
4           By foundation it's, you know, the common sense
5   interpretation.  The basis, you know, what's holding it up.
6   What's holding up his opinion, from reviewing his report and
7   deposition, is essentially documents that were prepared by
8   plaintiff's attorneys, his review of the Crush tape and the
9   deposition of Mr. Fields himself.
10  Q    Why is it so important that you obtain all the information
11  that you've been talking about as well as the psychological
12  tests?  What's the significance of gathering all that
13  information?
14  A    It's critical.  In forensic work, one of the issues you
15  constantly encounter is people who you're evaluating may not
16  always tell you the truth, or all the truth, or embellish the
17  truth, or deny the truth.  There are all kinds of permutations
18  and combinations.  Because the results of your assessments can
19  have an impact on them, if it's a civil case, economically,
20  and they could get more money depending on, you know, what a
21  jury decides, or it could deal with freedom issues if it's a
22  criminal case.
23          A competent forensic report is much like getting as
24  many pieces of a puzzle that you can, and each piece of data,
25  each record, each test is like a piece of a puzzle.  And the

1    job of the forensic expert is to put those pieces together as

2    well as can be reasonably done ethically and appropriately and

3    see what the picture that emerges tells us.

4         And I'm saying that Dr. Silberberg's foundation is

5    very flawed because the pieces are very few.  I would

6    estimate, using that metaphor, I've got fifty to a hundred

7    pieces of my puzzle.  I think he's got four.  He never did

8    psychological testing.  He doesn't have that whole important

9    area of data development.  So these are some of the

10   foundations of why I feel his report is fundamentally flawed.

11   Q   Is it the role of a forensic psychiatrist to determine

12   guilt or innocence of an individual as it pertains to a

13   criminal charge?

14   A   Absolutely not.  And if such an assumption wends its way

15   into part of the, quote, foundation of your opinion making,

16   that, in my opinion, would be a deviation from the standard of

17   practice.

18   Q   You are not here to render opinions as to guilt or

19   innocence, are you?

20   A   Absolutely not.

21              MR. BURNS:  Thank you.

22              Your Honor, may I have just one moment?

23              THE COURT:  Sure.

24              (Brief pause.)

25              MR. BURNS:  Thank you, your Honor.  Dr. Cavanaugh.

Cavanaugh - cross

1    THE COURT:  Cross.

2    MR. GOODMAN:  Thank you.

3                    CROSS EXAMINATION

4  BY MR. GOODMAN:

5  Q   Dr. Cavanaugh, you indicated that you are being

6  compensated for your time and your work on this case; is that

7  correct?

8  A   Correct.

9  Q   And is that an hourly rate?

10  A   Yes.

11  Q   What is the hourly rate that you're billing on this case?

12  A   I believe it's 395 an hour.

13  Q   And you said you've spent over 70 hours on the case; is

14  that correct?

15  A   Yes, I did say that.

16  Q   Including your testimony today, or will that be more than

17  70?

18  A   That will be more than 70.

19  Q   And is it correct that in all the hours you've spent on

20  the case, you've never actually interviewed Mr. Fields; is

21  that correct?

22  A   That's true.

23  Q   You relied on an interview conducted by Dr. Wasyliw; is

24  that correct?

25  A   I did, in terms of the agreement in this case.

1  Q   And it was Dr. Wasyliw that conducted these psychological

2  tests that you were talking about with Mr. Burns; is that

3  correct?

4  A   That's correct.

5  Q   And because he is a psychologist, he is the one that's

6  trained to administer these tests; is that correct?

7  A   Yes, as I explained earlier to the jury, yes.

8  Q   And Dr. Wasyliw is also the one that was trained to

9  interpret the tests, correct?

10  A   That's correct.

11  Q   You didn't personally interpret the Rorschach test or any

12  of the other tests, did you?

13  A   No.  I relied on his interpretation.  As is normal and

14  customary when physicians work with other subspecialists, you

15  rely on their reports.

16  Q   So all of these things that you were telling the jury

17  about about narcissistic personality, self-centered

18  personality, those are based on the interpretations of

19  Dr. Wasyliw; is that correct?

20  A   Not necessarily.  No.  Not totally.

21  Q   And, doctor, would it be consistent with self-centered

22  personality for a person on death row to help other inmates

23  prepare grievances and to obtain medical attention?

