IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | Docket No. 10 C 1168 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Chicago, Illinois |
| | ) | November 14, 2016 |
| Defendants. | ) | 5:30 o'clock p.m. |

TRANSCRIPT OF PROCEEDINGS - JURY SELECTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF H. CANDACE GORMAN
                       BY:  MS. H. CANDACE GORMAN
                       220 South Halsted Street, Suite 200
                       Chicago, IL  60661
                       (312) 441-0919


                       LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
                            MR. STEVEN EDWARDS ART
                            MR. ANAND SWAMINATHAN
                       311 North Aberdeen Street, 3rd Floor
                       Chicago, IL  60607
                       (312) 243-5900


NOTE:   THIS IS A PARTIAL TRANSCRIPT.  IN THE EVENT OF AN
        APPEAL, PLEASE CHECK TO SEE IF A FULL TRANSCRIPT
        IS ON FILE.  IF ONE IS, USE THE PAGINATION OF
        THAT TRANSCRIPT.


Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Suite 2102
                       Chicago, Illinois  60604
                       (312) 435-5639

APPEARANCES CONTINUED:

For Defendant
City of Chicago:          DYKEMA GOSSETT PLLC
                          BY:  MR. TERRENCE MICHAEL BURNS
                               MR. DANIEL MATTHEW NOLAND
                               MR. PAUL A. MICHALIK
                          10 South Wacker Drive, Suite 2300
                          Chicago, IL  60606
                          (312) 627-2100


For Defendant             KULWIN, MASCIOPINTO & KULWIN, LLP
David O'Callaghan:        BY:  MR. SHELLY BYRON KULWIN
                               MS. RACHEL ANNE KATZ
                          161 North Clark Street, Suite 2500
                          Chicago, IL  60601
                          (312) 641-0300

1            * * * * *

2    (The following proceedings were had in open court outside

3    the presence and hearing of the jury:)

4            THE COURT:  Okay.  So, number one, nobody leaves the

5    room with any copies of the questionnaires.  I need all copies

6    of the questionnaire left here.  And --

7            MR. BURNS:  You want a copy of the background,

8    Judge --

9            THE COURT:  Nobody raised any issues on it, so,

10   frankly, I don't need it.  It's just more paper for me.

11           MR. BURNS:  No, I think you had a copy.

12           THE COURT:  Oh, I do.  It's right here.

13           My suggestion would be that you just preserve it just

14   in case anything comes up later.  Just have somebody stick it

15   in an envelope somewhere.

16           I need the questionnaires before you leave.

17           Anyway, so what issues -- Mr. Loevy, you said you had

18   something you wanted to take up with me.

19           MR. LOEVY:  Several, your Honor, but by far, the most

20   important one is how we're going to handle the '72 conviction.

21   Is this an appropriate time to raise that, your Honor?

22           THE COURT:  Well, if you think it's going to come up

23   in openings.  I mean --

24           MR. LOEVY:  Yes.

25           THE COURT:  -- I thought I made a ruling on it that

1  was reasonably clear, but maybe I didn't.

2          MR. LOEVY:  The ruling was that -- I thought that we

3  had to decide what we were going to declare on the death

4  penalty.  And here's --

5          THE COURT:  Hang on a second.

6          MR. LOEVY:  Sure.

7          THE COURT:  Let me just -- I, like you, have been

8  kind of preoccupied all day, so let me get out the...

9          What I said I was going to discuss with you today is

10 when and how we're going to discuss it.  I didn't say we were

11 necessarily going to discuss it today.  I just wanted to

12 figure out when it needs to be discussed.

13         MR. LOEVY:  Well, we want, in opening, no reference

14 to the fact that the crime was for murder, and we certainly

15 don't want it in Mr. Fields' testimony.

16         THE COURT:  Is he the first witness?

17         MR. LOEVY:  Yes, your Honor.

18         THE COURT:  All right.

19         MR. KULWIN:  Well --

20         MR. LOEVY:  So, your Honor, I would like to make the

21 argument, if you'll allow me.

22         THE COURT:  So time out.

23         MR. LOEVY:  Yeah.

24         THE COURT:  I mean, I -- I mean, I guess I tried to

25 be as clear as I possibly could about, you know, what had been

1    ruled on before.  This is at pages -- this is the -- it's the

2    ruling on November 12th.  This was Saturday, called order on

3    certain motions for reconsideration and non-Monell motions in

4    limine.  And the discussion of the '72 murder conviction

5    starts over on page 9 and carries through to basically the end

6    of page 13.

7         I basically said that -- I basically reviewed the

8    rulings that I have made, and prior to trial, I had overruled

9    a number of grounds that had been argued by the defense for

10   putting it in.  I deferred a couple of things.  And during the

11   trial, there was some further developments, which are

12   discussed at page 11 over to page 12 of the ruling of November

13   the 12th, which, by the way, was actually -- maybe it was

14   November the 11th.  You know which one I am talking about.

15        And then on page 12, I say this:

16        Fields says that his then lead trial counsel, in what

17   he characterizes as a poor mistake in strategic decision,

18   opened the door to admission of the 1972 murder conviction,

19   and he says that he does not intend to make the same mistake

20   at the upcoming trial.  Defendants say it was no mistake and

21   that the prior ruling should stand.  Both sides are partly

22   right about this.  The Court rejected most of the grounds

23   offered by the defendants for introducing the 1972 murder

24   conviction.  It eventually admitted the conviction mainly

25   because of the decision made by Fields to use the fact that a

1  death sentence had been imposed to enhance his damages.  But

2  Fields is right when he says he opened the door to this based

3  on the way he tried the case previously.  Defendants are also

4  right when they say that Fields made a conscious decision to

5  open the door, at least keep it open during the discussion

6  referenced above.  The fact that Fields opened the door during

7  the prior trial does not mean he will do so again.  That

8  remains to be seen.

9          MR. LOEVY:  I got you.

10         THE COURT:  So, I mean, I think what I basically am

11  saying there is that before trial, I had essentially kept it

12  out and I let it in because of something that happened during

13  the trial.

14         MR. LOEVY:  I agree, your Honor.  I guess what I am

15  arguing now is that we should be able to mention the death

16  penalty, and I would like to persuade your Honor that that

17  doesn't open the door to the fact that the crime was a murder,

18  and we have -- two arguments, your Honor.

19         You know, I think I was overcomplicating it when I

20  argued that the causation point, it's not material because it

21  doesn't -- you know, we're not arguing that but for their

22  misconduct, he wouldn't have gotten the death sentence.