24  A   I'm talking about how he is demonstrating himself

25  psychologically.

1          Now, a person who's self-centered can certainly do
2  things that are helpful to others.  I'm not saying he does
3  nothing to help another person.  I'm just saying his world is
4  we call it ethnocentric.  It's based within himself.  He is
5  doing things and he is reacting as if he were the center of
6  attention.

7  Q    I want to ask you about post-traumatic stress disorder.
8  You would agree that that is a recognized psychiatric disorder
9  and in fact it is listed in the manual, the DSM V manual for
10 psychiatric disorders; is that correct?

11 A    That is correct.

12 Q    And the DSM V manual, just could you explain what that is?

13 A    Well, recently organized psychiatry moved from the DSM IV,
14 the Diagnostic and Statistical Manual of Mental Disorders,
15 which is the official diagnostic manual, went into a new
16 edition, the fifth edition, so it is the same thing as the
17 diagnostic manual of American psychiatry.

18 Q    And it's published by the American Psychiatric
19 Association; is that correct?

20 A    It is.

21 Q    And you talked about some of the criteria, the diagnostic
22 criteria that must be present in order to have a diagnosis of
23 PTSD; is that correct?

24 A    I did.

25 Q    And the first diagnostic criteria that you talked about is

1    exposure to -- I believe your words were exposure to

2    overwhelming trauma; is that correct?

3    A    Yes.

4    Q    And in fact, the -- in the diagnostic manual, it describes

5    a criteria of being exposed to death, threatened death, actual

6    or threatened serious injury or actual or threatened sexual

7    violence.

8    A    It does say that.

9    Q    Is that correct?

10          And in fact, it can be -- is it correct that the

11   criteria could include direct exposure or witnessing these

12   events happening to someone else?

13   A    If you look at the current version, the issue of

14   witnessing is limited to if the person you're witnessing who

15   is allegedly being traumatized, there has to be a close

16   personal relationship.  There has to be a, you know, a family

17   relationship, intimate relationship, that sort of thing.

18   Witnessing just generically really does not qualify.

19   Q    Is it correct, doctor, that a person can have symptoms and

20   in fact the diagnosis of PTSD based on a single traumatic

21   event occurring in their lives?

22   A    Sure, that's possible.

23   Q    And would it also be true that repeated or prolonged

24   exposure to traumatic events would increase the possibility of

25   a diagnosis of PTSD?

Cavanaugh - cross

1   A    This is a controversial area in psychiatry today, and

2   there certainly is a school that talks about sub-threshold

3   exposures that could lead to PTSD.  The data on that is still

4   being developed.  I'm fully aware that some colleagues believe

5   it, some don't.

6   Q    You would agree that PTSD is a common diagnosis for

7   soldiers who have been in war and are exposed to prolonged

8   periods of time where they are threatened with death or

9   serious physical injury; is that correct?

10  A    Of course I am, yes.

11  Q    And it's your opinion based on your 70 some hours of work

12  on this case that Mr. Fields, his twelve years on death row,

13  his many months in isolation, his many years of living with

14  the threat of imminent execution, his witnessing the execution

15  of colleagues and people that he met on death row --

16           MR. BURNS:  Objection.

17           MR. GOODMAN:  -- that none of these events caused --

18           MR. BURNS:  Objection.

19           MR. GOODMAN:  -- any psychological harm to

20  Mr. Fields?  Is that your opinion?

21           THE COURT:  To the witnessing thing?

22           MR. BURNS:  Yes.

23           THE COURT:  Witnessing the executions, I don't think

24  there was testimony he was there during the executions.

25  BY MR. GOODMAN:

1    Q    Let me rephrase that last part.

2              His being aware or witnessing people being taken off

3    death row, people that he had come to have a relationship with

4    being taken off death row and sent for their execution, that

5    none of these events caused any psychiatric harm to

6    Mr. Fields; is that your expert opinion?

7    A    No.  My opinion is that it did not cause him to develop a

8    major mental illness such as post-traumatic stress disorder.

9              MR. GOODMAN:  I have nothing further.

10             THE COURT:  Redirect.

11             MR. BURNS:  No.

12             THE COURT:  Okay.  Any questions from any of the

13   jurors?