23         It really is a 401/403 argument.  401, it is

24  probative, it is --

25         THE COURT:  But what's the "it"?

1          MR. LOEVY:  The fact that the crime he was convicted

2  of, the jury is going to hear he was convicted of a crime, the

3  fact that it was, in fact --

4          THE COURT:  The Smith/Hickman.

5          MR. LOEVY:  No, the '72 conviction.

6          THE COURT:  Okay.

7          MR. LOEVY:  They are going to hear he was convicted

8  in '72 of a crime.  That's where it is, unless we open the

9  door.

10         THE COURT:  Right.

11         MR. LOEVY:  We would like to open -- we would like to

12  argue that he --

13         THE COURT:  Wait a second.

14         MR. LOEVY:  Sure.

15         THE COURT:  I apologize, but for me, like you,

16  it's 5:40 in the afternoon.  Where is that?

17         MR. LOEVY:  No. 9.

18         THE COURT:  Page 9?

19         MR. LOEVY:  I think that's the whole thing you just

20  read to us.

21         THE COURT:  Said it was inadmissible to impeach his

22  credibility -- so when you say the jury is going to hear about

23  it, how are they going to hear about it?

24         MR. LOEVY:  We had it -- well, we had an

25  understanding that they were allowed to bring in that he was

1  convicted of a crime but not that it was a -- that the crime
2  was, in fact, murder.
3         So here's what I'm saying to your Honor.  Okay?  We
4  think that they should be -- the jury should be told that
5  in '72, he got convicted of a crime and he went to prison.
6  The marginal probative value of saying that that crime was
7  murder is almost nil because he's already -- when he gets
8  sentenced, he's looking at four murders, so telling the jury
9  that 14 years earlier he had a fifth murder, it was actually
10 an accountability theory, is -- the probative value is almost
11 zero.
12        And, your Honor, the key to my argument is the
13 prejudice is so overwhelming, when they find -- the jury hears
14 that he had a '72 crime that wasn't just a crime but it was
15 for murder, that was the first third of their
16 cross-examination, it was the first third of their opening
17 statement, it was their whole case, they never even made the
18 materiality argument that you said that arguably it would be
19 open for if we did the death penalty.  They never even argued
20 that that's why he got the death penalty.  They used it for
21 propensity, propensity, propensity, propensity.
22        So what we're asking, your Honor, is to allow us to
23 talk about the death penalty and allow the jury to hear that
24 he was convicted of a crime for which he did 10 years in
25 prison or whatever it was, and that he got released.

1      And the marginal probative value of saying, well,

2  hold on a sec, the crime he got convicted was also murder is

3  almost nil, and the prejudice is overwhelming.

4      And not to repeat, but, your Honor, but at the last

5  trial, you've seen this trial twice now, and you saw what they

6  did, what the defense did, when it came in that it was a

7  murder conviction.  That was the whole defense.  It was a

8  propensity defense.  That was all they cross-examined him

9  about.  Well, isn't it true you're a murderer?  Isn't it true

10 you shot in a car.  Mr. Burns asked him, Do you ever think

11 about Mr. Watkins?

12     That is so prejudicial that they are going to award

13 him $80,000, even if they think they got framed, because once

14 they hear that it's a murder, Mr. Fields says to say, well,

15 no, actually, it was an accountability theory.  And then they

16 say, well, didn't you fire a gun at a car?  And then it's

17 over.

18     What they should hear is that he was convicted of a

19 crime, he spent 10 years in prison, and that achieves the

20 materiality point.

21          THE COURT:  So to be clear about this --

22          MR. LOEVY:  Yeah.

23          THE COURT:  -- the only thing -- the only thing that

24 prior to the last trial that I admitted was the fact that

25 Mr. Fields had given false alibi testimony, this is

1    discussed -- at the trial of the 1972 murder --

2          MR. LOEVY:  Okay.

3          THE COURT:  -- this is discussed at pages 10 and 11

4    of the ruling that I just talked about --

5          MR. KULWIN:  And for --

6          THE COURT:  -- I had ruled that, Giving a false alibi

7    testimony at the trial in the '72 murder charge was admissible

8    but that did not authorize eliciting testimony regarding the

9    nature of the charge, i.e., that it was a murder charge or a

10   charge for a violent crime.  I did not rule prior to trial

11   that it was admissible for any other purpose.  I simply

12   overruled the argument that it was admissible to impeach

13   credibility, ruled that it was inadmissible to try to show a

14   pattern of behavior, I ruled that it was inadmissible to

15   explain this is why he was picked to carry out the murder.

16   You know, I overruled a bunch of other stuff too.

17          So it really -- the '72 conviction came in only

18   because of things that happened during the trial and the

19   arguments that I accepted at the time on that.  So you kind of

20   skipped over that step, so I just wanted to make that clear.

21          MR. LOEVY:  Thank you.

22          The argument that I understood it came in for was

23   Mr. Fields said, I would like to pursue damages for the death

24   penalty.  And then your Honor said, well, then it's material

25   that you had this fifth murder conviction, so I'm letting it

1    in.

2            THE COURT:  And that's the topic that -- and I have

3    said myself before probably in this case that judges don't

4    read footnotes.  I used a footnote on page 13 of that ruling,

5    and it's that that I sort of -- I guess I was sort of

6    questioning out loud whether there was a correct decision.

7            MR. LOEVY:  We --

8            THE COURT:  Let me hear from the defendants what

9    exactly you want to put in and the theory that you want to put

10   it in.

11           MR. KULWIN:  First of all, Judge, I think the

12   plaintiff has misapprehended your rulings, as I understand it.

13   What you said is and what makes perfect sense --

14           THE COURT:  Where and when?

15           MR. KULWIN:  In this opinion.

16           THE COURT:  This opinion.

17           MR. KULWIN:  Yes, in the opinion you were just

18   reading from.  And you hit the nail on the head.  The whole

19   ball of wax at this point is footnote 4.

20           We are not going to re-argue the ruling.  You ruled.

21   You basically ruled just the way you said and what you wrote.

22           The issue is this.  If they're -- if you're ruling

23   that we cannot bring up that it was a murder conviction, then

24   Vaughn/White is non-material.  As you point out, it would seem

25   that the Court -- it would seem to the Court that any

1   misconduct that was material regarding Fields' conviction on

2   Smith/Hickman, by definition, led to the death penalty because

3   that conviction rendered him death eligible.

4           Now, what they want to argue Vaughn/White for is, no

5   offense, is propensity, propensity, propensity, and

6   propensity.  And, quite frankly, I'm not particularly

7   concerned about what, you know, happened at the last trial

8   because what Ms. Gorman did at the last trial, what's good for

9   the goose is good for the gander, is spend hours and hours and

10  hours about the holdover sheet and the warrant and the typo.