14             (The following proceedings were had at sidebar in the

15             presence but out of the hearing of the jury:)

16             THE COURT:  You stated Dr. Silberberg's opinion was

17   flawed and he presumes Nathson was innocently imprisoned (self

18   reported).  Are your opinions based on a presumption of

19   innocence or guilt as it relates to Nathson's psychosis?

20             And I would change psychosis, which was actually

21   spelled phycosis, but whatever, to mental -- major mental

22   disorder I think was the term he used.  Does anybody have a

23   problem with that?

24             MR. GOODMAN:  No.

25             MR. BURNS:  No.

Cavanaugh -

1        MS. MATUZAK:  No.

2        THE COURT:  Okay.  So and I think -- I assume what

3   he's going to say is it's not based on it one way or the other

4   I think is essentially what he said.

5        MR. BURNS:  Yes.

6        THE COURT:  The other one I'm frankly having trouble

7   interpreting.  If I'm interpreting it right, I'm not sure it's

8   a proper question, so I'm just going to read it as it's

9   stated.

10        In your knowledge, is Mr. Fields has denial of his

11   responsibility and likely blame others for his choice, action?

12        I'm not sure exactly what that means.  I think she's

13   picking up on this reference to narcissism and asking just

14   generally if he's somebody who's likely to blame other people

15   for things that he does.  The question, however, is confusing

16   enough I'm just sort of not inclined to ask it.

17        MR. BURNS:  All right.

18        (The following proceedings were had in the presence

19        and hearing of the jury:)

20        THE COURT:  Okay.  And again I'll just remind the

21   jury I can't always ask every question, and don't try to

22   speculate on what the answers are if your question isn't

23   asked.

24        So, Dr. Cavanaugh, you stated that Dr. Silberberg's

25   opinion was flawed, and you made reference to the fact that

1    he's presuming or assuming that Mr. Fields was innocently

2    imprisoned or he was imprisoned despite the fact that he was

3    innocent.  Your opinions, are they based on an assumption that

4    Mr. Fields was guilty of the crime or that he was innocent of

5    the crime or neither of the above?

6              THE WITNESS:  Neither, as I said in my report.

7              THE COURT:  Okay.  Follow-up questions, Mr. Burns.

8              MR. BURNS:  Nothing, your Honor.

9              THE COURT:  Mr. Goodman.

10             MR. GOODMAN:  No.

11             THE COURT:  You're excused.  Thank you.

12             THE WITNESS:  Thank you, your Honor.

13             THE COURT:  Have we checked on the other person?  Are

14   we going to need a couple of minutes?

15             MR. BURNS:  Yes.

16             THE COURT:  Let me just talk to the lawyers about

17   scheduling real fast here.  We might make an adjustment when

18   we break for lunch.

19             (The following proceedings were had at sidebar in the

20             presence but out of the hearing of the jury:)

21             THE COURT:  Are you doing the direct?

22             MR. BURNS:  Of?

23             THE COURT:  Maue.

24             MR. BURNS:  No.  This one I'm not.

25             THE COURT:  Okay.  Who's doing the direct?

```
 1              How long is your direct, ballpark?
 2              MR. MICHALIK:  20, 25 minutes.
 3              THE COURT:  That's going to pull us till after lunch.
 4    So why don't we just take our lunch break now.  That will give
 5    you time to set up.  We'll talk about the jury instructions
 6    right after I take the jury out.  That will give you time to
 7    set up.  Then we'll deal with any issues we have to deal with
 8    on Maue.
 9              Is that the last?
10              MR. MICHALIK:  Then Mr. Cavanaugh.  Or O'Callaghan.
11              MR. BURNS:  O'Callaghan.
12              THE COURT:  Okay.  O'Callaghan and that's the last
13    person.
14              MR. BURNS:  Yes.
15              THE COURT:  And is there going to be any rebuttal?
16              MS. GORMAN:  No.
17              (The following proceedings were had in the presence
18               and hearing of the jury:)
19              THE COURT:  Okay.  So we have to do a little bit of
20    setup on the video thing, so what we're going to do is we're
21    going to adjust the schedule.  We're going to take a lunch
22    break now, now till one.  That will allow us to do that.  That
23    will allow me to talk to the lawyers about the jury
24    instructions.
25              We've got that one witness and maybe one more short
```

1    witness after that.  Again, we're still on track.  You'll hear

2    argument this afternoon, and you'll have the case before the

3    end of the day.