11          Vaughn/White is immaterial to this case unless, as

12  you ruled in the last trial, it's material if, if, if the

13  plaintiff is going to say, I got the death penalty because of

14  Vaughn/White, which is what the argument was that they made

15  last time.

16          THE COURT:  Can I have you pause for a second?

17          MR. KULWIN:  Sure.

18          THE COURT:  I want to sort of restate your argument

19  to make sure I'm getting it.

20          So what you're saying, if I'm understanding you

21  correctly, is if -- is if the plaintiff is saying, I got the

22  death penalty because of Smith/Hickman, then Vaughn/White

23  isn't admissible .  If the plaintiff wants to say that I got

24  the death penalty because of Smith/Hickman plus Vaughn/White,

25  then that's why Vaughn/White is coming in, and then what?

1  That's my --

2          MR. KULWIN:  And then the --

3          THE COURT:  I got it right so far?

4          MR. KULWIN:  Right, and then the murder conviction

5  comes in because the judge -- the jury could have found that,

6  well, you know, Vaughn/White was bad, but what really did it

7  for us was he had been convicted of murder before.  He wasn't

8  even charged in Vaughn/White.  He was not even charged.

9          So the jury could have literally said -- Mr. Noland

10  is standing here, I might be saying something wrong, but I

11  don't think so.  What the jury could have been thinking in

12  that death penalty case was, wow, he's death eligible for

13  Smith/Hickman, but he's got this prior conviction for murder

14  and not Vaughn/White.

15          So it seems to me that they have no argument -- they

16  cannot have their cake and eat it too.  What they want is, we

17  want to argue propensity, propensity, propensity on

18  Vaughn/White even though we don't need it for the death

19  penalty because, as you point out, he's death eligible by

20  Smith/Hickman, and we want to keep out the murder, which, as

21  you pointed out in the last trial very, very specifically, it

22  seems -- and I might be misquoting, but I think what you said

23  was, well, it seems to me that if you're going to argue

24  Vaughn/White, then the murder comes in for materiality.

25  That's what you ruled.

1       THE COURT:  Mr. Noland, is there anything

2   non-repetitive that you want to add to what Mr. Kulwin said?

3       MR. NOLAND:  One thing.  Death was issued in this

4   case before that jury based on Smith/Hickman, Vaughn/White,

5   and the 1972 murder.  And so that would be -- if the death

6   penalty is going to come in --

7       THE COURT:  We don't know what the fact -- finder of

8   fact thought, but I understand your point.

9       Okay.  I have a question for you before you start

10  answering this.  So what is the significance of the

11  Vaughn/White -- of anything having to do with fabrication,

12  concealment, et cetera, regarding Vaughn/White in this case?

13      MR. LOEVY:  Well, the primary argument is probable

14  cause, your Honor.  Anthony Sumner says, I am a credible

15  person.  I'm telling you he did Smith/Hickman and he did

16  Vaughn/White.

17      Then he said, you know what?  After he was convicted,

18  I lied about Vaughn/White.  Everything I told you was true

19  except but I superimposed Nate Fields into it.  And then they

20  continued the prosecution against Nate Fields for the

21  Smith/Hickman murder even after learning that Anthony Sumner

22  had lied -- had fabricated Fields' involvement.

23      There is no argument that Vaughn/White is not

24  relevant to probable cause.  You know, they want to talk

25  about 50 facts --

1        THE COURT:  And probable cause comes in, if for no
2  other reason, on the malicious prosecution.
3        MR. LOEVY:  Exactly.  On the 2009.  They continued to
4  prosecute even after they knew that the main source of the
5  prosecution had lied about Fields in the exact same way.
6        You know, until we accidentally tried to muss things
7  up, there was no argument that Vaughn/White wasn't part of the
8  case.  Mr. Kulwin's argument is backwards --
9        THE COURT:  That's annoying.  Sit down and stop doing
10  that.
11        MR. LOEVY:  Mr. Kulwin's --
12        THE COURT:  You have a bunch of bobbleheads in the
13  back, and it's annoying.
14        MR. LOEVY:  Mr. Kulwin's argument is backwards.  He's
15  saying, if you seek the death penalty, therefore, if we want
16  to introduce to the jury that he got the death penalty, well,
17  then the reasons why he got the death penalty are admissible.
18  That doesn't mean if we don't put in evidence of the death
19  penalty, that Vaughn/White is therefore not relevant.  I mean,
20  it's part of the case.  It's how Sumner got arrested.  It's
21  what Sumner told about Fields.  It's inextricably intertwined.
22        And there is no motion to bar Vaughn/White.  I mean,
23  as, you know --
24        THE COURT:  Well, I mean, he is kind of saying that
25  now.

1          MR. LOEVY:  Well, you know, at 6:00 o'clock --

2          THE COURT:  You are not in a very good position, Mr.

3  Loevy --

4          MR. LOEVY:  Point made.

5          THE COURT:  -- to talk to me about things that are

6  being said at the last minute.  Okay?

7          MR. LOEVY:  Point made.

8          THE COURT:  Anyway.

9          MR. LOEVY:  But back to the point that I started

10  with, which is we would like to introduce evidence of the

11  death penalty --

12          THE COURT:  So to get back to my question now, you

13  say that Vaughn/White comes in because it has to do with

14  Mr. Sumner and it goes to the issue of probable cause.

15          MR. LOEVY:  Right.  In other words --

16          THE COURT:  And what's the argument going to be

17  regarding -- how does the death penalty get used in your case

18  in any way, shape, or form?

19          MR. LOEVY:  We would like to put on Mr. Fields to

20  give very powerful testimony that, when I was wrongfully

21  convicted for Smith/Hickman, I got the death penalty, and it

22  caused me all kinds of emotional distress because they're

23  going to lethally inject me, and he has all kinds of very,

24  very poignant stories about what life was like on death row.

25          You ruled at the last trial if we do that, if we open

1   the door by talking about the fact that he got the death

2   penalty, that would open the door to the fact that --

3          THE COURT:  Thanks.  I have your answer to my

4   question.

5          So let me go back to Mr. Kulwin.  And here is my

6   question for you.

7          MR. KULWIN:  Sure.

8          THE COURT:  So my question is -- so if you look at --

9   and this is why I sort of was questioning -- not sort of -- I

10  was questioning my own ruling on this death penalty

11  materiality issue in footnote 4 of the decision that we are

12  talking about here, the jury instructions don't really say

13  anything about, you have to find that it was material to

14  whether -- anything that was material to whether Mr. Fields

15  got the death penalty.  It's really not an issue that the jury

16  has to decide.