4              So don't discuss it.  We'll resume at 1:00.  I'll be

5    right back out.

6              All rise.

7              (The following proceedings were had out of the

8              presence and hearing of the jury:)

9              THE COURT:  Okay.  So I'd like to spend whatever time

10   we need to talk about the draft instructions that I

11   circulated.  I only saw as I went through them one I guess

12   what I'd call a typo.  So why don't I give everybody a chance

13   to get them in front of you.

14             Does everybody have them?  Okay.

15             On page 2, the heading -- the page number two, the

16   compensatory damages instruction, in the fourth paragraph it

17   says you should consider only the following type of

18   compensatory damages.  Since there's more than one type in

19   there, I'm going to change that to types.  That's the only

20   thing I saw.

21             Does the plaintiff have any issues on these?

22             MS. GORMAN:  No, your Honor.

23             THE COURT:  Defendants, defendant.

24             MR. MICHALIK:  We do, your Honor.

25             THE COURT:  Yes.

1          MR. MICHALIK:  Generally the instruction tracks the

2    defendant's proposed instruction, which was, I believe, 29.

3    I'm going to look for it right now.

4          We would ask that the Court add to the instruction

5    the last paragraph, which is, if you find in favor of

6    plaintiff but find that the plaintiff has failed to prove

7    compensatory damages, you must return a verdict for plaintiff

8    in the amount of one dollar.

9          THE COURT:  So it's the nominal damages part of the

10   instruction.

11         MS. GORMAN:  Yes.  We would (inaudible).

12         THE COURT:  Is there law on whether I give that over

13   the plaintiff's objection, because, I mean, it says -- the

14   instruction basically as it reads without that would say if

15   the damages are zero, the damages are zero, not one dollar.

16   So is there law on whether I give that over the objection of

17   the plaintiff?  Because, I mean, in a lot of circumstances the

18   plaintiff is looking for that, you know, commonly in a

19   situation when the trial hasn't been bifurcated between

20   liability and damages, and so there needs to be some way of

21   signaling liability, and that's a way of doing it.

22         So do you have any law on that?

23         MR. MICHALIK:  We do not, your Honor.

24         THE COURT:  I mean, I'm not inclined to give it over

25   objection so --

1    MS. GORMAN:  Thank you.

2    THE COURT:  Anything else?

3    MR. MICHALIK:  Yes, Judge.

4         We would just also ask, you know, similar to our

5    previous request during the liability phase, we had the

6    proposed instruction No. 28, which for purposes of the damages

7    instruction it would be an in pari delicto instruction, which

8    would read plaintiff is not entitled to damages if you find he

9    bears at least substantially equal responsibility for the

10   injuries he alleges.

11        THE COURT:  I'm rejecting that for the same reason I

12   did before.  The instruction requires a preponderance of the

13   evidence that the damages were sustained, quote, as a direct

14   result of the defendant's wrongful conduct.  And I'm still

15   not, frankly, persuaded this is a good statement of the law in

16   Section 1983 cases.  But even if it is, the point's covered by

17   the instructions as they exist.

18        Any other issues?

19        MR. MICHALIK:  Those were the two, your Honor.

20        THE COURT:  Okay.  So I will -- just stick around a

21   second.  I'll print you out a revived version of these.

22        So I'm going to have the tech guy, I'm going to have

23   him come up here at let's say quarter to one to help you get

24   set up, so just make sure somebody's back up here at quarter

25   to one.

1    Are there issues that we're going to have to take up

2  before Mr. Maue testifies?

3    MR. MICHALIK:  None that I'm aware of.

4    THE COURT:  So if there's objections, we'll just kind

5  of take them as we go.

6    And I'm not sure how the -- I guess we'll find out

7  how the little fuzz box works on a witness who's remote.  My

8  guess is he might be able to hear us, actually, so we'll have

9  to come up with another way of dealing with that if there's an

10  issue.  I guess we'll find out.  So I'll go over there and

11  I'll say, hey, can you hear us.  If he does something, then

12  we'll know.

13    Okay.  See you at -- so the guy will be up here at a

14  quarter till.

15    MR. MICHALIK:  Thank you, your Honor.

16    MS. GORMAN:  Thank you, your Honor.

17    (The trial was adjourned until 1:00 p.m. of this same

18  day and date.)

19

20

21

22

23

24

25