17         Mr. Loevy has said that the reason Vaughn/White comes

18  in -- and I can deal with arguments about propensity, okay?  I

19  can absolutely deal with that.  I can preclude people from

20  making arguments about propensity.  But he says it comes in on

21  the issue of whether there was probable cause to either

22  commence or continue the prosecution at various points in

23  time.

24         So what do you think is the relevance of Vaughn/White

25  if the plaintiff makes the contention that Mr. Loevy just said

1  he's going to make; in other words, that the fact that I was

2  sentenced to death enhanced the degree of emotional distress

3  for reasons that he described?  Why is Vaughn/White

4  significant to that, or is it?

5          MR. KULWIN:  It isn't.

6          THE COURT:  Okay.

7          MR. KULWIN:  Vaughn/White doesn't -- as you point out

8  in your opinion, Judge, and there's two points I want to

9  address, Smith/Hickman made him death eligible.

10         THE COURT:  Right.

11         MR. KULWIN:  He doesn't need Vaughn/White.  So that's

12  out the door.

13         Now, what Mr. Loevy is now arguing is, we are not

14  arguing Vaughn/White for the death penalty.

15         THE COURT:  Right.

16         MR. KULWIN:  We're arguing --

17         THE COURT:  That's the way I heard his argument.

18         MR. KULWIN:  Right.  We're arguing Vaughn/White for a

19  completely different reason.  We're arguing because it shows

20  that the police didn't have probable cause because they knew

21  Sumner put him in another double murder.

22         Well, that's easily solved, Judge.  You're letting us

23  put in that there's another offense that he was convicted of,

24  and, you know, he lied, and he got three other guys to lie for

25  him, he suborned perjury, that all comes in.  They can have

1    someone testify, well, isn't it true that Mr. Sumner -- or

2    they could argue Mr. Sumner also wrongfully put Mr. Fields

3    into another double murder that happened at or near the same

4    time without going into all the details about it.  As you may

5    recall --

6              THE COURT:  I don't.

7              MR. KULWIN:  Okay.  I apologize.  So here is what it

8    is.  There were, I would say, 30 percent to 50 percent of

9    Mr. Fields' direct testimony in both trials.

10             THE COURT:  Had to do with what?

11             MR. KULWIN:  Had to do with Vaughn/White.

12   Remember -- I'm sorry.  You don't remember.

13             THE COURT:  Had to do with his involvement or not --

14             MR. KULWIN:  No, with his -- he was put in a lineup

15   with Vaughn/White --

16             THE COURT:  Ah.  This is about the lineup.

17             MR. KULWIN:  -- he could see through the one-way

18   mirrors --

19             THE COURT:  This is about the lineup.

20             MR. KULWIN:  Yeah.  O'Callaghan framed him on that

21   one too, the holdover sheet is phony, it proves that they were

22   out to get him on Vaughn/White.  And it's all propensity

23   evidence, and it's completely non-germane because there's

24   no -- it's not part of their case.

25             And so that comes out.  It's completely prejudicial

1    for them to be able to argue and spend an inordinate amount of

2    time, an inordinate amount of time, on a completely different

3    double murder that he wasn't charged with because the only

4    thing they have for that is it's propensity.

5           Again, it would be totally unfair to have the cake

6    and eat it too.

7           MR. LOEVY:  Your Honor --

8           THE COURT:  What you're referring to as the

9    propensity evidence involving the defendants --

10          MR. KULWIN:  Right.

11          THE COURT:  -- on Vaughn/White has to do with --

12   largely has to do with the lineup.

13          MR. KULWIN:  Right.

14          THE COURT:  Everybody pause for a second.

15          MR. KULWIN:  The lineup --

16          THE COURT:  Can I -- let me take a note.

17          The lineup, comma -- I am going to get to after the

18   comma in a second.

19          What else besides the lineup?

20          MR. KULWIN:  Well, they're saying that -- they're

21   basically saying he did the exact same thing.  Not him.  What

22   they're saying --

23          THE COURT:  Who is the "him"?

24          MR. KULWIN:  Mr. O'Callaghan.

25          That O'Callaghan -- there were these other suspects

1    and the little kids identified -- before O'Callaghan was in

2    the case -- O'Callaghan was in the case for one day.  He did

3    the lineup.  And then other detectives took it over for about,

4    I don't know, six or eight weeks.  And the little kids went to

5    the lineup, and they identified the wrong people, and

6    O'Callaghan testified that he would never put them in that

7    lineup to prove that he wasn't involved in that.

8          We literally tried in that case whether or not

9    O'Callaghan -- we spent -- you spent, again, a long time

10   talking about was -- A, was O'Callaghan even involved in

11   Vaughn/White, B, was O'Callaghan -- did Fields actually stand

12   in a lineup on June 30 -- on June 13th --

13         THE COURT:  So what's your response to -- and I

14   understand that you're talking about how this was argued at

15   some point as propensity evidence, but what's your response to

16   Mr. Loevy's argument that what the defendants had or at least

17   thought they had on Vaughn/White or contended they had on

18   Vaughn/White goes to the issue of probable cause on the

19   malicious prosecution?

20         MR. KULWIN:  Two-fold, Judge.  It had nothing to do

21   with it, number one; and number two, it's solid without going

22   into all the details.  Because what he's arguing is, the heart

23   of it is, the core of it is --

24         THE COURT:  Sumner?

25         MR. KULWIN:  Right.  That's what he just argued.

1   That's what he argued.  That's exactly what he just argued.

2   He said, Judge, they knew Sumner had lied on him.  Well, he

3   could have that evidence.  I don't -- you know, obviously, I'm

4   not waiving my objections on that.  We've already filed our

5   motions.

6           THE COURT:  Yeah.

7           MR. KULWIN:  But they could have that evidence.  All

8   they have to do is -- it takes two minutes.

9           MR. LOEVY:  But --

10          THE COURT:  Not yet.

11          MR. KULWIN:  It takes two minutes.  Isn't it true

12  that Sumner -- Sumner put him in another double murder.

13          THE COURT:  Mr. Noland, what did you want to say?

14          MR. NOLAND:  I would simply add on that argument from

15  Mr. Loevy that the Court did bar the defendants from

16  testifying as to their knowledge of the other cooperating El

17  Rukn statements for the purpose of the 2009 trial --

18          THE COURT:  So as I said before, the number of in

19  limine rulings I made in this case is the triple digits at

20  this point.  What did I rule and when did I rule it?

21          MR. NOLAND:  On April 11, 2004 --

22          THE COURT:  2004?  No, it can't be 2004.  It only

23  feels like I have had this case for 12 years.

24          MR. NOLAND:  2014.

25          THE COURT:  2014.  Okay.

1    MR. NOLAND:  Pages 630 to 647.

2    THE COURT:  Tell me again what that was, that I

3  precluded what?

4    MR. NOLAND:  You precluded the defendants, the

5  individual defendants, there was a discussion --

6    THE COURT:  Right.

7    MR. NOLAND:  -- of whether we could ask them --

8    THE COURT:  I see what you're looking at.  Do you

9  have my ruling there?

10    MR. NOLAND:  I have -- actually, it's our cheat sheet

11  of your ruling --

12    MR. KULWIN:  You could have it.

13    THE COURT:  I don't want to look at your cheat sheet.

14    MR. KULWIN:  What's the date on it?

15    MR. NOLAND:  I don't think it's a document.  I think

16  this was a transcript, discussion -- my recollection is --

17    THE COURT:  Say it again?  I precluded the defendants

18  from testifying about what?

19    MR. NOLAND:  As to the knowledge that they learned

20  from cooperating El Rukns that --

21    THE COURT:  About?

22    MR. NOLAND:  -- Nathson Fields had done the

23  Smith/Hickman murders.

24    THE COURT:  How does that relate to what we're

25  talking about on Vaughn/White?

1      MR. NOLAND:  Because Mr. Loevy is arguing about
2   probable cause and the defendants' knowledge of what Anthony
3   Sumner said and didn't say --
4      THE COURT:  If I can kind of summarize the argument
5   here -- again, I'm doing this to make sure that I'm getting
6   it -- if Vaughn/White is relevant to probable cause, that
7   doesn't warrant putting in the evidence about the lineup and
8   the other misconduct that surrounded -- we'll just say
9   surrounded that --
10      MR. KULWIN:  Correct.
11      THE COURT:  -- because that really doesn't bear on
12   the issue of probable cause.  I get that.
13      And I'm sorry to be kind of small-minded or whatever
14   about this, but one of the issues that's been kind of nagging
15   at me or gnawing at me, and it's what I refer to in this
16   footnote, is this whole issue about death penalty materiality.
17   But I have to tell you, I think I screwed that up.  Okay?  I
18   mean, I don't think -- I don't think that -- that all of the
19   whys and wherefores about whether Mr. Fields got the death
20   penalty other than the fact that he was death eligible because
21   of his conviction for the Smith/Hickman murders is relevant
22   really on anything.  I mean, it's not a question about, well,
23   would you have gotten the death penalty if the Vaughn/White
24   misconduct hadn't happened or if this hadn't happened.  The
25   fact of the matter is that when he's convicted of the

1 | Smith/Hickman murders, he's rendered eligible for the death

2 | penalty, and there is no separate requirement of death penalty

3 | materiality. I mean, as a matter of causation, it just isn't

4 | there.

5 | But what you're saying, though, is that if all that

6 | is at issue here is this question that Mr. Loevy is talking

7 | about regarding -- regarding emotional distress, maybe -- and

8 | this question of probable cause, that doesn't warrant putting

9 | in all of the misconduct surrounding the lineup.

10 | Am I getting it more or less right?

11 | MR. KULWIN: You're absolutely right, Judge, and --

12 | but Mr. Noland raises a very good point, actually --

13 | THE COURT: Explain it --

14 | MR. KULWIN: Okay. Let me put a finer point --

15 | THE COURT: Nothing personal, Mr. Noland. It's late

16 | in the day. I don't need it twice.

17 | MR. KULWIN: Okay. Let me just put a finer point on

18 | it. Another aspect of the plaintiff's case here, as you may

19 | recall, maybe not, is that --

20 | THE COURT: He always uses the "may recall."

21 | MR. KULWIN: As you may recall.

22 | -- (continuing) is that in 2009, the police should

23 | have stopped the prosecutor -- the police should have either

24 | gone to the prosecutor -- they're guilty for allowing him to

25 | be prosecuted again in 2009 --

1      THE COURT:  For Smith/Hickman.

2      MR. KULWIN:  For Smith/Hickman.

3      -- (continuing) because they knew that Sumner had

4  lied on him on Vaughn/White.  That's one of the reasons.  And

5  they knew that, you know, Gerald Morris had flipped back and

6  forth.  We're going to have a whole big fight about that as to

7  why during this trial.

8      What Mr. Noland I believe is referencing is the

9  defendants were precluded, these defendants, from saying, of

10  course I didn't, you know -- I think that's what you -- I am

11  not sure it's a hundred percent accurate -- is that the

12  defendants were precluded from saying, why would I do

13  anything?  I knew by that point in time that five other El

14  Rukns had pinned it on him.

15      THE COURT:  Had pinned -- what's the --

16      MR. KULWIN:  Had pinned the Smith/Hickman on him.

17  Okay?

18      I'm not -- I was planning on actually asking

19  Detective O'Callaghan why -- what -- you know, did you make

20  the decision in 2009?  No, the state's attorney did.  Did you

21  have evidence as to why you thought he was guilty at that

22  point in time?  Yes.  What was it?  I had this, I had this, I

23  had this, and I had the fact that a number of other El Rukns

24  had now come forward since his conviction and said that he did

25  Smith/Hickman.

1        So I'm not -- I'm not -- maybe I am unfamiliar with

2  your ruling, but I thought I could do that.  But I think

3  that's the point you were trying to make.

4        MR. NOLAND:  If I may?

5        THE COURT:  Is that the point you were trying to

6  make?

7        MR. NOLAND:  Well, Mr. Loevy's argument is it's the

8  defendants' knowledge, so it's the defendants' knowledge of

9  Mr. Sumner's lie.  But the Court had barred the defendants

10  themselves from talking about their knowledge of the other El

11  Rukns.  It would seem to be that -- you know, the same side of

12  the coin.

13        THE COURT:  Okay.  Mr. Loevy, you have the floor.

14        MR. LOEVY:  Thank you, your Honor.

15        Your Honor, the Vaughn/White stuff is extremely

16  relevant because it's the story.  What happened was Anthony

17  Sumner gets arrested in Cleveland.

18        THE COURT:  Right.

19        MR. LOEVY:  He's committed the Vaughn/White murders.

20  They say to him, Anthony, we're going to give you the death

21  penalty unless you give us something.  You did this heinous

22  crime, and we caught you.

23        THE COURT:  The heinous crime being Vaughn/White.

24        MR. LOEVY:  Vaughn/White.  They caught him.  And he

25  admitted he did Vaughn/White.  And they said, if you don't --

1    you're going to get the death penalty unless you give us a lot
2    of cases and a lot of El Rukns.  He gives them seven cases.
3    He testified to that at Mr. Fields' criminal trial.  He gives
4    them seven cases where he says there's confessions.  One of
5    them is Smith/Hickman.  The other one is Vaughn/White.  He
6    said, yes, I did Vaughn/White with Hawkins, and Mr. Fields, my
7    landlord, he was there with us.

8         Now, the defendants knew immediately that Sumner was
9    lying about Vaughn/White, that -- and by the way, Sumner is
10   the whole case.  That's probable cause pursuant for murder.
11   The reason they knew he was lying about Vaughn/White is
12   because Vaughn/White was committed by two men.  There was no
13   dispute Vaughn/White was committed by two men.  The two little
14   children saw two men tie up their parents, shoot them and stab
15   them.  The two children did lineups for the two men.
16   Vaughn/White was committed by two men, yet Sumner is saying,
17   it was me, it was Hawkins, and it was Fields.

18        So if they're going to pursue murder charges -- and
19   he's like, oh, and by the way, Fields helped me with
20   Smith/Hickman too, or, Fields helped Hawkins with
21   Smith/Hickman.

22        So Sumner gave him -- gave the police two crimes.  He
23   lied about one of them through his teeth --
24             THE COURT:  That's Vaughn/White.
25             MR. LOEVY:  Vaughn/White.

1          -- (continuing) and he did the same thing -- and then

2   they found out later but before the second prosecution, he

3   admitted, I lied about --

4          THE COURT:  Smith/Hickman.

5          MR. LOEVY:  -- Smith/Hickman -- no, I lied about

6   Vaughn/White.

7          THE COURT:  Vaughn/White.  Okay.

8          MR. LOEVY:  And then they pursued -- they continued

9   to pursue Smith/Hickman, your Honor.

10         So what Mr. Kulwin is saying is of course it's

11  relevant that he lied about Fields and that's probable cause,

12  so that's what we want to prove, that he lied about Fields.

13  But it's also part of the story because that's how the whole

14  thing started, they caught him in Cleveland --

15        THE COURT:  So where do these issues -- I mean, part

16  of what I'm getting from Mr. Kulwin is that -- has to do with

17  the issues regarding lineups and things like that.

18        MR. LOEVY:  I want to address that.

19        THE COURT:  How does that fit in --

20        MR. LOEVY:  Mr. Fields sat in no lineup for

21  Vaughn/White.  You might have gotten that impression.  There's

22  no lineup issue in Vaughn/White.  They did -- O'Callaghan did

23  a lineup before Sumner confessed, and they got the two wrong

24  guys.  And if they -- you know, that was a point --

25        THE COURT:  I thought there was a lineup involving

1    this case where there was an issue about a tattoo or

2    something?

3              MR. LOEVY:  Yeah, that's the Smith/Hickman lineup.

4              So we say that the lineups in Smith/Hickman were

5    bogus.  We -- you know, Mr. Kulwin I think just implied that

6    there was some -- that there's a propensity argument.  There

7    was no lineup of Fields in Vaughn/White.  So the lineup issue,

8    we can cross off.  The lineup issue was O'Callaghan did get

9    these two children to identify --

10             THE COURT:  Time out for a second.

11             MR. LOEVY:  Okay.

12             THE COURT:  So --

13             MR. LOEVY:  So what's the propensity?

14             THE COURT:  I apologize, but, again, there's a lot of

15   evidence in the case, and a lot of this I have not heard for

16   two and a half years.  Okay?  So I assume there is a lineup

17   report?

18             MR. KULWIN:  No.

19             THE COURT:  Is there a lineup report?

20             MR. KULWIN:  No.

21             THE COURT:  No lineup report.

22             MR. KULWIN:  Judge, let me refresh your recollection.

23   Okay?  I apologize.  The facts that Mr. Loevy is talking about

24   aren't the facts of the case, at least not the ones that was

25   tried in this courtroom.  Okay?

1          In this courtroom -- and if they're saying now, we're

2     not going to put any of this evidence in, I'll take it.  We

3     can stop arguing.  That's the first thing.  Okay?  Let's find

4     that out because we can save ourselves all a lot of time.

5     Okay?

6          In this case twice, Mr. Fields took the stand and

7     testified, I was in two lineups, one of them I could see

8     through a one-way mirror --

9          THE COURT:  I recall that.

10         MR. KULWIN:  -- and there were two little heads.  And

11    then Ms. Gorman made a big deal that the warrant had

12    Vaughn/White on it because it was the first case in a

13    continuation of cases.  And then they showed that the holdover

14    that Mr. O'Callaghan had written Vaughn/White because he was

15    also suspected of that.  And then he tried to try the case

16    that he was framed in Vaughn/White.

17         If what Mr. Loevy is saying -- I'll take yes for an

18    answer.  If what Mr. Loevy is saying is, look, okay -- hold

19    it, please.  If what Mr. Loevy is saying is, look, Judge, we

20    want to put in that someone lied on Fields in Vaughn/White,

21    okay -- that's what he's saying.  And that's all the evidence

22    we're going to put in on that.

23         Now, for this story about the --

24         THE COURT:  Finish the "if."  "If" that's what they

25    would say, then what?

1          MR. KULWIN:  If that's all they're going to say, I
2    think that they don't have to use the names Vaughn/White
3    because that creates other confusion, they could just say
4    "another double murder," then, okay.  I don't agree with that,
5    but I would understand you letting that in, okay, because
6    Sumner is a critical witness and it goes to his credibility
7    and it's a major issue in the case.  Fine.  Put that aside for
8    a second.
9          That doesn't mean that we have to have testimony
10   about seeing through one-way mirrors, I was in a lineup that
11   there's no lineup report for, zero.
12         And one other fact that I'll make is -- and
13   Mr. Noland is absolutely right, and I want to be clear about
14   this because I don't want to violate any orders, I think he's
15   wrong, is that there's no evidence that the police knew in
16   Cleveland at the time Sumner put Fields in Vaughn/White that
17   it was a lie.  That's just false.
18         THE COURT:  Okay.  Let me ask this question.  We
19   started off talking about the 1972 murders, and we have now
20   ended up -- and it's largely because I pushed you that way --
21   talking about Vaughn/White.
22         MR. LOEVY:  Right.
23         THE COURT:  So let me go kind of back to the question
24   we started out with.
25         What's the theory on which the defendants contend the

1   fact Mr. Fields had a murder conviction in 1972 comes in?

2   What's the theory on which that comes in?

3          MR. KULWIN:  It comes in -- Mr. Noland can correct me

4   if I'm wrong, Judge.  Just because someone is death eligible

5   doesn't mean the jury gives them death.  They could hear --

6          THE COURT:  See, that sounds to me like an argument

7   that Mr. Fields richly deserved the death penalty.

8          MR. KULWIN:  No, no, no, that's not what I'm saying.

9   That's not what I'm saying at all.

10         THE COURT:  Okay.  Let me put it in a different way.

11  It sounds like an argument that irrespective of what led to

12  the conviction, the Smith/Hickman conviction, which, by

13  definition, rendered him eligible for the death penalty

14  because it was a double murder or whatever, that he would have

15  gotten the death penalty anyway.  That's the thing that I

16  think I botched, because I -- essentially, I think I imposed a

17  double materiality requirement.  You have to prove not just

18  the materiality that's in the jury instruction, but that

19  something was material to getting the death penalty as well.

20         And the jury instructions don't say that, and just as

21  a matter of elementary causation law, that's just not right.

22  I mean, that's just not right.

23         So is there some other theory --

24         MR. KULWIN:  I apologize, Judge, because I've been

25  relying on your theories, which was basically --

1          THE COURT:  Yeah, but that's what I said -- that's
2    what I was sort of -- pretty strongly hinted --
3          MR. KULWIN:  Right, you did.
4          THE COURT:  -- in that footnote that was -- and I'm
5    now -- now I'm not hinting anymore.  I think I screwed that
6    up.
7          MR. KULWIN:  Okay.  Fine.  But you also reference
8    Vaughn/White.  And maybe we're two ships passing in the wind
9    and agreeing.
10         All I'm saying is I don't want to have to deal in my
11   opening statement and during this trial, okay, with the
12   Vaughn/White lineups and all that.  They can have their cake
13   that Fields was wrongfully put into a double murder for
14   another case without getting into -- and they can even argue
15   that that's why they wrongfully went ahead on them without
16   getting into all the details and implying, in my opinion,
17   really falsely that when there's no lineup report, there's no
18   credible evidence that he was in it, that Mr. O'Callaghan --
19         THE COURT:  This is what I am going to do.  I have
20   heard enough argument on this.  I think it's time for me to
21   kind of do something here.
22         So first of all, I am going to say for the third
23   time, I made a ruling at the previous trial that I think
24   erroneously imposed a double materiality requirement, and I
25   let in the '72 murder conviction; not the false alibi, which I

1   had let in for other reasons, but the nature of the

2   conviction, and maybe even the details of the conviction, I

3   let it in on the theory that it was material as to why

4   Mr. Fields got the death penalty, and I thought, incorrectly,

5   I believe, that that became a relevant issue because

6   Mr. Fields was arguing that the emotional distress caused by

7   the death penalty was part of his damages.  That ruling was

8   wrong.  I think it's wrong as a matter of causation law.

9   There's no extra materiality requirement.  The fact that

10  Mr. Fields was convicted of the Smith/Hickman murder rendered

11  him eligible for the death penalty, and then it's not a fight

12  over why he got it, why he didn't get it, whether he should

13  have gotten it, did he get it for this reason, did he get it

14  for that reason.

15          So the 1972 murder conviction is not admissible on

16  the theory that I ruled that it was admissible in the prior

17  trial.  That was an incorrect ruling.  Okay?  So there is a

18  ruling.

19          On the rest of it, whether it's ships passing in the

20  night or in the wind or wherever, it sounds like to me that

21  now where we are is that the defense is making an argument

22  that what I'm going to call the lineup -- the alleged lineup

23  episode or whatever the lineup episode is isn't relevant,

24  isn't properly admissible, shouldn't be admitted because

25  either it's not relevant or because it's propensity evidence

1    or because it's unfairly prejudicial or maybe perhaps all of
2    the above.
3            So here's the deal.  Okay?  And I apologize for
4    making people write more stuff, but I am going to make you
5    write more stuff.  Okay?
6            So I need -- I need your positions, and I don't
7    need -- what I don't need and I don't want is some kind of
8    stream of consciousness thing.  And I know I am not going to
9    get that because the writing on both sides of this case has
10   been actually terrific, it has been, on both sides at all
11   stages of the case.
12           What I need is something that articulates each side's
13   position on what I'll call the Vaughn/White evidence other
14   than Mr. Sumner's false implication of Mr. Fields.  I need an
15   argument on the plaintiff's side about why this is -- exactly
16   why this is relevant and why it's admissible.  I need an
17   argument on the defense side for exactly why it's not
18   admissible and not relevant.
19           If you want to refer to the way it was argued in the
20   prior trial, that's perfectly fair game.  However, there's
21   like 5,000 pages of transcript.  You attach the pages of the
22   transcript to the thing that you file so I don't have to go
23   hunting through 1200 docket entries to find it or through, you
24   know, basically the entirety of my iPad.
25           Is that clear enough to everybody?

1        Now, here's the deal.  The deal is that -- I know
2  it's 10 after 6:00, folks, but it just seems to me that this
3  is something I have to at least make a good-faith attempt to
4  deal with before the openings happen tomorrow.  I don't know
5  that I am going to be able to, but I am going to have to try.
6  Okay?  That means midnight oil is going to be burned, or at
7  least 9:00 o'clock oil is going to be burned.  Okay?  Is that
8  clear enough to everybody?  So that's one thing.

9        Here is thing two.  It sounds like to me, in the
10  course of -- in the course of talking about other things, it
11  sounded like to me that Mr. Noland made a ruling that I had
12  precluded something at the prior trial about whether the
13  defendants could testify to certain things, and then I think I
14  heard a couple minutes later Mr. Kulwin saying I was going to
15  go into that.

16        So I want to remind everybody of one thing.  There is
17  nobody on this earth that wants to try this case a fourth time
18  less than me.  Did I say that right?  There is nobody on the
19  earth that wants to try the case a fourth time less than me.

20        I am going to repeat what I said before.  If I made a
21  ruling in the prior trial, unless I have overruled it, it's
22  still a ruling.  And if somebody runs afoul of a motion in
23  limine, the first thing -- I am going to need somebody to show
24  me, you ruled that inadmissible, Judge, and they just did it.
25  Thing one, it's going to be a mistrial right then.  There is

1    not going to be any issue about, oh, we can cure this with a

2    limiting instruction, period, no, end of discussion.  It's a

3    mistrial right then.  It's fees and it's a penalty.  Okay?

4    Because this has happened in this case before, and I am not

5    going to go back.

6            And so, everybody, you don't even want to be kicking

7    up dust on the chalk line.  If you think I've made a ruling on

8    something, you are not to run afoul of it because you don't

9    want to find out on the other end of it that you did it wrong.

10   There will be hell to pay.  I am just -- that's about the only

11   way I can put it.  There will be hell to pay.

12           I need to stop for the day.  Okay?  Is there

13   something else that has to happen?  If there is, tell me now.

14           MR. KULWIN:  Just a couple of things.

15           THE COURT:  What are the couple of things?

16           MR. KULWIN:  There are still a couple non-Monell

17   motions in limine that you haven't ruled on.

18           THE COURT:  Which?

19           MR. KULWIN:  I think with Villa?  Remember Mr. Villa?

20   You might not -- I'm never going to say that again the rest of

21   this case.

22           THE COURT:  Non-Monell motions in limine that I

23   hadn't ruled on?

24           MR. KULWIN:  Yes, Judge.

25           THE COURT:  What I got was that there were some

1   motions to reconsider by the defense.  I ruled on those.

2   There were a whole boatload of motions in limine by the

3   plaintiff.  I'm going to wait until you're listening.  There

4   was a whole boatload of motions in limine by the plaintiff,

5   all but two of which were withdrawn, and I ruled on those.

6   What did I miss?

7            MR. KULWIN:  Oh, he withdrew it.  Okay.  Fine.

8   That's fine.

9            THE COURT:  Yeah.

10           MR. KULWIN:  I apologize.  My error, Judge.

11           THE COURT:  Okay.

12           MR. KULWIN:  There's this issue of Tredeste Murray

13  where the plaintiff has said, you've ruled -- that's the

14  stalking incident.

15           THE COURT:  Yeah.  That's the 1985 firearm.

16           MR. KULWIN:  Exactly.

17           THE COURT:  Pages 8 to 9 of the same ruling.

18           MR. KULWIN:  Right.  And what Mr. Loevy represents is

19  we are not going to go into peaceful lifestyle.

20           THE COURT:  Yep.

21           MR. KULWIN:  And, therefore, fine.  That's out.

22           The question I have is what's "peaceful lifestyle"?

23           THE COURT:  So I am going to quote Harry Blackmun.

24  I'll know it when I see it.

25           Here's the deal.  Here's the deal.  At the conclusion

1   of the direct examination, if you think that that line has

2   been crossed, you say, Judge, I need a sidebar, and we will

3   discuss it at sidebar.

4          MR. KULWIN:  Thank you.  That's exactly what I wanted

5   to know.

6          THE COURT:  That's the ruling.

7          MR. KULWIN:  Another very minor, real quick one is --

8          THE COURT:  I think it was Harry -- I think it was

9   Potter Stewart, actually.

10         MR. KULWIN:  It was Potter Stewart.  It was Potter

11  Stewart.  I don't know what it is, but I'll know it when I see

12  it.  The good old days.

13         So the other real quick one is, you know, order of

14  witnesses, how long -- how many days in advance, you know, to

15  get --

16         THE COURT:  What did I do -- anybody who was here the

17  last time around, can you remind me what I did?

18         MR. MICHALIK:  In terms of that, we actually worked

19  pretty well with Ms. Gorman on that.  We had like, you know,

20  two or three days in advance.

21         THE COURT:  It needs to be a rolling thing, and it

22  shouldn't be the night before.  I am just going to rely on you

23  if there's a -- so you ought to be -- before you walk out of

24  here today, you're going to be -- the opening statements are

25  going to take all of the morning tomorrow, it sounds like to

1   me, or close to it.  You ought to be telling -- these are our

2   first six, seven, or eight witnesses.

3           MR. KULWIN:  That's what I was asking.

4           MR. LOEVY:  As soon as he talks to me, then we won't

5   have a problem.

6           MR. KULWIN:  We did --

7           THE COURT:  Eh.

8           MR. KULWIN:  Forget I said that.

9           THE COURT:  No, that means technical foul.

10          MR. KULWIN:  Okay.  Technical foul.

11          THE COURT:  It means both, actually.

12          MR. KULWIN:  I won't say, as you recall, or, I know

13  you remember.  I won't do that either.

14          Can I just urge the Court one thing?  This is such a

15  critical issue.

16          THE COURT:  Which?

17          MR. KULWIN:  This Vaughn/White --

18          THE COURT:  Yeah, that's why I want something in

19  writing.

20          MR. KULWIN:  I understand that, and we're going to

21  burn the midnight oil.

22          My preference would be is that you tell both parties

23  no reference to Vaughn --

24          THE COURT:  So, look, here is the deal.  What I said

25  is that I am going to make my best efforts to rule on it

1   before you give opening statements, even if that means we

2   start a little late tomorrow.  Okay?  You are going to get me

3   stuff tonight, and I am going to do my best to rule on it in

4   the morning.

5           If I can't rule on it in the morning, then I will

6   figure out what happens next.  The possibilities would be you

7   don't get to talk about it or you get to talk about it, or you

8   get to talk about some of it but not all of it, and here is

9   what you get to talk about.

10          MR. KULWIN:  Thank you, Judge.

11          THE COURT:  My goal is to try to rule on it, and if I

12  can't rule on it, I will figure out what happens next.

13          Anything else?

14          MR. KULWIN:  Rachel wants to know what time we have

15  to file it by tonight.

16          MR. LOEVY:  Are you going to read it tonight or

17  tomorrow, your Honor?

18          THE COURT:  You have to get the person in the

19  negotiating position on this.

20          MS. KATZ:  Whatever --

21          THE COURT:  You mean he is not writing it?

22          MR. KULWIN:  No --

23          MS. KATZ:  The good writing, I will take that as a

24  compliment.

25          MR. KULWIN:  She does the writing.  I do the editing.

1    MS. KATZ:  Whenever your Honor will read --

2    THE COURT:  No, no, you have to give a position.

3    MS. KATZ:  10:00 o'clock?

4    THE COURT:  9:30.

5    MR. KULWIN:  Thanks, Judge.  Have a good evening,

6    your Honor.

7    THE COURT:  Anything that absolutely has to be talked

8    about before tomorrow morning?

9    MR. LOEVY:  The answer is no.

10   MS. KATZ:  No.

11   THE COURT:  Okay.  Have a lovely evening, those of

12   you who are not writing.

13   (Which were all the proceedings had in the above-entitled

14   cause on the day and date aforesaid.)

15   I certify that the foregoing is a correct transcript EXCERPT
     from the record of proceedings in the above-entitled matter.
16

17   _____          Date _____
     Carolyn R. Cox
     Official Court Reporter
18   Northern District of Illinois

19   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

20

21

22

23

24

25